## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

In re

Alexander E. Jones,

Debtor.

Bankruptcy
Case No. 22-33553 (CML)

Chapter 11

---

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Estate of Marcel Fontaine,

Plaintiffs,

v.

Alexander E. Jones and Free Speech Systems, LLC,

Defendants.

Adv. Pro. No.: 23-03035 (CML)

---

## <u>TEXAS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

FACTS ESTABLISHED IN STATE COURT ACTIONS...............................................3

    A.    Immediately after their children were murdered at Sandy Hook, and continuing over the next decade, Jones claimed the shooting was a hoax and that Movants were liars. ....................................................................4

    B.    Jones knew he was lying, but defaming Movants was good for business. .............9

    C.    Movants sued Jones; Jones repeatedly refused to provide discovery. ...................11

    D.    As a last resort, the court sanctioned Jones with default judgments establishing his liability. ...............................................................................16

    E.    Even after the default judgments, Jones continued to refuse to provide discovery. ...................................................................................................17

    F.    After a lengthy trial, a Texas jury awarded exemplary damages for Jones's knowing, "atrocious and utterly intolerable" conduct. ...........................................18

LEGAL STANDARD.......................................................................................................20

    I.    Summary Judgment Standard ...............................................................................20

    II.    Non-Dischargeability Under Section 523(a)(6).....................................................20

ARGUMENT    21

    I.    JONES IS COLLATERALLY ESTOPPED FROM RE-LITIGATING HIS WILLFUL AND MALICIOUS INJURY OF MOVANTS. ....................................21

        A.    The facts to be litigated here (whether Jones willfully and maliciously injured Movants) were fully and fairly litigated in state court. ...................................................................................................25

        B.    The findings of willful and malicious injury were essential to the judgments entered in the state court proceedings. .....................................32

        C.    Movants and Jones were cast as adversaries in the state-court actions. ...................................................................................................35

    II.    EVEN IF THE JUDGMENTS WERE NOT ENTITLED TO PRECLUSIVE EFFECT (WHICH THEY ARE), THE FACTS ON THE

STATE-COURT RECORDS ESTABLISH  WILLFUL AND
MALICIOUS INJURY. ..................................................................................36

A.      The court need not look beyond the closed state-court records. ................36

B.      The evidence in those closed state-court records confirms that
        Jones's conduct satisfies the objective and subjective standards for
        willful and malicious injury. ...................................................................38

CONCLUSION     ………………………………………………………………...44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*5 Star Diamond, LLC v. Singh*,
    369 S.W.3d 572 (Tex. App.-Dallas 2012, no pet.) ...............................................27

*A&W Indus., Inc. v. Goldbatt (In re Goldbatt)*,
    Adv. Pro. No. 00-4126, 2002 Bankr. LEXIS 2011
    (Bankr. N.D. Tex. Nov. 7, 2022) .......................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...........................................................................................20

*Avila v. St. Luke's Lutheran Hosp.*,
    948 S.W.2d 841 (Tex. App.—San Antonio 1997)..............................................35

*Bartenwerfer v. Buckley*,
    143 S. Ct. 665 (2023)........................................................................................36

*Bui v. Do (In re Do)*,
    Adv. Pro. No. 11-01027 (CAG), 2013 WL 1429435
    (Bankr. W.D. Tex. April 9, 2013)................................................................~~41~~, 42

*In re Caton*,
    157 F.3d 1026 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998)....................34

*Century 21 Real Estate LLC v. Gharbi (In re Gharbi)*,
    No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011) *aff'd*,
    No. A-11-CA-21 LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011)...............21, 41

*Chrysler Corp. v. Blackmon*,
    841 S.W.2d 844 (Tex. 1992)..............................................................................27

*In re Cummins-Cobb*,
    No. 2:17-bk-24993 (RK), 2020 WL 63140 (Feb. 10, 2020)...................................33

*Ex parte Davis*,
    470 S.W.2d 647 (Tex.1971)................................................................................36

*FDIC v. Smith (In re Smith)*,
    160 B.R. 549 (N.D. Tex 1993), *aff'd*, 39 F.3d 320 (5th Cir. 1994)........................20

*First Pac. Corp. v. Burnham (In re Burnham)*,
    Adv. Pro. No. 10-3062, 2010 WL 3808688 (Bankr. S.D. Tex. Sept. 22, 2010).....................23

*Fitz v. Toungate,*
    419 S.W.2d 708 (Tex. App.—Austin 1967) ....................................................................27

*See Fiber Systems Intern., Inc. v. Roehrs,*
    470 F.3d 1150 (5th Cir. 2006) .....................................................................................32

*Fleming Mfg. Co. v. Capitol Brick, Inc.,*
    734 S.W.2d 405 (Tex. App.—Austin 1987, writ ref'd n.r.e.)....................................34

*In re Free Speech Systems, LLC,*
    Case No. 22-60043 (CML) ..........................................................................................10

*In re Garner,*
    56 F.3d 677 (5th Cir. 1995) .........................................................................................24

*In re Gober,*
    100 F.3d 1195 (5th Cir. 1995) ..........................................................................1, 28, 31

*Gold v. Gold (In re Gold),*
    375 B.R. 316 (Bankr. N.D. Tex. 2007)........................................................................35

*Gonzalez v. Hibernia Nat'l Bank in Tex.,*
    No. 05-92-02355-CV, 1993 WL 265454, at *2 (Tex. App.—Dallas July 16,
    1993, no writ)........................................................................................................34, 35

*Grogan v. Garner,*
    498 U.S. 279 (1991)............................................................................................ *passim*

*Guion v. Sims (In re Sims),*
    479 B.R. 415 (Bankr. S.D. Tex. 2012) ........................................................................30

*Harris Cnty., Tex. v. CarMax Auto Superstores Inc.,*
    177 F.3d 306 (5th Cir. 1999) .......................................................................................36

*Harris Cnty. Water Control and Improvement Dist. No. 84 v. Hornberger,*
    601 S.W.2d 66 (Tex. App.—Houston 1980) ...............................................................27

*In re Harrison,*
    180 F. App'x 485 (5th Cir. 2006)................................................................................37

*Heslin v. Jones (In re Alexander E. Jones),*
    Adv. Proc. No. 23-03035 (CML) (Bankr. S.D. Tex. March 10, 2023)..........................3

*Hoffman-La Roche Inc. v. Zeltwanger,*
    144 S.W.3d 438 (Tex. 2004).........................................................................................33

*Holman St. Baptist Church v. Jefferson (In re Jefferson),*
    Adv. Proc. No. 11-3513, 2012 WL 2685208 (Bankr. S.D. Tex. July 6, 2012) ...........25

*In re Hudson,*
    107 F.3d 355 (5th Cir. 1997) ...............................................................................20

*Jackson v. Biotectronics, Inc.,*
    937 S.W.2d 38 (Tex. App.—Houston 1996, no writ) ..............................................34

*John G. & Marie Stella Kennedy Mem'l Found. v. Dewhurst,*
    90 S.W.3d 268 (Tex. 2002)....................................................................................24

*Jones v. Heslin,*
    587 S.W.3d 134 (Tex. App.—Austin 2019, no pet.) ..............................................13

*Jones v. Heslin,*
    No. 03-19-00811-CV, 2020 WL 1452025
    (Tex. App.—Austin, Mar. 25, 2020, pet. denied)............................................12, 14

*Joseph v. Bach & Wasserman, L.L.C.,*
    487 F. App'x 173 (5th Cir. 2012) .........................................................................37

*In re Kahn,*
    533 B.R. 576 (Bankr. W.D. Tex. 2015)..................................................................38

*Kawaauhau v. Geiger,*
    523 U.S. 57-59 (1998) ..........................................................................................20

*King v. Huizar (In re Huizar),*
    609 B.R. 482 (Bankr. W.D. Tex. 2019)..................................................................32

*Lee v. Weatherford (In re Weatherford),*
    2022 WL 174213 (Bankr. N.D. Tex. 2022)............................................................37

*Leon v. Rabalais (In re Rabalais),*
    Adv. Proc. No. 11-03617, 2012 WL 42101 (Bankr. S.D. Tex. Jan. 9, 2012)..............24, 37

*Macris v. Saxton (In re Saxton),*
    Adv. Proc. No. 10-04204, 2011 WL 2293320 (Bankr. N.D. Tex. June 8, 2011) .............25, 32

*In re Mahadevan,*
    617 F. Supp. 3d 654 (S.D. Tex 2022) ...................................................................37

*Mann Bracken, LLP v. Powers (In re Powers),*
    421 B.R. 326 (Bankr. W.D. Tex. 2009)...........................................................21, 39

*Marrese v. Am. Acad. of Orthopaedic Surgeons,*
    470 U.S. 373 (1985)..............................................................................................24

*Migra v. Warren City Sch. Dist. Bd. of Educ.,*
    465 U.S. 75 (1984)................................................................................................24

*In re Miller*,
    156 F.3d 598 (5th Cir. 1998) ....................................................................20, 21, 25, 38

*Moore v. Waldrop*,
    166 S.W.3d 380 (Tex. App.—Waco 2005, no pet.)..................................................32

*Morgan v. Compugraphic Corp.*,
    675 S.W.2d 729 (Tex. 1984)....................................................................................27

*Morgan v. Medtronic, Inc.*,
    172 F. Sup. 3d 959 (S.D. Tex. 2016) ......................................................................37

*In re Nance*,
    556 F.2d 602 (1st Cir. 1977)....................................................................................21

*Pancake v. Reliance Ins. Co. (In re Pancake)*,
    106 F.3d 1242 (5th Cir. 1997) ...........................................................................29, 30

*Parsons Steel, Inc. v. First Alabama Bank*,
    474 U.S. 518 (1986).................................................................................................24

*Pirtek USA, LLC v. Lager (In re Lager)*,
    No. 22-30072-MVL-11, 2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022) ...................39

*Pollock v. Marx (In re Marx)*,
    171 B.R. 218 (Bankr. N.D. Tex. 1994)....................................................................32

*Purser v. Scarbrough (In re Scarbrough)*,
    516 B.R. 897 (Bankr. W.D. Tex. 2014)..........................................................25, 26, 27, 33

*In re Radelat*,
    No. 02-17-00264-CV, 2019 WL 5792652 (Tex. App.—Ft. Worth 2019)..............................27

*In re Red*,
    96 F. App'x 229 (5th Cir. 2004) .........................................................................21, 38

*Rodriguez v. Ramirez (In re Ramirez)*,
    Adv. Pro. No. 09-7012, 2010 WL 715451 (Bankr. S.D. Tex. Feb. 22, 2010)......................23

*Matter of Shuler*,
    722 F.2d 1253 (5th Cir. 1984) ................................................................................38

*Standard Fruit & Vegetable Co. v. Johnson*,
    985 S.W.2d 62 (Tex. 1998)......................................................................................33

*Staton Holdings, Inc. v. Mileski (In re Mileski)*,
    416 B.R. 210 (Bankr. W.D.N.C. 2009)....................................................................29

*Stoner v. Thompson*,
  578 S.W.2d 679 (Tex. 1979) ................................................................................27

*The Gil Ramirez Group, LLC v. Jackson (In re Jackson)*,
  No. 17-80090, 2018 WL 5785244 (Bankr. S.D. Tex. Nov. 1, 2018) ......................................39

*TransAm. Nat'l Gas Corp. v. Powell*,
  811 S.W.2d 913 (Tex. 1991) ................................................................................27

*W.R. Berkley Corp. v. McGurk (In re McGurk)*,
  Adv. Proc. No. 16-05013, 2018 WL 1632896 (Bankr. D. Conn. Apr. 2, 2018) ....................26

*Wallace v. Perry (In re Perry)*,
  423 B.R. 215 (Bankr. S.D. Tex. 2010) ..................................................................23

*In re Williams*,
  337 F.3d 504 (5th Cir. 2003) ........................................................................20, 25, 38

## Statutes

11 U.S.C. 523(a)(6) ........................................................................... *passim*

17 U.S.C. § 1738 ............................................................................................24

Tex. Civ. Prac. & Rem. § 41.008(c)(7) ..............................................................3, 20, 35

Tex. Penal Code § 22.04 ...............................................................................20, 35

## Other Authorities

COLLIER ON BANKRUPTCY § 523.12[4] (16th ed. 2012) ...............................................32, 33

Fed. R. Civ. P. 56(a) ......................................................................................20

Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa (collectively, "**Movants**")[1] move for summary judgment on the following grounds:

## PRELIMINARY STATEMENT

1.      For years, Alex Jones repeatedly and falsely told his audience of millions that the Sandy Hook school shooting in which Movants' children were murdered was a hoax and that Movants were liars.  Movants sued Jones in Texas state court and secured judgments against him for defamation and intentional infliction of emotional distress.  Jones then filed for bankruptcy, seeking to discharge his liability to Movants.  This summary judgment motion presents a straight-forward legal question that can be answered based on longstanding and settled legal principles: whether the Texas state-court judgments finding Jones liable establish that Jones's debt is for his "willful and malicious injury" of Movants.  If so, the Bankruptcy Code prohibits Jones's debt under those judgments from being discharged.

2.      11 U.S.C. § 523(a)(6) prescribes that a debt arising from "willful and malicious injury by the debtor" is not dischargeable in bankruptcy.  The Supreme Court of the United States already settled that a creditor need only establish non-dischargeability by a "preponderance of the evidence" and can do so using collateral estoppel from a state-court judgment.  *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).  Courts in the Fifth Circuit have long applied that rule to hold on summary judgment: that where another court has already found a debtor liable for willful and malicious injury, the debtor is collaterally estopped from re-litigating that finding—making the debt non-dischargeable.  *See, e.g.*, *In re Gober*, 100 F.3d 1195 (5th Cir. 1995).  In *Grogan v. Garner*, the Supreme Court explained that "a debtor has no constitutional or 'fundamental' right

---

[1] Plaintiffs in this action have been referred to as the "**Texas Plaintiffs**" throughout these proceedings, as they all sued the Debtors in state court before the Debtors petitioned for bankruptcy.  One Texas Plaintiff—the Estate of Marcel Fontaine—is a Plaintiff in this action but not a party to this motion.

to a discharge in bankruptcy" and that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"  498 U.S. at 286-87.

3.       Jones is no "honest but unfortunate debtor."  As the state court found, Jones and his company Free Speech Systems, LLC ("**FSS**") engaged in a "five-year campaign of willful lies and malicious harassment" of Movants using their website InfoWars.com ("**InfoWars**") to spread their lies.  Although InfoWars personnel confirmed that Jones knew Sandy Hook was "a very real tragedy with very real victims" only a month after the shooting—and Jones himself testified that by July 2015 he "realized [the Sandy Hook shooting] probably did happen" and "there was a good chance I was wrong"—Jones continued to publicly doubt the shooting and claim that Movants were actors.  Lombardi Decl.[2], Ex. 1 (Aug. 3, 2022 Heslin/Lewis Trial Tr.) 17:23-18:9.  When Movants and over a dozen of Jones's other victims sued Jones in 2018, Jones countered with "literal years of blatant discovery abuse and intentional discovery abuse," (Lombardi Decl., Ex. 2, January 14, 2022 Hr'g Tr. 84:4-11) which resulted in default judgments on liability and the court finding that Jones's "pervasive and persistent" discovery abuses "justifie[d] a presumption that [his] defenses lack merit."  Lombardi Decl., Ex. 3 (Heslin Amended Default Judgment) 4.

4.       Movants Mr. Pozner and Ms. De La Rosa sued Jones in one action (the "**Pozner/De La Rosa Action**") and Movants Mr. Heslin and Ms. Lewis sued him in another (the "**Heslin/Lewis Action**"), and Jones was found liable in both.  In the Pozner/De La Rosa Action, the court found Jones liable for intentionally inflicting emotional distress on Movants Mr. Pozner and Ms. De La Rosa with his lies, which were "designed to harm the Movants' reputation and subject the Movants to public contempt, disgrace, ridicule or attack" and were made "in bad faith and with malicious

---

[2] As defined in paragraph 6.

motives."   Lombardi Decl., <u>Ex. 4</u> (Pozner/De La Rosa Amended Petition) ¶¶ 68, 85.   In the Heslin/Lewis Action, a jury found that Jones "published statements that were false and defamatory" and "knew the statements were false" or had "a high degree of awareness that they were probably false, to an extent that [Jones] in fact had serious doubts as to the truth of the statements."   Lombardi Decl., <u>Ex. 5</u> (Heslin/Lewis Compensatory Damages Jury Charge) 4; Lombardi Decl., <u>Ex. 6</u> (Heslin/Lewis Exemplary Damages Jury Charge) 4.   The court in the Heslin/Lewis Action also found that Jones's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."   Lombardi Decl., <u>Ex. 5</u> (Heslin/Lewis Compensatory Damages Jury Charge) 6; Lombardi Decl., <u>Ex. 6</u> (Heslin/Lewis Exemplary Damages Jury Charge) 6.   Although exemplary damages are generally capped by Texas statute, the court found that an exception to the cap applied in part because Jones's injury of Movants was done "knowingly or intentionally."  Lombardi Decl., <u>Ex. 7</u> (Heslin/Lewis Final Judgment) 3; Tex. Civ. Prac. and Rem. § 41.008(c)(7).

5.      The facts stated throughout this motion were found by the Texas court in the Pozner/De La Rosa and Heslin/Lewis Actions.  Jones is collaterally estopped from relitigating those findings.  As those findings establish that Jones's injury of Movants was willful and malicious, Supreme Court and Fifth Circuit precedent entitles Movants to summary judgment finding the debt non-dischargeable.

## <u>FACTS ESTABLISHED IN STATE COURT ACTIONS</u>

6.      As described more fully in the Complaint, Movants' children were murdered on December 14, 2012 in their classrooms at Sandy Hook Elementary School.  *Heslin v. Jones (In re Alexander E. Jones)*, Adv. Proc. No. 23-03035 (CML), Complaint to Determine Dischargeability of Debt (Bankr. S.D. Tex. March 10, 2023) (the "**Complaint**"); *see also* Declaration of Stuart R.

Lombardi, filed concurrently herewith (the "**Lombardi Decl.**"), Ex. 4 (Pozner/De La Rosa Amended Petition); Lombardi Decl., Ex. 8 (Heslin/Lewis Amended Petition).   After Jones repeatedly told his millions of followers that Movants were lying, their children were actors, and the shooting was a hoax, Movants sued him in Texas state court and won.   The following summarizes the facts as found and established by the state court[3] when it rendered judgments against Jones in those actions.

**A. Immediately after their children were murdered at Sandy Hook, and continuing over the next decade, Jones claimed the shooting was a hoax and that Movants were liars.**

7.      Starting from the day of the Sandy Hook massacre, Jones claimed that the Sandy Hook school shooting was a hoax.   The state-court records establish that Jones lied about the shooting on at least the following occasions:

8.      On the afternoon of the shooting, Jones broadcast "Connecticut School Massacre Looks Like False Flag Says Witnesses."   *See* Lombardi Decl., Ex. 9 (Heslin/Lewis Pl. Video Ex. 1).   In the next month, Jones alleged that Ms. De La Rosa faked an interview with Anderson Cooper, and cited this lie as a key piece of evidence in his claim that Sandy Hook was staged as part of a criminal plot.   Lombardi Decl., Ex. 10 (Pozner Affidavit) ¶ 7.   On December 17, Jones broadcast a segment titled "Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School."   Lombardi Decl., Ex. 11 (July 27, 2022 Heslin/Lewis Trial Tr. ) 6:11-18.   On December 19th, Jones broadcast "Sandy Hook Second Shooter Cover-Up."   *Id.* at 6:19-23.   On December 21, in an episode titled "Lower Part of Gotham Renamed 'Sandy Hook' in Dark Knight Film," Jones again claimed that the latest Batman movie revealed that the shooting was a hoax.   *Id.* at 6:24-7:3.

---

[3] Judge Maya Guerra Gamble of the 459th District Court of Travis County, Texas presided over both the Pozner/De La Rosa and the Heslin/Lewis Actions.

9.    As time passed, the lies continued.   On January 10, 2013, Jones broadcast "Professor Claims Sandy Hook Massacre MSM Misinformation." *Id*. at 7:4-8.  Five days later, Jones (through FSS/InfoWars) ran "Sandy Hook AR-15 Hoax? Still No School Surveillance Footage." *Id*. at 7:9-13.

10.    In a January 27, 2013 episode titled "Why People Think Sandy Hook is a Hoax," Jones told his audience, "[i]n the last month and a half, I have not come out and said this was a clearly staged event.  Unfortunately, evidence is beginning to come out that points more and more in that direction."  Lombardi Decl., Ex. 12 (Heslin/Lewis Pl. Video Ex. 5).  The "evidence" cited by Jones was his own claim that Plaintiff Veronique De La Rosa's interview with Anderson Cooper was faked on a blue-screen.  That was false, but it became a central pillar of Jones's Sandy Hook conspiracy theory.

11.    The state-court records established that Mr. Pozner, an occasional listener of Jones's show, heard the broadcast and emailed Jones to set the record straight.

> Alex,
> I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown.  Accusing us of being actors .
> . . . Haven't we had our share of pain and suffering?  All these accusations of government involvement, false flag terror, new world order etc.  I used to enjoy listening to your shows prior to 12-14-12.  Now I feel that your type of show created these hateful people and they need to be reeled in!

Lombardi Decl., Ex. 13 (Heslin/Lewis Pl. Ex. 48) (ellipsis in original).  InfoWars' Chief Editor Paul Watson replied by assuring Mr. Pozner that Jones and InfoWars knew Sandy Hook was "a very real tragedy with very real victims" and that they had "not promoted the 'actors' thing." *Id.*

12.    But on air, Jones told a much different story.  On March 27, 2013, he aired an episode titled "Sandy Hook was a Total False Flag!" Lombardi Decl., Ex. 11 (July 27, 2022

Heslin/Lewis Trial Tr.) 8:18-9:3.  Days later, another episode followed: "Crisis Actors Used at Sandy Hook! Special Report."  *Id*. at 10:6-9.

13.     2014 brought more lies.  On March 14, 2014, in an episode titled "Sandy Hook, False Narratives vs. The Reality," Jones claimed that the United Way was part of the plot, and told his audience, "undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."  *See* Lombardi Decl., Ex. 14 (Heslin/Lewis Pl. Video Ex. 8).  On May 9, 2014, "Revealed: Sandy Hook Truth Exposed" aired.  Lombardi Decl., Ex. 11 (July 27, 2022 Heslin/Lewis Trial Tr.) 23:7-11.  On May 13, 2014, "Sandy Hook Massacre was a DHS Illusion Says School Safety Expert."  *Id*. at 24:21-25:3.  Jones continued to publish articles throughout 2014 alleging the shooting was staged.  *See generally id*. at 23:7-43:9 (detailing at least seven separate InfoWars broadcasts or articles lying about the Sandy Hook shooting from May to December 2014).  On September 25, 2014, in an episode titled "Sandy Hook Deaths Missing from FBI Report," Jones did mock imitations of crying parents and stated, "there are photos of kids who are still alive they said died."  Lombardi Decl., Ex. 15 (Heslin/Lewis Pl. Video Ex. 10).  That same day, the Debtors published their third most popular story ever, "FBI Says Nobody Killed at Sandy Hook."  Lombardi Decl., Ex. 11 (July 27, 2022 Heslin/Lewis Trial Tr.) 31:1-33:15.

14.     In early December 2014, after Jones continued broadcasting his lies, Mr. Pozner began making complaints to YouTube.  On December 9, 2014, YouTube removed an InfoWars video.  Lombardi Decl., Ex. 16 (Heslin/Lewis Pl. Ex. 56).  InfoWars published an article that day naming Mr. Pozner and his business, comparing the removal of the video "to actions taken in the *1984* world envisioned by George Orwell" and commenting that "[t]his guy's company would come in handy to any Sandy Hook hoax perpetrators. . . ." *Id.*

15.     Jones continued to broadcast his Sandy Hook conspiracy theory.  On December 28, 2014, he told his InfoWars audience, "the whole thing is a giant hoax. How do you deal with a total hoax?  It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake." Lombardi Decl., Ex. 17 (Heslin/Lewis Pl. Video Ex. 12).

16.     On January 2, 2015, Jones (through FSS/InfoWars) published an article about Mr. Pozner's and Ms. De La Rosa's late son, Noah, titled "Sandy Hook Victim Dies (Again) in Pakistan." Lombardi Decl., Ex. 18 (Heslin/Lewis Pl. Ex. 59).  The next week, he targeted Noah again, telling his audience that "Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured [event].  I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids.  And it just shows how bold they are that they clearly used actors. I mean, they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in…Pakistan." Lombardi Decl., Ex. 19 (Heslin/Lewis Pl. Video Ex. 13).

17.     Mr. Pozner again complained to YouTube.  Jones then spent nearly an hour of his February 12, 2015 show to attacking Mr. Pozner directly, telling his audience that Mr. Pozner was "going after the Second Amendment."  Lombardi Decl., Ex. 20 (Heslin/Lewis Pl. Video Ex. 14); Lombardi Decl., Ex. 10 (Pozner Affidavit).  During the episode, Jones broadcast Mr. Pozner's personal information and maps to addresses tied to Mr. Pozner's family, and promised he would personally visit Florida to investigate Mr. Pozner.  Lombardi Decl., *Id.* ¶ 9.

18.     Soon after, an InfoWars viewer began stalking Mr. Pozner and leaving death threats on his voicemail and email, telling him "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH." Lombardi Decl., Ex. 4 (Pozner/De La Rosa Amended Petition) ¶ 48.  That viewer was eventually apprehended by the FBI and sentenced to federal

prison.  As a condition of her sentence, she was barred from accessing InfoWars content upon her release.  *Id.*; Lombardi Decl., Ex. 10 (Pozner Affidavit) ¶ 15.

19.      In June 2015, Jones dispatched one of his reporters, Dan Bidondi, to Newtown, Connecticut, where—on camera—Mr. Bidondi told local residents and town officials that they were "going to jail" for their lies, called them "scumbags," and yelled to passersby that "Sandy Hook was an inside job."  Lombardi Decl., Ex. 21 (Heslin/Lewis Pl. Video Ex. 27); Lombardi Decl., Ex. 22 (Heslin/Lewis Pl. Video Ex. 28).

20.      On November 18, 2016, Jones told his InfoWars audience, "[t]he official story of Sandy Hook has more holes in it than Swiss cheese. . . .  If children were lost at Sandy Hook, my heart goes out to each and every one of those parents.  And the people who say they're parents that I see on the news.  The only problem is, I've watched a lot of soap operas.  And I've seen actors before.  And I know when I'm watching a movie and when I'm watching something real."  Lombardi Decl., Ex. 23 (Heslin/Lewis Pl. Video Ex. 18).

21.      On April 22, 2017, in the episode "Sandy Hook Vampires Exposed," Jones again accused Ms. De La Rosa of conducting a fake interview with Anderson Cooper, warning his viewers not to "believe any of it."  Lombardi Decl., Ex. 24 (Heslin/Lewis Pl. Video Ex. 20); Lombardi Decl., Ex. 10 (Pozner Affidavit) ¶ 13.

22.      After about two months, Mr. Heslin appeared on *Sunday Night with Megyn Kelly*, where he described holding his dead son with a bullet hole in his head and the harm Jones's lies caused to him and his family.  *See* Lombardi Decl., Ex. 25 (Heslin/Lewis Pl. Video Ex. 22).  Eight days later, on June 26, 2017, Jones ran an InfoWars feature claiming, "[t]he statement [Heslin] made, fact-checkers on this have said cannot be accurate.  He's claiming that he held his son and saw the bullet hole in his head.  That is his claim.  Now, according to a timeline of events and a

coroner's testimony, that is not possible."  Lombardi Decl., Ex. 26 (Heslin/Lewis Pl. Video Ex.

23).  Then on July 20, 2017, Jones (through FSS/InfoWars) rebroadcasted the June 26th feature in

full, with Jones commenting, "[t]he stuff I found was they never let them see their bodies."

Lombardi Decl., Ex. 27 (Heslin/Lewis Pl. Ex. 100).

23.     Jones continued his lies that year, telling his audience on October 26, 2017 that Ms.

De La Rosa's interview was part of the "fake newscasts, with blue screens" and that the shooting

was "phony as a three-dollar bill."  Lombardi Decl., Ex. 28 (Heslin/Lewis Pl. Video Ex. 24).

24.     The Heslin/Lewis trial showed that Jones's false narrative has become so

widespread that in 2016, one out of every four Americans—more than 75 million people—

believed Movants were either possibly or definitely lying about the death of their children.

Lombardi Decl., Ex. 29 (Aug. 1, 2022 Heslin/Lewis Trial Tr. Vol. 5) 37:1-11.  Because of Jones,

tens of millions of people believe that Movants are "actors with criminal intent, that this didn't

happen, that they're trying to take people's guns away."  *Id.* at 47:13-17.

**B. Jones knew he was lying, but defaming Movants was good for business.**

25.     Jones has known that Sandy Hook was real from the start.  In January 2013, only a

month after the shooting, InfoWars' Chief Editor, Paul Watson, assured Mr. Pozner that Jones

knew that Sandy Hook was "a very real tragedy with very real victims."  Lombardi Decl., Ex. 13

(Heslin/Lewis Pl. Ex. 48).

26.     Even by Jones's own account, by July 2015, he "realized [the Sandy Hook

shooting] probably did happen" and "there was a good chance I was wrong" about the conspiracy

theory he broadcasted to millions. Lombardi Decl., Ex. 30 (Aug. 3, 2022 Heslin/Lewis Trial Tr.)

17:23-18:9.  Around that time, Chief Editor Watson urged Jones to stop lying about Sandy Hook.

On December 17, 2015, he texted: "This Sandy Hook stuff is killing us.  It's promoted by the most

batshit crazy people like Rense and Fetzer who all hate us anyway.  Plus it makes us look really

bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show."  Lombardi Decl., Ex. 30 (Heslin/Lewis Pl. Ex. 73).

27.     But Jones did not stop because his lies about Sandy Hook were good for business. While Jones is best known for his broadcasts, his primary business is selling dietary supplements through FSS—and he uses his broadcasts to drive those sales.  The "vast majority of FSS revenues comes from the sale of Supplements." *In re Free Speech Systems, LLC*, Case No. 22-60043 (CML) (Bankr. S.D. Tex. 2022), *Declaration of W. Marc Schwartz In Support of Voluntary Petition and First Day Motion*s ¶ 29 [Dkt. No. 10].  FSS is a "single talent business" with "a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones's credibility. . . . Historically, approximately 80% of FSS' revenue is derived from product sales[.]"  *Id.* at ¶¶ 25, 31.  Questioning mass shootings and other terrorist attacks has become a favored way for Jones to draw viewers and boost sales.  Indeed, Jones testified at trial about a wide variety of mass shootings and bombings, admitting that he told his audience they were all "false flags."  *See* Lombardi Decl., Ex. 1 (Aug. 3, 2022 Heslin/Lewis Trial Tr. Vol.) 7, 55-60 (detailing Jones's claims that nearly all mass shootings and terrorist attacks in the last 15 years were false flags, including those at the Boston Marathon, Sutherland Springs Church, Oklahoma City, Parkland, and Las Vegas). In December 2014, in the same video in which Jones broadcast Mr. Pozner's name and maps to his mailing address, Jones boasted that, conservatively, he reached 20 million viewers a week. Lombardi Decl., Ex. 20, (Heslin/Lewis Pl. Video Ex. 14).

28.     To his audience, Jones portrayed his Sandy Hook "reporting" as real.  But the state-court cases revealed that InfoWars' own managers and editors knew it was a lie.  Evidence at the Heslin/Lewis trial showed that FSS staff and Jones's family joked about the absurdity of his claims.  On November 18, 2016, the same day Jones told his InfoWars audience, "[t]he official

story of Sandy Hook has more holes in it than Swiss cheese" and insinuated the parents were akin

to "actors" on a "soap opera,"  Lombardi Decl., <u>Ex. 23</u> (Heslin/Lewis Pl. Video Ex. 18), Jones's

cousin and InfoWars manager Buckley Hamman joked to Mr. Watson, "Surely it's a conspiracy

theory that they are trying to suppress our popularity so that lizard people can return to the

ascension pad at Sandy Hook and feast on Sacrificed crisis actors! lol."  Lombardi Decl., <u>Ex. 31</u>

(Heslin/Lewis Pl. Ex. 77).

**C. Movants sued Jones; Jones repeatedly refused to provide discovery.**

29.     But this was no joke to Movants.  According to trial testimony, Mr. Heslin "was

shot at, his house was shot at, his car was shot at.  There were bullet casings found in his driveway.

There are many people who clearly think very intensely, have very intense negative feelings about

him and are willing to act on it." Lombardi Decl., <u>Ex. 29</u> (Aug. 1, 2022 Heslin/Lewis Trial Tr.

Vol. 5) 48:4-9.  Roy Lubit, an expert in psychiatry, testified that because of Jones's conduct, Mr.

Heslin and Ms. Lewis have "very high levels of anxiety" and that "[p]robably more in a nonclinical

write-up it would say they're terrified."  *Id.* at 38:23-39:4.  He further testified that, as a result,

they have "pulled away from people tremendously" (*Id*. at 40:1-2), "withdrawn from historic

friends" (*Id*. at 40:2-3), and even "withdrawn from society to an extent."  *Id*. at 39:24-40:1.  Ms.

Lewis sleeps with a gun, a knife, and pepper spray by her bed because she is terrified of being

attacked.  *Id*. at 55:1-3.  Even in extreme heat, she refuses to turn her air conditioner on because

she fears the sound may obstruct her ability to hear and evade an assailant.  *Id*. at 55:3-6.  Mr.

Pozner has been subjected to harassment and threats from Jones's audience for years.  Lombardi

Decl., <u>Ex. 10</u> (Pozner Affidavit) ¶ 15.  He and his family were forced to move seven times.  *Id.* ¶

10.  They have also been forced to take extreme steps to protect their privacy, such as maintaining

post office boxes in multiple cities to confuse conspiracy fanatics and placing utility accounts in

other names. *Id.* Even with these steps, conspiracy fanatics still routinely exchange Mr. Pozner's and Ms. De La Rosa's latest personal information and post those details online. *Id.*

30.     In 2018, Movants and more than a dozen of Jones's other victims sued Jones and FSS in state court.

i.     *The Heslin/Lewis Action[4]*

31.     On April 16, 2018, Mr. Heslin sued Jones, FSS, and related defendants. On July 13, 2018, the defendants moved to dismiss under the Texas Citizens Participation Act ("**TCPA**"). The state court entered a discovery order on August 31, 2018 requiring written discovery and depositions of Jones and other defendants in Mr. Heslin's case. *See* Lombardi Decl., Ex. 33 (Aug. 31, 2021 Combined Sanctions Hearing Tr.). Jones's counsel responded on October 1, 2018 with a statement claiming that they would not comply with the order. *Id.* at 8:13-16. Mr. Heslin promptly brought a motion for contempt. *Id.* at 8:17-19. The next day, Jones and his codefendants launched what the appellate court later found was a "frivolous" appeal. *Jones v. Heslin,* No. 03-19-00811-CV, 2020 WL 1452025 (Tex. App.—Austin, Mar. 25, 2020, pet. denied).

32.     After Scarlett Lewis sued on October 31, 2018, the court ordered written discovery and depositions of Jones and other defendants. Lombardi Decl., Ex. 33 (Aug. 31, 2021 Combined Sanctions Hearing Tr.) 9:5-8. Again, the defendants failed to respond. *Id.* at 9:8-9. FSS was eventually deposed, but its representative was unprepared and unresponsive. *Id.* at 9:13-17. On March 21, 2019, Ms. Lewis then moved for discovery sanctions, asserting that the defendants: (i) failed to respond to any court-ordered requests for production; (ii) failed to prepare their corporate representative, who provided no meaningful testimony; (iii) failed to produce relevant videos; and (iv) spoliated social media evidence and video directories. *See generally* Lombardi Decl., Ex. 34

---

[4] Mr. Heslin and Ms. Lewis initially brought separate actions against Jones, which were consolidated prior to trial.

(July 6, 2021 Lewis Motion for Contempt).  On April 3, 2019, the court granted Ms. Lewis's motion, found that Jones and his codefendants violated its discovery order, sanctioned them $8,100 for attorney fees, and denied their motion to dismiss under the TCPA.  Lombardi Decl., Ex. 35 (April 3, 2019 Lewis Hearing Tr.) 52-53.

33.     On August 30, 2019, Jones's appeal in Mr. Heslin's case was dismissed for lack of jurisdiction and the case was remanded to the trial court, which required Jones and FSS to comply with the discovery order.  *Jones v. Heslin*, 587 S.W.3d 134, 135 (Tex. App.—Austin 2019, no pet.).  When the defendants refused to provide any discovery or appear for depositions for another month, Mr. Heslin renewed his motion for contempt on October 1, 2019.  After a hearing, the court granted the motion, sanctioned the defendants $25,000 for flouting its discovery orders, denied Jones's TCPA motion to dismiss, and ordered more discovery and depositions on Mr. Heslin's intentional-infliction-of-emotional-distress claim.   Lombardi Decl., Ex. 33 (Aug. 31, 2021 Combined Sanctions Hearing Tr.) 14:3-9, 14:25-15:5.

34.     On December 9, 2019, after Jones again defied discovery, Mr. Heslin moved for a default judgment.  That motion alleged that the Debtors (i) refused to make good-faith responses to written discovery; (ii) failed to preserve or produce documents they created relating to the Sandy Hook shooting and Movants; (iii) admitted to withholding thousands of emails; (iv) deleted relevant messaging systems during litigation; (v) failed to produce videos of relevant InfoWars episodes; and (vi) presented the same unprepared corporate representative they offered months before in the *Lewis* case.  Lombardi Decl., Ex. 32 (Dec. 9, 2019 Heslin Motion for Default).  The court later called the corporate representative's testimony "a shockingly offensive mockery of a corporate deposition." Lombardi Decl., Ex. 2 (Jan. 14, 2022 Combined Hearing Tr.) 659.

35.     On December 18, 2019, the court held a hearing on Mr. Heslin's contempt motion.

There, Jones's counsel represented that Jones and his codefendants would comply with discovery

going forward:

> MR JEFFERIES [Jones's trial counsel]: I am certainly going to comply with [discovery] 100 percent, stay or no stay, moving forward, absolutely.
>
> THE COURT: So your point is let it come back to the trial judge who's going to try the case and see just how quickly you do that –
>
> MR. JEFFERIES: Exactly.
>
> THE COURT: – and how compliant you are with the order before we make potentially outcome determinative decisions?
>
> MR. JEFFERIES: Exactly right.
>
> THE COURT: All right.

Lombardi Decl., Ex. 36 (Dec. 18, 2021 Hearing Tr.) 80:23-81:13.

36.     Because of this representation, the court did not enter a default judgment. Instead,

it "assessed sanctions totaling $100,000 and held the defendants in contempt for intentionally

disobeying the order." *See* Lombardi Decl., Ex. 37 (Apr. 1, 2022 Order on Motion for Sanctions)

3. The court's order stated, "Defendants represented at the December 18th hearing that they would

continue to supplement discovery to belatedly comply with the October 18th order. The amount

of supplemental discovery is a factor that will be considered if the motion for sanctions is

reconsidered on remand." Lombardi Decl., Ex. 38 (Dec. 20, 2019 Heslin Order on Motion for

Sanctions) 2-3.

37.     Jones and his codefendants did not supplement their discovery at any time during

the appeal process. Lombardi Decl., Ex. 37 (Apr. 1, 2022 Order on Motion for Sanctions) 2. On

March 25, 2020, the Third Court of Appeals sanctioned Jones and FSS $22,500 and ruled that their

appeal of Mr. Heslin's case was "frivolous." *Jones v. Heslin,* 2020 WL 1452025 (Pet. denied).

The Heslin and Lewis cases were remanded back to the trial court in June 2021.  After Jones and

FSS continued to fail to provide discovery, Mr. Heslin and Ms. Lewis again moved for contempt.

*See* Lombardi Decl., <u>Ex. 39</u> (Heslin Second Motion for Contempt); Lombardi Decl., <u>Ex. 34</u> (July

6, 2021 Lewis Motion for Contempt).  On August 31, 2021, the court held a consolidated hearing

on contempt motions filed by both Heslin and Lewis and Pozner and De La Rosa.  *See generally*

Lombardi Decl., <u>Ex. 33</u> (Aug. 31, 2021 Combined Sanctions Hearing Tr.).

    ii.    *The Pozner/De La Rosa Action*

    38.    Like Mr. Heslin, Mr. Pozner and Ms. De La Rosa filed a defamation action against

Jones and related defendants on April 16, 2018.  They later amended their complaint to add

intentional-infliction-of-emotional-distress claims. Lombardi Decl., <u>Ex. 4</u> (Pozner/De La Rosa

Amended Petition) ¶¶ 83-93.

    39.    On May 29, 2018, counsel to Mr. Pozner and Ms. De La Rosa served written

discovery requests on Jones.  *See* Lombardi Decl., <u>Ex. 40</u> (July 27, 2021 Pozner/De La Rosa

Motion for Sanctions) ¶ 1.  Responses to those requests were due 30 days later.  *Id.*  After 28 days,

however, Jones moved to dismiss under the TCPA, which stayed all discovery.  *Id.*  When that

motion was denied, Jones and his codefendants appealed, continuing the discovery stay.  *Id.*

    40.    Jones lost his appeal.  When the cases were remanded to the trial court in June

2021—more than three years since the discovery requests were served—Jones and his

codefendants still had not provided discovery.  Lombardi Decl., <u>Ex. 37</u> (April 1, 2022 Order on

Motions for Sanctions) 3.  After the remand, Jones again refused to provide any discovery.  *Id.*

Mr. Pozner and Ms. De La Rosa moved for sanctions on July 27, 2021.  *Id.* at 12.  The motion

detailed that: (i) Mr. Pozner and Ms. De La Rosa served the Debtors with written discovery on

May 29, 2018; (ii) Jones "spent the following year successively violating numerous discovery

orders in this Court and the Superior Court of Connecticut in the other Sandy Hook lawsuits[;]"
(iii) defendants' counsel "stated the discovery situation would be immediately corrected and
begged the Court to postpone ruling on default sanctions pending those efforts" at the December
18, 2019 hearing; (iv) "over the next year and a half, Defendants made no efforts whatsoever to
address the discovery situation[;]" and (v) Jones and his codefendants continued to ignore their
discovery duties after the case was remanded, despite Movants providing an added grace period.
Lombardi Decl., <u>Ex. 40</u> (Pozner/De La Rosa Motion for Sanctions) 1-11.

**D. As a last resort, the court sanctioned Jones with default judgments establishing his liability.**

41.    On September 27, 2021, after a hearing on Jones's and his codefendants' repeated
discovery abuses, the court rendered default judgments in the Pozner/De La Rosa and
Heslin/Lewis Actions—establishing liability in both.  In the Pozner/De La Rosa Action, the court
explained that it had "more than a sufficient record to conclude that an escalating series of judicial
admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective in
deterring the abuse" and stated that it "considered lesser sanctions and determined they would be
inadequate to cure the violation in light of the history of the Defendant's conduct."  Lombardi
Decl., <u>Ex. 41</u> (Pozner/De La Rosa Default Judgment) 4.  The court found that Jones and his
codefendants "unreasonably and vexatiously failed to comply with their discovery duties" and
engaged in a "general bad faith approach to litigation," as further evidenced by calling the cases
"show trials." *Id.* at 2, 4.  It noted "the discovery misconduct is properly attributable to the client
and not the attorney, especially since Defendants have been represented by seven attorneys over
the course of this suit.  Regardless of the attorney, Defendants' discovery abuse remained
consistent."  *Id.* at 3.

42.     In the Heslin/Lewis Action, the court held that Jones and his codefendants displayed "flagrant bad faith and callous disregard for the responsibilities of discovery" and engaged in "pervasive and persistent obstruction."   Lombardi Decl., Ex. 42 (Lewis Default Judgment) 3; Lombardi Decl., Ex. 3 (Heslin Amended Default Judgment) 3-4 (together, the "**Heslin/Lewis Default Judgments**").  The Heslin order also found that "Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit."   Lombardi Decl., Ex. 3 (Heslin Amended Default Judgment) 4.

43.     Under the default judgments, the court found Jones liable on all claims, conclusively establishing the allegations in the Heslin/Lewis and Pozner/De La Rosa Amended Petitions.  All that remained to litigate was the amount of damages for that liability.

**E.  Even after the default judgments, Jones continued to refuse to provide discovery.**

44.     The default judgments did not deter Jones and FSS from abusing discovery.  On December 15, 2021, Movants had to bring more sanctions motions after the Debtors failed to produce a deponent for a corporate deposition on topics relating to damages.  Lombardi Decl., Ex. 43 (Dec. 15, 2021 Motion for Sanctions Regarding Corporate Deposition).  At a January 14, 2022 hearing on the motions, the Court stated:

> I'm confident that there are people who don't want our legal system to work and will be happy to have me forced into deciding almost everything about this case, but that's not what I want. I want it to work, but it only works if discovery works. And what I have seen so far is literal years of blatant discovery abuse and intentional discovery abuse, and I'm tired of that.

Lombardi Decl., Ex. 2 (January 14, 2022 Hr'g Tr. 84:4-11).

45.     On January 24, 2022, the court granted Movants' motions for sanctions and ordered the Debtors to pay Movants' expenses and appear for another deposition.  Lombardi Decl., Ex. 44 (Jan. 24, 2022 Order on Motion for Sanctions).  Movants then filed another sanctions motion on February 22, 2022, after the Debtors failed to prepare a corporate deponent for the fifth time.

- 17 -

Lombardi Decl., Ex. 45 (Feb. 22, 2022 Motion for Sanctions Regarding Corporate Deposition).
On April 1, 2022, the court granted the sanctions motions and awarded Movants all expenses
incurred in connection with discovery throughout the cases.  Lombardi Decl., Ex. 37 (April 1, 2022
Order on Motion for Sanctions).   The court found Jones and his codefendants "intentionally
thwarted the legitimate discovery process in these [Pozner/De La Rosa and Heslin/Lewis] cases,"
which "exhibits a disregard for and disrespect of the integrity of this Court and our judicial
system."  *Id.* at 4.   The court went on to find that "Plaintiffs' discovery of facts necessary to
properly present their claim for damages has been irreparably prejudiced in virtually all respects.
Absent severe action from this Court, Defendants will ultimately profit from their sabotage of the
discovery process."  *Id.*

### F.  After a lengthy trial, a Texas jury awarded exemplary damages for Jones's knowing, "atrocious and utterly intolerable" conduct.

46.    In the Heslin/Lewis Action, after the court found Jones liable on all counts, it held
a damages trial before a jury.  Jones, Mr. Heslin, Ms. Lewis, experts, and witnesses testified over
a nine-day trial.  On the stand, Jones admitted that the Sandy Hook shooting was "100% real."
Lombardi Decl., Ex. 1 (Aug. 3, 2022 Heslin/Lewis Trial Tr. Vol. 7) 16:24.

47.    At trial, the judge explained that Jones and his codefendants were precluded from
contesting any facts relating to their liability:

> We've already had this conversation multiple times in this trial, in addition
> to it before this trial, the time for that was during discovery, when Mr. Jones
> chose not to fully participate.  It is not the time to do that now.  If there is
> anything that he would like to put forth as a defense, he needed to do it a year
> ago during the discovery process.  It's too late now.

Lombardi Declaration, Ex. 46 (Aug. 2, 2022 Heslin/Lewis Trial Tr. Vol. 6) 200.

48.    The court went on to detail its reasoning for rendering the default judgments and
explained that Jones could no longer contest liability:

> My ruling, which was based on a longstanding principle in the law that, if you intentionally repeatedly, and over years in this case, again and again, refuse to participate in discovery, that is proof that you do not have a meritorious defense.  That was the basis of my ruling.  You cannot attack that in this trial.

*Id.* at 201:1-6.

49.     After Jones ignored these instructions, the judge instructed him as follows:

> You're also under oath to tell the truth.  You've already violated that oath twice today in just those two examples.  It seems absurd to instruct you again that you must tell the truth while you testify, yet here I am:  You must tell the truth while you testify…. You are under oath.  That means things must actually be true when you say them.

*Id.* at 202:5-10.

50.     The court instructed the jury that "Defendants Alex Jones and Free Speech Systems, LLC committed defamation against Neil Heslin," and that Jones "knew the statements were false" or had "a high degree of awareness that they were probably false, to an extent that [Jones] in fact had serious doubts as to the truth of the statements" when he made them.  Lombardi Decl., Ex. 5 (Heslin/Lewis Compensatory Damages Jury Charge) 4; Lombardi Decl., Ex. 6 (Heslin/Lewis Exemplary Damages Jury Charge) 4.  It also instructed jurors that "Defendants Alex Jones and Free Speech Systems, LLC committed intentional infliction of emotional distress against Neil Heslin and Scarlett Lewis in a continuing course of conduct from 2013 to 2018," and such conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.* at 6.  Based on those instructions and the evidence, the jury awarded Mr. Heslin and Ms. Lewis more than $4 million in compensatory damages and $45 million in exemplary damages.  Lombardi Decl., Ex. 7 (Heslin/Lewis Final Judgment).

51.     Although exemplary damages are normally capped by Texas statute, the court found that a statutory exception to the cap applied because Jones violated the Texas Penal Code

by "knowingly or intentionally" causing injury to Movants, who were already suffering "severe emotional disturbance" due to the loss of their son.  *Id.* at 3; Tex. Civ. Prac. & Rem. § 41.008(c)(7); Tex. Penal Code § 22.04.

## **LEGAL STANDARD**

I.  *Summary Judgment Standard*

52.     Rule 56 of the Federal Rules of Civil Procedure applies according to Federal Rule of Bankruptcy Procedure 7056.  Under Rule 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact only exists if a reasonable jury could enter a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

II.  *Non-Dischargeability Under Section 523(a)(6)*

53.     Section 523(a)(6) provides that debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity" are non-dischargeable.  11 U.S.C. 523(a)(6).  Under section 523(a)(6), so long as the creditor shows by a preponderance of the evidence that the defendant debtor acted willfully and maliciously, the debt is non-dischargeable. *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997); *Grogan v. Garner*, 498 U.S. 279 (1991); *FDIC v. Smith (In re Smith)*, 160 B.R. 549, 552 (N.D. Tex 1993), *aff'd*, 39 F.3d 320 (5th Cir. 1994).  An injury is "willful and malicious" if it is "done with the actual intent to cause injury," whereas injury is "unintended"—and thus beyond the scope of 523(a)(6)—if it was "neither desired nor in fact anticipated by the debtor." *Kawaauhau v. Geiger*, 523 U.S. 57-59, 61-62 (1998).

54.     In the Fifth Circuit, the debtor's conduct is "willful and malicious" if "there exists '***either*** an objective substantial certainty of harm ***or*** a subjective motive to cause harm' on the part of the debtor."  *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) (citing *In re Miller*, 156 F.3d

598, 603 (5th Cir. 1998) (emphases added)).   Under the objective test, if "from a reasonable person's standpoint" the debtor's actions "were substantially certain to result in harm," then the debt is non-dischargeable.  *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009).   Under the "subjective test," the debt is non-dischargeable if the "tortfeasor acts deliberately and intentionally, in knowing disregard of the rights of another." *Century 21 Real Estate LLC v. Gharbi (In re Gharbi)*, No. 08-11023-CAG, 2011 WL 831706, 26 (Bankr. W.D. Tex. Mar. 3, 2011) *aff'd*, No. A-11-CA-21 LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011) (citing *In re Miller*, 156 F.3d at 605–06 (adopting the definition of "implied malice" from *In re Nance*, 556 F.2d 602, 611 (1st Cir. 1977))).   "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so 'under the objective standard, if [the debtor's] acts were substantially certain to result in injury.'"   *In re Red*, 96 F. App'x 229, 231 (5th Cir. 2004) (internal citation omitted).

## **ARGUMENT**

*I.*     **JONES IS COLLATERALLY ESTOPPED FROM RE-LITIGATING HIS WILLFUL AND MALICIOUS INJURY OF MOVANTS.**

55.     In both the Pozner/De La Rosa Action and the Heslin/Lewis Action, the state court entered default judgments on the Jones's liability after more than three years of litigation and discovery abuse by Jones and FSS.   As the court explained, those defaults were based on the "longstanding principle in the law that, if you intentionally repeatedly, and over years in this case, again and again, refuse to participate in discovery, that is proof that you do not have a meritorious defense." Lombardi Decl., Ex. 46 (Aug. 2, 2022 Heslin/Lewis Trial Tr. Vol. 6) 201.  As discussed below, those judgments conclusively established the facts in Movants' Amended Petitions.

56.     Therefore, as to the Pozner/De La Rosa Action, it is settled that Jones intentionally inflicted emotional distress on Mr. Pozner and Ms. De La Rosa with his defamatory statements,

which were "designed to harm the Movants' reputation and subject the Movants to public contempt, disgrace, ridicule or attack" and were made "in bad faith and with malicious motives." Lombardi Decl., Ex. 4 (Pozner/De La Rosa Amended Petition) ¶¶ 68, 85. It is further established that "Mr. Jones' allegation regarding Mrs. De La Rosa's participation in a 'faked interview' is a central pillar of his years-long assertion that the Sandy Hook tragedy was faked and that the parents are participants in a cover-up" (*Id.* at ¶ 15) and that they "were a continuation and elaboration of a years-long campaign to falsely attack the honesty of the Sandy Hook parents, casting them as participants in a ghastly conspiracy and cover-up." *Id.* at ¶ 58.

57. Likewise, the Heslin/Lewis Default Judgment settled that Jones's statements were "knowingly false" (Lombardi Decl., Ex. 8, Heslin/Lewis Amended Petition ¶ 92), his acts were "intentional" (*Id*. at ¶ 104), that he made his statements "knowing they would cause severe emotional distress" (*Id*. at ¶ 101), that he "knew and intended for Movants to suffer emotional distress" in a "five-year campaign of willful lies and malicious harassment," (*Id*. at ¶¶ 107, 109) and that "Plaintiffs and their family have been specifically targeted in this campaign of harassment." *Id.* at ¶ 13. It also established that "Sandy Hook quickly became a core element of [InfoWars'] programming . . . [that was] part of a continuous course of conduct in which Mr. Jones promoted false facts about the death of Plaintiffs' son with malicious motives" (*Id.* at ¶ 85), and "Jones has continuously leveled his accusations against the parents, repeated a collection of false claims about the shooting, and even claimed the incident was phony a few months before the first lawsuits were filed against him." *Id.* at ¶ 79.

58. In the Heslin/Lewis Action, the court instructed the jury that he "published statements that were false and defamatory" and "knew the statements were false" or had "a high degree of awareness that they were probably false, to an extent that [Jones] in fact had serious

doubts as to the truth of the statements." Lombardi Decl., Ex. 5 (Heslin/Lewis Compensatory Damages Jury Charge) 4; Ex. 6 (Heslin/Lewis Exemplary Damages Jury Charge) 4. The jury charge characterized Jones's conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 6.

59.     Under long-standing precedent, Jones cannot relitigate those findings. Over 30 years ago, the Supreme Court held that collateral estoppel applies in non-dischargeability proceedings brought under section 523(a). *Grogan* v. *Garner*, 498 U.S. at 285 n.11. Thus, where the elements constituting a section 523 claim have been decided in the underlying litigation— either expressly or as an inherent element of the claim—summary judgment applying collateral estoppel for purposes of section 523(a)(6) is required. *A&W Indus., Inc. v. Goldbatt (In re Goldbatt)*, Adv. Pro. No. 00-4126, 2002 Bankr. LEXIS 2011 (Bankr. N.D. Tex. Nov. 7, 2022); *see also*, *First Pac. Corp. v. Burnham (In re Burnham)*, Adv. Pro. No. 10-3062, 2010 WL 3808688, at *2 (Bankr. S.D. Tex. Sept. 22, 2010) (granting summary judgment in favor of plaintiff pursuant to section 523(a)(2), (4), and (6) based on state court's findings of fact regarding debtor's knowledge of inaccuracy and intentional interference); *Wallace v. Perry (In re Perry)*, 423 B.R. 215, 281-82 (Bankr. S.D. Tex. 2010) (granting summary judgment and finding defamation claims non-dischargeable under section 523(a)(6) where state-court judgment referenced findings of fact demonstrating intent, including comments that debtor would "destroy" someone); *Rodriguez v. Ramirez (In re Ramirez)*, Adv. Pro. No. 09-7012, 2010 WL 715451, at *3 (Bankr. S.D. Tex. Feb. 22, 2010) (granting summary judgment on 523(a)(6) claim where debtor acted with "objective substantial certainty or subjective motive" to harm plaintiff). "In determining whether collateral estoppel is appropriate, the bankruptcy court should not rely just on the judgment itself, but should

also look to the record of the state proceeding." *Leon v. Rabalais (In re Rabalais)*, Adv. Proc. No.

11-03617, 2012 WL 42101, at \*4 (Bankr. S.D. Tex. Jan. 9, 2012).

      60.     Collateral estoppel is not discretionary, but rather is a requirement of full faith and

credit.  The full faith and credit statute mandates that "[t]he records and judicial proceedings of

any court" of "any State" "shall have the same full faith and credit in every court within the United

States."  17 U.S.C. § 1738.  The Fifth Circuit explained that in non-dischargeability proceedings,

full faith and credit thus ***requires*** courts to give preclusive effect to a state judgment if it would be

entitled to preclusive effect under state law.  *In re Garner*, 56 F.3d 677, 679 (5th Cir. 1995) (citing

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985)).

      61.     Because the underlying cases were in Texas state court, Texas issue-preclusion law

determines whether the judgments have preclusive effect.  *See Migra v. Warren City Sch. Dist. Bd.

of Educ.*, 465 U.S. 75, 81 (1984) ("A federal court must give to a state-court judgment the same

preclusive effect as would be given that judgment under the law of the State in which the judgment

was rendered."); *see also Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986)

("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a

state-court judgment as another court of that State would give"); *Marrese*, 470 U.S. at 380 (noting

the statute "directs a federal court to refer to the preclusion law of the State in which judgment was

rendered.").  Under Texas law, collateral estoppel bars a party from litigating issues when "(1) the

facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2)

those facts were essential to the judgment in the first action; and (3) the parties were cast as

adversaries in the first action."  *Id.*; *John G. & Marie Stella Kennedy Mem'l Found. v. Dewhurst*,

90 S.W.3d 268, 288 (Tex. 2002).

62.     Here, each prong is met and Jones should be collaterally estopped from re-litigating his willful and malicious injury of Movants.

**A.    The facts to be litigated here (whether Jones willfully and maliciously injured Movants) were fully and fairly litigated in state court.**

63.     The issue of fact to be litigated here is whether Jones caused "willful and malicious injury" to Movants, rendering his debt to them non-dischargeable under Section 523(a)(6).  The Fifth Circuit has held that for a debt to be non-dischargeable under 523(a)(6), "a debtor must have acted with objective substantial certainty or subjective motive to inflict injury." *In re Williams*, 337 F.3d at 509 (internal quotations omitted).  In this Circuit, the "maliciousness" element is an "implied malice standard." *In re Miller*, 156 F.3d at 605.  A debtor acts with implied malice when he acts "with the actual intent to cause injury." *In re Williams*, 337 F.3d at 509.  Thus, a debt is non-dischargeable if there was "either an objective substantial certainty of harm or a subjective motive to cause harm on the part of the debtor." *Id.*

64.     Courts in and beyond the Fifth Circuit have repeatedly held that where a debtor and creditor have already litigated that issue in state court, the debtor is collaterally estopped from re-litigating it.  *See, e.g.*, *Purser v. Scarbrough (In re Scarbrough)*, 516 B.R. 897, 912 (Bankr. W.D. Tex. 2014) (holding state-court judgment established "willful and malicious injury" because fact-finder was required to find that debtor made statements "he knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)"); *Holman St. Baptist Church v. Jefferson (In re Jefferson)*, Adv. Proc. No. 11-3513, 2012 WL 2685208 (Bankr. S.D. Tex. July 6, 2012) (barring debtor from relitigating affirmative defenses to creditor's claim that were already disposed of in state-court proceeding); *Macris v. Saxton (In re Saxton)*, Adv. Proc. No. 10-04204, 2011 WL 2293320, at *9 (Bankr. N.D. Tex. June 8, 2011) (Utah state-court judgment and findings regarding

debtor's slander of creditor entitled to preclusive effect for purposes of determining non-dischargeability under section 523(a)(6)); *W.R. Berkley Corp. v. McGurk (In re McGurk)*, Adv. Proc. No. 16-05013, 2018 WL 1632896, at \*5 (Bankr. D. Conn. Apr. 2, 2018) (debtor collaterally estopped from relitigating "willful and malicious injury" where trial court held that "the conduct of the defendants . . . was unethical, immoral, unscrupulous and likely to cause substantial injury").

65.     In the Pozner/De La Rosa and Heslin/Lewis Actions, the parties have already fully and fairly litigated whether Jones caused Movants "willful and malicious injury."[5]  Following more than three years of litigation, the Pozner/De La Rosa court entered default judgment against Jones, which admitted all of the allegations in the Pozner/De La Rosa Amended Petition, including that Jones intentionally inflicted emotional distress on Mr. Pozner and Ms. De La Rosa with his defamatory statements, which were made "in bad faith and with malicious motives" and "designed to harm the Plaintiffs' reputation and subject the Plaintiffs to public contempt, disgrace, ridicule or attack." Lombardi Decl., Ex. 4 (Pozner/De La Rosa Amended Petition) ¶¶ 68, 85.  Following years of litigation and Jones's testimony at the damages trial, the Heslin/Lewis court found that Jones "knew and intended for Plaintiffs to suffer emotional distress" in a "five-year campaign of willful lies and malicious harassment," (Lombardi Decl., Ex. 8 (Heslin/Lewis Amended Petition) ¶¶ 107, 109) and the jury awarded damages because he "published statements that were false and defamatory" and "knew the statements were false" or had "a high degree of awareness that they were probably false, to an extent that [Jones] in fact had serious doubts as to the truth of the statements"—the same exact language that was given preclusive effect in *In re Scarbrough.  See*

---

[5] Because all of the findings necessary to demonstrate Jones's liability for the "willful and malicious injury" of Mr. Pozner and Ms. De La Rosa were conclusively established upon entry of the default judgment, whether damages have been established is irrelevant for purposes of the collateral estoppel analysis.

Lombardi Decl., Ex. 5 (Heslin/Lewis Compensatory Damages Jury Charge) 4; Ex. 6 (Heslin/Lewis Exemplary Damages Jury Charge) 4; *see also In re Scarbrough*, 516 B.R. at 912.

66.     Jones had every opportunity to fully and fairly litigate those issues.  He appeared, answered the complaints, filed and opposed motions in both cases, and even testified at the Heslin/Lewis trial.  After years of litigation and Jones's discovery abuses, the Heslin/Lewis court found that Jones "do[es] not have a meritorious defense." Lombardi Decl., Ex. 46, (Aug. 2, 2022 Heslin/Lewis Trial Tr. Vol. 6) 201; *see also In re Radelat*, No. 02-17-00264-CV, 2019 WL 5792652, at *5 (Tex. App.—Ft. Worth 2019) (A court may presume a party's claims lack merit and grant default judgment when the party engages in "pervasive and persistent obstruction of the discovery process in general.") (citing *5 Star Diamond, LLC v. Singh*, 369 S.W.3d 572, 579 (Tex. App.—Dallas 2012, no pet.));  *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 850 (Tex. 1992) (a default judgment under Rule 215(b) occurs when "the court finds that the sanctioned party's conduct 'justifies a presumption that its claims or defenses lack merit.'") (quoting *TransAm. Nat'l Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex. 1991)).

67.     Where, as here, a default judgment is entered due to the defendant's failure to comply with discovery, as a matter of Texas law the allegations in the complaint are established as true.  *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984) ("[I]f the facts set out in the petition allege a cause of action, a default judgment conclusively establishes the defendant's liability.");  *Stoner v. Thompson*, 578 S.W.2d 679, 684 (Tex. 1979) ("A default judgment admits facts which are properly alleged."); *see also*, *Fitz v. Toungate*, 419 S.W.2d 708, 709 (Tex. App.—Austin 1967) (finding that the facts alleged were established by the default judgment); *Harris Cnty. Water Control and Improvement Dist. No. 84 v. Hornberger*, 601 S.W.2d

66, 68 (Tex. App.—Houston 1980) (finding plaintiff's allegations sufficient to apprise the defendant of the main contentions and thus were established by default judgment).

68.     Courts in the Fifth Circuit have held that default judgments entered as a sanction for discovery abuses, like those at issue here, meet the "fully litigated" prong and have preclusive effect for section 523 purposes.  *In re Gober*, 100 F.3d at 1199.  Jones's conduct here is like the debtor's in *In re Gober*, where the Fifth Circuit held that a Texas state-court default judgment entered as a sanction for discovery abuse had preclusive effect in a later bankruptcy proceeding on the judgment debt's dischargeability.  *Id*. at 1205-06.  There, the parties actively litigated for two years in state court before the default.  *Id.* at 1200. After two years, when the debtor failed to respond to discovery requests and did not attend the hearing on plaintiff's motion to dismiss the debtor's counterclaims and to strike his answer, the court struck the debtor's answer, dismissed his counterclaims, entered a default judgment against him, and found that the debtor "acted with fraudulent intent," and acted "maliciously and willfully."  *Id.*

69.     When the *Gober* debtor petitioned for bankruptcy, the plaintiff sued to establish non-dischargeability under § 523(a)(4) and (6) and asserted that issue preclusion barred the debtor from relitigating the factual and legal issues established in the underlying case.  *Id.*  The debtor argued that "because the state court struck his pleadings and deemed all of [plaintiff's] material allegations admitted, the issues relevant to discharge were not actually litigated for purposes of collateral estoppel."  *Id.* at 1203.  The bankruptcy court disagreed and granted summary judgment for the plaintiff.  *Id.* at 1200.  The Fifth Circuit affirmed.  In doing so, the Circuit court differentiated between a "no-answer" default and post-answer default. *Id.* at 1204.  In a no-answer default, the issues are not fully litigated because the defendant has not answered or contested any of the claims.  *Id.*  By contrast, in a post-answer default, the issues "are actually litigated for

purposes of collateral estoppel and may be given preclusive effect in a subsequent dischargeability proceeding in bankruptcy." *Id.*

70.     Bankruptcy courts thus routinely apply Texas law to give preclusive effect to so-called "death penalty" sanctions—a post-answer default judgment entered when a defendant engages in "such egregious conduct in the case that the trial court strikes his answer and enters default judgment against him." *See, e.g.*, *Staton Holdings, Inc. v. Mileski (In re Mileski)*, 416 B.R. 210, 218 (Bankr. W.D.N.C. 2009).   These "death penalty" sanctions meet the fully and fairly litigated standard for collateral estoppel when the record demonstrates that the plaintiff offered evidence and proved his case. *Id.* at 219 (citing *Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997)). The pleadings, hearing transcripts, and affidavits and exhibits presented to the court should all be considered in determining whether the plaintiff presented sufficient evidence to the court before the "death penalty" sanction was issued. *Id.* at 220.

71.     Here, that is exactly what happened in the Pozner/De La Rosa and Heslin/Lewis Actions.  In the Pozner/De La Rosa Action, Movants offered evidence that Jones falsely accused Ms. De La Rosa of faking an interview with Anderson Cooper and that Jones cited this lie as a key piece of support for his claim that Sandy Hook was staged as part of a criminal plot.  Lombardi Decl., <u>Ex. 10</u> (Pozner Affidavit) ¶ 7.  Movants also submitted evidence that Jones broadcast Mr. Pozner's personal information and maps to addresses associated with his family.  *Id.* ¶ 9.  The court entered a judgment against Jones after he answered the complaint and engaged in three years of litigation, motion practice, and multiple hearings.  The same is true in the Heslin/Lewis Action. There, Jones answered the complaint and Movants presented the court with dozens of videos showing Jones's lies about Sandy Hook and Movants specifically, as well as testimony from Jones and other FSS representatives.  *See generally* Heslin/Lewis Trial Transcripts; Lombardi Decl., <u>Ex.</u>

32 (Dec. 9, 2019 Heslin Motion for Default).  Unlike the debtor in *In re Pancake*, whose answer

was struck by the state court prior to issuance of the judgment, "thus creating a situation similar to

that where no answer is filed, i.e., a no-answer default judgment," (106 F.3d at 1244), here the

default judgments are post-answer default judgments entered as a last resort following Jones's

"egregious discovery abuse" and after Jones filed an answer and engaged in multiple rounds of

motion practice, including at the appellate level.  Lombardi Decl., Ex. 3 (Heslin Amended Default

Judgment) 4.

72.     Courts in this district have found that "death penalty" sanctions of this nature,

issued as a "last resort," satisfy the fully and fairly litigated prong.  Guion v. Sims (In re Sims),

479 B.R. 415, 421 (Bankr. S.D. Tex. 2012) ("Although Sims did not substantively litigate the fraud

issue in state court, the 'fully and fairly litigated' prong of collateral estoppel is satisfied due to

Sims's egregious conduct during the discovery process.").  In In re Sims, Judge Isgur reasoned

that the debtor "deliberately chose not to move forward with the state-court action and frustrated

the case by abusing the discovery process."  Id.

73.     That is the exact logic that the state court applied here when it entered default

judgments.  In the Pozner/De La Rosa Action, the state court found that because Jones and his

codefendants "unreasonably and vexatiously failed to comply with their discovery duties" and

engaged in a "general bad faith approach to litigation," and determined that "an escalating series

of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been

ineffective in deterring" Jones's misconduct.  Lombardi Decl., Ex. 41 (Pozner/De La Rosa Default

Judgment) 2, 4.  In the Heslin/Lewis Action, the state court likewise entered judgment due to

Jones's "flagrant bad faith and callous disregard for the responsibilities of discovery" and

"pervasive and persistent obstruction[,]" which the court found "justifie[d] a presumption that [his]

defenses lack merit."  Lombardi Decl., <u>Ex. 42</u> (Lewis Default Judgment) 3-4; Lombardi Decl., <u>Ex. 3</u> (Heslin Amended Default Judgment) 3-4.

74.    There is no doubt that the default judgments entered in these cases were entered as a last resort, as the court "considered lesser sanctions and determined they would be inadequate to cure the violation in light of the history of the Defendant's conduct."  Lombardi Decl., <u>Ex. 41</u>, (Pozner/De La Rosa Default Judgment) 4.  Jones had over *three years* to litigate the issues in the state-court proceedings and he filed multiple answers and motions to dismiss.  Instead of participating in discovery, however, he engaged in "literal years of blatant discovery abuse and intentional discovery abuse" (*supra* ¶ 44), forcing the court to enter default judgments admitting the facts alleged in Movants' amended petitions.  The court did so "based on a longstanding principle in the law that, if you intentionally repeatedly, and over years in this case, again and again, refuse to participate in discovery, that is proof that you do not have a meritorious defense." Lombardi Decl., <u>Ex. 46</u> (Aug. 2, 2022 Heslin/Lewis Trial Tr. Vol. 6) 201:1-5.  As was the case in *In re Gober* and *In re Sims*, Movants' allegations are now established and considered "fully litigated" by virtue of entry of the default judgments.

75.    And in the Heslin/Lewis Action, willful and malicious injury was further litigated and established at a nine-day damages-phase trial at which Jones testified, and after which the jury awarded $45 million in punitive damages.  Lombardi Decl., <u>Ex. 7</u> (Heslin/Lewis Final Judgment). As in *In re Gober*, those findings supporting punitive damages were "fully and fairly litigated for collateral estoppel purposes" and so Jones is "precluded from relitigating the issue of whether his conduct was willful and malicious for the purposes of § 523(a) dischargeability."  100 F.3d at 1205-06.

76. In short, there is nothing extraordinary about holding that the judgments against Jones establish that his debts to Movants are non-dischargeable. In *Grogan v. Garner*, the Supreme Court noted that where the elements for finding a judgment non-dischargeable overlap with the proof required to obtain that judgment, then the Bankruptcy Code "will permit exception from discharge" of all such claims "creditors have successfully reduced to judgment." 498 U.S. at 290. Several courts have already held that state-court judgments for defamation and intentional infliction of emotional distress must have preclusive force for that reason. *See, e.g.*, *In re Saxton*, 2011 WL 2293320, at *9 (slander and punitive damages); *King v. Huizar (In re Huizar)*, 609 B.R. 482, 490 (Bankr. W.D. Tex. 2019) (intentional infliction of emotional distress and punitive damages); *Pollock v. Marx (In re Marx)*, 171 B.R. 218, 224 (Bankr. N.D. Tex. 1994) (same); COLLIER ON BANKRUPTCY § 523.12[4] (16th ed. 2012) ("[C]laims based on [intentional infliction of emotional distress] have typically been held non-dischargeable."). The same outcome is appropriate here.

**B. The findings of willful and malicious injury were essential to the judgments entered in the state court proceedings.**

77. Collateral estoppel is appropriate where the facts to be litigated were essential to the state court judgment. Movants brought claims for defamation, defamation *per se* and intentional infliction of emotional distress against Jones in the underlying proceedings. Under Texas law, defamation is "a false statement about a person, published to a third party, without legal excuse." *See Fiber Systems Intern., Inc. v. Roehrs*, 470 F.3d 1150, 1161 (5th Cir. 2006); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). In a claim for defamation *per se*, "[t]he words are so obviously hurtful that they require no proof that they caused injury in order for them to be actionable." Bankruptcy courts applying Texas law have held that a state court's finding that the debtor "intended to cause injury" was essential to a defamation judgment

and barred relitigation of that issue under section 523(a)(6). *In re Cummins-Cobb*, No. 2:17-bk-24993 (RK), 2020 WL 63140 (Feb. 10, 2020). Similarly, the court in *In re Scarbrough* found that the "essential to the judgment" prong was met and debtor was precluded from relitigating his willful and malicious injury of plaintiff because the state court found him liable for defamation *per se* based on jury instructions that he made statements he "knew were false or which he made with a high degree of awareness they were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." 516 B.R. at 912. The bankruptcy court, in reaching its decision, also credited the fact that the debtor posted an inflammatory video of the plaintiff with her photo on YouTube and "freely admitted that he did not have any evidence to support his accusations." *Id.* at 912, 913-14. It stressed, "[t]he right to free speech does not insulate Debtor from civil liability for willful and malicious defamation." *Id.* at 914.

78.     This notion extends to intentional infliction of emotional distress claims, which, under Texas law, are reserved for "those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998); *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). Because of that high standard, "claims based on [intentional infliction of emotional distress] have typically been held nondischargeable" in bankruptcy. COLLIER ON BANKRUPTCY § 523.12[4] (16th ed. 2012).

79.     Here, the state court findings on Jones's intentional infliction of emotional distress and defamation claims are essential to the judgment, as they were in *In re Cummins* and *In re Scarbrough*. As an initial matter, the Heslin/Lewis jury was given the exact same jury instructions that were considered essential to the defamation judgment in *Scarbrough*. Moreover, the Heslin/Lewis Default Judgment settled that Jones's statements were "knowingly false" (Lombardi

Decl., <u>Ex. 8</u>, Heslin/Lewis Amended Petition ¶ 92), his acts were "intentional" (*Id*. at ¶ 104), that he made his statements "knowing they would cause severe emotional distress" (*Id*. at ¶ 101), and that he "knew and intended for Movants to suffer emotional distress" in a "five-year campaign of willful lies and malicious harassment." *Id*. at ¶¶ 107, 109.  Similarly, the Pozner/De La Rosa Default Judgment established that Jones intentionally inflicted emotional distress on Mr. Pozner and Ms. De La Rosa with his defamatory statements, which were "designed to harm the Movants' reputation and subject the Movants to public contempt, disgrace, ridicule or attack" and were made "in bad faith and with malicious motives." Lombardi Decl., <u>Ex. 4</u> (Pozner/De La Rosa Amended Petition) ¶¶ 68, 85.

80.     As a result, and consistent with the Fifth Circuit's holding when it evaluated the preclusive effect of a default judgment for purposes of section 523(a)(6) in *In re Caton*, "because the factual allegations [in the petition] are deemed admitted and the default judgment necessarily rests thereon, we are able to determine conclusively the issue decided by the court when rendering the default judgment." 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998). "By defaulting, [the party] admitted all of the allegations in the petition." *Jackson v. Biotectronics, Inc.*, 937 S.W.2d 38, 41 (Tex. App.—Houston 1996, no writ).

81.     Under Texas law, a defaulted defendant cannot contest whether its conduct was "knowing" if, as here, that fact was properly pleaded in the complaint.  *Fleming Mfg. Co. v. Capitol Brick, Inc.*, 734 S.W.2d 405, 409–10 (Tex. App.—Austin 1987, writ ref'd n.r.e.) ("Although Fleming may not contest whether its conduct was 'knowing,' it may however contest both the amount of actual damages, if any, and the extent of its knowledge which warrants an award of 'additional damages' under § 17.50(b)(1)."); *Gonzalez v. Hibernia Nat'l Bank in Tex.*, No. 05-92-02355-CV, 1993 WL 265454, at *2 (Tex. App.—Dallas July 16, 1993, no writ) (Plaintiff's

"original petition alleged that…'the conduct of Gonzalez was committed knowingly, intentionally, and wantonly.'  The default judgment established that Gonzalez converted the check to Hibernia in a knowing, intentional, and wanton manner.  Therefore, the *Geders* requirement of 'a willful and knowing conversion under circumstances showing a lack of good faith' for exemplary damages is fulfilled.") (internal citations omitted).  *See also Gold v. Gold (In re Gold)*, 375 B.R. 316, 334 (Bankr. N.D. Tex. 2007) (finding § 523(a)(6) applies since facts alleged were admitted by virtue of default judgment).

82.     Finally, to receive exemplary damages in excess of the statutory cap, Mr. Heslin and Ms. Lewis were required to show that Jones "knowingly or intentionally" injured them while they were already suffering from "severe emotional disturbance" due to the loss of their son.  Tex. Civ. Prac. & Rem. § 41.008(c)(7); Tex. Penal Code § 22.04.  This finding, too, is certainly essential to the judgments entered against Jones and he should be precluded from relitigating his willful and malicious injury.

**C.     Movants and Jones were cast as adversaries in the state-court actions.**

83.     Finally, there is no question that Jones and Movants were cast as adversaries in the state-court proceedings.  Under Texas law, the requirement that the parties be "cast as adversaries" in the first action is satisfied if the parties participated in the first action through adequate representation.  *Avila v. St. Luke's Lutheran Hosp.*, 948 S.W.2d 841, 848 (Tex. App.—San Antonio 1997) ("Due process requires that collateral estoppel operate only against persons who have had their day in court, either as a party to the prior suit or as a privy.").  The Supreme Court of Texas has stated that a person is "in active concert or participation" with a named party if he participated in the original proceeding and was a real party in interest when the decree was rendered.  *Harris Cnty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 315 (5th Cir. 1999) (citing *Ex parte Davis*, 470 S.W.2d 647, 649 (Tex.1971)).

84.     That test is satisfied for both the Pozner/De La Rosa Action and the Heslin/Lewis

Action.  The state-court judge specifically found that "[d]efendants"—which included Jones—

have been continuously represented in [the Heslin] case by competent Texas counsel."  Lombardi

Declaration, Ex. 38 (Dec. 20, 2019 Heslin Order on Motion for Sanctions).  That same counsel

represented Jones in the Pozner/De La Rosa Action. Thus, the state-court lawsuits constitute the

"first action[s]," and both parties had adequate legal representation throughout the proceedings.

85.     As such, the elements for collateral estoppel are satisfied and Jones is precluded

from arguing that the debts arising from the state-court judgments did not arise from his willful

and malicious injury of Movants.

## II.     EVEN IF THE JUDGMENTS WERE NOT ENTITLED TO PRECLUSIVE EFFECT (WHICH THEY ARE), THE FACTS ON THE STATE-COURT RECORDS ESTABLISH  WILLFUL AND MALICIOUS INJURY.

86.     The Supreme Court recently explained that the Bankruptcy Code "strikes a balance

between the interests of insolvent debtors and their creditors."  *Bartenwerfer v. Buckley*, 143 S. Ct.

665, 670 (2023).  "It generally allows debtors to discharge all prebankruptcy liabilities, but it

makes exceptions when, in Congress's judgment, the creditor's interest in recovering a particular

debt outweighs the debtor's interest in a fresh start."  *Id.*

87.     Even setting collateral estoppel aside, the state-court evidence (which the Court can

take judicial notice of ) confirms that Movants' interest in recovering from Jones on account of his

willful and malicious injury outweighs Jones's interest in a fresh start.

### A.     The court need not look beyond the closed state-court records.

88.     The debts owed by Jones to Movants arise out of the willful and malicious injury

established in the default judgments (and liquidated in the Heslin/Lewis Final Judgment).  Any

relevant evidence of whether the debt is one for a willful and malicious injury is contained in the

state-court proceedings underlying the judgments.   No further fact-finding is necessary or appropriate.

89.     As an initial matter, the court may take judicial notice of the contents of the state-court dockets.  *See, e.g.*, *Morgan v. Medtronic, Inc.*, 172 F. Sup. 3d 959, 963 (S.D. Tex. 2016) ("[T]he Court may take judicial notice of matters of public record, including pleadings filed in state court."); *Joseph v. Bach & Wasserman, L.L.C.*, 487 F. App'x 173, 178 n.2 (5th Cir. 2012) ("[T]he court may take judicial notice of matters of public record.  Here, the document referenced is a pleading filed with a Louisiana state district court, and it is a matter of public record.").  And courts frequently decide non-dischargeability at the summary judgment stage where the debt at issue arises from a prior judgment.  *See, e.g., In re Harrison*, 180 F. App'x 485 (5th Cir. 2006) (deciding debt was non-dischargeable at summary-judgment stage based on attached evidence—including state-court trial transcript and documents from underlying judgment—where debt arose from a prior judgment).

90.     In deciding whether a debt is non-dischargeable, "a court can look beyond the [state court] judgment and [jury] instructions to see if the evidence produced in the state-court proceedings supports a finding of intent" under Section 523(a)(6).  *In re Mahadevan*, 617 F. Supp. 3d at665 (citation omitted).  Accordingly, bankruptcy courts routinely find state-court judgments non-dischargeable based solely on the underlying state court record.  *See, e.g.*, *In re Rabalais*, 2012 WL 42101, at *4 (finding debt from state court judgment non-dischargeable based on "the presentation of testimony and evidence" in state-court proceeding); *Lee* v. *Weatherford (In re Weatherford)*, 2022 WL 174213, at *1 (Bankr. N.D. Tex. 2022) (finding debt non-dischargeable on summary judgment based on documentary evidence from state-court proceeding); *see also In*

*re Kahn*, 533 B.R. 576, 590 (Bankr. W.D. Tex. 2015) (deciding debt non-dischargeable on summary judgment based solely on the state-court record).

91.     The Fifth Circuit has held that when a bankruptcy court decides non-dischargeability, it "may not relitigate the entire case; to do so would do violence to judicial finality, a fundamental tenet of our judicial system." *Shuler*, 722 F.2d at 1256 (5th Cir. 1984) (quoting another source).  As a result, "[t]hose facts that were actually litigated and necessary to the decision in the court that rendered the judgment, and that are discernible from the record of the case, should not be reopened absent a compelling reason to avoid injustice." *Id.*  Thus, this Court should determine that Movants' claims are non-dischargeable based solely on its review of the state-court records.

### B.     The evidence in those closed state-court records confirms that Jones's conduct satisfies the objective and subjective standards for willful and malicious injury.

92.     As described above, the Fifth Circuit requires "'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor" to find willful and malicious injury.  *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)).  "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so 'under the objective standard, if [the debtor's] acts were substantially certain to result in injury.'"  *In re Red*, 96 F. App'x 229, 231 (5th Cir. 2004).  Accordingly, Movants need only show by a preponderance of evidence that either the objective *or* the subjective standard is met.  Here, the evidence requires summary judgment for Movants under either standard.

> i.     *The evidence satisfies the "objective standard" enumerated by the Fifth Circuit.*

93.     Jones meets the objective standard because, from a "reasonable person" standpoint, his actions were "substantially certain to result in harm" and the court found that "the debtor's

subjective intent was to inflict a willful and malicious injury" on Movants. *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009). Bankruptcy courts in the Fifth Circuit have found the "objective" standard was met with facts less egregious than those here. For example, in *Pirtek USA, LLC v. Lager (In re Lager)*, No. 22-30072-MVL-11, 2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022), the court found that the facts alleged in plaintiff's complaint (including that the debtor published on his website unsupported accusations that the plaintiff engaged in racially discriminatory practices and franchisee abuse) met the standard for non-dischargeability under section 523(a)(6) at the motion to dismiss stage because "the Court may easily infer that [the debtor] not only understood the potential consequences of accusing another business of racially discriminatory practices but intended such accusations to harm the Plaintiff's reputation." Likewise, in *The Gil Ramirez Group, LLC v. Jackson (In re Jackson)*, No. 17-80090, 2018 WL 5785244 (Bankr. S.D. Tex. Nov. 1, 2018), a debtor attempted to discharge punitive damages arising out of the debtor's efforts to bribe a school official to secure a school contract. A competitor sued and won punitive damages against the debtor. The debtor attempted to discharge that debt, arguing "that her acts of bribery unintentionally harmed [the competitor plaintiff, who lost out on the contracts], if they harmed him at all." *Id.* at *2. But, "[t]he Court strongly disagree[d]." *Id.* The court found that the "debtor intended to deprive [plaintiff] of contracts by using bribes to secure the contracts for herself and her company" and "intended the consequence of her bribes, which created a deliberate and intentional injury to [plaintiff]." *Id*.

94.     Jones's conduct easily meets this standard. The jury's verdict in the Heslin/Lewis Action was based on findings that Jones "published statements that were false and defamatory" and "knew the statements were false" or had "a high degree of awareness that they were probably false, to an extent that [Jones] in fact had serious doubts as to the truth of the statements." Lombardi

Decl., <u>Ex. 5</u> (Heslin/Lewis Compensatory Damages Jury Charge) 4; <u>Ex. 6</u> (Heslin/Lewis Exemplary Damages Jury Charge) 4.  Unlike in *In re Lager* and *In re Jackson*, the jury's award was based on its finding that Jones's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

95.    Moreover, the defaults occurred because Jones refused to participate in discovery, which was "proof that [he did] not have a meritorious defense."  Lombardi Decl., <u>Ex. 46</u> (Aug. 2, 2022 Heslin/Lewis Trial Tr. Vol. 6) 201:4-5.

96.    The default judgment in the Heslin/Lewis Action conclusively established that Movants and their family were "specifically targeted in [Jones's] campaign of harassment," Jones's statements were "knowingly false," his acts were "intentional" and done "knowing they would cause severe emotional distress," and Jones "knew and intended for Plaintiffs to suffer emotional distress" in a "five-year campaign of willful lies and malicious harassment,"  Lombardi Decl., <u>Ex. 8</u>, Heslin/Lewis Amended Petition ¶¶ 107, 109.  These findings easily meet the objective standard.

97.    In the Pozner/De La Rosa Action, the default judgment likewise established that Jones intentionally inflicted emotional distress on Mr. Pozner and Ms. De La Rosa with his defamatory statements, which were "designed to harm the Plaintiffs' reputation and subject the Plaintiffs to public contempt, disgrace, ridicule or attack" and were made "in bad faith and with malicious motives."  Lombardi Decl., <u>Ex. 4</u> (Pozner/De La Rosa Amended Petition) ¶¶ 68, 85.  Again, this easily satisfies the objective standard for non-dischargeability.

98.    Beyond the fact that the judgments alone meet the objective standard, the undisputed facts on the record speak for themselves.  Jones told his InfoWars audience that Sandy

Hook was a hoax on dozens of occasions (or more).  *See generally* ¶¶ 7-24. In addition to casting doubt on the shooting generally, he accused Movants of being actors in a conspiracy to strip Americans of their Second Amendment rights.  *Id.*  Jones claimed that Mr. Heslin lied about holding his dead son with a bullet hole in his head.  *Supra* ¶ 22.  He specifically accused Ms. De La Rosa of conducting a fake interview with Anderson Cooper on a blue-screen, which became a central component of his false narrative.  *Supra* ¶¶ 10, 56.  He claimed Noah Pozner "died (again) in Pakistan."  *Supra* ¶ 16.  Jones's broadcasts identifying Mr. Pozner and his personal information resulted in Mr. Pozner receiving death threats from InfoWars listeners.  *Supra* ¶ 18.

99.     The record also shows that Jones knew he was lying because it was pointed out to him on multiple occasions.  Less than a month after the shooting, Mr. Pozner pleaded with Jones to stop his lies and told him about the pain and suffering he was causing the families.  *Supra* ¶ 11. In response, InfoWars' Chief Editor assured him that Jones knew Sandy Hook was "a very real tragedy with very real victims."  *Id.*  By Jones's own admission, he "realized [the Sandy Hook shooting] probably did happen" and "there was a good chance [he] was wrong" by 2015.  *Supra* ¶¶ 26.  Around the same time, InfoWars' Chief Editor begged him to stop and informed Jones that the "experts" he had on the show were unreliable.  *Id.*  But Jones continued to broadcast his lies while his own family and staff joked about their absurdity.  *Supra* ¶¶ 28.  Jones's "pervasive and persistent" efforts to resist discovery and delay accountability also support a finding that his intent was to willfully and maliciously injure Movants.  *Supra* ¶¶ 42.

100.     Thus, the facts established in the state-court record easily meet the "objective standard," and so Jones's debt is non-dischargeable under section 523(a)(6).

        *ii.     Alternatively, the evidence satisfies the "subjective standard."*

101.    Based on the undisputed facts, the evidence also meets the "subjective test" because it establishes that Jones acted "deliberately and intentionally, in knowing disregard of the rights" of Movants. *Century 21 Real Estate LLC v. Gharbi (In re Gharbi)*, No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011) *aff'd*, No. A-11-CA-21 LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011) (citations omitted). *Bui v. Do (In re Do)*, Adv. Pro. No. 11-01027 (CAG), 2013 WL 1429435 (Bankr. W.D. Tex. April 9, 2013), is instructive.  In that case, plaintiff received a judgment against the debtor for defamation *per se* in a state-court action that proceeded while the debtor's bankruptcy was pending.  The underlying claims were based on statements the debtor posted to his website suggesting that the plaintiff was a communist, communist sympathizer, or spy for the communist party in Vietnam. *Id.* at *3.  In addition to the evidence at trial, the court also referenced the debtor's "overall posture toward Plaintiff, observed by the Court throughout the proceedings" (including the debtor calling the plaintiff a "traitor" in the courtroom and his refusal to remove a defamatory article from his website) in finding that the debtor met the "subjective test." *Id.* at *4.  The court held that while it "made findings of fact that Defendant acted with the specific intent to injure Plaintiff, the evidence independently demonstrate[d] that Defendant acted with a subjective motive to cause harm." *Id.* at *5.  The court walked through that evidence in detail:

> The circumstances surrounding the case foreclose the possibility that Defendant acted without subjective intent to cause harm. The evidence demonstrates that Defendant repeatedly published statements about Plaintiff, and even went so far as to knowingly distribute materials in an effort for others to draw negative inferences about Plaintiff. Defendant's significant knowledge regarding the history of the Vietnam War, and his status within the Vietnamese community, indicate to the Court that Defendant's conduct was deliberate and intentional. Defendant was aware not only that the statements Defendant made were false, but also that the Vietnamese community would react negatively towards Plaintiff as a result of those statements, especially in consideration of the cultural background

> and community sensitivities, of which Defendant is particularly knowledgeable.
>
> Based on the evidence presented in this case and the judgment of the State Court, this Court cannot accept that Defendant did not make or publish the statements, that Defendant was not aware that such statements were false at the time they were made, and, despite their falsity, that Defendant made such statements in order inflict a willful and malicious injury on Plaintiff. The Court therefore finds that the "subjective test" is met and Defendant acted with the subjective intent to cause harm.

*Id.*

102.    The similarities between the *In re Do* debtor and Jones are striking. The evidence here also demonstrates that Jones repeatedly published statements about Movants to his audience of millions, and even went so far as to appear on other programs, like *Sunday Night with Megyn Kelly*, to spread his lies about Movants. *Supra* ¶ 22. Jones has significant knowledge regarding mass shootings in the United States and the public discourse surrounding them, as he has covered dozens of shootings since he started broadcasting in the mid-1990s. *Supra* ¶ 28. Jones knew not only that his statements were false, but also that his audience would react negatively to them—and indeed *did* react negatively to them by sending death threats to Sandy Hook parents. *Supra* ¶ 18.

103.    In short, the state-court records establish that there can be no genuine dispute that Jones was unaware that his defamatory statements were false when he made them. Like the court in *Do*, this Court should find that the "subjective test" is met because Jones acted with the subjective intent to cause Movants harm. Based on the state-court judgments and evidence established on the state-court records, the debts arising from the judgments against Jones are thus non-dischargeable under section 523(a)(6).

## CONCLUSION

104.     The state-court proceedings established that Jones willfully and maliciously injured

Movants.   Under section 523(a)(6) of the Bankruptcy Code, then, he cannot discharge Movants'

judgments against him.   The Court should therefore grant Movants summary judgment.

Dated:  May 12, 2023

/s/ *Jennifer J. Hardy*

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas  77002
Telephone: 713-510-1700
Facsimile: 713-510-1799
Email: jhardy2@willkie.com

**AND**

Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York  10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: rstrickland@willkie.com
        slombardi@willkie.com
        csisco@willkie.com

*Bankruptcy Co-Counsel to the Texas Plaintiffs*

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg (Texas Bar No. 24083532)
1001 Fannin Street
Suite 2400
Houston, Texas  77002
Telephone: 713-337-5580
Facsimile: 713-337-8850
Email: avi.moshenberg@mhllp.com

**AND**

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin (Texas Bar No. 24070221)
1200 Smith Street
Suite 1400
Houston, Texas  77002
Telephone: 713-356-1280
Facsimile: 713-658-2553
Email: jarrod.martin@chamberlainlaw.com

*Bankruptcy Co-Counsel to the Texas Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 12, 2023.

*/s/ Jennifer J. Hardy*
Jennifer J. Hardy