# Exhibit 1

```
 1                    REPORTER'S RECORD
                    VOLUME 7 OF 9 VOLUME
 2            TRIAL COURT CAUSE NO. D-1-GN-18-001835

 3

 4   NEIL HESLIN AND SCARLETT    )  IN THE DISTRICT COURT
     LEWIS,                      )
 5                              )
         Plaintiffs             )
 6                              )
     VS.                        )  TRAVIS COUNTY, TEXAS
 7                              )
     ALEX E. JONES AND FREE      )
 8   SPEECH SYSTEMS, LLC,        )
                                )
 9       Defendants             )  261ST JUDICIAL DISTRICT

10

11

12   -------------------------------------------------------

13                    TRIAL ON THE MERITS

14   -------------------------------------------------------

15

16            On the 3rd day of August, 2022, the

17   following proceedings came on to be heard in the

18   above-entitled and numbered cause before the Honorable

19   Maya Guerra Gamble, Judge presiding, held in Austin,

20   Travis County, Texas;

21            Proceedings reported by machine shorthand.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        MARK D. BANKSTON
          SBOT NO. 24071066
 5        KYLE FARRAR
          SBOT 24034828
 6        WILLIAM R. OGDEN
          SBOT NO. 24073531
 7        WESLEY TODD "WES" BALL
          SBOT NO. 24038754
 8        KASTER LYNCH FARRAR & BALL, LLP
          1117 Herkimer Street
 9        Houston, Texas  77008
          (713) 221-8300
10

11   FOR THE DEFENDANTS ALEX JONES AND FREE SPEECH SYSTEMS,
     LLC:
12
          F. ANDINO REYNAL
13        SBOT NO. 24060482
          JOSEPH C. MAGLIOLO
14        SBOT NO. 12821600
          WESTLEY WILLIAM 'WEST' MEDLIN
15        SBOT NO. 24080702
          FERTITTA REYNAL, LLP
16        917 Franklin Street, Suite 600
          Houston, Texas  77002
17        (713) 228-5900

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X
                            VOLUME 7
 2                     TRIAL ON THE MERITS
                        AUGUST 3, 2022
 3

 4   DEFENDANT'S WITNESSES
                                                    Jury
 5               Direct   Cross   Redr    Recr   Exam    Vol.

 6   ALEX E. JONES      5      37    100           103     7

 7                                               Page    Vol.

 8   Defense Rests.........................      116      7

 9   Charge of the Jury....................      120      7

10   Closing Argument by Mr. Farrar........      136      7

11   Closing Argument by Mr. Reynal........      170      7

12   Final Argument by Mr. Farrar..........      195      7

13   Deliberations.........................      202      7

14   Proceedings...........................      203      7

15   Reporter's Certificate................      204      7

16

17

18

19

20

21

22

23

24

25
```

```
 1                       EXHIBIT INDEX
                          VOLUME 7
 2

 3    PLAINTIFF'S
      NO.     DESCRIPTION            OFFERED   ADMITTED/ VOL.
 4                                             REFUSED

 5    129-Image                        45        46       6

 6    131-Text Message                 80        81       6

 7    132-Text                         91        92       6

 8    134-Revenue Numbers              96        96       6

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          WEDNESDAY, AUGUST 3, 2022 - MORNING PROCEEDINGS
 2              (The following proceedings were held in open
 3      court in the presence of the jury)
 4                  THE COURT:  All right, you may be seated.
 5                  Mr. Jones, you're on the witness stand,
 6      sir.
 7                  All right, whenever you're ready,
 8      Mr. Reynal.
 9                  Same instructions as yesterday, Mr. Jones.
10                  ALEX E. JONES,
11        Having been duly sworn, testified as follows:
12                      DIRECT EXAMINATION
13      BY MR. REYNAL:
14          Q.   I would like to start today by explaining
15      some of the characters in this saga.  Who are -- what
16      are truthers or the truth movement?
17          A.   The truth movement started after the JFK
18      Assassination, where early on a large portion of the
19      public didn't believe the official story, there were a
20      lot of different conflicting accounts.  And then it
21      additionally got its name in the media and culture after
22      9/11, when a lot of people, including a lot of officers
23      in the military and people, didn't buy all the official
24      story we were told.  And it became a pejorative or an
25      insult by the corporate media to call people who
```

1    questioned big events "truthers."

2              And people kind of adopted that term and

3    said, okay, it's the truth movement.  And so its

4    confidence has been lost, things like the Gulf of Tonkin

5    in '64, saying it was staged, attacks on our ships to

6    start the Vietnam war by LBJ, as that happened people

7    lost more and more confidence.

8              Until now you've got a spectrum, where

9    you've got people over here who would call themselves

10   "truthers" that don't think anything is real and they

11   just think everything is fake, and I think they're

12   crazy; and then you've got people that still question, I

13   would say I'm more in the middle and I've gone too far

14   in the other direction, as well, and I realized that

15   years ago.

16             And then you've got other people who are

17   just as crazy as the far end of the truthers who think

18   everything they're told are true and don't question

19   anything.  In fact, in a way, that's probably even

20   crazier than thinking everything is fake.

21             And so, that's pretty much the best

22   description of what truthers are.

23        Q.   Are you familiar with a man named Steve

24   Pieczenik?

25        A.   Yes, I am.

1        Q.   How long have you known him?

2        A.   I've known him 21 years.

3        Q.   And who do you understand him to be?

4        A.   He ran psychological operations for the

5 State Department, the CIA, he ran the Camp David Accords

6 successfully, it's what he was first really known for.

7 He ran regime change in countries, he created the Tom

8 Clancy "Jack Ryan" character and wrote those books.

9 Jack Ryan is kind of who he is, it's his mind.

10        And he gave us a lot of information over

11 the years that turned out to be dead on and became a big

12 source of information.  He also got us a lot of

13 connections in armed Special Operations, he gave us a

14 lot of intelligence that was really good, like the intel

15 when I said Russia will invade in late February and

16 October of last year, I got that from him, Special

17 Operations.  So he's just been an incredible source that

18 was never wrong until he was the one that really pushed

19 me over the edge saying, no, it is staged and it -- I

20 really just believed him and I think he was wrong.

21        Q.   How about Dr. James Fetzer?

22        A.   I knew Fetzer, I had interviewed Fetzer

23 before Sandy Hook on his questions of 9/11.  He had

24 written some books on that, seemed very cogent and

25 intelligent.  And I -- I really didn't go off a lot of

1    his Sandy Hook stuff because I didn't read his book on

2    Sandy Hook, his book *Nobody Died At Sandy Hook,* which I

3    don't believe.

4                And we kind of had a falling out, because,

5    as he got a little more wild after 9/11, he was thinking

6    that they used the space-based weapons to disintegrate

7    the towers and I thought that was a little too much.

8    So, that was kind of where he was, so I didn't go that

9    much off him on Sandy Hook.

10        Q.   And he was never on the show, was he?

11        A.   Not on -- he was on about other things, not

12   that I remember, do a lot of shows, but not that I

13   remember about Sandy Hook.

14        Q.   How about Dr. James Tracy?

15        A.   He seemed credible.  He was a university

16   professor, seemed very well spoken and I -- I believe he

17   was interviewed by some of the other shows on InfoWars,

18   I don't remember interviewing him.  I remember seeing

19   some of his reports, reading some of his articles and

20   interviews.

21        Q.   And last, a gentleman we've heard a lot

22   about, Wolfgang Halbig.

23        A.   Yes, I did interview Wolfgang Halbig and he

24   seemed credible when I was first reading what he was

25   saying.

1     Q.   Do you now realize that that was a big

2  mistake?

3     A.   It was.  And that was part of the reason I

4  started to think Sandy Hook probably happened by 2015,

5  '16 or so, when at first I thought that the children

6  probably actually died but there might be some

7  involvement by some nefarious groups.  It's hard to

8  believe that Adam Lanza would do all that, it just

9  seemed so incredible.

10          You're kind of in first stages of grief,

11  even watching something, is denial.  And then, over

12  time, I kind of bought into what Halbig was saying and

13  what Pieczenik was saying.  And then Halbig began to get

14  mad at me, I don't remember exactly when, like 2015 or

15  so, saying I was covering up because I wouldn't have him

16  on.  And he started visibly degenerating more.  And so,

17  that's when I began to really think that I might have

18  made a mistake, you know, unintentionally.

19     Q.   Let's rewind and talk about December 14th,

20  2012.  The day that Adam Lanza attacked the school.

21  Where were you?

22     A.   I believe I was -- I believe I had gotten to

23  work by the time it was on the news and heard about it.

24  I don't remember the exact details, I just remember it

25  was just like unbelievable.

1       Q.    What was your -- what was your feeling when

2  you saw what had happened?

3       A.    Anybody would have just shock, especially

4  you have children, and I, of course, already had three

5  children then, that something like that could happen and

6  that somebody could do something like that.  And that

7  just that it was possible, just it's hard to believe.

8       Q.    Why did you choose to cover Sandy Hook at

9  all?

10      A.    It was the top story in the country and a

11 lot of powerful forces were also using it to blame gun

12 owners in general, and so a lot of people had resentment

13 that they hadn't done anything illegal with a gun and

14 they were being blamed collectively.  There was lot of

15 anger back then.  The show was more driven to calls, so

16 we open the phones up and people were predominantly I

17 think for a few weeks calling in about it.

18      Q.    As you sit here today, do you recall about

19 how much coverage InfoWars gave to the Sandy Hook school

20 shooting in 2012?

21      A.    I would have to see notes, but I think it

22 was like two and a half hours.

23      Q.    I would like to move into 2013.  In terms of

24 the Sandy Hook story, what was going on in 2013?

25      A.    A lot of pushes to restrict gun ownership.

1  I mean, just a lot of political fighting going on.

2       Q.    During that time you interviewed Steve

3  Pieczenik about the story.  Why did you pick him?  Did

4  you reach out to him?  Did he reach out to you?  How did

5  that --

6       A.    I reviewed the video but it was a few weeks

7  ago.  I mean, I believe he was on on other subjects and

8  I believe it came up or -- and then I believe I, in this

9  interview you're talking about, I think I argued with

10  him about it being totally staged and I found that hard

11  to believe.

12       Q.    During that time not you but another host

13  interviewed Dr. James Tracy.  Do you recall that?

14       A.    Yes.

15       Q.    Do you know why James Tracy was interviewed?

16       A.    It was a big topic on the internet and I --

17  I mean, the hosts usually set up their own guests.  I

18  don't think I watched at the time but I saw it later.

19       Q.    At the time were you or anyone else at

20  InfoWars taking a strong position that no one had died

21  at the school?

22       A.    No.  We were having -- when we did cover it,

23  out of the thousands of hours, it was -- it was a

24  discussion of what happened there.  And I knew that

25  there had been other false flag events where they

1    actually killed people, so I -- I still in general

2    thought that that was what was happening.  And one

3    reason to interview Pieczenik is he was a psychiatrist,

4    you look this up, there's a lot of article about it, who

5    was involved in some stuff in Europe, knew about

6    Operation Gladio, and had been involved.

7         Q.    What's Operation Gladio?

8         A.    That's a declassified NATO stay-behind

9    network program in Europe, eastern Europe, western

10   Europe, southern Europe, to stage terror attacks and

11   blame it on the Russians during the Cold War.  Operation

12   Gladio.  And Pieczenik had been involved in operations

13   dealing with the response, the kidnapping of the Italian

14   prime minister and things like that and the Red Brigade.

15   And so, I knew he was on record an expert on false

16   flags.

17        Q.    Let's move into 2014.  The comprehensive

18   report written by Detective Dan Jewiss was issued or

19   released around that time, December 2013 or early 2014.

20        A.    Say that again, please?

21        Q.    We've had testimony that the comprehensive

22   report written by Dan Jewiss, the detective for the

23   Connecticut State Police --

24        A.    Yes.

25        Q.    -- was released to the general public in

1    either very late 2013 or early 2014.  Why didn't that

2    end all discussion?

3         A.   I don't remember all the specifics.  I know

4    that it was a topic that the public was interested in,

5    so it would resurface from time to time.  It was not one

6    of our main topics.  Our main topics were wars and

7    surveillance and police state.  And I -- but I do

8    remember that they said a lot of it was, quote, still

9    classified and redacted.

10             I do remember there being a controversy

11   about that, and that was what made some people still

12   think that they were being lied to about what really

13   happened there.

14        Q.   Let me ask you before we move onto 2014, if

15   you recall, approximately how much time did InfoWars

16   devote to the Sandy Hook story in 2013?

17        A.   I actually went over and have some notes, if

18   I'm able to look at those I could give you --

19        Q.   Would those refresh your recollection?

20        A.   They would.  Because I don't want to say the

21   wrong numbers.

22             MR. BANKSTON:  Do you have a copy of that

23   for me?

24             MR. REYNAL:  Would you like to look at it?

25             MR. BANKSTON:  Your Honor, I object.

```
 1   These are just some handwritten notes in Exhibit 31
 2   which we know does not even come close to
 3   establishing --
 4                 THE COURT:  You have to lay a lot more
 5   background before you can refresh the notes.
 6                 MR. REYNAL:  He wrote the notes.
 7                 THE COURT:  He hasn't said that.  What you
 8   say is not evidence.
 9   BY MR. REYNAL:
10        Q.    Did you write some notes after reviewing
11   your documents in order to help you refresh your
12   recollection while you testify here today?
13        A.    I believe that was the entered evidence that
14   you told me I need to review, you also told me to review
15   the rules about --
16        Q.    Without saying what I told you to review.
17        A.    Yes, I reviewed that.
18        Q.    And did you take some notes based on your
19   review internally to refresh your recollection as to
20   what had happened?
21        A.    Yes, I did.  I rewatched them, too.
22        Q.    Would it help you to refer to your notes in
23   terms of time periods?
24        A.    Yes, please.
25                 MR. BANKSTON:  Your Honor, I'm going to
```

1    again object because of the discovery order that you

2    have entered, which establishes that is not a complete

3    list of videos, nor could it be used to refresh his

4    memory of what is a complete --

5                THE COURT:  Yes, actually could you

6    approach both of you, please.

7                *(Whereupon a discussion was held at the*

8    *bench off the record.)*

9    BY MR. REYNAL:

10       Q.   Based solely on your memory, without

11   reference to any documents that you've reviewed, about

12   how much coverage do you believe InfoWars gave to Sandy

13   Hook in the year 2013?

14       A.   I believe it was four or five hours.  Less

15   than one-tenth of one percent.

16       Q.   So, let's talk about 2014.  You started --

17   Wolfgang Halbig came on the show for the first time.

18       A.   I believe so.

19       Q.   And can you tell us what led you to have

20   Wolfgang Halbig on in 2014?

21       A.   He was on a lot of shows and he had a group

22   of bullet points and my producer set him up on the show,

23   so I had him on.

24       Q.   At the time what, if anything, else was

25   going on in your life?

1        A.   My family was falling apart --

2             MR. BANKSTON:  Your Honor, objection.

3   Relevance.

4             THE WITNESS:  I was getting a divorce.

5             THE COURT:  Sustain.

6   BY MR. REYNAL:

7        Q.   I would like to refer you to the end of

8   2014.  We've had a video received in evidence of you

9   stating your belief at that time that no one died at

10  Sandy Hook; that the whole thing was fake.  Do you

11  understand as you sit here today how crazy that is?

12       A.   I have said before that there have been so

13  many lies and so many things in the past and I was under

14  a lot of pressure and I truly, when I said those

15  statements, when I say something I mean it, that I

16  really could believe that it was totally staged at that

17  point and I was basing that off of really Steve

18  Pieczenik, who is -- has been a very prestigious person.

19       Q.   Do you understand now that it was absolutely

20  irresponsible of you to do that?

21       A.   It was.  Especially since I met the parents

22  and it's a hundred percent real, as I said on the radio

23  yesterday, and as I said here yesterday, it's a hundred

24  percent real.  And the media still ran with lies that I

25  was saying it wasn't real on air yesterday.  It's

1    incredible.  They won't let me take it back.  They just

2    want to keep me in the position of being the Sandy Hook

3    man.

4              My son got confronted yesterday --

5              MR. BANKSTON:  Your Honor, objection.

6    Speculation as to what the media wants.

7              Mr. Jones is just being on his show.

8              THE COURT:  Sustain.

9              MR. BANKSTON:  Thank you, Your Honor.

10             THE COURT:  I want to just remind you,

11   just answer the question that your attorney asks you.

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Thank you.

14   BY MR. REYNAL:

15        Q.   In 2014, based solely off your recollection,

16   without having looked at any documents, can you tell us

17   about how much time was devoted by InfoWars to

18   coveraging Sandy Hook?

19        A.   I believe it's five, six hours.

20        Q.   In the whole year?

21        A.   Yes.

22        Q.   Moving into 2015, at the end -- or at the

23   middle of 2015, in July 2015, you stopped -- InfoWars

24   stopped covering Sandy Hook.

25        A.   Yes.

1      Q.    Why did you stop?

2      A.    Because Halbig was saying that I was

3    involved in Sandy Hook because I wouldn't have him on

4    and I started finding out that some of the things, the

5    anomalies they put forward, weren't true.  And I just

6    ended my divorce and just kind of was -- got my head

7    cleaned up and stopped drinking for a while and realized

8    that it probably did happen and I was probably -- I

9    mean, there was good chance I was wrong.

10              So, I started basically trying to walk it

11    back long before I got sued, because I wasn't sure that

12    I was right anymore.  Not everything is a false flag,

13    not everything is staged.

14      Q.    During that time there was a reporter

15    working, or there's gentleman who at least we've had in

16    evidence worked at some point for InfoWars named Dan

17    Bidondi.  Are you familiar with that name?

18      A.    Yes.

19      Q.    Can you tell us who he is?

20      A.    He was a part-time reporter, he was a really

21    nice guy but we were -- we were being more comedy-based

22    part of the show then.  And so, Rob is like, this guy is

23    like a Howard Stern character.  And so we hired him to

24    do some funny stuff but he wanted to do serious stuff.

25    And then he was officially working for us but I let him

1    go when he moved to Austin for about six months, he just

2    didn't work out.

3            And then he went back and was doing his

4    own show but sometimes he would go out and, you know,

5    say he was doing stuff for InfoWars.  And we were proud

6    of some of it, not so proud of other parts of it.  And

7    he -- I mean, he --

8        Q.   Can you tell us specifically what you're not

9    proud of regarding Bidondi?

10       A.   I mean, I didn't like ones I saw, because I

11   wasn't at the time watching a lot of the shows, I was

12   just doing my own show.  I saw some of the reports he

13   put out, both on his platform and on ours, and I

14   remember saying, well, that's not how we want to handle

15   things if he's going to do that, tell him don't do that.

16   And then I began telling the crew, no more Sandy Hook,

17   don't cover it.

18       Q.   In that first half of 2015, before you shut

19   it down, do you recall approximately, based off your

20   memory, how much coverage Sandy Hook got?

21       A.   I don't think it was much, I don't remember.

22   I wrote it down but --

23       Q.   That's fair.

24       A.   I know for 16 months after that we didn't

25   talk about it any.

1        Q.    16 months?

2        A.    That's what my memory is, yes.

3        Q.    Let's talk about 2016.  Was that an election

4  year?

5        A.    Yes.

6        Q.    How did the election affect InfoWars?

7        A.    Before we had been seen by the right wing as

8  leftist and by the left wing as kind of crazy

9  libertarians, but I was popular with populus everywhere.

10 So, I was popular with land rights group and antipolice

11 corruption groups and was really well-known for being

12 anti police brutality at that time and antiwar.

13             And as soon as I got involved thinking

14 that Trump was an outsider, I got what politics is

15 really like, and I got thrown in the deep end of the

16 weaponization of politics and experienced what that was

17 like at a very, very personal level and --

18       Q.    How did the Clinton campaign weaponize

19 InfoWars' Sandy Hook coverage?

20       A.    Well, they looked at -- the media went with,

21 okay, this guy is bombastic, he's colorful, he said a

22 lot of wild stuff, we're going to use that and say he's

23 Trump's brain.  And all these shows said, Alex Jones

24 tells Trump what to do.  And people believed it.

25             MR. BANKSTON:  Your Honor, I object to the

 1  hearsay.

 2             THE COURT:  Sustained.

 3             You can't tell us what anyone else has

 4  said.

 5             THE WITNESS:  Okay.  Okay.

 6             THE COURT:  There are few exceptions that

 7  I do not think will come up in your testimony.  So if

 8  somebody else said it, you can't tell us.

 9             THE WITNESS:  Okay.

10  BY MR. REYNAL:

11      Q.   Based on your participation in the campaign,

12  just being in the country at the time, can you tell us

13  the volume, from your perspective, of campaign ads

14  linking you to Sandy Hook?

15      A.   In the last two months of the campaign I had

16  already been a big part of the Clinton campaign tying me

17  to Trump, and then they spent a huge ad buy for two

18  months talking about me, playing edited clips of me --

19             MR. BANKSTON:  Your Honor, objection.  He

20  doesn't know what their ad buy was or how huge it was.

21  This is just absolute speculation.

22             THE COURT:  Speculation.  Sustained.

23  Sustained.

24  BY MR. REYNAL:

25      Q.   How did you feel about that?

```
 1        A.   Well, when I read in the newspaper there was
 2   a $28 million ad buy --
 3        Q.   Don't say what you read in the newspaper.
 4             THE COURT:  So --
 5   BY MR. REYNAL:
 6        Q.   Don't say what you read in the newspaper,
 7   just tell me how you felt about it.
 8             THE COURT:  -- things that you have read
 9   are also hearsay.
10             THE WITNESS:  Okay.
11             THE COURT:  Because you didn't say them,
12   somebody else said them.
13             THE WITNESS:  Okay.
14             THE COURT:  Right?  A writing is speech.
15   Do not tell the jury anything that came from someone
16   else --
17             THE WITNESS:  Okay.
18             THE COURT:  -- that you read or heard.
19             You'll have to disregard that sentence.
20             THE WITNESS:  Okay.
21             THE COURT:  Go ahead.
22   BY MR. REYNAL:
23        Q.   How did you feel about the advertising that
24   was happening, the political advertising that was
25   happening regarding you and Sandy Hook?
```

 1          A.   I felt it was highly deceptive, I felt it

 2    stole my identity and was building me into a monster as

 3    a political tool.  And I wanted my identity back and did

 4    not want to be tied to the twisted things that they were

 5    saying I did by making me the Sandy Hook Man.  And I

 6    wanted to be able to try to set the record straight,

 7    because it wasn't just hurting me, it was hurting my

 8    family.

 9                And I also realized that it was going to

10    get other people, or possibly, to make it a big issue.

11    And it did, it made it bigger -- it made it a thousand

12    times bigger than it ever was when other people covered

13    it.  It was just huge.  And I had people on the street,

14    shopping malls, grocery stores, saying, stop talking

15    about Sandy Hook.

16                MR. BANKSTON:  Your Honor, objection.

17    Hearsay.  Objection.  Nonresponsive.

18                THE COURT:  Sustain.

19    BY MR. REYNAL:

20          Q.   You made a video in November of that year.

21    Do you recall that?

22          A.   Yes.

23          Q.   Called "Final Statement on Sandy Hook."

24          A.   Yes.

25          Q.   What was your purpose in making that video?

1        A.   To tell the media why I questioned things

2   but that I thought that it probably did happen and that

3   I did not want to talk about it anymore.  So, that was

4   basically where I stood, because I was getting a lot of

5   calls from the media saying they wanted to interview me

6   and I was saying, I don't want to talk about Sandy Hook.

7        Q.   As you sit here today, do you realize what a

8   mistake it was to allow yourself to be baited into

9   making that video?

10        A.   I feel I was completely baited, not just

11   that time but many other times after; and just caught in

12   this -- caught in this situation where I had been,

13   basically, typecast as someone that runs around talking

14   about Sandy Hook, who made money off Sandy Hook, who was

15   obsessed with Sandy Hook, when it was less than

16   one-tenth percent over those six years of what we

17   covered.  And so it was extremely frustrating.  It was

18   frustrating then, it's infinitely more now.

19        Q.   In 2016, how much coverage did you give to

20   Sandy Hook?

21        A.   I believe almost none.

22        Q.   That video?

23        A.   I think in my notes it's like 20 minutes or

24   something, I'm not sure.

25        Q.   Let's go into 2017.  And I want to ask you

 1   some questions about Megyn Kelly.  Did you know Megyn

 2   Kelly before 2017?

 3        A.   No.

 4        Q.   How did she approach you?

 5        A.   She kept calling my cellphone.

 6        Q.   And at some point, without telling us what

 7   she said, did you agree to the interview?

 8        A.   Yes.

 9        Q.   About how many phone calls did it take

10   before you agreed?

11        A.   I don't remember.  A lot.

12        Q.   Why did you agree to the interview?

13        A.   Because I was told that I would be allowed

14   to say that I thought Sandy Hook happened and apologize

15   to the families.

16        Q.   And did that turn out to be the case?

17        A.   No.

18        Q.   Tell us about the process of filming the

19   profile.  How did that go?

20        A.   She came to the office at about 9:00 a.m.

21   and we were done at about 10:00 o'clock at night.  And

22   then I was like three minutes of the program all edited

23   together with jump cuts.

24        Q.   What's a jump cut?

25        A.   It's like with the refrigerator magnet game

1   where you can move the words around wherever you want.

2   And you know you have jump cuts because the shots kept

3   changing and we're talking about every four or

4   five words being jump cut so that it would make it

5   appear that I wasn't sorry or that I wasn't sad about it

6   and that I was continuing to do it.

7        Q.   Do you recall around when the -- did the

8   filming occur before or after April of 2017?

9        A.   I believe it was in April.

10       Q.   When you realized what was going on, did you

11  make a video addressing the media and what had happened?

12       A.   I made several.  I actually released the

13  audio of Megyn Kelly, I recorded her once saying, we're

14  going to let you set the record straight and, you know,

15  say that you think Sandy Hook happened and all the rest

16  of it and then I also shot a Father's Day video to the

17  families saying I would like to have you on the show and

18  I'm sorry for what happened and I believe that, you

19  know, these mass shootings happen.

20            And that was my attempt, because the media

21  was saying, on Father's Day he will attack the families,

22  coming up, NBC, just promos everywhere on all the major

23  onus channels, how dare he attack them on Father's Day.

24            MR. BANKSTON:  Your Honor --

25            THE WITNESS:  I hadn't seen the report

1    yet.

2                    MR. BANKSTON:  Your Honor, again his

3    testimony --

4                    THE COURT:  Hearsay.

5                    MR. BANKSTON:  -- as to other networks --

6                    THE COURT:  Sustained.  Hearsay.

7    Sustained.

8                    So remember, Mr. Jones, if you heard it

9    it's hearsay.

10                    THE WITNESS:  Can I have one of these?

11                    THE COURT:  Yes, that's why they're there.

12                    If you heard it, it's hearsay.  So TV,

13    that's hearsay.

14                    THE WITNESS:  Okay.

15                    THE COURT:  There are some exceptions.

16                    THE WITNESS:  I understand.

17                    THE COURT:  But I don't think any of your

18    testimony is going to qualify for that exception.

19                    MR. REYNAL:  At this point we will play

20    Plaintiffs' Exhibit 21 which is in evidence, Your Honor.

21                    THE COURT:  All right.

22                    (Video played off the record.)

23    BY MR. REYNAL:

24        Q.   At the time you filmed that segment had you

25    ever heard the name Neil Heslin?

```
1          A.   I don't believe so.

2          Q.   In addition to filming this clip, going

3    after the mainstream media for the way they were

4    covering the event, did you also film a piece reaching

5    out to the families?

6          A.   Yes, sir.

7               Are you talking about the Father's Day

8    message.

9          Q.   Yes.

10              And why did you film that?

11         A.   Because I wanted the families to know that I

12   believe their children died and I was being used as a

13   pawn by putting two pit bull's in a cage to attack each

14   other.  And I wanted -- I wanted it to stop.  I didn't

15   want to cause them anymore pain and it was also causing

16   my family a lot of problems, and so I wanted it to stop.

17   And I didn't want to be sucked into it anymore.

18              That's why I agreed to the Megyn Kelly

19   interview.  She said, I'll just talk about it a bit.  I

20   said, I would like to be able to clarify that I think it

21   happened.  But she didn't let that get out on the air.

22   So -- sorry.  Sorry about this.  So, that's why I shot

23   the Father's Day report.

24         Q.   At this time we play Exhibit 67 in evidence,

25   the Father's Day report.
```

```
 1                THE COURT:  All right.

 2                (Video played off the record.)

 3  BY MR. REYNAL:

 4       Q.    After the Megyn Kelly profile aired, Owen

 5  Shroyer on InfoWars, as an employee of Free Speech

 6  Systems reported on a ZeroHedge story about Sandy Hook.

 7  Do you recall that?

 8       A.    Yes.

 9       Q.    Did you know he was going to cover it?

10       A.    No.

11       Q.    To your knowledge, before that piece aired,

12  had anyone on InfoWars ever mentioned Neil Heslin by

13  name?

14       A.    No.

15       Q.    Why haven't you fired Owen Shroyer for

16  airing that segment?

17       A.    Because I asked him why he did it and he's

18  testified that he wasn't denying his son died, he was

19  saying, why did Megyn Kelly put two conflicting things

20  out, obviously knowing journalistically that would stir

21  up a larger debate.  And also -- go ahead.

22       Q.    You know, though, that the gist of that

23  report, as found by the Court, was, as found by the

24  Court, defamatory to Mr. Heslin.

25       A.    Well, it was not my intention.  I didn't
```

1   know that.  And Owen, it's his opinion that he didn't

2   mean to be that way.

3            And also, Owen came to work after I put

4   out the directive to not cover Sandy Hook any more, and

5   it was an oversight that, while they're just printing

6   out hundreds of articles and bringing in newspapers for

7   the host to look at, you're not told to cover this, they

8   just bring in news articles and stacks of things.  He

9   saw that, thought it was interesting, and covered it.

10           And I don't think he intentionally, in my

11  view, I understand the judge has said that that's the

12  case, but I know that's not the case with me.  And Owen

13  is a really classy guy and really sad about what

14  happened.  So he would never, in my view, want to do

15  anything to just randomly hurt people.

16           I didn't even know who Mr. Heslin was,

17  never said his name.  He's a really nice person, now

18  that I know him, his ex-wife is an amazing person, very,

19  very touching what she's doing.

20           I really support -- I would like to work

21  with your network, I agree we've got to choose love, and

22  fix this evil that's ripping our country apart.  And I'm

23  just very blessed to be able to be here and actually say

24  what I think and what I stand for instead of -- instead

25  of a bunch of edited, out-of-context tapes.

1          But I do acknowledge that I

2    unintentionally took part in things that did hurt these

3    people's feelings, and I'm sorry for that.

4          Q.   To your knowledge, did you make money off of

5    your Sandy Hook coverage?

6          A.   No.  We lost money.  It really hurt us with

7    a large part of the audience and Paul Watson basically

8    ended up quitting over it.

9          And you cannot get sucked in by Pieczenik

10   and all of this, this is not -- this is not good.  And

11   around the time that happened, I guess 2015 or so, I

12   listened to him, but it was just like a cold sore

13   resurface occasionally, because it's a talk show.  And

14   so, I mean, look, now any mass shooting, like I said, I

15   almost didn't air the tape of the head of the state

16   police saying there's a cover up in Uvalde.  Sure,

17   children died, it's terrible, but I'm like hands-off now

18   because I don't want to be sucked into this black hole

19   of mass shootings anymore.

20         Q.   Let me -- we've had some testimony about

21   2018 de-platforming of your business.  What has that

22   meant in terms of your audience reach?

23         A.   What it does is you're technically still on

24   the internet, kind of like if you're in a prison you're

25   still on the earth, you just -- people have to come

1  visit you in the prison, they have to come to

2  InfoWars.com.  You can't get it anywhere else, other

3  than edited things your enemies put out.

4              So, you're not just locked in a prison, it

5  would be like being locked in your house.  You're still

6  in Austin but you can't go to the store, you can't go --

7  hundreds of platforms have barred us being there and

8  even things like Airbnbs and Uber, it's a social credit

9  score is being tested on us that China has.  They admit

10  that.

11              And so, it's -- it's been horrible and it,

12  you know, has crippled the number of people we're able

13  to reach.  And the worse part is people in the

14  establishment, in the corporate media, then can

15  misrepresent what you said on Twitter or Facebook and

16  you can't respond.

17              That's why big newspapers have gotten rid

18  of comments, they don't even want people to respond when

19  they gaslight people.  They can just say whatever they

20  want about you and cobble things together and then you

21  can't respond.  They edit a tape, they air it, and then

22  you can't go show them the tape of what really happened.

23  And they make sure that's their key is that you can't

24  ever respond.  And then they steal your identity,

25  basically, then they build this demon out of bad things

1    you did and good thing you did.

2            But the point is they magnify your faults,

3    they blow it up and then now they own you.  They can say

4    what they want about you, they can do what they want,

5    they can falsely quote you and they can basically do it

6    with impunity.  And it's next-Level 1984.

7            So, that's been the worse part about

8    de-banking, de-platforming, and all the persecution and

9    all the things that have come with it is that you don't

10   have a voice anymore in the utility that is the

11   internet.  Because these companies have utility

12   protections they're not publishers, that's how they're

13   protected.  And so, they have immunity, basically, and

14   then can say whatever they want, everybody else can

15   attack you on those platforms, but then you can't

16   respond to defend yourself.  So it's identity theft is

17   what it is.

18        Q.   Let me switch gears.  And we've touched on

19   this already.  As you sit here today, what are your

20   beliefs around the Sandy Hook school shooting?

21        A.   I've certainly studied it now, and I should

22   have done a better job studying it.  There was an

23   initial coverup of what happened, in my view, because

24   the local government was covering its behind, like they

25   do in Uvalde.  Those children really died, and they have

 1    that coverup there, it's admitted.  There's now state

 2    investigations of the cover up, Texas Rangers are on it

 3    and the governor said it's an outrageous coverup.  And

 4    it's incompetence is what it was.

 5                    And I thought it was incompetent what

 6    happened in Florida a few years ago --

 7                    MR. BANKSTON:  Your Honor, objection.

 8    Nonresponsive.

 9                    THE WITNESS:  Well, I mean --

10                    THE COURT:  Sustained.

11                    THE WITNESS:  What's the question?  Sorry.

12    BY MR. REYNAL:

13        Q.   My question was, as you sit here today, what

14    is your position, your view, on what happened, the

15    murders at Sandy Hook Elementary School in 2012?

16        A.   A young man on psychotropic drugs, the

17    inserts on those say it can make you do mass shootings,

18    mass murders --

19                    MR. BANKSTON:  Your Honor, I think we're

20    coming really close to contempt here.  We object to

21    hearsay.

22                    THE COURT:  Sustained.

23                    MR. REYNAL:  I'll move on.

24                    THE WITNESS:  I think Sandy Hook happened,

25    I think it's a terrible event, and I think we need to

 1   protect our children from mentally ill psychopaths.  And

 2   I think there was a coverup because they had warnings,

 3   the FBI knew about it, they knew he was planning to

 4   attack the school, that's been in even the *New York*

 5   *Times*, and I think --

 6                    MR. BANKSTON:  Your Honor.

 7                    THE WITNESS:  -- reports that --

 8                    MR. BANKSTON:  I'm going to object again

 9   for hearsay.

10                    THE COURT:  Well, right now there's

11   actually no question, it's just you talking.  This is

12   not a conversation --

13                    THE WITNESS:  Okay.

14                    THE COURT:  -- it's not a show.  It's a

15   question, answer to the question asked of you.

16                    THE WITNESS:  Got it.  Yes.

17                    THE COURT:  So, that objection is

18   sustained and we need another question.

19   BY MR. REYNAL:

20        Q.   I'm wrapping up here.  And I want you to

21   tell the Ladies and Gentlemen of the Jury what it is

22   that you're trying to accomplish with InfoWars.

23        A.   I'm trying to challenge the military

24   industrial complex, I'm trying to challenge the powerful

25   international forces that I believe are taking control

1     of our country, and I want to try to get people to ask

2     questions and to not believe the official story and to

3     try to investigate things for themselves.

4                    And I'm trying to promote American values

5     of the First Amendment and of the people's right to

6     think and to make decisions on their own and for the

7     public's right to be able to listen to what they want to

8     listen to and watch what they want to watch and read

9     what they want to read.

10                    And that's really what, in my view, this

11    is all about is the worse speech out there is, even if

12    you disagree with it, even if it's the KKK, horrible

13    people like nazis, I want to protect their right,

14    because if we take their right of speech away we're

15    going to end up all losing our rights, as it is more

16    than a slippery slope.

17                    And I regret that I, by my mistakes --

18                    MR. BANKSTON:  Objection.  Nonresponsive.

19                    THE COURT:  Sustain.

20    BY MR. REYNAL:

21         Q.   When you look back on your 20-plus years in

22    the media, what are you most proud of?

23         A.    I'm most proud of, early on, exposing that

24    the WMDs were in Iraq and it was a fraud and it was lie.

25    And I'm very, very proud of being the first to expose

1    Jeffrey Epstein and his child trafficking rings, world

2    record being the first to expose that a decade before

3    anybody else by name, and even exposing the island and

4    the rest of it from our sources.

5                    And I am proud of the fact that we have

6    inspired a lot of great people, independent journalists,

7    that are doing great work.  We've inspired a lot more

8    good people than we have bad people.

9                    And, you know, I'm actually proud of the

10   fact that I got a chance to have Neil and Scarlett come

11   over to me and shake my hand and, you know, talk to me

12   yesterday so I can tell them face-to-face that I'm

13   sorry.

14                   MR. BANKSTON:  Objection.  Relevance.

15                   THE COURT:  Sustain.

16                   MR. REYNAL:  Pass the witness.

17                   THE COURT:  All right.  Mr. Bankston.

18                        CROSS-EXAMINATION

19   BY MR. BANKSTON:

20       Q.   Mr. Jones, see, I've got a lot to talk to

21   you about.  Before I do that, though, before I talk to

22   you about the details of the history of this case, I

23   want to know, are you taking this trial seriously?  Are

24   you approaching it in good faith?

25       A.   Absolutely.

1          Q.   Okay.  The truth is, you and your company

2    want the world to believe that this judge is rigging

3    this court proceeding to make sure that a script, a

4    literal script, is being followed.  That's what you want

5    the world to believe; right?

6          A.   Aren't I barred from talking about this?

7          Q.   I'm asking you the question, Mr. Jones.

8    Answer the question.

9               THE COURT:  The way the court works is you

10   answer a question until there's an objection.

11              THE WITNESS:  Okay.

12   BY MR. BANKSTON:

13         Q.   Let me ask you the question again,

14   Mr. Jones, make sure you understand it very clearly.

15   You and your company want the world to believe that this

16   judge is rigging this court proceeding so that a script,

17   and I mean a literal script, is being followed.  That's

18   what you want the world to believe.  That's what

19   InfoWars wants --

20         A.   I believe when you're given a court order

21   that you cannot say you're innocent that that's not

22   America.  And the court order is right there on the

23   table.  I've been told I can't say I'm innocent --

24              THE COURT:  So you need to answer the

25   question that is asked.

1   BY MR. BANKSTON:

2       Q.   I asked you this question, yes or no, that's

3   what you want the world to believe.

4       A.   No, I believe the jury is real and I believe

5   that I'm innocent until proven guilty and I believe the

6   jury should decide my guilt.

7               MR. BANKSTON:  Your Honor, at this time we

8   would like to offer a clip from InfoWars on Friday for

9   the purposes of impeachment in which those exact words

10  are said.

11              THE COURT:  All right.  Do you have an

12  objection?

13              MR. REYNAL:  I haven't seen the clip, Your

14  Honor --

15              THE COURT:  Do you want to see it before

16  we play it?

17              MR. REYNAL:  I would.

18              THE COURT:  All right.  How long is it?

19              MR. BANKSTON:  That one in particular I

20  think is about 15 seconds.

21              THE COURT:  Is there some way to watch it

22  without making the whole jury leave?

23              MR. BANKSTON:  I guess we can go outside

24  the courtroom, me and Mr. Reynal.

25              THE COURT:  Do you have the ability to do

1  that?

2                  THE WITNESS:  Check the context.

3                  MR. BANKSTON:  It will take her a minute

4  to unplug and plug back in.

5                  THE COURT:  All right.  Why don't we do

6  this, why don't we go ahead and let the jury take a

7  morning break, so, 20 minutes or less, maybe 15 minutes,

8  and we'll make sure we get through as much that has to

9  be done outside of the jury as possible before you come

10  back.

11                 So, go ahead and take your break.

12  Remember my instructions.

13                 *(Whereupon the jurors exit the courtroom*

14  *and the following proceedings were held in open court:)*

15                 THE COURT:  Everyone may be seated.

16                 So, here is what I want to do.  And we can

17  send Mr. Jones into the hall if we need to, I don't know

18  if you have other impeachment evidence.

19                 MR. BANKSTON:  I do, Your Honor.

20                 THE COURT:  I don't want to do this over

21  and over and over and over.

22                 MR. BANKSTON:  Correct.

23                 THE COURT:  Okay.

24                 MR. BANKSTON:  I also do want to avoid,

25  though, disclosing impeachment evidence I don't have to

1    disclose to Mr. Reynal, which he then gets a break to

2    talk to his client at some point about that information.

3              THE COURT:  Well, you know, really, I'm

4    the one who probably needs to see it more than anybody

5    else.  So, why don't you send it to me and I'll watch it

6    in chambers by myself.

7              MR. BANKSTON:  Do you want me to send

8    all -- any video I might use for impeachment?  Because

9    it's pretty short.  It's not long.

10             THE COURT:  I was just going to say, how

11   long will it take you?

12             MR. BANKSTON:  I would say it will

13   probably take you two minutes to review.

14             THE COURT:  All right.  That will be fine.

15             Mr. Jones, you can go down next to your

16   counsel while we take this break.

17             Yes, Mr. Reynal.

18             MR. REYNAL:  I object to the process that

19   has just been described between the Court and the

20   Plaintiffs' attorneys.  I think it amounts to an ex

21   parte communication and I object to it.

22             THE COURT:  So, you want me to bring the

23   jury in and out, in and out every time?

24             MR. REYNAL:  If Mr. Bankston wants to keep

25   playing little video clips that he got off the internet

1  a week ago, yes.

2            THE COURT:  For impeachment purpose.

3            MR. REYNAL:  I understand, Your Honor.

4  He's got a decade of videos to play.  It seems

5  unnecessary and, if that's the process, that's the

6  process.

7            MR. BANKSTON:  My only other request,

8  then, if we want to do it in a way in which Mr. Reynal

9  is allowed to see all of my impeachment evidence while

10 Mr. Jones is now on the stand, is to sequester

11 Mr. Reynal and Mr. Jones at any break in the testimony.

12           MR. REYNAL:  I don't think that's

13 appropriate, either.  I'm not going to discuss anything

14 with Mr. Jones that I'm not supposed to.

15           THE COURT:  Well, let's watch the one

16 we've already talked about.  So let's watch that one

17 now.

18           Can we shut the door deputy, please, all

19 the way.

20           MR. BANKSTON:  We need --

21           THE COURT:  Oh, yeah.  I'm not sure that

22 that's necessary.

23           THE WITNESS:  I have to go to the

24 bathroom, anyway.

25           THE COURT:  All right, that's fine.

1           Is that all right with you, Mr. Reynal?

2           MR. REYNAL:  It's fine with me.

3           MR. JONES:  You telling me to wait?

4           THE COURT:  I'm not telling you to wait.

5   You said you need to use the restroom.

6                 *(Video played off the record.)*

7           That will definitely be allowed for

8   impeachment.

9           MR. BANKSTON:  Thank you, Your Honor.

10          THE COURT:  It's Free Speech Systems.

11          MR. REYNAL:  No, you're right, you're

12  right.  Yeah.  I heard him say, you were on your show

13  saying these things.

14          THE COURT:  You can go back, but he said

15  your company.

16          MR. REYNAL:  Fair enough, fair enough.

17                 *(Brief recess.)*

18                 *(The following proceedings were held*

19  *in open court in the presence of the jury.)*

20          THE COURT:  All right.  You may be seated.

21          And Mr. Bankston, you can start right back

22  where you were.

23          MR. BANKSTON:  Sure, Your Honor.  And at

24  this point we would like to offer for impeachment

25  purposes a video from InfoWars on Friday, July 29th.

```
 1                 THE COURT:  All right.

 2                 (Video is played off the record.)

 3   BY MR. BANKSTON:

 4        Q.    That man's name is Robert Barnes?

 5        A.    Yes.

 6        Q.    And that's InfoWars?

 7        A.    Yes.

 8        Q.    He was hosting your show on the 29th?

 9        A.    Yes.

10        Q.    Well, you were on the show for part of the

11   29th, right, you were in the courtroom part of it, on

12   your show part of it.

13        A.    I believe so.

14        Q.    Okay.  And Mr. Barnes, he's a frequent

15   anchor on InfoWars?

16        A.    He's been a frequent guest for about six

17   years or so.

18        Q.    He's also represented you in this case as an

19   attorney?

20        A.    Yes.

21        Q.    Okay.  You say, Mr. Jones, that you're

22   taking these court proceedings seriously; you're

23   approaching them in good faith.  But the truth of the

24   matter is you've been broadcasting repeatedly a picture

25   of our judge on fire.  Haven't you.
```

```
 1                  MR. REYNAL:  Objection.  Compound, Your
 2   Honor.
 3                  THE WITNESS:  No.
 4                  MR. REYNAL:  You have to wait until the
 5   Court rules.
 6                  MR. JONES:  Oh.
 7                  THE COURT:  Overruled.  There was a
 8   statement and then a question.
 9   BY MR. BANKSTON:
10        Q.   Mr. Jones, I'm going to hand you what I've
11   marked Plaintiffs' Exhibit 129.
12                  That's your show, isn't it?
13        A.   That's justice on fire.
14        Q.   Okay.  That's from your show, isn't it?
15        A.   Yes.  I haven't seen this.
16        Q.   And you've been running this video
17   repeatedly, haven't you.
18        A.   No, I have not been there all the time.
19        Q.   You haven't been a lot of the time.  You've
20   been there every day this last week, haven't you?  Every
21   single day.
22        A.   No, I tape some of the shows.  I haven't
23   been there today.
24                  MR. BANKSTON:  Your Honor, I would like to
25   move 129 into evidence.
```

1          MR. REYNAL:  Is this impeachment evidence?
2     I'm not exactly sure what Mr. Bankston wants to do
3     with --
4          THE COURT:  I think he wants to impeach
5     Mr. Jones with it.
6          MR. REYNAL:  Does he want to introduce
7     this, is it just to show to the jury or does he want it
8     to go into evidence?
9          THE COURT:  No, I think he --
10          MR. BANKSTON:  I'm moving to admit it as
11     evidence.
12          THE COURT:  -- admitted into evidence.
13     He's moving that it be accepted into evidence.  Do you
14     have an objection?
15          MR. REYNAL:  Yes, Your Honor, we do.
16          THE COURT:  What is the legal objection?
17          MR. REYNAL:  401, 403.
18          THE COURT:  Can I see it, please?
19          MR. BANKSTON:  Yes, you may, Your Honor.
20          THE COURT:  Plaintiffs' 129 is admitted.
21          *(Plaintiff's Exhibit 129 admitted.)*
22          MR. BANKSTON:  Thank you, Your Honor.
23     BY MR. BANKSTON:
24          Q.   The person on the left of this image is our
25     judge; right?

```
 1          A.    Yes.
 2          Q.    The person on the right is another judge you
 3   don't like; right?
 4          A.    Yes.
 5          Q.    One of the things -- you can take that down
 6   Malisa.
 7                One of the things you've been talking
 8   about a lot recently on your show, even for the past
 9   couple of months, is your allegation that government
10   officials are aiding in pedophilia, child trafficking,
11   and the grooming of children; right?
12          A.    You mean like what Jeffrey Epstein did with
13   the Clintons?
14          Q.    Sure, if that's a yes.  Is that a yes?
15          A.    Yes.
16          Q.    Okay.  And on Thursday, you and InfoWars
17   started connecting those allegations to our judge,
18   didn't you.
19          A.    No.
20          Q.    In fact, Mr. Jones, you're telling the world
21   not to believe what happens in this courtroom because
22   the judge worked with Child Protective Services, who you
23   say is involved with pedophilia and child trafficking;
24   correct?
25          A.    Not all of it, but the Texas Youth
```

1    Commission got caught doing it, there's been a lot of

2    that here.

3         Q.   I'm not asking you that, Mr. Jones.  I'm

4    asking you, you're telling the world not to believe

5    what's happening in this trial because this judge is

6    involved with CPS, who is working with child traffickers

7    and pedophilia; correct?

8         A.   No, that's not what I'm saying.

9              MR. BANKSTON:  Okay.  Your Honor, at this

10   time we would like to show a clip from Mr. Jones' show

11   on Thursday where those words are said.

12             THE COURT:  For impeachment purposes?

13             MR. BANKSTON:  For impeachment purposes.

14   Yes, Your Honor.

15             MR. REYNAL:  I would like to hear the

16   clip.

17             THE COURT:  All right.  Do we have a

18   system?

19             Okay.  And it won't show yet, right?

20             *(Pause in proceedings.)*

21             MR. REYNAL:  We would argue this is

22   impeachment on a collateral matter, not appropriate to

23   get into.  Improper impeachment, Your Honor.

24             THE COURT:  Well, those are two different

25   objections and a statement.  So, is it impeachment on a

1  collateral matter or an improper impeachment?

2            MR. REYNAL:  It is an improper impeachment

3  because it is on a collateral matter.

4            THE COURT:  And the collateral matter is

5  what he's saying about me.

6            MR. REYNAL:  Correct.

7            THE COURT:  And the question is about

8  whether he's taking this seriously.

9            MR. BANKSTON:  Correct.

10           THE COURT:  Overruled.

11           MR. BANKSTON:  Thank you, Your Honor.

12           *(Video played off the record.)*

13  BY MR. BANKSTON:

14      Q.   That's what you mean when you're taking this

15  seriously.

16      A.   I take this as serious as cancer.  And, I

17  mean, I don't know, you show somebody else's clip that

18  they're always a few seconds long, why don't you play

19  the whole thing.

20      Q.   Mr. Jones, that's not someone else's clip,

21  is it?

22      A.   Well, I didn't direct it or produce it is

23  what I'm saying.

24      Q.   You certainly published it.

25      A.   I'm not standing behind it.  I have to see

1    the full thing.

2        Q.   So, you don't stand by the things you

3    publish about our judge on your show repeatedly, day

4    after day?

5        A.   No, I said I don't not stand behind it, I

6    need to see not just five-second clips.

7        Q.   Well, we can talk about what you said

8    before --

9        A.   How long is the clip?  Can you play the

10   whole thing?

11       Q.   Mr. Jones, you're not asking questions

12   today.  Do you understand that, sir?

13       A.   Oh, I thought I could ask to see a full

14   document, if somebody showed me something I can see what

15   it was.

16            THE COURT:  This is a question from a

17   lawyer, answer from the witness.

18            MR. JONES:  Okay.

19            THE COURT:  Not the other way around.

20   BY MR. BANKSTON:

21       Q.   The only other thing I want to ask you about

22   is not the other weird stuff you said in that video, I

23   just want to ask you about the question that I asked

24   you, which you said no, I'm not saying the judge is

25   connected to pedophilia and child trafficking.  This is

1   you taking this trial seriously and in good faith?

2   That's what this is?

3        A.   It's a five-second clip.  I don't know what

4   you've cut off or on.

5        Q.   Does it matter?  Is there anything before

6   and after that that would make it great to show pictures

7   of our judge on fire and telling the world she's

8   involved in pedophilia?  Can you tell me the context

9   that would occur before and after --

10                COURT REPORTER:  Excuse me, can you slow

11   down.

12                MR. BANKSTON:  Excuse me.  I'm sorry,

13   Miss DuBois.

14                THE WITNESS:  I believe, if you're only

15   wanting me to go off five seconds, I believe the thing

16   is the judge is the fire burning Lady Liberty.  It's not

17   the judge -- the judge is consuming freedom.

18   BY MR. BANKSTON:

19        Q.   Wouldn't you agree with me, Mr. Jones,

20   that I sure hope some of your viewers are able to make

21   that distinction that you just put on the air, don't

22   you?

23                MR. REYNAL:  Object to the speculation,

24   Your Honor.

25                THE WITNESS:  All I know is --

```
1              MR. BANKSTON:  Withdrawn.
2              THE WITNESS:  -- I take this very
3   seriously.
4              THE COURT:  Sustain and withdrawn.  So
5   stop.
6   BY MR. BANKSTON:
7       Q.   You tell this jury you're taking this trial
8   seriously, but you're telling the world that someone
9   inside Travis County government rigged the jury summons
10  and picked these jurors specifically who don't know what
11  planet they are on.  Correct?  That's what you're
12  telling the world.
13      A.   I'm saying that that could potentially be a
14  danger if they don't know what's going on.
15      Q.   You think that's potentially is what you're
16  saying.  Potentially.  You didn't go on your show and
17  say those words is what you're going to tell me.
18      A.   I mean -- can you show me?
19      Q.   I would be happy to.
20              For purposes of impeachment we would like
21  to now offer a video from Mr. Jones' show on Friday
22  saying those words.
23      A.   Please do.
24              (Pause in proceedings.)
25              MR. REYNAL:  We would object to
```

 1    impeachment on a collateral matter and 403, Your Honor.

 2                    THE COURT:  Overruled.

 3                    MR. BANKSTON:  At this time let's go ahead

 4    and play that video.

 5                    *(Video played off the record.)*

 6    BY MR. BANKSTON:

 7         Q.   Mr. Jones, you don't like that this jury is

 8    made up of blue collar folk.  You think that's wrong.

 9         A.   No, I don't think that.

10         Q.   You don't think they know what planet

11    they're on?

12         A.   I'm saying some -- some people, like you

13    said in your opening statement, live in bubbles.  We all

14    live in bubbles.  And the people who live in a

15    mainstream media bubble, they might not have ever seen

16    what I really say or do.  That's what I was saying.

17         Q.   I understand that you've been unable to

18    attend a good portion of this trial due to a medical

19    issue.  Is that correct?

20         A.   Only a few -- some of it, yes.

21         Q.   Sure, sure.

22                    And you told the press outside this

23    courthouse that it was because of an untreated hernia?

24         A.   Well, I'm going to have to get that taken

25    care of and a bunch of other stuff.

1          MR. REYNAL:  Your Honor, it's absolutely

2    inappropriate for Mr. Bankston to question Mr. Jones

3    about his health issues.  He wasn't under subpoena, he

4    didn't have to be here.  It's private information what

5    is right or wrong with his health.

6          MR. BANKSTON:  It wasn't private when he

7    communicated --

8          THE COURT:  Okay, okay.  Mr. Jones has the

9    right to talk about his health with anyone he wants.  We

10   don't.  Other people don't.  You can talk to him about

11   attendance.  He's not required to be here.  It's his

12   choice.  But let's not get into his -- let's

13   not -- let's move on.

14         MR. BANKSTON:  I hear you, Your Honor.

15         THE COURT:  It wasn't a real legal

16   objection.  It's kind of a --

17   BY MR. BANKSTON:

18        Q.   Okay.  You've been on your show most of last

19   week, pretty much every day last week?

20        A.   I did an hour here, I taped some, as well.

21        Q.   Okay.  And you've been screaming and yelling

22   on your show; right?

23        A.   Yes, just like the media has been doing.

24        Q.   Okay.  Haven't been coughing on your show,

25   have you.  All these coughs in court, they don't happen

 1   on the full hour of your show.  You don't ever cough;

 2   right?

 3        A.    I mean, I've got cough drops right here in

 4   my pocket.  I've got laryngitis and a torn larynx.  It

 5   comes and goes.  It starts burning and it's then

 6   uncontrollable.  And I actually have been coughing a lot

 7   on air, if you guys have been watching my show --

 8        Q.    I have.

 9        A.    -- I have a cough button I can step on and

10   cough.  There's a button I step on.  I've been hacking

11   and coughing.  It's a hundred percent real.

12        Q.    Sure.

13              You were talking about how you've done

14   thousands of hours of programming; right?

15        A.    More than that over the years, yes.

16        Q.    Not all of it has been on Sandy Hook, you

17   talk about a lot of other stuff; right?

18        A.    In our estimation over 99-plus percent is

19   not on on Sandy Hook.

20        Q.    I want to talk about some of that other

21   stuff.  Boston bombing, you said it was fake, a DHS

22   drill.

23              MR. REYNAL:  Your Honor, we're going to

24   object.  403.  No relevance to Sandy Hook.

25              THE COURT:  We can get into it some

1  because it's been already introduced.  Some.

2  BY MR. BANKSTON:

3      Q.  I want to show the pattern here.  You talk

4  Boston bombing, you've been telling the world fake, not

5  real, a Department of Homeland Security drill.  Right?

6      A.  There was a drill.  I think real people got

7  bombed, but we've asked questions on both sides years

8  ago.

9      Q.  Yet you said the exact opposite.  You've, in

10  fact, said some of these people who claimed to be

11  injured were crisis actors in other tragedies, just like

12  in Sandy Hook you said.

13      A.  No, we reported on other people saying that.

14      Q.  In fact, you said some of the people at

15  Sandy Hook, during your coverage of Sandy Hook, you have

16  said they were actually some of the people pretending to

17  be injured in the Boston bombing.  You said that.

18      A.  I don't remember that.

19      Q.  Okay.  Shooting of Representative Gabrielle

20  Giffords.  Do you remember when that happened in

21  Arizona?

22      A.  Yes.

23      Q.  Okay.  And you said that was a government

24  mind-control operation; right?

25      A.  I said the guy fit the bill.

1       Q.   Did you say he fit the bill or did you tell

2  your audience explicitly that was a government mind

3  control operation?  Which did you do?

4       A.   I didn't know you were going to bring this

5  up, that was a long time ago.

6       Q.   What about the Sutherland Springs church

7  shooting just down the road from here, that wasn't that

8  long ago, you said that was fake, an antifa false flag

9  staged operation; right?

10      A.   I believe we said that happened.  We

11 questioned, like Uvalde.  Everybody is questioning that.

12      Q.   How about Oklahoma City, you said that's a

13 false flag inside job.

14      A.   Absolutely.  I've interviewed the police

15 officers and others that were there, found the other

16 bombs inside.  They've been on my show.

17      Q.   Do you remember the shooting in Parkland,

18 Florida, in 2018?

19      A.   Yes.

20      Q.   You called a bunch of people crisis actors

21 there; you said crisis actors were used in Parkland,

22 Florida; right?

23      A.   No, I didn't.  I said they had the film --

24 the drama club then go do interviews because they had

25 skills to present themselves.  I said that I believe

1  that that happened and I had students on the day after

2  the shooting saying it happened and that there had been

3  a police stand down and that CNN said I had actors on

4  and it wasn't true, I had real people.

5       Q.   You don't remember saying on the day of and

6  the next day that it was false flag, engineered to start

7  a civil war?  Did you say that about Parkland?

8       A.   They knew about the young deranged man.  He

9  was known as "School Shooter," that was his nickname.

10 And he was kicked out of school for threats at the time

11 and he was again left alone --

12            MR. BANKSTON:  Objection.  Nonresponsive.

13            THE COURT:  Sustained.

14 BY MR. BANKSTON:

15      Q.   Mr. Jones, I asked you on that day and the

16 day after, do you remember saying that Parkland was a

17 false flag, engineered to start a civil war?

18      A.   I said it could -- I mean, I believe it

19 could be.

20      Q.   Okay.  Las Vegas, the shooting there at the

21 concert, said that's a false flag government operation;

22 right?

23      A.   Well, a lot of people have questions about

24 Vegas.  I mean, that's --

25            THE COURT:  So, Mr. Jones --

1          MR. BANKSTON:  Objection.  Nonresponsive.

2          THE COURT:  Sustained.

3          Mr. Jones, I know you want to tell your --

4     what you want to tell us, but this is a question and

5     answer.

6          THE WITNESS:  Got it.  Yes.

7          THE COURT:  So, just like Mr. Reynal can

8     ask you questions later and you'll get to answer them,

9     right now --

10         THE WITNESS:  I understand.

11         THE COURT:  -- you have to just listen to

12    the question that Mr. Bankston asks you and just answer

13    that question.

14         THE WITNESS:  Okay.

15         THE COURT:  All right.  Let's try again.

16  BY MR. BANKSTON:

17     Q.   Las Vegas shooting, you said it's a false

18    flag, government operation.

19         MR. REYNAL:  I'm going to object.  403

20    again.  I think we've gone enough down this road, Your

21    Honor.

22         THE COURT:  We'll finish with this one.

23         MR. BANKSTON:  Okay.

24         THE WITNESS:  I believe it should be

25    investigated.

```
 1   BY MR. BANKSTON:
 2        Q.   Would you agree with me there is not a mass
 3   tragedy, mass bombing, mass shooting that has occurred
 4   in America in the past 15 years that you have not
 5   attached the words "false flag" to?
 6        A.   I have asked the question.  Because I
 7   believe a lot of things are provocateured or allowed to
 8   happen.  I believe children died in Uvalde and --
 9             MR. BANKSTON:  Objection.  Nonresponsive.
10             THE WITNESS:  Okay.
11             THE COURT:  Sustained.
12   BY MR. BANKSTON:
13        Q.   Mr. Jones, please listen to my question.
14   It's a very, very simple question.  Would you agree with
15   me that every single mass tragedy, mass shooting, mass
16   bombing that you can recall right now in the past
17   15 years you have attached the words "false flag"to it.
18   Yes or no.
19        A.   No.
20        Q.   Okay.  You remember yesterday you were
21   testifying about what the word "synthetic" means over on
22   that board?
23        A.   Yes.
24        Q.   Okay.  And you testified that when you use
25   the term "synthetic," that means real stuff happened but
```

1   that it was being provocateurized, with provocateurs;

2   right?

3          A.    It can mean both, but yes generally.

4          Q.    Well, I would like to show you right now

5   from Plaintiff's Exhibit 13A, I mean Plaintiff's video

6   Exhibit 13A in evidence, an example of you talking about

7   something being synthetic.  So, we are playing

8   Plaintiff's Video Exhibit 13A.

9                  *(Video played off the record.)*

10                 Now, I think you'll agree with me,

11  Mr. Jones, that when you were testifying yesterday about

12  what the word "synthetic" means, you did not tell the

13  jury it can mean both.  You told them, would you agree

14  with me, that it means something really happened, that's

15  what you mean.  That's what you said yesterday?

16         A.    No.  No, I mean, I'm saying that's totally

17  synthetic back at the time, for that one year I was

18  saying it totally didn't happen, in like 2014 or

19  whatever it was.

20                 MR. BANKSTON:  Objection.  Objection.

21  Nonresponsive.

22                 THE WITNESS:  No, that's not --

23                 THE COURT:  Okay.  After the beginning,

24  sustained.

25  *///*

```
 1   BY MR. BANKSTON:
 2        Q.    I'll move on.
 3              Let's talk about Jim Fetzer for a minute.
 4   All right.  I believe you just testified that you
 5   figured out, you figured out Jim Fetzer was a little
 6   nutty.  You came to that conclusion.  Right?
 7        A.    Yes.
 8        Q.    Around 2015 is what you testified to?
 9        A.    I don't remember the exact days.
10        Q.    You just got it, you seem to remember pretty
11   well when Mr. Reynal was testifying that you apparently
12   put a ban on Sandy Hook coverage in 2015; right?
13              MR. REYNAL:  Objection.  Compound.
14              THE WITNESS:  I told him I can't remember,
15   I had notes.  I can't --
16              THE COURT:  Okay.  When you hear
17   "objection" that means you wait.
18              Objection.  Compound.
19              MR. REYNAL:  Yeah, we began with Fetzer
20   and we ended with Sandy Hook.
21              THE COURT:  Sustain.
22              One question at a time, please,
23   Mr. Bankston.
24              MR. BANKSTON:  Sure, sure.
25   ///
```

```
 1   BY MR. BANKSTON:

 2        Q.   By 2015 you put -- you're claiming you put a

 3   ban on Sandy Hook stuff; right?  You just testified to

 4   that?

 5        A.   I believe that's around the time I told

 6   people to stop covering it.

 7        Q.   And you knew Fetzer, by that time you

 8   figured out he was not well; right?

 9        A.   Yes.

10        Q.   And were you here for the testimony of your

11   corporate representative, Brittany Paz?  I don't know if

12   you were here for that.

13        A.   No, I wasn't.

14        Q.   Okay.  Were you aware, either from seeing

15   her testimony at an earlier point or from hearing about

16   it secondhand, were you aware that she testified that at

17   the time the company was using Jim Fetzer's material

18   that they knew he was not a well man?  Did you see that

19   testimony?

20        A.   I didn't see that testimony.

21        Q.   Okay.  Miss Paz testified to that.

22             If your corporate representative got up

23   here and testified, when we were using Fetzer's stuff we

24   knew he was not credible, would you disagree with that?

25   Is she telling the truth?
```

1          A.    I mean, I think she would have to be

2    mistaken.  We didn't have a corporate rep., so we went

3    and hired someone to come look at all our books and

4    everything and try to figure out what was going on, so.

5    But, I mean, I never interviewed Fetzer on that, none of

6    us interviewed him on Sandy Hook, so.  Did we cover a

7    news article that might have had a quote by him or

8    something in it?   I saw that.  But we weren't closely

9    associated with him at that time, is my memory.

10                    MR. BANKSTON:  Objection again.

11   Nonresponsive.

12                    THE COURT:  Sustain.

13   BY MR. BANKSTON:

14         Q.    With respect to Mr. Halbig, I believe you

15   testified also just now you figured out he was crazy in

16   to 2015; right?

17         A.    Sometime around then, yeah.

18         Q.    Okay.  And, in fact, though, did you see

19   Miss Paz's testimony where she said the company received

20   emails from Wolfgang Halbig as early as 2014 that they

21   thanked him for that they knew were crazy; did you see

22   that testimony?

23         A.    I did not see that testimony.

24         Q.    Okay.  And you understand that she talked to

25   all your employees, right?  She went and interviewed

1    people and figured out what they thought about

2    Mr. Halbig.  Do you understand that happened?

3         A.    That's what we hired her to do.

4         Q.    She talked to you, too; right?

5         A.    Yes.

6         Q.    She went in there and testified under oath

7    on behalf of the company that the company, in 2014, knew

8    he was crazy and was thanking him for the things he was

9    providing that were crazy; right?

10        A.    Well, that's not my understanding of it, so.

11        Q.    Okay.  Well, at least you, you here saying

12   that you knew by 2015 he was crazy, so certainly,

13   certainly we shouldn't see anything that Mr. Halbig said

14   on your show after 2015, should we.

15        A.    I told you, the dates all blur together.

16        Q.    Sure, Mr. Jones.  I understand.

17              So, it could have been, heck, maybe just

18   yesterday you realized that Mr. Halbig was going to be a

19   huge liability for you; correct?

20        A.    No, that was a long -- it was a long time

21   ago.

22        Q.    Okay.  Let's talk about a little 2015.  You

23   said you stopped covering Sandy Hook in 2015.  Put a ban

24   on it.

25        A.    At some point.

66

1      Q.   Right.

2           And I believe Mr. Reynal put Exhibit 31 in

3  front of you, right?  You know, the list of videos?

4      A.   Yes.

5      Q.   What you made notes on?

6      A.   No.  I wasn't allowed to have the list.

7      Q.   Right.  But you made notes on that video?

8  On that list?

9      A.   I watched it and I, yeah, I made some notes

10  so I can try to accurately answer the questions.

11      Q.   Okay.  And you testified from that that

12  stopping in July 2015, which is the last video we have

13  on that list in 2015, that for the next 16 months you

14  didn't cover Sandy Hook.  That's what you said?

15      A.   I did not testify from it.  I wasn't allowed

16  to have it.

17      Q.   No, I'm telling you right now, I'm just

18  telling you the video, July 2015, is the last one we

19  have on that list, and we know you reviewed that list to

20  calculate how long you didn't cover Sandy Hook, and

21  you're going to tell me from July 2015 for the next

22  16 months you didn't cover Sandy Hook.

23      A.   Not in the list we have.  We've tried to

24  find everything.

25      Q.   Okay.  Can you put up Exhibit 73 for me.

1              Now, you understand I don't have all your

2    videos about Sandy Hook, either.  You understand that,

3    right?  Correct, Mr. Jones?

4         A.   If you say so.

5         Q.   No, how about you say so.  You understand

6    that; right?

7         A.   We have located what we're able to find.  We

8    believe it's almost all of it.

9         Q.   No, you remember Rob Dew testifying as your

10   corporate representative, God knows where all the videos

11   are.  Do you remember that?

12        A.   Well, that's de-platforming, because --

13             MR. BANKSTON:  Objection.  Nonresponsive.

14   BY MR. BANKSTON:

15        Q.   Do you remember Rob Dew saying that?

16             THE COURT:  Just answer the question,

17   Mr. Jones.

18             THE WITNESS:  No, I don't.

19             THE COURT:  Thank you.

20   BY MR. BANKSTON:

21        Q.   See that email right here?  We've seen it a

22   few times in this lawsuit, haven't we?

23        A.   Yes.

24        Q.   This is Mr. Watson warning you not in

25   June 2015, not in March 2015, but he was warning you in

1    December 2015 that, this Sandy Hook stuff is killing us.

2    Correct?

3         A.   Yes.

4         Q.   I think we can surmise pretty easily from

5    this email that in July 2015 you did not put a ban on

6    Sandy Hook and, in fact, there are videos that we don't

7    have that Mr. Watson is talking about.  Would agree with

8    me?

9         A.   I mean, I don't know that and that's us

10   trying again to not talk about it.

11        Q.   Is that what it is, is that you -- I think

12   that's Mr. Watson telling you, Mr. Jones, a warning;

13   right?

14        A.   No.  I went, I was telling people not to

15   cover it, too.

16        Q.   Really.

17        A.   Yes.

18        Q.   Who were you telling that to?

19        A.   Adan Salazar, Rob Dew, because they were

20   still convinced it didn't happen.

21        Q.   Now, I know you said that Mr. Shroyer came

22   later so maybe he didn't hear the instruction; right?

23        A.   Yes.

24        Q.   Let's get to that in a minute.  Let's talk

25   more about 2015, you talked about Dan Bidondi during

1     that period?

2         A.   Yes.

3         Q.   And you described him as a part-time

4     reporter; right?

5         A.   If that, by the end, yes.

6         Q.   If that.  Maybe not even a part-time

7     employee; right?

8         A.   Well, he was a full-time reporter for a

9     while and then we let him go and he went back to

10    Connecticut, or I think Rhode Island is where he lived,

11    and then he went out and did some --

12         Q.   You have -- before we go any further I just

13    want to make sure what the testimony is.  He was a

14    part-time reporter or he was but now he's a full-time

15    reporter?  Which is it?

16         A.   No, he entered some contest and stuff,

17    wasn't a reporter then, he came down to Austin and was a

18    full-time employee for like six months, if memory

19    serves, then we let him go, and then he asked if he

20    could still just do some stuff on the side over the

21    years and did some things.

22         Q.   Did you see his testimony in the courtroom

23    when it was played?  Were you here for that?

24         A.   No.

25         Q.   So, I'm guessing you also, unless you heard

1    it secondhand, you didn't see Mr. Bidondi testify that

2    he was a producer for the Alex Jones show and spent six

3    days a week with you.  You didn't see that?

4          A.   Well, that's not true.

5          Q.   Okay.  Mr. Bidondi is lying?

6          A.   I think he's mistaken.

7          Q.   Okay.  And the truth is you didn't fire him

8    until late 2016, when he embarrassed you at a Trump

9    rally.  Do you remember us talking about that, me and

10   you?

11         A.   I don't remember that.

12         Q.   Okay.  I want to talk a little bit about

13   your final statement on Sandy Hook.  Right?  And you

14   testified that the reason that you did that final

15   statement in 2016 is so that you could tell the world

16   that you thought it really happened.  Right?

17         A.   That was the beginning of me doing that.

18         Q.   The beginning of you doing that.

19              And I think, as we've seen in this case,

20   that the video in which you said, "If children were

21   killed at Sandy Hook my heart goes out to those parents.

22   But the problem is I've seen actors before and I know

23   when I'm watching a movie, and I know when I'm watching

24   something real?"

25              Do you remember seeing you say that in

1   this trial?

2        A.   Yes, I did say that.

3        Q.   And that was your final statement, looking

4   directly at camera, addressing the people who say

5   they're parents I see on TV, right, that was your final

6   statement.

7        A.   But it wasn't my final statement.

8        Q.   Sure wasn't.  But it certainly wasn't to go

9   on the world and tell the world that it probably

10  happened.  In fact, it was the exact opposite, wasn't

11  it, Mr. Jones?

12       A.   I believe I actually say I think it happened

13  on the tape.

14       Q.   The jury has that in evidence, they can

15  rewatch it.

16            Let's talk about 2017, the Megyn Kelly

17  interview.  You remember you talked about how that was

18  filmed in April; right?

19       A.   I'm not allowed to have notes, but I think

20  around then.

21       Q.   I don't understand, Mr. Jones, that when you

22  were asked questions on direct examination about when

23  these events happened and were very quickly able to say

24  it happened in April of 2017, why when I ask the same

25  question you are very confused.

1        A.    I said I think that, too, then.  I don't
2   remember exactly.  I think so.
3        Q.    Well, in April 2017 the other thing you did
4   right after that interview is film a video called "Sandy
5   Hook Vampires Exposed," didn't you?
6        A.    Yes.
7        Q.    And in that video you were saying a lot of
8   things, like Sandy Hook wasn't even an operating school.
9   Do you remember seeing that being played in this court?
10        A.    I believe so.
11        Q.    Yeah.  And that's something that Halbig told
12   you or that you were relying on Halbig for; right?
13        A.    I had seen articles and things about it, as
14   well.
15        Q.    You had seen articles that Sandy Hook wasn't
16   an operating school.  Is that what you're testifying to
17   under oath right now?
18        A.    I had seen people do articles about it.  I
19   don't remember the exact articles.
20        Q.    Sure.
21            All right.  But what we can know is that
22   in 2017, shortly before these people brought their suit,
23   you were on InfoWars saying Sandy Hook wasn't an
24   operating school; right?
25        A.    If you say so.  Play the video.

1      Q.   No, I want you, you can testify to that.

2           Do you even remember what was played in

3  this courtroom?

4      A.   I've seen a lot.  I think I did say that.

5      Q.   I think you did, too.

6           You also remember you and Mr. Dew talking

7  about how much you wanted to see the bodies, there's no

8  bodies, they never showed us any bodies?

9      A.   I don't know that, but I'll take your word

10 for it.

11     Q.   Okay.  And you'll agree with me in that

12 video you were saying a bunch of same stuff from

13 Wolfgang Halbig that the company knew from as far back

14 as 2014 was crazy.  You're going to admit to that now,

15 or you're going to deny that?

16     A.   I thought we were talking about Halbig in

17 2015.

18     Q.   Well, we're now in 2017 and we had

19 actually -- you said 2015.  Do you remember I asked you

20 about Mrs. Paz's testimony in 2014.  Do you remember

21 that?

22     A.   Yes.

23     Q.   Okay.  So, what I'm asking you now is that,

24 whether it's you in 2015 knowing it or whether Miss Paz

25 says the company knew it in 2014, regardless of which

1    one of those, that was years later, in 2017, InfoWars is

2    still publishing the things from Halbig it knows are

3    crazy.

4          A.    I --

5          Q.    Do you admit that?

6          A.    I hadn't read those emails, so I don't --

7          Q.    Hold on, Mr. Jones, hold on.  You testified,

8    you, that in 2015 you knew Halbig was crazy.

9          A.    Because he started saying that I was

10   covering up Sandy Hook.

11         Q.    Correct.

12               So now, in 2017, two years later, you're

13   repeating all the things Halbig says, knowing he was

14   crazy.

15         A.    Halbig wasn't the only one saying that.  The

16   other --

17               MR. BANKSTON:  Objection.  Nonresponsive.

18               THE COURT:  Sustained.

19   BY MR. BANKSTON:

20         Q.    Let's talk about Plaintiff's Exhibit 21,

21   which is the video that your attorney played, that

22   17-minute video that was on I believe the day before

23   your Megyn Kelly video was going to air.

24         A.    Yes, I think.

25         Q.    And you were -- I think you would agree with

1   me that you were trying to urge NBC not to air it;

2   correct?

3        A.   Yes.

4        Q.   Now, I notice that you said in that video

5   that, the media never quotes what I said; right?  They

6   always just try to paraphrase you, they don't actually

7   use the real quotes; right?

8        A.   In general, yes.

9        Q.   Okay.  But ZeroPointNow, this anonymous

10  blogger, he did quote what you said and you said, he did

11  a good job, I want him to write for me maybe.  Do you

12  remember hearing it in the video?

13       A.   Yes.

14       Q.   Then you went through what ZeroPointNow was

15  quoting about what you said about Sandy Hook; right?

16       A.   Yes.

17       Q.   Okay.  And one of those things in 2017 was

18  you saying that the Sandy Hook website had no internet

19  traffic during the years when the shooting supposedly

20  happened?

21       A.   That was my memory.

22       Q.   Right.  And that wasn't true.

23       A.   I meant the quotes where I said I think

24  Sandy Hook happened, I like to think that that was

25  quoted.  That was the whole point.

1          Q.    Mr. Jones, in that video you went down and

2     read these questions about these false things about

3     Sandy Hook.  You did that in that video.

4          A.    Yes.

5          Q.    And I notice you skipped the one about

6     Robbie Parker, you started to read it and then you

7     stopped reading it.  Did you see where that happened?

8          A.    No.

9          Q.    And the reason that you were a little

10    hesitant, though, at that time to mention a parent's

11    name is because you knew legal threats were on the

12    horizon, didn't you.

13         A.    No.

14         Q.    Okay.  The things you did say, though, that

15    were quoted from you that you wanted to repeat to your

16    audience, because they had done such a good job of

17    covering you, was also that the police were eating their

18    food inside of the school in the crime scene.  Do you

19    remember that?

20         A.    I don't remember.

21         Q.    You don't remember what we just watched ten

22    minutes ago?

23         A.    I missed that part.

24         Q.    Okay.  Do you remember them talking about

25    the FBI crime stat saying no one killed in Sandy Hook

1    that you read in that 2017 video?

2         A.   That was the headlines, yes.

3         Q.   What headline?  Your headline.

4         A.   That's what it said.

5         Q.   No, it didn't, Mr. Jones.  Do you admit that

6    now?  The FBI did not have a crime stat.

7         A.   I mean, I admit we later learned in the full

8    report they don't report those in that state, they do I

9    think everywhere else.

10         Q.   Mr. Jones, we've heard a lot of testimony

11    about the FBI crime stat and how that got wrong.  We

12    heard that from Mr. Salazar.  Were you in the courtroom

13    for that?

14         A.   I think I was in here for part of it.

15         Q.   Okay.  So you probably heard Mr. Salazar,

16    how he messed that up; right?

17         A.   I mean, I think we admit we messed that up.

18         Q.   Right.

19              But you were still saying it in 2017.  At

20    a time where you want this jury to believe you were

21    saying it really happened, you in 2017 were saying the

22    FBI says nobody died.

23         A.   I said on the video I thought it happened

24    five times.

25         Q.   Just like Megyn Kelly said in your

1    interview, you want to have it all, don't you,

2    Mr. Jones.

3         A.   No.  I think Sandy Hook happened.

4         Q.   Yeah, but if Sandy Hook happened, that means

5    there's not an FBI crime stat that nobody died, it means

6    that there was website traffic, it means nobody ate

7    their food inside the school.  All these things you're

8    saying are false.  Right?

9         A.   I would have to review all of it again.

10        Q.   You ten minutes ago, we saw a video saying

11   no EMTs entered the building.  Do you remember that?  Do

12   you remember saying that on --

13        A.   I have to see the timelines of what you're

14   speaking about.

15        Q.   I'm asking you if, when we broke from your

16   break, when your attorney put up the video that he

17   really wanted this jury to see how fair you were being

18   about Sandy Hook, you said no paramedics entered the

19   building.  Right?

20        A.   In a certain timeframe.

21        Q.   What do you mean by that?

22        A.   I would have to see the timeframe you're

23   talking about.

24        Q.   What do you mean timeframe?  You said they

25   never entered it.

1      A.    Never entered it?

2      Q.    That's what you said.  You said that for

3  years.

4      A.    Well, I think you're taking it out of

5  context.

6      Q.    Right?

7            Because they had to keep them out of the

8  building because, otherwise, you would have to pay off

9  all the EMTs because they would get in the building and

10 they would see there's no bodies.  That's what you told

11 your audience.  You told them that many times.

12     A.    I don't remember what you're talking about.

13     Q.    Sure.

14           One of the things you talked about

15 yesterday is you complied with discovery; right?  Said

16 that on the witness stand?

17     A.    That's one of the things I talked about.

18     Q.    Okay.  One of the things that you were

19 ordered to do in this lawsuit, you were ordered to turn

20 over any text messages mentioning Sandy Hook.  Right?

21     A.    Yes.

22     Q.    And you didn't have any; right?

23     A.    Not that we could find.

24     Q.    And you, in fact, told me in your testimony,

25 sworn testimony before coming to this courtroom, you

```
 1   searched; right?

 2        A.   I did.

 3        Q.   Okay.  Do you remember, were you here for

 4   Mr. Shroyer's testimony?

 5        A.   Yes.

 6        Q.   Okay.  You remember what Owen said, the

 7   company has learned from its mistakes about Sandy Hook.

 8   Do you remember that?

 9        A.   I did hear him say that.

10        Q.   You agree with that?

11        A.   Yeah, we've certainly learned from our

12   mistakes, got a lot better.

13        Q.   Okay.  Mr. Jones, I would like to show you

14   what's been marked as Plaintiff's Exhibit 130.

15                  You've got it upside-down.

16                  That's text messages between you and Paul

17   Watson, isn't it?

18        A.   Yes.

19        Q.   And they mention Sandy Hook, don't they?

20        A.   Yes.

21             MR. BANKSTON:  Plaintiffs move 130 into

22   evidence.

23             THE COURT:  Any objection?

24             (Discussion between counsel off the

25   record.)
```

```
 1            MR. REYNAL:  No objection.

 2            THE COURT:  Plaintiff's 130 is admitted.

 3         (Plaintiff's Exhibit 130 admitted.)

 4   BY MR. BANKSTON:

 5        Q.   Let's zoom in on the little article up in

 6   the corner, please.  I want to walk over this to you so

 7   we can kind of point, I know it's a little hard to read,

 8   you may be able to read it a little better on your

 9   screen.  But this is a zoom of Mr. Watson has sent you a

10   screen shot from InfoWars.com; correct?

11        A.   It appears to be.

12        Q.   Yeah.  And it has an article here; right?

13        A.   Yes.

14        Q.   And it says, "Staged, video shows hospital

15   using dummies in E.R. for Coronavirus footage."  Is that

16   what it says?

17        A.   I believe so.

18        Q.   Let's go to the first message from

19   Mr. Watson.  Read along with me, Mr. Jones.  He says

20   this is a video --

21        A.   Sorry, give me one second.

22        Q.   No problem, take your time.

23             Are you ready?

24        A.   Yeah, this -- you may not think it's a

25   problem, but it's a real one.
```

1      Q.   Sure.

2      A.   Just give me a second.

3           All right.  Go ahead.

4      Q.   Mr. Watson says, "This is a video of a

5  medical student training to intubate.  Makes us look

6  ridiculous, suggesting this means COVID is fake.  Sandy

7  Hook all over again."

8           Did I read that correctly?

9      A.   Yes.

10      Q.   Go to the next message.

11           What did you tell Mr. Watson?

12      A.   I get it.

13      Q.   Mr. Jones, it's true that this article is

14  right now live on InfoWars.com, I can pull it up; right?

15      A.   I've never seen this text message, I guess

16  you guys got Paul's.  My phone didn't save them.  So,

17  that's fine with me.

18      Q.   Your phone didn't save this text message.

19      A.   I told you guys, I gave it to the lawyers

20  and said they drained the phone, didn't find that stuff.

21      Q.   You gave it to lawyers, they were supposed

22  to find this.  That's what your testimony is?

23      A.   No, I searched it, as well.  I mean, you

24  guys have all this stuff and you say we didn't give you

25  anything.  It's ridiculous.

```
 1        Q.    Mr. Jones, you know how iPhone works, you've
 2   had iPhone text messaging for several years now.
 3        A.    Yeah.
 4        Q.    What does it mean if the messages are in
 5   blue?  Whose messages are those?  Whose phone is this
 6   taken from?
 7        A.    I don't know whose phone this is taken from.
 8   I mean, I just -- I turned the phone over and said, take
 9   the stuff off.
10        Q.    Can I have you look in the very bottom,
11   below the very bottom left corner.  Is that your phone
12   number?
13        A.    Yes.
14              So, you did get my text messages.  And you
15   said you didn't.  Nice trick.
16        Q.    Yes, Mr. Jones.  Indeed.
17              You didn't give this text message to me,
18   you don't know where this came from.  Do you know where
19   I got this?
20        A.    No.
21        Q.    Mr. Jones, did you know that 12 days ago,
22   12 days ago, your attorneys messed up and sent me an
23   entire digital copy of your entire cell phone with every
24   text message you've sent for the past two years and,
25   when informed, did not take any steps to identify it as
```

1   privileged or protected in any way.  And as of two days

2   ago it fell free and clear into my possession and that

3   is how I know you lied to me when you said you didn't

4   have text messages about Sandy Hook.  Did you know that?

5          A.   See, I told you the truth.  This is your

6   Perry Mason moment.  I gave them my phone and --

7               THE COURT:  Mr. Jones, you need to answer

8   the question.

9   BY MR. BANKSTON:

10         Q.   Did you know this happened?

11         A.   No, I didn't know this happened.  But I

12   mean, I told you I gave the phone over.

13              THE COURT:  Just answer the question.

14   BY MR. BANKSTON:

15         Q.   And you said, you said in your deposition,

16   you searched your phone.  You said you pulled down the

17   text, did the search function for Sandy Hook.  That's

18   what you said, Mr. Jones; correct?

19         A.   And I had several, several different phones

20   with this number.  But I did, yeah, of course.  I mean,

21   that's why you got it.

22         Q.   No, Mr. Jones.  That's not why I have it.

23         A.   My lawyer sent it to you, but I'm hiding it.

24   Okay.

25              THE COURT:  Mr. Jones, please just answer

1     questions.   There's no question.

2                    Mr. Bankston, also only ask questions.

3                    MR. BANKSTON:   Sure.

4     BY MR. BANKSTON:

5          Q.   Mr. Jones, in discovery you were asked, do

6     you have Sandy Hook text messages on your phone, and you

7     said no.   Correct?   You said that under oath, Mr. Jones,

8     didn't you?

9          A.   I mean, if I was mistaken, I was mistaken.

10    But you got the messages right there.

11         Q.   You know what perjury is; right?   I just

12    want to make sure you know before we go any further.

13    You know what it is?

14         A.   Yes, I do.   I'm not a tech guy.   I told you

15    I gave, in testimony, the phone to the lawyers or

16    whatever.   So, you got my phone, but we didn't give it

17    to you.

18         Q.   No, Mr. Jones, one more time, and please

19    remember if you need to assert the Fifth Amendment you

20    can, I need you to know that you can do that, but you

21    testified under oath previously that you personally

22    searched your phone for the phrase "Sandy Hook" and

23    there were no messages.   You said that under oath.

24         A.   Yes.

25         Q.   You lied when you said it?

 1          A.    No, I did not lie.

 2          Q.    Emails, you testified yesterday you don't

 3   have -- you got rid of your email ten years ago?

 4          A.    InfoWars email.

 5          Q.    Oh, so now it's InfoWars.  You do use email,

 6   though, don't you?

 7          A.    Not -- not -- it's like household stuff and

 8   things like that.

 9          Q.    Ah.  So, it's --

10          A.    I don't personally send emails.  My

11   assistant does.  And it's for like, you know, broken

12   sprinklers or whatever.

13          Q.    Okay.  So you don't have emails about Sandy

14   Hook.  You don't have emails about this case.

15          A.    You got hundreds of thousands of our emails.

16          Q.    None from you.  And I didn't get hundreds

17   and thousands of emails, most of those, in fact, you

18   would agree with me, nearly every email you produced to

19   me outside of maybe a hundred are emails of Wolfgang

20   Halbig and Jim Fetzer, because they sent you thousands

21   of emails; right?

22          A.    I mean, I quit opening email and using it

23   before Sandy Hook.

24          Q.    Okay.  So, in other words, if somebody was

25   to tell me, oh, I have emails from Mr. Jones that he

1  wrote about this case in the past couple of years, that

2  person would be lying?  You're telling the truth?

3      A.   Somebody else has got my InfoWars email,

4  because I haven't been using it.

5      Q.   Let's not qualify it, Mr. Jones.  You know

6  in this case you were asked to produce your emails, any

7  emails you had about Sandy Hook.  You know you were

8  asked to do that; right?

9      A.   Yeah.

10      Q.   And you said you didn't have any.

11      A.   I told my I.T. people.  You've got all that

12  stuff.

13      Q.   No, Mr. Jones, I'm saying in deposition,

14  under oath, sworn to God, you said you don't have any

15  emails for Sandy Hook because you don't use email;

16  right?

17      A.   I mean, I -- I think I have -- I mean, I

18  haven't been using InfoWars email, it's got to be a

19  decade or longer in my memory.  I don't -- with an

20  InfoWars.com email?

21      Q.   No, Mr. Jones, no.  That's not what I'm

22  asking.

23          You noticed when Mr. Watson emailed you,

24  right, he didn't have an InfoWars email address, does

25  he.  He has like PaulWatson@sky.com.  It's a U.K. email

1    address?

2        A.   Yes.

3        Q.   We asked for all emails.  And you told us

4    you don't use email and there are no emails for Sandy

5    Hook.  That's what you said under oath, isn't it.

6        A.   There might be, I'm sure there might be like

7    privileged emails where like lawyers requesting

8    documents or stuff about the case.

9        Q.   Mr. Jones.

10        A.   Yeah.

11        MR. BANKSTON:  First, objection.

12    Nonresponsive.

13        THE COURT:  Sustained.

14    BY MR. BANKSTON:

15        Q.   Did you testify under oath that you do not

16    use email and that there are no responsive emails

17    relating to this case.  Did you testify to that?

18        A.   Yes, I personally do not get on the internet

19    and sit there and use email.  I never send emails

20    myself.  Because I don't like it, I can't stand it,

21    there's just too many of them.  That's a fact, that I

22    don't use email.  I call people on the phone.

23        Q.   Okay.  Your Honor -- excuse me, Mr. Jones, I

24    would like show you this document.

25        Is that your email address?

```
 1         A.    Yes.
 2         Q.    Is that you writing an email?  Is that an
 3  email, Mr. Jones?
 4         A.    Yes.  Yes.
 5         Q.    Okay.  Thank you, Mr. Jones.  So --
 6         A.    I'm reading it.  This is from -- what's this
 7  have to do with Sandy Hook?
 8         Q.    I'm not asking you a question other than
 9  that's an email you sent.  Let's start there.  Can you
10  do that?  Can you say that's an email you sent?
11         A.    I must have dictated that to my assistant.
12         Q.    Uh-huh.
13               Okay.  So there are, would you agree
14  below, there are emails --
15               I'm done with that.
16               There are emails that you sent to your
17  lawyers, your staff and others concerning your business
18  operations that we requested for, Sandy Hook, other
19  topics that have been requested in this lawsuit, like
20  ZeroHedge?  You would agree, those emails, they exist.
21  Do you agree with that or not?
22         A.    I've dictated emails to people and you guys
23  have gone and gotten other people to give you their
24  email.  But that is my personal email that I use for
25  personal stuff, has nothing to do with Sandy Hook,
```

 1   unless lawyers have sent me emails there that my

 2   assistant prints off for me.

 3        Q.   You talked yesterday about pre-packaged

 4   food.  Do you remember that?  Do you know what I'm

 5   talking about?

 6        A.   No.

 7        Q.   You don't remember yesterday testifying

 8   about selling prepackaged food?

 9        A.   Oh, yes.

10        Q.   And you sell these, some of them come in

11   tubs that you could, for instance, like store for a long

12   time in case something horrible happens; right?

13        A.   Yes.

14        Q.   Okay.  And, in fact, you talk about that's

15   one of your big items, that's a big deal type thing on

16   InfoWars?

17        A.   Sure.

18        Q.   Okay.  And you also talked about how it's a

19   tough business in a lot of ways because you only have

20   about a 20 percent profit margin on the sale of food?

21        A.   Said about 20 to 40, yes.

22        Q.   So, for instance -- so, for every hundred

23   thousand dollars in sales of food, that means you're

24   profiting $20,000, maybe even up to $40,000?

25        A.   Yes.

1        Q.    Okay.  Show you another document, Mr. Jones.

2   This has been marked as Plaintiff's Exhibit 132.

3              Do you see that?

4        A.    Yes.

5        Q.    Those are text messages of Tim Fruge, the

6   operations manager of InfoWars; right?

7        A.    Yes.

8        Q.    And we requested information about your

9   revenues in this case.  Do you remember that?

10       A.    Yes.

11       Q.    Didn't give us this, did you?

12       A.    There was a lot of stuff.

13       Q.    Yeah, you didn't even look through your text

14   messages, Mr. Jones, you hid them; right?  Correct?

15       A.    No.

16       Q.    Okay.

17       A.    I gave it to the lawyers, that's why you

18   have it.

19       Q.    That's not why.

20       A.    I mean, that is ridiculous.

21             MR. BANKSTON:  Plaintiff's Exhibit 132.

22             THE COURT:  Are you moving to admit it?

23             MR. BANKSTON:  No -- yes, I'm sorry, could

24   we move to admit Exhibit 132 at this time?

25             THE COURT:  Any objection?

```
 1                    MR. REYNAL:  No.

 2                    THE COURT:  Plaintiff's 132 is admitted.

 3              (Plaintiff's Exhibit 132 admitted.)

 4   BY MR. BANKSTON:

 5         Q.   Before we put that up, Mr. Jones, I just

 6   want to make sure you understand something about these

 7   emails.  You understand that when your attorney sent me

 8   your whole phone he didn't mean to do that.  Do you

 9   understand that?

10                    MR. REYNAL:  Objection, Your Honor.

11                    MR. BANKSTON:  I just want to make sure.

12   This is not discovery.

13                    THE COURT:  Well, I do think it's

14   important that, since we're discussing all of this, that

15   the jury understands discovery is a process that occurs

16   and concludes well before trial.  What the lawyers say

17   isn't evidence, so we don't know if it was on accident

18   or on purpose, because we don't have evidence about

19   that.  But what we do know is that it wasn't properly

20   turned over when it should have been.

21                    There's no question, Mr. Jones.

22                    So, you need to ask a question that does

23   not call for speculation.  And even if Mr. Jones does

24   know, he would have gotten that information from

25   Mr. Reynal, his attorney, and so it would be protected,
```

1    most likely.

2                        MR. BANKSTON:  Most likely.

3    BY MR. BANKSTON:

4        Q.    Mr. Jones, you know what Bates numbers are,

5    right?  We've talked about --

6        A.    I believe that's these?

7        Q.    No, that's -- you're talking about an

8    exhibit sticker.

9        A.    Okay.

10       Q.    Yeah.  You remember we've talked in

11   deposition before that there were Bates numbers on the

12   bottoms of documents that your company produces for this

13   lawsuit and they start with FSSTX and they have a long

14   number after that.

15       A.    Okay.

16       Q.    No Bates number on this, is there?

17       A.    But it was -- I gave it to the lawyers, like

18   I told you at the start of this testimony.

19                       MR. BANKSTON:  Objection.

20                       THE COURT:  Mr. Jones, Mr. Jones, I know

21   it's hard but I know you can do it.

22                       THE WITNESS:  All right.

23                       THE COURT:  The question, there's no Bates

24   number on this document.

25                       THE WITNESS:  No, there's not.

```
 1                THE COURT:  Thank you.
 2                And please don't interrupt me or the
 3   lawyers.
 4   BY MR. BANKSTON:
 5        Q.   Let's display 132.  Let's go to the last two
 6   messages.  Can you pull those up?
 7                Mr. Fruge -- Fru-JAY?  Frooj?  How do I
 8   say his name, Mr. Jones?
 9        A.   Fru-JAY.
10        Q.   All right.  So, Mr. Fruge, would you agree
11   with me that pretty much every day he sent you an update
12   on how much the store has sold and sometimes he tells
13   you how much profit you have made; right?
14        A.   Yes.
15        Q.   And in this message he says 110 gross sales
16   in food equates to almost 70K pure profit.  That's what
17   he told you.
18        A.   That's what that says and that's not what it
19   does.  So, I have a question about it, so.
20        Q.   Okay.  Can we go up to the, hey, Mr. Jones,
21   did you respond with a question?
22        A.   I don't know.
23        Q.   I don't know, either.
24                Let's pull up the big box.  Yeah, that
25   one.
```

 1            This shows some of the totals per day;

 2   right?

 3            Is that right?

 4       A.   Yes.

 5       Q.   Okay.  And so, this is something Mr. Fruge

 6   would send you from time to time; right?

 7       A.   Yes.

 8       Q.   Okay.  All right.  You can take that down,

 9   Malisa.

10            I think it's clear, would you agree with

11   me, to everyone in this courtroom that the statement

12   that you only get 20 percent or 40 percent profit margin

13   on food was not true?

14       A.   No, I can bring those numbers in here and

15   show that you.

16       Q.   Well, I asked you for those numbers, I asked

17   you for those numbers and I didn't get them and instead

18   now I have this text message that says something totally

19   different.

20            Do you think in those circumstances anyone

21   should believe a word you say?

22       A.   I'm confused by that, because that's --

23   that's not the margin on them.  I wish that was the

24   margin.

25       Q.   I'm going to show you what's marked

1  Plaintiff's 134.  It's more messages with Mr. Fruge,

2  isn't it.

3         A.   Yeah, these were our best sale numbers ever.

4  I remember this.  It was during CPAC.

5              MR. BANKSTON:  I would like to move 134

6  into evidence at this time.

7              THE COURT:  Any objection?

8              MR. REYNAL:  I don't see the relevance,

9  Your Honor, frankly, processing numbers in 2020?

10             MR. BANKSTON:  I will make that connection

11  very quickly.  If you would like to see it I would like

12  to discuss it.

13             THE COURT:  So, the only objection is

14  relevance.  Mr. Jones has recognized it, so I will

15  overrule the objection and admit Plaintiffs Exhibit 134.

16             *(Plaintiff's Exhibit 134 admitted.)*

17  BY MR. BANKSTON:

18        Q.   One of the things that I think we've heard a

19  lot of in this courtroom is how you've lost millions,

20  lost everything.  And the de-platforming, all of it has

21  caused you to lose everything.  Right?  We've heard

22  that?

23        A.   Not everything.

24        Q.   Indeed.

25             Can we bring up this bubble Malisa?

1          Now, we've seen some revenue numbers, you

2     remember that in Plaintiff's Exhibit 35 that you

3     testified about?  Do you remember that?

4          A.   Yes.

5          Q.   Okay.  And this is those revenue figures.

6     Would you agree with me that generally, generally

7     speaking, between 2016 and 2018 InfoWars was making

8     somewhere between a hundred and $2,000 a day in sales,

9     do you agree with that?

10         A.   Yes.

11         Q.   And we see here that that's not always true,

12    is it, that some days you're making 800,000, $745,000 a

13    day; right?

14         A.   Yeah, you guys cherry picked the best

15    numbers we ever had.  That's why I remember this.

16         Q.   All right, Mr. Jones, so, what I'm saying

17    is, well after your de-platforming, your numbers kept

18    getting better.  You kept having better days.

19         A.   No, no, it's de-platforming, it's gone down.

20    This was -- this was CPAC, because I remember these

21    numbers.

22         Q.   Sure.

23              But, you know, the problem is, Mr. Jones,

24    I have the very limited years of revenue that you

25    provided but I don't have anything else, do I, from you.

1  On that.  Not until this; right?

2      A.   You guys have been given the gross numbers.

3  They're accurate.

4      Q.   Okay, Mr. Jones.  $800,000 a day, if you cut

5  that pace up, which I don't know what you did the rest

6  of the year because I don't have it.

7      A.   Well, that's one day out of here.

8      Q.   I'm asking you, Mr. Jones, to please let me

9  finish my question.  Can you do that for me?

10         You need to respond verbally so she

11  understands.

12      A.   Yes.

13      Q.   She has to type it down.

14         Thank you, Mr. Jones.

15         If you're able to keep up that pace for

16  the rest of that year, you're able to launch more of

17  these specials and sales and you can keep going at

18  $800,000 a day.  That would come out to an average of

19  something like 300 million in a year.  That's about

20  right?

21      A.   Gross, yes.

22      Q.   Okay.  300 million.

23         And then I think we saw your revenues from

24  20 -- so, we saw a few months of 2015 on the beginning

25  of that document; right?  Do you remember that document

 1  you relied on and testified about, Plaintiff's

 2  Exhibit 35?

 3       A.   I mean, I saw it, yes.

 4       Q.   Okay.  Now, add a couple of months from 2015

 5  on it but not a whole lot of sales on that; right?

 6       A.   I believe so.

 7       Q.   So, we're mainly just talking about 2016,

 8  2018, right?  You remember that.  165 million.  Do you

 9  remember testifying to that?

10       A.   Yes.

11       Q.   Okay.  And I know you testified about your

12  profit margins, but I think we've seen that now, that

13  you are saying that that's gross, so that maybe

14  doesn't -- you would have to calculate what your profit

15  is.  Right?

16       A.   Uh-huh.

17       Q.   Okay.  But after seeing --

18            THE COURT:  I'm sorry, I need a "yes" or

19  "no."

20            THE WITNESS:  Yes.

21            THE COURT:  Thank you.

22  BY MR. BANKSTON:

23       Q.   But after seeing all of that, all of those

24  millions and millions.  And millions.  Hundreds of

25  millions.  Are you aware that your attorney has argued

1  this (indicating), this is what you should pay for the

2  damages that your company admits under oath, through

3  your corporate representative, it cost.  Are you aware

4  of that?  A dollar.  Are you aware?

5       A.   Yes, I know we were --

6       Q.   Do you agree with that?

7       A.   Do I agree with it?

8       Q.   A dollar.  Is that -- Are we done?  I'll pay

9  it for you.  Are we done?

10       A.   What does the *New York Times* do about lying

11  about WMDs?

12            MR. BANKSTON:  I don't think there's any

13  point in asking you any more questions, Mr. Jones.

14            THE WITNESS:  Okay.

15            THE COURT:  All right.  Mr. Reynal.

16            MR. REYNAL:  May I approach, Your Honor?

17            THE COURT:  Me?

18            MR. REYNAL:  Briefly.

19            THE COURT:  Yes.  Wait.

20            *(Whereupon a discussion was held at the*

21  *bench off the record.)*

22                 REDIRECT EXAMINATION

23  BY MR. REYNAL:

24       Q.   Mr. Jones, you have trusted your lawyers to

25  produce the relevant documents.

```
 1          A.    Yes.

 2          Q.    You cooperated with us in every way?

 3          A.    Yes.

 4          Q.    And you've trusted us to do a good job and

 5   turn over what we need to turn over?

 6          A.    Yes.

 7          Q.    When we're supposed to turn it over?

 8          A.    Yes.

 9                MR. REYNAL:  No further questions.

10                THE COURT:  Anything else, Mr. Bankston?

11                MR. BANKSTON:  No, I think we're done with

12   Mr. Jones.

13                THE COURT:  All right.  Well, at this time

14   I'm going to send my jury back.  You know the drill by

15   now.  If you have questions for Mr. Jones, and only if,

16   this is an opportunity, not a requirement, you may each

17   individually write them down.

18                I would like to go ahead and finish this

19   before lunch, so go ahead and do those questions, any

20   questions you have, right at the beginning of the break.

21   Remember all of my instructions, there can be no

22   conversation between you about anything that has

23   happened so far.

24                All right.  You may be excused.

25                     (Brief recess.)
```

1              *(The following proceedings were held in open*
2    *court outside the presence of the jury.)*
3                   THE COURT:  All right, on the record.
4                   We've gone over the questions submitted by
5    the jury, we've eliminated some and I've -- I will be
6    reading some.
7                   Any objection to those I will be reading,
8    Mr. Bankston?
9                   MR. BANKSTON:  None from the plaintiffs,
10   Your Honor.
11                  THE COURT:   Mr. Reynal, same questions.
12                  MR. REYNAL:  None from the defense.
13                  THE COURT:  All right.  Let's bring the
14   jury in so we can all go to lunch.  And the witness.
15                  If you'll call in Mr. Jones, please,
16   deputy.  Thank you.
17                   *(Jury enters courtroom)*
18                  THE COURT:  All right, you may be seated.
19                  All right, Mr. Jones, what happens now is
20   a little different.  I'm going to read some questions to
21   you, and you answer them.
22                  THE WITNESS:  Okay.
23                  THE COURT:  You need to answer the
24   question exactly as it's presented, nothing extra.  If
25   you don't understand it, you tell me that.  Okay?

1          THE WITNESS:  Okay.

2                    EXAMINATION

3          THE COURT:  There is a theory called "mass

4   shooting contagion" that causes the effect media has on

5   inspiring future mass tragedy events from coverage of

6   previous events.  Are the media that report on these

7   events accountable for any damage that occur from their

8   reporting?

9          THE WITNESS:  The studies do show that

10  hyping up shootings causes more shootings, and talking

11  about the shooters does that.  And I think that all the

12  media contributes to copycats.  But they have a First

13  Amendment right and it's just part of the world we live

14  in.

15         THE COURT:  So, I want to just ask you to

16  answer the question.  Are the media that report on these

17  events accountable for any damages that occur from their

18  reporting?

19         THE WITNESS:  No.

20         THE COURT:  Okay.  If no, why doesn't Free

21  Speech Systems capitalize on the opportunity to act

22  better than the, quote, mainstream media, end quote, by

23  not asserting information recklessly in their reporting

24  and why does it not attempt to minimize harm from their

25  reporting.

 1                 THE WITNESS:  I agree.  I've probably

 2    learned a lot more about mass shootings now and that's

 3    why we have one-one hundredth the coverage of Uvalde we

 4    would normally have.  And I think that was even too

 5    much.  But you've got to still report something

 6    happened, but statistically, it's terrible what happens,

 7    but it's very small compared to, say, automobile

 8    accidents.  So, I mean, I think we should report on what

 9    the big death numbers are, like famine worldwide, 65

10    million plus have died the last year.

11                 THE COURT:  All right, thank you,

12    Mr. Jones.

13                 Why do you think Sandy Hook was a

14    conspiracy?

15                 THE WITNESS:  Because I had seen so many

16    other things in history that were declassified that had

17    been staged or completely made up that, when you're a

18    hammer, everything starts looking like a nail.

19                 And I saw really powerful forces

20    politicize it and blame gun owners, and so I guess at a

21    subconscious level I felt offended, and I knew I was

22    innocent and that I hadn't done what Adam Lanza did, and

23    so I think we subconsciously didn't want to believe it

24    because it was being blamed collectively on gun owners.

25    And that's in retrospect, years later, when I realized

1    that I did use to go overboard and believe everything

2    was staged, or almost everything.  And so it's

3    definitely been a learning process in dealing with that.

4              But that's -- I mean, that's why I thought

5    it was staged, there were people out there that brought

6    up things that sounded credible and I had seen so much

7    stuff that was, you know, seen so much stuff that --

8              THE COURT:  All right, thank you.  You're

9    just going back over.

10             THE WITNESS:  Yes.

11             THE COURT:  Are you going to change the

12   way you present your news and comments on your show

13   based on what is happening today?

14             THE WITNESS:  Yes, I'm going to do my

15   best, because I've never been like the corporate media

16   that lies on purpose, but we've definitely made big

17   mistakes and it's been terrible for everybody involved,

18   including myself.  So I really do want to try to change

19   things and hopefully be a more positive force when it

20   comes to issues like mass shootings.

21             THE COURT:  Your employees have

22   appreciated your ability to tell the truth and how you

23   allow them to express their own creativity and

24   individual personalities.  In light of their obvious

25   loyalty, would you take personal responsibility for

1    their actions and decisions while at work for Free

2    Speech Systems and InfoWars?

3                    THE WITNESS:  I mean, I think the other

4    day -- I mean, I do.  I am responsible for what they do.

5                    THE COURT:  Thank you.

6                    If you are genuinely sorry and regretful

7    about how your words caused harm to grieving parents,

8    how do you plan to show, rather than just tell, that you

9    are sorry?  Would you, for instance, join and promote

10   Ms. Lewis's Choose Love movement to help make our world

11   a better place for our children?

12                   THE WITNESS:  Absolutely.  Regardless of

13   how it goes, I would invite her on the show in person

14   next week, I would invite her, and Neil I think is a

15   great person, I apologize to -- legitimately, I would

16   love to invite you guys on the show regardless so you

17   can actually meet the people, come on, and I think it

18   will be huge for everybody to see that.  And I want

19   that -- I'm more concerned about that than I am even

20   monetary stuff.  Because I do not want to be the Sandy

21   Hook guy and I want to show the world that what's been

22   misrepresented is not who I am but that I have done some

23   things that are wrong and I didn't do it on purpose and

24   I apologize and I want to make it better.  Because --

25                   THE COURT:  Okay.  Going forward, would

1  you consider providing better training to your employees

2  about how to be sensitive to individuals involved in a

3  tragic event while still taking a stance on government

4  or globalist agendas?

5            THE WITNESS:  Yes.  Absolutely.  And we've

6  been trying to do that.  And I was planning to shut down

7  InfoWars six years ago, when I got married I promised my

8  wife, I love the crew, I'm sick of this, and then I got

9  stuck in this fight with the system and everything else

10  that's going on and --

11            THE COURT:  Okay.

12            THE WITNESS:  Now I'm going to continue

13  InfoWars to make it even better and because other people

14  said they want to use this case to shut me down.

15            THE COURT:  All right.  Again, don't tell

16  us anything that anyone else has said.

17            THE WITNESS:  I understand.

18            THE COURT:  That is hearsay, disregard any

19  hearsay.

20            And I want you just to really just answer

21  the question.

22            THE WITNESS:  Yes.

23            THE COURT:  Nothing else.

24            As a person worried about and questioning

25  the authenticity of clipped videos, how much precaution

1  do you plan to take with the clipped videos presented on

2  your own show?

3             THE WITNESS:  We take way more precaution

4  now than even mainstream media, because our listeners

5  get mad that we put something out that's fake.  And it

6  has been a long time since we did that and we did do one

7  three weeks ago, and I rarely smash stuff but I did

8  smash up my office and because it pissed me off so bad

9  that we aired a, what do you call those, deep faith

10  video.

11            They're so good now that I just -- I

12  declare, I've developed an allergy to this stuff, like I

13  don't want to be wrong and I don't want to try to lie

14  like the corporate media does on purpose.  And we did

15  air one about the CEO of Pfizer, who does enough bad

16  stuff on his own without us putting it -- we didn't do

17  it.  It looked so good on Twitter that we put a fake

18  video out.

19            THE COURT:  All right.  Thank you.

20            The defense has testified InfoWars

21  mentioned Sandy Hook less than half a percent of the

22  time.  Is it your stance that there should be no

23  punishment for breaking the law as long as it is done

24  only on rare occasions?

25            THE WITNESS:  Could you read this again,

1    please?

2                    THE COURT:  Yes, I can.

3                    The defense has testified InfoWars

4    mentioned Sandy Hook less than half a percent of the

5    time.  Is it your stance that there should be no

6    punishment for breaking the law as long as it's done

7    only on rare occasions?

8                    THE WITNESS:  Well, this is civil, but

9    there is law of right and wrong, and we have paid a

10   massive price for the mistakes we made.

11                   THE COURT:  Okay, Mr. Jones --

12                   THE WITNESS:  Yes, read again, please.

13                   THE COURT:  Is it your stance that there

14   should be no punishment for breaking the law as long as

15   it's done only on rare occasions?  "Yes" or "no."

16                   THE WITNESS:  That's -- it's not -- no, I

17   don't think, even the people do stuff on accident, I

18   think they're still somewhat culpability.  But I did not

19   do this consciously --

20                   THE COURT:  No, Mr. Jones.

21                   THE WITNESS:  All right.

22                   THE COURT:  That's not the question.

23                   What is your definition of blue collar?

24                   THE WITNESS:  I'm talking about people,

25   who I think are great, who are working so hard that they

1   don't have time to be involved in the weird esoteric

2   bubbles of the liberals or the conservatives or anybody.

3   I can't even keep track of what the liberals are doing

4   or the conservatives, the libertarians, or the

5   transhumanists.

6                   THE COURT:  So, your definition of blue

7   collar is people who work so hard they can't follow all

8   these things you're saying?  What is your definition of

9   blue collar.

10                  THE WITNESS:  My definition of blue collar

11  is the working man and woman who keep their head down

12  and keep the whole world running and, in my experience,

13  generally are not even paying attention to politics.

14                  THE COURT:  Where did you get the idea the

15  jury are all blue collar?

16                  THE WITNESS:  I mean, I've seen

17  statistically, I read in news articles in Austin that a

18  lot of times it's --

19                  THE COURT:  Okay, don't tell us what

20  you've read, remember.

21                  THE WITNESS:  Well, where did I hear?

22  What did I think?

23                  THE COURT:  Yeah, it's a bad question,

24  where did you get the idea.  Because if the place you

25  got the idea is from someone else, then you can't tell

1  us that.  So it's a tricky question for me to ask you.

2  I'll agree with that.

3           Okay.  What compensation would you believe

4  to be appropriate?

5           THE WITNESS:  What compensation do I think

6  is appropriate.  Despite these numbers that were

7  presented, the best week we had ever, that's when COVID

8  was starting and there was a run on storable food

9  nationwide, and so they --

10          THE COURT:  Mr. Jones.

11          THE WITNESS:  I'm just saying.

12          THE COURT:  We don't do speaking

13  conversation.

14          What compensation would you believe to be

15  appropriate.  It doesn't really matter about that,

16  it's --

17          THE WITNESS:  I understand, but I can

18  answer the question, however, I wish I'm not barred

19  about talking about where we're at financially.

20          THE COURT:  No, you are at this stage.

21  Right now the question is what compensation would be

22  appropriate.

23          THE WITNESS:  Any compensation above

24  $2 million will sink us and --

25          THE COURT:  No, no.

1          THE WITNESS:  -- we will be shut down.

2          THE COURT:  No, appropriate not to you,

3    appropriate for what happened to them.

4          THE WITNESS:  I mean, I think it's

5    appropriate for whatever -- whatever you decide you want

6    to do, because I'm really --

7          THE COURT:  That's a great answer.  Thank

8    you.

9          Have you ever made the distinction while

10   live on air to your viewers that you are speaking as a

11   pundit and not as a journalist?

12         THE WITNESS:  Thousands and thousands of

13   times:  But this is my opinion, you should research what

14   I'm saying, all this stuff we're covering is other

15   people's opinions, you should look into this.  When I'm

16   really sure about something I'll be definitive about

17   something, and I'm usually right.  We constantly, this

18   is talk radio on TV, we constantly explain these are

19   people's opinions, these are debates, these are ideas.

20   In fact, I used to play an intro that said, the views

21   expressed here aren't necessarily those of the host, the

22   guest, the callers, or the station.

23         THE COURT:  All right.

24         THE WITNESS:  Standard thing.

25         THE COURT:   Are you aware that this jury

1  consists of 16 intelligent, fair-minded citizens who are

2  not being improperly influenced in any way?

3              THE WITNESS:  Yes, I don't think that you

4  are operatives, I don't think that you are part of a

5  false flag.  I don't think that you are bad people, I

6  think you're good people, and I just am very, very

7  critical about the whole process that I've been through

8  so far where I've given I believe everything over and

9  then I'm always told we didn't, even though we're seeing

10 it.  And so that's why I'm really concerned about --

11             THE COURT:  Mr. Jones.

12             THE WITNESS:  -- a lot has been

13 misrepresented.

14             THE COURT:  You've wandered off the

15 question.

16             THE WITNESS:  Okay.

17             THE COURT:  Do you feel you're getting a

18 fair trial?  And if not, why not?

19             THE WITNESS:  I'm barred from saying --

20             THE COURT:  Succinctly, please.

21             THE WITNESS:  I have been found guilty by

22 a judge, and I thought in America you're found guilty by

23 juries.

24             THE COURT:  All right.  There's no guilty

25 or innocence in civil court.

1          THE WITNESS:  I understand.

2          THE COURT:  Liable or not.  Not guilty.

3   So, please don't use the -- and you're not a lawyer,

4   that's fine.

5          THE WITNESS:  Okay.  Well, I'm -- I've

6   been found liable, okay, by a judge, and in all the

7   other cases coming up I've already been found.  So, this

8   is a dangerous new system they're setting up, and if

9   people want to get rid of that and get rid of America,

10  it's okay, I understand, we're an old republic, may be

11  time for us to go.  Okay.

12         THE COURT:  How many employees does

13  InfoWars have currently?

14         THE WITNESS:  We've got about 80 workers

15  and contractors and -- about 80.

16         THE COURT:  What was the annual revenue of

17  InfoWars in the most recent fiscal year?

18         THE WITNESS:  I don't have that number in

19  front of me, but it was, I would imagine, 60, 70

20  million.  Those have been our biggest years, 60 or 70

21  million gross.  And so it would be -- the question is

22  how much money am I making?

23         THE COURT:  No, the question is what was

24  the annual revenue of InfoWars in the most recent fiscal

25  year, but I think you said you don't know.

1          Do you know or not?

2          THE WITNESS:  I -- it is like $70 million,

3   right around there.

4          THE COURT:  What are some specific changes

5   you've made to your business processes to increase

6   oversight and accountability at InfoWars.

7          THE WITNESS:  I mean, I think I've

8   explained to people we're not just some little internet

9   show, and I'm telling myself this when I'm telling them

10  that, that you need to really pay attention to what

11  you're doing, because everything you say is going to get

12  looked at and zoomed in on.  And even if you didn't mean

13  it for harm, it can get turned around for harm.

14          It's like the "Spiderman" thing, with

15  great power comes great responsibility.  And I

16  definitely have underestimated how powerful InfoWars

17  was, because I'm always thinking of myself as small and,

18  you know, and then I've only realized the last four or

19  five years how big we were.

20          THE COURT:  Thank you, Mr. Jones.  I

21  appreciate your time and testimony.  You may return to

22  counsel table.

23          THE WITNESS:  Thank you.

24          THE COURT:  All right, Mr. Reynal do you

25  have another witness for us?

1          MR. REYNAL:  I do not, Your Honor.

2          THE COURT:  So defense rests.

3          MR. REYNAL:  Yes, Your Honor.

4          THE COURT:  Plaintiffs rest and close.

5          MR. BANKSTON:  Correct, Your Honor.

6          THE COURT:  Defense rests and close.

7          MR. REYNAL:  Yes, Your Honor.

8          THE COURT:  All right.  Ladies and

9  Gentlemen of the Jury, that concludes the evidence in

10  this case.

11          It is now necessary for the attorneys and

12  myself to spend some time preparing the charge for

13  submission to you.  I'm not able to know in advance

14  exactly how long it will take, it generally takes longer

15  than we think.  We have been working on it in the

16  evenings and on breaks, but we do still have more work

17  to do.  It's 12:30, I'm going to try to get it done over

18  lunch.

19          Your lunch is waiting for you, so I'm not

20  going to give you an end time.  We will try to be back

21  in an hour, hour and a half, so don't wait to eat.  But

22  you're going to be in recess until now, until I bring

23  you back.

24          Please remember, the evidence is concluded

25  but you have not yet been sent to deliberate.  This

1   means you may not yet discuss the case.  And as always,

2   you still may not do any research into anything about

3   the case.  So, go and enjoy your lunch and we'll see you

4   as soon as we can.  Thank you.

5                    *(Whereupon the jurors exit the courtroom*

6   *and the following proceedings were held in open court)*

7                    Okay, we've just had one of our informal

8   charge conferences and there are some words in the

9   version you have, Version 3, which are italicized and we

10  are going to remove the italics and put those in normal

11  font.  And then that will be the final version.  Other

12  than that, there are no other edits to be made.

13                   Do you accept this charge of the Court to

14  be proper, Mr. Bankston?

15                   MR. BANKSTON:  Yes, the plaintiffs do.

16                   THE COURT:  Mr. Reynal.

17                   MR. REYNAL:  Yes, Your Honor.

18                   THE COURT:  Wonderful.  We can go off the

19  record.

20                   *(Discussion between court and counsel off the*

21  *record.)*

22                   THE COURT:  Yes, on the record,

23  Mr. Reynal.

24                   MR. REYNAL:  I wanted to renew my motion

25  for directed verdict.

1          THE COURT:  Okay, that's -- that is still

2    denied.

3          Okay.  We can go back off the record.

4              *(Noon recess.)*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      WEDNESDAY, AUGUST 3, 2022 - AFTERNOON SESSION

2              *(The following proceedings were held in open*

3      *Court in the presence of the jury)*

4              THE COURT:  All right, you may be seated.

5              Okay.  Welcome back, everybody.

6              Ladies and Gentlemen of the Jury, at this

7      time I will present to you the Charge of the Court.

8      Copies of the charge have been made for each of you, and

9      you may read along with me if you wish.  However, during

10     the arguments of counsel, do not read or refer to it

11     unless specifically requested to do so by counsel.  It

12     can be read to you again later by the presiding juror,

13     and you may refer to it during your deliberations.  So

14     this is not the last time you will hear it.

15              Also, after I read the charge, under the

16     rules the attorneys are permitted to present to the jury

17     their summation of the evidence in light of this charge.

18     Under the rules, the attorney for the plaintiff is

19     permitted to proceed first, then the attorney for the

20     defendant, and then the attorney for the plaintiff is

21     permitted to close.

22              The attorneys have a specified maximum

23     time to argue and have asked me to give a few minutes'

24     warning before their portion of the argument is

25     finished.  So, if I say, for example, "ten minutes" or

1    "five minutes," I am not scolding the attorneys, I'm

2    just letting the attorneys know where they are in their

3    argument.

4               Counsel, I'll ask that you let me know

5    you've heard me so I don't have to interrupt you more

6    than once.

7               We will very likely take a break in the

8    middle of the arguments, maybe even two short ones.  All

9    right.

10              Members of the Jury:  After the closing

11   arguments, you will go to the jury room to decide the

12   case, answer the questions that are attached, and reach

13   a verdict.  You may discuss the case with other jurors

14   only when you are all together in the jury room.

15              Remember my previous instructions:  Do not

16   discuss the case with anyone else, either in person or

17   by any other means.  Do not do any independent

18   research -- excuse me, independent investigation about

19   the case or conduct any research.  Do not look up any

20   words in dictionaries or on the internet.  Do not post

21   information about the case on the internet.  Do not

22   share any special knowledge or experiences with the

23   other jurors.  Do not use your phone or any other

24   electronic device during your deliberations for any

25   reason.  In the case of an emergency, others may contact

1    you through my Judicial Executive Assistant at the

2    number previously provided.

3              Any notes you have taken are for your own

4    personal use.  You may take your notes back into the

5    jury room and consult them during deliberations, but do

6    not show or read your notes to your fellow jurors during

7    your deliberations.  Your notes are not evidence.  Each

8    of you should rely on your independent recollection of

9    the evidence and not be influenced by the fact that

10   another juror has or has not taken notes.

11             You must leave your notes with the

12   Judicial Executive Assistant when you leave the

13   courthouse.  We will make sure your notes are kept in a

14   safe, secure location and not disclosed to anyone.

15   After you complete your deliberations, we will collect

16   your notes; and when you are released from jury duty we

17   will promptly destroy your notes so that nobody can read

18   what you wrote.

19             Alternate jurors serve a valuable purpose.

20   Without them, much time and money would be spent in the

21   re-trial of cases.  They're not in here, but I want to

22   thank my alternate jurors in this case.  They have been

23   released from their oath, and they are free to go about

24   their business, including observing the remainder of the

25   trial if they would like to do so.  And I already

1    explained that to them.

2            Here are the instructions for answering

3    the questions:

4            1.  Do not let bias, prejudice, or

5    sympathy play any part in your decision.  Everyone,

6    including me, has feelings, assumptions, perceptions,

7    fears, and stereotypes that we may not be aware of but

8    that can affect what we see and hear, how we remember

9    what we see and hear, and how we make decisions.

10   Because you are making important decisions as jurors in

11   this case, you must evaluate the evidence carefully, and

12   you must not jump to conclusions based on personal likes

13   and dislikes, generalizations, gut feelings, prejudices,

14   sympathies, stereotypes, or biases.  Techniques to

15   identify and check one's implicit biases include slowing

16   down and examining your thought processes thoroughly to

17   identify where you may be relying on reflexive, gut

18   reactions or making assumptions that have no basis in

19   the evidence; asking yourself whether you would view the

20   evidence differently if the players were reversed or

21   other types of people were involved; and listening

22   carefully to the opinions of your fellow jurors, each of

23   whom brings a different, valid perspective to the table.

24   Our system of justice is counting on you to render a

25   just verdict based on the evidence, not on biases.

1              2.   Base your answers only on the evidence

2  admitted in Court and on the law that is in these

3  instructions and questions.  Do not consider or discuss

4  any evidence that was not admitted in the courtroom.

5              3.   You are to make up your own minds

6  about the facts.  You are the sole judges of the

7  credibility of the witnesses and the weight to give

8  their testimony.  But on matters of law, you must follow

9  my instructions.

10             4.   If my instructions use a word in a way

11 that is different from its ordinary meaning, use the

12 meaning I give you, which will be a proper legal

13 definition.

14             5.   All the questions and answers are

15 important.  No one should say that any question or

16 answer is not important.

17             6.   Answer "yes" or "no" to all questions

18 unless you are your told otherwise.  A "yes" answer must

19 be based on a preponderance of the evidence unless you

20 are told otherwise.  Whenever a question requires an

21 answer other than "yes" or "no," your answer must be

22 based on a preponderance of the evidence unless you are

23 told otherwise.

24             The term "preponderance of the evidence"

25 means the greater weight of credible evidence presented

1    in this case.  If you do not find that a preponderance

2    of the evidence supports a "yes" answer, then answer

3    "no."  A preponderance of the evidence is not measured

4    by the number of witnesses or by the number of documents

5    admitted in evidence.  For a fact to be proved by a

6    preponderance of the evidence, you must find that the

7    fact is more likely true than not true.

8              7.  Do not decide who you think should win

9    before you answer the questions and then just answer the

10   questions to match your decision.  Answer each question

11   carefully, without considering who will win.  Do not

12   discuss or consider the effect your answers will have.

13             8.  Do not answer questions by drawing

14   straws or by any method of chance.

15             9.  Do not trade your answers.  For

16   example, do not say, "I will answer this question your

17   way if you answer another question my way."

18             10.  The answers to the questions must be

19   based on the decision of at least ten of the twelve

20   jurors.  The same ten jurors must agree on every answer.

21   Do not agree to be bound by a vote of anything less than

22   ten jurors, even if it would be a majority.

23             11.  A fact may be established by direct

24   evidence or by circumstantial evidence or both.  A fact

25   is established by direct evidence when proved by

1   documentary evidence or by witnesses who saw the act

2   done or heard the words spoken.  A fact is established

3   by circumstantial evidence when it may be fairly and

4   reasonably inferred from other facts proved.

5               12.  You are the sole judges of the

6   credibility or believability of each witness and the

7   weight to be given to his or her testimony.  In weighing

8   the testimony of a witness, you should consider their

9   relationship to the party; their interest, if any, in

10  the outcome of the case; their demeanor or manner of

11  testifying; their opportunity to observe or acquire

12  knowledge concerning the facts about which they have

13  testified; their candor, fairness and intelligence; and

14  the extent to which they have been supported or

15  contradicted by other credible evidence.  You may, in

16  short, except or reject the testimony of any witness in

17  full or in part.

18               As I have said before, if you do not

19  follow these instructions you will be guilty of juror

20  misconduct and I might have to order a new trial and

21  start this process over again.  This would waste your

22  time and the parties's money and it would require the

23  taxpayers of this county to pay for another trial.  If a

24  juror breaks any of these rules, tell that person to

25  stop and report to to me immediately.

1          Cause of action number 1.  Defamation

2   committed against Neil Heslin.

3          You are instructed that Defendants Alex

4   Jones and Free Speech Systems, LLC committed defamation

5   against Neil Heslin.  You are further instructed that

6   Defendants Alex Jones and Free Speech Systems, LLC

7   published statements that were false and defamatory

8   concerning Neil Heslin on June 26, 2017, and July 20th,

9   2017.

10         "Publish" means intentionally or

11  negligently to communicate the matter to a person other

12  than Neil Heslin who is capable of understanding its

13  meaning.

14         "False" means that a statement is not

15  literally true or not substantially true.  A statement

16  is not substantially true if, in the mind of the average

17  person, the gist of the statement is more damaging to

18  the person affected by it than the literally true

19  statement would have been.

20         "Defamatory" means an ordinary person

21  would interpret the statement in a way that tends to

22  injure a living person's reputation and thereby expose

23  the person to public hatred, contempt or ridicule or

24  financial injury or to impeach the person's honesty,

25  integrity, virtue, or reputation.

1       You are further instructed that Defendants
2  Alex Jones and Free Speech Systems, LLC knew or should
3  have known in the exercise of ordinary care that the
4  statements published on June 26, 2017, and July 20th,
5  2017, were false and had the potential to be defamatory.
6       "Ordinary care" concerning the truth of
7  the statement and its potential to be defamatory means
8  that degree of care that would be used by a person of
9  ordinary prudence under the same or similar
10 circumstances.
11      You are further instructed that at the
12 time that Defendants Alex Jones and Free Speech Systems,
13 LLC published the statements on June 26, 2017, and
14 July 20th, 2017, Defendants knew the statements were
15 false as it related to Neil Heslin or that Defendants
16 published the statements with a high degree of awareness
17 that they were probably false to an extent that
18 Defendants, in fact, had serious doubts as to the truth
19 of the statements.
20      Under Texas law, Defendants are
21 responsible for all damages proximately caused by their
22 actions which were reasonably foreseeable, including
23 damages, if any, caused by participating in this
24 litigation.
25      Question No. 1:

1            What sum of money, if paid now in cash,

2    would fairly and reasonably compensate Neil Heslin for

3    his damages, if any, that were proximately caused by

4    Defendant's defamatory publications on June 26, 2017,

5    and July 20th, 2017?

6            "Proximate cause" means a cause that was a

7    substantial factor in bringing about an injury and

8    without which cause such injury would not have occurred.

9    In order to be a proximate cause, the act or omission

10   complained of must be such that a person using ordinary

11   care would have foreseen that the injury, or some

12   similar injury, might reasonably result therefrom.

13   There may be more than one proximate cause of an injury.

14           "Mental anguish" means the emotional pain,

15   torment, and suffering experienced by Neil Heslin.

16           Do not include any amount for any

17   condition existing before the defamatory publications,

18   except to the extent, if any, that such other condition

19   was aggravated by any injuries that resulted from the

20   defamatory publications.

21           Consider the elements of damages listed

22   below and none other.  Consider each element separately.

23   Do not award any sum of money on any element if you have

24   otherwise, under some other element, awarded a sum of

25   money for the same loss.  That is, do not compensate

1 twice for the same loss, if any.  Do not include

2 interest on any amount of damages you find.

3     Answer separately in dollars and cents for

4 the damages listed below, if any.

5     A.  Injury to reputation that Neil Heslin

6 sustained in the past.  Answer.

7     And there is a spot for an answer.

8     Injury to reputation that, in reasonable

9 probability, Neil Heslin will sustain in the future.

10     Sorry, that was B.

11     And there's an answer.

12     C.  Mental anguish that Neil Heslin

13 sustained in the past.  Answer.

14     D.  Mental anguish that, in reasonable

15 probability, Neil Heslin will sustain in the future.

16 Answer.

17     Cause of action number 2.  Intentional

18 infliction of emotional distress committed against Neil

19 Heslin and Scarlett Lewis.

20     You are instructed that Defendants Alex

21 Jones and Free Speech Systems, LLC committed intentional

22 infliction of emotional distress against Neil Heslin and

23 Scarlett Lewis in a continuing course of conduct from

24 2013 to 2018.

25     "Intentional infliction of emotional

1  distress" means the defendant acts intentionally or

2  recklessly with extreme and outrageous conduct to cause

3  the plaintiff emotional distress, and the emotional

4  distress suffered by the plaintiff was severe.

5          "Extreme and outrageous conduct" means the

6  conduct has been so outrages in character, and so

7  extreme in degree, as to go beyond all possible bounds

8  of decency and to be regarded as atrocious and utterly

9  intolerable in a civilized community.

10          Under Texas law, Defendants are

11  responsible for all damages proximately caused by their

12  actions which were reasonably foreseeable, including

13  damages, if any, caused by participating in this

14  litigation.

15          Question number 2:  What sum of money, if

16  paid now in cash, would fairly and reasonably compensate

17  Neil Heslin for his damages, if any, that were

18  proximately caused by Defendant's intentional infliction

19  of emotional distress from 2013 to 2018?

20          "Proximate cause" means a cause that was a

21  substantial factor in bringing about an injury, and

22  without with cause such injury would not have occurred.

23  In order to be a proximate cause, the act or omission

24  complained of must be such that a person using ordinary

25  care would have foreseen that the injury, or some

 1   similar injury, might reasonably result therefrom.

 2   There may be more than one proximate cause of an injury.

 3                "Mental anguish" means the emotional pain,

 4   torment and suffering experienced by Neil Heslin.

 5                Do not include any amount for any

 6   condition existing before the extreme and outrageous

 7   conduct except to the extent, if any, that such other

 8   condition was aggravated by any injuries that resulted

 9   from the extreme and outrageous conduct.

10                Consider the elements of damages listed

11   below and none other.  Consider each element separately.

12   Do not award any sum of money on any element if you have

13   otherwise, under some other element, awarded a sum of

14   money for the same loss.  That is, do not compensate

15   twice for the same loss, if any.  Do not include

16   interest on any amount of damages you find.

17                Answer separately in dollars and cents for

18   each person for the damages listed below, if any.

19                A.  Mental anguish that Neil Heslin

20   sustained in the past.  And then Answer and there's a

21   line.

22                B.  Mental anguish that, in reasonable

23   probability, Neil Heslin will sustain in the future, and

24   there's an answer.

25                Question number 3.

1               What sum of money, if paid now in cash,

2     would fairly and reasonably compensate Scarlett Lewis

3     for her damages, if any, that were approximately caused

4     by Defendant's intentional infliction of emotional

5     distress from 2013 to 2018?

6               "Proximate cause" means a cause that was a

7     substantial factor in bringing about an injury, and

8     without which cause such injury not have occurred.  In

9     order to be a proximate cause, the act or omission

10    complained of must be such that a person using ordinary

11    care would have foreseen that the injury, or some

12    similar injury, might reasonably result therefrom.

13    There may be more than one proximate cause of an injury.

14              "Mental anguish" means the emotional pain,

15    torment, and suffering experienced by Scarlett Lewis.

16              Do not include any amount for any

17    condition existing before the extreme and outrageous

18    conduct, except to the extent, if any, that such other

19    condition was aggravated by any injuries that resulted

20    from the extreme and outrageous conduct.

21              Consider the elements of damages listed

22    below and none other.  Consider each element separately.

23    Do not award any sum of money on any element if you have

24    otherwise, under some other element, awarded a sum of

25    money for the same loss.  That is, do not compensate

 1   twice for the same loss, if any.  Do not include

 2   interest on any amount of damages you find.

 3                   Answer separately in dollars and cents for

 4   each person for the damages listed below, if any.

 5                   A.  Mental anguish that Scarlett Lewis

 6   sustained in the past.  Answer.

 7                   B.  Mental anguish that, in reasonable

 8   probability, Scarlett Lewis will sustain in the future.

 9   Answer.

10                   Presiding juror.

11                   When you go into the jury room to answer

12   the questions, the first thing thing you need to do is

13   choose a presiding juror.

14                   The presiding juror has these duties:

15                   A.  Have the complete charge read aloud if

16   it will be helpful to your deliberations;

17                   B.  Preside over your deliberations,

18   meaning manage the discussions, and see that you follow

19   these instructions;

20                   C.  Give written questions or comments to

21   the Judicial Executive Assistant, who will give them to

22   the judge;

23                   D.  Write down the answers on which you

24   agree;

25                   E.  Get the signatures for a verdict

1    certificate; and.

2                    F.   Notify the Judicial Executive

3    Assistant that you have reached a verdict.

4                    Do you understand the duties of the

5    presiding juror?

6                    That's a question for my jury.  Everyone

7    has nodded or said "yes."  All right.

8                    If you do not, please tell me now.

9                    Instructions for signing the verdict

10   certificate:

11                   1.  Unless otherwise instructed, you may

12   answer the questions on a vote of ten jurors.  The same

13   ten jurors must agree on every answer in the charge.

14   This means you may not have one group of ten jurors

15   agree on one answer and a different group of ten jurors

16   agree on another answer.

17                   2.  If ten jurors agree on every answer,

18   those ten jurors sign the verdict.  If eleven jurors

19   agree on every answer, those eleven jurors sign the

20   verdict.  If all twelve of you agree on every answer,

21   you are unanimous, and only the presiding juror signs

22   the verdict.

23                   3.  All jurors should deliberate on every

24   question.  You may end up with all twelve of you

25   agreeing on some answers while only ten or eleven of you

1    agree on other answers.  But when you sign the verdict,

2    only those ten who agree on every answer will sign the

3    verdict.

4              And then you'll see the original copy has

5    my signature.

6              Verdict certificate.

7              Check one:

8              Our verdict is unanimous, all twelve of us

9    have agreed to each and every answer.  The presiding

10   juror has signed the certificate for all twelve of us.

11             And there's a line for the signature and

12   the printed name of the presiding juror.

13             Or, our verdict is not unanimous, eleven

14   of us have agreed to each and every answer and have

15   signed the certificate below.

16             Or, our verdict is not unanimous, ten of

17   us have agreed to each and every answer and have signed

18   the certificate below.

19             And then you will see there are eleven

20   lines for signatures and printed names.

21             All right.  At this time we were going to

22   hear from the attorneys.  And for the plaintiff it will

23   be Mr. Farrar; is that right?

24             MR. FARRAR:  Yes, Your Honor.

25             THE COURT:  All right.  Thank you.

1          MR. FARRAR:  Thank you.

2          May it please the Court.

3          THE COURT:  Yes.

4          MR. FARRAR:  The truth lives at InfoWars.

5   That was at the very end of the video that the

6   defendants played today with Mr. Jones on the stand.

7   That was the video that, supposedly, the idea was this

8   is Alex Jones telling the world, finally, once and for

9   all, I think Sandy Hook was real.  Believe me, I think

10  it was real.

11          But what you notice when you're looking at

12  that that video is he goes to a screen and he points out

13  "FBI Reports No Deaths At Sandy Hook," he goes down and

14  he says, "No EMS Allowed in the Building."  He said the

15  police ate lunch inside.  Lie, lie, lie.  None of that's

16  true.

17          His effort to tell the world he believes

18  Sandy Hook was real was filled with the exact same thing

19  he has said for years at that point.  The actual truth

20  is the day Sandy Hook happened Alex Jones planted a seed

21  of misinformation that lasted a decade, the most

22  horrific decade of misinformation in American history.

23  And he just watered that seed over and over until it

24  finally bore fruit:  Cruelty and money.  That's what it

25  bore.

1          When Neil and Scarlett heard about what
2    was going on, different times early in 2013 or '14, they
3    had some choices to make.  And the first choice was,
4    let's try to ignore this.  Let's not dignify this, this
5    is crazy.  People won't believe this.  Nobody is going
6    to believe that.  This is real.  Nobody has seen this
7    type of level of misinformation before.  Ever.  They
8    don't believe it could be happening to them.
9          So, they try to ignore it for years and it
10   doesn't work.  2017, we know that Neil went on the Megyn
11   Kelly show.  He was invited and he said, I don't think I
12   really want to, and then he decided, if I can appeal to
13   Alex Jones' humanity, he's a father, he'll stop.  That's
14   what kind of people.  Neil doesn't go on the show and
15   say, stop it, Alex, that's a lie.  Stop your
16   misinformation.  He appeals to his heart and says, I
17   hope you have a Happy Father's Day with your kids.
18   You're lucky, you're blessed.  I don't have mine.  That
19   was his way of saying, that's a lie and stop it.
20          It didn't work.  They asked for a
21   retraction.  Didn't work.  There was never a retraction.
22   What Scarlett and Neil didn't appreciate at the time was
23   that money was much more powerful than truth to Alex
24   Jones.
25          You heard Miss Karpova testify there are

1    different truths.  No, there's not.  There's the truth,

2    and then there's everything else.  There may be

3    different levels of truth at InfoWars, but not in

4    reality.  We don't have different levels of truth.  We

5    have one truth.

6             There is one truth.  Jesse lived.  Jesse

7    died December 14th, 2012, at the Sandy Hook Elementary

8    School shooting.  Jesse died a hero.  He saved nine

9    little kids that day.  Jesse's life mattered.  His

10   legacy matters.

11            Mr. Bankston at the beginning of the case

12   told you about two different rules we have in society.

13   I'm going to add one.  He told you you can't recklessly

14   tell lies about somebody.  He told you you can't

15   recklessly tell lies about something important to

16   someone.  And here is the rule I'm going to add:  If you

17   do, you have to pay for it.  And that's what we're here

18   to do.  To make sure Alex Jones and his company pays for

19   the reckless lies that they told about these folks.

20            So, why do we have these rules?  Because

21   speech is free, but you have to pay for your lies.

22   That's what Mr. Bankston said in opening.  You have to

23   pay for the harm that they cause people.  If I go walk

24   into a Pottery Barn and start smashing vases, nobody

25   looked at me and says, well, just say you're sorry and

1   go about your way.  You have to pay for that loss.  You

2   have to be held accountable.

3            Remember what Scarlett said just yesterday

4   when she was talking about forgiveness and she said,

5   look, rape victims can forgive the assailant, but that

6   doesn't mean that person isn't held accountable for what

7   they did.  They go to prison.

8            This is obviously a civil case, but this

9   is still your opportunity to hold Alex Jones accountable

10  for the harm he did to Scarlett and the harm he did to

11  Neil.

12           So, if we follow the rules, this is how it

13  works, this is from Fred Zipp.  You follow the rules,

14  you check your sources.  You do something to make sure

15  that the information that you're about to tell the world

16  is accurate.  If you're making accusations about people,

17  there has to be solid evidence that that is true.

18           And here is the thing, if you're wrong,

19  and people are wrong, this isn't the first defamation

20  case that's ever been brought in front of the jury,

21  right?  People get it wrong and you make a retraction.

22  You minimize the harm, you minimize the damage.  You

23  don't keep doing it year and year and year, over and

24  over and over again.  That's chaos.

25           We know the rules were broken.  We know

1    from -- this is Miss Paz, she testified via deposition.

2    Miss Karpova sat up on the stand, she was a corporate

3    representative for Free Speech, Miss Paz testified at

4    deposition she was also a corporate representative.  And

5    I know that may not mean a lot to you, but what it's

6    saying is, this is the company speaking, because

7    companies can't speak.  So, this is Free Speech Systems

8    speaking.

9                And what does she say?  "I don't think,"

10   this is the question:

11        "I don't think we need to split a lot of

12        hairs about what was fake -- what fake is or is

13        not.  And would you agree with me that the

14        reason that we don't need to do this -- that is

15        because many, many times people on InfoWars,

16        including Mr. Jones, has unequivocally said

17        that Sandy Hook is completely false, totally

18        synthetic, manufactured.  Do you agree with

19        that."

20        She said, "I agree those are direct

21        quotes on Mr. Jones' opinions, yes."

22                We know he broke the rules, we know it

23   from the jury charge you were just read.  You were

24   instructed that there was defamation against Neil Heslin

25   and that there was intentional infliction of emotional

1    distress against both Neil and Scarlett.  And in case

2    you're wondering why defamation with Neil, is because he

3    was singled out by name.

4              Rob Jacobson.  You remember him, he was a

5    reporter who left.  He testified, I heard them, I heard

6    InfoWars making accusations based on extremely narrow

7    cross-sections of information; that I did my best to

8    make the writers and the staff aware that what they were

9    doing was speculation based on not enough information.

10   It bothered me.  That bothered me that I felt they had

11   no concept of journalistic ethics.  That's what he's

12   telling the folks at InfoWars.

13             And if you think for a second that he

14   misremembered what he said, Adan Salazar confirmed it.

15   He testified in deposition, he was asked, "Did

16   Mr. Jacobson ever advise you of his concerns about

17   relying on Mr. Halbig as a source for reporting that

18   Sandy Hook was a scripted event?

19             He says, "Mr. Jacobson I think did raise

20   concerns.  But I didn't really regard them, because

21   Mr. Jacobson had some wild theories about a lot of

22   things."  So they ignored him.

23             And what did Mr. Salazar actually want to

24   do?  He wanted to make bumper stickers and t-shirts that

25   said "Halbig Was Right."

1           The seed was planted.  The misinformation

2  was planted.  The day of the shooting, December 14th,

3  2012, Alex Jones was on air and he's calling it a false

4  flag already.  He has no information.  Nobody has any

5  information.  He criticized the media because they're

6  trying to get information out as they get it in, and

7  that's a criticism.  He says, oh, there's this many

8  people that were killed and that number changes as

9  information becomes available.

10          He says that's -- that's the conspiracy.

11  That's the thing that we should be worried about.  Not

12  that he goes on instantly and says, this is a false

13  flag, that maybe it's CIA or FBI agents that killed

14  these children, or maybe they didn't die at all.  That's

15  not what we have to worry about.  We have to worry about

16  the media, the CNN folks who changed the number of

17  deaths.

18          The videos are in evidence.  I'm going to

19  go through a few, I'm not actually going to play the

20  videos but I'm to go through just some of the things he

21  said.  2013, inside job.  Inside is government.  He

22  thinks the CIA maybe.  And one thing that has struck me

23  this whole -- whole trial is this idea that there was a

24  time Alex Jones thought the government killed the

25  children, then there was a time he thought it was a

 1    complete hoax and it never happened, and then there was

 2    a time he thought the government killed the children.

 3              He just said on the stand today that maybe

 4    the FBI killed those children.  How is that any less

 5    painful to these people?  How is it any less painful to

 6    hear, you're a crisis actor and this never happened, or,

 7    you actually did have a child, but by the way, the

 8    government killed them for some political gain.  That's

 9    not less painful to them.  That's not an excuse.

10              2014:  Total hoax, photos of kids still

11    alive they said died.

12              2015:  Synthetic, completely fake, with

13    actors.

14              This is Exhibit 31, it's been talked about

15    a lot.  You will be able to look at the dates and the

16    titles.  Most of the videos are in evidence also.  If we

17    just start looking, I'm not going to show them all, just

18    picking a few.  2012, this was the day of the accident:

19    "Connecticut School Massacre Looks Like False Flag Says

20    Witnesses."

21              The next year early, "Why People Think

22    Sandy Hook is a Hoax."  A month later, "Children of

23    Sandy Hook to Perform At Superbowl."  A couple of months

24    later, "Crisis Actors Used At Sandy Hook, Special

25    Report."  "Crisis actors used at Sandy Hook."  This

1  idea, as if it is a defense at all, that he didn't start

2  believing that it was a complete hoax until 2014 or '15,

3  in 2013 he says, "Crisis Actors Used At Sandy Hook."

4           2014:  "Revealed, Sandy Hook Truth

5  Exposed."  Same year, "Bombshell, Sandy Hook Massacre

6  Was a DHS Illusion Says School Safety Expert."

7           We all know who that school safety expert

8  is.  That's Wolfgang Halbig.

9           September 2014:  "Sandy Hook Deaths

10  Missing From FBI Report."  Because he looked at Table 8,

11  not Table 9.

12           May 2015:  "Sandy Hook, the Lies Keep

13  Growing."

14           July 2015:  "Government is Manufacturing

15  Crisis."

16           And that takes us to Owen Shroyer, his

17  June 25th, 2017, telecast.  Show.  Hit piece.

18  Defamation.  Mr. Shroyer was on the stand and I went

19  through a list of items that he didn't know before he

20  ran that.  Never heard of Mr. Heslin.  He didn't do

21  anything to fact check the accuracy of his report.

22  Nothing.

23           Do you remember what he said?  He said --

24  because I remember it, I was walking back, he was there

25  and he said, I could have done a better job.  I turned

1  around and I said, you could have done a job.  Because

2  you did nothing to fact check that.  Didn't watch the

3  video clips.  May not have actually even read the

4  article first.  Never heard of Ibankcoin.  Never heard

5  of the author ZeroPointNow.

6           I'm going to stop here for a second.

7  During that, the video that the defense played just

8  today, Alex Jones on that video went to some report and

9  it had all these quotes that were good for him, do you

10 remember that?  Things that he liked.  And it was

11 published by Ibankcoin and it was ran on -- it was ran

12 on ZeroHedge.

13          You heard testimony, what ZeroHedge is is

14 a blog that you can post anonymous stories on.  And if

15 you remember the story he was talking about was

16 ZeroPointNow.  That was the author.  So, he's taking

17 articles from a blog that anybody can publish on that

18 are positive to him from an author named ZeroPointNow.

19 I wonder where that author works.

20          He talks about -- in this trial talks

21 about how Megyn Kelly was so unfair to cut the clips,

22 how we've been so unfair when we cut clips.  That's what

23 he did.  That's why we're here.

24          This is Mr. Carver, the medical examiner.

25 And you remember the question he asked was, what

1  condition were the bodies in when the parents had to

2  identify their children.  And he goes on to say, well,

3  we didn't do that, we didn't bring the children and the

4  parents in together.  He's answering the question.

5  That's not how they identified the children.  That would

6  be a level of cruelty that's hard to even imagine, if

7  you just brought parents into a morgue and just had them

8  look around until they found their child.

9          No, they interviewed them and said, what

10 was he wearing, I've got photographers.  He said the

11 best photographers, ones that can take pictures that

12 aren't as horrendous as they have to be to make these

13 identifications.  And they cut it to make it sound like

14 he never saw his kid.

15         The Anderson Cooper article -- or I'm

16 sorry, interview with the McConnell family, cut her

17 answer in mid-answer when she says, I wanted to see my

18 child, and then cut it off when she says, but I decided

19 not to because I wanted to remember her as she was.  She

20 wanted to remember Grace with her long blond hair and

21 her bows in it.

22         The article that's shown was written by

23 Jim Fetzer.  We heard testimony about him today.  He's

24 mentally ill.  You know, we throw these terms around,

25 like "crazy" or whatever, and it's -- it's unfortunate.

1    He's a mentally ill person.  He's a discredited former

2    professor from the University of Minnesota.

3                   Miss Paz testified about him.  Said,

4    "Prior to this June 26, 2017 -- prior to the video of

5    June 26, 2017, that discusses information from

6    Mr. Fetzer, the company had in its possession an

7    extremely large volume of emails from Mr. Fetzer, which

8    clearly revealed to any rational person that Mr. Fetzer

9    is not mentally balanced; correct?"

10                   She says, "Are you asking whether they're

11   in our possession or whether -- yes, they're in our

12   possession.  They're on our email server."

13                   They knew before that he is not mentally

14   well.  That's why they never had him on the show.

15                   We have an email from Paul Watson.  This

16   is a year and a half before that article was aired.  The

17   story was aired and he said, "The Sandy Hook stuff is

18   killing us.  It's promoted by the most batshit crazy

19   people like Rense and Fetzer, who all hate us anyway.

20   It makes us look bad."

21                   There is no doubt they knew he was crazy.

22   So, they took a man who they thought was mentally ill,

23   wrote an article, published it by an anonymous author on

24   a blog, and ran with it.

25                   And this idea that they're just

1   republishing that, you saw the video multiple times,

2   Owen Shroyer is not just republishing it, he said,

3   that's not something you would forget, holding your dead

4   child.  And he kept calling it a claim.  He claims this

5   and he claims that and he shows these other videos to

6   try to prove it's wrong.  And then he demands some sort

7   of explanation from Mr. Heslin, like he owes Owen

8   Shroyer anything in the world.

9               "Final statement on Sandy Hook."

10  Mr. Jones again testified just today, this was my

11  attempt, this was going to be my final statement, I

12  didn't want anything to do with it anymore, I wanted out

13  of it, I was getting beat up by it, I want out, I'm

14  going to tell the world I believe Sandy Hook happened

15  and I believe these parents are real and that Jesse

16  lived.

17              What does he say at the very end of

18  that --

19              *(Video played off the record.)*

20              "I know when I'm watching a movie and I

21  know when I'm watching something real.  Let's look into

22  Sandy Hook."  That was his way of conveying what he

23  testified today that it probably did happen.  He

24  couldn't even testify today, he said this was my way of

25  saying it probably happened.  That's not saying it

149

1  happened.  That's saying it didn't happen.  That's
2  saying that they're actors.  It's saying exactly what he
3  said the years before.
4            What is the impact when you break the
5  rules?  Because, you know, Mr. Bankston talked in
6  opening, I think he's right, there's nothing that's ever
7  happened like this before.  Sure, there's been
8  defamation cases, articles in newspapers or magazines
9  have been run that have something wrong.  There's never
10 been a continuous, year after year campaign of
11 defamation and intentional infliction of emotional
12 distress on people.  Ever.  Never happened.  It's the
13 first time.  This is the first year to ever hear
14 anything like this.
15           This isn't the fender bender that
16 Mr. Reynal kept talking about in jury selection.  This
17 is a decade of lies, a decade of deceit.  It destroyed
18 people's lives.  Good people.  People that chose love.
19 He's made them live their lives in fear.  Fear of
20 actually being harmed or murdered by people that follow
21 the lies.  And want to do something about it.  That
22 believe the lies and the hate that come from Mr. Jones.
23           You heard Scarlett testify, healing and
24 fear are mutually exclusive.  She cannot heal while
25 she's in fear.  She can't heal from the loss of Jesse

1   while she stays in fear.

2            One of the things that I thought was

3   powerful from Scarlett when she testified a lot, but she

4   talked directly to Alex and she said, Alex, every day of

5   my life has been a little bit worse because you're in

6   it.  Every day in her life, a little bit worse for what

7   he's done.

8            You heard from our expert Becca Lewis on

9   misinformation, and she told you that misinformation

10   spreads six times faster than truth.  Six times faster.

11            So, these lies are spreading across the

12   country at an insane rate and people are taking action.

13   They're confronting them all the time.  Neil was asked

14   by Mr. Reynal, he was asked, well, how often, how often

15   are you getting harrassed?  And he said, sometimes, you

16   know, not for a month or two, sometimes a dozen times in

17   a week.

18            The thing that caught my ear was sometimes

19   he can go two whole months without being harassed.  It's

20   been nine and a half years.  His house was shot up, his

21   car was shot up, somebody drove by his house, and to

22   Neil's credit he said, I don't want to speculate, it

23   sounded like gunfire, but yelled "InfoWars" and "Alex

24   Jones" and he thought he heard gunfire.  They harassed

25   him online.  There's death threats.  We heard the death

1    threat from Mr. Pozner.  That lady went to prison.

2            This idea that they can't say it was all

3    from Alex Jones, she went to prison and was not allowed

4    to get on InfoWars.com as part of her punishment.  It's

5    all from Alex Jones.  Becca Lewis talked about that.

6    His reach is so much greater than anybody else's.

7    There's nothing else out there close in the

8    misinformation.

9            Each time, even when -- each time they're

10   confronted, they just reset the healing.  They have to

11   live the worse day, week, or month, that first painful

12   part of their life again after Jesse's death every time.

13   And some of its innocent.  You heard Neil talking about

14   some of it's innocent.  Right, it's the friend:  Man,

15   did you hear that new crazy theory that Jesse never died

16   or that Jesse was killed by a CIA agent?  Did you hear

17   about that?  That's not malicious, but it affects them

18   just the same.  Sure, that doesn't scare them, but it

19   resets it.  It resets that pain every single time.

20           So, they started devoting themselves to

21   protecting Jesse's legacy, you heard Mr. Michael crouch

22   talking about, and we all know this, parents have to

23   protect their kids.  That's what we're here for, we

24   protect our kids.  Jesse is gone, they can't protect

25   him, and there's some sense of guilt.  They both clearly

1    know there's nothing they could have done, it's not
2    their fault that Jesse was killed, but there's always a
3    sense of guilt.
4              So, they are protecting his legacy in
5    different ways.  Neil is fighting disinformation.  He's
6    here making sure that we're going to fight.  Scarlett
7    has Choose Hope, Choose Love, and goes around the
8    country trying to make sure these type of things will
9    never happen again.
10             What's hard for them is to know that the
11   motive was money.  It was money.  If somebody makes a
12   mistake, it may be hard, but it's easier to take.  It
13   affects you when you know someone is profiting off of
14   your pain and off the pain -- off the death of your
15   child.  Someone is making money off of that by spreading
16   misinformation and spreading lies.  That absolutely
17   hurts.
18             You heard Alex Jones talking about, today,
19   70 million in revenue.  He testified to That.  He
20   testified on direct in 2012 that it was his goal, if you
21   remember yesterday, he said, in 2012 I had a goal to get
22   $70 million in revenue.  He achieved it.  Through lies.
23   Through misinformation.  Through riling up a base of
24   conspiracy theorists that all want to go buy his prepper
25   gear now.  Buy his food.

1          Alex Jones doesn't find value -- or
2  doesn't value Neil and Scarlett's pain, he finds value
3  in their pain.  He sees value in that pain.  There is a
4  complete inability to take responsibility, it's just
5  excuses.  Today there's no ability to take
6  responsibility.  Saying "I'm sorry" is not taking
7  responsibility.  It's not.  Being forgiven by Scarlett
8  isn't taking responsibility.  I think she had the best
9  possible analogy when she said, you can forgive the
10 rapist but he still has to be held accountable.  I'm
11 sorries don't cut it.  You caused damage, you caused
12 harm, you have to pay for what you broke.
13          And the thing I keep noticing is every
14 "I'm sorry" has a comma-but; right?  It's never just,
15 I'm sorry for what I did.  It's, I'm sorry, but that
16 Megyn Kelly, she went out and she got me.  She entrapped
17 me.  Megyn Kelly is a reporter just like Alex Jones is.
18          I'm sorry, but I'm not responsible.
19          Well, Miss Paz testified to this.  "Okay.
20 But we -- you did agree that InfoWars, its coverage, did
21 impact that grieving process, you just don't think they
22 have any responsibility for it; right?"
23          What did she say?  "That's correct."
24          We hurt these folks, our coverage hurt
25 these folks, we're just not responsible.

1            That's this whole trial has been one

2   excuse after another.  I'm going to go through the nine

3   that I sort of heard, may have heard them a little bit

4   different but I this think covers the gist but we're

5   going to talking about each one.

6            Return a verdict of $1.  That is not

7   taking responsibility.

8            What did Owen Shroyer say when he was

9   asked the question, if you had it to do over again would

10  you do anything different?  He said, Yeah, I wouldn't

11  air the piece at all, it has really negatively

12  affected -- not these folks -- my life and career.

13           This lawsuit has affected Alex Jones'

14  well-being, heard a lot about that today.

15           Other people were spreading lies.

16           Less than half a percent of our coverage

17  was about Sandy Hook.

18           They should have called Alex Jones and

19  worked through their pain with him.

20           Believing Wolfgang Halbig's credentials

21  was the worse decision InfoWars ever made.

22           Neil and Scarlett are malingerers who lied

23  to Dr. Lubit and Michael Crouch.

24           And Jones said he is sorry.

25           Let's talking about each one of those.

1          Return a verdict of $1.  This is the jury

2   charge.  And you've been instructed that Alex Jones and

3   Free Speech Systems committed intentional infliction of

4   emotional distress against Neil Heslin and Scarlett

5   Lewis.  And in that definition of intentional infliction

6   of emotional distress, just so when you get there you'll

7   know, the emotional distress suffered by Plaintiff was

8   severe.

9          You are instructed their emotional

10  distress is severe.  The conduct has gone beyond all

11  possible bounds of decency and to be regarded as

12  atrocious and utterly intolerable in a civilized

13  community.  Utterly intolerable for what we're doing in

14  our community.  Our civilization.  We can't do that.

15          The idea of returning a verdict of $1 is

16  offensive.  Scarlett said, every day he's made my life

17  worse since shortly after Jesse died.

18          Shroyer says, when asked the question, if

19  you had it to do over what would you do to make any

20  changes, he said, I wouldn't air the piece because it

21  negatively affected my life and career.  He's in the

22  same job making $130,000 a year, doesn't sound too

23  negative.  That is a level of inability to accept

24  responsibility that's hard to grasp.

25          And there was a question, I wanted to

1    address it, one of the questions was whether or not Alex

2    Jones would take responsibility for the folks that work

3    for him.  And he said, graciously, he said, yes, I

4    absolutely would.

5              I do want to make sure that if we look at

6    the jury charge, though, for Cause of Action number 1 it

7    says, you are instructed that Defendants Alex Jones and

8    Free Speech Systems, LLC committed defamation against

9    Neil Heslin.  Goes on to say, you are further instructed

10   that Defendants Alex Jones and Free Speech Systems, LLC

11   published statements that were false and defamatory

12   concerning Neil Heslin on June 26, 2017, and July 20th,

13   2017.

14             Point being, the Court has already

15   instructed you, Free Speech Systems and Alex Jones are

16   responsible for Owen Shroyer's defamation.  There's two

17   dates also because Alex Jones republished that on

18   July 20th, 2017.

19             This lawsuit has affected Alex Jones'

20   well-being.  I've got to say, the biggest offense I've

21   heard is he's the victim.  He caused all this pain to

22   this family and he's the victim.  He defamed Neil Heslin

23   and he is the victim.

24             Miss Karpova testified, people think Alex

25   Jones killed those children.  No, they don't.

1                    Nobody thinks that, Alex.  Nobody does.

2    They -- you killed their ability to get over the loss of

3    their children, you didn't kill their children.

4                    He's the victim?

5                    What did he say when he was asked by

6    Mr. Reynal about being de-platformed.  I wrote it down,

7    I don't want to get it wrong.  He said, now people can

8    say whatever they want about you and everyone else can

9    attack you and you can't fight back.  That's what he

10   said about being de-platformed.  That sounds exactly

11   like what he did to these folks.  Right?  Exactly what

12   he did to them.  They didn't have an ability to fight

13   back.  This is their fighting back.

14                   They told you Alex Jones wasn't the only

15   one spreading these lies, there's other people.  What

16   did Detective Jewiss say?  Remember, he talked about how

17   he's still the lead detective because their role really

18   became support the families, support the families at all

19   cost.  There was a trooper assigned to every family for

20   a year.  And he was asked, have you heard of these other

21   people?  He said, no, I've only heard of Alex Jones and

22   Wolfgang Halbig.  That's the only two.

23                   Owen Shroyer testified the same, Alex

24   Jones and Wolfgang Halbig was spreading this

25   information.

 1             And what did Wolfgang Halbig say?  He
 2    said, without InfoWars, nobody would hear the truth.
 3    Wolfgang Halbig had no ability to get his message out.
 4    That -- his web of lies that he came up with and his 16
 5    questions or whatever it was.  The only way to get that
 6    out was through InfoWars and Alex Jones. He didn't have
 7    a TV show or a radio broadcast or a website with any
 8    real traffic on it at all.  Nothing.  It's all through
 9    Alex Jones and InfoWars.
10             Becca Lewis testified and she said -- she
11    was asked the question, more likely than not where are
12    all these people getting this misinformation, the
13    24 percent of Americans that think Sandy Hook was either
14    faked or in some way have questions about its validity.
15    All these people.  Where do they get their information?
16    And she said, in academics we don't do a lot of
17    absolutes, we just don't.  This is one I can.  It
18    absolutely came from Alex Jones, and it absolutely came
19    from InfoWars.
20             Less than five percent of our coverage was
21    about Sandy Hook.  I think the question that the juror
22    asked, just because you commit crimes seldomly, does
23    that mean you shouldn't be held responsible?
24             Absolutely not.  That's crazy.  Of course
25    you're held responsible whenever you break the law.

1  Whenever you break -- whenever you defame somebody.  You

2  don't have to defame them 20 times.  Just once.  But

3  that's not what happened in this case.  Again, 27 hours

4  of agreed upon, agreed upon, coverage of Sandy Hook by

5  InfoWars.  27 hours.

6              Mr. Reynal:  Your Honor, I object.  That

7  is exactly the evidence that I've been trying to get in

8  that you excluded.

9              MR. FARRAR:  I don't know --

10              THE COURT:  -- your objection is

11  overruled.

12              MR. FARRAR:  That's unprecedented.

13              Like I said earlier, most defamation cases

14  is one article that ran.  27 hours of coverage over

15  years.  Doesn't help that it's hidden between

16  95 -- 99.5 percent of other libelous and slanders and

17  lies and misinformation.  It doesn't matter that it's

18  hidden in there.  It matters what it did to these

19  people, who heard it, and how they reacted and how they

20  came after them and attacked them.  That's what matters.

21              They should have worked through their pain

22  with Alex Jones.  Neil Heslin called him a psychopath on

23  the stand.  Well, how would he call Alex Jones and want

24  to sit down and work through their pain with Alex Jones?

25  Literally, literally the last person in the world that

1  this family would want to sit down with and work through

2  their pain.

3        Believing Wolfgang Halbig's credentials

4  was the worse decision InfoWars ever made.  That's what

5  Miss Karpova testified to.  The word "credentials" I

6  find sort of funny.  I don't know how you have

7  credentials that allow you to say children were

8  kidnapped by a satanic cult and put on the Superbowl

9  stage to sing to us and then taken off.  There's no

10  credentials for that.  We don't have like an

11  apprenticeship program for that.

12        But they knew, the thing is they knew that

13  he was not mentally well.  Miss Paz testifies to it.

14  But you can agree that there are plenty of emails he

15  sent in 2014 that the company did, in fact, read and

16  thanked him for it.  She says yes.  That are crazy.  She

17  says, yeah, that happened in 2014.

18        Adan Salazar says the same -- well,

19  actually what Adan Salazar, remember, he put a lot of

20  articles up of Wolfgang.  He said, "Beyond listening to

21  the interview and visiting the website you described,

22  you did nothing to further check Mr. Halbig's

23  credentials or credibility; correct?"

24        He says, "Yeah, that's correct."

25        This is Exhibit 51, it was in a

1    deposition.  Mr. Salazar, it's an email exchange, we're

2    not going to go through it all, from 2014 in March, and

3    it goes through all these reasons that Wolfgang is not

4    credible.  That idea that he was an expert in Columbine,

5    not true.  This idea that he is some sort of foremost

6    school safety expert, not true.  He just made all that

7    up and people believed him.  Nobody fact checked any of

8    that.

9           This is the picture -- the Superbowl

10   picture with the kids at Sandy Hook in February of 2013,

11   went and sang at the Superbowl.  He says, this is Jesse

12   Lewis.  Fake name.  He sends that to InfoWars

13   March 2015.  And Nico at InfoWars responds, got the

14   Superbowl pic.  Thank you for sending.  This should have

15   been a pretty good sign we really shouldn't have him on

16   the show.  I don't think he's quite right.  I don't

17   think he's mentally stable.  We should stop basing our

18   weird conspiracy theory that Sandy Hook didn't happen

19   from this guy.  Because he's really the source.  He's

20   the number one guy.

21           This is why it's intentional infliction of

22   emotional distress.  This is intentional, when you start

23   getting all the warning signs and you keep going after

24   people, it becomes intentional, it's not a mistake, it's

25   not negligent anymore.  It's intentional.

1          Neil and Scarlett are malingerers who lied

2     to Lubit and Mr. Crouch.  So, we sort of have to think

3     about how that would work, because Mr. Crouch said the

4     first notes about some sort of profiteering and

5     conspiracy theories appears in 2013.  So, Neil has to

6     think to himself, I think in three years there's going

7     to be this election between Hillary Clinton and Donald

8     Trump and I think Hillary is probably going to run some

9     hit pieces on Donald Trump, linking him to Alex Jones

10     and this conspiracy theory.  So, if I want to take Alex

11     Jones down in 2022, I need to start right now

12     complaining about it.  That's how you have to get there.

13     Conspiracy theory.

14          He said he's sorry.  Jones said he's

15     sorry.

16          Remember what Mr. Bidondi said.  He said,

17     "Just Operation Cover Your Ass.  I mean, like if you're

18     going to report something, make sure you got documented

19     facts so we don't get sued.  That was the big thing, you

20     know what I mean? "

21          Said, "That was the term that they

22     actually used, 'Operation Cover Your Ass'?"

23          He said, "Yeah, that was Rob Dew's term.

24     Just make sure."

25          Anybody not think that those apologies are

1   part of Operation Cover Your Ass?  He realized the heat

2   was coming.  Lawsuits were getting threatened.  He went

3   to Operation Cover Your Ass.

4           He just testified today that maybe the FBI

5   killed those kids, too.  He was about halfway out and

6   Mr. Bankston objected and said, What are we talking

7   about anymore?  He says he's learned, he said he learned

8   his lesson, I think Mr. Shroyer said, well, I think we

9   really learned our lesson.  What did Mr. Bankston ask

10  him?  Every single -- every single mass death, mass

11  event since then:  Staged, hoax, staged, hoax, staged,

12  hoax.  It's not learning your lesson, it's doing the

13  same thing over and over and over again.

14          So, what is your role.

15          A couple of things before we get to the

16  actual role.  You remember Christopher Daniels, he was

17  asked, "You believe that calling somebody a crisis actor

18  would be a horrible claim; right."

19          He said, "If it's false."

20          "Question:  So, falsely saying that

21  someone is a crisis actor would be a horrible claim."

22          He says, "Well, it depends on the context.

23  I mean, you don't want to be called something that

24  you're not, you know."

25          Adan Salazar.  "Did it occur to you how

1    families who have lost loved ones at Sandy Hook would

2    react to an allegation that, in fact, their children

3    were murdered in an event that was scripted and planned

4    over two and a half years?  Did that occur to you?

5                "No, I didn't think about that."

6                So, what is your role.  We see things on

7    the news all the time, we say, man, somebody should do

8    something about that, that's not right.  We should do

9    something about that.  That's your role.  You get to do

10   something about that.  Right now.  Right today.  Do

11   something about the harm that was caused to these folks.

12               Mr. Reynal:  I'm going to object to this

13   punitive damages argument in this phase.

14               THE COURT:  Overruled.

15               MR. FARRAR:  Your job is to determine the

16   right amount, what is just and fair compensation to the

17   harm that was caused to Neil and Scarlett.  And if you

18   remember, back in jury selection there was a question

19   that was asked, is there anybody here that just cannot

20   give over $100 million regardless of what the evidence

21   showed, and a bunch of people raised their hands and

22   they were talked to.  None of those people are on the

23   jury.

24               There was a question, is there anybody

25   here that can't give mental anguish damages, and a bunch

1   of people raised their hand.  Nobody there is on this

2   jury.

3            This jury is comprised of people that are

4   willing and capable to give a large verdict if the

5   evidence shows it.  And the evidence absolutely shows it

6   in this case.

7            So, what does it cost Alex Jones and his

8   company to steal the last memory Neil Heslin had of

9   Jesse, to steal it from him.  In the pursuit of selling

10  more products.  What does it cost Alex Jones and his

11  company to spread lies and rile up a base, and spread

12  lies so vile that people actually came and accosted them

13  and harassed them and sent them death threats and sent

14  death threats to other people, shoot at his house.  What

15  does it cost to do that all in the goal of selling more

16  pills.

17           What does cost to destroy a reputation,

18  not just in Sandy Hook or Newtown, not just Connecticut,

19  not even just the United States, the entire world, to

20  destroy people's reputations in the entire world all in

21  the pursuit of selling more prepper gear.

22           What does it cost when a mom can't even

23  turn on her air conditioning at night in the summer for

24  fear that she'll miss the sound of an intruder coming

25  in, just to sell more gear, to make more money, to hit

1    that $70 million revenue goal in 2012.

2                    What is it going to take to make sure Alex

3    Jones and his companies pay for what they broke.

4                    You remember Mr. Crouch, when he was on

5    the stand, this is the psychotherapist, Mr. Reynal asked

6    him a question about buckets, how do you -- how do you

7    differentiate the pain that these folks felt for the

8    loss of Jesse, which is real.  And Dr. Lubit and

9    Mr. Crouch, they both testified you never really get

10   over the loss of a child, it's not the normal course of

11   life.  It's different.  We can't really get over this.

12   We can get better and we get functional and we start

13   enjoying life and we start remembering the good things.

14   And they were there, they were starting to remember the

15   good things.

16                   But the question was, how do you separate

17   those buckets.  And Mr. Crouch said that's easy.  This

18   is a whole separate and distinct injury.  Each one of

19   those buckets has mental anguish and it has grief, and

20   the one that Alex Jones caused them is full.  That's

21   what he said.

22                   And Dr. Lubit talked about that, too.

23   Allostatic?  I'm not even going to try.  But the idea

24   that you're out of emotions, you're all done, you're

25   flat.  They talked about seeing the different interviews

1   from Neil from 2012, 2017, and one recent one, and he's
2   flat.  He's all out of emotion.  The fear, the anxiety,
3   the drive to keep Jesse alive, to keep his legacy, to
4   not have it tarnished as some sort of false actor or
5   fake or that he didn't exist has taken it all out of
6   him.
7               They're still protecting Jesse, that's
8   what Mr. Crouch said.  That's their job.  They said that
9   this verdict will tell the world that Jesse lived; that
10  he was real; that he mattered; and that the lies are
11  just that, they're lies.
12              So what does it take to fix what he broke,
13  that number, 24 percent.  That's 75 million adult
14  Americans believe that Sandy Hook was staged, faked, or
15  at least have some doubt as to whether or not it's real.
16  A dollar a person that believes that lie.
17              I said 75, 150 million, I'm sorry.  150
18  million Americans.
19              A dollar a person for everybody who
20  believes that lie is the fair, it's the reasonable, it's
21  the just amount.  The weight of that many people every
22  time.  It doesn't matter where they go, they want to go
23  on vacation, to Miami, wherever it may be, one out of
24  four people walk by, they don't know if they think that
25  person is somebody who thinks Sandy Hook was a hoax, was

1    a complete hoax.  And of those they don't know, are any

2    of them going to recognize them.  And of those, are any

3    of them dangerous.  That's not a way to live your life.

4    That's why they've retreated.  They don't have friends.

5    They don't go do things anymore.

6               I could have stood up here and said what

7    Miss Lewis talked about.  She said the InfoWars site had

8    3 billion hits from I think it was 2012 to 2019.  3

9    billion hits.  Not 3 billion different users, that's not

10   what she said, she said 3 billion hits.  You can't tell

11   how many different users, you only tell a number of

12   hits.  I could have said a dollar a person who clicked

13   on that website would be fair.

14              But it's 75 million for Neil and 75

15   million for Scarlett for what they've had to endure.

16   For every day of your life being a little bit worse

17   because somebody else exists and somebody else keeps

18   spreading lies about you.  Intentionally, recklessly,

19   maliciously.

20              One of the things you may have noticed

21   when you're reading through the jury charge is that Neil

22   has the claim for defamation that Scarlett doesn't.  So

23   he's got more places to be compensated, he's got loss of

24   reputational damages and mental anguish specific for

25   that.  I think you put 75 million total for each one.

1 So, for Neil that's 12,500,000 for each one of those

2 spots.  Scarlett only has two lines, hers is 37,500,000.

3           The impact.  The impact of what they've

4 done has lasted and it continues to last, it's nine and

5 a half years and it's going to keep going, it's not

6 stopping.  Even if Alex Jones stops talking about it

7 right now, it's out there and those people are still

8 going to harass them.  That damage is done.  And it's

9 taken years to get to this point, to get in front of

10 you, for Neil to be able to tell his story and Scarlett

11 to be able to tell her story.  Years of fight.

12           When you go back there I implore you, it's

13 a hard process, stick with it.  Don't compromise.  The

14 truth matters.  It's too important.  Don't compromise

15 the truth.

16           Neil told you on the stand that Alex

17 started this fight and that he intends to end it.  Your

18 verdict ends that fight.  End this nightmare for them.

19           THE COURT:  Thank you, Mr. Farrar.

20           I think, I think we should take a short

21 break and then we'll come back.  So let's take a

22 15-minute break.  So, let's come back at about -- I'm

23 not good -- 3:10.  So remember you're still not released

24 to have any conversation yet.  Go ahead and head on

25 back.

1              *(Brief recess.)*

2              THE COURT:  All right, you may be seated.

3              Mr. Reynal, whenever you're ready.

4              Mr. Reynal:  Ladies and Gentlemen of the

5      Jury.  It's an honor to be standing in front of you here

6      again about a week and a half after we first began this

7      trial.  These last few days have gone by in a blur for

8      me.  And I'm sure they've gone by in a blur for you, as

9      well.  You have a very, very important decision to make.

10     And I don't envy you that.  I don't envy you that.  It's

11     going to be hard.

12             And I think the best way that I can help

13     you to make that decision is by superimposing the facts

14     and the law as they were from the Court's instructions

15     and from the actual evidence that we heard from the

16     witness stand and that we got in the form of videos and

17     in the form of documents.

18             We are here to discuss actual damages.  I

19     would like you all to remember before this trial started

20     the Court told you, instructed you, that there are two

21     phases.  This is phase one.  Now is the time to decide

22     actual damages, actual compensation.  I understand that

23     there may be some of you who believe that Mr. Jones

24     needs to be punished for what he did, and you're going

25     to have the opportunity to send that message.

1          But you haven't heard all the evidence yet
2     so that you can send it.  You're going to hear more and
3     you're going to retire to deliberate again and I'm going
4     to have the opportunity to address you again.  And
5     there's so much I heard from Mr. Farrar's argument that
6     is all about punishment.  I'm going to talk to you guys
7     about punishment when the time comes.
8          But today, right now, I want to talk to
9     you about actual damages, and actual damages require
10    actual evidence.  Not what you wish the evidence was or
11    you hope the evidence had been.  Now is the time when
12    you can actually hold us to our word.  I said during our
13    opening statement a lawyer's opening statement is not
14    like a politician's speech.  You get to hold us to our
15    burden.  Hold them to their burden.  They brought this
16    case.  They need to prove it.
17         On the bottom of every slide you're going
18    to see today is the question in yellow, "Where is the
19    evidence?"  Over the next few minutes I want to talking
20    about five different things with you.  I want to review
21    the facts as we learnt them from the witness stand,
22    through the documents and through the videos.  I want to
23    review with you some of the key instructions that the
24    Court has already given you and that will guide you in
25    your deliberations.

1           And then I want to review the evidence
2   specifically as it relates to whether Alex Jones caused
3   Neil Heslin and Scarlett Lewis to be harassed.  Whether
4   Alex Jones caused Neil Heslin and Scarlett Lewis to
5   suffer mental anguish.  Whether Alex Jones caused damage
6   to their reputation.
7           And I prepared this PowerPoint based on
8   the opening statement.  It seems to be a bit of a moving
9   target.  We had been at 75 million, now we're at 150
10  million.  There was some suggestion that maybe we should
11  be at three billion.  So, I'm going to have something to
12  say to you all about that.
13          And finally, I want to talk to you about
14  the verdict form, the numbers that we think are
15  appropriate in this case, and what your verdict should
16  be and why.
17          Let's talking about the facts.  What is it
18  that are the facts beyond change, what are the things
19  that we can all agree have been proven through the
20  evidence.
21          We can all agree that on December 14th,
22  2012, Adam Lanza shot his way into an elementary school
23  in Sandy Hook, Connecticut, and murdered twenty children
24  and six educators.
25          We can all agree that that very day two

1   groups of people became intensely interested in what had

2   happened.  On the one hand, you had politicians and the

3   mainstream media.  They descended on Sandy Hook like

4   vultures, trying to get a story and trying to push a

5   message.  I talked to Mr. Heslin about that, about

6   whether death and murder should be private events.  It's

7   sad that we live in a country like that.  But we do.

8   And that is the price we pay in some ways for

9   transparency.

10          They came and they reported and they

11   reported irresponsibly, and a lot of the things that

12   they reported turned out to be incorrect and a lot of

13   the things that they reported fed into a conspiracy

14   narrative that was driven by people who are known as the

15   truthers, people who had been active since the Kennedy

16   Assassination, who had gotten online after

17   September 11th, who included people like Wolfgang

18   Halbig, Steve Pieczenik, James Fetzer, Dr. James Tracy,

19   and hundreds and thousands of others that organized

20   around Facebook and You Tube and other areas.  Detective

21   Jewiss testified about that.

22          Where was Alex Jones when that happened?

23   He was 1500 miles away, in Austin, Texas, and he was

24   just as shocked as everyone else.

25          I have endeavored every chance I could to

1   play for you unedited, complete video.  You all watched

2   Alex on the first day.  You watched that 51 minutes and

3   you heard, I don't need to tell you, I don't need to

4   remind you, you watched it, it's in evidence, I don't

5   need to reframe it, I don't need to turn it into a video

6   clip.  It is there.

7             So what do we know?  We know that there

8   was intense public interest and public scrutiny.  We

9   know that Alex has a talk show, where he invites guests,

10  where he takes callers, and we know that he reported on

11  what had happened at Sandy Hook.  And Alex doesn't trust

12  the government.  He doesn't trust the official

13  narrative.

14            You know, we heard during closing argument

15  that Alex had said from the witness stand that the FBI

16  killed the children?  You all were here.  He said that

17  the New York Times had reported that an FBI agent

18  interviewed Adam Lanza four years before the murders.

19  We're here about facts that come from the witness stand,

20  not what people wish they had said.

21            So, Alex ran with the story and he made a

22  mistake.  He trusted the wrong people.  He was going

23  through a difficult time in his life and he ran with the

24  story that ended up being false.  The Court has

25  instructed you as to that.  At the time Steve Pieczenik

1    was somebody that he trusted.  And Wolfgang Halbig, as

2    far as he was concerned, seemed credentialed.  He made a

3    terrible mistake, okay?  But what happens next.

4              That mistake was weaponized by the same

5    political forces that had descended upon Sandy Hook.

6    And it was magnified and amplified throughout the 2016

7    election.  I mean, we talking about -- it's sad, we

8    talking about people feeding off these children, I mean

9    politicians, the news media, right?  I mean, it's

10   happening everywhere.  And so it becomes this election

11   issue and that magnifies it.

12             And let's get one thing straight that both

13   Mr. Heslin and Miss Lewis testified to and is

14   corroborated by Dr. Crouch's patient notes, which are

15   contemporaneous:  Before 2018, neither Scarlett Lewis

16   nor Neil Heslin had ever watched a single Alex Jones

17   broadcast.  They hadn't.

18             So, Megyn Kelly is running her hit piece.

19   And we didn't get from the evidence why Neil reached out

20   to her or how that process worked.   It's just a gap in

21   the evidence, because you all need to base your verdict

22   on the evidence.  So, I don't know it.  Perhaps it's

23   fair to infer that, because of the campaign coverage

24   that had been given to the Sandy Hook event, he felt he

25   needed to reach out.

1            The point is, after that Alex finds out

2   what's going to happen and he tries to intervene.  He

3   goes on his show, he accuses the mainstream media of

4   perverting what he's saying, what he no longer believes.

5   He reaches out to Neil Heslin, well, to all the Sandy

6   Hook families, right?  He never mentions Neil by name.

7   And guess what.  Nobody listens.  Why doesn't anybody

8   listen?  Because Alex's platform isn't that big.  He's

9   not Hillary Clinton, he's not Megyn Kelly.  When he goes

10  on, not that many people listen.

11            I mean, don't get me wrong, I'm not trying

12  to minimize his platform.  He has a platform.  But it's

13  not the kind of national platform that they're talking

14  about.  And that came through in the evidence.  He's got

15  40 -- well, sorry, now 80 employees, at the time it was,

16  you know, fifty employees.  This is not the *New York*

17  *Times*.  This isn't CNN.  This is a talk show in Austin,

18  Texas.

19            So, Neil goes on the show and Owen

20  Shroyer, a young reporter, runs this ZeroHedge piece.

21  And the Court has found that that piece was defamatory.

22            What did we learn from the witness stand?

23  Neither Neil nor Scarlett knew about it.  They had no

24  idea about Owen Shroyer's report until almost a year

25  later.  And I've put it to you that it is fair to infer

1    from the evidence that someone, something, weaponized

2    Neil and Scarlett's grief and convinced them that Alex

3    Jones was responsible.

4                I asked them both on the stand, did you

5    review the videos?  No.  And I'm not saying that they

6    should, right?  But I asked them, how did you come to

7    this conclusion that Alex Jones is the root of all that

8    is wrong with your life?  And the only answer they had

9    is that, that's what I've heard.  That's what I'm

10   convinced of.  You all, sitting here, have the chance to

11   actually examine that, and that's what actual damages

12   are about.  Right?  It's about examining whether Alex's

13   actions and his words actually caused harm.

14               The most important evidence in the case

15   are the videos.  Right?  The complete, unedited videos.

16   They are a contemporaneous record of everything that

17   Alex said.  The plaintiffs have excellent lawyers.  And

18   they've spared no expense.  They chose the case that

19   they wanted to put on.  And the case that they wanted to

20   put on did not have 27 hours of video.

21               I changed this because it changed during

22   their closing.  I did have a nice PowerPoint, I did

23   receive some criticism for my flip charts.  I hope

24   everyone can see them.  Between 2012 and 2018, in

25   evidence, we have 18 hours and 43 minutes of video.

1   Okay.  What did we get from the witness stand in terms

2   of how much time InfoWars is broadcasting?

3               Alex Jones testified, and so did Daria

4   Karpova that during the early years it was seven hours a

5   day, and that that went up to ten hours per day in 2017.

6   If you take 18 hours and 43 minutes and you divide it by

7   the amount of time, 11,947 hours that they were on the

8   air, that gives you .16 percent.

9               I propose to you we've spent more time

10  talking about Sandy Hook during this trial than Alex

11  Jones or his organization spent in six years talking

12  about it.  And they want to tell you that that drove

13  people insane?

14              MR. FARRAR:  Your Honor, I have to object,

15  the same reason we don't know what all the videos are,

16  we haven't established that.

17              THE COURT:  In evidence.

18              MR. REYNAL:  In evidence, Your Honor.

19              THE COURT:  That's all, but not -- we

20  don't know in the world.  We don't.

21              MR. REYNAL:  Your Honor, I would object to

22  the commentary on the evidence.

23              Your job and your instruction from the

24  Court is to base your verdict on the evidence that has

25  been admitted and the testimony that we've received.

1  They chose what case to bring.  We don't want to be here

2  at all.  They have the burden.  .16 percent.

3                 And not only that, as we know, Mr. Heslin,

4  Miss Lewis, I'm sorry I called them Neil and Scarlett

5  earlier, that might not have been respectful of me and I

6  apologize for it.  Mr. Heslin and Miss Lewis did not see

7  any of those videos broadcast.  They both testified to

8  that.

9                 Let's talking about the law.  In your jury

10 instructions there are several pieces that I would like

11 to bring particular attention to.  The first, let me

12 move this.  There was something we talked about during

13 Voir Dire.  Do not let bias, prejudice, or sympathy play

14 any part in your decision.  I put it to you that most of

15 the presentation we've had thus far has been about bias

16 and prejudice and sympathy.

17                 We entered this courtroom already having

18 lost.  That's why we're here just about damages.  Yet

19 that is what we hear the least about in this courtroom.

20 Why is that?  Because Mr. Heslin and Miss Lewis are

21 tremendously sympathetic people.  They are.  My heart

22 goes out to them for their loss.  They are tremendously

23 sympathetic.  But that has no role in the dispassionate

24 oath you took to decide this case based on the facts.

25                 Similarly, thinking that Alex isn't a good

1    person or hasn't done the right thing, if some of you

2    all think that, should play no role in deciding whether

3    there have been actual damages and to what extent, and

4    whether they have been proven, because now we can

5    talking about what's been proven.

6              It's on the second page of your jury

7    instructions.  Sub point 2:  Base your answers only on

8    the evidence admitted in Court and on the law in these

9    instructions.  Truth may be an amorphous concept outside

10   this room.  But in this room truth comes from evidence.

11   Actual evidence that's been admitted.

12             This is a long one, proximate cause.

13   You'll see it on every one, starting on page 5, each one

14   of the questions, the second full paragraph is proximate

15   cause.  And I'll give you a moment to read it for

16   yourself if you would like before I continue.

17             There are two aspects of proximate cause

18   that I want to bring particular attention to.  One,

19   "proximate cause" means a cause that was a substantial

20   factor in bringing about the injury.  A substantial

21   factor.  18 hours and 43 minutes over six years.

22             "Reasonable foreseeability."  The act or

23   omission complained of must be such that a person using

24   ordinary care would have foreseen that the injury, or

25   some similar injury, might reasonably result therefrom.

1          Ask yourself how reasonable is it for a

2    talk show host in Austin, Texas, to believe that

3    18 hours and 43 minutes of coverage that we have in

4    evidence would cause people to harass Neil Heslin and

5    Scarlett Lewis.

6          "Pre-existing condition."  We all know

7    what that is.  It's the horrific death of their child.

8    I can't imagine the pain and suffering and anguish that

9    comes from it.  Dr. Crouch testified that it's not

10   something you ever get over.  I think he's absolutely

11   right.  So ask yourselves, take that -- when you go back

12   to deliberate, think about that, think about proximate

13   cause, think about pre-existing condition.  And follow

14   the evidence as you heard it from the witness stand and

15   as it came in through the videos.

16          Let's talking about the evidence.  You

17   know, this can a stressful profession.  And I, I have a

18   hobby.  I shoot a bow and arrow.  It helps me to just

19   concentrate on one thing and clear my mind of everything

20   else.  Now, I go to a range to do that.  If I went to my

21   range and shot for a couple of hours and then sometime

22   later the owner of the range came to me and said, hey,

23   there's been some damage to the range and we think you

24   did it.

25          I would say, well, how do you know?

1            They say, no, no, no, we think you did it

2    because you shot a lot of arrows.

3            And I would say, well, did you look at the

4    arrow?  Did you examine it?

5            Well, no.

6            I say, okay, well, was anybody else out

7    there shooting at the same time?

8            Say, no, we don't care.  You were out

9    there.

10           And then finally I say, well, you haven't

11   looked at the arrows, you haven't looked at if anybody

12   else was out there.

13           And the answer is, no, someone told us you

14   did it.

15           You say who?  Who told you this?

16           Well, I don't know.

17           All right.  That's kind of like the

18   evidence we got in this case.  Did Alex Jones make these

19   statements?  Yes, he did.  And he genuinely apologized

20   for it.  On the witness stand repeatedly.  He said that

21   they fell short.  And I heard your questions to him.

22   Are you going to change things, have you changed things,

23   what are you going to do so that this doesn't happen

24   again.  And he answered those questions truthfully.  And

25   his employees answered those questions truthfully, as

1    well.

2              Corroboration.  I spent a lot of time with

3    Dr. Lubit talking about corroboration.  Hey, Dr. Lubit,

4    you're saying all these things, did you take any steps

5    to corroborate them?  Did you interview the neighbors?

6    Did you ask for a police report?  Did you do anything at

7    all to substantiate that these things had happened.  No,

8    no, no.

9              And one of you asked him, if I remember

10   correctly, one of you asked him, hey, Dr. Lubit -- I

11   mean words to this effect, hey, Dr. Lubit, if media

12   organizations should substantiate their sources, why

13   shouldn't forensic psychiatrists?  And he just said,

14   well, that's different, that's different.  If the

15   lawyers don't prove it, then you can throw out my entire

16   opinion.  Well, where is the evidence?  Where is the

17   evidence.

18              Again, look to Dr. Crouch.  First mention

19   of Alex Jones, 2018.  And he said he had nothing before

20   that.  I put to you, use your recollection.  Dr. Crouch

21   was handed an affidavit and asked to testify from it.

22   His notes, his contemporaneous interviews, did not

23   reflect this pattern of harassment that has been

24   discussed.  Again, where is the evidence.

25              Also, go back to the number of hours.

1    You'll have the exhibit.  Look at how many broadcasts

2    were made in 2012.  In 2013.  Scarlett Lewis testified

3    that when she was at the wake for her son she heard

4    somebody talking about a conspiracy theory.  You know

5    that Alex Jones wasn't saying that the children hadn't

6    died.

7              Wolfgang Halbig, he actually is the only

8    person we can say definitively ever did anything to

9    Scarlett Lewis and Neil Heslin.  We've got two emails

10   from him.  Bear in mind, this is a man who supposedly

11   sent thousands of emails.  Where are they?  Where are

12   the recordings?  We heard testimony that Scarlett Lewis

13   has a sophisticated home security system.  That's all we

14   heard about.  We didn't get any records, we didn't get

15   any video.

16             This case has been pending since 2018.  If

17   there were the kind of pattern of harassment that we're

18   talking about, where's the evidence?

19             And critically important also is the fact

20   that the evidence shows that Alex Jones never said

21   Scarlett Lewis's name.  And Owen Shroyer said Neil

22   Heslin's name for the first time in 2017.  They never

23   published their addresses.  Never even thought about it

24   really.  There's no evidence.

25             For people, if -- and there again we're

1   speculating, if people were approaching them, which

2   there's no evidence on, where did they get that from?

3   You have the videos to watch that the plaintiffs put in

4   evidence.  Is that more consistent with Alex Jones

5   having directed some kind of harassment, or with people

6   like Wolfgang Halbig who are mentally ill, obsessed.

7   Acting on their own.

8               Unfortunately, in a free society there is

9   risk associated with choice.  We live in a community

10  where some people just are unbalanced and are going to

11  take action on their own.  Is that reasonably

12  foreseeable to every broadcaster?  Most importantly,

13  there was no call to action.  Look through the videos.

14  None.

15              Mental anguish.  This is where

16  pre-existing condition comes in and where you can also

17  ask yourself, who is responsible for the mental anguish.

18  Is it Alex Jones or is it someone else.  Follow your

19  oath.  It's not going to be popular, but zero evidence

20  equals minimal damages.

21              It's just like that auto accident we

22  talked about during Voir Dire, you have the auto

23  accident, somebody gets hurt.  We talked about this.

24  They say, hey, you break it, you buy it.  All right?  If

25  you lie about somebody and you hurt them, then you pay

1   for it.  How do you know?  Show me the receipts.  Show

2   me the lost wages.  Show me the healthcare costs.  Show

3   me the cost associated with therapy.

4             Who asked those questions in this

5   courtroom?  I did.  That is evidence for you and came

6   from our side because we're interested in truth.  Not in

7   edited video clips and supposition.

8             Remember, you will have an opportunity to

9   decide punitive damages.  We are here about actual

10  damages.  And you all are smart people.  You wouldn't be

11  on this jury if you weren't smart.  We want smart

12  people, we want people who are going to be diligent,

13  people who are going to look at the evidence, who are

14  going to follow their oath to decide the case on the

15  facts.

16            Damage to reputation.  Again, where is the

17  lost job opportunity?  Where is the credit line that

18  wasn't extended, where is the social organization that

19  was denied him membership?  We had no evidence to

20  corroborate that anyone thinks less of Neil Heslin in

21  his community.  Zero evidence equals minimal damage.

22            Ask yourselves, who's really responsible

23  for these parents' pain?  Is it Adam Lanza's mother, who

24  bought him the gun?  Is it Adam Lanza, who murdered her

25  and then murdered 26 children?  Is it the mainstream

1    media misreporting the facts and events around Sandy

2    Hook?  Is it the truthers, who are out there waiting for

3    events like these to happen?  Or is it the talk show

4    host?

5                      Life is complicated.  This job is

6    complicated.

7                      Think about proximate cause.  That

8    instruction that is before every one of those questions.

9    Was Alex Jones' broadcast a substantial factor and was

10   it reasonably foreseeable to him.

11                     I forgot to mention, how about our

12   electoral system that magnified and broadcast.  That's

13   not something Alex Jones did.  It's something a campaign

14   politician did in order to paint their opponent.  What

15   fault do they bear?  Megyn Kelly, what responsibility

16   does she have?

17                     MR. FARRAR:  I have to object.  There's no

18   responsible third party pled in this case to talking

19   about other people.

20                     THE COURT:  Sustain.

21                     MR. REYNAL:  $150 million.  It's their job

22   to ask for a lot of money.  It's your job to decide the

23   case based on the evidence.  There's a concept called

24   anchoring.  And the idea of anchoring is that, if you

25   say a really, really big number people are going to work

1   off it.  So, if you say 150 million dollars and then you

2   guys go back and you say, oh, man, I don't think they

3   proved it, I don't think they proved it, so why don't we

4   give them ten percent of that.  And award $15 million.

5           That's not how this process works.  They

6   have the burden of proof.  They start from zero and they

7   work their way up from there.  And it's very creative, I

8   mean their, what was it, 24 percent.  They brought in

9   Becca Lewis, who is working on her Ph.D.  They brought

10  in a grad student who read selected excerpts from other

11  people's publications and then cited a study that, if

12  she had taken the time to Google it, I asked her about

13  this, if she had taken the time to Google it she would

14  have found out that it's widely discredited.  She

15  admitted that there was an article in *The Atlantic*

16  talking about this.

17          MR. FARRAR:  Objection, Your Honor.

18  There's no evidence of widely discredited.

19          THE COURT:  Okay, let's just move on.  I

20  mean sustained, but let's move on.

21          MR. REYNAL:  Ask yourself, is that number

22  reasonable?  I mean, there's twelve of you.  Do three of

23  you think Sandy Hook never happened?  It's not

24  reasonable.  It's not right.  And think about what

25  $150 million represents.  A person making $100,000 a

 1   year would have to work for 1500 years to make

 2   $150 million.  It would take 18 generations to make

 3   $150 million.  And that's assuming you didn't spend

 4   anything.  Let's say you saved half your money.

 5   3,000 years.  32 generations.  This isn't a real number.

 6                You know, I asked my son about

 7   $150 million and he said, you know, that would weigh

 8   33,000 pounds.  The equivalent of eight fully grown

 9   elephants.

10                This is a hard part of my presentation,

11   and I took a long time thinking about this and I went

12   back and forth in my mind as to whether I would say

13   these words and show you what I'm going to show you.

14   And ultimately the reason I'm going to is because I

15   believe in the process.  I am committed to what we're

16   doing right here, to twelve individuals, members of the

17   community, deciding a case based on the evidence and

18   holding people to their burden of proof.

19                "Question 1:  Defamation.  What amount of

20   money, if paid now in cash, would compensate Neil Heslin

21   for the damages that were proximately caused by Alex

22   Jones."  You see you've got two dates up there, June 26,

23   2017, and July 20th, 2017.  Those are the dates of the

24   defamatory publication.  Have we even seen the July

25   20th, 2017, one?

1             Injury to reputation that he sustained in

2   the past.  He didn't even see Alex Jones' show until

3   2018.  $1.  Not proven.  Not proven.

4             Injury to his reputation that Neil Heslin

5   will sustain in the future.  This trial is being

6   broadcast to the world.  I mean, the eyes that we have

7   around us.  I think Neil Heslin can walk out of here

8   with his head held high.  He's told the world his story,

9   Alex Jones has told the world his story.  He sat on that

10  witness stand, Alex Jones did, and said, I believe those

11  children died.  I am very sorry for the coverage that we

12  gave.  There is no reputational harm going forward.  Not

13  proven.  Not proven.

14            Mental anguish that Neil Heslin sustained

15  in the past.  Proximate cause.  Is his mental anguish

16  the result of what Alex Jones did?  Ask yourself, was he

17  a substantial factor?  18 hours and 43 minutes over six

18  years.  That's an average of three hours per year.  That

19  was the evidence they chose to bring in.  Not proven.

20            I don't like this.  But this is what the

21  law requires.  And you'll have your chance if you want

22  to punish Alex Jones.  You'll have your chance.  Mental

23  anguish in reasonable probability that Neil Heslin will

24  sustain in the future.

25            I hope to God that this process has been

1    good.  I hope to God that you've gotten some level of

2    closure, I really do.  Both of you.

3                    What's been proven.  Ask yourself, what's

4    been proven caused by Alex Jones.  You need actual

5    evidence.

6                    I'm not going to belabor the point.  These

7    are repetitive.  Question number 2 relates to

8    intentional infliction of emotional distress from 2013

9    to 2018.  First paragraph:  He never even watched his

10   videos.  That was the evidence we had from the witness

11   chair.  How can we say that Alex Jones caused more than

12   minimal damage when Mr. Heslin didn't even see his

13   broadcast?

14                    We don't have a single -- there was an --

15   I actually wrote this down.  The Plaintiffs' attorneys

16   referred during their closing to harassment online.  Do

17   you recall what Neil Heslin said about how much he likes

18   computers?  I do.  He said he doesn't even like his

19   cellphone.  He is not a computer guy.  What type of

20   online harassment are we talking about?  Was that

21   proven?  Is there actual evidence of that?  No.  How

22   about in the future?

23                    Ask yourself, what are we doing here?  I

24   said before, I hope there is closure, I hope this

25   sordid, sad story comes to an end in the next couple of

 1   days, after you come back with your verdict on punitive

 2   damages.  But there's been no evidence that there will

 3   be future mental anguish that was caused by Alex Jones.

 4           Mr. Heslin is clearly very, very upset,

 5   and I think that is genuine.  But that is not what you

 6   base a verdict on.  That he is upset is Step one.  You

 7   need to be sure that this man caused it.

 8           Scarlett Lewis, 2013 to 2018.  No

 9   contemporaneous records.  She testified that she spent

10   at least I think $50,000 in therapy.  No contemporaneous

11   records.  Four years that this litigation is pending

12   that there is every incentive to preserve everything and

13   we have an email from Wolfgang Halbig.  I think overall

14   we had two emails, I think there was one from 2015 that

15   somehow made its way into InfoWars' possession

16   through one of those email dumps.  2019, one email.

17           They admitted it separately, they put two

18   different exhibit stickers on it but remember when I

19   asked about it, it was an attachment to a single email.

20   Not proven.  Future mental anguish damages.  Not proven.

21           I understand these numbers are different.

22   I understand your job is hard.  And maybe I would even

23   understand if you said, you know what, I -- we feel like

24   we should give them some money for mental health

25   treatment so that they can continue.  I don't think it's

1    supported by the evidence, but I can see that.

2              The evidence shows that plaintiffs have

3    been victimized four times:  By Adam Lanza, by

4    politicians and members of the mainstream media, by the

5    truthers, and by those people who took their grief and

6    weaponized it.  And I'm profoundly sorry for that.  I

7    think it is a sad reflection on the state of our nation.

8              There's a couple of things that came out

9    during Mr. Farrar's closing argument that I think are

10   worth addressing because I don't want there to be any

11   confusion.  Mr. Farrar made reference to Wolfgang

12   Halbig's disgusting Superbowl picture from, if you look

13   at it, Odd.TV.  I elicited from several witnesses that

14   picture never made its way onto InfoWars.  There is a

15   line in the videos where it says "Sandy Hook Children

16   Perform At Superbowl."  It's in 2013.  We had evidence

17   that they did perform at the Superbowl.  And InfoWars

18   covered it.

19             Look a couple before there.  I think you

20   have one that's "Sandy Hook survivor remembers fallen

21   hero."  Again, they picked -- they got to pick the

22   evidence they brought in here.  They picked the worse

23   things they could find.  And if you take their video

24   clips and add them together, it's not 18 hours and

25   43 minutes.  It's 90 minutes.  90 minutes over six years

1    they say caused all this harm.

2              Alex Jones may not be to your particular

3    taste, but millions of Americas tune in to be informed,

4    to be entertained, to have their voices heard.

5              Verdict, the word "verdict," it comes from

6    the latin *veredictum*.  To speak the truth.  Speak the

7    truth in your verdict because you're deciding for them

8    and for all Americans.  Do you want to choose what you

9    get to to watch and listen to or do you want a

10   Plaintiffs' attorney to decide for you.

11             MR. FARRAR:  Your Honor.

12             THE COURT:  Sustained.

13             MR. REYNAL:  There was a Lutheran minister

14   named Martin Niemöller in the 1930s, and he was

15   imprisoned in a concentration camp.  And when he got out

16   he reflected on the fact that he had stood quiet.  And

17   he said first they came for the communists and I said

18   I'm not a communist and didn't do anything.  Then they

19   came for the trade unionists and I said, I'm not a trade

20   unionist.  Then they came for the Jews and I said, I'm

21   not a Jew.  And when they came for me, there was no one

22   left.

23             It's been an honor to talk to you, to

24   present our side.  I look forward to addressing you

25   again on the issue of punitive damages.  I have a lot to

1    say about what the right number is, and I look forward

2    to that opportunity.

3                    Thank you.

4                    THE COURT:  All right.  I think we

5    probably need another very short break.  Remember all of

6    my instructions.  Let's try to keep it to ten minutes,

7    please.

8                    *(Brief recess.)*

9                    THE COURT:  All right, you may be seated.

10                   All right.  You ready?

11                   MR. FARRAR:  Yes, Your Honor.

12                   THE COURT:  All right, you may begin.

13                   MR. FARRAR:  Thanks, Your Honor.

14                   We apparently are still living in this

15   Alex Jones conspiracy world where nothing as it seems;

16   that somehow I assume lawyers here weaponized Neil and

17   Scarlett to try to take down Alex Jones.  We weaponized

18   them to take down Alex Jones.  We're the deep state now

19   in this weird conspiracy theory where you guys were hand

20   picked by the clerk and the judge and part of the deep

21   state.

22                   And this is a script, a literal script, as

23   they said on his show just a couple of days ago.  That's

24   the conspiracy theory that's spinning in this room right

25   now, because that's the conspiracy theory that Alex

1   Jones wants the world to believe when you return a

2   verdict that you say, this is not what we do in society.

3   We don't tell lies about people, we don't hurt people.

4   That's the spin that he wants to put on it.  That's what

5   just happened.  That's what that closing was all about.

6               That we got -- that they lied to Dr. Lubit

7   and Mr. Crouch about their treatment?  Mr. Crouch said

8   in 2013 Neil talked about conspiracy theories.  About

9   people making money and profits off his dad -- or off

10  his son.  They have called them liars for ten years to

11  make money and they sat here and called them liars to

12  save money.  That's what just happened.

13               You appreciate the irony of that.

14  Anything to make money or to save money.  Anything that

15  will stomp on absolutely anybody, and they stomped on

16  them and they have to pay for what they broke.  That's

17  what they have to do.

18               The full videos, they're in evidence.  I

19  don't understand why the defendants keep saying That.  I

20  don't want to play you an hour or two hours of a full

21  video of all kinds of crazy conspiracy theories.  We

22  focused on the Sandy Hook ones.  That makes a whole lot

23  of sense because this case is about Sandy Hook.  Why

24  would I play you his conspiracy theories about frogs

25  being gay.  Why would I play that to you.  That doesn't

1    make any sense.  You don't want to see that.  I don't

2    want to see that.  They're in evidence, you can watch

3    them if you want.

4              More importantly, Mr. Reynal could have

5    played them at any point he wanted.  He could have

6    played them to you.  He did once.  He played a

7    51-minute, the very first witness that he got up, he

8    played a full video.  And I think he realized, that was

9    a horrible idea, that didn't help my client at all.  It

10   just showed how many people he will stomp on to get more

11   clicks to buy more -- or sell more pills.  That's all it

12   shows.

13             If you want to watch them, they're here,

14   all however many, I'll take his word for it, it was

15   18-something hours.  So, we showed you, what it was, he

16   said we showed nine minutes?  Ten minutes?  Yeah, that's

17   the part.  Those are the parts where he defames people

18   and he intentionally inflicts emotional distress on

19   people and it affects them.

20             And this idea, this idea that they didn't

21   watch them?  Yeah, they don't watch his show.  Big

22   shock.

23             What did Mr. Crouch talk -- he talked

24   about that.  Finding out someone lies to you secondhand

25   is worse because you know what it means?  The lie is

1   spreading.  If someone comes to your face and just lies
2   to you and no one else hears it, it ain't great but it's
3   definitely not as bad as someone comes over to you and
4   says, hey, there's a guy on a national broadcast,
5   actually, take it back, worldwide broadcast lying about
6   you.  That hurts.  Because the lie is spreading by
7   definition, because you didn't hear it from the horse's
8   mouth.  Definitionally spreading.
9         The number of times this idea of he's
10  apologized has come up is troubling to me.  What is he
11  apologizing for?  His lawyer just stood up and said $8
12  should take care of their pain.  The harm.  So, he
13  clearly doesn't think he hurt these people.  That's --
14  clearly he doesn't think he hurt them if you think it's
15  worth $8.
16        He said there's -- they've been victimized
17  by four different people, and then he listed them off.
18  And I was like, well, surely the last one is Alex Jones,
19  right?  You can't possibly list people that have
20  victimized Neil and Scarlett and not say the word Alex
21  Jones, the name Alex Jones.  He did.  What's he
22  apologizing for?
23        That's why an apology doesn't matter.
24  It's not real.  It's never been real.  It's fake.  It
25  means absolutely nothing to Neil and Scarlett because

1   they've heard it, it means absolutely nothing to Alex

2   Jones because he doesn't mean it.

3            He made this excuse that he was tricked by

4   the truthers.  He's the Pied Piper of the truthers.

5   They're following him wherever he goes and he spews

6   hate.  That's what gets people riled up.  That's what

7   gets people to their house, that's what gets bullet

8   holes through his car.  That's what gets death threats.

9   This, I guess he took it down, this .16 percent of the

10  time, that's 99 -- so, he's saying 99.84 percent of the

11  time he is not defaming or inflicting emotional distress

12  on them.  Congratulations.

13           If I was in Court in a criminal case and I

14  said, Judge, 99.8 percent of the time I don't steal

15  anything, nothing, that's not a defense, that's crazy.

16  Doesn't matter what he does all the other time, it

17  matters what he does when he's defaming people and when

18  he's intentionally inflicting emotional distress on

19  people.  That's what matters.  When he's spreading lies

20  about the parents of Sandy Hook, that's what matters.

21  That's why we brought you those videos.

22           Preexisting condition.  I can't -- so, he

23  says they're not harmed, but if they are harmed it was

24  from something else.  And he has this weird thing about

25  the bow and arrow and that nobody examined the arrows.

1    People examined the arrows.  Dr. Lubit examined the

2    arrows.  Mr. Crouch examined the arrows.  And he said

3    they are broken, they are injured, and it came from Alex

4    Jones.

5            Nobody else came.  They had the ability to

6    call somebody on the stand and say, no, no, no, no, hold

7    up, hold up.  Hold up.  They're not either hurt or their

8    damage is clearly from the loss of Jesse, not the lies

9    spread about him in a worldwide forum.  19 hours or

10   18 hours of lies spread in a worldwide forum.  That's

11   not what hurt them.  They didn't do that, there's a

12   reason.  There's no psychiatrist or psychotherapist in

13   the world that would say that.

14           They have separate and distinct injuries,

15   there's no question.  And you know what the easy way to

16   know it?  Fear.  Jesse's murder didn't cause them fear,

17   it caused them unimaginable grief that they started to

18   recover from.  Fear is caused by Alex Jones and him

19   weaponize -- talking about weaponizing, him weaponizing

20   mentally unstable people to go after them.  Fear tells

21   you there's two separate and distinct injuries.

22           Just as a quick aside, the July 20th,

23   2017, video they said they never played?  It's because

24   they destroyed it.  That's why we never played it.  They

25   didn't tell you that.

1          What is $150 million?  Me and Mr. Reynal
2  talked about that.  Yeah, about six months of revenue at
3  InfoWars, that's what it means.
4          Miss Karpova testified and she said one
5  thing that was interesting.  She said words are Alex
6  Jones' weapon.  This verdict is your weapon to right a
7  serious wrong that happened to Neil and Scarlett.
8  Mr. Reynal said twice I hope this verdict you can look
9  back in 20 years and be proud of.  Yeah, so do I.  I
10  hope you look back at this verdict for years and you're
11  proud of it.  So, go do it.
12          THE COURT:  All right.  Thank you.
13          In a moment you will retire to the jury
14  room to select your presiding juror who will read the
15  charge and then begin your deliberations.  We will bring
16  you the original charge, which is the one that should be
17  signed by the presiding juror if the verdict is
18  unanimous or signed by the ten or eleven of you if it is
19  not unanimous.
20          We will also bring all of the exhibits to
21  you in a few minutes.  You should not be concerned if
22  the exhibits are not in sequential order; and if there
23  are any redactions, don't let that worry you, either.
24  Those are decisions that have been made in the admission
25  of that evidence.

1        After you select your presiding juror, I

2   need you to let my Judicial Executive Assistant know who

3   that is.

4        Now, I want to be really clear, you are

5   finally going to be able to discuss what you have heard

6   in this room.  You must all twelve be in the room any

7   time there is any deliberations or discussion.  So, if

8   somebody needs a break, everybody takes a break.  You

9   are free to work all day long, including through lunch.

10  I think that's been our routine so far so we'll probably

11  continue it, but we can talking about that.  If you take

12  a long break do let us know, so, say more than 15

13  minutes might affect what we do out here.

14        Anything else, any questions about that

15  part?

16        It's 4:36.  My guess is you're not going

17  to get much beyond presiding juror today, and that's

18  fine.  You can start as early as 8:30 tomorrow.  All

19  right?  So you're excused and, when you're all together,

20  you can talking about the case.  Thank you.

21                *(Jury retired for deliberations)*

22        At this time I do need one counsel from

23  each side to come up and verify the exhibits for me,

24  please.  As a reminder, I'll need you to state on the

25  record that you examined the exhibits and that those are

1   being taken to those jury room are all admitted, should

2   be taken to the jury room, any necessary redactions have

3   been made, and otherwise any objections will be deemed

4   waived.

5                    *(Off the record.)*

6                    THE COURT:  Let's go back on the record.

7                    Okay.  So, both sides have had an

8   opportunity to examine all of the exhibits, so we'll

9   start with Mr. Bankston.  Do you verify that you have

10  examined the exhibits, those that are being taken to the

11  jury room are all admitted, should be taken to the jury

12  room, all necessary redactions have been made.

13                   MR. BANKSTON:  I agree, Your Honor.

14                   THE COURT:  All right.  Same question,

15  Mr. Reynal.

16                   MR. REYNAL:  I agree, Your Honor.

17                   THE COURT:  All right.  Then we can go

18  back off the record.

19                   (End of proceedings.)

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2   THE STATE OF TEXAS          )

 3   COUNTY OF TRAVIS            )

 4              I, Alicia DuBois, Official Court Reporter

 5   in and for the 459th District Court of Travis County,

 6   State of Texas, do hereby certify that the above and

 7   foregoing contains a true and correct transcription of

 8   all portions of evidence and other proceedings requested

 9   in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open Court or in chambers and were reported by me.

13              I further certify that this Reporter's

14   Record of the Proceedings truly and correctly reflects

15   the exhibits, if any, offered in evidence by the

16   respective parties.

17              WITNESS MY OFFICIAL HAND this, the 1st day

18   of October, 2022.

19                         /s/ Alicia DuBois
                           Alicia DuBois, CSR
20                         Texas CSR 5332
                           Exp. Date:  1/31/24
21                         Official Court Reporter
                           459th District Court
22                         Travis County, Texas
                           P.O. Box 1748
23                         Austin, Texas 78767
                           (512) 854-9301
24

25
```