# Exhibit 2

| | | |
|---|---|---|
| 1 | REPORTER'S RECORD | |
| | VOLUME 1 OF 1 VOLUME | |
| 2 | MARCEL FONTAINE, | ) IN THE DISTRICT COURT |
| | | ) |
| 3 | Plaintiff | ) TRAVIS COUNTY, TEXAS |
| | | ) |
| 4 | VS. | ) 459TH JUDICIAL DISTRICT |
| | | ) |
| 5 | ALEX E. JONES, INFOWARS, | ) |
| | LLC, ET AL., | ) TRIAL COURT CAUSE NO. |
| 6 | | ) D-1-GN-18-001605 |
| | Defendants | ) |
| 7 | | |
| | NEIL HESLIN, | ) IN THE DISTRICT COURT |
| 8 | | ) |
| | Plaintiff | ) TRAVIS COUNTY, TEXAS |
| 9 | | ) |
| | VS. | ) 459TH JUDICIAL DISTRICT |
| 10 | | ) |
| | ALEX E. JONES, INFOWARS, | ) |
| 11 | LLC, ET AL., | ) TRIAL COURT CAUSE NO. |
| | | ) D-1-GN-18-001835 AND |
| 12 | Defendant | ) D-1-GN-19-004651 |
| 13 | LEONARD POZNER AND | ) IN THE DISTRICT COURT |
| | VERONIQUE DE LA ROSA, | ) |
| 14 | | ) TRAVIS COUNTY, TEXAS |
| | Plaintiff | ) |
| 15 | | ) 459TH JUDICIAL DISTRICT |
| | VS. | ) |
| 16 | | ) |
| | ALEX E. JONES, INFOWARS, | ) TRIAL COURT CAUSE NOS. |
| 17 | LLC, ET AL., | ) D-1-GN-18-001842 |
| | | ) |
| 18 | DEFENDANTS | ) |
| 19 | SCARLETT LEWIS, | ) IN THE DISTRICT COURT |
| | | ) |
| 20 | Plaintiff | ) TRAVIS COUNTY, TEXAS |
| | | ) |
| 21 | VS. | ) 459TH JUDICIAL DISTRICT |
| | | ) |
| 22 | ALEX E. JONES, INFOWARS, | ) |
| | LLC, ET AL., | ) |
| 23 | | ) TRIAL COURT CAUSE NO. |
| | DEFENDANTS | ) D-1-GN-18-006623 |
| 24 | | ) |
| | ----------------------------------------------------------- | |
| 25 | MOTION FOR SANCTIONS; MOTION TO COMPEL | |

1            On the 14th day of January, 2022, the

2    following proceedings came on to be heard in the

3    above-entitled and numbered cause before the Honorable

4    Maya Guerra Gamble, Judge presiding, held in Austin,

5    Travis County, Texas, held via videoconference;

6            Proceedings reported by machine

7    shorthand.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         Mark D. Bankston
           SBOT No. 24071066
 5         William R. Ogden
           SBOT. NO. 24073531
 6         Kaster Lynch Farrar & Ball, LLP
           1117 Herkimer Street
 7         Houston, Texas  77008
           (713) 221-8300
 8

 9    FOR THE DEFENDANTS IN CAUSE NO. D-1-GN-18-001605:

10         Bradley J. Reeves
           SBOT No. 24068266
11         Reeves Law, PLLC
           702 Rio Grande Street, Suite 306
12         Austin, Texas  78701
           (512) 827-2246
13

14    FOR THE DEFENDANTS IN CAUSE NOS. D-1-GN-18-001835,
      D-1-GN-18-001842, D-1-GN-18-006623 AN D-1-GN-1004651:
15
           Jacquelyn W. Blott
16         SBOT No. 07473250
           Law Office of Jacquelyn W. Blott
17         200 University Boulevard, Suite 225 #251
           Round Rock, Texas  78665
18         (512) 639-9904

19
           Bradley J. Reeves
20         SBOT No. 24068266
           Reeves Law, PLLC
21         702 Rio Grande Street, Suite 306
           Austin, Texas  78701
22         (512) 827-2246

23

24

25
```

```
1                         I N D E X
                          VOLUME 1
2             MOTION FOR SANCTIONS; MOTION TO COMPEL
                       JANUARY 14, 2022
3

4                                          Page      Vol.

5    Announcements........................    5         1

6    Proceedings..........................    9         1

7    Argument by Mr. Ogden................   17         1

8    Argument by Mr. Reeves...............   24         1

9    Final Argument by Mr. Ogden..........   27         1

10   Ruling...............................   28         1

11   Argument by Mr. Bankston.............   32         1

12   Argument by Ms. Blott................   55         1

13   Final Argument by Mr. Bankston.......   70         1

14   Ruling...............................   78         1

15   Scheduling...........................   88         1

16   Adjournment..........................   97         1

17   Reporter's Certificate...............   98         1

18

19

20

21

22

23

24

25
```

```
 1              FRIDAY, JANUARY 14, 2022 - MORNING PROCEEDINGS
 2              (The following proceedings were held in open
 3    court, via YouTube)
 4              THE COURT:  All right, D-1-GN-18-001835,
 5    Neil Heslin versus Free Speech Systems, LLC, InfoWars,
 6    LLC, Alex Jones and Owen Shroyer.
 7              Don't answer yet.
 8              D-1-GN-18-001842, Leonard Pozner and
 9    Veronique De la Rosa versus the same defendants, and
10    D-1-GN-18-006623, Scarlett Lewis versus again the Free
11    Speech Systems and Alex Jones Defendants.
12              Who is here on that case today?
13              MR. BANKSTON:  Mark Bankston is appearing
14    on behalf of Plaintiffs for the Sandy Hook cases and
15    Mr. Ogden for Fontaine.
16              THE COURT:  Just that I just called the
17    Sandy Hook cases.
18              MR. BANKSTON:  Oh, excuse me.  Sorry
19    about that, Your Honor.
20              THE COURT:  That's okay, that's okay.
21    And you're it on that side today.
22              MR. BANKSTON:  Yes, I will be the one
23    appearing for the plaintiffs on that side.
24              THE COURT:  All right.  And Mr. Reeves.
25              MS. BLOTT:  Jacqueline Blott --
```

1           MR. REEVES:  Excuse me, Your Honor,

2    Miss Jacqueline Blott has recently appeared and been

3    designated lead counsel; I'll let her introduce

4    herself.

5           THE COURT:  Well, that is a very

6    interesting thing for you to tell me now today, because

7    I haven't received anything.  And I know, Mr. Reeves,

8    that -- and Miss Blott, could you adjust your camera?

9    All I can see is your eyes.

10           Do you recall the letter I sent when this

11    case -- these cases were assigned to me, Mr. Reeves?

12           MR. REEVES:  I remember you sending a

13    letter, Your Honor.  I don't remember exactly what

14    you're specifying but I absolutely remember you sending

15    it, yes.

16           THE COURT:  Do you recall that the letter

17    instructs the attorneys on this case that filing things

18    with the clerk's office, while a necessary step, is not

19    sufficient to notify the court of anything.

20           MR. REEVES:  Your Honor, I understand

21    that; and I believe that the notice of appearance of

22    Miss Blott was also provided via the submission docket.

23           THE COURT:  It was not.

24           MR. REEVES:  I apologize, Your Honor,

25    that's part of the service list on there, I presumed

1   that had been done.  Miss Blott filed her appearance

2   but I apologize, it was not -- I recognize that you

3   asked us to send you things directly, as well, so I

4   thought that had been done based on the service list.

5              THE COURT:  Okay.  Have you shared that

6   letter with Miss Blott?

7              MR. REEVES:  No, ma'am, I don't believe

8   so.  I apologize for that.

9              THE COURT:  All right.  Well, I'm going

10  to direct you to do that.

11             MR. REEVES:  Yes, ma'am.

12             THE COURT:  All right.  So, Miss Blott, I

13  take it to understand that you are now representing all

14  four of the defendants?

15             MS. BLOTT:  Yes, Your Honor.

16             THE COURT:  And you, I assume, because of

17  what Mr. Reeves just told me, have filed a notice of

18  appearance in all four cases?

19             MS. BLOTT:  Yes, Your Honor.

20             MR. REEVES:  Your Honor, not the Fontaine

21  matter.

22             MS. BLOTT:  Oh, that's correct.  I

23  apologize, Your Honor, I misspoke.

24             THE COURT:  Just the three Sandy Hook

25  cases.

1          MS. BLOTT:  Yes, Your Honor.

2          THE COURT:  All right.  Anyone else with

3     you here today?

4          MS. BLOTT:  No, Your Honor.

5          THE COURT:  All right.  D-1-GN-18-001605,

6     Marcel Fontaine versus InfoWars, et al.  I didn't write

7     all of them down, sorry.

8          MR. OGDEN:  Bill Ogden for the plaintiff,

9     Your Honor.

10          THE COURT:  All right.

11          MR. REEVES:  And Your Honor, Brad Reeves

12     for the defendants in that matter, Your Honor.

13          THE COURT:  Only you, Mr. Reeves.

14          MR. REEVES:  Yes, Your Honor, that's

15     correct.

16          THE COURT:  All right.  Well, we have a

17     lot to get over on those cases.  I've made some

18     extensive notes about what I think is in front of me

19     today, what I think has been filed but not delivered to

20     me but not set.  And also, even though I tried, we have

21     to basically move all the trial settings.  So we'll

22     come back to all of that.

23          *(Other unrelated matters heard and not*

24     *transcribed herein.)*

25          THE COURT:  Ms. DuBois, I assume we're on

1    the record.  Rather than reading out all four cause

2    numbers again, I'm going to talk about all four cases

3    that we colloquially refer to as Sandy Hook and the

4    one -- I always get the one in Florida wrong.

5                    MR. REEVES:  Parkland.

6                    THE COURT:  The Sandy Hook and the

7    Parkland case.

8                    Okay.  So, number one, I know we are here

9    on Plaintiff's motion for sanctions regarding corporate

10   depositions.  Um.  I have that, that was delivered to

11   me, that's what my docket says.  Um.  And maybe, but I

12   don't think so, um, attorneys fees from the

13   October 26th order?

14                   MR. BANKSTON:  We should be fine on that,

15   Your Honor.

16                   THE COURT:  Here is how we're going to do

17   it.  We're just going to have Mr. Bankston answer for

18   now.

19                   MR. BANKSTON:  Okay.  Yes, regarding

20   those fees, we should be good on that.

21                   THE COURT:  I thought so, okay.

22                   MR. BANKSTON:  Yeah, yeah, we had

23   provided you, and I think we have a signed order on

24   that.

25                   THE COURT:  I thought we did, too, but

1    honestly there are a lot of orders on this case and,

2    just like everyone else, I'm at work by myself, because

3    everyone is staying home to delay COVID.  I don't think

4    there's any avoiding it anymore, but to delay it; which

5    there's a value in delaying.

6                    Okay, so that one is taken care of.

7                    So here is what I have.  I have a note to

8    myself that says "Remind the attorneys about court

9    directions."  And by that I mean this case is -- these

10   cases are assigned to me and me only.  You still have

11   to file everything with the clerk's office.  The

12   clerk's office does not forward pleadings to the judge.

13                   If you file something and you want me to

14   know about it, you have to send it to my office.  If it

15   is more than 20 pages you have to do that on paper.  If

16   you file a motion and you would like a hearing, you

17   have to call my office and request one.  It does not

18   magically happen; I don't set them for you.  I am not

19   in the business of determining your strategy or

20   deciding what your intentions are.

21                   So, essentially that is to say I have

22   seen a number of pleadings filed with the clerk's

23   office, and I assume that they have been filed just to

24   have them on file because nobody has asked me to take

25   any action on them.  And that's my position until I am

 1    requested to do something.  All right.

 2              I do want an update, I obviously know

 3    what happened with the mandamus at the Third Court of

 4    Appeals.  Again, I don't tell anyone what is available,

 5    but I would like to know if anyone is pursuing or

 6    intending to pursue further appellate action -- I'm not

 7    saying it's available, I'm not saying it isn't

 8    available -- because that will affect trial settings.

 9              Ms. Blott?

10              MS. BLOTT:  Not at this time, Your Honor.

11              THE COURT:  Okay.  Thank you.

12              All right.  So, we're definitely going to

13    take up Plaintiff's Motions For Sanctions Regarding

14    Corporate Depositions.  I also saw, um, a couple of

15    defense motions, again nobody has asked me to set them.

16    I did get copies of one, or maybe we printed them out

17    because they were emailed to us, that's Defendant's

18    motion to exclude Plaintiff's Experts Fred Zipp and

19    Becca Lewis.  But I don't believe it is set today.

20              Are you under the impression it is set

21    today, Ms. Blott?

22              MS. BLOTT:  No, Your Honor, I am not

23    under that impression.

24              THE COURT:  And then I also saw another

25    defense filing, a motion to reconsider the default

1    judgment, also not delivered to my office and not set.

2              Do you agree, Miss Blott?

3              MS. BLOTT:  Yes, Your Honor, I do.

4              THE COURT:  Great.  Then we're on the

5    same page there.

6              MR. BANKSTON:  Your Honor, one thing I

7    just wanted to mention because I'm getting a bunch of

8    messages about it, obviously not a priority to me but

9    I'm hearing the live stream is not working.

10             THE COURT:  It's not working?

11             MR. BANKSTON:  Exactly.

12             THE COURT:  Miss Matusek-Steele, can you

13   fix that, please.  I thought I had -- it popped up a

14   separate browser and I thought it was -- it popped it

15   up and I shut it and I thought it was working, but it's

16   not working, you're completely right.  And it is

17   important, so.  She is working on it now.  But I'll

18   have to start it again, so I'll wait until she tells

19   me.  Coffee break.

20             If you don't have your calendar handy

21   maybe get your calendars ready for the next part.  I

22   think I was optimistic when we set all those trial

23   settings and also a little aggressive.  Also forgot I

24   was having a child graduate from high school and that

25   has blocked some weeks from consideration, so.  Also,

1   my thirty-year reunion to college, I know no one can

2   believe it because I look 12.  That's a joke.  It is my

3   thirtieth reunion from college, so I was hoping to go

4   to that, as well.  So we'll see.

5                    *(Pause in proceedings.)*

6                    THE COURT:  Nope, it is not working,

7   Miss Matusek-Steele.  I just see the courthouse steps

8   as usual and then the docket from this week.

9                    Um, so normally I just go ahead because

10  nobody really cares and half the people in front of me

11  don't want everyone to watch.  I feel like this case is

12  different than that.  So, what I can offer is that we

13  all logoff and log back on and Miss Matusek-Steele will

14  reset it in the interim and that should work, or we

15  proceed like this.  And I'm going to need agreement

16  from the lawyers for whichever one we do.

17                    So, Mr. Bankston.

18                    MR. BANKSTON:  Plaintiff, the only thing

19  I'm concerned about is time crunch.  So that is why we

20  would want to go ahead, I guess.

21                    THE COURT:  Miss Blott.

22                    MS. BLOTT:  I agree, Your Honor.

23                    THE COURT:  So, you want to proceed

24  without live stream?

25                    MR. BANKSTON:  Yes, Your Honor.

1          THE COURT:  All right, that's fine with

2     me.

3          All right.  Then on the Fontaine case,

4     Parkland case, I have Plaintiff's Motion to Compel and

5     Motion for Sanctions.  Is that right?

6          MR. OGDEN:  Yes, Your Honor.

7          THE COURT:  And that's set for today, as

8     well?

9          MR. OGDEN:  Yes, Your Honor, it is.

10          THE COURT:  And that's it.

11          MR. OGDEN:  On Fontaine, yes.

12          THE COURT:  Okay.  So, really just one

13     motion on each set of cases.  Okay.  Right now Heslin

14     is set for March 28th, um, for two weeks.  I'm not

15     available the 7th and 8th.  I am available the 11th

16     through the 15th.  We could leave that one.  That feels

17     alarmingly close to me.  Um.  No one has asked me to

18     move it yet, but I'm just going to tell you what that

19     would look like is March 28th through April the 12th --

20     well, probably the 13th, because I have to cutoff early

21     on the 6th at like 1:00 p.m.  So, a two-week

22     announcement, which is what I was asked for, would be

23     March 28th through April 13th for that one if we -- if

24     we stick with it.

25          Um, Lewis is set for April 25th through

1    May 6th.  And then I have -- I believe this is

2    100 percent my fault but I have, I believe, deleted

3    from my calendar the Pozner setting, so we don't

4    even -- I have to look it up to figure out when that

5    one was set.  I feel like since I took it off my

6    calendar I can't do it.  And then Fontaine, June 27th

7    through July 8th.  And that's fine, as well.

8              So, the main problem is Heslin seems very

9    early to me and I think, if I didn't make it clear,

10   just so you all know, in my head I did leave open the

11   possibility of a future repeat motion to consolidate

12   after we get through a little more of the pretrial

13   damages discovery, if we manage to do that.  Um.  And

14   so I still want to know, everyone, that that's open.

15   That's a possibility even though I denied it a couple

16   of weeks ago in the current state.

17             So, Mr. Bankston, do you happen to

18   remember or know when the Pozner case was originally

19   set for?

20             MR. BANKSTON:  No.  And, in fact, I'm not

21   a hundred percent sure it was, because I remember we

22   had the March and the April setting and then the June

23   was sort of a backup setting at one point.  I'm not

24   sure if we ever had an official setting.

25             MS. BLOTT:  I have those dates, Your

1    Honor, if you would like them.

2                    THE COURT:  I would.

3                    MS. BLOTT:  Heslin, March 28; Lewis,

4    April 25th; and Pozner, May 23rd.

5                    THE COURT:  I put -- my mug, which has

6    never failed me, literally poured coffee --

7                    MS. BLOTT:  Oh, I'm sorry.

8                    THE COURT:  No, I'm laughing, too.  I use

9    this mug every single day, I have never had that happen

10   before.

11                   All right, I'm so sorry, you're going to

12   have to repeat yourself, I sprayed myself with coffee.

13                   MS. BLOTT:  That's okay.  I have the

14   following dates, trial dates:  March 28th, I believe

15   that's Heslin; April 25th, I believe that was the Lewis

16   case; and May 23rd, which I believe is the Pozner case.

17                   THE COURT:  Yes.

18                   MS. BLOTT:  I do not have the Fontaine

19   case right now, for which I apologize.

20                   THE COURT:  That's okay, that one was

21   June 27th.

22                   So, Pozner, I took it off my calendar

23   because those two weeks are high school graduation and

24   my thirtieth college reunion.  So, I did take that off

25   the calendar and I should have told you.  Maybe I did

ask, that's why you don't have it, Mr. Bankston.  But that date won't work for me anymore, and I do apologize about that.

I'm sorry, I'm going to -- I think I put my mug together wrong today.  No one cares but it has that little like seal that comes out and if you put it in upside-down it does not work.  I think we've all -- I just discovered.  Okay.  Sorry.

All right.  So what -- we can talk about those at the end or we can talk about those now.  I guess, you know what, let's do it at the end because it might make a difference, what happens with this hearing.

So, Mr. Bankston, do you want to go first on the Sandy Hook cases or does Mr. Ogden want to go first?

MR. BANKSTON:  I think the Fontaine stuff is going to be so much faster, let's just get it out of the way.

THE COURT:  All right, Mr. Ogden.

MR. OGDEN:  Yes, Your Honor.  If I could share my screen.

THE COURT:  Absolutely.

MR. OGDEN:  Your Honor, as you're aware, the Fontaine case involves Marcel Fontaine, an

1   individual who was wrongfully pinned as the Parkland

2   High School shooter by the defendants.  And I'm not

3   going to go into detail about the case because I'm

4   pretty sure the judge knows as much as I do at this

5   point what it's about.

6           We sent some discovery requests to

7   Defendants and there were four in issue in our brief.

8   One of them has been resolved, so this is only going to

9   take a few minutes to go through the three at issue.

10          THE COURT:  Which one was resolved?

11          MR. OGDEN:  That would be Request for

12   Production Number 7.

13          THE COURT:  Okay, I'm looking for the --

14   this is the chart that I asked you to give me; right?

15          MR. REEVES:  No, Your Honor -- I'm sorry,

16   this is Brad Reeves.  That chart is in the Sandy Hook

17   matters, Your Honor.

18          THE COURT:  Oh, okay.

19          I'm not sure I'm as prepared as I was

20   planning to be, then.  I thought I had read everything,

21   but it is a massive amount of paperwork that I get on

22   this case.

23          MR. OGDEN:  Your Honor, if it will help I

24   have the requests and responses in this Powerpoint.

25          THE COURT:  Okay, that's fine, I just had

1  notes that I wrote, but I think I found it.  I'm just

2  dealing with the things that aren't set and the things

3  that are.  So now I've got it.  I'm in the right place.

4         MR. OGDEN:  Okay.  The first request at

5  issue is Request for Production Number 3 that was

6  propounded to Defendants.  And that request was to

7  produce all documents written or sent by employee of

8  Free Speech Systems, LLC from February 14th, 2013, to

9  the present regarding 4Chan.

10        4Chan is the website that is an anonymous

11 message board where Defendants got Mr. Fontaine's

12 photograph and ultimately published it with an article.

13        On October 20th, after receiving no

14 documents, we got information from Defendants that

15 says, "We will limit your request to only include

16 documents written or sent within the scope of their

17 employment with your client."  They also, in our meet

18 and confer, said that, "We believe five years is a

19 reasonable timeframe, especially since one would expect

20 total volume of documents would be relatively low."

21        Following that, and still today,

22 Defendants have refused to respond whatsoever.  And in

23 their briefing, in response to our motion, they argue

24 the -- overbroad and vague as to that specific request.

25 But to date they have not attempted to even give us any

1   documents, even with the limitations that they offered
2   in the meet and confer.  So, that would be the first
3   issue that we have.
4              I didn't know if you wanted me to go
5   through all three and then let them respond or take
6   them one by one.  How would you like to do that, Your
7   Honor?
8              THE COURT:  Just -- we'll do them all and
9   then we'll go from there.
10              MR. OGDEN:  Okay.  The next one is
11   Request for Production Number 7.  That one has been
12   resolved.  We were informed on January 8th that
13   Defendants have no documents for that, so we can skip
14   that one.
15              THE COURT:  Okay.
16              MR. OGDEN:  Request for Production Number
17   8 is, "Produce all documents relating to Denver Public
18   School Band Director, Dave Hammond, or the use of his
19   photo on Infowars.com, including any communications
20   with Mr. Hammond or any representative of the Denver
21   Public School System regarding Mr. Hammond."
22              In the months prior to Mr. Fontaine being
23   misidentified, Mr. Hammond was misidentified as a
24   teacher in Denver who was allegedly improper with a
25   student.

1          THE COURT:  By InfoWars.

2          MR. OGDEN:  Yes, Your Honor.

3          THE COURT:  Like by the defendants in

4    this case.

5          MR. OGDEN:  That is correct.

6          THE COURT:  Okay.

7          MR. OGDEN:  Mr. Hammond actually reached

8    out to Mr. Bankston and myself and informed us of the

9    situation, and that occurred after the loss of this

10   file.  Which is why we have this specific request in

11   our discovery, because I don't -- I think this easily

12   gets past the step of improper character evidence when

13   it shows a motive -- I mean, a modus operandi of how

14   they operated as an organization.

15          In response, they have refused to respond

16   whatsoever.  And in the briefing responsive to our

17   motion, Defendants ignore Mr. Hammond entirely.  There

18   is no argument or justification as to why they're

19   ignoring that request.

20          The last issue we have is a document that

21   is Document 333, and it relates to a demand for

22   correction that was made by Darren Howard.  Darren

23   Howard was misidentified as a crisis actor who is

24   playing a fake COVID patient in the United Kingdom

25   News.

1           This is the document that we received

2    from them, and it has been redacted.

3           On October 19th, we asked why this

4    document was redacted; and we got responsive -- we got

5    a response from Defendants that the redaction was to

6    material that was nonresponsive to the request.

7           Now, we look at *Simms v. Austin*

8    *Radiological Association*, and that name might ring a

9    bell because it was actually argued on appeal by you,

10   Judge Guerra Gamble.  And that case is specifically on

11   point and it was exhaustively opined by the court of

12   appeals that a party can not unilaterally redact

13   information it believes is irrelevant or nonresponsive.

14           The *Simms* decision cites that "The Court

15   should not be burdened with an *in-camera* inspection of

16   redacted documents merely to confirm the relevance or

17   irrelevance of redacted information, but only when

18   necessary to protect privileged material."

19           Here, there is no privileged material

20   that they are protecting; rather, they've made the

21   unilateral decision to be the judge themselves on what

22   is and is not relevant.

23           "Redaction is, after all, an alteration

24   of potential evidence," which is disallowed by the

25   Texas courts.

1          Also, with regards to Document 333, the

2    objections that they do make when they have -- after

3    they redacted the document, um, were completely

4    untimely.  And also, they assert a work product

5    privilege to the document itself.

6          Rule 193.2 says that a party must make

7    any objection to written discovery within the time for

8    response.  Here it's -- this objection was months late,

9    after they realized that they have redacted the

10   document without objection.

11          So in summary, these were the three

12   points of documents that are at issue.  The first would

13   be the internal documents regarding 4Chan; the second

14   is any documents referencing Mr. Hammond, who is the

15   teacher from Denver; and the third is producing an

16   unredacted copy of Document 333 relating to Darren

17   Howard.

18          We met and conferred with defense counsel

19   on these issues and, as we have been in the past with

20   all the discovery issues we've run into with the

21   defendants, we've been unsuccessful to get the

22   documents produced and/or get the documents fully,

23   properly produced without redactions.  And that's

24   our -- that's Plaintiff's position on our motion.

25          THE COURT:  All right.  Thank you.

1          Miss Blott.

2          MR. REEVES:  Your Honor, Brad Reeves, I'm

3    handling the Fontaine.

4          THE COURT:  I'm sorry, you told me that.

5    I forgot.  Mr. Reeves.

6          MR. REEVES:  You're fine.

7          Thank you, Your Honor.  Very quickly.

8    So, as far as the -- I'm just going to go request by

9    request, because it should be relatively quick and

10   easy.

11          As far as with the 4Chan documents, um,

12   you know, we've objected to it as overly broad and

13   we've also objected to it as vague, because the idea of

14   a phrase regarding "4Chan" and what those documents

15   entail is truly vague and could have any number of

16   interpretations.

17          If, you know, it's kind of a question of

18   is it on the same responsive document, being if the --

19   4Chan is referenced or if it's a discussion about

20   4Chan, and so we feel like those, the breadth of the

21   request is so broad as far as we can't really

22   reasonably respond to it without having more

23   specificity of what it's going to.

24          You know, I appreciate how they've

25   confined the time period, or they agreed to confine to

1   the employees working in their course and scope; but it

2   still leaves a lot to be desired as far as

3   understanding what exactly they're asking for.  I

4   think, you know, and I don't want to go into

5   interpreting their request too much, I think what

6   they're looking for is whether or not there have been

7   discussions about 4Chan, whether or not it's a reliable

8   source to be using for any stories.  But that's, you

9   know, that's me reading between the tea leaves.

10                  And so, because of the broadness and the

11  vagueness of it, that's why we've objected to it and

12  have been unable to respond as far as fully

13  understanding what they're looking for.

14                  Regarding -- so, the Request Number 8 for

15  Mr. Hammond, we believe that anything related to --

16  that's related to any other individuals that have been

17  allegedly misidentified, that really that has nothing

18  to do with the claims at issue in this lawsuit.  I

19  recognize they want to try to draw a correlation

20  between they misidentified one or you misidentified

21  another; but the basis for that, there's no real

22  connection other than the potential allegations that we

23  also feel like -- that has really no relevance to

24  Mr. Fontaine's claims.

25                  And so that's why -- and, you know, and

1    I've asked them -- as far as Mr. Hammond is concerned,

2    I don't have -- I have my client looking to see if

3    there's any potential responsive documents.  I know on

4    the Request Number 7 we've been able to determine there

5    are no responsive documents.  The other one, we're

6    looking for those to see if there's any.  So, I don't

7    want to make a mountain out of a molehill as far as

8    there may not even be documents there.

9          But given -- the overall concept here is

10   we feel like requests relating to third party

11   individuals who have nothing to do with this lawsuit

12   really aren't relevant and really shouldn't be -- are

13   not within a reasonable scope of what discovery should

14   be in this case.

15         Finally, as far as the redacted documents

16   concerned, you know, prior counsel did -- they did

17   denote it and they redacted, said it was nonresponsive,

18   I believe they could have been more, um, specific in

19   saying that the reason the information was

20   nonresponsive is because the information that's been

21   redacted is both work product and attorney-client.

22         If you look at the part of the document

23   that is not redacted, you can see very clear a

24   retraction notice that's been sent to InfoWars about

25   Mr. Howard.  And so the e-mails that are above it that

1    have been redacted involve discussions of that and also

2    involve, frankly, attorney-client privilege related to

3    that retraction notice.  That's why that's been

4    redacted.  Can't waive attorney-client privilege.

5              You know, I did supplement the responses

6    to the objections -- with objections to make that more

7    specific objection, but that's why that information is

8    redacted and why we believe that the plaintiff is not

9    entitled to that information, Your Honor.

10             THE COURT:  All right.  Mr. Ogden.

11             MR. OGDEN:  Yes, Your Honor.  I want

12   to --

13             THE COURT:  Just focus on the redacted

14   document only.

15             MR. OGDEN:  Sure, I can focus on the

16   redacted document.

17             They can't redact a document.  The law is

18   pretty clear on that.  And Mr. Reeves, you know, says,

19   oh, I went back and asserted the proper objection.  He

20   doesn't get another bite at the apple on that.

21             This process is being continually

22   frustrated by, and I'm not blaming Mr. Reeves, but I'm

23   also not in the position that -- he's not allowed at

24   this point to come in and throw prior counsel under the

25   bus.  As you're aware, we now have Miss Blott on the

1  Sandy Hook cases, so, if every time, which it's

2  happened a lot, a lawyer for the defendants does

3  something like this, they can't just hire a new lawyer

4  to say, hey, that wasn't me, I'm sorry.

5              THE COURT:  Right.  Every successive

6  lawyer is responsible for everything every prior lawyer

7  did.

8              Okay.  The motion to compel is granted on

9  all three requests as narrowed in today's presentation.

10  And the costs for the motion and the hearing on

11  Fontaine are awarded, as well.

12              MR. REEVES:  Your Honor, if I may.  So, I

13  understand your ruling and I do want to say first I

14  wasn't intending or wanted to throw prior counsel under

15  the bus.  That's not at all -- I was just saying how --

16  further specificity on the objections that were done to

17  supplement, there is very clear attorney-client

18  privileged material in this redacted document.

19              There's some that -- I'll just be frank

20  with you since you granted, the document itself,

21  there's the top email that's in this chain is

22  attorney-client privilege.  There's then discussions

23  of -- about this retraction amongst InfoWars

24  individuals that is the bulk of the retraction as far

25  as what we consider work product and in the space of

1    litigation.

2            So, I'm not entirely sure how I'm

3    supposed to handle especially attorney -- I mean, I

4    guess I can what -- if you're going to make me produce

5    it in it's form unredacted what I would like is get the

6    court's permission to be able to redact the

7    attorney-client privilege aspect of it and then we'll

8    give them the rest of it.  Is that....

9            I'm trying to understand -- I'm trying to

10   understand where I stand on it as far as the

11   privilege -- you know, attorney-client privilege can't

12   be waived whether it's asserted or not in their written

13   responses.

14            THE COURT:  No.  I'm -- basically you

15   just argued to me that the entirety of those redactions

16   were due to attorney-client privilege.  And now that

17   I've said you have to turn it over, you're going, okay,

18   well, actually this little part, that's really

19   attorney-client privilege.  So I'm certain you

20   understand how that casts doubt on the veracity of what

21   you're telling me today.

22            MR. REEVES:  Your Honor --

23            THE COURT:  Right?

24            MR. REEVES:  I do believe I said

25   attorney-client and work product.  So, I'm not

1  trying -- they are different -- those privileges are

2  being asserted as to different aspects of this email,

3  and I don't want to -- I don't want you to feel like

4  I'm not telling you what -- you know, it is both is

5  why -- what the privileges have been asserted.  What

6  I'm saying is that especially -- I have no problem as

7  far as showing the email addresses to show that it's a

8  lawyer that it's sent to with the text being redacted.

9           THE COURT:  Just because there's a lawyer

10  on a text stream or an email stream does not actually

11  mean it's attorney-client privileged.  There are a lot

12  of other considerations that make something

13  attorney-client privileged or that show that it has

14  actually been waived.  So, that alone is not going to

15  be enough.

16           Here is what I do not want to happen.  I

17  do not want you to redact everything and then make a

18  series of claims about why until you land on one and

19  then I have to look at every single document before you

20  turn it over.  I'm not interested in that, that's not

21  you doing your job, and so that's not what we're going

22  to do.  Um.

23           We have a protective order in this case.

24  You can mark it with that and send it over, and if

25  Mr. Ogden agrees that part of it is attorney-client

1 privileged and hasn't been waived by the client, by

2 including I don't know who in the e-mails, then he will

3 take appropriate action, I am confident.

4     MR. REEVES:  Okay.  I can deal with

5 Mr. Ogden on that.  Thank you, Your Honor.

6     THE COURT:  All right.  And Mr. Ogden --

7 Mr. Reeves, rather, do you want Mr. Ogden to -- do you

8 want to challenge what he is going to say his fees were

9 for preparing this motion and coming to court today to

10 present it and preparing an order?

11     MR. REEVES:  Your Honor, I think that if

12 Mr. Ogden will send me what his thoughts are on that as

13 far as -- that he and I can hopefully try to work out

14 an agreement on that so that we're not having to put

15 that on your plate.

16     THE COURT:  So, include that in the order

17 that you send me, then, please.

18     MR. OGDEN:  Yes, Your Honor.  Thank you.

19     THE COURT:  Okay.  Great.

20     All right, then we are ready, all right,

21 we were ready to move onto the Heslin, Pozner, and

22 Lewis cases.

23     MR. OGDEN:  Your Honor, before we start I

24 just wanted to make the court aware, I have an

25 11:00 o'clock hearing and I didn't want to interrupt

1    anybody by leaving.  I'm not arguing this motion but I

2    do want to stick around as long as I can, if that's

3    okay.

4              THE COURT:  That's fine.  Thank you for

5    telling me.

6              MR. OGDEN:  Thank you.

7              THE COURT:  I'm ready when you are,

8    Mr. Bankston.

9              MR. BANKSTON:  You're ready.

10             THE COURT:  I am.

11             MR. BANKSTON:  Okay.  So, the motion I'm

12   going to take up is the corporate deposition motion.

13   And as I believe you had mentioned earlier, you had

14   talked about the charts that you had just gotten.

15             THE COURT:  Yes.

16             MR. BANKSTON:  And some of those relate

17   to some of these same issues.  Basically, we had

18   post-remand written discovery and that's been pending

19   since October.  We had a hearing on that sanctions

20   motion.  And then --

21             THE COURT:  But okay, I thought I

22   decided -- so, here is, to take you off track, I'm

23   trying to find a page that doesn't show any other case.

24   Okay.  So, you guys probably can't see this, but.

25   There you go.  This -- I have this for each of our

```
 1   cases.
 2                    MR. BANKSTON:  Sure.
 3                    THE COURT:  And under "Orders Under
 4   Advisement" I don't have anything written down.  Which
 5   means I think I've decided everything we've had a
 6   hearing on.  Do you disagree?
 7                    MR. BANKSTON:  Yeah.  Yeah, let me take
 8   you through that real quick.
 9                    THE COURT:  So, I messed up somewhere in
10   my record keeping.  And honestly, it's because it has
11   the same name.
12                    MR. BANKSTON:  And actually I think it
13   works out for the best in this case.
14                    THE COURT:  Okay.
15                    MR. BANKSTON:  I think it's going to help
16   you.
17                    THE COURT:  Okay.
18                    MR. BANKSTON:  Because what had happened
19   is on 10/25 we had had a hearing on a motion for
20   sanctions regarding written discovery post remand.  So,
21   this is the discovery that we thought was due for
22   damages and punitive damages post remand.  We had that
23   hearing and, in fact, Defendants have filed a response
24   on the day of the hearing, so you had given me leave to
25   file a reply.
```

1          THE COURT:  Right.

2          MR. BANKSTON:  So, I had filed that reply

3   and then about three weeks ago Miss Ward had contacted

4   us and said, what the judge would like you to do to

5   help resolve these motions is to create a chart of all

6   the requests, put what was originally requested, what

7   Plaintiff still says they need, et cetera, and what

8   Defendant still needs.

9          That same day, I -- the very following

10  morning I emailed Miss Ward back, said, hey, I filled

11  out the chart, I got it all completed, I sent it over

12  to Defendant's counsel, as soon as Defendant's counsel

13  fills in their section for what they think they've

14  produced, I'll turn in the chart to you.

15         That time went by and, it wasn't until

16  yesterday, finally I emailed Miss Ward and said, hey,

17  more than three weeks have passed, they haven't sent

18  the chart, here is the chart that's incomplete, I hope

19  it's still helpful even though it's only our side, and

20  then a couple of hours later Mr. Reeves put together

21  something and sent that to her, as well.

22         So, that chart reflects to the written

23  discovery for that motion that still is yet undecided.

24         THE COURT:  Okay, and I have it and I've

25  looked for it, I still can't find it and I asked

1   Miss Matusek-Steele to look for it.  So, she actually

2   came in today, so she's here so I don't have to get off

3   the bench to go and find it.

4             MR. BANKSTON:  All right.  Now

5   technically that motion isn't set for today.

6             THE COURT:  Because I've already heard

7   it.

8             MR. BANKSTON:  Sure, you already heard

9   it, exactly.  And it relates to today, of course.

10            THE COURT:  Right.  I actually thought it

11  was done, but that's okay.  Okay.

12            MR. BANKSTON:  And also --

13            MR. REEVES:  And Your Honor --

14            MR. BANKSTON:  -- a lot of those topics

15  relate to the same deposition topics that we're going

16  to be talking about today in the corporate deposition,

17  as well.  So, these areas overlap and, in fact, the

18  remedies that we're asking are basically the same in

19  both motions.  So, the fact that you're going to decide

20  them at the same time, honestly, makes a lot of sense.

21  It's going to help us.

22            THE COURT:  Okay.  And I did read

23  Plaintiff's Motion For Sanctions Regarding the

24  Corporate Deposition, Defendant's Response in

25  Opposition, and then they sent me a proposed order, as

1  well.  So, those are the pleadings I have read, um, in

2  preparation.

3              MR. BANKSTON:  Perfect.

4              All right.  I'm going to share my screen,

5  as well.

6              All right.  So, this motion about

7  corporate depositions.  I want to go through some of

8  the background; obviously, I don't want to do the

9  background to the entire discovery but just the efforts

10  that we've taken to get a corporate deposition.

11             So, we were first ordered one in Heslin

12  back on August 31st, 2018, Defendants refused to appear

13  at that deposition.  We had a deposition ordered in

14  Lewis on January 25th, 2019.  The defendant designated

15  Rob Dew.  Mr. Dew was not prepared.  This court called

16  it a worthless deposition and at that time they paid

17  attorneys fees.

18             Upon remand of the Heslin case in 2019,

19  Defendant again refused to appear and the court granted

20  a contempt motion, at that time fining Defendants

21  $25,000.

22             On the fourth time we tried this, there

23  was a deposition ordered in the Heslin IIED case on

24  October 18, 2019.  Defendant again designated Rob Dew.

25  Again Rob Dew was not prepared.  We cited a

1    considerable portion of Mr. Dew's testimony from that

2    deposition in our motion, and the reason we did so is

3    because it's functionally identical to some of the

4    testimony we're going to be talking about.

5                On December 20th, 2019, the court again

6    granted contempt and held a default under advisement.

7    There was a $100,000 sanction.  The defendants promised

8    they would get the discovery situation fixed up before

9    the appeal was over.  Upon remand in 2021, Defendants

10   ignored the entirety of their discovery problems for

11   months, and then that resulted in a default judgment.

12               At that time, back on August 31st, 2021,

13   you told me, "My concern is that you need this

14   discovery even for a damages trial."  My question is

15   just, if you're trying to get punitive damages, you

16   probably do need more discovery.  And I told you at

17   that time, after this hearing and I have more of an

18   understanding of what the scope of discovery is like

19   going forward, then we'll serve new discovery requests

20   and depositions that we may need.

21               At that time I was owed about four

22   separate depositions, and obviously I could take

23   depositions in all of the cases individually.  Um.

24   What I agreed to do with Defendants is to have one

25   deposition for the corporate deposition.  We would have

1     one single deposition, it would cover some of the

2     topics from the discovery order that were still

3     relevant to punitive and compensatory damages, and then

4     there would be some additional topics also on damage

5     issues.

6                    THE COURT:  For the three cases.

7                    MR. BANKSTON:  For all three cases,

8     exactly.  There would be one deposition cross-noticed

9     on all three cases.

10                   So, the topics that we -- we did, we kept

11    these topics from the 2019 discovery order that they

12    still owed me, which was sourcing and research for the

13    videos described in Plaintiff's petition, the internal

14    editorial discussions regarding their coverage of Sandy

15    Hook -- and these were, of course, the two topics that

16    Rob Dew has never been able to answer and that they've

17    been repeatedly held in contempt for.  These are the

18    topics that are still really relevant to my punitive

19    damages claim.

20                   We also had the topic the documents

21    produced by the company in response to Plaintiff's

22    discovery requests:  The efforts made by the company to

23    preserve potential evidence.  And then Defendant's have

24    also agreed to the following three topics:  The

25    company's knowledge of the plaintiffs, the audience

1  reach of the challenged publications, and the company's

2  business structure and its relationship with other

3  parties.

4          Now, they produced -- on December 3rd

5  they produced a woman named Daria Karpova.  She's some

6  sort of producer at InfoWars.  She's not intimately

7  involved in the production of these videos that are at

8  issue in this case, but she's a producer there.  She

9  was not able to give meaningful testimony on any of

10 these topics.  The reason is due to her preparation.

11         And it is really -- is shameful how

12 poorly prepared she was for this deposition,

13 considering especially the prior history of the case.

14 She spent maybe an hour with her counsel of record,

15 that's it, two days before the deposition.

16         She then spent a couple of hours on the

17 day before the deposition with Marc Randazza.

18 Mr. Randazza actually came down to Texas, prepared the

19 witness, and he actually attended the deposition of

20 Mr. Jones on the Saturday.  He didn't appear at the

21 weekday depositions but he appeared at that one.  And

22 so, apparently he had spent a couple of hours with her,

23 and that seems to be the bulk of what actually

24 happened.

25         She said she actually spent one hour

1    preparing by herself.  She said that she spoke with the

2    prior corporate representative, that was Mr. Dew, who

3    gave her no information.  And it's strange, because

4    Mr. Dew should have been the first person to be able to

5    tell her:  There's some things you need to get prepared

6    for and here is what they are, and here is what I was

7    not prepared for.  And instead she described the

8    conversation as Mr. Dew saying, "No, you're fine, go

9    for it, you should be all fine."  She did not speak

10   with Mr. Jones or any employees involved in creating

11   any of the videos.

12           Now, Miss Karpova was not required as a

13   corporate representative to have personal knowledge,

14   but the company was required to prepare her by using

15   those who do.  And these are the individuals who

16   actually have that personal knowledge.  They're ones

17   who are actually firsthand involved in these videos.

18   She didn't speak to anybody.

19           Here is the total universe of documents

20   that Miss Karpova had prepared for before the

21   deposition.  She had pulled the "Wikipedia" articles

22   for false flag, the Reichstag Fire, and Pearl Harbor

23   advance-knowledge conspiracy theory.  She had an

24   article from "History Today" summarizing the sinking of

25   the USS Maine in 1895.  She had an anonymous blog post

1   from D.C. Clothesline.

2           She had a bio of Dr. Steve Pieczenick,

3   who is an InfoWars guest.  She had an article from

4   "LovetheTruth.com" entitled "I Think Sandy Hook Was a

5   Massive Elaborate Hoax."  And she had two news articles

6   with what she called interesting information regarding

7   the victim's mother and her request to have an open

8   casket.

9           So, it looks like what Miss Karpova did

10  was basically just Google some stuff, and none of it

11  really relevant to the case, per se, and certainly not

12  preparing for all of those topics that we just talked

13  about.

14          When you see her testimony, and we've

15  quoted in that motion, as I'm sure you've read, a lot

16  of her testimony, and it's not -- we -- we could have

17  quoted so much more.  I mean honestly, the whole

18  deposition is there, it's in the Box, it is a painful

19  deposition to read.  It was extremely frustrating.

20  Particularly in light of what has happened in prior

21  depositions, it was astonishing to have a corporate

22  representative giving the exact same answers, the exact

23  same kind of, oh, yeah, no, I didn't do anything to

24  prepare, I haven't even watched that's videos, nobody

25  has watched them, nobody has catalogued them, reviewed

1   them, figured out what they say.

2           I mean, I come into corporate depositions

3   all the time and you have corporate designees who have

4   been very prepared, they have notes about who they

5   talked to and what they were told.  I mean, you go into

6   a plant explosion case, a failed tire, a medical

7   device, any other corporate case, your corporate

8   designee is going to be prepared because they have

9   those duties to do that.

10          Now, like I say, we produced a lot of

11  that testimony to you, but one thing I did want to do

12  is, because the court of appeals places a great premium

13  and deference on you actually seeing the demeanor and

14  the credibility of the witness, so I want to show you

15  about ten minutes of Miss Karpova's testimony.

16               THE COURT:  All right.

17               MR. BANKSTON:  And I think not so much on

18  the credibility as in personally Miss Karpova doesn't

19  have credibility or something like that, but what I

20  think you'll see from the demeanor of this witness is a

21  witness who was clearly unprepared to testify, and

22  you'll see how frustrating that was.  So, I'm going to

23  play that now.

24               *(Video recording played off the record)*

25               MR. BANKSTON:  All right, Your Honor.

1    So, that is the testimony, a little bit of a sample of
2    what I got.  And it was this for every topic.  So, when
3    it came to the audience reach she could not tell us
4    what audience it reached, where InfoWars videos were
5    disseminated.  I still to this day can not prove where
6    InfoWars videos were disseminated at any time during
7    any point of this case.
8                    Obviously couldn't tell us anything about
9    the plaintiffs, the videos.  The internal editorial
10   discussions she denied even exists.  She took no steps
11   to prepare on those, she said we never had editorial
12   discussions about Sandy Hook.  And we know from the
13   documents that we do have or we've been able to piece
14   together that, yes, they absolutely did.  Indeed, their
15   internal employees were telling each other that our
16   sources are crazy.  There was no ability for
17   Miss Karpova to talk about any of these, for any of
18   these topics.
19                    And we got a response, um, and it's sort
20   of surprising to me, because the response only makes
21   two arguments, and they're both patently frivolous.
22   Which is -- the first argument that Defendant's
23   response makes is that the complaints about the
24   corporate representative were unfounded and without
25   merit.  That she was more than able to and did provide

1    appropriate responses to Free Speech System's

2    knowledge, understanding, and information it had which

3    relate to the issues in this case.  And respectfully,

4    that's just not true.

5              I mean, you just saw on a video where she

6    answered to the question about your knowledge of the

7    plaintiffs, what information -- do you know what

8    information the company has about any of these

9    plaintiffs?  And she said no, I don't.  I haven't been

10   prepared.  I haven't looked -- the only documents that

11   she looked at was some smear job about Miss Pozner

12   having an open casket funeral.  Didn't even look at any

13   of the documents that have been produced about any of

14   the plaintiffs.  And they're going to try to tell us

15   with a straight face that this was okay.

16             And then that means that, if this

17   deposition was okay, then the court's prior orders, the

18   multiple prior orders about the prior depositions were

19   wrongly decided because it was the same testimony.

20   It's the same situation.  The person is like, I did

21   functionally nothing to prepare for these topics.  And

22   what happened here is pretty egregious because they

23   spent less than an hour with their counsel of record,

24   and the entire deposition is really just a product of

25   Marc Randazza.  And big surprise, we don't have any

1    useful information after that happens.

2              Their second argument is that every issue

3    raised by the plaintiffs in their motion touches on the

4    issue of liability and not damages.  And this again is

5    just frivolous.  Because, even as you recognized at the

6    hearing, a lot of these issues are still going to be

7    relative to Plaintiff's punitive damages case.  The

8    plaintiff is going to have to prove how egregious

9    InfoWars' conduct was, how far it departed from the

10   standard of care, because that is going to be what

11   determines the amount of punitive damages.  And then

12   some of these topics are just completely relevant to

13   compensatory damages.

14              So, there is not an issue here that none

15   of this was relevant.  If none of this was relevant, we

16   wouldn't have gone forward, there would have been no

17   reason to take this deposition.

18              So, these are two complete excuses that

19   just ignore the reality of the situation.  Even now,

20   this late into the case, Defendants are not going to be

21   able to look at that deposition and say, yes, that was

22   inadequate.  They will not take responsibility for

23   that.

24              I want you to remember that back on

25   November 26, 2019, Jones gave a deposition.  And you

1  saw that deposition during the default judgment

2  hearing, that's the clip we played during that hearing.

3  And what you may remember is there were lots of

4  questions where Mr. Jones said, Well, yeah, I didn't

5  produce this but I didn't really know what you were

6  looking for, and of course I can identify my sources,

7  of course I can pull that up, oh, we just have to go

8  back and pull it up real quick, it wouldn't be a

9  problem at all, now that I know what you're looking

10 for, is what Mr. Jones was saying.

11          And this was already after we had gone

12 through discovery a couple of times, so even back in

13 2019 those answers were a little ridiculous.  But

14 Mr. Jones assured us that he could identify his

15 sources.  And this appears to be borne out by the

16 exhibit that we submitted that you have there in the

17 Box with you.  There was just recently a statement made

18 on Mr. Jones' show right after the deposition.  And so,

19 I want to just play you about ten seconds of Mr. Jones

20 talking about his archivist.

21          *(Audio recording played off the record)*

22          MR. BANKSTON:  So, Mr. Jones says he has

23 a bloodhound who can find all this stuff.  And why

24 wasn't that person involved in the corporate

25 deposition.  Why didn't Miss Karpova talk to that

1   person, if they have an archivist and we're going back

2   and looking for this stuff.

3           And instead, you have Defendant's counsel

4   who are coming in filing responses saying, no, no, the

5   company can't find that information, that information

6   doesn't exist, there are no records, there's nothing to

7   go look for.  And here you have Mr. Jones saying, no,

8   we have an archivist who can find it.  And Miss Karpova

9   never talked to him or any employee ever involved in

10  any of this stuff.

11          The reason is -- Mr. Jones revealed it

12  pretty clearly at his deposition that we took the day

13  after Miss Karpova's deposition.  And what we learned

14  there is that Mr. Jones just straight-up admits he

15  doesn't care.  So, I asked him in that deposition, hey,

16  do you remember back in your prior deposition you said

17  that you could find all this stuff.  You said that if

18  we needed these sources you could go pull them up, it

19  wouldn't be very difficult at all.  Do you remember

20  saying that?

21          He says, yeah, I remember saying that.

22          I said, well, you haven't done that, have

23  you?  Why haven't you done that?

24          And as you'll see cited in our motion,

25  Mr. Jones' answer to me is, well, frankly, Bankston,

1     you don't occupy much space in my mind.

2               He doesn't care.  He knows that he's

3     supposed to be doing these things, he does not care.

4     And the lawyer that he actually has running the show,

5     who keeps parading now the eighth lawyer in here to try

6     take the fall for this, that lawyer who is actually

7     running the show doesn't care, either.

8               And it gets ridiculous because now here

9     we are, every single time Defendants have come up on a

10    sanctions motion, any time that this has happened they

11    go get a new lawyer.  They just take the last lawyer

12    and throw it under the bus.  And it is very ironic to

13    me in this case that in both hearings we're having, in

14    the Fontaine and the Sandy Hook hearing, are both being

15    argued by a lawyer who had no personal involvement

16    whatsoever in the discovery that's being agreed about.

17    Which is doubly ironic in this particular case because

18    the lawyer who ostensibly did, although he spent less

19    than an hour with his deponent, is actually here

20    sitting in this hearing but not arguing this case.

21              And this sort of -- this farce grows old

22    after a certain point.

23              It leads us to the conundrum that I

24    really have in this case and that I think is also

25    facing you.  And the conundrum is what do you do when

1    you're a defendant against whom liability is assured,

2    but there are skeletons in your closet which can

3    inflame a punitive damage verdict.  What if there are

4    communications that are really bad, things that you

5    were saying to people, crazy people you were talking

6    about to try to get to harass people, secrets that if

7    they come out would be super damaging.  What do you do

8    if you're an unscrupulous defendant.

9              Well, you obstruct discovery, you incur a

10   default if necessary, because it doesn't matter,

11   liability was always assured.  It was never a question

12   of liability.  The idea is to prevent horrific facts

13   from reaching a jury, potentially saving you millions

14   of dollars.

15             If you were to design an artificial

16   intelligence to defend this case, to adopt this

17   strategy, and that artificial intelligence had no

18   scruples and no respect for the rule of law, this is

19   the strategy it would come up with.  This is the

20   rationale which to approach this case if you have no

21   respect for the rule of law.

22             And so, sometimes people say to me about

23   this case, they see these hearings, they see each new

24   lawyer come in, they see just the constant mess that

25   has come and they say to me, why do you think Jones is

1  acting so irrationally?

2              And I say maybe he's not.  Maybe this is

3  perfectly rationale.  Maybe that's exactly what's going

4  on is that this is the perfect strategy for him to

5  adopt if he's not going to respect the rule of law.

6  Because no matter what we do in this courtroom, no

7  matter what is any way of your arsenal of remedies that

8  you can do, it will never be worse than the millions he

9  might lose if those punitive damage facts ever reach

10  the jury.  So, it's always going to be profitable for

11  him to take this course of conduct.

12              This makes it difficult for me, because I

13  don't even really know what remedies to tell you.  The

14  strange thing is that I'm going to tell you basically

15  the same remedies that I had in the last sanctions

16  motion we had, the other one that's pending.  And I

17  think these can just be decided together and these can

18  be the remedies.  But I'm going to be real honest with

19  you, I'm not sure they do the trick.  I don't know what

20  to do.  All that I can do is point you towards 215.

21              And so, we look at the remedies that are

22  left in 215.  And the first one is (b)(1), which is an

23  order disallowing any further discovery of any kind.

24  And this is the one I think has to happen.  Because now

25  we've been to a point -- we don't even have basic

1    written discovery in nearly any case.  We have no

2    Request for disclosure in anything.  Any written

3    discovery that has occurred in any of these cases is a

4    joke, has been granted sanctions on it, has never been

5    supplemented.  We don't have the most basic information

6    about this case.  And as you've seen, the corporate

7    deposition has been another waste.  Repeatedly just a

8    waste of our time.  We have been denied so much.

9              Now, Plaintiffs, on the other hand, have

10   produced an expert designation; they have produced all

11   the documents that their expert has relied on, all of

12   their experts have relied on.  All of the plaintiffs

13   have now appeared for deposition.  They were required

14   to appear for in-person deposition right at the height

15   of Omicron.  They did that.  They gave defense counsel

16   their depositions.

17             But 14 days from today I'm supposed to be

18   responding to written discovery and I'm supposed to be

19   producing documents.  And of course I'm going to be

20   doing that in a forthright way, if I'm required to do

21   it.  And they're going to get this benefit, this

22   unequal benefit, of moving into Plaintiff's damages

23   trial being given the grace of the discovery that they

24   had no, no, no respect to give to the plaintiffs.

25             And now, after seeing what just happened

1    in this corporate deposition, after giving a chance

2    after default, I think we can see now it would be very

3    unfair to make Plaintiffs respond, Your Honor.

4                    So, I'm going to ask you for one of two

5    things for you to let me know at the end of this

6    hearing, which is either, one, that you're going to

7    order this and I don't have to respond to that

8    discovery; or, two, that my obligation to respond to

9    that discovery is stayed until 14 days after you make

10   your decision.  So that that way that isn't mooted in

11   the interim.  So, one of those two things I would ask

12   you to let me know today.

13                   The other two things that I would ask you

14   is (b)(2) is an order charging any or all portions of

15   the expenses of discovery.  I think we should probably

16   do this, I certainly think we should submit our costs.

17   Again I have to be honest, I don't think that's much of

18   a remedy or a deterrence; because they're going to much

19   rather pay that cost than have the actual facts of the

20   punitive damages case come out.  This is all part of

21   that calculus.  There's really no practical amount that

22   you could ever sanction them that would make it less

23   profitable to do what they're doing right now.

24                   The final is (b)(3), which is an order

25   that designated facts be taken as established for the

1    purposes of the action.  We've taken an attempt to do

2    this in our proposed order.  And you'll see, you should

3    have a paper copy of that, we have a copy in the Box

4    for you, we've tried to do that.  And you can take a

5    look and maybe we've done it right, maybe we haven't.

6    The idea being that we give something like an

7    instruction to the jury that says, if there is a

8    factual dispute over any of the following topics, which

9    is the corporate rep. topics, if there's a factual

10   dispute among the parties you are to take that fact as

11   to be taken as established in favor of the plaintiffs.

12   That would be the way that we would think that that

13   would be done.  So, we've taken a stab at doing that.

14   Um.

15           But to be honest, Your Honor, I don't

16   really know what to do at this point.  And, thankfully,

17   I think we're at the end, I don't think there's any

18   more discovery to take.  There's some lingering net

19   worth issues that are hopefully going to be worked out

20   in Fontaine that we'll be able to get that all taken

21   care of.  But I think we're done and I think we just

22   need to get to trial.  But on this particular thing I

23   think we need our final remedy here, which is we were

24   supposed to be given an opportunity to do this kind of

25   damage discovery, um, that we needed this for a damage

1  trial, and we were met with something completely

2  ridiculous.

3            So, again we would ask for those

4  remedies.  And as far as we wanted to let you know

5  today what you're thinking on that so I can know what

6  to be doing over the next 14 days.

7            THE COURT:  All right.  We're going to

8  take an -- is that it?

9            MR. BANKSTON:  That is it, Your Honor.

10            THE COURT:  All right.  We're going to

11  take a ten-minute break, 15-minute break.  We'll come

12  back at 10:35.

13            MR. BANKSTON:  Okay.  Thank you, Your

14  Honor.

15            THE COURT:  Thank you.

16            MS. BLOTT:  Thank you, Your Honor.

17                 *(Brief recess.)*

18            THE COURT: All right, welcome back.

19  Okay.  YouTube should be working.  We worked on it over

20  the break, I think it's working again.

21            I want to apologize for anyone -- a

22  number of people had reached out to my office this

23  morning, um, wanting to watch.  I'm sorry, we had

24  technical difficulties.  We do the best we can.

25  Similarly, you know, imagine if we were in person and

1    we had more people than could fit in the courtroom,

2    some people wouldn't get to see.  That's kind of how I

3    interpret a technical problem like this, as well.

4              As a reminder, since you may not have

5    seen what I said earlier, there is no recording of

6    these proceedings by an observer.  So, you know, that

7    applies to you basically.  If you think, does that mean

8    me?  It means you, yes.

9              Well, Mr. Bankston, you didn't get your

10   chance on YouTube today, but Miss Blott, you do.

11             MS. BLOTT:  Thank you, Your Honor.

12             May I proceed?

13             THE COURT:  Yes.

14             MS. BLOTT:  Um, I will attempt to address

15   the allegations that are in the motion for sanctions

16   with respect to the corporate representatives as

17   succinctly as possible, Your Honor, but feel compelled

18   to address some of the comments that Mr. Bankston made,

19   specifically with respect to they don't like what

20   happens, they hire a new lawyer and they throw all the

21   previous lawyers under the bus.

22             I have been licensed to practice law in

23   Texas for 32 years on the plaintiff's side having to do

24   with mass tort litigation.  So, when I read discovery

25   requests and I respond to discovery requests, I am

1  quite truthfully as transparent as the Rules of Texas

2  Procedure require me to be and obviously do not produce

3  anything that is attorney-client privileged or subject

4  to the attorney work product.

5           Mr. Reeves has not been fired.  The fact

6  that he is not arguing this motion has nothing to do

7  with him individually as an attorney or professionally

8  as an attorney, but a decision that the clients made

9  based on the years of experience that I have versus the

10  years of experience that Mr. Reeves has.

11           So, that having been said, Your Honor, I

12  would like to proceed to address Mr. Bankston's

13  allegations in his motion to compel.  Or motion for

14  sanctions, excuse me.

15           And I would like to first point out, Your

16  Honor, that I'm only focusing on the designation -- or

17  the deposition of the corporate representative because

18  all of the other motions for sanctions, motions to

19  compel, have been addressed by this court.  They are

20  what they are.  We need to move forward, we need to get

21  this case on track, and we need to get it to trial.

22           First and foremost, I would like to

23  address globally whether or not Miss KAR-pov --

24  Karpova, excuse me, um, was she disingenuous, was she

25  disrespectful.  It was quite easy to assume that she

1   was based on the limited video clips that Mr. Bankston

2   presented, as well as the limited excerpts, if you

3   will, from her deposition that are actually contained

4   in her deposition.  So, first and foremost I would like

5   to globally address that and then I will get into more

6   detail as it's pertinent to your ruling.

7              First and foremost, Your Honor, the

8   deposition notice of the corporate representative was

9   the third amended deposition notice, and it was served

10  on Free Speech Systems, LLC and Free Speech Systems,

11  LLC only.  She was not there to represent or speak on

12  behalf of InfoWars, LLC.  You will see that, despite

13  the fact that she was only designated as a corporate

14  representative for Free Speech Systems, that

15  Mr. Bankston's questions 99.9 percent of the time were

16  addressed to -- as they related to InfoWars, LLC.

17             Now, Mr. Bankston's right, she is not a

18  seasoned witness, she not an expert retained for the

19  purposes of trial.  She is just an ordinary citizen who

20  does not involve her life in practicing, if you will,

21  depositions.  She answered all of his questions as --

22  regardless of who or what legal business entity they

23  related to.

24             Again, Your Honor, the only remaining

25  issues after the various orders in this court in all

1    three cases are the issues on damages and not

2    liability.  And while I understand and appreciate that

3    in a defamation case there are some facts that spill

4    over, which would traditionally just be a liability

5    issue are also relative to damages; but regardless, she

6    answered all of Mr. Bankston's questions as best as she

7    could based on her knowledge of events.

8              Third of all, Your Honor, he includes --

9    the majority of the videotapes about which he complains

10   of her responsiveness are video clips from as early as

11   2013.  They are outside the scope of the statute of

12   limitations on this case.  The -- obviously with the

13   potential infliction of emotional distress claims, that

14   would be April 16th of 2016.  But again, regardless,

15   she did her best to answer the questions she had, and I

16   believe she did so fully and completely.

17             With respect to the documents that

18   Miss Karpova brought to the deposition, I would like to

19   point out, Your Honor, that this was not a notice of

20   deposition and subpoena duces tecum.  She was not

21   required to bring any documents to the deposition.

22   However, she did.  And when questioned by Mr. Bankston

23   about what documents she brought and why, her response

24   was that she believed that those documents would help

25   refresh her memory in the deposition to the extent that

1  she needed it so that she could provide complete and

2  full testimony.

3          That is not a statement or the action of

4  a witness who comes to be obstreperous and not answer

5  the questions of the questioning attorney.

6          So, in that regard I have broken down the

7  topics about which Mr. Bankston complains.  His first

8  issue has to do with in his opinion she did not spend

9  sufficient time with her counsel or any other

10  individuals preparing for her deposition.  That is not

11  his decision to make, and it's not sanctionable

12  conduct.  The only thing that is relevant is was she

13  sufficiently prepared.

14          He represented that she met with Brad

15  Reeves and with another counsel who is not of record,

16  Mr. Randazza.  She met with them for hours.  She could

17  not quantify the number of hours she spent with them,

18  but she did spend hours with them.  Obviously the

19  attorneys who have -- were representing Mr. Jones at

20  the time, including Mr. Reeves, felt that the time that

21  they spent with her was sufficient and it was their

22  judgment and their only judgment to make.

23          She also testified that she met with

24  Mr. Dew, who is a former corporate representative in

25  another deposition.  She met with Mr. Zimmerman.  That

1  was left out.  He was also a former corporate

2  representative, um, who was deposed by the plaintiff.

3  He did leave out the fact that she also met with the

4  head of human resources, Melinda Flores, in order to

5  gain additional information on personnel that she hoped

6  and believed would lead her to be able to more

7  completely answer Mr. Bankston's questions as they

8  related to the producers.

9           So, let's address his topics.  He wants

10  her sanctioned because she could not answer his

11  question on who did the research.  And with all due

12  respect to Mr. Bankston, he did not ask the right

13  question.  He was so busy asking her, did this person

14  do the research, did this person do the research, who

15  did the research, and if you read her deposition in its

16  entirety and not limit yourself to the excerpts that he

17  chooses to bring forward, um, you see that, for

18  example, on page 69 of her deposition, I have the

19  deposition up and unless I'm technologically challenged

20  I can share my screen, but he shows her a document and

21  she testifies, well, this isn't research that's coming

22  from a particular employee that's feeding Alex any

23  information.  This appears to me as Alex's opinions and

24  commentary on the situation that he has -- is -- has in

25  front of him that he's watching based on main street

1  news reporting and other sources that he might have had

2  at the time.

3             THE COURT:  I don't see that on page 69.

4             MS. BLOTT:  And you know, Your Honor, and

5  I apologize because I have a -- the dirty transcript up

6  and I use the number from the PDF.  So, I am scrolling

7  to that right now.  Let me jump to it.

8             THE COURT:  So, I have both versions, one

9  I have on paper and the one I have just digitally.  So,

10  the one I have on paper is the, you know, the fast one

11  you get that's not broken out into four pages.

12             MS. BLOTT:  Right.

13             THE COURT:  That's the one I have.  It

14  has page numbers, however, and 69 does not have what

15  you just read to me.

16             MS. BLOTT:  Okay, it is on -- I have to

17  find -- it's on the dirty -- what I call the dirty

18  transcript it is on page 74, line 17 through line 23.

19             THE COURT:  Um, does the page number come

20  at the end of the page or the beginning of the page?

21  It comes at the end, right?   Okay.

22             MS. BLOTT:  I'm looking.

23             THE COURT:  Okay, I found it.

24             MS. BLOTT:  Let me know when I may

25  continue, Your Honor.

1           THE COURT:  You can.

2           MS. BLOTT:  Okay.  And again, and I'm

3   addressing the research issue brought up by him.  She

4   again testifies on page 80 -- or, excuse me, page 78.

5   He again is asking her about a document:  It came from

6   either that interview with Mr. Halbig that was included

7   in this video or a source that Alex Jones had.

8           Again on page 80:  We don't keep those

9   kinds of records of any show.

10          You can't produce what you don't have.

11  If in the response to the discovery that was

12  propounded, which I have not read, admittedly, yet,

13  they failed to say that they did not have those

14  documents, they should have.

15          With respect to pictures, and this was a

16  picture I believe of -- from the Sandy Hook that had

17  an -- oh, it was a picture of the children as

18  teenagers, um, they don't have those --

19          THE COURT:  Let's be clear. It was a

20  picture of some people who were teenagers.

21          MS. BLOTT:  Yes.  And I apologize.

22          THE COURT:  Because it clearly was not

23  the children involved in Sandy Hook, because they never

24  got to be teenagers.

25          MS. BLOTT:  Unfortunately, absolutely,

1    unfortunately and very, very tragically as a mother.

2            We don't keep -- or pictures were

3    produced by guests on the show.  They don't have those

4    pictures.  If a picture wasn't produced by the company,

5    then we don't have a record of that, of the picture.

6    That appears on page 80.

7            With respect to sourcing, and this is a

8    big issue.  Free Speech Systems is not ABC, they are

9    not KXAN, they are not CNN.  They do not have dedicated

10   staff to do dedicated things, as you would expect to

11   see in one of the major networks.  Sourcing is not

12   done.  So, what Miss Karpova did in an effort to fully

13   and completely -- or strike that.  Records of sourcing

14   are not necessarily maintained.

15           So, what she did in an effort to be

16   completely transparent was to say that, on page 54 of

17   her deposition, It's pretty much impossible to figure

18   out on that particular day of the -- what was the

19   sourcing.  We don't have that kind of documentation for

20   every show and every video.

21           And then again, page 68, line 17

22   through 23:  A lot of information that Alex had

23   commentary upon came from meshoo (phonetic) media,

24   videos, or articles.  There is no way to access every

25   single piece of that information at this point.  It

1  would be hard, even if it was the day before, to have

2  access to whatever the sourcing was for Alex at that

3  particular time.

4          So -- but instead of saying she doesn't

5  know:  Mr. Bankston, this is the likely source of that

6  information.

7          With respect to specifically the Sandy

8  Hook videos, again he asked it as it related to

9  InfoWars, but she testified the sources would be -- and

10  Your Honor, this is at page 46, Mr. Halbig and

11  Mr. Pieczenik, and I'm probably mispronouncing his

12  name.  That's on again page 46.

13          Then he asked her about the final

14  statement on Sandy Hook.  And she knew, although there

15  was not a record of it, that information came from the

16  Wayback Machine.  That testimony is on page 115 of her

17  deposition.

18          With respect to an April 22nd, 2017,

19  video that related to Mr. Pozner:  It's based on the

20  previous videos that were watched by Alex and

21  statements that were made by Mr. Halbig.

22          I don't know how she could have answered

23  the questions more specifically when records are not

24  kept, but she in good faith gave him the answers to the

25  questions he asked, regardless of whether they were

1    directed to InfoWars or Free Speech, based on her

2    knowledge.  So, she did provide sources.  Her sources

3    that she identified were the Wayback Machine,

4    Mr. Halbig, Mr. Pieczenick, um, other sources of

5    information.  And if Mr. Bankston doesn't like those

6    answers, I don't know what to do.

7                    And then we go, Your Honor, to his

8    complaints about the editorial discussions.  Um, the

9    question was as it relates to discussions with Free

10   Speech Systems' documents and their editorial

11   discussions.  Well, what does editorial discussions

12   mean.  Is a conversation between two employees in a

13   bathroom an editorial discussion?  No.

14                    THE COURT:  Maybe.  It depends on the

15   corporate culture.

16                    MS. BLOTT:  And that is true.  But are

17   there formal discussions.

18                    THE COURT:  They don't have to be formal.

19                    MS. BLOTT:  I understand that.  But other

20   than, as he pointed out, an email from an individual

21   criticizing or making a comment on the Sandy Hook

22   videos and the conversation between two individuals,

23   other than those, there are no editorial discussions of

24   which Miss Karpova was aware.

25                    THE COURT:  Right.  But the problem is

1   she's not supposed to be aware because she was there,

2   she's supposed to be aware because the company needed

3   and had an obligation to prepare her, meaning gather

4   knowledge throughout the company and put it in this one

5   person to be a repository to deliver it to the

6   deposition.  And by her own testimony she did not do

7   that and Free Speech Systems did not do that.

8              Every time she said, I didn't watch it,

9   or, I didn't talk to someone, or I didn't read it, she

10  is saying, judge, I didn't do what I said I was going

11  to do, I didn't do what the rules tell me I have to do.

12  That's what she did.

13             So, the fact that she came up with some

14  answers for some questions does not recover, it's not

15  enough to say, okay, well, she -- she spoke to two

16  people.  She didn't even watch the videos that were the

17  itemized topic for this deposition.

18             If you truly have the experience you're

19  telling me you have, Miss Blott, then you know a

20  corporate deposition is not show up and answer what you

21  remember.  That's not what it is.

22             MS. BLOTT:  And I understand that, Your

23  Honor, and I appreciate it.

24             So, with respect to the editorial

25  discussions, if there is no documents of it how is she

1   supposed to find out the answer to that, especially as

2   it relates to editorial discussions that happened

3   between individuals who for the most part are not still

4   employed by InfoWars.

5                    THE COURT:  Well --

6                    MS. BLOTT:  Not because of --

7                    THE COURT:  -- to the extent that any of

8   them are, she should go by where they're standing and

9   ask them questions, number one.  Number two, this

10  company has been sued for a number of years now and

11  should have taken all appropriate steps to preserve and

12  maintain this kind of evidence.

13                   MS. BLOTT:  To the extent that it ever

14  existed.  And I don't know the answer to that, Your

15  Honor.

16                   THE COURT:  Because you're the eighth

17  attorney on this case.

18                   MS. BLOTT:  I was recently hired.  That's

19  true.  Um --

20                   THE COURT:  Any knowledge anyone of your

21  predecessors had or should have had, you have or should

22  have, and I am not going to hear any excuses that start

23  with "I'm new to the case."

24                   MS. BLOTT:  Okay.  And I'm not going to

25  sit here and say that, Your Honor.

1          THE COURT:  You just did.  Literally just
2    said it.
3          MS. BLOTT:  I am going to get to the
4    bottom of what has been produced, what, if anything,
5    has not produced, should it have been produced.  And to
6    the extent that it should have been produced, it will
7    be produced.
8               And again, and this goes to the sources,
9    because it is important.  Um, she assumed because that
10   was the only information, either personal knowledge or
11   through documentation, the documentation being the
12   videos themselves, that Mr. Halbig or Mr. Pieczenick
13   were the two sources of the videos because they were
14   the sources of the Sandy Hook information to begin
15   with.
16              He asked her to -- who the producers were
17   of each video identified in the broadcast.  She does
18   not know the answer to that question because
19   documentation is not kept as to who the producers were.
20   And as I said, some of the videos that he questioned
21   her about went back as far at 2013.  She wasn't even
22   employed there at 2013.  And to the extent that that
23   information, based on her conversations with the people
24   in preparation for her deposition, was that information
25   still available, is it still available today.

1          THE COURT:  I don't know because she
2     didn't try and find out.
3          MS. BLOTT:  But what we don't -- but what
4     we don't know is did she ask the question of the --
5          THE COURT:  We know that she didn't,
6     because she testified that she didn't talk to anyone.
7     And she didn't try to prepare.  So, we do know.
8          MS. BLOTT:  Well, and I -- we do know
9     that she talked to Mr. Dew; Mr. Zimmerman, who by the
10    way at the time she spoke to him was a former employee
11    that she tracked down; and Mr. Jones.
12          THE COURT:  So, Mr. Dew gave a shockingly
13    offensive mockery of a corporate deposition.  And then
14    her testimony was he said nothing to her.  So, that
15    doesn't count as preparing.  Okay.  So, your clients
16    were sanctioned for Mr. Dew's performance.  Sending him
17    to prepare the next corporate representative is
18    probably malpractice.  It certainly isn't proper
19    preparation of a corporate representative for a
20    deposition in three lawsuits in state court.
21          You can continue.
22          MS. BLOTT:  She sought out individuals
23    who she believed would have the information, including
24    not only Mr. Dew but Mr. Zimmerman and Mr. Jones.
25          THE COURT:  She didn't talk to Mr. Jones.

1    She said, I didn't talk to Mr. Jones.  She should have.

2    She should have because he has said, I'm InfoWars and

3    InfoWars is me, I'm Free Speech Systems and Free Speech

4    Systems is me.  So, the corporate representative of

5    either of those companies absolutely should prepare for

6    their deposition via extensive conversation with

7    Mr. Jones to fill in all the gaps of their corporate

8    knowledge.  But she testified that she didn't talk to

9    him in preparation for her deposition.

10            All right.  Anything new, Miss Blott that

11   you haven't told me for your side?

12            MS. BLOTT:  No.  No, Your Honor.

13            THE COURT:  All right.  Mr. Bankston, any

14   kind of reply?

15            MR. BANKSTON:  Yeah, I'll do a quick

16   rebuttal, Your Honor, because I think we're on the same

17   page.

18            I'm not implying that Miss Karpova was

19   disingenuous or disrespectful.  I actually kind of felt

20   bad for her.  She had been put in a hard spot by

21   Mr. Jones, who sent her in there to take this fall, and

22   I feel bad for her.

23            I've been told that I was given only

24   limited excerpts of her testimony.  You've seen 40

25   pages of it in our briefing, so I don't think that's an

```
 1   issue.
 2                  One of the big things --
 3                  THE COURT:  I have the entire thing here,
 4   right?
 5                  MR. BANKSTON:  Yeah, you have the entire
 6   deposition --
 7                  THE COURT:  Right.
 8                  MR. BANKSTON:  -- and, in fact, if you
 9   need it, I don't think you do, but I can file the video
10   for you if you want to see the video, too.  But I think
11   you have -- from the text and what you saw you have a
12   pretty good handle on the deposition.
13                  I'm a little concerned, one of the things
14   that most concerned me is her saying that she wasn't --
15   she wasn't there on behalf of InfoWars, LLC.
16                  THE COURT:  Well, that concerns me, too.
17   So, is that true?
18                  MR. BANKSTON:  90 percent of the
19   questions were directed to -- I don't think Miss Blott
20   I understands these companies at all.  InfoWars, LLC
21   exists on paper only.  It has no employees, no revenue,
22   no business functions, nothing.  It's an intellectual
23   property holding company that has never been used since
24   2013.  Free Speech Systems is the entire repository of
25   Mr. Jones's business.
```

1            Even if that's -- even if you ignore

2   that, right, that is already troubling, that the lawyer

3   who was actually involved, knows about these things, is

4   telling us this, and the lawyer who isn't is telling us

5   something totally different.  Um.  But even if --

6   Miss Blott should also be aware from prior orders that

7   InfoWars, Free Speech, and Mr. Jones are one thing.

8   And this court has repeatedly held that in connection

9   with other discovery motions.

10           So, to have to address these arguments

11  again and again and again every time there's a new

12  lawyer I believe is a waste of our time.

13           She also mentioned that some of these

14  videos are outside the scope of the statute of

15  limitations.  And I just want to bring this up again,

16  because these kind of arguments are going to be

17  problematic.  There's a default judgment.  There is no

18  statute of limitations defense.  And an intentional

19  infliction of emotional distress was pled based on a

20  continuing course of conduct from 2013 to the time of

21  suit in 2018.

22           So, all five years of those videos are

23  not only both subject of the suit but have now been

24  admitted liability under the default judgment rule.

25           She mentions that she was not -- the

1    deponent was not required to bring documents.  And

2    maybe that's true, but she was required to prepare on

3    documents.  And, Your Honor, obviously I think when one

4    of the topics is documents produced by the defendants,

5    to not have reviewed any of those documents is a big

6    problem.  To only have pulled off some very bizarre

7    stuff off the internet about why Sandy Hook is a hoax

8    and about Noah Pozner's open casket I just think is

9    insulting.

10              You know, your honor, I really -- I can't

11    emphasize enough that there were in the corporate files

12    187 page comprehensive report on Mr. Pozner and his

13    relatives, and I still don't know why they had it, I

14    still don't know what they've ever done with it.

15    Really I think I may know the answer, but I -- it's

16    terrifying to me that we really don't know what they've

17    done with this information.

18              She said that she couldn't quantify the

19    time that she spent with counsel.  She absolutely did.

20    She said under an hour, maybe an hour with Brad Reeves

21    and a couple of hours with Mr. Randazza and that's it.

22              You're very correct on Mr. Dew with her

23    meeting with him, but Mr. Dew gave her no information.

24    She testified the same thing about Mr. Zimmerman, gave

25    her no information.  So, we literally have her talking

1    to nobody in the company who gave her personal

2    information.

3              There's the suggestion that she talked to

4    Melinda Flores.  That's news to me.  If you search this

5    deposition for Melinda Flores or the name Flores,

6    that's not in there.  That would be completely new

7    information to me.

8              She talked one time about where she was

9    just guessing about what Alex Jones may have relied on,

10   obviously didn't talk to him.

11             Ms. Blott says the company doesn't have

12   documents relating to internal editorial discussions.

13   And again this is shocking to me because I mentioned

14   that one email that's maybe the most famous email in

15   this case that's discussed in every brief is the email

16   about the sources being crazy.  But we submitted months

17   ago a motion for net worth discovery which included

18   50 pages of testimony and documents about editorial

19   discussions.

20             So, that's why it was really shocking for

21   me to have that witness tell me there were no editorial

22   discussions.  And even if there weren't extensive

23   documentation of those discussions, which there is,

24   obviously the employees who were actually involved were

25   never consulted.

1        She also says in the company doesn't have

2   the pictures that were talked about, there was

3   testimony about this picture.  Which you're right is an

4   insulting picture which claims that a Superbowl choir

5   of preteens is actually the murdered children.  That

6   document, that picture, was shown to Miss Karpova in

7   deposition because it was produced by the company.  It

8   was produced along with some emails about that picture.

9   And that picture is a pretty significant part of how we

10  know that InfoWars was completely reckless and

11  malicious from the very beginning of this case.  And

12  those pictures exist.  And so for Miss Blott to come in

13  here and represent to the court that they don't, again

14  is there shouldn't be -- I shouldn't be having to do

15  any of this.

16        Miss Blott notes that they are not KXAN.

17  I 100 percent agree with that, they are not KXAN.  KXAN

18  is a much smaller, less profitable operation than

19  InfoWars.  As you saw demonstrated in the motion,

20  InfoWars is one of the most lucrative media

21  organizations in the country.  There is no one who is

22  better prepared to take the steps to prepare a

23  corporate representative.  And just like we wouldn't

24  accept this from any other company who has that much

25  more revenue, and we saw how big those numbers are, we

1    should not accept it from InfoWars here.  They

2    absolutely have the resources to get this done.

3              She told us there's no dedicated

4    staffing.  There absolutely is.  That's the problem, is

5    we talked about in the motion that you're facing on the

6    written discovery, you'll remember in that motion these

7    same issues are contested about the audience reach and

8    the knowledge of the plaintiff, things like this.  And

9    it's -- we found out, they told us, hey, we don't have

10   any of these documents, we don't have anybody who can

11   do, we don't know anybody who can tell us about

12   agreements we have with radio stations, TV, all of

13   that, and then we produce evidence showing, no, they

14   have an affiliate relations department.  And that

15   affiliate relations department has been out in public

16   talking about how it can answer all those questions.

17             Then when we get to deposition,

18   Miss Karpova says she can't answer a lot of these

19   questions because she hasn't talked to affiliate

20   relations.  As if she didn't know she was supposed to

21   talk to them before this deposition.

22             The last argument that was put forward is

23   that it's too hard to answer these topics.  That it's

24   impossible for them to answer these topics.  And if

25   that was the case, they had a duty to object to those

1  topic.  If it was going to be impossible to prepare

2  Miss Karpova to testify about any one of these topics

3  they had duty to object.  They did not do that.

4          I also just want to note, I think you

5  probably saw it, but Miss Karpova herself defined what

6  "editorial discussions" means.  She was asked about

7  that.  Because there was in idea of that's sort of

8  vague. Right?  No, she actually was asked that question

9  and she defined it perfectly.  She defined it as a

10  conversation between editorial staff regarding the

11  sources or angles that they should take with a certain

12  story.  She knew exactly what it was.  So, they knew

13  that there was that.

14          The last thing I want to talk to Your

15  Honor is Miss Blott says that she's going to get to the

16  bottom of this and she's going to find out what's been

17  produced and solve the discovery.  We were so far past

18  that.  We are so -- we were far past that in August,

19  when we came back from attorneys who have -- every

20  single attorney has promised the same thing.  Every

21  last one.  And so, now we are here post-default, when

22  they were given one chance to do discovery on damages.

23          I don't need any further discovery at

24  this point, I don't need to be bogged down by even

25  dealing with that, and what I'm going to get is not

1    going to be forthright.  This defendant during its

2    default already thoroughly demonstrated that its claims

3    lack merit because it's going to be continually doing

4    this in discovery.  So, I don't think there's any

5    remedy like that going forward.

6            So again, the things that we're just

7    going to ask for are 215(b)(1) through (3) and, like I

8    said, I'm hoping you can let me know on one what I need

9    to do about that today.  But that's all we have for you

10   today.

11           THE COURT:  Well, you get two for sure.

12   So, whatever your expenses are on discovery, um, for

13   this, for negotiating, noticing, conducting, preparing

14   this motion and appearing today and preparing whatever

15   I order after for this corporate deposition, those

16   costs are taxed to the defendants.  So, that's --

17   that's easy.

18           MR. BANKSTON:  Okay.

19           THE COURT:  Um, I think where I am

20   struggling is I actually believe we are most likely to

21   end up in a situation where I am going to be telling

22   the jury, We gave the defendants all these

23   opportunities to answer these questions, and you

24   may -- you may decide from the answers they gave or did

25   not give that, had they answered, those answers would

1    hurt their case.  Or some language to that effect.  I

2    just don't know that we're there today on these issues

3    after one shameful corporate rep. deposition on

4    damages.

5              And so my, um, you know, I would really

6    like to have one corporate deposition where the witness

7    actually prepares, and by that I mean, um, let's see if

8    I can find the list of the seven topics.

9              Where are they easy for me to find.  Oh,

10   here we go.  Actually I have eight topics, by the way,

11   in the motion, but today you only mentioned seven, so.

12             MR. BANKSTON:  I believe I left one out,

13   Your Honor, you're right about that.

14             THE COURT:  Okay.  So, sourcing and

15   research for the videos described in Plaintiff's

16   petition.  This is not, what I'm about to describe, the

17   universe of preparation that a corporate deposition

18   should do.  What I'm about to describe is the minimum

19   preparation a corporate deposition should do to respond

20   to that topic.

21             They should watch every video in the

22   weeks leading up to the deposition.  They should

23   identify for themselves, for the company, every

24   statement that they believe in those videos has a

25   source and they should make efforts to determine what

1     that source was and they should be able to answer

2     intelligently as to the sources and the efforts they

3     have taken to determine those sources.

4              They need to be able to speak about

5     everything Alex Jones said in any of those videos,

6     about every piece of paper he holds up, every piece of

7     paper he shows on that desk camera.  They need to

8     search for every person quoted in each video.  And by

9     that I mean they need to search every single thing

10    InfoWars or Free Speech Systems or Alex Jones has in

11    their possession on paper, in email, on a text, on any

12    other communication system or in the mind of any

13    employee or former employee or guest of the show.

14    Anything and everything.  And they need to be prepared

15    to identify and describe the role of every employee

16    involved with every video.

17             And if they are going to show up and say,

18    we don't keep records on these things, then they need

19    to show up and be definitive in every response.  No

20    more guessing, assuming, or thinking.  They need to

21    know.  Because if the answer is Free Speech Systems

22    does not care who the source is so we don't -- we don't

23    check them, we don't write them down, we don't talk

24    about them and we don't keep a record of them, then the

25    jury needs to hear that.

1        I think I've covered the second one and

2   the third one in that description of the minimum

3   required preparation for the next corporate

4   representative deposition.

5        The company's knowledge of the

6   plaintiffs.  Clearly the representative who was sent

7   did not even try to determine what the company knew,

8   since she had no knowledge of documents that were

9   provided by the company she was there representing in

10  the discovery in these cases.  So, I consider it to be

11  minimum efforts for the corporate representative to

12  review every document produced by the company in this

13  litigation prior to their deposition.  That covers

14  request or topic five.  No, let's see.  Six, as well.

15        Seven, efforts made by the company to

16  preserve potential evidence.  Similar.  If she shows up

17  again, or I'm sure we'll get a new one because that's

18  the way this works, and that person says, I don't know,

19  then they will have disregarded the orders I am making

20  today.  Your client, Miss Blott, will have violated the

21  orders I am making today.  I do not want, "I don't

22  know," "I'm guessing," "I think," "maybe," or "I infer"

23  to be part of the answer at all.  Any answer by a

24  corporate representative designated by the corporation.

25  You choose, we don't.  Mr. Bankston doesn't choose, the

1    court doesn't choose.  You choose who is going to

2    represent the company at this deposition.

3              So, if the answer is, we destroy

4    everything as fast as we can, then I want them to come

5    and say that.  And if the answer is, we don't care

6    where it comes from so we don't ever create a record,

7    they need to say that in that way.

8              MS. BLOTT:  Understood.

9              THE COURT:  Not, "I think maybe something

10   happened somewhere, I'm new to the company."  I don't

11   care if it's their first day with the company.  If you

12   designate them, they better have answers.

13             Number, let's see, number five, the

14   audience reach of the videos described in the

15   plaintiff's petition.  If it is the case that Free

16   Speech Systems, InfoWars, and Alex Jones do not track

17   who plays their videos, I know it is the case that they

18   track where the stuff they sell gets sold; and that

19   information will need to be provided so that we can go

20   around in the back to see where these videos were

21   played.  Does that make sense?

22             I mean, the videos are Alex Jones

23   talking, Alex Jones selling some stuff.  He may not

24   know who plays it because he puts it on the internet

25   and says, play it if you want.  Maybe that's true.  But

1   he knows who is buying his stuff.  And so, we'll need

2   that information to answer the audience reach of these

3   videos.

4           The last is the company's business

5   structure in relationship with other parties.

6   Honestly, the idea that I have to explain what that

7   means to a corporation is again ridiculous.  No more

8   answers of, well, I didn't talk to Mr. Jones, I'm not

9   really sure, I'm new, nobody works here, it's just all,

10  I don't know, fairy dust that makes these videos go

11  out.  None of that.  They know.  This company knows.

12  Mr. Bankston gets to know.

13          Then if we have a similar experience file

14  a motion again, Mr. Bankston.  Because then I'll

15  just -- in fact, then send me the transcript, you can

16  put the new motion on top of it.  You don't need to

17  pull out every single excerpt, you can just send me the

18  whole transcript, I'll read the whole transcript and,

19  um, then I'll need a proposed order if this happens

20  again.

21          So, um, essentially the motion is

22  granted.  And all the costs for this second deposition

23  are to be borne by the defendant for the plaintiff's

24  side.  I am not going to designate facts as established

25  until after this next deposition and then only if I

1    have to, because I think it may come to that, but

2    that's not what anybody who believes in our legal

3    system wants.

4              Now, I'm confident that there are people

5    who don't want our legal system to work and will be

6    happy to have me forced into deciding almost everything

7    about this case, but that's not what I want.  I want it

8    to work, but it only works if discovery works.  And

9    what I have seen so far is literal years of blatant

10   discovery abuse and intentional discovery abuse, and

11   I'm tired of that.

12             Um, Mr. Bankston does not need to respond

13   to any discovery until after this corporate deposition

14   is taken again and, um, until at least -- a minimum of

15   two weeks after the deposition.  And if he files

16   another motion along the lines of this one, then the

17   stay will continue.  So, it's essentially his

18   responses -- the deadlines for Mr. Bankston's responses

19   to any discovery requests are stayed until further

20   order of the court.

21             Anything else?

22             MR. BANKSTON:  That's it from the

23   plaintiffs, Your Honor.

24             THE COURT:  I'll ask you to prepare an

25   order for me, Mr. Bankston, send it to Miss Blott.

1          Mr. Reeves, are you even still counsel on
2    the Sandy Hook cases?
3          MR. REEVES:  I am, Your Honor.
4    Miss Blott is lead counsel but I am still counsel in
5    the cases, Your Honor.
6          THE COURT:  All right.  And you're the
7    only attorney on the Fontaine case now.
8          MR. REEVES:  That's correct, Your Honor.
9          THE COURT:  Okay.
10          MS. BLOTT:  Your Honor, um, may I ask,
11    just for purposes of my scheduling, how soon or what
12    period of time will have elapsed before this deposition
13    of the corporate representative takes place?  I want to
14    have everyone prepared to fully respond.
15          THE COURT:  Do you know who will be
16    designated or if there will be more than one person
17    designated to respond to these topics?
18          MS. BLOTT:  I will have the answer to
19    that by the end of today, and I am relatively certain
20    that it will be more than one person.
21          THE COURT:  All right.  Then I'm going to
22    leave it to you and Mr. Bankston to attempt to schedule
23    those depositions.  I think within a month.  Does that
24    seem fair to you, Miss Blott and Mr. Bankston?
25          MS. BLOTT:  I will dedicate all my time

1    to that, Your Honor.

2              THE COURT:  All right.  I don't think

3    we're going to trial on March 28th but I could be

4    proven wrong.  Do we want to leave that trial setting

5    or do we want to -- what do we want to do?  I'm -- I

6    think it's important to have trial settings.  If the

7    deadlines roll from trial settings, the pressure is put

8    on with them.

9              I'll be honest, I don't know that I want

10   to have this Voir Dire on Zoom.  Um.

11             I don't know how much the two of you --

12   or the three of you, sorry, Mr. Reeves, have thought

13   about numbers for a panel.  Um.  I'm expecting it to be

14   a larger-than-normal panel request, I just don't know

15   how much larger.  Um.  And I just don't know -- I don't

16   know exactly what's going to happen with this Voir

17   Dire.  But I have done five or six virtual jury trials,

18   I've got another one in a week and a half.  Or in week,

19   rather.

20             We do virtual Voir Dire.  We did it.

21   It's real hard.  I mean it's not hard in the sense that

22   it doesn't work, it totally works.  It's exhausting,

23   and that's coming from me.  I spend eight hours a day

24   on Zoom, have for almost two years now, so I'm used to

25   Zoom.  It's exhausting for the jurors; it's exhausting

1    for the lawyers, because even lawyers who are involved

2    in full-time litigation typically are not in court all

3    day long every day.

4              The picture of each person isn't very

5    big, especially with a larger panel.  Zoom can -- the

6    largest number of faces that you can have on one

7    monitor are 49, I guess that is the largest number is

8    49.  You've got multiple monitors, which I strongly

9    suggest.  I suggest that every time and yet every time

10   I have lawyers who don't do it.

11             So, I feel like, in person or virtual,

12   we're going to be splitting up Voir Dire into more than

13   one session.  That's my expectation.

14             So, um, I guess we can leave it for now,

15   but we need to start thinking about it.  We're clearly

16   going to have to have pretrial settings much further in

17   advance than the Friday before, which is my typical

18   practice for a pretrial, um, virtual pre jury trial

19   pretrial setting, or the Monday of, which is my

20   practice for an in-person jury trial.  I think we're

21   going to need to handle those issues earlier.  So, I

22   guess that's just kind of me thinking, these are the

23   things I'm thinking about in my office.

24             I just realized I didn't issue orders on

25   the October -- have you already sent me proposed order

1    on that Motion For Sanctions on Written Discovery,

2    Mr. Bankston?

3                    MR. BANKSTON:  Yes, I have.  Yes, it's

4    real basic but I have.

5                    THE COURT:  Okay.  Do you mind sending it

6    again.

7                    MR. BANKSTON:  Not a problem.

8                    THE COURT:  Just the motions that we --

9                    MR. BANKSTON:  The written discovery

10   motions.

11                   THE COURT:  Yes, in October.  Obviously

12   CC Miss Blott and/or Mr. Reeves.

13                   MR. BANKSTON:  Okay.

14                   THE COURT:  And then in Word if you don't

15   mind so that I can make changes as I might want to.

16                   All right, here is what I'm going to do,

17   we're going to leave Lewis, we're going to leave

18   Fontaine, we're going to leave Heslin. Pozner is not

19   set for May 23rd.  Even if it is, it isn't happening

20   because that's the week I'll be gone and my son will be

21   graduating from high school and I'm not going to be in

22   trial when he's graduating from high school.  I'll come

23   to work but I'm not going to be in the middle of -- you

24   know, that's too consuming.  Everyone would miss my

25   attention on both sides, I think.

```
 1                 So, um, so we need to find another date

 2    for Pozner and we need to think about Heslin.  And I

 3    want to ask, Mr. Bankston, if you think you are going

 4    to reurge your motion to consolidate at some point.

 5                 MR. BANKSTON:  At least -- at the very

 6    least Heslin and Lewis consolidated together.

 7                 THE COURT:  And just without -- without

 8    binding yourself, just tell me why those two.

 9                 MR. BANKSTON:  Because they are the

10    co-parents of Jesse Lewis.

11                 THE COURT:  Oh.  I thought we had already

12    consolidated the parents.

13                 MR. BANKSTON:  No.  What we had actually

14    done is Mr. Heslin, because of the TCPA causes, had his

15    defamation and IIED in separate suits, and that case

16    was consolidated together into once case.  So, both of

17    Mr. Heslin's claims are now together.

18                 But what I would -- certainly a first

19    step that I would -- certainly would want to do is get

20    the co-parents together.

21                 THE COURT:  So, Heslin and Lewis.  So

22    Mr. Heslin and Ms. Lewis are the parents of the same

23    child.

24                 MR. BANKSTON:  Yes, that's correct.

25                 THE COURT:  Okay.  Well, we can
```

1  consolidate that, and then we'll set those on

2  April 25th.  So, send me an order consolidating Heslin

3  and Lewis.

4                    MR. BANKSTON:  Okay.

5                    THE COURT:  And we will set that for

6  trial April 25th.  And we're not going to go to trial

7  in March.

8                    MR. REEVES:  Your Honor, if I may very

9  quickly.

10                   One of the reasons that we had opposed a

11  consolidation of those cases before was that

12  Mr. Shroyer is only a defendant in Mr. Heslin's

13  defamation suit.  However, the parties with Mr. Shroyer

14  recently come in principle to a resolution, so, and

15  we're trying to work out the final details of that.

16  So, I think that that might be more probable for us

17  once that's done as far as Mr. Shroyer not being a

18  defendant.

19                   That was one of the main issues we had,

20  though, as far as he was an individual defendant in one

21  case and not another, and so, we --

22                   THE COURT:  Well, this will provide extra

23  encouragement to resolve that part of the case.  I'm

24  going to consolidate the Lewis and Heslin cases for

25  purposes of trial.  And it is set for April 25th on a

```
 1  two-week setting --
 2                  MR. BANKSTON:  Okay.
 3                  THE COURT:  -- for damages.
 4                  And Fontaine will stay on June 27th and
 5  Pozner we need to set separately.
 6                  Sorry.
 7                  Do you guys hear that?
 8                  MR. BANKSTON:  Just barely.
 9                  THE COURT:  I had hurt my back several
10  years back and I was getting physical therapy for it
11  and I had my phone on silent but in my bag.  I never
12  look at my phone when I'm out here, I'm out here
13  because I have to have it to log in, because everything
14  is two, you know, requires two ways to log in.  I don't
15  look at it, it's facing the other way.
16                  Anyway, my therapist was like, I think
17  there is a rodent in your purse.  I was like, yeah,
18  that's the phone but, okay.  So, I just remember
19  thinking like does he really think I have an animal in
20  my purse?  Okay.  He was joking.
21                  All right, let's look.  First day of
22  school in Austin is August 15th.
23                  MS. BLOTT:  I don't have that problem.
24                  THE COURT:  I don't consider it a
25  problem --
```

1          MS. BLOTT:  Well, I don't have that

2     issue.

3          THE COURT:  -- but it is a consideration.

4          So, I think -- the problem is settlement

5     week.  Wow.  Okay.  I think we're stuck with

6     August 22nd.  And again we don't know, it may be that

7     things will resolve after the first trial, I don't

8     know.

9          MR. BANKSTON:  Can I ask one other

10    question, Your Honor?  I was just kind of curious

11    about --

12         THE COURT:  Always.

13         MR. BANKSTON:  -- we don't know, I mean

14    now that I'm thinking this we don't know the answer to

15    this because of what we've been living with the past

16    two years.  But I'm wondering if by April 25th or

17    June 27th, are we looking at a live trial or is that

18    still something we're going to handle remotely?

19         THE COURT:  I'm hoping we are, yes.

20         MR. BANKSTON:  Yeah.  Okay.

21         THE COURT:  Yes.  I think we are.  I

22    mean, I've already done one live jury trial since COVID

23    in November.  The problem is every time we get down --

24    in Travis County, um, we follow the guidance of our

25    county Commissioner's Court and our county-appointed

1   medical experts.  "We" being the civil and family

2   district judges.  So, we make our own decisions but we

3   like to follow the advice of the experts and set a good

4   example for the rest of Travis County.

5           We also are housed in a building that is

6   almost 100 years old.  Um.  It's beautiful.  It doesn't

7   have big spaces.  It doesn't have wonderful, um,

8   ventilation systems.  It was designed and built to

9   house either four or six courts, I've heard varying

10  reports on that.  That's the entire building.  The

11  fifth floor, where my courtroom is, has five or six

12  courtrooms -- I think six courtrooms just on the fifth

13  floor alone.

14          To create those spaces over the years,

15  the county has created courtrooms out of viewing

16  galleries, has walled off important things like

17  plumbing that we can no longer get to.  So, there are a

18  number of issues in a building this old when it comes

19  to an airborne pandemic.

20          But I have conducted successfully, with

21  no infection, an in-person jury trial in November of

22  2021.  So, I am confident that if Travis County, which

23  is at what we call Stage 5, is down at Stage 3, or

24  maybe even Stage 4, but certainly Stage 3 or lower,

25  then we can do it just fine.  We wore masks, everybody

1    wore a mask except for the witnesses, the witnesses

2    took their masks off, we used covers on the

3    microphones. It was fine.

4           I did not ask anyone whether they were

5    vaccinated, but I'm open to motions to consider doing

6    that.  Um.  Because I can do that privately; that

7    doesn't have to be a public thing.  We ask juries and

8    potential juries all kinds of personal questions.  I'm

9    open to doing what some of the federal courts have

10    done, which is that they, once they seat their jury and

11    alternates, they -- then the judge goes and talks to

12    the jury kind of one-on-one about their preference

13    regarding masking and other measures and also their

14    vaccination status to make a decision then, with actual

15    information about the people in the room, what kind of

16    restrictions are going to be followed.  And then I'll

17    issue orders for the court, if necessary.  Um.

18           So, I'm open to any of those ideas, we

19    can talk about them as we get closer to it.

20           If you wanted to wait until we were in

21    the fancy new courthouse, that's a delay of a whole

22    year.  We're not moving until 2023; and I don't think

23    that this -- these causes should wait on construction,

24    basically, I think I should go ahead.  And I think we

25    can do it.  We have -- my courtroom is relatively

1    large.  We have set up overflow rooms for audience, so

2    they essentially are watching a feed of the entire

3    courtroom from another courtroom.  Um.

4              We can do it.  I've done it once, I was

5    scheduled to do it again next week but obviously it's

6    been converted to virtual, so.  I am confident we can

7    do it in person.

8              Now, I do believe our jury selection

9    process will not take place in one afternoon or one

10   morning.  It will be in stages, where we bring in a

11   percentage of our panel on more, you know, two or more

12   time periods and conduct the Voir Dire that way.  So,

13   that's something to plan for.

14             MR. BANKSTON:  Okay.

15             THE COURT:  Anything else?

16             MS. BLOTT:  No, Your Honor.

17             THE COURT:  Okay.  So, to wrap up, the

18   Motion to Compel and Sanctions on Fontaine, Mr. Ogden

19   will be getting me the order, those were granted.  The

20   plaintiff's -- all the plaintiff's motions for

21   sanctions regarding the corporate depositions

22   Mr. Bankston will be preparing an order in conformance

23   with the orders I gave orally.  And Mr. Bankston is

24   going to do me the courtesy of sending me in Word

25   format again the proposed orders on the October Motion

1    to Compel and for Sanctions on Written Discovery in the

2    three Sandy Hook cases.

3              And nothing else is set in front of me or

4    set at all in front of me today or another day.

5              MR. BANKSTON:  That's right.

6              THE COURT:  So, we're -- when I issue

7    those orders I will be all caught up until I hear from

8    one or the both of you.

9              MR. BANKSTON:  Okay.

10             THE COURT:  All right?

11             And if you want to, let me know when you

12   schedule that deposition.  Hopefully you won't need me

13   during it, but if I know when it is that -- that's

14   helpful.

15             MR. BANKSTON:  Absolutely.

16             THE COURT:  All right, I think that's

17   everything.

18             And I apologize about the YouTube glitch

19   earlier but it's working now, and hopefully that will

20   not be a problem again.

21             Also I just want to say, we have our new

22   dates, I'll get those scheduled, but if you, um, think

23   that those date changes change any of the deadlines and

24   you don't agree about that, send it to me through my

25   assistant very clearly, here is what one side thinks,

1   here is what the other side thinks, and then I'll tell

2   you what the answer is.  And do it quickly, so that

3   we're not -- we don't then -- I don't then hear an

4   excuse that, well, if we had known two weeks ago that

5   that was the deadline we could have met it.  No.  Do

6   it -- figure that out right away.  Okay?

7             MR. BANKSTON:  Okay.

8             THE COURT:  Oh, and Mr. Bankston, you

9   need to send me the order consolidating Heslin and

10   Lewis.

11             MR. BANKSTON:  Correct.  Yes, I have that

12   down, as well.

13             THE COURT:  Okay, good.  I think that's

14   everything.

15             Thank you all.  Have a good day.

16             MR. BANKSTON:  All right, thank you, Your

17   Honor.

18             MS. BLOTT:  Thank you, Your Honor.

19             May we be excused?

20             THE COURT:  Yes, everyone is excused.

21   Thank you.

22             MS. BLOTT:  Thank you.

23                 (End of proceedings.)

24

25

```
1                    REPORTER'S CERTIFICATE

2    THE STATE OF TEXAS          )

3    COUNTY OF TRAVIS            )

4                    I, Alicia DuBois, Official Court Reporter

5    in and for the 459th District Court of Travis County,

6    State of Texas, do hereby certify that the above and

7    foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings

9    requested in writing by counsel for the parties to be

10   included in this volume of the Reporter's Record, in

11   the above-styled and numbered cause, all of which

12   occurred in open court or in chambers and were reported

13   by me.

14                    I further certify that this Reporter's

15   Record of the Proceedings truly and correctly reflects

16   the exhibits, if any, offered in evidence by the

17   respective parties.

18                    WITNESS MY OFFICIAL HAND this, the 9th

19   day of February, 2022.

20

21                              /s/ Alicia DuBois
                                Alicia DuBois, CSR
22                              Texas CSR 5332
                                Exp. Date:  1/31/24
23                              Official Court Reporter
                                459th District Court
24                              Travis County, Texas
                                P.O. Box 1748
25                              Austin, Texas 78767
                                (512) 854-9301
```