# Exhibit 11

```
 1                   REPORTER'S RECORD
                   VOLUME 2 OF 9 VOLUME
 2          TRIAL COURT CAUSE NO. D-1-GN-18-001835

 3

 4   NEIL HESLIN AND SCARLETT    )  IN THE DISTRICT COURT
     LEWIS,                      )
 5                               )
          Plaintiffs             )
 6                               )
     VS.                         )  TRAVIS COUNTY, TEXAS
 7                               )
     ALEX E. JONES AND FREE      )
 8   SPEECH SYSTEMS, LLC,        )
                                 )
 9        Defendants             )  261ST JUDICIAL DISTRICT

10

11   --------------------------------------------------------

12                   TRIAL ON THE MERITS

13   --------------------------------------------------------

14

15             On the 27th day of July, 2022, the

16   following proceedings came on to be heard in the

17   above-entitled and numbered cause before the Honorable

18   Maya Guerra Gamble, Judge presiding, held in Austin,

19   Travis County, Texas;

20             Proceedings reported by machine shorthand.

21

22

23

24

25
```

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4         MARK D. BANKSTON
          SBOT NO. 24071066
5         KYLE FARRAR
          SBOT 24034828
6         WILLIAM R. OGDEN
          SBOT NO. 24073531
7         WESLEY TODD "WES" BALL
          SBOT NO. 24038754
8         KASTER LYNCH FARRAR & BALL, LLP
          1117 Herkimer Street
9         Houston, Texas  77008
          (713) 221-8300
10

11   FOR THE DEFENDANTS ALEX JONES AND FREE SPEECH SYSTEMS,
     LLC:
12
          F. ANDINO REYNAL
13        SBOT NO. 24060482
          JOSEPH C. MAGLIOLO
14        SBOT NO. 12821600
          WESTLEY WILLIAM 'WEST' MEDLIN
15        SBOT NO. 24080702
          FERTITTA REYNAL, LLP
16        917 Franklin Street, Suite 600
          Houston, Texas  77002
17        (713) 228-5900

18

19

20

21

22

23

24

25
```

1
                        I N D E X
                        VOLUME 2
2                   TRIAL ON THE MERITS
                     JULY 27, 2022
3

4    PLAINTIFF'S WITNESSES
                                                    Jury
5                   Direct   Cross   Redr   Recr   Exam    Vol.

6    DARIA KARPOVA        5      216                        2

7                                                   Page    Vol.

8    Jury Excused..........................   234      2

9    Proceedings...........................   234      2

10   Adjournment...........................   246      2

11   Reporter's Certificate................   247      2

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX
                            VOLUME 2
 2

 3      PLAINTIFF'S
        NO.      DESCRIPTION          OFFERED   ADMITTED/ VOL.
 4                                              REFUSED

 5      53-Email                        27        27       2

 6      55-Email                        39        40       2

 7      57-Email                        44        44       2

 8      58-Email                        58        58       2

 9      PVX 14-Video, Title Unknown     79        80       2

10      61-Email                       101       101       2

11      62-Email                        96        97       2

12      63-Email                       111       112       2

13      64-Email                       116       116       2

14      66-Letter                      132       135       2

15      67-Email                       126       126       2

16      73-Email                       164       164       2

17      81-Email                       189       189       2

18

19

20

21

22

23

24

25
```

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

```
 1            WEDNESDAY, JULY 27, 2022 - MORNING PROCEEDINGS
 2                 (The following proceedings were held in open
 3      court in the presence of the jury)
 4                      THE COURT:  All right.  You may be seated.
 5      Thank you.
 6                      Miss Karpova, you're still under oath.
 7      We're just going to pick up right where we left off
 8      yesterday.  All right?
 9                      THE WITNESS:  Yes, ma'am.
10                      THE COURT:  Same instructions as before.
11                      THE WITNESS:  Thank you.
12                      THE COURT:  And whenever you're ready.
13                  MR. BANKSTON:  Thank you, Your Honor.
14                        DARIA KARPOVA,
15          Having been duly sworn, testified as follows:
16                       DIRECT EXAMINATION
17      BY MR. BANKSTON:
18          Q.   Miss Karpova, before we get started I have
19      the exhibits up here from yesterday, and I'm going to
20      put Exhibit 31 back in front of you.  This is the list
21      of all the videos.
22                  Do you remember that?
23          A.   Yes, yes.
24          Q.   Okay.  All right, Miss Karpova, I kind of
25      want to recap where we're at.  So, I want to remind the
```

1    jury, yesterday we talked about some videos, we started

2    talking about them; right?

3            A.    Yes.

4            Q.    Okay.  And you remember the first one of

5    those was on the day of Sandy Hook.  You remember that?

6            A.    Yes.

7            Q.    And that video on December 14th, 2012, was

8    called "Connecticut School Massacre Looks Like False

9    Flag, Says Witnesses."  Correct?

10           A.    Correct.

11           Q.    We also looked at a video that was done five

12   days after Sandy Hook, on December 17th, 2012.  Do you

13   remember that?

14           A.    Yes.

15           Q.    And that video was called "Creepy Illuminati

16   Message in Batman Movie Hints At Sandy Hook School;" is

17   that right?

18           A.    Correct.

19           Q.    Then we also looked at another video that

20   was just a couple of days later, seven days after the

21   shooting, and that one was entitled "Sandy Hook Second

22   Shooter Coverup."  Right?

23           A.    Yes, sir.

24           Q.    And then we talked about another video that

25   was two days after that, on December 21st, 2012, and

1    that was entitled "Lower Part of Gotham Renamed 'Sandy
2    Hook' in Dark Knight Film"?
3            A.   Yes, correct.
4            Q.   Okay.  And then we talked about how, on
5    January 10th, as we turn the new year, there was a video
6    entitled, "Professor Claims Sandy Hook Massacre MSM
7    Misinformation."
8            A.   Correct.
9            Q.   Okay.  And then we talked about how, on
10   January 15th, 2013, five days later, InfoWars published
11   a video titled "Sandy Hook AR-15 Hoax?  Still No School
12   Surveillance Footage;" correct?
13           A.   Yes.
14           Q.   And then we talked about a video a couple of
15   weeks later, on January 27th, 2013, and that one was
16   entitled "Why People Think Sandy Hook is a Hoax."
17           A.   Yes.
18           Q.   Okay.  And then at the end of the day we
19   talked about an email with one of the parents.  Do you
20   remember that?
21           A.   Yes.
22           Q.   It was an email in which one of the parents
23   was asking InfoWars to please knock it off with the
24   crisis actor and false flag terror stuff on the
25   coverage.  Do you remember that?

1          A.    I remember it was sent to the writers, yes.

2          Q.    Okay.  And, in fact, it was replied to,

3    wasn't it?

4          A.    Yes.

5          Q.    And then what the reply was was that

6    InfoWars had an editor claiming they were actively

7    distancing themselves from the actors thing?

8          A.    Well, the point on that, I think Paul Joseph

9    Watson, I'm not sure if he was speaking exactly for Alex

10    Jones himself, he might have just been speaking for

11    himself and other employees at InfoWars.  But as to Alex

12    Jones, I'm not sure if he was speaking for him.

13          Q.    Well, and that would make sense, wouldn't

14    it, because you also testified yesterday that InfoWars

15    did not distance itself from the actors thing; correct?

16          A.    Alex Jones did mention he continued to

17    wonder and search for the truth in the incident, yes.

18          Q.    Okay.  Now, let's pick back up, and we had

19    just gotten to basically a month after the shooting, we

20    had seen all these videos about false flags.  And then,

21    in March 2013, you understand that InfoWars published a

22    broadcast that day, didn't it?

23          A.    You're referring to one of the videos?

24          Q.    On March 27th, 2013.

25          A.    Yes.

1       Q.    What is the title of that video?

2       A.    "Dr. Steve Pieczenik:  Sandy Hook Was a

3  Total False Flag."

4       Q.    Okay.  So, "Dr. Steve Pieczenik:  Sandy Hook

5  Was a Total False Flag."

6             If I'm correct, Dr. Steve Pieczenik is

7  somebody that has told Alex that he used to be in the

8  CIA.

9       A.    I'm not -- I don't have the details of his

10  bio, but he has a pretty extensive bio that has to do

11  with psychological operations, working for the

12  government, being involved in overthrowing governments,

13  things like that.

14       Q.    Does he have those credentials or did he

15  just tell InfoWars he has those credentials?

16       A.    He's reported to have those credentials,

17  that's what he claims in his bio.

18       Q.    Reported by Mr. *PEACH*-nick, right?  Or

19  Pe-*CHEN*-ik?

20       A.    Pe-*CHEN*-ik, yes.

21       Q.    And that episode, when that episode is

22  talking about false flags in that instance, you're

23  talking about crisis actors; right?

24       A.    Specifically crisis actors, I can't remember

25  if that specifically was mentioned in there.

1          I just want to be very accurate.

2     Q.   Sure.

3          Okay.  Well, let's talk four days later.

4     Can you flip the page for me?

5     A.   Yes.

6     Q.   What's the next video called on April 1st,

7     2013?

8     A.   "Crisis Actors Used At Sandy Hook, Special

9     Report."

10    Q.   Okay.  So, there we have April 1st, 2013,

11    InfoWars is publishing a video called "Crisis Actors

12    Used At Sandy Hook, Special Report."  Correct?

13    A.   Yes.

14    Q.   Okay.  On April 9, 2013, InfoWars published

15    a video about Sandy Hook; correct?

16    A.   Yes.

17    Q.   And that video was called "Obama Gun Grab

18    Psyop."  Correct?

19    A.   Correct.

20    Q.   And would you agree with me that "PSYOP"

21    means "psychological operation"?

22    A.   Yes.

23    Q.   So, we've seen now a list of videos from

24    2013 talking about things like false flag, crisis

25    actors, hoax.  Do you agree with that?

1       A.    Yes.

2       Q.    Okay.  So, if somebody was to say in this

3  courtroom that Mr. Jones in 2013 was not saying this was

4  fake, was not saying it was a hoax, was not saying that

5  there were crisis actors pretending to be these victims,

6  that would not be true, is it.

7       A.    I think it -- it would be true because,

8  again, Alex Jones was still researching things, and with

9  the contradictions in the media that was thrown in that

10  time, in the mainstream media, he thought it was his

11  duty to investigate, especially when it involves

12  something as tragic as the deaths of children that

13  shouldn't be used in, say, a government operation.

14       Q.    Can you look at the title of that April 1st

15  video for me.  Do you see it on the page?

16       A.    Yes.

17       Q.    Okay.  The title of that video is not there

18  are contradictions that raise questions about what

19  happened at Sandy Hook.  The title of that video, if I'm

20  right, is "Crisis Actors Used At Sandy Hook."  Is that

21  right?

22       A.    Correct.

23       Q.    Okay.

24       A.    But oftentimes titles just are meant to grab

25  audiences' attention, and then later in the video they

1    get into details.

2              Just like all of the mainstream media

3    does, flip on any newspaper right now, website, it's

4    going to be full of clickbait articles.  And I'm not

5    even saying that this is clickbait, but I'm saying it's

6    meant to grab a person's attention so they can take a

7    look at the video and see the details.

8         Q.   Sure does grab attention, right, that there

9    are crisis actors used at Sandy Hook.  That's pretty

10   shocking.

11        A.   That would be pretty shocking, yes.

12        Q.   Sure would.

13             You'll agree with me that it was known

14   that the official reports of Sandy Hook that were

15   released by the Connecticut State Attorney's Office,

16   those were available to InfoWars, and InfoWars knew they

17   were available on -- by December of 2013.

18        A.   I don't believe that's true.

19        Q.   Okay.  Miss Karpova, I am going to approach

20   you now and show you the company's March -- I mean,

21   excuse me, the company's May 20th, 2019, Request For

22   Admissions.  We're going to look at those together,

23   okay?

24        A.   Yes.

25        Q.   We're going to read this together, okay?

1          Can you see 245 here?

2     A.   Yes.

3     Q.   Okay.  I'm going to read it for you:

4          "The report of the state's attorney for

5     the Judicial District of Danbury on the shootings at

6     Sandy Hook Elementary School at 36 Yogananda Street,

7     Newtown, Connecticut, on December 13th, 2012, was

8     released to the public on November 25th, 2013."

9          Can you read what the company's answer to

10    that was?

11    A.   "Admit."

12    Q.   Then on 246 it states, "This report and the

13    appendix to the report can be accessed and downloaded

14    from the following website," and then you see a website

15    here.

16    A.   Yes.

17    Q.   Then what is the company's answer?

18    A.   "Admit."

19    Q.   And then the company was asked, "You were

20    aware that this report was publically available on or

21    about December 1st, 2013."

22         What is the company's answer?

23    A.   "Admit."

24    Q.   Thank you, Miss Karpova.

25         THE COURT:  I think it's important to make

1  a little instruction for the jury at this time.

2            So, those questions and answers are part

3  of the process that leads up to trial.  And similar to

4  how Miss Karpova is under oath today as she gives her

5  answers, when the representative for the company

6  answered those questions in writing, it was a sworn

7  answer.

8  BY MR. BANKSTON:

9        Q.   And speaking of that process that happened

10 pre-trial to answer these questions, that's something

11 that you were involved with in the company, helping to

12 answer these things and provide testimony?

13       A.   Yes.

14       Q.   In fact, not only was the company aware of

15 the report, but it had the report.  You agree with that?

16       A.   Must have had the report, yes.

17       Q.   Okay.

18       A.   It must have questioned the report, which is

19 why Alex continued to dig into the story.

20       Q.   Right.

21            So, people at InfoWars, editors at

22 InfoWars, had access to all of the material that was in

23 the state's attorney's report.  You agree with that?

24       A.   Evidently so, yes.

25       Q.   Okay.  Now, I want to talk to you a little

1   bit about Wolfgang Halbig.  You know who he is; right?

2       A.    Yes.

3       Q.    In fact, you personally, Daria Karpova,

4   you're someone who has an understanding of

5   Mr. Halbig's -- what he calls his questions about Sandy

6   Hook.  You understand?

7       A.    I do have a general understanding that this

8   person, who had the credentials to question this event,

9   did have several questions on the list that were not

10  answered.

11      Q.    Okay.

12      A.    That was my understanding.

13      Q.    What I'm specifically asking you is not just

14  you had an understanding that he had questions, you have

15  an understanding of those questions.

16      A.    I can't recall the specific questions right

17  now.

18      Q.    Sure.  But if I bring any of these questions

19  to you, you have a knowledge base and an understanding

20  that you can talk about those questions, can't you.

21      A.    I'm not sure what you mean by that.

22      Q.    I'm saying you, through your personal

23  knowledge you've gained, if I were to ask you about any

24  of Wolfgang Halbig's 16 questions, you have done the

25  research that would allow you to answer and tell us

1   about those questions?

2           MR. REYNAL:  Your Honor, I object.  It

3   calls for hearsay as to, you know, so you understand his

4   questions and you've done the research and then you're

5   going to tell me about the research that you've done?

6           THE COURT:  Overruled.

7   BY MR. BANKSTON:

8       Q.   Do you have an understanding, Miss Karpova?

9       A.   Well, I -- my job is comprised of doing a

10  lot of things, and since Sandy Hook was not the focus of

11  our broadcasts at all, I have a lot of duties to take

12  care of and research, so I didn't really spend much time

13  into digging in depth of these specific questions.

14  Because that wasn't -- that wasn't my priority as the

15  producer, having to take care of a lot of things.  And

16  it's a live broadcast, so there are a lot of things to

17  take care of before and after the show.

18      Q.   You remember giving a deposition with me,

19  right?

20      A.   Yes.

21      Q.   On December 3rd, 2021?

22      A.   Yes, sir.

23      Q.   You were under oath?

24      A.   Yes.

25      Q.   Do you remember telling me in that

1  deposition when I asked you, do you have an

2  understanding of Mr. Wolfgang Halbig's 16 questions

3  about Sandy Hook and you telling me yes?

4       A.   Again, that's just very vague questions.  I

5  generally have an understanding.  But exactly what you

6  mean by that, I'm not even sure right now what you mean

7  by that.

8       Q.   Well, let's find out, okay, let's go to the

9  next video that I want to talk to you about, which is

10  March 14th, 2014.  Do you see that?

11      A.   Yes, I do.

12      Q.   That video is entitled "Sandy Hook, False

13  Narratives vs. The Reality"?

14      A.   Yes, sir.

15      Q.   Okay.  I'm going to want to show you a clip

16  from that video so we can talk about it.  Okay?

17      A.   Yes.

18           MR. BANKSTON:  At this time can we play

19  8A.

20           *(Video played off the record.)*

21 BY MR. BANKSTON:

22      Q.   You heard Mr. Jones in that video refer to

23  Mr. Halbig as a top consultant; correct?

24      A.   Yes.  That's what Halbig claimed to be.

25      Q.   That's what he claimed to be; right?

```
 1          A.   Yes.

 2               We didn't have any reason to doubt it at

 3     that time.

 4          Q.   Really.  So, would you agree with me that

 5     people were explicitly warning the company that Wolfgang

 6     Halbig's credentials were not real?

 7          A.   Again, there are so many emails that we get

 8     it's impossible to go through every email, and if it

 9     went to writers, or I can't remember exactly who it went

10     to, but if it didn't get to Alex or even if he was

11     warned, I'm just, you know, I can't speak for Alex.

12               But again, a lot of people were

13     questioning, not just Wolfgang Halbig, and Alex felt it

14     was his duty to address the concerns of the people who

15     were callers calling into the show.  Again, it didn't

16     even happen that often.

17          Q.   Okay.  But what I want to make sure you

18     don't dispute with me is that people definitely were

19     warning the company in explicit terms that Wolfgang

20     Halbig's credentials were fake.  Would you agree with

21     that?

22          A.   Would you tell me exactly what you're

23     referring to?

24          Q.   I'm just asking if you agree with it.

25          A.   I can't remember right now.
```

1      Q.    Okay.  Thank you.

2            The truth is, though, it doesn't matter

3  whether people were warning you at InfoWars, because,

4  according to you, as an InfoWars producer, you do not

5  believe you're responsible for verifying all the claims

6  of your guests.  That's true?

7      A.    It just would not be possible to verify

8  everything.  We have guests.  It's a talk radio show.

9      Q.    I understand.

10     A.    It would be impossible.  It's an

11 opinion-driven talk show, political and social

12 commentary.

13     Q.    So, before Wolfgang Halbig comes on the show

14 your testimony is it is impossible to check or verify

15 his credentials.

16     A.    I wasn't the producer at that time, and I'm

17 sure the producer at that time did the best they could

18 to verify his credentials, and to him it might have

19 checked out.  I'm just -- that's the standard practice,

20 we do a basic look into the guest and if they seem okay,

21 if they've been on other shows, then we, you know, we

22 give them platform and let the audience decide if they

23 should listen to them, believe them or turn them off.

24     Q.    Okay.  But, what I really want to get to,

25 Miss Karpova, is you believe, as an InfoWars producer,

 1     it is not your responsibility to verify your guest's

 2     claims; correct?

 3          A.   I would say it's in part my responsibility.

 4          Q.   Okay.  Do you remember --

 5          A.   And I do that as in my job to the best of my

 6     ability.  Sorry.

 7          Q.   That's okay.  I'll give you some time.

 8               Do you remember giving this deposition in

 9     December 3rd, 2021?

10          A.   Yes.

11          Q.   Okay.  And you were under oath at that time.

12          A.   Yes.

13          Q.   Okay.  Do you remember in that deposition

14     when I asked you if you think Wolfgang Halbig's

15     credentials are true or reliable that you told me that,

16     I'm not responsible for making sure the claims of our

17     guests are all accurate.  Do you remember telling me

18     that?

19          A.   Yes.  And that comports to what I'm saying

20     right now.

21          Q.   That -- it's not your responsibility to

22     verify any of this.  That's what you're telling me.

23          A.   To the best of my ability.

24          Q.   Well, I mean what I'm saying to you, it was

25     your testimony under oath last year.

1      A.    Yes, that's what I was referring to.

2      Q.    That you had no responsibility.

3      A.    Well, I don't think I said no

4 responsibility.

5            And I'm sorry to be interrupting you.

6            THE COURT:  Right.  Only one person can

7 speak at a time.

8            THE WITNESS:  Again, my truthful answer is

9 that I do -- it's my responsibility to do my best to

10 research the guest and their claims.  And I've done that

11 before and I think you actually have an email that I

12 authored referring to a guest that I didn't think was

13 credible at the time, another guest.  So, I do -- I do

14 do that on a regular basis, and that's what I was

15 referring to.

16            It is my responsibility to the best of my

17 ability, but beyond that it isn't.  I'm not the arbitor

18 of ultimate truth of the claims.

19 BY MR. BANKSTON:

20      Q.    I hear you.

21            I would like to show you that question and

22 answer from your deposition, which is different from

23 this.

24            Are you able to see that?  Is this close

25 enough for you?

1          A.    Yes.

2          Q.    Okay.  I'm going to read the question and I

3     would like you to read the answer, okay?

4                And I said, "I'm sure Wolfgang Halbig has

5     said a lot of things about his credentials.  Do you

6     think they're all true?  Do you think Wolfgang Halbig is

7     a reliable source about his own credentials?"

8                What was your answer?

9          A.    "I'm not responsible for making sure that

10     the claims of our guests are all accurate."

11          Q.    Thank you, ma'am.

12                THE COURT:  I'm going to interrupt one

13     more time, just to give the jury another instruction

14     about depositions, which is what was just read from in

15     case you aren't familiar with them.

16                A deposition is a procedure conducted out

17     of court in which a witness testifies under oath

18     answering questions asked by one or more attorneys.

19     Later in this trial you may hear longer excerpts from

20     depositions, but I wanted you to understand that it is a

21     procedure conducted out of court but with the same oath

22     as in court, so those answers are also under oath.

23                And I'll tell you more about depositions

24     when we hear a longer one later.

25                MR. BANKSTON:  Thank you, Your Honor.

```
 1   BY MR. BANKSTON:
 2        Q.   Let's go to the next video that I want to
 3   talk to you about.
 4             Do you have the list of videos in front of
 5   you?
 6        A.   I do.
 7        Q.   On May 9th, 2014.  Do you see that?
 8        A.   Yes.
 9        Q.   Okay.  That was an episode called "Revealed:
10   Sandy Hook Truth Exposed."
11        A.   Yes.
12        Q.   And InfoWars wants its viewers to have faith
13   that they can get the truth from InfoWars; correct?
14        A.   It's up to the -- we always rely -- we
15   always -- we think our audience is smart and we rely on
16   them to figure out for themselves what they think is
17   true and what's not.  But we present our opinion.
18        Q.   Well, the truth, right?  That's what you're
19   telling your audience you give them is the truth?
20        A.   Sure.  Everybody has their own definition of
21   truth.
22        Q.   I don't think that's true, Miss Karpova.
23   Isn't there a truth and anything that's not true, or
24   people have other truths that compete with each other.
25   How do you view that?
```

1       A.    Well, because a lot of things you said in

2  opening statement weren't true.

3       Q.    Well, if they're not true, they weren't

4  true, I'm sure somebody is gonna prove that.

5              What I'm saying is that, we've watched on

6  these videos and you've seen the tag line up on those

7  videos where it says "InfoWars, the Front Line of Truth

8  Journalism."  That's true, isn't it?

9       A.    In a way that we believe what we're saying,

10  absolutely.  And we stand by that.

11      Q.    Okay.  On May 13th, just a couple of days

12  later, May 13, 2014, InfoWars aired an episode entitled

13  "Sandy Hook Officials Caught in Coverup and Running

14  Scared."  Is that true?

15      A.    That's the title, yes.

16      Q.    And that meant that the town officials were

17  hiding the truth; right?

18      A.    Again, I'm referring to my previous answer,

19  that is a title that's meant to catch the audience and

20  watch the video for more details.

21      Q.    Let's talk about another one of those

22  titles.  And that was on the same day.  Do you see

23  another video on May 13th, 2014?

24      A.    Yes.

25      Q.    And you'll see it's called "Bombshell:

1    Sandy Hook Massacre Was a DHS Illusion Says School

2    Safety Expert."

3         A.   Yes, sir.

4         Q.   DHS stands for Department of Homeland

5    Security?

6         A.   Yes.

7         Q.   Okay.  I would like play you a clip from

8    that video.

9              Let's go ahead and play 9A.

10             And this should be the clip from

11   "Bombshell:  Sandy Hook Massacre Was a DHS Illusion Says

12   School Safety Expert."

13                 *(Video played off the record.)*

14             During the video we saw some video footage

15   of Wolfgang Halbig at a Newtown Board of Education

16   meeting?  You're familiar with that?

17        A.   Yes, I saw that video.

18        Q.   Okay.  That video was taken by an InfoWars

19   camera crew?

20        A.   I'm not sure.

21        Q.   Okay.  Well, you understand Dan Bidondi went

22   up there; right?

23        A.   Yes, he did.

24        Q.   Okay.  That's an InfoWars reporter.

25        A.   I think at some time he was reporting, he

1    took that responsibility onto himself.

2         Q.    Really.  So, I'll try to understand your

3    testimony --

4         A.    Just like all the reporters for InfoWars, as

5    well.

6         Q.    Okay.  So, in other words, he's just -- just

7    as any other reporter --

8         A.    I'm just saying, there are other reporters

9    or people that have proclaimed to be InfoWars reporters

10   that Alex specifically didn't solicit that just go out

11   there and do their own investigative research as people,

12   things on the street, yes.

13        Q.    That's not what happened with Dan Bidondi

14   going to Newtown though; right?  InfoWars sent Dan

15   Bidondi to Newtown; correct?

16        A.    I don't remember the specifics of him being

17   sent.

18        Q.    Let's start -- first of all, Dan Bidondi was

19   a hired employee of InfoWars; right?

20        A.    Again, I would have to talk to the H.R.

21   person.  I'm not sure his status as to employee or

22   contractor, just --

23        Q.    Let's maybe put it this way, this may

24   shorten it up.  You might not be the best person to talk

25   about Dan Bidondi's employment status; correct?

```
 1          A.    Correct.

 2          Q.    Okay.  We'll deal with that with some

 3   others.

 4                On May 14th, 2014, there was another

 5   video; correct?

 6          A.    Yes.

 7          Q.    And that one was called "Sandy Hook Red

 8   Flags Ignored By Newtown School Board."  Correct?

 9          A.    Yes.

10          Q.    Okay.  And that was another report about the

11   meeting that Mr. Halbig was at.

12          A.    I believe so.

13          Q.    Okay.  I want to show you an email from that

14   day.

15               (Discussion between counsel off the record.)

16                MR. REYNAL:  No objection.

17                THE COURT:  All right.

18                MR. BANKSTON:  Your Honor, at this time we

19   would move to admit Plaintiffs' Exhibit 53.

20                THE COURT:  53 is admitted.

21               (Plaintiff's Exhibit 53 admitted.)

22   BY MR. BANKSTON:

23          Q.    I'm going to hand you a copy of what's been

24   marked Plaintiffs' Exhibit 53.

25                And again I do apologize to the jury, I
```

 1     know on these emails this lettering is very small.

 2                 So, we're going to read this together.

 3     Okay, Miss Karpova?

 4         A.    Yes.

 5         Q.    Okay.  So, follow along with me here.  And

 6     what we have is an email at the bottom and that is from

 7     Matt@InfoWars.com; correct?

 8         A.    Correct.

 9         Q.    And it is to LouieS@InfoWars.Com; correct?

10         A.    Yes.

11         Q.    Okay.  Now, Louie is somebody who handles a

12     lot of the website and social media stuff.  You would

13     agree with that?

14         A.    Yes.

15         Q.    Okay.  So Matt, an InfoWars employee, writes

16     to Louie and he says:

17             "Hello, Louie.  Could you do me a favor?

18         Just got a phone call from my friend Johnny

19         Walker.  Some people are posting some bullshit

20         about how he was involved in the Sandy Hook

21         school shooting last year, including some

22         personal stuff about John.  They did the thing

23         about a year ago.  Apparently there are more

24         than one Johnny Walker in the world.  Last time

25         it involved going through his Facebook page and

1          pointing out friends with Jewish names and

2          things like that.  John is a character, but was

3          not even in the Sandy Hook time zone."

4               "If you see it, could you take care of it

5          for him?

6               "Thanks, Matt W."

7                    Did I read that correctly?

8          A.   Yes.

9          Q.   Okay.  And then Louie says, "The site has

10    been acting weird and not letting me search."

11                    I think we can make a fair assumption he's

12    talking about the InfoWars website at that point?

13          A.   I believe so.

14          Q.   Okay.  And he says, "If he can give me an

15    article or user name involved, let me know.  Otherwise,

16    I'll see it at I'll get on it," and then a little winky

17    face smile.

18                    Now, it's true that the InfoWars website

19    has portions of it where viewers can participate in

20    forums and post things on the website.

21          A.   There are comments, which is a -- typical of

22    video hosting site or article hosting site to where,

23    underneath the article, users, the registered users, are

24    able to post some comments.

25          Q.   And what's being said here from Matt to

1    Louie, is Matt's telling Louie that one of his friends
2    is getting caught up in this Sandy Hook hoax stuff by
3    users of the website, and he would like Louie to delete
4    that stuff, and Louie says he will do that if he finds
5    it.  That's correct?
6         A.   Correct.
7         Q.   Okay.  I want to talk to you about an
8    article.  And that article was called, "FBI says nobody
9    died at Sandy Hook."  You know what I'm talking about,
10   don't you?
11        A.   Could you refresh my memory, please?
12        Q.   Sure, I think we can do that.  One thing
13   that I think would be really easy to refresh your memory
14   with is Plaintiffs' exhibit 39 that we looked at the
15   other day.  Yesterday.
16             Malisa, can you put 39 up on the screen
17   for me?  And Malisa, can you zoom in on the entry for
18   number 14?
19             Okay.  You saw we were looking at the
20   analytics of the InfoWars website before; correct?
21        A.   Yes.
22        Q.   Okay.  And here we have an entry for a
23   landing page, a website for an article at InfoWars;
24   correct?
25        A.   Correct.

1      Q.   Okay.  And that article, it writes here,
2  "FBI Says No One Killed At Sandy Hook."  Right?
3      A.   Correct.
4      Q.   Okay.  And the number of people who saw
5  that, the page views on that page, 3,646,000 people,
6  that's the number of clicks on that story?
7      A.   Yes.
8      Q.   Okay.  I would like you, too, if I can put
9  this in front of you, as we go down those lists on the
10  list of 1 to 14, most of the things on the list of the
11  top landing sites on InfoWars are things just like
12  InfoWars.com/, or InfoWars.com/videos; right?  That's
13  another one.  Or there's another one for the sections on
14  the website, the various sections of the website.
15  Right?
16      A.   Yes.
17      Q.   But we only see on this list, this one right
18  here is a story, number 7; right?
19      A.   Yes.  Looks like a video maybe.
20      Q.   Okay.  And then if you look down you'll see
21  there's another story listed, too; right?  There's a
22  couple of stories on there.
23           But you would agree with me that "FBI Says
24  No One Killed Sandy Hook" is the third most viewed story
25  on that list?

1      A.   I think it might be a video, but let's see.

2  Again I'll take your word for it.  I'm just, I'm not

3  able to really quickly calculate the ratings right now.

4  If there -- oh, yeah.  Can you show -- can you point it

5  out?

6      Q.   Well, here, let me try to go down it with

7  you and we can see.  All right?

8      A.   Yes.

9      Q.   All right.  I might need my reading glasses

10 for this one.  It's very small print.

11           Well, those are coming apart on me.  We're

12 going to do it this fancy way for a moment.  Hello to

13 you.  This is horrible.

14           All right.  So, we have number 7; right?

15     A.   Yes.

16     Q.   You see number 7?  And that says --

17     A.   Looks like a video to me.

18     Q.   Right.  And it says, "Graphic, shocking,

19 complete video shot from Virginia gunman's point of

20 view."  Right?

21     A.   Yes.

22     Q.   This isn't a story, right, that's not story?

23     A.   Correct.

24     Q.   The next story would be this one, right, 13.

25 You agree with me?

1    A.   Again, I think it's a video.  I know you're

2  saying story, but I think it's a video.

3    Q.   Let's talk about it this way.

4    A.   I'm not sure.  Yes.

5    Q.   Right, and because we're not sure, let's

6  call it a landing page.  This is a landing page, right,

7  this was "Boston Bombing Culprits Found;" right?

8    A.   Yes.

9    Q.   And then this one is 14, "FBI Says No One

10  Killed At Sandy Hook."

11    A.   Yes.

12    Q.   That's the third one on the list, right,

13  third most popular of those landing pages or stories or

14  videos.

15    A.   Oh, got you.  Yes.

16         MR. BANKSTON:  Thank you, Miss Karpova.

17         Your Honor, if you will give me just a

18  second to go in here and replace my defective eyewear.

19         THE COURT:  Yes.  I was going to say, I

20  keep a pair up here for witnesses which we can share.

21  But if you have more, that's great.

22         MR. BANKSTON:  I'm good.

23         THE COURT:  You would be amazed how many

24  witnesses don't bring their reading glasses with them.

25         MR. BANKSTON:  Not a bad trick, I would

1    imagine.

2              THE COURT:  I never thought of that.  I

3    really just thought they forgot them because they didn't

4    know they would be reading something.

5    BY MR. BANKSTON:

6         Q.   All right.  I want to talk about the

7    following day.  Miss Karpova, we talked about this

8    article, FBI, or video, I don't know how it was

9    presented.  But I want to talk about the following day,

10   on September 25th, 2014.  Do you see a video on that

11   list?

12        A.   Yes.

13        Q.   Okay.  And let me ask you this, do you see a

14   video on September 24th, 2015?

15        A.   I do not.

16        Q.   So if there is a video entitled "FBI Says

17   Nobody Killed At Sandy Hook," if that's a video and not

18   an article, InfoWars never handed it over in this case.

19        A.   I guess they couldn't find it.  It wasn't

20   there.

21        Q.   Because --

22        A.   Because of the de-platforming.

23        Q.   Because there's a lot of videos that

24   InfoWars might not be able to find anymore; right?

25        A.   Correct.

1      Q.   So, if somebody was to say that those videos

2  on that list were the total amount that InfoWars covered

3  Sandy Hook, they can't say that, can they?

4      A.   I don't know.

5      Q.   Okay.  I want to talk about that next day,

6  September 25th, 2014.  There was a video called "Sandy

7  Hook Deaths Missing From FBI Report."  Do you agree with

8  that?

9      A.   That's the title.

10     Q.   Okay.  I would like to show you a clip from

11 that video.

12               *(Video played off the record.)*

13          Miss Karpova, did you hear Mr. Jones say

14 in that episode or in that clip right there there are

15 photos of kids who are still alive they said died?

16     A.   Yes.

17     Q.   That would be pretty shocking if it were

18 true; right?

19     A.   It would be pretty shocking if he looked at

20 those photos and thought those were the children.

21     Q.   It's the kind of thing that's so shocking it

22 would be the kind of thing you would want to verify or

23 confirm before you said it to millions of people;

24 correct?

25     A.   Again, Wolfgang Halbig was very pushy,

1   persistent on getting on the broadcast.  You know, if he

2   claimed that he had bombshell information Alex would

3   have him on, but after a while, once the story kept

4   developing, Wolfgang would send dozens of emails per day

5   and they were all ignored to just general InfoWars box.

6               MR. BANKSTON:  Okay.  Objection,

7   nonresponsive.

8               THE COURT:  Sustained.

9   BY MR. BANKSTON:

10          Q.   We didn't hear Wolfgang Halbig talk in that

11   video, did we?

12          A.   Well, he was the guest.

13          Q.   Sure, I understand that.  But we heard

14   Mr. Jones say there are photos of kids who they said

15   died who are still alive.  That's what Mr. Jones said?

16          A.   Correct.

17          Q.   And Mr. Jones should have verified that if

18   he was going to say something that outrageous.  Right?

19   Or do you not think so?

20          A.   I'm -- I can't speak for him, I'm not sure

21   what was going through his head at that time.

22          Q.   Okay.

23          A.   And the research that he had done.

24          Q.   I would like to show you another clip from

25   that same video.  Again we're looking at September 25th,

```
 1    2014, "Sandy Hook Deaths Missing From FBI Report."
 2                Can we play clip 10B.
 3                (Video played off the record.)
 4                All right.  Once again we're hearing this
 5    story about how the FBI said nobody died at Sandy Hook;
 6    right?
 7         A.   Correct.
 8         Q.   Okay.  And that also, that would be pretty
 9    shocking if it was true, wouldn't it?
10         A.   Yes.  Very.
11         Q.   Might be the kind of thing you would want to
12    verify with the FBI, isn't it.
13         A.   Well, Alex was relying on the writers, like
14    he just mentioned in the video, and he, Alex, lets the
15    writers do their own research and post a story and he
16    doesn't really control what they write.
17         Q.   And that wasn't verified with the FBI, was
18    it?
19         A.   I don't know if the writer verified it or
20    not.
21         Q.   Okay.  Well, maybe ask him.
22                I would like to play another part of that
23    episode.
24                Can we play clip 10C?
25                (Video played off the record.)
```

```
 1              Miss Karpova, in this video they talk
 2   about this helicopter footage of some people being
 3   detained in the woods?
 4        A.   Correct.
 5        Q.   And that it was taken at 12:23, hours after
 6   the shooting?
 7        A.   Correct.
 8        Q.   Okay.  The company now understands that's
 9   reporters that were trying to get too close to the
10   school?
11        A.   Correct.
12        Q.   Understands that was fully documented in the
13   final report?
14        A.   Correct.
15        Q.   Okay.
16        A.   And this is a live show, Wolfgang was a
17   guest and just spur of the moment.  They didn't
18   pre-plan.  You know, the beauty of Alex Jones show is it
19   is not a scripted show.  So, whatever the guest says is
20   what you get.  This is why people actually tune into
21   Alex Jones as opposed to CNN.
22        Q.   You describe that as beautiful?
23        A.   It's one of the -- the genuineness of the
24   broadcast and Alex presenting what he believes at that
25   time is what people are attracted to.  He's not lying
```

1  about what he's saying.

2      Q.   Now, you will agree with me that over the

3  next few years that Mr. Jones, despite knowing from

4  Wolfgang Halbig that that video was taken hours after

5  the shooting, at 12:24, that Mr. Jones has repeatedly

6  claimed that that video depicts second shooters dressed

7  in SWAT gear being detained in the woods.  You

8  understand that?

9      A.   I don't know if he knew that that was false

10 video, and again because it's not -- it doesn't -- it's

11 comprised of -- Sandy Hook comprised very little of his

12 attention, you know, he's -- I don't know how much, you

13 know, I don't know, I don't know if he -- I know for a

14 fact that he wasn't lying when he was presenting that

15 video.  If he had remembered it wrong that's another

16 story.  And again I don't know.

17     Q.   Okay.  Would you agree with me that, around

18 this time, anyway, the term "crisis actor" was

19 frequently being used inside of InfoWars attached to

20 this event?

21     A.   Yes.

22     Q.   Okay.

23         (Discussion between counsel off the record.)

24             MR. BANKSTON:  No objection?

25             MR. REYNAL:  No objection.

```
 1                    THE COURT:  What number?
 2                    MR. BANKSTON:  55.
 3                    THE COURT:  Plaintiffs' 55 is admitted.
 4                 (Plaintiff's Exhibit 55 admitted.)
 5   BY MR. BANKSTON:
 6        Q.   All right.  I'm going to show you 55, at
 7   least real quick.  No body of this email, nothing right?
 8        A.   Correct.
 9        Q.   This is an email from Nico?
10        A.   Yes.
11        Q.   That's an InfoWars producer?
12        A.   Yes.  Used to be.
13        Q.   That is to Rob Dew?
14        A.   Yes.
15        Q.   Rob Dew at this time, I believe, was the
16   nightly news director?
17        A.   I'm not sure exactly the dates of him being
18   the director for nighty news, but I'll take your word
19   for it.
20        Q.   One thing we can probably agree is Rob Dew
21   is a very high-level production employee at InfoWars.
22        A.   He used to be.
23        Q.   Used to be, okay.
24             Now, this email, it seems to have some
25   attachments to it; right?
```

1   A. Yes. A PDF file.

2   Q. And then the subject says "Ebola Sandy Hook

3 Crisis Actor Clips Attached." Correct?

4   A. Correct.

5   Q. Okay. Thank you, Miss Karpova.

6     Miss Karpova, I would like to show you

7 what's already been marked as Plaintiffs' Exhibit 56, an

8 article that was written by InfoWars.

9     This article was entitled "Internet

10 Censors Viral Sandy Hook Truth Documentary." That's

11 right?

12   A. Correct.

13   Q. And the date we see on there is

14 December 9th, 2014; is that right?

15   A. Yes.

16   Q. All right. Let's pull up the first three

17 paragraphs of this article.

18     I'm going to read this to you, okay? It

19 states:

20     "Last Monday, an organization known as

21   the Independent Media Solidarity released an

22   epic documentary entitled, 'We Need to Talk

23   About Sandy Hook,' which they hosted on their

24   own site, as well as YouTube. Within hours of

25   the video's upload, it was well on its way to

1          going viral.  However, its success was short

2          lived.  Shortly after InfoWars began hosting

3          the video, the following Tuesday morning, it

4          was suddenly removed from YouTube due to a

5          copyright claim by Lenny Pozner."

6                    Is that right?

7          A.   Yes.

8          Q.   Okay.  And then you'll see in these articles

9     their advertisements for the supplements that we've been

10    talking about in this trial; right?

11         A.   Sure.

12         Q.   Okay.  So, basically there had been some

13    group of people who were trying to investigate Sandy

14    Hook and they had published a documentary which had been

15    quickly banned.  And InfoWars decided it would

16    distribute it using its platform; is that right?

17         A.   Correct, because we stand against

18    censorship.  And this is the point of the article is

19    trying to say that, as soon as InfoWars posted it, it

20    got removed.

21         Q.   Because InfoWars believes it should be able

22    to publish false facts about anyone with no consequence;

23    right?

24         A.   False.

25                   THE COURT:  I'm sorry, what exhibit number

1    was that?

2                    MR. BANKSTON:  I'm sorry, Your Honor, that

3    was 56.

4                    THE COURT:  Thank you.

5    BY MR. BANKSTON:

6          Q.    Then on December 12th, 2014, on your list,

7    InfoWars published a video entitled "Sandy Hook Film

8    Censorship Efforts Backfire."  Is that right?

9          A.    That's the title.

10         Q.    Right.

11                In that show, Mr. Jones brought on these

12   YouTubers from Independent Media Solidarity to talk

13   about their film.  Is that right?

14         A.    Probably.

15         Q.    Okay.  And Mr. Jones helped promote their

16   efforts; is that right?

17         A.    I believe Alex wanted to remedy the fact

18   that they were censored.

19         Q.    Around this time, I'm drawing your attention

20   basically to December 2014, which is right around the

21   second anniversary of the shooting, by this time people

22   had been contacting InfoWars and warning them that what

23   they were doing as it concerned Sandy Hook was very bad.

24   You would agree with that?

25         A.    I can't agree with that specific statement.

```
 1                    (Discussion between counsel off the record.)
 2                    MR. REYNAL:  No objection.
 3                    THE COURT:  I don't know the number.
 4                    MR. BANKSTON:  I am going to bring you
 5    what I've marked as Plaintiffs' Exhibit 57.
 6                    THE COURT:  No objection?
 7                    MR. REYNAL:  No objection, your honor.
 8                    THE COURT:  Plaintiffs' 57 is admitted.
 9                    (Plaintiff's Exhibit 57 admitted.)
10                    MR. BANKSTON:  Thank you, Your Honor.
11    BY MR. BANKSTON:
12         Q.   And Miss Karpova, on this email I would like
13    you to switch, go to the final page.  And you'll see how
14    that's the very end of an email; right?
15         A.   Appears so.
16         Q.   Okay.  So, let's go back previous, one page,
17    to the start of that email.
18              Do you see where that email starts?
19         A.   Yes, I do.
20         Q.   Okay.  Malisa, can you put Plaintiffs' 57 up
21    on the screen.
22              I'm going to read this to you, okay?
23         A.   Yes.
24         Q.   This is sent to InfoWars whistleblowers,
25    whistleblowers@InfoWars.com; right?
```

1      A.   Yes.

2      Q.   Okay.  This message reads:

3           "To whom it may concern.  I'm a writer

4      whose articles have been featured on your

5      website, InfoWars.com.  I now primarily write

6      for American Free Press.  However, what I am

7      writing to you now is not on their behalf.

8           "I know Lenny Pozner personally.

9      Mr. Pozner's son was brutally murdered on

10     12/14/2012.  I have met with this man and have

11     seen verified documents that are indisputable

12     proof that his son was murdered.  I have also

13     seen the email exchanges between himself and

14     your staff.  You told Mr. Pozner that Alex

15     Jones acknowledged that children died and

16     dismissed the idea of a hoax.

17          "Now you are promoting the hoax mythology

18     and entertaining individuals I can prove are

19     frauds and child predators.  I must warn you

20     that you are traveling down a road that will

21     ultimately lead to serious lawful consequences.

22     Those you have placed your faith in are

23     providing you with information that is

24     verifiably false, and your ignorance to this

25     fact is no excuse against your complicity.

1          "Think about what you are doing.  You are

2      willingly participating and facilitating in the

3      defamation and libel of a man whose young child

4      was brutally murdered and doing so at a time

5      which we are approaching the second anniversary

6      of this horrendous act.  Think about that for a

7      moment.

8          "I will do all in my power to assist

9      Mr. Pozner and other victims of these deranged

10     individuals who they have fallen prey to.  To

11     that end, I would ask that I be allowed to

12     appear on your program and set the record

13     straight on so much disinformation that is

14     being spread about the SHES massacre.

15         "Please make the wise decision."

16         I read that correctly?

17     A.   Yes.

18     Q.   All right.  Let's go up to the next email.

19  All right.

20         This email is from Rob Dew; is that right?

21     A.   Yes.

22     Q.   Who we agreed is a high-production employee

23  at InfoWars?  At that time?

24     A.   At that time.

25     Q.   Okay.  He says:

1          "Keith, can you be more specific of who

2     you are referring to being frauds and child

3     predators?  You are warning us about talking

4     about something and you work for the 'American

5     Free Press'?  Are we only allowed to talk about

6     topics you approve?

7          "If you have undisputed proof about Sandy

8     Hook, I would love to put it on our show.

9     Threatening our organization to appear on the

10    show is not the way to do it.

11          "Censorship is news, and people and

12    organizations in Newtown have singled out a

13    single video when there are millions of videos

14    about the Sandy Hook incident.  I never

15    discount our government on the ability to

16    murder, but when the act is pinned on a feeble

17    kid carrying pounds of ammunition, firearms,

18    and there is not one shred of video evidence

19    that this person was inside or in front of the

20    school, which has just upgraded its video

21    surveillance system, then it's our duty to ask

22    questions.  When those who ask questions are

23    attacked and their questions ignored, that only

24    increases the likelihood of a coverup.

25          "Why is Sandy Hook the only event we were

1          not allowed to question?

2               "We can have you on Friday for the

3          nightly news.  We shoot interviews via video

4          Skype.

5               "Thanks, Rob Dew."

6               I read that right?

7     A.   You read the words right, but the tone you

8  inflict on it just supposes that he's being snarky or

9  some kind of condescending to this person.  But he isn't

10 at all.

11    Q.   Okay.  I mean --

12    A.   I can read you the email in Rob Dew's voice,

13 if you would like me.

14    Q.   I don't need you to do a Rob Dew

15 impersonation, no, ma'am.

16               Let's go to the next email.  That one is a

17 little hard to zoom because it's pretty much the whole

18 page.  So, I'm going to read it along with you,

19 hopefully the jury can listen in on this.  We got it a

20 little bit better but we'll try to do what we can.

21               Rob says:  "Thank you for your reply," or,

22 I'm sorry, Keith Johnson says to Rob.

23               "Rob, thank you for your reply.  I would

24          love to be on the show Friday night, but I

25          cannot use have Skype.  I live in rural area of

1       Tennessee, must rely on HughesNet satellite,

2       which causes a delay.  If calling in by phone

3       is not acceptable, I can try and make

4       arrangements with a friend to use their Skype.

5            "Now, concerning some of the points you

6       raised.  For one thing, the security system was

7       not upgraded in 2012.  It was upgraded earlier

8       than that, and I have proof.  The letter

9       referring to the upgrade was on the school

10      website originally written in 2010.  The video

11      camera in use at the time had no recording

12      feature.

13           "Adam Lanza was more than capable of

14      carrying out the attacks, and I can explain why

15      on your show.  I also wrote an article recently

16      with my interview with a prominent clinical

17      psychologist on Asperger's and what impact it

18      would have on Lanza's ability to carry out the

19      attacks.

20           "Frauds?  You are promoting Wolfgang

21      Halbig, a man with less than a year of law

22      enforcement as a ticket-writing Florida Highway

23      Patrolman in 1974 and a 3.3-hour online

24      certificate with NIMS.  He claims to have been

25      a homicide detective and a consultant on

1    Columbine.  Both claims are false and I can

2    prove it.

3         "I have documented multiple lies this man

4    told.  In addition, I have exposed the

5    intentional manufacturing of evidence by Sandy

6    Hook conspiracy theorists and have indisputable

7    and documented proof of their frauds.

8         "Child predators?  The dictionary

9    definition of a predator, a person or group

10    that ruthlessly exploits others.  What else

11    would you call those seeking to hunt down the

12    children who sang at the 2013 Superbowl and

13    stalks children at playgrounds in Newtown and

14    plots ways to exhume the bodies of dead

15    children?  I have further information on that I

16    can also share.

17         "Let's talk about censorship.  Censorship

18    is a function of government, not private

19    industry.  The videos that were taken down were

20    done so after the complaints of copyright

21    holders of photos and music were filed.

22         "As far as questions not being answered?

23    Those questions have been answered, especially

24    Wolfgang Halbig's notorious 16 questions.

25    Myself and Sandy Hook researcher C. W. Wade

1       have both answered those questions.

2               "I will follow up this email with more

3       information in the next few hours, but I wanted

4       to get something out before the night expires.

5       I have a few chores to attend to in the

6       meantime.

7               "Thanks for your timely reply.  Talk

8       soon.

9               "Sincerely, Keith Johnson."

10              I read that correctly?

11      A.    Yes.

12      Q.    Okay.  Now, InfoWars did eventually have

13   Mr. Johnson on the show; right?

14      A.    Correct.

15      Q.    Had him there to do a debate with Wolfgang,

16   didn't they?

17      A.    That's what I recall.

18      Q.    And Mr. Johnson tried to explain on InfoWars

19   why Wolfgang was wrong, didn't he?

20      A.    I can't recall specific details of the video

21   again.

22      Q.    Well, in any case, after that episode,

23   InfoWars ultimately sided with Wolfgang, kept having him

24   on the show and repeating the things he was saying;

25   right?

1        A.    Are you referring to a specific video of

2    Wolfgang after?

3        Q.    I'm asking you, Miss --

4        A.    After this debate?

5        Q.    Sure, I'm asking you, Miss Karpova, after

6    2014 Wolfgang Halbig was on the show repeatedly

7    throughout the next year, and InfoWars kept repeating

8    his claims, repeatedly, until 2017, 2018.  Can you agree

9    with that?

10       A.    Are those the videos that you have here on

11   the list?

12       Q.    Let's stop for just one second.  I want to

13   show you something else.  That will hopefully help us

14   with this.

15             Miss Karpova, I'm approaching you with the

16   notice that was given to you for the things you were to

17   be prepared on to testify in this case.  Okay?

18       A.    Yes.

19             MR. REYNAL:  I would object.  At the

20   deposition.

21             MR. BANKSTON:  Sure, sure, in her role as

22   a corporate representative to provide testimony as a

23   corporate representative.  Okay?

24   BY MR. BANKSTON:

25       Q.    I would like you -- do you remember seeing

1    this notice?

2         A.   Yes.

3         Q.   Okay.  Do you see how it has the topics at

4    the bottom?

5         A.   Yes.

6         Q.   What's the number one topic?

7         A.   Sourcing and research for the videos

8    described in Plaintiffs' petition.

9         Q.   After the preparation that you had done, are

10   you telling me right now that you cannot tell me if

11   between -- after 2015 InfoWars was still hosting

12   Wolfgang Halbig and repeating the things he was saying.

13   Are you not prepared to testify to that?

14        A.   Again, I'm not sure the videos you're

15   referring to.  There are a lot of videos that InfoWars

16   produces.

17        Q.   They're in front of you.

18        A.   Okay.  So, these are the videos you're

19   talking about.

20        Q.   Well, certainly a lot of those happened

21   after 2015, didn't you?

22        A.   Well, you referred specifically to Wolfgang

23   Halbig being in those videos and I can't remember

24   specifically those instances.

25        Q.   Why don't you take a look.

1        A.    Okay.

2        Q.    Take a look at the videos in 2015 for me.

3              Is Wolfgang Halbig in any of those videos,

4    do you think?

5        A.    Okay.  So, there are a total of 1, 2, 3, 4,

6    5, 6, 7 videos in, what -- I'm sorry, 1, 2, 3, 4,

7    5 -- ten videos in the year 2015.

8        Q.    And looking at those titles, you can tell me

9    right now Mr. Halbig was in some of these.  We're going

10   to watch them in a minute.

11       A.    Sure, let's watch them.

12       Q.    Okay, let's do that, that's probably easier.

13   We'll just see Wolfgang Halbig.

14       A.    Yes.

15       Q.    Around this time, at the end of 2014,

16   InfoWars' corporate files had information showing that

17   Wolfgang Halbig was harassing parents.  Do you agree

18   with that?

19       A.    Could you repeat that again?  I'm sorry.

20       Q.    In 2014, at the conclusion of that year, by

21   that point InfoWars had documents in its corporate files

22   establishing the fact that Wolfgang Halbig was harassing

23   parents.  Do you agree with that?

24       A.    I would just need to see the documents

25   you're referring to, please.

```
 1                    MR. REYNAL:  I'm going to object.  This is
 2   not a corporate file.
 3                    MR. BANKSTON:  Let's lay some foundation
 4   for that.
 5   BY MR. BANKSTON:
 6        Q.   Miss Karpova, I'm going to show you this.
 7                    THE COURT:  What's the number?
 8                    MR. BANKSTON:  This is Plaintiffs'
 9   Exhibit 58.
10                    THE COURT:  Thank you.
11   BY MR. BANKSTON:
12        Q.   Now, Miss Karpova, the first question I want
13   to ask you is, do you see down at the bottom, it has a
14   series of numbers on it; correct?
15        A.   Yes.
16        Q.   And those numbers say FSSTX-039550.
17   Correct?
18        A.   It does say that.
19        Q.   Now, you know in dealing with the discovery
20   in this case that what that is is a stamp that InfoWars
21   put on the documents that it gave to the plaintiff.  You
22   understand that?
23        A.   I assume so.
24        Q.   You also, we saw this, we discussed this
25   document in deposition; right?
```

1        A.    If you give me a second to go over the
2    email.
3        Q.    Sure, why don't you go ahead and read the
4    email just really quick to see if you remember us
5    talking about it in deposition.
6        A.    (Witness complies.)
7              Yes, I remember.
8        Q.    You remember discussing this email; right?
9        A.    Yes.
10       Q.    And you remember how we discussed how this
11   email came out of InfoWars' corporate files.  This
12   resides in InfoWars corporate files.
13             MR. REYNAL:  Objection.  Corporate files?
14   That's vague, Your Honor.  Object to it as vague.
15   Corporate files.
16             THE COURT:  Well, I'm going to overrule
17   it.  She can answer the question if she knows the
18   answer.
19             THE WITNESS:  Yes, so, the corporate --
20   I'm not sure where the corporate files came from, and I
21   surely don't for sure don't know if Alex had seen this
22   email or --
23             THE COURT:  Okay.  The question, the
24   question, you need to focus on what the question --
25             THE WITNESS:  I'm sorry.

1           THE COURT:  Please don't interrupt me.

2           You need to focus on the question you're

3 asked, not just what you feel like saying.  And the

4 question, "You remember how we discussed how this email

5 came out of InfoWars' corporate files.  This resides in

6 InfoWars corporate files."  That was the question.

7           THE WITNESS:  Correct.  And I'm sorry, I

8 just can't truthfully answer as to the nature of

9 corporate files, judge.  I'm sorry about that.

10          THE COURT:  I don't want your apologies, I

11 want you to have prepared the way I ordered you to

12 prepare months and months ago, and I want you to answer

13 the questions that are asked of you truthfully.  So if

14 the answer is "yes," if the answer is "no," if the

15 answer is "I don't know," I just want the answer.

16          MR. REYNAL:  Your Honor, I object to that

17 instruction.  Miss Karpova is not here as a corporate

18 representative, she's here as an independent.

19          THE COURT:  She's being questioned about

20 her deposition testimony when she was a corporate

21 representative.  That's what this question referred to.

22          MR. REYNAL:  I understand.  I think she

23 doesn't understand what a -- what the corporate files

24 means.

25          THE COURT:  She didn't say that.  She

1    said, "correct."

2              I think we can move on.  The answer was

3    "correct."  That's the answer we got.

4              MR. BANKSTON:  Your Honor, at this time we

5    would move to admit Plaintiffs' 58.

6              THE COURT:  58 is admitted.

7          *(Plaintiff's Exhibit 58 admitted.)*

8              MR. BANKSTON:  Thank you, Your Honor.

9              Can we put 58 up.

10   BY MR. BANKSTON:

11       Q.   Okay.  And let's show this part first so you

12   can see what it is first.  I know this is going to be a

13   hard email to read.  But you see how this is from

14   Wolfgang Halbig; correct?

15       A.   Yes, it is.

16              THE COURT:  She still has it in front of

17   her, right?

18              THE WITNESS:  Yes.

19   BY MR. BANKSTON:

20       Q.   You still have the document in front of you?

21              And it's to, there's an email address of a

22   person's name at something called Hager Sharp and an

23   email address at Info@SafeandSoundSchools.org.  Do you

24   see that?

25       Q.   Yes.

1       Q.   This email is dated December 21st, 2014?

2       A.   Yes.

3       Q.   Okay.  And the subject is, "I urge Michelle

4    to stop using Josephine and making money and appearing

5    on speaking engagements."

6       A.   Yes.

7       Q.   Is that what it says?

8            I'm going to read this email to you.

9            "Michelle, how could you and your

10           husband, as responsible parents, even allow

11           your precious child Josephine to attend that

12           filthy and deplorable-looking school on

13           December 14th, 2012.  This school has, as you

14           must have known, is and was a toxic waste dump

15           as reported by the environmental consultants

16           who requested more money from the city of

17           Newtown leaders before demolishing the school

18           and transported all the high levels of lead

19           paint, high asbestos, and especially the high

20           levels of PCBs in the groundwater at the Sandy

21           Hook out of state.

22           "Josephine, your child, should have

23           expected more from you before that tragic day

24           as a parent.  You were supposed to protect her

25           from lifelong serious health -- lifelong health

1  risks when you send her to that school every

2  day.  Why would you, as a parent, and all those

3  other parents --"

4      Miss Karpova, it would help if you would

5  read along with the document so I can ask you if I've

6  read it correctly.

7      A.  I'm sorry, I just -- okay.

8      Q.  (Reading:)

9      "Why would you, as a parent, and all

10  those other parents who supposedly lost a child

11  to gunfire allow their children, as you did, to

12  serious toxic waste?  This all unfolded before

13  the first shot at the school even occurred.

14      "Did you not see the filth and deplorable

15  conditions when you went to that school or are

16  you blind?  I do not understand, unless you

17  explain it to me and the world, why you and

18  your husband failed Josephine, who is a

19  nonverbal child as you stated and depended on

20  you for her safety.

21      "She needed you to protect her from all

22  of the serious health risks that you sentenced

23  her to on a daily basis.  Now you talk about

24  school security.  You have got to be joking.

25  You have all these experts on your staff who

1    are now part of your conspiracy.  They should

2    be ashamed in their actions in supporting you.

3    A mom puts her own child at risk on a daily

4    basis is now the expert on school security?

5         "I look forward in meeting you one day

6    when I can take your deposition, not about the

7    shooting, but why you and your husband failed

8    Josephine by sending her to that filthy and

9    deplorable school with all that toxic waste.

10        "We call this child endangerment when you

11   know of danger that you expose your child to

12   serious lifelong health risks.  We must know

13   without a doubt, because pictures do not --"

14   and it says "li" and I believe that's "lie."

15        "You put her life in serious risk every

16   day knowing how filthy and deplorable that

17   school is.  I am enclosing photos that you must

18   recognize, since you took your child to that

19   school, and having a child in special needs,

20   you would expect a school environment and

21   school climate that allows children to learn

22   and teachers to teach."

23            Or it said "teachers to tech," but I think

24   that's "teach."  And then he says, "right?"

25

1          "Please explain to me, if you can, why a

2      school principal, Dawn Hochsprung, would allow

3      her school to be so filthy and deplorable.

4      There is not one female elementary school

5      principal in this country that would allow her

6      school to be that filthy and deplorable both

7      inside and outside and, most of all, allow her

8      school to become a toxic waste dump, placing

9      every child in her school and staff in serious

10     lifelong health risk.  Right?

11          "All the pictures were taken by major

12     crime squad from the Connecticut State Police.

13     Please respond, since you are now the expert on

14     school security."

15          "Wolfgang W. Halbig."

16          Did I read that; right?

17     A.    Yes, you read that right.

18     Q.    And Wolfgang had sent this email to the

19 parents of a murdered autistic girl.  You realize that?

20     A.    I realize that, and you were suppose -- yes.

21     Q.    Okay.  So, InfoWars in its corporate files,

22 had information as early as the end of 2014 that

23 Wolfgang Halbig was doing this kind of thing.  Do you

24 agree with that?

25     A.    Could you specify "this kind of thing"?

1      Q.    The email we just saw.

2      A.    Correct.  And you're classifying it as a

3  harassment of the parents.

4      Q.    I would.  Sure.

5            But I'm just asking you, they knew about

6  this.  InfoWars knew about this.

7      A.    I'm not sure who at InfoWars knew about

8  this.

9            THE COURT:  Is this a good time for a

10  break?

11           MR. BANKSTON:  It sure would be, Your

12  Honor.

13           THE COURT:  All right.  This is going to

14  be our morning break.  It's 10:30.  We'll return at

15  10:50.  So, we'll take a 20-minute break.

16           Jury, please remember all of my prior

17  instructions about not discussing anything that's going

18  on in the courtroom during the break.  Thank you.

19                    *(Brief recess.)*

20           THE COURT:  You may resume.

21           MR. BANKSTON:  Thank you.

22  BY MR. BANKSTON:

23      Q.    Miss Karpova, before we had our break we had

24  talked about an email from Wolfgang Halbig; correct?

25      A.    Yes.

1      Q.    And that was from December of 2014?

2      A.    Yes.

3      Q.    That InfoWars has.

4            You have that email, your company has it.

5      A.    Again, truthfully, I'm not sure where the

6   email came from, but.

7      Q.    I'm not sure -- I'm not real interested in

8   where it came from, I'm interested in the company gave

9   it to me from its materials; correct?

10     A.    I would assume so.

11     Q.    Well, I'm not asking you to assume.  Didn't

12  you testify to me that you were personally involved in

13  the discovery in this case and that you personally know

14  that that stamp down at the bottom means that that was a

15  document given by the company to me?  You know that;

16  right?

17     A.    It appears so.

18     Q.    Okay.  And that email is Wolfgang Halbig

19  harassing the parents of a murdered little girl.  Right?

20     A.    I can't agree with that statement.

21     Q.    So, I want to make sure we have this clear

22  for the jury.  We just read this email about Wolfgang

23  Halbig telling this mother how she failed her nonverbal

24  child.  And levelling all these accusations against her.

25  To you, InfoWars eyes sees this email, that's not

1    harassment?

2          A.   To me this seems like Wolfgang was a person

3    who was very perturbed by the incident and horrified

4    that, in his mind, the children were used for this

5    tragedy, and he's trying his best to address the

6    situation, is what it sounds like to me.  And he

7    certainly -- I don't feel like he believes that this is

8    a parent who lost a child, and he is truthfully is just

9    horrified that the children in his mind are being used.

10         Q.   That's right.  Because in this email, when

11   he keeps on talking about, to Miss Gay, Josephine, your

12   nonverbal child, and you failed Josephine in the

13   shooting that day, the truth of it is he's mocking her

14   because he doesn't believe that she had a child named

15   Josephine.  He doesn't believe there was a real child.

16   That's correct; right?

17         A.   I don't believe he's mocking her.  I

18   think --

19         Q.   Okay.

20         A.   He's just appalled.

21         Q.   So am I.

22              Let's look at another video.  I would like

23   you to look at your list December 28th, 2014.

24              Do you see that?

25         A.   Yes.

1          Q.   Okay.  So, we're still not even out of 2014

2    yet and we have another video called, "America the False

3    Democracy," right?

4          A.   We did, yes.

5          Q.   I would like to show you a clip from that

6    video.

7               Can we play 12A.

8               *(Video played off the record.)*

9               Mr. Jones said, "The state police have

10   gone public."  Did you hear that?

11         A.   Yes.

12         Q.   What does that mean?

13         A.   I'm not sure.

14         Q.   Okay.  Do you remember earlier we looked at

15   the notice of the topics that you were supposed to

16   prepare for when you were becoming a corporate

17   representative; right?

18         A.   Yes.

19         Q.   One of those was the sourcing and research

20   for the videos in Plaintiffs' petition; right?

21         A.   Correct.

22         Q.   And those claims that were made in those

23   petitions; right?

24         A.   Correct.

25         Q.   And but, as far as Mr. Jones saying, "The

1    state police have gone public," you can't testify about

2    what that's supposed to mean.

3         A.   I have no idea what Alex is referring to.

4         Q.   Okay.  Would you at least agree with me that

5    the state police of any state have not gone public

6    saying that Sandy Hook is fake?  You would agree with

7    that; right?

8         A.   I can't -- I don't know for sure.

9         Q.   Okay.  So, you're going to testify to this

10   jury that you think, sitting on the stand today, that it

11   might be possible that one of the state police forces of

12   one of the 50 states came public and said Sandy Hook was

13   fake.  You think that's possible?

14        A.   I'm trying to be as truthful and possible

15   right now, and from my personal knowledge I can't make

16   that definitive statement.

17        Q.   That's fair enough.  Okay.

18             You know about -- do you know about the

19   article, "Sandy Hook Victim Dies Again in Pakistan."

20   Are you familiar with that?

21        A.   Could you --

22        Q.   It's not a video, so it won't be on that

23   list.  I'm just asking if you're familiar with this

24   article.  It's a pretty eventful thing in InfoWars.

25        A.   Would you refresh my memory, please.

1          Q.    Sure.  Do you remember the fact that
2     Mr. Jones made the claim that a Sandy Hook victim, Noah
3     Pozner, was actually also died again in a fake mass
4     shooting in Pakistan.  Do you know about that article?
5          A.    Could you remind me the year of the article?
6     Sorry.
7          Q.    Yeah, right about right now when we're
8     talking about, which is right at the end of 2014 to
9     right at the beginning January 2nd or so of 2015.  You
10    remember that that was a big story being pushed on
11    InfoWars, that Noah Pozner died again in a fake mass
12    shooting a Pakistan; right?
13         A.    I wasn't following InfoWars closely at that
14    time and I wasn't working at the company yet, so I
15    cannot testify to --
16         Q.    So, again, with the topics that you were
17    asked to prepare for, including the sourcing of the
18    videos, if there's videos in this case talking about
19    Noah Pozner dying again in Pakistan and this fake mass
20    shooting in Pakistan, you can't testify about that, can
21    you.
22         A.    I'm not sure, sir.
23         Q.    Okay.  Well, I would like to show you a
24    video from January 13th, 2013.  You see that on the
25    list; right?

1      A.    Yes.

2      Q.    Okay.  And that episode is entitled "Why We

3  Accept Government Lies."

4      A.    Yes.

5      Q.    Okay.  I would like you to pay attention

6  while I play you a clip from this video.  And

7  specifically there's a lot of things said in this video,

8  right, so pay attention to all of it, but you're going

9  to hear about this fake mass shooting in Pakistan,

10  right, and about using the Sandy Hook victim's picture.

11  I want you to watch that and see if it refreshes your

12  memory on this controversy.  All right?

13      A.    Yes.

14      Q.    So, let's play clip 13A.

15            *(Video played off the record.)*

16            Okay.  The first thing I want to ask you

17  about, you hear about the Pakistan thing?

18      A.    Yes.

19      Q.    Does that refresh you at all, what I'm

20  talking about?

21      A.    It's been a while since I've heard about

22  that.

23      Q.    Right.  So, in other words, when you were

24  preparing in this case for these videos that wasn't

25  something you heard about, it's been a while since

1    you've heard about that?

2         A.   Well, the sourcing, I was tasked to prepare

3    with the sourcing of videos, and the sourcing in this

4    case was Alex Jones' mind, because it wasn't anything

5    that was prepared as a -- like before the -- I don't

6    believe, I don't believe so, that it was a document that

7    he was reading, but something from his mind, from his

8    own research.  And --

9         Q.   Right.  So as far as this thing about

10   Pakistan and the sources of that --

11              MR. REYNAL:  Your Honor, I'm going to

12   object under CPLR 31.11 [sic] to evidence that doesn't

13   go to compensatory damages.  It's the section that says

14   that we need to bifurcate the evidence that deals with

15   punitive damages.

16              THE COURT:  Right, no, I -- but where are

17   you -- what rule are you putting me into?  What do you

18   want me to look at?

19              MR. REYNAL:  The Civil Practice and

20   Remedies Code.

21              THE COURT:  Oh, I thought you said "LR,"

22   and I was like, what is that?  I have like 30 books, I

23   don't have them all memorized.

24              All right, where do you want me to look?

25              MR. REYNAL:  Civil Practice and Remedies

```
 1   Code Section 31.
 2                 THE COURT:  31.  Thank you.
 3                 Which part?
 4                 MR. REYNAL:  Sub point 11.
 5                 THE COURT:  31.11?  31.011?
 6                 MR. REYNAL:  Yes, 011.
 7                 THE COURT:  Is that new?  My book doesn't
 8   have that.
 9                 MR. REYNAL:  Well, I will get it for Your
10   Honor, if you would like.
11                 THE COURT:  I have a 31.10, 010, and
12   that's it, it stops there.
13                 MR. REYNAL:  My objection, your honor,
14   maybe this will make it easier, is this evidence that's
15   being elicited does not go to the issue of compensatory
16   and actual damages for the plaintiff, it is evidence
17   that's solely designed to go to punitive damages and to
18   attack the character and the reprehensibility of the
19   conduct and, therefore, shouldn't be admitted at this
20   point when we're supposed to be dealing with
21   compensatory damages.
22                 THE COURT:  Overruled.
23                 MR. BANKSTON:  Your Honor, I would just
24   request if we could maybe limit objections
25   to evidentiary basis and not long, speaking objections.
```

```
 1                    THE COURT:  Yes, please.

 2                    MR. BANKSTON:  Okay.  Thank you.

 3     BY MR. BANKSTON:

 4          Q.   All right, Miss Karpova, we had seen in

 5     some of the last videos tag line at the top of the

 6     screen that said, "The Front Line the Truth Journalism."

 7     But we see a different tag line on the top of this

 8     screen; right?

 9          A.   Yes.

10          Q.   And that says "InfoWars.Com, Because There

11     is a War on For Your Mind."  That's right?

12          A.   That's been InfoWars' slogan.

13          Q.    In this video that we just watched, do you

14     recall him saying that there was an email from Michael

15     Bloomberg telling his people, get ready in the next

16     24 hours to capitalize on a shooting, do you remember

17     hearing that?

18          A.   He said something along those lines.

19          Q.   Yeah.  And that basically saying that

20     Michael Bloomberg knew 24 hours before Sandy Hook that

21     they were going to stage an event; right?

22          A.   I'm not sure exactly what Alex meant by

23     that.

24          Q.   That's not something you can testify to

25     today.
```

```
 1        A.   I'm not sure, sir.  I don't want to --
 2        Q.   Would you agree with me it's pretty
 3   ridiculous to think the former mayor of New York,
 4   Michael Bloomberg, had an email that he sent out to his
 5   gun groups, his gun control groups?  Would you agree?
 6              MR. REYNAL:  Objection.  Argumentative.
 7              THE COURT:  Overruled.
 8   BY MR. BANKSTON:
 9        Q.   You would agree with me that it is
10   ridiculous that former mayor Michael Bloomberg sent out
11   an email to his gun groups telling them all, get ready
12   in the next 24 hours to capitalize on a mass shooting.
13   That is ridiculous, you would agree with that?
14        A.   I can't agree with that specific statement,
15   sir.
16        Q.   Okay.  At the end Mr. Jones references that
17   false mass shooting in Pakistan.  You know that's about
18   Noah Pozner; right?
19        A.   Correct.
20        Q.   Mr. Pozner complained about that, right, to
21   YouTube?
22        A.   You're referring to --
23              THE COURT:  You're going to have to speak
24   up a little bit.
25              THE WITNESS:  Are you referring to a
```

 1   specific document?

 2   BY MR. BANKSTON:

 3        Q.   No, I'm not.  I'm asking you, do you know

 4   Mr. Pozner complained about that story to YouTube?  Do

 5   you know that?

 6              MR. REYNAL:  I'm going to object again,

 7   Your Honor, under the Civil Practice and Remedies Code

 8   Chapter 41.011.

 9              THE COURT:  I'll look.  But your objection

10   is the same; right?

11              MR. REYNAL:  Yes.

12              THE COURT:  Yeah, overruled.

13              MR. BANKSTON:  Thank you.

14              MR. REYNAL:  May I have a running

15   objection, your honor?

16              THE COURT:  You may.

17              MR. REYNAL:  Thank you.

18   BY MR. BANKSTON:

19        Q.   Do you remember one of the videos you were

20   supposed to get prepared for was on February 12th, 2015?

21        A.   It says "Title Unknown."

22        Q.   That's correct.  Because you didn't give us

23   this video, right?  We had to go find it.  And we don't

24   know its title.  Did you understand that?

25        A.   That's what I assume.

75

1       Q.   Yeah, we got lucky and we found it.  And I

2  want to play a clip of this video for you now.

3            This is something you reviewed for your

4  preparation; correct?

5       A.   Will you show it to me to refresh my memory?

6       Q.   Well, let's ask you this, are you now

7  telling me there are videos in the Plaintiffs' petition

8  that, despite the Court's instruction, you did not

9  review?

10      A.   I just don't remember which videos I

11 reviewed and which were available to me to review.

12      Q.   Okay.  Well, if it's on this list you should

13 have reviewed it; right?

14      A.   Again, sir, I'm -- the videos that were

15 available to me I did review.

16      Q.   Okay.  Can you tell me if the videos that

17 were available to you, that were made available to you,

18 are all the videos in Plaintiffs' petition?  Do you know

19 that?

20      A.   Are you referring to all these videos?

21      Q.   Well, I'm asking what you prepared on.

22           Miss Karpova, I'm having a hard time

23 understanding what exactly you prepared on, and what I'm

24 trying to figure out is do you know if the videos that

25 were provided to you by whoever provided them to you to

1   get prepared, were they all the videos in Plaintiffs'

2   petition?  Did you do anything to verify that?

3         A.   I'm not sure, sir.

4         Q.   Okay.  Well, I would like to play you a clip

5   from this video, and I assume you've seen it and

6   prepared on it but we're going to play it, okay.  And

7   we're going to play right now from February 12th, 2015.

8   As we stated, the title is unknown, but we're going to

9   play clip 14C.

10              *(Video played off the record.)*

11              Mr. Jones' concern was that complaints

12  from the parents could potentially shut down the

13  company's YouTube channel; right?

14        A.   One of the concerns in this video.

15        Q.   Correct.  That's in the clip we just saw?

16        A.   Yes.

17        Q.   Okay.  Like to play for you now clip 14D.

18              *(Video played off the record.)*

19              One thing we can see at the end of this

20  clip is that Mr. Jones decided when a parent complained

21  he was going to put that parent's name and email out to

22  millions of people.  We can agree on that?

23        A.   Well, I believe that's public record when

24  the complaint is sent.  I'm not sure what you --

25              THE COURT:  Miss Karpova, I want you to

1    listen to the question and answer the question that

2    you're asked.  Mr. Reynal will ask you questions later,

3    but right now you have to answer Mr. Bankston's

4    questions.

5    BY MR. BANKSTON:

6         Q.   This was a notification from YouTube sent to

7    InfoWars.  Do you see that?

8         A.   Yes.

9         Q.   Okay.  And not sent to the public, sent to

10   InfoWars.  Do you agree with that?

11        A.   Yes.

12        Q.   Okay.  And InfoWars decided to take this

13   notification they had been given from YouTube and put it

14   on the air with Lenny Pozner's name and his email

15   address.  That happened; right?

16        A.   With the claimants, yes.

17        Q.   Yes.  Okay.

18             And also, Mr. Jones says during this that,

19   "I want to be careful."  Did you hear him say that?

20        A.   I did.

21        Q.   That's not truth, he's being the exact

22   opposite throughout all of these videos we're seeing;

23   correct?

24             MR. REYNAL:  Objection, your honor.  She's

25   not here to judge whether he's being truthful or not.

```
 1                    THE COURT:  What's the legal objection,
 2    Mr. Reynal?
 3                    MR. REYNAL:  Calls for speculation, Your
 4    Honor.
 5                    THE COURT:  All right.  Overruled.
 6                    THE WITNESS:  What's the question again?
 7    BY MR. BANKSTON:
 8         Q.   Can I have that read back?
 9              (The record was read as requested.)
10         A.   No, I -- I think he's trying to be as
11    truthful or as careful as he can.
12         Q.   Okay.  He was saying in there, "We're not
13    even saying in that headline that children weren't
14    killed."  You heard him say that?
15         A.   Yes.
16         Q.   Yeah.
17              In fact, what he's saying, didn't the
18    headline say Noah Pozner died twice.  Right?  That's
19    what it said.
20         A.   Yes.
21         Q.   Okay.  I want to play you another clip.
22              You understand, like we talked earlier,
23    that Mr. Jones will sometimes have people who make
24    YouTube videos who have been featured on the show, he'll
25    sometimes invite the people who made those YouTube
```

```
 1    videos that were featured, he'll invite them on the show
 2    to talk.  That's happened before.
 3            A.   I would say occasionally.
 4            Q.   Sure.  Okay.  Well, I want to show you
 5    something like that; right?
 6            A.   Yes.
 7            Q.   Let's play clip 14H of Mr. Jones talking to
 8    people who were trying to get their YouTube videos on
 9    his show.
10                 THE COURT:  Just a second.  Can you
11    approach real quick?
12                 MR. BANKSTON:  Sure.
13                 (Whereupon a discussion was held at the
14    bench off the record.)
15                 MR. BANKSTON:  That's okay, Your Honor,
16    we'll get that figured out and if we need to come back
17    and revisit it we can.
18                 THE COURT:  If you want to admit it now,
19    we will.
20                 (Discussion between counsel off the record.)
21                 THE COURT:  Is it part of PVX 14?
22                 MR. BANKSTON:  Correct.  I just want to
23    make sure it's been disclosed to defendants.
24                 MR. REYNAL:  Yes, that's fine.
25                 THE COURT:  All right.  Then, that's fine.
```

1              *(Plaintiff's Exhibit PVX 14 admitted.)*

2              Just before you start it I just want to

3    explain to the jury, sometimes you'll see exhibits have

4    to be admitted in court and sometimes we've agreed in

5    advance that they're already admitted.  But I keep track

6    of everything that's done.  So, that's all that's

7    happening right now.

8              All right, go ahead.

9                   MR. BANKSTON:  All right.  Can we go ahead

10   and play now clip 14H.

11                  *(Video played off the record.)*

12   BY MR. BANKSTON:

13        Q.    During that clip, Mr. Jones said, about the

14   parents who were complaining, "They made a major mistake

15   involving us."  That's what he said?

16        A.    I'm not sure who Alex is referring to

17   that -- that made a mistake.

18        Q.    He's talking about this network of people,

19   right?  Who complained?

20        A.    Well, I think the caller is concerned here

21   with the trolls that he's being attacked with, as well

22   as his family, and that's what he's raising with Alex.

23   And to my understanding from this clip is that he's

24   saying he doesn't appreciate, you know, having been

25   entangled in this by the trolls who, again, post to the

81

1    website, perhaps.

2         Q.    Make sure I understand.  This caller who had

3    been posting videos with murdered parents' children in

4    them and calling them fake, who had now been getting

5    complaints from Mr. Pozner, that person was mad that he

6    got entangled in this.  That's what you're telling me?

7         A.    I'm not sure what this caller was doing.

8         Q.    Okay.  Well, let's talk about Mr. Jones,

9    then, because he said, "They made a major mistake

10   involving us."  You agree that's what he said?

11        A.    He did say that.

12        Q.    Okay.  And here is the other thing I want to

13   ask you about.  Alex Jones said, "I'm not somebody to

14   mess with."  That's true, isn't it?

15        A.    He did say that.

16        Q.    And it's true, right?  You don't want to

17   mess with Alex Jones.

18        A.    I'm not sure what he meant by that.

19        Q.    Okay.

20        A.    I think he means that he's not going to

21   stop, he is not going to shut up.  That's his weapon is

22   his speech.

23        Q.    Let's see how he uses that weapon.  Let's

24   check that out on the next clip.

25                    Malisa, can you play for us clip number

1    PVX 14I.

2                    *(Video played off the record.)*

3                    That was Mr. Robert Dew talking; right?

4         A.    Yes.

5         Q.    Okay.  So, in terms of Mr. Jones using his

6    speech he has, which you say is his weapon, when a

7    parent of murdered children complained, the way

8    Mr. Jones used that speech as a weapon is by showing

9    literal maps to where they picked up their mail to all

10   of his followers.  That's what he did with his weapon of

11   speech; right?

12        A.    I wouldn't agree with that statement, sir.

13        Q.    All right.  Well, let's just make that

14   really simple.  We just saw, and the jury saw, too,

15   after these complaints and he said, "I'm not somebody to

16   mess with," the next thing that happens on InfoWars

17   later on that broadcast is him putting up literal maps

18   to where these people pick up their mail.  That

19   happened, right?

20        A.    Well, I think what Rob Dew was doing here is

21   looking up the business name or the organization name

22   that's filed the complaint and researching into it, so.

23        Q.    Yeah, you know, a father, Lenny Pozner, had

24   created a name called HONR Network to try to be a little

25   more anonymous when he was making these complaints.  Did

1    you know that?  You heard about that?

2         A.   Correct, we know that now.

3         Q.   Yeah.

4              And you all knew Lenny Pozner was running

5    the HONR Network, they showed it earlier on the clip;

6    right?

7              Miss Karpova, we saw his email address,

8    right?

9         A.   The HONR Network, yes.  The address and the

10   email.

11        Q.   And you saw Lenny Pozner's name; right?

12        A.   Yes.

13        Q.   And you know down there in Florida, what he

14   showed, that's where Lenny Pozner was picking up his

15   mail.

16        A.   I'm not sure if that address was public,

17   because the way they were able to find it, the

18   organization's address, and that's what he was showing

19   on air.

20             MR. BANKSTON:  Objection.   Nonresponsive.

21             THE COURT:  Sustained.

22   BY MR. BANKSTON:

23        Q.   They showed maps to where Lenny Pozner was

24   picking up his mail, correct?

25        A.   Yes.

1          Q.    One thing we definitely know, I know you're

2    saying you don't know it was public, it was definitely

3    public after that, wasn't it, to millions of people.

4          A.    Well, I'm assuming it was public, that's how

5    he was able to find it and it was on Google Maps and

6    what he was showing --

7          Q.    Miss Karpova, can I please remind you, do

8    not assume anything.

9                You don't know for a fact where that came

10   from, do you?

11         A.    I'm trying my best to answer your question.

12         Q.    Would you please agree with me that when I'm

13   asking you a question and you're testifying under oath

14   about the truth, can you please just not assume things.

15   Will you make that agreement with me?

16         A.    Yes, sir.

17         Q.    Okay.  You understand this trial is very

18   important; right?

19         A.    Very important.

20         Q.    Okay.  And so I definitely want to make sure

21   that you're not saying anything that you cannot say

22   under oath.  Do you understand that?

23         A.    Absolutely.

24         Q.    Okay.  I want to show you another clip from

25   this.  Let me show you a very short clip at the end of

 1     this discussion that they're having.

 2                     PVX 14J.

 3                     *(Video played off the record.)*

 4                     So, Mr. Jones says essentially, because

 5     Mr. Dew is confused that Mr. Pozner is using a UPS box

 6     and that he doesn't have a memorial set up or something,

 7     he's confused.  Because of that Mr. Jones says he needs

 8     to go down to Florida and investigate this; right?

 9          A.   I'm not sure if I agree with that

10     statement --

11          Q.   Okay.

12          A.   -- fully, sir.

13          Q.   That's fine.

14                     Let's move into 2015 a little bit later.

15     Let's go to March 2015.  All right.  On March 4th, 2015,

16     there's another video; right?

17          A.   Yes.

18          Q.   Okay.  And that is called "New Bombshell

19     Sandy Hook Information in-bound;" right?

20          A.   Yes.

21          Q.   And I know in the last few videos where

22     we've been seeing Mr. Jones talking about the incident

23     being totally synthetic, completely manufactured, that

24     kids didn't die, these last few videos we haven't been

25     seeing a lot of Halbig.  But in this video here about

1    the bombshell information this is Halbig we're going to

2    be talking about; right?

3         A.    I'll take your word for it.

4         Q.    Well, let's look at a video.  Let's show you

5    a clip from that as PVX 15B.

6                   *(Video played off the record.)*

7              All right.  Miss Karpova, first of all, at

8    this point in 2015, InfoWars had already had possession

9    of the state's attorney's release of the official Sandy

10   Hook files and the report since 2013, for all of that

11   time since, up until this video, it has had those

12   materials.  Do you agree with that?

13        A.    I can't agree with that specific statement,

14   sir.

15        Q.    Well, didn't we just put at the beginning of

16   your testimony these Requests For Admissions that you

17   were involved with in the discovery, and we went through

18   them all and see that it was admitted that the company

19   did, in fact, possess that report in December of 2013.

20   You remember we did that?

21        A.    Correct.  But if you're referring to who at

22   the company had them, I have no idea who saw it.

23        Q.    Okay.  I don't need to know a specific

24   person.  We know that the information was in the

25   company's possession as of 2013; right?

1          A.    It appears so.

2          Q.    Okay.  And now we have in this video

3    Mr. Jones saying the place was falling apart in the

4    photos and the videos that we saw didn't look like a

5    real school.

6                What I want to ask you, Miss Karpova, is,

7    in getting prepared to testify, in getting prepared to

8    be a corporate representative, is it your belief that,

9    if we were to show this jury those photos and those

10   videos taken inside of Sandy Hook that day, do you

11   believe it would show that it doesn't look like a real

12   school; that it's falling apart.  Do you know?

13         A.    The photos that Alex was referring to, I

14   believe so, yes.

15         Q.    Okay.  So, you think -- let me tell you,

16   we're going to -- you think when the jury sees the

17   photos of the inside of the school and see the video of

18   the inside of the school, they're going to think this

19   was not an operating school.

20         A.    I just said the photos and the videos that

21   Alex saw that he was referring to.

22         Q.    What are those?

23         A.    I'm not sure.

24         Q.    And you were responsible for the sourcing

25   and the research on Plaintiffs' petition?

1          A.    I couldn't find them.  That's something that

2     Alex had done his research on.

3          Q.    You didn't even talk to Alex, did you.

4          A.    I don't remember.

5          Q.    Didn't you testify yesterday in getting

6     prepared for your corporate representative to testify

7     about these topics you didn't even talk to Alex.

8          A.    Specifically not for that.

9          Q.    And you're telling me that all this stuff is

10    coming right out of his brain.  Right?

11               Right?

12         A.    That's how he normally does it.  He does

13    previous research at home or right there on air.

14         Q.    Do you think it's fair that these parents

15    now have their day in court and we're asking for this

16    information, and when you were ordered to prepare

17    yourself on this information that you didn't?  That you

18    didn't even talk to Mr. Jones?  Do you think that's fair

19    to them?

20               MR. REYNAL:  Objection to the relevance,

21    Your Honor, of discovery issues that have happened in

22    this case.

23               THE COURT:  You know what, I'm going to

24    sustain the objection for now.  But if we can't get

25    answers to the things she was supposed to be able to

1    answer, I might -- I might allow it later.

2                    MR. BANKSTON:  Thank you, Your Honor.

3                    THE COURT:  So, sustain for now.

4    BY MR. BANKSTON:

5         Q.   I want to show you another clip from this

6    March 4th, 2015, video called, "New Bombshell Sandy Hook

7    Information in-bound."

8                    Play the clip 15D.

9                    *(Video played off the record.)*

10                   Miss Karpova, there was a lot said there,

11   but what I really want to ask you about is this, I wrote

12   it down here:  Mr. Jones said, "And then they bring in

13   all the actors to break down and cry and they think

14   we're so stupid that they use the same actors as

15   different people."  You heard that?

16        A.   Yes.

17        Q.   What people who were -- supposedly played

18   the different people that were supposedly played by the

19   same actor, who was that?

20        A.   It's hard to say who he's referring to here.

21   I don't know.

22        Q.   It would definitely be hard to say if you

23   didn't talk to Mr. Jones and prepare; right?

24        A.   I did prepare the best I could.

25                   MR. REYNAL:  If I may, Your Honor, and I

90

1    think that -- she's not here as a corporate

2    representative.  She gave a deposition as one.  If they

3    want to play the deposition, that's different.  This is

4    inappropriate.  She wasn't supposed to be here as a

5    corporate representative.

6                    THE COURT:  Are you objecting to this last

7    question?

8                    MR. REYNAL:  Yes, I'm objecting to this

9    last question, this entire line of questioning about

10   corporate representative stuff.

11                   THE COURT:  Well, you're actually

12   objecting to a sidebar, and I will sustain the objection

13   to a sidebar.

14                   MR. BANKSTON:  Understood, Your Honor.

15                   THE COURT:  Ask a question.

16                   MR. BANKSTON:  Understood.  And again, if

17   I could re -- hopefully we can limit speaking

18   objections.

19                   THE COURT:  Yes.

20   BY MR. BANKSTON:

21        Q.   Let's talk about another clip in this video,

22   okay.  And I want you to pay attention to what

23   Mr. Halbig is saying.  In this video we're going to hear

24   from Mr. Halbig.  This is clip 15G.

25                   Can we play that?

1          *(Video played off the record.)*

2          Miss Karpova, I want to ask you something

3 very specific about what Mr. Jones said, or, I'm sorry,

4 about what Mr. Halbig said.  Did you hear the portion

5 where he was sort of praising InfoWars?

6          A.   Yes.

7          Q.   Okay.  And in that clip he said, "Support

8 InfoWars because, if we don't have your voice, nobody is

9 going to hear the truth."  That's what Mr. Halbig said?

10         A.   He did say that.

11         Q.   Mr. Halbig doesn't have a media company,

12 does he?

13         A.   I don't believe so.

14         Q.   He doesn't appear in front of an audience of

15 millions, does he, unless he is on InfoWars; right?

16         A.   I believe he's been on other shows, before,

17 as well.

18         Q.   Where has he appeared in front of millions

19 of people, Miss Karpova?

20         A.   I'm not sure.  I wasn't -- I'm not sure

21 right now.

22         Q.   All right.  Because you would agree with me

23 that nobody in this country, nobody who runs a media

24 empire with millions of viewers, would ever put Wolfgang

25 Halbig on its shows other than InfoWars; right?

1        A.   I don't know that.

2        Q.   Okay.  But, according to Mr. Halbig, if

3   InfoWars isn't out there, if InfoWars isn't helping

4   Mr. Halbig get his message out, nobody is going to hear

5   the truth, according to Mr. Halbig.  That's what he

6   said?

7        A.   That's something that pretty much every

8   guest we have on say, and they also ask for donations.

9        Q.   I bet.  I bet those people want that

10  audience and, in fact, that's what was happening here is

11  even Mr. Jones was saying, folks need to donate; right?

12       A.   Yes.

13       Q.   Mr. Jones was helping raise money to let

14  Mr. Halbig do all of the things that we've been seeing

15  him do.  Right?

16       A.   Well, Alex just likes to help the little guy

17  because he doesn't, you know, his time, at the time in

18  his opinion and he, Alex, always states that it's

19  according to him, it's his opinion, that Wolfgang was

20  not getting a big national attention and he was trying

21  to help him out.

22       Q.   Let me make sure I understand you.  Alex

23  likes to support the little guy; right?  That's what you

24  said?

25       A.   Yes.

1      Q.   And in this case, the little guy is the guy

2  that was sending harassing emails to the parents of

3  murdered children.  That's right?

4      A.   Again, I do not agree with your assessment

5  that it's a -- was a malicious, harassing email.

6      Q.   Okay.  Let's play another clip from that

7  same episode, and let me just repeat that for the jury,

8  "New Bombshell Sandy Hook Information in-bound," on

9  March 4th, 2014.

10                Let's play clip 15F.

11                (Video played off the record.)

12                I heard there Mr. Jones talking about how,

13  "They traumatized us, the people who did Sandy Hook,

14  they traumatized us."  Did you hear that?

15      A.   Yes.

16      Q.   And did you hear in the earlier clip when

17  Mr. Jones and Halbig were talking about how this event

18  was calculated to inflict emotional distress on the

19  public.  Do you remember him saying that?

20      A.   Yes.

21      Q.   Okay.  Is it, I want to know, is it the

22  company's current position that Neil and Scarlett were

23  involved in fakery, are not real parents, and inflicted

24  emotional distress on the company?  Is that the

25  company's position?

```
 1              MR. REYNAL:  Objection.  She's not a
 2   corporate representative, Your Honor.
 3              MR. BANKSTON:  I'll ask it to her
 4   personally.
 5              THE COURT:  I mean, did you ask it at the
 6   deposition?  I don't know.
 7              MR. BANKSTON:  Yes, but I'm not sure I
 8   want to go into that right now.
 9              THE COURT:  All right.
10   BY MR. BANKSTON:
11       Q.   But I'll ask it to you personally, from your
12   personal perspective what do you think?
13       A.   Could you repeat that again?
14       Q.   Yeah, do you believe Neil and Scarlett,
15   right here, do you believe these two people are fake
16   parents who inflicted emotional distress on America?  Is
17   that something you believe, Miss Karpova?
18       A.   I don't believe that and I believe that
19   their grief is being used and they're being lied to.
20       Q.   By who?
21       A.   By Mr. Jones is their enemy when he's not.
22   You're their enemy because you're lying to them and
23   you're using their grief to make bank with lies and law
24   fair [ph].  And I think this reasonable jury here will
25   see that, that the truth is on our side in this case.
```

95

1          Q.   They'll see that the things you're saying

2     here today are reasonable, good things to do.  Is that

3     what they'll see?

4          A.   They will see that Alex meant everything

5     from his heart and he never claimed something for sure,

6     it was his opinion, he stated it every time and he was

7     trying to do honest investigative research to the best

8     of his ability and that's his job.  And he takes it very

9     seriously.  And that's why people love him.

10          Q.   Now, I remember you also were saying that

11     you, in attempting to meet your responsibilities as the

12     corporate representative, you did the best you could;

13     right?  You remember saying that?

14          A.   Yes, I did.

15          Q.   And the best you could do to prepare for the

16     things that Alex Jones said that were from him didn't

17     even include talking to Alex Jones, that was the best

18     you could to.  Is that what you're telling us?

19          A.   I -- I did the best that I was advised to

20     do, and I did that.

21          Q.   You were advised not to speak to Mr. Jones

22     then, weren't you.

23          A.   I wasn't advised to --

24               MR. REYNAL:  Objection, your honor.  I

25     think that we're getting into attorney-client privilege

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

```
 1  stuff.  She's not here as a corporate representative,
 2  the questions are argumentative.
 3              THE COURT:  I would like to move on from
 4  that advice.
 5              MR. BANKSTON:  Sure.  Absolutely.
 6              Let's move onto a new exhibit.
 7  BY MR. BANKSTON:
 8      Q.   I want to -- you remember, we were talking
 9  in this video or they were talking in this video about
10  Mr. Halbig bringing a lawsuit in Seminole County,
11  Florida?
12      A.   Yes, he did say that.
13      Q.   Okay.  And you understand that the company
14  got email information from an outsider that told them
15  that there was a good chance Mr. Halbig might be lying
16  about that entire legal proceedings.  Do you remember us
17  talking about that?
18      A.   Yes, the email.
19      Q.   Okay.  I would like to show that to you now.
20              This, Your Honor, is going to be 62.
21              MR. REYNAL:  I'll object.  Hearsay, Your
22  Honor.
23              MR. BANKSTON:  Let me give you a copy,
24  Your Honor.
25              THE COURT:  I have a copy.
```

1          MR. BANKSTON:  Okay.  And our response is

2   not for the truth of the matter asserted, warning to the

3   company, something they needed to investigate.

4          MR. REYNAL:  I will not object to it on

5   that basis.

6          THE COURT:  I'm sorry?

7          MR. REYNAL:  I said, if they're not

8   offering it it for the truth, then I'm fine with that.

9          THE COURT:  All right, then 62 is

10  admitted.

11          *(Plaintiff's Exhibit 62 admitted.)*

12          MR. BANKSTON:  Thank you, Your Honor.

13  BY MR. BANKSTON:

14      Q.   Miss Karpova, I'm going to hand you what's

15  been marked as Exhibit 62.

16          Malisa, would you mind putting 62 up for

17  me.  Let's go into the very top email, the one that's

18  just one line long.  Can we bring that up?

19          Now, Miss Karpova, there's a first email

20  here from Nico, right, that's an InfoWars producer at

21  the time?

22      A.   Yes.

23      Q.   And that is to Rob Dew, and then we're not

24  sure what his job function was in 2015 but definitely a

25  high-production person inside of InfoWars?

```
 1          A.    Again, I'm not sure what his job was --
 2          Q.    Right.
 3          A.    -- at that particular time.
 4          Q.    But we can agree, have agreed in this
 5    courtroom several times now, he was high-production
 6    employee at InfoWars?
 7          A.    Yes.
 8          Q.    Yes.  Okay.
 9                And he is emailing to Rob, saying, here
10    are some comments on Halbig's last interview from a law
11    student; right?
12          A.    Yes.
13          Q.    All right.  Let's pull up that second email.
14          A.    It says, and you can go down this email with
15    me, it says:
16                "Madam or sir, I am in my final semester
17          of law school.  I listened to the Wolfgang
18          Halbig video and some significant alarm bells
19          went off.  I also wrote on the YouTube page
20          that I copy and paste here.
21                "Okay.  So, just so I get this straight,
22          starting at 31:30, he filed his lawsuit in
23          Seminole County court in Florida?  Not federal
24          court in Florida, but state court?  There is a
25          legal requirement called 'standing.'  He does
```

1    not have the standing to sue in Seminole County

2    court.  He was not a party to the shooting in

3    any fashion.

4         "There is also a concept called

5    'jurisdiction.'  Either the man is lying, or

6    the judge is insane.  A Florida county-level

7    judge would would not have jurisdiction for any

8    reason other than a contract, tort, or crime

9    issue directly involving Mr. Halbig.

10         "Something is completely wrong here.  Had

11    he said in the Federal District of Florida, or

12    whatever district it might be if the state is

13    split, that may at least be plausible.  This is

14    completely insane and cannot go anywhere but

15    into a trash can -- the trash can.  No

16    standing, no subject matter jurisdiction, no

17    personal jurisdiction.

18         "Two cents from a third-year law student

19    who is legally current in his education.

20         "This man seems to be grasping and

21    stretching.  No judge in their right mind would

22    do such a thing as he describes.

23         "Here is an example.  Imagine there's a

24    crime in Las Vegas and the criminal kills

25    himself.  There is no law whatsoever that would

1          allow Alex or anyone else to file suit in San

2          Antonio for anything regarding the crime in Las

3          Vegas.  There is no claim that could be made in

4          Texas for something that happened in Nevada.

5          It's a rule.

6               "Signed, R. Darren Blumfield,"

7                    Who was apparently at that time at the

8     William S. Boyd School of Law.

9                    I read that email correctly?

10         A.    Apparently.

11         Q.    Okay.  And so, Nico had actually brought

12    this to Rob's attention; right?

13         A.    Yes.

14         Q.    Okay.  So, the company was on notice that

15    there might be some significant problems with the things

16    that Wolfgang Halbig was saying.  That's what this email

17    was saying; correct?

18         A.    Nico had forwarded this email to Rob Dew.

19    What happened to it afterwards, I don't know.

20              MR. BANKSTON:  Objection, nonresponsive.

21              THE COURT:  Sustain.

22    BY MR. BANKSTON:

23         Q.    Miss Karpova, I'm not asking you about what

24    happened with the forwarding, I'm asking you, InfoWars

25    had received an email in its possession that had been

```
 1    discussed among -- had been forwarded among these
 2    production employees that suggested that the things that
 3    Mr. Halbig were saying in his interview were insane;
 4    right?
 5         A.   Yes, appears so.
 6         Q.   Okay.  I want to go back to the day that
 7    Mr. Halbig came on the show right before that email.
 8    And that was the video we were just watching, March 4th,
 9    2015.  So, I want to go back from the sense of how he
10    got on that show.
11              Now, I think you know that, in making
12    arrangements for getting on the show and those sort of
13    things, run through a producer, in this case Nico;
14    right?
15         A.   Yes.
16         Q.   Okay.
17              (Discussion between counsel off the record.)
18              MR. REYNAL:  No objection.
19              THE COURT:  Plaintiffs' 61 admitted.
20              (Plaintiff's Exhibit 61 admitted.)
21              MR. BANKSTON:  Thank you, Your Honor.
22    BY MR. BANKSTON:
23         Q.   I've handed you what's been marked as 61.
24              MR. REYNAL:  Your Honor, I'm saying no
25    objection, no objection subject to my prior objection
```

 1    regarding Chapter 41 of the Civil Practice and Remedies

 2    Code.

 3                    THE COURT:  Which is overruled.

 4                    MR. REYNAL:  Thank you.

 5    BY MR. BANKSTON:

 6        Q.   Let's start at the bottom email.  Wolfgang

 7    is writing to Nico here; right?

 8        A.   Yes.

 9        Q.   You know who Nathaniel is?  Somebody at

10    InfoWars; right?

11        A.   I don't recognize that name at all.

12        Q.   Well, in any case, Nico is the producer he's

13    working with that day; right?

14        A.   Appears so.

15        Q.   Okay.  And he says, "Nico, the picture of

16    the Sandy Hook Elementary School choir is one of the

17    keys."  And then he says, "other pictures are great for

18    discussion, these are the CT," and I believe that's

19    probably "Connecticut", "crime pictures."  And he signs

20    it Wolf.

21                    Read that correctly?

22        A.   Yes.

23        Q.   Okay.  And then let's go up to the next

24    email.

25                    Nico's response.  And he says:

1          "Got the Superbowl picture.  Thank you for

2     sending.  Will you be calling on Skype at 1:00 p.m.

3     Eastern Time?  How long will you be available for the

4     interview today?  Thanks.  Nico."

5               I read that correctly?

6          A.   Yes.

7          Q.   So, he's thanking him for sending the

8     Superbowl picture.  You know what that is; right?

9          A.   I believe I've seen it before and this isn't

10    specifically for the picture that he's thanking, this is

11    just for materials.  We thank every guest that comes on

12    if they send supplemental materials.

13               MR. BANKSTON:  Your Honor, objection

14    nonresponsive.

15               THE COURT:  Sustained.

16    BY MR. BANKSTON:

17         Q.   Miss Karpova, I am only asking you --

18         A.   Yes.

19         Q.   All I am asking you, you have seen the

20    Superbowl picture?

21         A.   You showed it to me before.

22         Q.   Right.  We've talked about it before,

23    haven't we?

24         A.   Yes.

25         Q.   Okay.  And you testified to your feelings

1    about it, didn't you.

2         A.   I cannot recall specifically what I said.

3         Q.   Okay.  Go to the top email.  Wolfgang

4    replies for how long he can be on the show:  "As long as

5    you and Alex can put up with me.  Wolfgang."

6              Read that correctly?

7         A.   Yes.

8         Q.   Now, you understood -- well, first let's

9    start this way, Superbowl 2013 is about one month after

10   the Sandy Hook shooting.  You're aware that a choir of

11   Sandy Hook school children was sent to that Superbowl to

12   sing during the halftime performance of that choir?

13        A.   Yes.

14        Q.   And you understand that Mr. Halbig believed

15   that that choir of school children who sang at the

16   Superbowl were actually the children who were claimed to

17   be murdered at Sandy Hook.  You knew that.

18        A.   Yes.

19        Q.   Okay.  And that Superbowl picture, that's

20   something I want to look at now.

21             MR. BANKSTON:  Your Honor, I'm going to

22   provide the witness Exhibit 43.

23             THE COURT:  All right.

24             MR. BANKSTON:  Malisa, can you put 43 on

25   the screen.

```
 1    BY MR. BANKSTON:
 2        Q.   It says "Ten Sandy Hook Children Found Alive
 3    and Well;" right?
 4        A.   Yes.
 5             MR. BANKSTON:  Your Honor, can I approach
 6    the screen?
 7             Your Honor, can I approach the screen?
 8             THE COURT:  Oh, yes.  I'm sorry, I
 9    couldn't understand what you said.
10             MR. BANKSTON:  Yeah, I know.  I'm speaking
11    quickly.  I'm sorry.
12    BY MR. BANKSTON:
13        Q.   Do you see this name?
14        A.   Yes.
15        Q.   Jesse Lewis?
16        A.   Yes.
17        Q.   You know that's their son, right?
18        A.   Yes.
19        Q.   Well, Jesse Lewis, the name is their son,
20    you know that, that's their son's name is what I'm --
21        A.   Yes.
22        Q.   This is not their son.  Right?
23        A.   Right.
24        Q.   Wolfgang sent this picture to InfoWars
25    before he went on the show on March 4th, 2015; right?
```

1      A.   Yes.

2      Q.   And Nico said, "Got the Superbowl picture.

3  Thanks for sending."  That's what he said; right?

4      A.   Yes.

5      Q.   Miss Karpova, looking at this picture, it's

6  true, your personal opinion, as to whether this was

7  created by a sane, rational human being, you have no

8  personal opinion about that, do you?

9      A.   I have a personal opinion.

10     Q.   Okay.  Do you remember testifying to me back

11 in December?

12     A.   As a corporate rep.?

13     Q.   Uh-huh.  Do you remember that?

14     A.   I'm not sure what I said.

15     Q.   You remember giving a deposition?

16     A.   I do.

17     Q.   Okay.  And were you under oath in that

18 deposition?

19     A.   Yes.

20     Q.   Miss Karpova, I want to talk to you about

21 your deposition.  I'm going to bring you this copy so we

22 can read it together; okay?

23     A.   Yes.

24     Q.   Okay.  And can I move this, is that okay?

25     A.   Yes.

1     Q.   That way I'm not having to reach over you
2  and stuff like that.
3          All right.  I want you to look here, and
4  what I am going to read to you, okay, let me find it for
5  you really quick.  94, 14, and you see it's highlighted
6  but it's kind of grayed; right?
7     A.   Yes.
8     Q.   And I'll ask you this question and answer.
9  All right?
10         "Miss Karpova, will you admit, sitting
11  here right now, this was not created by a rational, sane
12  human being, or are you going to tell this jury that
13  this is created by a rational, sane human being?"
14         Can you tell me what your answer under
15  oath was?
16    A.   My answer under oath was, "I don't have an
17  opinion, a personal opinion on it."
18         But since I have developed an opinion
19  that's my truthful answer right now.
20    Q.   Okay.  So, back six months or so ago, when
21  you were being deposed and you were shown this picture,
22  you didn't have a personal opinion on it at all, but in
23  the intervening time before you've come to this witness
24  stand in this court and this trial, now you have a
25  personal opinion?

```
 1          A.    Correct.
 2          Q.    Okay.  Tell me now, Miss Karpova, was that
 3    created by a sane, rational human being, in your
 4    opinion?
 5          A.    May I ask you a question?
 6          Q.    No, you may not.
 7          A.    So, I will answer your question, it's just
 8    this particular screen shot is -- are we referring to
 9    Wolfgang Halbig here?
10          A.    Yes.
11          Q.    So, this, I don't believe this is a -- he
12    sent this picture but he didn't make this picture.  I'm
13    not sure who made this picture, which is why I can't
14    comment.
15                    MR. BANKSTON:  Miss Karpova --
16                    THE COURT:  Listen to the question.
17                    Ask it again.
18    BY MR. BANKSTON:
19          Q.    The truth is, you don't know that Wolfgang
20    Halbig didn't make that photo.  You don't have that
21    knowledge.
22          A.    I don't, no.
23          Q.    Okay.  So, I would please appreciate it if
24    you didn't testify about things you don't know.  Okay?
25          A.    Yes.
```

1    Q.   I don't want you telling this jury that
2  Wolfgang Halbig didn't make this photo if you don't know
3  that.  Okay.

4         Was this photo made by a sane, rational
5  human being?  Do you have an opinion on it?

6    A.   Yes.

7    Q.   What is your opinion now?

8    A.   I think this photo was made by a person who
9  is deeply disturbed at what happened and that messed
10  with his mind.  So the answer would be partially no to
11  your question.

12    Q.   Partially no.  Okay.

13         Do you -- do you, sitting here today, do
14  you understand how wrong it was to encourage this man's
15  delusions like this?  Do you understand that?

16    A.   We did the best at the time, it wasn't
17  something that was done on purpose.

18    Q.   According to you, if a source sent you this
19  picture, it would cause you to have a lot of hope
20  because you wouldn't want to think that the kids are
21  dead, you would rather they be alive; right?

22    A.   In -- it was my personal preference, yeah, I
23  would much rather think that the kids actually were
24  involved in some kind of operation with the government,
25  that way they would still be alive.

1    Q.   What do you think would be happening to

2  those kids, if they were actually being used by the

3  satanic globalists for an occult ritual, where they cart

4  them out for the Superbowl and put them in our face and

5  taunt us with the fact that we actually faked that and

6  here are the real murdered children who are still in the

7  possession of the satanic globalists?  At the end of

8  their performance when they leave the Superbowl, do you

9  think they're about to have a good time?

10    A.   I can't agree with any of what you just

11  said.  My only statement is that I would have much

12  rather think that these children are alive as opposed to

13  have been shot the way they were.

14    Q.   Okay.  Let's move forward a week.

15  March 10th, 2015.  Okay?  I want to show you Plaintiffs'

16  Exhibit 63.

17         MR. REYNAL:  Are you going to lay

18  foundation or do you want me to object now?

19         MR. BANKSTON:  What's your objection and

20  tell me I have to lay some foundation.  Have you got a

21  legal objection?

22         MR. REYNAL:  My legal objection is that

23  this is an email from --

24         THE COURT:  If you're going to object you

25  can't talk about what it is.  You know that.

1          MR. REYNAL:  This is not an -- I object,

2    Your Honor, relevance to an email that wasn't sent to

3    InfoWars or InfoWars staff.

4          THE COURT:  All right.  So, you're going

5    to have to establish something.

6          MR. BANKSTON:  Sure.  Do the same thing.

7    BY MR. BANKSTON:

8    Q.    Miss Karpova, bottom of this email, read the

9    numbers on the label.  Or the letters and numbers.

10   A.    The right corner?

11   Q.    Right here.  Yes, ma'am.

12   A.    FSSTX-040027.

13   Q.    And you understand that to mean that that

14   means that this document was in the possession of Free

15   Speech Systems and that they turned it over to me in

16   this lawsuit; right?

17   A.    It appears so.

18   Q.    Okay.  So, InfoWars had personal possession

19   of this email and it was aware what is the content of

20   this email.  You agree?

21   A.    It was in the files that's labeled here.

22         MR. BANKSTON:  Okay.  Your Honor, I move

23   to admit this email.

24         THE COURT:  Any objection?

25         MR. REYNAL:  Same objection, your honor,

```
 1   just because it was --

 2                   THE COURT:  Overruled.

 3                   Petitioner's 63 admitted.

 4             (Plaintiff's Exhibit 63 admitted.)

 5                   MR. BANKSTON:  Thank you, Your Honor.

 6   BY MR. BANKSTON:

 7        Q.   All right.  You have 63 in front of you

 8   right now?

 9        A.   Yes.

10        Q.   Okay.  Let's put that up on the screen,

11   Exhibit 63.

12             That email is from Wolfgang Halbig.  And

13   as I believe we talked about in your deposition, you see

14   the email that's to, I know you probably don't recognize

15   that email address, but you see the introduction of it

16   says "Scarlett," right?

17        A.   Yes.

18        Q.   And we've come to know that's Scarlett's,

19   and I'm not going to say her email right now, but that

20   that is her email address; right?

21        A.   Okay.  I'll take your word for.

22        Q.   So, this is Wolfgang Halbig running to

23   Scarlett on March 10th, 2015, right?

24             Correct?

25        A.   Yes.
```

1          Q.   Okay.  So, I'm going to read this for us.
2    It says:
3               "Scarlett, it is just a matter of time
4          and all that money you have has to be returned.
5          How could you even stop to buy your coffee and
6          you bought coffee for two other people.  What
7          kind of mother does that, especially when you
8          were on the news tell everyone how you ran
9          across that fire department parking lot.  If
10         you did, you would have spilled the coffee.
11              "Do some serious soul searching, because
12         the scam is up.  Wolfgang."
13                   That's what the email says; right?
14         A.   Yes.
15         Q.   Do you know if Scarlett Lewis bought coffee
16    that morning?
17         A.   I have no idea what incident he's referring
18    to, that he means by that.
19         Q.   Okay.  One thing InfoWars did have in its
20    possession as early as 2015 is an email establishing
21    that its guest that it kept promoting to millions was
22    harassing Scarlett Lewis.  That's one thing it had.
23         A.   I can't fully agree with that statement.
24         Q.   Is the reason you can't agree with that
25    statement is because you're going to tell this jury and

1    tell them that this email to the mother of a murdered

2    little boy is not harassment?  Is that what you're going

3    to say?

4            A.    I'm going to say that I don't know what

5    incident he's referring to.  I don't know if he had

6    personal contact with her.  I have no idea about any

7    of -- I can't comment on the contents of an email.

8            Q.    Okay.  So I understand you don't know

9    anything about the incident.  I didn't know anything

10   about the incident, either.  I'm sure nobody in this

11   room knew anything about this incident.  But I'm sure

12   that at least some of the people in this room have

13   formed an opinion one way or another about whether that

14   is harassing.  I want to know yours.  Is that harassing

15   or not?

16           A.    I don't have any comment on that.

17                 MR. BANKSTON:  Okay.

18                 THE COURT:  All right.  We're going to

19   break for lunch.  We're going to break for an hour and a

20   half.

21                 Remember all of my instructions:  No

22   research, no conversation about anything that's happened

23   in this courtroom.  The rule is still in effect for all

24   the witnesses, and we'll be back at 1:30.  Thank you.

25                      *(Noon recess.)*

```
 1          WEDNESDAY, JULY 27, 2022 - AFTERNOON SESSION
 2              (The following proceedings were held in open
 3      court in the presence of the jury)
 4                     THE COURT:  Mr. Bankston, when you're
 5      ready.
 6                     MR. BANKSTON:  It's okay if they don't
 7      have counsel in the room?
 8                     THE COURT:  It's 1:34.  We are set to the
 9      resume at 1:30.
10                     DIRECT EXAMINATION
11      BY MR. BANKSTON:
12          Q.   Miss Karpova, before we broke, you were
13      discussing an email from Wolfgang Halbig harassing
14      Miss Lewis; correct?
15          A.   There was an email from Mr. Halbig to
16      Scarlett.
17          Q.   Okay.  I'm -- I want to let -- I'm standing
18      back here, there's a lot of just some air vent noise, I
19      know the jurors, too, if I can just ask you again if you
20      can try to speak up so I can make sure I can hear you.
21                     And I believe you said there was an email
22      from Mr. Halbig to Scarlett.
23          A.   Yes, before the break we were discussing the
24      email from Wolfgang here, the signature, to the
25      addressee is Scarlett.
```

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

```
 1        Q.    Okay.  And that was an email harassing
 2   Miss Scarlett, saying that she was committing a scam;
 3   right?
 4        A.    I don't know what Mr. Halbig's intent was
 5   here.
 6        Q.    Well, regardless of what his intent was, if
 7   you have -- a man is accusing the mother of a murdered
 8   son of engaging in a scam, regardless of whatever he
 9   intended, that's harassing, isn't it?
10        A.    I'm sorry, I can't comment on that.
11             MR. BANKSTON:  Okay.  64.
12             MR. REYNAL:  Subject to my prior
13   objection.
14             THE COURT:  Your running objection, you
15   mean?
16             MR. REYNAL:  Yes, Your Honor.
17             THE COURT:  So, your running objection.
18             It's overruled, then it's agreed.  So,
19   Petitioner's 64 is admitted.
20          (Plaintiff's Exhibit 64 admitted.)
21             MR. BANKSTON:  Thank you, Your Honor.
22   BY MR. BANKSTON:
23        Q.    Miss Karpova, I'm going to show you what's
24   been marked as Exhibit 64.
25             Malisa would you mind putting that on the
```

1    screen for me?   Thanks.

2              This is an email internal to InfoWars;

3    correct?

4        A.   Yes, it appears so.

5        Q.   Yeah, Lee Ann is an InfoWars employee;

6    right?

7        A.   At that time.

8        Q.   Lee Ann McAdoo, she did anchor work and

9    reporting from InfoWars?

10       A.   Yes.

11       Q.   Louie S., we talked about him earlier;

12   right?

13       A.   Yes.

14       Q.   He handles a lot of the website and social

15   media stuff, he runs that department of InfoWars; right?

16       A.   Yes.

17       Q.   And on this list, we see that there are a

18   list of topics; correct?

19       A.   Yes.

20       Q.   And it says the subject is "Playlist Ideas;"

21   right?

22       A.   Correct.

23       Q.   And this is April 16th, 2015.  You realize

24   we were now in the third year after Sandy Hook.  You

25   understand that?

1     A.   Yes.

2     Q.   Okay.  And these topics are, with important

3  high for playlist ideas, are the following:  Vaccines;

4  police state; InfoWars health; Alex Jones Show; Second

5  Amendment; rants; celebrity; border; TSA, which I take

6  is Transportation Safety Administration; geo

7  engineering; chem trails; GMO; resistance; Boston

8  bombing; Sandy Hook; victories; winning; good news.

9  Correct?

10     A.   Correct.

11     Q.   Okay.  So, just on a couple of these that

12  might not be familiar to the jury, chem trails is the

13  idea that there are aircraft flying through the country

14  releasing chemicals into the air that have some sort of

15  malignant effect on the people of this country.

16  Correct?

17     A.   Not necessarily.

18     Q.   Okay.  But that's one thing that chem trails

19  means.  That's something Mr. Jones has talked about;

20  right?  How these airplanes are leaving these chem

21  trails by spraying out these chemicals that leads to

22  population control and all that sort of stuff?

23     A.   I don't remember the specific reference that

24  you're implying here to the broadcast that he's

25  mentioned this.

1          Q.    Okay.

2          A.    But I know that's something that people have

3    talked about in general as being part of that.

4          Q.    Okay.  When it says "GMO," that's

5    genetically modified organisms?

6          A.    Yes.

7          Q.    And Mr. Jones, when selling his products on

8    his website, talks about the idea of genetically

9    modified organisms making us unsafe; right?

10         A.    Yes.

11         Q.    He sells products that will make you safer;

12   right?

13         A.    I wouldn't say that.  I don't agree with

14   that.

15         Q.    Okay.  And then another thing we can see is

16   that it's been almost three years since the Sandy Hook

17   shooting and InfoWars is still proposing Sandy Hook for

18   its playlist ideas.  That's correct?

19         A.    Yes.

20         Q.    Okay.  You add to your list of videos -- is

21   that still in front of you?

22         A.    Yes, it is.

23         Q.    Okay.  Can you look at May 29th, 2015.  Did

24   InfoWars publish any videos at that time?

25         A.    Yes.

1          Q.    How many -- on May 29th, 2015, did InfoWars

2     publish a video or multiple videos?

3          A.    Three videos.

4          Q.    Okay.  Three videos on that day.  And the

5     first one is titled "Sandy Hook, the Lies Keep Growing."

6     Right?

7          A.    No, I believe that's the middle one.

8          Q.    Oh, okay.  You may have them in a different

9     order.  Let me give you all three titles, you can tell

10    me if these are the three titles, how does that sound?

11         A.    Yes.

12         Q.    You have "Sandy Hook, the Lies Keep

13    Growing," "School Administrator Exposes Sandy Hook

14    Stonewall," and "New Sandy Hook Questions Arise From

15    FOIA Hearing."  Is that correct?

16         A.    Yes.

17         Q.    Okay.  And InfoWars asked reporter Dan

18    Bidondi to go cover Halbig's FOIA hearing; right?

19         A.    I'm not sure who asked Dan Bidondi.

20         Q.    Okay.  But certainly InfoWars doesn't allow

21    outsiders to tell its reporters and send them on

22    assignments.  If Dan Bidondi is going to Newtown to

23    record things to be played on InfoWars, somebody at

24    InfoWars told him to do that, right?  That's how that

25    would happen?

1      A.   I wouldn't agree with that, no.

2      Q.   Okay.  We'll see.

3          Just a couple of days later, June 4th,

4  2015, there's a video there.

5      A.   Yes.

6      Q.   And that's "Official Claims DHS Involved in

7  Sandy Hook;" right?

8      A.   Yes.

9      Q.   Do you know what official it's talking

10  about?

11      A.   I don't remember, recall right now.

12      Q.   Wolfgang though, Wolfgang Halbig?  That's

13  who this video is talking about?  Does that refresh your

14  memory?

15      A.   I'll take your word on it.

16      Q.   Okay.  And on June 4th, 2015, Mr. Bidondi

17  ended up confronting some Newtown city officials in

18  Newtown.  You're aware of that; right?

19      A.   I'm not sure what date it was, but, yes,

20  I've seen the confrontation.

21      Q.   Okay.  Let's take a look at that now.

22          Can we play the copy of video 27?

23          THE COURT:  Did you say 27?

24          MR. BANKSTON:  Yes, Your Honor.

25          *(Video played off the record.)*

```
 1   BY MR. BANKSTON:

 2       Q.   Now, Miss Karpova, as we have discussed, you

 3   had seen those confrontations before?

 4       A.   Yes.

 5       Q.   And we had talked about them, you and I,

 6   before; correct?

 7       A.   Yes.

 8       Q.   And I am correct that, after seeing that

 9   video and understanding about Dan Bidondi, that you

10   believe Dan Bidondi is a good reporter.  Right?

11       A.   I wouldn't completely agree with that

12   statement.  I think he was doing -- is he a little rough

13   around the edges and gets in people's faces, yes, and

14   it's not exactly my style.  But he -- I think that he

15   did what he believed was the right thing to do at that

16   time.

17       Q.   Okay.

18       A.   So by that definition of him trying to

19   pursue the truth in his mind, I think that makes him a

20   good reporter in that way.

21       Q.   Okay.  Do you remember giving your

22   deposition in December 2021 right?

23       A.   Yes.

24       Q.   Okay.  And you were under oath for that

25   deposition?
```

```
 1          A.    Yes.
 2          Q.    Okay.  I am going to show you from your
 3    deposition, since you told me that you disagreed, I'm
 4    going to show you lines 173, I mean, excuse me,
 5    page 173, 14.  Okay.  I'm going to see if we can get
 6    this in front of you.
 7                And you see these questions; right?
 8          A.    Yes.
 9          Q.    This question/answer.
10                And it says, "You, you are testifying
11    here, right now, Dan Bidondi is a good reporter.  Is
12    that what you're testifying to?"
13                Can you tell us your answer?
14          A.    "Insofar as him trying to investigate what
15    happened to find the truth, that's what a good reporter
16    is supposed to do."
17          Q.    What we just saw on that video, the things
18    Mr. Bidondi said, that's what a good reporter is
19    supposed to do?
20          A.    That's what I just answered.  He believed
21    what he was doing and he was trying to find the truth,
22    and my answer is pretty much exactly the same as my
23    previous testimony.
24          Q.    So, today you stand by your answer in
25    deposition, Mr. Bidondi is a good reporter, that's what
```

1  good reporters do.

2        A.    I just qualified it.  A good reporter is

3  supposed to get out there and find the truth no matter

4  what.

5        Q.    Okay.  No matter what.

6        A.    It's not my style the way he did it, I

7  wouldn't advise him to do so, but he's his own person.

8        Q.    Well, it's InfoWars' style, right?  They

9  loved this; right?

10       A.    I don't know that.

11       Q.    In fact, they knew, InfoWars knew, your

12  colleagues fully knew, that InfoWars -- that Dan Bidondi

13  was down there in Newtown and he might be frightening

14  people.  They knew that.  And liked it.  Right?

15       A.    I don't agree with that.

16       Q.    Okay.  Well, let's see.  I would like to

17  look an your list there.  Do you see a video from

18  July 8, 2015?

19       A.    Yes.

20       Q.    And that video is entitled "The Fight For

21  Freedom of Information in Sandy Hook."  Right?

22       A.    Yes.

23       Q.    Okay.  Let's play clip 31C.

24              *(Video played off the record.)*

25              Did you hear Mr. Dew say about Mr. Bidondi

1  confronting that official, "He seemed to be afraid of

2  you"?

3       A.   I think I recall that, yes.

4       Q.   Okay.  So, Mr. Dew knew that Mr. Bidondi was

5  in Newtown and might be frightening people.  He knew

6  that.

7            MR. REYNAL:  Object to the speculation,

8  Your Honor, as to what Rob Dew knew.

9            THE COURT:  I think you need to rephrase

10  your question.

11            MR. BANKSTON:  Sure.

12            THE COURT:  So, sustained.

13  BY MR. BANKSTON:

14       Q.   This video shows in a production video of

15  the company that at that time the company was airing

16  information showing that the company knew that Dan

17  Bidondi might be scaring people.

18       A.   This seems to be like his opinion of Rob Dew

19  just watching the clip from Dan Bidondi.  That's what it

20  is.

21       Q.   Sure.

22            So, the nightly news director seems to

23  have acquired the opinion from this video, as you just

24  testified, that Mr. Bidondi might be scaring people;

25  right?

1       A.   Whatever that meant to him, yes.

2       Q.   Sure.

3            Do you know if, after these

4    confrontations, do you know if InfoWars asked him to go

5    back to Sandy Hook?

6       A.   I don't know.

7            MR. BANKSTON:  67.

8            MR. REYNAL:  Subject to my running

9    objection nothing further, Your Honor.

10            THE COURT:  67 is admitted.

11        (Plaintiff's Exhibit 67 admitted.)

12            MR. BANKSTON:  Thank you, Your Honor.

13            Malisa, can we put up 67 on the screen.

14    And we'll start with the bottom email.

15    BY MR. BANKSTON:

16       Q.   Here's a copy of that.  So what we've got

17    here is a message from Dan Bidondi to Rob Dew; right?

18       A.   It appears so.

19       Q.   And it says, "Hey, Rob, can I do an MOS

20    tomorrow?"

21            "MOS" is Man on the Street; right?

22       A.   Yes.

23       Q.   And he said, "I wanted to hit up the Bristol

24    4th of July parade.  It's the country's oldest and

25    longest-running 4th of July parade celebrations."

1          So then he starts talking about the
2    questions he wants to ask.  And he says, "Questions, any
3    you want to add or take out, let me know:
4              "What holiday are we celebrating today?
5    What country did we defeat to gain our independence?  In
6    what year did we declare our independence?  What is the
7    name of the document that was signed on this date?  Can
8    you name any of the Founding Fathers that signed the
9    Declaration of Independence?"
10             And then, "According to our constitution,
11   who gives us our rights, the government; the military;
12   we, the people; or Obama?  How many stars are on the
13   flag?  How many strips?"
14             Which I believe means stripes.
15             "Islamic leader Louis Farrakhan recently
16   stated that the American flag needs to be put down.  Do
17   you agree or not?  What is your thought -- your
18   thoughts -- what is your thought about people burning
19   and stomping on the American flag?"  And "Do you think
20   the Confederate flag should be banned?"  And "Do you
21   think that banning this flag is an attack on the First
22   Amendment?"
23             Those are what Mr. Bidondi wanted to go
24   out and ask people; right?
25        A.    Suggestions, yes.

1    Q.   Sure.

2         Now, let's go up and look at what Mr. Dew

3    said.

4         He said, "Dan, the MOS will be old by the

5    time we can air it.  Go to Sandy Hook.  We will cover

6    that.  Rob."  That's what he wrote.

7    A.   Correct.

8    Q.   Okay.  So, if anyone was to say that

9    Mr. Bidondi stopped working for InfoWars, they stopped

10   asking him to do stuff because of what he did in

11   Newtown, that's not true if it was said?

12   A.   I'm not sure in what capacity he would be

13   doing this particular assignment.

14   Q.   What do you mean by that, you don't know

15   what capacity he would be doing it?

16   A.   I --

17   Q.   Rob Dew is asking an employee of the

18   company, who is working for InfoWars as its reporter, to

19   go and cover Sandy Hook, and he's referencing a report

20   that happened days ago.  He knows that he did what he

21   did days ago, so, when he's asking him to do this, he's

22   asking him to go do the same thing; right?

23             MR. BANKSTON:  Objection.  Compound.

24             THE COURT:  It was a little bit

25   complicated.

1          MR. BANKSTON:  It is a little clunky.  Let

2     me try again.

3     BY MR. BANKSTON:

4          Q.   Because InfoWars knew about what Bidondi had

5     done days before, it's a reasonable inference that, when

6     Rob was asking him to go to Sandy Hook again, he was

7     wanting him to do basically the same thing.  Isn't that

8     fair?

9          MR. REYNAL:  Objection.  Relevance.  Calls

10    for speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  I wouldn't completely agree

13    with that, no.

14    BY MR. BANKSTON:

15         Q.   You don't completely agree with that?

16         A.   With your statement, yes.

17         Q.   Right.

18          Because what you then, I guess, think is

19    Mr. Bidondi was going to go to Sandy Hook and do

20    something totally different than what he had done

21    before?  Is that what you're saying?

22         A.   I don't know what he would have done.  Rob

23    Dew has a better idea in this email what he could have

24    done.

25         Q.   Okay.  Dan Bidondi's nickname inside of

1    InfoWars is the Kraken; correct?

2         A.   I don't think I've heard that before.

3         Q.   You've never heard them say, "Release the

4    Kraken," about Daniel Bidondi?

5         A.   No.  I know that's a general expression on

6    the internet about a lot of things, but.

7         Q.   What does that mean to you?

8         A.   I'm not even sure, to be honest with you.

9         Q.   Okay.  Dan Bidondi is a former professional

10   wrestler?

11        A.   I'm sorry?

12        Q.   Dan Bidondi is a former professional

13   wrestler?

14        A.   I don't know his background.  I never seen

15   or talked to the guy.  I haven't really -- but I believe

16   that's correct.

17        Q.   Let's play from that same video.  This is

18   again July 8th, 2015, "The Fight For Freedom of

19   Information in Sandy Hook."  Let's take a look at 31A.

20             *(Video played off the record.)*

21             All right, on the right there, that's

22   Lee Ann McAdoo right?

23        A.   Yes.

24        Q.   She's, as we discussed, an InfoWars anchor

25   and reporter at that time?

```
 1          A.    Yes.

 2          Q.    And on the left there, that's Robert Dew;

 3     right?

 4          A.    Yes.

 5          Q.    Again, one of the people we were talking

 6     about as a high-production employee during the course of

 7     his career at InfoWars; right?

 8          A.    At some point I believe he was.

 9          Q.    I mean, look, Miss Karpova, I think you can

10     agree with me, for many, many, many years Rob Dew was

11     Alex Jones' right-hand man when it came to production.

12     Do you agree with that?

13          A.    He does a lot of things.  His official sort

14     of --

15          Q.    Okay.  And in that clip Mr. Dew is again

16     talking about this idea of the Superbowl choir,

17     something fishy going on with the Superbowl choir.

18     That's what he's talking about?

19          A.    I believe that's what he's talking about.

20          Q.    Yeah.  And so, even after -- that's after

21     Wolfgang Halbig had sent Plaintiff's Exhibit 43 and they

22     had seen this picture, Rob Dew is still on InfoWars

23     later talking about this Superbowl choir, isn't he?

24          A.    Must have had questions about this picture.

25          Q.    All right.  At this time you're aware,
```

```
 1   aren't you, that the company knew that Mr. Halbig had
 2   been warned about trespassing on the Catholic private
 3   school at Sandy Hook.  You knew that.
 4        A.   Would you remind me what exactly you're
 5   referring to?
 6        Q.   I would love to.
 7             MR. BANKSTON:  66.
 8             MR. REYNAL:  I would like to see some
 9   predicate.  I can't agree to it that the point, Your
10   Honor.
11             THE COURT:  Okay.
12   BY MR. BANKSTON:
13        Q.   All right.  I'm going to show you this
14   document.  It's got one of those labels at the bottom
15   again.
16        A.   Yes.
17        Q.   Do you want to read it for me?
18        A.   FSSTX-042477.
19        Q.   This was in the company's possession that
20   they gave to me?
21        A.   It appears so.
22        Q.   You knew that's what that label means,
23   Miss Karpova, we testified about that before, right, the
24   company give that document to me?
25        A.   It appears so.
```

1      Q.   This document was in the company's
2  possession?

3      A.   My answer is the same.

4      Q.   The information in this document was in the
5  company's possession.

6      A.   It appears so.

7      Q.   If anyone in the company actually cared to
8  look, they could learn every piece of information in
9  this document.  It was in their possession.  Right?

10      A.   I don't know whose possession it was in.

11      Q.   Yes, you do, Miss Karpova.  You've just
12  testified that that label means it was in InfoWars'
13  possession and they gave it to me.  Right?

14      A.   Correct, but the company comprises of people
15  and I don't know who the people would be.

16      Q.   You understand that Free Speech Systems, LLC
17  is a defendant in this case?

18      A.   Yes.

19      Q.   A corporation isn't a person, like we know a
20  person, right, it's a thing.  You understand what I
21  mean?

22      A.   Yes, but --

23      Q.   And it's a defendant; right?

24      A.   Yes, but inanimate object cannot read an
25  email and and be in possession.

1          Q.   That's absolutely true, isn't it?

2          A.   Right.

3          Q.   A corporation can only act through the

4    people who are inside of it.  And so, if a corporation

5    has a piece of information in its possession, the only

6    way that they can act on it is if somebody actually

7    reads it; right?

8          A.   Yes.

9          Q.   And this piece of information was in the

10   possession of Free Speech Systems, LLC.  You agree with

11   that?

12         A.   According to this stamp, yes.

13              MR. BANKSTON:  Move 63 -- I mean, excuse

14   me, 66 into evidence.

15              THE COURT:  Any objection?

16              MR. REYNAL:  Yes, Your Honor.  I mean, the

17   fact that this was in the possession of the company --

18              MR. BANKSTON:  Your Honor --

19              THE COURT:  What is the legal objection?

20              MR. REYNAL:  They haven't established any

21   predicate other than we produced it in discovery and

22   it's not our document.

23              MR. BANKSTON:  Your Honor, I don't know

24   what that legal objection is.

25              THE COURT:  I don't, either.

1           MR. REYNAL:  What's the exception to the

2    hearsay rule?

3           MR. BANKSTON:  It's not offered for the

4    truth of the matter asserted.  It's offered that he had

5    knowledge that these events happened or that Mr. Halbig

6    was informed of these events.

7           MR. REYNAL:  His question -- I object,

8    Your Honor.

9           THE COURT:  All right.  Overruled.

10          Petitioner's 66 is admitted into evidence.

11          (Plaintiff's Exhibit 66 admitted.)

12          MR. BANKSTON:  Thank you, Your Honor.

13          Can we put 66 up on the screen?

14   BY MR. BANKSTON:

15      Q.   We see up at the top here --

16          Malisa, can you highlight the letterhead

17   at the very top that says "Diocese"?

18          See how it says "Diocese of Bridgeport"?

19   Do you know what a diocese is?

20      A.   Vaguely.

21      Q.   Like a division of the Catholic church.

22      A.   Yes, yes.

23      Q.   Okay.  Let's go down now to who it's

24   addressed to.  We'll go down to the email and the date

25   and the address.  June 25th, 2015, Wolfgang Halbig, down

1   in Sorrento, Florida; correct?

2          A.   That's what it says.

3          Q.   And that's June 25th.  That is now I believe

4   21 days after the videos that we just saw with Dan

5   Bidondi and Wolfgang Halbig in Newtown together; right?

6          A.   Appears so.

7          Q.   Okay.  Can we go down to the text of this

8   letter?

9              "Dear Mr. Halbig.  As the Chief Legal

10          Officer of the Diocese of Bridgeport, I write

11          to serve you notice that you are to cease and

12          desist any activity on or in the vicinity of

13          St. Rose of Lima Parrish, including the church,

14          rectory, school, and any other ancillary

15          buildings on or near the Parrish grounds.  Your

16          presence will be considered a trespass and a

17          nuisance.

18              "Should there be any violation of this

19          order, the Parrish reserves the right to seek

20          any and all remedies available to it under the

21          law and will immediately contact law

22          enforcement to remove you and any individuals

23          in your company from the property, forcibly, if

24          necessary.

25              "This order shall remain in effect from

1        the date of this letter forward.

2              "Very truly yours, Anne O. McCrory, Chief

3        Legal and Real Estate Officer."

4              I read that correctly?

5        A.   Yes.

6        Q.   Okay.  So, in the possession of Free Speech

7   Systems, LLC was a document which establishes that

8   Wolfgang Halbig had been warned about a trespass on this

9   church's property.

10       A.   I don't know where this document came from,

11  especially to answer truthfully.

12       Q.   No, I think you do know where it came from

13  because we saw at the top.  It came from the Diocese of

14  Bridgeport; right?   That's where it came from; right?

15       A.   That's what it says.

16       Q.   And we know from your testimony this was in

17  the possession of Free Speech Systems, LLC; correct?

18       A.   According to the stamp.

19       Q.   Sure.

20              Did you know that Mr. Halbig was alleging

21  that children at that private school were actually the

22  crisis actor children of Sandy Hook?  Did you know that?

23       A.   I don't recall that specifically.

24       Q.   Okay.  You don't recall Mr. Bidondi talking

25  about that?

1    A.   I don't specifically recall that.

2    Q.   You don't recall Mr. Dew talking about that?

3    A.   About what?

4    Q.   About the fact that Wolfgang Halbig believed

5 that children enrolled at the St. Rose of Lima Parrish

6 School were actually crisis actor children used to fake

7 Sandy Hook.  Did you know Mr. Dew ever talked about

8 that?

9    A.   I don't remember the details.

10   Q.   Okay.  Let's go forward just a little bit,

11 another week or so.  Let's go to July 7th, 2015.

12        Do you have your list in front of you?

13   A.   Yes.

14   Q.   And Free Speech Systems made a video on that

15 day related to Sandy Hook; correct?

16   A.   Yes.

17   Q.   And that video was called "Government is

18 Manufacturing Crises;" right?

19   A.   Yes.

20   Q.   Okay.  Now, Rob Dew has an uncle that you

21 know about; right?  You know who I'm talking about when

22 I say Rob Dew's uncle?

23   A.   I heard him talk about his uncle in the

24 videos.  I don't know his uncle.

25   Q.   Personally, I understand that.

1             But you know, for instance, that Rob Dew's

2    uncle, who it's claimed was in the FBI at some point,

3    that he went to go watch the hearing with Wolfgang

4    Halbig.  Do you know that?

5          A.   I don't know if he did that.  I don't

6    know -- I can't remember if Rob Dew claimed that.

7          Q.   Oh, okay.

8          A.   If he --

9          Q.   Let me go ahead and show you a clip, maybe

10   make it easier to talk about.

11             Let's take look at that video, July 7th,

12   2015, "Government is Manufacturing Crises."  And this is

13   PVX 16C.

14                  *(Video played off the record.)*

15             Mr. Jones said "The people who did Sandy

16   Hook know where your uncle lives."  You heard that?

17         A.   Yes.

18         Q.   Who are the people who did Sandy Hook?

19         A.   I have no idea who he was referring to.

20         Q.   So, you have no idea what Mr. Jones is

21   talking about in terms of who he is claiming was

22   responsible for Sandy Hook.

23         A.   I don't know what he -- what people he's

24   referring to.

25         Q.   Don't you think by all of the videos we

1  watched today that talk about government coverup, false

2  flag, Obama's PSYOP, don't you think you know who he is

3  talking about?

4          A.   I don't -- I don't know.  You ask me to not

5  speculate and I'm telling you what truthfully -- I don't

6  want to speculate on what people he meant there.

7          Q.   Okay.  One thing we know Mr. Jones did say

8  is that, as far as his telling his audience about the

9  people who did Sandy Hook, he thought it was really

10  dangerous but he had to tell the truth; right?  He's

11  telling his audience the truth; do you agree?

12          A.   As best he believed, yes.

13          Q.   Because again, Mr. Jones tells his audience

14  he is the front line of truth journalism; right?

15          A.   Uh-huh.  Yes.

16          Q.   Okay.  You see there's another video

17  July 7th, 2015; correct?

18          A.   Yes.

19          Q.   And that video is entitled "Retired FBI

20  Agent Investigates Sandy Hook:  Mega Massive Coverup."

21  Correct?

22          A.   That's what it says.

23          Q.   That is also talking about Rob Dew's uncle.

24          A.   Okay.

25          Q.   I'm not -- I'm asking you to tell us, is

1      that talking about Rob Dew's uncle?

2             A.    You would have to refresh my memory.

3             Q.    Okay.  You know that one of the things you

4      were supposed to prepare on is the sources for these

5      videos; right?

6             A.    I understand that.

7             Q.    And so, as far as who the sources named in

8      the title of this video, that's not something you can

9      testify about today?

10                  MR. REYNAL:  She's not here as a --

11                  THE COURT:  You know what, let's approach

12     on this.

13                  MR. BANKSTON:  Okay.

14                  (Whereupon a discussion was held at the

15     bench off the record.)

16     BY MR. BANKSTON:

17            Q.    Okay, Miss Karpova, let's revisit this.  In

18     fact, let's make sure it's really clear with you --

19                  MR. REYNAL:  Based on our conversation,

20     may I have a running objection?

21                  THE COURT:  Yes, and we'll put it on the

22     record at the next break.

23     BY MR. BANKSTON:

24            Q.    Miss Karpova, you remember earlier we looked

25     at your notice that set forth the topics that you were

1    supposed to be prepared to testify about as a corporate

2    representative.  You remember that?

3        A.   Yes.

4        Q.   Okay.  I -- actually I think it would be

5    helpful for this jury if we go over all of them

6    together, okay?  The things that you're supposed to be

7    testifying about today.

8             One is the sourcing and research for the

9    videos described in Plaintiffs' petition.  That's one of

10   the topics.  Right?

11       A.   Yes.

12       Q.   And we know you didn't bring anything today

13   with you to help you testify about that; right?

14       A.   I did not.

15       Q.   So, anything has got to be in your mind

16   today; right?

17       A.   Yes.

18       Q.   And you are not prepared to talk about the

19   sourcing of these videos, are you?

20       A.   The best I can, I am.

21       Q.   Well, let's just be real honest about it,

22   Miss Karpova, if I want to know the source of some of

23   these videos, these people I've asked you and you said

24   no, you're not prepared to tell me the source, are you?

25       A.    If the source is Alex Jones' research and

1    his -- his mind, then that's the source.

2         Q.   Right.  And again --

3         A.   I can't give you something that doesn't

4    exist beyond that.

5         Q.   He's right there.  I see him, he exists.

6    I'm looking at him right now.  And I remember you told

7    me it all came out of his mind; right?

8              MR. REYNAL:  Objection to the sidebar,

9    Your Honor.  She's testifying, not him.

10             THE COURT:  You know what, I think we're

11   going to take a little break for the jury.  I'm going to

12   ask the jury to go back for maybe 15 minutes, I'm not a

13   hundred percent sure how long this will take.

14             Remember my instructions, no conversation

15   while this is going on.  We're going to clear this up

16   and then hopefully I can explain to you what's going on

17   after you come back.

18             Miss Karpova, you can step down.

19             *(Whereupon the jurors exit the courtroom*

20   *and the following proceedings were held in open court:)*

21             THE COURT:  All right.  So, we've had a

22   number of objections that Miss Karpova is not here as a

23   corporate representative.  Miss Karpova was designated

24   as a corporate representative for Free Speech Systems

25   back last year.  I don't remember the exact date.  I

1    issued an order of all the things she was supposed to be

2    prepared to testify about at that deposition.

3            You have objected that she is not a

4    corporate rep. in a deposition today.  I have researched

5    and can not find any authority for the contention that,

6    once designated as a corporate rep. in a deposition,

7    that when you get to trial they are no longer a

8    corporate rep.  So, you can make your argument about

9    that, but I think she is the corporate rep. today for

10   the topics she was the corporate rep. for by your

11   client's designation.  She is also an individual who can

12   testify to her individual knowledge, and she's an

13   employee of the company.

14           So, I think we're going to have to clear

15   up for the jury that she does, in fact, speak for Free

16   Speech Systems according to that list of designated

17   topics.

18           MR. REYNAL:  Your Honor, our position is

19   that, if the plaintiffs would like to use her as a

20   corporate rep., they have a full deposition to do so.

21   She was designated as the corporate rep. for the

22   deposition.  The deposition is evidence in this case,

23   it's not hearsay, the questions and the answers are

24   there.

25           When I was asked to present her here, I

1    was not told that she was being brought as a corporate

2    representative, I was not given any notice that she

3    would be examined as a corporate representative, I

4    wasn't told the topics about it.  And she wasn't told.

5    And I think it would give the jury the wrong impression

6    to say that she somehow knew that she needed to be

7    prepared on these topics today.

8              She didn't work at the company during any

9    of the period that he's talking about; she started there

10   almost in 2016.  So, she went through, and I'm not going

11   relitigate the breadth of the topics that were

12   designated, but they're extremely broad.  She did her

13   best to be prepared then, which was almost a year ago.

14   Now, you know, a year later, to expect her to remember,

15   especially since she wasn't asked to, I think it would

16   leave the wrong impression in the jury's mind.

17              THE COURT:  Mr. Bankston.

18              MR. BANKSTON:  Your Honor, the only

19   mechanism by which to have a corporate representative

20   prepare and to place them under that duty is a proper

21   deposition notice under Rule 199.  There is no mechanism

22   under Texas law for me to create new topics or change

23   anything around or make anything different, or there's

24   nothing requiring me to serve on a corporate

25   representative at trial any sort of new notice or notice

1    that they need to be prepared.

2           The only thing that I ever need to do is

3    have that person create the corporate representative

4    notice and they choose for those topics.  Now, that

5    person is now a corporate representative and has that

6    knowledge.  So it's our position on that.

7           I can tell you, though, hopefully, if it

8    helps this out, I don't plan to ask her a lot more about

9    corporate representative stuff.  I plan to go now into

10   personal stuff.  But as far as what we've already got,

11   she was clearly noticed the correct way.  And if

12   Mr. Reynal wants to point me to how I would have -- what

13   Rule of Civil Procedure I would have invoked to have

14   her, right, to give her that notice again, or that I'm

15   required to give it to her again, I would certainly look

16   at that authority; but I don't know it, either.

17          THE COURT:  I also specifically remember,

18   and I don't know if you were the attorney at the time,

19   but you're bound by what your predecessors did, saying

20   that Free Speech Systems would be free to designate as

21   many individuals as it believed necessary to comply with

22   the order of topics.  Right?  Does that make sense?

23          MR. REYNAL:  Absolutely.

24          THE COURT:  So, the fact that your client

25   chose an individual who didn't work there during the

 1    pertinent timeframe was your client's choice.  So that

 2    argument fails.  She was -- she was designated by Free

 3    Speech Systems; she speaks for Free Speech Systems on

 4    those topics today.

 5              I -- I think if you -- I don't want to

 6    confuse the jury in either direction.  I think what I

 7    need to tell them is she was designated as the corporate

 8    representative for Free Speech Systems for her

 9    deposition, what date was it?  Was it in December?

10              MR. REYNAL:  December 3rd, 2021.

11              THE COURT:  In December 2021.  To the

12    extent she is asked questions about those topics today,

13    she is still the corporate rep., but she also is

14    testifying about other things as a corporate employee or

15    as an individual.

16              MR. BANKSTON:  That's fine, Your Honor.

17              THE COURT:  Do you have an alternative

18    suggestion?

19              MR. REYNAL:  I think that the entire line

20    of questioning was inappropriate.  Your Honor has

21    repeatedly sanctioned Free Speech Systems for not having

22    a prepared corporate rep.  It appears that this is yet

23    another sanction piled on top of the earlier ones by

24    making --

25              THE COURT:  It is not.

1          MR. REYNAL:  -- making Free Speech Systems
2    look unprepared at trial.
3          THE COURT:  Nobody can do that but Free
4    Speech Systems.  That's their choice.
5          MR. BANKSTON:  Your Honor, the other thing
6    I just wanted to say, not for you but for the appellate
7    record, is that Plaintiffs find it profoundly unjust for
8    Defendants to say we should not be able to have
9    questioned their corporate representative designated at
10   trial when -- and, instead, use a deposition that was
11   ruled by this Court to be a nonappearance.  And so we
12   think for an additional reason --
13         THE COURT:  Well, I also think depositions
14   are disfavored when the witness is available to testify
15   in person in Texas.  We all know that.  Because the jury
16   needs to see and hear the witness right in front of them
17   and the back and forth.  So, that argument also is not
18   compelling to me.
19         MR. REYNAL:  I would ask that Mr. Bankston
20   agree that when he emailed me to make Miss Karpova
21   available he did not say he wanted her here as a
22   corporate representative.
23         MR. BANKSTON:  I don't, yeah, I don't see
24   where that requirement is.  I mean, he's the one who
25   made her a corporate representative, I don't think --

1    I'm not sure why --

2              THE COURT:  I mean, here is the thing, I

3    don't think this is usually a fight because I don't

4    think people usually object to a corporate

5    representative testifying in that role, because they've

6    chosen them and they've prepared them and they want them

7    to represent their corporation.  So, this is, yet,

8    another unique situation here.

9              So, there's -- I couldn't find any caselaw

10   in Texas on this issue, and it was bothering me because

11   I felt like we were giving the wrong impression.  So no,

12   sure, he didn't do that, because this has never happened

13   before as far as I'm aware.  So, I am going to tell the

14   jury very briefly, to the extent she's testifying about

15   the issues that she was designated by Free Speech

16   Systems to be the person to represent them, that's what

17   she's doing here today, as well.

18             And Mr. Bankston and yourself, Mr. Reynal,

19   when you examine her, make sure you make it clear that

20   that's the capacity, if it is, or if it's her capacity

21   as a producer or person, whatever it is.  All right?

22   That's what we're going to do.

23             MR. BANKSTON:  Absolutely.

24             THE COURT:  Okay.  We were ready to bring

25   the jury back.

1          *(The following proceedings were held in*
2  *open court in the presence of the jury.)*
3          THE COURT:  All right.  So, for my jury,
4  just to try to keep things clear and not confused,
5  Ms. Karpova was designated by Free Speech Systems to be
6  their corporate representative at a deposition.  For
7  that -- in that process, she is -- Free Speech Systems
8  and Miss Karpova are given, in advance, the list of
9  topics that will be covered at that deposition, because
10  she is actually required to be prepared to speak on them
11  on behalf of the corporation.
12          For the purposes of this trial, if the
13  question is in that role as the corporate
14  representative, she can answer on behalf of Free Speech
15  Systems.  She may also be asked questions as an
16  individual or an employee and a producer, and those have
17  similar and different implications for Free Speech
18  Systems.
19          So, that probably is confusing but
20  hopefully helps a little bit.  And now we're going to
21  keep going.
22          MR. BANKSTON:  Thank you, Your Honor.
23  BY MR. BANKSTON:
24      Q.  We're going to come talk about these topics
25  again.  All right.  And I have these topics in front of

1   you.  And the first topic we had talked about was the

2   sourcing and research for the videos in Plaintiffs'

3   petition; correct?

4           A.   Yes.

5           Q.   And as you told me, most of the sourcing and

6   research from that came out of Alex Jones' mind.  Right?

7           A.   If Alex Jones is on the video, yes.

8           Q.   Yes.  Okay.

9                And in preparing, when you were ordered to

10  get prepared for this a year ago, before this trial, the

11  company knew what information was going to be important,

12  what needed to be prepared on.  When you were doing

13  that, you didn't even talk to Alex Jones.

14          A.   No.

15          Q.   And according to you, he was pretty much the

16  sole source of information.  Right?

17          A.   Yeah, it would be impossible to determine

18  the particular source --

19               THE COURT:  I'm sorry, Miss Karpova, I

20  can't hear you.  Your voice is very quiet.

21               THE WITNESS:  It would be impossible to

22  determine particular sources involved in the videos,

23  because if it was an article, it's probably destroyed,

24  other video, it's just very difficult to find sources.

25  ///

1  BY MR. BANKSTON:

2        Q.   Miss Karpova, you're testifying to this jury

3  that, without even talking to Alex Jones to try to find

4  the source, well, the article was probably destroyed.

5  You don't know, do you?

6        A.   I know how the show is run.

7        Q.   Right.  But you didn't talk to Alex Jones,

8  and it's in his mind; right?

9        A.   That's what it would have to be.

10       Q.   Yeah.

11            Let's look at topic number two.  It says,

12  individuals involved in the production of the videos

13  described in Plaintiffs' petition; right?

14       A.   Yes.

15       Q.   That's another thing that, if we talk about

16  today, you're speaking with the voice of the

17  corporation.  Right?

18       A.   Yes.

19       Q.   And you're supposed to get ready for under

20  this deposition notice; right?

21            Correct?

22       A.   And the -- based on knowing how the show is

23  run, it would be very difficult to determine the

24  individuals involved in particular videos.

25            MR. BANKSTON:  Your Honor, objection.

1   Nonresponsive.

2                   THE COURT:   Sustained.

3   BY MR. BANKSTON:

4       Q.   Miss Karpova, again I really need you to

5   answer the question that I'm asking, which is you were

6   asked to be prepared on the individuals involved in the

7   production of the videos in Plaintiffs' petition.   You

8   were asked to do that.

9       A.   Yes.

10      Q.   Okay.   And any testimony that you talk about

11  about today when you do that, you're speaking with the

12  voice of the corporation; right?

13      A.   Yes.

14      Q.   Okay.   Now, topic number three is the

15  internal editorial discussions regarding Sandy Hook --

16  or regarding InfoWars' covering of the Sandy Hook

17  Elementary School shooting; correct?

18      A.   Correct.

19      Q.   That's another topic which, if you're

20  talking about it, you're speaking with the voice of the

21  corporation; aren't you.

22      A.   Correct.

23      Q.   The next topic is the documents produced by

24  the company in response to Plaintiffs' discovery

25  request.   That's another topic?

1      A.   Yes.

2      Q.   Another topic would be efforts made by the

3  company to preserve potential evidence; right?

4      A.   Yes.

5      Q.   Another would be the company's knowledge of

6  the plaintiffs.

7      A.   Yes.

8      Q.   Another would be the audience reach of the

9  videos described in Plaintiffs' petition.

10     A.   Yes.

11     Q.   All right.  For any of those topics you're

12  going to be speaking with the corporation's voice today.

13  That's correct?

14     A.   Correct.

15         MR. BANKSTON:  Okay.

16         71.

17         Mr. Reynal, I'm sorry, 71.

18         THE COURT:  71 is already admitted.

19         MR. BANKSTON:  Oh, I'm sorry, Your Honor,

20  I didn't have that on my list.  Thank you very much.

21  BY MR. BANKSTON:

22     Q.   Miss Karpova, I am going to hand you

23  Plaintiffs' Exhibit 71.

24         Can we put 71 up on the screen.  Perfect.

25         Now, let's get the bottom email up.

```
1                    And it's from Louie again, and this time
2       to Travis Knight, Rob Dew, and Darrin.  Those are all
3       InfoWars production staff; right?
4             A.    Not all.
5             Q.    Okay.  So, Rob Dew is; right?
6             A.    He is not really involved in the show
7       production, no.
8             Q.    At the date of this email he's the nightly
9       news director, isn't he?
10            A.    Perhaps.
11            Q.    Okay.  So, he's nightly news director,
12      right?
13                   And then Darrin, he's involved in
14      production.  Darrin McBreen?
15            A.    I'm not sure his involvement at that time.
16            Q.    He's also been on-air talent, hasn't he?
17      He's been like an on-air anchor, too?
18            A.    He has.
19            Q.    Okay.  And then Travis Knight, that's
20      somebody involved in production; right?
21            A.    To my recollection, Travis Knight was not
22      very involved in production.
23            Q.    Okay.  Did you prepare to find that out?
24            A.    Yes.
25            Q.    Do anything to find that out?
```

1          A.   To my recollection, yes.

2          Q.   Okay.  Now, he says here -- Louie says to

3     these gentlemen, "Video files for Facebook upload."  I'm

4     taking "FB" means Facebook upload?  Would you agree with

5     that?

6          A.   Yes.

7          Q.   Because in the next line of the email it

8     says, "can I get these video files for future strategic

9     Facebook uploads?"; right?

10         A.   Yes.

11         Q.   So, this involves the company's social media

12    strategy; right?

13                    *(Interruption in proceedings.)*

14              THE COURT:  Just a reminder, got to turn

15    off your phone before you come in the courtroom.

16    BY MR. BANKSTON:

17         Q.   All right.  Let me ask you that one more

18    time.  This email relates to the company's social media

19    strategy.

20         A.   I'm not sure exactly what Louis' meaning of

21    here.

22         Q.   Well, we know what Facebook is; right?

23         A.   Yes.

24         Q.   That's social media.  Right?

25         A.   Yes.

 1          Q.    And then he asked about strategic uploads.
 2     Right?
 3          A.    Correct.
 4          Q.    That's not a big stretch to say he's talking
 5     about social media strategy, is it, Miss Karpova.
 6          A.    I'm not sure what he's talking about, what
 7     he's referring to.  They have specific lingo between
 8     them.  I don't know.
 9          Q.    Sure.
10               All right, let's look at some of the
11     things that he's asking that we can get the videos up
12     for.  One is about "The Father of Weaponized Weather,"
13     you see that.  Right?
14          A.    Yes.
15          Q.    One is "How to Survive a Mass Shooting;"
16     correct?
17          A.    Yes.
18          Q.    One is "Ancient Health Secrets Big Pharma
19     Fears;" right?
20          A.    Yes.
21          Q.    All right.  Let's scroll down.
22               "Charlie Sheen's video message to
23     President Obama."  Correct?
24          A.    Yes.
25          Q.    "Drones Shot Down Over Texas;" correct?

```
 1          A.    Yes.
 2          Q.    "Food:  The Ultimate Secret Exposed, Part 1
 3   of 2."
 4          A.    Correct.
 5          Q.    "Immortal Technique on Fire With Alex
 6   Jones."
 7          A.    Correct.
 8          Q.    And the "Why People Think Sandy Hook is a
 9   Hoax."
10          A.    Correct.
11          Q.    That video down at the end, the Sandy Hook
12   why people think it's a hoax, as you remember that was a
13   video we talked about from 2013, wasn't it.
14          A.    I do believe this was on the list.  Yes.
15          Q.    From 2013.
16                So, here we are, a couple of years later,
17   and InfoWars is using that video as part of its
18   strategic Facebook uploads; right?
19          A.    Whatever that means, yes.
20          Q.    Well, one of the things that you were
21   supposed to be prepared on was, A, the company's
22   documents that were produced in response to the
23   discovery request; and, B, the company's editorial
24   discussions about Sandy Hook.  This falls under both of
25   that, doesn't it.
```

1      A.   I'm not sure if this email falls under

2  those.

3      Q.   This is an editorial discussion, isn't it?

4  Talking about Facebook upload strategies.  Right?

5      A.   I wouldn't call that editorial conversation.

6      Q.   But one thing we know, it's certainly a

7  document produced by the defendants in discovery.

8      A.   It appears so.  The stamp, yes.

9      Q.   Okay.  You can take that town.

10          You know Jim Fetzer.  Do you know who that

11  is?

12      A.   I know of him.

13      Q.   Familiar, yeah.  Not know him personally,

14  you know who I'm talking about when I say Jim Fetzer.

15      A.   Yes.

16      Q.   Okay.  Now, Jim Fetzer, as you will agree

17  with me, I believe, is a former professor at a

18  university.

19      A.   Yes.

20      Q.   And after he stopped being a professor,

21  Mr. Fetzer started getting into very obscure, strange

22  conspiracy theories.  You would agree with that?

23      A.   I do think he was heavy into conspiracies,

24  yes.

25      Q.   Really weird ones, too; right?  Do you know

1    about any of his strange conspiracies?

2         A.   I haven't followed Jim Fetzer at all, pretty

3    much at all.

4         Q.   Okay.  Well, I want to, let's -- you know

5    about Jim Fetzer's PDF book he made that he released?

6    Do you know what I'm talking about?

7         A.   The famous book you're talking about?

8         Q.   I don't know why you would think it was

9    famous.  Do you have a reason to think it's famous?

10        A.   Well, infamous?

11        Q.   I think that might be.  I'll go with you

12   there.  But are you telling me right now you have a

13   reason to think that there's a reason that this book is

14   bad if it's infamous?  Is that what you're telling me?

15        A.   I'm not sure, the question again?

16        Q.   Sure.  Usually when I describe somebody as

17   infamous, I'm not paying them a compliment.  Do you

18   understand what I mean?

19        A.   Yes.

20        Q.   So, when you're describing Mr. Fetzer's book

21   as infamous, you are not paying it a compliment?

22        A.   Well, this book is a subject -- it came up a

23   lot during the course of this lawsuit, which is why I'm

24   describing it that way.

25        Q.   Got you.  Okay.

```
 1                    72.

 2                    THE COURT:  72 is also already admitted.

 3                    MR. BANKSTON:  Oh, I don't know why I

 4      don't have that one down here.

 5      BY MR. BANKSTON:

 6           Q.   I'm going to show you Plaintiffs'

 7      Exhibit 72.

 8                    Can we bring up the bottom email.  On 72.

 9                    All right.  In this document there's a

10      gentleman named Allan Powell writing.  Do you know who

11      he is?

12           A.   I do not know who he is.

13           Q.   It says:

14                "Rob, Jim Fetzer put together a book on

15                Sandy Hook to which I contributed two chapters.

16                Amazon have decided they won't handle it.  I

17                think Jim would agree to it being distributed

18                by InfoWars free as a PDF.  We were both just

19                on the Jeff Rense show today, and Jim gave that

20                right of distribution to Jeff.

21                "Would you see if Alex would have Jim and

22                Jim Tracy on to promote the book and talk about

23                the still running sore of Sandy Hook?  I spoke

24                to Jim Fetzer about this today and said I would

25                speak to you."
```

1          I read that correctly?

2     A.    Yes.

3     Q.    You see that Jeff Rense is mentioned in this

4  email; correct?

5     A.    Yes.

6     Q.    This is somebody also InfoWars understood

7  was not a reliable person.  You would agree with that?

8     A.    I'm not sure the status of reliability of

9  Jeff Rense.

10    Q.    Okay.  We'll come back to that.

11         Same question for Jim Fetzer.  The company

12 understood that Jim Fetzer was not a reliable source of

13 information.  You agree with that?

14    A.    At that time I'm not sure if Rob realized it

15 or not.

16    Q.    Okay.  Let's go up to the next email.

17         Now, here is an email from Jim Fetzer,

18 Mr. Rob Dew, and James Tracy, and it says subject is

19 "Banned Sandy Hook Book;" right?

20    A.    Yes.

21    Q.    Okay.  And it says:

22         "Rob, we are making the book available to

23 the public for free.  Here's the cover and the PDF.

24 Several sites are now offering it.  I would be glad if

25 Alex were to do the same.  I am sure James would be glad

1    to come on with me, if Alex wanted to interview us about

2    this stunning event.  I think the latest case was the

3    pentagon papers."

4              Read that correctly?

5        A.   Yes.

6        Q.   Okay.  Let's go up to the top.  Top email.

7              And Rob writes to James and says, "Thanks

8    for the heads up.  Sent the links to Adan and he is

9    writing an article about it.  Let us know if there is a

10   bump in downloads."

11             Correct?

12       A.   Yes.

13       Q.   Okay.  Adan Salazar is a writer at InfoWars?

14       A.   Yes.

15       Q.   Okay.  And so we can see from this email in

16   2015 that InfoWars was helping promote Jim Fetzer's

17   notorious book; correct?

18       A.   I think, based on the fact that it was

19   banned and they were very asking a lot to help with the

20   book, I think that's what Rob Dew did here.

21       Q.   So, yeah, helped him promote his book,

22   right?  That's what InfoWars did?

23       A.   Yes.

24       Q.   Okay.  I would like to move forward one

25   month.  And I'm going to put in front of you a document

1    which has been admitted as Plaintiffs' Exhibit 73.

2              You remember this email, correct?

3         A.   Give me one second.

4         Q.   Sure.

5         A.   Yes.

6         Q.   You remember discussing this email?

7         A.   Yes.

8         Q.   All right.  At the bottom we see that same

9    Bate stamp; correct?

10        A.   Yes.

11        Q.   What we call the stamping on the bottom.

12   So, we know this came from InfoWars, we see that it came

13   from an InfoWars editor, it was to other InfoWars

14   employees, and we see that there's a discussion about

15   some of the things we're talking about today; right?

16        A.   Yes.

17             MR. BANKSTON:  Your Honor, I believe this

18   is just admitted for opening.  If it is, I would like to

19   put it into evidence.

20             THE COURT:  Any objection?

21             MR. REYNAL:  Subject to my running

22   objection under 41.

23             THE COURT:  All right.  73 is admitted.

24        *(Plaintiff's Exhibit 73 admitted.)*

25             MR. BANKSTON:  Okay.  Let's put 73 up on

1    the screen.

2    BY MR. BANKSTON:

3         Q.    This says from Paul Joseph Watson.  He is

4    the editor at large of the company at this point;

5    correct?

6         A.    I believe so.

7         Q.    Okay.  It is to Buckley at InfoWars.com;

8    right?

9         A.    Yes.

10        Q.    Now, he is a managerial-level employee at

11   this time.

12        A.    In some capacity, I believe.

13        Q.    And he has supervisory role over other

14   employees?

15        A.    I'm not sure as to his exact duties.

16        Q.    Okay.  One thing we did know about him, it's

17   Alex Jones' cousin; right?

18        A.    Yes.

19        Q.    Anthony, that's Anthony Gucciardi?

20        A.    I believe so.

21        Q.    Okay.  And he was an employee at InfoWars?

22        A.    I'm sorry, I'm not sure.

23        Q.    Okay.  Do you know if he was a business

24   partner of Mr. Jones?

25        A.    I don't know for sure, no.

166

1        Q.   Okay.  Paul says on December 17th, 2015,

2  "Sent this to Alex."  And he says:

3            "This Sandy Hook stuff is killing us.

4  It's promoted by the most batshit crazy people, like

5  Rense and Fetzer, who all hate us anyway.  Plus it makes

6  us look really bad to align with people who harass the

7  parents of dead kids.  It's going to hurt us with Drudge

8  and bringing bigger names into the show.  Plus, the

9  event happened three years ago.  Why even risk our

10  reputation for it?"

11           That's what Mr. Watson wrote.

12        A.   Yes.

13        Q.   At the time of this email the company knew

14  that both Fetzer and Rense would be very questionable

15  sources of information.  You agree with that?

16        A.   I think Paul Watson was calling -- was

17  having that assessment of those people.

18        Q.   Let me ask you, as you, as the company, I

19  want to make this very clear, I'm asking you as the

20  company, to speak as the company, because you were asked

21  to prepare on the editorial discussions on Sandy Hook.

22  It is the company's position that, at the time of this

23  email, the company knew that Fetzer and Rense would be

24  very questionable sources of information.  You agree

25  with that?

1           A.    Yes, based on Paul Watson's email here.

2           Q.    Right.

3                 So, in other words, from this point

4     forward, if anybody relies on Jeff Rense or Jim Fetzer,

5     they know in the company they were relying on an

6     unreliable, questionable piece of information.  You

7     would agree with that?

8           A.    I wouldn't say that that person would know,

9     because it would have to be that individual person who

10    would review -- who would talk to Paul or --

11          Q.    Well, I want to make clear, because you said

12    the company knew, right, the company knew.  So, if Free

13    Speech Systems published things after this date relying

14    on Jeff Rense and Jim Fetzer, then Free Speech Systems

15    knew when it published those things that Fetzer and

16    Rense were very questionable sources of information.

17    The company knew that.

18          A.    Paul watson is an individual, this is his

19    opinion.  His opinion is not getting distributed to

20    everybody in the company.

21          Q.    I don't want to know about Paul's.  What I'm

22    getting from you is you disagree with me, that was not

23    the company's position.

24          A.    I would have to repeat my answer.

25          Q.    All right.  Well, let's check that out,

1   actually.

2                    Do you remember giving your deposition in

3   2021?

4        A.   Yes.

5        Q.   And you were under oath at the time?

6        A.   Yes.

7             (*Discussion between counsel off the record*)

8        Q.   Miss Karpova, I'm going to show you now what

9   is page 258 of your deposition when you were under oath.

10  And I want to read these questions and answers to you.

11  We're going to read this part, okay?

12       A.   Uh-huh.  Yes.

13       Q.   And I'm going to say:

14            "Question:  This email where Paul watson

15  says 'it's promoted by the most batshit crazy people

16  like Rense and Fetzer,' does the company agree

17  Mr. Watson's position or does it disagree with

18  Mr. Watson's position?"

19            What was your first answer?

20       A.   "That's Paul's opinion."

21       Q.   And then my next question was, "That's

22  not -- I know that.  I know that.  Does the company

23  agree with it or not?"

24            What is the answer?

25       A.   "At this time this appears that Fetzer and

1  Rense would be a very questionable source of

2  information."

3      Q.    "Fetzer and Rense would be a very

4  questionable source of information."  That's what you

5  said in your deposition?

6      A.    I stand by that answer at this time.

7      Q.    So from this point forward if the company is

8  relying on Rense and Fetzer, they are relying on a very

9  questionable source of information.  You would with

10  agree that?

11      A.    No, because you were referring to -- you

12  were asking me as a company representative at the time

13  of deposition and that -- what I was referring to, at

14  the time of the deposition those people are considered

15  by the company as questionable sources, but now

16  they're --

17      Q.    I thought your testimony to me now was that

18  once the company got this email, once this email was

19  sent around, now it was in the company's knowledge that

20  Rense and Fetzer are.  But that's not what you're

21  saying?

22      A.    I already told you that this came from Paul

23  Watson, and in order for the company to know, company

24  comprised of people, and this email would have to be

25  distributed to everybody who has editorial --

```
 1              THE COURT:  That's not the law.  The
 2    company does not need to notify every single employee
 3    for the company to have the knowledge.
 4              MR. BANKSTON:  Thank you, Your Honor.
 5              THE WITNESS:  This is how our company
 6    works.  And this email was not distributed to every
 7    single person in the company.
 8    BY MR. BANKSTON:
 9         Q.   It sure wasn't.  But it was distributed to
10    one person, wasn't it.  Who is that?  Who is Alex in
11    that?
12         A.   According to Paul that's what he did.  Yes.
13         Q.   Sent it to Alex Jones.
14         A.   That's what he says he did.
15         Q.   And Alex Jones was on notice after this day
16    of what Mr. Watson was saying; right?
17         A.   I'm not sure.
18         Q.   Finally we're up to 2016.  Okay.
19              And I don't have too much farther to go.
20              2016, do you remember the U.S.
21    presidential campaign?
22         A.   Yes.
23         Q.   And you will agree with me that Mr. Jones
24    became a major issue in that campaign?
25         A.   Yes.
```

1      Q.    And, in fact, President -- I mean Secretary

2  Clinton discussed him in campaign speeches?

3      A.    She did.

4      Q.    Mr. Jones didn't like that?

5      A.    He did not, no.

6      Q.    He made a response video about this

7  controversy in the campaign that he called "Alex Jones'

8  final statement on Sandy Hook."

9            You're familiar with that video?

10     A.    Yes.

11     Q.    That was published on your list on

12  November 18, 2016.

13     A.    Yes.

14     Q.    Okay.  I would like to show some of that

15  video.  So, the first thing we're going to do is I want

16  to play you PVX 18B.

17            *(Video played off the record.)*

18            Malisa, can you bring up 35 seconds for

19  me.

20            I think you recall hearing Mr. Jones call

21  it the smoking gun on the Sandy Hook coverup.  Do you

22  remember him saying that?

23     A.    Yes.

24     Q.    This is the internet Wayback Machine, a

25  screen shot from it?

1      A.   Yes.

2      Q.   And according to Mr. Jones he says that this

3 shows that the Newtown School District had no traffic;

4 right?

5      A.   That's what he thought at the time that

6 meant, yes.

7      Q.   Right.  But he's wrong?

8      A.   It appears he's wrong, yes.

9      Q.   Why -- in fact, you've testified he's wrong?

10      A.   Yes.

11      Q.   Do you even know that's the right website?

12      A.   Are you referring to the -- which --

13      Q.   Newtown.K-12.CS.US/~Sandy Hook.

14           Do you know if that website was in

15 operation after 2008 or if the school district moved to

16 a new website?

17      A.   No, I don't know.

18      Q.   Show me 1:05.

19           That's not Sandy Hook, is it, the school?

20      A.   Correct.

21      Q.   Okay.  So, when Mr. Jones said there were

22 kids going in and out of the building at Sandy Hook and

23 that that doesn't make any sense because you would be

24 getting them away from the building, that's not even the

25 school.  Right?

1    A.   Right.  There was a lot of confusing reports

2  at that time that reported that to be the school.

3    Q.   Nobody verified it, did they.

4         Who reported that was the school?

5    A.   I don't -- a lot of people.

6    Q.   You said a lot.  Name one.

7    A.   I don't -- it would be impossible to go back

8  and figure out who that person was.

9    Q.   You didn't try, did you?

10   A.   Or source.

11   Q.   Were you asked to?

12   A.   We tried, we tried.

13   Q.   What did you do?

14   A.   Just look at -- look at a backup of -- it's

15  hard to find any videos about Sandy Hook in the first

16  place now, because they were either deleted or banned or

17  what.

18   Q.   One thing we can say is that Mr. Jones

19  falsely told his audience that was the school.

20   A.   He believed that was the school.  That's

21  what -- he didn't knowingly lie to the public.

22   Q.   I didn't ask you --

23        In fact, objection.  Nonresponsive.

24        THE COURT:  Sustained.

25  ///

BY MR. BANKSTON:

     Q.   I asked you if Mr. Jones, the statements he made about that school, that building being Sandy Hook, were false; right?

     A.   Yes, they were.

     Q.   Okay.  Do you remember when he said that there were porta potties set up for the press?

     A.   Yes.

     Q.   Do you know when porta potties arrived?

     A.   I don't.

     Q.   Okay.  And you know, like, some press people came to the town once the story got out that there was a mass shooting there; right?  Do you understand that?

     A.   Yes, there was just a lot of confusion on the information media about times and events.

     Q.   A lot of confusion.  But -- times and events.  But if you wanted to know, if you wanted to know when something showed up at Sandy Hook school that day, one thing you could do was look at the dash cams of the police officers' cars parked in the parking lot entrance, and you would see anything that went into the school.  Right?

     A.   I don't know who would have thought to check that or how they would have come across that information.

1      Q.    Haven't multiple people on InfoWars

2 discussed the dash cam and how it shows things coming in

3 and out of Sandy Hook?

4      A.    I don't remember specifically the videos

5 you're referring to.

6      Q.    Okay.  And you understand that those dash

7 cam videos are in the report that InfoWars had

8 possession of since 2013.  You understand that.

9      A.    I'll take your word for it.

10      Q.    Sure.  I don't want you to do that.

11      A.    Okay.

12      Q.    I'll show you.

13           This is Plaintiffs' Exhibit 27.  And you

14 see here we've got lot of media attachments.  Do you see

15 that --

16      A.    Yes.

17      Q.    -- where it says media attachments?

18           We have outdoor scene processing videos,

19 don't we.

20      A.    Yes.

21      Q.    And we even have indoor scene processing

22 videos; right?

23      A.    Yes.

24      Q.    And then we have primary scene videos; don't

25 we?

1          A.    Yes.

2          Q.    Okay.  And this website was known to the

3    company, as we established earlier; correct?

4          A.    This website?

5          Q.    The website that contains the official

6    report of the Sandy Hook crisis released by the state's

7    attorney's office.  We confirmed that InfoWars knew

8    about this website in those Requests For Admissions.  Do

9    you remember that?

10         A.    Actually, I don't remember.  Can you remind

11   me real quick?

12         Q.    Sure, I'll come over and point it out again.

13   Let's go through your stack here, and I'm going to kind

14   of help you with your papers.  We're going to move some

15   of these exhibits out of your way.

16              It looks like the Request For Admissions

17   have wandered off the witness stand.  Let me get those

18   for you one second.

19              THE COURT:  Well, they're not an exhibit

20   so you probably wouldn't have left them there.

21              MR. BANKSTON:  Yeah, that's what I

22   figured, exactly.  Thank you, Your Honor.

23              Yes, when I say they walked off, yeah, I

24   mean I walked off with them absentmindedly.

25   ///

BY MR. BANKSTON:

Q.   Here we go.  Do you remember this question: "The report and appendix to the report can be accessed and downloaded from the following website:"

And the company said?

A.   "Admit."

Q.   "And you were aware that this report was publically available on that date."

A.   "Admit."

Q.   Okay.  Thank you, Miss Karpova.

We talked again the men in the woods in camouflage.  Do you remember that?

A.   Yes.

Q.   We established in an earlier video, though, that they knew that was hours after the shooting; right?

A.   Who knew?

Q.   Mr. Jones and Mr. Halbig.  Remember, they were talking about the men in the woods and the helicopter and it was at 12:24 p.m., hours after the shooting.  Mr. Halbig said the school was already safe and secure by 10:23.  Do you remember any of this?

A.   I think there was just a lot of confusion in the times and --

Q.   Didn't get cleared up before this video, did it.

```
 1        A.    Yeah, I believe there was still a lot of
 2   confusion.
 3        Q.    Jones talks about two reporters talking to
 4   each other from the same parking lot?  Did you see that
 5   part?
 6              Let's pull it up for you.
 7              Can you pull up two minutes?
 8              Remember this?
 9        A.    Yes.
10        Q.    Okay.  Do you see the date here?
11        A.    Yes.
12              MR. BANKSTON:  All right.  Malisa, is
13   there any way you can bring up this box.
14              (Discussion off the record)
15              Won't be very clear but we're going to
16   give it a try.  I hope we're going to be able to see it,
17   but what I think you can see is P-H-O-E-N-I-X.  Phoenix.
18              Zoom it out again.
19   BY MR. BANKSTON:
20        Q.    Both of these say "Phoenix," don't they.
21   Right?
22        A.    It appears so.
23        Q.    Okay.  And let's go back down again to the
24   date.  May 9th, 2013.  That is way after Sandy Hook;
25   right?
```

1          A.    Sometime after Sandy Hook.

2          Q.    Do you know what these women are covering?

3    Do you know?  It's not Sandy Hook, is it.

4          A.    Okay.

5          Q.    I'm asking, do you know?

6          A.    I'm not sure.  No.

7          Q.    Okay.  So this, as far as we know, this has

8    nothing to do with Sandy Hook; right?

9          A.    I don't know.  I'm sorry.

10          Q.    These women are in a parking lot covering

11   some event, but it's not Sandy Hook if it's in Phoenix,

12   is it.

13          A.    I don't know.

14          Q.    And they don't say they're in different

15   places, do they.  They say they're both in Phoenix;

16   right?

17          A.    Yes.  I don't know if Alex saw other video

18   or he's talking about this video.  I'm not sure.  And

19   the article is not -- it's a re-post from Happy Place.

20   I'm just not sure.

21          Q.    Miss Karpova, please.

22                Objection, nonresponsive.

23                THE COURT:  Sustain.

24   BY MR. BANKSTON:

25          Q.    Miss Karpova, I don't know why I can't get

```
 1   you to answer the questions.
 2         A.    I'm trying my best.
 3         Q.    I know, I know, you're trying --
 4               MR. REYNAL:  Object to the sidebar.
 5               THE COURT:  Sustained.
 6               MR. BANKSTON:  Sorry, Your Honor.
 7               THE COURT:  So, I sustained your objection
 8   to her answer being nonresponsive.
 9               That means you didn't answer the question
10   he asked you.  He's going to another question.  You're
11   going to listen to the question he asks you and answer
12   that question.
13               THE WITNESS:  Okay.
14               THE COURT:  Not whatever you feel like
15   saying.  Answer the question he asks you.
16               Go ahead.
17   BY MR. BANKSTON:
18         Q.    This shows these women are both in Phoenix;
19   right?
20         A.    Yes.
21         Q.    Nobody said they were in difference places.
22   Right?
23         A.    I don't know who said they were in different
24   places, if anybody did say or not.
25         Q.    Okay.  And now, well, Mr. Jones did.
```

1          A.   Yes.

2          Q.   Okay.  And you say now that it might be a

3    different video, this might be the wrong video.  Is that

4    what you're saying?

5          A.   I don't want to speculate.

6          Q.   Right.

7               And because you were ordered to prepare on

8    the sourcing and research for the claims like this in

9    Plaintiffs' petition, that was something you should have

10   at some point reviewed; right?

11         A.   Well, again, this was taken down, so it's

12   hard, it's impossible to go back to this particular

13   article and see what was in it.

14         Q.   This article isn't on the InfoWars website

15   right now?

16         A.   I don't believe so.

17         Q.   This video is certainly in your possession,

18   isn't it?

19         A.   I don't believe so.

20         Q.   Miss Karpova, your company gave this video

21   to me.  Do you understand that?

22         A.   Okay.

23         Q.   So, the video is in your possession.  Did

24   you even look at it?

25         A.   I looked at a lot of videos.  I don't

1    remember.

2         Q.   Okay.  Sometimes you've seen out in front of

3    like parking lots, the courthouse, trailers of CNN

4    anchors and they're sitting in their little chairs and

5    their setups and they're being filmed in a parking lot.

6    You've seen that before?

7         A.   Yes.

8         Q.   Okay.  And these women here are both CNN

9    anchors.  Do you see that down at the bottom?

10        A.   Yes.

11        Q.   Right.  So, I'm just trying to get,

12   Miss Karpova, what in the heck is suspicious about this?

13        A.   I don't know.

14        Q.   I don't, either.  Okay.

15             Let's play another clip from this video.

16   Let's play 18C.

17             THE COURT:  Is this from the same clip?

18             MR. BANKSTON:  Yes.  And I'll make that

19   clear for the record, Your Honor.

20             THE COURT:  Well, I'm just trying to

21   figure out a break time.  I want you to finish your, you

22   know, topic and then --

23             MR. BANKSTON:  Let's do -- this is about a

24   two-minute video.  So, let's take a break.

25             THE COURT:  Oh, you want to take the break

1   now.

2               Let's take the break now.  All right.

3   It's 2:58.  The afternoon break is going to be a little

4   bit longer because everyone needs it.  So, it's 30

5   minutes.  We'll come back a little before 3:30.

6   Remember all of my instructions, they still apply.

7               Thank you.

8                    *(Brief recess.)*

9               THE COURT:  And whenever you're ready,

10  Mr. Bankston.

11              MR. BANKSTON:  Thank you, Your Honor.

12  BY MR. BANKSTON:

13       Q.   Miss Karpova, before we broke we were

14  looking at a video that was recorded on November 18,

15  2016.  It was called "Alex Jones' Final Statement on

16  Sandy Hook."  Do you remember that?

17       A.   Yes.

18       Q.   Okay.  I would like to show you now a third

19  clip from that video.  Let's look at clip 18C.

20                  *(Video played off the record.)*

21              When Mr. Jones said there, "Let's look

22  into Sandy Hook," he means his audience, too.  They

23  should look into it, too.  That's what he's saying?

24       A.   Yes.

25       Q.   Miss Karpova, I would like to show you an

1    email from that same day.  Okay?

2              I will be talking to her about 77.

3        *(Discussion between counsel off the record.)*

4              THE COURT:  77 is already admitted.

5              MR. BANKSTON:  Okay.  Just making sure.  I

6    wasn't sure if that was just for opening.

7    BY MR. BANKSTON:

8        Q.   I'm going to show you a copy of what's been

9    marked Plaintiffs' Exhibit 77.  All right?  And I would

10   like you, Miss Karpova to start at the second page, the

11   bottom of this email.  Okay.

12             Can we bring up Plaintiffs' Exhibit 77?

13             All right, this is the first email on the

14   bottom that InfoWars received.  And you'll see at the

15   bottom it says from Lainie Mulvey, Senior Communications

16   Manager.  And I believe if you flip to your front page

17   you will see that it's addressed to, "Hello, Paul

18   Joseph."

19             Do you see that?

20       A.   Yes.

21       Q.   Okay.  So, let's read this email.  And this

22   woman here identifies herself with Quantcast.  She says,

23   "InfoWars experienced a surge in traffic around

24   November 8th."

25             Now, that's not usual, right, because

1  November 8th was election day; right?

2      A.   Correct.

3      Q.   There's nothing unusual about InfoWars

4  getting a lot of traffic that day.

5           But it says, "As a normal measure all

6  large sites experiencing a traffic surge have a hold

7  automatically placed on rankings for systems review."

8           All right.  And it says, "This process

9  typically takes seven to ten business days.  During this

10  period, the InfoWars profile has remained public at

11  Quantcast.com/InfoWars.  We hope this resolves any

12  confusion surrounding the temporary hold on your

13  ranking, which will be restored shortly, hopefully as

14  soon as tomorrow.

15           "Please know that, as a Quantcast

16  customer, InfoWars can contact our support team at any

17  time with questions regarding your measurement

18  information."

19           Did I read that right?

20      A.   Yes.

21      Q.   All right.  Now, Quantcast is something that

22  InfoWars is a customer of that will help track rankings

23  of websites and who is getting traffic; right?

24      A.   I'm not sure what they do or how InfoWars

25  communicates with them, but something along those lines.

1        Q.    Something to do with the traffic for the --

2   tracking the traffic of the InfoWars website, we're not

3   exactly sure but something along those lines.  Right?

4        A.    Or some kind of hosting, yes.

5        Q.    Okay.  I want to go up to the next email

6   that just says, "Thanks, I'll pass this on."

7              Can we go up to the next one?

8              And it's Paul, the editor, writing back to

9   the woman at Quantcast, saying, "Thanks, I'll pass this

10  on;" right?

11       A.    Yes.

12       Q.    And then I want to go up.  Because

13  Mr. Watson gets sent an email from the person he passed

14  it onto named Buckley.  And you'll see that right there

15  it will say -- and, in fact, Malisa, you see where it

16  says on Friday, 18 November, 2016, if you can zoom it in

17  there hopefully we can make it be a little better.

18              Okay.  So, here is the first part of

19  Buckley's email that was written on November 18, 2016,

20  the same day as the video we were just watching.  And it

21  says, "But no, surely it's a conspiracy theory that they

22  are trying to suppress our popularity so that the lizard

23  people can return to the ascension pad at Sandy Hook and

24  feast on sacrificed crisis actors."

25              And if you scroll down you see that

1    Buckley has included here a caricature of a man missing

2    his teeth giving an "okay" symbol.

3              Do you see that?

4         A.   Yes.

5         Q.   So, Buckley is making a joke here; right?

6    That's what he's doing.

7         A.   It's some kind of meme, and he's making --

8    and he's saying 'LOL' at the end.  And, yes, it's some

9    kind of an inside joke he's making.

10        Q.   An inside joke.  Exactly.

11             Because outside, outside InfoWars, on this

12   very day Mr. Jones is talking about the parents being

13   actors.  And at the same time that's happening we can

14   tell from this email that his cousin, a managerial

15   employee, is cracking jokes about the sacrifice of

16   crisis actors at Sandy Hook.  You agree with that?

17   That's what's happened?

18        A.   I don't see how that's related.  I don't

19   know if Buckley is watching the broadcast, I have no

20   idea what....

21        Q.   I don't know, either, but what we do know is

22   that from inside of InfoWars, at the same time these

23   events where Mr. Jones is going on telling the public,

24   that these folks think it's all a big joke.  Right?

25        A.   I wouldn't say that, no.

1       Q.   I mean, talking about lizard people that

2   return to the ascension pad to feast on sacrificed

3   crisis actors, that's sick, isn't it?  It's a bad, bad

4   joke, isn't it?

5       A.   It's meant to be some kind of grotesque

6   joke, but it's also -- he's attaching a meme to it.

7       Q.   Are you talking about that picture, the man

8   there, the meme?  Is what you're saying?

9       A.   A meme.

10      Q.   Yeah, m-e-m-e-m-e?

11      A.   M-e-m-e.

12      Q.   Right.  And yeah, repeated a couple of M-Es

13   there.

14            But what a meme is maybe from, you know, I

15   actually, you know, I've grown up on the internet, that

16   we have images that we use as jokes on the internet.

17   Right?

18      A.   Yes.

19      Q.   Okay.  And that's what's happening here;

20   right?

21            Right?  That's what's happening here.

22      A.   He's -- what's happening here is he's making

23   a joke, yes.

24      Q.   Uh-huh.

25            I would like to move forward just a little

```
 1   bit.  81.
 2                 MR. REYNAL:  Subject to my continuing
 3   objection.
 4                 THE COURT:  The running objection.
 5                 MR. REYNAL:  Yes.
 6                 THE COURT:  The one.  Petitioner's 81 is
 7   admitted.
 8            (Plaintiff's Exhibit 81 admitted.)
 9                 MR. BANKSTON:  Thank you, Your Honor.
10   BY MR. BANKSTON:
11        Q.   I'm going to provide you with 81.
12                 Malisa, let's bring up 81.
13                 Up at the top is a big line of email
14   addresses, right?
15        A.   Yes.
16        Q.   Zoom in on that box of email addresses.
17                 Now, one of -- it's all from Wolfgang
18   Halbig; right?
19        A.   Yes.
20        Q.   Let me walk over to the screen so I can
21   point some stuff out.  NewtownCT.gov, that's somebody
22   that works in the Newtown government; right?
23        A.   Appears so.
24        Q.   Okay.  You know what the A.P. is, the
25   Associated Press, AP.org?
```

```
 1          A.    Appears so.

 2          Q.    FBI.gov?

 3          A.    Yes.

 4          Q.    You've got stuff like attorneys, I believe

 5   that's wicker Smith, you've got Newtown government.  You

 6   see those?

 7          A.    Yes.

 8          Q.    Washington Post.  Right?

 9          A.    Washington Post.

10          Q.    Washington Post?  Washpost?

11          A.    Oh, yes.

12          Q.    Right?

13          A.    Yes.

14          Q.    You've got Brian Ross at ABC?

15          A.    Yes.

16          Q.    You've got the governor of Connecticut?

17          A.    Yes.

18          Q.    Criminal division of the US DOJ?

19          A.    Yes.

20          Q.    Rob Dew at InfoWars?

21          A.    Yes.

22          Q.    Nico at InfoWars?

23          A.    Yes.

24          Q.    Some more Orlando Sentinel.  That's a

25   Florida newspaper?
```

1       A.   Appears so.

2       Q.   Okay.  New York Times?

3       A.   Yes.

4       Q.   More FBI?

5       A.   Correct.

6       Q.   Stratfordk.  That's some sort of school?

7       A.   Something like that.

8       Q.   A lot of people copied on this email, right?

9       A.   Yes.

10      Q.   Let's go down to the email.  Let's start
11  with the first few lines, let's start reading it down.

12           Now, this was sent, as you see on the
13  document before you, on March 21, 2017.  Is that right?

14      A.   Yes.

15      Q.   Okay.  And it says:

16           "Nick and Laura Phelps did a great job of
17      acting in Newtown, Connecticut, on

18      December 14th, 2012.  I visited their home

19      today --"

20           And I'm not going to read their address
21  for this live stream, but he visited it in Windemere,
22  Florida.

23           "-- thanks to Lieutenant Vangelli telling
24      me during my wellness check of Nick and Laura

25      Phelps that they no longer live in Newtown,

1    Connecticut, and they are now Richard and
2    Jennifer Sexton.
3         "Guess what.  He is totally right.  And
4    can you believe it that my Newtown Police
5    Department guided me in the right direction.
6         "They have a beautiful home with a
7    three-car garage.  They were not home today.
8    But the good news is that the three adult
9    female moms with their children standing
10   outside their homes observed me and wanted to
11   know what I was doing.
12        "It is spring break for Orange County,
13   Florida, school children.  I showed them this
14   picture and told them that I did not want to go
15   to the wrong house to surprise Nick and Laura
16   from Newtown, Connecticut, aka Richard and
17   Jennifer Sexton, today.
18        "It took a few minutes for them to look
19   at the pictures and then they asked why I
20   wanted to speak to them.  They asked for my
21   name, which I gave them as Wolfgang W. Halbig.
22   They told me how I knew them and I told them
23   that they have been on the national news and so
24   I wanted to meet them again.
25        "Our conversation was all about Newtown,

1       Connecticut.  So she said, do you mind if I

2       text her?  I said absolutely not.  Waited about

3       ten minutes only to learn that they did not

4       know me, which surprised me.  They verified the

5       pictures and why would she text them about

6       Newtown, Connecticut, and that someone from

7       there wanted to visit if they were not Nick and

8       Laura Phelps, now Richard and Jennifer Sexton."

9               Then he says:

10              "At first I did not want to enter, since

11      it is a gated community, but several people

12      told me to just go on in.  There is no security

13      guard at the gates.  If there is a CCTV they

14      will see me being told to go in and that is the

15      only reason or I would not have entered.

16              "Now who says that law enforcement does

17      not know what they are doing.  Thank you,

18      Newtown Connecticut Police Department."

19              Read that right?

20      A.   Yes.

21      Q.   Let's flip the page here and look at that

22  picture he's talking about.

23                  Want to bring that up for me, Malisa?

24                  Then it says, "Sandy Hook Hoax Actors."

25  And then you see a YouTube clip of Nick Phelps and his

1   wife; right?

2        A.   Yes.

3        Q.   Okay.  And it says, "Playing the part of

4   grief-stricken parents."  And then we see there's

5   another picture down there that seems to say that the

6   two people in the photo below are actually them and that

7   they're from Florida.  Do you see that?

8        A.   Yes.

9        Q.   Okay.  This is the kind of thing that

10  Mr. Halbig was sending InfoWars that InfoWars had in

11  it's possession; correct?

12       A.   It's the kind of thing that he was sending

13  and which most of them were not even read.  If nobody

14  responded to this email, I don't think it was read.  And

15  even if it was read, I mean, if I had read it I would

16  ignore it because it just -- I would consider it

17  somebody just rambling.  Kind of a crazy person.  But I

18  don't think this email was even seen by anybody.

19            MR. BANKSTON:  Okay.  First, objection.

20  Nonresponsive.

21            THE COURT:  Sustained.

22  BY MR. BANKSTON:

23       Q.   Miss Karpova, I asked you, is that email in

24  the company's possession.

25       A.   According to --

1        Q.    Can you answer that first?

2        A.    Sorry.  According to the stamp, yes.

3        Q.    Okay.  And in that email, which you think

4   shows a crazy person?  Is that what you said?

5        A.    If I had read this email, if I had gotten it

6   at that time and read it, it would appear to me like

7   that, yes.

8        Q.    Yeah, it does, doesn't it.  Because that's

9   Wolfgang Halbig showing up at people's houses.  Right?

10       A.    I don't know if he's telling the truth here

11   or what, but it does appear like an unstable person

12   talking here.

13       Q.    Do you remember earlier today I asked you,

14   do you understand how wrong it was to encourage this

15   man's delusions like that?  Do you still stand by your

16   answer or after this do you understand how wrong it was?

17       A.    I want to say again as my previous answer,

18   the -- at that time we did not believe that Halbig was

19   this unstable crazy person, and had we believed it we

20   would have not put him on the air.

21       Q.    Okay.  I hear you saying today that when you

22   read this email it strikes you as crazy.   But isn't it

23   true, Miss Karpova, the truth is that when you were

24   first shown this email it didn't bother you at all and,

25   in fact, it struck you as an impassioned man who

1    believes in his heart what he believes and wants to get

2    to the truth?  Isn't that how that email strikes you?

3         A.   I mean, it can be read many ways.

4         Q.   That's one of -- and no, no, hold on.  How

5    did you read it the first time you saw it.  You

6    believed, it struck you, as an impassioned man who

7    believed this with all of his heart and wanted to get to

8    the bottom of it.  That's the truth.

9         A.   I -- you're telling me that I read this

10   email before?  How -- I don't remember reading it.

11        Q.   Okay.  Let's refresh your memory on that.

12   Okay?

13             Do you remember giving your deposition in

14   2021?

15        A.   Yes.

16        Q.   And you were under oath.

17             Let me ask you this, Miss Karpova.  Before

18   you came into this courtroom did you read your

19   deposition?

20        A.   Yes.

21        Q.   Okay.  When did you do that?

22        A.   I'm sorry?

23        Q.   When did you do that?

24        A.   Last night.  I mean not that, but before the

25   first day of deposition.

1          *(Discussion between counsel off the record.)*

2          Q.   All right.  Miss Karpova, we're going to

3     read some from your deposition again.  Okay?  And this

4     is on page 214 of your deposition.  And do you see my

5     question, and then these are the answers.  All right?

6          A.   Yes.

7          Q.   I said, "It doesn't creep you out to have

8     Wolfgang Halbig showing up at these people's houses and

9     describing their three-car garage and all that stuff,

10    accusing them of being people they're not?  Actually

11    are?  That doesn't -- that doesn't have any -- you don't

12    have any strong feelings on that one way or another?"

13              Your answer?

14         A.   "No response."

15         Q.   Says "No response."

16              And then I said, "Correct?"

17              What did you say?

18         A.   "Are you asking my personal opinion?"

19         Q.   And I said, "Yeah, your personal opinion."

20              What did you say, Miss Karpova?

21         A.   "It strikes me as an impassioned man who is

22    doing an investigation of something he believes in his

23    own heart and he wants to get to the bottom of."

24              I stand by that, he was an unstable man

25    who -- that still stands, that he was impassioned to

1    what he was doing.

2          Q.   You know about a month after that,

3    April 22nd, 2017, InfoWars published a video?

4          A.   Which video are you referring to?

5          Q.   Let me get you your list in front of you.

6    Okay?

7          A.   I have it, can you just point it out.

8          Q.   Okay.  April 22nd, 2017.

9          A.   Yes.

10         Q.   Why don't you tell the jury what the title

11   of that video was.

12         A.   "Sandy Hook Vampires Exposed."

13         Q.   Okay.  So, one month after we get this --

14   after Wolfgang Halbig has said that he has visited the

15   Phelps in Florida, we have this InfoWars episode

16   entitled "Sandy Hook Vampires Exposed."  I would like to

17   show you a clip that we can talking about from that

18   video.  Okay?

19         A.   Yes.

20         Q.   Okay.  Let's play clip 20B.

21              (Video played off the record.)

22              All right.  Miss Karpova, vast majority of

23   what we just heard in there was the same stuff we've

24   been hearing Mr. Jones and Mr. Halbig talking about over

25   and over again; right?

1          A.   Yes, a lot of that stuff is repeat.

2          Q.   In fact, a lot of that stuff comes from

3    those 16 questions you told me you understood; right?

4          A.   I don't have every question memorized but

5    I'll take your word for that.

6          Q.   I didn't ask you that.  I asked you, some of

7    that came from Wolfgang Halbig's questions?

8          A.   I would assume so, yes.

9          Q.   So, in 2017, well after years of InfoWars

10   receiving emails from Wolfgang Halbig of the type we've

11   seen today, they were still repeating the stuff he said

12   on InfoWars in 2017; correct?

13         A.   Could you repeat that again?

14         Q.   Sure.  Years after InfoWars had possession

15   of all these emails that we've seen from Wolfgang Halbig

16   and all of the things that he was doing, they were still

17   repeating the things he said in 2017.

18         A.   Yeah, again.

19         Q.   Is that a yes?

20         A.   It appears so, yes.

21         Q.   Yes.  Okay.

22              By the way, we've talked about most of

23   these false things that are said in there.  But have you

24   ever seen this supposed dash cam footage of these cops

25   that Mr. Jones is talking about?  Or Mr. Dew was talking

1    about?

2         A.   I would like to see what you're referring

3    to.

4         Q.   I've never seen it.  That's what I'm asking

5    you.

6         A.   Okay.

7         Q.   And I'm asking you because I don't think it

8    exists.  Right?

9         A.   I don't know.

10        Q.   That's made up.

11        A.   If they talked about it they must have seen

12   it.

13        Q.   Really.  You think they must have seen it?

14        A.   They didn't make it up.

15        Q.   Well, you're just assuming that, right?  You

16   didn't talk to Rob Dew about this, did you?

17             MR. REYNAL:  Objection.  Argumentative,

18   Your Honor.

19             THE COURT:  Let's just --

20             MR. BANKSTON:  I can rephrase.

21             THE COURT:  You can ask the question and

22   you can ask it that way.  Let's just take a beat and

23   then ask the question again.

24             MR. BANKSTON:  Absolutely.  Okay.

25   ///

```
 1   BY MR. BANKSTON:
 2        Q.   Are you testifying here under oath that Rob
 3   Dew has seen this supposed dash cam footage?
 4        A.   If he had talked about it, he had seen it,
 5   yes.
 6        Q.   You're positive of that under oath.
 7        A.   Yes.  I've never heard or seen him lie about
 8   you know -- lie on purpose.
 9        Q.   Why hasn't anybody given it to me if that's
10   true?
11        A.   They probably couldn't find it and it was
12   downloaded from the internet.
13        Q.   Why didn't they put it on the show?
14        A.   I don't know.
15        Q.   Sounds like Rob Dew was saying, there's this
16   supposed dash cam footage.  I usually don't say
17   "supposed" about things I've never seen before.
18   Wouldn't you agree with that?
19        A.   I'm not sure what he meant by that.
20        Q.   Well, sort of like, if somebody says the
21   supposed murders of --
22             I'm sorry, do you have an objection?
23             MR. REYNAL:  Yeah, this whole thing is
24   speculative as to what's in Rob Dew's mind, what he's
25   testifying about.
```

```
 1              MR. BANKSTON:  That's my point.
 2              THE COURT:  Well, I think that
 3  Miss Karpova is the one who brought this in by saying he
 4  wouldn't say it if he hadn't seen it.  He wouldn't lie.
 5  So, now we have to explore how she knows that.
 6  BY MR. BANKSTON:
 7      Q.   Sort of like if somebody was to say the
 8  supposed victims of Sandy Hook, that sort of signals
 9  they're not sure, doesn't it.
10      A.   They're not sure about what?
11      Q.   Whether there's victims of Sandy Hook.
12      A.   Yeah, "supposed" can mean several things,
13  yes.
14      Q.   One of those things can mean Rob Dew has
15  never seen that dash cam footage; he thought it was
16  supposed dash cam footage; right?
17      A.   I don't know if he read about -- again, I
18  don't know what he means by that here.  I'm just
19  assuming based on my experience with Rob Dew.
20      Q.   You don't know that; right?
21      A.   I don't know for sure.
22      Q.   Thank you, Miss Karpova.
23              Around this time in the summer of '17 you
24  understand that Mr. Jones gave an interview to Megyn
25  Kelly; right?
```

```
1          A.    Yes.

2          Q.    And you understand around this time that a

3   controversy had developed that Ms. Kelly was covering

4   about Mr. Jones' statements about Sandy Hook; right?

5          A.    Yes.

6          Q.    Okay.  And Mr. Jones, once he gave that

7   interview, was not happy with how it went.  You would

8   agree with that?

9          A.    Yes, because she lied about why she was

10  inviting him.

11         Q.    Yeah, she kind of suckered him into a hit

12  piece, huh?

13         A.    Pretty much.  Set a trap for him.

14         Q.    Entrapped him.  A good reporter might go to

15  a subject and, say, try to soften his defenses and say,

16  oh, Mr. Jones you're so important, so powerful, we would

17  really like to interview you.  But then when she got in

18  the room she went a different direction, didn't she.

19         A.    And I believe she specifically said it

20  wasn't going to be about Sandy Hook, which is why he

21  accepted the interview.  Because he wasn't the one who

22  wanted to keep the conversation about Sandy Hook going,

23  it was her and the mainstream media attaching him to the

24  Sandy Hook.

25         Q.    And he wanted to stop talking about Sandy
```

1    Hook because he was potentially facing some legal

2    threat; right?

3           A.    I don't know that.

4           Q.    Okay.  Let's take a look at a video.  Do you

5    remember -- let's take a look on your list there

6    June 13th, 2017.  Do you see that?

7           A.    Yes.

8           Q.    Okay.  And do you see there was an episode

9    entitled "Media Refuses to Report Alex Jones' Real

10   Statements on Sandy Hook."  Is that right?

11          A.    Yes.

12          Q.    Okay.  Let's take a look at that clip.

13   Let's look at PVX 21A.

14                    *(Video played off the record.)*

15                MR. BANKSTON:  Your Honor, if I could just

16   have a second to pull up a screen.

17   BY MR. BANKSTON:

18          Q.    Now, do you remember a part of this video

19   where Mr. Jones, and this is going to be advancing it to

20   this part, was reading through this list; right?

21          A.    Yes.

22          Q.    Okay.  Not true, right?  Number one, not

23   true; correct?

24          A.    These are -- I can't agree.  I mean, these

25   are the questions.  He's making a point that Sandy Hook,

1    sorry, that ZeroHedge is actually reporting on what his

2    questions are.  I think that's the point that he's

3    making here.

4         Q.   Right.  "His" means Jones'.

5         A.   Yes.

6         Q.   Why does the Sandy Hook school website

7    traffic have zero traffic for four years.

8              That's not true; right?

9         A.   Correct, but that's his question that they

10   won't report on.

11        Q.   Well, it's not a question, Miss Karpova,

12   it's a statement; right?  If I was to say, Miss Karpova,

13   why do you steal from the school?  Why do you steal?

14   Why do you lie?  Why do you cheat?  Those are false

15   statements; right?

16             That's false.  There was -- this is false,

17   this is a false question; right?

18        A.   Right.

19        Q.   Okay.  False.  Right?  No one dressed in

20   camouflage fled into the woods; right?

21        A.   The questions that Alex Jones has.

22        Q.   And they're false.  There were no shooters

23   who dressed in camouflage.  You can't answer why that

24   happened if there were none.  Correct?

25             MR. REYNAL:  Objection.  Asked and

```
 1   answered.
 2             THE COURT:  She didn't answer.  So
 3   overruled.
 4   BY MR. BANKSTON:
 5        Q.   Right?
 6        A.   I'm sorry, repeat that again?
 7        Q.   You can't answer the question why these
 8   people in camouflage fled into the woods if there were
 9   no people.  There's no "why" answer if there were none.
10   That's false.  Right?
11        A.   Well, if the answer would have been, you
12   know, false reports that he had seen, I mean, you can
13   still answer the question.
14        Q.   There's no false -- Mr. Jones says this,
15   camouflage, fled in the woods.  He just made it up;
16   right?
17        A.   No, he's basing his question off the videos
18   that he had seen.
19        Q.   What videos?  Of somebody in camouflage
20   fleeing into the woods?
21        A.   Something like that, yes.
22        Q.   All right.  Porta potties, sandwiches,
23   fruit, chips, and drinks brought up inside the school.
24   That's a lie.  That's not true.  Right?
25        A.   Again, that's a question that he has in his
```

1    mind.  The question is true because he's -- that's his

2    question.  I'm not sure -- that's his question and

3    they're reporting on.  I think that's the whole point.

4         Q.   Did you notice how he started to read this

5    one right here?  He started to go, "Sandy Hook," and

6    then he stopped and then he highlighted the next one.

7    Did you see that?

8              Let's play it again, Malisa.  Can you play

9    that segment right now?  I want to see it.

10             *(Video played off the record.)*

11             He was about to read it, wasn't he?

12        A.   Alex Jones does that a lot.  I don't think

13   it means anything.

14        Q.   You don't think -- so, you don't think it

15   was -- let me ask you this, earlier in this trial we

16   heard from Detective Dan Jewiss, and he was talking --

17   he at least knew of one other person who was

18   specifically identified by InfoWars who had brought

19   similar claims named Lenny Pozner.  You knew about him;

20   right?

21        A.   Yes.

22        Q.   Robbie Parker is another, isn't he?

23        A.   Yes.

24        Q.   So, Mr. Jones didn't want to say his name

25   anymore.

1    A.   I don't know what he was -- but Alex Jones

2  is known to skip lines whenever he reads stuff in the

3  articles just because his mind is racing, he skips

4  through lines.

5       Q.   Sure.  Okay, Miss Karpova --

6            You can take this down.

7            The Megyn Kelly interview aired, and then

8  you understand we've talked about this in your

9  deposition that a week later there was a video with Owen

10 Shroyer talking about Neil Heslin's statement that he

11 held his boy after Sandy Hook.  You know that?

12      A.   Yes.

13      Q.   Okay.  We're going to talk a little bit

14 about that video of Owen Shroyer.

15           I understand you weren't the director

16 involved in that video; right?

17      A.   Yes.

18      Q.   But I do want to show you one thing we've

19 talked about in it.

20           And can you bring up for me slide 62.

21 This is going to be from --

22           THE COURT:  This is an exhibit or --

23           MR. BANKSTON:  Yes.  It's going to be from

24 PVX 23.  This was a slide from the opening statement,

25 okay?  All right.

BY MR. BANKSTON:

Q.   This is a screen shot from Plaintiffs' video Exhibit 23.  The Owen Shroyer broadcast that Mr. Shroyer will be discussing with us later, but if you look right here, the article that InfoWars was citing contained information from Jim Fetzer.  That's right?

A.   Yes.

Q.   Okay.  Would you agree with me, Miss Karpova, at the time of this video InfoWars knew there were issues regarding Mr. Fetzer's credibility. They knew that.

A.   If you're referring back to the email from Paul Watson --

Q.   I am not, ma'am.  Just can you answer that question?

A.   I'm not sure, I'm sorry.

Q.   Okay.  You remember giving your deposition in 2021, don't you?

A.   Yes.

Q.   Okay.  Ma'am, I'm going to approach you with your deposition.  We're going to be reading this excerpt here.

Do you see that?

A.   Yes.

Q.   Okay.  I'm going to ask you:

1           "If Owen, and given your previous answer,

2    given that there was some -- InfoWars was aware that

3    there were some issues being raised of Mr. Fetzer's

4    credibility, that happened in the exact same year that

5    Owen published this video in 2017."

6           What was your answer?

7    A.   "Right."

8    Q.   My question was:  "So, if Owen relied on, if

9    it did happen, that Owen's video contains material from

10   Mr. Fetzer, it was done so at a time where InfoWars knew

11   there were issues regarding his credibility."

12          Ma'am, what was your answer?

13   A.   "Yes."

14   Q.   You can go down to October 26, 2017.  We're

15   almost done.

16          Do you see a video there?

17   A.   Yes.

18   Q.   And it says "JFK Assassination Documents to

19   Drop Tonight."  Is that correct?

20   A.   Yes.

21   Q.   Okay.  Let's play from there PVX 24A.

22          (Video played off the record.)

23          So, there we're hearing Mr. Jones saying

24   it's phoney as a $3 Bill; right?

25   A.   That's an expression, yes.

1      Q.   During his programming Mr. Jones would

2  frequently switch gears midstream and start asking his

3  audience to buy his products; right?

4      A.   Are you talking about ads that he does?

5      Q.   Sure.  In the middle of his giving news and

6  then suddenly he'll just transition over and start

7  selling products; right?

8      A.   That's called a plug.  That's what he does

9  on a regular basis.

10     Q.   Yeah.  Let's take a look at that.  Let's

11  look at that same video October 26, 2017.

12            Can we play PVX 17?

13         *(Video played off the record.)*

14            So, InfoWars tells its audience that

15  buying its products will help InfoWars fight back

16  against the globalists who staged Sandy Hook.  That's

17  what they're telling them.

18     A.   That's not what he said.

19     Q.   Well, we know what he's talking about when

20  he says the globalists, right?  That's the billionaires

21  who control and stage and enslave America under Alex

22  Jones' view; right?

23     A.   That's part of it.

24     Q.   Part of it, right.

25            And when Mr. Jones said earlier, "The

 1   people who did Sandy Hook," he's talking about the

 2   globalists, isn't he?

 3          A.   Well, this --

 4          Q.   When Mr. Jones said -- when he said the

 5   people who did Sandy Hook, he was talking about the

 6   globalists?

 7          A.   You're talking about the ad?

 8          Q.   No, Miss Karpova, I'm talking about when we

 9   heard today Mr. Jones say, "The people who did Sandy

10   Hook," he means the globalists.

11          A.   Well, I -- I previously told you yes --

12   earlier today that I didn't specifically know who he was

13   referring to.

14          Q.   Okay.  Now, we get to the end here, as the

15   new year changes, and we come into 2018, and you

16   understand that this suit was filed.  Suit was filed

17   against InfoWars based on all of the events we're

18   talking about and Owen Shroyer's video and everything.

19   You know that happened in 2018.  Right?

20          A.   Yes.

21          Q.   Okay.  Miss Karpova, by my count we've now

22   seen something like 20-plus videos of your employer Alex

23   Jones denying Sandy Hook ever happened, more importantly

24   denying the existence in the death of their son, Jesse,

25   that's correct?

1          A.    I don't agree with that.

2          Q.    Okay.  You're also aware of other videos

3    where Mr. Jones tried to walk back these disgusting

4    claims.  Are you aware of those videos?

5          A.    Every time he's -- every time he is

6    questioning Sandy Hook he's also saying that he doesn't

7    know what happened and he -- some videos he says that he

8    now believed that children were killed.

9          Q.    Right.

10                And the reason he started late in this

11    period to try --

12                If you need to stand up, stand up.

13                MR. REYNAL:  I do.

14                Your Honor, I think you previously ruled

15    that post-suit videos weren't come in because they

16    discuss the case and what's going on.

17                THE COURT:  I have not made that ruling.

18    What we said was, if you wanted to bring in -- oh, that

19    was something different.  I don't remember that.  Is it

20    on the list?  Is it --

21                MR. REYNAL:  I think it was discussed at

22    the pretrial conference.

23                MR. BANKSTON:  I'm sorry, what are

24    we -- I'm confused what we're talking about.

25                THE COURT:  Let's do this, let's wait

```
 1    until we have a question or an exhibit and then you can

 2    object if you think you have an objection.

 3    BY MR. BANKSTON:

 4         Q.    In 2017 to 2018 --

 5               THE COURT:  I don't know.

 6    BY MR. BANKSTON:

 7         Q.    -- right before this suit was filed,

 8    Mr. Jones was trying to walk back some of his claims

 9    about Sandy Hook, right?

10               Right?

11         A.    I don't know what you mean by "walk back."

12         Q.    It means he was trying to now say, as

13    opposed to all those earlier videos that you saw where

14    he said it was completely fake, totally synthetic, at

15    first I thought they killed real kids but I did deep

16    research and it didn't happen, he started to change his

17    tune a little bit in late 2017 to 2018, didn't he, he

18    tried to walk some of that back?

19         A.    I don't think so.  He's always wavered.  He

20    always said that he didn't know exactly what happened

21    but he was trying to get to the truth.

22         Q.    I'm not -- you would think that some of the

23    videos we saw today, he said he didn't know what

24    happened.

25         A.    Yes.
```

1    Q.    That's your testimony?  Okay.

2    A.    He did say that.

3    Q.    Now, the truth is, Miss Karpova, the reason

4    that he started to say some of these things and start to

5    back off is because he was under threat of legal action;

6    right?

7    A.    I don't believe that.

8    Q.    Okay.  And even after Mr. Jones walked it

9    back, up until very, very recently, as we saw in opening

10    statement, he was still saying it was synthetic; wasn't

11    he?

12    A.    I believe his -- throughout the years he was

13    wavering on the subject, not knowing what the truth was

14    and trying to get to it the best he could.

15    Q.    What I'm asking you is, in October of 2021,

16    as we saw in opening statement, Mr. Jones kept on saying

17    Sandy Hook is synthetic.  Correct?

18    A.    He also says "in my opinion" and then he

19    says that he doesn't know.

20    Q.    Have you seen that video?  You know what

21    video I'm talking about?

22          You weren't here for opening statement;

23    right?

24    A.    I was.

25    Q.    Oh, you were?

 1        A.    Not for the entire opening statement.  I

 2   came in later.

 3        Q.    Okay.  So, you saw that video in

 4   October 2021, then Mr. Jones still saying it's

 5   synthetic, isn't he?

 6        A.    He has his definition of what he means by

 7   that.

 8              MR. BANKSTON:  Okay.  Miss Karpova, I have

 9   no more questions for you.

10              THE COURT:  All right.  Mr. Reynal.

11                   CROSS-EXAMINATION

12   BY MR. REYNAL:

13        Q.    So, you've been on the stand for a long

14   time.  We've discussed a variety of different issues,

15   and I think that it would be best if we established

16   first some time periods.

17              So, can you tell the Members of the Jury

18   when it was that you first began to work at InfoWars?

19        A.    Late 2015.

20        Q.    So many of the videos that we've watched and

21   articles that we've looked at, they were produced and

22   put out before you worked there?

23              MR. BANKSTON:  Objection.  Leading.

24              THE COURT:  Sustain.

25   ///

1   BY MR. REYNAL:

2          Q.    Many of the videos that we -- well, let me

3   ask you this, were you working at InfoWars or were you

4   somewhere else in 2013 when some of the videos that we

5   watched were produced?

6          A.    I was not at InfoWars.

7          Q.    And in 2014 were you working at InfoWars or

8   were you working somewhere else when those videos were

9   produced?

10         A.    Somewhere else.

11         Q.    And in 2015, what month did you say that you

12  began?

13         A.    October.

14         Q.    So, prior to October 2015 were you working

15  at InfoWars or were you working somewhere else?

16         A.    I was working somewhere else.

17         Q.    Okay.  Now, what was your first job at

18  InfoWars?

19         A.    I was hired as a sound engineer.

20         Q.    And were you living in Texas or were you

21  living somewhere else before that?

22         A.    I was living somewhere else.

23         Q.    And what -- how did you hear about the job

24  at InfoWars?

25         A.     It was a long time, but I believe I

1    overheard an ad, Alex was recruiting for more crew

2    personnel and he asked for -- to send in resumes with

3    qualifications.

4         Q.    And so you were an InfoWars listener at the

5    time?

6         A.    I wouldn't say so, but I knew of Alex Jones.

7         Q.    And did you watch his programming on

8    occasion?

9         A.    On occasion I would say.

10        Q.    And what was your general impression of his

11   programming at the time?

12        A.    Um, bombastic, a lot of information that I

13   wasn't able to process because I had other jobs, other

14   things to take care of.  It's a three-hour, four-hour

15   broadcast, it's just hard to keep up with everything

16   that he's saying.  That was my general impression.

17        Q.    Did you like the show?

18        A.    I didn't dislike it.

19        Q.    Okay.  Liked it enough to listen to it on

20   occasion?

21        A.    Yes.

22        Q.    So, when you started there how long did it

23   take before you moved into production?

24        Q.    Well, as a sound engineer, still considered

25   part of production since I'm there during the show.  I'm

1   engineering the music, bumpers, in and out, I'm hearing
2   Alex between the breaks.  If I need to do something else
3   I would be, you know, available to do that.  So, I'm
4   sort of part in that atmosphere of production in the
5   control room.
6          Q.   And did you have a prior career, in your
7   education do you have some experience in music and
8   sound?
9          A.   Yes, I do.
10          Q.   And can you tell us about that?
11          A.   Well, I grew up playing piano classically.
12   I've always had passion for music.  After I got out of
13   the military I was thinking, what should I do now?  And
14   I wanted to see, you know, I kind of talked to myself
15   and thought what was it that I wanted to do and I wanted
16   to go back to my true passion, which was music.  And I
17   figured out what I could do in that area and I decided
18   to become a music engineer.  It was something up my
19   alley, I really enjoyed it.
20          Q.   When you -- so, you got the job and you
21   moved to Austin?
22          A.   Correct.
23          Q.   And when you first started work what was
24   your impression of -- well, can you describe for the
25   jury what the InfoWars studio is like.  What does it

1  look like?

2      A.   Cameras, screens, very well taken care of,

3  clean.  Lots of lights, a lot of things going on at one

4  time every day.  People running around, people trying to

5  give Alex what he's asked for.  So, just busy, busy

6  environment, I would say.

7      Q.   And how many hours a day is InfoWars

8  producing content, at least when you started back in --

9  I think you said October?  Is that correct?

10     A.   Yes.

11     Q.   Of 2015.

12     A.   Let me think.  I would say around eight,

13  nine hours of content per day.

14     Q.   And how many days a week?

15     A.   A lot of weeks seven days a week.

16     Q.   And now I'm going to ask you, in your role

17  as corporate representative, has that been consistent

18  since before the events that led to this lawsuit in 2012

19  occurred?  In other words, was InfoWars back then also

20  producing eight or nine hours of content per day?

21     A.   You mean before I started?

22     Q.   Yeah, I'm asking you in the corporate role

23  that's been imposed upon you.

24     A.   Yes, that's been about the same.

25     Q.   Okay.  And so -- and that's so if we were to

1     think about that -- well, let's back up.

2              Alex Jones, how many hours per day is he

3     on the air?

4          A.   At least four hours a day.

5          Q.   How many days a week?

6          A.   On average seven days a week.

7          Q.   Okay.  And so, if we did some math, do you

8     have an estimate of about how many hours he would be on

9     the air in any given week?

10         A.   Some weeks it's busier than others because

11    during very busy times, like the election, the midterms,

12    I mean he is on air 24/7.  So, it's just -- it's very

13    hard to estimate.  But I would say it's a lot.

14         Q.   So, if we did four times let's say six, that

15    it would be 24 hours a week?

16         A.   I would say so.

17         Q.   Plus there's other coverage, as well.

18         A.   Yes.

19         Q.   Now, we've gone through the videos or at

20    least clips from the videos in this case.  And do you

21    recall the years that they spanned?

22         A.   These videos on the list, yes.

23         Q.   Feel free to look.

24         A.   Starting 2012 into 2017.

25         Q.   And based upon your knowledge of how many

1   hours per week per year and about how many hours of

2   video here, is it fair to say that Alex Jones devoted

3   more or less than one-half of one percent of the total

4   time of InfoWars coverage at Sandy Hook?

5           A.   In my opinion, less.

6           Q.   Less than half of total -- of one percent of

7   total air time.

8           A.   If I had to estimate, yes.

9           Q.   What are your job responsibilities now?

10          A.   Well, to make it easy I put it just -- I

11   would say think of a general contractor, they're just

12   responsible for making sure the people who are tasked

13   with their job are doing their job.  So, I oversee that

14   the production is started off right, that everything is

15   technically going correctly during the broadcast, that

16   Alex gets everything he needs.  If I need to delegate

17   something to happen I will do that but -- if I find the

18   right person to complete that job.  If something is

19   required of me to do, I will do that, as well.  I

20   coordinate guests.

21          Q.   Do you prepare a script for Mr. Jones?

22          A.   Never.  Absolutely not.

23          Q.   Does anyone prepare a script for Mr. Jones?

24          A.   Absolutely not.

25          Q.   Is there ever a script for any of his shows?

```
 1          A.   No.

 2          Q.   Does anybody have really any idea what

 3     granularly is going to occur on the show?

 4          A.   No, not ever.

 5          Q.   Is that -- would you describe that as part

 6     of the appeal of the Alex Jones show?

 7          A.   Absolutely.  I think that's why -- and it

 8     was also part of my appeal when I tuned in the show on

 9     the rare occasions that I had before I started working

10     there and why I actually wanted to work there, because

11     it seemed like just kind of a fun place where people

12     aren't -- their shoulder isn't being looked over and

13     they're allowed to be creative, to express their

14     opinion.

15               What was the question?  I'm sorry.

16          Q.   The question was whether it's part of the

17     appeal of the show that it's unscripted.

18          A.   Yes, I believe so very much.  That's why

19     people tune into it, because it's so much different than

20     a lot of the established media out there that people are

21     used to.

22          Q.   Is the entire show devoted to mass casualty

23     events and school shootings?

24          A.   No, absolutely not.

25          Q.   Do you all cover UFOs?
```

1          A.    I don't remember the last time we covered

2    that, no.

3          Q.    But has Alex covered UFOs and --

4          A.    Maybe occasionally.

5          Q.    How about David Icke's lizard people idea?

6          A.    Alex makes fun of David for that.

7          Q.    And can you tell us some of the -- has he

8    covered issues related to the effect of groundwater on

9    the breeding habits of frogs?

10          A.    Repeat that question?

11          Q.    Did he do a segment that talked about how

12    the plastics that were in water were affecting the

13    breeding habits of frogs so that they would not

14    reproduce?

15          A.    Yes, he's done segments on that and they've

16    become, I mean, very popular on internet.  So, he's gone

17    back to it and, you know, shown studies from Berkley,

18    videos from professors, again from Berkley University,

19    showing how the frogs have morphed their original sex

20    and became the opposite sex due to the chemicals in the

21    water.

22          Q.    And does he occasionally appear on his show

23    in costume?

24          A.    Yes.

25          Q.    And does he paint his face?

```
 1        A.   Yes.

 2        Q.   And on occasion does he act like a wrestler

 3   on his show?

 4        A.   Yes.

 5        Q.   And rip his shirt off.

 6        A.   Yes.

 7        Q.   And do people find it amusing?

 8        A.   They do.

 9        Q.   Would you say that everybody who tunes into

10   the Alex Jones show tunes in because, you know, they

11   love everything he has to say?

12             MR. BANKSTON:  Objection.  Speculation.

13             THE COURT:  Sustained.

14   BY MR. REYNAL:

15        Q.   As part of your job as a production

16   assistant have you had occasion to get to know members

17   of Alex Jones' audience?

18        A.   Yeah, we have people call in, make

19   conversation with a lot of people, go to -- if there's a

20   rally or event he goes to his listeners go there, too.

21        Q.   And does everybody who call in agree with

22   everything that Alex says?

23             MR. BANKSTON:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25   ///
```

BY MR. REYNAL:

    Q.   From a production standpoint, would you say that part of Alex's show is appealing to people who love to hate him?

        MR. BANKSTON:  Objection.  Leading, Your Honor.

        THE COURT:  I think you could do a better job not leading a witness who works for your client.

BY MR. REYNAL:

    Q.   What would you say is, if you described as a production person, the type of audience that's out there, what different types of segments of people are watching the show or listening to it.

    A.   Well, I can tell you personally that a part of my duties is to take calls, and I hear it all.  A lot of people call in, diehard Alex's fans, they want to contribute information, Alex can do nothing wrong --

        MR. BANKSTON:  Your Honor, we object to the hearsay of what these people are saying.

BY MR. REYNAL:

    Q.   Without telling us what they said, can you just tell us generally what you understand from speaking to these people.

    A.   Correct.  Some people love him, some people genuinely hate him.

 1            MR. BANKSTON:  Your Honor, objection.  It

 2  still calls for hearsay.

 3            THE COURT:  Yeah, I mean it -- let me just

 4  read it.

 5            The answer is giving us hearsay.

 6  Sustained.

 7  BY MR. REYNAL:

 8       Q.   So, at some point you were asked to be

 9  a -- well, let me back up just one more.

10            Would you describe Alex's show more as

11  radio or as television?

12       A.   I would say both.  It's very

13  television-driven because we do produce --

14       Q.   You have to speak up a little bit.

15       A.   It's very television-driven because we do

16  produce imagery on screen, and it's a lot more

17  interactive for the audience.  Our guests come on via

18  video.  But I would also think it's -- I would also say

19  that it's a radio show in itself also, yes.

20       Q.   How much of the content that's on InfoWars

21  or that's -- Alex talks about, how much of that is

22  self-produced original journalism and how much of it is

23  just discussing things that are found on the internet or

24  that are trending.

25       A.   The vast majority is the latter.

1          Q.    And by the latter, you mean?

2          A.    It's taken from other sources, current

3    breaking news, articles, videos.

4          Q.    At some point you were asked to be the

5    corporate representative for InfoWars?

6          A.    Yes.

7          Q.    And when was that?

8          A.    About a year ago.

9          Q.    And do you recall as part of that being

10   asked to review certain documents that had been turned

11   over to the personal injury lawyers?

12         A.    Your question was again?

13         Q.    Do you recall being asked to review the

14   documents produced in this case?

15         A.    Yes.

16         Q.    What did you understand that to mean?

17         A.    I didn't really, because I didn't exactly

18   understand what it meant, because the amount of

19   documents is so vast.  I wasn't really pointed to

20   specific documents to review.

21         Q.    When you say the amount of documents was

22   vast, what do you -- give us a sense of scale, please.

23         A.    I think millions of emails.

24         Q.    Do people email InfoWars, and I'm asking you

25   as a corporate representative, do people email InfoWars

```
 1   frequently?
 2         A.    Every day.
 3         Q.    About how many emails does InfoWars receive
 4   on a given day?
 5         A.    Thousands of thousands.
 6         Q.    And was that as true in 2012 as it is today?
 7         A.    Yes.
 8         Q.    And how many people work at InfoWars?
 9         A.    Its entire company?
10         Q.    Uh-huh.
11         A.    I believe between 50 and 80.  Just varies.
12         Q.    And how many of those people are tasked with
13   reading this volume of emails that are coming in?
14         A.    No one.
15         Q.    Of the emails that were turned over, were
16   most of them opened or unopened by InfoWars staff?
17         A.    Most of them were unopened.
18         Q.    You've been asked about a bunch of different
19   documents earlier that had a label on the bottom.  Do
20   you know that to be what's called a Bates label?
21         A.    I'm not sure what that means.
22         Q.    Okay.  The series of digits on the bottom
23   that Mr. Bankston described, do you remember that?
24         A.    Yes.
25         Q.    Now, some of those, if you look at the
```

1    header, they do not have an InfoWars employee.

2                   MR. BANKSTON:  Objection.  Leading.  And I

3    would ask that the point for an instruction so that

4    Mr. Reynal knows what leading is.

5                   THE COURT:  Sustained.

6                   Mr. Reynal, you need to stop leading the

7    witness.  This is not an actual cross-examination.

8    BY MR. REYNAL:

9         Q.   Do you recall being asked about a

10   Plaintiffs' Exhibit 66?

11        A.   Yes.  I have it right here.

12                  MR. BANKSTON:  Your Honor, I have a quick

13   issue I was hoping I could approach on.

14                  THE COURT:  All right.

15                  MR. BANKSTON:  An objection very quickly.

16                  THE COURT:  Okay.

17                  *(Whereupon a discussion was held at the*

18   *bench off the record.)*

19   BY MR. REYNAL:

20        Q.   Earlier I asked you about how many emails

21   have been produced.  Do you recall that?

22        A.   Yes.

23        Q.   Is it fair to say that, rather than

24   millions, it was hundreds of thousands?

25        A.   Yes.

1      Q.   Now, I'm showing you this -- do you see this

2  number here?

3      A.   Yes.

4      Q.   What does that number mean to you?

5      A.   I was told that means that it was in the

6  corporate file.

7      Q.   Okay.  Do you know or can you say when

8  InfoWars received --

9      A.   No.

10      Q.   -- this document?

11      A.   No.

12      Q.   Do you think or can you say whether it was

13  before or after 2017?

14      A.   It could have been after.  Could have been

15  after, I don't know.

16      Q.   And there were -- do you recall, you were

17  asked about Plaintiffs' Exhibit 63?

18      A.   Yes.

19      Q.   Will you remind us what that is?

20      A.   That is an email from Wolfgang Halbig to

21  Scarlett.

22      A.   And do you see an InfoWars person anywhere

23  on that email?

24      A.   No.

25      Q.   Do you know how this email came into the

1    possession of InfoWars?

2          A.    I do not.

3          Q.    Do you recall around when InfoWars made its

4    production?

5          A.    2018?

6          Q.    Do you have an opinion as to when this came

7    into the possession of InfoWars or how?

8          A.    I don't know.  I don't want to speculate.  I

9    have no idea.

10         Q.    I want to go back and talk about the time

11   period between 2012 and 2013.  And the type of coverage

12   that InfoWars was giving at the time.

13               You have your list of videos in front of

14   you?

15         A.    Yes.

16         Q.    I'm going to direct you to a video called

17   "Sandy Hook Second Shooter Coverup."  It's

18   December 19th, 2012.

19               How many days after the shooting is that?

20         A.    Five days.

21         Q.    Okay.  We're going to play the video.

22               MR. BANKSTON:  The whole exhibit?

23               MR. REYNAL:  Yes.

24               THE COURT:  What exhibit number is this?

25               MR. REYNAL:  Exhibit -- Defense Exhibit 4,

1    Your Honor.

2              THE COURT:  Well, no defense exhibits have

3    been admitted, so you're not playing that yet.

4              MR. REYNAL:  Your Honor, we stipulated --

5              THE COURT:  No, it has not been admitted.

6    We had a conversation at pretrial, no one was prepared,

7    so you need to move to admit it.  You might have an

8    agreement, but I don't know about it and it's not on the

9    record.

10             MR. REYNAL:  Defense moves to admit

11   Defense Exhibit 4.

12             THE COURT:  Any objection?

13             MR. BANKSTON:  No, Your Honor.  The

14   plaintiffs have their exhibits, so we object to hearsay

15   on this one.

16             THE COURT:  So do you object or not?

17   Because you said "No."

18             MR. BANKSTON:  Yes, no, for our videos

19   we're okay.  His is hearsay.  We can use them against a

20   party for hearsay, but this is an out-of-court statement

21   of Alex Jones.  He can't use it against us.

22             THE COURT:  All right.  Here is what we're

23   going to do.  You guys are going to get to go home

24   14 minutes early and we're going to finish up this,

25   because --

1          So, all of my rules and restrictions still
2   apply:  Do not watch the news, don't go on social media,
3   don't talk to anyone about anything that's happened here
4   in this case.  Ms. Matusek-Steele is going to give you
5   the information that I was going to give you because I'm
6   going to be out here.  It's very brief.  If you have any
7   questions we can talk about it in the morning.
8          We'll see you here at 8:45 so we can get
9   started again tomorrow.  All right?  Thank you so much.
10          *(Whereupon the jurors exit the courtroom*
11   *and the following proceedings were held in open court:)*
12          THE COURT:  All right, everyone can sit
13   down.
14          All right, let's roll back first.  You
15   wanted to raise on objection about I think her answer.
16   I don't know what it was.  What was the objection?
17          MR. BANKSTON:  My -- actually, Your Honor,
18   can you allow me to consider that?  Let's table that for
19   now.
20          THE COURT:  All right.  So, now we have a
21   conversation we should have had at pretrial.  You want
22   to admit some of the videos.
23          I'm waiting for the door to shut.
24          And you want to object.  So, right now we
25   just have Defense 4.

1           MR. BANKSTON:  Okay.

2           THE COURT:  Okay --

3           MR. BANKSTON:  So, here would be my

4    objections.

5           THE COURT:  All right.

6           MR. BANKSTON:  The first objection is that

7    the video is hearsay.  It's an out-of-court statement

8    not being used against the party, right?  It's Jones and

9    I'm using it, my exhibits come in.  He can't just put on

10   extrajudicial statements of his client at length.  He

11   can't do that.

12          My second objection is that you ordered us

13   on March 10th to specifically identify any clips that we

14   wanted to play from the videos.  Partially this is

15   because for the reasons of optional completeness I need

16   to know what they're planning before and after.  There's

17   no clips.  So now we just have this full video.

18          When we got to pretrial we made an

19   agreement, and that agreement was we don't have to

20   discuss all these objections and all these things I'm

21   talking to you about now because not only did he provide

22   not provide me clips but he made the agreement that day,

23   and he made it again, that the only reason that

24   Defendants would be offering video evidence in this case

25   is for optional completeness.

1          As such, I have not had a chance to lodge

2     any of the objections or, in fact, even review the

3     things on Defendant's exhibit list, because the only

4     reasons I would ever think they would come in is if I

5     offered something with a misleading statement and he

6     identified for you a specific statement in another -- an

7     unplayed part that needed to be played to make that

8     fully understood.

9          Now, without that, and now he's talking

10    about adding in the substantive evidence, not only do I

11    have the hearsay, but he violated your pretrial order.

12    He's had my clips for months and then I was under the

13    impression we were only doing optional completeness.

14          I, almost certainly, if I need to go

15    through his Defense exhibits, am going to find loads of

16    objectionable material, things that totally violate your

17    orders.  I was never offered any opportunity to do that,

18    and he just totally violated your pretrial order.

19          THE COURT:  All right.

20          MR. REYNAL:  I couldn't disagree more.  I

21    think that Attorney Bankston is being absolutely

22    dishonest with the Court.

23          THE COURT:  Let's just focus on the issue.

24          MR. REYNAL:  We -- Exhibit 31 is a summary

25    of voluminous records that I agreed to because we agreed

1   that they were all in evidence.  That's what a summary

2   of voluminous records is.  Under the rules it has to be

3   in evidence to be a summary.  And Mr. Bankston agreed to

4   that.

5               Beyond that, we have an intentional

6   infliction of emotional distress claim here which is

7   based on the coverage that InfoWars gave to Sandy Hook

8   during the period between 2012 and 2018.  And this is

9   the coverage that InfoWars gave to Sandy Hook during

10  that period.  So, it's absolutely important substantive

11  evidence in the case that he already agreed to.

12              It's also a business record of the

13  company, if you want me to go through that dance.  But I

14  don't think it's necessary, given Mr. Bankston's earlier

15  agreement that this was all in; and it's important

16  substantive evidence in the case.

17              THE COURT:  All right.  It is not, the

18  summary, what you're calling the summary, Plaintiff's

19  Exhibit 31, was told to me is an agreed list of videos.

20  So, that is a very vague sentence, it doesn't say it's a

21  summary exhibit.  Maybe that was your understanding,

22  maybe that was your agreement.  I don't know.  It's not

23  how it was presented to me.  That's number one.

24              You have an intentional infliction of

25  emotional distress verdict, not claim.  It's already

238

1  been decided.  So, you don't get to defend against the

2  intentional infliction of emotional distress, you only

3  get to defend against damages.

4           MR. REYNAL:  Your Honor, the videos

5  themselves, Plaintiffs have been playing them for a

6  reason.  Since the beginning of this case I've been

7  saying that during this period we should just be

8  focusing on the actual damages suffered by the

9  plaintiffs.  Instead, Plaintiffs have chosen to play

10 little clips from cherry-picked videos throughout this

11 period.

12           They agreed before that these would come

13 in, and now I'm hearing for the first time that I can't

14 put them in.  They are relevant to showing the level of

15 emotional distress that the jury can infer was caused by

16 these publications.

17           MR. BANKSTON:  I mean, if you did want to

18 hear from me, Your Honor, if there was an agreement that

19 I made I think it would be put in front of you.  I think

20 there would be a Rule 11.

21           I emailed Mr. Reynal about these to say

22 that that list of videos, which is an agreed list of

23 videos that were produced in this case, all right.  I

24 have certainly never agreed to the admission of any

25 Defense exhibits.  And we went through, you'll remember,

1   we went through at pretrial what was admitted.  All

2   right.

3            I'm very disturbed about the idea that

4   they blatantly defied your order to designate what they

5   were going to play.  And that they have made the only

6   agreement we have in open court, the only one, is that

7   they will only offer evidence for optional completeness.

8   I'm fine with that.  If they want to offer things in my

9   case because they need to be to fully under something

10  that I mislead, I'm fine with that.  What I'm not fine

11  with is now being told that now we're offering

12  substantive evidence.  That was never -- that's what's

13  in violation of the agreement in open court.

14            And so, not only do I think they are

15  hearsay, and we can probably talk about that, because

16  there's hearsay in hearsay in here, right; but the fact

17  they violated your pretrial order, the fact that I did

18  everything you asked me to, you told us, show me what

19  your substantive evidence is going to be, and I didn't

20  get that, that's real disturbing to me.  They've had all

21  my evidence for months.

22            THE COURT:  Is this video one of the ones

23  that you played part of today?

24            MR. BANKSTON:  No.

25            THE COURT:  It's not.

1              MR. BANKSTON:  No.

2              MR. REYNAL:  And, Your Honor, I'm hearing

3    a lot about video clips.  It's a nine-minute video.  I'm

4    going to play the whole thing.  And beyond that, there

5    is --

6              THE COURT:  Well, here is why I asked you

7    to exchange your exhibits before trial and be prepared

8    at pretrial to go through the list.  And what I remember

9    is that when I said, okay, let's go through the

10   Plaintiffs' exhibits, we did that, and then I said,

11   let's go through these, do you have them, and you didn't

12   have them here.  I didn't have a list from you at that

13   time; you weren't ready to go through them.

14             So, the problem I have is, if we have a

15   hearsay objection to Defense Exhibit 4, I have to look

16   at it to make that decision.  I can't do it in a vacuum,

17   where you tell me what you think it says and he -- no.

18   I have to look at it.

19             So now I need the two of you to go through

20   these exhibits and tell me where the hearsay is so that

21   I can look at it before we bring the jury back.

22             MR. BANKSTON:  You know, what's

23   challenging to me, Your Honor, is that, because I was

24   given the agreement that videos --

25             THE COURT:  Are you giving me new

1    information or are you just trying to make a point.

2                    MR. BANKSTON:  No, I can't identify for

3    you in this exhibit or in 30 hours of the total videos,

4    I can't identify the hearsay.  I would have, absolutely,

5    if he had not made the agreement that we're only going

6    to play them for optional completeness.  I would have

7    done my work pretrial, you know I would have.  And I

8    can't right now, sitting here, before we bring the jury

9    back in or even by tomorrow morning certainly go through

10   all the videos.  Because I would have done that had he

11   not agreed in open court, I'm only playing them for

12   optional completeness.

13                   MR. REYNAL:  I never said that.  Beyond

14   that --

15                   THE COURT:  I mean, you did use the word

16   "optional completeness" many, many times at pretrial.

17                   MR. REYNAL:  Because I wanted to play them

18   at the time, Your Honor, instead of having to wait until

19   it was my turn.  But now it's my turn.  And the fact is,

20   we didn't review their videos, either.  When we were

21   talking about who had their exhibits, we were talking

22   about paper exhibits.

23                   THE COURT:  No, we discussed the video

24   exhibits, as well.  And you agreed to them.

25                   MR. REYNAL:  We did.  I agreed to them

 1    based on their representations and we didn't review --

 2                    THE COURT:  But that's your choice.

 3                    MR. REYNAL:  But I'm saying when Your

 4    Honor said I didn't bring them, I had the video

 5    exhibits.  It was the paper exhibits that we were

 6    talking about.

 7                    THE COURT:  Look.  You're going to have to

 8    go through the videos that you want to admit and find

 9    out if there are any that can be admitted by agreement.

10    If there are some -- I'll just give you some guidance.

11    If there are some that mention Sandy Hook, they're going

12    to be admitted.  If there are parts of videos, if there

13    are parts of videos from Plaintiff's Exhibit -- Video

14    Exhibit 1, 8, 9, 10, 12, 13, 14, 15, 16, 18, 20, 21, 23,

15    24, 27, 31, or 30 that you think are needed to show the

16    context of the part we've already seen, then you need to

17    prepare that.  And the way you do that is you prepare

18    the clip so it shows it including the part Mr. Bankston

19    showed us.  That's how you do optional completeness, you

20    do the whole thing together.  So you're going to have to

21    get that ready.

22                    MR. REYNAL:  I understand, Your Honor.

23    The videos I want to play are on Mr. Bankston's list.

24                    THE COURT:  But did he admit them?

25                    MR. REYNAL:  But they're the Sandy Hook

1     videos.  They don't discuss other things.

2               THE COURT:  Which list?  I have like eight

3     lists in front of me.

4               MR. REYNAL:  Exhibit 31.

5               THE COURT:  Okay.  This is just a list of

6     video names.

7               MR. REYNAL:  That were agreed to be the

8     videos that discuss Sandy Hook.

9               THE COURT:  They're not even all admitted.

10              MR. REYNAL:  That's what we're talking

11    about now.

12              THE COURT:  Right.  And I'm giving you

13    some guidance on how to get them admitted.

14              MR. REYNAL:  We would offer them as the

15    business records of --

16              THE COURT:  Have you filed a business

17    records affidavit?

18              MR. REYNAL:  I have a corporate

19    representative on the stand, Your Honor.

20              THE COURT:  So then you'll have to

21    question her about them.  And since all we've heard from

22    her today is she doesn't know where to find the videos,

23    she's never seen the videos, she doesn't think they keep

24    the videos, they all got de-platformed, you're going to

25    have a hard time with that.

 1                    All right.  Anything else before we leave

 2      for the day?

 3                    MR. BANKSTON:  I just want to make sure to

 4      clarify what I need to do for homework tonight.  Do I

 5      need to figure out hearsay in all their exhibits?

 6                    MR. REYNAL:  Yes.

 7                    THE COURT:  I would talk to Mr. Reynal

 8      about what he is hoping to admit tomorrow and start

 9      there.  We know D-4.

10                    MR. FARRAR:  Your Honor, can I bring up

11      one quick issue?

12                    THE COURT:  I suppose.

13                    MR. FARRAR:  Sorry to do it now.

14                    I want to be clear.  All four of us are

15      very proud of what we do.  I'm a little tired of the

16      "personal injury lawyers" stuff.  It's a direct

17      violation of Texas Disciplinary Rules sub-Preamble

18      paragraph 4.  I think it should stop.

19                    THE COURT:  I haven't heard it since

20      opening.  Has it been more?

21                    MR. FARRAR:  He did it twice today.

22                    THE COURT:  Oh.  Stop doing that.

23                    MR. BANKSTON:  Thank you, Your Honor.

24                    THE COURT:  Is there anything else?

25                    I mean, that crosses very close to the

1  line of personal attack against another counsel, which

2  you know we don't do in our courts; right?

3            MR. REYNAL:  Certainly, Your Honor.

4            THE COURT:  You agree with me or you don't

5  agree with me?

6            MR. REYNAL:  I agree.  They are personal

7  injury lawyers, but I won't call them that.

8            THE COURT:  Well, I mean, just --

9            MR. REYNAL:  They're dishonest.

10            MR. FARRAR:  That is a personal attack and

11  that is on the record.

12            MR. REYNAL:  I stood there with him and he

13  agreed to these videos.

14            THE COURT:  When, and was it on the

15  record?

16            MR. REYNAL:  It was not on the record.  I

17  took him at his word as a Texas lawyer.  I shouldn't

18  have.

19            THE COURT:  Okay.  So I can't -- do we

20  need to -- I wonder if they've already left.

21            *(Discussion between the Court and Court*

22  *staff)*

23            I think I need both of you to spend the

24  evening figuring out where you agree, where you don't

25  agree, what you think you had an agreement on, both of

1  you what you think you had an agreement on, and

2  rereading the Standing Order in Limine in Travis County

3  District Court cases, and rereading the Texas Code of

4  Disciplinary, or whatever it's called, the Conduct Code,

5  because, if you're going to call other attorneys in my

6  courtroom dishonest, you're going to have to back that

7  up.

8           For now, I'm going to assume this has been

9  a rough day and everyone's emotions are high and you're

10  never going to do it again and we're going to move on.

11  But I want everyone to do those three things tonight.

12           In addition to what I asked you to do with

13  the exhibits, you need to tell them which exhibits

14  you're going to try to get introduced through this

15  witness so that they can take a look at them tonight and

16  we will meet in the morning at 9:00 and go over all the

17  exhibits before we bring the jury in.

18           MR. FARRAR:  Thank you, judge.

19           MR. OGDEN:  Thank you.

20           MR. BANKSTON:  Thank you, Your Honor.

21           THE COURT:  That's it for today.

22           We're off the record.

23           (End of proceedings.)

24

25

```
 1                    REPORTER'S CERTIFICATE

 2    THE STATE OF TEXAS         )

 3    COUNTY OF TRAVIS           )

 4              I, Alicia DuBois, Official Court Reporter

 5    in and for the 459th District Court of Travis County,

 6    State of Texas, do hereby certify that the above and

 7    foregoing contains a true and correct transcription of

 8    all portions of evidence and other proceedings requested

 9    in writing by counsel for the parties to be included in

10    this volume of the Reporter's Record, in the

11    above-styled and numbered cause, all of which occurred

12    in open court or in chambers and were reported by me.

13              I further certify that this Reporter's

14    Record of the Proceedings truly and correctly reflects

15    the exhibits, if any, offered in evidence by the

16    respective parties.

17              WITNESS MY OFFICIAL HAND this, the 9th day

18    of September, 2022.

19                        /s/ Alicia DuBois
                          Alicia DuBois, CSR
20                        Texas CSR 5332
                          Exp. Date:  1/31/24
21                        Official Court Reporter
                          459th District Court
22                        Travis County, Texas
                          P.O. Box 1748
23                        Austin, Texas 78767
                          (512) 854-9301
24

25
```