# Exhibit 29

```
 1                     REPORTER'S RECORD
                     VOLUME 5 OF 9 VOLUME
 2              TRIAL COURT CAUSE NO. D-1-GN-18-001835

 3

 4   NEIL HESLIN AND SCARLETT    )  IN THE DISTRICT COURT
     LEWIS,                      )
 5                               )
         Plaintiffs              )
 6                               )
     VS.                         )  TRAVIS COUNTY, TEXAS
 7                               )
     ALEX E. JONES AND FREE      )
 8   SPEECH SYSTEMS, LLC,        )
                                 )
 9       Defendants              )  261ST JUDICIAL DISTRICT

10

11   ------------------------------------------------------

12                    TRIAL ON THE MERITS

13   ------------------------------------------------------

14

15             On the 1st day of August, 2022, the

16   following proceedings came on to be heard in the

17   above-entitled and numbered cause before the Honorable

18   Maya Guerra Gamble, Judge presiding, held in Austin,

19   Travis County, Texas;

20             Proceedings reported by machine shorthand.

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        MARK D. BANKSTON
          SBOT NO. 24071066
 5        KYLE FARRAR
          SBOT 24034828
 6        WILLIAM R. OGDEN
          SBOT NO. 24073531
 7        WESLEY TODD "WES" BALL
          SBOT NO. 24038754
 8        KASTER LYNCH FARRAR & BALL, LLP
          1117 Herkimer Street
 9        Houston, Texas  77008
          (713) 221-8300
10

11   FOR THE DEFENDANTS ALEX JONES AND FREE SPEECH SYSTEMS,
     LLC:
12
          F. ANDINO REYNAL
13        SBOT NO. 24060482
          JOSEPH C. MAGLIOLO
14        SBOT NO. 12821600
          WESTLEY WILLIAM 'WEST' MEDLIN
15        SBOT NO. 24080702
          FERTITTA REYNAL, LLP
16        917 Franklin Street, Suite 600
          Houston, Texas  77002
17        (713) 228-5900

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X
                        VOLUME 5
 2                 TRIAL ON THE MERITS
                    AUGUST 1, 2022
 3

 4   PLAINTIFF'S WITNESSES
                                                  Jury
 5                  Direct   Cross   Redr   Recr  Exam   Vol.

 6   ADAN SALAZAR        5                               5
        (Video Deposition)
 7
     BRITTANY PAZ        6                               5
 8      (Video Deposition)

 9   ROY LUBIT           7      70     103         118   5

10   MICHAEL CROUCH    126     149     163         168   5

11                                                Page   Vol.

12   Adjournment........................   170    5

13   Reporter's Certificate.................   171    5

14

15

16

17

18

19

20

21

22

23

24

25
```

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

```
1                        EXHIBIT INDEX
                          VOLUME 5
2

3    PLAINTIFF'S
     NO.        DESCRIPTION              OFFERED   ADMITTED   VOL.
4

5    51-Email                              5          5        5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MONDAY, AUGUST 1, 2022 - MORNING PROCEEDINGS
 2                  (The following proceedings were held in open
 3      court in the presence of the jury:)
 4                      THE COURT:  Who will be taking the next
 5      witness and who is the next witness?
 6                      MR. OGDEN:  Plaintiffs call Adan Salazar
 7      by video deposition.
 8                      THE COURT:  All right.  You will remember
 9      my previous explanation as to video depositions.
10                      Whenever you're ready.
11                          ADAN SALAZAR,
12      having been first duly sworn, testified via videotaped
13      recording.  Transcript of said recording has been marked
14      as a Court's Exhibit.
15                      THE COURT:  Okay.  Next witness.
16                      MR. OGDEN:  Plaintiffs call Free Speech
17      Systems by video deposition, their corporate
18      representative, Brittany Paz.
19                      THE COURT:  All right.
20                      MR. OGDEN:  Your Honor, before we start
21      Miss Paz, Plaintiffs would move Exhibit 51 into
22      evidence.
23                      THE COURT:  Any objection?
24                      MR. REYNAL:  No, Your Honor.
25                      THE COURT:  Plaintiffs' 51 is admitted.
```

```
 1                    (Plaintiff's Exhibit 51 admitted.)
 2                        BRITTANY PAZ,
 3   having been first duly sworn, testified via videotaped
 4   recording.  Transcript of said recording has been marked
 5   as a Court's Exhibit.
 6                    THE COURT:  All right.  Next witness.
 7                    MR. OGDEN:  Plaintiffs call Dr. Roy Lubit.
 8                    And, Your Honor, if we may approach.
 9                    THE COURT:  Sure.
10                    (Whereupon a discussion was held at the
11   bench off the record.)
12                    THE COURT:  All right, I'm sorry, you said
13   Dr. Luvin?
14                    MR. OGDEN:  Lubit.
15                    THE COURT:  Okay.  Is he in the hallway?
16   He's in the courtroom.
17                    MR. OGDEN:  Here he is, right here.
18                    All right.  Sir, if you'll come up here,
19   please.  No, right in front of me.
20                    Raise your right hand.
21                    Do you solemnly swear or affirm under
22   penalty of perjury that the testimony you are about to
23   give shall be the truth, the whole truth, and nothing
24   but the truth?
25                    THE WITNESS:  Yes, your honor.
```

1          THE COURT:  Thank you so much, doctor.

2   You can come have a seat here in the witness stand.

3          You'll see we have cups and water.  It

4   seems like you might be a little soft spoken, so I might

5   need you to scoot a little closer to the microphone than

6   some other witnesses, but I want you to be comfortable.

7   So we'll play with it until we can all hear you.

8          Testifying is a little different than a

9   conversation.  It's a question and answer.  So, you have

10  to let the lawyers completely finish asking their

11  question before you start your answer.  Can you do that?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Thank you.

14          And then I need you to also answer out

15  loud with words.  Sometimes people shake or nod their

16  heads and I can't get a good record for that, okay?

17          THE WITNESS:  Yes, your honor.

18          THE COURT:  Thank you so much.

19          You may proceed.

20          MR. OGDEN:  Thank you, your honor.

21                  ROY LUBIT,

22      Having been duly sworn, testified as follows:

23                DIRECT EXAMINATION

24  BY MR. OGDEN:

25      Q.   Dr. Lubit, will you please introduce

1    yourself to the jury.

2         A.    I'm a psychiatrist.  I'm board certified in

3    psychiatry and neurology, I'm board certified in child

4    and adolescent psychology and in forensic psychology.  I

5    trained at -- went to medical school at NYU, did my

6    psychiatry residency at Yale, and then child and

7    adolescent psychiatry at Boston Children's.

8              I then did a two-year fellowship in

9    advanced psychotherapy fellowship.  Following that, I

10   actually started becoming involved with political

11   psychology, which is studying certain areas, such as

12   terrorism and leadership.  And I eventually earned a

13   Ph.D. while I was doing psychiatry during the summers

14   and in the evening, doing a lot of on-call work.

15             And then, um, because of writings I had

16   done and learned about organizational behavior, I was

17   hired by PricewaterhouseCoopers for two years to do

18   organizational consulting.  During those two years my

19   contract forbid me from doing anything else, so those

20   two years I didn't do psychiatry, but I did up until

21   then and after.

22             Then I went back and did a forensic

23   psychiatry fellowship at St. Vincent's Hospital, which

24   is in the lower part of Manhattan, and it's the largest

25   hospital anywhere near Ground Zero.  And I happened to

1    be there at 9/11.  And my superior just happened to be

2    the world expert on children's trauma, and so I did a

3    great deal of -- I learned a lot, a lot of opportunities

4    came, a lot of training was brought in.  And then I

5    spent a year there as an assistant professor and then I

6    was hired away by Mount Sinai because of my experience

7    with emotional trauma and they wanted me to teach what I

8    had learned.

9              Then after that -- so, it took around

10   2004, I primarily have been in private practice, see

11   some patients, do a fair amount of forensic work, do a

12   fair amount of writing.

13        Q.   Dr. Lubit, have you ever been deemed an

14   expert in a courtroom before?

15        A.   Yes, I have.

16        Q.   How many times?

17        A.   A hundred, 200.  I'm not sure the numbers.

18        Q.   You mentioned the support that you gave

19   during 9/11 dealing with adults who experienced a

20   traumatic event.  Can you tell us a little bit more

21   about what you did.

22        A.   I spoke to many, many adults, did, you know,

23   brief work with them afterwards, did evaluations.  Um.

24   Supervised others who were doing therapy with victims.

25        Q.   When you -- earlier you said clinical

1   psychology.  Does that mean you see patients currently?

2       A.   Psychiatry.

3       Q.   Psychiatry, I apologize.

4       A.   Yes, I do have therapy patients.

5       Q.   When you take forensic cases like this one,

6   do you take both plaintiff and defense cases?

7       A.   Roughly equal amounts of plaintiff and

8   defense cases.  And a fair amount that I turn down.

9       Q.   Have you ever been brought onto a case and

10  given a court an opinion that was actually negative to

11  the party that hired you?

12      A.   Yes.  I try to turn down the case if I think

13  that my opinion is likely to go against them.  But there

14  are times where I am not able to make that

15  determination, then I render an opinion sometimes that's

16  against the people that retain me.

17      Q.   Are you paid for your work in forensic

18  psychiatry?

19      A.   Yes.

20      Q.   And you're being paid today; correct?

21      A.   Yes.

22      Q.   What are you being paid?

23      A.   The contract, I believe, was for 650 an hour

24  originally.

25      Q.   How many hours, roughly, have you spent on

11

1    this case?

2         A.    I'm not sure.  I had expected it was going

3    to be 30, I know that I had ran the numbers, 30 hours

4    for the two cases, basically.  And then, since I didn't

5    testify on Friday, I've been here through the weekend

6    and I asked you if there would be some compensation for

7    that and you said yes.  I didn't ask you how much.

8         Q.    Were you able to come to opinions in this

9    case?

10        A.    Yes.

11        Q.    And when you -- in coming to your opinions

12   what did you review and rely on?

13        A.    I did multiple interviews of the two

14   plaintiffs in the case.  I spoke with Dr. Crouch, who

15   has done therapy with Neil Heslin since 2013 and saw

16   Scarlett more recently for about ten sessions.  I've

17   seen various videos, I watched three videos of Neil

18   Heslin testify -- speaking on the air, one in 2012, one

19   in 2017, and one in 2022.  Those are -- I reviewed their

20   depositions that they had given in this case.

21        Q.    Did you review their records from

22   Dr. Crouch?

23        A.    No.

24        Q.    Is that common, for you to form opinions

25   without actually looking at the records?

1       A.    Most of the time I just speak to therapists.

2   I found that the records are generally illegible and

3   often don't say as much as the therapist can say to me.

4       Q.    And how much were you able to communicate

5   with Dr. Crouch about Neil and Scarlett?

6       A.    We spoke a fair amount of time, a couple of

7   times during the last few days.

8       Q.    Did you do any independent research?

9       A.    Yes, well, it's complicated.  For the last

10  few years I've been working on two papers.  One is on

11  the impact on forensic evaluation of emotional trauma,

12  which is a rewrite of a paper from 20 years ago done

13  with a professional before who was an expert.  And the

14  paper is essentially done, I just have to do last-minute

15  editing and hopefully it will go out the next couple of

16  days.  It would have been out this weekend, but.

17             And also important was a paper on betrayal

18  trauma that is finished.  It's a review of betrayal

19  trauma.  And it's basically what happens when people,

20  who you expect to support them or be fair to you, either

21  fail to do so or do negative things, give what are

22  called negative social support.  Invalidation sometimes

23  is the most common, and sometimes, you know, victim

24  blaming.

25             And there's a lot -- very large literature

1    on that at this time and I reviewed it, and a lot of the

2    things that I'm probably going to talk about today come

3    from that research.

4         Q.   I want to talk about the specific facts of

5    this case now.

6              Do people heal from the loss of a child

7    typically?

8         A.   It depends what you mean by healing.  Do

9    people ever -- does the pain ever stop, does there ever

10   cease to be a bit of a hole in one's heart?  No.  Is

11   there going to be sadness around the holidays and times?

12   There's going to be.  But.

13             It's a pretty traumatic event, to say the

14   least, to lose a child, it's completely against nature

15   and our expectations and usually our hopes go into our

16   children.  When they die it's a terrible loss.  And

17   people will often then have -- maybe have posttraumatic

18   stress disorder or major depression.  They're going to

19   have symptoms.

20             Usually after a few years people are able

21   to move on to a degree.  They're able to enjoy things

22   again, they're able to find pleasure in life.  They

23   can -- often have withdrawn at first, now they're able

24   to do things with people, their sleep will improve,

25   their concentration will improve, they won't be

1    obsessing or ruminating about the loss all the time and

2    hopefully also -- and in general they'll also start

3    being able to focus more on happen times they had

4    together.

5              So, you know, if you get a wound, it

6    heals, but you have a scar.  It's healed largely and

7    you're able to get on with things again but there's

8    still a scar that may be annoying at times.

9         Q.   And you mention the symptoms that people

10   experience when they lose a child.  What affects the

11   severity of different types of symptoms?

12        A.   The severity of all traumas, all emotional

13   traumas, depends tremendously on negative -- how much

14   positive social support versus negative social support.

15             I remember hearing this many years ago and

16   I was sort of surprised and a little bit shocked to hear

17   that the magnitude of the trauma is often less important

18   than the amount of social support, but there's now

19   plenty of literature showing that.

20             And even supporting it more, there are --

21   there's very specific trauma-focused therapy.  More

22   recently, people have tried interpersonal therapy, which

23   does not focus on the trauma at all, it's on

24   strengthening the person's social connections to other

25   people, and it works as well as trauma-focused therapy.

1              And how someone --

2        Q.   Let me stop you there, sorry.  You used a

3  couple of terms that we might not understand.  I know I

4  don't exactly.  But you started with positive social

5  support.  Tell us what that is.

6        A.   Positive social support is feeling that

7  other people care and are concerned about you, and

8  empathize or sympathize for what you've been through.

9  And also it's found that the emotional part is more

10  important than doing concrete things for them.

11        Q.   I want to apply that to why we're here

12  today.  Can you give us some examples of the positive

13  social support that Neil and Scarlett initially received

14  after the murder of their son Jesse?

15        A.   Obama came down to -- across to Newtown,

16  Connecticut.  There were vigils.  There were many, many

17  people at the funeral.  That's showing sympathy, showing

18  concern, helping people to not feel alone with a

19  terrible loss.

20        Q.   So, positive social support doesn't just

21  come from your loved ones or your close friends but can

22  also come from society as a whole?

23        A.   It can come from society as a whole.  It

24  often comes from, you know, officials, people with

25  power.  It's -- there's a sliding negative social

1   support, how a doctor and how the police treat a rape

2   victim has a tremendous impact on how that person does.

3   And --

4          Q.   Tell us a little bit more about what you

5   mean.

6          A.   There -- again, there's very strong

7   literature that, unfortunately, doctors and police often

8   ask invalidating questions of people who have been

9   victimized, people who have been raped, and say things

10  that are somewhat shocking, such as, you know, didn't

11  you want it, or look how you were dressed, you caused

12  this to happen.

13              And so, victim blaming or, are you sure it

14  was rape, are you sure, you know, you weren't interested

15  and now you're changing your mind, that would be

16  invalidation that they have been harmed.  And that does

17  tremendous damage.

18         Q.   And you mentioned invalidation.  Is that a

19  type of negative social support?

20         A.   Yes.

21         Q.   Tell us a little bit more about what

22  negative social support is.

23         A.   There's a -- one can have a hierarchy, from

24  minimizing how significant it was, oh, it's no big deal,

25  they'll get over it; to, you know, it didn't happen, no

1   one did anything wrong to you; to vilification, victim

2   blaming.

3           And the only thing above that is actually

4   punishing the victim.  You know, saying -- going to the

5   point of saying, which I've seen, you know, you filed --

6   putting someone -- arresting someone because they

7   allegedly filed a false police report saying that they

8   had been raped.

9       Q.   Tell us the difference between invalidation

10  and vilification.

11      A.   Invalification [ph] is saying it didn't

12  happen or it's not a big deal, whereas vilification is

13  blaming the person, is saying that they're a bad person;

14  that they did something terribly wrong and perhaps --

15  and they deserved it or for other reasons that they're a

16  bad person.  It's attacking the person.

17      Q.   So, can negative social support start as

18  invalidation and invalification and then morph into

19  vilification?

20      A.   Yes.

21      Q.   Tell us how that happens.

22      A.   Well, going back to the example of a rape

23  and the policemen, if they start questioning what

24  happened and was it really what you're saying, and then

25  they go ahead and file charges against the person

 1    because they don't believe it was a rape and they file

 2    charges against them, and one case I had they put it on

 3    the internet that this woman was arrested for filing

 4    false charges when she, in fact, had been raped.

 5         Q.   Invalification and vilification are both

 6    subsets of negative social support; correct?

 7         A.   They're negative social support, yes.

 8         Q.   Can you tell us some of the examples of

 9    negative social support that Neil and Scarlett received

10    following the murder of their son Jesse?

11         A.   Saying that it didn't occur is negative

12    social support.  And it really sets up all sorts of

13    triggers in the brain and increases the pain.  Going and

14    saying that they are crisis actors, the children were

15    killed by the CIA, and that, you know, they had criminal

16    intent, this is vilification.

17         Q.   Does that invalification -- am I saying that

18    correctly?

19         A.   Invalidation.

20         Q.   Invalidation, vilification.  I knew I was

21    messing up one.

22              Is the invalidation, is that just doubting

23    someone's feelings?

24         A.   It's not just doubting their feelings.  I

25    mean, doubting that it occurred and, I mean, one can --

1    it's more on the borderline of saying that, you know, it

2    didn't occur, somewhat it's vilification because it's

3    saying they're lying.  It's saying that they're not

4    telling the truth.

5         Q.   I'm sorry, can you speak up just a little

6    bit?  I can't hear.  Sorry.  You can pull that closer.

7         A.   It's a hazard of my profession, I've learned

8    to talk softly.

9         Q.   There you go.

10        A.   It's, I mean, I think that denying that the

11   event occurred is -- I mostly think of it as

12   invalidation, but saying the person is lying is sliding

13   to vilification and to more directly say that they're

14   lying or they're crisis actors or they're -- criminal

15   intent, that's straight vilification.

16        Q.   During your review and coming to your

17   conclusions, did you find instance -- specific instances

18   of vilification that were made against Neil and

19   Scarlett?

20        A.   Well, there were, you know, the videos that

21   have been shown here on Friday when I was here, the

22   statements that they were crisis actors with criminal

23   intent and they were trying to take people's guns away

24   and, et cetera, this was vilification.  It was an attack

25   on them.  And it led people to then confront them.

1           And Neil Heslin had a bullet shot at his

2    home, at his car.  They've both -- they've gotten phone

3    calls with threats.  Scarlett also has been confronted

4    and is very anxious.  Neil was telling me that, you

5    know, on many occasions, dozens of occasions, people

6    have come up to him and started challenging him about

7    his claim that this actually occurred.  He's been

8    shoved.  This is all pretty frightening.

9           Q.   What's more significant, positive social

10   support, or is that outweighed by negative social

11   support?

12          A.   The research, unfortunately, it's

13   unfortunate, but the research shows pretty clearly that

14   negative social support is much more powerful than

15   positive social support.  And I think we all experience

16   that in some ways or we've seen it.

17               If a child has, you know, loving parents

18   and good friends and teachers like him but someone at

19   school, one, two kids start teasing him, hassling him,

20   assaulting him, he's probably going to feel pretty

21   badly.  And all the, you know, the love from his parents

22   and friends and teachers is still valuable, but he's

23   very likely to feel pretty badly and worried and scared.

24          Q.   And when we're dealing with the different

25   types of social support, which one lasts longer?

1         A.   Well, it depends.  I mean, in terms of Neil

2    and Scarlett, the, you know, Obama was there for a day.

3    The vigils, the funeral is there for a few days.  And --

4    but in time that stops.  And then the negative

5    statements about them -- about it not happening and them

6    lying went on for years, and after 2017 it greatly

7    increased with more direct attacks on Neil.

8         Q.   And is this positive and negative social

9    support, is that backed by research?

10        A.   Yes.  Yes.  Absolutely.

11        Q.   Tell us a little bit about that.

12        A.   There's research that -- looking at people

13   after traumatic events and how people treated them and

14   how they did afterwards.  There were a number of studies

15   I've seen, I can't quote the details of the studies at

16   this time.

17        Q.   Now that we know that Neil and Scarlett both

18   experienced negative social support, I want to talk

19   about how it affected them, and we'll start with Neil.

20             But, before we do that, did Neil and

21   Scarlett experience different impacts in their lives

22   from negative social support?

23        A.   Did they -- different types of negative

24   social support or different impacts on their functions?

25        Q.   Did it affect them differently?

```
 1          A.    There were some differences but there are a
 2   lot of similarities.
 3          Q.    Okay.  Tell us about the similarities first.
 4          A.    They both have a very strong concern about
 5   the damage to the memory of Jesse, to Jesse's legacy.
 6   And that's a major similarity and driving force for
 7   them.  They also carry a great deal of anxiety about
 8   being killed.
 9                Scarlett I think talks about it a bit
10   more, just that she's constantly anxious.  A car will go
11   by down the street, just drive down the street, she gets
12   nervous.  She has a fairly sophisticated surveillance
13   system and multiple weapons that she sleeps with.
14          Q.    And are all of those directly related to the
15   effects of the negative social support that she's
16   received since the murder of her son?
17          A.    Yes.
18          Q.    Is it common -- you mentioned that Scarlett
19   talks more about it.  Is it common for females to be
20   more open and sharing the effects that they're having
21   internally, versus when a male has to do it?
22          A.    Absolutely.  And there are differences
23   between individuals in the same gender but, in general,
24   women are a little bit less used to physical threats.
25          Q.    You and I both have a relationship with Neil
```

1    and Scarlett.  They're different types of people.  Neil

2    is more inclined to close up and not share, versus

3    Scarlett is okay opening up and sharing her feelings;

4    correct?

5         A.   Yes.

6         Q.   You talked about Scarlett and some of the

7    specific effects that she has.  I want to talk about

8    Neil and some of the specific ones that he has.

9         A.   There's a lot more to stay about Scarlett.

10   I can do it later, but at some point I think there's a

11   lot more than what I just said.

12        Q.   Before we -- before we get into -- actually,

13   go on a little bit about Scarlett.

14        A.   Okay.  For the past three years, Scarlett

15   has been having episodes in which she sort of spaces

16   out, doesn't know where she is, what's going on around

17   her, can't think, can't function.  She said that she has

18   frozen on stage in these episodes and had to be walked

19   off.  She said it's happened on conference calls and she

20   said she closed the computer.

21             And I asked her, well, why didn't you just

22   press the button for or the tab for turning the video

23   off?  And she said she wouldn't be able to do that.

24   It's she can't think at those times.

25        Q.   What is it called when someone starts having

1  that?

2      A.   Well, it could be various things.  In her

3  case I believe, to a reasonable degree of medical

4  certainty, she's dissociating.

5      Q.   What is dissociating?

6      A.   Dissociation is a sign -- is a defense

7  mechanism against extreme distress and usually comes

8  with PTSD or caused by traumatic incidents.  And it's a

9  complex mechanism that's quite hard to understand, I

10 don't -- it doesn't quite make sense to me, but we know

11 it happens.

12          You know, I assume all of us in this

13 courtroom know who we are, where we are, and what our

14 history is.  In dissociation, those three mental

15 functions split apart.  So, at the most extreme we have

16 multiple personality disorder.  Not quite as severe is

17 our fugue states, in which people for hours to months

18 potentially, weeks, could function and they can drive

19 their car, they can do things, but they may not remember

20 who they are or anything about their history.  And I --

21     Q.   I want to ask, the negative support that's

22 causing all of these things to Scarlett, is that

23 stemming from the conduct of Alex Jones and his company?

24     A.   Yes.

25     Q.   Now, I want to talk about Neil, because you

1    said that they were experiencing differences.

2         A.    I have not heard about Neil dissociating.

3         Q.    Correct.

4              Tell us what you have heard about Neil.

5         A.    Neil has many symptoms.  One thing I found

6    that's striking, when I looked at the videos of him

7    speaking six days after the tragedy, 2017 at some point

8    and 2022, and how he's behaved with me, which is like

9    what I saw in the 2022 video; and he showed emotion in

10   2012 and 2017 that was sadness, you can see there was

11   feeling there, there was -- you had a sense of a person

12   there.

13             In my interactions with him frequently and

14   in the video in 2022, he was sort of almost

15   expressionless, looking up much of the time, not making

16   eye contact, it didn't seem like he was making eye

17   contact with whom he was being interviewed by.  And

18   facial muscles were pretty flat and the voice was flat.

19   And I asked him about this and he said that the emotions

20   are all drained out of him.

21        Q.    Is it common for you to be able to see the

22   toll that negative social support has on a person?

23        A.    Well, as a psychiatrist, yes.  But in terms

24   of -- it was striking to me, I have rarely seen someone

25   have that huge a change in the way they present, where

1    they're just so overwhelmed that they stop feeling.

2         Q.    Earlier you told us about the betrayal

3    trauma.  Is what is happening to Neil and causing that

4    change, is that considered the betrayal trauma?

5         A.    I would, I consider it, you know, an aspect

6    of type of betrayal trauma.  It's not done by an

7    authority or someone you know, but there's a line of

8    research called "institutional betrayal" and so, even if

9    you don't know the people -- if, for example, if someone

10   is assaulted, raped, and they feel that the institution

11   had done all that it could to protect them and prevent

12   this, make it easy to report it, they will have less

13   severe symptoms than if they feel the organization

14   didn't do things to support them; that it wasn't easy to

15   report; that people didn't treat them that well when

16   they reported it; and that they didn't have call boxes

17   put around campus.

18        Q.    Can you tell us what specific things

19   happened to Neil to cause that reaction?

20        A.    I think the anxiety drains us.  There's a

21   term that's important in medicine called allostatic

22   attrition, which is that after long periods of stress

23   our ability to deal with stress goes down.  You know, we

24   see that some people don't develop PTSD until months

25   after an incident.  In almost all cases they have

1    symptoms at first but the symptoms get worse in time

2    because their ability to handle it just get more and

3    more exhausted emotionally.

4        Q.   So, you mentioned PTSD.

5        A.   Yes.

6        Q.   What is PTSD?

7        A.   Posttraumatic stress disorder is one of the

8    things that can happen after an emotionally traumatic

9    event.  Many people just become depressed, many people

10   develop anxiety disorders.  Many people meet many but

11   not all of the symptoms of PTSD.  After the World Trade

12   Center, there were roughly equal amount of people who

13   developed an anxiety disorder, depression and

14   posttraumatic stress disorder.

15             So, it's important to remember that, just

16   because you don't meet the diagnostic criteria for PTSD

17   does not mean you're right by all means.  It's used to a

18   large extent for research, they have a fixed set of

19   symptoms and they can do studies on people on what

20   causes it, on what works in terms of treatment.

21       Q.   Do Neil and Scarlett have --

22       A.   Oh, but in terms of -- I talked around it so

23   far.

24       Q.   Sure.

25       A.   There are several things that you need for

 1   the diagnosis.  Unlike most mental disorders, you need a
 2   particular type of cause, which it currently is defined
 3   as being exposed to a threat of serious injury or death,
 4   or sexual violence.
 5              And then there are a number of symptoms.
 6   You need one or more symptoms of intrusive
 7   recollections.  This could be nightmares; this could be
 8   experiencing locked distress, when there are reminders
 9   of what happened; this could be flashbacks, in which you
10   feel as if it's occurring again; and/or could be that it
11   keeps coming to mind when you don't want it to come to
12   mind.  Then you need a symptom of avoidance, which could
13   be avoiding thinking or talking about it or avoiding the
14   place.
15              So, then you need two or more symptoms of
16   negative alterations in mood and cognition.  And these
17   include feeling irrational guilt or irrational blame for
18   someone or having many -- there's four commotions, a lot
19   of anxiety or depression or both, much harder time
20   enjoying things, withdrawing from activities and people,
21   feeling cut off from people, detached.
22              It can also be much more negative feelings
23   about the world or yourself, and also not remembering
24   part of what happened, which you think you should
25   remember.  And that usually indicates that there's some

```
 1    dissociation occurring.
 2                And finally, there are trauma-based
 3    changes in arousal and reactivity, which are decreased
 4    sleep problems, concentration problems, irritability,
 5    increased startle reaction, and being on edge.
 6         Q.   So, to diagnose someone with PTSD they have
 7    to have a number of different signs, symptoms --
 8         A.   Yes.
 9         Q.   -- experiences.
10         A.   Yes.
11         Q.   I want to start -- I want to make them
12    individual, because Neil and Scarlett have been affected
13    differently.
14                Does Neil have PTSD?
15         A.   Yes.
16         Q.   Does Scarlett?
17         A.   Yes.
18         Q.   Okay.  Tell me how you determined Neil has
19    PTSD?
20         A.   They also both have -- they're also quite
21    depressed.
22                Neil, is -- he's thinking, both of them
23    are, it's on their mind all the time.  What's on their
24    mind is not the death of their child, what's on their
25    mind is the threats, the attacks, the verbal attacks on
```

 1   their son by denying that he existed, by denying this

 2   had occurred to him, attacks on them as being -- as

 3   lying, deceiving the public.  They both try to avoid

 4   thinking about it and talk about it to the extent they

 5   can.

 6              And avoiding doesn't mean that you never

 7   did.  It means that, unless it's an important reason,

 8   you try to avoid it.  So, going to trial doesn't mean

 9   that you don't have PTSD.

10        Q.   Sure.

11        A.   But it's quite painful to do it.

12              I can't -- at this moment I'm forgetting

13   which one told me that they avoid Newtown completely.

14              In terms of, you know, altered level of

15   arousal, they both have sleep problems.  Scarlett wakes

16   up multiple times a night, she used to sleep very well.

17   Neil said that, you know, after the death of his son he

18   was getting two to four hours a night and now he's

19   getting less than two hours a night.

20              Both talked about concentration being

21   down.  Scarlett said that, other than the work she's

22   doing, and the amount of work she's doing is a problem,

23   it's a defense against the pain, she can't look at a

24   book and read it for any length of time.  Concentration

25   is not there, she's scattered.

1      Q.   You said this all -- you said that that all

2    stems from being exposed to a threat?

3      A.   Yes.

4      Q.   What's the threat in this case?

5      A.   The -- the physical and psychological.  The

6    statements that -- the attacks on their reputation, the

7    attacks on them as people, that they're lying, the

8    attack on Jesse's memory, the claim that he didn't exist

9    or he wasn't killed, attack on his legacy, of who he

10   was.  And he was a remarkable young man, little boy, six

11   years of age, and what he did is not what little boys

12   do.  He was quite a young special person.

13            And those, both the pain of denial and the

14   attack, Neil talks more about the attack on his

15   reputation and ability of people to trust him and think

16   well of him than Scarlett does.  But the anxiety,

17   Scarlett has -- by her bedside she has a gun, she has a

18   knife, she has pepper spray, you know, she put in a

19   security system.  She's very, very -- she's constantly

20   worried about her safety.  And Neil also is constantly

21   worried about his safety.

22     Q.   When Scarlett and Neil wake up, do they live

23   in fear?

24     A.   Yes.  It's throughout the day.

25     Q.   You were in the courtroom on Friday when

1    Miss Lewis testified.  She was the expert in what

2    sounded like the entire internet.

3            A.    Yes.

4            Q.    Do you remember that?

5            A.    Yes.

6            Q.    Did the fact that billions of people were

7    reaching this type of material, these messages from Alex

8    Jones, did the size of it, does that impact Neil and

9    Scarlett?

10           A.    Yes.  I don't know if the people outside the

11   U.S. matter to them that much, but certainly within the

12   United States.  That they talk about the -- both of them

13   have withdrawn from people.  Scarlett used to have large

14   dinner parties and enjoyed that, and now she doesn't

15   want someone in her house.  She stopped the dinner

16   parties.

17               She, both of them, talk about how -- not

18   knowing when someone is going to bring this up.  Neil

19   has been -- again, he said dozens of times people

20   confronted him, sometimes shoved him.  Friends will ask

21   him, you know, what about this Alex Jones stuff, is that

22   true what he's saying?  And this is very painful.  And

23   for one thing, it's a traumatic trigger to the loss of

24   their son, but it's a traumatic trigger to all these

25   people and to their reputation is being damaged.

1          Q.    When Mr. Jones's message finds its way to

2    Neil and Scarlett, it doesn't make them relive the

3    murder of Jesse --

4          A.    No.

5          Q.    -- it causes them a different pain; right?

6          A.    On some level it may remind them and trigger

7    them.  And I think that what has happened is that they

8    were both healing quite well and then this new trauma

9    reversed a lot of the healing that had occurred.  And

10   this does happen at times, something happens that just

11   undoes the healing, the progress.  And so now they're

12   struggling both with constant threat to their safety and

13   more trauma from -- than they would otherwise have had

14   from the loss.

15               THE COURT:  I'm sorry to interrupt.

16               MR. OGDEN:  Yes, Your Honor.

17               THE COURT:  I do want to give the jury a

18   morning break.  Is this an okay time?

19               MR. OGDEN:  Perfect time.

20               THE COURT:  10:24.  We'll break for

21   20 minutes.  This is just a break.  No conversation.

22   You know my instructions, they are still in place.  So

23   just a break, 20 minutes.  You may go.

24                    *(Brief recess.)*

25               THE COURT:  Mr. Ogden, you may proceed.

1    BY MR. OGDEN:

2        Q.    Dr. Lubit, before we went on break we were

3    talking about PTSD.

4        A.    Yes.

5        Q.    Are there different types of PTSD?

6        A.    Yes.  The complex PT -- Neil and Scarlett

7    have complex PTSD, which is also called DESNOS,

8    Disorders of Extreme Stress Not Otherwise Specified.

9    It's the PTSD that comes from having chronic threats,

10   being in a war zone, being an abused child, where it's

11   not one -- simply one incident, such as you're in the

12   World Trade Center, you have a car accident, someone

13   hits you in a bar.  It's constant draining threat and

14   anxiety.  And the amount of anxiety they have is

15   extremely high and constant.

16              I use the term "anxiety" because that's

17   the medical term, but it's more accurate in some ways to

18   say they're terrified.  Scarlett doesn't use the air

19   conditioner because she's scared that the noise will

20   prevent her from hearing something she needs to hear to

21   protect her safety.  She constantly works.  Middle of

22   the night she's texting her staff.

23              She's just -- she's dropped most of her

24   general activities.  She used to like to ride, she

25   doesn't.  She has a boat.  She goes out on a boat, she's

1    going to be texting people.  And the reason that she's

2    working so intensely is to block out the fear and the

3    pain.

4              This is something that happens to

5    traumatized people, I've seen it before, where it's just

6    things are so painful that you block it out by just

7    constantly making yourself busy.

8         Q.   I want to be clear for everyone.  All of the

9    fear that they're living in, all of the steps that

10   they're taking to protect their selves, all of the

11   feelings that they're experiencing in a negative way,

12   none of those are from the murder of Jesse, they're all

13   stemming from Alex Jones.  Correct?

14        A.   Yes.  They were both doing much much better

15   before Jones started focusing and attacking much more

16   strongly, which occurred after Neil went on Megyn Kelly

17   and said, no, this actually happened, my son was killed,

18   I did hold my son with a bullet in his -- with a bullet

19   hole in his head.

20             It was kind of shocking to me that the --

21   one of the media people had said it couldn't have

22   happened, didn't think that it wasn't an inconsistency.

23   Yes, it's true that, you know, in general people did not

24   see their kids, but first thing I thought was that

25   Neil -- something was likely an exception, and I then

1  went back and asked him and he said that, you know, he

2  stayed there til midnight, after midnight, I'm not sure,

3  and that at some point a compassionate guard let him go

4  and hold his son.

5          I'm not aware if that happened to anybody

6  else, but I assumed something must have happened as

7  opposed to just saying he was lying.

8      Q.   Why would Neil have to go on national TV to

9  a giant audience to say, I did hold my son?

10     A.   Because people were denying it and they were

11 saying that he was a liar and that he was a -- doing

12 these bad things.  And he was hoping that, if he got on

13 TV, that this would stop, that Jones would stop.

14     Q.   Did Neil genuinely think that doing the

15 first interview was going to make it all go away --

16 excuse me, not the first, the interview with Megyn

17 Kelly, that this was all going to go away?

18     A.   At least decrease markedly.  Whether, you

19 know, I didn't ask him whether he thought it would all

20 go away, but he thought it was going to deal with it

21 largely.

22     Q.   And when you say decrease it markedly, it's

23 because this isn't just a small group of people;

24 correct?

25     A.   Correct.

1      Q.    This is a massive.  Millions of people.
2  Correct?
3      A.    Correct.  It's every fourth person.
4      Q.    So, roughly, we heard it throughout the
5  trial, roughly 75 million people believed some sort of
6  theory that what Neil was saying was not true?
7                MR. REYNAL:  I'm going to object to this
8  part.  He's not on expert an statistics.  I think we had
9  Miss Lewis the other day, Your Honor.
10               THE COURT:  Overruled.
11               THE WITNESS:  Yes.
12               I mean, it's the idea of walking down the
13  street and every fourth person that passes you, and you
14  don't know which one, but out of the every four people,
15  one of them likely believes that you're a liar and
16  fooling the American -- trying to fool the American
17  people and that they -- many of them, you know, shove
18  him, confront him, et cetera.
19     Q.    And this -- this is anywhere they go in the
20  country.
21     A.    Yes.
22     Q.    When you -- when a person deals with a
23  traumatic event and is suffering from PTSD, it stems
24  from a person influencing that large number of people.
25  What does that do with the severity of what Neil and

1  Scarlett are feeling inside?

2      A.   It creates a great deal of anxiety.  It

3  creates terror.  We see that in the things they said to

4  me and the precautions that I -- mostly we talked

5  about -- more about Scarlett, about her having a gun and

6  a knife and pepper spray and big alarm system, not even

7  be willing to use the air conditioner despite how hot it

8  is this summer.

9      Q.   And all these things she does every single

10 day of her life, none of them have to do with the death,

11 the murder, of Jesse; correct?

12     A.   No, no, they don't.

13     Q.   They all have to do -- they all stem from

14 what Alex Jones did to her.

15     A.   Yes, from Alex Jones stirring people up and

16 then people believing him and believing that they are

17 lying.  And trying to take away their guns.

18     Q.   You used the term "anxiety" just a second

19 ago.

20     A.   Yes.

21     Q.   That's a clinical term; correct?

22     A.   That's a term of psychiatry, yes.

23     Q.   In the courtroom today when you're talking

24 about anxiety, you're talking about the fear Neil and

25 Scarlett wake up with every day because of what Alex

1    Jones did?

2         A.   I would say it's very high levels of

3    anxiety.   Probably more in a nonclinical write-up it

4    would say they're terrified.

5         Q.   And this isn't just one instance of

6    Mr. Jones and his show spreading these lies, they were

7    confronted with different people who have seen different

8    videos or stories and that all fuels the abuse that they

9    receive; correct?

10              MR. REYNAL:   Object to the leading, Your

11   Honor.

12              THE COURT:   I'll sustain the objection to

13   leading.   But you can ask the question a different way.

14   BY MR. OGDEN:

15        Q.   What fuels the different fears when they're

16   out in the world around other people they don't know?

17        A.   That -- knowing that roughly one in four

18   people believe they're doing something terrible, that --

19   criminal, immoral, lying, et cetera, and trying to take

20   away their second amendment rights, and not even knowing

21   which one of those four people, which one of, you know,

22   you see eight people, you don't know which two are the

23   ones that despise you.

24        Q.   After experiencing that out in the world, do

25   Neil and Scarlett withdraw from society to an extent?

1          A.    Oh, tremendously.  Neil, both of them pulled

2     away from people tremendously.  Neil has withdrawn from

3     his historic friends, I think maintains phone contact

4     with a couple of people he still has contact with, but

5     much, much less social.  And I mentioned earlier,

6     Scarlett used to have large dinner parties and enjoyed

7     that.  And now she doesn't and she just doesn't really

8     want -- interacting with people when she doesn't have

9     to.  And prefers not having anyone in the house.

10          Q.    Why are Neil and Scarlett isolating?

11          A.    It's a very common thing to find after any

12     trauma, but more so if the person is scared of people.

13     But in general frequently with emotional trauma people

14     withdraw.  They feel depressed, they feel anxious, they

15     want to be alone.  It's a classic symptom of PTSD.

16          Q.    When they're dealing with the trauma that

17     Mr. Jones has caused, is that a natural feeling, to want

18     to withdraw and isolate?

19          A.    Yes.  I think it's much more intense, the

20     tendency to withdraw is much more intense when you have

21     a situation where you're scared of who out there may be

22     going after you.

23          Q.    And does literature support that?

24          A.    Yes.

25          Q.    Tell us a little bit about how.

1       A.   One of the diagnostic -- one of the possible

2   diagnostic criteria, I mentioned before one of the four

3   categories is negative alterations and cognition and

4   mood, and one of them is withdrawing from activities and

5   people.

6       Q.   Have humans evolved to react this way?

7       A.   Yes.  Much of what they're experiencing is a

8   result of evolution.

9       Q.   Tell us more about that.

10      A.   You know, people don't simply make decisions

11  based on logical instrumental reasons.  So, an

12  instrumental reason, we go to work, we want to make

13  money, et cetera, et cetera.  There's an actual danger

14  out there, so we avoid the place.  But we've been

15  programmed by evolution to be -- to want certain things

16  and to be scared of certain things.

17           For example, there are many people who are

18  terrified of spiders and snakes, and even if they're in

19  an area that doesn't have brown recluse or black widows,

20  doesn't have poisonous snakes, the person knows that

21  it's not one of those, just a common garden snake, some

22  people are terrified because our ancestors who were

23  scared of snakes were more likely to survive if they

24  were just scared of snakes and bugs and they stayed away

25  from them and they didn't get poisoned by one of the

1   poisonous varieties.

2              And similarly, our ancestors, our brains
3   are hardwired by evolution to need relationships with
4   others for a variety of reasons.  Our ancestors were not
5   going to survive on their own outside of the community,
6   they certainly weren't going to survive and have
7   children who had survived to adulthood.

8              And even within a community they needed to
9   have people think well of them, because if people think
10   well of you, they'll help you when you're in trouble,
11   they'll give you assistance, they'll treat you well,
12   they'll want to marry you, they'll want to, you know,
13   their children to marry your children.  So, those people
14   were able to bear more children that would lived to
15   adulthood.

16              If someone was disliked, not respected,
17   people would not want to marry them, marry their
18   children, treat them well, come to their aid and, in
19   fact, they might push them out of the community and
20   exile them, which would be basically a death sentence.

21              And so, even though today things are not
22   quite that dangerous, we still have that in us.  And so
23   this is where the power of negative social support and
24   of positive social support partially comes from.  And
25   there's still an instrumental value now, there's still a

1    tendency, you know, helpful and nicer, but the intense

2    amount that people seek it, the amount of distress

3    people have around damage to their reputation, which is

4    something Neil talks a particularly large amount about,

5    is sort of hardwired by evolution.

6         Q.   So, it's as if there's these hardwires in

7    our brains that developed far before any of us were

8    born.

9         A.   Yes.

10        Q.   One dealing with kind of being cut out of

11   society?

12        A.   Yes.

13        Q.   And the want to be wanted; correct?  Is that

14   what you're saying?

15        A.   Yes.

16             MR. REYNAL:  Object to the leading, Your

17   Honor.

18             THE COURT:  Overruled.

19   BY MR. OGDEN:

20        Q.   Is that --

21        A.   Yes, that's what I'm saying.

22        Q.   And it sounds like another one has to do

23   with everyone's natural feeling to want to protect the

24   reputation.

25        A.   Yes.

1          Q.   Why -- let's take those one by one.  I want
2     to start with feeling alone.  Where did that come from?
3          A.   Well, there's alone and there's isolation,
4     and they're both in the same direction.  But feeling
5     alone is scary and it's, you know, there are people who
6     have separation anxiety and many children have
7     separation anxiety, and hopefully it decreases over
8     time.  But again that's inborn in us, there's a --
9     Fairbairn said, you know, that the innate drive is not
10    for sex, it's for relationships, he disagreed with
11    Freud; and that there was very strong drive to connect
12    with people, to be around people for most people.  And
13    to not be isolated in the world.
14         Q.   Does that kind of go back to being exiled?
15         A.   Yes.
16         Q.   Exiled in the past has a different meaning
17    than the current society, but can you explain why humans
18    feel pain when they are exiled?
19         A.   If our ancestors were pushed out of the
20    community, they were exiled, they were very unlikely to
21    survive.  You know, we don't have claws and we don't run
22    that fast or have strong jaws, and they were likely to
23    be killed.  And they certainly were unlikely on their
24    own to have children that would pass along their genes.
25         Q.   Have you ever treated a patient in your

1   entire career who has had that feeling stemming from 75

2   million people in the country thinking it?

3       A.   Not from 75 million people.  Who felt cut

4   off and isolated and generally feels extremely painful.

5   But feeling that 75 -- one in four people, anywhere in

6   this country you go is going to reject you, think poorly

7   of you, despise you, could, well, you know, hassle you,

8   verbally assault you or physically assault you, no, I

9   have not seen anything like that.

10      Q.   Does that make a person -- or, excuse me,

11  let's ask this, has it made Neil and Scarlett doubt who

12  they can trust?

13      A.   Oh, completely.

14      Q.   Tell us more about that.

15      A.   Neil is withdrawn, generally talks about

16  withdrawing from friends and very much not knowing who's

17  going to say what or on the street who is going to

18  confront him.  And Scarlett stopped her business or

19  dinner parties and her socializing with people.

20      Q.   The reason we were talking about the number

21  75 million is that this case isn't the run-of-the-mill

22  case?

23      A.   Correct.

24      Q.   This is probably the largest number of

25  people questioning a single person that you've ever

1    heard of.

2         A.    Correct.

3         Q.    Are any of the questions that those 75

4    million people are asking -- or, excuse me, or the lies

5    that they're believing, are any of those related to the

6    murder of Jesse?

7         A.    Well, related in the way that Jones claims

8    that Jesse didn't die or didn't exist.  But in terms of

9    would this have happened if Jones wasn't pushing it,

10   there would be a much smaller number and there would,

11   you know, from my studies in political science, in my

12   studies in organizational behavior, very few --

13              MR. REYNAL:  Your Honor, I'm going to

14   object to an opinion on his studies on organizational

15   behavior and organizational studies.

16              THE COURT:  I think what you can do for

17   us, doctor, is just tell us about how Mr. Heslin and

18   Miss Lewis have reacted to this situation versus how

19   they would have reacted were the numbers much smaller.

20              THE WITNESS:  Okay.

21              THE COURT:  Without telling us what might

22   have caused that, if that makes sense.

23              THE WITNESS:  Okay.  Yes, Your Honor.

24              THE COURT:  So, you can go ahead and

25   answer.

```
 1              THE WITNESS:  Could I have the question
 2   again, then?
 3   BY MR. OGDEN:
 4        Q.   Sure.  The number of individuals that are
 5   doubting them.
 6        A.   Yes.
 7        Q.   That impacts Neil and Scarlett much more?
 8        A.   Yes.
 9        Q.   I want to talk about reputation now.
10   Because you mentioned that that affects Neil more so
11   than Scarlett, but it affects them both; correct?
12        A.   Yes.
13        Q.   Why is their reputation being affected?
14        A.   Because many people have been -- have come
15   to believe, you know, that they are lying; that they're,
16   you know, actors with criminal intent, that this didn't
17   happen, that they're trying to take people's guns away.
18        Q.   Excuse me.  Trying to deny them their
19   constitutional rights?  And that's all coming from Alex
20   Jones's lies?
21        A.   There would be some people who would likely
22   believe it without Alex Jones, but the vast numbers and
23   the -- and the support that people have for acting
24   strongly, the intensity of their life and their belief
25   that they should do something, they get -- people get
```

1    roused up by orators like Alex Jones.

2        Q.   How have Mr. Jones's lies actually affected

3    Neil's reputation?

4        A.   Many people challenged him.  He was shot at,

5    his house was shot at, his car was shot at.  There were

6    bullet casings found in his driveway.  There are many

7    people who clearly think very intensely, have very

8    intense negative feelings about him and are willing to

9    act on it.

10       Q.   How would Mr. Jones's lies have impacted the

11   memory that Neil has of his son's reputation and legacy?

12       A.   That's very important, too.  It's --

13   there's -- there's a desire to feel that a piece of

14   our -- that a piece of us, our legacy, lives on, that

15   there's a piece of a child that's died lives on, will

16   affect the world, had significance, made a difference.

17            And the statement that he didn't exist,

18   that he wasn't that extremely brave boy who saved nine

19   classmates, that's very painful.  It feels that his

20   legacy is being destroyed.  And we see this with many

21   people.  I mean, some people set up foundations.  Some

22   people, politicians, care about their legacy, what

23   they've done.  People give huge amounts of money to

24   institutions to get their names on the institution.

25            We're symbolic creatures, and I think it's

1    a way of trying to live on past our death.

2         Q.   Is it inherent for a parent to want to

3    protect those memories of their son?

4         A.   Yes.  It's not that common people have to

5    bury their kids, but if they do they're going to be very

6    protective of legacy as they would have -- as they try

7    to be protective of their child.  And both parents feel

8    some guilt that they failed their child; that they were

9    supposed to protect their child in this world, and this

10   is part of the irrational guilt of posttraumatic stress

11   disorder.

12              Neil had stated after dropping Jesse off

13   that day he had some phone calls to make.  He stayed at

14   the school and left I think shortly before Adam Lanza

15   arrived, and he feels if he had only stayed longer.  He

16   couldn't have known, but that doesn't change the fact

17   that the person in that position is going to feel, why

18   didn't I stay.  If I stayed, he said, I would have

19   rushed in there and it would have been me, not my child.

20              And Scarlett also has talked about just

21   the feeling she failed her child.

22        Q.   How have Mr. Jones's lies impacted Neil and

23   Scarlett's ability to heal from the murder of their son?

24        A.   Well, it's more than just interfere with

25   healing.  It has pushed them back.  It has shoved them

1    back into some of the earlier pain.  And I've seen this,

2    again, I've seen this with others, where an individual

3    is healing from a trauma, sexual assault at a restaurant

4    over -- extended assaults over a period of time, and

5    they were -- pretty much the symptoms were gone and then

6    at deposition they were badly roughed up and challenged

7    and invalidated by the defense lawyer and they fell back

8    to their original symptoms.

9         Q.    Just so we're clear, the original symptoms

10   are similar but they're different in the fact that

11   they're upset from the lies that are being told?

12        A.    Yes.

13        Q.    They're not going back to Step 1, it's a

14   different pain, it just hurts as much.

15        A.    Well, it's -- it prevented them -- reversed

16   some of their healing.  But the primary cause of their

17   trauma and stress now is not the loss of their child.  I

18   mean, I think it's -- there's some from that still, much

19   more than there would be if the lies hadn't been told.

20   But the primary thing now is they speak about, you know,

21   this terror for their own physical safety.  What they

22   obsess about is Jones.

23              Neil told me that he has nightmares about

24   Jones, not about -- I specifically asked him, do you

25   have nightmares about your son?  He said no, I have

1    nightmares about Jones and what he's done and what he

2    does.

3              So, the overwhelming cause of their pain

4    is what Jones is doing, and that's also is some addition

5    from reinvoking some of the -- damaging some of the

6    healing that had occurred in terms of their -- the loss

7    of their child.

8         Q.   And when you say some of the healing, how is

9    that affected by a new trauma that's coming in that's

10   different than a healing that you've already done from

11   one event?

12        A.   Well, having had a prior trauma

13   makes -- makes you very vulnerable, makes the individual

14   less resilient and very vulnerable to a future trauma.

15   So, it weakens the person.

16              And so, it speaks to just how overwhelmed

17   they are and how -- I don't see them healing very much,

18   ever healing fully from the Jones events.  Because

19   they -- this happened on top of someone who is already

20   weakened by an earlier trauma, the symptoms are going to

21   be worse than they would otherwise have been and they'll

22   last a lot longer than they otherwise would have lasted.

23        Q.   And you weren't asked in this case to tell

24   us why Mr. Jones decided to attack the vulnerable people

25   in this situation, were you?

1       A.   No.

2       Q.   What about the statement "Sticks and stones

3   may break my bones, but words will ever hurt me"?

4       A.   Oh, I wish it were true, but it's not,

5   unfortunately.

6       Q.   Tell us why.

7       A.   We say that to people to try to get to them

8   to step away a bit from the pain of verbal statements,

9   but the reality is that verbal statements can -- are far

10  more cutting.  We know that verbal abuse of children is

11  worse than physical abuse of children.  The magnitude of

12  the harm, the longevity of the harm is usually much

13  worse.  Because it attacks the sense of themselves, who

14  they are, what they believe about themselves, how they

15  feel about their selves, their self esteem.  And they

16  can come to see themselves as bad people and it gets

17  engrained into their self image.

18           Again, I think it goes back to, you know,

19  evolution, that we're programmed to care a great deal

20  about what others think about us.  Because those who

21  didn't would likely act in ways that would alienate

22  others and lead them to not get help, not get married,

23  kicked out of the community and not procreate.  Those

24  who did care about what others thought would mold their

25  behavior in ways and treat others in ways that would

 1   lead people to like them.
 2       Q.   We talked about Neil having to go on
 3   national television to try to get this to stop.
 4   Remember that?
 5       A.   Yes.
 6       Q.   How did Mr. Jones react when Mr. Heslin did
 7   that?
 8       A.   The attacks focused on him, became much more
 9   intense and frequent, and particularly picked him out
10   and made him much more of a target than others.
11       Q.   And that was specific to Neil; correct?
12       A.   Yes, yes.
13       Q.   They named him; correct?
14       A.   Yes.
15       Q.   As Neil started being attacked individually.
16   How did he react?
17       A.   He was scared.
18       Q.   Tell us more about that.
19       A.   He's talked a lot about his reputation,
20   legacy of his son and fear for his safety, and developed
21   multiple symptoms.  His sleep got much worse, his
22   concentration got much more, he withdrew much more from
23   people, more depressed and anxious.
24       Q.   Earlier you mentioned Neil's last memory
25   with his son.

1       A.   Yes.

2       Q.   And that's a hard memory to have, but it was

3  his.

4       A.   Yes.

5       Q.   The video that we saw last week with

6  Mr. Shroyer talking, questioning him and then saying

7  that it was impossible, what did that do to that memory

8  of Neil's?

9       A.   He feels it tarnished it; that it's, you

10  know, it's a painful memory but it's still his last

11  memory of he and his son, and it -- we are generally

12  programmed that, if people start challenging us and

13  questioning us, that no matter how sure we were about

14  something, many people would start wondering and start

15  being unsure of themselves.  And that makes things very

16  uncomfortable.

17       Q.   When a memory like that is ruined, it has

18  nothing to do with what happened to Jesse, it has

19  everything to do with what Mr. Jones and his company did

20  in response to Neil; correct?

21       A.   Yes.

22       Q.   How does Neil -- how do Neil and Scarlett

23  currently feel about their personal safety?

24       A.   They're terrified, again to the point of --

25  it's rather unusual, I've treated a thousand, 2,000,

1    3,000 people, I don't know how many in my career.  I

2    have not before heard someone with a gun and a knife

3    and, um, pepper spray by their bed, much less they can't

4    turn on the air conditioner during extremely hot weather

5    because they can't risk not hearing something they need

6    hear.

7         Q.   If they could, would Neil and Scarlett hire

8    security to be with them at all times every day?

9         A.   Oh, yes.

10        Q.   You've interacted with Mr. Heslin and

11   Ms. Lewis a number of times over the past few days while

12   you've been here; correct?

13        A.   Yes.

14        Q.   Have they hired security for this particular

15   case?

16        A.   Yes, there's quite a strong security detail.

17        Q.   Why?

18        A.   They are very, very frightened.

19        Q.   Of who?

20        A.   Someone, some follower of Jones trying to

21   kill them.

22        Q.   And is that based on the history of what's

23   happened to them by other Jones followers over the last

24   five years?

25        A.   Yes.

 1          Q.   Is it unreasonable for them to feel that

 2     way?

 3          A.   No, it's not unreasonable.  I think it's --

 4     there's a real threat.

 5          Q.   I want to talk about Scarlett.

 6               One more thing on Neil.  Neil has and

 7     continues to seek mental health treatment; correct?

 8          A.   Yes, he continues to work with Mr. Crouch.

 9          Q.   Mr. Crouch.

10               And Mr. Crouch is in the courtroom right

11     now; correct?

12          A.   Yes.

13          Q.   You have spoken with him at length for both

14     Neil and Scarlett.

15          A.   A couple of times.

16          Q.   Scarlett does not treat with Mr. Crouch

17     anymore; correct?

18          A.   Correct.

19          Q.   How much did she treat with Mr. Crouch?

20          A.   I think she saw him for ten sessions.  But

21     she's had a number of therapists, and she said that she

22     has generally been in therapy but she finds each person

23     just isn't helping her enough; that her symptoms

24     continue.  So, she's bounced from one to another to

25     another, trying to get the help.  And she said a great

```
 1   majority of the time she's in therapy but with different

 2   people.

 3        Q.   Neil and Scarlett, they don't medicate for

 4   their symptoms, for the depression or for their anxiety,

 5   for any of the traumas; correct?

 6        A.   Correct.

 7        Q.   Why?

 8        A.   Concern about the side effects, about --

 9   Scarlett in particular had said she was concerned about

10   that she wouldn't be able to be there for her son and

11   relate well, that it would cloud her thinking.

12        Q.   Is another reason why because the things

13   that are causing the depression and the anxiety are

14   still going?  A pill is not going to make crazy people

15   stop coming after them.

16        A.   Correct.

17             It's one of the well-known facts about

18   treating emotional trauma is you must be in a safe

19   place.  The first thing you do with people who have been

20   through a trauma, community disaster, whatever, is to

21   get them to a place where they feel safe.  Until you've

22   done that, you're not going to be able to accomplish

23   anything.

24        Q.   So, Neil finds it's best to deal with a

25   clinical psychotherapist like Mr. Crouch.  Scarlett
```

1    doesn't and she's not currently treating now.  What is

2    she doing to deal with this?

3            A.    I don't quite agree with that.

4            Q.    Okay.

5            A.    It's that she hasn't -- with person after

6    person she hasn't gotten the benefit she was hoping to

7    get.  And to some extent it's not surprising, because

8    the danger is still there.  And so -- and not -- it's

9    not surprising that someone that doesn't feel like

10   they're getting much out of therapy to try somebody

11   else.  But in her case I don't know who the people are

12   that she saw, it was Mr. Crouch, and what I've seen from

13   Mr. Crouch, he's very experienced and seems a very

14   knowledgeable trauma therapist, but she quit with him,

15   too.

16           Q.    What, after evaluating Neil and Scarlett, in

17   your expert opinion what would make their pain and their

18   mental anguish stop, or at least subside greatly?

19           A.    It's -- it's not going to stop.  And it

20   would subside significantly if -- I mean, if the attacks

21   stopped and people -- they kept no longer hearing that

22   this is all a farce, that it had never occurred.

23                 But also one of the -- it's very hard to

24   survive after a disaster such as they suffered.  One of

25   the ways or, in fact, the main way that people survive

1    it and can go on with life is if they can somehow use it

2    to do something good out of it.  And Scarlett is working

3    very hard at a social-emotional learning program that

4    she started.

5         Q.   What's it called?

6         A.   Love --

7         Q.   Choose?

8         A.   Choose Love.  Thank you.

9              And that's what again she does every

10   waking minute and when she wakes up during the night.

11        Q.   What is the Choose Love Foundation?  Tell us

12   about that.

13        A.   It's social-emotional learning at schools,

14   trying to teach kids -- get kids the help that they need

15   so that they don't turn out like Adam Lanza.

16        Q.   Why did she start that foundation?

17        A.   Because it was --

18             MR. REYNAL:  Your Honor, object to the

19   relevancy to his testimony as to their mental health,

20   why she started the foundation.

21             THE COURT:  Overruled.

22   BY MR. OGDEN:

23        Q.   Why did Scarlett start the Choose Love Jesse

24   Foundation?

25        A.   It gave her a purpose in life.  Instead of

1    feeling empty and loss with one of her sons dead it

2    gives her a purpose.  It makes some sense, at least she

3    can say, yes, what happened to our child was horrific,

4    if she could undo it she would gladly give up all

5    benefits that come from it.  But the one thing she can

6    do is try to help other kids.  And this is always --

7    she's a very compassionate person.

8              I was rather -- I was rather stunned

9    almost by both of them, that both of them were concerned

10   about the Lanza family and how they had suffered.  And

11   Scarlett's attitude was that there were 28 victims, not

12   26; that Adam Lanza and his mother were also victims;

13   that society had failed them, had not taken care of his

14   mental health needs and, therefore, this occurred.

15             And I've seen a tape six days after the

16   murder where Neil was saying that he -- he has

17   condolences, I don't remember the exact words that he

18   used, but he feels sad for the Lanza family because of

19   what they are now going through.  They lost a child,

20   too.

21             It's kind of shocking that people who have

22   unusual levels of compassion have been treated in the

23   way they are.  And that to some extent makes it a bigger

24   hurt.

25             You know, if someone is, you know, rough

 1    and angry and aggressive and sees the world as a, you

 2    know, rough place, that you fight for things and

 3    something bad happens, oh, well, that's the risks in

 4    life.  When what happens is outside of their way of

 5    thinking, things are worse, and there's -- there's again

 6    lots of research on this, that people who are more

 7    pessimistic and expect bad things to happen usually have

 8    small reactions to traumatic events than people who are

 9    more optimistic and think that things are going to be

10    okay and all of a sudden their world view gets crushed.

11              There's a lot of literature about the

12    psychological mechanism that happens in PTSD, and one is

13    the person's world image collapses.  You know, we see

14    the world as reasonably safe, as manageable, as

15    reasonably just.  We may know -- intellectually we may

16    know differently, but we act as though it is these

17    positive things.  And when a traumatic incident occurs

18    all of a sudden our feelings change about the world, it

19    no longer feels just, it no longer feels reasonable or

20    fair or safe.  And that has a huge impact on symptoms.

21    And some people feel that's a necessary thing to happen

22    for someone to develop PTSD.

23         Q.   How does Scarlett keep dealing with the pain

24    of having to wake up in fear every day from the

25    defendant's lies?

1          A.     She works every minute.  She is just

2    completely obsessed with the Choose Love Foundation, or

3    Choose Love movement, and spreading social-emotional

4    learning for kids so that other parents don't suffer the

5    same consequences.  And both of them, also now, the

6    motivation for this trial for them is to try to decrease

7    the likelihood that someone else will do -- that some

8    media person will do to someone else what has been done

9    to them.  And to spare others trauma.

10          Q.     How do you know that?  How do you know that?

11          A.     They told me.

12               MR. REYNAL:  Object under Chapter 41.011.

13               THE COURT:  Overruled.

14    BY MR. OGDEN:

15          Q.     How do you know?

16               MR. REYNAL:  May I have a running

17    objection?

18               THE COURT:  Sure.

19    BY MR. OGDEN:

20          Q.     How do you know that Neil and Scarlett's

21    reasoning for bringing this lawsuit was to protect any

22    other family from having to go through this?

23          A.     They've told me and I believe it.  And

24    it's -- going through this, this sort of a trial and

25    increasing the risk to themselves is -- it's traumatic

 1  in itself, it's very, very stressful.  It increases

 2  risks.  But they are both very compassionate people who

 3  care about others and want to make a difference in the

 4  world, and particularly Scarlett with her movement and

 5  she feels that this can -- this can make a difference,

 6  that other parents shouldn't have to suffer either the

 7  death of their child or the sort of opprobrium attacks

 8  that they've suffered.

 9       Q.   And in trying to do that does Scarlett in

10  any way have a healthy relationship with work?

11       A.   With what?

12       Q.   With her work?

13       A.   It's -- that's an in any way to have a

14  healthy one, I mean, it's healthy to try to make a

15  difference and to do something that you love, that you

16  are committed to and want to make a difference in the

17  world, that's healthy.  But the way she does it, um,

18  working constantly, giving up social life, giving up

19  recreations, and being so driven to do it that she has

20  no choice, it just -- it's on her mind constantly.

21  She's driven, and the reason is to avoid thinking about

22  the dangers.

23                 I saw someone, church sex abuse case who

24  abused a child.  For the next 50 years, I guess, he

25  would work two jobs, work 80 hours a day, I'm sorry,

1    80 hours a week, and didn't enjoy life very much.  And

2    when he stopped working he collapsed with intrusive

3    recollections of the sexual abuse.  And being

4    overwhelmed by it.  He was working to push that out of

5    his mind.

6         Q.   What's fueling Scarlett to not have a

7    balance between her life and her work?  Why has her work

8    consumed her?

9         A.   Her fear of the dangers, her pain over

10   what's being done to Jesse's legacy and memory; that

11   instead of people seeing that there was this young man

12   named Jesse who was incredibly brave, who saved nine

13   kids and lost his life in the process and a very caring

14   kid who had written on the blackboard the day before he

15   died "nurturing, love," something else.  And that,

16   instead of that memory being there, that he's -- he

17   didn't die or he didn't exist or --

18        Q.   And so, she's fighting not to protect

19   Jesse's legacy but she's fighting for the memories that

20   she has of what he actually is?

21        A.   But those memories are also -- we're

22   symbolic creatures, I think somebody spoke about

23   semiotics the other day, we're symbolic creatures and

24   the memories keep the person alive to us.  There's a

25   sense that they haven't fully gone if we remember them.

65

```
1   If there are any Harry Potter fans, near the end where,

2   I'm forgetting his name, are saying that he's not gone,

3   he's in our hearts.

4        Q.    Neil and Scarlett aren't in the courtroom

5   right now, are they?

6        A.    No.

7        Q.    Is that for their own good?

8        A.    I suggested that they not hear things that I

9   was saying about them.

10        Q.    Why?

11        A.    To hear about how strong -- greatly impaired

12   they are, to hear more about their suffering, it would

13   be a traumatic trigger.  It would, for a little bit,

14   make things worse.

15        Q.    One last thing, one follow-up thing on

16   Scarlett.  You mentioned that she has a son.

17        A.    Yes.

18        Q.    Who is her son?

19        A.    J.T.

20        Q.    J.T.

21             And has -- as a mother, has she had to

22   protect her other son, J.T., throughout this process?

23        A.    Yes, and she feels that she was not as good

24   a mother as she wanted to be with him, because she was

25   so overwhelmed, preoccupied in pain.
```

```
 1              But when J.T. was still in high school,
 2    someone wrote letters to his teachers, to the college he
 3    wanted to go to, making negative comments to the local
 4    reporter, and she is scared for his safety.
 5              And I, by the way, I strongly, strongly
 6    suggested that J.T. not be in this courtroom when I was
 7    speaking.  I didn't want him to hear about the level of
 8    pain and distress that his parents are in, his mother is
 9    in.
10         Q.   And the abuse that was done by this Jones
11    follower, he's a 17-year old kid at the time?
12         A.   Yeah.
13         Q.   How did Scarlett react?
14         A.   I'm sorry, I don't understand.
15         Q.   How did Scarlett react to J.T., her son, a
16    minor, receiving all of this attack from Jones and his
17    follower?
18         A.   It scares her.  And she feels her other son
19    is being victimized, as well.  And he is.
20         Q.   What is character Assassination?
21         A.   What has happened to Neil and Scarlett.
22         Q.   Tell us a little bit about what it is.
23         A.   It's -- it's destroying someone's good name.
24    Which is a very serious thing.
25              There's a line from *Othello* that, you
```

1    know, if someone takes my purse, it's not a big deal.

2    It was mine, it is his, it was slave to many other

3    people, no big deal.  He didn't say no big deal, but I

4    can't quote the exact line from Iago.  But if someone

5    takes my good name, that is a very serious injury.

6              And it's -- people care about their good

7    names, it's very important in the world to have a good

8    name.  In an instrumental way it's very important, but

9    also one's self image, it's very hard to think well of

10   one's self if there are people around that are

11   badmouthing you.

12             MR. REYNAL:  I'm going to object, outside

13   the scope of his expert testimony that was disclosed.

14             THE COURT:  Overruled.

15             THE WITNESS:  And you know, we see it in

16   various places.  Someone makes -- go to a bar, some --

17   let's say both people have lots of friends, one person

18   in the bar makes a negative comment, possibly about the

19   person's mother, in the playing field that's the way to

20   get into a fight in middle school, just say something

21   about somebody's mother.  And in a bar, making whatever

22   comment, acting in a disrespectful way towards somebody

23   else.  And you're asking for a fight.  And the two

24   people, you know, are probably pretty aware that a

25   fight's likely to come.

1              But it stirs people up so much that

2     they'll fight, even though one could say, who cares what

3     this person that I don't know is saying about me or my

4     mother.  You know, I've got all my friends, who cares

5     about this person.  But people do.  And it's -- it

6     doesn't make logical sense, it's not instrumental, it's

7     terribly uninstrumental, it's dangerous.  But this is

8     how evolution has hardwired us.

9     BY MR. OGDEN:

10         Q.    What do we do when Alex Jones influences

11    this many people to attack Neil and Scarlett's name?

12    How are they supposed to fight back?

13         A.    I --

14         Q.    Or is that what this courtroom is for?

15         A.    That is what the courtroom is for, and the

16    one way is to try to get a clear statement that --

17              MR. REYNAL:  I reurge the objection under

18    41.011, Your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  That this is wrong.

21    BY MR. OGDEN:

22         Q.    Let's back up, just so we're clear.  It's to

23    get a clear statement of?

24         A.    That they weren't lying and also that what

25    Alex Jones did was terrible and wrong.  And they also

1   very much want to -- it will help them heal to whatever

2   extent they can heal if they're able to make a big

3   enough statement here that other people, media people,

4   are less likely to do to other parents what Alex Jones

5   did to them.

6        Q.   Why are Neil and Scarlett so selfless about

7   that?

8        A.   That's who they are.  They're remarkably

9   compassionate people to have concerns about the person

10   who murdered their son, about the family.  That's

11   remarkable.

12        Q.   The opinions you've given today to us, are

13   they to a reasonable degree of medical certainty?

14        A.   Yes.

15        Q.   And the materials and interviews that you

16   relied on, are those the types of things that other

17   experts in your field generally do when coming to expert

18   opinions?

19        A.   Yes.

20             MR. OGDEN:  Thank you for your time,

21   doctor.  I don't have anything right now.

22             THE COURT:  All right, thank you.

23             Mr. Reynal.

24   ///

25   ///

```
 1                    CROSS-EXAMINATION
 2   BY MR. REYNAL:
 3        Q.   Dr. Lubit, I believe you've testified that
 4   you have testified in the past in at least a hundred
 5   cases?
 6        A.   Yes.
 7        Q.   I think you said maybe even 200?
 8        A.   Possibly.
 9        Q.   You derive a substantial portion of your
10   income from acting as a forensic psychiatrist; correct?
11        A.   Yes.
12        Q.   And that means testifying persuasively in
13   court?
14        A.   Yes.
15        Q.   Are you familiar with the American Academy
16   of Psychiatry and the Law?
17        A.   Yes.
18        Q.   And do they promulgate rules of ethics for
19   people in your position?
20        A.   Yes.
21        Q.   Do you consider them to be authoritative?
22        A.   They're significant.  I've also written
23   on -- I published on ethics, I wrote the chapter on
24   ethics for two versions of the Comprehensive Textbook of
25   Psychiatry.
```

```
 1          Q.   My question to you was about the American
 2   Academy of Psychiatry and the Law and whether you
 3   consider them to be a reputable authoritative rulemaking
 4   body for ethics in forensic psychiatry.
 5          A.   They're a reputable body.
 6          Q.   And are they authoritative?
 7          A.   I'm not sure what you mean by authoritative.
 8          Q.   Well, would you like to see what they have
 9   to say about the risks involved in testifying in a
10   lawsuit?
11          A.   Please show me.
12          Q.   Now, I would like you to read out loud to
13   the Members of the Jury the passage I've highlighted for
14   you from the ethical rules.
15               MR. OGDEN:  Your Honor, I'm going to
16   object.  Hearsay.
17               THE COURT:  So, I thought the question was
18   do you consider them authoritative and we don't have an
19   answer on that yet; is that right?
20               MR. OGDEN:  I did, as well.
21               THE COURT:  So, I think you need an answer
22   on that before you can --
23               THE WITNESS:  They're not obligatory --
24               MR. OGDEN:  Hold on, doctor.
25               THE COURT:  I'm sorry.
```

```
 1                   So, for now I will sustain the objection.
 2                   MR. OGDEN:  Your Honor, I also might add,
 3    I have no idea what he's showing him.  I haven't seen
 4    it.
 5                   THE COURT:  Oh, you're not allowed to show
 6    the witness anything that we haven't shown opposing
 7    counsel.  I think we learned that first year of law
 8    school.  Don't do it again.
 9    BY MR. REYNAL:
10         Q.   So, you said they weren't obligatory, and I
11    agree with you.  The question is, are you familiar with
12    other bodies that promulgate similar rules?
13         A.   What I read is something that I've written
14    myself.
15         Q.   Okay.
16         A.   Which is one needs to be careful about bias
17    when doing forensic evaluations.  And needing to be --
18    the American Academy of Psychiatry and the Law, the
19    members are forensic psychiatrists who do forensic
20    evaluations.  So, the purpose of the organization -- so,
21    the organization certainly thinks that it's appropriate
22    to do forensic evaluations and to testify in court.
23    That's the whole purpose of the organization.
24         Q.   And a forensic psychiatrist has a different
25    role from a treating psychiatrist; true?
```

1          A.    Agree.

2          Q.    A forensic psychiatrist is primarily or

3    should primarily be concerned with truth in the

4    courtroom to the fact finder; right?

5          A.    Yes, yes.

6          Q.    And a treating psychiatrist, their primary

7    concern is the well-being of their patient?

8          A.    Yes.

9          Q.    And did I hear you correctly that you've

10   done about ten sessions with Ms. Lewis?

11         A.    No, no, no, no, no.  Mr. Crouch saw her ten

12   times.

13         Q.    Understood.

14               So, a treating psychiatrist, unlike a

15   forensic psychiatrist, will usually take a patient's

16   version of events at face value; correct?

17         A.    Not necessarily.  I don't much of the time.

18   But therapists typically do.

19         Q.    Therapists typically.

20               And a forensic psychiatrist shouldn't take

21   anything at face value, should they?

22         A.    The word "anything" is far too broad.  I

23   mean a patient, if someone says, you know, they're

24   anxious and they -- and things are consistent and likely

25   and the pieces fit together, we usually accept it.

74

```
 1          Q.    Well, so, when you say consistent and the
 2    pieces fit together, that's based on evaluating them
 3    when they speak to you?
 4          A.    Agree.
 5          Q.    And then also taking some steps to verify or
 6    investigate their life history?
 7          A.    No.   It's not our job to go and in most
 8    cases to evaluate someone's life history.
 9          Q.    Well, certainly --
10          A.    It's not required.  I'm trying --
11                MR. OGDEN:  Your Honor, I'm going to
12    object so the witness can finish his answer.
13                MR. REYNAL:  I'll object, nonresponsive,
14    Your Honor.
15                THE COURT:  Hang on.
16                MR. OGDEN:  We know what he --
17                THE COURT:  Hang on, hang on.
18                MR. OGDEN:  Yes, Your Honor.
19                THE COURT:  Okay.  So, sustained and
20    overruled.
21                You have to let him answer the question
22    you ask, especially when you ask an open-ended question.
23                MR. REYNAL:  Very well.
24                Please.
25                THE WITNESS:  I mean, it's not standard
```

1 practice to go and -- and get the individual's, you

2 know, school records and work evaluations and look up

3 where they lived, check their credit rating, whatever.

4 It's -- there are times when I do get school records and

5 try to get work records, particularly in situations

6 where it's a work-related injury.  Or they're claiming,

7 you know, traumatic brain injury.

8          But in terms of emotional trauma and

9 stress, it's not standard practice to go and see, you

10 know, go through records to find out all sort of things.

11 It would make -- it would severely increase the cost of

12 the services, and it's up to the lawyers to see to it

13 that the facts are correct.

14          And if it turns out at trial that facts

15 that I was relying on are not correct, that's likely to,

16 depending on the significance of those facts, it may

17 wipe out my opinion.  And I had a trial in which

18 something came out that I should have been told that I

19 wasn't and I withdrew my opinion.

20     Q.   Would you agree that it is standard practice

21 within your industry to be heightenly aware of the

22 possibility for fabrication if an individual is referred

23 by an attorney to the clinician for examination?

24     A.   Clinician for -- if someone is referred to a

25 clinician for evaluation there is a risk there, yes.

1    Especially in custody battles.

2         Q.   And similarly there is an important -- it's

3    important, in the context of being a forensic

4    psychiatrist, to see if there's a marked discrepancy

5    between the individual's claimed stress and the

6    objective finding and observations.

7         A.   If there are such findings.  I mean, I, in

8    one of the papers that I told you I'm going to be

9    finishing this week, there's a large section on

10   assessing for malingering.

11        Q.   So, you said that people shot at Mr. Heslin.

12   That sounds like an objective statement to me.

13        A.   Shot at his house and his car.

14        Q.   Sounds likes an objective statement to me.

15        A.   Yes.

16        Q.   You said that Alex Jones caused them to do

17   that.  Sounds like an objective statement to me.

18        A.   That his oratory stirred people up.

19        Q.   You've said that Scarlett Lewis no longer

20   has dinner parties.  Sounds like an objective statement

21   to me.

22        A.   Yes.

23        Q.   Fair to say that you didn't speak to any of

24   their friends or get any police reports to confirm any

25   of those things.

1       A.    That would not be standard practice.  I
2   reviewed hundreds and hundreds of reports by other
3   forensic evaluators and I don't see that.
4       Q.    Is it fair to say that you have not regarded
5   information provided to you by the plaintiffs' attorneys
6   or other experts with any degree of skepticism?
7       A.    No, I have.  I was surprised at the degree
8   of focus on the son's memory, so I went back to research
9   and started thinking about how this would come about,
10  does it make sense.  And it does make sense.  I was at
11  first surprised about it.
12      Q.    So, on direct examination you repeated I
13  think something that we heard from Becca Lewis yesterday
14  that billions of individuals have received Mr. Jones's
15  message.  Do you recall saying that?
16      A.    Yes.
17      Q.    Last time I checked there were about 400
18  million Americans; true?
19      A.    Yes.
20      Q.    And in the world there are about 1.3 billion
21  people who even speak English.
22      A.    I also said earlier in my direct that I
23  wasn't concerned about people outside the country.  And
24  that I didn't know about the billions, but roughly, you
25  know, one in four million people here, and I think

1   that's adults, one in 75 million adults.  I doubt

2   children were asked, so one in four adults.

3        Q.   Would -- is your testimony that Alex Jones

4   is so convincing and so persuasive that people watch him

5   and believe him even who don't speak English?

6        A.   Obviously if they don't speak English, no.

7   But again I didn't -- I dismissed the issue of people

8   outside of this country, and I think the great majority

9   of Americans speak English.

10       Q.   And so it would be fair to say that billions

11   of people would have been a great exaggeration, wouldn't

12   it?

13       A.   I don't know.  I don't know about media

14   habits of others, I don't know what data Miss Lewis had.

15   I didn't care about what was outside the country because

16   I didn't think that would be terribly threatening unless

17   they were traveling a lot.  The focus was on people

18   here.

19       Q.   Let's talk a little bit about bias.  You've

20   testified that you're getting paid to testify here;

21   right?

22       A.   Yes.

23       Q.   But this isn't the first time you've

24   testified for a parent of somebody injured at Sandy

25   Hook; isn't that true?

1      A.   Correct.

2      Q.   And you testified for a man named Leonard

3  Pozner?

4      A.   Yes.  I testified for the truth.  I was

5  retained by Leonard Pozner.

6      Q.   And in that case you did it for free?

7      A.   That is true.

8      Q.   Because you said you felt it was an

9  important case?

10     A.   Well, I did it for free because they knew

11 from the start that there would be no monetary return

12 because he had no money.  And so, I felt it was

13 important enough that I donated my time, as I've done in

14 a good number of cases.

15     Q.   You wanted to help Mr. Pozner because you

16 feel strongly, personally, that he should have won that

17 case?

18     A.   I was testifying for the truth.  I thought

19 that was an important issue and my job was to speak the

20 truth and inform people about the knowledge of

21 psychiatry that would be helpful to people -- to the

22 trier of fact to make a decision.

23     Q.   Would you agree that a personal connection

24 to the events at Sandy Hook is the kind of thing that

25 should be disclosed and considered in terms of assessing

1  your bias?

2      A.   I didn't lose a child to Sandy Hook.

3      Q.   I'm not suggesting you did.  I'm simply

4  asking if a connection to the events should be assessed

5  in looking at any potential bias.

6      A.    It depends what the person -- what the

7  connection is.  It depends the sort of statements

8  they're giving.  In terms of the issue of bias with me,

9  almost everything I've said is straight out of the two

10  papers that I finished up, and I largely, when I was

11  working on what I thought would be important to say

12  today, I basically cut and pasted from my writings that

13  were done before the case.

14      Q.   Is Alex Jones causing the injury to the

15  parents anywhere in your papers?

16      A.   No.

17      Q.   Is Neil's house was shot at and he's been

18  accosted on the street anywhere in your paper?

19      A.    Those particular facts -- but those are

20  facts.  And if it turns out that those facts are not

21  true, that is going to affect my opinion.  But in terms

22  of the issue of the power of negative social support

23  versus positive social support, the concerns about

24  reputation, these are things that I built articles on,

25  these are things that I've written about in my own

1    papers.

2              And there are a lot of things that I

3    didn't go into such that again are in my papers, such as

4    that Scarlett's memory is going on her, and a recent

5    paper that I found said that women between the ages of

6    50 and 70 who suffer severe stress suffer premature

7    damage to their memories and to their -- and brain

8    problems.

9              And I didn't mention on direct, but this

10   is something that is fact, this is literature, this is

11   what I've written about.  It's not a bias, it's

12   scientific fact.

13        Q.    Are you finished?

14        A.    Yes.

15        Q.    Your -- would you agree that your curriculum

16   vitae states that you live and work in New York?

17        A.    Yes.

18        Q.    You own another home; isn't that true?

19        A.    I own -- there's another home that I helped

20   a friend buy when his girlfriend and him broke up,

21   couldn't afford it himself, and so, yes, I'm on the

22   mortgage and on the deed.

23        Q.    And that home is in Connecticut; right?

24        A.    Yes.

25        Q.    In Fairfield County?

```
 1        A.   Yes.

 2        Q.   In Southport?

 3        A.   Yes.

 4        Q.   About 20 miles from Newton?  Newtown, excuse

 5   me?

 6        A.   I'm not sure how far.  I've almost never

 7   gone to the place.

 8        Q.   Okay.  You must have been a resident of

 9   Connecticut in 2018, weren't you?

10        A.   I had the house, yes.

11        Q.   I'm sorry?

12        A.   Yes, I was there at that time.

13        Q.   And you were using that house as your

14   address; right?

15        A.   Yes.

16        Q.   Okay.  And that's because you ran for

17   Congress that year; isn't it?

18        A.   Yes.

19        Q.   And you ran as a Democrat, isn't it?

20        A.   Yes.

21        Q.   This is the same Fairfield County where

22   Sandy Hook is located?

23        A.   Yes.

24        Q.   I'm sorry, they're not here, but Neil and

25   Scarlett would have been your constituents; right?
```

1       A.   I don't know where they live, I don't even
2  know exactly where they live, so I don't know whether
3  they would have been or not.
4       Q.   It's fair to say, since you ran for
5  Congress, that you have some interest in politics?
6       A.   Yes.
7       Q.   And you know that Alex Jones is a notorious
8  target for the Democratic party?
9       A.   I'm not aware of that.
10       Q.   Well, did you -- did you live the 2016
11  election?
12       A.   Did I live the 2016 -- I'm not sure what
13  that means.
14       Q.   Were you there?  Did you watch it?  Did you
15  vote?
16       A.   I voted.
17       Q.   Okay.  Hillary Clinton versus Donald Trump;
18  right?
19       A.   Yes.
20       Q.   And Hillary Clinton ran massive ads across
21  the country associating Alex Jones with Sandy Hook and
22  with Donald Trump; true?
23       A.   I don't recall it.
24       Q.   The fact is you don't like Alex Jones, do
25  you.

1        A.    I don't like what he does.  I don't know the
2   person, I think what he does is wrong.
3        Q.    And it would win you friends within your
4   community if you were to participate in taking him down,
5   wouldn't it?
6        A.    No.  I don't see how it would win me
7   friends.  I have no intention of ever going back to
8   politics.  It was an unexpected thing.  But to see it
9   opened up, I have no intention of ever returning to try
10   to run for office.
11        Q.    Are you finished?
12        A.    Yeah.
13        Q.    We've had a couple of emails from -- well,
14   actually, let me move from that.
15            So, you've testified very strongly that
16   Alex Jones victimized the plaintiffs in this case.  Do
17   you recall that testimony?
18        A.    Yes.
19        Q.    Let me ask you, based on your speaking to
20   them, when did Alex Jones's message or when did they
21   first hear one of his broadcasts for the first time?
22        A.    I don't know when they heard it for the
23   first time, but they started becoming much more
24   distressed about things in 2018 when the attacks and --
25   direct attacks at Neil occurred and Alex Jones

1    intensified his rhetoric.

2         Q.    Okay.  So, we've had evidence that there was

3    a four-minute video done by Owen Shroyer and then maybe

4    an additional minute later by Alex Jones.  Is it your

5    position here that those five minutes of air time are

6    what have caused all of this damage?  "Yes" or "no,"

7    sir.

8         A.    I don't think I can answer that "yes" or

9    "no."

10        Q.    That's fine.

11             Let me go back to my original question.

12   Based on your speaking to them, when was the first time

13   that they ever heard a broadcast or ever heard Mr. Jones

14   speaking on his show?

15        A.    I don't know when they first heard it, but

16   it was around 2018 that it greatly intensified and it

17   was then scaring them and very upsetting.

18             MR. REYNAL:  Move to strike everything

19   after "I don't know."

20             THE COURT:  I mean it's already in, but

21   sure, sustained.

22             MR. REYNAL:  Thank you.

23   BY MR. REYNAL:

24        Q.    Don't you think it would have been important

25   for you to determine, even based on speaking to them,

1    when it was that they first actually heard

2    Alex's -- Alex Jones' voice anywhere?

3         A.    No.

4         Q.    Is it your testimony that that segment in

5    2017 by Owen Shroyer and the follow-up where Alex

6    replayed the segment, that that's what has caused, in

7    your opinion, a quarter of Americans to disbelieve them?

8         A.    I don't have the data to say whether that

9    particular segment was what stirred up a quarter of

10   America.  I think it was probably a range of things.

11   That -- those statements were particularly painful

12   because it denied -- it was focused on Neil and it

13   denied his last experience with his son.  And it was

14   painting him as a liar and he wasn't lying.

15        Q.    So, my question was, is it your testimony

16   that that segment is what caused, in your words, a

17   quarter of the entire nation to believe that they were

18   liars?

19        A.    I don't have the data on that.

20        Q.    Would it surprise you that the supposed

21   study was published and conducted in 2016, a year before

22   those statements ever aired?

23        A.    Um, wouldn't necessarily surprise me, no.

24             THE COURT:  All right, it's noon.  We're

25   going to break for our lunch.  We're going to break for

1    an hour and a half.

2              Remember all of my instructions.  You are

3    not yet free to have any conversations about anything

4    that's happened in the courtroom yet.  Let's go ahead

5    and go to our lunch now.

6

7                   *(Noon recess.)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            WEDNESDAY, JULY 29, 2022 - AFTERNOON SESSION
 2                 (The following proceedings were held in open
 3       court in the presence of the jury)
 4                      THE COURT:  All right.  You may resume.
 5                      MR. REYNAL:  Thank you, Your Honor.
 6                            CROSS-EXAMINATION
 7       BY MR. REYNAL:
 8            Q.   Dr. Lubit, did you speak to the plaintiffs'
 9       attorneys over the break?
10            A.   Yes.
11            Q.   And what did you guys discuss?
12            A.   I noticed that there was some things that I
13       thought we might cover about the impact on the brain,
14       the body.  That was -- I don't remember many other
15       details.
16            Q.   How long was the conversation?
17            A.   A few minutes.
18            Q.   You testified to the jury earlier that, for
19       Neil Heslin and Scarlett Lewis, finding out that a
20       quarter of all Americans believe that they're liars was
21       tremendously hurtful.
22            A.   I don't -- no.  I think they probably had
23       known that earlier.  It was when Neil was singled out
24       and attacked and they found out that there was
25       increasing amounts of talk about it and people were
```

1    harassing them that it became very distressful.  So,

2    we're talking about around 2018 is when they told me it

3    became a really serious problem for them emotionally.

4         Q.    Okay.  So, as I take it now, what you had

5    said earlier about how they walk out on the street and

6    they don't know which person might be somebody who is a

7    Sandy Hook denier and how that causes them a tremendous

8    amount of stress because of this -- this poll, that's

9    not the primary reason of their distress?

10         A.    Well, it's not just the poll.  I mean,

11    certainly thinking that many people were deniers adds to

12    the problem, but the real problem and the tremendous

13    fear they have is because of threatening calls,

14    threatening messages, people confronting Neil on the

15    street, and the intensity of the statements.  I think if

16    it was just that one quarter of Americans didn't believe

17    it, I don't -- that's not the problem.  It's the anger

18    and the venom and continual attacks.

19         Q.    Let me ask you this, was it Alex Jones who

20    told them that there was a  poll that said that a

21    quarter of Americans didn't believe them, or was it

22    someone else?

23         A.    I think they got -- I don't recall Alex

24    Jones telling them.

25         Q.    Do you think it was something they heard as

1    part of this litigation?

2         A.   I don't know when they heard it.

3         Q.   You've said that Alex Jones 100 percent

4    caused these parents mental anguish?

5         A.   I -- wait, wait, I don't think I said

6    100 percent of their mental anguish, every drop of it is

7    from Alex Jones.   What I was saying is that Alex Jones

8    using his pulpit and oratory pushed the issue and kept

9    repeating it and in a very attacking way and stirred

10   people up, and then some of those people have followed

11   and calls and shoving Neil and made them very

12   frightened.

13        Q.   So, as you sit here today, you're not

14   expressing an opinion as to what percentage, if any, of

15   the harassment suffered, if any, by the plaintiffs was

16   caused by Alex Jones?

17        A.   I think Alex Jones drove -- well, the

18   question before was different than what you're saying

19   now.   Before the question was 100 percent of their

20   anguish.   I'm saying that there are other things that

21   are painful in life, as well, but that, you know, they

22   would not be -- they would not have complex PTSD, they

23   would not be suffering, they would be able to do

24   positive things in life, enjoy things, sleep okay, enjoy

25   normal activities and relationships, had it not been for

1  Alex Jones driving many people to see them as these evil

2  people.

3       Q.   And so, your position, then, is that it's

4  Alex Jones' fault that they suffer mental anguish?

5       A.   I think that's an issue for jury and

6  lawyers, but he is the root cause that there is such a

7  tremendous -- this goes on and on and that the

8  statements became so persuasive and that they suffered

9  character assassination and vilification.  If someone

10 had simply left it at, you know, we're not so sure that

11 this occurred, they knew that there were deniers early

12 on, but it was after Alex Jones was pushing it and

13 intensifying the rhetoric and people then responded that

14 they became much more fearful.

15      Q.   And you would concede that you did not take

16 the time to substantiate that anybody, in fact,

17 responded.  True?

18      A.   That anyone, in fact, responded, I'm --

19      Q.   Responded by harassing the parents.  You did

20 not take any steps to corroborate that that actually

21 occurred; true?

22      A.   It can't be answered "yes" or "no."

23      Q.   Okay.  You know we're on national television

24 right now?

25      A.   Yes.

1       Q.    And if somebody watching you testify went

2   out and did something to Alex Jones, do you think that

3   you should be held responsible?

4       A.    No.

5       Q.    You didn't substantiate your sources.

6       A.    It's not standard practice for a forensic

7   psychiatrist to call up the police and see if the

8   individual is making up what happened.  It's standard

9   practice, and what I write about in my article has a big

10  section on malingering, is do the pieces fit together,

11  does the pattern of emotional harm or depression or

12  trauma, does it fit together, does it make sense or is

13  it a strange pattern that is doubtful, and is the

14  problem that they're pointing out, the event or events,

15  could that cause the symptoms that they're reporting.

16             But, you know, I am not aware of Neil

17  going and reporting to the police or taking a picture of

18  everyone who shoved him, so I don't know how it could be

19  corroborated, you know, in terms of, you know, absolute

20  proof.  But I do accept that it's happened.

21      Q.    Let's go back to -- let's go back to an

22  earlier question I don't think we got fully clarified.

23  As you sit here today, do you know if Mr. Heslin and

24  Miss Lewis were ever exposed in the sense that they

25  actually viewed an Alex Jones broadcast prior to 2017?

1        A.    I don't know if they did before 2017.

2        Q.    Do you have an opinion on what percentage of

3    the mental anguish that you have described is

4    attributable to participating in this litigation?

5        A.    I do not know a percentage.  I mean, they

6    were extremely anxious and stressed before, litigation

7    is stressful no matter what it's about for everyone but

8    lawyers, and so I don't know what percentage.  But they

9    clearly had serious harm before the litigation.

10        Q.    You never met with them before the

11    litigation, did you?

12        A.    No.

13        Q.    So, you're testifying to that, just like so

14    many other things, based on post-litigation

15    conversations that you had with them?

16        A.    It's not post because litigation is not

17    over, but I spoke with the therapist who saw both of

18    them, I listened to what he told me had been happening

19    and how he was functioning at different points in time,

20    and it made -- fit reasonable patterns that we know

21    occur in medicine and that's how it's -- forensic

22    evaluation is generally done.

23        Q.    Do you know that in -- on Father's Day 2017

24    Alex Jones issued a video invitation to the Sandy Hook

25    parents to contact him?

1          A.    No, I wasn't aware of that.

2          Q.    So, I don't know whether or not they ever

3     received the message.

4          A.    Who received what message?

5          Q.    The Sandy Hook parents ever received Alex

6     Jones' message inviting them to contact him.

7          A.    I do not know.

8          Q.    If they had heard it and they had contacted

9     him, do you think that that might have had a positive

10    impact on their mental health, to have worked through

11    this with him?

12         A.    I do not think so because I don't think that

13    Alex Jones was going to apologize.  He hasn't, to my

14    knowledge, he hasn't apologized now for what he's done.

15    He's made multiple false statements, statements that had

16    little basis, really no basis, in reality, and I think

17    that that would have -- he would have used that as a

18    media, from everything that I've seen about him, he

19    would have used that as another media opportunity.  He

20    would be able to say, I spoke with the parents and from

21    speaking to them I know.

22         Q.    And this knowledge that you have from

23    Alex Jones comes from watching the videos that we have

24    in evidence in this case?

25         A.    Yes.

1      Q.   Earlier you said that Owen Shroyer called

2  Neil Heslin a liar.  Do you recall that testimony?

3      A.   He said that it was not possible that Neil

4  held his son within a day of the tragedy.

5      Q.   I'm sorry, that he?

6      A.   Did not hold his son after the tragedy,

7  within one day of the tragedy.

8      Q.   Because you know that, in fact, Mr. Heslin

9  did hold his son the day of the tragedy or that night at

10  around 1:30 in the morning?

11      A.   I wasn't there, I haven't called up the

12  policemen.  That's not really the job of the forensic.

13  And to get into that level of detail.  My first thought,

14  I was surprised when Mr. Shroyer said that this is, you

15  know, not possible, because the first thing that came to

16  my mind was, of course it's possible, at some point he

17  may have stuck around and somebody may have let him,

18  even though, you know, people were told that they

19  couldn't, that somebody may have let him out of pity,

20  out of compassion.

21      Q.   So, your belief when you watched the video

22  is that Owen Shroyer's comment was directed at whether

23  or not Mr. Heslin held the body that day or that night?

24      A.   Directed at, that was --

25      Q.   The gist of it?

1     A.   -- that specific comment, I mean, the

2  underlying statement was that they're liars.

3     Q.   Now, harassment is a crime, is it not?

4     A.   I believe so.

5     Q.   Stalking is a crime?

6     A.   Yes.

7     Q.   And you would agree with me that it's not

8  the defense's job to prove that the parents weren't

9  harassed, is it?

10     A.   We're going into legal issues now which are

11  not part of psychiatry.

12     Q.   You testified in 200 plus cases, you're

13  probably pretty familiar with the burden of proof,

14  aren't you?

15          MR. OGDEN:  Your Honor, at this point I'm

16  going to object to an improper expert opinion.

17          THE COURT:  I mean, there are a million

18  things you could have objected to, and they're all

19  sustained.

20  BY MR. REYNAL:

21     Q.   You testified that Miss Lewis said that she

22  had a state-of-the-art surveillance system?

23     A.   She has significant -- well, she has an -- I

24  don't think state of the art, I don't -- she has a very

25  significant surveillance system, and her anxiety is such

```
 1    that she won't even use an air conditioner because she
 2    might not hear something.
 3           Q.   And she's had this surveillance system,
 4    security system, for a number of years?
 5           A.   A few years.  I don't know the exact number.
 6           Q.   Now, since you took the time to review the
 7    videos, you know that there's less than 24 -- there's
 8    23 hours and 39 minutes of video that InfoWars released
 9    about Sandy Hook over the entire five-year period.
10    Isn't that true?
11           A.   I don't know the number of hours.
12                  MR. OGDEN:  Your Honor, I'm going to
13    object.
14                  MR. REYNAL:  He --
15                  THE COURT:  Sustained.
16                  MR. REYNAL:  He testified he reviewed it.
17                  THE COURT:  No, you asked a question that
18    assumes facts not in evidence and misrepresents the
19    testimony that we have had in this case so far.
20                  MR. REYNAL:  It does not, Your Honor.
21                  THE COURT:  Excuse me?
22                  MR. REYNAL:  Shall I move on?
23                  THE COURT:  You had better.
24    BY MR. REYNAL:
25           Q.    You testified you reviewed the videos?
```

1      A.    No, I saw some of the videos through this

2  trial and before.

3      Q.    In 2016, did Neil Heslin or Scarlett Lewis

4  ever tell you that in 2016 the Sandy Hook controversy

5  was thrust into the public attention again by the

6  Hillary Clinton campaign?

7      A.    We did discuss that.

8      Q.    Would it have been relevant to you if at the

9  time that controversy had arisen it had been 16 months

10  since Mr. Jones had made any kind of a statement about

11  Sandy Hook?

12           MR. OGDEN:  Objection, your honor.  It's

13  misleading.  That's facts not in evidence.

14           THE COURT:  I'll sustain that.

15  BY MR. REYNAL:

16      Q.    I'm showing you what's been marked as

17  Plaintiffs' Exhibit 31 in evidence.  And I'm going to

18  direct you to the second to the last entry on that.

19      A.    Yes.

20      Q.    It says it's for a video entitled "The Fight

21  For Freedom of Information in Sandy Hook."  Is that

22  correct?

23      A.    Yes.

24      Q.    And the date on that video is July 8th,

25  2015?

```
 1        A.   Yes.

 2        Q.   And the next entry states that the title of

 3   the video is "Alex Jones Final Statement on Sandy Hook"?

 4        A.   Yes.

 5        Q.   And the date of that video is November 18th,

 6   2016?

 7        A.   Yes.

 8             MR. OGDEN:  Your Honor, objection.  He's

 9   doing the same thing.  He's just trying to use

10   Exhibit 31 as an exhaustive list knowing that's not all

11   the videos.  It's the only one produced to us or that we

12   had to find.

13             THE COURT:  So the questions so far are

14   allowed, but I don't know if the next one will be.  So I

15   take your point, Mr. Ogden.

16   BY MR. REYNAL:

17        Q.   Do you have any idea how many hours we've

18   spent in trial discussing Sandy Hook so far?

19             MR. OGDEN:  Objection.  Relevance.

20             THE COURT:  Sustained.

21   BY MR. REYNAL:

22        Q.   You testified earlier that you disagreed

23   with the idea of sticks and stones may break your bones

24   but words will never hurt you.  Would you concede that

25   sometimes important speech can be viewed as offensive?
```

```
 1          A.   Yes.
 2          Q.   We briefly touched on the psychiatric
 3   concept of malingering earlier.  Do you recall that?
 4          A.   Yes.
 5          Q.   Would you agree with the definition of
 6   malingering as the intentional production of false or
 7   grossly exaggerated physical or psychological symptoms
 8   motivated by external incentives?
 9          A.   Yes.
10          Q.   External incentives can be monetary?
11          A.   Yes.
12          Q.   They can be social?
13          A.   Yes.
14          Q.   And by social, I mean seeking approval?
15          A.   Yes.
16          Q.   Seeking fame?
17          A.   Yes.
18          Q.   Seeking meaning?
19          A.   I'm not sure what you mean by seeking
20   meaning in this context.
21          Q.   How about seeking revenge?
22          A.   Could be.
23          Q.   You stated that you reviewed the depositions
24   in this case.
25          A.   Yes.
```

1      Q.   You reviewed Mr. Heslin's deposition?

2      A.   Yes.

3      Q.   You saw where he says he has a vendetta

4    against Mr. Jones?

5      A.   Yes.

6      Q.   A vendetta is a blood feud; correct?

7      A.   I don't know what he meant by the word.  I

8    didn't ask him about that word.  And it would be very --

9    it would be crucial to ask him what he means.

10      Q.   Did you ask him what he meant by that word

11    when you read it in his deposition?

12      A.   No, I took it to mean that he was very angry

13    that Alex Jones had done the things he had done and

14    caused so much harm to himself and the mother of his

15    child and also harm to T.J.

16      Q.   It's J.T.?

17      A.   J.T.

18      Q.   You testified earlier that, in the wake of a

19    tragedy, people often look to find meaning in the

20    tragedy, in the sorrow, in the loss.

21      A.   They seek to do something, create something

22    that they wouldn't have created without it --

23      Q.   And --

24      A.   -- so some benefit comes out of what's

25    basically a horrible thing.

1      Q.   And part of that is because nobody likes to

2  think that something that awful would happen for no

3  reason at all?

4      A.   I don't know if that's necessarily the case,

5  that it happens for no reason, but they try to

6  make -- to make something good from it.

7      Q.   And would you agree that people sometimes

8  can be influenced in the causes that they embrace in the

9  wake of a tragedy?

10      A.   It's too vague.  I don't understand the

11  question.

12      Q.   Well, is it possible that, in the wake of a

13  school shooting, that a bereaved parent would take up

14  the cause of gun control in order to find meaning in the

15  tragedy that they suffered?

16      A.   There are people who have done that after

17  school shootings.

18      Q.   In fact, Mr. Heslin is one of them?

19      A.   I don't know -- yes.  Yes.

20      Q.   And somebody could seek to find meaning in

21  helping kids deal with emotional issues in school; true?

22      A.   Yes.

23      Q.   And somebody could also find meaning in

24  destroying Alex Jones.

25      A.   I'm not aware that Alex Jones was anything

1    to them until -- or any significance, even, until the

2    continued vilification of Scarlett and Neil.

3                    MR. REYNAL:  Pass the witness.

4                    THE COURT:  Thank you.

5                    MR. OGDEN:  Redirect?

6                    THE COURT:  Yes, Mr. Ogden.

7                    MR. OGDEN:  Thank you, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. OGDEN:

10        Q.    Dr. Lubit, I'm going to ask you a few

11   questions about the questioning and answer that you

12   earlier gave Mr. Reynal.

13                First I want to start off with Mr. Reynal

14   asked you if you were aware whether or not Neil and

15   Scarlett had reached out to Mr. Jones so they could sit

16   down and he could be a therapist to them.  Do you

17   remember that?

18        A.    I think he -- I thought he said Jones

19   reached out to them.

20        Q.    Correct, and he asked you if they had taken

21   him up on that.  Do you remember that?

22        A.    I'm not aware of them taking him up on it.

23        Q.    Are you aware that Neil and Scarlett did, in

24   fact, communicate with Mr. Jones when they served him

25   with this lawsuit?

1        A.    I believe so, yes.

2        Q.    Are you aware that, prior to that, they

3    served him with an offer for him to retract these

4    statements and correct them and he never did that.  Are

5    you aware of that?

6        A.    Yes, I am.

7        Q.    Did Alex Jones say, okay, now let's sit down

8    and talk about it?

9        A.    Not that I'm aware of.

10       Q.    I want to talk about important speech.  How

11   important is it for someone to lie about the murder of a

12   bunch of six year olds?  How important is that speech?

13       A.    Well, it goes beyond not being important.

14   You, coming back to my page in political science, you

15   can't have a democracy in which there are lies floating

16   around and people are telling different truths.  You can

17   have a democracy where people can have different

18   opinions but not different facts.  That tears the place

19   apart.  So it's highly destructive to do that.

20       Q.    Similar question, how important is it for an

21   individual to intentionally inflict emotional distress

22   on two parents who lost a son for the better part of ten

23   years?  How important is that?

24       A.    Well, it's important for the person who does

25   it because it generally will make them a lot of money if

1  they're on TV, but it's not to the benefit of society in

2  any way.

3       Q.   Were you in the courtroom when Miss Lewis

4  testified on Friday?

5       A.   Yes.

6       Q.   Did you hear her testimony when she said

7  that video about Sandy Hook and the vampires was Alex

8  Jones' third most read article he had ever published in

9  the history of this company?

10      A.   It was one of the most published, yes.  At

11 the top of the list.

12      Q.   Mr. Reynal asked you about how three billion

13 people saw this content that Mr. Jones was spewing to

14 the world.  When Miss Lewis said that number did she say

15 three billion people or did she say three billion views?

16      A.   Oh, yes, she talked about it very clearly,

17 three billion, through she didn't know how many

18 times -- how many different people did it or how many

19 were re-viewing as opposed to separate individuals.  It

20 is a staggering number either way, but it is -- it's

21 much more believable if it was three billion views.

22                 THE COURT:  Is that a new exhibit?

23                 MR. OGDEN:  Yes, Your Honor.

24                 THE COURT:  So, a new exhibit would be

25 119.  Plaintiffs' 119.  Let me just double check that

1    real quick.

2    BY MR. OGDEN:

3        Q.   I'll hand that to you, Dr. Lubit.

4            THE COURT:  Yeah.  Oh, well actually you

5    must have numbered some we haven't seen.  So, there's --

6    the last one I have is 126.  So 127.

7            MR. OGDEN:  Thank you, Your Honor.

8            And is it okay if I sticker it properly?

9            THE COURT:  She has stickers.

10           MR. OGDEN:  Oh, perfect.

11   BY MR. OGDEN:

12       Q.   Dr. Lubit, I've just handed you a copy of

13   what's marked as Plaintiffs' Exhibit 126.

14           THE COURT:  127.

15           MR. OGDEN:  127.  I'm sorry, Your Honor.

16           THE COURT:  That's all right.

17   BY MR. OGDEN:

18       Q.   What is Exhibit 127?  Without telling us the

19   contents of the document.

20       A.   Affidavit of Neil Heslin.

21       Q.   And prior to your testimony today had you

22   reviewed that document?

23       A.   I don't specifically recall it.  I may have,

24   I may not have.  I'm not sure.

25       Q.   Take a moment and read what's in it to see

1    if that refreshes your recollection on whether or not

2    you have seen it.

3        A.    (Witness complies).

4            I have seen this before.

5        Q.    Okay.  And is it part of the materials that

6    you relied on in coming to the opinions you provided

7    earlier today?

8        A.    Yes.

9            MR. OGDEN:  Your Honor, Plaintiffs offer

10   127 into evidence.

11           THE COURT:  Any objection?

12           MR. REYNAL:  Hearsay, Your Honor.

13           THE COURT:  Do you have a copy for me?

14           MR. OGDEN:  Yes, Your Honor.

15           May I approach?

16           THE COURT:  Yes.

17           I'm a little confused.

18           MR. OGDEN:  If I may respond to the

19   objection, your honor.

20           THE COURT:  Yes.

21           MR. OGDEN:  Under 703 an expert may rely

22   on hearsay or other inadmissible evidence and it can be

23   disclosed to the jury if the probative value or if the

24   unfair prejudice is not outweighed by the probative

25   value.  There's zero unfair prejudice with this

1   document, Your Honor.

2          THE COURT:  So, he certainly can rely on

3   it, no doubt.  Can talk about it.  But I don't know

4   about it coming into evidence as a standalone document.

5   So, where do you think that's in the rules?

6          MR. OGDEN:  Your Honor, instead of

7   admitting it I can withdraw my admission and we can just

8   disclose -- we can put it up on the screen and go

9   through without actually admitting it.

10          THE COURT:  Well, he can talk about it.

11          MR. OGDEN:  Okay.

12          THE COURT:  He can talk about everything

13   in it if he relied on it as part of developing his

14   expert opinion.

15          MR. OGDEN:  Sure.

16          THE COURT:  But you can't show it to the

17   jury unless it's admitted.

18          MR. OGDEN:  Okay.

19          THE COURT:  But, yeah, he can absolutely

20   talk about -- he can talk about the whole thing.

21   BY MR. OGDEN:

22      Q.  Dr. Lubit, when you were answering questions

23   earlier you were asked about timelines and if anything

24   had been seen before 2018.  Now that you've reviewed

25   this document, exhibit -- or excuse me, what was marked

1   as 127, can you tell me what number four, can you read

2   number four and tell us how that affected the fact that

3   Mr. Heslin had seen and was aware of this context and

4   the hoax prior to 2018?

5        A.   He was avoiding it.  He did not want to get

6   drawn in.  And it's notable to me that he didn't

7   approach Megyn Kelly, Megyn Kelly approached him.

8        Q.   To avoid getting drawn into a hoax, do you

9   have to know it exists?

10       A.   Yes.

11       Q.   How long or was there a long period of time

12   that Mr. Heslin proactively sought to avoid getting

13   pulled into the hoax in these conspiracies?

14       A.   Yes, yes.

15       Q.   Are we talking days, months, or years?

16       A.   Years, until he finally spoke -- he agreed

17   to go on Megyn Kelly and after asked, in 2017, roughly

18   five years after, to hopefully stop, you know, the lies

19   and, you know, hoping it would stop things.  Instead,

20   the opposite happened.

21       Q.   I want to go up to Section 2.

22            After reviewing Section 2, are you aware

23   that Mr. Heslin was aware that the hoax that he was

24   avoiding was being spread by Alex Jones?

25       A.   Yes.

1    Q.    And when did the hoax start, when did

2  Mr. Jones start this hoax?

3    A.    My recollection is this was very shortly

4  after, days.

5    Q.    Mr. Reynal was asking you questions about

6  2018, saying they never saw anything before, they didn't

7  know anything about Alex Jones.  Do you remember that?

8    A.    I don't specifically recall him saying that,

9  but they did know about him before.

10    Q.    Why would Mr. Heslin go on a Megyn Kelly

11  show to refute Mr. Jones' claims in 2017 if he didn't

12  know any of those hoax claims existed until a year

13  later?

14    A.    That wouldn't make any sense.  Well, unless

15  Megyn Kelly had called him up and told him, but he knew

16  before and he probably wouldn't have gone on unless he

17  knew there was a real problem.

18    Q.    When someone lies about you, do you have to

19  physically hear that person say it for it to harm you?

20    A.    Oh, of course not.  However you hear it, you

21  get it secondhand from people, that's even worse in some

22  ways.  You know, if someone lies to your face about you

23  it's painful, it hurts.  But if you hear that someone is

24  passing around rumors about you and so that many people

25  are now thinking this, that's worse.

1     Q.   Did Mr. Heslin or Miss Lewis have to watch
2  an Alex Jones Show and hear the lies for them to be
3  harmed?
4     A.   No, not at all.  Again, if you know the
5  rumor is being passed around, it's worse than just one
6  person saying something.
7     Q.   Would you say it's even more worse when
8  they're not rumors but people are physically
9  encountering you?
10     A.   Of course.
11     Q.   And harassing you about those messages?
12     A.   Of course, yes.
13     Q.   Corroboration was talked about a lot.  Do
14  you remember that?
15     A.   Yes.
16     Q.   You spoke with Mr. Crouch; correct?
17     A.   Yes.
18     Q.   He's right here in the courtroom, he's
19  coming up next; right?
20     A.   Yes.
21     Q.   We're not going to hide him.
22     A.   Correct.
23     Q.   Everything that Mr. Heslin and Miss Lewis
24  communicated to you, did you then go and corroborate it
25  with somebody that documented it as it was happening?

1        A.    Yes, I did do just that with Mr. Crouch.
2   And I saw a number of tapes myself of what Mr. Jones was
3   saying.
4        Q.    The other -- the last area I have is
5   in -- you testified in cases before and sometimes are
6   there other experts that represent the party that didn't
7   hire you?
8        A.    Almost all the time.  I don't know if I can
9   even think of a case where there wasn't an expert hired
10  by the other side.
11       Q.    And when that happens, you review their
12  materials and their testimony so that you can compare
13  what yours looks like; right?
14       A.    Yes.
15       Q.    Are you aware of any expert whatsoever that
16  represent or that was hired by the defense that's going
17  to testify in this case?
18              MR. REYNAL:  Your Honor, I object to this
19  line of questioning.  Mr. Ogden knows very well why
20  that's the case, and it has nothing to do with this
21  witness.
22              MR. OGDEN:  If I may respond, Your Honor.
23              THE COURT:  Briefly.
24              MR. OGDEN:  I'm not sure how his conduct
25  can be rewarded by me not getting to ask these questions

1   that are admissible otherwise.  I don't see how you can

2   get rewarded for that.

3              MR. REYNAL:  It's not part of his expert

4   testimony, what usually happens in cases.

5              THE COURT:  All right.  I'm going to

6   overrule the objection.  I don't want to spend forever

7   on it, but you can answer the question.

8   BY MR. OGDEN:

9       Q.   To your knowledge, does Mr. Jones or his

10  company, are they bringing an expert in --

11      A.   No.

12      Q.   -- in mental health whatsoever?

13      A.    I would have, hopefully, been given a report

14  by them if they were testifying.  If someone had done a

15  report.

16              MR. OGDEN:  Thank you, Dr. Lubit. I don't

17  have any questions.

18              THE COURT:  Mr. Reynal?

19              MR. REYNAL:  Nothing further, Your Honor.

20              THE COURT:  All right.  At this time for

21  my jury, you know the drill, remember as always all of

22  my instructions, this is an individual exercise, you're

23  not encouraged, you're just permitted, and we'll take --

24  let's keep it a short break because we've only been back

25  40 minutes.

1           All right, you can go ahead and head back

2    now.  Thank you.

3           *(Whereupon the jury exited the courtroom and*

4    *the following proceedings were held in open court)*

5                THE COURT:  Put it on the record.

6                MR. REYNAL:  Well, I would move now for a

7    mistrial under CPRC 41.011, Your Honor.

8                THE COURT:  Okay.  That's denied.

9                MR. REYNAL:  Thank you.

10               MR. BANKSTON:  And then I have something

11   very briefly to raise with You Honor.

12               THE COURT:  Okay.

13               MR. BANKSTON:  I would like that raise an

14   objection right now for whatever Your Honor wants to do

15   about it, I am not moving for a mistrial, but I am very

16   concerned about a series of things that have just

17   happened and I want to make sure that everybody in the

18   room is on the same page.

19               Mr. Reynal had told the jury that there

20   was 29 minutes total of InfoWars videos.  They played

21   51 minutes in a single video, so we know that's not

22   true.  He tried to tell the jury about Miss Lewis's

23   testimony about three million -- three billion page

24   views, that she had testified there was three billion

25   individuals, which she explicitly said was not -- could

1    not be determined, and, in fact, were people returning

2    multiple times, attempting to mislead the witness into

3    thinking that's what she was saying.

4                 He has routinely, every single day of this

5    trial, broken rules that a first-year lawyer knows.  He

6    has routinely placed inadmissible material in front of

7    the jury.  It is, from our perspective at this table,

8    that Mr. Reynal is actively trying for a mistrial and

9    obviously we don't want that to happen.

10                We would hope that at this point we could

11   have Mr. Reynal instructed to please follow the rules

12   which we all know he very well knows and to not attempt

13   to sabotage what has happened to those plaintiffs.

14   Otherwise, I want this on the record, why I'm bringing

15   it to you now, because we will be bringing it to show

16   motions for sanctions if this conduct continues.

17                THE COURT:  All right.  I am very upset

18   that you have tried to imply to the jury that we know

19   how many videos about Sandy Hook were released by your

20   clients when we don't, because they refused to respond

21   to discovery.  So, I do not want you to do that again.

22   And I don't want you to argue with me about it.  That is

23   the rule of this case, that is the -- that's it.  They

24   didn't respond, we don't know.  So, don't couch it in

25   that language.

1          MR. REYNAL:  Your Honor?  If I may.

2          THE COURT:  I'm still talking.

3          I'm not really being asked to do anything

4     except to tell you to follow the rules, which I feel

5     like I've done many times already.  We've had multiple

6     conversations about how I know you know what the rules

7     are and you know you know what the rules are.  But

8     you've chosen not to follow them on occasion and I'm

9     asking you again, follow the rules.

10          We are not going to take up sanctions in

11     the middle of this trial.  So, if somebody wants to file

12     a motion for sanctions, we'll take it up at the

13     conclusion of the trial.  If I believe actions in front

14     of me rise to the level of contempt of Court, I will

15     deal with that when it happens.  Had I been in the room

16     the day there was the altercation, we would be in that

17     situation, but I was not.

18          MR. REYNAL:  Your Honor, the jury

19     instructions that you just distributed said that the

20     jury has to base its decision on the evidence adduced in

21     the courtroom.  Frankly, the number of videos, their

22     length, this is evidence that is being adduced in the

23     courtroom.

24          THE COURT:  Yes, but what you said was

25     not, we've shown the jury 29 minutes of clips where the

1    word "Sandy Hook" appears, or anything like that.  It

2    was, they released in total 29 minutes.  That is not

3    true.

4                   MR. REYNAL:  Okay.  I can change the

5    questioning, Your Honor.

6                   THE COURT:  So, don't -- well, I'm not

7    going to tell you what question to ask, that is

8    definitely not my job.  But I'm telling you what

9    question not to ask.

10                  MR. REYNAL:  Very well.

11                  THE COURT:  Anything else?

12                  MR. BANKSTON:  Not from our side, Your

13   Honor.

14                  THE COURT:  All right.

15                       (Brief recess.)

16              (Discussion between court and counsel off the

17   record.)

18                  THE COURT:  We've just been discussing the

19   questions for Dr. Lubit, we've reached an agreement on

20   which ones we're going to ask and which ones we're not.

21                  Any further objections, Mr. Ogden?

22                  MR. OGDEN:  No, Your Honor.

23                  THE COURT:  Mr. Reynal.

24                  MR. REYNAL:  No, Your Honor.

25                  THE COURT:  Okay.  We are ready for the

1  jury and the witness.

2              *(The following proceedings were held in*

3  *open court in the presence of the jury.)*

4              Dr. Lubit I'm going to read you some

5  questions that have been submitted by the jury.  You

6  just answer them as if they came from one of the

7  lawyers, just listen really hard to the question, answer

8  the question as best you understand or let us know if

9  you don't.

10              This is for the jury:  Remember, if you

11  don't hear your question that's because I made a

12  decision that there was a reason why I couldn't read it.

13  Okay?

14              Are you ready?

15              THE WITNESS:  Yes, Your Honor.

16                        EXAMINATION

17              THE COURT:  How many years have you been

18  treating Mr. Heslin and Miss Lewis?

19              THE WITNESS:  I have never treated

20  Miss Lewis or Mr. Heslin.  I did a forensic evaluation

21  and there's no doctor-patient relationship.  And I will

22  not be treating them again, I won't be interviewing them

23  at any other time.

24              THE COURT:  To your knowledge, did

25  Mr. Heslin or Miss Lewis feel as though a quarter of the

1    population distrusted them?

2                THE WITNESS:  I believe so, that there

3    was, especially Neil talked about just how many people

4    out there, you know, he would never know and people

5    would come up to him, and also Scarlett withdrew from

6    people, not knowing even among her friends what people

7    thought anymore or who, she had people over who might be

8    part of that, would be feeling that she was a fake and a

9    fraud, too.

10               THE COURT:  Have Mr. Heslin and Miss Lewis

11   discussed what good they would like to do or come from

12   the tragedy at Sandy Hook?

13               THE WITNESS:  Scarlett has talked, there's

14   her foundation, Choose Love, and trying to develop

15   social-emotional learning programs in schools and to

16   help children so that there isn't another Sandy Hook.

17   Both of them have talked about the tremendous harm that

18   this -- the type of behavior that Mr. Jones has engaged

19   in does to people and hope that, you know, their

20   succeeding in the trial will dissuade people in the

21   future.

22               There's also the issue of their son's

23   legacy and wanting that to be clear, and for them to be

24   able to try to put some closure on this period in which

25   they were invalidated and vilified and so many people

1   were made to believe that they were bad people who lied

2   and did bad things.

3                    THE COURT:  What are the signs that a

4   person might be malingering?

5                    THE WITNESS:  That's something I write

6   about.  What we do as psychiatrists, psychologist, too,

7   is to look at the pattern of the problem.  So, we look

8   at, you know, what was the cause of the emotional

9   trauma, does it make sense that this cause could lead to

10  a lot of symptoms, does the pattern of symptoms make

11  sense.

12                   So, and often people give strange

13  patterns, or they repeat over and over again just how

14  terrible it was for them.  No matter what question you

15  ask, they just jump back and say how terrible it was.

16  They -- pushing the idea too much.

17                   There's talking to people at different

18  times, which is something I did hear, and seeing if

19  people give the same answers.  It's -- if someone is

20  telling the truth they probably -- they're going to say

21  the same thing or almost the same thing at two different

22  points in time.  You separate the interviews out,

23  they're likely not going to remember what they said,

24  they're not taking notes on my questions, and then a few

25  months later they're going to say something different

 1   very likely.  So, all those things are looked at.

 2            I looked at their emotions when speaking

 3   to me and is it consistent.

 4            One situation, a girl was claiming that

 5   she had been sexually abused and she was completely

 6   comfortable in the way she looked and I asked her, how

 7   you feeling?  She's, oh, I'm fine.  For a 12-,

 8   13-year-old girl to be telling a male stranger that she

 9   had been raped is unlikely, and so that raised serious

10   questions for me whether it had actually happened.

11            Sorry.

12            THE COURT:  That's all right.  Is

13   everything okay?

14            THE WITNESS:  No, that was my phone, fell

15   out of my pocket.

16            THE COURT:  All right.  You can pick it

17   up.

18            THE WITNESS:  No, at the end or it will

19   fall down again.

20            THE COURT:  All right.  If the statements

21   from InfoWars stopped today, how long do you think it

22   would take for the healing to occur?

23            THE WITNESS:  I think it's going to -- it

24   takes more than just the statements to stop.  When we've

25   been -- when people are injured, we think about our own

1    feelings, responses to things.  If someone stops doing

2    something bad to us, hurtful to us, that's usually not

3    enough.  We need vindication, we need statements that

4    this should not have happened, the person should not

5    have done it and it was bad thing that they did to us,

6    and that would help the healing.

7                Are they ever going to fully heal?  I

8    don't think so.  This is a really traumatic situation.

9    You know, I used the word "complex trauma" before, when

10    traumas are repeated incidents instead of just one.  And

11    complex trauma, particularly damaging is to be able to

12    trust people in general, and that's very disruptive to

13    relationships, to everything.  And complex trauma is

14    much harder to heal than single-incident trauma.

15                THE COURT:  Is it possible that forensic

16    psychologists, academic researchers, news editors, et

17    al., are able to set aside their own potential bias in

18    their search for the truth in the same way that this

19    jury is asked to?

20                THE WITNESS:  We have to be careful about

21    it.  I've written an article just on, oh, one focused on

22    bias, I addressed it again in the article I'm writing

23    now.  And it's important, very important, to do one's

24    best to do that.  And it depends what we're talking

25    about.

1          When I -- when I'm basically asked general

2    questions and I'm quoting myself from things that I've

3    written in, you know, before I got involved, I think

4    that's fairly unbiased.  It's not in any way based on

5    the trial.  I don't think it's biased for me to say that

6    they have posttraumatic stress disorder, because they --

7    there is a list of specific symptoms and they have

8    enough symptoms, they meet the criteria.

9          I have seen people, you know, ignore data

10   or spin data heavily.  I try very hard never to do that.

11   You can really minimize the risk of bias if you present

12   to yourself competing hypotheses about what happened and

13   then you look and see how the data fit each.  And I try

14   to do that in every case, rather than looking for data

15   that just supports what your gut instinct says is true.

16         THE COURT:  In your opinion, why would it

17   be more important for a news organization to verify its

18   claims and conduct investigations than a forensic

19   psychologist?

20         THE WITNESS:  It's simply not -- it's not

21   practical.  It takes -- it would take a huge number of

22   man hours to go back and check on each fact.  And you

23   have people on each side of the case and if the facts as

24   you believe them are not correct, they are the ones to

25   be doing the research and saying, wait a minute.

1          But, so, we do our best to look at

2   different reports we have, such again Mr. Crouch, who

3   lived this all the way along, myself interviewing him on

4   multiple occasions, the -- his emotions and the trauma

5   and the symptoms they have fitting together, and those

6   pieces are what we use in forensic psychiatry is showing

7   that -- that we feel that the person is more likely

8   credible than not.

9          And all the pieces fit well together.

10  Everything that I do as a forensic psychiatrist

11  indicates to me that I'm being told the truth.  And I

12  often felt that I wasn't being told the truth, but in

13  this case I do.

14          THE COURT:  All right.  Thank you so much,

15  Dr. Lubit, for your time and your testimony.  At this

16  time you're free to return to whatever it is you need to

17  be doing, whether that's in here or somewhere else.

18          Don't forget your phone.

19          All right.  And who is our next witness?

20          MR. FARRAR:  Plaintiffs call Michael

21  Crouch.

22          THE COURT:  All right, Mr. Crouch, come up

23  here please.

24          Will you raise your right hand.

25          Do you solemnly swear or affirm under

1    penalty of perjury that the testimony you are about to

2    give shall be the truth, the whole truth, and nothing

3    but the truth?

4                    THE WITNESS:  I do.

5                    THE COURT:  Thank you so much.  Come have

6    a seat here.

7                    You'll see there's water and glasses.  And

8    microphones.

9                    THE WITNESS:  Thank you.

10                   THE COURT:  I can't tell if you also are a

11   little bit soft spoken.  If you are, you'll have to just

12   scoot the chair up a little bit closer.

13                   Did you hear my instructions about letting

14   the attorney completely finish their question and all of

15   that?

16                   THE WITNESS:  I do.

17                   THE COURT:  All right.  Then I'll try, I

18   tend to repeat it every single time, but we'll give you

19   a chance, we'll see how it goes.

20                   THE WITNESS:  Okay.

21                   THE COURT:  Thank you.

22                   Go ahead.

23                        MICHAEL CROUCH,

24        Having been duly sworn, testified as follows:

25   ///

```
 1                    DIRECT EXAMINATION
 2   BY MR. FARRAR:
 3         Q.   Good afternoon.
 4         A.   Good afternoon.
 5         Q.   Can you introduce yourself, please.
 6         A.   Yeah, Michael Crouch.
 7         Q.   How are you doing, sir?
 8         A.   I'm okay.  I'm a little nervous.
 9         Q.   You've never testified, or I guess once
10   maybe, a long time ago?
11         A.   Maybe 25-plus years.
12         Q.   That's the only other time you had ever
13   taken the witness stand?
14         A.   That's right.
15         Q.   Tell me what you do for a living.
16         A.   I'm a psychotherapist.
17         Q.   What's a psychotherapist?
18         A.   So, I work with patients and couples who
19   struggle with depression, anxiety disorders, trauma,
20   that kind of stuff.
21         Q.   Where do you live?
22         A.   I live in Norwalk, Connecticut.
23         Q.   How long have you been a psychotherapist?
24         A.   31 years.
25         Q.   Is that something you get licensed for?
```

1          A.    It is.  I have an -- I am licensed in the

2     state of Connecticut.

3          Q.    Can you walk me through the education that's

4     required to be a psychotherapist.

5          A.    Yeah,  I have an undergraduate in psychology

6     and then I graduated with a masters in social work from

7     Columbia University in 1991.

8          Q.    You and I have had opportunity to spend a

9     little time together this weekend and talk about some of

10    the care that you had of Neil and Scarlett; right?

11         A.    Yes.

12         Q.    All right.  So, I know a few things about

13    you, but there was gap between undergrad and when you

14    went to Columbia.  Tell us about that.

15         A.    My first career, which brought me from

16    Kansas to New York City, was I have about 15, 16 years

17    in theater, musical theater.

18         Q.    You were working on trying to become that

19    star?

20         A.    I was.

21         Q.    All right.

22         A.    When I realized that wasn't going to happen,

23    I moved on.

24         Q.    Started taking care of people.

25         A.    I did.  And they're both listening

1    businesses, you know.

2         Q.   I'll just get this out of the way, we're

3    not -- well, let me tell you, we're compensating you for

4    your time; right?

5         A.   We are.  Yes, you are.

6         Q.   And if I remember right, it's just whatever

7    amount that you would -- you're here out from a day's

8    practice that you had; right?

9         A.   That's correct.

10        Q.   So you didn't charge me for even being here

11   this weekend, even though you were here this weekend?

12        A.   No, I did not.

13        Q.   All right.  It's important for you to be

14   here, for you; right?

15        A.   It's really important for me to be here.

16   It's part of my work.

17        Q.   Part of your care.

18        A.   Yes.

19        Q.   There's something we were talking about

20   called the Trauma Recovery Network.  Can you tell the

21   Ladies and Gentlemen of the Jury what that is.

22        A.   Yeah, back in 2011 there was a Christmas day

23   fire in Stamford, Connecticut, where 70 firefighters

24   were involved both in the rescue operation attempts and

25   the recovery operation.  And there were three children

1   who died and their grandparents.

2        Q.   This was a house fire?

3        A.   This was a house fire.

4        Q.   Do you remember what happened?

5        A.   From what I was told that there were -- they

6   had a fire in the fireplace and one of the twins, there

7   were twin daughters who were such and then a

8   nine-year-old daughter, said, Santa Claus won't be able

9   to get down the chimney.  So, the boyfriend who --

10   cleared out the fireplace of all of the ashes and put

11   them in the breezeway outside.  And that breezeway

12   caught fire.

13        Q.   How did you get involved in that?

14        A.   That -- on Christmas day there was a mixup

15   in the EAP with the city of Stamford.

16        Q.   EAP?

17        A.   Employee Assistance Program.

18        Q.   Okay.

19        A.   And so, there was no response.  And the --

20   my understanding is that the mental health -- other

21   mental health providers said, we don't come out on

22   weekends or holidays, so.

23        Q.   When you say no response, you mean no

24   response by mental health professionals?

25        A.   That's correct.

1       Q.   Okay.

2       A.   And there were 70 firefighters involved in

3   that fire who needed some help, who were struggling with

4   that.  Now, the loss of a child is always difficult.

5       Q.   For the first responders to see even?

6       A.   Yes.

7       Q.   So, and I just want to make sure we're

8   clear, you were called out to talk with the 70

9   firefighters that had to deal with either trying to

10  fight the fire or, when you say recovery efforts, for

11  the bodies?

12      A.   Recover both the children and their

13  grandparents, that's right.

14      Q.   At this time there was no Trauma Recovery

15  Network in Connecticut; is that right?

16      A.   That's correct.  There were only three at

17  that time, New York City, Western Massachusetts, and

18  Arizona.

19      Q.   So, how did this 2011 Christmas fire at

20  Stamford become a Trauma Recovery Network?

21      A.   I got a call from a therapist who said,

22  Michael, did you hear what happened?  And I said, no.

23  And her husband was a captain on the fire department and

24  she said, there was a Christmas fire and there's no

25  mental health coverage.

1          So, I went the next day, which was Monday

2    I think, to talk to the assistant chief and find out

3    what they were going to do.  And they were going to have

4    a debriefing the next day, and so I called three

5    therapists that I knew, EMDR therapists that I knew --

6    EMDR, Eye Movement Desensitization Reprocessing, been

7    around since late 80s.

8          Q.   Okay.

9          A.   Okay.  So I called three and all three of

10   them said yes, and they were there the next day during

11   the debriefing.  And then, Karen Alter-Reid, who is one

12   of the cofounders of the Trauma Recovery Network, said,

13   you should started a TRN.  So I did.

14         Q.   All right.

15         A.   Not knowing what I was getting into.

16         Q.   And have you been involved in that TRN since

17   that late 2011?

18         A.   Yes.

19         Q.   Did you and your team help treat those

20   firefighters, what they were going through?

21         A.   Yes, we did.  And we were -- Stamford Fire

22   TRN, and then Newtown happened a year later.

23         Q.   All right.  So, a year later this TRN, this

24   Trauma Recovery Network, is already set up and in place;

25   right?

1       A.    That's correct.

2       Q.    How does it get involved with what happened

3   at the Sandy Hook Elementary School?

4       A.    We went the next day, which I believe was

5   Saturday morning, just to talk to the psychotherapists

6   in the Newtown area about what they were going through.

7       Q.    When you say we, how big had your team

8   gotten at that time?

9       A.    At that time there were only ten of us.

10      Q.    Okay.  Some full time, some part time?

11      A.    All were full time at that time.

12      Q.    So, just correct me if I'm wrong, it wasn't

13  that you just treated folks whenever there was some

14  major event, but even just officers on sort of their

15  day-to-day, had a tough day with some traffic stops,

16  things like that?

17      A.    Yeah.  Any time there are duty-induced

18  issues or family issues or they're struggling with

19  depression, anxiety, they can call us.

20      Q.    So, you're helping the first responders cope

21  with what they do.

22      A.    With what they do, that's correct.

23      Q.    I know you treated Neil and Scarlett, we're

24  going to get to that in one second.  But just your other

25  work at Sandy Hook, how many folks did your TRN treat

1    for mental health problems that they had from that?

2         A.   Oh, my guess is between two and 250.

3         Q.   You treated a handful yourself.

4         A.   I sure did.  Both individually I treated

5    about six and then a number of groups and things like

6    that that we were involved in.

7         Q.   And I think you told me that's how Neil

8    Heslin ended up finding you; right?

9         A.   That's correct.

10        Q.   When did you first start treating Neil

11   Heslin?

12        A.   In July of 2013.

13        Q.   So about such, such and a half months after

14   Sandy Hook?

15        A.   Uh-huh.

16        Q.   Are you still treating him?

17        A.   I am.

18        Q.   Okay.  So, he's been your patient ever

19   sense; right?

20        A.   That's correct.

21        Q.   We're going to talk about Scarlett, too.

22   Scarlett didn't start with you back in 2013; right?

23        A.   No.  She had been through a number of

24   different therapists and came to me, I think at Neil's

25   suggestion, around 2020.

1      Q.   And you're not still treating Scarlett; is

2  that right?

3      A.   I'm not.

4      Q.   Do you know how many times you treated

5  Scarlett?

6      A.   I saw her about ten times.

7      Q.   Was this during -- so, 2020, is this during

8  the pandemic, so your treatment is Zoom?

9      A.   That's correct.  I use a platform called

10  Simple Practice.

11      Q.   Okay.

12      A.   Because it's HIPAA compliant.

13      Q.   Fair enough.

14           But you never got a chance to really sit

15  down and be in the same room and connect with Scarlett?

16      A.   No, I did not.

17      Q.   This is probably a silly question, you keep

18  notes of your sessions; right?

19      A.   I do.

20      Q.   Okay.  And as part of your sort of weekend

21  assignment, did you look at those notes and try to

22  refresh your recollection?

23      A.   I did, yes.

24      Q.   You also looked at the affidavit of Neil

25  Heslin that we talked about with Dr. Lubit; is that

1  right?

2       A.   I did.

3       Q.   When you looked at your notes of your -- is

4  it sessions or treatments?  What is the right word?

5       A.   Whatever.  Sessions is good.

6       Q.   Sessions, okay.

7            Let's talk about Mr. Heslin first, then

8  we'll move to Scarlett, if that's okay.

9            When you look back at your notes of

10  Mr. Heslin, when is the first time you saw, in your

11  notes, some issue about either Alex Jones or people

12  profiting off of what happened at Sandy Hook?

13       A.   Way back in 2013, when I first started with

14  Neil he said that there are a number of people who are

15  profiting off of what happened at his son's school, and

16  then he went on to say there are a number of people who

17  are profiting off the loss of children.

18       Q.   All right.

19       A.   That was in 2013.

20       Q.   When is the first time that -- I guess let

21  me ask you this, did that intensify as the years went

22  along?

23       A.   A little bit, in that he was certainly

24  scared a little bit of what was going on.  He was

25  dedicated to the memory of his son, so he -- and he --

1    he worked on gun control and mental health issues to

2    honor his son Jesse.

3        Q.   Did you see where Mr. Heslin had said that

4    he was trying to distance himself from that hoax

5    controversy for the first several years?

6        A.   For the first several years he said, I don't

7    want to dignify, and that was the first time he used

8    Mr. Jones' name, Alex Jones, he said, I don't want to

9    dignify his false claims.

10       Q.   The hoax?

11       A.   The hoax, that's correct.

12            So that was in -- again in 2013 he said

13   that.

14       Q.   Okay.  Did it intensify in early 2018, in

15   the April timeframe?

16       A.   Yes.  Actually, that was the first time that

17   he realized, because he spoke to Mr. Pozner and he

18   said -- Mr. Pozner said, Neil, they are using your name,

19   back in 2017 when he went on Megyn Kelly.

20       Q.   After the first time you saw the words,

21   actually the words "Alex Jones" in your notes, what

22   percentage of your notes thereafter have the words "Alex

23   Jones" in them --

24       A.   90 percent.

25       Q.   It became an obsession.

1        A.   Yes.

2        Q.   I'm going to talk to you, I'm going to try

3   to separate sort of two parts of time.  I want to talk

4   to you about before the 2018 when Alex Jones is real

5   intense and then after it; okay?

6        A.   Uh-huh.

7        Q.   So, let's talk about before.  And I know you

8   started treating him such months, just walk me through,

9   how is he doing as the years go by?

10       A.   Well, I think, you know, whenever we lose a

11  child it's not easy.  Ever.  But you could see the

12  narrative changing.  When it first happened there was

13  kind of scattershot.  That's trauma.

14       Q.   What do you mean by scattershot?

15       A.   Meaning that he remembered all of the bad

16  things that had happened.

17       Q.   Okay.

18       A.   You know, and that he was not able to

19  protect his son.

20       Q.   How was things like, you know, in the first

21  six, eight months you treated him, his sleep?

22       A.   Sleep was better then.  It was right after

23  the murder, but he's -- he was only getting two to

24  four hours of sleep a night.

25       Q.   As the years start going, do you start

1    seeing improvements in Mr. Heslin?  Does he get better?

2         A.   I did.

3         Q.   Oh, I've heard --

4              THE COURT:  Can you speak up a little bit,

5    Mr. Farrar?  I'm sorry, you're kind of quiet.  I'm

6    having a heard time hearing your questions.

7    BY MR. FARRAR:

8         Q.   I think I heard Dr. Lubit say that you never

9    get over the loss of a child.  Do you agree with that?

10        A.   I absolutely agree with that.

11        Q.   Do you get better?

12        A.   You can find a place to put that loss.

13        Q.   Was he doing that?  Was he getting better?

14        A.   He was getting better in that he was

15   beginning to remember all the things that he did with

16   Jesse, and all the -- all the things that -- that

17   brought joy to him.

18        Q.   He was starting to have positive memories of

19   Jesse; is that right?

20        A.   That's correct.

21        Q.   Before, you know, right after the murder,

22   were the feelings much more negative and just always

23   remembering the murder as opposed to --

24        A.   Well, remembering the murder, remembering

25   the fact that he, in fact, dropped off his son and that

 1    he didn't -- he believed he didn't do enough to protect

 2    him.

 3         Q.    Did he start finding enjoyment in life

 4    again?

 5         A.    Boy, oh, boy, that's a tough one.  He found,

 6    yes, he was able to find a way to return to work, he was

 7    able to find a way -- he was sleeping a little better,

 8    he was able to find a way to remember, have positive

 9    memories of Jesse and his relationship with him.

10         Q.    Is that clinically significant, to find --

11    to start having these positive memories of your son?

12         A.    Yes --

13         Q.    Explain that.

14         A.    -- it is.

15              Well, in EMDR we talk about how

16    distressing is that memory, how distressing is what you

17    remember about your son and how he died.  And at that

18    time it was from 0 to 10, you know, it was a 22.  It was

19    hard for him.  And it -- you could see it decreasing

20    maybe to an 8, a 7.  So he was beginning to have

21    positive memories, beginning to return to work, sleeping

22    two to four hours, which is a little better.  So those

23    are things that would be significant.

24         Q.    The healing process is underway; is that

25    fair to say?

```
 1          A.    That is fair to say.

 2          Q.    When you first see the Alex Jones name in

 3    2018, tell me what happens differently to Mr. Heslin.

 4          A.    When you talk about obsession, you could see

 5    that all of a sudden there was a closing down.  There

 6    was a focus on, I've got to protect my son's legacy, my

 7    son's honor, my son's memory.

 8          Q.    How is he doing that?

 9          A.    Well, he went on Megyn Kelly in 2017 and

10    said, please stop.

11          Q.    In your professional opinion, why did he go

12    on Megyn Kelly?

13          A.    He was hoping that, if he begged and

14    pleaded, that Alex Jones would stop.

15          Q.    Do you remember what his message to Alex

16    Jones was at the end of that?

17          A.    Yeah.  He said, you have -- you have a

18    family.  You have a son, or children.  Enjoy Father's

19    Day.  He said, I can't.  I don't have a son anymore, so

20    I can't enjoy Father's Day.  But I want you to enjoy

21    Father's Day.

22          Q.    He is compassionate.

23          A.    Very.  Both -- both Alex -- I'm sorry, both

24    Neil Heslin and Scarlett Lewis are very good people,

25    compassionate people.
```

1      Q.   The, enjoy Father's Day because I can't, do

2  you understand that to be his message to Alex Jones that

3  my son Jesse was real?

4      A.   Yeah.  And he was.

5           You know, it's technicality, he held Jesse

6  I think at 1:00 o'clock in the morning the day of the

7  shooting.  You know, the shooting is, what, between 9:04

8  and 10:00 o'clock.  So, he held his son because he asked

9  a law enforcement officer, please let me in to see my

10 son, and the law enforcement officer allowed him to do

11 that.

12     Q.   After he talks to Mr. Pozner in 2018, and

13 you continue to treat him all the way up to -- he's

14 still your patient; right?

15     A.   He is.

16     Q.   I'm sorry, I meant that after Mr. Heslin

17 spoke with Mr. Pozner 2018.  You understand that?

18     A.   Correct.

19     Q.   Okay.  I want, if you can, to describe to

20 the jury the differences in Neil's mental health after

21 2018.

22     A.   When he realized that Alex Jones was not

23 stopping, he became very focused on, I've got to

24 protect, which is what all parents do, I've got to

25 protect my son.  I've got to protect my son's name, my

1   son's honor, his memory.  Because if -- if Alex Jones,

2   if he was spreading the belief, the lies, that Neil is

3   an actor, that means that -- I'm sorry.  That means that

4   Jesse didn't exist.  Which is crazy.

5              And that means if Jesse didn't exist and

6   Newtown didn't happen, the Sandy Hook shooting didn't

7   happen, then -- then what he knows about his son is

8   false.  That's crazy.  Jesse was hero.  Jesse saved

9   lives.

10       Q.   How did he save lives?

11       A.   He yelled "Run."  When Adam Lanza ran out of

12   ammunition and was reloading, Jesse said, "Run."

13       Q.   Kids got out?

14       A.   And kids got out.

15              And there are kids who are now turning 16

16   that wouldn't be alive today if he didn't yell "Run."

17       Q.   He was six.

18       A.   He was six years old.

19              But that's what -- what Scarlett and Neil

20   taught him, you know, we don't quit until the job is

21   over; right?

22       Q.   And Alex Jones is trying to -- when he said

23   he doesn't exist, he's stealing that from Neil; is that

24   right?

25       A.   That's correct.

1          Q.    He's stealing it from Scarlett.  Right?

2          A.    Stealing a belief that -- and a knowledge

3    that -- because this was told to Neil -- my

4    understanding is it was told to Neil by kids who got

5    out, "Jesse saved our lives, he said, 'Run.'"  So, yes,

6    you're taking away from Neil and Scarlett what they know

7    of their son, what they want to hold onto.

8          Q.    How did that affect Neil's well-being?  What

9    did he start doing?

10         A.    In 2018?

11         Q.    Yes, sir.

12         A.    He, when he realized that Alex Jones was not

13   going to stop, he said, okay, the next step is to sue

14   him for defamation of character.  He got -- he went to

15   Mr. Pozner and he said, why, why do people -- why do I

16   keep getting death threats, why do I keep getting people

17   calling me and talking to me?

18              And Mr. Pozner said, he mentioned your

19   name a year ago, Neil.

20              And Neil didn't know that.  Because he

21   didn't want to dignify what Alex Jones was saying.

22         Q.    I want to run that piece and have you watch

23   it, if that's okay.

24         A.    Sure.

25              THE COURT:  It's Plaintiffs' Exhibit PVX

1   23.  It should show up on your screen here.

2               THE WITNESS:  Okay.  Thank you.

3               *(Video played off the record.)*

4   BY MR. FARRAR:

5        Q.   Mr. Crouch, did you hear the part in there

6   where Mr. Shroyer said, you would remember if you held

7   your dead kid, that is not something you would misspeak

8   on?

9        A.   Yes, I heard that.

10       Q.   He's calling Neil Heslin a liar; isn't he?

11       A.   He's calling Neil a liar and he's saying

12   that Jesse didn't die; that he didn't exist.

13       Q.   That he didn't exist.  He's not really

14   saying that he didn't hold Jesse, he's saying he didn't

15   exist; right?

16       A.   Correct.

17       Q.   What did that do to Neil, when he heard

18   that?

19       A.   I don't -- I can say what it did to me.  I

20   was just -- I watched this video and I thought, this guy

21   has no feelings.  He doesn't -- he doesn't check his

22   facts.  I would imagine that, when Neil heard that, he

23   was incensed, again somebody is calling him a liar,

24   somebody is saying that his son didn't exist.  That's

25   just --

1          Q.    Did you see in Neil's affidavit where he

2    said after he found out about this, fear dominated my

3    thoughts?

4          A.    Yes, I saw that.

5          Q.    Is that consistent with your treatment and

6    what you saw in your notes?

7          A.    Yes, as of in -- when he realized that this

8    was real, this was going on, you could see -- you could

9    see Neil change.  There was a lack of emotion, there was

10   a lack of affect, and he was focused on, I've got to

11   right this wrong.  This is not right.

12         Q.    How did he try to right that wrong?

13         A.    We're here today.  He went on Megyn Kelly a

14   year before to try to say, please stop.  When that

15   didn't work, I think he said, I've got to take the next

16   step.

17         Q.    This is the system we hold people

18   accountable in America; right?

19         A.    That's correct.

20         Q.    It's sort of what separates us from wild

21   animals, who just fight each other to death; right?

22         A.    Right.

23         Q.    There's criticism, you've heard the

24   criticism that he filed this lawsuit and somehow making

25   it worse.  This is what he has to do; right?

1        A.    I think it's what he feels he has to do,

2    yeah.  If Alex Jones doesn't stop, then he has to do

3    this.  He has got to say, this is real, my son was real.

4    I held my son.

5        Q.    When he went on Megyn Kelly he was reaching

6    out to Alex Jones before he filed this case; right?

7        A.    That's correct.  He was hoping that that

8    would get him to stop.  It didn't.

9        Q.    Did he discuss with you his fear for his own

10    personal safety?

11        A.    Well, it's -- that's the new injury, is that

12    now he not only is aware that there are a number of

13    people, and I don't care if it's one or six billion, I

14    don't care, but there are a number of people who are

15    believing that Sandy Hook was a hoax.  And so he needs

16    to -- he needs to right that wrong.

17        Q.    Is the realization that people believe Sandy

18    Hook elementary was a hoax, is that a new and separate

19    and distinct injury from the loss of Jesse?

20        A.    I think the -- God.  You know, I think the

21    loss of Jessie is a loss by itself.  You know, you can't

22    make that okay, you can't -- he's not going to recover

23    from that.  He'll find a place to put it.  The new

24    injury is his own personal safety and that there are

25    people, yes, there are people that believe that Sandy

1    Hook was a hoax, and he has to set that right.

2         Q.    That became his sole purpose?

3         A.    That's his sole purpose, yes.

4         Q.    I want to talk to you a little bit about

5    Scarlett.  I know you didn't get a chance to see her as

6    often.

7         A.    I saw her only about ten times.

8         Q.    And was that all in 2020?

9         A.    2020.

10        Q.    Tell us a little bit about what she was

11   going through when you met her.

12        A.    You know, she was so, you know, things were

13   out of balance.  She was so focused on Choose Love, that

14   was her focus and that was how she was healing the loss

15   of Jesse was staying focused on that.  So, there was a

16   loss of a balance, a personal happiness that didn't

17   happen.

18             She did like to have people over and have

19   dinner parties and she didn't do that anymore.  She

20   loved going out on her boat.  That was her happy place,

21   and she talked about how Jesse loved the boat and all of

22   that was taken away when she lost Jesse.

23        Q.    Was she -- was some of the obsession with

24   work, was it related to her fear that was caused by Alex

25   Jones?

1      A.   I can only assume.  She never really talked
2  about that.  But she -- just things were out of whack.
3      Q.   Okay.
4      A.   She focused more and more and more on Choose
5  Love.
6      Q.   Let me ask -- sorry.
7      A.   It's okay.
8      Q.   What do you think Neil's life would look
9  like if Alex Jones had never come in it, never said
10  anything about Sandy Hook?
11      A.   I think he would still be grieving, he and
12  Scarlett both would still be grieving the loss of Jesse,
13  but I do think that he would have found a way to return
14  to life, have a more social life, have more of a work
15  life, more balance in his life.  I think he would have
16  found a way.
17           And, you know, Scarlett would continue
18  with Choose Love because that's how she's healing.
19           Would Neil still live in Connecticut?  I
20  don't know.  But he would definitely have more balance
21  in his life.
22      Q.   Why is this trial, why is this case
23  important to Neil and Scarlett?
24      A.   They have -- they need to know and to have
25  the world know that their son mattered; that he lived.

1    They were good parents and so they still feel, I've got

2    to protect that memory and that honor of our son.  And

3    so that would still be going on.  But they wouldn't be

4    so scared as they are right now.  They wouldn't have to

5    fight this or as significantly fight this belief that

6    Sandy Hook was a hoax.

7         Q.    They're still protecting Jesse?

8         A.    They are absolutely still protecting their

9    son.

10                MR. FARRAR:  Thank you, Mr. Crouch.

11                THE COURT:  All right, Mr. Reynal.

12                MR. REYNAL:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. REYNAL:

15        Q.    Thank you for appearing here, Dr. Crouch.

16        A.    You're welcome.

17        Q.    I want to take you back to December of 2012

18   and when you first became involved in this tragedy.

19        A.    Uh-huh.

20        Q.    When the world found out what had happened

21   at the Sandy Hook Elementary School, how would you

22   describe the reaction at the time?

23        A.    I think the world opened up and supported

24   those -- the people who had lost children, the teachers

25   who had died.  I think they tried to support any way

1    they could.

2         Q.   And how did they do that?

3         A.   Oh, my God.  They sent hundreds of thousands

4    of stuffed animals.  I remember there was a religious

5    group that showed up and were going to confront the

6    families and the Hell's Angels literally lined the

7    streets and made sure that they didn't get close to

8    those families during the funerals.

9         Q.   Did the Connecticut -- let's say the state

10   government, did they support the families and the town

11   of Newtown?

12        A.   They did.  The state troopers, each of them,

13   took a family who had lost a child and stayed with them

14   up to a year.

15        Q.   You mean lived in their home?

16        A.   Didn't live in their homes but made sure

17   that they were there first thing in the morning and left

18   when they went to bed.

19        Q.   And for many of those state troopers did

20   that relationship end in, let's say, the first -- 2014?

21        A.   I don't know.  I don't think so.  I think it

22   goes on.

23        Q.   Do you know who the state trooper was that

24   was assigned to Mr. Heslin?

25        A.   I do not.

```
1          Q.   Miss Lewis?

2          A.   I do not.

3          Q.   Did President Obama come to --

4          A.   I think he did.

5               And I think the governor came, too.

6          Q.   And do you know if -- do you know that

7     Scarlett Lewis got to meet President Obama?

8          A.   I don't know.

9          Q.   Okay.

10         A.   I do know that they missed Troop A,  the

11    state troopers that were there on that day and stayed in

12    that room for up to a week.

13         Q.   I'm sorry, they missed?

14         A.   They, for some reason, didn't stop there and

15    didn't invite them to meet the president.

16         Q.   Oh.  And what effect did that have on the

17    troopers of Troop A?

18         A.   It was devastating to them.  Sad.

19         Q.   They felt like their government wasn't

20    supporting them?

21         A.   I think so.

22         Q.   You spend most of your time working with

23    first responders?

24         A.   A significant amount of my time.

25         Q.   And I saw that you have several YouTube
```

1    videos out.

2         A.   I have one, one TEDx talk on grit.

3         Q.   If I can disagree with you, I think you have

4    two, because there's a speech, as well, where you go

5    through everything -- well, it doesn't matter.

6         A.   I don't know, maybe so.  That's good info.

7         Q.   In your speeches, and I'll just ask you now,

8    you believe that posttraumatic stress disorder is

9    treatable?

10        A.   I do believe that.

11        Q.   And the method that you use is called EMDR?

12        A.   That's correct.

13        Q.   And I think you said that it's been around

14   for a long time?

15        A.   Since the late '80s, yeah.

16        Q.   And how effective do you find it to be in

17   the treatment of PTSD?

18        A.   Very effective.  You know, some people it

19   takes as little as three, six sessions, others it can go

20   on.

21        Q.   And?

22        A.   Others find it not helpful, so.

23        Q.   Okay.  You also say that PTSD is an injury

24   that can be seen in the brain through imaging?

25        A.   Correct.

1        Q.    And please describe that.

2        A.    If you -- if you do a PET scan of the brain

3    you will -- it will light up, you'll see red areas and

4    your brain is trying to figure out what happened and how

5    to -- how to resolve it.  If you've had -- almost had a

6    car accident, you might for 15 minutes or so go, oh, my

7    God, what just happened, and then you go, okay, I'm

8    okay, I survived and I'm all right.

9              When there's a logjam, that's when you've

10   got a problem.

11       Q.    What are you referring to when you say

12   there's a logjam and how do you see that?

13       A.    Okay.  So, when there is something that

14   keeps the trauma, keeps the image present in your brain,

15   then we have a problem.

16       Q.    Have you ever done any forensic work?

17       A.    No.

18       Q.    Would you think that conducting such a PET

19   scan would be a useful tool in diagnosing somebody with

20   or without PTSD?

21       A.    It would be a useful tool, not the only one.

22       Q.    You're familiar with the DSM-5?

23       A.    Uh-huh.

24       Q.    Can you explain to the members of the jury

25   what that is?

```
 1        A.   Yeah, it's a diagnostic manual that we use

 2   to determine -- you know, in fact, a DSM-1 had a hundred

 3   diagnoses, the DSM-5 has well over 300.  We can argue

 4   what that's about, but that's the difference in it.  And

 5   it's how we diagnose and there are a list of symptoms.

 6        Q.   And you work with it often?

 7        A.   Uh-huh.

 8        Q.   Almost routinely?

 9        A.   That's correct.

10        Q.   In order to diagnose PTSD, what symptoms

11   have to be present?

12        A.   There are a number of them.  Avoidance of

13   something that reminds you or is similar to the issue

14   that brought on the trauma; some of those symptoms are

15   similar to depression, problems sleeping, problems with

16   concentration, problems with focus.  Those kinds of

17   things.

18        Q.   When we speak of trauma in terms of the

19   diagnosis of posttraumatic stress disorder --

20        A.   Uh-huh.

21        Q.   -- what kind of trauma are we talking about?

22        A.   There are a number of things, and it's

23   really how the individual responds to it more than the

24   symptom.

25        Q.   Is it fair to say that in the DSM they limit
```

1   trauma to physical or sexual assault upon yourself or a

2   loved one?

3       A.   I think -- you know, I'm not sure about

4   that.  I think it would be physical, sexual, and

5   emotional --

6       Q.   Okay.

7       A.   -- assault.

8       Q.   So any kind of -- your testimony here today

9   is that you believe that any type of an emotional

10  assault qualifies for posttraumatic stress disorder?

11      A.   I would say so, yes.

12      Q.   Would it be helpful to you to look at the

13  DSM-5?

14      A.   Might be.

15          MR. FARRAR:  Your Honor, I don't have a

16  problem if I knew this was the right DSM-5.  He's

17  just -- the website he got up.

18          MR. REYNAL:  I can ask him some questions,

19  perhaps put it in front of the witness, ask him some

20  questions about it.

21          THE COURT:  Well, you're trying to refresh

22  his recollection with this document, so you have to know

23  what you're showing him.  So, can you not tell?

24          MR. FARRAR:  I don't mind if he shows

25  Mr. Crouch, if Mr. Crouch says, this is it, then that's

1    great, I'll allow that.

2              THE COURT:  All right, then you can show

3    it to him.

4              MR. FARRAR:  I just wonder where you're

5    going.

6              THE WITNESS:  Yeah, I don't know if this

7    is the DSM, number one.

8    BY MR. REYNAL:

9         Q.   Okay.

10        A.   I can tell you that, yeah, it's not about --

11   in the DSM it doesn't say "The child rarely or

12   minimally."   So, this must be about children.

13        Q.   If I may, I think it refreshed and you're

14   reading about reactive attachment disorder.

15        A.   Okay, but -- okay.

16        Q.   But let me ask you a couple more questions.

17   Does the -- are you familiar with the -- is it the

18   American Psychiatric Institute that publishes the DSM-5?

19        A.   Yes.

20        Q.   And if you -- do they publish it both in a

21   print copy, as well as digitally online?

22        A.   They do.

23        Q.   And please take a look and see if that

24   appears to be the digital version of the DSM-5.

25        A.   You know, I think this is an explanation of

1    what the DSM-5 might say.  It's very brief, the symptoms

2    of trauma and stress are outlined differently in the

3    DSM.

4          Q.   Yeah?

5          A.   Yeah.

6          Q.   If you look here --

7          A.   Yeah.

8          Q.   So --

9          A.   Again, this is not the DSM that I'm aware

10   of.

11         Q.   Very well.

12              There's a -- withdrawn.

13              How often do you visit with Mr. Heslin?

14         A.   It depends.  It's been weekly and it's been

15   monthly.  It depends on when Neil calls.

16         Q.   Has it ever been more than once a week?

17         A.   No.

18         Q.   And how much do you charge?

19         A.   195 per session.

20         Q.   And you've been seeing him for about nine

21   years, ten years?

22         A.   Been seeing him since 2013.  So, nine years,

23   yeah.

24         Q.   What intervention are you recommending for

25   Mr. Heslin at this time?

1      A.   At this time what we're doing is talking

2  about what he's going through.  We're not doing EMDR

3  right now.

4      Q.   Have you used EMDR on Mr. Heslin?

5      A.   Uh-huh.  I have, yes.

6      Q.   And have you had some success with it?

7      A.   I have.

8      Q.   Do you hope to have more success with it in

9  the future?

10      A.   I do.

11      Q.   Do you believe that Mr. Heslin can recover?

12      A.   I believe that Mr. Heslin can find a way to

13  put memories of Jesse in a place where he can return to

14  work -- well, he is working, but where his work will

15  be -- actually, he may retire, but he will be able to

16  have a life.

17      Q.   Okay.

18      A.   Right?

19      Q.   And that's an achievable goal, in your view?

20      A.   I think that that's achievable.

21      Q.   And when you talked before, it's -- I think

22  you testified words to the effect of, or tell me if you

23  agree, that it is -- when you lose a child in this

24  manner it is something that, in some way or another,

25  will haunt you for the rest of your life.

1      A.   I think that's true.  And I think what's

2  important, I talked about logjams, Alex Jones is a

3  logjam.  What happened to Neil, that's a logjam.

4      Q.   The logjam, and I wanted to get our timeline

5  a little bit cleaned up, because I heard 2013 and then I

6  heard 2018.  When did Alex Jones become an issue for

7  Neil?

8      A.   I think he became an issue in 2013, when

9  Neil was aware that people were claiming that Newtown

10  had not happened.  Then he really became an issue in

11  2018 when Neil realized that he was directly being

12  attacked.  Viciously attacked.

13      Q.   Between 2013 and 2018, was Mr. Heslin

14  actively engaged with rumination about Alex Jones or had

15  he moved on?

16      A.   I think he was avoiding that issue.  He

17  said, I don't want to dignify that issue right now.  So,

18  had he moved on, that's -- I wouldn't say "moved on" is

19  an accurate term.  He had found a way to avoid, ignore

20  what was going on.

21      Q.   And he had exercised his power to choose to

22  shut that down.

23      A.   Well, that's -- that's a symptom of trauma,

24  isn't it.  I'm going to -- I'm going to disconnect from

25  something that is troubling to me.

1      Q.   Isn't that healthy, though?

2      A.   It's -- I would suggest no, not in

3  Mr. Heslin's case, because it kept the injury alive.

4      Q.   How -- in your notes how often do you see

5  Alex Jones' name appearing between 2013 and 2018?

6      A.   I do not see Alex Jones' name because Neil

7  was choosing to not dignify it, not go there.

8      Q.   And did you write in your notes, Mr. Heslin

9  is actively avoiding Alex Jones and dealing with that?

10      A.   No, because he didn't talk about it.  And I,

11  quite honestly, didn't know about Alex Jones until 2018.

12      Q.   So, based on your treatment of Mr. Heslin

13  and your personal contact with him, the first time Alex

14  Jones comes up is in 2018?

15      A.   That's correct.

16      Q.   As a -- as Mr. Heslin's therapist you have

17  an implicit and explicit contract with him to act in his

18  best interest.

19      A.   As I see it, not necessarily as he sees it.

20      Q.   And that is to -- you're not -- your

21  relationship isn't defined by necessarily giving

22  testimony in court, it's defined by whether or not

23  Mr. Heslin is improving?

24      A.   I guess you can say that.

25      Q.   And as part of that it's not your job to go

1    out and investigate or question whether what Mr. Heslin
2    is telling you during your sessions is the truth rather
3    than his truth?
4        A.    I think my job is to listen to what he has
5    to say and help him move towards a more functional life.
6        Q.    And I guess what I mean, and maybe this will
7    be a better question, after you have a session with
8    Mr. Heslin you don't go out and investigate if what he
9    told you is true or not true?
10       A.    No.
11       Q.    That's not part of what you do?
12       A.    That's right.
13       Q.    Can you tell this jury to a reasonable
14   degree of medical certainty how much of Mr. Heslin's or
15   Miss Lewis's emotional pain was caused by the murder of
16   their son by the killer, Adam Lanza, versus the talk
17   show host Alex Jones?
18       A.    I think that those are two separate
19   questions.  The loss of a child absolutely is
20   devastating and causes grief and pain that I'm not sure
21   as a parent you ever get over.  But when I talk about
22   logjams, so, in 2018 when Neil realized that he was
23   being targeted and that the credibility of his son and
24   of Scarlett and Neil was being challenged, that's a new
25   injury.

1          So, from 2018 when he realized, oh, my

2   God, this is -- this is real and this is happening to

3   us, um, I think Neil became very focused on getting some

4   honor and some clarity about his memory of Jesse.  How

5   much?  I don't know.  I could say a hundred percent, I

6   could say whatever.  It's painful.

7          Q.   And what I --

8          A.   And so, what Alex Jones has said is painful

9   to him.  And he has said, it's too painful for me.

10          Q.   So what I'm hearing you saying is that you

11   consider it to be a new injury.  But that, within the

12   course of dealing with a patient, it's very difficult to

13   take a particular constellation of emotional pain and

14   put it into one bucket or into a different bucket.

15          A.   I think that, again, there are two buckets

16   here.  One is the loss of a child, and that's always

17   painful and will never really be healed.  The other is

18   the belief that and the accusation that it didn't

19   happen.  That's painful.  And that's a different bucket

20   and that bucket's full right now.

21          Q.   I -- when you testify about negation, that

22   Alex Jones has negated the existence of Mr. Heslin and

23   Miss Lewis's son?

24          A.   Uh-huh.  I think I called it a logjam, yeah.

25          Q.   I'm sorry?

1          A.    That's okay.

2          Q.    You are basing that off of what Mr. Heslin

3    and what Miss Lewis have told you and not on a

4    dispassionate analysis of the evidence in the case?

5          A.    I'm basing it off of, yes, what Neil and

6    Scarlett have told me.  But also what I have observed on

7    the internet in terms of watching Alex Jones claim it

8    was fake.

9          Q.    And since you are a member of the community

10   and you did that, you went online to search out that

11   claim, can you tell us in what year and for how long

12   Alex Jones said that it was fake?

13         A.    I don't know when he said that or when he

14   started.  No, I don't know.

15              MR. REYNAL:  Pass the witness.

16              THE WITNESS:  Okay.

17              THE COURT:  All right.  Do you have a lot?

18              MR. FARRAR:  A couple of minutes.

19              THE COURT:  Okay.  I think we'll just keep

20   going and do a break and questions all at the same time.

21                    REDIRECT EXAMINATION

22   BY MR. FARRAR:

23         Q.    Mr. Crouch, did you sort of pick up on this

24   theory that maybe Mr. Heslin or Miss Lewis was not being

25   honest with you from the questions?

1        A.    There was a challenge of that.

2        Q.    You find that ironic in this case?

3        A.    A little bit, in that I -- I know that they

4   have been very honest with me, that they trust me.

5        Q.    They pay you money to help them; right?

6        A.    That's correct.

7              Actually, I get paid by Sandy Hook.

8        Q.    Okay.

9        A.    Paid by the town.

10       Q.    You were asked whether the EMDR is effective

11   for PTSD?

12       A.    Yes.

13       Q.    Is EMDR effective to treat PTSD if the PTSD

14   is ongoing and complex and that trauma hasn't stopped

15   yet?

16       A.    No.  Nothing is, frankly.

17             MR. FARRAR:  Thank you, Mr. Crouch.

18             THE COURT:  Mr. Reynal.

19             MR. REYNAL:  Thank you.

20             THE COURT:  All right.  So then the jury

21   will combine, it's 3:26, we'll do a 30-minute break and

22   question break.  Remember all of my instructions about

23   how these questions go and everything else, please.

24             *(Brief recess.)*

25             *(Discussion between court and counsel*

1   *off the record.)*

2          THE COURT:  We've gone over the questions

3   submitted by the jury.  Are you in agreement with those

4   we've decided to ask, Mr. Farrar?

5          MR. FARRAR:  Yes.

6          THE COURT:  Mr. Reynal?

7          MR. REYNAL:  Yes.

8          MR. FARRAR:  Your Honor, before we call

9   the jury back Mr. Ball has one quick issue.

10          MR. BALL:  Just we're really close to the

11   end of the day.  We were going to call Jesse Lewis --

12   not Jesse Lewis, J.T..  J.T. Lewis.  Long story short,

13   we're not, and we didn't think -- we thought we were

14   going to be at the end of the day, so we would like to

15   just, if we have another 15 or 20 minutes, something

16   like that, work on the jury charge.

17          THE COURT:  You want to let the jury go

18   home early today.

19          MR. BALL:  Yeah, and start again tomorrow.

20          THE COURT:  We do need to talk about the

21   jury, so I think that's fine.

22          So, you're not going to call him at all or

23   you're not going to call him today?

24          MR. BALL:  We're not going to call him at

25   all.

1          THE COURT:  Okay.  That's probably good.

2          I'm assuming, while we're sitting here

3    talking about it, that we've gone through all the depos,

4    we have a witness for the second phase, right, the

5    economist.

6          MR. BALL:  That would be correct.

7          THE COURT:  You're not calling --

8          MR. BALL:  And then we have two more

9    witnesses left on our first phase.

10          THE COURT:  So, the rest of your witnesses

11   you're not planning on calling, just Mr. Heslin and

12   Miss Lewis?

13          MR. BALL:  That's correct, Your Honor.

14   And I don't expect for them, at least for the direct, to

15   be on for any extended period of time.  So I think we

16   would be finished with our case, the first phase, by

17   tomorrow at noon at the very latest, the absolute

18   latest, and then probably before that really.

19          THE COURT:  All right.  And will you be

20   calling any independent witnesses of your own,

21   Mr. Reynal?

22          MR. REYNAL:  Independent, you mean other

23   than my client, Your Honor?

24          THE COURT:  I mean other than -- are you

25   going to call any witnesses in your phase of the case,

1  the first phase?

2         MR. REYNAL:  I still haven't decided.  If

3  I called a witness it would be my client.

4         THE COURT:  Okay.

5         MR. BALL:  Well, Your Honor, we need to

6  know who's being called.

7         THE COURT:  Yeah, I make them tell

8  everyone.  You have until 5:00 to decide, how is that.

9         MR. REYNAL:  Well, I can tell them if I

10  called any witness at all, it would be him.

11         THE COURT:  Well, you have until 5:00 to

12  tell us what your plan is tomorrow.  Just like I have

13  made them every single day tell us who is going to be up

14  next, that's the rule in this courtroom.

15         All right, let's bring back the witness

16  and the jury.

17              *(The following proceedings were held in*

18  *open court in the presence of the jury.)*

19         THE COURT:  All right.  So, Dr. Crouch,

20  I'm going to read some questions for you to answer and I

21  need you to just listen to the question and answer it

22  for the jury.

23         THE WITNESS:  Okay.

24         THE COURT:  Let me know if you don't

25  understand it, we'll probably just move on, something

1   like that.  Okay?

2              THE WITNESS:  Okay.

3              THE COURT:  Jury, same instructions as

4   always, if you don't hear your question that's because I

5   made that decision, and you can direct your frustration

6   in my direction.

7              All right.  Ready?

8              THE WITNESS:  Yeah.

9                    EXAMINATION

10             THE COURT:  Besides this lawsuit, what

11  other ways have you suggested that Mr. Heslin cope?

12             THE WITNESS:  Wow.  Again I think counsel

13  talked about two buckets, there's coping with the death

14  of his son and then there's coping with somebody who

15  says he's a liar.  So, I'm not sure there's another way

16  to cope with that.  I think he's tried to cope with --

17  when he talked to Megyn Kelly he tried to cope.  He

18  tried to say, please stop, and that didn't work.  So, in

19  terms of that logjam, I don't think there's another way

20  to cope.

21             In terms of the death of his son, I think

22  that it's -- the grief is complicated, and I think that

23  we will return to EMDR when the logjam is out of the way

24  and hopefully we can find a way to get him to reenter

25  his life.  And the same thing with Scarlett to find some

 1    balance for him.  Her.

 2                THE COURT:  As a member of the Trauma

 3    Recovery Network and your association with the Sandy

 4    Hook community, are you familiar with any other parents

 5    or teachers or first responders who have been targeted

 6    with threats or actual violence by persons that claim

 7    Sandy Hook was a hoax?

 8                THE WITNESS:  Only -- only in dealings

 9    with the parents and as a co-coordinator of the Trauma

10    Recovery Network, there are other clinicians who

11    struggle with that, who have dealt with the belief that

12    they're liars, that this didn't happen.  And I think

13    that they are all watching what happens in this trial.

14                THE COURT:  Did Mr. Heslin receive a PET

15    scan to determine PTSD?

16                THE WITNESS:  No, he did not.  I'm sorry.

17                THE COURT:  No, that's okay.  I was just

18    going to say there's a second part.  If it is not an

19    important method to determine PTSD, then what is the

20    value of it?  What is it used for?

21                THE WITNESS:  Okay.  It's not that it's

22    not an important way of determining PTSD, it's one of

23    the many ways.  We can do a PET scan and you can see

24    that there's a block.  And it's relatively new, PET

25    scans, in terms of seeing the brain and where there is

1    injury.  PET scans, I've just started to hear about them

2    over the last ten years or so.  If EMDR has been around

3    since the late 1980ss, PET scans are relatively new.

4                I don't use them, one, because it costs

5    money; two, because if you listen to the symptoms you

6    know that someone has been traumatized.  And to what

7    level they are.

8                THE COURT:  Does the duration and quantity

9    of instances dictate the degree of traumatic injury

10   sustained?

11               THE WITNESS:  Could you read that again

12   for me?

13               THE COURT:  Of course.  Does the duration

14   and quantity of instances dictate the degrees of

15   traumatic injury sustained?

16               THE WITNESS:  Um, you know, it's just

17   another trauma.  So, and it may be different.  You know,

18   as a car accident is the same as another form of trauma,

19   you know, sexual abuse, the death of a child, is one

20   trauma, I think I testified to that, the belief that

21   you're a liar and that Jesse didn't exist is another

22   trauma.  And that will require treatment for that

23   specific incident; right?

24               I don't know if that answers the question.

25               THE COURT:  Can duration and quantity of

1  instances magnify the severity of the trauma inflicted?

2              THE WITNESS:  I would say yes, that if

3  there are -- if there are numerous instances of the same

4  trauma, for instance, in sexual abuse if it went on for

5  a number of years, then yes, I think the trauma is more

6  severe, as opposed to a single instance, instanced

7  trauma.  So, yes.

8              THE COURT:  Dr. Crouch, those are the

9  questions that I have for you.  I want to thank you for

10  your time and testimony.

11             THE WITNESS:  Thank you.

12             THE COURT:  Thank you.  And you're free to

13  go back down.

14             So, we had -- the lawyers and I had a

15  brief conversation during the break, we were

16  expecting -- we have some expectations about how the day

17  tomorrow will go and to get there we have some work that

18  we need to do outside the presence of the jury.  Given

19  the late time of day, what I've decided to do is just

20  release you today to go home and we'll start again

21  tomorrow.  So, I'm hoping you'll arrive at 8:45 just

22  like normal, ready to go.

23             Remember all of my instructions, no news,

24  no social media, no conversation, no research.

25             Thank you, and I'll see you tomorrow.

1          We can go off the record.

2             (End of proceedings.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2   THE STATE OF TEXAS          )

 3   COUNTY OF TRAVIS            )

 4              I, Alicia DuBois, Official Court Reporter

 5   in and for the 459th District Court of Travis County,

 6   State of Texas, do hereby certify that the above and

 7   foregoing contains a true and correct transcription of

 8   all portions of evidence and other proceedings requested

 9   in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13              I further certify that this Reporter's

14   Record of the Proceedings truly and correctly reflects

15   the exhibits, if any, offered in evidence by the

16   respective parties.

17              WITNESS MY OFFICIAL HAND this, the 29th

18   day of September, 2022.

19

20                          /s/ Alicia DuBois
                            Alicia DuBois, CSR
21                          Texas CSR 5332
                            Exp. Date:  1/31/24
22                          Official Court Reporter
                            459th District Court
23                          Travis County, Texas
                            P.O. Box 1748
24                          Austin, Texas 78767
                            (512) 854-9301
25
```