# Exhibit 32

CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | 261st DISTRICT COURT |
| *Defendants* | § | |
| | § | |

---

**PLAINTIFF'S MOTION FOR SANCTIONS AND MOTION FOR DEFAULT JUDGMENT**

---

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE MOTION ...................................................................................................... 1

SUMMARY OF DISCOVERY ABUSE IN THE SANDY HOOK LITIGATION ............................... 2

    I.      InfoWars committed discovery abuse in *Lewis v. Jones, et al* ........................ 2

    II.     InfoWars committed discovery abuse in *Lafferty v. Jones, et al* ................... 3

    II.     InfoWars committed discovery abuse in *Heslin I* ................................................ 4

    II.     InfoWars has continued to commit discovery abuse in *Heslin II* ................. 5

ARGUMENT............................................................................................................................ 6

    I.      Free Speech Systems Failed to Prepare its Corporate Representative
         to Testify .................................................................................................................. 6

        A.    Mr. Dew was not prepared to discuss the sourcing and
            research of the fourteen videos quoted in Plaintiff's petition...... 6

              1.    "Shadow Government Strikes Again" - April 16,
                   2013 ................................................................................................ 7

              2.    "Obama Gun Grabbing Psyop Speech of Evil" -
                   April 9, 2013 .................................................................................. 8

              3.    "Sandy Hook: False Narrative Versus the
                   Reality" - March 14, 2014 ................................................... 8

              4.    "Bombshell Sandy Hook Massacre Was A DHS
                   Illusion Says School Safety Expert" - May 13,
                   2014 ................................................................................................ 9

              5.    "Connecticut PD has FBI Falsify Crime Statistics"
                   - September 25th, 2014 .................................................... 10

              6.    "Lawsuit Could Reveal Truth about Sandy Hook"
                   - December 27, 2014.......................................................... 11

              7.    "America the False Democracy" - December
                   29th, 2014 .............................................................................. 11

8. "Why We Accept Gov't Lies" - January 13, 2015 ..... 12

9. "New Bombshell Sandy Hook Information Inbound" - March 4th, 2015 ............................................ 12

10. "Government is Manufacturing Crises" - July 7th, 2015 ...................................................................... 13

11. "Retired FBI Agent Investigates Sandy Hook Mega Massive Coverup" - July 7th, 2015 ................... 14

12. "Final Statement on Sandy Hook" - November 18th, 2016 ................................................................ 14

13. "Sandy Hook Vampires Exposed" - April 22, 2017 ................................................................ 15

14. "JFK Assassination Documents to Drop Tonight" - October 26, 2017 ............................................... 16

B. Mr. Dew was not prepared to discuss the Sandy Hook research performed by InfoWars employees .................................. 17

C. Mr. Dew was not prepared to discuss editorial discussions regarding Sandy Hook .................................................... 21

II. Mr. Jones Refused to Make Good Faith Efforts to Identify his Sources in Written Discovery or Deposition .......................................... 23

A. Mr. Jones claimed in sworn interrogatories that he was unable to identify his sources ................................ 23

B. Mr. Jones claimed in deposition that he could identify his sources if asked .............................................. 23

III. Defendants Failed to Preserve and Produce all Documents it Created Relating to the Sandy Hook School Shooting, the Plaintiff, or his Family .......................................................................... 27

A. Defendants ignored the parties' Rule 11 agreement regarding document production ......................... 27

    B.     Defendants admit to withholding a massive amount of missing emails ........................................................................... 29

    C.     Defendants failed to preserve emails after the start of litigation ....................................................................................... 31

    D.     InfoWars failed to secure documents held by individual employees, leading to both reckless and intentional spoliation ..................................................................................... 32

    E.     Defendants failed to preserve and search all of their computer servers ........................................................................... 35

    F.     Defendants failed to preserve or search alternative methods of electronic communication, including a messaging system that was permanently destroyed ........................................... 36

    G.     Defendants failed to preserve their social media accounts, leading to their permanent deletion ................................... 38

    H.     Defendants failed to preserve relevant videos, leading to the destruction of crucial evidence ............................................. 42

IV.   Having Tested Lesser Sanctions, a Default Judgment is Appropriate for the Combined Effects of Repeated Flagrant Discovery Abuse, Intentional Spoliation of Critical Evidence, and Bad Faith Dilatory Tactics ....................................................................................... 44

CONCLUSION ....................................................................................... 47

CERTIFICATE OF CONFERENCE ..................................................... 48

CERTIFICATE OF SERVICE ............................................................... 49

Comes now, Plaintiff Neil Heslin, and files this Motion for Sanctions and Motion for Default Judgment, and would show the Court as follows:

### SUMMARY OF THE MOTION

On all three prior occasions in which Defendants were court-ordered to provide Sandy Hook discovery, they committed willful and flagrant discovery abuse. Now, despite an escalating series of sanctions from this Court and the Connecticut Superior Court, Defendants once again ignored their obligations under this Court's latest order. Even worse, deposition testimony confirmed Defendants' discovery obstruction has permanently compromised the evidence in this case in nearly every way imaginable. This motion will discuss how:

- Defendants once again failed to prepare their corporate representative to give any testimony.

- Mr. Jones refused to make good faith efforts to answer written discovery or respond at deposition.

- Defendants ignored the parties' Rule 11 agreement regarding document production.

- Defendants withheld tens of thousands of emails relating to Sandy Hook.

- Defendants failed to order a litigation hold or preserve its email system until almost a year after being sued.

- Apart from emails, Defendants relied entirely on individual employees to search their own devices for responsive documents, and not a single employee returned a single responsive document.

- Defendants intentionally erased many of the computers used by employees after the start of litigation but prior to any collection efforts.

1

- Defendants failed to preserve and search all of their computer servers, including file storage servers and cloud servers.

- Defendants intentionally destroyed data from their internal messaging service known as "Slack" when the company switched messaging services in 2019.

- Defendants failed to preserve their social media accounts despite multiple warnings from the social media companies, which led to their deletion.

- Defendants failed to preserve relevant videos, leading to the destruction of crucial evidence at the heart of Plaintiff's claim.

Defendants took these actions with total disregard for the sanctions they have faced thus far. They do not care if the Court denies their TCPA motion; they seek only the dilatory benefits of interlocutory appeals. They do not care about monetary sanctions; they are willing to pay significant amounts of money to safely abuse the discovery process. Now, after a year of undeterred non-compliance, obstruction, and delay, Defendants' actions have permanently compromised the state of the evidence and demonstrated a clear disregard for the integrity of these proceedings.

### SUMMARY OF DISCOVERY ABUSE IN THE SANDY HOOK LITIGATION

### I.     InfoWars committed discovery abuse in *Lewis v. Jones, et al.*

On January 25, 2019, this Court ordered expedited discovery in *Lewis.* Defendants ignored the discovery process, leading to a motion for sanctions.[1] The motion showed Defendants failed to produce any documents despite the Court's deadlines, failed to produce any responsive videos, and failed to prepare their corporate deponent to give

---

[1] Exhibit 2 - March 20, 2019 Motion for Sanctions in *Lewis v. Jones*.

any testimony whatsoever on behalf of the company. Following the depositions and the filing of the sanctions motion, Defendants provided a disorganized document dump riddled with non-responsive documents which had not been subject to any review.

At oral hearing, after the Court found the discovery situation "disturbing" and "very disconcerting"[2], InfoWars' counsel Robert Barnes avoided a ruling by making a sweeping concession in which he abandoned all but a single legal issue. He also agreed to pay attorney fees of $8,200.[3]

## II.    InfoWars committed discovery abuse in *Lafferty v. Jones, et al.*

Following this Court's order in *Lewis,* discovery efforts continued in the parallel Connecticut lawsuit, *Lafferty v. Jones.* As in *Lewis,* the defendants had failed to comply with discovery deadlines in *Lafferty.* Following a belated document dump in May, the Connecticut plaintiffs' counsel were informed by their consultants there were images of child pornography in the documents provided by InfoWars.[4] Counsel immediately contacted the FBI.[5] FBI investigators analyzed InfoWars' document production and found a dozen files with child pornography.[6] Soon thereafter, there was a joint phone call between plaintiffs' counsel, the U.S. Attorney's office, and defendant's counsel.[7]

As noted in oral hearing in the *Lafferty* case, none of these events became public until Mr. Jones appeared on his show and delivered a 20-minute explosive tirade in which

---

[2] Exhibit 3 - April 3, 2019 Hearing Transcript in *Lewis v. Jones*, at 4:21-5:3.
[3] *Id.* at 51:9-20.
[4] Exhibit 4 - June 18, 2019 Hearing Transcript in *Lafferty v. Jones*, 7:24.
[5] *Id.* at 8:4.
[6] *Id.* at 8:14.
[7] *Id.* at 9:1.

he accused plaintiffs' counsel Chris Mattei of planting the child pornography to frame him.[8] Judge Barbara Bellis noted that even ignoring these developments, the discovery situation in *Lafferty* was unacceptable:

> Putting aside the fact that the documents the Jones defendants did produce contained child pornography, putting aside the fact that the Jones defendants filed with the Court a purported affidavit from Alex Jones that was not in fact signed by Alex Jones, the discovery in this case has been marked with obfuscation and delay on the part of the defendants, who, despite several Court-ordered deadlines as recently as yesterday…, the Jones defendants have still not fully and fairly complied with their discovery obligations.[9]

As a result, on June 19, 2019, Judge Bellis struck Defendants' motion to dismiss. Judge Bellis told Mr. Jones that he was on very thin ice and faced a default judgment if discovery obstruction continued:

> At this point, I decline to default the Alex Jones defendants, but I will – I don't know how clearly I can say this. As this case progresses…if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the Alex Jones defendants if they from this point forward continue with their behavior with respect to discovery.[10]

## III.   InfoWars committed discovery abuse in *Heslin I*.

On August 30, 2019, the Court of Appeals dismissed Defendants' appeal in *Heslin I*. When the *Heslin* appeal was initiated, there was a pending motion for contempt for failure to answer discovery. Upon remand, Defendants took no action regarding discovery, but nonetheless asked this Court to hear their motion to dismiss on October

---

[8] *Id.* at 16:7-18.
[9] Exhibit 5 - June 19, 2019 Transcript in *Lafferty v Jones*, 1:4-19.
[10] *Id.* at 8:12-23.

3, 2019.[11] The Court set the hearing and also heard Plaintiff's pending motion for contempt.[12] On October 18, 2019, the Court granted the motion for contempt. The Court entered an order making evidentiary findings, denied the motion the dismiss, and assessed $25,875 in attorney fees.[13]

## IV.    InfoWars has continued to commit discovery abuse in *Heslin II.*

On October 18, 2019, this Court ordered expedited discovery in this case. Upon receipt of the discovery responses, it was apparent no good faith effort was made to respond. Despite meet and confer letters, the discovery responses remained deficient when the parties appeared for deposition. On the evening before the depositions, Plaintiff's counsel was informed Mr. Jones had fired Robert Barnes, the attorney in charge of this litigation, and that new local counsel Wade Jefferies would be taking over the case.[14] Plaintiff's counsel was also informed that additional videos would be turned over at the deposition.

The depositions not only confirmed Defendants flagrant abuse of the discovery process, but they also revealed alarming facts about Defendants' conduct which has threatened these proceedings. Defendants have shown a total indifference to their legal obligations and to the integrity of the evidence. Despite a series of escalating sanctions, Defendants refuse to take these proceedings seriously or obey the rule of law. The result has been severe irreparable prejudice to Plaintiff's case.

---

[11] Exhibit 6 - October 18, 2019 Order in *Heslin I,* p. 1.
[12] *Id.*
[13] *Id.,* p. 2.
[14] Exhibit 7 – November 26, 2019 email from Defendant's counsel Wade Jefferies. Plaintiff notes this motion takes no issue with any conduct by Mr. Jefferies, who is brand new to the case.

## ARGUMENT

I.    **Free Speech Systems Failed to Prepare its Corporate Representative to Testify.**

Pursuant to this court's order, InfoWars presented its employee Rob Dew to testify about two topics: 1) "Sourcing and research for the videos described in Plaintiff's petition," and 2) "Internal editorial discussions regarding Free Speech Systems' coverage of the Sandy Hook Elementary School shooting."[15] Yet Mr. Dew was completely unprepared to discuss either topic. The Court may recall that Mr. Dew was the corporate representative who was equally unprepared to testify in the *Lewis* case. The Court described Mr. Dew's previous testimony as "clueless about InfoWars," resulting in "a pretty meaningless deposition."[16] Despite that history, Defendants once again failed to prepare Mr. Dew, who repeatedly admitted he could not offer testimony and openly acknowledged he was unprepared.

A.    **Mr. Dew was not prepared to discuss the sourcing and research of the fourteen videos quoted in Plaintiff's petition.**

As became evident during the deposition, Mr. Dew did virtually nothing to prepare for his testimony:

> Q.    What did you do to prepare for your deposition testimony today regarding sourcing and research for the videos described in plaintiff's petition?
>
> A.    Not much, other than speak with my attorney.[17]

---

[15] Exhibit 8 - Deposition of Rob Dew, 3:16-20.
[16] Exhibit 3 - April 3, 2019 Transcript in *Lewis* v. Jones, 34:8-12.
[17] Exhibit 8 - Deposition of Rob Dew, 3:21-25.

6

At one point in the deposition, it became clear Mr. Dew had never been informed what topics he would be responsible for discussing:

> Q.    When you were preparing for your testimony, you knew that you would be responsible for discussing the sourcing and research that went into the videos described in plaintiff's petition such as this one, correct?
>
> A.    I'm not sure if I ever had a meeting on that, no.[18]

Mr. Dew did not review any documents beyond the deposition notice, and he did not talk to any fellow employees other than Alex Jones.[19] As a result he was unprepared to discuss the research or sources used in the fourteen videos quoted in Plaintiff's petition. In every case, Mr. Dew was totally unable to answer. Mr. Dew's testimony relating to these videos is set forth below.

### 1.    "Shadow Government Strikes Again" - April 16, 2013

> Q.    Who did the research for that video?
>
> A.    I believe Alex Jones did.
>
> Q.    Why do you believe that?
>
> A.    Can you describe what was in the video?
>
> Q.    No, it was your job to be prepared to discuss it.
>
> A.    Okay.
>
> Q.    Who did the research? Excuse me, why do you believe Alex Jones did the research?
>
> A.    Because it sounds like a video that he would have titled.

---

[18] *Id.* at 58:11-59:3
[19] *Id.* at 4:2-5.

Q.    What was the source of the information?

A.    Probably hundreds of articles.

Q.    I'm not asking you probably. As Free Speech Systems, what specific sources were relied upon to make that video?

A.    I don't know if we have that video in our possession anymore.

Q.    Not an answer to my question. Yes, no or I don't know.

A.    Okay.

Q.    The sources used to make that video "Shadow Government Strikes Again?"

A.    I don't know.[20]

**2.    "Obama Gun Grabbing Psyop Speech of Evil" - April 9, 2013**

Q.    The April 9, 2013 video "Obama Gun Grabbing Psyop Speech of Evil." Does that ring a bell?

A.    Can you describe what the video looks like? Some of these we don't have anymore because they -- they've been taken off YouTube.[21]

**3.    "Sandy Hook: False Narrative Versus the Reality" - March 14, 2014**

Q.    Who did the research for that one?

A.    I don't know.

Q.    What steps did you take to find out?

---

[20] *Id.* at 51:3-52:1.
[21] *Id.* at 45:17-21.

A.    Since we don't have that video, I don't know what -- I'd have to see the video to jog my memory of what's in it.

Q.    Okay. What was the source of the information in that video?

A.    Like I -- I'll refer to my previous answer.

Q.    You don't have this video is your testimony, and by you, you mean Free Speech Systems?

A.    I didn't have it in any of the searches that I made.

Q.    How long did you spend looking for the sources or the video or the researcher for Sandy Hook, false narratives versus the reality?

A.    For that particular video, maybe 15 minutes.

Q.    Are you aware that in this case you produced this video to me?

A.    Okay.
...

Q.    So you have it in your possession, correct?

A.    I don't know if I have it in my possession.[22]

**4.    "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert" - May 13, 2014**

Q.    Who did the research for this video?

A.    I would imagine Wolfgang Halbig did the research for that.

Q.    Again, I'm not asking you to imagine.

---

[22] *Id.* at 52:3-53:15.

A.    Okay. I'll say Wolfgang Halbig, school safety expert, that was Wolfgang Halbig.

Q.    How do you know he did the research – excuse me. Did anyone else research any of the information that went into this episode?

A.    That is most likely an interview between Wolfgang Halbig and Alex Jones.

Q.    You don't even know what's in this video, do you?

A.    No.[23]

**5.    "Connecticut PD has FBI Falsify Crime Statistics" - September 25th, 2014**

Q.    Were any of the writers involved in any of this information?

A.    I think one of the writers probably brought that information to Alex.

Q.    Again, I'm not asking probably. I'm asking what Free Speech Systems knows or doesn't know. And if so, which writer?

A.    I don't know which writer, but that's how Alex would have gotten that information for that particular video.[24]

...

Q.    So you don't know anybody else that would have appeared in this video?

A.    No.

Q.    In the last year, have you seen this video?

---

[23] *Id.* at 54:3-18.
[24] *Id.* at 55:10-19.

A.    No.[25]

**6.      "Lawsuit Could Reveal Truth about Sandy Hook" - December 27, 2014**

Q.    What was the source of the information in this one?

A.    I don't know.

Q.    Do you know what information is in this video?

A.    No.

Q.    Are you prepared to discuss the research that was in the video which you don't know what it's about?

A.    No.[26]

**7.      "America the False Democracy" - December 29th, 2014**

Q.    Have you ever seen this one?

A.    I'd probably know it if I saw it.

Q.    Sitting here -- have you seen it in the last year?

A.    No.

Q.    Did you do anything to prepare where the information came from in this video that you don't know what it's about?

A.    No.

Q.    You have no -- is it fair to say you don't know who the source of the information is that's in this video?

---

[25] *Id.* at 55:23-56-3.
[26] *Id.* at 56:6-13.

A.   That would be fair.[27]

**8.   "Why We Accept Gov't Lies" - January 13, 2015**

Q.   Have you seen this video in the last year?

A.   I have not seen it in the last year.

Q.   Are you prepared to discuss the research that went into the information that was put in this video?

A.   No.

Q.   Are you prepared to tell us the source of information for this video?

A.   No.[28]

**9.   "New Bombshell Sandy Hook Information Inbound" - March 4th, 2015**

Q.   What's this video about?

A.   What was the date again, March 14th --

Q.   March 4th, 2015.

A.   That probably has to do with --

Q.   Again, not probably.

A.   Oh, sorry. I'm not prepared to talk about it.

Q.   You can't tell us sitting here today what that new bombshell was?

A.   It was probably information that came out of one of those meetings.

---

[27] *Id.* at 56:15-57:3.
[28] *Id.* at 57:5-13.

Q.   Again, not probably. I want to know what it was, what it was not or you don't know.

A.   I don't know.[29]

## 10.   "Government is Manufacturing Crises" - July 7th, 2015

Q.   Do you know what this video is about?

A.   From its title, I would suggest -- it would suggest that the government is manufacturing crisis.[30]

...

Q.   When is the last time you saw this video?

A.   Probably when I made it.

Q.   And I'm not asking probably. I'm asking when. Did you review it preparing for your testimony today?

A.   No.

Q.   And you -- when you were preparing for your testimony, you knew that you would be responsible for discussing the sourcing and research that went into the videos described in plaintiff's petition such as this one, correct?

A.   I'm not sure if I ever had a meeting on that, no.

Q.   I'm not asking you if you had a meeting. I'm asking if you did anything at all to prepare yourself to discuss this video and the source and research that went into it?

A.   That video, no.[31]

---

[29] *Id.* at 57:14-58:3.
[30] *Id.* at 58:5-8.
[31] *Id.* at 58:11-59:3.

13

### 11.    "Retired FBI Agent Investigates Sandy Hook Mega Massive Coverup" - July 7th, 2015

Q.    When was the last time you saw this video?

A.    Probably when it was made.

Q.    Are you prepared to discuss the sourcing and research that went into it?

A.    Parts of it I can discuss.[32]
...

Q.    Ambulances came an hour and a half later. What's the source of that information?

A.    That might have been Wolfgang Halbig.

Q.    Again, not asking might. I want definitive answers. One, I know; two, I don't know. Do you know?

A.    I don't know.[33]

### 12.    "Final Statement on Sandy Hook" - November 18th, 2016

Q.    What were the sources that y'all used?

A.    News articles and video.

Q.    From where?

A.    Probably from previous videos that we had done.

Q.    Again, not probably. I'm asking for specifics because you have a duty sitting here today to be very specific with me on what Free Speech Systems knows. Okay. What news articles did you rely on?

---

[32] *Id.* at 59:11-16.
[33] *Id.* at 59:20-25.

A.  I don't know.[34]

...

Q.  You've seen the video of Mr. Jones mocking Robbie Parker about crying over his dead son, right?

A.  I don't know if I have seen that video.

Q.  So you're not prepared to talk about that video that's listed in plaintiff's petition that you had a duty to prepare for today?

A.  I am not prepared to talk about that video of Robbie Parker crying over his son.

Q.  Oh, no, of Mr. Jones mocking Robbie Parker crying over his son.

A.  I'm not.[35]

**13.  "Sandy Hook Vampires Exposed" - April 22, 2017**

Q.  Who researched the information for that video?

A.  I would say myself and Alex did.

Q.  What were your sources?

A.  I believe a Megyn Kelly interview.[36]

...

Q.  Are you aware that on April 22nd, 2017, that the Megyn Kelly interview hadn't even happened yet?

A.  Oh, it hadn't happened yet? Okay.

Q.  Fair to say you're not prepared to discuss this video?

---

[34] *Id.* at 65:7-15.
[35] *Id.* at 48:15-49:1.
[36] *Id.* at 72:17-20.

A.   I'm -- must be confused with another Sandy Hook vampire video.

Q.   Fair to say you're not prepared to discuss the one from April 22nd, 2017? Yes?

A.   Correct.[37]

**14.   "JFK Assassination Documents to Drop Tonight" - October 26, 2017**

Q.   Do you remember that video?

A.   No, I don't remember that video.

Q.   It's fair to say that then you were -- you're not prepared to discuss the source of the information related to Sandy Hook in that video?

A.   Correct.

Q.   It's fair to say that you're also not prepared to discuss the research that went into the information in that video relating to Sandy Hook?

A.   That's correct.[38]

In sum, Mr. Dew was unprepared to offer testimony on the research or sourcing of any of the videos quoted in Plaintiff's petition. This failure was exacerbated by Mr. Jones' failure to answer an interrogatory on this subject. In Interrogatory No. 2, Mr. Jones was asked to "identify your source(s), if any, for the contention that" followed by 18 specific contentions quoted in Plaintiff's petition. Instead, Mr. Jones merely responded

---

[37] *Id.* at 72:24-73:9.
[38] *Id.* at 75:15-25.

that his sources "included news articles, published videos, interviews with individuals and independent researchers."[39] On November 8th, Plaintiff's counsel sent a letter noting that Mr. Jones had not answered the question, and that he had only repeated the definition of "source."[40] Nonetheless, Mr. Jones refused to identify any sources in his amended responses.[41]

In the *Lewis* matter, Mr. Jones had been equally vague about his sources and editorial discussions. Plaintiff hoped to resolve the issue through a sworn interrogatory and a corporate representative deposition. Yet neither avenue produced any evidence. Defendants had a duty to prepare Mr. Dew to testify on these matters. Their failure to prepare Mr. Dew -- for the second time -- was a flagrant act of discovery abuse.

**B.     Mr. Dew was not prepared to discuss the Sandy Hook research performed by InfoWars employees.**

The deposition of Free Speech Systems on research and sourcing was also intended to follow up on Plaintiff's Interrogatory No. 3, which asked the company to:

> Identify every employee or agent of Free Speech Systems, LLC who was involved in the writing, research, sourcing, or editing of the videos or articles cited in the Declaration of Brooke Binkowski or which you identified in response to Interrogatory No. 2, and describe their specific role(s) and dates of employment.

In response, Defendants stated that they could not identify any relevant employees beyond the three on-screen anchors and the website editor:

> Free Speech is unable to identify every such employee or agent and Free Speech does not records in a format which

---

[39] Exhibit 9 – November 7, 2019 Alex Jones' Responses to Written Discovery.
[40] Exhibit 10 - November 8, 2019 letter from Plaintiff's counsel.
[41] Exhibit 11 – November 14, 2019 Alex Jones' Amended Responses.

> would allow it to answer Interrogatory No. 3. The individuals
> known to be in the videos or have some role in the videos
> include Alex Jones, Owen Shroyer and Rob Dew. The editor
> for the website during the time period of the subject matter
> was Paul Watson.[42]

On November 8, 2019, Plaintiff's counsel sent a letter noting this response was absurd.[43] Numerous individuals are involved in the writing, research, and editing of an InfoWars episode beyond the on-screen anchors. InfoWars possessed the documents necessary to answer this interrogatory, because even the few documents produced in this case show many employees who were involved in the research and sourcing for these videos.

During the deposition of Free Speech Systems regarding research and sourcing for the videos, Mr. Dew was questioned about the research done by these InfoWars employees. Mr. Dew confirmed these individuals either performed or may have performed Sandy Hook research or sourcing, but in every case, Mr. Dew admitted he was unprepared to testify. First, Mr. Dew confirmed that current employee Darrin McBreen performs research for InfoWars[44], but he was not prepared to discuss that research:

> Q.    Are you prepared to discuss the research that Darrin
>       McBreen was involved with regarding Sandy Hook?
>
> A.    I would say no.[45]

Next, Mr. Dew confirmed that Marcos Morales was still a current employee, but could not discuss his role in the Sandy Hook videos:

---

[42] Exhibit 12 - November 7, 2019 Free Speech Systems' Responses to Discovery.
[43] Exhibit 10 - November 8, 2019 letter from Plaintiff's counsel.
[44] Exhibit 8 – Deposition of Rob Dew, 6:1-4.
[45] *Id.* at 6:18.

> Q.    I asked whether or not Free Speech Systems knows
> whether or not Marcos Morales has done any research
> for the -- pertaining to the videos in plaintiff's petition?
>
> A.    I can't answer that.[46]
>
> ...
>
> Q.    So you don't know whether or not he was involved
> with any sourcing of the videos in plaintiff's petition?
> And I'm not trying to trip you up. I just want a yes or
> no.
>
> A.    I don't know.[47]

When asked about InfoWars employee Travis Knight, Mr. Dew confirmed he may
have been involved in Sandy Hook research.[48] Yet Mr. Dew could not give an answer on
behalf of the company:

> Q.    Does Free Speech Systems know whether or not Travis
> Knight was involved in research or sourcing of the
> videos in plaintiff's petition?
>
> A.    No.
>
> Q.    Did you talk to Travis Knight in preparing for today?
>
> A.    I did not.[49]

Similarly, Mr. Dew was not able to testify about Alejandra Guteirrez, a lead
producer.[50] With respect to Ms. Gutierrez's role in the Sandy Hook research and sourcing,
Mr. Dew stated, "I couldn't tell you."[51]

---

[46] *Id.* at 9:11-14.
[47] *Id.* at 12:2-5.
[48] *Id.* at 12:20-25.
[49] *Id.* at 13:11-17.
[50] *Id.* at 13:23.
[51] *Id.* at 14:17-18.

The same is true as to Wilson Bondesen, who was involved with tips coming in and sources giving information.[52] Mr. Dew did not speak to Mr. Bondesen, and Dew admitted he was not "prepared to testify as to Wilson Bondesen's involvement with sourcing and researching for the videos in plaintiff's petition."[53]

Mr. Dew further testified that Jerome Corsi is another employee who might have been involved in Sandy Hook research at InfoWars, but Mr. Dew was not prepared to testify about his involvement.[54]

Mr. Dew also testified that Daria Karpova was the lead producer of the Alex Jones Show, but he did not speak to her.[55] Mr. Dew could not testify about her involvement in Sandy Hook research and sourcing.[56]

Mr. Dew was asked about Harrison Smith, who is an InfoWars host and reporter.[57] Yet Mr. Dew testified that "Free Speech Systems does not know one way or the other whether or not Harrison Smith was involved with sourcing or research for the videos described in plaintiff's petition."[58]

Mr. Dew confirmed that Owen Shroyer and Adan Salazar were involved in Sandy Hook research, but he did not speak to them.[59] Mr. Dew also confirmed that two ex-employees, Aaron Dykes and Kurt Nimmo, were responsible for Sandy Hook research.[60]

---

[52] *Id.* at 15:2-5.
[53] *Id.* at 15:6-8.
[54] *Id.* at 15:19-16:18.
[55] *Id.* at 17:7-11.
[56] *Id.* at 18:9.
[57] *Id.* at 21:6.
[58] *Id.* at 21:16.
[59] *Id.* at 23:9; 26:7.
[60] *Id.* at 26:7-26:25.

None of these individuals had been identified in Free Speech Systems interrogatory responses. In sum, Mr. Dew was unable to discuss the research or sourcing performed by any InfoWars employee, and he was unable to identify which employees were even involved.

    **C.    Mr. Dew was not prepared to discuss editorial discussions regarding Sandy Hook.**

Defendants also failed to prepare Mr. Dew to address the second topic regarding editorial discussions on Sandy Hook. On this critical topic, Mr. Dew had no preparation beyond a brief conversation with counsel, and he did not review any documents beyond the deposition notice.[61] He did not speak with "any of the employees that are still at InfoWars that may have been related to Sandy Hook in any way."[62]

Mr. Dew admitted he was not prepared to discuss the topic for the same reason he unable to discuss the first topic:

> Q.    We know that from your answers related to the videos and not knowing the sources of the information or any of the researchers, that any discussion that would have involved that -- those people that did that, you're not prepared to discuss that, correct?
>
> A.    That's correct.[63]

Mr. Dew claimed that he could only testify about any editorial discussion in which he was directly involved and still remembered, and could not testify about editorial discussions on behalf of the company:

---

[61] *Id.* at 76:7-8-77:2.
[62] *Id.*
[63] *Id.* at 77:6-11.

> Q.   Did you take any steps to prepare yourself to discuss whether or not there are any editorial discussions that were had between anyone at Free Speech Systems outside your purview?
>
> A.   No.[64]

Moreover, Mr. Dew acknowledged that editorial discussions could be contained within documents, but he admitted he did not use any documents to help prepare for the deposition:

> Q.   If there are discussions out there within Free Speech Systems' documents that were produced in this case that have editorial discussions in there, that's something you should know about, correct?
>
> A.   If you're saying I reviewed every e-mail that was sent around the office during those time periods, I didn't do that.
>
> Q.   You didn't review any e-mails preparing for today?
>
> A.   That's correct.
>
> Q.   Do you think you should have?
>
> A.   I was relying on the advice of my attorney.[65]

Mr. Dew's testimony shows Defendants intentionally failed to prepare him to offer any meaningful testimony. Given their past experience offering Mr. Dew in the *Lewis* case, Defendants understood their obligation to prepare their corporate designee. This intentional act of discovery abuse shows flagrant disregard for the rules.

---

[64] *Id.* at 78:8-15.
[65] *Id.* at 80:16-81:7.

II.    **Mr. Jones Refused to Make Good Faith Efforts to Identify his Sources in Written Discovery or Deposition.**

As noted above, Mr. Jones was asked in Interrogatory No. 2 to "identify your source(s), if any, for the contention that" followed by 18 specific contentions quoted in Plaintiff's petition. Instead, Mr. Jones merely responded that his sources "included news articles, published videos, interviews with individuals and independent researchers."[66] He refused to identify any specific source.

However, during his deposition, Mr. Jones claimed ignorance of any request asking him to identify his sources. Mr. Jones stated he could identify those sources if he had known to look. For example, regarding his claim about a Bloomberg email showing foreknowledge of the shooting, Mr. Jones testified that he should be able to locate his source:

> Q.    Could you find those reports if you needed to? Could you identify your source?
>
> A.    Well, I mean, A, you can hold back a source if you want to, but I remember it being online. I can try to go find that again…I remember the news articles about it that we reported on.
>
> Q.    So you could find those, right?
>
> A.    I should be able to.[67]

Likewise, Mr. Jones was unable to discuss the source for his allegation about the school website's internet traffic, stating he would have to "pull that up":

> Q.    You say there's things showing there's no traffic coming to the school. What are you talking about?

---

[66] Exhibit 11 – November 14, 2019 Alex Jones' Amended Responses.
[67] Exhibit 13 – Deposition of Alex Jones, 86:21-87:9.

23

> A.    I would have to pull that up. This was years ago.[68]

Mr. Jones was unable to discuss the source for his allegation about the school being

shut down, and he said he made no efforts to identify his source:

> Q.    You said, the word is that school was shut down for those years, that's what the records show; that was your argument, correct?
>
> A.    I was specifically talking about the other articles I was talking about, yes.
>
> Q.    That's what I'm asking you about right now. Those records, what are you talking about?
>
> A.    I would have to go pull them up.
>
> Q.    And you haven't done that?
>
> A.    No, not -- no, not recently.[69]

Regarding his claim about ambulances, Mr. Jones testified:

> Q.    Are you going to claim in this lawsuit that those ambulances came an hour and a half later?
>
> A.    I'm going to have to check that.
>
> Q.    Well, I asked you to check it. Did you? I asked you in discovery to check it. Did you?
>
> A.    I'm going from memory. I believe there's some conflicting reports.
>
> Q.    I'm not asking what your memory was. I'm asking if you checked it.
>
> A.    I think I did check it. I don't --

---

[68] *Id.* at 70:8-12.
[69] *Id.* at 72:12-21.

> Q.    What were the results of you checking it?
>
> A.    I don't have that in front of me.
>
> Q.    And whatever it was, you didn't give it to me either, right, in discovery? Correct?
>
> A.    Oh, I thought that was rhetorical.
>
> Q.    I don't ask rhetorical questions, Mr. Jones. I want testimony.
>
> A.    Oh, I don't have that in front of me. I can't speak accurately to that.[70]

Regarding his claim about emergency helicopters, Mr. Jones stated, "I remember there was some research in the news and that was pointed out. I would have to pull that up, though."[71] Regarding alleged emails from Newtown city council about closing the school, Mr. Jones stated, "I guess I could go find that stuff somewhere and dig it up."[72]

When pressed about why he didn't make any attempt to identify his sources, Mr. Jones claimed he did not know Plaintiff was seeking that information, despite the specific interrogatories he ignored:

> Q.    You've been under lawsuit now for over a year on Sandy Hook-related cases, multiple cases, and you haven't done anything to go try to find what your sources for these claims are, have you?
>
> A.     I've done a lot of work.
>
> Q.    Well, you were asked in interrogatories, weren't you, to identify your sources for all your Sandy Hook claims, including this one? You were asked that, right?

---

[70] *Id.* at 125:6-24.
[71] *Id.* at 77:1-4.
[72] *Id.* at 94:13-14.

A.    I don't remember.

Q.    Okay. You don't remember saying you couldn't figure out what your sources were; is that what you're saying?

A.    I don't understand.

Q.    Let's just ask you right now. Are you able to figure out what your sources are?

A.    Yes, I could specifically -- now that I understand what you're asking, I could go find that.

Q.    So if I wanted to know when you say "The records show that the school was closed down," you could produce those records?

A.    I could show what I was talking about at that point.

Q.    Or you could produce whatever you were relying on as your source, right?

A.    Now that you've specified.[73]

In truth, Plaintiff's Interrogatory No. 2(b) specifically asked Mr. Jones to "identify your source(s), if any, for the contention that 'the school was closed until that year [2012]' as reference on the April 22, 2017 episode of the Alex Jones Show."[74] Interrogatory No. 2 also sought sources for sixteen other claims made Jones, but no responsive answers were provided, and Mr. Jones was unable to provide any testimony. During his testimony, Mr. Jones answered "I don't remember" forty-four times, and he answered "I don't know" fifty-one times.

---

[73] *Id.* at 72:22-74:5
[74] Exhibit 11 - November 14, 2019 Alex Jones' Amended Responses, p. 3.

During deposition, Mr. Jones claimed, "one thing you're right about is I do need to, I guess, spend time and burrow into this more."[75] For over a year, the Sandy Hook parents have been trying to get answers about the circumstances of InfoWars' reporting. And for over a year, Alex Jones has consistently obstructed their efforts.

## III.   Defendants Failed to Preserve and Produce all Documents it Created Relating to the Sandy Hook School Shooting, the Plaintiff, or his Family.

In Request for Production No. 1, Plaintiff asked Free Speech Systems to produce:

> All documents and communications created, edited or replied to by any named Defendant or any of their employees or agents which relate to the Sandy Hook school shooting, Neil Heslin, Scarlett Lewis, or their son J.L.

Defendants failed to adequately comply with this request on nearly every level. Through a pattern of obstruction, intentional destruction, willful disregard for preservation, and open contempt, Defendants refused to take their obligations seriously. As a result, they have compromised the entirety of the evidentiary record.

### A.   Defendants ignored the parties' Rule 11 agreement regarding document production.

On November 5, 2019, Defendants' counsel Michael Burnett asked Plaintiff's counsel to enter into a Rule 11 agreement regarding responsive documents which were previously included in the *Lewis* production. Specifically, Defendants' counsel asked Plaintiff's counsel to agree that any documents produced in *Lewis* "do not need to be

---

[75] Exhibit 13 – Deposition of Alex Jones, 122:16-21.

reproduced in this case, so long as they are identified in Defendant's discovery responses by the corresponding Bates Number."[76]

When time came for production, Defendants' in-house counsel Robert Barnes simply ignored the parties' Rule 11 agreement. Defendants did not produce responsive documents from *Lewis* or identify any documents by Bates number. Instead, Defendants produced approximately sixty entirely new emails, each duplicated ten times or more in a set of 623 pages. Plaintiff's counsel sent a letter on November 12th reminding Defendants' of their Rule 11 agreement to identify which documents in the *Lewis* production are responsive to the request.[77] In their amended responses, Defendants continued to ignore the agreement, and merely directed Plaintiff to "documents previously produced."[78]

Not only did Defendants violate the Rule 11 agreement, but there are serious problems with Defendants now relying in any way upon the *Lewis* production. At the time of the *Lewis* hearing, it was already apparent that the *Lewis* production was blatantly non-compliant. Relying purely on *Lewis* documents would not constitute an adequate response even if the Rule 11 agreement had been honored in this case. Even worse, deposition testimony in this case revealed disturbing new facts about Defendants' document collection.

---

[76] Exhibit 14 - Correspondence on Rule 11 Agreement.
[77] Exhibit 15 - November 12, 2019 letter from Plaintiff's Counsel.
[78] Exhibit 16 - Nov. 14 Free Speech Systems Amended Responses.

### B.     Defendants admit to withholding a massive amount of missing emails.

While still collecting documents for *Lewis* and *Lafferty*, Defendants' representative David Jones stated in an affidavit on February 22, 2019 that 80,000 emails existed containing the term "Sandy Hook":

> Searching by terms that plaintiff describes, such as "Sandy Hook," has so far yielded about 80,000 emails, and defendants expect similar volumes on searches for other terms that plaintiff's discovery requests have described.[79]

David Jones also stated that InfoWars needed time "to review each retrieved document for actual responsiveness."[80] Yet the *Lewis* production consisted of approximately 15,000 total documents on all topics.[81] Even assuming all 15,000 documents contained the term "Sandy Hook" (which they do not), that would mean InfoWars decided that approximately 65,000 emails containing the term "Sandy Hook" should be withheld as non-responsive.

While testifying for the company in this case, InfoWars IT Director Michael Zimmerman testified that David Jones' affidavit about 80,000 emails is accurate:

> Q.     And my question is, the 80,000 that were found, is that a number that sounds about right or is that a number there's no way that it's that many?
>
> A.     No, I believe that's about right.
>
> Q.     What did you do with all those?

---

[79] Exhibit 17, February 22, 2019 Affidavit of David Jones, para. 21.

[80] *Id.*

[81] Given the manner in which Defendants produced their documents, it is difficult to ascertain the total number of documents. Most documents were produced individually, while others were produced in giant PDF files. But even making absurdly generous estimates on average pages per email, Defendants produced less than 25,000 documents.

A.    We still have those e-mails.

Q.    When you did the search to get that number, did you save those?

A.    Yes.

Q.    Did you give them to anyone?

A.    I believe I gave those to whatever attorney we were working with on that case.[82]

...

Q.    But I'm just curious as to -- 80,000, that is an accurate number, David Jones isn't lying, just --

A.    No.

Q.    -- someone didn't produce it to us?

A.    That seems more likely, yes. Because I certainly searched and returned 80,000 e-mails at some point.[83]

Mr. Zimmerman also explained that InfoWars does not remove duplicates for its document production, and it produced multiple copies of emails which "landed in multiple people's inboxes."[84] As such, the 80,000 emails are not simply duplicates, as copious duplicates were produced in both cases. The problem likely lies with Mr. Barnes' review and belated production of the *Lewis* documents. As Mr. Barnes stated in an April 3, 2019 hearing:

I realized I was taking too long to get this done. So I reviewed over 100,000 documents. I got rid of 30,000, but there was still more to get rid of to filter out.[85]

---

[82] Exhibit 18 – Deposition of Michael Zimmerman, 40:18-41:5.
[83] *Id.* at 41:23-42:5.
[84] *Id.* at 28:7-9.
[85] Exhibit 3 - April 3, 2019 Transcript in *Lewis v Jones*, 27:21-25.

Mr. Barnes ended up producing documents in a haphazard manner immediately after Ms. Lewis' sanction motion was filed. Nobody but Mr. Barnes can say what happened in that process, and he is no longer before this Court. Suffice to say, Defendants' sworn statements about document collection in *Lewis* and *Lafferty* conflict with the disorganized, largely unreviewed documents provided by Mr. Barnes for those cases – documents which also contained child pornography. The document situation is an absolute mess, and it is clear Defendants made no efforts to unravel it.

### C.    Defendants failed to preserve emails after the start of litigation.

To aggravate matters, there was an intentional disregard for any preservation and collection of documents, leading to the permanent loss of information. Defendants failed to issue any kind of company-wide litigation hold. Despite being sued in April 2018, no steps were taken to ensure internal documents were preserved until February 2019 during the discovery process in the *Lewis* case.  IT Director Michael Zimmerman testified the first time Free Speech Systems LLC took any effort to preserve its email server was at the beginning of this year during discovery in *Lewis*, almost a year after it had been sued.[86] Before InfoWars created a secure mirror copy of the email server earlier this year, employees could have deleted emails off the server at any time.

In *Carduco,* the Corpus Christi court found "substantial circumstantial evidence" to support intentional spoliation when a defendant disregarded any efforts to preserve its email system. *Mercedes Benz USA, LLC v. Carduco, Inc*. No. 13-13-00296-CV, 2016 WL

---

[86] Exhibit 18 – Deposition of Michael Zimmerman, 29:9-10.

1274535, *26 (Tex. App. - Corpus Christi-Edinburgh Mar. 31, 2016, rev'd on other grounds). In that case, the in-house counsel had not issued a litigation hold after litigation began, and the party then failed to preserve its computer database until the trial court ordered it to respond to discovery long after litigation had been underway. The same facts are present here, but even more egregious. As shown below, the failure to issue a litigation hold resulted in the destruction of multiple forms of crucial evidence.

### D. InfoWars failed to secure documents held by individual employees, leading to both reckless and intentional spoliation.

InfoWars failed to secure documents held by its employees, who were left to determine if responsive materials should be turned over from their computers, devices, messing applications, and document storage.[87] During the collection process in February 2019, InfoWars employee Tim Fruge sent "an e-mail out to employees to ask them to search for documents to produce."[88] None of the employees gave him a single document:

> Q.     Did you tell employees to bring to you any content that they found that was responsive?
>
> A.     Yes.
>
> Q.     Okay. And did anyone bring anything to you?
>
> A.     No.
>
> Q.     Not a single employee?
>
> A.     Not one single employee.[89]

---

[87] *Id.* at 11:8-14.
[88] Exhibit 19 – *Lafferty* Deposition of Tim Fruge, 47:10.
[89] *Id.* at 48:15-22.

In this case, InfoWars' IT Director Michael Zimmerman testified he found it surprising no documents were turned over by the employees:

> Q.   And did you find it peculiar that so many articles and videos were made and e-mails were had and not a single one came back when everybody had to self-police themselves and search their own computers?
>
> A.   I don't know who all actually completed the search. I know he sent the e-mail requesting people to do that.
>
> Q.   As you sit here today on behalf of the company, was the company surprised when not a single employee found any responsive communications during this search?
>
> A.   That does seem surprising, yes.[90]

Here, Defendants' actions were improper because "[Defendants] never issued a litigation hold…Instead, [Defendants] reached out to individual employees and requested that they submit any responsive documents." *Mercedes-Benz USA, LLC*, 2016 WL 1274535 at *25. Even if Mr. Fruge's email in February 2019 had been sent a year earlier, it still would have been insufficient and reckless, as many courts have observed:

> This instruction does not meet the standard for a litigation hold. It does not direct employees to *preserve* all relevant records—both paper and electronic—nor does it create a mechanism for *collecting* the preserved records so that they can be searched by someone other than the employee. Rather, the directive places total reliance on the employee to search and select what that employee believed to be responsive records without any supervision from Counsel.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F. Supp. 2d 456, 473 (S.D.N.Y. 2010); *see also Adams v. Dell,* 621 F.Supp.2d 1173, 1194 (D.Utah 2009)

---

[90] Exhibit 18 – Deposition of Michael Zimmerman, 15:7-17.

(duty violated when defendant's practices "place operations-level employees in the position of deciding what information is relevant"); *Browder v. City of Albuquerque,* 209 F. Supp. 3d 1236, 1246 (D.N.M. 2016)(duty violated when "the City's practices place a wide variety of employees…in the position of deciding what information is relevant."); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("It is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched.") (emphasis in original); *Phillip M. Adams & Associates, L.L.C. v. Dell, Inc.,* 621 F. Supp. 2d 1173, 1194 (D. Utah 2009) (Information likely lost when defendant's "practices place operations-level employees in the position of deciding what information is relevant.")

Even worse, in the absence of a litigation hold, InfoWars had been erasing multiple employees' computers in the past year before Mr. Fruge's letter asking employees to check for computer files. Mr. Zimmerman testified that since April 2018, numerous computers had been erased:

> Q.    Since the lawsuits were filed in April 2018, have any employees had received new computers?
>
> A.    A number of employees have.
>
> Q.    What happened with the old computers?
>
> A.    Generally if they can be repurposed for another use at the company, they are formatted and given to another employee.
>
> Q.    And when you format it, you kind of just wipe it clean and reinstall --

A.     Install a new operating system.

Q.     Okay. So since these lawsuits were filed, Free Speech Systems has taken old computers, wiped, them destroying all of the information on them, and repurposed them for other employees?

A.     Computers themselves, yes.[91]

Erasing employees' computers during litigation is an egregious offense. Given the way InfoWars' business operates, these computers were likely to contain responsive documents. By intentionally erasing these computers, InfoWars has intentionally destroyed evidence in bad faith. This act alone requires the most severe sanctions.

### E.    Defendants failed to preserve and search all of their computer servers.

While InfoWars searched its email server in February 2019, it did not search the company's "file storage servers."[92] Mr. Zimmerman testified about the file storage servers during his deposition in the *Lafferty* case:

> It is a server called FreeNAS. It acts a network file storage location. Much like on your computer, you would have your file browser and your local files. It is a shared commonplace to store files used in production.[93]

Mr. Zimmerman confirmed the company's file storage servers were not searched.[94] Mr. Zimmerman also testified that InfoWars writes and publishes a newsletter to certain subscribed users. The contents of these newsletters are stored on

---

[91] *Id.* at 36:2-16.
[92] Exhibit 20 – *Lafferty* Deposition of Michael Zimmerman, 39:7.
[93] *Id.* at 44:16-45:1
[94] *Id.* at 45:9-17.

a third party "Cloud-based storage system."[95] That storage system was not searched during the collection of documents.[96] Finally, Mr. Zimmerman stated that despite a discovery request for documents relating to Plaintiff's son, no search was performed because he did not "know the name of their son" and "no one ever informed [him] of what that is."[97]

### F.    Defendants failed to preserve or search alternative methods of electronic communication, including a messaging system that was permanently destroyed.

In Interrogatory No. 4, Plaintiff asked Free Speech Systems to "identify every method by which employees or agents of Free Speech Systems, LLC have communicated messages to other employees, agents, or sources concerning the subject matter of this lawsuit, including the name of any electronic application, program, or service used in such communications." Plaintiff posed an identical interrogatory to Mr. Jones. Both Defendants answered that "the methods by which employees or agents of Free Speech have communicated messages is via email, telephone and/or verbally."[98] On November 8th, Plaintiff's counsel sent a letter noting this response was not complete and that other methods were certainly used. Yet in their amended responses, Defendants did not alter their answer.

---

[95] *Id.* at 46:22-25.
[96] *Id.* at 47:1-4.
[97] Exhibit 18 – Deposition of Michael Zimmerman, 8:9-14.
[98] Exhibit 11 - Alex Jones' Amended Responses; Exhibit 16, Free Speech Systems' Amended Responses.

Depositions confirmed Defendants used a variety of electronic methods to communicate with each other and their sources, as IT Director Michael Zimmerman testified:

> Q.    When Mr. Dew says e-mail, telephone and verbally on behalf of the company, that's not the whole answer, is it?
>
> A.    No, it's not. There's other electronic communications.[99]

Deposition testimony confirmed these electronic communications were not preserved or searched, and that one of the systems in use has been permanently deleted. The company has been using an internal messaging system known as "Rocket.Chat" since the start of 2019.[100] The company was using a different chat system known as "Slack" at the time this lawsuit was filed in 2018, but it was not preserved or searched. Instead, all Slack data was destroyed when the company switched messaging applications in 2019. Mr. Zimmerman testified that he did not "believe anyone has access to [Slack] anymore."[101] Mr. Zimmerman stated that "a good portion of the employees" used the former chat system.[102] Indeed, Defendants produced an internal email which mentions a Slack message relating to Sandy Hook being sent between InfoWars employees Rob Dew and Adan Salazar.[103] Internal emails show that even Alex Jones was a user of internal messaging applications, despite his sworn answer to the contrary.[104] Any messages

---

[99] Exhibit 18 – Deposition of Michael Zimmerman, 45:5-10.
[100] *Id.* at 12:13.
[101] *Id.* at 3:14-15.
[102] *Id.* at 13:4.
[103] Exhibit 21 - Slack message reminder email - FSSTX-069008.
[104] Exhibit 22 - Internal email showing Jones chat log - FSSTX-068319.

relating to Sandy Hook that existed in the Slack application at the time this lawsuit was filed until it was replaced in 2019 no longer exist.

With respect to Rocket.Chat -- the messaging system in use since earlier this year -- Mr. Zimmerman claimed there was "no way within our admin interface to search across all messages" and that a letter was sent "to all staff asking them to search their own records, personal files, anything like that for the terms in the request for production," including Rocket.Chat.[105] The employees were allowed to perform their own collection, but none of them returned a single document of any kind.

Mr. Zimmerman also testified that employees possibly communicated with each other using Twitter or Facebook inboxes.[106] Here again, internal emails show messages relating to Sandy Hook were received on social media.[107] Yet as shown below, the company took no steps to preserve these social media accounts, and they were slowly deleted over the course the last year.

### G.    Defendants failed to preserve their social media accounts, leading to their permanent deletion.

Mr. Zimmerman testified that when the first Sandy Hook lawsuit was filed in April 2018, InfoWars possessed accounts on YouTube, Twitter, Facebook, Periscope, Pinterest, and Instagram.[108] However, over the next year, InfoWars began to lose access to those accounts after a series of warnings and temporarily suspensions escalated into various

---

[105] Exhibit 20 – *Lafferty* Deposition of Michael Zimmerman, 30:9-21.
[106] *Id.* at 45:16-20.
[107] Exhibit 23 - Twitter Direct Message to Rob Dew re Sandy Hook - FSSTX-076374.
[108] Exhibit 18 – Deposition of Michael Zimmerman, 32:14-24.

bans across major internet platforms. A timeline of the loss of these social media accounts is shown below:

| April 11, 2018 | Veronique De La Rosa and Leonard Pozner sent InfoWars a request for evidence preservation.[109] |
| July 24, 2018 | YouTube issued a warning "strike" against the InfoWars channel for four videos which violated their rules.[110] |
| July 27, 2018 | Facebook limited Jones' account for thirty days for the same videos.[111] |
| Aug 6, 2018 | YouTube, Apple, and Pinterest permanently banned Jones and InfoWars from their platforms based on new videos, and Facebook temporarily suspended Jones' account.[112] |
| Aug 14, 2018 | Jack Dorsey, CEO of Twitter and Periscope, warned that Jones could be banned if he violated Twitter rules.[113] |
| Sept 6, 2018 | Twitter and Periscope permanently suspended accounts for InfoWars and Jones.[114] |
| May 3, 2019 | Facebook and Instagram permanently suspended all InfoWars accounts and banned Jones from their platforms.[115] |

Mr. Zimmerman testified that from April 2018 to the various points at which these social media accounts were suspended over the next year, no efforts were made to preserve the accounts.[116] Mr. Zimmerman confirmed Defendants took no action even

---

[109] Exhibit 24 – April 10, 2018 Preservation Letter.
[110] https://www.nytimes.com/2018/07/27/technology/alex-jones-facebook-youtube.html
[111] https://www.theguardian.com/technology/2018/jul/27/facebook-suspends-us-conspiracy-theorist-alex-jones
[112] https://www.theguardian.com/technology/2018/aug/06/apple-removes-podcasts-infowars-alex-jones
[113] https://twitter.com/jack/status/1026984245925793792
[114] https://www.bbc.com/news/world-us-canada-45442417
[115] https://www.nytimes.com/2019/05/02/technology/facebook-alex-jones-louis-farrakhan-ban.html
[116] Exhibit 18 – Deposition of Michael Zimmerman, 33:4-12.

though they "knew there has been a constant attempt to get us removed from social media platforms that was ultimately effective."[117] As InfoWars' corporate representative, he testified there were no preservation efforts:

> Q. Were any conversations made whatsoever to attempt to preserve information that was on platforms knowing that the company had a fear that they were going to be deplatformed by those specific companies, Facebook, Instagram and Twitter?
>
> A. Not that I know of. I was not part of that.[118]

Mr. Zimmerman testified he is aware Facebook provides an option to download your Facebook account, but he testified he did not know about that option until after the accounts were deleted.[119] Twitter provides a similar option[120], but it was not utilized either. Mr. Zimmerman testified that "[c]reating backups of social media accounts is something we had never done in the past."[121] Nor did InfoWars take any steps to back-up the videos it stored on YouTube despite clear warnings that its account was in peril.

Over a year ago, in an oral hearing in the *Heslin I* case, Plaintiff's counsel expressed bewilderment that social media accounts were not being preserved after InfoWars deleted four of its own tweets out of fear its account would be deleted:

> In fact, all of their social media troubles recently would mean that they should be preserving every social media account down to everything, down to the kitchen sink, and I do not understand why that hasn't occurred already.[122]

---

[117] *Id.* at 46:17-19.
[118] *Id.* at 48:18-24.
[119] *Id.* at, 48:15-17; 47:8-15.
[120] https://help.twitter.com/en/managing-your-account/how-to-download-your-twitter-archive
[121] Exhibit 18 – Deposition of Michael Zimmerman, 34:21-35:4.
[122] Exhibit 25 - October 15, 2018 Transcript in *Heslin v. Jones,* 67:8-13.

The situation is similar to *In re J.H. Walker*, in which a trucking company allowed a trailer to be destroyed by a third-party after the anticipation of litigation. *In re J.H. Walker*, No. 05-14-01497-CV, 2016 WL819592, at *7 (Tex. App. - Dallas Jan. 15, 2016). Though the defendants in that case did not destroy the evidence themselves, they nonetheless "allowed for the destruction" of critical evidence knowing it was relevant to a claim. *Id.* The same principles apply to electronic evidence on the internet. "[A]s has been found in analogous cases involving governmental entities and corporations, the lack of policies or procedures designed to give an agency (or other entity) the ability to effectuate, on relatively short notice, a litigation hold involving a website, provides further support for a finding of spoliation." *Lab. Corp. of Am. v. United States,* 108 Fed. Cl. 549, 561 (2012).

Here, despite the obvious signs that its social media accounts were in danger, InfoWars never took steps to ensure the vital information stored on those accounts was preserved. Defendants' social media accounts contained the most crucial evidence in this case. Their importance cannot be overstated. As an internet-based media organization, Defendants performed the overwhelming bulk of their communication over social media. Not only did InfoWars and Mr. Jones publish copious amounts of written material on these accounts and communicate with sources through social media inboxes, but as shown below, InfoWars also lost the majority of its video archive because it was exclusively stored on YouTube, and no steps were taken to create a back-up despite clear warnings.

### H. Defendants failed to preserve relevant videos, leading to the destruction of crucial evidence.

In Interrogatory No. 2, Mr. Heslin asked Free Speech Systems to:

> Identify by date and title every article or video discussing the Sandy Hook Elementary School shooting created or published by Free Speech Systems, LLC which is not already listed in the Declaration of Brooke Binkowski.

Plaintiff also requested those videos be produced. In the *Lewis* case, Defendants responded to similar requests by referring counsel to a website containing 29 videos.[123] In Ms. Lewis' sanctions motion, she demonstrated why the list was incomplete. In this case, Defendants initially responded by providing 42 videos on November 7, 2019.[124] On November 8, Plaintiffs' counsel wrote to Defendants noting the list was still far from complete. On November 14, Defendants produced an additional 14 videos.[125] Yet the list was still obviously incomplete, even for videos that simply contained "Sandy Hook" in the title.

For example, the list does not include numerous videos known to have existed, including titles such as "Sandy Hook Name Seen on Dark Knight Map" and "Were Crisis Actors Used in the Sandy Hook Massacre?," both of which Plaintiff's counsel learned were once on YouTube.[126] Another unproduced video, entitled "Sandy Hook Victim Dies Again in Pakistan," is mentioned in a July 20, 2017 InfoWars article.[127] Another known omission is a November 28, 2017 video in which InfoWars reporter Owen Shroyer criticized Erica

---

[123] Exhibit 26 – February 26, 2019 email in *Lewis v. Jones.*
[124] Exhibit 27 - November 7, 2019 Index of Video Discovery.
[125] Exhibit 28 - November 12, 2019 Index of Supplemental Videos.
[126] Exhibit 29 - Sandy Hook Facts YouTube Video Screenshots.
[127] https://www.infowars.com/youtube-censoring-sandy-hook-videos/

Lafferty, the daughter of slain Sandy Hook Elementary School principal Dawn Hochsprung, for calling on President-elect Donald Trump not to appear on InfoWars. This video is discussed in a *Media Matters* article, but it was not produced.[128] It is obvious InfoWars failed to produce every video with "Sandy Hook" in the title, much less every video discussing Sandy Hook. InfoWars should have provided dozens of additional videos, if not more. Something was clearly wrong.

During the November 26th deposition of Free Speech Systems, it was revealed these videos were destroyed. Testifying for the company, Rob Dew stated that "[m]ost of our video library got wiped out with YouTube and so whatever is left is still around and whatever's not is not."[129] Mr. Dew stated that "I don't think God knows all the videos because they're gone. They don't exist anymore."[130] Mr. Dew admitted InfoWars did not preserve its videos, but stated, "[y]ou can thank YouTube for that. You can thank YouTube and Facebook and everybody else."[131]

As a result of InfoWars failure to preserve its videos after the start of the Sandy Hook litigation, Plaintiff lost the ability to prove the conduct underlying the five years of harassment he suffered. The primary evidence underlying his claim has been irreparably destroyed.

---

[128] https://www.mediamatters.org/donald-trump/alex-jones-infowarscom-attacks-sandy-hook-principals-daughter
[129] Exhibit 8 - Deposition of Rob Dew, 75:3-5.
[130] *Id.* at 85:20-21.
[131] *Id.* at 85:10-14.

**IV.     Having Tested Lesser Sanctions, a Default Judgment is Appropriate for the Combined Effects of Repeated Flagrant Discovery Abuse, Intentional Spoliation of Critical Evidence, and Bad Faith Dilatory Tactics.**

When a party fails to "obey an order to provide or permit discovery," Rule 215.2 provides an escalating series of remedies, some of which this Court has already tried. These remedies include:

- An order charging the expenses of discovery against the disobedient party or the attorney advising him;

- An order that certain matters be taken to be established for the purposes of the action;

- An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

- An order striking out pleadings or rendering a judgment by default.

Prior to this case, Defendants committed flagrant discovery abuse in three prior cases. Nonetheless, an escalating series of adverse rulings and sanctions has done nothing to deter Defendants. In this case, Defendants ignored a Rule 11 agreement, refused to respond to interrogatories in good faith, failed to produce requested documents and videos, refused to present a prepared corporate witness, and gave false and conflicting statements about discovery efforts. By ignoring their discovery obligations, Defendants used the TCPA as a means to delay for years Plaintiff's ability to learn about their conduct, long after the events are fresh.

Given Defendants' history of non-compliance, an elevated response is warranted. At this stage, the Court could test a more severe sanction, such as striking certain defenses or prohibiting certain evidentiary matters at trial. Yet Plaintiff urges a default

44

judgment because there is no reason to believe these particular Defendants will ever participate in these lawsuits in good faith. The parties will continue to accumulate legal expenses as Defendants continue their farce.

In addition to its consideration of discovery abuse under Rule 215, this Court must also consider Defendants' spoliation of evidence in determining a sanction. First, the Court "must determine, as a question of law, whether a party spoliated evidence." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 13 (Tex. 2014). Next, "if spoliation occurred, the court must assess an appropriate penalty." *Id.*

In determining whether spoliation occurred, the Court must consider whether "the spoliating party had a duty to reasonably preserve evidence" and whether "the party intentionally or negligently breached that duty by failing to do so." *Id.* at 14. In determining a proper remedy, the Court must consider "[t]he level of culpability of the spoliating party" and "[t]he degree of prejudice, if any, suffered by the nonspoliating party." *Id.* "[T]he spectrum of remedies that may be imposed range from an award of attorney's fees to the dismissal of the lawsuit." *Id.* Indeed, default of a defendant's case may be proper when the spoliator knowingly destroys documents that deprive the victim of the opportunity to present critical evidence on its claims to the jury.

Such is the case here. Defendants were provided a preservation letter on April 10, 2018,[132] but took no action until February 2019 to preserve and collect documents. In the interim, the company intentionally erased computers, destroyed logs of its internal messaging service "Slack," and allowed its social media accounts to be deleted despite

---

[132] Exhibit 24 - April 10, 2018 Preservation Letter.

clear warnings from the social media companies. In addition, document preservation efforts were willfully ignored. There was no written litigation hold to all employees, and the email system was not independently preserved until recently. Individual employees were left to collect documents, and none of them actually did. The massive loss of video evidence is especially harmful to Plaintiff, as noted by the Supreme Court in *Brookshire Bros.*:

> [A] spoliating party might argue that no prejudice resulted from spoliation of a video of an incident because there is also eyewitness testimony regarding the incident. But many of the inherent problems with such testimony—inaccurate memory, poor eyesight, bias, etc.—are simply not present with a video recording. Again, a picture is often worth a thousand words. The same can be true with respect to testimony regarding the contents of a destroyed document, compared to the document itself. The differences in kind and quality between the available evidence and the spoliated evidence will thus be a key factor in analyzing prejudice to the nonspoliating party.

*Id.* at 22.

While Defendants have been doing everything they can to delay these lawsuits, the parents have been struggling for a year and a half to conduct basic discovery on the facts. Over that time, evidence was destroyed and lost, and memories are rapidly fading. Defendants' actions have irreparably damaged Plaintiff, depriving him the opportunity to present critical evidence on his claim. This injury is compounded by the year-long pattern of flagrant discovery obstruction and utter disregard for their obligations in these lawsuits, all in service of Defendants' delay tactics. Under these circumstances, a default judgment on liability is now appropriate.

Finally, in addition to whatever other steps the Court takes, an award of reasonable attorney's fees and costs is also required under Rule 215.2. Plaintiff has attached a declaration from counsel setting forth these fees and expenses.[133]

## CONCLUSION

Defendants have been given ample opportunity to take these lawsuits seriously and obey the rule of law. Yet despite a rotating cast of counsel, Defendants have remained stubborn in their refusal to respect the integrity of the proceedings. Now it has become apparent that Defendants' cavalier indifference to this Court's authority has compromised every form of evidence in this case. Accordingly, due to the combination of Defendants' unrelenting discovery abuse and egregious spoliation, Plaintiff asks this Court to enter a default judgment on liability with costs.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

---

[133] Exhibit 1 - Declaration of Mark Bankston.

## **CERTIFICATE OF CONFERENCE**

I hereby certify that I have conferred on numerous occasions, by letter and by phone, regarding the necessity for this motion. Despite best efforts, no agreement could be reached with opposing counsel.


_____

MARK D. BANKSTON

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 9, 2019 the forgoing Motion was served upon all counsel of record via electronic service, as follows:

T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701
twadejefferies@twj-law.com


_____
MARK D. BANKSTON

## EXHIBIT LIST

**(Exhibits withheld due to space constraints but available upon request)**

**Exhibit 1**: Declaration of Mark Bankston

**Exhibit 2**: March 20, 2019 Motion for Sanctions in *Lewis v. Jones*

**Exhibit 3**: April 3, 2019 Hearing Transcript in *Lewis v. Jones*

**Exhibit 4**: June 18, 2019 Hearing Transcript in *Lafferty v. Jones*

**Exhibit 5**: June 19, 2019 Hearing Transcript in *Lafferty v. Jones*

**Exhibit 6**: October 18, 2019 Order in *Heslin I*

**Exhibit 7**: November 26, 2019 email from Defendant's counsel Wade Jefferies

**Exhibit 8**: Deposition of Rob Dew

**Exhibit 9**: November 9, 2019 Alex Jones' Responses to Written Discovery

**Exhibit 10**: November 8, 2019 letter from Plaintiff's counsel

**Exhibit 11**: November 14, 2019 Alex Jones' Amended Responses

**Exhibit 12**: November 7, 2019 Free Speech Systems' Responses to Discovery

**Exhibit 13**: Deposition of Alex Jones

**Exhibit 14**: Correspondence on Rule 11 Agreement

**Exhibit 15**: November 12, 2019 letter from Plaintiff's Counsel

**Exhibit 16**: Nov 14 Free Speech Systems Amended Responses

**Exhibit 17**: February 22, 2019 Affidavit of David Jones

**Exhibit 18**: Deposition of Michael Zimmerman

**Exhibit 19**: *Lafferty* Deposition of Tim Fruge

**Exhibit 20**: *Lafferty* Deposition of Michael Zimmerman

**Exhibit 21**: Slack message reminder email- FSSTX-069008

**Exhibit 22**: Internal email showing Jones chat log- FSSTX-068319

**Exhibit 23**: Twitter Direct Message to Rob Dew re Sandy Hook- FSSTX-076374

**Exhibit 24**: April 10, 2018 Preservation Letter

**Exhibit 25**: October 15, 2018 Transcript in *Heslin v. Jones*

**Exhibit 26**: February 26, 2019 Email in *Lewis v. Jones*

**Exhibit 27**: November 7, 2019 Index of Video Discovery

**Exhibit 28**: November 12, 2019 Index of Supplemental Videos

**Exhibit 29**: Sandy Hook Facts YouTube Video Screenshots