# Exhibit 33

```
 1                      REPORTER'S RECORD
                      VOLUME 1 OF 1 VOLUME
 2

 3   NEIL HESLIN,                 )  IN THE DISTRICT COURT
                                  )
 4        Plaintiff              )  TRAVIS COUNTY, TEXAS
                                  )
 5   VS.                          )  459TH JUDICIAL DISTRICT
                                  )
 6   ALEX E. JONES, INFOWARS,     )
     LLC, ET AL.,                 )  TRIAL COURT CAUSE NO.
 7                                )  D-1-GN-18-001835 AND
          Defendant              )  D-1-GN-19-004651
 8

 9   LEONARD POZNER AND           )  IN THE DISTRICT COURT
     VERONIQUE DE LA ROSA,        )
10                                )  TRAVIS COUNTY, TEXAS
          Plaintiff              )
11                                )  459TH JUDICIAL DISTRICT
     VS.                          )
12                                )
     ALEX E. JONES, INFOWARS,     )  TRIAL COURT CAUSE NOS.
13   LLC, ET AL.,                 )  D-1-GN-18-001842
                                  )
14        DEFENDANTS             )

15
     SCARLETT LEWIS,              )  IN THE DISTRICT COURT
16                                )
          Plaintiff              )  TRAVIS COUNTY, TEXAS
17                                )
     VS.                          )  459TH JUDICIAL DISTRICT
18                                )
     ALEX E. JONES, INFOWARS,     )
19   LLC, ET AL.,                 )  TRIAL COURT CAUSE NO.
                                  )  D-1-GN-18-006623
20        DEFENDANTS             )

21
     -------------------------------------------------------
22

23
          MOTION TO COMPEL; MOTION FOR SANCTIONS
24

25
```

1          On the 31st day of August, 2021, the

2   following proceedings came on to be heard in the

3   above-entitled and numbered cause before the Honorable

4   Maya Guerra Gamble, Judge presiding, held in Austin,

5   Travis County, Texas, held via videoconference;

6          Proceedings reported by machine shorthand.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2


 3    FOR THE PLAINTIFFS:

 4         Mark D. Bankston
           SBOT NO. 24071066
 5         Kaster Lynch Farrar & Ball, LLP
           1117 Herkimer Street
 6         Houston, Texas  77008
           (713) 221-8300
 7


 8    FOR THE DEFENDANTS IN CAUSE NOS. D-1-GN-18-001835,
      D-1-GN-18-001842, D-1-GN-18-006623 AN D-1-GN-1004651:
 9
           Bradley J. Reeves
10         SBOT NO. 24068266
           Reeves Law, PLLC
11         702 Rio Grande Street, Suite 306
           Austin, Texas  78701
12         (512) 827-2246

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X
                          VOLUME 1
2            MOTION TO COMPEL; MOTION FOR SANCTIONS
                      AUGUST 31, 2021
3

4                                           Page      Vol.
```

```
5    Announcements..........................      5        1

6    Argument by Mr. Bankston...............      7        1

7    Argument by Mr. Reeves.................     75        1

8    Response by Mr. Bankston...............     87        1

9    Response by Mr. Reeves.................     96        1

10   Court Takes Matter Under Advisement....     96        1

11   Adjournment............................    107        1

12   Reporter's Certificate.................    108        1
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

1          TUESDAY, AUGUST 31, 2021 - MORNING PROCEEDINGS

2                *(The following proceedings were held in open*

3     *court, via YouTube:)*

4          THE COURT:  So, we're on the record, we are

5     here today for D-1-GN-18-001835, Heslin versus Jones;

6     D-1-GN-18-001842, Pozner versus Jones -- oh, I have the

7     wrong piece of paper here -- and D-1-GN-18-006623,

8     Lewis versus Jones.

9          Is that right, Mr. Bankston?

10         MR. BANKSTON:  That is correct, Your Honor.

11         THE COURT:  Can I have your announcement for

12    the record, please, Mr. Bankston.

13         MR. BANKSTON:  Sure.  Mark Bankston appearing

14    for all of the plaintiffs in this matter.

15         THE COURT:  All right, and Mr. Reeves.

16         MR. REEVES:  Brad Reeves for defendants in

17    all the matters.

18         THE COURT:  All right.  So, Mr. Bankston and

19    Mr. Reeves, we had a brief conversation about what we

20    were going to cover today.  And now that we're on the

21    record we're going to go ahead and get started.

22         Mr. Bankston, all of the motions today are

23    yours.  Do you have a preference on what order you

24    would like to take them?

25         MR. BANKSTON:  Well, actually, Your Honor, I

1    kind of figured, for convenience and efficiency sake,

2    we do a presentation that kind of brings up the

3    histories of the cases and, because these discovery

4    disputes kind of weave in and out of each other, I was

5    planning on dealing with them kind of collectively.

6                THE COURT:  All right.  I think that's fine.

7                MR. BANKSTON:  As opposed to doing the same

8    material over and over again.

9                THE COURT:  I noticed a lot of overlap

10    reading the briefs getting ready for today.  That is an

11    excellent suggestion and I'm ready when you are.

12                MR. BANKSTON:  Okay.  Your Honor, I'm going

13    to share my screen, if that's okay.

14                THE COURT:  Yes, please.

15                MR. BANKSTON:  Let's see if this is working.

16                THE COURT:  It is working.  I do see like

17    your slides and everything.  It's not like the

18    presentation mode, if you care about that.

19                MR. BANKSTON:  I do, actually, and I have it

20    up and now it's on a different screen than what I seem

21    to be sharing.  I take it you can just see the

22    PowerPoint screen, not a full presentation screen.

23                THE COURT:  Correct, correct.  I see the

24    whole behind the scenes.

25                MR. BANKSTON:  I'm not -- hold on.

1          MR. REEVES:  If you go to the share screen

2     button, if you have two screens on your computer it

3     should allow you to change to the other screen.

4          MR. BANKSTON:  If I go to the share button to

5     number two.  Oh, man I'm trying here, hold on here.

6          THE COURT:  You can unshare it.

7          MR. BANKSTON:  I got it.

8          Okay.  Now are y'all seeing my presentation?

9          THE COURT:  Yes.

10         MR. REEVES:  Yes.

11         THE COURT:  Okay.  Great.  Okay.  And I'm

12    going to minimize these windows here so I can see.  All

13    right.

14         So, Your Honor, as you know, we're going to

15    be covering all four cases.  And I think there's no

16    better place than to start from the beginning.  So the

17    first thing that we are going to do, if -- oh, great.

18    There we go.  All right.

19         Your Honor, the first case that we're dealing

20    with today is Heslin v Jones.  This was the defamation

21    case involving InfoWars' allegations that Mr. Heslin

22    was lying about holding his dead child after Sandy

23    Hook.  Mr. Heslin had appeared on Megyn Kelly's show to

24    push back against Mr. Jones' allegations that this

25    entire incident was fake.  After he did that, he was

1    retaliated against when they said that he was lying

2    about having held his son.

3            That case was brought back in 2018.  And, in

4    fact, a discovery order was entered on August 31st,

5    2018, so it's sort of happy third birthday to our

6    discovery order in this case.  That order, which to

7    this date has never been responded to in any way,

8    shape, or form, required written discovery in

9    deposition of all the defendants.  About 30 pages of

10   written discovery and then for each of the four

11   defendants.  The defendants refused to respond to that

12   discovery.

13           Actually, it's correct to say they did

14   respond, but their responses simply said, the court

15   does not have the authority to order us to answer this

16   discovery, so we're not going to do it.  So they

17   basically just told the court to pound sand.  We

18   immediately filed a motion for contempt, being very

19   alarmed with that.  They appealed the following day.

20   So for a moment let's stick a pin in Mr. Heslin's case,

21   that second motion for contempt, because that went up

22   on appeal.

23           And that brings us to our next case, which is

24   Lewis versus Jones.  Mrs. Lewis is the co-parent with

25   Mr. Heslin of Jesse Lewis, a victim of Sandy Hook.

1   Mrs. Lewis brought her suit a little bit later.  Her

2   suit alleges intentional infliction of emotional

3   distress, because InfoWars made false statements about

4   the circumstances of the death of her child.

5          In that case the court likewise -- in the

6   discovery orders on January 25th and March 8th, 2019,

7   that also required written discovery and deposition of

8   all the defendants.  The defendants refused to respond

9   to that discovery.  They did show up for deposition,

10  but they failed to prepare their corporate

11  representative for the companies.  That was Rob Dew.

12  And, as noted by the court during the hearing, it was a

13  completely useless deposition, Mr. Dew did not have any

14  idea what he was supposed to be talking about, had no

15  idea he was supposed to prepare for the deposition, and

16  basically answered "I don't know" to every single

17  question.

18          We filed a motion for sanctions.  On the eve

19  of that hearing, defendant provided a document dump

20  filled with nonresponsive materials, and we'll talk a

21  little bit more about those materials in a bit here.

22  But for the moment we can just say everybody at that

23  moment was in agreement that this discovery production

24  was a mess.

25          Defendant's counsel, during that hearing,

1    begged the court not to enter actual sanctions on the

2    record and instead said that he would agree to

3    privately pay $8,000 in attorneys fees and surrendered

4    his client's TCPA motion except for a single legal

5    issue:  They wanted to argue, the only thing they

6    wanted to argue, was that Mrs. Lewis could not bring a

7    claim if she had not been personally identified.

8            And we knew this argument was bunk because,

9    for instance, when Natalie Holloway disappeared in

10   Aruba, her mother, Elizabeth Holloway, was able to sue

11   the "National Inquirer" when the "National Inquirer"

12   made false statements about her daughter's

13   disappearance.  So we knew first the identification of

14   the plaintiff wasn't an issue, so we agreed to forego

15   the component of the motion seeking to strike the TCPA

16   motion, because we knew we had it in the bag by then.

17           Those appeals actually turned out to be a

18   little bit differently so we aren't going to be

19   accepting those kind of stipulations in the future, but

20   for the moment that's what's happened there and

21   discovery was still a very big mess.

22           What happened next in the chain of events is

23   actually the Connecticut case was part of the same

24   process.  As you know, there is a different group of

25   parents who are suing in Connecticut.  They are

1    undergoing exactly the same kind of anti-SLAPP process

2    except Connecticut's deadlines on that are a little

3    more generous, so they were actually going a little bit

4    after the Lewis case.

5              So, once the Lewis case happened and that

6    discovery problem, we then had the discovery problems

7    in Lafferty.  And these become relevant to our cases a

8    little bit later.  What had happened there is that, by

9    March of 2019, the defendants had violated numerous

10   discovery orders.  And this is the Connecticut Supreme

11   Court kind of summarizing what happened in that case.

12             Defendants' local counsel at that time, this

13   is, you know, March and April, started saying that he

14   was in an ethically ambiguous position and he could not

15   discharge his obligations on the pending discovery

16   orders in a way that would permit him to put his

17   signature to a document.  He said, the discovery

18   situation is a mess right now.  That's Exhibit 5 to our

19   brief.

20             Judge Bellis gave one final extension and

21   then defendants produced a dozen files of child

22   pornography.

23             Plaintiff's counsel in Connecticut informed

24   the F.B.I., my counterpart Chris Mattei up there.  And

25   after InfoWars was informed, Jones appeared on his show

1   and threatened plaintiff's counsel.  None of this was

2   public at this point, this was Jones making it public.

3   Jones called plaintiff's counsel gang members, offered

4   a bounty on their heads.

5           And you have to remember that, to Jones, all

6   of us are one big group.  We're a conspiracy of

7   democratic operative lawyers who have been recruited

8   and, by his words, by George Soros, who put on payroll

9   and Hillary Clinton is directing us.  And we're the

10  people he's coming after.  Specifically in this video,

11  too, he was threatening Chris Mattei directly.

12          Now, what I want to show you now, Your Honor,

13  this is our plaintiff's hearing Exhibit 1, this is a

14  video clip, uh, from April 2019.  This was actually

15  admitted and played in court in our last hearing in

16  this case, in December 20th, 2019.  The sort of hearing

17  that we're continuing right now.  So this has already

18  been admitted and is part of the record, but I'm going

19  to offer it now because I want to play a video for you

20  of what Jones said right after all of that happened.

21          THE COURT:  All right.

22          MR. BANKSTON:  Also I should warn this -- for

23  the folks who are on the live stream, this video I'm

24  about to play is extremely not safe for work.  Um.  It

25  has a lot of profanity in it.  Also, even if you're

1   okay with the profanity, if you have children in the

2   room this video gets a little frightening at points.

3   So I just want to warn the live stream people.

4           THE COURT:  Thank you.

5           *(Video recording played off the record.)*

6           MR. BANKSTON:  Okay.  So, that is what

7   Mr. Jones said.  Obviously that was very, very

8   disturbing to us.

9           Right after that, Judge Bellis assessed

10  sanctions and struck InfoWars's motion to dismiss.  She

11  cited the production of child pornography, the

12  despicable, potentially criminal, threats.  There was

13  also a fraudulent affidavit submitted up there in

14  Connecticut that was not actually signed by Mr. Jones.

15  But the court said, even if you ignore all of that,

16  which is completely unprecedented, there were still

17  multiple failures to comply with these discovery

18  deadlines.  Defendants would not fairly comply with

19  their discovery obligations.

20          Judge Bellis said at that time that she

21  wasn't going to grant a default, but if there's

22  continued obfuscation and delay and tactics like I've

23  seen up to this point, I will not hesitate, after a

24  hearing and an opportunity to be heard, to default the

25  Alex Jones defendants if they, from this point forward,

1    continue with their behavior with respect to discovery.

2    You can see that in Exhibit 6.

3          The next thing that happened was Heslin

4    versus Jones comes back to Texas.  As you remember,

5    that case had gone up on appeal after they refused to

6    answer discovery and we had brought a motion for

7    contempt.  That was dismissed on August 30th, 2019.

8    For the next month, InfoWars did absolutely nothing.

9    Just like they've done in this case, actually.

10         Judge Jenkins then held a hearing on

11   October 3rd, 2019.  And you can see from that hearing

12   he is extremely puzzled why, after everything that's

13   happened in this case, these defendants are still

14   refusing to respond to discovery and will not obey his

15   orders.

16         Now, I'm sure you know Judge Jenkins, him

17   being one of the more senior judges in this last

18   generation.  And lawyers around here will tell you, you

19   do not get sanctions from Judge Jenkins.  Judge

20   Jenkins, I think to his credit, is a judge who

21   vigorously pursues conciliatory actions and tries to

22   work things out and really wants to give people a

23   chance.  You know, he didn't sanction immediately in

24   the Lewis case.

25         The idea of Judge Jenkins granting a contempt

1  sanction and a $25,000 fine is pretty extreme in this

2  courthouse.  I haven't found anybody who has ever heard

3  of it happening.  But at that point he was upset and

4  went ahead and granted the motion and granted our

5  attorneys fees.

6          They had another chance to comply, because

7  right at the same time that that had happened

8  Mr. Heslin's claim for intentional infliction of

9  emotional distress came for a hearing on expedited

10  discovery.  And once again for the -- now, again in

11  Mr. Heslin's case, Judge Jenkins ordered discovery for

12  the claim -- for the IIED claim.  That discovery order

13  was entered on October 18th, 2019.  That required

14  written discovery and depositions of Jones, Free Speech

15  Systems, and their chief editor, Paul Watson.

16          So, let's talk about what happened there.

17  First, the defendants gave false and evasive answers to

18  discovery.  And what you need to understand, as you see

19  from our exhibits in here, the written discovery that

20  was served in the court's discovery order is very

21  simple stuff.  It is very simple.  It's stuff like,

22  identify all the videos about Sandy Hook; identify all

23  the employees who were involved in those videos;

24  identify -- for every statement, you know, here are 17

25  statements you made about Sandy Hook, identify your

1    source for those statements; identify the methods of

2    communication that's used in the office.

3            All of them were not answered.  They were

4    given answers with things like, our sources were

5    newspapers and things we found on the internet.  When

6    asked who was involved in these episodes:  Alex Jones

7    and Rob Dew and maybe some other people.  We don't

8    know.  We can't figure it out.  They would never tell

9    me what videos there are.  Any of the most basic

10   information in interrogatories or request for

11   production, completely evaded.

12           They failed to prepare Mr. Dew, again.  And

13   this is what's really shocking, Judge Jenkins was

14   clearly shocked by this, that the exact same deponent,

15   who was vigorously chewed out about not being prepared,

16   they show up again and perform the some mockery of the

17   deposition again.  In fact, both depositions.

18           They failed to remedy the document

19   production, and we're going to talk about this a little

20   bit later, there's some really alarming testimony about

21   what has and hasn't been produced in this case and that

22   there should be a lot more production that has not

23   happened, And that was confirmed in some of those

24   depositions.

25           And those depositions also revealed other

1    alarming irregularities.  We know that there was no

2    discover -- I mean, no litigation hold put out in this

3    case.  It was never until 2019 was there any

4    communication with inside InfoWars to tell people to

5    preserve documents.  And at that point they just sent

6    an email to every employee saying, hey, if you have any

7    documents, collect them and bring them to us.  Nobody

8    actually went and searched or monitored any of this.

9    The very employees who may have been giving the most

10   damning testimony were told to go look for documents on

11   their own files.  And what happened?  Not a single

12   employee returned a single document.

13          The defendants also failed to produce crucial

14   evidence, and this is -- at the heart of it is mostly

15   the videos that are at the heart of plaintiff's claim,

16   which we don't yet have.  As you know from the

17   briefing, very soon after we sued, all of their videos

18   started being taken down off of line.  So none of them

19   are publically available like they used to be.

20   InfoWars has made at this point our best estimate is

21   over a hundred videos on Sandy Hook.  We don't have

22   that.  And of course we don't have their social media.

23          One thing that the briefing gives you a

24   flavor for is all those things, I don't think the

25   briefing quite gives you a flavor for how evasive

1    Mr. Jones was on these issues, on things like his

2    sources and identifying those in interrogatories or

3    methods of communication or the videos.  Any of it.

4            And so I want to show you just about ten

5    minutes from Mr. Jones' November 2019 deposition,

6    because I do think it gives you a flavor of the bad

7    faith we've seen in this case.  And this is plaintiff's

8    hearing Exhibit Number 2 which I'm going to play now.

9            THE COURT:  Can you turn the volume up,

10   Mr. Bankston?

11           MR. BANKSTON:  I'm going to see how I can, if

12   I can do that.

13           THE COURT:  Because I already turned it up a

14   lot on my end.

15           MR. BANKSTON:  And I'm wondering if it's --

16           THE COURT:  If that makes you loud.

17           MR. BANKSTON:  -- if you controlled the

18   volume on your end, I don't know.

19           Let me see what I can do here to make sure

20   I'm all the way up.  Okay, let's try this.

21           *(Video recording played off the record.)*

22           THE COURT:  Can I interrupt you,

23   Mr. Bankston?

24           MR. BANKSTON:  Yes, you sure can.

25           Are you having hearing problems on it?

1      THE COURT:  Yes, we just can't hear it.  And
2  I realize I should have made it clear before you
3  started playing videos that, because they're exhibits,
4  I don't ask my court reporter to record the content of
5  the video.
6      MR. BANKSTON:  Sure.
7      THE COURT:  Okay.  So just -- I just realized
8  I should have made that clear, because I think some
9  courts do that differently.
10     MR. BANKSTON:  Okay.
11     THE COURT:  And she also can't understand it
12 well enough to make a record, even if I had asked her
13 to.  She did let me know that.  But typically an
14 exhibit I do not have her record the contents.
15     MR. BANKSTON:  And, Your Honor, I also
16 figured out just now how I can -- the problem was the
17 sound is coming through my speaker to my microphone.  I
18 figured out how I can share the sound directly.
19     THE COURT:  That was the second thing I was
20 going to say is when you share a video you have to
21 click to share audio also.
22     MR. BANKSTON:  Yes, I see that now.
23     THE COURT:  Okay, wonderful.  Let's try
24 again.  It's up to you whether you want to start over.
25     MR. BANKSTON:  I think that's probably for

1   the best.

2           THE COURT:  Okay.

3           MR. BANKSTON:  Because we're doing good on

4   time right now.  I'm going to go ahead and start that

5   over.  And I just want to make sure, since I'm sharing

6   again, that you all are seeing the screen in full

7   screen.

8           THE COURT:  The video is fine, it's the audio

9   that's the problem.

10          *(Video recording played off the record.)*

11          THE COURT:  That's better.

12          MR. BANKSTON:  Is that better?  Okay, great.

13          THE COURT:  Much better.

14          MR. BANKSTON:  All right.

15          *(Videotape played off the record.)*

16          MR. BANKSTON:  Okay.  So, for November during

17  his deposition, I dealt with that for about three

18  hours.  We didn't get anywhere with Mr. Jones.  Same

19  thing with his corporate representatives, as you saw.

20  The entire thing was a mess.  They, despite everything

21  that happened, were still not cooperating in discovery

22  in any meaningful way.

23          We had a hearing on that motion.  Their

24  counsel at that time said the following, after the

25  hearing did not go too well.  He said:

1    "I will represent to this court that, you

2  know, regardless if this goes on appeal, that doesn't

3  preclude me from -- it precludes -- it stays the court

4  as far as filing motions, et cetera.  It certainly

5  doesn't preclude me from providing additional videos,

6  documents, and information they're seeking during that

7  period of time.  And I fully intend to do so.  I've

8  already started that process.  So again, they're asking

9  now for basically an instruction that, you know."  And

10  then he's cut off.

11        Judge Jenkins asks:  So, what you're saying

12  is you're going to continue to comply with the order,

13  that includes written discovery, which is the exhibit

14  to my order, ordering you to produce those things?"

15        Mr. Jeffries said, "Absolutely, judge.  I'm

16  representing to the court that I have spent countless

17  hours understanding infrastructure, what exists, et

18  cetera, et cetera, and I am certainly going to comply

19  with that 100 percent, stay or no stay, moving forward,

20  absolutely."

21        The court replies:  "So, your point is let it

22  come back to the trial judge who is going to try the

23  case and see just how quickly you do that --

24        "Exactly.

25        " -- and how compliant you are with the order

1  before we make potentially outcome-determinative

2  decisions."

3         Mr. Jeffries says, "Exactly right."

4         On December 20th, Judge Jenkins granted the

5  motion for sanctions and assessed $100,000 in attorneys

6  fees for all the work that we had done in deposition,

7  bringing the motion, et cetera.  The order holds the

8  default judgment under advisement.

9         I think, as you'll see from that order and

10 from the transcript, Judge Jenkins's opinion was that

11 he only needed to decide the things that were

12 immediately important then, which was the TCPA motion

13 and whatever fees we needed.  But whatever remedies

14 needed to flow from whatever actions happened here in

15 this court, that needed to be saved for the trial

16 judge, who is going to have more control over the

17 trial.  Because he knew he was retiring.

18        I think also another cardinal sort of

19 principle, Judge Jenkins's judicial philosophy, is that

20 if it is possible to decide less, it is necessary to

21 decide less.  And in that case he did not want to

22 decide something that he thought you should be

23 deciding, which is, here we're going to give him

24 another chance, the guy made a promise, he made a

25 representation to the court to try to avoid a bigger

1   sanction by saying, we're going to get this taken care

2   of, we're going to make sure that this happens and that

3   we don't, you know, years don't go by and all this

4   information is lost and we can't ever figure it out

5   again.

6          The court's order says, "Defendants

7   represented at the December 18th hearing that they

8   would continue to supplement discovery to belatedly

9   comply with the October 18th order.  The amount of

10  supplemental discovery is a factor that will be

11  considered if the motion for sanctions is reconsidered

12  on remand.  That's Exhibit 1 is that order.

13         Now, for the next year and a half we go on

14  the appeals and the defendant did not supplement any

15  discovery, they just completely disregarded their

16  promise to Judge Jenkins.  They got out from under fire

17  by using that promise and then they ignored it.  They

18  then continued an appeal, where obviously the court of

19  appeals is very frustrated with them in the Lewis

20  appeal and noted that in that record, and then in the

21  second one, in the Heslin appeal, they went ahead and

22  sanctioned them.  So now we have another fine against

23  them from the court of appeals because they're still

24  engaging in frivolous litigation.

25         I need to mention right now, too, before we

1    get kind of caught up to date, about InfoWars' sham

2    defense, because this becomes very important later

3    after they start producing documents.  This is in our

4    supplemental brief on page 37.

5         Essentially, InfoWars defended the IIED case

6    in Mr. Heslin's case the same way they did Mrs. Lewis's

7    case, which is to say they argued that, because

8    Mr. Heslin was not identified in any of the videos

9    claiming IIED, as opposed to his defamation claim, that

10   he could not pursue those IIED claims.  Obviously we

11   thought this all was bunk, but there's something more

12   important going on, is in Mr. Heslin's case we

13   requested from them transcripts of all these videos,

14   and they wouldn't provide them.  They said, we don't

15   have them.  They didn't give us any transcripts of

16   these videos.

17        In fact, it came to be that there was never

18   any transcripts of a certain amount of these videos

19   because some of them had come off of YouTube and nobody

20   had any transcripts.  In the appeal it's even talked

21   about how there are no transcripts.  InfoWars argued

22   because we could not prove -- we had no transcript to

23   prove anything.  And they also told the court in

24   multiple representations, in these certain videos that

25   they enumerated, we never identified Mr. Heslin.

1          Well, it turns out close to the end of the

2     appeal we discovered, buried in the 5,000-page record

3     of the Lewis case, that attached to an unrelated motion

4     was a partial transcript of one of those videos.  And

5     that video, although Mr. Heslin's name was misspelled

6     so we didn't catch it when we searched, they identify

7     Mr. Heslin in that video.

8          In other words, the entire appeal that

9     InfoWars launched against Mr. Heslin on his IIED case

10    was based on a false representation by InfoWars that

11    they didn't identify him, when they knew that they did.

12         Now, InfoWars claims that it's all my fault,

13    that I should have found this errant transcript in the

14    giant Lewis record before this happened.  And maybe we

15    should have found it earlier and that's certainly true.

16    That doesn't excuse them lying about the fact that they

17    didn't identify him to multiple courts.  So all of that

18    was a waste of time.  But that actually becomes way

19    more important later, and we'll talk about that in a

20    minute.

21         Let's talk now about coming back on remand.

22    After their appeals failed, they were remanded and the

23    mandate was issued on June 4th.  And so let's talk

24    about what they're out of compliance of at that moment.

25         THE COURT:  June 4th, 2021.

1        MR. BANKSTON:  Correct, Your Honor, of this

2  year.  Right.

3             So, this is just a few month ago.  And they

4  came back and they are out of compliance first with the

5  Heslin IIED discovery order with a default under

6  advisement.  That's everything we just talked about,

7  where they had responded but the responses were

8  absolutely bunk and their depositions were a complete

9  joke.

10            The next thing they're out of compliance with

11 is the Heslin defamation discovery order, the one from

12 2018, which they had already been held in contempt for

13 and they had never answered in any way, shape, or form.

14            They were also out of compliance with the

15 Lewis IIED order, for which they had already paid

16 attorneys fees and admitted that the discovery

17 situation there was a mess.

18            They were also out of compliance with the

19 Pozner defamation discovery request, the next case that

20 we haven't even talked about yet; because Pozner went

21 up on appeal without any discovery first.  We went

22 ahead and just took that one up on appeal because the

23 case was so strong.  We didn't feel like we needed any

24 discovery, they didn't have any of these complaints

25 like they had in their later cases.  But they had

1    discovery served at the outset of those cases, and

2    after the TCPA motion was denied, ever since then,

3    they've just completely ignored them.

4           So that's everything that was pending on

5    remand.  And what I thought was going to happen, Your

6    Honor, because I knew when they made that promise they

7    weren't going to supplement anything during the appeal,

8    I knew that was a lie.  But what I thought might happen

9    is, when we got back on remand, I thought the moment

10   that the Texas Supreme Court dismisses their case they

11   would realize, okay, now we have to do something and at

12   remand they would get in a panic and produce a bunch of

13   things and show that they were in compliance with

14   discovery and that I would have to be arguing to you

15   that that wasn't good enough, that two years later,

16   trying to make sense of any of this all would just be a

17   mess, that's what I was going to have to do.

18          That is not what happened.  Nothing could be

19   further from what happened.  From June 4th to

20   August 26, 2021, Defendants did absolutely nothing in

21   terms of any kind of discovery.  There's nothing been

22   produced.  It wasn't until a couple of days before this

23   hearing that I was inundated with some documents.

24          And so let's talk about what's happened

25   during this entire summer that InfoWars has thrown in

1   the trash.

2          First there was June.  And for that entire

3   month there was no efforts made to comply with

4   discovery in any case.  This was just like in 2019,

5   when Mr. Heslin's case came back from remand and for an

6   entire month they had done nothing.  And Judge Jenkins

7   held them in contempt for that.  Well, at the end of

8   the month, with them doing nothing, we went ahead and

9   filed our supplemental brief in support of the default

10  sanctions in Mr. Heslin's IIED case.

11          We move to July.  And in July still nothing

12  has happened.  On July 6 we bring the Heslin and Lewis

13  motions for contempt.  We had reached out to them, and

14  that's an exhibit you'll see is our July 2nd letter.

15  It's their only exhibit to their response.  And that

16  letter fully explains to them everything that's going

17  on, why aren't you responding.  And they at that point

18  basically say, we have no idea what you're talking

19  about.  Please send us any discovery you say hasn't

20  been responded to.

21          So at that point it's clear that they haven't

22  even been working on Heslin and Lewis in the motions

23  for contempt, so we filed those motions.  We also at

24  that point sent them the Pozner discovery requests,

25  too, and say, these haven't been responded to.

1          On July 9th, three days later in oral

2    hearing, we all met together and at that time I went

3    through kind of a mini version of what I'm presenting

4    to you now; and we also reminded them of their

5    discovery problems in all three of those cases.  One of

6    the things you'll remember I specifically reminded them

7    of on the record is, because the defendants in Fontaine

8    had just filed a motion to un -- withdraw their deemed

9    admissions, I told you that I expected for this

10   hearing, when we were scheduling this hearing, that I

11   expected one of the things we would have to accommodate

12   was a motion to withdraw deemed admissions in the

13   Pozner case, because those hadn't been answered.  So I

14   was expecting that to happen in a matter of days after

15   the July 9th hearing.  Because if I heard that I would

16   get those denied and served up with a response.

17          Nothing happened.  We gave them a deadline

18   until July 16th, I believe, to respond, and they

19   didn't.  But we went ahead and gave them some more time

20   just to see if they would.  They didn't.  So on

21   July 27th we filed the Pozner motion for sanctions,

22   which goes and describes all of this.  They continued

23   to do nothing.

24          August opens, and there's a couple of

25   developments that happened in Lafferty in August that I

1    need to talk to you about.  We filed a supplemental

2    brief about this on August 10th.

3            So on August 6th, that Friday, there were two

4    orders entered.  First was a sanction order for

5    continuing failure to comply with discovery.  There's

6    still -- they're in the same place we are, they've been

7    remanded, now they're trying to go back and figure out,

8    try to see if any of the discovery is getting answered.

9    They have discovery orders there that they're not being

10   complied with.

11           The second order was that they disclosed

12   confidential information from a plaintiff's deposition.

13   This -- Your Honor, this was astonishing.  They started

14   a plaintiff's deposition which at the beginning of the

15   record was designated as attorneys eyes only,

16   confidential.  Then, during the actual deposition,

17   defendant's counsel, the local counsel Mr. Randazza has

18   working up there in Connecticut, wrote down the things

19   the plaintiff was saying in the deposition, put them in

20   a motion, and filed them publically during the

21   deposition itself.  Didn't even wait for its transcript

22   and filed that publically and disclosed that

23   information.

24           Now, you'll see from the court's orders on

25   this what's clearly about to happen in Lafferty, which

1   is that now that Lafferty, just like in this case, had

2   already threatened a default sanction if any of this

3   keeps up, that's clearly what's been happening now,

4   because the court's orders there takes very extreme

5   language that you can see what it's doing, is saying

6   that the plaintiff is now prejudiced from further

7   prosecuting their claim and that the plaintiff is also

8   prejudiced from taking additional depositions.

9          And the court also says that witnesses are

10  going to be brightly afraid to appear in this case or

11  give forthright testimony, believing that their

12  confidential information will be disclosed.  So all of

13  those things about how the plaintiff can't even

14  prosecute their case anymore, it's pretty obvious

15  what's going to happen in Lafferty.

16          I thought that that would actually be taken

17  care of by the time of this hearing, but their August

18  24th hearing was actually just a status conference

19  call.  They have a hearing set for September 24th.

20  There's actually another sanctions pending motion

21  regarding some analytics information that was produced

22  that is also extremely troubling.  So it's pretty clear

23  where we're heading in Lafferty.  They're heading for

24  the same place.

25          Now, we get into the second week of August,

1   defendants still haven't done anything.  And at this

2   point we get this very strange email where, you'll see

3   in hearing Exhibit 5, is that Mr. Reeves stated that

4   his client does not possess what production has been

5   provided to date.  He asked plaintiffs to, send me the

6   production you have, indeed, received to date.

7           So, I'm not sure how you would even

8   supplement your own discovery if you don't even know

9   what you've produced, but at this point it's now --

10  this, as you may remember, this is six days before the

11  originally-scheduled hearing of this matter, they were

12  asking me to send them the production because they

13  don't even have it.

14          A week later we still don't have anything.

15  And their counsel wrote again, asking if I would agree

16  to a protective order for the overdue documents.

17  Counsel said the documents were ready to produce but

18  were being withheld because defendants require such an

19  order to be entered.  And we told them, very straight

20  up, you cannot seek protection over discovery that is

21  already due.  Rule 192 requires you to make that motion

22  or seek protection within the time period for the

23  responses; and three-year-old discovery that you are

24  already under contempt for not producing, you cannot

25  have a protective order.

1          The next week we still don't have documents.

2     We get two emails that day, the first one very early in

3     the morning.  Counsel wrote to us asking for consent

4     for a motion for consolidated discovery plan.  We had

5     no interest in that.  We told them, look, the court

6     asked us to do a discovery plan, we just did it, we're

7     now days before the hearing.  We'll talk to you next

8     week after the hearing if you want to talk about this,

9     but we have no interest in doing a discovery plan right

10    now.

11          He said he was finalizing document production

12    which will only be produced in the Lewis matter, due to

13    the confidentiality of certain documents.  But counsel

14    stated, You will have these documents today.  We did

15    not get those documents.

16          THE COURT:  I'm sorry, Mr. Bankston, which of

17    the binders has these exhibits?

18          MR. BANKSTON:  Oh, I'm sorry, Your Honor.

19    So, these exhibits I'm talking about right now, hearing

20    exhibits, were uploaded to the Box last night after

21    defendants filed their responses.  So they're in --

22          THE COURT:  Oh, so they're not in one of the

23    binders you gave me.

24          MR. BANKSTON:  No, unfortunately not.  These

25    are in response to --

1          THE COURT:  Okay, that's fine, then.  I just

2     thought I would flip through as you were talking.

3     That's okay.

4          MR. BANKSTON:  Sure.  But they are in there

5     noted as plaintiff's hearing exhibits.

6          THE COURT:  Okay.

7          MR. BANKSTON:  So then later that day, or

8     that evening, we didn't get the documents.  Counsel

9     wrote us that night and said he will be moving for a

10    protective order in Heslin and Pozner, and that

11    defendants intended to withhold confidential documents.

12    And no documents were produced that day.

13         Then on August 26th, just a couple of days

14    ago, at 6:00 p.m. counsel provided about 6,000 pages of

15    supplemental production and, as promised, withheld

16    confidential documents from both Heslin and Pozner

17    cases, despite the fact that he has no ability to

18    object to those cases and he's under contempt in the

19    Heslin case.

20         Let's talk about what was produced in that

21    6,000 pages, because this is where it really starts to

22    get interesting.  The first thing that was produced was

23    nearly 2500 pages of transcripts of InfoWars' videos,

24    and there's a lot of reasons why this is very alarming.

25    First of all, it might be excusable, say, if there was

1    2500 pages of transcripts buried somewhere in

2    Mr. Jones's corporate files that were difficult to

3    locate and they're just now finding them now, something

4    like that.

5              The problem, Your Honor, is that these

6    transcripts were prepared by a court reporter.  These

7    were made -- a great proportion of these transcripts

8    were made in June and July of 2019.  They had them

9    commissioned to be made by a court reporter.  That was

10   months before they had told me in the Heslin case there

11   were no transcripts and they didn't produce any of

12   these transcripts.  But they had them the whole time,

13   prepared by a court reporter.

14             And what's shocking about that, of course, is

15   that, much later in that case, they then attempted to

16   argue to me that they didn't identify Mr. Heslin and

17   that my case was deficient because I didn't have

18   transcripts.  And the entire time they had actually

19   prepared them with a court reporter.

20             The other thing that's very disturbing about

21   these transcripts is there are more transcripts than

22   there are videos that I have been produced.  And right

23   here on the screen you'll see a list of dates.  They're

24   all titled differently, some of them have episode

25   titles, some of them just have dates.  All of these

1    dates are dates I don't have videos for.  And these are

2    videos that mention Sandy Hook.  And they're videos

3    that they obviously provided to a court reporter to

4    transcribe but they never provided to me.

5          This is the tip of the iceberg, too, because

6    I know about a ton of videos that aren't on this list.

7    But it is extremely disturbing to me that these

8    transcripts exist and these videos existed.  They were

9    never produced to me and, in fact, hidden and used to

10   try to get Mr. Heslin's case dismissed.

11         The next thing that they produced is, the

12   bulk of what they produced, is 2100 pages of Google

13   Analytics screen shots and Excel spreadsheets.  What

14   this is is a bunch of data about entry links, keywords,

15   search terms and exit pages for the InfoWars.com

16   website.  This is not responsive to anything in our

17   discovery requests that are issued in this motion.

18   None of the discovery that occurred prior to remand has

19   anything to do with this.

20         There is one request we issued after remand,

21   it's not related to this motion, that was, produce your

22   analytics or web traffic for every video identified in

23   plaintiff's petition.  And some of the videos in

24   plaintiff's petition have promotional pages on the

25   InfoWars website here, but ultimately this is kind of

1    not really responsive to anything.  I mean, there's --

2    buried in here is some responsive information I guess

3    to that, but not fully responsive.  But mostly this has

4    nothing to do with what we're talking about today, we

5    may end up talking about it later.

6            The next thing they gave us is there's this

7    gentleman -- well, not a gentleman --

8            THE COURT:  So, Mr. Bankston, is it your --

9    are you trying to say that they just included that to

10   clog your review?

11           MR. BANKSTON:  I don't want to make that

12   representation, Your Honor.  I certainly hope that's

13   not why.  I mean, him hoping that they thought it was

14   partially responsive to a post remand request.

15   That's -- I'm going to be charitable and say that

16   that's what I think.  Then again, Your Honor, you are

17   right that there is thousands of pages of things that

18   are not responsive to me.  I don't need to know exit

19   pages for InfoWars, things like that.  It is very

20   nonresponsive.

21           The next thing they produced to me, there's a

22   man named Wolfgang Halbig.  He's a conspiracy theorist

23   crank who has pursued these families for years, saying

24   Sandy Hook is fake.  He's been a guest on InfoWars

25   several times.  They produce me, you know, about 600

1    pages of strange emails and a transcript of a town

2    meeting he was at.  Which is responsive, that's fine.

3    I'm just saying it doesn't have anything to do with

4    what we are asking for in this motion.

5          They gave us 239 pages of InfoWars articles,

6    some high-quality scams, some from litigation.  All of

7    them were previously produced.  And then there were a

8    few other things they produced.  About 150 pages of

9    messages to the news tip email address.  We already

10   have thousands of those.  I haven't been able to check

11   yet but I'm pretty sure most of those are going to be

12   duplicates.  There are a few dozen pages from another

13   conspiracy theorist blog named Jim Fetzer, who they've

14   cited on occasion, a handful of emails.

15         There's a few dozen internal emails regarding

16   show scheduling and topics.  There's around a dozen

17   press inquiries to InfoWars about this lawsuit.  For

18   some reason there's affidavits from Jones and Dew in

19   March of 2019 regarding Lafferty requests.  And there's

20   David Jones's deposition transcript, which we don't

21   understand why that's in there, either.  That was an

22   exhibit to our sanctions motion, in fact.

23         And there were some interesting things in

24   there, Your Honor.  This is an email actually that was

25   produced in 2019, before remand.  And this is -- what

39

1    you're looking at is an email notification sent to Rob

2    Dew that he got a message on Twitter, a private

3    message, and this message is three days before they

4    defamed Mr. Heslin and it's talking about

5    Mr. Heslin's -- the interview he had with Megyn Kelly.

6    And we obviously can't see the full message because we

7    don't have access to that.

8              But in 2021 they produced this email, which

9    is another notification, and this is a month later, and

10   this one is on the day of the second video that defamed

11   Mr. Heslin.  And as you can see from this message, this

12   person is engaging in a conversation with Rob, with

13   Mr. Dew, who is obviously responding and giving his

14   thoughts.  And they're talking more about these

15   relevant events.

16             So here is -- we know that there are messages

17   from Mr. Dew on Twitter giving their mental state of

18   mind at the exact moment that they defamed Mr. Heslin.

19   We don't have them because this is social media

20   evidence.  We only have these notifications to know

21   that they exist.

22             We got a couple of other surprises.  First we

23   got an email from Chief Editor Paul Watson discussing

24   the messaging application BaseCamp.  And we've never

25   heard of this messaging application in this case.  This

1    is one of the things they were supposed to identify.

2    And we don't know that anybody has ever accounted for

3    this or searched this or knows anything about it.

4           We also got an email from Roger Stone to Alex

5    Jones referencing Sandy Hook, and we had been told that

6    Alex Jones doesn't use email to communicate with

7    people.  We had been told that there were no Sandy Hook

8    conversations.  But now all of a sudden there is this

9    single email from Roger Stone about Sandy Hook.  I

10   mean, we think that's because they think that we'll

11   eventually get that email from Roger Stone.  We don't

12   know why we're just now getting one solitary email from

13   Alex Jones.

14          But most importantly let's talk about what we

15   don't have.  Discovery responses.  So first -- the very

16   first one I talked to you about, Mr. Heslin's case, we

17   don't have discovery responses on his defamation claim.

18   32 pages of written discovery, we -- none of that has

19   ever been answered.  And defendants apparently seem to

20   think they have answered it, which is strange to me,

21   but they have not answered that.  They haven't answered

22   any discovery in Pozner.  And then the discovery

23   responses that you have from Mr. Heslin's IIED claim

24   and Mrs. Lewis's claim have both been admitted that

25   they're patently insufficient, but there's never been

1    any supplemental discovery responses.

2            We still don't have the most basic

3    information about this case, even like requests for

4    disclosures which are already due, we don't have.  We

5    don't know who has knowledge of relevant facts, what

6    the videos are, who was involved, any of it.  Documents

7    have never been supplemented in any meaningful way.

8    We're going to talk -- really an important one about

9    this is the amount of emails they should have, and

10   we'll talk about that in just a minute.

11           Depositions.  We were owed four different

12   deposition in Mr. Heslin' case that we have never

13   gotten.  And one of those -- actually a couple of those

14   are pretty important because, for instance, we were

15   supposed to have the deposition of Owen Shroyer, and we

16   haven't had that in three years.  And the problem with

17   that is Mr. Shroyer was just arrested on federal

18   indictment for insurrection activities on January 6th.

19   And so we're not sure if we're ever going to have an

20   opportunity to depose him.

21           And, in fact, in Mr. Shroyer's arrest

22   affidavit, in all the pictures of him breaking the law

23   where he's not supposed to be, Mr. Jones is standing

24   right next to him.  So we have a strong suspicion that

25   Mr. Jones is about to face federal indictment, as well,

1  and arrest.  But we're not sure we're ever going to get

2  those depositions.

3          The videos have never been supplemented.  And

4  as we see now they have videos that I don't have and

5  there are videos out there they should have; and if

6  they were to go through their own documents they would

7  know about tons of more videos and they have not done

8  any reasonable good faith effort to get us those.  And

9  we don't have social media evidence and that's all gone

10  now, too.  You've seen that talked in about our brief

11  quite a lot.

12          And who knows what else.  This is really the

13  important part is that, when there was a promise made

14  to supplement this discovery, it was because discovery

15  had been so badly bumped for a year, waiting another

16  two years wasn't gonna do it.  I mean, now we're

17  talking about having to go find people three years out

18  from where we would have normally done it, to see who

19  was involved in this case, who might still have

20  documents, do they still even have them.  You know, the

21  quality of the evidence, of people's memories and the

22  physical evidence, all degrades.  And we have now been

23  kept from discovering any of the basic facts of our

24  case for three years.  We don't know what else is out

25  there.

1          For instance, thank gosh that Robert

2    Jacobson, their video editor at one point, decided to

3    approach us and say he felt bad about what happened and

4    needed to testify.  We don't know who else is out

5    there.  We don't know what other information.

6          Let's talk now, Your Honor, about these

7    responses.  And I definitely agree with you that,

8    filing these responses last night, um, or actually I

9    believe they filed them while you were in trial this

10   last afternoon and I was in deposition, and then when

11   we got out we would have had to have been expected to

12   drop everything we were doing and read these last

13   night.  And I know you didn't, but I did.  I had my

14   wife take care of my kid and spent all night dealing

15   with these.

16          These responses further show defendant's

17   utter conscious disregard for these cases.  They're

18   really quite amazing.  So I want to talk a little bit

19   about what was said in these responses because you

20   haven't gotten a chance to read them yet.  So this will

21   be your first look.

22          First there is the Pozner response I want to

23   talk about, and they just in flatly admit that they

24   have not responded to discovery, they do not dispute

25   that at all.  They say, the undersigned had the

1   misunderstanding that plaintiff's discovery requests

2   had already been responded to.  They say that when

3   plaintiffs's counsel emailed regarding the responses to

4   plaintiff's discovery requests, the undersigned failed

5   to recognize that these outstanding discovery requests

6   had not actually been responded to.

7            This is very strange, Your Honor.  Because if

8   you look at their sole exhibit to their motion, to

9   their response, is their -- Exhibit 1 is the July 2nd

10  email.  And you'll notice at the bottom of the email is

11  my first email on that one.  And I lay out to them on

12  every case exactly what's wrong and what they need to

13  do.  And in Pozner it's very simple.  I told them,

14  regarding that case, your clients have not responded to

15  plaintiff's initial discovery requests.  Those

16  responses were due on September 1st, 2018.  When the

17  appeal was initiated the responses were almost two

18  weeks overdue.  Upon remand you have made no efforts to

19  respond.  Now, the requests are nearly a month and a

20  half overdue.  And now they're three and a half months

21  overdue.

22           THE COURT:  I'm just going to, because I

23  can't help it, point out that, while I appreciate you

24  taking the time and effort to lay out what they have

25  not responded to yet, that was not your obligation.

1   You filed the discovery and it is their obligation to

2   keep track of what they have responded or not.

3        MR. BANKSTON:  I would agree with you, Your

4   Honor.  I definitely agree.  But, this is an unusual

5   case and I sometimes have to do the lifting for both

6   sides in order for anything to make sense.  And so --

7        THE COURT:  Well, I appreciate it.  I just

8   wanted to be clear that that was not in any way your

9   obligation.

10        MR. BANKSTON:  Thank you, Your Honor.

11        But again, you know, Your Honor, it's

12   interesting, I'm right with you there, but one thing I

13   wanted to make sure and do was to put this out there as

14   clear as possible so that we could demonstrate their

15   absolute conscious disregard.  So.

16        And one place I did that again was the

17   July 9th oral hearing.  I reminded them that no

18   response has been served.  I told them they needed to

19   file a motion to undeem the admissions.  And they

20   didn't do that.

21        A whole month, the rest of that month passed,

22   and then on July 27th on the motion for sanctions all

23   of the above was summarized:  That they had never

24   responded to the discovery request; that all of this

25   had happened in oral hearing, that I reminded them to

1   file the motion to withdraw the admissions.  They

2   didn't do any of it.  None of -- they just ignored it.

3   A complete, conscious disregard.

4        August 30th they filed a defamation response

5   in Mr. Heslin's case.  Let's talk about that one really

6   quick.  This one is also astonishing, Your Honor.  They

7   say, the motion fails to provide any pointed

8   explanation as to what alleged discovery abuses by

9   defendants are ongoing which would warrant a contempt

10  finding beyond making the nebulous, conclusory claims

11  that defendants have failed to adhere to their

12  discovery obligations.

13       Defendants have never responded to the

14  August 31st discovery order.  That is 30 page of

15  written discovery.  That is four depositions that they

16  were supposed to give that they first told the court,

17  you don't have authority to make us do this.  Then they

18  launched an appeal with no jurisdiction.  Then they

19  came back, refused to respond, and the court held them

20  in contempt and fined them $25,000.

21       Then they appealed again, launched a

22  frivolous appeal for which they were sanctioned, came

23  back, and still have never responded to these discovery

24  requests.  And now they have the temerity to tell this

25  court that I'm being vexatious and that there is no way

1  they could possibly know what they would have to do to

2  comply with this order.  They've never responded.

3          On Heslin contempt Exhibit 10, on July 2nd

4  there's that email that I sent them that we just talked

5  about.  And they were reminded that they never

6  responded.  In very clear language I laid out this

7  exact situation, how in 2018 they chose not to respond;

8  in 2019, they again continued not to respond; and how

9  now, where are the responses, why have they not

10  responded.  Defendants now claim that, hey, how would

11  they ever know what to do.

12          It's frankly, Your Honor, the disregard to

13  respond to a second contempt motion in this way, to not

14  even know that you haven't answered the discovery, when

15  I have provided you that -- I sent them the -- the

16  order has it all set out.  And these are orders of the

17  court.  It's frankly just baffling to me, Your Honor.

18  Also, this is conscious disregard.

19          Let's talk about -- my screen popped up,

20  there we are.  All right.

21          Let's talk about Lewis really quick.  That

22  response they cared -- they say that the plaintiff

23  characterizes the Lewis production as largely

24  containing nonresponsive materials.  Plaintiff truly

25  makes no effort to provide evidentiary support for this

1    allegation.

2           If you look at Lewis contempt Exhibit 5, it

3    is a copy of our April 2nd, 2019, Lewis reply on motion

4    for sanctions.  You'll remember, that motion was filed

5    when they had produced nothing and then after the

6    motion was filed on the eve of the hearing they did

7    this document dump.  That reply goes into extreme

8    detail, sets out how the production was deficient and

9    nonresponsive, gives example documents.  It contains a

10   declaration from our expert, who was helping us review

11   it, who describes what an incredible mess it was.  So,

12   from our standpoint, yes, we absolutely have provided

13   support for that.

14          But more importantly, this is sort of just

15   relitigating things that were already decided in 2019.

16   Because they say, for instance, that the Lewis motion

17   does not show how defendants have failed to comply with

18   such orders and how, when, and by what means defendants

19   have abused the discovery process.  But they admitted

20   in that hearing that the Lewis production was

21   inadequate.  They agreed to pay attorneys fees.  They

22   totally understood what a mess they made of the

23   situation and promised to fix it.  And, in fact, right

24   after that their other attorney said that discovery

25   situation was a mess and a short time after that they

1    ended up producing child pornography.

2         We all know that the Lewis production is in

3    no way adequate, but they don't seem to want to

4    supplement their answers in any way.

5         Let's talk about the Heslin IIED response

6    now.  They say that plaintiff's supplemental brief is

7    nothing more than a veiled attempt to have this court

8    reconsider that ruling and implement additional

9    sanctions when that situation has already been

10   addressed.  And, Your Honor, I think we both know that

11   that is a flat misreading of the court's order and the

12   transcript, where this court definitely was in the

13   mindset that, if this discovery was not supplemented as

14   Mr. Jefferies promised, that additional sanctions would

15   be considered.  And that he was expressly holding this

16   off to let you decide how to deal with all this

17   situation.

18        They talk about the document situation.  I

19   want to address this really well, too.  Because they

20   say that, what plaintiff conveniently omits from his

21   briefing is that the scope of discovery in Lafferty is

22   much wider and all-encompassing than the discovery at

23   issue in this case.  For example, plaintiff sites to an

24   affidavit of David Jones filed in the Lafferty matter

25   that search terms in that case yielded approximately

1  80,000 emails that were potentially responsive to the
2  Lafferty plaintiff's discovery request, but in no way
3  does that support the idea that those emails are
4  responsive to this plaintiff's limited discovery
5  request.
6          Your Honor, if you'll actually look at that
7  affidavit that's in our response, what Mr. Jones said
8  is that searching for the terms "Sandy Hook" in emails
9  returned nearly 80,000 emails and that they expected
10 similar volumes for other search terms in the Lafferty
11 plaintiff's request.
12         We've obviously requested all emails with
13 Sandy Hook in them.  We have about 11,000 total
14 documents in this case and I would just give you a
15 rough estimate of about half of them contain the term
16 "Sandy Hook" in them.  So we're not anywhere close to
17 that universe.  And most of those emails we have, a
18 good portion of it, Your Honor, is the same 15 people
19 who are writing InfoWars unsolicited, and they are
20 extremely mentally ill and writing 500-page emails to
21 InfoWars on a weekly basis.  And it's these same ten
22 people over and over again.  So what we're seeing here
23 is not in any way a search of this.
24         We also took the deposition of Michael
25 Zimmerman, who is like a 23-year old IT employee at

1    InfoWars who emailed some of this.  And he confirmed

2    for us in this case, David Jones's testimony, that

3    there should be 80,000 emails relating to Sandy Hook.

4            Now, they also talk about messaging systems

5    in their response.  They say that Free Speech Systems

6    utilized Slack as a messaging system, but that system

7    has not been utilized since April 2016 and that data

8    has been preserved and to the undersigned's best

9    knowledge has been produced.

10           I don't know what this undersign's best

11   knowledge is, because he doesn't have that knowledge.

12   I mean, this is just -- he's copying and pasting

13   something from 2019 or something, I don't know.  I

14   don't think anybody has everybody alleged this Slack

15   data has been preserved or produced.  We have testimony

16   on our records showing -- in our motion showing that

17   Slack data has not been preserved and is not available

18   anymore.  If it is available, we have notifications

19   from emails that show that Sandy Hook was discussed in

20   the Slack system, so there should be those messages.

21   Those haven't been produced.

22           The same deal with this Rocket.Chat makes the

23   exact same statement.  And we don't have any

24   Rocket.Chat production.  None.  And we don't have any

25   indication that that's been preserved.  You'll also

1   notice there's a gap between 2016 and 2018.  They don't

2   say what messaging system they were using at that

3   point, but we know that that exists, too, and none of

4   this has been accounted for.

5           This stuff about the undersign's best

6   knowledge, you're going to see this a lot in this case.

7   This is because Mr. Reeves is not getting any

8   cooperation from his client.  So the undersign's best

9   knowledge is just a guess on his part.

10          MR. REEVES:  Your Honor, I would object to

11  that because he doesn't know what I'm talking about.  I

12  mean, I can understand that he's frustrated here, but

13  he doesn't need to be opining on what I'm saying.  I

14  can certainly discuss it with you, but I object to that

15  statement there.

16          THE COURT:  Well, you can object to it but I

17  can also read and make a conclusion about what that

18  statement means.

19          MR. REEVES:  I understand, Your Honor.  I'm

20  just -- what I --

21          THE COURT:  What it means is you don't know.

22  You don't have any idea.  Because if you knew you would

23  say so.

24          Go ahead, Mr. Bankston.

25          MR. BANKSTON:  Okay.  The other thing that

1    the IIED response from them last night addresses is

2    videos.  It says, while plaintiff's briefing addresses

3    a couple of videos he says have not been produced by

4    defendants, plaintiff notably does not provide any

5    information to the court as how such videos are in any

6    way relevant or connected to his IIED claims in this

7    case.

8              And, Your Honor, this is so ridiculous.

9    Because if a video is about Sandy Hook, it's obviously

10   relevant.  I mean, we're alleging a continuing course

11   of conduct here.  The other thing that's ridiculous

12   about this is, when you're already under contempt for

13   not producing it, the idea that it's not relevant is

14   not a great argument at this point.  This is obviously

15   directly connected to my case.

16             It's also way more than a couple of videos.

17   We identified about six in that brief right there,

18   we've given them a list with others they haven't

19   produced, and we know there's ones they have they

20   haven't given us.  No effort has ever been made to

21   answer even the most basic interrogatory about what

22   videos exist.

23             Then there's social media evidence.  Their

24   excuse here, you saw in our motion how they had every

25   opportunity in the world to preserve this, they knew

1    that it was about to be deleted, they got every thread

2    over a course of months.  And they said it's our

3    problem because we haven't given third party subpoenas

4    to any of the social media companies.  And the problem

5    here is during the first period of this case up until

6    this remand I was under discovery stays where I could

7    only have the expedited discovery against the

8    defendants that was granted by the court.  I couldn't

9    just go out and do discovery.

10             But more importantly, if they have a superior

11    right of access to this, these are their accounts and

12    they can get them much easier from FaceBook or Twitter

13    than I can.  This would be like if I was saying, well,

14    you know, I have medical records but I'm not going to

15    try to get them for you, you gotta go get them.  This

16    is -- in this situation I have no reason whatsoever

17    that Facebook, Twitter, or YouTube is going to comply

18    with me in any way.  But they have to make a reasonable

19    effort to get things that are within their custody and

20    control, and they haven't tried to do that at all.

21             The other thing that is said in this response

22    is that the undersigned counsel was not involved in

23    those disputes but certainly has reviewed the record

24    and understands where the issues were alleged to exist

25    and what has been done to try to remedy those discovery

1   disputes.  The undersigned has been personally

2   reviewing over 75,000 documents gathered during this

3   litigation.

4         Your Honor, respectfully, from what you've

5   seen today, this not true.  Mr. Reeves does not

6   understand where the issues were alleged to have

7   existed.  He believes he's responded to discovery he's

8   never even responded to.  Which tells you something,

9   Your Honor, which tells you that he has never checked

10  to see in holding his hands the discovery responses

11  that have been issued in this case.

12        In other words, he is telling you in a

13  contempt motion that there is wild, spurious

14  accusations against them that should never be granted

15  and they're in compliance because they have responded,

16  and he told you that without ever laying his hands on

17  the discovery responses to see if they were compliant.

18  Because if he had tried he would realize there are

19  none.  And so to then say he understands what issues

20  are alleged to exist, no, he doesn't.  And they have

21  not tried to remedy those discovery disputes.  They

22  tried to do some eleventh-hour figgely before they

23  produced us 6,000 papers of mostly useless documents.

24        He also says the undersigned has been

25  reviewing all those 75,000 pages?  They surely didn't

1    even have those until at least August 11th, when they

2    told us they didn't have them and they wanted us to

3    give them to them.  I'm not even sure I totally believe

4    right now that they do have them.  I think maybe they

5    kind of got embarrassed and said, no, no, okay, we're

6    okay, don't give us the documents.

7          So the idea that since August 11th, with the

8    other briefing the defendants have done, with the other

9    briefing I know Mr. Reeves has done in another court

10   with me, there's no way since August 11th you've

11   reviewed 75,000 pages of documents.  I did that, I

12   remembered doing that.  I couldn't have done it in that

13   period of time even with nothing else going on.

14         There's also a response made about the

15   pattern of conduct in this case.  Defendants say that

16   none of the cases cited by plaintiff, the vast majority

17   of which are non Texas cases, support the position that

18   the court can consider alleged discovery violations in

19   entirely separate matters.  I mean, that's just not

20   true.  First of all, look at page 42, that's *Caron v.*

21   *Smaby*, and that's where you had conduct, and this is

22   from my home district, where it was in one court of the

23   district in Harris County but there was also discovery

24   abuse previously in another district court of that

25   county.  We'll talk about some other cases like that.

1   In fact, that's a good place to transition right now to
2   talk about the legal principles.
3         THE COURT:  Let's take a little break, then.
4         MR. BANKSTON:  That's great, that's great,
5   Your Honor.
6         THE COURT:  Yeah.  So let's take like a
7   15-minute break.  We'll come back at 10:30.  My
8   assistant will put up a break sign, but if you don't
9   want whatever you're doing on break visible or audible
10   on YouTube, you need to turn your camera and your sound
11   off.  Okay?
12         MR. BANKSTON:  All right, Your Honor.
13         THE COURT:  See you at 10:30.
14         MR. BANKSTON:  Okay.
15                 *(Brief recess.)*
16         THE COURT:  All right.  Welcome back.
17         Mr. Bankston.  You can pick back up.
18         MR. BANKSTON:  All right.  I think I only
19   have like ten or fifteen more minutes with you,
20   hopefully.
21         THE COURT:  All right.
22         MR. BANKSTON:  Okay.  Y'all got that in front
23   of you?
24         THE COURT:  But it's not the -- it's the
25   wrong screen again.

1          MR. BANKSTON:  I'll get that taken care of.

2    Screen number two.  There we go.

3          All right.  Are we looking good now?

4          THE COURT:  Yes.

5          MR. BANKSTON:  Okay.  So, we just wrapped up

6    talking about the responses that were filed yesterday.

7    I did also want to add on that, um, to kind of follow

8    back up on your comments about that, you know, staff

9    attorney Mr. Denton had sent us out a chart of

10   everything for this hearing to get us ready and had

11   asked us, sort of as a convenience, you know, when we

12   were scheduled on August 17th, you know, can you please

13   get me copies, paper copies, of all relevant pleadings

14   by the 6th.

15          That following week defendants had contacted

16   the court and said, hey, we didn't know that

17   necessarily applied to us.  We're going to file our

18   response tomorrow, on the 10th.  And at that time

19   Mr. Denton said, you know, look, hey, this is just to

20   try to be a guideline, there's no court order here

21   setting a deadline.  But the judge would like you to

22   get your pleadings in as soon as you can so she has

23   plenty of time to review them.  And that was back on

24   the 10th.  And they went ahead and just sat on those

25   until the night before the hearing.

1          And I do feel like that was done in a

2  calculated way so that there would be no time to reply

3  to that, there would be no time to look at that.

4  Luckily, I did have time last night to throw everything

5  to the sidelines and dive into those.  But we actually

6  believe that their failure to address these motions

7  that have been pending for quite some time and are

8  quite serious and the gravity of them, their failure to

9  really respond to those, to us, speaks to the conscious

10 disregard.

11         THE COURT:  I agree with you and I want to

12 make it clear that in all cases in front of me,

13 Mr. Reeves, whether they involve Alex Jones or another

14 party, from now on, when you are the attorney, I'm

15 going to set deadlines for when everything is due.  And

16 particularly in these cases.  And if they're late, I'm

17 not going to consider them.

18         MR. REEVES:  And I understand.  And there was

19 no gamesmanship, Your Honor, there was simply --

20         THE COURT:  Hard to believe. It's hard to

21 believe.

22         MR. REEVES:  I understand that, Your Honor.

23 But I can tell you for me personally there was no

24 gamesmanship for me.  But I understand what you're

25 going to do and I can appreciate that and I'll make

1    sure that we meet whatever deadlines the court sets.

2           THE COURT:  Which I shouldn't have to do, and

3    I don't in almost any case.

4           All right.

5           MR. BANKSTON:  Let's move on to legal

6    principles underlying this motion.  And as you know,

7    these are -- it's interesting, because they're all

8    essentially motions under 215, right, we're talking

9    about discovery abuse and the powers available to you

10   when a party is engaged in this kind of years of

11   discovery abuse.

12          The first principle that we talked about --

13   first principle we talked about in our motion on

14   page 40 is that persistent discovery abuse justifies

15   presumption that a defense lacks merit.  And when the

16   court can reach a presumption that the defense lacks

17   merit, default sanctions can be granted.  The court in

18   doing so must only consider, and not test, lesser

19   sanctions.

20          Obviously in this case -- in these cases the

21   court has tested all sorts of sanctions.  It's

22   interesting, though, that InfoWars' argument is

23   essentially going to be, because we have only been

24   sanctioned once in each case, or because there's only

25   been discovery violations once each case, you can't

1    consider what's happened in the past, you've just got

2    to keep on giving us the lower sanction each and every

3    time we do something in your court.

4             This isn't the law, though.  Because, as we

5    point out on page 41, the trial court may consider

6    action taken in another court when that action is

7    relevant to the case pending before the trial court.

8    And in here it's not even really another court really

9    so much, because so much of this already happened in

10   your court.  Defendants want to say in their response

11   that this sort of law only applies when the same

12   lawsuit has been transferred between courts but you

13   can't consider anything else.  And that's just flatly

14   not true.

15            Not only have we talked about the case of

16   *Caron* earlier, but I actually think *Zenergy* is maybe

17   the most important case for you to look at in this

18   dispute.  We put that into the Box and highlighted it

19   for you.  *Zenergy* is so factually similar here but far

20   less egregious.  *Zenergy* was a corporate dispute where

21   both parties sued each other and in that case the

22   defendants did not provide discovery.  They -- and it

23   wasn't nearly as far ranging as ours, but there was

24   certain information that defendants did not provide.

25            They had also moved for summary judgment at

1    the same time, which is dispositive in much the same

2    way a TCPA motion is.  It was discovered that they had

3    hid discovery, didn't fully comply, so there was a

4    sanctions hearing held.

5            And then at that sanctions hearing the court

6    didn't take action, much like in this case.  The court

7    said, well, there's going to be a stay of proceedings

8    for a little while in this case, so we're going to hold

9    off on making a ruling now.  The stay went for a year

10   and then, upon a year, when they came back from the

11   stay, the judge noted, well, Zenergy hasn't done

12   anything to respond to these requests, even though

13   they've known for a year that default sanctions could

14   be imminent and they haven't done anything to get that

15   information in front of the court.

16           There had never been any prior discovery

17   abuse in *Zenergy*.  But what happened is that the judge

18   in that case noted that two of the three same

19   defendants had committed discovery abuse in a previous

20   case.  It's unclear from *Zenergy* whether that was even

21   a state case, that might have been a federal case.  But

22   it was a previous similar lawsuit involving Zenergy in

23   which they had conducted -- had been sanctioned for

24   similar discovery abuse.

25           The judge in that case said, well,

1    considering this prior conduct, I can assume that my

2    sanctions here are not going to be effective.  So

3    that's why a default was granted.

4         When it was reviewed by the Corpus Christi

5    court they said he was entirely proper to do that

6    because he could rely on the fact that they had been

7    sanctioned by the same conduct before; and that they

8    had repeated it in front of this next judge, that judge

9    did not have any confidence that his sanctions are

10   going to change their behavior.  So in *Zenergy*, under

11   much less worse facts, a default was granted.

12        There's also, we also need to talk a little

13   bit about, the defendant's bad faith.  Defendants are

14   correct that simply bad faith or things you do outside

15   the litigation are not an independent basis for

16   sanctions under 215.  But once the court determines

17   that 215 sanctions are appropriate and it starts to

18   consider whether -- what kind of sanctions would be

19   effective, it is absolutely allowed to consider

20   defendant's bad faith approach to the litigation in

21   general.

22        And one of those first things you can talk

23   about is, I know the video that we played earlier

24   didn't really have volume to it so I may need to play

25   that at the very end of this presentation again, but

1    you would see from that video Jones has created a

2    hostile atmosphere, and it will discourage people from

3    participating in litigation.  He has shown an abject

4    disrespect for this proceedings and the safety of

5    everybody involved.

6            As you may know from the briefing, right

7    after that video, the judge in Connecticut started

8    getting death threats that the F.B.I. warned her about.

9    The plaintiff's counsel did up there, they actually got

10   police to guard their office.  My wife got a message on

11   her phone after Mr. Jones called me a gremlin and a

12   goblin who was terrorizing InfoWars' audience and he

13   asked them to stand up.  He does this.  He has no

14   problem creating that atmosphere.

15           He also is obsessed with this idea that there

16   is a conspiracy that has made these trials show trials

17   and that there are powerful forces in the democratic

18   party, headed by Hillary Clinton, who apparently

19   control us, who are causing him to become railroaded.

20           He has called Judge Jenkins a hoodwinked

21   mainline liberal who is being manipulated.  He has

22   openly called these lawsuits show trials.  And there's

23   a really good understanding, when you see his conduct

24   of that nature, why he's not participating in discovery

25   and why these sanctions are not effective.

1          The defendant's conduct here was egregious,

2    and what I want to really emphasize is how the courts

3    frequently default parties for so much less than this.

4    If we look, for instance, at *Alma Investments*, this was

5    a lawsuit about some condo developments in South Padre

6    Island, multimillion dollar lawsuits, where the

7    companies were suing each other.

8          In that case there were two failures to

9    appear at deposition and a failure to deposit funds in

10   the registry.  They said the court twice ordered the

11   Pakidehs to appear for depositions but both orders were

12   not followed.  Additionally, the trial court ordered

13   Alma, the company, to deposit $20,000 in the registry

14   of the court to pay an auditor.  That's all that

15   happened and those parties lost their ability to defend

16   their claim.

17          And I think you would have to look at that

18   situation and think about the Pakidehs and think, if

19   they were denied the ability to put on their case but

20   Mr. Jones in what he did is going to put on his case?

21   And I think you would have to understand that the

22   Pakidehs would think that was very unfair.

23          The same thing would be true in *Salomon v.*

24   *Lesay*.  There there were just three failures to appear

25   at deposition, and one of them occurred after a

1    monetary sanction of a thousand dollars.  Which is far

2    less egregious us than what's happened here, with

3    numerous depositions missed, numerous monetary

4    sanctions, numerous cases where they are not responding

5    to discovery and where they're across the board

6    obstructing every other discovery.

7              Here again you would look at somebody like

8    Michel Salomon and what would he think to know that he

9    was kicked out of his case but Mr. Jones is going to

10   keep going in his.  I think that would be the reaction

11   basically across the state is that if the people were

12   to see what has happened here and then see Mr. Jones

13   continue, they're -- the reaction would be Alex Jones

14   got away with what?  And that has really been the

15   jaw-dropping reaction of everybody who has seen this

16   case.

17             The other thing I want to remind the court is

18   that discovery affects all aspects of these cases.  And

19   I've put down here the three elements that we're going

20   to have to prove, for instance, in our defamation

21   cases.  And the reason is is because, one of the things

22   the court might be inclined to do in a situation like

23   this, is to pursue a lesser sanction of saying, I'm

24   going to make an evidentiary finding on a certain issue

25   in the case that discovery affected.  Something less

1  than a default.

2          Well, here I want to go over these elements,

3  right, and how every single one of them has been

4  blocked by discovery.

5          First there is published.  And we know that

6  there's a dispute over who published what, as you

7  remember from our last hearings, whether InfoWars, LLC

8  was involved, from the discovery there, and we've been

9  just absolutely obstructed discovery on InfoWars, LLC.

10          We have to prove it's a false statement.  And

11  obviously whether the statements are false can be

12  proven with discovery from the defendant, because

13  there's a good chance that they're going to give us

14  discovery that they knew it was false.

15          We also need to prove it was a statement of

16  fact and not an opinion.  But if defendants are relying

17  on the idea that they were simply analyzing certain

18  disclosed facts and giving their opinion based on those

19  disclosed facts, if we discover evidence that they knew

20  that those facts were false, then they are not entitled

21  to express that opinion and they do not get that

22  defense.

23          Furthermore, prior statements of the

24  defendant may, in fact, change the meaning of the

25  actual statements in the challenge.  So for a lot of

1    reasons discovery is important to opinion cases.

2         Then we also have whether it's about the

3    plaintiff.  Image with me that InfoWars has a document

4    saying, ha, ha, ha, this new broadcast we're going to

5    do is really going to mess over Lenny Pozner's life.

6    It would be very difficult for them to come back and

7    say then, nobody can possibly interpret that video as

8    being about Lenny Pozner.  That impeachment evidence

9    could be critical.

10        The idea that the statement caused the

11   plaintiff reputational harm is my next element.  And

12   honestly, that one is not really important here because

13   these are per se cases.  So there's the presumption

14   that the plaintiff is caused harm.  But even still,

15   there's clearly we can get evidence of reputational

16   harm from the defendant's discovery.

17        And finally, that defendants acted with the

18   required fault.  And this one here is pretty obvious to

19   me, too, because everything under the sun that they

20   could produce to us could possibly go to their fault.

21        So those, if all of those are the issues, if

22   any of those are left intact, we are actually still

23   suffering prejudice from this discovery in the fact

24   that it's been absolutely botched and will never be

25   fixed,

1          The last thing that defendant's counsel

2    leaves you with is his plea, right?  He says to you

3    this plea, that the undersigned requests that the court

4    grant him an opportunity to prove that he has control

5    of this discovery situation.  Well, with respect, he

6    has already had that opportunity and he has thoroughly

7    proven that he does not have control of this discovery

8    situation.  Doesn't even understand the discovery

9    situation, much less have control over it.

10         But what's really interesting to me is that

11   this is the exact same plea given to this court to

12   avoid default sanctions in 2019.  This is exactly the

13   same thing that Mr. Jefferies said to this court and

14   how much time he had put in to getting an understanding

15   of what's going on and they were going to get this

16   fixed.  The exact same excuse.  And what's even more

17   ironic is that was also the same excuse used by the

18   lawyer before him.  And the lawyer before him.  And the

19   lawyer before him.

20         It just keeps going, Your Honor.  It's like

21   that movie "Groundhog's Day" with Bill Murray.  And I

22   remember him saying this line:  One day I went to

23   Mexico and had a great vacation down there.  I spent a

24   whole day on the beach, drank pina coladas.  Why

25   couldn't I have that day over and over and over again.

1  And we really have been stuck in the same situation.

2          So to hear this defense counsel make this

3  exact same plea, after having just completely trashed

4  the entire summer, remember that defendant's counsel

5  came to this court and negotiated and agreed for a

6  discovery plan that has me designating experts in about

7  14 days, and I don't have any discovery to do that.

8  That's not going to stop me, I'm still going to

9  designate my experts, because we realize we've gotten

10  all the discovery we're ever going to get.  There's

11  never ever going to be a fix to this problem.

12          There is a reason, you might wonder and it

13  kind of starts to make sense, why every single counsel

14  comes to you and makes the same plea and why no counsel

15  can ever get control of the discovery situation.  It's

16  because of this man.  We've told you this in our brief.

17  We set this very clearly.  There's a reason why no

18  sanctions have ever been effective at changing this

19  man's behavior.

20          He will continue to introduce chaos, defiance

21  and danger into this lawsuit, because it is built

22  straight into his DNA.  We have had all of these

23  different lawyers and it has been -- one thing that has

24  remained consistent is Mr. Jones' complete disregard

25  for these proceedings and, in fact, his open attacks on

1    these proceedings.

2            And it's really for that reason, Your Honor,

3    is that we now have given you proposed orders on all

4    the cases, and the discovery abuse has gotten so bad

5    these last three months, the conscious disregard is so

6    shocking, that we are asking for a default judgment in

7    all four cases.  Because in every single case you have

8    a long history of discovery abuse you can rely on to

9    show you that anything you try to do right now to

10   compel compliance is not going to work.

11           Your Honor, so that is what we are

12   requesting.  We have added proposed orders to the Box.

13           There is one other thing I would like to do,

14   I've been let known that during the playing of this

15   first video that we're looking at a screen shot right

16   now, Your Honor, that the sound wasn't working so it

17   wasn't able to be heard.  It's a two-minute video and I

18   do think it's important for the court to hear what is

19   heard, so if it's okay with you I would like to close

20   by playing that two-minute video.

21           THE COURT:  All right.  I heard most of it

22   but that's okay, you can play it again.

23           MR. BANKSTON:  Okay.  I just figure for two

24   minutes it's probably not the worst way to end.

25           All right, Your Honor, here we go.

1          THE COURT:  And this is Exhibit 1.

2          MR. BANKSTON:  Correct, Plaintiff's Hearing

3     Exhibit 1.  And this is the broadcast that was made

4     after the discovery of child pornography in Lafferty.

5          Again for the audience who is watching on the

6     live stream, this is extremely not safe for work, there

7     is a lot of profanity, so I do want to give you that

8     warning before I start.

9          *(Videotape played off the record.)*

10         MR. BANKSTON:  All right, Your Honor, as

11    closing let me just say the person you saw there at the

12    end of that video was Norman Pattis.  He's a local

13    counsel for Mr. Jones in Connecticut.  And the pattern

14    that you see in this case, and I see it over and over

15    and over, is that they select some local counsel, who

16    comes in and takes these, falls on the sword, and it's

17    always a new local counsel that they throw under the

18    bus every single time.

19         And really what the elephant in the room is

20    is the elephant that's not in the room right now, which

21    is Mr. Randazza, and that he has now told you in his

22    briefing that he has actually really been InfoWars'

23    corporate counsel, coordinating the litigation from all

24    over.  And that seems to be accurate.  And you have a

25    party who is non-appearing, a person who is

1    non-appearing attorney, who's acting as corporate

2    counsel.  He's general counsel.  He's essentially the

3    party.  He is their corporate lawyer.

4         And you have these attorneys who come in who

5    are put in these awkward positions, like you can see

6    Mr. Pattis really found himself in an awkward position

7    there.  And each of these attorneys will then come and

8    the next local counsel will blame it on the local

9    counsel before.  And so here we have Mr. Reeves again,

10   who is the latest series in that, and I'm expecting,

11   just like Mr. Jefferies, he will blame the one before

12   him.  But what you'll see is the consistent behavior of

13   party itself.  And that is the reason why we think

14   anything more at this point just becomes ridiculous.

15        So what we're asking is the default judgment

16   and to let a trial proceed forward just on whether

17   Jones' conduct merits punitive damages; what the

18   compensatory damages are; and, if there is a punitive

19   damages finding, what the punitive damages should be.

20   And that's what we're asking for today, Your Honor.

21        THE COURT:  So, I printed out your proposed

22   orders.  I haven't read them yet because I didn't know

23   they were there until this morning.

24        My concern is you need this discovery even

25   for a damages trial.  So, are you asking me to default

1    liability and order the discovery still be responded to
2    again?

3            MR. BANKSTON:  It's interesting.  I do think
4    you're right, that there will need to be some damages
5    discovery from therein that's directed towards them.  I
6    don't honestly think it's ever -- I'm going to get
7    much.  And I don't -- let me put it this way, I don't
8    think the discovery that was, um, issued under the
9    court's prior discovery orders, which was TCPA-directed
10   discovery, all that goes to my burdens.  So I don't
11   think we've served any discovery yet that would be
12   subject to these orders that would be damage related.

13           Certainly if we go forward and there's
14   something going on with damages that we need to bring
15   to the court, you know, for -- we could have that.  But
16   I'm just kind of hoping that we can go forward and at
17   least put on a damages trial, even if they don't
18   produce us anything.

19           THE COURT:  Right.  I mean you can, but my
20   question is just, if you're trying to get punitive
21   damages, you probably do need more discovery.

22           MR. BANKSTON:  I think that's true.

23           Well, I'm going to tell you, Your Honor, I
24   think I have enough to prove punitive damages right
25   now.  I do.

1          THE COURT:  Okay.  You might want more, let's

2     put it that way.

3          MR. BANKSTON:  I do.  Exactly.  Correct, Your

4     Honor.

5          THE COURT:  Okay.  But your position is

6     you'll file that later.

7          MR. BANKSTON:  Right.

8          Right, if we need -- if, for instance, after

9     this hearing and I have more of an understanding of

10    what the scope of discovery is like going forward, then

11    we'll serve new discovery requests and depositions that

12    we may need.  I think that would be very limited.

13         THE COURT:  Okay.  All right.  Thank you.

14         Mr. Reeves.

15         MR. REEVES:  Okay.  Thank you, Your Honor.

16         You know, Mr. Bankston, he kind of merged

17    everything together and I feel like, for at least my

18    purposes, the best way to approach this is individually

19    with each motion so that we can make sure that we have,

20    you know, a clear understanding of each particular

21    motion, what is requested here.

22         The first thing I want to say is that, you

23    know, the statement at the very end where he pulled out

24    where I asked you to give me basically a chance to deal

25    with the discovery issue is from a brief in Pozner,

1    whereas my response states, frankly, when the -- he

2    sent me about a page-long email and when I was

3    reviewing this I was in the midst of preparing for

4    trial with Judge Meachum and everything, and my,

5    frankly, misunderstanding was that every discovery

6    request issue was in the same posture.  As far as

7    dealing with TCPA discovery, frankly, you know what,

8    I'm falling on my sword because this is my lack of

9    understanding.  I'm not blaming any prior counsel --

10            THE COURT:  I mean, I've been on this case

11   for a few months and you're now the second InfoWars

12   lawyer to come in and claim responsibility for

13   discovery problems.  I've only been on the case a few

14   months.

15            MR. REEVES:  And I understand that.

16            THE COURT:  And I just, before you get too

17   far into this argument, you can make it, but know, I

18   know you know, and I want to make it clear that I know,

19   that you're responsible for whatever any lawyer who

20   came before you did.  You had a choice about accepting

21   this representation.  You accepted it.  Your schedule

22   and the attorneys before you are not my problem.

23            MR. REEVES:  And I understand that, Your

24   Honor.  And I am not blaming, I'm putting it in

25   context.

1          Regardless of what anyone has said in the

2     past I have no desire to lay any blame on prior

3     counsel.  I have appeared here, I'm lead counsel here.

4     I know Mr. Bankston spoke about Mr. Randazza because of

5     the fact this pro hac vice is pending and has not been

6     approved by this court, Mr. Randazza frankly has not

7     been involved in these cases because we want to keep --

8     I, personally, want to ensure that we are not having

9     someone practice in these cases where they're not

10    admitted to practice.

11         So I recognize Mr. Bankston has said that,

12    but I'm letting the court know I am the one dealing

13    with these things.  I am the one that's been brought in

14    to try to get everything under control here

15    discovery-wise.

16         The first, you know, the biggest motion --

17    first of all, plaintiff has now said that they want a

18    default in all four cases.  You know, that's not

19    something that's been requested in anything except the

20    one Heslin IIED claim, so I would say that that's not

21    requested relief that's on the board here.

22         But regarding the, you know, the Heslin, the

23    Lewis, those two cases, um, the biggest issues that I

24    want to point out to the court context-wise about the

25    discovery that's at issue, is that every case that

1    plaintiff has cited for support of their motion for

2    their default judgment sanctions has to deal with

3    discovery that is issued in the pendency of the regular

4    litigation merits-based discovery.  Discovery that's at

5    issue here in those cases is only the specific and

6    limited discovery that was allowed by Judge Jenkins

7    that was relevant to the TCPA motion to dismiss.  It

8    wasn't merits-based discovery.

9         You know, obviously there is some overlap

10   between what would be merits-based versus issues

11   dealing with the TCPA motion, but that's not the

12   full -- that discovery doesn't have anything to do with

13   the underlying merits of the claims.  And so that's why

14   we believe that it's -- it would be, you know, it would

15   be extremely excessive to enter a default judgment on

16   discovery that's only supposed to be limited and

17   relevant to the motion to dismiss under the TCPA.

18        Secondly, related to the discovery, um, I am

19   personally reviewing 75,000 different documents to

20   determine what's responsive.  Mr. Bankston has received

21   6,000 of those.  There's still more for me to go.  I'm

22   going as fast as I humanly possibly can.  And I

23   recognize he's entitled to this discovery.  Um, and,

24   frankly, the only other thing I want to point out about

25   the discovery and the status of it was, when I sent him

1  an email asking him to tell me what had been produced,

2  I had incorrectly done the search on this database to

3  determine what had been produced.  And what he didn't

4  tell you was, ten minutes after I sent him that email,

5  I sent him one back saying, I have it, I'm sorry, thank

6  you for being accommodating to me but I have it.

7          So I know what's been produced.  I know -- so

8  I know what's been produced, what's out there.

9          But as far as the Heslin motion for default

10  judgment, there's simply no basis legally, there's no

11  caselaw cited, there's no caselaw that I could find

12  that talks about granting a merits-based sanction based

13  solely on limited discovery allowed under the TCPA.

14  It's only supposed to be relevant to the motion itself.

15  And so, you know, that would be the main argument

16  against why there would be sanctions involved here.

17          In addition, as, you know, counsel

18  recognized, I've already worked to supplement

19  production, I'm continuing to work with that.  I've

20  been working with my client to get -- these

21  interrogatories are not simple.  He says that they ask

22  for simple information.  They are not simple.  InfoWars

23  is a, you know, they have a lot of employees, they have

24  a lot of different people involved.  It requires me to

25  get a lot of different information that I'm gathering

1   to fully respond to these because, as an officer of the

2   court, I recognize that there are objections that have

3   been waived due to not responding to things like that,

4   so I need to give him full and complete answers.  And

5   so, you know, that's what I am trying to do.

6          And, you know, Mr. Bankston, he likes to file

7   his motions for sanctions, and I understand he feels

8   the need to aggressively pursue his case; but, you

9   know, there's just been a lot of things stated today

10   that are just incorrect or flat-out misrepresentations

11   to the court.  You know, first of all, the video that

12   Mr. Bankston just played, you know, I don't know if you

13   noticed but that video was spliced together from

14   different clips.

15          The stuff about the million dollars related

16   to this child porn thing, that was when Mr. Jones was

17   talking about figuring out -- trying to find out who

18   had, you know, potentially done this or put this in

19   here.  There was no accusation from them that the

20   plaintiff's counsel had done it.  Those are just kind

21   of meshed together.

22          You know, and there's other things about --

23   Mr. Bankston mentioned missed depositions.  I don't

24   have any understanding of what depositions have been

25   missed.  I recognize that there have been some

1   corporate rep. depositions for the TCPA motion to

2   dismiss that Mr. Bankston was unhappy about the

3   answers, and he brought those to Judge Jenkins's

4   attention and Judge Jenkins entered an order of

5   contempt and a $500 fine on that.

6          But there's been no missed depositions.  I

7   haven't received any requests for additional

8   depositions.  There's been no pushback from me on him

9   saying he's not entitled to depositions.  So I don't

10  know where that comes from.

11         You know, and the last thing about this

12  filing that occurred in the midst of a deposition,

13  Mr. Pattis, who filed that thing in Connecticut, first

14  of all, he didn't identify the plaintiff, he didn't

15  actually provide quotes to transcription of the

16  statements, but he wasn't even in the deposition, that

17  was kind of his thing that he did, he wasn't even the

18  one doing that.

19         But more importantly, I had nothing to do --

20         THE COURT:  You just said he wasn't -- that

21  was his thing that he did, he didn't even do that.

22  That's literally what just came out of your mouth.

23         MR. REEVES:  No, I'm sorry, I didn't mean

24  that.

25         He -- he did not -- Mr. Pattis was not taking

1   the deposition.  He did not file the motion as he was

2   taking the deposition.  Another lawyer for the

3   defendants was taking the deposition and he just, in

4   the midst of this, filed it.  And that was, you know.

5   But he didn't actually do anything as far as

6   identifying the plaintiff or anything like that.

7           But really overall, the overarching point

8   here is that there's nothing in Connecticut that has

9   anything to do with these cases as far as the discovery

10  is concerned.  I know Mr. Bankston wants to draw

11  corollaries between them, but the discovery stuff that

12  is at issue in Connecticut is far broader, far more

13  encompassing than the discovery issue here.  And so

14  it's not a one-to-one correlation to what's there

15  versus what should be here.

16          Mr. Bankston also fails to mention that

17  there's also a Virginia case where there has been no

18  discovery issues because, frankly, Mr. Randazza is part

19  of that case now and discovery has proceeded orderly

20  there.  There's no issues there.  There's been some

21  slight disagreements, but there's been none of this --

22  you know, Connecticut and here, there's a lot of puff

23  up over discovery, lots of motions for sanctions and

24  lots of issues there, but that's, you know.

25          Again, I can't -- I'm here to live in the

1    present and to take what's here and to move forward and

2    to address the problems.  I have already attempted to

3    do that by supplementing the production, I'm working to

4    do that even more, with more production.  I'm working

5    as diligently as I can to do that.

6            I just believe that, especially related to

7    the request for default sanctions, that that would be

8    hugely excessive, considering where we stand in these

9    cases as far as procedurally speaking, and the fact

10   that the discovery issue is this TCPA issue, it's not

11   merits-based discovery.

12           That's -- unless you would like to ask me

13   questions about the default motion I can move onto the

14   other ones.

15           THE COURT:  Okay.

16           MR. REEVES:  Okay.  So, regarding the two

17   motions for contempt, they're essentially verbatim.

18   You know, again I have produced supplemental document

19   production.  Um, I have already -- and, you know, and

20   again these are not -- these are not questions that I,

21   as lawyer, can answer.  These interrogatories.  They

22   ask for a lot of identifying information.

23           And, you know, Mr. Bankston wants to opine

24   that I don't have any, you know, control or contact

25   with my client or anything like that.  I do.  And I'm

1   working on it.  But it's not just I can talk to
2   Mr. Jones and get all this information.  He doesn't
3   know a lot of these answers relating to the corporate
4   as far as involvement of who is doing what and things
5   like that within Free Speech Systems.  That requires me
6   to speak to other individuals, which I am also doing
7   and getting information, like I said, because what I'm
8   trying to do is give him full, complete, responsive
9   discovery responses so that we are done with these
10  issues and he can move on to finding other issues.
11          I don't want to be in a situation where I
12  give him half of the stuff and then he comes back to
13  the court again and stuff like that.  And I also
14  recognize that he's entitled to it.  And if he wants to
15  move his expert designation deadline back because of
16  this, I'm agreeable to that.  I, you know, like I said,
17  I'm here living in the present trying to solve the
18  problems that do exist.  And I recognize they exist.  I
19  just don't --
20          And, you know, as far as the contempt motions
21  are concerned, from a, you know, purely procedural
22  standpoint, it's unclear whether the plaintiff is
23  seeking criminal or civil contempt findings.  If they
24  are criminal contempt findings that they're seeking,
25  that would require actual notice and service upon the

1    defendants themselves, not just through their attorney.

2    Um, so if that's what they're seeking that would be

3    improper at this time due to lack of due process and

4    their required notice.

5              And last thing on Pozner.  You know, in the

6    response that I filed, which again, Your Honor, there

7    was no gamesmanship involved, they're very simple

8    responses, but I can understand, you know, the opinion

9    there and I'm not really going to --

10             THE COURT:  Well, I mean, you knew I wanted

11   to read everything in advance.  I wouldn't ask you to

12   deliver it in paper if I wasn't going to look at it

13   before the hearing.

14             MR. REEVES:  And I can understand that, Your

15   Honor, and that's why -- and that's -- and I can

16   understand that, Your Honor.

17             And as far as the motion for default

18   sanctions is concerned, this is really a continuation

19   of his December 2019 filing of it, which defendants had

20   already responded to, I simply filed a response to

21   their supplemental briefing.  So there's already a

22   response on file.  All of those responses are in Box.

23   But I just summed up the default judgment for you.

24             With Pozner, this is the first time we're

25   here from -- on any sort of motion to compel, motion

1    for sanctions.  I've already told -- in the motion I've

2    already said that I recognize they weren't responded

3    to.  I place no blame or responsibility on anyone but

4    myself for that.

5              As far as the deadlines, I in no way would

6    ever imply that Mr. Bankston would be responsible for

7    keeping track of my deadlines.  I took these cases on,

8    I understand that.  I'm responsible for that.  And I

9    want the court to understand very clearly that that's

10   not the argument I'm making.  I'm not making an

11   argument beyond, I'm preparing these responses, I asked

12   the court for 14 days in my response before the court

13   determines whether or not sanctions are warranted.

14             I do not -- we do not oppose the motion to

15   compel itself.  But what I have asked is the two weeks

16   to be able to get him these full and complete answers.

17   Because there are numerous interrogatories -- it's more

18   the interrogatories.  I've already produced documents

19   in the Pozner case, and I've also told counsel that the

20   defendants have stipulated that discovery in other

21   matters and prior production is discovery for this

22   matter, too.  So he has all that discovery, too.

23             So, you know, but as far as the requests are

24   concerned, it's more the interrogatories that require

25   me to gather a decent amount of information that I am

1    actively working on.

2            But that's really where I stand on all these

3    motions, Your Honor, and I'm happy to answer any

4    questions that you have.

5            THE COURT:  All right.  Mr. Bankston, did you

6    want to respond?

7            MR. BANKSTON:  All right.  Yes, Your Honor, I

8    want a brief rebuttal on that.

9            THE COURT:  All right.

10           MR. BANKSTON:  I'll just go down each of

11   them.

12           First of all, with the idea that a default

13   was not requested in any of the motions but one, these

14   motions are all brought under 215 and default is always

15   one of the available options for the court when it's

16   faced with a 215 sanction.

17           They say that the discovery wasn't

18   merits-based and that it doesn't address the underlying

19   merits.  There's nothing really special about TCPA

20   discovery except that what happens is the discovery

21   stay just vanishes and then the plaintiff can have

22   discovery on anything that's to the motion.  The motion

23   is to require clear and convincing evidence of every

24   element of plaintiff's claims and defendant's defenses.

25   So the discovery literally addresses everything in the

1   case on liability, it just doesn't go to damages.

2   Right?

3         So, the idea -- you can look at some of these

4   other default cases in the past and it's things like

5   not appearing for deposition is a big one that does it,

6   and it's not the entire case has been -- every bit of

7   discovery has been compromised, but often it's these

8   very discreet parts.  But the court says that's so

9   egregious and it's such a thumb in the nose at the

10  court's face that we default.

11        Here every -- everything is spoiled by this.

12  There's nothing it doesn't touch in terms of liability.

13        They said that they produced 6,000 pages and

14  that Mr. Reeves is going through 75,000 pages more to

15  produce.  It was my understanding that, when he said he

16  was going through the 75,000 pages, that was the

17  75,000 pages already produced in this case.  But

18  apparently now Mr. Reeves is saying that there is

19  75,000 pages of documents he is still reviewing, which

20  is astonishing to me.

21        Also, when Mr. Reeves produced those

22  6,000 pages to me a couple of days ago, he wrote to me

23  and said, here is your 6,000 pages, we trust this is

24  going to be sufficient to solve all of your issues of

25  discovery.  That was no indication that there was this

1   massive trove of information that was still coming.  It

2   was, that's it, that will solve it, here is our

3   eleventh-hour fig leaf over our completely naked

4   contempt.  Now they say there's more.

5           He tells me the rogs, the interrogatories,

6   are not simple, that they're really hard to answer.

7   So, okay, he couldn't answer them in 30 days maybe.

8   You know, in normal cases he could probably get an

9   extension on that.  But then he couldn't answer them in

10  three and a half months?  They're that complicated?

11  They're not that complicated.

12          He then talks a bit about Mr. Jones's

13  broadcast there and that that million dollar bounty was

14  not about us, was not about plaintiff's counsel and

15  that actually he was talking about somebody else and

16  then he just happened to be later in the same clip

17  accusing Mr. Mattei and the plaintiff's counsel of

18  being the ones who did all this.

19          The Connecticut Supreme Court has already

20  rejected all of this and said no, obviously Mr. Jones

21  was threatening a million dollar bounty on the lives of

22  plaintiff's counsel, he has unreasonably caused danger

23  to these proceedings and encouraged people not

24  participate.  The idea that right now we're going to be

25  trying to defend what Mr. Jones did in that video is

1    absurd to me, but those sanctions have already been

2    affirmed by a high court.

3            Mr. Reeves also says that he doesn't know of

4    any missed depositions, he only seems to know that

5    there was some corporate representative depositions

6    that are effectively nonappearances.  But Mr. Reeves,

7    even after my presentation, does not seem to understand

8    that in August 31st, 2018, exactly three years ago

9    today, the court issued a discovery order in Heslin

10   that has never been responded to in any way, shape or

11   form.

12           There's never been any responses to the

13   written discovery, and there was supposed to be a

14   deposition of Alex Jones, of Free Speech Systems, of

15   InfoWars, LLC, and of Owen Shroyer.  That's why I

16   brought up Mr. Shroyer's arrest, because I'm not sure

17   I'll ever depose him.  Mr. Reeves currently does not

18   know those depositions hasn't happened or that

19   discovery hasn't been answered to on a discovery order

20   which he has prior -- that client has prior been held

21   in contempt of court.  And that again is baffling to

22   me.

23           He briefly addresses Mr. Pattis and the

24   deposition about the Hillary Clinton thing, where he

25   was writing a motion about Hillary Clinton and was

1    disclosing client's information.  Mr. Pattis was

2    sitting inside the deposition when that happened.  His

3    co-counsel was taking the deposition and he wrote up a

4    motion, typed it on up and sent it off to the court and

5    publically filed it.  And that could very well happen

6    again in this case.

7              He then goes onto the contempt motions.  And

8    the first again he says that the interrogatories are

9    hard to answer.  But on the contempt motions they

10   haven't even tried to supplement discovery.  And from

11   his perspective he didn't think he would have the need

12   to, is what he was telling us.  He thought that that

13   was just about the request for production and the 6,000

14   documents would be enough.  But apparently now they're

15   talking about going and answering those

16   interrogatories, and I don't know that that's ever

17   going to happen.

18             He does offer you a solution to this contempt

19   motion.  His solution is more delay.  Is that now,

20   after all of the delay in the trial court before, all

21   of the frivolous appeals for which they were sanctioned

22   for, and after now just throwing away the entire summer

23   doing nothing, Mr. Reeves' solution is, let's just push

24   all the dates back and give me more time to keep doing

25   this.  That is not a solution to this case; that

1    definitely prejudices us.

2          His other argument is that it's unclear

3    whether there are civil or criminal contempt being

4    sought in this motion.  But the motion is captioned

5    motion for contempt under Rule 215 of the Texas civil

6    rules.  Their motion recounts that well, that we're

7    going under Civil Rule 215.  We're not seeking criminal

8    sanctions.

9          With Pozner his only real response there is

10   that there was no gamesmanship.  And I, you know what,

11   I think I would probably agree with that because I

12   think, in order to play a game, you actually have to

13   care enough to play.  And there was no -- it was a

14   complete conscious disregard.  If you consciously

15   disregard to this extent you're not playing games,

16   you're just not -- not respecting this court's

17   authority is what's happening.

18         He says that this is the first time, the

19   Pozner was the first time they've ever gotten any kind

20   of trouble on Pozner.  But the thing is is that you see

21   all of these sanction cases talking about you can

22   default a party in the first instance if that instance

23   is coming off of a long pattern of years of discovery

24   abuse and repeated thumbs in the noses of the court.

25   You have to understand that that's perfectly consistent

1    with everything else they've done in front of this

2    court.

3              His solution on this one is that he wants

4    14 days.  Just give me 14 more days to answer this

5    discovery.  Again, that's not an acceptable solution.

6              He actually says he does not oppose the

7    motion to compel; in other words, it should be granted.

8    And if that's the case, then Rule 215 is

9    nondiscretionary.  You have to grant fees if that's the

10   case.

11             THE COURT:  I have to do what?

12             MR. BANKSTON:  You have to grant fees if

13   that's the case.  Attorneys fees will have to be

14   granted if that is what their position is.

15             And of course, Your Honor, that's true of

16   every motion.  Each one of those motions, being

17   meritorious, has an entitlement to attorneys fees with

18   it.

19             I hadn't wanted to put more paper in front of

20   you, because I knew you were going to have a lot to

21   review.  And I honestly anticipated you have a lot to

22   review from them.  So I wanted to let you decide to

23   rule first before I gave you any evidence on that.  I

24   can do it however you want, I can give you testimony

25   now or I can give you an affidavit and send it directly

1   to the court, however you want to deal with the

2   attorneys fees issues.

3           THE COURT:  I'm fine with an affidavit,

4   unless Mr. Reeves is going to want to, you know, cross

5   your testimony, which he can't -- it's hard to do to an

6   affidavit.

7           MR. BANKSTON:  Right.

8           MR. REEVES:  Your Honor, I'm happy to deal

9   with the attorneys fees on written submission to you.

10  If I have any issues with what Mr. Bankston submits, I

11  will point those out in writing.  I do not need -- we

12  don't need to do that right now, in my opinion.

13          THE COURT:  All right.  Then I'll include it

14  in any orders where it is relevant.  But just so it's

15  clear and on the record now, your response will be due

16  seven days after Mr. Bankston files his affidavit on

17  attorneys fees or motion or any other filing on

18  attorneys fees.

19          MR. REEVES:  Okay.

20          MR. BANKSTON:  And, Your Honor, there was one

21  other note that I had made, just my last point I wanted

22  to make to you on rebuttal is -- I had to flip a page.

23  And this is just from again your orders and everything

24  to understand this.  Mr. Reeves just represented to you

25  that they told us, they informed us a couple of days

1   ago, that discovery for prior matters is now discovery

2   for all matters.  Right.

3          And what the court needs to be aware of is

4   there is a prior agreement between counsel in this

5   case.  There's a prior agreement that says, if any of

6   the documents produced in the Lewis matter you contend

7   are responsive to any request in the other cases, like

8   if there's response to the request in Heslin, then you

9   don't have to produce those documents again, so long as

10  they are identified by their corresponding Bates

11  numbers in the responses.  And in here we don't have

12  responses.  So none of that works.

13         So the idea that some Lewis production would

14  be somehow partially compliant with any of the other

15  cases or help any of the other cases, that's in

16  violation of the parties's agreement.  So again another

17  small point on that.

18         But with that, that's all the arguments we

19  have today and we ask you to grant the motions.

20         THE COURT:  All right.  Thank you.  Um.

21         MR. REEVES:  Your Honor, if I may really

22  fast.  If that's okay.  I'm sorry, I don't mean to

23  interrupt you.

24         THE COURT:  Well, if what you're going to say

25  is what you meant was they didn't notice a deposition

1   and that's why it didn't happen --

2          MR. REEVES:  No.

3          THE COURT:  What are you going to say?

4          MR. REEVES:  No, Your Honor, it's on the --

5          THE COURT:  Then Mr. Bankston is going to

6   talk again.

7          MR. REEVES:  Sure.

8          It's just on the idea that, you know, again

9   he's asked for default across the board and, you know,

10  again that's not relief he requested.  And most

11  definitely in these two contempt motions he asked for

12  finding of contempt.  And so I would just -- I would

13  again point out that that would be far beyond what he's

14  requested here within his motion.  I realize that he

15  said they're under Rule 15, but he specifically

16  requested a contempt finding under Rule 15.  215.

17         THE COURT:  215, right?

18         MR. REEVES:  215, yes, Your Honor.

19         THE COURT:  All right.

20         MR. REEVES:  That's it, Your Honor.

21         THE COURT:  Mr. Bankston?

22         MR. BANKSTON:  I don't need to respond, I

23  think you know what you can do under 215.

24         THE COURT:  Okay.  All right, I'm going to

25  take it under advisement.

1          I know the other case is still under

2    advisement but honestly I kind of wanted to wait until

3    we were all together again before I issued orders in

4    that case or on the motion for pro hac vice, which is

5    not looking good, by the way.  So that's part of why

6    I've been waiting.  And I'll get this to you pretty

7    quickly.  As quickly as I can.

8          MR. REEVES:  Your Honor, just one brief

9    point.  On the pro hac vice that you mentioned, again I

10   do want to mention to you that Mr. Randazza is involved

11   in this Virginia case where, ever since he's been

12   involved, this discovery has gone fantastically there,

13   it's been dealt with accordingly, it's been dealt with

14   in an orderly fashion.  You know, Mr. Bankston has

15   previously told me that he thinks that my client has

16   tons of lawyers working for him in this case --

17         THE COURT:  Well, he's allowed to, that's

18   fine.  But the question is does that attorney get to

19   appear in this courtroom.  And that's a separate

20   question.  He can work on anything somebody properly

21   hires him to work on behind the scenes.  That's

22   different.

23         Somebody wants to take a chance bringing a

24   lawyer in who is not licensed in this state to give

25   advice on what to do in this litigation, they have the

1    right to do that.  What they don't have the right to do

2    is have him appear and represent him in court.  I get

3    to decide whether he does that or not.

4              MR. REEVES:  And yes, I understand that, Your

5    Honor.

6              THE COURT:  Okay.

7              MR. BANKSTON:  Your Honor, I have one

8    question about that.  Mr. Randazza likes to email me

9    and do stuff on this case.  I don't feel like I have

10   any duty to have to deal with him.  I don't know if

11   it's fine with you for me not to want to deal with

12   Mr. Randazza but to deal with Mr. Reeves instead.

13             THE COURT:  Well, um, Mr. Reeves, as he told

14   us today, is lead counsel for these cases, is the only

15   counsel of record filed with the court that I'm aware

16   of.

17             Right, Mr. Reeves?

18             MR. REEVES:  That's correct, Your Honor.

19             THE COURT:  So, I guess Mr. Randazza could

20   email, similarly to how an associate of Mr. Reeves

21   could email, and be speaking for Mr. Reeves if

22   Mr. Reeves allows him to do that.  I would suggest that

23   that information be written down.

24             MR. REEVES:  And, Your Honor, as far as I

25   know, there's been no direct communication between

1   Mr. Randazza and Mr. Bankston without me involved.

2   It's more the issue of I have included Mr. Randazza on

3   emails as a cc and he has responded sometimes.  But

4   it's not like a -- it's not like just Mr. Bankston is

5   dealing with Mr. Randazza.

6          I'm involved because this is, like I said,

7   I'm lead counsel, I take that very seriously in these

8   cases, especially given their history.  I'm, you know,

9   I take it very seriously, what's going on here and what

10  I'm dealing with.  And so -- and I want the court to

11  understand that and be aware of that.

12         But, you know, that's what Mr. Bankston is

13  referring to is that Mr. Randazza has been included on

14  emails, has responded to some of them, but it's not

15  solely Mr. Randazza doing things without me knowing or

16  being involved in these matters.

17         THE COURT:  So you're telling me that

18  Mr. Randazza is speaking for you in these

19  communications.

20         MR. REEVES:  The only communications that he

21  has spoken for me about was dealing with sanctions that

22  the court of appeals had rendered on a prior appeal,

23  where they determined the appeal was frivolous that

24  hadn't been paid that we were working out details of

25  how to pay that.  That's really it.  But everything

```
 1  else --
 2              THE COURT:  Your --
 3              MR. REEVES:  I'm not trying to capitulate.
 4              THE COURT:  Your response reminds me of a
 5  depo transcript I listened to earlier.
 6              MR. REEVES:  I'm sorry.  I'm trying to answer
 7  the question.
 8              THE COURT:  So the question, the question was
 9  what you're telling the court is that when Mr. Randazza
10  sends an email it's on your behalf and he is speaking
11  for you.  Is that right?
12              MR. REEVES:  If he -- if it involves these
13  Texas cases I will say yes, Your Honor.
14              THE COURT:  Okay.  Does that help,
15  Mr. Bankston?
16              MR. BANKSTON:  Sure.  That will help for now.
17              THE COURT:  All right.
18              MR. BANKSTON:  The other -- one other thing I
19  wanted to bring up, Your Honor, I don't know if this
20  sounds like a good idea to you, obviously these cases
21  require more judicial babysitting than maybe other
22  cases have required in the past.
23              THE COURT:  I'm definitely learning that.
24              MR. BANKSTON:  Yeah.
25              So, in Lafferty they have come up with a
```

1   system of where they're actually having monthly status

2   conferences to just make sure everything is working.  I

3   don't know if you want to preschedule our next meeting

4   together or how you may want to do that.  I certainly

5   know I would be willing to do something like that.

6         THE COURT:  I mean, it's probably not a bad

7   idea.

8         MR. BANKSTON:  And, you know, there may be

9   cases where you say, hey, do we need to have a status

10  conference this month and both parties say no,

11  everything is swimming smoothly, we don't need to, or

12  whatever.  But something I just thought I would throw

13  it out there.

14        THE COURT:  I think I mentioned at the

15  conclusion of the Fontaine hearing that I had some

16  second thoughts about our trial schedule.  Um.  Mostly

17  I think just for the toll it would take on this court

18  to hear those cases in such rapid succession, assuming

19  that after the first one or two the rest don't settle.

20  Um.  Which I would love to sit here and say, looking at

21  it rationally, this is what I think will happen; I just

22  don't know how helpful that kind of examination of what

23  should happen will be in this case, given the

24  personalities and the subject matter and the emotions

25  involved.

1          So, I don't think I can -- I'm not

2    comfortable setting a schedule for this court that

3    assumes what happens in the first case will affect what

4    happens in the remaining cases.  Does that make sense?

5          MR. BANKSTON:  It does.

6          THE COURT:  Okay.  So, it is my plan to take

7    another look at those schedules and make some changes.

8    I think I mentioned already one of them was like a

9    backup setting, and we are not going to trial that

10   week.  So I haven't issued an order but I've let you

11   guys know that one is not -- there's not going to be a

12   trial that backup setting week.

13         MR. BANKSTON:  One thing I should probably

14   let you know, if you're going to be thinking about

15   trial settings and that sort of thing, is our decision

16   on how to go forward on those cases is obviously going

17   to be heavily affected by the outcome of this motion.

18         THE COURT:  I would assume.

19         MR. BANKSTON:  And so what I would say to

20   that is, just to give the court a heads's up, this is

21   what we would be intending to do, I'm giving the

22   defendant's counsel a head's up, too, that if the

23   disparate liability issues are sort of taken out of the

24   case, like through a default, and there isn't the

25   possibility of jury confusion over the liability

1   issue --

2          THE COURT:  You're going to seek to

3   consolidate?

4          MR. BANKSTON:  All of them for damages.  It's

5   the only thing that makes since under that situation,

6   because then you don't have the jury confusion of those

7   ideas.  And then you're only looking at one trial.

8          So I think to make some of these decisions

9   it's going to have to know what happens in this motion

10  first.

11         THE COURT:  Yeah, okay.  Thank you.  Okay.

12         Well, I think that's it.  I'm going to take

13  it under advisement.  I've got your suggestion,

14  Mr. Bankston, I'll let you guys know, Mr. Reeves and

15  Mr. Bankston, I'll let the two of you know if I'm going

16  to set this for some kind of regular schedule.  At a

17  minimum we will have another schedule to discuss the

18  schedules.  So.

19         MR. REEVES:  And, Your Honor, just a quick,

20  the backup setting you're talking about, do you know if

21  it's the April 25th setting that you're referencing?

22         THE COURT:  I don't know.  When you look at

23  the list it clearly says backup for another case.

24         MR. REEVES:  There's two on the same case.

25  There is Pozner and Lewis are set on the same date.

1   And that's kind of what I figured, I just wanted to

2   make sure I have the correct understanding.

3          THE COURT:  I wouldn't worry about it too

4   much in general because we're going to address those

5   again.  And I also know there are a number of, I think,

6   anyway, that there are several other motions pending

7   that were not set for today, so we're going to have to

8   have another hearing, anyway, on those, right?

9          So when we ended Fontaine with a possible

10  agreement on confidential records, I don't think I've

11  seen that agreement.  Don't talk about it because he's

12  not here, I don't want to make that mistake again.  But

13  we had also discussed wanting a similar agreement or

14  order in these cases.  So, I haven't seen that in any

15  version, so I expect that's coming.

16         MR. BANKSTON:  Actually I'm glad you brought

17  that up because we probably need to set a hearing for

18  that, Your Honor.

19         THE COURT:  Right, that's what I'm saying.

20         MR. BANKSTON:  Yeah, because I'm going to be

21  getting records soon, I would assume.  And yeah, we

22  were able to reach agreement on the other case, but

23  here --

24         THE COURT:  Do I have a copy of it?  I don't

25  think I have a copy.

1          MR. BANKSTON:  Yeah, that's been filed. Again
2    I'm not going to go into that.
3          THE COURT:  But remember, Mr. Bankston, when
4    you file something I don't get it.
5          MR. BANKSTON:  Right, it actually wasn't us
6    that filed it.  I had assumed that he provided it to
7    you.  I guess he hasn't.
8          THE COURT:  He should know even better than
9    you that I don't get it, because he works in Travis
10   County.
11         MR. REEVES:  You're talking about in the
12   Fontaine matter, Your Honor.  That's not -- that hasn't
13   happened in this case.
14         THE COURT:  I understand.
15         MR. REEVES:  Okay.  Just making sure.
16         MR. BANKSTON:  In this case Mr. Reeves
17   opposes a protocol for in-camera review, says he wants
18   to subpoena the records himself, not have *in camera*
19   review.
20         THE COURT:  Okay.  You can set that for
21   hearing but you're going to lose that one because these
22   are sensitive records and I don't -- we're not doing
23   that.
24         MR. REEVES:  Okay, and I appreciate that.
25   And what I will do with that, I'll retrace and I'll

1    talk to Mr. Bankston about it.  It more had been

2    honestly, Your Honor, the idea that plaintiff was going

3    to be the gatekeeper of what was going to be submitted

4    *in camera*.

5            THE COURT:  Right, so that -- he's not the

6    gatekeeper of what's submitted, he's the gatekeeper of

7    what is not submitted *in camera*.  And that's standard.

8    We do this all the time for medical and mental health

9    records in every kind of injury case you can think of.

10           So the plaintiff gets the records, goes

11   through them, says, you can have these, if you want

12   these we're going to ask the judge to look at them

13   first.  That's super standard.

14           MR. REEVES:  Sure.

15           THE COURT:  If you oppose that, that's not

16   going to go well.  You're going to have a very hard,

17   uphill road convincing me that there's some reason what

18   works in every other case I get won't work in this one.

19           MR. REEVES:  And I understand that, Your

20   Honor.  And I want you to know I in no way -- I have no

21   desire to waste the court's time with things like that,

22   especially given now what you've said here.  I've used

23   that process many times, I represent -- I mean I have

24   personal injury clients and things.  I understand the

25   process.  It was just the way that Mr. Bankston and I

1  discussed it it was -- to me did not comport with that

2  process.

3          But again I will, especially given what you

4  said, I'll revisit it with Mr. Bankston.  I'm sure we

5  can come to an agreement so the court doesn't have to

6  waste their time dealing with that.  I have no desire

7  to have the court deal with things that we, as the

8  parties, should be able to figure out.

9          THE COURT:  Great.  So when you reach that

10 agreement and you execute it, send me a copy.  Don't

11 just file with the clerk.

12         MR. REEVES:  Yes, Your Honor.

13         THE COURT:  Okay.  Thank you.

14         That's going to conclude the hearing,

15 everyone is excused, and I will get with you as soon as

16 possible.  Thanks.

17         MR. REEVES:  Thank you, Your Honor.

18         Have a good afternoon.

19                  (End of proceedings.)

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2    THE STATE OF TEXAS          )

3    COUNTY OF TRAVIS            )

4             I, Alicia DuBois, Official Court Reporter in

5    and for the 459th District Court of Travis County,

6    State of Texas, do hereby certify that the above and

7    foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings

9    requested in writing by counsel for the parties to be

10   included in this volume of the Reporter's Record, in

11   the above-styled and numbered cause, all of which

12   occurred in open court or in chambers and were reported

13   by me.

14            I further certify that this Reporter's Record

15   of the Proceedings truly and correctly reflects the

16   exhibits, if any, offered in evidence by the respective

17   parties.

18            WITNESS MY OFFICIAL HAND this, the 1st day of

19   October, 2021.

20

21                        */s/ Alicia DuBois*
                          Alicia DuBois, CSR
22                        Texas CSR 5332
                          Exp. Date:  1/31/22
23                        Official Court Reporter
                          459th District Court
24                        Travis County, Texas
                          P.O. Box 1748
25                        Austin, Texas 78767
                          (512) 854-9301

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County