# Exhibit 35

```
 1                      REPORTER'S RECORD
                      VOLUME 1 OF 1 VOLUME
 2             TRIAL COURT CAUSE NO. D-1-GN-18-006623

 3
      SCARLETT LEWIS              )  IN THE DISTRICT COURT
 4                                )
           Plaintiff              )
 5                                )
                                  )
 6    VS.                         )
                                  )  TRAVIS COUNTY, TEXAS
 7                                )
      ALEX E. JONES, INFOWARS,    )
 8    LLC, AND FREE SPEECH        )
      SYSTEMS, LLC                )
 9                                )
           Defendants             )  53RD JUDICIAL DISTRICT
10

11

12         -------------------------------------------------

13

14         EXCERPT FROM HEARING ON MOTION FOR SANCTIONS

15

16         -------------------------------------------------

17

18       On the 3rd day of April, 2019, the following

19    proceedings came on to be heard in the above-entitled

20    and numbered cause before the Honorable Scott H.

21    Jenkins, Judge presiding, held in Austin, Travis County,

22    Texas;

23       Proceedings reported by machine shorthand.

24

25
```

```
 1              A P P E A R A N C E S

 2
    FOR THE PLAINTIFF:
 3
          MARK D. BANKSTON
 4        SBOT NO. 24071066
          WILLIAM OGDEN
 5        SBOT NO. 24073531
          KASTER, LYNCH, FARRAR & BALL
 6        1010 Lamar, Suite 1600
          Houston, Texas  77002
 7        (713) 221-8300

 8

 9  FOR THE DEFENDANTS:

10        ROBERT BARNES  (Admitted Pro Hac Vice)
          BARNES LAW
11        601 South Figueroa Stree, Suite 4050
          Los Angels, California  90017
12        (213) 330-3341

13        RICHARD E. YOUNG
          SBOT NO. 22204800
14        GLAST, PHILLIPS & MURRAY
          14801 Quorum Drive, Suite 500
15        Dallas, Texas  75254
          (972) 419-8300

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**VOLUME 1**

**EXCERPT FROM HEARING ON MOTION FOR SANCTIONS**

**APRIL 3, 2019**

|  | <u>Page</u> | <u>Vol.</u> |
|---|---|---|
| Argument by Mr. Barnes............... | 4 | 1 |
| Further Argument by Mr. Bankston..... | 39 | 1 |
| Rule 11 Agreement.................... | 53 | 1 |
| Adjournment.......................... | 54 | 1 |
| Court Reporter's Certificate......... | 55 | 1 |

**HEARING EXCERPT**

1

2          THE COURT:  All right.  You may proceed.

3          MR. BARNES:  Thank you, Your Honor.  A few

4  points sort of overarching as to the motion, Mr. -- the

5  Enoch firm, Mr. Young, will be making the legal

6  argument.  I just want to go over the factual history

7  and answer some of the Court's inquiries that you

8  previously made.

9          At the outset, I do believe that a First

10 Amendment defense, which is what the Texas Citizens

11 Participation Act is all about, as it says in

12 Chapter 27, it's meant to protect issues involving the

13 expression of certain constitutional rights, that

14 striking the motion in its entirety would be a severe or

15 death penalty sanction.  That word may be used more

16 commonly in Texas than other jurisdictions maybe because

17 of what happened at SMU several years ago.  But I do

18 think that's the case.  This is a fundamental First

19 Amendment case that is going to make new law for the

20 country one way or the other.

21         THE COURT:  What should I do then about

22 the failure of defendants to open the spigot and have

23 the production of documents start flowing?  I find that

24 disturbing.  I'm not saying that was your decision.

25 We'll probably never know whose decision it was.  But

1  somebody decided to slow boat these documents, and they

2  got a ton of them delivered after the depositions.

3  That's very disconcerting.  What should I do about that?

4          MR. BARNES:  Two things, Your Honor.  I do

5  have a further explanation, and you will know exactly

6  how everything happened because I'm going to explain it

7  to you all the way through.  And the -- and as to

8  potential remedies, what I proposed actually to

9  plaintiffs other than, you know, making people available

10 for depositions without cost, paying for additional

11 depositions and all of that once he identified any

12 issues that he needed additional depositions on with

13 discovery --

14          THE COURT:  But at some point that

15 becomes, I mean -- and we all know this.  I mean, we --

16 there's only so much trial lawyers can do.  You know,

17 there's seven days in the week and you've got to sleep.

18 And, you know, at some point that is an unfair burden

19 when someone's under a time deadline to say, well, why

20 don't we -- let's get a redo; let's do a redo now; in

21 light of our slow production, just take the depositions

22 again.  I appreciate that you're willing to go to

23 Houston to do it.  I read that.  But, you know, at some

24 point that's just -- that's not fair.

25          MR. BARNES:  I understand the Court's

1  concern, Your Honor.  And in that regard, the other

2  option I proposed is that if he identified -- as I see

3  the motion, our main argument is about whether the

4  complaint states a cause of action on its face.  It's

5  not so much a fact question that goes to the intent

6  question.  My understanding from the Court's order is

7  that all of the discovery really relates to only one

8  component of the motion and that is whether or not there

9  was actual malice under the First Amendment standard as

10  applied to intentional infliction of emotional distress

11  claims and whether there was intent to harm under the

12  intentional infliction of emotional distress claim.

13           What I told plaintiff's counsel at the

14  break was that if it is the case when he reviews this

15  that he feels he cannot adequately review it for

16  purposes of determining the intent question, we're

17  willing to, solely for the purposes of this motion,

18  withdraw our part of the motion that deals with their

19  prima facie proof and say for the purpose of this motion

20  only we stipulate that the intent aspect is met, that

21  the actual -- we're not disputing actual malice or

22  intent; we'll only dispute whether or not someone can

23  bring an intentional infliction of emotional distress

24  claim when they have never been individually identified

25  by any statement.

1            THE COURT:  So you're going to limit your

2   motion to dismiss -- is this the first time they've ever

3   heard this?  You're going to limit your motion to

4   dismiss to a pure question of law whether such a claim

5   can be brought as an intentional infliction claim under

6   the law.

7            MR. BARNES:  Yes, Your Honor.

8            THE COURT:  And you will concede today,

9   and you are for the record, that for the purpose of

10  deciding the motion to dismiss the Court can assume that

11  the statements made by Alex Jones were done with malice,

12  that is to say, he knew they were false and said them

13  anyway.

14            MR. BARNES:  We're not disputing the

15  intent issue as to this motion, that's correct,

16  Your Honor.

17            THE COURT:  So he intended to make false

18  statements.  The question is, can you take that intent

19  to make false statements and can an individual bring a

20  claim for intentional infliction on those facts?

21            MR. BARNES:  Precisely, Your Honor.  In

22  other words, if the case is -- when someone has not been

23  personally mentioned -- in the defamation context they

24  call it colloquium, which the word colloquial comes

25  from.  And if no statement is ever made about that

1  person, can that person bring a claim for defamation or

2  intentional infliction of emotional distress when they

3  have never been mentioned?  That --

4              THE COURT:  Well, what you're saying now

5  means they don't even need to put on any affidavits or

6  anything on the hearing on March -- on May 2nd; they

7  just need to make legal briefing.

8              MR. BARNES:  Precisely.  That's correct,

9  Your Honor.

10              THE COURT:  And it'll be granted or denied

11  based upon that legal argument.

12              MR. BARNES:  Precisely.

13              THE COURT:  That's really interesting.  Is

14  this the first time -- you can tell in my old age I find

15  this maddening that people don't talk the way they used

16  to.  Is this the first time they're hearing this from

17  you?

18              MR. BARNES:  I mentioned it during the

19  break, Your Honor.  I mean, based on the Court's

20  comments, I thought -- I had thought about this solution

21  all the way back.  If I had personally brought the

22  motion, I would have brought it differently.  There was

23  just a difference.  I wasn't involved at that point,

24  Your Honor.  Because to me when I looked at it, it was

25  just a straightforward legal issue.  I was also trying

1  to figure out other ways to get a continuance, whether

2  we could do the motion nunc pro tunc, but that didn't

3  work out.

4  　　　　　　THE COURT:  Well, in fairness to

5  Mr. Enoch, he made those arguments on the discovery

6  hearing saying, Judge, you should not give discovery

7  because they can't even bring this claim.  That argument

8  was actually made.  The argument you're just making now

9  was made, but he was not ready to concede at that point

10 just assume it's malice, we're going to live or die on

11 the law.

12 　　　　　　MR. BARNES:  Precisely.  And that's what I

13 would have done.

14 　　　　　　THE COURT:  And he could have said that

15 then and we wouldn't have even had any of this

16 discovery, right?

17 　　　　　　MR. BARNES:  Yes, Your Honor, absolutely.

18 　　　　　　THE COURT:  Because we would not have

19 needed it.

20 　　　　　　MR. BARNES:  Yes, Your Honor.

21 　　　　　　THE COURT:  That's your argument now.

22 　　　　　　MR. BARNES:  Yes.

23 　　　　　　THE COURT:  I see.  How interesting.

24 　　　　　　MR. BARNES:  And again, it's just to

25 facilitate the resolution of the matter one way or the

1  other.

2          THE COURT:  Why this dramatic change today

3  on the break in this motion?  Because we could have done

4  that two months ago and teed up the motion to dismiss, I

5  don't know, for today.

6          MR. BARNES:  It was always my position,

7  Your Honor.  In fact, and it has been broached in

8  Connecticut, so the same pitch has been made, that to me

9  the real big issue here isn't the factual issue.  That's

10 going to be decided how it is.  To me the uniqueness of

11 this from a constitutional legal perspective is can this

12 kind of claim assuming certain facts to be true --

13 assuming all the facts alleged in the complaint are true

14 and are provable true, can that constitute a claim given

15 the First Amendment protections?  And from my

16 understanding looking at it, this kind of claim is not

17 one.  This has not been tested yet through the court

18 system.

19          THE COURT:  And I'm sorry to pick on you

20 because I appreciate what you're saying because that

21 seems to be simplifying this matter greatly.  I'm

22 just -- it kind of taps into what counsel started off

23 saying at the beginning of his argument; I don't know

24 who's in charge over there.  And what you just did on

25 the record now kind of makes me -- I have to ask you,

1 and, of course, this is getting into attorney-client, so

2 the answer may be I can't tell you, but why this sudden

3 dramatic 180-degree turn in the position taken by

4 defendants on how to posture this case for this motion?

5         MR. BARNES:  So it's based on that I'm

6 running this case now once I was admitted *pro hac*, so

7 that was the only delay on that side of the aisle.  And

8 as to that, Your Honor, different counsel have

9 different -- I understand most lawyers want to assert

10 every defense.

11         THE COURT:  But you took over when?  When

12 did you -- when were you in command of the ship?

13         MR. BARNES:  I could control the case once

14 I was admitted *pro hac*.  I was brought in initially as

15 in-house general counsel.

16         THE COURT:  That's okay.  When did you

17 take over command of the ship to basically guide the

18 client to do exactly what you just did in court?

19         MR. BARNES:  I mean, formally yesterday.

20 So the -- I've been involved all the way through, and I

21 was going to go through all the details of that.

22         THE COURT:  So you were not in a position

23 to do what you just did until yesterday?

24         MR. BARNES:  That's -- yeah, until I was

25 granted *pro hac*, yes, Your Honor, short answer.

1            THE COURT:  And I don't mean to pick on

2 you because I appreciate the change.  It's just, golly,

3 we've spent an awful lot of time getting to this point

4 only to find out you didn't even need the discovery; you

5 can just presume all of this.

6            MR. BARNES:  Well, absolutely, Your Honor.

7 That's what I would have proposed from the get-go.  So

8 because --

9            THE COURT:  It's just nobody listened

10 until I guess yesterday.

11            MR. BARNES:  Other -- I mean,

12 respectfully, other counsel had their -- they believed

13 it was best to defend on all components.

14            THE COURT:  Okay.

15            MR. BARNES:  It was proposed in

16 Connecticut and the plaintiffs just turned it down in

17 Connecticut.

18            THE COURT:  Okay.  Well, I mean, I respect

19 that.  Lawyers have different ways they wish to -- or

20 advise the client to proceed.

21            MR. BARNES:  Yes, sir.

22            THE COURT:  Okay.

23            MR. BARNES:  And I think it's because in

24 part Mr. Enoch wasn't aware of some of the complexity we

25 were going to deal with in discovery, and so I'll go

1  through that history.

2          So to be clear, all of the defendants

3  Mr. Jones, Free Speech Systems -- I'll explain what

4  InfoWars is; it's a paper entity, but I'll explain that

5  in further detail -- produced all of the discovery that

6  was requested on February 24th to the Enoch firm.  On

7  February 25th they started producing and produced about

8  6500 documents.  I believe plaintiff's counsel referred

9  to it as, quote, an enormous amount of information in

10 his motions at that time.

11          Then what happened the next day was

12 plaintiff's counsel in Texas and later plaintiff's

13 counsel in Connecticut, because they're sharing

14 documents back and forth, said that the production of

15 that amount of documents was a waiver for everybody as

16 to everything that could ever exist.  And the particular

17 concern was not about internal documents.  As I think

18 plaintiff's counsel is aware from interviewing

19 employees -- ex-employees of InfoWars and of the

20 defendants, Mr. Jones almost never uses email.  He

21 doesn't even have a corporate email account.  He comes

22 out of the Talk Radio Network/Access TV world.  He has a

23 personal email account that he only uses for online

24 banking and things of that nature.  He doesn't respond

25 to lawyer emails by email.  He's just not an email

1  person at all.  There's many reasons for that.

2  Partially it's a personal preference.  It's the nature

3  of how he grew up in talk radio.  The second part is if

4  he was accessible by email, he would get bombarded.

5          InfoWars already receives approximately

6  one million external emails each year, most of them all

7  from third parties, often, you know, different people.

8  So the ability for him to filter information and be

9  reachable and to reach out to people he needs to talk

10  to, he needs to not be available by email.  It needs to

11  be in person, on the phone, or through a person in

12  person.

13          The way InfoWars operates at the company

14  is entirely verbal.  They get together.  They have a

15  conference in the morning and then they do work and do

16  their own research, then they print out things, and then

17  they talk.  It's basically a network access TV show

18  turned talk radio show that's done online.

19          THE COURT:  Excuse me just a second.

20          *(Discussion off the record*

21          *with court staff)*

22          MR. BARNES:  So the effect of it is that

23  the total amount of email -- so here's how the search

24  was done back in February.  The IT people and the

25  production people both started looking for videos,

1  articles, and for all responsive documents.  The nature

2  of it is there was over nine million emails to be

3  searched.  They did sort of like what Google does.  What

4  Google does is they do like a spider -- what they call

5  spidering.  It does a web -- a search of the web.  They

6  did a search of all of the entire computer servers and

7  everybody's emails.  That produced over 100,000

8  documents that could respond to the various search

9  terms.

10              So he talks about crisis actors and some

11  other components.  What it is is his request was sort of

12  generic in some of the language, so it said any

13  communication that deals with the notion that something

14  is -- that the shooting was either staged or synthetic,

15  phony or manipulated.  In Connecticut they had reduced

16  those to specific search terms, like crisis actor, like

17  Sandy Hook, like Newtown.  So because we're producing

18  for both and they're sharing with each other, that's why

19  we were just making sure everything was produced for

20  both, but that produced a massive volume of documents

21  and information.

22              So what Mr. Enoch relayed to the

23  plaintiffs on February 25th is he anticipated that being

24  the ruling.  When they came back and said, you know

25  what, you've just waived all of your clients' rights and

1   any third party rights to privacy or to privilege under

2   the shield, and they said the same thing in Connecticut,

3   that is when -- I had been brought in as outside general

4   counsel at that point.  I said, well, hold on, in

5   California we can get sued by any person we release

6   their email from if it's not properly done.  So I said,

7   can you ask both plaintiff's counsel in Connecticut and

8   Texas, please withdraw the waiver argument and we'll

9   keep getting rolling production to you.

10              THE COURT:  Now you really -- sorry, that

11  got my attention.  In California you can get sued for

12  releasing an email when there's no expectation of

13  privacy in the email?  I mean, how can anybody have

14  expectation of privacy -- that's my question -- in any

15  email?  You know, it's like a cockroach.  It never dies.

16              MR. BARNES:  It's starting to expand over

17  the past 15 years.  So sometimes the expectation of

18  privacy is rooted in a contractual arrangement.  So

19  here, for example, everybody that works at InfoWars has

20  a non-disclosure agreement that effectively protects

21  their emails from external exposure outside of the court

22  order process.  In California and some other

23  jurisdictions, they interpret that as entitling them to

24  an expectation of privacy in their email from third

25  party disclosure.

1          The second one goes actually to what the

2  Court's ultimate order was.  If a party sent

3  something -- a third party sends something to you and

4  they either affirmatively request it or believe it's

5  confidential --

6          THE COURT:  Well, that I understand.  If

7  there's some -- which actually I wove into my order; I

8  tried to --

9          MR. BARNES:  Yes, Your Honor.

10          THE COURT:  -- on the reporter's

11  privilege, is if there's some expression of an

12  expectation of privacy, I understand that.  That was the

13  line I was trying to draw.

14          MR. BARNES:  Exactly.  And so because

15  a lot of their emails came through the tips line,

16  whistleblower line, source line, generic emails from

17  third parties, figuring out if we disclose those, can

18  someone sue was my concern, so I was like at least say

19  that whatever we produce is not a waiver as to those

20  other potential ones.  Both plaintiffs' lawyers in Texas

21  and Connecticut said they refuse to withdraw their

22  waiver claim.  So that frankly just put a panic for me.

23  I was like, well, hold on a second, we need to make sure

24  that whatever we produce doesn't lead to third party

25  lawsuit claims against us because now we're disclosing

1  something that we didn't at the time we reviewed and

2  that we've actually waived by producing anything else.

3            THE COURT:  But even if somebody had a

4  desire to maintain privacy, you can't use private

5  communication -- of course, you've just basically -- but

6  ultimately when you try this case if you come to a

7  trial, you can't say, well, I got this information, it

8  formed the basis for my sincere belief that there was a

9  question about whether these children were shot, but I

10  can't tell you what it is.

11            MR. BARNES:  Oh, you're absolutely right.

12            THE COURT:  I can't share it with you.

13            MR. BARNES:  No doubt.

14            THE COURT:  I mean, you can't use that.

15  You can't do sword and shield that way, right?

16            MR. BARNES:  Absolutely.  That's

17  absolutely right.

18            THE COURT:  Okay.  And you heard counsel's

19  expression of concern that he's going to be surprised.

20  You just took that away from him a few minutes ago.

21            MR. BARNES:  Absolutely.

22            THE COURT:  But at the trial of this case,

23  you can't do it then either, right?

24            MR. BARNES:  Absolutely not.  If we

25  withhold anything under privilege or privacy grounds, we

1  cannot use that as affirmative evidence at trial.

2                THE COURT:  Exactly.

3                MR. BARNES:  Absolutely, Your Honor.

4                THE COURT:  So he needn't worry even at

5  the final trial that you would do that because you

6  can't.

7                MR. BARNES:  No, exactly.

8                THE COURT:  And you have to supplement

9  your discovery as soon as you know it exists, and surely

10 you know it exists right now --

11               MR. BARNES:  Absolutely.

12               THE COURT:  -- as we sit here today.

13               MR. BARNES:  Oh, yes, absolutely.

14               THE COURT:  There we go.  So he knows

15 exactly what was the basis for making these statements.

16 He's known it since he made them.  And that information,

17 assuming -- has already been provided to opposing

18 counsel or not?  Because until today you were -- you

19 tell me you were compliant with discovery.  Counsel's

20 worried that you haven't given him everything that you

21 would be using at this hearing that you're now not going

22 to need to use, but you already have.  You're telling me

23 everything's over in his office.  Everything that Alex

24 Jones ever relied on to form the basis to make the

25 statements he made is in plaintiff's counsel's office.

1    Is that --

2                   MR. BARNES:  That's my understanding,

3    absolutely, Your Honor, from the deposition -- I mean,

4    what he testified from the deposition, he didn't rely on

5    emails for anything that he -- for his opinions.

6                   THE COURT:  Just verbal communications.

7                   MR. BARNES:  Absolutely.

8                   THE COURT:  Informal verbal

9    communications.

10                   MR. BARNES:  Or something that he read or

11   saw.

12                   THE COURT:  Okay.  So counsel knows

13   everything upon which Alex Jones relied to make any

14   statement he ever made on the air about Sandy Hook,

15   right?

16                   MR. BARNES:  Absolutely, correct.

17                   THE COURT:  Okay.  I always like

18   transparency, and I like people to confirm that,

19   you know, on behalf of their clients they have complied,

20   and that's good.

21                   MR. BARNES:  Yes, Your Honor.  And I'll

22   provide some context on that as to why there's --

23   another reason why there's no internal emails on the

24   aspects of this.  Aside from the fact they don't use

25   them for broadcast purposes and they don't -- for

1  planning broadcasts or publications, they don't use

2  internal emails very often at all.  It's almost all

3  external communication.

4              The second part of that is there was about

5  90 percent of what InfoWars published -- because there

6  was a difference of opinion that he explored in the

7  deposition.  InfoWars' editor was Paul Joseph Watson.

8  He always believed Sandy Hook was a real event.  He said

9  so.  That's why 90 percent of what Free Speech Systems

10 published after the shooting was that Sandy Hook was a

11 real event.

12             So you had essentially the opinions of the

13 editor that Sandy Hook was a real event, argued that

14 repeatedly and argued it through InfoWars and its

15 publications and broadcasts.  About two years after

16 Sandy Hook, Alex Jones for a period of time doubted

17 whether Sandy Hook was a real event.  It happened over

18 about six months.  But it was a small minority of what

19 he ever talked about in Sandy Hook.  And Sandy Hook was

20 less than 1/100th of 1 percent of what InfoWars ever

21 broadcast.  That's why whenever we did the discovery

22 requests, we were going to get a lot of stuff that has

23 nothing to do with whether or not Sandy Hook was a real

24 event.

25             I did apprise plaintiff's counsel of that

1  on March 7th after the hearing.  And I originally asked
2  him, I said, well, if you still need the discovery, if
3  you can give me a week to get through it all to make
4  sure the confidentiality is protected, then let's move
5  the depositions to the following week, the 18th through
6  the 20th.  Initially he was amenable to that.  He got
7  back to me over the weekend and said that wouldn't work
8  with his schedule.  So for various reasons I didn't
9  receive a copy of the court order until the 13th.
10 Mr. Enoch's firm thought they forwarded it to me but
11 they hadn't.  So when I'm coming in to do the
12 depositions on 14th and the 15th, I find out, okay, the
13 Court's order.
14              During that time period I had done a lot
15 of legal research to make sure I wasn't creating
16 additional exposure for my client.  Again, my client
17 turned everything over back on February 24th.  I just
18 didn't want to screw up and have a bunch of stuff that
19 was suddenly waived by disclosing and all of a sudden
20 I've got third parties now that get to sue my client
21 because I screwed up.
22              I researched the Texas shield statute,
23 because one of the questions is who owns the privilege.
24 Does the media company own the privilege or does the
25 person who sends it in own the privilege?  There's

1  almost no case law on the statute.

2          Then I looked at the Texas Constitution,

3  which has also applied -- asserted a confidentiality

4  provision to various First Amendment protections under

5  the Granberg (phonetic) doctrine from the U.S. Supreme

6  Court, but the specific issue hadn't come up.

7          THE COURT:  We seem to be plowing a lot of

8  new ground in this case.

9          MR. BARNES:  Yes, Your Honor.  Yes,

10  absolutely.  I have spent over 400 hours on this, me and

11  my team.  I mean, there's been no effort to hide

12  anything, no effort to delay anything.  I was trying to

13  even figure out a way we can nunc pro tunc to delay the

14  hearing, and there just isn't a way to do so

15  procedurally I guess in Texas, so no effort to do any of

16  that.

17          I also had to -- because Connecticut said

18  anything we put in Texas was a release of anything -- a

19  waiver of anything in Connecticut, I had to review

20  Connecticut law also.  No precedent, no court

21  adjudication of it either in the constitutional

22  provision or in the statutory provision in Connecticut.

23  Connecticut's a little bit different than Texas.

24          So then I had to review other scholarly

25  articles or other areas where this statute had been

1    interpreted.  And there was good argument that basically

2    the Court's ruling is where the law is leaning according

3    to most legal scholars and other precedents that are out

4    there, which is to say we, the media company, own the

5    privilege; we can waive it unless they affirmatively

6    requested confidentiality.

7                So then it was like, okay, so now I can

8    turn back to the emails.  We're going to do the

9    depositions on the 14th and the 15th.  I'll get right

10   back to the emails to make sure we screen out anybody

11   who had affirmatively requested confidentiality.  And I

12   was trying to screen out all this auxiliary stuff

13   because so much of it is you have customer orders.

14   There's a lot of --

15                THE COURT:  Slow that down a little bit.

16   You have what?

17                MR. BARNES:  I'm sorry.  There are

18   customer orders that are -- because it turns out there

19   are a lot of Newtowns.  It turns out there's like

20   multiple Sandy Hook towns.  Sandy Hook, Kentucky is

21   another town.

22                Also briefly on the legal part, I also

23   made sure we were complying with California law and EU

24   law.  Because some of the employees and some of the

25   people who sent information are governed under EU law,

1  in the EU, they do have broad privacy for email

2  communication, and you can get fined if you disclose it

3  without a specific court order on that specific email.

4  So I was making sure that that was something that we

5  could waive under the ways in which they set it at.

6              So after doing that all that and doing the

7  depositions on the 14th -- and during this time period

8  between the 8th and the 18th -- or actually the 8th and

9  the 19th, plaintiff's counsel doesn't tell me he has to

10 have documents or info now to do something.  I don't

11 hear from him.  So I'm thinking, okay, we'll do the

12 depositions, then I'll get to the documents, get him

13 everything, try to filter out as much as possible, make

14 sure we don't screw up any confidentiality designations.

15             THE COURT:  I'm not sure I understand what

16 you just said.  And I'm sorry to pick on you again.

17             MR. BARNES:  No problem.

18             THE COURT:  But it was clear in March he

19 wanted the documents right then, was very upset that the

20 spigot had been turned off.  I said turn it back on now

21 today, go ahead and tell your people today, because

22 we've got depositions coming up.  So I'm not

23 understanding what you just said that you didn't hear

24 from counsel that he needed this stuff for the

25 depositions.  That was apparent.

1          MR. BARNES:  Well, yes, Your Honor, but
2 here's my understanding.  After the hearing, I said, can
3 we -- let's do the -- let me get the emails to you
4 first, all the documents first, and then move the
5 depositions.
6          THE COURT:  Okay.
7          MR. BARNES:  When he said he couldn't move
8 the depositions, I figured he was -- because he also
9 mentioned doing bifurcated depositions.  So I figured,
10 okay, he's just going to use this time to do depositions
11 on all the stuff he has, will ultimately see that most
12 of the emails are not helpful for deposition purposes,
13 but if he does, we'll just schedule them the beginning
14 of April.  So I didn't realize he felt he needed all of
15 the emails before that first set of depositions,
16 Your Honor.
17          And so as soon as the 15th deposition
18 ended, went back to make sure that we had coordinated
19 all the discovery between Connecticut and Texas, made
20 sure it was all uploaded.  They had already confirmed
21 that what they had produced on February 24th was
22 everything.  I needed to be personally familiar with how
23 they store information, secure information, produce
24 information so I could make these statements to the
25 Court.  Did all of that.  On the 16th we started

1  uploading it all to a program called Box to share --

2              THE COURT:  A program called?

3              MR. BARNES:  Box, Your Honor, Box.com.  So

4  it's like Dropbox, but the advantage of Box is I wanted

5  to be able to have all the lawyers in Connecticut and in

6  Texas -- and my client authorized bringing in additional

7  lawyers just to help with this process.  They all had

8  access to it, could all filter through and do the

9  review, and I was doing that on the 18th and the 19th.

10             And on the 19th I told plaintiff's counsel

11 I think you'll start getting it on the 20th.  I did

12 request a blanket confidentiality protection for 21 days

13 because I said I'd rather start giving you stuff, and if

14 it turns out I improperly listed something I was

15 supposed to redact, you'll give me time to do that, but

16 at least you have the documents in the interim, and he

17 agreed to that.

18             And then the morning of the 20th he sent

19 in his draft motion for sanctions.  So at that point I

20 stepped back from the process.  I realized I was taking

21 too long to get this done.  So I reviewed over 100,000

22 documents.  I got rid of 30,000, but there was still

23 more to get rid of to filter out.  But the decision was

24 made let's just produce, produce, produce, and anything

25 we've got to bring back we'll pull back later.

1            So at that point I also had a trial in

2    Milwaukee that last week of March.  So from March 20th

3    until two days ago, Mr. Enoch was in charge of all of

4    that while I was taking care of the other case and was

5    getting as many documents to them as possible.  There

6    was never any desire to make it a slow boat.  That was

7    not an intention whatsoever.  This is an unusual set of

8    complex issues that apply to this particular set of

9    documents in discovery.  And that's why I'm willing to

10   make whatever accommodations are needed to make sure

11   that it's not unfair to the other side that this

12   happened to be a very complex process.

13            Let's see.  I think that mostly sums it

14   up, Your Honor, in terms of the factual chronology.  If

15   the Court has any questions I'm happy to answer.  There

16   was never a desire to make anything confusing.  What

17   Connecticut counsel was referencing is that this was a

18   unique complex set of issues where -- I'll give you an

19   example.  In California, somebody -- a lawyer disclosed

20   documents in a case to the other side that were

21   supposed -- that they determined that document was not

22   supposed to be disclosed under privacy rules.  The

23   lawyer got sued, the other lawyer got sued, and the

24   other party got sued, and the Court said it was okay to

25   bring that kind of suit.

1          So it's those kind of -- and because we're

2     a media company that gets all these third party,

3     you know, information in, the question was, could we get

4     sued by someone if we improperly disclosed their name

5     and identity?  There was no desire whatsoever to hinder

6     or in any way impair their process.  And I'm willing to

7     make whatever accommodations out of my own pocket to

8     have it done because the client turned everything over

9     all the way back from the beginning.  I was just trying

10    to make sure I didn't screw up.  Thank you, Your Honor.

11          THE COURT:  Now before you leave, you

12    heard me question -- we've been spending all of our time

13    on the documents, which is bullet points 1 and 2 --

14          MR. BARNES:  Yes, Your Honor.

15          THE COURT:  -- in his motion.  Bullet

16    point 3 is responsive videos, which no one's really

17    talked about today.  Bullet point 4 is failure to

18    prepare a 30(b)(6) deponent, which actually is the wrong

19    rule.  It's 199.2(b).  But in any event, the corporate

20    rep deponent.  You heard me say if they prevail --

21    you've really simplified this today.  It's going to be a

22    pure legal argument on May 2nd whether this claim,

23    assuming everything they say is true --

24          MR. BARNES:  Absolutely.

25          THE COURT:  -- assuming every factual

1  allegation made by the plaintiffs is true, they cannot

2  bring this claim as a matter of law as an intentional

3  infliction of emotional distress claim.  I'm sure the

4  answer to this is going to be yes.  That would mean if

5  that's -- that's true as to all defendants.  So they

6  don't need to worry anymore either about the failure of

7  the defendants to present an InfoWars corporate

8  representative who has a clue about InfoWars as a

9  corporation.

10          MR. BARNES:  That's correct, Your Honor.

11          THE COURT:  Because you heard me say,

12  golly, if they prevail as to the other defendants, you

13  shouldn't be able to kick out InfoWars because they

14  haven't been able to get information about InfoWars.

15          MR. BARNES:  That's correct, Your Honor.

16          THE COURT:  But that's taken care of

17  because it's subsumed within the concession, the broad

18  concession you made earlier.

19          MR. BARNES:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. BARNES:  And one additional component

22  of that, I had offered the plaintiffs Mr. Jones to be

23  the InfoWars guy.

24          THE COURT:  Say that once again.  I'm

25  sorry.

1          MR. BARNES:  I'm sorry, Your Honor.

2          THE COURT:  No, it's me.  It's me.

3          MR. BARNES:  I'm sorry.  Oh, I had offered

4    the plaintiffs prior to the deposition -- what happened

5    is on March the 11th, that Monday, the person who had

6    signed the interrogatories for InfoWars, LLC had -- I

7    can't disclose -- had a medical emergency that he

8    actually was hospitalized for.

9          THE COURT:  One of the exhibits was some

10   really generic statement by a doctor, but I saw that.

11         MR. BARNES:  I was trying to avoid --

12   there's strict HIPAA limitations on what I can say.

13         THE COURT:  I understand.

14         MR. BARNES:  But it was a serious

15   emergency.  So then I realized we needed to sub them

16   out.  So one thing that I offered plaintiff's counsel

17   was I said Alex Jones will be available on the 20th when

18   they were -- to be the InfoWars representative when they

19   were also doing other depositions.  They declined.

20         THE COURT:  They declined to have Alex

21   Jones be the corporate rep for InfoWars?

22         MR. BARNES:  For the -- on the -- yes,

23   Your Honor, on the 20th.  They said they wanted to go

24   forward on the 15th.  So I assumed, to be honest with

25   you, that they --

1             THE COURT:  Let me make sure I understand

2  it, not that this matters anymore in light of your

3  global concession you've made in this hearing.  You

4  offered when to make Alex Jones the corporate rep for

5  InfoWars and they declined?

6             MR. BARNES:  I believe on -- I believe it

7  was March the 12th, Your Honor.

8             THE COURT:  And why did they not want Alex

9  Jones to be the corporate rep for InfoWars?  He would be

10  the person most knowledgeable about InfoWars.

11             MR. BARNES:  That he would be available

12  for that on the 20th, and they wanted the corporate rep

13  to be deposed on the 15th.

14             THE COURT:  Which was the schedule.

15             MR. BARNES:  Absolutely.

16             THE COURT:  I see.  So you weren't

17  offering to make Alex Jones the corporate rep on the

18  date that had already been ordered for the corporate rep

19  deposition.  You wanted to postpone it and make him the

20  corporate rep on a later date.

21             MR. BARNES:  That's correct, Your Honor.

22             THE COURT:  So it was really the timing, I

23  guess I'll hear, to the extent it matters anymore on

24  that.

25             MR. BARNES:  Yes, Your Honor.

1            THE COURT:  Okay.

2            MR. BARNES:  And the way I interpreted it

3  is -- Rob Dew is the director of production for Free

4  Speech Systems.  He handles all the -- getting the

5  broadcasts together.  So I -- and he was already going

6  to be the person for Free Speech Systems.  So I thought,

7  oh, really what they want to get into is how did the

8  broadcast happen, what information was relied on.  So

9  that's why I had him designated as InfoWars.  And I was

10  the one that confirmed that it's only a paper entity.

11  It was formed many years ago originally with the

12  intentions of putting the website into InfoWars.  That

13  never functionally happened.  Then the divorce

14  proceeding started, so he's advised just to freeze

15  everything.

16            I think to the degree it makes it easier,

17  we'll probably just make InfoWars, LLC -- rather than

18  dissolve it, just make it a subsidiary of Free Speech

19  Systems.  That simplifies it across the board.  But

20  there was no goal or objective of trying to not have

21  someone available.  I thought they were looking at just

22  the production side, this is the same guy that knows the

23  production side, so I'll produce him.  And because he

24  was relying upon me for his information about InfoWars,

25  that was where he didn't go into detail on that aspect.

1  But there was no goal whatsoever to have someone

2  unavailable for those purposes.  It's just an entity

3  that only exists on paper, and all Alex Jones could say

4  is the exact same thing.  It exists on paper.  The

5  lawyers did it.

6              THE COURT:  Well, he'd say more than that

7  witness.  I mean, the part of the transcript I read, he

8  was clueless about InfoWars.

9              MR. BARNES:  Yeah, I mean, he has very

10 limited --

11             THE COURT:  The deponent just knew nothing

12 about InfoWars, so it was a pretty meaningless

13 deposition in terms of explicating InfoWars as an

14 entity.

15             MR. BARNES:  It only exists on paper, so

16 there's not -- like I didn't know what else --

17             THE COURT:  I understand, but he didn't

18 even really explain that, but okay.

19             MR. BARNES:  Oh, yeah.  That's because I

20 thought they were really having him there for the other

21 purposes.

22             THE COURT:  Okay.

23             MR. BARNES:  There was, again, no goal or

24 objective to in any way withhold information or anything

25 else.  So, again, we'll accommodate the plaintiffs

1  however it needs to be done.  I apologize and agree that

2  I didn't get it as fast as I would have loved to have

3  got it as fast done.  There was no desire to delay

4  anything.  My client produced everything in a timely

5  manner.  Just the lawyer review took time because of

6  unusual issues in the case.  That's it, Your Honor.

7          THE COURT:  Well, once -- you've already

8  kind of taken away any need for sanctions, it seems

9  like, because there's no need for the plaintiff to prove

10  anything.  The Court can assume on May 2nd everything

11  they allege is true, so --

12          MR. BARNES:  I agree, Your Honor.

13          THE COURT:  I'm sorry.  Go ahead.

14          MR. BARNES:  Yes, Your Honor.  I agree

15  that this is a pure question of law that's going to

16  impact cases and the freedom of press and the freedom of

17  speech across the country, what are the limits, what are

18  the First Amendment limits.  And I think from a legal

19  perspective it's best that it get addressed purely

20  assuming all the facts are true, because the real

21  question is, assuming all the facts are true, does this

22  state a claim given the First Amendment issues

23  implicated thereby?

24          THE COURT:  Well, here's a real good

25  question, I think.  Why don't you just withdraw your

1  motion to dismiss and frame this as a motion for summary

2  judgment?  This is a pure traditional motion for summary

3  judgment, not a no-evidence motion.  It's a traditional

4  motion for summary judgment that says assuming

5  everything in their pleadings is true, they cannot as a

6  matter of law proceed on this theory.  That's a motion

7  for summary judgment.  Why do we have this expedited --

8  the purpose of the anti-SLAPP motions are to stop

9  discovery, to protect people on their First Amendment

10 rights and not have to go through motions for summary

11 judgment, not have to do any -- well, not have to do any

12 discovery really other than specified unlimited

13 discovery.  But you've just basically made a concession

14 that said we didn't need to go through all we've gone

15 through in the last two or three months, and I

16 appreciate it; let's just go to a dispositive motion as

17 a matter of law.  That is not an anti-SLAPP motion.

18 That's a motion for summary judgment.  Do you see what I

19 mean?

20         MR. BARNES:  Yes, Your Honor.  I see it as

21 like in the federal system a 12(b)(6) motion to dismiss.

22         THE COURT:  But we don't have those.

23         MR. BARNES:  We don't, that's correct.

24         THE COURT:  Well, actually, we have a

25 newer sort of version, but that's not what you're

1  saying.  You're basically saying this is a traditional

2  motion for summary judgment; as a matter of law, they

3  cannot proceed.  The very argument Mr. Enoch made when I

4  granted some discovery, he said you shouldn't give

5  discovery because as a matter of law they can't proceed.

6  I wish I had thought of this question then or had it

7  suggested to me, but it seems like a pure simple motion

8  for summary judgment; let's just tee this up and

9  everybody can brief it and let's kind of give ourselves

10  a break.

11          MR. BARNES:  I see it as a pure motion to

12  dismiss.  In other words, I see it not as a summary

13  judgment motion but -- in other words, I see summary

14  judgment as we got through all the discovery, does the

15  evidence support whether there's a dispute as --

16          THE COURT:  No, but you could even do a

17  motion for summary judgment without any discovery.  You

18  can come in early on -- not a no-evidence motion, but

19  you can come in early on with a traditional motion -- I

20  get them all the time -- as a matter of law, we will

21  assume everything the plaintiff alleges in their

22  pleadings is true, what you just said today, as a matter

23  of law they cannot proceed with this case; we want a

24  final dispositive judgment dismissing the case as a

25  matter of law pursuant to this motion for summary

1  judgment.  You could have done that instead.  And we've

2  put everybody under the gun with all this discovery and

3  made everybody's life difficult, and now we're going to

4  really simplify it.  And I appreciate that, but why not

5  just have an MSJ hearing at your leisure?

6              MR. BARNES:  Because I believe that TCPA

7  is well suited to tee these kind of issues up.  In other

8  words, I think it was designed for it.  We have the

9  interlocutory appeal, so you get to go up and figure

10 out, let's have all the courts look at this just as a

11 matter of law.

12             THE COURT:  Well, that's a good point.

13 You don't get an interloc appeal if your MSJ is denied.

14             MR. BARNES:  Right.

15             THE COURT:  And that's your argument.  Now

16 you're going to trial on this case that you think even

17 when they -- even if they prove the case after trial, as

18 a matter of law they can't get a judgment, so --

19             MR. BARNES:  Right.  I want the appellate

20 food chain to -- well, I want everybody to make an

21 adjudication.

22             THE COURT:  That's a good observation,

23 just for the sake of judicial economy, should we try the

24 case if as a matter of law they can't proceed on this.

25             MR. BARNES:  Exactly, Your Honor.

```
 1                    THE COURT:  Okay.
 2                    MR. BARNES:  That's my goal.
 3                    THE COURT:  All right.  Good answer.
 4                    MR. BARNES:  Thank you, Your Honor.
 5                    THE COURT:  Sure.  Anything else your
 6  table wants to say?
 7                    MR. YOUNG:  No, sir.  The Court already
 8  covered everything and read everything, so I'm done.
 9  Thank you.
10                    THE COURT:  Okay.  Thank you.
11                    Back to you.  Kind of an O. Henry ending
12  here.
13                    MR. BANKSTON:  Well, yeah, everything's --
14  yeah, the situation's changed quite a bit in the last
15  20 minutes.  What I'll say, Your Honor, is that we hear
16  their concession.  If what I'm hearing is they're going
17  to bring a pure motion of law and that the facts as
18  alleged by plaintiff are not going to be contested and
19  that this isn't going to be a factual motion, this is
20  going to be a pure -- we're going to have a law school
21  exam kind of motion, that we're just going to talk about
22  the law, hearing that, that solves a lot of my problem.
23  It really does.  And with that, I think a big portion of
24  my component of my sanctions motion can go.
25                    I do believe that that would be -- that
```

1  solution would satisfy the same things that I'm asking

2  for you in this higher sanction, and so I don't -- I

3  think this could cure the problem without striking the

4  motion.  So I'm on a -- if I hear that concession and

5  that's what's happening and that we're not going to have

6  to be dealing with this huge amount of discovery we had

7  when responding to this motion, I think that eliminates

8  the prejudice I talked to you about.  So for that part,

9  that component of my sanctions motion, I think they've

10 effectively taken that off the table.

11             THE COURT:  I'm not understanding you're

12 saying, that component.  Your sanctions motion was to

13 strike or not to strike the motion to dismiss.

14             MR. BANKSTON:  Actually, there's one more

15 thing I requested.

16             THE COURT:  Okay.

17             MR. BANKSTON:  And that's attorney's fees.

18             THE COURT:  Ah.

19             MR. BANKSTON:  And you have to grant them.

20 The statute doesn't give you any leeway on this.  Now,

21 what you grant --

22             THE COURT:  I'm sorry.  I have to grant

23 attorney's fees on the anti-SLAPP motion.

24             MR. BANKSTON:  I was actually talking

25 about the motion for sanctions under 215, but yes, you

1  are correct that if they prevail on their SLAPP motion

2  you would have to grant fees, and permissibly if I was

3  to win.  But my affidavit in that motion sets forth the

4  fees that we've spent while doing this discovery.  And

5  what I'm hearing now is that that was entirely

6  pointless.  None of that that we just did for the past

7  two months is going to have any relationship to what we

8  do on May 2nd, and I have had to do all of that.

9           THE COURT:  Well, but it's going to --

10 ultimately your position is this case should not be

11 dismissed on May 2nd; I'm going to need discovery.

12 You've just had, I guess -- in light of the dramatic

13 change of strategy on the part of the defendants today,

14 you just had an open window into discovery early in the

15 case that you otherwise wouldn't have had if they had

16 taken this position two months ago.  So all of that

17 discovery inures to your benefit because you needed all

18 that anyway, right?

19           MR. BANKSTON:  No, that's well taken.

20 Right.  I do benefit down the road from that discovery.

21           THE COURT:  Yes.

22           MR. BANKSTON:  What I did there is

23 somewhat beneficial to me.

24           THE COURT:  So you might not have needed

25 to draft this motion for sanctions.  You might not have

1  needed to come here to Austin today.  But other than

2  that, everything you got was beneficial to you in the

3  case-in-chief.

4              MR. BANKSTON:  And I think that's really

5  well taken.  But at the same time, when weighing that

6  and understanding that, what we did over the past two

7  months on this incredibly compressed scale has caused us

8  to work in a way that we would not normally work.

9              THE COURT:  Well, maybe you could argue I

10 get overtime hours as an attorney; I get time and a half

11 for my hourly rate.  But other than that, it seems like

12 all the work you did in the last two months is stuff

13 you're going to have to do someday anyway.  Do you see

14 my point?

15             MR. BANKSTON:  I think a lot of that is,

16 but I don't think all of it is.  I think there were

17 things that were brought up in the motion to dismiss

18 that are now gone and off the table that I had to

19 develop discovery on that I wouldn't have really

20 necessarily gone too deep into in any form.  Honestly, I

21 don't care who runs InfoWars, LLC.  The only reason I'm

22 having to do that is because I've got to meet the

23 prima facie case that they're saying that I've got to

24 prove that InfoWars, LLC is involved.

25             THE COURT:  No, that's actually not true.

1  If you're going to get a judgment against InfoWars

2  ultimately, you're going to have to show that InfoWars

3  was responsible in part or had some control over the

4  communications that went out that intentionally

5  inflicted emotional distress.  So to impose liability on

6  any defendant, you have to show their responsibility for

7  the harm done, for the actions taken and the harm done.

8  So ultimately you do have to prove that.  So ultimately

9  you do need that discovery.  On any respondeat superior

10  case I ever tried I had to prove that, so you need that

11  discovery.

12          MR. BANKSTON:  I would remind -- one thing

13  I would remind is that I didn't need it in *Heslin*

14  because I didn't need to do discovery because I got

15  evidence in the public domain that met my burden.

16          THE COURT:  Okay.

17          MR. BANKSTON:  They contested that.

18          THE COURT:  Okay.

19          MR. BANKSTON:  When that got thrown in to

20  contest, all of a sudden I've got to start deposing

21  people and stuff like that.  That may have happened down

22  the road.  I don't know.  I'm not going to push hard on

23  that, right?  All I'm saying is that there were efforts

24  undertaken in discovery that was an unusual situation.

25  Not all of it is -- there were components of it that are

1  totally keyed to the motion to dismiss.  And again, I

2  think you're absolutely right; you can't look at those

3  fees and go, yep, all of those are good because, you're

4  right, some of that is beneficial.  Some of that would

5  be duplicated later anyway, so I believe that.  But I

6  think there has to be something awarded in terms of what

7  we've had to do.

8              I think you're right; the motion -- what

9  we did here today, I think there's no question, right,

10  that there has to be fees for that.  And, you know, if

11  you want to look at that affidavit and see if, you know,

12  there are some things in there and use your judgment of

13  saying, no, I think you would have had to already do

14  that, I think that would have already benefitted you,

15  you know, and you say, no, scratch that fee off, but I'm

16  just letting you know that affidavit is there for your

17  review.

18              THE COURT:  Well, no, I'm doing it right

19  now.

20              MR. BANKSTON:  Okay.

21              THE COURT:  I'm not going to have time to

22  go back and parse through your attorney's fees --

23              MR. BANKSTON:  Okay.

24              THE COURT:  -- hour by hour and decide

25  what I think should be awarded or not.  I'm sorry.  I

1 | have not been focused on your attorney's fees.  I've
2 | been focused really on the merits.  But now the last
3 | thing you want today -- and I understand that and
4 | respect your right to do that -- is you want me to award
5 | attorney's fees today for this motion for sanctions
6 | motion, right?
7 | MR. BANKSTON:  Correct.
8 | THE COURT:  And what in your affidavit
9 | segregates, which is the word they use on attorney's
10 | fees applications, the fees that are uniquely
11 | attributable to the effort made for this motion today as
12 | opposed to discovery that you're going to need anyway
13 | for which I think you've just conceded I don't get
14 | attorney's fees because I need that anyway in the
15 | case --
16 | MR. BANKSTON:  Right.
17 | THE COURT:  How am I -- what is the
18 | attorney's fee for today and the filing of the motion
19 | that you're now arguing was unnecessary, and what can I
20 | glean from the affidavit, very quickly, that would say,
21 | oh, that discrete work would never have needed to be
22 | done if it wasn't for their failure to make the
23 | discovery when they made it?
24 | MR. BANKSTON:  Absolutely.  The legal work
25 | is all itemized, and I'm just going to give you the one.

```
 1                    THE COURT:  Well, you have to do it right
 2   now.
 3                    MR. BANKSTON:  Yeah, I'm just going to
 4   give you the one.
 5                    THE COURT:  Let me open your motion.  It
 6   was filed --
 7                    MR. BANKSTON:  There were --
 8                    THE COURT:  Hang on.  Let me look at the
 9   affidavit on my screen.
10                    MR. BANKSTON:  It's Exhibit 12.
11                    THE COURT:  Any idea what page number that
12   would be in your 304 pages that were filed?
13                    MR. BANKSTON:  It's going to be the very
14   last thing.
15                    THE COURT:  The very last thing.  Oh,
16   that's easy.
17                    MR. BANKSTON:  It's the last exhibit.
18                    MS. HOGAN:  It's not, though, because of
19   the way it's --
20                    MR. BANKSTON:  Oh.
21                    THE COURT:  That's okay.
22                    MS. HOGAN:  Page 25.
23                    THE COURT:  It's not.  That's a
24   transcript.  That's a transcript.  I'm up to Page 27 and
25   it's still a transcript.
```

 1                    MS. HOGAN:  No, I'm sorry, on the reply,
 2  not on the motion.
 3                    THE COURT:  I'm looking at the wrong
 4  document.  This was attached to the reply you filed
 5  yesterday.
 6                    MR. BANKSTON:  Correct, Your Honor, yes.
 7                    THE COURT:  Yeah.  Well, that's why I
 8  didn't -- and that's another 339 pages.  Let me -- I
 9  read the reply, but, of course, I couldn't read 339
10  pages last night.  Well, I guess I could have, but it's
11  probably better to sleep a little.
12                    There we go.  Got it.  Let me look at
13  that.  I don't know how many pages it is.  What page do
14  I look at to try to glean --
15                    MR. BANKSTON:  That's the only one I want
16  to show you right now, is if you go to Page 3, the very
17  bottom of Page 3.
18                    THE COURT:  Okay.
19                    MR. BANKSTON:  And you'll see there the
20  last entry is plaintiff's motion for sanctions for
21  discovery abuse.
22                    THE COURT:  I spent 16 hours preparing
23  plaintiff's motion.  The reasonable value of this legal
24  work is $7200.  That's it, right?
25                    MR. BANKSTON:  That's for that one, yes,

1  Your Honor.  And I think that's the one that's

2  unquestionable.  I would suggest that --

3              THE COURT:  So you're asking me to award

4  $7200 today for having to file this motion that given

5  their change of position today was not necessary because

6  if they had done a Rule 11 stipulation with you doing

7  exactly what they did in court today, this would not

8  have been necessary.

9              MR. BANKSTON:  Exactly.

10             THE COURT:  That's your argument.

11             MR. BANKSTON:  And actually, the figure

12  wasn't -- it hadn't happened at the time of this

13  affidavit, but now I've spent two hours here today, and

14  so that would bring it up to 8100, so I would add $900.

15             THE COURT:  Let me calculate that rate.

16  What is that?

17             MR. BANKSTON:  There are a couple of other

18  things I want to talk to you about, but I think that's

19  the one that's concrete.

20             THE COURT:  I'm sorry.  16 hours.  So what

21  is your rate?  16 times what gets you to --

22             MR. BANKSTON:  450.

23             THE COURT:  I'm sorry?

24             MR. BANKSTON:  450.

25             THE COURT:  Okay.

 1              MR. BANKSTON:  So there's that, and that

 2  would be our request.  The other thing, Your Honor, is

 3  I'm on board with you 100 percent; any time I'm doing

 4  discovery, reviewing discovery, taking depositions,

 5  that's no cost.  But what does kind of -- I wonder about

 6  motion for expedited discovery, motion to compel under

 7  reporter's privilege, a response to an extension of

 8  time.  All of these pleadings would never have happened

 9  if we weren't doing the discovery.

10              THE COURT:  Well, but you've

11  accomplished --

12              MR. BANKSTON:  Now, if that is -- I think

13  I'd leave that up to you whether you think that's a

14  nexus enough to what's going on here.

15              THE COURT:  Well, maybe, but you've

16  accomplished a lot by getting them to make this

17  concession today.  By getting them to make this a pure

18  legal argument, you have simplified your life

19  tremendously for May 2nd.

20              MR. BANKSTON:  I think you're right about

21  that.

22              THE COURT:  And, you know, you should be

23  pleased about that.  I'm sure opposing counsel

24  congratulates you for that.  And, you know, he has

25  steered the ship in a dramatically new direction since

1 he became captain apparently.

2 MR. BANKSTON:  Your Honor, I think you're

3 right.  So with that being said, then I will say our

4 only request in terms of fees under 215 is for this

5 motion and for this appearance.

6 THE COURT:  All right.  I'll do one of my

7 favorite things now.  I feel like I'm going to be a

8 mediator for a minute here.  Let me see if I can talk to

9 the other side about that.  Thank you.

10 MR. BANKSTON:  Sure.

11 THE COURT:  I think that's a fair argument

12 that this is a dramatic change today and I respect that.

13 New counsel is taking charge as captain of the ship and

14 saying we need to stop this direction, let's just put it

15 on this course, make this a pure question of law, I

16 think we win or lose on that, and that certainly -- I

17 appreciate it because it simplifies my life

18 tremendously, and it's interesting.  It's a legal

19 argument that's really, really interesting, and so thank

20 you for that.

21 Having said that, that's new, and he

22 wouldn't have spent 16 hours drafting this motion for

23 sanctions if you had taken over sooner and had conveyed

24 to the plaintiff's side you need not worry about your

25 sanctions because we're just going to make this a pure

1    question of law on May 2nd.  And because he didn't know

2    that until today, none of us did, he spent about $8,000

3    worth of attorney time to do what we just did.

4              Why shouldn't he get an award of $8,000 in

5    attorney's fees for having to file this motion and come

6    down to get everybody on the other side to decide how to

7    redirect the ship?

8              MR. BARNES:  Yes, Your Honor.  I don't

9    think it would be an obligation of my client because

10   these were legal decisions that were being made, so I'll

11   pay it.  I'm happy to write a check for him and cover

12   the 8100 right out of my own pocket because it was my

13   decision to try to figure all this out, protect

14   everybody as best as possible, do it as expedited as I

15   could.  But I understand it did take him time, and so

16   for that reason I'm happy to pay it myself, Your Honor,

17   out of my own pocket.  But the client didn't do anything

18   to delay discovery or delay documents or do anything to

19   do this.  This was the lawyers making decisions.

20             THE COURT:  Well, I am supposed to decide

21   that, who's supposed to pay the fees on discovery,

22   you know.  And that's always a vexing problem because to

23   answer that question you have to get into

24   attorney-client privilege --

25             MR. BARNES:  Precisely.

1          THE COURT:  -- to know who made this more

2     difficult than it needed to be.  I've always wondered,

3     how am I supposed to do that when I can't ask those

4     questions?  But once again, you've kind of made it easy.

5     I should award attorney's fees -- or you concede that

6     the argument is logical for attorney's fees, and because

7     it is logical, if anyone should pay, it should be me

8     personally, and so simply assess $8,000 in attorney's

9     fees against you personally.

10          MR. BARNES:  Yes, Your Honor.

11          THE COURT:  Is that what you're saying?

12          MR. BARNES:  Yeah.  What I would request

13    is that I be allowed to pay it without it being an

14    order.  The only reason for that is it will then be

15    cited in Connecticut and I'll have to explain what

16    happened, and I don't want there to be a

17    misunderstanding of the order that the Court made a

18    determination that I acted in bad faith or anything like

19    that.  That's my only reason.

20          THE COURT:  I understand that.  And so --

21    well, we'll chat about who's going to draft that order

22    in a minute, but you don't want it to be used as a sword

23    suggesting that you did something in bad faith.  This is

24    really a dramatic strategic change to make this a pure

25    question of law and that makes it much more efficient

1  for everybody.

2              MR. BARNES:  Yes, Your Honor.

3              THE COURT:  All right.  Thank you.  Does

4  that conclude our record for today?

5              MR. BANKSTON:  Yes, Your Honor.

6              MR. BARNES:  Yes, Your Honor.

7              THE COURT:  All right.  We're now off the

8  record.

9              *(Discussion off the record)*

10             THE COURT:  We're back on the record.

11 You've had a collegial discussion about attorney's fees

12 in order to satisfy plaintiff's request for attorney's

13 fees.  I understand you've reached a Rule 11 agreement

14 obviating the need -- I've used that word a lot today

15 too, haven't I -- for the Court to issue an order.  You

16 may make your Rule 11 statement.

17             MR. BARNES:  Thank you, Your Honor.

18 Attorney Robert Barnes will pay 8100 to plaintiff's

19 counsel within ten days as part of our Rule 11 agreement

20 to satisfy that issue.

21             MR. BANKSTON:  Plaintiff's counsel is in

22 agreement with the offer.  I think we're good.

23             THE COURT:  Is that everything we need for

24 the record?

25             MR. BANKSTON:  I think so, Your Honor.

1             MR. BARNES:  That's all, Your Honor.

2    Thank you.

3             THE COURT:  All right.  That concludes our

4    record.  Thank you both very much.

5                      *(Court adjourned)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3  THE STATE OF TEXAS   )

4  COUNTY OF TRAVIS     )

5                I, Chavela V. Crain, Official Court

6  Reporter in and for the 53rd District Court of Travis

7  County, State of Texas, do hereby certify that the above

8  and foregoing contains a true and correct transcription

9  of all portions of evidence and other proceedings

10  requested in writing by counsel for the parties to be

11  included in this volume of the Reporter's Record, in the

12  above-styled and numbered cause, all of which occurred

13  in open court or in chambers and were reported by me.

14      I further certify that this Reporter's Record of

15  the proceedings truly and correctly reflects the

16  exhibits, if any, offered in evidence by the respective

17  parties.

18      WITNESS MY OFFICIAL HAND this the 5th day of April,

19  2019.

20
                        */s/ Chavela V. Crain*
21                      Chavela V. Crain, CSR, RDR, RMR, CRR
                        Texas CSR 3064
22                      Expiration Date:  12/31/2019
                        Official Court Reporter
23                      53rd District Court
                        Travis County, Texas
24                      P.O. Box 1748
                        Austin, Texas 78767
25                      (512) 854-9322
    *