# Exhibit 36

# 03-20-00008-CV

REPORTER'S RECORD
VOLUME 3 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-19-004651
COURT OF APPEALS NO. 03-20-00008-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/21/2020 3:48:25 PM
JEFFREY D. KYLE
Clerk

| | |
|---|---|
| NEIL HESLIN, | ) IN THE DISTRICT COURT |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) |
| VS. | ) |
| | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ALEX E. JONES, INFOWARS, | ) |
| LLC, and FREE SPEECH | ) |
| SYSTEMS, LLC, | ) |
| | ) |
| Defendants | ) 261ST JUDICIAL DISTRICT |

-----------------------------------------------

HEARING ON MOTION TO DISMISS AND

MOTION FOR SANCTIONS

-----------------------------------------------

On the 18th day of December, 2019, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

Proceedings reported by machine shorthand.

```
 1                      A P P E A R A N C E S

 2

   FOR THE PLAINTIFF:
 3
          MARK D. BANKSTON
 4        SBOT NO. 24071066
          WILLIAM OGDEN
 5        SBOT NO. 24073531
          KASTER, LYNCH, FARRAR & BALL
 6        1010 Lamar, Suite 1600
          Houston, Texas  77002
 7        (713) 221-8300

 8

 9 FOR THE DEFENDANTS:

10        T. WADE JEFFERIES
          SBOT NO. 00790962
11        LAW FIRM OF T. WADE JEFFERIES
          401 Congress Avenue, Suite 1540
12        Austin, Texas  78701
          (512) 201-2727
13
          MICHAEL BURNETT
14        SBOT NO. 00790399
          BURNETT TURNER
15        6034 W. Courtyard Dr., Suite 140
          Austin, Texas  78730
16        (512) 472-5060

17

18

19

20

21

22

23

24

25
```

# I N D E X

## VOLUME 3

### HEARING ON MOTION TO DISMISS AND MOTION FOR SANCTIONS

### DECEMBER 18, 2019

|  | Page | Vol. |
|---|---|---|
| Announcements......................... | 4 | 3 |
| Argument by Mr. Jefferies.............. | 9 | 3 |
| Argument by Mr. Bankston............... | 25 | 3 |
| Further Argument by Mr. Jefferies...... | 77 | 3 |

**DEFENDANTS' WITNESSES**

|  | Direct | Cross | Vol. |
|---|---|---|---|
| WADE JEFFERIES |  |  |  |
| By Mr. Burnett | 82 |  | 3 |
| By Mr. Ogden |  | 85 | 3 |
| MICHAEL BURNETT |  |  |  |
| By Mr. Burnett | 90 |  | 3 |
| By Mr. Ogden |  | 101 | 3 |

|  | Page | Vol. |
|---|---|---|
| Closing Argument by Mr. Bankston....... | 110 | 3 |
| Closing Argument by Mr. Jefferies...... | 118 | 3 |
| Court Takes Matters Under Advisement... | 121 | 3 |
| Adjournment........................... | 122 | 3 |
| Court Reporter's Certificate.......... | 123 | 3 |

```
 1                        EXHIBIT INDEX

 2

 3  DEFENDANTS'
    NO.   DESCRIPTION              OFFERED    ADMITTED   VOL.
 4
    1     Declaration of Mark         92         92       3
 5          Bankston

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS**

1

2          THE COURT:  We are on the record in

3    Cause No. GN-19-4651 styled Neil Heslin vs. Alex E.

4    Jones, InfoWars, LLC, and Free Speech Systems, LLC.

5    Would you announce your presence for the record

6    beginning with counsel for plaintiff.

7          MR. BANKSTON:  Mark Bankston on behalf of

8    the plaintiff.

9          MR. OGDEN:  And Bill Ogden on behalf of

10   the plaintiff.

11         MR. JEFFERIES:  Wade Jeffries and Michael

12   Burnett on behalf of the defendants.

13         THE COURT:  All right.  Thank you,

14   Counsel.  We just had a very collegial discussion before

15   going on the record to confirm our order of business in

16   this hearing.  This is a resumption of the hearing that

17   was initiated or started in October on defendants'

18   motion to dismiss.  It's the motion that was filed on

19   September 6th.  Plaintiff filed a response on

20   September 30th.  We had a hearing in October, following

21   which -- we also had a hearing on defendants' Rule 91a

22   motion to dismiss.  We all agree that is under

23   advisement.  There will be no additional argument on the

24   91a motion today.  We're here exclusively following the

25   order which I issued that was filed on October 18th,

1  order on plaintiff's motion for expedited discovery,

2  et cetera.

3          You've gone forth to do some discovery.

4  You're now back to resume argument on the motion to

5  dismiss.  And in addition, there is a new motion filed,

6  which is plaintiff's motion for sanctions and motion for

7  default judgment, all one motion, filed a week ago

8  Monday to which defendants filed a response late last

9  night and again early this morning both of which I've

10 read.  I've read both responses.  Of course, I read the

11 motion for sanctions.  I won't say I read every one of

12 the 600 and some-odd pages attached to the motion for

13 sanctions, but I read salient portions, particularly,

14 for example, Exhibit 24 was referenced by one of you

15 about the do not destroy letter that was actually sent

16 in another case, not in this case.  But I went and

17 looked at that because I thought you'd want me to be

18 prepared for that.  In addition, of course, I read the

19 *Brookshire* opinion which you both discuss in your

20 motions for sanctions.

21          So I've read this.  And now you wish to

22 make some brief argument.  You've agreed that you don't

23 need a lot of time for argument, but you do want to put

24 on three witnesses.  I was told by counsel for

25 defendants you want to put on basically just three

1    lawyer witnesses.  You, right, Mr. Jeffries?

2                    MR. JEFFERIES:  Correct.

3                    THE COURT:  And also Mr. Burnett and

4    counsel for plaintiff.

5                    MR. JEFFERIES:  Correct.

6                    THE COURT:  Just those three witnesses.

7                    MR. JEFFERIES:  Correct, Judge.

8                    THE COURT:  You wish to make a brief

9    argument on those motions.  We've agreed that because

10   the defendants have the burden of persuasion on the

11   motion to dismiss, which is the main motion, and because

12   the motion for sanctions is inextricably intertwined

13   with that, that the defendants will get the last word.

14                   And I understand plaintiffs filed

15   supplemental exhibits at 10:00 a.m. this morning.

16   You'll have to walk me through that because I had two

17   different family law cases this morning, so I've read

18   all of this in my spare time last night and on breaks

19   today.

20                   So with that, that's what we have before

21   us.  And I think I told you at the beginning because

22   these cases have been extensively argued -- the *Scarlett*

23   *Lewis* case was an IIED case also.  And I also have

24   *Heslin 1.*  And no one for a minute could think that if

25   this case is ever tried it's not going to be a single

1   case, Heslin against the defendants.  We discussed that

2   at the prior hearing too.  And because I've heard

3   extensive arguments on all these different claims,

4   *Heslin 1* being a defamation case, *Heslin 2,* the case

5   today, being an IIED case similar to *Scarlett Lewis*, I'm

6   going to be uncharacteristically quiet.  But I must say

7   many of the questions I posed and observations made in

8   these other cases are pertinent now and I don't -- I

9   just don't think I need to repeat them.

10                  So that's what I plan to do.  With that,

11  I'm going to turn it over to you.  And you've agreed

12  that with your witnesses and argument and everything you

13  will confine every bit of time you're going to use today

14  in an hour and 20 minutes for the defendants and an hour

15  and 20 minutes for the plaintiff.  Is that correct?

16                  MR. JEFFERIES:  That's correct, Judge.

17                  MR. BANKSTON:  Yes, Judge.

18                  THE COURT:  I will keep track of your

19  time.  I'm not going to micromanage how you use it.  But

20  we all agree that the defendants, getting the last word,

21  the final few minutes of this case this afternoon, you

22  will not get more than just a few minutes to get the

23  final word, five, ten at most.  Agreed?

24                  MR. JEFFERIES:  Agreed, Judge.

25                  THE COURT:  All right.  With that, I'm

1  going to keep track of the clock now, and you may

2  proceed.

3           MR. JEFFERIES:  Okay.  Judge, just

4  briefly, may it please the Court.  Again, Wade

5  Jefferies.  As you know, I'm relatively new to this

6  case.  Anyway, I read the transcript of the prior

7  hearing on motion to dismiss and the TCPA motion that

8  was back in October.  That was continued when the judge

9  ordered discovery under the TCPA motion.  So again, very

10 brief argument on that issue.  I did want to point the

11 Court and I provided your staff attorney with a copy of

12 a case.  I didn't see it cited in any of the pleadings,

13 but I do think it's relevant to our TCPA motion.  That's

14 the *Creditwatch, Inc. v. Jackson* case, Supreme Court of

15 Texas, decided February 25th, 2005.

16          THE COURT:  I believe that case has been

17 cited among all of the Sandy Hook cases.  It was cited

18 somewhere because I remember it.

19          MR. JEFFERIES:  Okay.  And, Judge, bear in

20 mind, I'm still playing catch-up on all four of these,

21 so I apologize if it's already been cited.

22          So again, the reason I wanted to bring

23 that up is when I read the transcript of the prior

24 motion that Mr. Burnett was arguing, you know, one of

25 his big pushes for the motion is, Judge, IIED is a gap

1  filler and isn't appropriate for Mr. Heslin because he

2  already has a defamation case on file in '18.

3              THE COURT:  For some conduct, but not for

4  some of the conduct alleged in *Heslin 2*.

5              MR. JEFFERIES:  That's correct.  However,

6  my reading of *Creditwatch*, et cetera was that's

7  irrelevant.  He has got a claim on file.  And according

8  to *Creditwatch*, again, you know -- basically *Creditwatch*

9  is a sexual harassment claim.  She tried to bring

10 various actions under the Human Rights Act Commission --

11             THE COURT:  But wasn't it the same conduct

12 for which they were being sued?

13             MR. JEFFERIES:  It was the same conduct.

14             THE COURT:  And isn't that distinction in

15 this case?  I told you I wasn't going to ask questions,

16 but here I am doing it anyway.  I guess I just can't

17 help myself.  You see my question.

18             MR. JEFFERIES:  I see your question, and

19 let me try to answer it to the best of my ability.

20             THE COURT:  And I think we discussed this

21 in October too.

22             MR. JEFFERIES:  Okay.  Yes.  And, Judge,

23 the reason I think there is a distinction is because

24 when she filed -- or excuse me -- when he filed his case

25 in '18, he knew of the conduct now complained of, okay?

1  So again, just because he had ability, regardless if

2  it's barred by the statute of limitations, he waited to

3  file, et cetera, if he had an alternate route that he

4  could have filed a lawsuit on, and even if he didn't do

5  so -- let's assume he didn't even file *Heslin* in '18,

6  okay?  Since clearly he's got a defamation cause of

7  action according to him that he's pled and he's argued,

8  whether or not he wins, loses, is barred by the statute

9  of limitations, at the end of the day it doesn't matter.

10  According to *Creditwatch*, just because other avenues may

11  be barred, that doesn't give him a right to file an IIED

12  claim.

13              THE COURT:  Well, let's assume it's all

14  one case because we all know if this case is ever tried

15  it will not be -- there will not be a *Heslin 1* trial and

16  then a *Heslin 2* trial.  There will be one *Heslin* trial.

17              MR. JEFFERIES:  It will be consolidated.

18              THE COURT:  Exactly.  I think we all know

19  eventually it will be consolidated.  I'm even getting

20  some affirmation signs from the plaintiff's side as I

21  say this.  So let's assume it's all one pleading.  Your

22  argument is because there are different discrete conduct

23  by the defendants, some of which cannot give rise to a

24  defamation case, even -- because there are some --

25  there's some conduct that does give rise to a defamation

1 case, no one can ever sue for IIED for separate and

2 discrete conduct, separate and discrete acts that are

3 not defamatory acts but instead could arguably be an

4 IIED claim.

5          MR. JEFFERIES:  Your Honor, I would

6 disagree that in this particular case they couldn't sue

7 under those things for defamation.  That being said, my

8 argument would be -- my follow-up argument would be the

9 acts they allege of in their petition as a matter of law

10 don't rise to the level of outrageousness.

11          THE COURT:  That's a different argument.

12          MR. JEFFERIES:  No, it is a different

13 argument.

14          THE COURT:  All right.

15          MR. JEFFERIES:  But again, sort of

16 addressing both, you're required to have an IIED case.

17 And specifically, again, in *Creditwatch* the Court states

18 we certainly understand judicial reticence to dismiss

19 claims like this one stemming from heinous acts, but

20 except in circumstances bordering on serious criminal

21 acts, we repeat that such acts will rarely have merit as

22 intentional infliction claims.

23          So, yeah, that's my only argument,

24 Your Honor.  I wanted to bring the cases.  It sounds

25 like the judge has already read it and is familiar with

1   it.  But yes, my argument would be under either

2   scenario, *Heslin 2* as a matter of law is not proper to

3   go forward and should be dismissed.  Okay.

4                    THE COURT:  Anything else on the motion

5   for sanctions you wish to say before we get --

6                    MR. JEFFERIES:  Oh, I --

7                    THE COURT:  -- before we go to evidence?

8                    MR. JEFFERIES:  Absolutely, Judge, just

9   briefly.

10                    THE COURT:  Go ahead.

11                    MR. JEFFERIES:  Particularly, the first

12   part of the motion for sanctions is basically that my

13   clients spoliated evidence, okay?  And I understand the

14   Court's read the file, et cetera, 615 some pages of

15   exhibits, but a couple of small things I do want to

16   point out to the Court that I think is very important.

17   One is I think that they seriously misrepresent

18   Mr. Zimmerman, who is the IT professional who testified.

19                    THE COURT:  I read your response that

20   there are all these backups --

21                    MR. JEFFERIES:  Correct.  Correct.

22                    THE COURT:  -- and the data is still

23   there.

24                    MR. JEFFERIES:  Correct.  And in fact, the

25   issue I've got and what I want to point out to the Court

1   is, you know, they basically quoted a very -- they

2   misquoted him in their motion for sanctions and I take

3   issue with that.  And they basically misquoted him

4   saying they took no efforts to secure their server prior

5   to April of this year when he made a -- when he did a

6   full backup of the email server.  It starts on Page 34

7   of the motion, Judge, for sanctions.  Here we go.  I'm

8   sorry.  It's on Page 31.

9              On Page 31 at the bottom about ten lines

10  out they state IT director Michael Zimmerman testified

11  that the first time Free Speech Systems, LLC took any

12  effort to preserve its email server was at the beginning

13  of this year during discovery in *Lewis* almost a year

14  after it's been sued, and then they cite to his

15  deposition.

16             That is just a false misrepresentation to

17  the Court.  His deposition testimony, which is in the

18  618 pages, but if you look starting on Page 39, the

19  question asked is, Question by Mr. Ogden:  Earlier you

20  testified that the email backup was done in January of

21  2019, correct?

22             Answer:  January, February, sometime

23  earlier this year.

24             Question:  At no point between April of

25  2018 and that time were steps taken to preserve any

1  evidence?

2          His answer:  Periodic backups of the email

3  system were done frequently.

4          Okay.  Why then would you need to build a

5  backup other than the periodic backups?

6          His answer:  Searching on the server

7  itself is very time intensive.  With 9.6 million emails

8  or 9.3, somewhere in that range, it is a lot more

9  effective to pull that over to a different system than

10  to perform the searches on the system.

11          Question:  So the backup that was done

12  earlier this year, that was just for the availability to

13  help you search all these --

14          Effectively, yeah.

15          Okay.

16          So, again, it's clear from the transcript

17  what he did was he created a copy of their email backup

18  in order to more efficiently try to find these emails.

19          THE COURT:  It's easier to search.  I

20  understood.

21          MR. JEFFERIES:  Okay.  Yes, they're

22  representing in their motion that he spoliated the

23  evidence, so I think that's an important point to make.

24          They then go -- they also indicate in

25  their motion, and I'm sure you've read it in

1　Mr. Zimmerman's affidavit, that from time to time

2　computers need to be repurposed.  And Mr. Zimmerman even

3　testified that when that happened he would in fact

4　reload a new operating system and new program files onto

5　those new computers, okay?  Well, obviously the

6　follow-up question was asked, and that's addressed in

7　Mr. Zimmerman's affidavit, that the employees at Free

8　Speech Systems, which is the parent company that owns

9　InfoWars, so whether you call it Free Speech or

10　InfoWars -- the employees all have portable hard drives

11　where the data is kept.  So the mere fact that you'd go

12　when you've got an aging computer or a hard drive or

13　something that happens to that computer and you

14　repurpose that computer or even replace that computer,

15　there's no evidence there whatsoever of any data loss or

16　spoliation.  Based on Mr. Zimmerman's affidavit, it's

17　clear they use external hard drives that still exist.

18　Again, no evidence of spoliation.  I think that's

19　critical.

20　　　　　　　They then talk about that we deleted

21　various data from internal chat systems that the

22　employees used to communicate.  There are two that are

23　referenced in this case, Your Honor.  The first one is

24　called Slack messaging system.  And again, that's the

25　interim.  And the second one is Rocket.Chat.  Okay.  And

1  again, Mr. Zimmerman's affidavit makes clear after his

2  deposition, after I was involved in the case and I met

3  with him, he's still able to access the Slack data.  So

4  none of that's been destroyed.  That is still available

5  and recoverable, so we don't have a spoliation issue

6  there.  Likewise on RocketChat, same thing, all the data

7  has been preserved.

8              So, again, on the spoliation claims,

9  Your Honor, I just want to address there is no proper

10  evidence before the Court that in fact any spoliation

11  has occurred.  The last issue on that is they argue that

12  because the YouTube video archive has been deleted -- or

13  is no longer available to my client, that that somehow

14  constitutes spoliation.  Again, it's my understanding --

15  and, in fact, Mr. Zimmerman's affidavit states clearly

16  that everything that was uploaded to YouTube, Free

17  Speech Systems or InfoWars still has on their servers,

18  so that data is still available.

19              Furthermore, regarding their argument

20  regarding spoliation that we were somehow negligent or

21  intentionally allowed data to be destroyed when we

22  didn't do a backup of Facebook and some of the other

23  third-party accounts before this new platform, again,

24  *Brookshire* is clear.  For spoliation to occur, one of

25  the things the Court should look at is to determine

1  whether or not that evidence is available from the

2  third-party source.  So we've got the YouTube.  That's

3  clear from Mr. Zimmerman's affidavit.  As far as

4  Facebook, Twitter, et cetera, my guess is once an

5  issue -- a subpoena is issued to those third companies,

6  that that is going to be there.

7           As the Court knows, in 2019, once data has

8  sort of been uploaded onto the Internet, it rarely goes

9  away for good.  So I'm confident that it's going to be

10  found; and therefore, spoliation shouldn't apply.  So

11  briefly I just wanted to address all the issues, Judge.

12           I will now call Mr. Burnett to the stand.

13           THE COURT:  Well, before you do that, you

14  might want to address -- and they get to argue first

15  before you start calling witnesses.

16           MR. JEFFERIES:  Okay.  Fair enough.

17           THE COURT:  So I'll let them do that.

18           MR. JEFFERIES:  Okay.

19           THE COURT:  But you addressed the

20  spoliation.  What you didn't address that was

21  disconcerting to me is the -- my order says that Free

22  Speech Systems must produce a corporate

23  representative -- this is on October 18th, the order --

24  who is prepared to testify about the following topics.

25  And the first one is the sourcing and research for the

1  videos described in plaintiff's petition.  And my

2  reading of this indicates that corporate rep wasn't

3  prepared to discuss any of that, was just completely --

4  and I'm sorry to pick on your co-counsel at the table,

5  but some of the questions suggested I didn't understand

6  I was supposed to do this.  And that is a --

7                    MR. JEFFERIES:  Yeah, and --

8                    THE COURT:  That to me struck me as a

9  massive failure to communicate.  I don't know why it

10 happened, but I found it very disconcerting since the

11 order was so specific about that.

12                    MR. JEFFERIES:  Understood.

13                    THE COURT:  And that isn't spoliation;

14 that's just declining to follow a court order and

15 produce the discovery that's ordered.

16                    MR. JEFFERIES:  I understand.

17                    THE COURT:  Do you see what I mean?

18                    MR. JEFFERIES:  I understand completely,

19 Judge.

20                    THE COURT:  All right.

21                    MR. JEFFERIES:  And let me respond to

22 that.  First of all, Mr. Burnett had nothing to do with

23 that.  I said first of all -- first of all, I'm sure the

24 Court has read in their motion for sanctions and for

25 default judgment that Mr. Barnes was terminated the

```
 1   night before those depositions.  Robert Barnes.
 2                   THE COURT:  Yes.
 3                   MR. JEFFERIES:  Okay, okay.
 4                   THE COURT:  But Mr. Burnett was at the
 5   hearing in October --
 6                   MR. JEFFERIES:  He was at the hearing, but
 7   Mr. --
 8                   THE COURT:  -- and when I issued this
 9   discovery order, right?
10                   MR. JEFFERIES:  That's correct,
11   Your Honor.
12                   THE COURT:  I just don't think the
13   discovery order could be any more clear.  It's at the
14   bottom of Page 1.  It's just like clear as can be what
15   you're supposed to do.
16                   MR. JEFFERIES:  Correct.
17                   THE COURT:  So why wasn't it done, is my
18   question?
19                   MR. JEFFERIES:  I can't answer that.  It
20   should have been done.  I don't think any fault goes on
21   Mr. Burnett.  Again --
22                   THE COURT:  Well, it's somebody's fault.
23   I think we can agree it's somebody's fault and that part
24   of the order was not complied with.
25                   MR. JEFFERIES:  I agree, Judge.
```

```
 1                    THE COURT:  Do you agree?

 2                    MR. JEFFERIES:  I agree.

 3                    THE COURT:  I appreciate that.

 4                    MR. JEFFERIES:  I agree with that, Judge.

 5    There's no way to argue around that.  If I could I

 6    would.  I may could give it a best shot, but you're

 7    right.  I mean, the reality is he was unable to answer

 8    the questions at the deposition.  The transcript is

 9    clear on that point.

10                    THE COURT:  Well, good lawyers fall on

11    their swords --

12                    MR. JEFFERIES:  Okay.

13                    THE COURT:  -- or have their clients fall

14    on their sword.  So the order was not complied with.

15    Now the question is:  What is the remedy for that?

16                    MR. JEFFERIES:  Sure.

17                    THE COURT:  And their motion for

18    sanctions, even if I don't go with them on spoliation,

19    you basically just conceded, well, the plaintiff is

20    right, they didn't comply with the court order under

21    4(a), for example --

22                    MR. JEFFERIES:  Correct.

23                    THE COURT:  -- and so a sanction must flow

24    from that, right?  What should it be?

25                    MR. JEFFERIES:  Sure.  Well, first of all,
```

 1  it definitely should not be the death penalty sanction.

 2  I do want to point out this is the first motion for

 3  sanctions in this case.

 4              THE COURT:  I understand.

 5              MR. JEFFERIES:  I know there were some

 6  others in --

 7              THE COURT:  And I read *Transamerica* many

 8  years ago and I went back -- thank you for making me do

 9  it -- and reread *Brookshire* last night at home.

10              MR. JEFFERIES:  Okay.  Okay.

11              THE COURT:  It was very interesting.  It's

12  a long opinion.

13              MR. JEFFERIES:  Yes.

14              THE COURT:  So I read that and I

15  understand.  You know, the end sanction, that there's a

16  continuum and courts should really consider -- if

17  there's something less draconian on the continuum that

18  will accomplish the same purpose, I'm supposed to do

19  that.

20              MR. JEFFERIES:  Right.

21              THE COURT:  I'll pick on the other side

22  about that.  So it's not default.  What is it?

23              MR. JEFFERIES:  I would argue, Your Honor,

24  that the appropriate sanctions would be a ruling that as

25  a result of that they meet their *prima facie* burden

1    under the TCPA.

2                 THE COURT:  Well, wouldn't that mean you

3    wouldn't have any basis to appeal it then?  In other

4    words, if I deny the motion -- so that means I should

5    deny the motion to dismiss.  If they had met their

6    *prima facie* burden, the motion should be denied.

7                 MR. JEFFERIES:  Well, Your Honor, we still

8    have under the TCPA motion -- if your decision regarding

9    sanctions is a result of the corporate rep not being

10   prepared, under the TCPA rules, even if you say because

11   of that they've met their *prima facie*, I've got the

12   right to argue affirmative defenses.

13                THE COURT:  I get that.  And that gets

14   back to your legal arguments --

15                MR. JEFFERIES:  Bingo, correct.

16                THE COURT:  -- that you believe are

17   dispositive.

18                MR. JEFFERIES:  Correct.

19                THE COURT:  I understand your position.

20                MR. JEFFERIES:  Okay.  Thank you.

21                THE COURT:  And I appreciate that.

22                MR. JEFFERIES:  Okay.  Sure.  Thank you.

23                THE COURT:  So really I could do much of

24   what -- like what was done in *Heslin 1* --

25                MR. JEFFERIES:  Correct.

```
 1              THE COURT:  -- because under Rule 215 one
 2   can presume that had that discovery been complied with,
 3   had -- I guess it was Rob Dew who didn't have a clue how
 4   to answer the questions, and so that corporate rep
 5   couldn't answer the questions and therefore you did not
 6   comply -- the defendants did not comply with 4(a) of my
 7   order, I -- that would lead to an order much like I did
 8   in Heslin 1, which is -- under Rule 215, you can presume
 9   that they met their burdens.  Exactly what you just
10   said --
11              MR. JEFFERIES:  Right.
12              THE COURT:  -- can go in the order.
13              MR. JEFFERIES:  The Court clearly has the
14   authority to do that, correct, Judge.
15              THE COURT:  Okay.  Thank you.
16              MR. JEFFERIES:  And again, you know, my
17   argument is -- and just to follow up and then I'll be
18   done with my argument.  It should be the last prong of
19   their motion.  You know, what do you do?  They attempt,
20   I think extremely inappropriately, to bootstrap in other
21   cases into this case.  I think under the Brookshire
22   opinion it's clear that it's the Court's responsibility
23   to look at the conduct of this case, certainly not the
24   conduct that occurs out in the Connecticut lawsuit, but
25   in this case and this case alone.  As you know,
```

1  you know, in *Brookshire* and it's Texas policy that

2  absent, you know, lesser sanctions moving forward, you

3  want to try the case on its merits, not by default.

4              So now I understand that they get to

5  argue, and then I'll put on my evidence?  That's the way

6  we're going to proceed?

7              THE COURT:  Yes.

8              MR. JEFFERIES:  Okay.  Nothing further at

9  this point, Judge.

10              THE COURT:  Thank you.  Do you wish to

11  make an opening argument?

12              MR. BANKSTON:  Yes, Your Honor.  As part

13  of the first part of it I'm going to present some slides

14  to you to sort of get us up to speed.

15              THE COURT:  Just argument slides?

16              MR. BANKSTON:  Yes, exactly.  PowerPoint,

17  I think, yes.

18              THE COURT:  Are these things that were

19  attached to the motion or referenced in the motion?

20              MR. BANKSTON:  These are visual aids of

21  the exhibits that I filed this morning.

22              THE COURT:  Ah, the ones you filed at

23  10:00 a.m. this morning.

24              MR. BANKSTON:  Correct.

25              THE COURT:  Okay.  That's probably a good

1    thing to walk me through since it came in so recently.

2                    MR. BANKSTON:  Exactly.  Exactly.

3                    THE COURT:  All right.

4                    MR. BANKSTON:  So I'm going to have

5    Mr. Ogden bring up the PowerPoint.  I'm hoping that's

6    going to be up on your screen.

7                    THE COURT:  Yes, and it should be on the

8    screen on counsel table too for their convenience.

9                    MR. BANKSTON:  Your Honor, may it please

10   the Court.  The elephant in the room is Robert Barnes.

11   We heard from counsel -- it was asked, why didn't this

12   get done?  Why weren't they prepared?  And the obvious

13   answer to that is because Robert Barnes was totally

14   responsible for that.  The lawyers who were signed as

15   attorney of record in this case did not have

16   responsibility for that.  They didn't do that.

17                   THE COURT:  Which lawyer appeared with the

18   corporate rep for Free Speech Systems?

19                   MR. BANKSTON:  That would be

20   Mr. Jefferies.  Mr. Jefferies --

21                   MR. JEFFERIES:  *(Stood up)*.

22                   THE COURT:  It's not your turn.  You'll

23   get to speak again when it is your turn, but they're

24   burning their time now.  Go ahead.

25                   MR. BANKSTON:  That night before the

1 deposition, I got an email from Mr. Jeffries saying that

2 he would be appearing and not Mr. Barnes and that he was

3 then taking over control of the case.  So from that

4 night apparently when Mr. Jeffries had discovered that

5 Mr. Barnes had completely botched discovery is when

6 Mr. Barnes was officially terminated, or so we're led to

7 believe, and Mr. Jefferies --

8             THE COURT:  So what you're saying is I can

9 infer that Mr. Barnes is the one who did not adequately

10 prepare a corporate rep.

11             MR. BANKSTON:  I believe that's true.  I

12 don't think there's any way you can infer anything else.

13 I don't believe that you're going to have testimony from

14 either of these counsels that they spent time with any

15 of the deponents or did anything in terms of discovery.

16             What we had here is you remember we had

17 Mr. Barnes back in *Lewis* who was *pro hac*.  He didn't

18 come do *pro hac* in this case because of what happened in

19 our case, plus things that continued to happen over that

20 summer.  He didn't want to come back in front of this

21 Court.  So instead he found some local counsel who would

22 just put the names on his discovery and that's what

23 happened.

24             So I want to walk you through the history

25 of how this came to happen and how it's been so harmful

1   to the plaintiffs to have an attorney who is not an

2   attorney of record, is actually the person who's doing

3   everything and is now beyond this Court's reach, because

4   one of the important things about this motion,

5   Your Honor, is you can't sanction Bob Barnes because

6   he's not here.  He's never been before the Court in this

7   case.  Let's go to the first slide.

8              THE COURT:  And the other thing is courts

9   are supposed to determine whether it's the client or the

10  lawyer who is to be sanctioned.

11             MR. BANKSTON:  Exactly.  And I think

12  that's going to raise a very interesting question on

13  just who was Robert Barnes in this case, right?  We're

14  going -- the first thing I want to show you is an

15  affidavit from March 22nd.

16             THE COURT:  I also saw the most recent

17  affidavit filed this morning by opposing counsel, at

18  7:30 this morning, an affidavit from Alex Jones saying

19  Barnes was never an employee.  He was an independent

20  lawyer who appeared *pro hac*, as you say, and he's no

21  longer in that role.

22             MR. BANKSTON:  He's never appeared *pro hac*

23  in this case, though.

24             THE COURT:  Well, I know.  No, but he did

25  previously.

1          MR. BANKSTON:  In a different case, sure.

2          THE COURT:  What I'm saying is I read that

3    affidavit, and he was just a lawyer appearing in court.

4          MR. BANKSTON:  He was a -- they don't --

5    they've called him plenty of times on the record general

6    counsel before.  They no longer want to call him general

7    counsel.  The reason they don't want to call him general

8    counsel is because they're afraid that's going to get a

9    sanction of the party.  Their hope is that they can get

10   a sanction against Robert Barnes.

11         THE COURT:  Well, whoever said that

12   besides Robert Barnes himself?

13         MR. BANKSTON:  Mr. Jones has said that

14   multiple times.

15         THE COURT:  Oh, in deposition.

16         MR. BANKSTON:  Yeah, in both deposition

17   and in the real world too has said that multiple times.

18         THE COURT:  And of course, we'd have to

19   understand when he said it he knew what that meant and

20   that that somehow meant that whenever he said something

21   he was speaking for the company as opposed to an

22   independent counsel.

23         MR. BANKSTON:  Sure.  My only point on

24   this, though, Your Honor, is that a party cannot escape

25   sanctions by saying, oh, the actual responsible party is

1    this lawyer who never appeared in the case and was never

2    before the Court and you should sanction that person and

3    not the client or the current attorneys of record.

4            THE COURT:  Well, but they've never made

5    that argument.  And in fact, opposing counsel just

6    graciously conceded we didn't comply with your order,

7    let me just fall on that sword right at the beginning;

8    we did not; and therefore, some sanction can be levied

9    for discovery, but it shouldn't be dispositive; it

10   should be something along the lines of what I did in

11   *Heslin 1*, which is actually, I thought, a fairly

12   gracious admission.  Why wouldn't that be enough?

13           MR. BANKSTON:  Well, let's -- kind of

14   going back to -- we're getting to the end of my

15   presentation now.

16           THE COURT:  I have a way of doing that.

17           MR. BANKSTON:  I'll jump there for you,

18   which is to say that if a party continually has orders

19   from the Court to do something and it continually does

20   the same thing over and over again, if you're just going

21   to use the same sanction again, if you're not going to

22   elevate your sanction, there's no deterrent effect

23   whatsoever.

24           THE COURT:  So what your argument is I've

25   already sanctioned him in *Heslin 1;* I need to do

1    something more in *Heslin 2* because *Heslin 1* wasn't

2    enough.

3              MR. BANKSTON:  Especially considering what

4    happened in *Lewis* and what happened in *Lafferty.*  Yes,

5    the Court can consider that conduct, and we'll get into

6    that as well.  That's a whole different legal thing

7    we'll unravel.  But to kind of -- like I said, to get to

8    the end of what I'm saying is that the prejudice that's

9    happened to plaintiffs is you'll remember that the first

10   time the plaintiffs were able to have an opportunity to

11   discover facts about their case, because the TCPA puts

12   everything on hold, was in *Heslin 1* about a year ago.

13   We missed that opportunity because they did this

14   erroneous appeal.  We tried again in *Lewis* to get facts

15   about the case, couldn't do it there.

16             THE COURT:  Well, you did get them in

17   *Lewis*.  In fact, you got a deposition in *Lewis*.

18             MR. BANKSTON:  I got a deposition.  But

19   one of the things you'll remember is you never ruled on

20   that motion for sanctions because they took it out from

21   under you because they were in a bad spot.  And had that

22   hearing gone to conclusion, I think you would have

23   agreed with me that that discovery is absolutely

24   worthless, which is something you're also going to

25   conclude with me as I go through my presentation today

1    about what was given to me in this case, because what

2    was given to me in this case in terms of documentary

3    evidence is exactly what was given to me in *Lewis*.

4              THE COURT:  Is there a case in Texas where

5    a previous order for sanctions on another completely

6    separate case -- it is separate; these are different

7    cases; you're the one who filed two different Heslin

8    cases -- can be used to walk up the ladder of sanctions

9    in *Transamerica* and do something more draconian because

10   something in another case didn't work?

11             MR. BANKSTON:  Yes.  Again, skipping to

12   the end, we're going to -- I'm going to get to two cases

13   for you.  And what those two cases are, they're

14   actually -- if you think about it, they're cases you see

15   all the time, and you see them especially common in

16   federal court where you have very vexatious litigants,

17   which as the Court says that is presented with evidence

18   that a certain plaintiff has attempted a certain

19   fraudulent act, a fraudulent type of -- and in the case

20   that we're going to talk about it's about obtaining

21   fraudulent temporary restraining orders and the

22   plaintiff had a pattern of doing that through these

23   courts, and in several prior cases they had done bad

24   conduct, and that was presented to the Court.

25             THE COURT:  But that wasn't a discovery

1  sanction.

2          MR. BANKSTON:  No, that actually wasn't a

3  215 sanction, right.  Right.

4          THE COURT:  Exactly.  I'm talking about is

5  there law in Texas about basically the *Transamerica*

6  analysis under 215, how you're supposed to pick a

7  sanction that is appropriate to put the plaintiff -- put

8  the discovering party in the position they would be in

9  had the discovery been provided, which is what I think I

10  did in *Heslin 1* and would accomplish the same thing in

11  *Heslin 2*.  Is there a case in Texas where you would go

12  to a more draconian sanction in discovery under Rule 215

13  because of another order in another case that wasn't

14  enough to get the party providing discovery to comply?

15          MR. BANKSTON:  That is my belief,

16  Your Honor.  Yes, that's how I read that case.

17          THE COURT:  What's the case?

18          MR. BANKSTON:  Well, first of all -- I

19  don't have the -- I'm going to get to it in the

20  presentation.  I have a case name.  I don't have it

21  memorized off the top of my head.

22          THE COURT:  It's the federal court case

23  about the vexatious litigant.

24          MR. BANKSTON:  No.  I have a Texas case

25  about that as well.

1           THE COURT:  Oh.

2           MR. BANKSTON:  I do have a Northern

3  District of Texas case, but I have a Texas case that's

4  another one of these that is basically -- and again, not

5  looking at it right now, I'm not totally positive it's

6  215, so I may need to look closer at that.

7           THE COURT:  Okay.

8           MR. BANKSTON:  But in terms of the test

9  that you're given under *Cummings* and *Transamerica* and

10  all this, it's not that you actually have to test a

11  lesser sanction, but you must consider whether a lesser

12  sanction would be effective.  And in considering whether

13  that lesser sanction would be effective, you can

14  consider whether that party has had sanctions against

15  them in the past in front of the court that we're

16  talking about that has failed to make them act

17  appropriately.

18           THE COURT:  But, Counsel, we're not even

19  yet on the merits of the case.  We're simply at the

20  threshold motion to dismiss stage.

21           MR. BANKSTON:  Yeah.

22           THE COURT:  And the only reason for the

23  specified and limited discovery was so that you could

24  make your *prima facie* showing.

25           MR. BANKSTON:  You're absolutely right.

1          THE COURT:  If by failure to produce the

2    discovery, counsel's concession here today, that meets

3    that burden, that gives you everything.  In other words,

4    you didn't even need this discovery.  If they would have

5    just stood up in October and said we will agree that

6    every bit of this discovery will meet the burden that

7    the plaintiff has to make a *prima facie* showing, we

8    wouldn't have even needed discovery.

9          MR. BANKSTON:  I see what you're saying,

10   but I powerfully disagree with that.

11          THE COURT:  Why?

12          MR. BANKSTON:  Okay.  Because the

13   discovery that I was granted, right, isn't -- I haven't

14   learned anything about my case yet that is in their

15   possession, anything of real substance, and I'm entitled

16   to that right.  And now for two years is basically how

17   long it's going to take me to even begin that, because

18   they're going to walk away from here not giving me

19   discovery.

20          THE COURT:  It will be when we come back

21   from the appellate courts and we're back to move toward

22   a trial.

23          MR. BANKSTON:  And everybody's memory is

24   faded, all the qualities of the evidence has been

25   degraded.  They have used the TCPA as a sword to

1  successfully defeat my ability to discover my facts

2  about my case for more than two years, which I have a

3  strong belief are way worse than what I have in the

4  petition that's before you.  But that's the petition I

5  have to go up on now.  I have to go up on appeal on that

6  petition.  And I don't have what I was entitled to from

7  discovery.

8               THE COURT:  But one of the other --

9               MR. BANKSTON:  And worse off, I'm

10  prejudiced for the entire future of this case.

11               THE COURT:  Then one of the other --

12               MR. BANKSTON:  And counsel --

13               THE COURT:  Excuse me.  Let me get a

14  question out if you don't mind.  Then one of the other

15  sanctions could be they are prohibited from presenting

16  any evidence about sources, for example.  If they don't

17  show it to you now and they don't give it to you until

18  two years from now, this case -- this motion could be

19  held under advisement for the time when it comes back on

20  the TCPA decision -- assuming you prevail on the TCPA

21  decision and it comes back for trial, this court or the

22  trial court could then decide, you know, we're going to

23  issue more sanctions; you are prohibited, defendants,

24  from offering any evidence about sources because, for

25  whatever reason, you didn't give it to them in response

1  to a clear order telling you to do so.  Why wouldn't

2  that be a sanction that would work for you for trying

3  your case?

4           MR. BANKSTON:  I think that's very worth

5  your considering.  I'm not going to tell you that that's

6  not a good sanction or that that's not somewhere you

7  should end up.  I think, again, the very -- one of

8  the -- the very last slide you're going to see from me

9  today is 215(b)(2) and all the list of the things you

10 can do, and that is one of them.  I think another one

11 that's interesting to look at is having now completely

12 spiked the discovery process for me, you can limit their

13 ability to do discovery in the future, and that's

14 another thing you can do that isn't merits based and

15 isn't a default.

16          THE COURT:  But it doesn't have to be done

17 now, does it?

18          MR. BANKSTON:  No, not all of your order

19 needs to take effect right now.

20          THE COURT:  In fact, the only part that

21 really must occur now is the part which affects the

22 decision on the motion to dismiss.

23          MR. BANKSTON:  I would say that the other

24 purpose of your order needs to punish the offender and

25 deter similar conduct from other litigants; and

1   therefore, there must be a punitive effect that takes

2   effect.

3                    THE COURT:  Well, you can have attorney's

4   fees for wasted time preparing for depositions that were

5   useless.

6                    MR. BANKSTON:  And this last one in

7   *Heslin,* that wasn't -- the way it was done in *Heslin*

8   wasn't enough of a deterrent because that was put to the

9   end of the case.

10                   THE COURT:  But my point is that all --

11                   MR. BANKSTON:  They didn't care.

12                   THE COURT:  My point is that this ratchet

13  of sanctions can be imposed by the trial judge when and

14  if this case comes back.  Because you're right on the

15  motion to dismiss; if it's determined ultimately you're

16  right and it comes back for trial, this whole list of

17  sanctions can be given based on the very argument you're

18  making now.  Now we're two years down the road.  Now I

19  can't get the discovery that should have been provided

20  in response to the order from October, and now I'm

21  prejudiced by getting it two years late.  I want an

22  order that prevents the defendants from offering any

23  evidence about sources.

24                   MR. BANKSTON:  I think that's true.

25                   THE COURT:  Okay.

1           MR. BANKSTON:  Here's a couple of hang-ups

2    I have about that.  One is that it's going to be way

3    easier for me to get that order from you now than it is

4    coming back here six, eight, more than a year later --

5           THE COURT:  But the --

6           MR. BANKSTON:  -- and have you try to

7    understand what happened and the same effect.

8           THE COURT:  The posture is the same.  The

9    order is just -- it's only a two-page order.

10          MR. BANKSTON:  No, I understand the

11   posture is the same.  I'm saying that if I come back in

12   here, I'm not going to have a judge in front of me who

13   is as familiar with -- that's going to be year-old facts

14   to you, and I'm going to basically have to reargue the

15   motion again and going to have to go through the entire

16   steps.  I just think from a judicial economy standpoint

17   it would be nice to get one order now that also lets the

18   parties know what's going to happen in the case.

19          THE COURT:  Well, maybe, but you need to

20   understand that trial judges like the judge who's going

21   to try the case to be able to put their imprimatur on

22   things because it determines how they're able to try the

23   case.

24          MR. BANKSTON:  Right.

25          THE COURT:  So one thing I don't like to

1   do is hamstring a colleague who's going to have to

2   conduct this jury trial with rulings -- by embedding

3   rulings that constrain the trial judge.  For example,

4   you want a default on *Heslin 2*, which is only as to IIED

5   claims.  So if it goes up and comes back, the Court of

6   Appeals is not going to rule on the default.  We know

7   that, right?

8              MR. BANKSTON:  Yes.

9              THE COURT:  You do know that.

10             MR. BANKSTON:  Yes, they're not going

11  to -- right.  I wouldn't figure so.  That wouldn't be

12  how the procedure would work out.  Right.

13             THE COURT:  Right, because it's not a

14  final appealable because it's only as to liability is

15  what you're asking for, right?

16             MR. BANKSTON:  Exactly.

17             THE COURT:  So we'd have this

18  interlocutory order embedded in there with a default on

19  liability only.  The Court of Appeals is not even going

20  to look at it.  They're only going to look at the motion

21  to dismiss ruling.  Then it comes back, and we've

22  embedded -- so we don't get any advice from the Court of

23  Appeals whatsoever.  And it comes back to a trial judge

24  who's got a liability finding on part of the case but

25  not on the other, not on the first part, not on any of

1    the defamation allegations.

2              MR. BANKSTON:  Except I will move for that

3    upon return, though, obviously.

4              THE COURT:  Well, but then you could move

5    for that upon return along with considering a ruling on

6    this motion for liability on the IIED.

7              MR. BANKSTON:  No, I take your -- I take

8    your meaning.  I do.

9              THE COURT:  I'm just trying to think about

10   this in part practically.

11             MR. BANKSTON:  I mean, that's where I'm

12   kind of worried too, is that I know based on -- I mean,

13   based on what their strategy has been in this case is to

14   make sure you're not the trial judge, and I know that

15   there's a substantial chance you won't be.

16             THE COURT:  There's a good chance there

17   will be a better one than me.

18             MR. BANKSTON:  Maybe so, right?  But I'm

19   going to have to have some judge try to make sense out

20   of what your proceedings were here, and that's why I'd

21   like to get to as final or as close to done as I can.  I

22   do -- I understand exactly what you're saying, though.

23             THE COURT:  Well, that's why this

24   transcript maybe could be helpful to somebody who's

25   trying to glean what it is I was thinking to navigate

1    this.  And, you know, the pathway is how do we get to a
2    jury verdict and how do we get to a final judgment one
3    way or the other.
4              MR. BANKSTON:  The only thing I would say
5    about that is if you are thinking like I'm hoping you
6    will after I'm done with my presentation that there is a
7    possibility that you might default these defendants is
8    that you come to the conclusion that there is no reason
9    to force us to spend more legal fees on this.  There's
10   no reason for us to go up on a year or more appeals on
11   both parties if this case needs to be defaulted.
12             Now, I do take your meaning that if you're
13   looking at a lesser sanction than default, there might
14   be benefit from you from your standpoint of saying I'm
15   going to grant certain things as to the TCPA motion and
16   attorneys' fees, but I'm going to wait upon remand to
17   handle the rest of the motion.  I can understand that.
18             THE COURT:  But you kind of framed an
19   argument for them at the beginning when you're
20   suggesting it's really Mr. Barnes who's responsible for
21   this train wreck, and then why should I default his
22   client on liability because a lawyer -- you're arguing a
23   lawyer malfeasance -- or a lawyer colossal mistake.  Let
24   me say it that way.
25             MR. BANKSTON:  You couldn't have given me

1   a better opportunity to start my presentation.

2                    THE COURT:  Okay.

3                    MR. BANKSTON:  All right.  So here we go.

4   So now I'm going to actually dive into it.  The first

5   thing I want to show you is a March 22nd, 2019 affidavit

6   from Alex Jones.  You notice that there was an affidavit

7   today sort of pushing him -- distancing himself from

8   Robert Barnes.

9                    THE COURT:  I read that.

10                   MR. BANKSTON:  They've already tried this.

11  They've already thrown Mr. Barnes under the bus.  Right

12  around the time just a -- just probably about a week

13  before Mr. Barnes showed up into this court for the

14  first time they filed this affidavit in *Lafferty*.  And

15  the thing was that *Lafferty* and *Lewis* were running about

16  neck and neck, but Connecticut's anti-SLAPP is a little

17  more generous in timelines, so it was slightly behind

18  *Lewis*.

19                   THE COURT:  Was a deposition taken of

20  Alex --

21                   MR. BANKSTON:  No, no deposition taken.

22                   THE COURT:  You've got to let me get my

23  questions out.  The court reporter is going to be so

24  frustrated with us.

25                   MR. BANKSTON:  Sure.

1          THE COURT:  When I ask a question, please

2    let me finish it before you answer.  I guess you

3    answered it.  No deposition has been taken of Alex Jones

4    in any case other than the *Scarlett Lewis* case and

5    *Heslin 2*.

6          MR. BANKSTON:  With regard to cases filed

7    about the Sandy Hook litigation, yes, Your Honor.

8          THE COURT:  Thank you for that.

9          MR. BANKSTON:  This affidavit was put at

10   the same point that we were at with *Lewis* where they had

11   not met deadlines to produce documents, all right?  So

12   at the same point as basically the eve of the *Lewis*

13   hearing, this affidavit is put forward, which basically

14   says from Mr. Jones I instructed Mr. Barnes to do these

15   things; I instructed him to comply; I thought that he

16   had complied; I had no idea; I've instructed this other

17   attorney, Norman Pattis up in Connecticut, to take over

18   and take care of everything in the case.

19          THE COURT:  And this affidavit is part of

20   your 600 and some-odd pages attached to this motion?

21          MR. BANKSTON:  No.  It's actually one of

22   the supplemental exhibits filed this morning.

23          THE COURT:  Filed this morning.  Thank

24   you.

25          MR. BANKSTON:  Okay.  In that hearing that

1  followed that affidavit -- that's the other exhibit

2  that's in my supplemental exhibits.  Mr. Norman Pattis

3  got up in front of the Court and said these things.  He

4  said I was in an unstainable position where I was being

5  given direction by Mr. Barnes to do things that I

6  thought were unsupportable and the client needed to know

7  that.  The client has taken those steps.

8             All right.  The client is aware of

9  Mr. Barnes' behavior and what's going on and is actively

10  throwing him under the bus in Connecticut in order to

11  avoid a sanctions ruling.

12             He says:  I'll be candid.  I consulted my

13  lawyer, who's Willie Dow, and I described the situation

14  to try to find out what my ethical obligations were, and

15  he basically told me I was in a very precarious

16  situation.  So I took the steps that I needed to take to

17  protect myself, and the result is that Mr. Barnes is no

18  longer in the picture and I am it.

19             Next slide.  He said he's no longer

20  corporate counsel and no longer has any role in

21  directing this litigation because my view and my

22  representation to the client was, based on what I saw in

23  this case, if they continued to follow Barnes' advice,

24  they'd suffer adverse consequences.

25             Next slide.  You'll also remember around

1   this time is when Mr. Enoch stopped showing up to oral

2   hearing in our cases and then he started to withdraw.

3   Mr. Pattis was candid with the Court about why that was.

4   He said that Enoch is local counsel in Texas to the

5   Jones defendants and Mr. Barnes is *pro hac vice* counsel

6   and there's been a struggle there.  Candidly, Judge,

7   what blew this into crisis mode for me and led me to

8   consider withdrawing is I received a phone call and had

9   my first communication with Texas counsel on Monday.

10                  Next slide.

11                  THE COURT:  And you're reading from Norm

12   Pattis again?

13                  MR. BANKSTON:  Yes, exactly.

14                  THE COURT:  In the Connecticut case.

15                  MR. BANKSTON:  In the Connecticut *Lafferty*

16   case.  And so as you'll remember, Mr. Enoch left the

17   case and then there was just Mr. Barnes here in Texas.

18                  THE COURT:  I do remember.  Let me tell

19   both sides now you've each used 20 minutes, so you're

20   each now down to one hour per side for every question of

21   every witness and every argument you're going to make.

22                  MR. BANKSTON:  Thank you, Your Honor.

23                  THE COURT:  Go ahead.

24                  MR. BANKSTON:  The last thing that

25   Mr. Pattis said to assure the Court is Mr. Barnes has

1  been eased out of the picture and will no longer be

2  involved in the case.  Of course, Mr. Barnes didn't

3  mention any of this to us when he showed up to our

4  hearings in Texas.

5            And if you could go to the next slide.

6            And what Mr. Pattis said was obviously not

7  true.  And this, as you see, is of the videos that they

8  produced to me.  All since the time of that affidavit

9  Mr. Barnes has been appearing on InfoWars as general

10  counsel discussing with Mr. Jones, threatening me,

11  making a big scene, basically acting like this is all a

12  circus and not taking it seriously.  There's an episode

13  saying that we're going to respond to the Sandy Hook

14  show trials.  This is all a period where they're not

15  taking anything seriously.

16            They were able to get the extension in

17  *Lafferty*, though.  So they were able to have until June

18  in *Lafferty* to be able to comply with the discovery

19  orders.  Mr. Barnes then is still now running everything

20  even though the client's already thrown him under the

21  bus.  And Mr. Barnes at that point produces to the

22  plaintiff's counsel, which I'm also in the sharing

23  agreement on, a bunch of new documents.  And at this

24  point they'll have produced a total in *Lafferty* of

25  53,000 documents, all right?  But *Lafferty* has a much

1   wider discovery scope than we did.  They're getting

2   these things called Google Analytics and marketing

3   data --

4                    THE COURT:  Are they --

5                    MR. BANKSTON:  -- and all sorts of stuff.

6                    THE COURT:  I'm sorry.  I interrupted you

7   that time.  Are they in a motion to dismiss stage or are

8   they doing final trial discovery?

9                    MR. BANKSTON:  No, I'm getting that right

10  now.  They're actually still technically procedurally

11  dealing with the anti-SLAPP.  It's on appeal right now.

12                   THE COURT:  They still get discovery while

13  it's on appeal?

14                   MR. BANKSTON:  Well, no.  You'll see in a

15  minute as I get through these slides, okay?

16                   THE COURT:  Okay.

17                   MR. BANKSTON:  This is right now about May

18  to June.  They're still waiting to answer their

19  discovery, okay, in *Lafferty*.  They've been given one

20  extension past *Lewis*.  So they actually do.  They end up

21  producing some documents.  The anti-SLAPP at this point

22  is still waiting to get ruled on.  All right.  They

23  produce the documents, these 53,000 total at this point.

24  What I'm sure you've read in the motion is at that point

25  plaintiff's counsel up in Connecticut discovered that

1    what we've been given had child pornography in it.

2    Okay.  At this point Mr. Barnes is still managing

3    things.

4              So right after this one before the

5    *Lafferty* hearing, I want to show you the other final

6    supplemental exhibit I filed, which is a short video.

7    And this is three minutes that I'm going to show you

8    from a video that was published by Mr. Jones directly

9    after this.  And it's in the PowerPoint.

10             Yes, next slide.  This was a video

11   Mr. Jones published directly after the production of the

12   meeting, basically a call where plaintiff's counsel

13   called up Mr. Jones and said we found this, let's set up

14   a meeting with the U.S. Attorney's Office and we'll get

15   this figured out.

16             Mr. Jones did not react well to this.  I'm

17   going to show you this video, and I'm going to warn you

18   this video is incredibly profane.  And it's

19   performatively so.  And what I think you're going to see

20   about this video is at this point in the proceedings

21   Mr. Jones is not taking these proceedings seriously.  He

22   is using them as a world wrestling entertainment type

23   event and is placing everybody at risk for it and is at

24   this point even obviously still not taking discovery

25   seriously.  So let me show you this video and we'll talk

1    about what happened afterwards.

2                  *(The video was played)*

3                  THE COURT:  Who is that?

4                  MR. BANKSTON:  The gentleman laughing at

5    the end is Mr. Jones' attorney in Connecticut.  That's

6    Norman Pattis who, just like Mr. Barnes, started to make

7    appearances on InfoWars with Mr. Jones.

8                  THE COURT:  He's the one who made the

9    statement that Barnes had put him in a compromised

10   position?

11                 MR. BANKSTON:  Exactly.  Exactly.  And in

12   fact, what you'll also learn is that none of those

13   statements that he was making to the Court appeared to

14   be true because Mr. Barnes was still completely involved

15   and did all the discovery.

16                 In fact, if you go to the next slide, the

17   very next thing that happens is on June 19th, 2019,

18   Judge Bellis in Connecticut strikes their motion to

19   dismiss.  And that discussion was about how Mr. Barnes

20   had botched that discovery.

21                 THE COURT:  I'm sorry.  That discussion

22   was -- say it slower.

23                 MR. BANKSTON:  That discussion was about

24   how Mr. Barnes had botched discovery.

25                 THE COURT:  Okay.

 1              MR. BANKSTON:  In that hearing -- you'll
 2   see some of it quoted in our motion and there's a
 3   transcript for it.  Judge Bellis says, look, even if you
 4   disregard that video we just saw, even if you disregard
 5   that child pornography that was produced in discovery,
 6   even if you disregard that there was an affidavit from
 7   Mr. Jones submitted that wasn't actually signed by
 8   Mr. Jones in that case, that even if all of that is
 9   disregarded, they had fundamentally and egregiously
10   violated the discovery orders with total disrespect.
11   And the Court said I'm striking everything and got
12   really close -- considered doing a default and said I'm
13   not going to do a default now, but I can't make this any
14   more clear; if you keep this up, you're done; you are
15   not taking this lawsuit seriously.
16              Next slide.  The next thing that happens
17   is we get the discovery -- the discovery -- the case
18   comes back in *Heslin 1*.  And that's the case where they
19   had done no discovery at the time and then did no
20   discovery before.  So here you end up granting our
21   motion and ended up giving the findings that you did and
22   giving $25,000 in attorneys' fees.
23              THE COURT:  Well, you didn't make a move
24   after it came back on remand to have that order for
25   discovery enforced in any other way, as I recall, in

1  *Heslin 1.*

2             MR. BANKSTON:  Yeah, we had a discussion

3  about that in the court about how if the appeal had

4  never happened, which fundamentally it didn't because

5  there was no jurisdiction, upon filing the motion for

6  sanctions and then to the point of the hearing, I

7  wouldn't have filed anything else, so there was nothing

8  intermittent in there, but we had a pending motion for

9  sanctions.  But one of the things you did in that case

10  was say, all right, we're only going to do attorneys'

11  fees for the attorneys' fees that were spent in *Heslin 1*

12  in 2018 during that period, so you kind of limited it

13  there.

14             But essentially we got an order there that

15  had the two basic -- the first most basic elements of

16  215.  And we had the award of attorneys' fees, which

17  were mandatory.  And then we had an evidentiary finding,

18  which is not exactly what 215 contemplates, because 215

19  actually contemplates an evidentiary finding for the

20  purposes of the action.  Now, your order did it for the

21  purposes of the motion, which I think -- I don't have

22  any authority for it but I think is still fine.  I think

23  you're totally empowered to do that.  Because I think

24  215 kind of gives you a catch-all, you can do whatever

25  is just.

1          THE COURT:  Well, obviously I decided that
2    I was empowered to do it --
3          MR. BANKSTON:  To do it, sure.
4          THE COURT:  -- because I did it.
5          MR. BANKSTON:  Because you did it,
6    exactly.
7          THE COURT:  And I haven't changed my mind
8    since then.
9          MR. BANKSTON:  And I feel like we're going
10   to be fine at the Court of Appeals on that too.  So in
11   other words, those are remedies I think you can take
12   today without hesitation.  But again, to me, that's the
13   floor.  If you have a defendant who's acting this way,
14   who is not responding to any forms of deterrence
15   whatsoever in the case, has now seriously compromised
16   the state of the evidence, there must be some sort of
17   elevated sanction here.  So I'd like to walk through a
18   little bit --
19          THE COURT:  Which can occur now or on
20   remand to prepare for trial.
21          MR. BANKSTON:  Either way, yes.  And we'll
22   get to how that plays out at the very end here.  I do
23   want to go through the allegations of what discovery
24   abuse was committed in this case because not much of it
25   has been talked about.  So the first -- the first point

1  here is the corporate representative.  And you're on

2  that.  I don't think I need to say another word about

3  that.  The thing that's egregious to me is that he's the

4  same one who wasn't prepared last time --

5            THE REPORTER:  Can you slow down?  It's

6  getting really hard.

7            MR. BANKSTON:  I'm very sorry.

8            THE COURT:  Yeah, you really can't get a

9  record the way you're going.

10            MR. BANKSTON:  Yeah, I understand.  We

11  know that last time Mr. Dew wasn't prepared, and he

12  wasn't prepared this time, and it was by the same group

13  of counsel.  They absolutely knew what their duties

14  were.  This is an intentional act of discovery abuse.

15  But the one that didn't -- that wasn't addressed in

16  their response.  They didn't even answer it.

17            The next one is that Mr. Jones didn't

18  respond to written discovery in good faith.  If you look

19  at the actual written discovery responses that are given

20  in this case, they're absurd.  They say we can't

21  identify any of the employees who worked on this, we

22  don't know any of our sources, we can't -- we don't

23  basically know anything.

24            THE COURT:  But can't you just hamstring

25  them at trial, and wouldn't that be your dynamite at

1  trial?  They can't even defend themselves on sources.

2  They can't even tell the jury there are sources if they

3  don't produce them in discovery.  That could be one of

4  the remedies.

5          MR. BANKSTON:  I think -- I think it helps

6  to have -- the problem is I've been on these cases long

7  enough and they're going to go forward and they're going

8  to have a new answer.  And yeah, I'm going to be able to

9  impeach them at trial, but I'll have been denied

10 discovery on it the entire time, and they're going to

11 have a new answer and somebody's going to let them

12 testify to it.

13         THE COURT:  Well, even when they come up

14 with the source, does anybody seriously think the source

15 is going to explain, you know, the basis for saying that

16 children weren't killed?

17         MR. BANKSTON:  Oh, I think it's much more

18 than that actually, Your Honor.  I think not only can

19 you use who their sources were and what it was to prove

20 that they acted recklessly false, but I think once I

21 start discovering who those sources are and what they

22 did together, I'm going to discover other things that

23 they did to these parents.

24         THE COURT:  Well, and that's the point.

25 If you finally get -- when you finally get the

1   discovery, your point is it's going to be an even better

2   trial for me, even if I get it late, because I'm going

3   to be able to use those sources to show the absurdity of

4   their statements is what you're saying.

5              MR. BANKSTON:  I don't see why you at this

6   point would have any faith that I'm getting any

7   discovery on this point ever.  They don't have it, and

8   they will not give it.  And no matter what this Court

9   does they don't give it.

10             THE COURT:  Well, and then you get back to

11   the point that you can't give it to the jury then.  If

12   you don't give it during discovery and if you don't give

13   it when it's reasonably available to you, which is

14   really now, right now, you can't -- and you can't

15   explain why you waited so long to give it, you can't use

16   it at trial.

17             MR. BANKSTON:  I think that's a good

18   order.  I think that's good.

19             THE COURT:  Okay.

20             MR. BANKSTON:  I think that needs to be

21   firm.  You know, it needs to be not that I'm suddenly

22   ambushed at trial by new explanations of what these

23   things are when, when the discovery was fresh and

24   available, they didn't make the efforts to go do it.

25             THE COURT:  Okay.

1          MR. BANKSTON:  And now they've had four

2   times to do it.

3          Move to the next one.

4          The next one is they broke their own

5   Rule 11 agreement.  Never mentioned it.  They just

6   didn't respond to that.  They made a Rule 11 agreement

7   about the discovery and about the production of *Lewis*

8   documents.  They just simply ignored it.  Mr. Burnett

9   made that agreement and then Mr. Barnes apparently did

10  not follow through on it.

11         Next one.  They relied on the deficient

12  *Lewis* production for the request for production.  So in

13  the request for production in this case I got 600 new

14  documents, but they were all duplicated ten times or

15  more.  So basically I got about 50 new emails that had

16  never been produced in *Lewis* for some reason.  But for

17  everything else, they just said go look at *Lewis;* it's

18  in there somewhere.  And that production, as explained

19  through our motion, is entirely deficient in ways that

20  can be proven.

21         THE COURT:  The *Lewis* production.

22         MR. BANKSTON:  Exactly, right.  And not

23  only was it obviously not complying at the time it was

24  given, deposition testimony in this case has revealed

25  some more bad things about it, particularly the next

1   one.

2           Defendants can't account for tens of

3   thousands of missing emails.  They have no response to

4   this in their motion.  There is an affidavit up in

5   *Lafferty* given around the same time as that other stuff

6   saying that there's 80,000 emails with Sandy Hook in the

7   title.  In our case we didn't get as much discovery as

8   *Lafferty* because it was broader.  So we got somewhere in

9   the neighborhood of 15,000 to 25,000 emails or total

10  documents.  Given the way they produced it, it's a

11  little hard to give you a total number, but it's right

12  around that neighborhood.  *Lafferty* got about double.

13  But there's about 80,000 emails that we know have Sandy

14  Hook in the title.  And we know they don't collate out

15  the duplicates because Mr. Zimmerman testified in both

16  cases they give out duplicates.  Mr. Zimmerman testified

17  there's 80,000 emails with Sandy Hook on them somewhere,

18  and nobody knows what the story is.  And there are these

19  tens of thousands of missing emails now that have no

20  explanation from anybody on the record.

21          Next one.  They didn't issue a litigation

22  hold.  There's zero.  That did not happen.  And in fact,

23  you would know if it did happen.  If there was a written

24  letter that has a litigation hold for Sandy Hook related

25  materials, we'd have it because it would be

1   non-privileged and it would have the words Sandy Hook in

2   it.  That never got produced.  In fact, what they

3   testified happened was that around the time of the *Lewis*

4   discovery they sent out an email to the company that

5   said, hey, everybody, look for documents.  They never

6   did a litigation hold.

7                   We talked about them preserving their

8   email servers.  And Mr. Zimmerman testified exactly like

9   what we said.  The first time a mirror image of the

10  server was created was in January of 2019.  Before that

11  the server was periodically overriding itself, so it was

12  periodic backups.  So take, for instance -- let's say it

13  does it once every month.  There's emails on the server

14  at the time this lawsuit started and for months and

15  months afterward.  But say an employee decides he wants

16  to take those emails off and delete those emails.  The

17  moment that the server backs itself up the next time

18  that email is lost forever.  There was never any attempt

19  to make a solid preservation of the documents that the

20  defendants had in their possession.  So none of the

21  defendants' servers were imaged.  There was no

22  litigation hold sent throughout the entire company.

23  This is grossly negligent behavior.

24                   THE COURT:  So you would argue under the

25  *Brookshire* case a spoliation instruction that those

1  emails would be damaging to the defendants' defense.

2           MR. BANKSTON:  Yes.  And I would also

3  argue by extension I would get a finding, and I'm not

4  sure exactly how you'd want to word it, but that would

5  accomplish the same thing for the purposes of this

6  motion saying that had that discovery been produced it

7  would have been favorable to the plaintiff for the

8  purposes of this motion, this motion to dismiss.

9           Next one.  The erasure of computers.  This

10 is interesting because --

11          THE COURT:  And you agree we have to have

12 an evidentiary hearing.  Looking at *Brookshire*, a judge

13 has to decide as a matter of fact whether it was

14 intentional, whether they intentionally spoliated.

15 That's what --

16          MR. BANKSTON:  Yes.

17          THE COURT:  That's what the majority

18 opinion talks about.  There are some exceptional

19 circumstances for negligent destruction, but it has to

20 be when it's out -- essentially outcome determinative

21 information.

22          MR. BANKSTON:  Exactly.

23          THE COURT:  Otherwise, it has to be

24 intentional destruction.

25          MR. BANKSTON:  Right.  And that's --

1          THE COURT:  And you believe this record

2    before me now proves intentional destruction of these

3    emails; ergo, I should rule now that they get a

4    spoliation instruction when this case is ultimately

5    tried to a jury?

6          MR. BANKSTON:  Yes, I believe that.  And I

7    think it's well beyond the emails.  So I think the

8    emails is actually maybe the smallest component of that.

9    And I do think intentional as used in *Brookshire*

10   *Brothers* is a bit of a term of art because it also

11   encompasses a reckless disregard of such severity that

12   you showed absolutely no care about trying to preserve

13   anything.  I think that can do it too.  But I don't

14   think you have to worry about that because there's

15   plenty of intentional here.

16          First let's talk about the computers,

17   all right?  These were definitely erased.  There's no

18   question about that.  What is being said now that was

19   never said before is there exists apparently these

20   portable hard drives, all right?  There's apparently a

21   set of portable hard drives that contain information

22   that was at one time on these computers, maybe put on

23   new computers.

24          We asked for all sources of information.

25   We questioned the witnesses about exactly what was

1  searched.  This is brand new.  I can guarantee you

2  there's no testimony about them searching portable hard

3  drives or anything like that.  This just seems to be an

4  invention out of thin air.

5           And if you look at how they left the

6  employees, if you can go to the next one -- oh, let's

7  talk about Slack real quick too.  Okay.  So here's

8  another thing where there was some obvious destruction

9  going on here.  First of all, you have people testifying

10 that nobody at the company has access to Slack anymore.

11 Slack was a messaging service used before RocketChat.

12           THE COURT:  Slow that down.  It was used

13 before -- because the court reporter is hearing these

14 terms for the first time.  I've read them.  Slack was

15 the service used before --

16           MR. BANKSTON:  RocketChat.  When the

17 testimony was made, it was -- the implication was given

18 that Slack and RocketChat are successive to each other;

19 in other words, the moment Slack ended they started

20 using RocketChat.  Apparently from the affidavits today

21 there is a third instant messaging system that was never

22 identified in interrogatories because there were

23 specific questions about that, never testified about.

24 And now there's this third messaging system that's still

25 unidentified and we don't know anything about it,

1  whatever was in use between April 2016 and August 2018,

2  right, which means that it was in use at the time the

3  lawsuit was filed and for many months afterwards.  And

4  we have no information about what it is, and certainly

5  nothing was ever done to search it.

6           More importantly, the Slack system, they

7  now say in an affidavit that all the data to it is

8  preserved.  Well, if that's true, we have an email

9  notification showing there were Sandy Hook Slack

10 messages.  Why don't we have those Slack messages,

11 right?

12          There's nothing that they're saying about

13 this that makes any sense.  It does not add up.  And

14 it's our belief that they don't have anything in Slack

15 that is going to be responsive to anything.  They don't

16 have the ability to search it.  Zimmerman also told us

17 they don't have the ability to search RocketChat.  They

18 said that they had to leave employees to do that for

19 themselves.  According to Zimmerman in testimony, that

20 was the only thing that still existed.  Now apparently

21 there's an entire preservation of Slack somewhere that

22 should contain responsive messages that wasn't searched

23 and wasn't turned over and a whole new messaging system.

24 And none of these were effectively managed or even cared

25 about by counsel.

1          The next is where the defendants allowed

2   individual employees to search their own files and

3   devices.  And here to allow the very people who are

4   potentially implicated by the conduct to manage the

5   discovery is clearly not sufficient.  So there's just

6   more on top of their total disregard for care.

7          Keep going.  The social media accounts.

8   This is interesting to me.  Imagine you were an

9   insurance company defending a case for something

10  involving an auto accident and there was a vehicle that

11  was in a storage facility that was set to be destroyed,

12  or say you were paying to have a vehicle stored

13  somewhere and you decided to stop paying your bill and

14  the company gave you a warning that said, hey, if you

15  don't pay your bill, if you don't follow our rules,

16  we're going to destroy the car.

17          THE COURT:  I should let you know you've

18  now used 40 minutes.

19          MR. BANKSTON:  Okay.

20          THE COURT:  Go ahead.

21          MR. BANKSTON:  They say we're going to

22  destroy the car.  If that defendant does nothing, they

23  have intentionally spoliated that evidence, and that is

24  exactly what happened here with social media accounts.

25  And again, these accounts, when you talk about evidence

1 that underlies the claim, this is huge because this is

2 how they communicate as an online media empire.  And the

3 argument that I hear is, well, maybe it's not lost.  I

4 mean, possibly these companies backed it up and they

5 still have it a year now later; they still saved all of

6 our data.  No evidence of that and no attempts by

7 defendants to even try to locate any of it.  What we

8 know is that those accounts were terminated and they do

9 not exist anymore.  That information is not available.

10           The last one.  The videos.  And this I

11 just don't understand, Your Honor.  We had unequivocal

12 testimony, and you can see it from two different

13 witnesses, from Jones and Dew, saying the videos are

14 destroyed, not even God knows what all the videos are,

15 we don't have them, YouTube destroyed them and we lost

16 them.  Now Michael Zimmerman is saying, no, everything

17 we've ever uploaded to YouTube we actually have.

18           THE COURT:  They say they backed up every

19 one of the videos.

20           MR. BANKSTON:  Every one.  Well, if that's

21 true, then all of my meet and confer letters when I

22 said, hey, what about this video, this video, this

23 video, and this video, where I have the specific titles

24 and I know they have Sandy Hook in them, why don't I

25 have those videos, right?  There's something very

1  confusing about the video situation.

2             THE COURT:  But you're suing over certain

3  videos, aren't you?

4             MR. BANKSTON:  I am.

5             THE COURT:  Aren't you talking about the

6  very same videos that you already know exist and in fact

7  you've even seen?

8             MR. BANKSTON:  Oh, and I know there's way

9  more.  My client has seen way more in the past.

10            THE COURT:  I see.  So you're looking for

11  more and you might even augment your pleadings with --

12            MR. BANKSTON:  Oh, absolutely.

13            THE COURT:  -- additional videos for

14  different dates falling within the statute of

15  limitations and you believe they're out there.

16            MR. BANKSTON:  Two things on that.  One is

17  that additional videos could also bolster the continuing

18  course of conduct sort of thing.  But yes, it's our --

19  from what we were able to tell from how InfoWars has

20  been written about over these years and from my client's

21  own memory, we know that this video list is not even

22  close to complete.  And therefore, the very evidence on

23  which plaintiff is suing on the very conduct which we

24  need to prove to a jury is gone and I don't have it.

25  And that is very, very serious too.

1              Okay.  So I'm going to talk to you a
2    little bit about the law first, when we talked about
3    considering, not testing, lesser sanctions.  I'll move
4    real quickly through this.
5              Go to the next slide.  I'm sure you know
6    the *Cummings* case.  And about -- my point is that you
7    don't actually have to test them.  You just have to
8    consider if they would be effective.  And in this case,
9    I don't think there's any reason to believe -- after
10   *Heslin 1* where you gave a sanction and then on that very
11   same day told them now you need to answer discovery in
12   *Heslin 2*, it didn't affect their conduct, didn't have
13   any ability to affect their conduct.  So my argument
14   would be there has to be something stronger than
15   *Heslin 1*.
16             If you can go to another slide.
17             I want to talk about what *Cummings* was
18   about because that case was a default, was entered when
19   a party intentionally destroyed audiotapes that related
20   to the claim.  Basically in that situation it was
21   recordings that they had made with the other party at
22   some point, so it was extremely relevant to the case.
23   And after being ordered to produce them, the plaintiff
24   ended up destroying them.  In that case they were
25   defaulted.  You have a similar situation here, but it's

1   actually much worse.

2          So first is you didn't have broad

3   discovery obstruction in *Cummings*.  You just had that

4   one event.  Here you have an entire tableau of them not

5   taking this case seriously.

6          Go to the next one.

7          In *Cummings* you didn't have the

8   destruction of the evidence upon which the claim was

9   based, right?  They didn't lose that.  They still had

10  what they were actually suing on.  My client's been

11  denied that.

12         The other problem is that in *Cummings* one

13  of the things they talk about in what kind of sanctions

14  you could consider, including whether you should default

15  someone, is whether there's the availability of

16  alternative evidence.  And in this case, most of that

17  alternative evidence has also been compromised through

18  various forms of loss and failure to preserve, so we

19  don't even have that.

20         And our last one.  In *Cummings* there

21  wasn't a prior pattern of discovery abuse by the same

22  party in a string of related cases in front of that same

23  Court, and that is something that this Court can

24  consider.

25         Let me show you a couple of these cases.

1  This first one I want to show you is a San Antonio case.
2  This is the one about the restraining orders.  And I
3  understand this is not a discovery sanction case.  What
4  it's talking about is a pattern of misconduct in prior
5  cases.  And so you had this -- you presented the trial
6  court with several other cases where bad conduct --
7  sanctionable conduct happened.  And the trial court
8  said, based on what's happening, I need to make sure
9  it's a substantial sanction so it doesn't happen again.
10  And here I think you are faced with the same thing, that
11  these defendants need some sort of sign to take this
12  lawsuit seriously, and they don't have one yet, and
13  that's what this Court needs to do.
14             Another one I wanted to point out to you,
15  this is a Northern District of Texas case.  And this was
16  about you had a plaintiff who across the board just
17  repeatedly failed to obey the Court rules and procedures
18  in other cases, and so now they show up in another case
19  and they still are not obeying the rules and procedures,
20  and the Court says it's absolutely fine to consider
21  their conduct in my prior cases when I'm trying to
22  decide if they should have a dismissal.  I believe you
23  can do the same thing here.
24             These are what we can do, right?  I think
25  215.2 probably gives you some creativity on top of this,

1    but any time you do that you're going out in uncharted

2    territory, right?  So I think and my opinion is we need

3    to kind of stick to these types of remedies.  And so

4    you've tried some of them.  Basically you've tried two

5    and three on here.  You've tried the expenses of

6    discovery and the taxable court costs and you've made an

7    order about designated facts being established, not for

8    the purposes of the action like No. 3 says, but for the

9    purposes of the motion.

10                   So here I think I have somewhat of a sense

11   of what's going on in this courtroom, that you may be

12   quite rightly hesitant to consider a default.  I

13   understand that.  I think there are a lot of other

14   things in 215 that can actually have an effect in this

15   case that can actually act as a deterrent and can maybe

16   change this defendant's behavior.  Because out of all of

17   this, I think that's the most important.  I don't think

18   there's a lot you can really do to remedy me on the

19   discovery side.  I think if the goal of your action is

20   to try to put me back in the place where I would be if I

21   had gotten discovery, I don't think we can ever do that.

22                   So what I think really has to -- the other

23   two goals of this order under the case law was to punish

24   the violator and to deter future conduct.  And I don't

25   know another way to say it, Judge, except that if a

1  defendant is allowed to come into this courtroom and

2  make excuses after excuses and then is able to

3  completely ignore discovery in the last case and that

4  they know that they're really not going to face any --

5  look, they don't care if the motion's denied.  They

6  don't.  They don't care.  That's not part of the

7  strategy.  The strategy is not to win the motion.  They

8  don't care about that.  The strategy is to delay.  The

9  strategy is to use this TCPA as a weapon to keep me as

10 far away from a courtroom as possible.

11              THE COURT:  Well, you have two depositions

12 of Alex Jones, who is apparently the very heart of this

13 entire operation.

14              MR. BANKSTON:  And it wasn't -- I don't

15 know if you've seen those transcripts.

16              THE COURT:  And you wouldn't have had

17 those if I hadn't ordered the discovery.

18              MR. BANKSTON:  I agree.

19              THE COURT:  And you got fairly extensive

20 depositions.

21              MR. BANKSTON:  I'm not sure if you've read

22 those depositions or not, Your Honor, so I don't --

23              THE COURT:  I've read portions.

24              MR. BANKSTON:  Okay.  And particularly in

25 this last one, something that was very revealing -- and

1  you're right; he is the center of all this.  He should

2  know everything.  He doesn't know anything.

3              THE COURT:  Well, but isn't that

4  incredibly helpful to you?  I mean, when you play that

5  to a fact-finder, "This, this is your answer for what is

6  your basis for saying these things?  This is your

7  answer?"  I mean --

8              MR. BANKSTON:  I get what you're saying.

9  I do.  I understand what you're saying, that Jones --

10  but Jones has to make a choice here, and I think they've

11  made the choice.  They can either participate in

12  discovery with good faith, and if they do, that's not

13  going to be good for them.

14              THE COURT:  Or you can hoist them on the

15  petard he's created for himself, which is I can't tell

16  you one thing I used as a source.

17              MR. BANKSTON:  For them, that is way

18  preferable to actually disclosing what the truth is.

19              THE COURT:  Well, that's interesting.

20              MR. BANKSTON:  Right?  Because --

21              THE COURT:  It doesn't seem like it looks

22  good to me.

23              MR. BANKSTON:  It's not good.  They don't

24  have a good choice.  They have a Rosemary's -- or a

25  Sophie's choice, right?  They can either take the

1  sanction on the hit, pay the money at the end of the

2  case, which they may or may not do because some --

3  there's a good idea that this probably ends up with

4  Jones running from every judgment ever, but they can

5  just delay everything to the end of the case, they can

6  take the hit, which is to say now we're going to have

7  these evidentiary findings against us, but nobody ever

8  has to find out the deep dark truth of what happened

9  here.  That's what these defendants are doing right now.

10  So they don't want me anywhere close to the truth of

11  what happened here because what happened here was

12  horrifying.

13            THE COURT:  But a default doesn't get you

14  any closer to that either.  A default on liability means

15  that liability is over, all we're going to move to

16  now -- be careful what you ask for -- is how did this

17  personally affect me as opposed to how was I affected by

18  the death of my son to begin with.

19            MR. BANKSTON:  Exactly.

20            THE COURT:  And that's a limited offer of

21  proof.  You wouldn't go into all the liability facts,

22  which seems to me, as a former plaintiff's lawyer

23  myself, you might want to do.  I don't know.

24            MR. BANKSTON:  I think that's --

25            THE COURT:  I'm not understanding how a

1    default gets you what you just said you want.

2              MR. BANKSTON:  Ah, okay.

3              THE COURT:  In fact, it kind of cuts it

4    off.

5              MR. BANKSTON:  You're right.

6              THE COURT:  No more discovery of facts.

7    We're done.  Right?

8              MR. BANKSTON:  Yes, absolutely.

9              THE COURT:  Okay.

10             MR. BANKSTON:  No, no, and I see what

11   you -- I kind of see what your point is there of

12   wouldn't I want to keep doing litigation to try to get

13   facts or something like that.

14             THE COURT:  I'm always wondering why trial

15   lawyers are doing what they're doing.  I can't help

16   myself, having been one myself.

17             MR. BANKSTON:  I have got no indication

18   that any of the money I've spent and any of the time

19   I've spent is getting me anywhere closer to that goal,

20   nowhere closer to it.  For two years I've been trying

21   after that goal and I'm nowhere closer to it.  I don't

22   believe that these defendants will ever take this

23   lawsuit seriously in any way, shape or form.  And I do

24   believe that instead of relying on whatever I just

25   happen to have to have, whatever findings I can get out

1   of the court or whatever I have now in my petition, I

2   don't want to roll the dice with a liability claim and

3   then have my client wonder, would that jury have found

4   liability if we had actually gotten the discovery?  No,

5   I'd just rather have the default.  Again --

6               THE COURT:  So you're thinking if he can't

7   even put on any evidence about any sources, that you run

8   the risk of a non-liability finding and then the client

9   could be upset about that when you could have gotten a

10  default from a discovery failure.

11              MR. BANKSTON:  I think there are some

12  other things in the discovery too that satisfy that too.

13  I mean, we're kind of focusing in on this source issue,

14  but, you know, I think they brought up this point of the

15  *prima facie* elements could be met and they'd still have

16  a way to prevail on the motion through like their

17  affirmative defenses and all of that.

18              And as I think we talked about at the

19  hearing last time, my discovery is relevant to a lot of

20  those issues that that they're raising.  You know, they

21  have this constitutional argument that kind of hangs

22  over the case that has a lot to do with what their

23  motivations were and how they treated my client

24  specifically and what their thinking was about my client

25  specifically, not just about the malice issue.  But they

1  seem to want to believe that they need -- that I would

2  need to prove that Mr. Jones intended to cause my client

3  harm, things like that.

4          There's a lot of different peripheral

5  issues that are still addressed by discovery.  And so I

6  actually think in terms of how you handle the motion

7  from an evidentiary standpoint, how you handled it in

8  *Heslin 1* is logically correct, because instead of doing

9  something like -- I mean, I don't want to bad mouth the

10 Connecticut court, but instead of just striking the

11 motion to dismiss, I think it's proper to make a finding

12 that then affects your denial of it.  And so I think

13 that needs to happen here.

14          But what I'm really arguing with you today

15 is that that's exactly what you gave for me last time,

16 and there needs to be an escalation of how this Court

17 responds to what is just egregious behavior by a party

18 that knew that it was conducting this egregious

19 behavior.  We talked a little bit about Barnes because

20 they knew who Barnes was and what he was doing.  They

21 had thrown him under the bus before.  They stuck with

22 him.  And they stuck with him in this case.

23          And so here when we sanction, there's a

24 sanction that flows from any of this, and there has to

25 be -- there has to be mandatory attorneys' fees.  You

1   can't let the client slip out from under that by saying,

2   oh, it was this lawyer who's now lost to the wind to us.

3   And you can't let the attorneys say, no, you can't get

4   us either so nobody gets sanctioned, right?  The client

5   knew what they were doing.  It was a very intentional

6   act.  And I think you can see from how that client was

7   acting it was an intentional act.

8               So we have fees before you.  I'm not going

9   to go into those because I have the anticipation I'm

10  about to be put on the witness stand to talk about them,

11  so I'm not going to talk to you much about that.

12              THE COURT:  Also, you're running out of

13  time.

14              MR. BANKSTON:  I should be running out of

15  time, exactly.  And, of course, on the merits, I think

16  you don't need to hear anything from me.  So with that,

17  let's go ahead and get to the evidence and we'll finish

18  up.

19              THE COURT:  Okay.  Let me log your time

20  here.  Back to you for any more argument or we can go

21  straight to evidence.

22              MR. JEFFERIES:  Sure.  I'd like to briefly

23  before I go to evidence respond to some of that in their

24  argument.

25              THE COURT:  All right.

1            MR. JEFFERIES:  Again, Judge, I just want

2    to reiterate again this is the first motion for

3    sanctions in this case.  The two cases he put up there

4    are totally inapplicable to Rule 215, *Transamerica*,

5    et cetera.

6            As far as spoliation, I don't think they

7    met their burden in their evidence attached to their

8    motion that spoliation occurred.  Again, we talked about

9    the misleading representation, and I read to you

10   out loud Mr. Zimmerman's deposition testimony.  There is

11   no evidence that those emails -- any email has been

12   lost.  There is no evidence that any video has been

13   lost.  There is no evidence that, you know, any

14   information on Facebook or Twitter isn't available --

15   they're the ones who host the site -- that isn't

16   available through a subpoena to them.

17           And again, I want to focus the judge on --

18   and the judge made a very good point earlier.  You know,

19   we're here today in connection with the TCPA dismissal

20   claim.  The judge granted in my opinion pretty broad

21   discovery to them.

22           THE COURT:  Meaning me?

23           MR. JEFFERIES:  Yes.  Yes, I mean, they

24   got to take Alex -- Mr. Jones' deposition.  They got to

25   take Mr. Zimmerman's deposition.  They got a certain

1   amount of documents.  Again, I'm not defending what
2   happened with Mr. Dew, the corporate rep, but they got
3   Mr. Jones' deposition.  They don't like the answers
4   primarily, but, you know, that's part of a deposition.
5          That being said, as far as their concern
6   or their request that because Mr. Dew was not prepared
7   to talk about sources, that they should get some order
8   precluding the defendants from putting on evidence in
9   the future regarding sources I think would be wholly
10  inappropriate for a couple of reasons.  One is there's
11  no, again, evidence that's going anywhere.
12          There's nothing to preclude, meaning
13  again -- you know, there's a new quarterback now.
14  Barnes is gone.  They've complained about Barnes all
15  throughout their motion, in their presentation,
16  et cetera.  He's gone, okay?  He is off the case.  I
17  know already I cannot tell you -- yeah, all cases, I
18  mean, any representation.  He was never general counsel.
19  He had a retention agreement.  Yes, he was represented
20  as general counsel.  Mr. Jones -- you know, that's a
21  generic term.  But he had a retention agreement.  He was
22  never an employee of either FSS or InfoWars.  So,
23  you know, how he was referred to, he was an attorney.
24  He's been dismissed from all facets of any
25  representation of Mr. Jones, you know, as of the night

1    before the depositions, okay?

2              I can assure this Court I've spent

3    significant time finding out what's available, what if

4    anything is no longer available, hence Mr. Zimmerman's

5    affidavit.  And I will represent to this Court that,

6    you know, regardless if this goes on appeal, that

7    doesn't preclude me from -- it precludes -- it stays the

8    Court as far as filing motions, et cetera.  It certainly

9    doesn't preclude me from providing additional videos,

10   documents, and information they're seeking during that

11   period of time, and I fully intend to do so.  I've

12   already started that process.  So again, they're asking

13   now for basically an instruction that, you know --

14             THE COURT:  So what you're saying is

15   you're going to continue to comply with the order --

16             MR. JEFFERIES:  I --

17             THE COURT:  -- excuse me -- that includes

18   written discovery, which is the exhibit to my order,

19   ordering you to produce those things.

20             MR. JEFFERIES:  Absolutely, Judge.  I'm

21   representing to the Court that I have spent countless

22   hours understanding infrastructure, what exists,

23   et cetera, et cetera, and I am certainly going to comply

24   with that 100 percent, stay or no stay, moving forward,

25   absolutely.

```
 1                    THE COURT:  So your point is let it come
 2  back to the trial judge who's going to try the case and
 3  see just how quickly you do that --
 4                    MR. JEFFERIES:  Exactly.
 5                    THE COURT:  -- and how compliant you are
 6  with the order before we make potentially outcome
 7  determinative decisions --
 8                    MR. JEFFERIES:  Exactly right.
 9                    THE COURT:  -- or preclude evidence from
10  being offered, et cetera.
11                    MR. JEFFERIES:  Exactly right.  Exactly
12  right.
13                    THE COURT:  All right.
14                    MR. JEFFERIES:  And again, I do want to
15  reiterate one last time that the video that was shown,
16  et cetera, et cetera, these are in other cases.
17                    So that's all the argument I have.  I'll
18  call myself as the first witness.
19                    THE COURT:  Let me make sure they don't
20  have any more argument.  They've already used
21  53 minutes.  I would think they wouldn't.
22                    You don't want to burn more time, do you?
23                    MR. BANKSTON:  I wasn't aware that I even
24  had the option.  I do not plan on it.
25                    THE COURT:  I was just going to go back
```

1  and forth until you're ready for witnesses.  All right.

2  You may call your first witness.

3          MR. JEFFERIES:  It will be myself, and

4  Mr. Burnett will ask questions.

5          THE COURT:  Please step forward in front

6  of me and raise your right hand.  Oh, yeah, maybe we

7  should take a break.  Hang on just one second.  Let me

8  log your time.  We'll take a break now for 10 or 15

9  minutes.  I'll see you back then.

10          *(Recess taken)*

11          THE COURT:  You may call your first

12  witness.

13          MR. JEFFERIES:  I call myself, Your Honor.

14          THE COURT:  All right.  Please step

15  forward in front of me and raise your right hand.

16          *(The witness was sworn)*

17                  **WADE JEFFERIES,**

18  having been first duly sworn, testified as follows:

19                **DIRECT EXAMINATION**

20  BY MR. BURNETT:

21      Q.   Good afternoon.  Will you tell us your name for

22  the record.

23      A.   Wade Jefferies.

24      Q.   Are you a licensed lawyer in the state of

25  Texas?

1      A.    I am.

2      Q.    Are you the lead counsel for the defendants in

3   this case?

4      A.    I am now.

5      Q.    And when did you become lead counsel for the

6   defendants?

7      A.    November 26th, the night before the depositions

8   in this -- the case we're here for today.

9      Q.    And the depositions you're referring to are the

10  ones that Judge Jenkins ordered in October, correct?

11     A.    That's correct.

12     Q.    Okay.  And when you became involved in this

13  case as lead counsel for the defendants, what did -- who

14  do you understand was in charge of responding to the

15  discovery request as ordered by Judge Jenkins?

16     A.    Robert Barnes.

17     Q.    And was he doing so as sort of outside general

18  counsel for the defendants?

19     A.    Yes, he was -- correct, outside is fair.

20     Q.    Was it your understanding that I, Michael

21  Burnett, had no involvement, participation, or

22  responsibility for responding to that discovery as

23  ordered by Judge Jenkins?

24     A.    That's correct.

25     Q.    And then did you represent the defendants at

1  the depositions?

2       A.    I did.  I defended their depositions.

3       Q.    And did it become clear to you during the

4  corporate representative's deposition that the corporate

5  representative that was identified by Mr. Barnes to

6  appear on behalf of the corporation was unable to answer

7  all of the questions along the topics as ordered by

8  Judge Jenkins?

9       A.    Yes.  I did two things the night before.  One,

10 I realized that Mr. Dew, who was chosen by Mr. Barnes to

11 be the corporate rep on all issues, that he couldn't

12 testify at all regarding IT issues.  So I immediately

13 called Mr. Bankston and said we're going to have two

14 corporate reps as opposed to one.  But then during the

15 deposition the following day I realized Mr. Dew was

16 unable to answer the questions posed to him.

17      Q.    Okay.  And what efforts, if any, did you make

18 after that deposition to cure this situation and

19 hopefully avoid a hearing like we're in today?

20      A.    Sure.  I reached out to plaintiff's counsel,

21 Mr. Bankston.  I told him that, you know, I understood

22 that Mr. Dew was unable to answer the questions posed,

23 offered to bring a new corporate rep to Houston so he

24 could take that deposition again and to pay for,

25 you know, the delta in additional cost as a result of

1   having to retake that deposition.

2       Q.   And you made that offer to Mr. Bankston?

3       A.   Absolutely.

4       Q.   Okay.  And what was Mr. Bankston's response to

5   that offer?

6       A.   He declined.

7       Q.   All right.  Do you know why he declined?  Or

8   excuse me.  Did he tell you why he was declining your

9   offer?

10      A.   He stated that it wasn't about money; it was

11  about time.

12              MR. BANKSTON:  Pass the witness.

13              THE COURT:  Use your microphone if you're

14  going to ask any questions.

15              MR. OGDEN:  I have questions, Your Honor.

16                  **CROSS-EXAMINATION**

17  BY MR. OGDEN:

18      Q.   Mr. Jefferies, you testified a second ago that

19  on November 26 was when you became lead counsel and your

20  understanding was Robert Barnes was lead counsel prior

21  to you, correct?

22      A.   Correct.

23      Q.   So as general counsel for InfoWars, Robert

24  Barnes was actually in the process of litigating the

25  case as well?

1      A.   He was -- I wouldn't say he was responsible for

2  litigating the case.  He was responsible for interfacing

3  with the clients, getting the interrogatory responses

4  from the clients, interfacing with the clients in

5  obtaining the documents that were ultimately produced to

6  you and Mr. Bankston.

7      Q.   Who was in charge of litigating the case prior

8  to you?  Excuse me.  Immediately prior to you.

9      A.   Immediately prior to me?  In this case, I don't

10 know.

11     Q.   Are you familiar with the motion to substitute

12 counsel that was filed that introduced you into the case

13 somewhere in September of 2019?

14     A.   No, there's never been a motion to substitute

15 on my behalf.  I filed notices of appearances in all

16 four of the Austin cases.

17     Q.   Okay.  Are there any motions to withdraw as

18 counsel filed on behalf of the defendants you represent

19 currently?

20     A.   Not in this case, no.  I believe in the

21 *Scarlett Lewis* case that Mark Enoch has a pending motion

22 to withdraw.

23     Q.   Earlier you said outside general counsel,

24 correct?

25     A.   Correct.

1    Q.    What is that?

2    A.    Outside general counsel as I would define it

3  would mean it's somebody generally representing a client

4  on various matters.  However, he or she is not employed

5  by the entity he is acting -- he or she is acting as

6  outside general counsel for.

7    Q.    So from the time that you filed an appearance

8  in this case to sitting here today, you aren't sure who

9  was litigating this case prior to you; is that your

10  testimony?

11    A.    No, it's not my testimony.  As far as what

12  Austin attorney prior to November 26?  Is that your

13  question?

14    Q.    It can be Austin.  It can -- I'm just trying to

15  figure out which attorney was in charge of litigating

16  this case.

17    A.    I guess I'm struggling with your term

18  litigating.  Prior to November 26, I filed my notice of

19  appearance I believe on November the 7th, maybe November

20  the 6th.  And Michael Burnett is also an attorney of

21  record in this case.

22    Q.    Are there any other attorneys of record in this

23  case besides Mr. Burnett and yourself?

24    A.    Not to my knowledge.

25    Q.    Have there ever been to your knowledge?

1      A.    Not to my knowledge in this case.

2      Q.    So it will be -- and Mr. Burnett was lead

3 counsel -- was counsel of record in this case prior to

4 you joining, correct?

5      A.    That's correct.

6      Q.    So would it be your understanding that

7 Mr. Burnett was lead counsel in this case prior to

8 November 26, 2019?

9      A.    It would be my understanding that Mr. Burnett

10 was Austin litigation counsel for this case, that's

11 correct.

12     Q.    What's the difference between Austin litigation

13 counsel and lead counsel?

14     A.    Sure.  The distinction in my mind is imagine --

15 the distinction in my mind is Mr. Barnes in his capacity

16 as outside general counsel was directing, you know,

17 discovery efforts, et cetera, et cetera, as opposed to

18 Mr. Burnett.  Mr. Burnett's responsibility would have

19 been showing up, as he is today, arguing at various

20 hearings.

21     Q.    You would agree with me that when an attorney

22 files something with his name at the bottom, he's

23 responsible for that filing, correct?

24     A.    I'd agree with that.

25     Q.    Do you know whose name is on the discovery

1  responses in this case?

2      A.   My name is on several of them.

3      Q.   Do you know who else's name is on them?

4      A.   I don't believe there was any discovery.  I

5  think it's only my name.

6      Q.   My last question is -- or the last area,

7  depending on your answer to the last question.

8      A.   Sure, fair enough.

9      Q.   You didn't prep Mr. Dew on any of the other

10  topics other than IT and learned for the first time

11  during his deposition that he was not prepared on any of

12  the other corporate topics?

13      A.   Let me -- I think that's -- let me try to

14  answer that question.  I learned the night before the

15  depositions that Mr. Dew was not prepared to answer

16  anything regarding IT.  I also learned the night before

17  that he had -- was not as prepared as I had hoped he

18  would be regarding the other matters.

19      Q.   And from the time you filed your notice of

20  appearance in early November to the time Mr. Dew was

21  deposed, did you spend all of that time trying to read

22  the file and catch up with what was going on?

23      A.   Oh, I spent the majority of time reviewing all

24  four case files, obviously catching up on two years'

25  worth of documents, et cetera, et cetera.  That's where

```
 1   I spent the majority of my time.

 2                MR. OGDEN:  That's all I have.

 3                MR. BURNETT:  No questions.

 4                THE COURT:  All right.  You may step down.

 5                MR. JEFFERIES:  Thank you, Judge.

 6                THE COURT:  You may call your next

 7   witness.

 8                MR. JEFFERIES:  Michael Burnett.

 9                THE COURT:  Step forward in front of me

10   and raise your right hand.

11                (The witness was sworn)

12                MR. JEFFERIES:  Your Honor, may I approach

13   to have two exhibits marked?

14                THE COURT:  Yes, you can approach the

15   court reporter to mark exhibits.

16                (The witness was sworn)

17                     MICHAEL BURNETT,

18   having been first duly sworn, testified as follows:

19                     DIRECT EXAMINATION

20   BY MR. JEFFERIES:

21       Q.   Can you state your name for the record?

22       A.   Michael Burnett.

23       Q.   And Michael Burnett, are you an attorney?

24       A.   Yes, I am.

25       Q.   And how long have you been practicing?
```

1    A.    I've been practicing in Austin for -- I guess

2  I've been licensed for 25 years.  I worked for a federal

3  judge for a year, and then for the last 24 years I've

4  been here in Austin.

5    Q.    Okay.  Are you familiar with the rates charged

6  by other attorneys here in Travis County --

7    A.    Yes, I am.

8    Q.    -- for cases --

9          THE COURT:  Excuse me.  Wait until he gets

10  his entire question out.  The court reporter can't

11  record it otherwise.

12          THE REPORTER:  I didn't get the last few

13  words.

14          THE COURT:  She didn't get it.

15          MR. JEFFERIES:  Sure.

16    Q.    (BY MR. JEFFERIES)  Are you familiar with the

17  rates customarily charged by attorneys here in Travis

18  County for cases such as this?

19    A.    Yes, I am.  I am primarily a family lawyer now,

20  board certified in family law, and my practice is -- if

21  it's not 100 percent, 99 percent in the family law area.

22  But prior to that, for at least 15 years I practiced

23  extensively in commercial litigation, and I still

24  occasionally will have a commercial litigation case that

25  I'll handle.  So yes, I'm familiar with the rates in the

1  commercial litigation area as well as the family law

2  area.

3      Q.   Okay.  And can you identify what's been marked

4  as Exhibit 1?

5      A.   Yes.  Exhibit No. 1 is the declaration of Mark

6  Bankston that he's offered to support his attorneys'

7  fees claim in this case.

8      Q.   Okay.  And that's a true and correct copy?

9      A.   Yes, it is.

10              MR. JEFFERIES:  I move that Exhibit 1 be

11  admitted, Judge.

12              MR. BANKSTON:  No objection, Your Honor.

13              THE COURT:  Thank you, Counsel.

14  Defendants' 1 is admitted.

15              *(Defendants' Exhibit 1 admitted)*

16      Q.   (BY MR. JEFFERIES)  Have you had a chance to

17  look over Exhibit No. 1?

18      A.   I have.

19      Q.   Okay.  And what conclusions -- well, have you

20  had a chance to run any calculations or analysis of

21  Exhibit No. 1?

22      A.   I have.

23      Q.   Okay.  And as a result of that analysis, what

24  conclusions, if any, did you reach?

25      A.   A few conclusions that I have.  And let me

1   preface my comments that with the exception that I don't

2   like the way plaintiff's counsel is litigating this case

3   in the press, I have no questions about their integrity,

4   their professionalism.  We've gotten along well.  I

5   don't want any of my testimony to be construed as

6   damaging or impugning their character or the work that

7   they're doing in this case because I do think they are

8   fine lawyers.  However, they are from Houston, and I

9   first and foremost believe that the rates that they are

10  charging are not reasonable rates for the Austin market.

11  I have done litigation in Houston myself, and I know the

12  rates in Houston are higher than the Austin market.

13          But here Mr. Bankston has been licensed to

14  practice law for ten years.  He's claiming a rate of

15  $450 per hour.  And in the Austin market, for someone

16  with his level of experience and being a very fine

17  lawyer, I think a reasonable rate for his level of

18  experience would be $350 an hour, not $450 an hour.

19          Similarly for Mr. Ogden, who's also a fine

20  lawyer, he's been practicing law for six years.  It

21  appears that he's been practicing longer -- I'll give

22  him credit for that -- by the job he's doing in this

23  case.  But the rate that he's claiming here is $400 an

24  hour, and a reasonable rate for someone even as good as

25  he is in Austin as a six-year lawyer would be around

1   $275 per hour.

2   Q.   Okay.   In addition to your analysis and

3   opinions on their rates and whether they're reasonable

4   or not for the Austin market, have you had a chance to

5   look at the time entries -- the time charged for various

6   services provided or documents drafted?

7   A.   Yes, I have.   If you look at Exhibit No. 1,

8   there's no breakdown by day, by specific date, what was

9   done, but there's a general description.   And it goes

10  through from the beginning of drafting the written

11  discovery request that is the subject of the motion,

12  drafting the motion to compel that the Court granted --

13  or the motion for discovery that the Court granted, and

14  then actually then reviewing the discovery and taking

15  the discovery and drafting today's -- the motion that's

16  the subject of today's hearing.   They're down in those

17  different categories.   If you take the claimed amount of

18  time that they did to draft the written discovery

19  request, he's claiming 3.5 hours.   If you look at

20  written discovery request, I don't think it would be

21  more than an hour and a half to draft that discovery.

22  Q.   Okay.   Let me stop you right there.   Look at

23  Exhibit No. 2.

24  A.   Yes.

25  Q.   And can you identify what's been marked as

1  Exhibit No. 2?

2      A.   Yes.  Exhibit No. 2 are the written discovery

3  requests that Judge Jenkins ordered that the defendants

4  answered.

5      Q.   Okay.  And how many -- for Free Speech Systems,

6  how many discovery requests were sent to Free Speech

7  Systems?

8      A.   Well, if you look at them, there's one request

9  for admission, four interrogatories, and three requests

10  for documents.

11      Q.   Okay.  And do you know if Mr. Bankston drafted

12  discovery requests for Free Speech Systems in the

13  *Scarlett Lewis* matter?

14      A.   Yes.

15      Q.   So all in all, looking at the discovery

16  contained in Exhibit No. 2, how long do you think it

17  should have taken to draft these particular motions --

18  or these discovery requests?  Excuse me.

19      A.   In many law firms this discovery would have

20  been drafted by a paralegal or an associate, not the

21  lead counsel for the client.  But regardless of who was

22  doing it, especially someone of Mr. Bankston's level and

23  experience and skill, an hour and a half at the most.

24      Q.   Okay.  Let me draw your attention down to the

25  drafting of the motion for sanctions for discovery

1  abuse.

2      A.    Yes.

3      Q.    It says 36 hours, correct?

4      A.    Right.

5      Q.    And it's got a date range from November 27th,

6  '19 through 12-10-19, correct?

7      A.    Right.

8      Q.    So it's nowhere broken down by how much hours

9  spent per day or anything like that, correct?

10      A.    No.  No.  It is bold billing -- or actually, I

11  think we refer to that as block billing.  He claims that

12  he spent 36 hours drafting the motion for sanctions and

13  that Mr. Ogden says that he worked on it for 18 hours.

14  That's a total of 54 hours to draft a 47-page motion

15  that included a lot of quotes from other cases and

16  discovery in there.  And if you break it down per page,

17  that means they would have spent almost 69 minutes, over

18  an hour, drafting each page of that motion, which in my

19  opinion is excessive and not reasonable.

20      Q.    Okay.  And going back to -- you said citations.

21  You reviewed their motion for sanctions, true?

22      A.    Yes.

23      Q.    Okay.  And would you agree that a large portion

24  of their 46-page -- not the exhibits but the actual

25  motion for sanctions is copy and pasted deposition

1  testimony for depositions in this case?

2      A.   Yeah.  Well, in this case and then also

3  information that they've had in other cases that I

4  believe would have been reviewed before the drafting of

5  this motion because it's been referred to by plaintiff's

6  counsel in other contexts.

7      Q.   And when you've got a 46-page motion that

8  includes a lot of those cut and paste kind of jobs, as I

9  call them, in your experience and expertise typically

10 does it take less to draft such a motion as opposed to,

11 you know, a court appellate brief or a motion for

12 summary judgment brief?

13     A.   Of course.

14     Q.   Okay.

15     A.   And then --

16     Q.   Go ahead.

17     A.   Did you want to ask me about some of the other

18 entries?

19     Q.   Oh, yeah.  Let me ask you a couple other

20 questions.  One, let me point to deposition preparation

21 for Alex Jones, 20 hours.  Do you see that?

22     A.   Right.  I don't think it's reasonable to spend

23 20 hours preparing to take a three-hour deposition when

24 counsel's already taken the deposition of Mr. Jones

25 before.  He obviously was prepared about the facts of

1  the case because we had a previous hearing on a motion

2  to dismiss where he went into a lot of the allegations.

3  I don't believe it should have taken him more than five

4  hours to prepare to depose Mr. Jones.

5      Q.   And do you have an opinion on whether or not

6  that deposition preparation is going to --

7                THE COURT:  I'm sorry.  What did you say

8  instead of the 36 hours for drafting the motion?  Did

9  you ever answer a question about how long you think it

10  should have taken?

11               THE WITNESS:  Five hours, Your Honor.

12               THE COURT:  Instead of 36 hours.

13               THE WITNESS:  Yes, Your Honor.

14      Q.   (BY MR. JEFFERIES)  Well, and for

15  clarification, it was 36 by Mr. Bankston and 18 hours by

16  Mr. Ogden, correct?

17      A.   That's correct.

18      Q.   Okay.  So that's a total of 54 hours they

19  charged, correct?

20      A.   That's correct.

21      Q.   Okay.  Now, going back to the preparation for

22  the deposition, do you have an opinion whether or not

23  that preparation is going to carry over once we start

24  getting into discovery in the case-in-chief?

25      A.   Yes, I do.  I think all that information -- I

1  mean, or time that he spent preparing for Mr. Jones'
2  deposition and also the time he spent preparing for
3  Mr. Watson's deposition can be used in the
4  case-in-chief, I'll call it.
5          When you look at the deposition
6  preparation for Paul Watson, Mr. Bankston avers that he
7  spent 14 hours preparing for that deposition.  I don't
8  think it should have taken him more than five hours to
9  prepare for that deposition.
10         Mr. Bankston also says that he spent 18
11 hours reviewing documents.  Similar to the deposition
12 prep, that's not wasted time on the discovery -- or,
13 you know, that's not lost time for the corporate rep not
14 being able to testify about all the matters because
15 those documents would have had to have been reviewed as
16 part of the case-in-chief anyway, so that information
17 can be used --
18    Q.   Okay.  Going back --
19    A.    -- you know, after the hearing.
20         THE COURT:  Excuse me.  He didn't finish
21 his answer and now you're speaking.
22         MR. JEFFERIES:  I apologize, Judge.
23         THE COURT:  The court reporter just can't
24 do that.  Do you want to finish your answer?
25         THE WITNESS:  Yeah.

1    A.   That time that Mr. Bankston and Mr. Ogden both

2  spent preparing for these depositions can be used in the

3  case-in-chief and also the time they spent reviewing the

4  documents.  I do believe that, you know -- I've gone

5  through and calculated if you want me to answer what I

6  do think would be an appropriate amount of time that

7  they have spent that could be argued by counsel as being

8  wasted because they were unable to get all of the

9  discovery ordered by Judge Jenkins.

10    Q.   (BY MR. JEFFERIES)  And what is that amount?

11    A.   Well, I would say -- if you look at the time

12  that they have on Exhibit No. 1, preparing -- for

13  Mr. Bankston's time, five hours to prepare for

14  Mr. Jones' deposition would be a reasonable amount of

15  time.  Five hours for preparing for Mr. Watson's

16  deposition.  I think he should get the full credit for

17  the four hours he actually took Mr. Jones' deposition,

18  the two hours to take the deposition of Mr. Watson, and

19  then five hours for drafting the motion.  That would be

20  21 hours that I think can be argued was, quote, unquote,

21  wasted on that discovery that he didn't obtain that was

22  ordered by Judge Jenkins.

23         And then if you look at Mr. Ogden's time,

24  I think five hours preparing for the deposition of Free

25  Speech Systems, LLC and four hours to actually take that

1   deposition for a total of nine hours it could be argued

2   as wasted on the discovery that they weren't able to

3   get.

4               If you add those hours together, if you

5   just -- you know, if the Court orders that the rates

6   claimed by or charged by plaintiff's counsel is a

7   reasonable rate for Austin, using those rates then the

8   total amount of fees would be $13,050.  If the Court

9   were going to go with the lower rates that I testified

10  that I think are reasonable for the Austin market, then

11  the fees would be $9,825.

12               MR. JEFFERIES:  I'll pass the witness.

13               MR. OGDEN:  Cross, Your Honor.

14               THE COURT:  Use your microphone, please.

15               MR. OGDEN:  Yes, Your Honor.

16                      **CROSS-EXAMINATION**

17  BY MR. OGDEN:

18      Q.   Mr. Burnett, earlier you said -- or you used

19  the term the Austin market, correct?

20      A.   Yes.

21      Q.   What did you do to prepare for your testimony

22  today to determine reasonable rates for the Austin

23  market?

24      A.   Well, one, I'm familiar with the rates because

25  I practice here in Austin and so I have personal

1   knowledge what the rates are.  In addition, prior to my

2   testimony today, I called Mark Hawkins, who's a licensed

3   lawyer here in town who does commercial litigation.

4   He's been practicing law in Austin since I think 1995.

5   He's a partner at Armbrust & Brown.  I've got a lot of

6   respect for him.  He's got a great reputation.  In

7   addition to being a commercial litigator himself,

8   Mr. Hawkins is a mediator for commercial litigation

9   cases.  And in his role as a mediator, he encounters

10   a lot of other lawyers and is familiar with the rates

11   charged by other lawyers doing commercial litigation.

12   And I asked him what he thought was a reasonable rate,

13   and the answers he gave me coincidentally were the same

14   rates that I had come up with on my own and that I

15   testified to earlier today.

16          THE COURT:  I should let the plaintiffs

17   now know you've crossed the hour point.  You're down to

18   under 20 minutes for everything you're going to say and

19   every question you're going to ask.

20          MR. OGDEN:  Yes, Your Honor.

21     Q.   (BY MR. OGDEN)  During your questioning, you

22   mentioned your experience and said -- you listed a lot

23   of areas that you practice, family law and commercial

24   litigation.  You did not mention that you practiced any

25   personal injury, correct?

1    A.    No, I'm not a personal injury lawyer.  I have

2  handled defamation cases for the plaintiff and the

3  defendant, but in my mind personal injury like car

4  wrecks, medical malpractice, those kind of cases, I've

5  never handled those in my practice.

6    Q.    What do you charge by the hour?

7    A.    I charge $575 an hour.

8    Q.    How many defamation cases have you done?

9    A.    Three that I can think of right now, including

10  one trial I had against 60 Minutes in El Paso.

11    Q.    How much do you believe is a reasonable rate

12  for Mr. Bankston to charge for this case?

13    A.    $350 per hour.

14    Q.    How did you get to that number?

15    A.    Based on his years of practicing law, someone

16  at the top level of that.  I think that's what the

17  market here in Austin is, based on my experience and

18  conversations with Mr. Hawkins.

19    Q.    So the accepted principles and methods that you

20  used to apply to the facts of this case to come to your

21  expert opinion are based solely on an attorney's

22  experience and numbers of years, correct?

23    A.    No.  No.  No, it's not based solely on the

24  number of years.  In Austin if you're -- he's a very

25  accomplished and talented lawyer, but he's a ten-year

lawyer.  I don't believe he's board certified.  And

ten-year lawyers -- I don't know what you guys do down

there.  In Austin they don't charge $450 per hour, and

that's based on my own personal experience in dealing

with other lawyers and also my conversation with

Mr. Hawkins.  It doesn't mean he's a bad lawyer or he's

not doing a good job.  I'm just saying someone at that

level, you have to be in your -- for most people in the

20 years of practice to be able to charge a rate that

high.

    Q.   What about $400 an hour?  How long do you need

to practice to charge $400 an hour?

    A.   I think around probably in Austin in this kind

of case closer to 15 years.

    Q.   Are you aware that Mr. Enoch who represents

your clients charged his son, who has less experience

than I do, $400 an hour and sought over $130,000 against

my client for a TCPA motion in *Heslin 1*?  Did you know

that?

    A.   No, I didn't know that.  But Mr. Enoch is a

Dallas lawyer where the rates are higher up in Dallas

than they are in Austin.  And I'm also familiar with the

case law, and I assume you are as well, that the

reasonableness of your rates have nothing to do with the

rate or hours that the opposing side charges.  That's

1   not the standard.  So that's my answer on that.

2        Q.   Are you aware that Mr. -- is it your

3   understanding Mr. Bankston only practices in Houston?

4        A.   No, I never said that.

5        Q.   Are you aware that Mr. Bankston practices in

6   Austin?

7        A.   I don't know one way or the other, but that

8   doesn't change my testimony on what his rate should be.

9   I mean, the fact of whether --

10             THE COURT:  Just answer the question and

11   wait for the next question.

12             THE WITNESS:  Right.

13        Q.   (BY MR. OGDEN)  Your answer is no, you don't

14   know where Mr. Bankston practices?

15        A.   No.  I just know he has these four cases in

16   Austin, but I don't know the extent of his docket.

17        Q.   Are you aware that Mr. -- did you do anything

18   to prepare yourself to learn Mr. Bankston's experience

19   over the last ten years?

20        A.   Yes.  I looked at his website, and I looked him

21   up on the state bar website to find out when he was

22   licensed to practice law, and I tried to find out

23   whether or not he was board certified in any practice

24   area.

25        Q.   Are you aware that Mr. Bankston is undefeated

1  at three state supreme courts outside of Texas and

2  currently has a brief pending in front of the United

3  States Supreme Court all involving complex products

4  liability cases?

5      A.   No.  That doesn't make a difference to me, no.

6      Q.   So it doesn't matter to you what a lawyer does

7  once he's licensed; you just count the years?

8      A.   No, no.  No, it does matter what he did.  I

9  gave him the benefit of the doubt of being a very

10 excellent lawyer in coming up with the rate.  I think he

11 at 350 an hour for a ten-year lawyer in Austin is on the

12 very high end.  There's a lot of lawyers that have been

13 practicing ten years that I would say based on their

14 experience and level of competency should be around 200

15 or 225 per hour.  I do think he's a fine lawyer.  And

16 that's great to hear he's undefeated, but...

17     Q.   You understand that you're -- that you've been

18 called as an expert in this case as you sit here,

19 correct?

20     A.   Yes.

21     Q.   Do you believe you adequately prepared yourself

22 to give expert testimony within a reasonable degree of

23 professional certainty as to Mr. Bankston's experience?

24     A.   Yes, and also for your experience as well, I

25 do.

1     Q.    You said that the 36 hours Mr. Bankston spent

2  on the briefing shouldn't have been more than five

3  hours, correct?

4     A.    That's my opinion, yes.

5     Q.    How many documents were attached to the motion?

6     A.    Many, many pages.

7     Q.    You don't know?

8     A.    No, no, I didn't count the pages, but I know --

9  I think it's a 600-something-page document, and many of

10 the pages are transcripts that are attached that

11 Mr. Bankston has been referencing in other cases, and

12 he's also been sending this information -- many of

13 this -- much of this information to the press.  And so I

14 don't think it's reasonable to attribute all the time

15 that he's done looking at this information and gathering

16 it for this motion to be reasonable.  I don't.

17    Q.    There are three new depositions that were

18 involved in this motion, correct?

19    A.    The three new depositions?

20    Q.    Yes.

21    A.    Yeah, those are the corporate represent -- the

22 corporate representative depositions and Mr. Jones'

23 depositions that Mr. Bankston attended.

24    Q.    How many pages were there?

25    A.    I didn't count the pages.

1    Q.   Did you read them?

2    A.   The depositions?

3    Q.   Yes.

4    A.   No.  I wasn't there and I have not read the

5 transcripts.

6    Q.   So you don't know how many pages were involved

7 in the motion, attached to the motion as attachments --

8 you don't know how many pages each deposition was that

9 was cited in the motion, yet you're giving an opinion to

10 a reasonable degree of professional certainty on how

11 many hours it should have taken to draft the motion,

12 correct?

13    A.   That is correct.  He was at the deposition --

14          MR. BURNETT:  That's all I have,

15 Your Honor.

16          MR. JEFFERIES:  No further questions,

17 Your Honor.  Pass the witness.

18          THE COURT:  You may step down.

19          MR. JEFFERIES:  I have no further

20 witnesses, Judge.

21          THE COURT:  Oh, I thought you were calling

22 another one.

23          Okay.  The hearing turns to you to call

24 any witnesses you wish to call.  Any witnesses you wish

25 to call?

1          MR. BANKSTON:  Excuse me, Your Honor.  No,
2    we -- no need to call any witnesses.
3          THE COURT:  Okay.  You have an unequal
4    consumption of time.  How much time do you want to --
5    you made extensive arguments at the beginning.  I'm sure
6    you don't want to make those arguments again.  How long
7    do you wish to argue now?
8          MR. JEFFERIES:  I mean, Your Honor, I just
9    need a short closing statement.
10          THE COURT:  Do you want them to close
11    first and then you --
12          MR. JEFFERIES:  Yes.
13          THE COURT:  -- so that you can have the
14    last word?
15          MR. JEFFERIES:  Yes, Your Honor.
16          THE COURT:  Can we simply say ten minutes
17    a side for a final closing argument?
18          MR. JEFFERIES:  Certainly.
19          THE COURT:  Or do you need -- is that
20    ample?
21          MR. BANKSTON:  That's ample for me,
22    Your Honor.
23          MR. JEFFERIES:  Likewise, Judge.
24          THE COURT:  Great.  Then you get to go
25    first because I said they would get the last word since

1   they have the burden of persuasion.

2              MR. BANKSTON:  Your Honor, if it please

3   the Court, I don't think I need to talk about obviously

4   the merits of the motion to dismiss or even really the

5   sanctions motion.  I think you've heard quite a bit

6   about it and the papers are really exhaustive.  I just

7   wanted to spend a little time here at the end addressing

8   my fees and Mr. Ogden's fees and some of the testimony

9   that was given about that.

10             First of all, as you can tell from my

11  affidavit, I am an unusually accomplished lawyer for my

12  age.  I understand that.  I have reduced what my

13  standard billing is.  I bill at the same level

14  Mr. Burnett bills at.  I submit those bills in

15  consolidated litigation.  I've been paid in many, many

16  cases at the rate of $550 an hour.  You know, I've

17  talked about some of those experiences.

18             Mr. Ogden likewise is sort of a rising

19  star here in Texas and is at the center of some of the

20  most complicated mass torts in south Texas, and he bills

21  at a high rate too.

22             We've both reduced our fees for this case,

23  and I've tried to explain why that is.  And it is a

24  lower rate than Mr. Burnett.  It's a lower rate than

25  Mr. Enoch's 535.  And so we've brought that rate down,

1   and I do believe it's appropriate.  I belong to a
2   law firm that is very accomplished and is one of the --
3   is in the running for the top three products liability
4   firms in the country this year.  We do fantastic work.
5   And I take any umbrage at the idea that the billing that
6   I testified to is not worth for what it is in this case.
7   This case is a very unusual case.  It is a case that has
8   incredible national focus on it.  And I think it's right
9   for these clients to have hired a lawyer of my type.
10              In terms of the time on some of these, you
11  heard a little bit of Mr. Ogden talking about
12  Mr. Burnett making these opinions without knowing the
13  actual specifics of how much some of this should have
14  taken.  And I want to point to an example of that.  For
15  instance, take the interrogatories, for example.  I had
16  to draft discovery in this case.  And Mr. Burnett says,
17  no, there's no way it should have taken you long to
18  draft that discovery.
19              THE COURT:  Is that the category drafting
20  proposed written discovery?
21              MR. BANKSTON:  That's correct, Your Honor.
22  Okay.  And Mr. Burnett says, oh, you should have only
23  taken about an hour, an hour and a half to do that.  And
24  if you look at that discovery, let's just take one of
25  the interrogatories, which is one of the interrogatories

1    to Mr. Jones.  And that interrogatory has 18 separate

2    subparts that reference 18 specific contentions that

3    were advanced in 18 separate videos, all right?  The

4    amount of time it took to organize those videos, pull

5    the quotes, arrange all of that into that one

6    interrogatory took me an hour and a half, much less the

7    entire remainder of the discovery.

8              This case is incredibly detailed oriented,

9    and it has an ever exponentially growing record as I

10   keep discovery more in the public domain.  It has taken

11   an immense amount of time.

12             None of the testimony that was given to

13   you about the fees was really done to a reasonable

14   degree of certainty.  It was just sort of another

15   lawyer's opinion.  And in case after case after case

16   that I've been involved in which I'm doing high-level

17   briefing -- and in this case, this motion for sanctions

18   is a highly technical motion and, as you saw, with

19   nearly 30 exhibits that had to be all coordinated and

20   done.  I typically average about an hour a page to get a

21   motion like that done.  And that's what's happened on

22   this case and it's happened in all of what you see in

23   front of you.

24             The hours that I have claimed are

25   substantially less than what defendants have routinely

1  claimed over and over in this case.  And there is some
2  element of fairness to be considered there.  But what I
3  really want --
4            THE COURT:  What you're saying is to draft
5  this motion was a total of 46 hours of attorney time; is
6  that right?
7            MR. BANKSTON:  Yes, Your Honor.
8            THE COURT:  No, I'm sorry.  54 hours of
9  attorney time.
10            MR. BANKSTON:  Yes, 54 hours of attorney
11  time to draft the 50-page motion and do the exhibits and
12  have it all done.  Basically me and Mr. Ogden took
13  sections of that.  He took a smaller portion of the
14  motion than I did and we worked on it side by side.
15            I also want to point out that we have been
16  and always are conscientious of this Court to be
17  conservative in our fees.  Not everything that we have
18  done in this case quite clearly is charged on those.
19  One of the things that we have done, for instance, just
20  because -- I think maybe we're entitled to it, but I
21  haven't done it.  You aren't going to see charges up
22  there for me and Mr. Ogden's travel.  You're not going
23  to see us for the time that we literally have to spend
24  here away from other work.  None of that is in there.
25  We've tried -- both Mr. Ogden and I showed up to all

1    three depositions.  We're only charging one lawyer.

2                  THE COURT:  How are you getting here, now

3    that I'm curious?

4                  MR. BANKSTON:  Actually, I've actually

5    discovered a service called Vonlane, which is a bus

6    service that comes up here.

7                  THE COURT:  Yes, I've heard about it.

8                  MR. BANKSTON:  And it's really great for

9    attorneys because they'll set you up a desk too while

10   you're working.  Maybe that's another reason I don't

11   need to claim the time that I'm on the bus, because I

12   can actually make something of it, but I am

13   conscientious about those things.

14                 This attorneys' fees is consistent with

15   every other affidavit we've ever submitted in the case.

16   If you go back and you look at our expedited discovery

17   or any of the other affidavits that I've submitted,

18   you're going to see the amounts of times to do these

19   tasks is directly on target.

20                 THE COURT:  Well, since you bring that up,

21   have you compared this to your affidavit that you

22   submitted for your 91a claim for fees?

23                 MR. BANKSTON:  Yes.  For the work that was

24   done in *Heslin 1*, correct, Your Honor.  Yes, I've taken

25   a look at that.

1                    THE COURT:  Well, the 91a is -- there's

2    the 91a motion to dismiss in *Heslin 2*.  Do you remember?

3    We had a hearing --

4                    MR. BANKSTON:  Oh, yes.  Yes.  I'm sorry,

5    Your Honor.  Yes.

6                    THE COURT:  Have you looked at that

7    affidavit to compare it to the affidavit that you

8    submitted for the motion for sanctions?

9                    MR. BANKSTON:  I have done that at one

10   point, not recently enough to talk to you about it in

11   great detail without me pulling it up.

12                    THE COURT:  You would agree, though, you

13   were telling me I really have to award all the fees in

14   the 91a motion if I deny it.

15                    MR. BANKSTON:  Right.  That was my

16   argument, yes.

17                    THE COURT:  Yes.  And there are several

18   entries on that affidavit that match up the entries on

19   this affidavit.  I should not order them twice, right?

20                    MR. BANKSTON:  Oh, I agree with that, yes.

21                    THE COURT:  And I found -- and I'm sorry

22   to tell you this -- but some disconcerting

23   inconsistencies on three entries on the affidavit.  I

24   did look at them.  For example, on the 91a affidavit, it

25   says -- let's see.  Drafting proposed discovery, two

1    hours.  But on this affidavit it's drafting proposed

2    written discovery, three and a half hours.  Of course,

3    if I had already awarded drafting discovery in the 91a

4    motion, I shouldn't award it here, but it's a different

5    number of hours.  And then drafting the motion for

6    expedited discovery in the 91a motion, six hours.  In

7    this motion today, nine hours.  And then finally,

8    consultation with expert regarding discovery.  And I

9    will say you put three different dates, 9-5 to 9-8, on

10   this new affidavit, but on the affidavit you submitted

11   in October all of your -- and you said this was all the

12   work you've done on the case and I should award all of

13   it.

14            MR. BANKSTON:  Right.

15            THE COURT:  That was the argument.  I

16   remember.

17            MR. BANKSTON:  Okay.

18            THE COURT:  Not just discovery, but all of

19   it.  Consultation with discovery -- with expert for

20   discovery was two hours, but now on this new affidavit,

21   consultation with expert on declaration for discovery

22   motion is four hours.  So those are some

23   inconsistencies.

24            MR. BANKSTON:  So -- okay.  So some of

25   that I need to -- in creating the affidavit for this

1  case went back and looked at what I did with my expert

2  and in combination with the expedited discovery motion,

3  and I think I have divided that time up differently than

4  the first affidavit that I did in the second affidavit.

5  So I believe, one, I was pretty conservative about it in

6  my first affidavit.  But in the second affidavit I

7  believe I have some of my expert time actually with what

8  we did on the motion.

9            THE COURT:  But you understand all I have

10 is affidavits, no additional testimony, and I found

11 those --

12            MR. BANKSTON:  No, I understand.

13            THE COURT:  -- three inconsistencies.  So

14 I just have to do the best I can divining what that

15 means.

16            MR. BANKSTON:  Look, I'll make that part

17 of it easy for you.  If you have any conflicts with my

18 affidavit, I play it like the lower number that I have

19 is -- you can take that number.

20            THE COURT:  Good answer.  Thank you.

21            MR. BANKSTON:  So I think there might be a

22 couple like that on there that are like those because,

23 again, we had some tasks that were all in one ball of

24 wax.  So please do just take the lower number on those.

25 But with respect mainly to --

1            THE COURT:  And you're down to the last

2  couple of minutes.

3            MR. BANKSTON:  Sure.  And what I'll just

4  say to conclude is that you see the quality of the

5  motion and what we had to do to do it and you see

6  everything that went into it beforehand.  And there's

7  this allegation that maybe I shouldn't have spent so

8  much time preparing for a deposition of Alex Jones,

9  which as I think you've seen from both transcripts are

10 two qualitatively different depositions.

11           I believe that all the time that we spent

12 was necessary and reasonable in this case, particularly

13 because of the nature of the case and how heavily it's

14 being litigated.  So I believe in comparison to all the

15 other affidavits in the case, this one is right in line

16 with everything else from both sides.  That's why we'd

17 urge those attorneys' fees.  Thank you, Your Honor.

18           THE COURT:  Thank you.  It's your turn.

19           MR. JEFFERIES:  Yes, Your Honor.  We're

20 going to respond on attorneys' fees, specifically

21 regarding the drafting of the motion for discovery

22 abuse, the 54 cumulative motions by both attorneys -- or

23 54, yeah, total hours for both attorneys.  And again,

24 Judge, I would argue, you know, to refer to the quality

25 of the motion.  Again, I don't think they pointed to one

1   Rule 215 case that says you can bring in and incorporate

2   into a 46-page motion with -- you know, 600 total with

3   exhibits and that's proper under a 215 motion talking

4   about other cases other than this one, much less a

5   Connecticut case.  And a majority of a portion of their

6   brief deals with those types of issues.  So I would

7   request that the Court take that into consideration when

8   looking at that number.  I just think that is

9   unnecessary.  There's no basis in Texas law in my

10  opinion for the Court to look at conduct outside of the

11  conduct in this case under Rule 215, which is --

12          THE COURT:  Can't you, though, look for a

13  pattern and practice?  And maybe you can't do sanctions

14  for what happened in another case, but this is not an

15  accident; this is a habit.  It's almost like habit

16  evidence, that you can't use evidence of what people did

17  under other circumstances to prove they did it in this

18  case.  But on the other hand, if someone is habitually

19  doing these things, it's something courts can consider.

20  And when I think about the inability of Alex Jones to

21  answer any questions about sources but saying, oh, I can

22  find -- I didn't know I had to look for that, but I can

23  go find that, and then you admit, and I appreciate it,

24  the deposition of the corporate rep, Rob Dew, was

25  completely useless, and it has been before.  I mean, the

1    discovery before in other cases has been not

2    forthcoming, even cases I've handled.  So I don't know

3    why I can't consider those things as part of the

4    pattern.

5                    MR. JEFFERIES:  Fair enough, Judge.  Part

6    of the pattern, again under the *Brookshire* case,

7    you know, one of the points it makes is that the

8    plaintiff in this case shouldn't get the fruits of

9    alleged improprieties in other cases, meaning they can't

10   argue because of that alleged discovery abuse in other

11   cases that Mr. Heslin in this *Heslin 2* case should get

12   the benefit of that.  And that's what they're asking for

13   both under monetary sanctions and other sanctions from

14   the Court.  So anyway -- so again, I think that's,

15   you know, Texas Supreme case law.  You need to look

16   at --

17                    THE COURT:  But I'm required to order

18   attorneys' fees for anything that was incurred,

19   including, of course, drafting the motion for sanctions,

20   unless it's substantially justified, unless the

21   resistance to this motion is substantially justified.  I

22   believe that's something along the lines of what the

23   rule says.  Am I right?

24                    MR. JEFFERIES:  Agreed.  And I'm not

25   questioning the Court's ability or authority to award

1  attorneys' fees.  I'm questioning what's fair and

2  reasonable given the *Brookshire* case, et cetera, that

3  the plaintiff in this case shouldn't benefit from

4  alleged bad acts in another case.  The purpose of

5  Rule 215 is to get corrective conduct in this case.

6            Again, the last thing would be going back

7  to Mr. Bankston's, I guess, request to somehow have an

8  order entered which would preclude my clients from

9  putting on any source evidence they have in the future.

10  Again, I made a representation to the Court.  I'm

11  actively going on that.  I'm getting a handle on this.

12  There's been an active flow of information.  Again, this

13  has been transcribed.  There's a record here for the

14  judge.  But to do it now I would think is inappropriate,

15  Your Honor, and I request that that order not be

16  entered.  Thank you, Judge.

17            THE COURT:  All right.  That concludes our

18  record.  I'm required to rule on this quickly.  So by

19  the middle of January I have to rule or it's overruled

20  by operation of law, I believe, the motion to dismiss.

21  So you'll get a ruling from me, and you'll get a ruling

22  from me on the motion for sanctions.  It will be in a

23  single order.  You can already tell some of the things

24  I'm thinking about in light of what I did in *Heslin 1*.

25  But I'll ruminate on that some more and decide how to

1  deal with all of the arguments you've made and what

2  should be done at this juncture in the case.

3              Thank you again for your arguments and

4  your briefing.  That concludes our record.

5                    *(Court adjourned)*

1                        **REPORTER'S CERTIFICATE**

2

3  THE STATE OF TEXAS   )

4  COUNTY OF TRAVIS     )

5                   I, Chavela V. Crain, Official Court

6  Reporter in and for the 53rd District Court of Travis

7  County, State of Texas, do hereby certify that the above

8  and foregoing contains a true and correct transcription

9  of all portions of evidence and other proceedings

10 requested in writing by counsel for the parties to be

11 included in this volume of the Reporter's Record, in the

12 above-styled and numbered cause, all of which occurred

13 in open court or in chambers and were reported by me.

14     I further certify that this Reporter's Record of

15 the proceedings truly and correctly reflects the

16 exhibits, if any, offered in evidence by the respective

17 parties.

18     WITNESS MY OFFICIAL HAND this the 21st day of

19 January, 2020.

20
                              */s/ Chavela V. Crain*
21                            Chavela V. Crain, CSR, RDR, RMR, CRR
                              Texas CSR 3064
22                            Expiration Date:  12/31/2019
                              Official Court Reporter
23                            53rd District Court
                              Travis County, Texas
24                            P.O. Box 1748
                              Austin, Texas 78767
25                            (512) 854-9322
   *