# Exhibit 43

## D-1-GN-18-001835

| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## D-1-GN-18-006623

| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

**PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

    I.      InfoWars has Repeatedly Refused to Present a Corporate
Representative ...........................................................................................1

    II.     InfoWars Failed to Present a Corporate Representative for a Fourth
Time ..........................................................................................................8

          A.    The materials provided to Ms. Karpova and her lack of
preparation time were a farce ......................................................8

          B.    Ms. Karpova was not prepared to testify about sourcing and
research for the videos described in Plaintiffs' petitions ............... 11

          C.    Ms. Karpova was not prepared to testify about individuals
involved in the production of the videos described in
Plaintiffs' petitions .................................................................. 23

          D.    Ms. Karpova was not prepared to testify about internal
editorial discussions regarding InfoWars' coverage of the
Sandy Hook Elementary School shooting .................................... 24

          E.    Ms. Karpova was not prepared to testify about the company's
knowledge of the Plaintiffs .......................................................... 26

          F.    Ms. Karpova was not prepared to testify about the documents
produced by the company in response to Plaintiffs' discovery
requests ................................................................................... 31

          G.    Ms. Karpova was not prepared to testify about efforts made by
the company to preserve potential evidence ........................... 32

          H.    Ms. Karpova was not prepared to testify about the audience
reach of the videos described in Plaintiffs' petitions ........................ 34

          I.    Ms. Karpova was not prepared to testify about the company's
business structure and relationship with other parties .................. 36

    III.    Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith ............ 37

IV.     InfoWars has the Resources to Properly Prepare its Corporate Designee .. 38

V.     This Court Should Enter All Remedies at its Disposal..........................................40

       A.    Preclude further discovery under Rule 215(b)(1) .............................40

       B.    Award all litigation costs under Rule 215(b)(2) .................................40

       C.    Enter evidentiary findings under Rule 215(b)(3)...............................41

       D.    Assess punitive monetary sanctions for outrageous discovery abuse...................................................................................................41

CONCLUSION ............................................................................................................................42

CERTIFICATE OF SERVICE ....................................................................................................43

CERTIFICATE OF SERVICE ....................................................................................................43

## INTRODUCTION

Following the default judgment entered by this Court, Plaintiffs sought discovery on the remaining issues to be decided by the jury concerning punitive and compensatory damages. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs sought depositions of the Defendants, including a corporate representative of Free Speech Systems, LLC. On December 3rd, the company produced Daria Karpova as its corporate representative to testify about eight topics. Ms. Karpova was completely unprepared to testify about the designated topics, ultimately making a mockery of the deposition.

While sanctionable in isolation, this conduct is truly egregious given that Defendants have repeatedly refused to produce a prepared corporate designee on three prior occasions. For these non-appearances, Defendants incurred sanctions, a contempt finding, and ultimately a default judgment. Throughout this case, Defendants' open disrespect for the judicial process has been on full display, and they have now made the conscious decision to sabotage the remainder of the proceedings. Every sanction ever entered by this Court has been completely ineffective at altering Defendants' conduct. As such, Plaintiffs asks the Court to take forceful measures to balance the playing field for their upcoming damages trial, including an award of all litigation costs, preclusion of further discovery, evidentiary findings relating to the corporate deposition topics, and punitive monetary sanctions.

## ARGUMENT

### I.    InfoWars has Repeatedly Refused to Present a Corporate Representative.

Throughout these lawsuits, InfoWars has consistently evaded its obligation to provide corporate testimony. First, on August 31, 2018, this Court ordered a corporate

deposition in Mr. Heslin's defamation case, but InfoWars refused to comply with the order, and the Court ultimately assessed sanctions the following year for the non-appearance.[1]

On January 25, 2019, the Court again ordered discovery in the *Lewis* case, but that process turned into a complete farce. Ms. Lewis was forced to take depositions without any document production. Even worse, when InfoWars produced Rob Dew as a corporate representative, InfoWars failed to prepare him to give any testimony whatsoever on behalf of the company. In oral hearing, Judge Jenkins chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition."[2]

On October 18, 2019, this Court ordered Defendant to produce a corporate representative for a third time in Mr. Heslin's IIED case. In response, InfoWars again chose Rob Dew to testify about two topics: 1) "Sourcing and research for the videos described in Plaintiff's petition," and 2) "Internal editorial discussions regarding Free Speech Systems' coverage of the Sandy Hook Elementary School shooting."[3] Once again, Mr. Dew was completely unprepared to discuss either topic. For example, Mr. Dew gave the following testimony about a March 2014 video from Plaintiff's petition:

> Q.   Who did the research for that one?
> A.   I don't know.
> Q.   What steps did you take to find out?
> A.   Since we don't have that video, I don't know what -- I'd have to see the video to jog my memory of what's in it.
> ...
> Q.   You don't have this video is your testimony, and by you, you mean Free Speech Systems?
> A.   I didn't have it in any of the searches that I made.

---

[1] *See* October 18, 2019 *Heslin* Order on Plaintiff's Motion for Contempt Under Rule 215 (assessing sanctions of $25,875).
[2] Exhibit 1, April 3, 2019 Transcript in *Lewis,* p. 30; p. 34.
[3] Exhibit 2, November 26, 2019 Deposition of Rob Dew, 3:16-20.

> Q. How long did you spend looking for the sources or the video or the researcher for "Sandy Hook: False Narratives Versus the Reality?"
> A. For that particular video, maybe 15 minutes.
> Q. Are you aware that in this case you produced this video to me?
> A. Okay.
> ...
> Q. So you have it in your possession, correct?
> A. I don't know if I have it in my possession.[4]

When Mr. Dew testified regarding a May 13, 2014 from Plaintiff's petition, he speculated on its content without knowing what was in the video:

> Q. Who did the research for this video?
> A. I would imagine Wolfgang Halbig did the research for that.
> Q. Again, I'm not asking you to imagine.
> A. Okay. I'll say Wolfgang Halbig, school safety expert, that was Wolfgang Halbig.
> Q. How do you know he did the research – excuse me. Did anyone else research any of the information that went into this episode?
> A. That is most likely an interview between Wolfgang Halbig and Alex Jones.
> Q. You don't even know what's in this video, do you?
> A. No.[5]

Mr. Dew testified in the same way about a December 27, 2014 video from Plaintiff's petition:

> Q. What was the source of the information in this one?
> A. I don't know.
> Q. Do you know what information is in this video?
> A. No.
> Q. Are you prepared to discuss the research that was in the video which you don't know what it's about?
> A. No.[6]

---

[4] *Id.* at 52:3-53:15.
[5] *Id.* at 54:3-18.
[6] *Id.* at 56:6-13.

Mr. Dew gave the same testimony regarding a December 29, 2014 video from Plaintiff's petition:

> Q.   Have you ever seen this one?
> A.   I'd probably know it if I saw it.
> Q.   Sitting here -- have you seen it in the last year?
> A.   No.
> Q.   Did you do anything to prepare where the information came from in this video that you don't know what it's about?
> A.   No.
> Q.   You have no -- is it fair to say you don't know who the source of the information is that's in this video?
> A.   That would be fair.[7]

Mr. Dew gave the same testimony regarding a January 13, 2015 video from Plaintiff's petition:

> Q.   Have you seen this video in the last year?
> A.   I have not seen it in the last year.
> Q.   Are you prepared to discuss the research that went into the information that was put in this video?
> A.   No.
> Q.   Are you prepared to tell us the source of information for this video?
> A.   No.[8]

This testimony continued for video after video through 2015, 2016, and 2017. For each of the additional videos, Mr. Dew admitted he was not prepared, even including the crucial 2017 "Sandy Hook Vampires Exposed" video:

> Q.   Who researched the information for that video?
> A.   I would say myself and Alex did.
> Q.   What were your sources?
> A.   I believe a Megyn Kelly interview.[9]
> ...
> Q.   Are you aware that on April 22nd, 2017, that the Megyn Kelly interview hadn't even happened yet?

---

[7] *Id.* at 56:15-57:3.
[8] *Id.* at 57:5-13.
[9] *Id.* at 72:17-20.

> A.    Oh, it hadn't happened yet? Okay.
>
> Q.    Fair to say you're not prepared to discuss this video?
>
> A.    I'm -- must be confused with another Sandy Hook vampire video.
>
> Q.    Fair to say you're not prepared to discuss the one from April 22nd, 2017? Yes?
>
> A.    Correct.[10]

Mr. Dew was likewise unprepared to testify regarding the employees who were involved in Sandy Hook research. For each employee inquired about, Mr. Dew testified that he was not "prepared to testify as to [the employee's] involvement with sourcing and researching for the videos in plaintiff's petition."[11] Mr. Dew further testified that he was unprepared to discuss InfoWars' editorial discussions about Sandy Hook:

> Q.    We know that from your answers related to the videos and not knowing the sources of the information or any of the researchers, that any discussion that would have involved that -- those people that did that, you're not prepared to discuss that, correct?
>
> A.    That's correct.[12]
>
> Q.    Did you take any steps to prepare yourself to discuss whether or not there are any editorial discussions that were had between anyone at Free Speech Systems outside your purview?
>
> A.    No.[13]

Moreover, Mr. Dew acknowledged that editorial discussions could be contained within documents, but he admitted he did not use any documents to help prepare for the deposition:

> Q.    If there are discussions out there within Free Speech Systems' documents that were produced in this case that have editorial discussions in there, that's something you should know about, correct?

---

[10] *Id.* at 72:24-73:9.
[11] *Id.* at 15:6-8; *see also* p. 15-26.
[12] *Id.* at 77:6-11.
[13] *Id.* at 78:8-15.

> A.    If you're saying I reviewed every e-mail that was sent around the office during those time periods, I didn't do that.
>
> Q.    You didn't review any e-mails preparing for today?
>
> A.    That's correct.
>
> Q.    Do you think you should have?
>
> A.    I was relying on the advice of my attorney.[14]

Mr. Dew's testimony showed that Defendants intentionally failed to prepare him to offer testimony. Given their prior experience failing to prepare Mr. Dew in the *Lewis* case, Defendants understood their obligation to prepare their corporate designee. On December 20, 2019, this Court assessed sanctions and held Defendants in contempt for their third non-appearance.[15] In a set of companion orders, the Court assessed $100,000 in monetary sanctions.[16] The Court noted:

> Defendants' failure to produce a corporate representative who was prepared to testify about a) sourcing and research for the videos described in Plaintiff's petition and b) internal editorial discussions regarding Free Speech System, LLC's coverage of the Sandy Hook Elementary School shooting should be treated as contempt of court. Defendants have been continuously represented in this case by competent Texas counsel. The same counsel who represented Defendants at the October 17 hearing…are representing Defendants now, with one additional attorney recently appearing. Surely this Court can assume that Defendants' counsel fulfilled their professional obligation to insure that Defendants understood this Court's October 18 order. And the order itself is clear and unmistakable, easily understood by any competent reader. On the record presented, the Court concludes that Defendants intentionally disregarded the October 18 order. The Court notes that a client's refusal to cooperate with an attorney may rise to good cause for the attorney's withdrawal under Texas Disciplinary Rule of Professional Conduct 1.15(b).[17]

---

[14] *Id.* at 80:16-81:7.

[15] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions (awarding sanctions of $65,825).

[16] *See* December 20, 2019 Order on Defendants' Rule 91(a) Motion (awarding additional $34,323.80).

[17] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions, p. 2.

During the 2019 hearing, Defendants' counsel promised to address the discovery situation despite the pending appeal. Yet even upon remand in 2021, Defendants spent the entire summer ignoring the situation, eventually resulting in the Court entering the default judgment which it had held under advisement since 2019.

During the default judgment hearing on August 31, 2021, this Court inquired about the necessity of further discovery, noting that "[m]y concern is you need this discovery even for a damages trial."[18] The Court also noted that "if [plaintiffs] are trying to get punitive damages, [they] probably do need more discovery."[19] Plaintiffs' counsel responded that "after this hearing and I have more of an understanding of what the scope of discovery is like going forward, then we'll serve new discovery requests and depositions that we may need."[20]

## II.    InfoWars Failed to Present a Corporate Representative for a Fourth Time.

Following the default judgment, Plaintiffs sought discovery for the remaining issues to be decided by the jury. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs also sought the deposition of Free Speech Systems, LLC, which was cross-noticed in all three cases. The company was instructed to designate a witness to testify about the following topics:

- Sourcing and research for the videos described in Plaintiffs' petitions.

- Individuals involved in the production of the videos described in Plaintiffs' petitions.

- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.

- The company's knowledge of the Plaintiffs.

---

[18] Exhibit 3, August 31, 2021 hearing transcript, p. 73.
[19] *Id.,* p. 74.
[20] *Id.,* p. 75.

- The audience reach of the videos described in Plaintiffs' petitions.

- The documents produced by the company in response to Plaintiffs' discovery requests.

- Efforts made by the company to preserve potential evidence.

- The company's business structure and relationship with other parties.

These topics included not only the topics about which Mr. Dew had failed to testify before, but additional topics relating to punitive and compensatory damages. No objections were made to any topic. The deposition was originally set for November 4, 2021. However, due to a medical emergency in the family of Defendants' counsel, the deposition was postponed to December 3, 2021. At deposition, the company produced Daria Karpova as its corporate representative. Ms. Karpova, an InfoWars producer and manager, was completely unprepared to testify on any of the eight topics.

**A.    The materials provided to Ms. Karpova and her lack of preparation time were a farce.**

Ms. Karpova testified that her preparation for the deposition consisted of the following:

- "Maybe an hour" on December 1st with Bradley Reeves.[21]
- "A couple of hours" on December 2nd with Marc Randazza.[22]
- One hour preparing by herself.[23]

---

[21] Exhibit 4, November 3, 2021 Deposition of Free Speech Systems, LLC, at 5:8.

[22] *Id.* at 4:1. Mr. Randazza's conduct in preparing the corporate designee and appearing at Mr. Jones' deposition creates tension with Texas statutes regarding the unauthorized practice of law by performing these services in Texas for a particular proceeding in a Texas case. The Government Code defines the "practice of law" to include not only court appearances, but also a "service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge." Tex. Govt. Code 81.101. "The statutory definition is not exclusive. Courts inherently have the power to determine what is the practice of law on a case-by-case basis. The practice of law embraces, in general, all advice to clients and all action taken for them in matters connected with the law." *Green v. Unauthorized Practice of Law Comm.,* 883 S.W.2d 293, 297–98 (Tex. App.—Dallas 1994, no writ) (internal citations omitted).

[23] *Id.* at 11:8.

Ms. Karpova brought a small file folder to the deposition containing the "documents that [Ms. Karpova] reviewed prior to this deposition."[24] Those documents "represent the total universe of documents that [Ms. Karpova] had prepared for before the deposition."[25] The folder contained the following:

- Wikipedia articles for "False flag,"[26] "The Reichstag Fire,"[27] and "Pearl Harbor advance-knowledge conspiracy theory."[28]

- A post from "HistoryToday.com" summarizing the sinking of the USS Maine in 1895.[29]

- An anonymous blog post from "DC Clothesline" which purported to contain biographical information about Wolfgang Halbig, an InfoWars source.[30]

- A bio of Dr. Steve Pieczenik, an InfoWars guest, from "StevePieczenik.com."[31]

- An article from "LoveTheTruth.com" entitled "I Think Sandy Hook Was a Massive Elaborate Hoax."[32]

- Two news articles with "interesting information regarding the victim's mother and her request to have an open casket,"[33] which Ms. Karpova felt was relevant because it was "unconscionable" and "horrific."[34]

---

[24] *Id.* at 9:20.
[25] *Id.* at 10:19-21.
[26] *Id.* at 19:9.
[27] *Id.* at 21:17.
[28] *Id.* at 27:8.
[29] *Id.* at 25:24.
[30] *Id.* at 27:23.
[31] *Id.* at 29:17.
[32] *Id.* at 28:11.
[33] *Id.* at 30:18.
[34] *Id.* at 32:22; 33:4.

Mr. Karpova also testified that she met briefly with the other prior corporate representatives designated by InfoWars, but she did not acquire any relevant information from those discussions:

> Q.  You met with Mr. Dew and talked to him about the topics you'd be speaking about today?
> A.  Briefly.
> Q.  What's briefly? What does that mean?
> A.  I basically sort of ran through the topics and asked him if I was going to say anything, if he had any information for me and he said no.[35]
> ...
> Q.  Okay. Who's the other corporate rep you know?
> A.  Michael Zimmerman.
> Q.  Okay. Did you get any information from Mr. Zimmerman?
> A.  No.[36]

In sum, Ms. Karpova's preparation was completely lacking. She only had short meetings with counsel, did not meet any employees who gave her information, and the materials she did review were frivolous, unreliable, and largely irrelevant. Later in the deposition, after prompting from her counsel, Ms. Kaprova claimed she reviewed additional documents, but she testified that those documents were not relevant to the deposition topics:

> Q.  There are documents that you have reviewed prior to this deposition that you did not bring to this deposition?
> A.  I did not think they were relevant to the specific points.[37]

As shown below, Ms. Karpova was unable to testify about *any* of the topics for the deposition. The lack of preparation she was given demonstrates InfoWars' continuing disrespect for the legal process, causing irreparable prejudice to the upcoming trial.

---

[35] *Id.* at 7:16-22.
[36] *Id.* at 8:6-10.
[37] *Id.* at 40:16-20.

**B.**   **Ms. Karpova was not prepared to testify about sourcing and research for the videos described in Plaintiffs' petitions.**

Ms. Karpova had not been prepared to testify about the videos in Plaintiffs' petitions.

Prior to the deposition, Ms. Karpova did not review any of the videos:

> Q.   Topic number one is the sourcing and research for the videos described in plaintiffs' petitions. When was the last time you watched those videos? Back up. I made an assumption there. Have you watched the videos in plaintiffs' petition ever in your history at InfoWars?
>
> A.   I've watched some of them.
>
> Q.   Okay. So one thing we can say is that in preparation for this deposition you didn't watch those videos, correct?
>
> A.   (No response.)
>
> Q.   I'm sorry, Ms. Karpova, is that a difficult question for you to answer?
>
> A.   Well, I've already answered some of the videos.
>
> Q.   Right. No. I understand that you have in your history at InfoWars since 2015, you've probably on occasion seen some of these videos. I understand that. What I'm asking you is since the date you were told you were giving this deposition in November and you were preparing for this deposition, you haven't watched any of these videos, right?
>
> A.   I have not.[38]

Ms. Karpova did not even know if she had reviewed the Plaintiffs' Petitions which

describe the videos:

> Q.   When that topic number one says sourcing and research for the videos described in Plaintiffs' Petitions, have you seen the Plaintiffs' Petitions?
>
> A.   Briefly.
>
> Q.   Okay. They're not in this folder, are they?
>
> A.   No.[39]
>
> ...
>
> Q.   But in terms of Plaintiffs' Petitions, is that something you looked at before this deposition?
>
> A.   I honestly can't recall.[40]

---

[38] *Id.* at 35:22-36:16.
[39] *Id.* at 22:5-11.
[40] *Id.* at 22:18-20.

When faced with basic questions about the videos in Plaintiffs' Petition, it immediately became apparent that Ms. Karpova could not testify:

> Q.   Do you see that paragraph 14 identifies the January 27, 2013 video entitled, "Why People Think Sandy Hook is a Hoax"?
> A.   Yes.
> Q.   Okay. You're familiar with the claims made in that video, right?
> MR. REEVES:  Objection; form.
> A.   I don't recall the exact video.
> Q.   And so sitting here today, you're not familiar with the claims made in that video.
> A.   No.[41]
> ...
> Q.   And do you see in paragraph 25 it discussing a September 25, 2014 video entitled "Connecticut PD Has FBI Falsify Crime Statistics," correct?
> A.   Yes.
> Q.   Okay. First of all, are you familiar with the claim that InfoWars has made that the FBI either falsified crime statistics or admitted that nobody died at Sandy Hook?  Are you familiar with those claims?
> A.   As far as it's quoted here in this paragraph, the company believes that to be the case.
> Q.   No. What I'm asking, Ms. Karpova, is based on the title and this talking about FBI falsified crime statistics. Are you personally right now familiar with that claim made by InfoWars?
> A.   Personally I'm not.
> Q.   Okay. Did you talk to anybody about that claim?
> A.   No.
> Q.   Okay. So this video and its title, you don't really understand where that comes from, right?
> A.   No.[42]
> ...
> Q.   Does paragraph 29 contain a video that you're supposed to talk about under topic number one?
> A.   Yes.
> Q.   The video is December 27, 2014, entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," correct?
> A.   Yes.
> Q.   What lawsuit is being talked about?
> A.   I don't know for sure.

---

[41] *Id.* at 47:21-6.
[42] *Id.* at 77:1-15.

Q.  Well, at least this one we're lucky because I do. Do you know Wolfgang [Halbig] sued Leonard Pozner, that they were in a lawsuit together?

A.  Yes.[43]

...

Q.  Well, first of all, we know that you didn't know that this video referred to that lawsuit. You didn't know what lawsuit it was. So you also, I would take it, you haven't done any research to determine what that lawsuit is or anything about it, right?

A.  I haven't reviewed that lawsuit, no.

Q.  Or anything that has to do with what this video said about the lawsuit, right?

A.  I mean, if you ask me specifically? Because you're saying anything. If you ask me a specific point, then I may or may not recall.

Q.  Sure. What truth about the Sandy Hook massacre could this lawsuit reveal? What did the video have to say about that?

A.  Well, based on the quotes here in this paragraph, you know, the truth would be -- I mean something to do with it not being the way the mainstream news reported.

Q.  Okay. Help me understand. The lawsuit could reveal something that's different than the mainstream media. That's your answer? Is that -- am I understanding --

A.  Different than what the mainstream media finally reported about the incident. I believe it took a year for the State of Connecticut to release the final report on the event.

Q.  What does that have to do with the lawsuit? I'm confused. What -- what's the lawsuit having to do --

A.  Are you asking me what it could've --

Q.  Well, let's --

A.  So that truth might have been something that contradicted the report that the State of Connecticut had issued.

Q.  You have no idea, do you? You say "might." You don't have any idea.

A.  Yeah, we don't have a record of that.

Q.  Yeah. And you -- when you got this petition and you read it and you saw there was a video entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," you did nothing to figure out what that lawsuit was or what it could reveal, did you?

A.  Huh-uh. No. Not specifically.[44]

...

Q.  You see here this talks about a March 4, 24  2015 video entitled "New Bombshell Sandy Hook Information Inbound"?

A.  Yes.

Q.  What was the bombshell information?

---

[43] *Id.* at 94:25-95:14
[44] *Id.* at 96:13-98:8.

A.   The bombshell information was the new statement -- information
     Mr. Halbig had brought on that show is what I can infer.
Q.   Which is what? What's the bombshell?
A.   I wouldn't know the details of it.
Q.   So when you had this video to try to figure out what was the sourcing
     and the research that went into it, you don't even know what the
     bombshell information was that is described in the title of the video,
     correct?
A.   Well, any new information would be bombshell. So just because it
     says bombshell, there -- there might have been a lot of information
     in that video which there's no way I can remember what was in that
     video exactly.
Q.   Well, I mean, it's not a matter of you not remembering. You never
     watched it, right?
A.   Not recently.
Q.   Right. And so -- and you didn't do anything to try to get prepared on
     it for this deposition, right?
MR. REEVES:  Objection; form.
A.   No.
Q.   You haven't read any documents about this video.
A.   No.
Q.   And you haven't talked to any employees about this video.
A.   No.
Q.   Have you tried to talk to Mr. Halbig about this video?
A.   No.[45]

When it became clear Ms. Karpova could not testify about research and sourcing for

these claims, Plaintiffs' counsel confirmed that she was unprepared to testify about *any* of

the videos in Plaintiffs' Petitions:

Q.   I want to cover some of the things we talked about in this first video
     to see if they apply for every video because I think we might be able
     to save some time. Alright? And you can tell me if we can or we can't.
     But from what I understand about that first video is, A, you didn't
     watch it and, B, you didn't talk to any of the employees involved in
     making it. That's correct, right?
A.   Yes.
Q.   Okay. Is that true for all the videos?
A.   Yes.
Q.   Okay. And in terms of understanding what claims were made in the
     videos, is that the same that you don't know what claims were made
     in the videos for all the videos?

---

[45] *Id.* at 113:23-115:8.

A.   Correct.[46]

Despite having no preparation, Ms. Karpova frequently speculated about the source for the videos, but she admitted she was making guesses, not giving testimony from knowledge or preparation. Indeed, Plaintiffs' counsel frequently had to correct Ms. Karpova when her guesses were not true:

> Q.   So sitting here today, you couldn't tell me who the sources were for the claims that you don't know, correct?
> A.   From -- I would assume they were either Mr. Halbig or Pieczenik, because these were the two sources that were -- that had pertained to the videos.[47]
> ...
> Q.   Okay. And you are telling me you're making this assumption that this must have something to do with Wolfgang Halbig or Dr. Steve Pieczenik. But do you know if either of those individuals had ever been on InfoWars by 2013?  Do you know?
> A.   Not for a fact I do not know. I could find that information if that was a question that I knew I had to prepare for.[48]
> ...
> Q.   But for these videos, where Wolfgang Halbig or Dr. Steve Pieczenik had never said anything about Sandy Hook until at least 2014, you don't know what the sources for these videos are, do you?
> A.   I would say no.[49]

Yet throughout the deposition, Ms. Karpova continued to speculate with no actual knowledge behind her answers:

> Q.   Ma'am, I just want you to understand, before we answer any more questions, that Wolfgang Halbig didn't even start investigating Sandy Hook until 2014. So when I have you here under oath saying that this must come from Wolfgang Halbig, I'm a little concerned. So I just want to stop and make sure we're not making assumptions, that we're answering the questions based on the knowledge that we have. Okay? And the reality is that when it comes to whether "the evidence was overwhelming," one, you don't know what evidence is even being talked about in that statement, do you?

---

[46] *Id.* at 54:9-25.
[47] *Id.* at 48:7-12.
[48] *Id.* at 49:5-12.
[49] *Id.* at 51:13-17.

A.  I don't.

Q.  Okay. Two, you don't know where any of that alleged evidence came from, do you?

A.  No. It's been a long time, though. Correct.

Q.  That's why I'm taking this deposition. And sitting here today, you can't do it, can you? You cannot tell me what evidence is being talked about in paragraph 17?

A.  No.[50]

Continually through the deposition, Ms. Karpova seemed eager to speculate that Wolfgang Halbig was the source for particular claims made by InfoWars, but her testimony was not correct:

Q.  Do you see where it says they had kids going around in circles in and out of the building as a photo op?

A.  Yes.

Q.  Do you know the company source on that?

A.  I believe it should be -- the company believes it to be Wolfgang Halbig.

Q.  Well, it's interesting, you know, because -- have you watched Alex Jones' deposition the first time I took it?

A.  Parts of it.

Q.  Okay. Did you watch the part about the kids allegedly going in circles around the video with the building? Have you seen that?

A.  I don't remember that specifically.

Q.  Okay. Because here's the thing. And I'm -- just again, to try to make sure that you're answering questions that you know the answer to, we already know where that one came from. We had a deposition, and we put the video up. And there's kind of an infamous YouTube video made by just some random YouTuber, some conspiracy person, and it's called the "Going in Circles" video. And it has -- it's actually not Sandy Hook Elementary at all. It's a firehouse down the street. It's not kids going in and out of the building, but it's actually adults and young teenagers. But there's this video of this circle of people going from the front to the back. And we talked about all this in deposition. It comes from a YouTube video. It doesn't come from Mr. Halbig. It doesn't come from Mr. Fetzer. It doesn't come from any of these people. But when you sit here and you say, well, I can infer it can came from Mr. Halbig, you can allow for me the possibility that those answers aren't correct, right?

---

[50] *Id.* at 60:25-61:21.

A.   Well, you can also infer that the source for the video was either Mr.
     Halbig or Fetzer, as you just mentioned. You don't know where the
     video came from.
Q.   You don't know, do you?
A.   No, you don't know.
Q.   You don't know, right?
A.   Just as you don't know.
Q.   Right. So we're just all speculating here today, right? We have no
     idea what's going on.
A.   You're speculating yourself.[51]

Ms. Karpova could not even give any testimony on the specific claims quoted verbatim

in Plaintiffs' Petitions:

Q.   When it comes to trying to figure out who [Mr. Jones is] even talking
     about here in terms of "actors playing different parts of different
     people," you didn't do anything to figure that out, correct?
A.   Correct.
Q.   You didn't ask Alex about this statement or this video, correct?
A.   Correct.[52]
...
Q.   So do you see in that paragraph it's talking about "photos of kids that
     are alive that they say died?"
A.   Yes, I see that paragraph.
Q.   Do you know what photo they're talking about?
A.   From what I can infer, it was probably a photo that -- or photos that
     were going around that people were talking about online.
Q.   Sure. You have no idea what they are. I mean, you're guessing, right?
     Right?
A.   To the best of my knowledge. There's no way to tell what they were.
Q.   You have no personal knowledge about this, correct?
A.   Well, there's no way to go back to that video because we don't keep
     those kinds of records of every show. Of any show.
Q.   You didn't talk to any of the employees, did you?
A.   It's hard to tell who worked on that day.[53]
...
Q.   Do you see where it says "DHS an hour and a half later with a time
     stamp put up signs saying 'sign in here?'"
A.   Yes.
Q.   Do you know where that came from?

---

[51] *Id.* at 101:13-103:8.
[52] *Id.* at 73:5-12.
[53] *Id.* at 79:5-22. This answer contradicts Ms. Karpova's other testimony, in which she testified "I have a list of people who were working on that day." *See* 52:20.

17

A.  No.

Q.  Okay. They had a statement that said, "They had Porta Potties being delivered within an hour and a half." Do you see where it says that? It's also in that first paragraph.

A.  Yes.

Q.  Do you know where that came from?

A.  No.

Q.  In the third paragraph, the first sentence, do you see where it says "We have the emails from the city council back and forth and the school talking about it being shut down a year before?" Do you see that?

A.  Yes.

Q.  ...Does the company know if those emails actually exist?

A.  No, it doesn't.

Q.  Do you know what the company source for saying that was?

A.  No.[54]

When confronted with her lack of preparation, Ms. Karpova asked if she could review each video at the deposition before answering:

A.  Can we review the video right now?

Q.  No. I'm not going to play a 2-hour video for you right now, no.

A.  But you expect me to know what's going on in every video?

Q.  Uh-huh. I do. I do, Ms. Karpova. And I expected Rob Dew to do the same thing when he showed up to the deposition to talk about sourcing and research and he didn't do that twice.

MR. REEVES:  Object to the sidebar.

Q.  So I do -- I want to make sure this witness understands what she's here to do today and my questions, what they are. I do expect you to have done your homework and know what was in those videos, yes, ma'am, I do. So for instance in this video, there's a claim made about Charles Jaco. Do you know who he is?

A.  No.

Q.  Okay. So you wouldn't be able to talk to me in any way about the claims made about Charles Jaco in the January 27, 2013 video?

A.  No.[55]

During a break in the deposition, Defendants' counsel requested extra time for the

break because Ms. Karpova is a nursing mother and needed time to pump, which Plaintiffs

---

[54] *Id.* at 120:19-121:19.
[55] *Id.* at 51:20-52:17.

were happy to oblige. However, Defendants also used this extra time to attempt to show Ms.

Karpova the remaining videos during the break. Yet even after this mid-deposition crash

course screening, Ms. Karpova could not meaningfully answer questions about the videos:

> Q.  Do you see there it's talking about an April 22, 2017 video called "Sandy Hook Vampires Exposed"?
> A.  Yes.
> ...
> Q.  Okay. Did you watch that video? I mean, unless you've watched it in the last couple of hours, you haven't watched it, right, for this deposition?
> A.  I'm familiar with the video.
> Q.  Did you watch it in preparing for this deposition, though?
> A.  Yes, I believe so.
> Q.  Okay. When did you watch it?
> A.  Earlier today.
> Q.  Earlier today when?
> A.  During the break.
> Q.  Oh. So during the break when it became apparent that you hadn't watched these videos, you went and tried to watch this video?
> A.  Yes.
> Q.  You didn't watch the whole thing, though, did you?
> A.  No.
> Q.  Because it's a 45-minute video, right?
> A.  It's a lengthy video.
> Q.  Yeah. So you didn't watch this video.
> MR. REEVES:  Objection; form.
> Q.  You watched pieces of this video, correct?
> A.  Correct.
> Q.  How many pieces did you watch? How many minutes total did you watch of this video?
> A.  I did not count.
> Q.  So you have no idea, sitting here today, how long it was, when it was just a couple of minutes ago?
> A.  I did not count the amount of minutes I watched.
> Q.  Okay. Was it more than 5 minutes?
> A.  I'm not sure.
> Q.  Okay. So you just watched the video within the last 20 minutes; and you're not sure if you watched more than 5 minutes of it, correct?
> MR. REEVES:  Objection; form.
> Q.  Is that correct?
> A.  I didn't time the amount of minutes I watched.[56]

---

[56] *Id.* at 122:21-124:23.

...

Q.  Do you see it talks about a June 13, 2017 video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook"?

A.  Yes.

Q.  Is that another one you were just shown during the break?

A.  Yes.

Q.  Okay. Is it fair to say that what happened is that every video past this in the petition, that you went and tried to watch a little piece of it before you came back into this room?

MR. REEVES:  Objection; form.

A.  This video I watched in its entirety.

Q.  Okay. So when did you watch that?

A.  During the break.[57]

...

Q.  Where does this come from, this picture? Where does it come from?

A.  This is a still from the show.

Q.  Do you know what show?

A.  Not specifically. It doesn't have the date year.

Q.  Okay. It's the one you just apparently watched a couple of minutes ago. You don't remember seeing this?

A.  Not this part specifically.

Q.  Okay. So you maybe didn't even watch this part of the video?

A.  I watched the video.

Q.  Okay.

A.  I don't remember this specific --

Q.  Okay. A large portion of that video is Mr. Jones going over these questions. Do you remember that from the video you just watched?

A.  Yes.[58]

...

Q.  This talks about an October 26, 2017 video called "JFK Assassination Documents to Drop Tonight." Is that another one that you just looked at at the break?

A.  Yes.

Q.  Okay. How much of that one did you watch?

A.  That's a long video. I watched parts of it.

Q.  You understand that doesn't help me, right? That that's not helping me understand what you've watched. You understand that?

A.  I understand that.

Q.  Okay. So when I'm asking you the question, this is a -- it's an hour long video, isn't it? It might be a full 4-hour episode. Do you know?

A.  I don't know the exact timestamp on that, but I know it's a long video.

Q.  How did you decide what part of it to watch?

---

[57] *Id.* at 126:8-23.
[58] *Id.* at 127:14-128:7.

A.   I skimmed through it.[59]

...

Q.   Do you see the part about the CIA visiting Lanza for recruiting? Not on the petition. In the video you watched?

A.   No.

Q.   It's in the petition. I'm asking if you saw it in the video.

A.   Yes.

Q.   You did see that part?

A.   Yes.

Q.   What was the company source for that?

A.   Again, that was based on previously sourced information Alex -- from his guests, as well as other reports.

Q.   Ms. Karpova, no, it was not. And I -- please, can you stop guessing? Because I need you to understand if you watched that video, you'd understand that this video was done because a new set of documents was declassified by the FBI on that date, and Lee Ann McAdoo did a report on InfoWars talking about those documents. It didn't come from Mr. Halbig. The testimony you gave is just not correct, is it?

MR. REEVES:  Objection; form. She didn't say anything about Mr. Halbig.

Q.   Alright. Let me adjust to your objection. This didn't come from prior videos, did it, Ms. Karpova? Or do you know?

A.   The company believe it did come from previously sourced material.

Q.   Okay. So when I talk about Lee Ann McAdoo doing this report on the documents that were declassified on that day, on October 26, 2017, do you have any idea what I'm talking about? Is that new information to you, or do you know what I'm talking about?

A.   I -- I have some information about it.[60]

...

Q.   Well, I'm asking you about the statement that the CIA recruited Lanza which you said came from prior videos. But that's not true, because that piece of information was in that released report that day, correct? Or do you know?

A.   I do not know.[61]

Ms. Kaprova could not even answer basic questions about the sourcing of the most recent video in Plaintiffs' Petition:

Q.   In 2017 did the company believe that Jim Fetzer was a reliable source of information?

A.   At that time there was controversy regarding that individual.

---

[59] *Id.* at 132:25-133:17.

[60] *Id.* at 134:2-135:12.

[61] *Id.* at 137:3-8.

Q.   In 2017 InfoWars published a video that relied on Mr. Fetzer, correct?

MR. REEVES:  Objection; form.

A.   Okay.

Q.   That's true?

A.   You're telling me that? I --

Q.   I'm actually -- no.  You need to tell me, Ms. Karpova, because you're here to talk to me about the sourcing and researching in plaintiffs' petition of those videos. Is that one of the videos you watched when y'all took the break?

A.   The Owen Shroyer video?

Q.   Yeah.

A.   Yes, I've seen that video before.

Q.   Of course. Yeah. You knew you were going to testify about it.

A.   What is the --

Q.   My question is, that was in 2017?

A.   Uh-huh.

Q.   It relied on Jim Fetzer. It had material from Jim Fetzer, correct?

A.   I don't know where Owen got that material.[62]

Ms. Karpova also testified that despite her lack of preparation, the company did not feel it needed to do anything else to prepare her for the deposition:

Q.   When the company knew that it had to produce testimony about these videos in the plaintiffs' petition, the company did not feel it was worthwhile to have employees review, watch, catalog and figure out what was said and make that available to you, correct?

A.   The company believes that I have sufficient knowledge to testify regarding these matters.[63]

Ms. Karpova's testimony was even worse than the unprepared testimony previously given by Rob Dew. Indeed, many of the questions on this topic were the exact same questions from the prior depositions. Despite understanding not only the topic, but the specific questions being asked, the company did not prepare Ms. Karpova. To excuse her lack of preparation, Ms. Karpova claimed the topic was impossible to answer:

Q.   Ms. Karpova, did you just assert for me that that topic was too broad to be answered correctly? Is that what you told me?

---

[62] *Id.* at 256:2-257:3.
[63] *Id.* at 118:19-119:1.

A.   When it comes to -- yes, for -- for all intents and purposes, yes.

Q.   So when I ask you I want to know the sourcing for a video at InfoWars, you can't figure that out? That's too broad?

A.   Sourcing can mean a lot of different things. It can -- can you be more specifically what you mean by sources?

Q.   I think you know what it means, don't you? Right? What a source is? What do you think a source is?

A.   Where you get a particular information.[64]

In sum, the deposition resulted in no actual information regarding the videos or the sources and research for the claims made by the company.

### C.   Ms. Karpova was not prepared to testify about individuals involved in the production of the videos described in Plaintiffs' petitions.

On the second topic, Ms. Karpova had not been prepared and could not give testimony about which employees were involved in the creation of the videos or what roles they played. Even worse, Ms. Karpova testified that she possessed a list of which employees were working at specific times, but she did not bring the document to the deposition, so she could not answer specific questions:

Q.   Can you tell me what employees were involved in researching that video? Who came up with those claims in that video?

A.   I have a list of people who were working on that day. From that list I could tell you who might have been in production for that day.

Q.   So the best we can tell you is -- the best we can figure out is who might have been working in the production side at that date, correct?

A.   Yes.

Q.   Okay. Have you talked to any of those people before your deposition today?

A.   No.[65]

InfoWars employs a sizeable writing, editing, and production staff, many of whom contributed to the company's coverage of Sandy Hook. Unlike Ms. Karpova, those employees

---

[64] *Id.* at 50:11-25.
[65] *Id.* at 52:18-53:5.

possess first-hand knowledge of the research and sourcing for the videos. Ms. Karpova admitted that she had every opportunity to speak to those employees, but she chose not to do so.

> Q. But for any of the videos that we're going to talk about today, for any of the videos in Plaintiffs' Petitions, you had a list of who was working at InfoWars at that time, correct?
> A. Yes.
> Q. And you could have interviewed those employees, correct?
> A. I could have.
> Q. And you didn't, correct?
> A. Correct.[66]

As a result of her lack of preparation, Ms. Karpova continuously disclaimed any knowledge of what employees were involved in researching InfoWars' claims:

> Q. And again, just like our prior answers, you don't know what employee researched the information to create the claims in this video, correct?
> A. Correct.[67]

In sum, Ms. Kaprova was completely unprepared to offer any testimony about the role played by InfoWars' employees in this case.

**D.   Ms. Karpova was not prepared to testify about internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.**

Ms. Karpova was required to prepare to testify about InfoWars' editorial discussions about its Sandy Hook coverage, but Ms. Karpova made no such preparations. In fact, she did not prepare because Ms. Karpova testified that "we did not – we do not have editorial discussions regarding Sandy Hook."[68] This statement is so wildly false that Plaintiffs' counsel made sure to confirm her testimony:

---

[66] *Id.* at 52:22-54:6.
[67] *Id.* at 58:9-12.
[68] *Id.* at 87:7-8.

> Q.   Did I hear you say InfoWars never had editorial discussions on Sandy Hook?
> A.   Correct.
> Q.   Okay. That's not true, though, right? People inside InfoWars have talked about Sandy Hook from an editorial standpoint a lot, correct?
> MR. REEVES:  Objection; form.
> A.   Negative.[69]

Ms. Karpova also confirmed that she understood the topic. She testified that "an editorial discussion would be an internal conversation about what type of information, angles to go with live on air or website or anywhere else."[70] After confirming Ms. Kaprova understood the topic, Plaintiffs' counsel again confirmed her testimony:

> A.   You asked me about the editorial discussions --
> Q.   Right.
> A.   -- of Sandy Hook.
> Q.   And there's never been any -- was that your testimony?
> A.   Yes.[71]

Plaintiffs' counsel further confirmed that if any editorial discussions *did* exist, Ms. Karpova was unprepared to talk about those discussions:

> Q.   If there were conversations between editors having editorial discussions about whether the sources they were using for Sandy Hook were reliable or not, are those discussions you're prepared to talk about today?
> A.   I have no knowledge of those discussions.[72]
> ...
> Q.   So I take it by that same token, you have never seen any documents in which one editor or high person in InfoWars, a writer, editor -- let's say editor or producer is talking to another management-level employee and saying I'm really worried about our Sandy Hook sources, you've never seen any documents like that?
> A.   Not specifically like that, no.[73]

---

[69] *Id.* at 104:9.
[70] *Id.* at 105:1-3.
[71] *Id.* at 106:8-13.
[72] *Id.* at 109:15-19.
[73] *Id.* at 109:20-110:2.

InfoWars' editorial discussions about Sandy Hook have been a central focus of the evidence offered by Plaintiffs throughout this case. In fact, Plaintiffs' recent Motion for Leave to Serve Net Worth Discovery contained a 50+ page recitation of evidence relating to internal editorial discussions. Indeed, one of the most oft-cited documents in this lawsuit, having been featured in every deposition and numerous briefs, is an email from InfoWars' chief editor telling another editor that he warned Ms. Jones that his sources on Sandy Hook were "batshit crazy."[74] The depositions and briefing in these cases have featured dozens of documents containing editorial discussions of Sandy Hook. Ms. Karpova was not prepared to address any of these discussions, denying that they even existed.

### D. Ms. Karpova was not prepared to testify about the company's knowledge of the Plaintiffs.

Ms. Karpova could not testify about the company's knowledge of the Plaintiffs or the documents produced concerning the Plaintiffs. For example, Defendants provided a set of electronic documents a few days before this Court's October 25, 2021 sanctions hearing. Included in those documents were folders containing documents specific to the four plaintiffs. The folder for Mr. Pozner contained a single document: a 187-page comprehensive background report on Mr. Pozner and dozens of his relatives. When asked about this document, Ms. Karpova could not provide any testimony:

> Q.   Have you ever seen that? Have you seen that before today?
> A.   No, I have not.
> Q.   So in terms of the document, a single document that was recently produced to me about Leonard Pozner, you've never seen.
> A.   If this is the single document you're talking about.
> Q.   That's it. Uh-huh.
> A.   No.
> Q.   Okay. Do you see where it says FSSTX dash 8085544?
> A.   Yes.

---

[74] *Id.* at 252:14.

Q.   Okay. You don't know what this is, do you? If I wanted to ask you what is this, you couldn't tell me.

A.   It looks like a background information.

Q.   Right. I mean, I can figure that out, right? Like, we can look at the top at the table of contents right here, and it says "For Licensed Investigator Purposes Only." Do you see where it says that?

A.   Yes.

Q.   And then do you see where it says "Leonard Pozner Comprehensive Report?

A.   Yes.

Q.   Do you see where it has all these entries about all this information about Leonard Pozner?

A.   Yes.

Q.   This is a lot of knowledge that the company has in its possession concerning Leonard Pozner. You'd agree with that?

A.   Yes.[75]

...

Q.   Do you see where it says page 66 for possible relatives? Can you flip to page 66 in that document for me?

A.   (Witness complies.)

Q.   This is a bunch of people's personal information, isn't it?

A.   Yes.

Q.   And you can't tell me why the company has this, can you?

A.   I don't know.

Q.   So when it comes to testifying about the company's knowledge of Leonard Pozner, which you can now see, it is extremely extensive, you're not prepared to testify about that today, right?

MR. REEVES:  Objection; form.

A.   Well, the company was asked for the knowledge of the plaintiffs.

Q.   Uh-huh. Lenny Pozner is a plaintiff, right?

A.   This is what they produced about the knowledge of the plaintiff.

Q.   Right. I understand that. I asked for a request for production of documents. Then I asked for your testimony. Part of the reason I asked for your testimony and the knowledge of the plaintiffs is because you produced to me -- your company produced to me -- a 187 page comprehensive background report on Leonard Pozner, and I wanted to know why. And I wanted to ask questions about that document. I wanted to know what was inside of it. I wanted to know the information that the company had and what they did with it. You can't answer any of that, can you?

A.    Well, this is -- just looks like a typical, like, investigation report done on a person.

Q.   You have no idea where it comes from, do you, Ms. Karpova? None, right?

---

[75] *Id.* at 219:19-220:24.

> A.   This is a document that you were provided by the company.
> Q.   Yeah. Where did the company get it? Do you know?
> A.   (No response.)
> Q.   So you don't know, correct?
> A.   Are you talking about specific people? No.
> Q.   You have no -- let's make this really clear. You have zero knowledge about this document, none whatsoever, correct?
> A.   Not other than it being an investigation report on Leonard Pozner.
> Q.   Which you have seen now –
> A.   Back -- background -- background information.
> Q.    Which you have now seen for the very first time, correct?
> A.   Yes.[76]

Ms. Karpova was also unable to give testimony concerning the videos made by the

company about Mr. Pozner:

> Q.   You know Mr. Jones did a video in February 15, 2015 about Mr. Pozner. You know that, right?
> A.   I don't have the video in front of me.[77]
> ...
> Q.   You understand InfoWars took Mr. Pozner's address and put it on air to its viewers. You know that, right?
> MR. REEVES:  Objection; form.
> Q.   Or do you not know that?
> A.   I do not have the record of it right now.[78]

Ms. Karpova was also unable to give any testimony about the correspondence the

company has had with Mr. Pozner:

> Q.   Have you seen the email Leonard Pozner wrote to the company weeks after the shooting? Have you seen it?
> A.   I don't have the recollection of it.
> Q.   So in terms of trying to get up to speed on the company's knowledge of the Plaintiffs in terms of complaints that Leonard Pozner may have made to InfoWars, you haven't seen those, have you?
> A.   I haven't seen the email you're talking about.
> Q.   Right. Yeah. You know that both Paul Watson and Alex Jones, like, worked on responses to send to Leonard Pozner? Have you seen those?
> A.   I've seen, like I said, a lot of documents.

---

[76] *Id.* at 221:9-223:2-11.
[77] *Id.* at 145:8-11.
[78] *Id.* at 145:24-146:4.

Q.   I'm not asking you --
A.   (Cross-talk.)
Q.   So that's what I'm asking you. When you got prepared to talk to me about the company's knowledge of the Plaintiffs, you haven't even seen the correspondence that InfoWars has had with that Plaintiff, right?
A.   I have not.
Q.   You don't deny Mr. Pozner complained to InfoWars about its coverage within weeks of the shooting, right? You do acknowledge that. The company acknowledges that. The company has that knowledge. Or do you not know if the company has that knowledge?
A.   I don't have specific dates of his complaints.[79]

Ms. Karpova admitted that when it comes to the company's knowledge of the Plaintiffs and the "documents [Defendants] produced as it relates specifically to those four clients," she has only "[c]ursory knowledge of Leonard Pozner and no knowledge of the other people."[80] In fact, Ms. Karpova admitted she was not prepared to testify about the company's knowledge of any other Plaintiff:

Q.   What about Scarlett Lewis, do you know what the company has in terms of information about Scarlett Lewis?
A.   No.
Q.   Do you know what information the company has about Neil Heslin?
A.   No.
Q.   Do you know what information it has about Veronique De La Rosa?
A.   No.[81]

Defendants have twice produced a small collection of documents regarding Ms. De La Rosa, Ms. Lewis, and Mr. Heslin -- first in 2019 and again in 2021 -- but Ms. Karpova was unaware of these documents. Ms. Karpova also denied InfoWars had gathered information on Mr. Heslin:

Q.   Are you sitting here and telling me today the company hasn't produced documents on those folks?
A.   No, the company has no knowledge.

---

[79] *Id.* at 217:2-218:3.
[80] *Id.* at 219:1-7.
[81] *Id.* at 223:12-21.

> Q. Really? Okay. So InfoWars' employees weren't researching materials about Mr. Heslin?
> A. There are -- there's no records of any employees researching things like that that --
> Q. Yeah, there are. Unfortunately for you, Ms. Karpova, there definitely are.[82]

Ms. Karpova's testimony is contradicted by Defendants' document production. Among the few documents produced by InfoWars discussing Mr. Heslin are multiple emails showing that InfoWars anchor David Knight was researching hit-pieces about Neil Heslin's past immediately after Mr. Heslin's appearance on Megyn Kelly in 2017. These documents were later discussed in Mr. Jones' deposition.[83] Defendants also produced documents about the other Plaintiffs, but Ms. Karpova had no awareness of those documents.

Finally, Ms. Kaprova admitted that the only materials she reviewed in preparing to testify about the company's knowledge of the Plaintiffs were two articles about Noah Pozner having an open casket at his viewing service:

> Q. The only two pieces of documentation that you have reviewed for this deposition about the Plaintiffs are two articles, both of which discuss in the article Noah Pozner's open-casket funeral, correct?
> A. Yes.[84]
> ...
> Q. Okay. So when it comes down to the documents that you reviewed for this deposition about the Plaintiffs, the only information that you're really gleaning from this that's useful to this deposition concerns Noah Pozner's open casket and the appearance of his body, correct?
> A. It was useful to some of the points.
> Q. I'm not asking what it's useful for. I'm asking you that of all the documents that you reviewed about the plaintiffs, the only piece of information that you have had gleaned from those documents that is relevant to this deposition concerns Noah Pozner's open-casket funeral and the appearance of his body, correct?
> A. These are the articles that I had chosen to bring.

---

[82] *Id.* at 224:16-25.
[83] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 71:8-73:24.
[84] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 34:8-12.

> Q.   So that is correct, right?
> A.   (No response.)
> Q.   Let's try it this way. You can't give me another piece of information out of either of those two articles that you believe is relevant to this deposition, right, other than Noah Pozner's open-casket funeral and the appearance of his body?
> A.   Correct. Those are the articles for it, yes.
> Q.   And those are the only articles that you've reviewed about the plaintiffs in preparation for this deposition, correct?
> A.   Yes.[85]

With a trial on damages approaching, one of the chief purposes of this deposition was to discover what knowledge and information Defendants possessed about the Plaintiffs. Due to Ms. Karpova's lack of preparation, those discussions were impossible, irreparably prejudicing Plaintiffs' trial.

### E.   Ms. Karpova was not prepared to testify about the documents produced by the company in response to Plaintiffs' discovery requests.

Throughout the deposition, Ms. Karpova showed she was unfamiliar with Defendants' document production. As shown above, she totally uninformed as it concerned documents about the Plaintiffs. She was also unprepared to testify about numerous documents which have featured prominently in the case. Even worse, she testified that she did not review any documents produced in the case. After prompting from her counsel, Ms. Karpova later claimed that she *did* review documents relating to this topic, but she could not identify those documents, nor did she bring them to the deposition. Ms. Karpova testified as follows:

> Q.   You thought it was important to bring articles about Noah Pozner's open-casket funeral, but did not think you should bring documents that you reviewed relevant to topic number four, correct?
> A.   Correct.[86]
> ...
> Q.   Would the documents fit in this folder (indicating)? Would they all fit in here do you think?

---

[85] *Id.* at 34:19-35:21.
[86] *Id.* at 41:16-21.

A.   I think so.

Q.   Okay. So you wouldn't need, say, like this to hold all them all. You could hold them all -- not in a banker's box like this, but in a manila folder like this, correct? Is that accurate?

A.   Yes.

Q.   Now, surely you remember some of those documents, right?

A.   I'm not sure.[87]

...

Q.   So sitting here today you can't identify any of the documents you reviewed. So you're not going – none of your testimony today is going to be based on those documents, correct?

A.   Not -- not off the top of my head.[88]

Ms. Karpova was also unprepared to speak to any specifics regarding the document production, nor could she address which requests InfoWars' produced documents.[89] Due to her lack of preparation, Plaintiffs was unable to secure testimony on this topic.

### F.   Ms. Karpova was not prepared to testify about efforts made by the company to preserve potential evidence.

Ms. Karpova could not answer questions about Defendants' document preservation efforts. Ms. Karpova did not know when a letter went out through the company issuing a litigation hold.[90] Ms. Karpova also had no knowledge of document preservation requests from the Plaintiffs or the company's actions in response to those requests:

Q.   Let me ask you this. Has the company ever received any correspondence from the plaintiffs saying please preserve evidence? Do you know?

A.   I don't have any documents on that that I understand.

Q.   Okay. So in terms of getting ready to testify about efforts made to preserve documents, you have not seen any correspondence from the plaintiffs or their counsel asking to preserve documents?

A.   I have not. Point number five has anything to do with efforts made by the company to preserve potential evidence.

Q.   Right. And here's what I'm getting at, Ms. Karpova, is that I want to know when the plaintiffs served a request to preserve documents

---

[87] *Id.* at 44:6-19.

[88] *Id.* at 46:1-5.

[89] *See, e.g., id.* at 229-233.

[90] *Id.* at 242:11.

> back in April of 2018, one, if you have seen it, and two, if the company actually did anything. And from what I understand, you didn't ever see that correspondence, right?
>
> A.   I haven't.[91]

In addition, Ms. Karpova knew nothing about efforts made to preserve InfoWars'

various internal communication systems.

> Q.   You know who Rocket.Chat is, right?
> A.   Yes.
> Q.   Okay. Is the company still using that?
> A.   Yes.
> Q.   Do you know when Rocket.Chat was searched?
> A.   No.
> Q.   Okay. Do you know when it was preserved?
> A.   No.
> Q.   Okay. What about Yahoo Messenger, do you know when that was used? Was that used during the events of this lawsuit?
> A.   No, don't know.
> Q.   Okay. What about Slack, was Slack used during the events of this lawsuit, since 2013?
> A.   I'm not sure.
> Q.   Okay. Was any efforts made to preserve any messaging systems like Slack?
> A.   I don't know for sure.
> Q.   Okay. What about things like Basecamp? Do you know what Basecamp is?
> A.   Yes.
> Q.   Okay. Was anything done to preserve Basecamp?
> A.   I don't know any Basecamp associations with InfoWars.
> Q.   Okay. Let me ask you this. Does InfoWars -- have they used Basecamp? Have employees used that to communicate with each other?
> A.   No, not that I know of.
> Q.   Okay. Not that you know of, right?
> A.   I've never heard of Basecamp being a communication platform for InfoWars employees.
> Q.   I hadn't either. And it was strange because we requested -- obviously we requested and asked for it, what are your communication platforms. Whatever, that's a whole other story. But I recently got produced a document from Paul Watson that talks about his Basecamp communications with another employee. And I'm just

---

[91] *Id.* at 243:8-244:1.

> wondering when was Basecamp used.  But you aren't familiar with
> Basecamp?
> A.   No.
> Q.   Okay. So by the same token if were there any efforts made to
>      preserve Basecamp messages, you don't know what those steps
>      were?
> A.   No.[92]

Each of these issues has come up in prior corporate depositions and in the parties'

briefing. Nonetheless, Ms. Karpova had not been prepared to give any testimony on this topic.

**G.    Ms. Karpova was not prepared to testify about the audience reach of the
videos described in Plaintiffs' petitions.**

Ms. Karpova made no efforts to learn any information relevant to the audience reach

of the videos in Plaintiffs' petitions. Ms. Karpova could not identify everywhere the videos

appeared or were disseminated by InfoWars, and she made no attempts to secure audience

size information for any of the different mediums:

> Q.   InfoWars is currently broadcast on over 200 radio stations, correct?
> A.   Around there.
> Q.   Okay. What did you do to go find out their viewership and audience
>      for those dates?
> A.   There would be no information.
> Q.   How do you know that? Who did you ask? Have you gone to -- let me
>      back this up. How many of those radio stations did you make
>      requests to?
> A.   I didn't.
> Q.   Okay. Did you do anything to figure out what those radio stations
>      audienceship was at the time those videos were broadcast?
> A.   No.
> Q.   Okay. At the time of the videos described in the plaintiffs' lawsuit,
>      how many over-the-air television stations from 2013 to 2018?
> A.   I don't have the exact number.
> Q.   So if I wanted to establish what the audience reach was of over-the-
>      air television broadcast of InfoWars, you can't help me with that
>      because you don't even know how many there are in terms of over-
>      the-air television, right?
> A.   Well, the topics asked for specific videos and the reach of those
>      videos.

---

[92] *Id.* at 245:14-247:8.

Q.   Uh-huh. And those videos were broadcast on over-the-air television, right?

A.   I would say during -- well, not necessarily. Some of the videos could have been posted as standalone videos.

Q.   A lot of "coulds" in this room. We don't know, do we? Right? So we know -- one thing we do know is at least some of them were broadcast over-the-air television, right?

A.   Yes.[93]

...

Q.   How many cable packages was InfoWars carried on between 2013 to 2019?

A.   That wasn't part of the questions. I could have found that information for you from an Affiliate Relations person.

Q.   Part of InfoWars' audience reach is the people that it reaches over cable packages, right?

MR. REEVES:  Objection; form.

Q.   Isn't that true?

A.   That is a very specific question pertaining to a department, a particular department that would need to be --

Q.   And you didn't go do that?

A.   No. That wasn't in the scope of the questions.

Q.   So in terms of the audience reach of these videos that was reached on any cable packages, you don't have any information on that for me today?

A.   No.

Q.   Okay. How many OTT services -- well, first of all, do you know what an OTT service is?

A.   What is it?

Q.   Over-the-top.

A.   Okay.

Q.   Over-the-top box systems.

A.   Okay.

Q.   Like, I think one example might be, like, Roku.

A.   Okay.

Q.   That would be an example of an OTT system. InfoWars has frequently promoted that it's on multiple OTT systems, right?

A.   But the company would have no -- the company would keep no track of those kinds of views.

Q.   But you don't know if that information is accessible, do you?

A.   There's no information for me that.

Q.   Well, let's fist figure out the first thing that I might need if I'm going to try to figure out the audience reach was, which is how many OTT packages is InfoWars included on?

A.   I would have to go back and check on that.

---

[93] *Id.* at 225:16-227:3.

Q. So in terms of the reach -- the audience reach of the audience that was reached through those OTT packages, InfoWars has no information to offer today.

A. Correct.[94]

In order to answer questions about the audience reach and various mediums of distribution, Ms. Karpova claimed she would have to talk to employees in InfoWars' Affiliate Relations department. This answer by Ms. Karpova was especially surprising since InfoWars' Affiliate Relations department was discussed at length in connection with Plaintiffs' pending sanction motion regarding post-remand written discovery. In that briefing, Plaintiffs showed how InfoWars' evasive answers about its audience reach and channels of distribution were not made in good faith given the existence of InfoWars' Affiliate Relations department. Plaintiffs' briefing even included public statements made by the manager of InfoWars' Affiliate Relations department. These matters were also discussed at oral hearing, where Plaintiffs' counsel again raised the problems with InfoWars' written discovery on this topic. Nonetheless, Ms. Karpova was unprepared to address these issues and had not spoken with Affiliate Relations about where InfoWars videos were distributed and what audiences they reached.

**H.    Ms. Karpova was not prepared to testify about the company's business structure and relationship with other parties.**

As this Court may recall from both the Sandy Hook lawsuits and the *Fontaine* case, Plaintiffs have faced immense difficulty in securing information about the business of structure of Mr. Jones' companies. Plaintiffs had no better success in Ms. Karpova's deposition. Ms. Karpova was unprepared to testify regarding the basic facts about InfoWars,

---

[94] *Id.* at 227:10-229:3.

LLC. For example, Ms. Karpova did not know if InfoWars, LLC was a holding company.[95] However, Defendants admitted in the *Furie* copyright litigation that InfoWars, LLC "is an intellectual property holding company." *Furie v. Infowars, LLC,* 401 F. Supp. 3d 952, 970 (C.D. Cal. 2019). Likewise, Ms. Karpova denied that InfoWars, LLC was a subsidiary of Free Speech Systems.[96] Yet more than two years ago, Defendants' counsel stated InfoWars, LLC would be considered as "a subsidiary of Free Speech Systems" for the purposes of this litigation.[97] Because Ms. Karpova did not even understand InfoWars, LLC or its purpose as a holding company, it was clear she was unprepared to testify about the company.

### III.     Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith.

Mr. Jones appeared for deposition the day after Ms. Karpova. During his belligerent testimony, the first words out of Mr. Jones' mouth again made clear his utter contempt for these proceedings:

> I know that my seventh amendment rights were violated by a political show trial. Yes, I do know that.[98]

Mr. Jones later testified that:

> The death penalty sanction with all the stuff we produced I believe was a fraud. And it's because they're scared of the real evidence coming out and want to be able to tell a jury that this man is guilty, now you decide how guilty.[99]
> ...
> I know I didn't get a jury trial. I know a judge said I was guilty. I don't believe that I live in the Soviet Union.[100]

---

[95] *Id.* at 244:16-24.
[96] *Id.* at 244:2-4.
[97] Exhibit 1, April 3, 2019 Hearing Transcript in *Lewis,* p. 33.
[98] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 1:23-25.
[99] *Id.* at 11:17-22.
[100] *Id.* at 13:22.

Mr. Jones testified that if this Court's conduct "isn't fraud, then nothing is."[101] Mr. Jones also blew off his obligations by claiming that he did not spend much time thinking about the discovery requests served by Plaintiffs' counsel:

> Q.   You remember we talked in that last deposition about the Bloomberg email where Bloomberg sent an email out to his people, said get ready in the next 24 hours, there's going to be a big event? You remember that?
> A.   That was a news story, yeah.[102]
> ...
> Q.   And then you remember you told me you could find it for me. Right?
> A.   Yeah, I believe I said that.
> Q.   And then you never gave it to me, did you?
> A.   To be honest with you, Bankston, you don't really inhabit much in my mind.
> Q.   I know, yeah. You don't have much respect for any of this process, do you? None of it?
> A.   I don't think you have respect for America or anything.[103]

It is abundantly clear from Mr. Jones' own statements that he has no respect for this process and does not intend on complying with his obligations as it concerns these lawsuits. Despite all of this Court's prior interventions (and indeed because of them), Mr. Jones intends to proceed in bad faith through the remainder of this case, asserting that these cases are a political show trial after having sabotaged the proceedings.

## IV.   InfoWars has the Resources to Properly Prepare its Corporate Designee.

Given the resources at its disposal, InfoWars had no excuse for its failure to prepare its deponent. During the deposition, Ms. Karpova was questioned about a document reflecting revenue to the InfoWars.com online store between 2016 and 2018.[104] Ms. Karpova testified that the sales revenue reflected in the document during that period was in excess of

---

[101] *Id.* at 12:22.
[102] *Id.* at 22:5-10.
[103] *Id.* at 22:17-23:1.
[104] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 239:17.

$165 million.[105] The document shows that InfoWars' revenue figures rose even after its social media "deplatforming" in August of 2018.[106] Yet even assuming no growth in revenue in 2019-2021, it would appear InfoWars has generated another quarter billion dollars in revenue during the three years of this lawsuit solely from online sales in the InfoWars.com store. This does not even account for InfoWars' numerous other revenue streams, which has included advertisers, click-through promotion revenue, Amazon.com sales, Ebay.com sales, YouTube monetization, donation drives, and others. According to its net worth interrogatory answer, Free Speech Systems, LLC appears to possess in excess of $50 million in capital, which it claims it owe in its entirely to "PQPR Holdings, Inc.," another shell company registered by attorney Eric Taube which is owned and controlled by Alex Jones.[107] In his own net worth interrogatory answer, Mr. Jones' noted significant assets, including equity interest in excess of $50 million, an interest note in excess of $25 million, and over $6 million in various other assets, cash, and cryptocurrency.[108] Given the history of this suit and Mr. Jones' lack of candor, Plaintiffs also expect that he has additional assets squirreled away, likely in some other shell company as yet undisclosed.

In short, Mr. Jones' operation is not a small business or a "mom and pop" company. Instead, it is one of the most lucrative media enterprises on the planet, acting as a full-time informercial for massive sales of dietary and herbal supplements. InfoWars has the resources to properly participate in corporate discovery and take the steps necessary to prepare its designee or multiple designees.

---

[105] *Id.* at 240:3.
[106] Exhibit 6, Revenue Spreadsheet, FSSTX-086589.
[107] Exhibit 7, Free Speech Systems, LLC Answer to Net Worth Interrogatory; *see also* https://opencorporates.com/companies/us_tx/0801863807
[108] Exhibit 8, Alex Jones' Answer to Net Worth Interrogatory.

**V.      This Court Should Enter All Remedies at its Disposal.**

Little more can be said about Defendants' ceaseless pattern of discovery abuse that has not already been said. Defendants have sabotaged Plaintiffs' case at every step of the proceedings, undeterred by repeated sanctions and contempt findings. Even after the severe sanction of a liability default, Defendants' bad faith obstruction continues, now sabotaging the remaining issues in the case. Obviously, Plaintiffs ask the Court to grant this motion and award reasonable expenses caused by Defendants' conduct. In addition, Plaintiffs request the following remedies:

**A.      Preclude further discovery.**

Rule 215(b)(1) authorizes this Court to enter "an order disallowing any further discovery of any kind or of a particular kind by the disobedient party." In this case, where Defendants have flagrantly sabotaged Plaintiffs' discovery at every step, Defendants should not reap the reward of any further discovery from the Plaintiffs. To preserve fairness, this Court should address Defendants' ceaseless contempt by terminating discovery.

**B.      Award all litigation costs under Rule 215(b)(2).**

Plaintiffs have expended extraordinary effort pursing discovery for years, only to be met by consistent obstruction and bad faith. Plaintiffs should not be forced to absorb those expenses. This Court has already awarded some of the attorney's fees related to discovery, but Plaintiffs have incurred numerous other expenses and court costs over the course of the litigation. This Court is empowered under Rule 215(b)(2) to address this inequity by entering "an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him." Such an award is appropriate given Defendants' ceaseless obstruction.

### C.      Enter evidentiary findings under Rule 215(b)(3).

These depositions have been sought since they were ordered by the Court in August 2018 yet ignored by Defendants. In particular, the corporate deposition was the last available avenue to secure necessary information relating to Plaintiffs' claims for punitive and compensatory damages. By repeatedly sabotaging this process, Defendants have prejudiced Plaintiffs' ability to introduce evidence on the topics of the corporate deposition. It should be remembered that Plaintiffs' ability to take a meaningful corporate deposition had already been severely hamstrung due to Defendants' false and evasive answers to post-remand written discovery. Under Rule 215(b)(3), this Court is authorized to order that "designated facts shall be taken to be established for the purposes of the action." Here, the Court should enter an order instructing the jury that relevant facts relating to the eight corporate deposition topics should be taken as established in favor of the Plaintiffs.

### D.      Assess punitive monetary sanctions for outrageous discovery abuse.

In addition to awards of attorney's fees, the Court can award punitive monetary sanctions. "Trial courts have discretion to impose monetary sanctions within limits" so long as those sanctions are "directed toward remedying prejudice caused to the innocent party." *CHRISTUS Health Gulf Coast v. Carswell,* 505 S.W.3d 528, 541 (Tex. 2016). In awarding a punitive monetary sanction, a trial court must "explain its rationale behind the amount imposed as monetary sanctions or the relationship between the sanctions and particular conduct." *Id.* At 540. In *RH White Oak,* the Court of Appeals upheld the following justification for awarding punitive monetary sanctions in addition to attorney's fees:

> The egregiousness and repetitiveness of Defendants' egregious perjury and misconduct exhibits Defendants' total disregard for and disrespect of the integrity of this Court and our judicial system. The Court finds that Defendants can pay monetary

41

sanctions, if ordered by the Court. Again, Defendants' perjury and misconduct go to the heart of this case, is egregious, exceptional and exemplifies a pattern of misconduct and disregard for truth which is not to be tolerated. Additional monetary sanctions are just, appropriate and there is a direct relationship between the egregiousness and repetitiveness of Defendants', their perjury and misconduct and this sanction because this is an exceptional case of perjury and misconduct, not about failing to produce one document or one lie, but a mountain of evasiveness, lack of candor, concealment, numerous outright lies, and total disregard for truth, which is the foundation of our judicial system based on truth, rules and litigants' compliance with those rules. Accordingly, additional monetary sanctions are appropriate, just and not excessive.

*RH White Oak, L.L.C. v. Lone Star Bank,* 14-16-00840-CV, 2018 WL 4925118, at *6 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018) (remanded by agreement, Feb. 8, 2019). In this case, every corrective step taken by the Court and other courts have been ineffective at altering or deterring Mr. Jones' contempt for these lawsuits. As such, a severe monetary penalty is now justified to address Mr. Jones' determined efforts to sabotage this process.

### CONCLUSION

For all of the reasons above, Plaintiffs ask this Court to grant their motion and enter all appropriate remedies, as reflected in Plaintiffs' Proposed Order.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

_____
MARK D. BANKSTON

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2021, the forgoing document was served upon the Court and all counsel of record via e-mail. The document was not filed on that date, pursuant to Protective Order, pending potential action on a Motion to Seal. No action having been taken, the document has now been filed on December 27, 2021.

_____
MARK D. BANKSTON

## EXHIBIT LIST

**(Exhibits withheld due to space constraints but available upon request)**

**Exhibit 1**: April 3, 2019 Transcript in *Lewis*

**Exhibit 2**: November 26, 2019 Deposition of Rob Dew

**Exhibit 3**: August 31, 2021 Hearing Transcript

**Exhibit 4**: November 3, 2021 Deposition of Free Speech Systems, LLC

**Exhibit 5**: December 4, 2021 Deposition of Alex Jones

**Exhibit 6**: Revenue Spreadsheet, FSSTX-086589

**Exhibit 7**: Free Speech Systems, LLC Answer to Net Worth Interrogatory

**Exhibit 8**: Alex Jones' Answer to Net Worth Interrogatory