# Exhibit 46

```
 1                    REPORTER'S RECORD
                    VOLUME 6 OF 9 VOLUME
 2           TRIAL COURT CAUSE NO. D-1-GN-18-001835

 3

 4   NEIL HESLIN AND SCARLETT    )  IN THE DISTRICT COURT
     LEWIS,                      )
 5                               )
         Plaintiffs              )
 6                               )
     VS.                         )  TRAVIS COUNTY, TEXAS
 7                               )
     ALEX E. JONES AND FREE      )
 8   SPEECH SYSTEMS, LLC,        )
                                 )
 9       Defendants              )  261ST JUDICIAL DISTRICT

10

11   ------------------------------------------------------

12                    TRIAL ON THE MERITS

13   ------------------------------------------------------

14

15            On the 2nd day of August, 2022, the

16   following proceedings came on to be heard in the

17   above-entitled and numbered cause before the Honorable

18   Maya Guerra Gamble, Judge presiding, held in Austin,

19   Travis County, Texas;

20            Proceedings reported by machine shorthand.

21

22

23

24

25
```

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4         MARK D. BANKSTON
          SBOT NO. 24071066
5         KYLE FARRAR
          SBOT 24034828
6         WILLIAM R. OGDEN
          SBOT NO. 24073531
7         WESLEY TODD "WES" BALL
          SBOT NO. 24038754
8         KASTER LYNCH FARRAR & BALL, LLP
          1117 Herkimer Street
9         Houston, Texas  77008
          (713) 221-8300
10

11   FOR THE DEFENDANTS ALEX JONES AND FREE SPEECH SYSTEMS,
     LLC:
12
          F. ANDINO REYNAL
13        SBOT NO. 24060482
          JOSEPH C. MAGLIOLO
14        SBOT NO. 12821600
          WESTLEY WILLIAM 'WEST' MEDLIN
15        SBOT NO. 24080702
          FERTITTA REYNAL, LLP
16        917 Franklin Street, Suite 600
          Houston, Texas  77002
17        (713) 228-5900

18

19

20

21

22

23

24

25
```

3

```
1                          I N D E X
                           VOLUME 1
2                      TRIAL ON THE MERITS
                       SEPTEMBER 2, 2022
3

4    PLAINTIFF'S WITNESSES
                                                    Jury
5                   Direct   Cross   Redr   Recr   Exam    Vol.

6    NEIL HESLIN        7      29      47     48     50      6

7    SCARLETT LEWIS    58     108     128    128    131      6

8                                                   Page    Vol.

9    Plaintiffs Rest........................        135      6

10   Defense motion........................         136      6

11   DEFENDANT'S WITNESSES
                                                    Jury
12                  Direct   Cross   Redr   Recr   Exam    Vol.

13   ALEX E. JONES    146                                    6

14                                                  Page    Vol.

15   Proceedings...........................         191      6

16   Adjournment...........................         209      6

17   Reporter's Certificate................         210      6
```

4

```
 1                         EXHIBIT INDEX
                             VOLUME 6
 2

 3    PLAINTIFF'S
      NO.      DESCRIPTION            OFFERED   ADMITTED   VOL.
 4

 5    128-Email                         69        70        6

 6    131-Email                         64        64        6

 7    PVX 32-Video, Title Unknown       92        93        6

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          TUESDAY, AUGUST 2, 2022 - MORNING PROCEEDINGS

2               *(The following proceedings were held in open*

3    *court in the presence of the jury)*

4                    THE COURT:  Good morning.  Everyone may be

5    seated.

6                    Mr. Ball, your next witness.

7                    MR. BALL:  Plaintiffs call Mr. Neil Heslin

8    to the stand.

9                    THE COURT:  All right, Mr. Heslin, you'll

10   come in front of me, please, so I can swear you in.

11   Raise your right hand.

12                   Do you solemnly swear or affirm under

13   penalty of perjury that the testimony you are about to

14   give shall be the truth, the whole truth, and nothing

15   but the truth?

16                   THE WITNESS:  I do, Your Honor.

17                   THE COURT:  Thank you so much.  Come have

18   a seat here in the witness stand.

19                   I know you've heard me say it but I'll say

20   it again, there's water, there's microphones.  If you

21   are loud enough you won't have to lean in too far, I'll

22   let you know if we can't hear you.

23                   Remember to let the lawyers completely

24   finish their question before you begin your answer.

25   Take your time.  If you don't understand something, ask

1    for clarification.  Try to answer out loud in words.

2    And try not to be nervous.

3                    THE WITNESS:  Yes, Your Honor.

4                    THE COURT:  It's not an easy thing under

5    any circumstances testifying, but particularly this.

6                    THE WITNESS:  Thank you.

7                    The only thing I ask is that everybody --

8    that counsel speak loud.  I don't hear that well.

9                    THE COURT:  Okay, great.  Let's use the

10   microphone and if you're not going to use it you'll

11   project your voice.

12                   MR. BALL:  I certain will.  Can we maybe

13   pull the microphone --

14                   THE COURT:  The chairs move, right?  You

15   can just move the chair a little closer?  Hopefully that

16   will work.

17                   THE WITNESS:  Is one of these a speaker?

18                   THE COURT:  Yes, the long skinny one is

19   the one that projects into the room.

20                   THE WITNESS:  Okay.  Thank you.

21                   THE COURT:  Thank you.

22                        NEIL HESLIN,

23       Having been duly sworn, testified as follows:

24   ///

25   ///

```
 1                    DIRECT EXAMINATION
 2   BY MR. BALL:
 3        Q.   Mr. Heslin, if you would introduce yourself
 4   to the Ladies and Gentlemen of the Jury.
 5        A.   My name is Neil Heslin, I'm the father of
 6   Jesse McCord Lewis, killed at Sandy Hook Elementary in a
 7   school murder December 14th, 2012.
 8        Q.   Mr. Heslin, why is today so important for
 9   you?
10        A.   Today is very important for me and it's been
11   a long time coming.  And I feel very good about being
12   here today, to face Alex Jones, to hold him accountable
13   for what he said and did to me, and to restore the honor
14   and the legacy of my son that was tarnished by
15   Mr. Jones.
16        Q.   Mr. Heslin, you might have seen yesterday
17   that Mr. Jones' attorney said that he would be here
18   today.  You might have known that it was understood he
19   would be here today.  How does it make you feel, sitting
20   in this courtroom right now, that Mr. Jones is not
21   sitting here facing you?
22        A.   I think it's a disrespect and I think it is
23   a cowardly act of Alex Jones not to be facing me here in
24   this courtroom.  I've been here for a week and a half
25   and my final testimony Mr. Alex Jones does not have the
```

8

1    courage to sit in front of me or face me on this

2    morning.

3         Q.   Explain to us how it is that you expect to

4    restore Jesse's honor with your testimony and through

5    this process.

6         A.   It's very important for me to have this

7    trial and this testimony today.  The reason, to hold

8    Alex Jones accountable and InfoWars for their actions.

9    Statements and the remarks and the comments made by both

10   InfoWars and Alex Jones repeatedly have tarnished

11   Jesse's legacy, questioning whether he died, whether he

12   is still alive.

13            I can't even put in words how difficult it

14   is to lose a child, regardless of that age, under such

15   brutal and horrific circumstances as Sandy Hook

16   Elementary School, the massacre.  And I just -- it's

17   something that's safe, it should have never been touched

18   or brought into a conspiracy theory, a hoax.  It just --

19   I can't even describe the last nine and a half years of

20   the living hell that I and others have had to endure

21   because of the negligence and the recklessness of Alex

22   Jones.  And his propaganda that he has peddled for his

23   own profits and success.

24        Q.   Mr. Heslin, tell us about when you first

25   remember hearing of this ugly, profane conspiracy theory

1    that Sandy Hook didn't happen; that Jesse wasn't

2    murdered.

3         A.   Well, I -- I wish the fact that those

4    statements, I wish that it was true, I wish that Jesse

5    was alive.  And that's -- that's not the case.

6         Q.   Please speak up a little bit for us on this

7    so that we can hear you, please.

8         A.   I'm sorry.

9              I said, I wish that was the case and the

10   fact that Jesse was alive, but that's not -- he's not

11   here with us.  I became aware of the statements, the

12   remarks that it didn't happen, Sandy Hook, that Jesse

13   didn't die in 2013.

14        Q.   And how did it make you feel, in 2013,

15   months, weeks, days, after Jesse's murder, hearing that

16   people were beginning to believe this thought that that,

17   in fact, did not happen?

18        A.   It was very disturbing.  I was suffering at

19   that time and mourning the loss of my son, and I -- I

20   just couldn't fathom or understand why people

21   would -- would or -- question such a horrific tragedy

22   and a loss.  I still to this day can't fathom it.

23             It's taken me years to understand the

24   dynamics and the depth of this -- conspiracy theories

25   and the hoaxes that are out there and promoted by Alex

1    Jones and InfoWars.  It goes a lot deeper than just

2    statements and the remarks and the broadcast, it

3    resonates out to followers.  And what was said about me

4    and Sandy Hook itself, it resonates around the world.

5    It's not just in this courtroom, it's not just in

6    Austin, it's not just in Connecticut, in Sandy Hook, it

7    resonates around the world.

8            And as time went on I truly realized how

9    dangerous it was and the extremists that believe this,

10   that follow Alex Jones and InfoWars and other sources

11   that repeat this, the conspiracy and the hoax.  My life

12   has been threatened, I fear for my life, I fear for my

13   safety and my family safety and their life.

14       Q.   Mr. Heslin, did you hear what was being said

15   by Alex Jones and his associates as a denial that Jesse

16   ever existed?  Did you hear it that way?

17       A.   Can you explain that a little better.

18       Q.   Sure.

19       A.   Denial?  Denial by who, the conspiracy?

20       Q.   When Alex Jones said this never happened,

21   did you hear them saying Jesse never existed, if it

22   never happened that he never existed?  I think you've

23   told me that that's the way you've heard it from time to

24   time.

25       A.   Yes, it is.

1      Q.   How did hearing other people tell you

2 essentially that Jesse never existed make you feel?

3      A.   It's hurtful.

4           But when you -- I would like to step back

5 and finish answering the first part of that.  When it's

6 stated that Jesse's was fake, that is an indication that

7 he didn't exist.  And he didn't live.

8           He did live.  I was blessed with him for

9 six and a half years.  He's been gone one and a half

10 times that.  And -- but I cherish those days.  Those

11 years.  With Jesse.

12      Q.   Take your time, Mr. Heslin.

13           THE COURT:  There are some tissues there,

14 Mr. Heslin.

15           THE WITNESS:  Allergies are bad here, I

16 guess.  Sorry.  I'm all right.

17 BY MR. BALL:

18      Q.   I know what you're doing today is incredibly

19 difficult.

20      A.   It is.

21      Q.   Mr. Heslin --

22      A.   It reopens the wounds that have never really

23 healed, never really closed.  And never will.  I only

24 hope after this trial, the outcome of it, I will be able

25 to put this behind me.

```
 1            Q.   Mr. Heslin --
 2            A.   And put a -- put an end to what's been said
 3   about Jesse, myself, and Sandy Hook, the tragedy.
 4            Q.   Tell us, if you would, about your son,
 5   Jesse.
 6            A.   Jesse --
 7            Q.   Before you do that.
 8                 Malisa, if you would please put up 3 PX.
 9                 THE COURT:  And I'm sorry, but can you
10   scoot a little closer to the microphone?  Because you
11   are hard to hear.
12   BY MR. BALL:
13            Q.   You'll notice that I put up a picture of
14   Jesse.
15            A.   Yeah.
16            Q.   How old was he when this picture was taken?
17            A.   That picture was taken about two weeks or so
18   before Jesse was murdered.  That was his class picture.
19   And we didn't get that class picture until a week or so
20   after -- after he was killed or maybe after the funeral.
21   That exact picture I carry with me every day right here
22   in my coat pocket.
23            Q.   Tell us about Jesse, if you would, please.
24   About the child that Alex Jones said never existed.
25            A.    Jesse was six and a half years old when he
```

1  was brutally murdered.  He was an energetic young child,

2  happy, always wanted to help people.  A heart as big as

3  gold.  He was a force when he came into the room, he --

4  it was like a tornado came by.  He had a very strong,

5  clear voice at a very young age.  If he was standing

6  behind you, you would think it was a 40-year-old adult

7  speaking to you.  He was on old soul, in my view or my

8  thoughts.  Loved school, he loved horses, he loved dogs,

9  he loved animals.

10          Some of the things he enjoyed most in life

11  were soccer, fishing.  We have a trout stream near our

12  home, he loved that.  He was learning to ride a bike

13  just before he got killed the summer of 2012.

14          One of the more fond memory or most fond

15  memories were in school they were just learning to add,

16  you know, it was the basic two plus two is four, and

17  then they learn that if you put a 0 on that it would be,

18  you know, 20 would equal 40.  So, he figured out the

19  more zeros you add the bigger the number you would end

20  up with and he was so proud of that, that he could add

21  such large numbers.  And simple as it is, but you know,

22  it was a big -- he was just so proud of that.

23          I have dyslexia, I don't read very well.

24  He would always say, I'll teach you sight words, dad.

25          I'm sorry.

1          He loved to work.

2          I got to catch my breath for a minute.

3          He loved to earn money, collect bottles.

4     He would do whatever little odd jobs he could.  He would

5     offer to do it for neighbors, friends, just to make

6     money.  Loved to save his money.

7          Q.   He collected coins?

8          A.   Yeah, the coins he collected were the coins

9     he made and working or he -- coins that came from the

10    balance of the bottles that he collected and cans and

11    returned.  And one of the biggest thrills and most

12    profitable things for Jesse was collecting scrap metal,

13    taking it to the scrap yard.

14          He was driving down the road, wish, oh,

15    got to get that scrap metal if it was out by the

16    curbside.  We had a pile in our backyard, periodically

17    would go get loaded in one of the trucks and he would

18    take it to the scrap yard and he would make his money on

19    it.  And afterwards he always want to stop at Mickey D's

20    for a treat, a snack he referred to it as.  But he

21    was -- he was the best.  My little buddy.

22          Q.   I know this is hard, Mr. Heslin.  And I'm

23    very sorry.

24          A.   Thank you.  Sorry.

25          Q.   I want to switch gears just a little bit.  I

1    don't want you to have to relive this day --

2          A.    I'm sorry.

3          Q.    -- too much.

4          A.    I'm sorry.

5                THE COURT:  You don't need to apologize.

6    BY MR. BALL:

7          Q.    You do not, you do not need to apologize.

8    I'm sorry that we are here.

9                Tell me when you first remember hearing

10   about the man Alex Jones.

11         A.    I heard the name Alex Jones and I heard the

12   word or the name InfoWars early on, after the beginning

13   of 2013.  I don't recall if I actually connected both

14   Alex Jones and InfoWars together and the statements and

15   the comments that were being resonated by both Alex and

16   InfoWars.  Took a little bit of time to compile and put

17   everything together.  I tried to ignore it, I tried to

18   put it out of my mind, not feed into it.

19               As time went on, it escalated quite a bit

20   more.  It was a lot more out being peddled on the

21   internet, and social media platforms was being brought

22   to my attention more often, more frequently.  I would be

23   asked by rational and sane people why people would say

24   these things and why -- why would they, in their minds,

25   believe or state that this tragedy and this murder

1   didn't happen and that Jesse wasn't killed, why people

2   accused myself and the others of being crisis actors,

3   fake, phoney.

4          And I -- it took me a long time to really

5   understand the dynamics of it, and I couldn't -- I

6   couldn't explain that, I couldn't give the people an

7   answer short of just crazy people out there in this

8   world.  And then I realized that -- that we have

9   psychopaths like Alex Jones.  Their motive I learned --

10      Q.   You didn't watch or listen to Alex Jones,

11  did you?

12      A.   No, I never listened to Alex Jones.  I never

13  followed him.  I -- the only time I did watch him was

14  when things were brought to my attention and I was

15  forced to see what was being said about me, about Jesse,

16  about the tragedy.

17      Q.   When these things are being said about you,

18  Sandy Hook didn't happen, that you never held your

19  child, that your child never existed, are you having

20  encounters with people in the public about these

21  horrific lies?

22      A.   I do.  I have.  Right up to this day.  And

23  this morning.

24      Q.   Talk to us about some of the earliest

25  encounters.

17

```
 1        A.    There's so many of them and there's such a
 2  variety of them.  The encounters or interaction, many of
 3  them are on the internet, many of them are anonymous
 4  phone calls.  Extremely large number are people come up
 5  to you in the community or through travels.  It's
 6  just -- it became a way of life, an awful way of life to
 7  have to live.
 8        Q.    Is it still that way of life today for you?
 9        A.    Pardon?
10        Q.    Is it still that way of life today for you?
11        A.    I didn't hear.
12        Q.    Is it still that way of life today for you,
13  people encountering you in the public and pushing these
14  awful lies and conspiracies that Alex Jones has
15  broadcast?
16        A.    Yes, it is.  Sometimes it's more -- more
17  often than not, sometimes it's -- there's fewer, fewer
18  encounters or interactions.  It just -- it varies.
19  There's no rhyme or reason how often or how frequent,
20  but an overall it's -- it's frequent, it's substantial.
21        Q.    And when it happens, do these encounters
22  often specifically mention Alex Jones and InfoWars?
23        A.    Often they do.  There's a lot of times no
24  one is mentioned in particular.
25        Q.    Every time this happens, and we're going to
```

1    go into a few of these, but every time this happens, did

2    it reopen that wound, that scar of Jesse's murder?

3         A.    It does.  It brings back memories, it brings

4    back flashbacks of that day, and it brings back the

5    memories of when Jesse was -- was alive.  I'm blessed to

6    have those memories, pictures of him, but when you think

7    about those memories, when you look at pictures, it's

8    sad.  It's easier to try to put it in the back of your

9    mind and not think about it and not look at the

10   pictures.

11        Q.    We've in this trial heard about the

12   interview that you gave to Megyn Kelly.

13        A.    Yes.

14        Q.    You've seen some stuff with that, and you --

15   obviously you lived it; right?

16        A.    Pardon?

17        Q.    You lived it.  You gave an interview to

18   Megyn Kelly at her request.

19        A.    I did.

20        Q.    Tell us why you did that, Mr. Heslin.

21        A.    I did that interview for a couple of

22   reasons.  Hopes of reaching Alex Jones and trying to get

23   him to stop what he was saying and doing.  I never

24   attacked Alex Jones viciously or negatively; in fact,

25   I -- that interview was around Father's Day, I believe I

1    even wished him a Happy Father's Day and I remember

2    thinking or stating how lucky Alex was, he's a very

3    lucky man to have his children with him.  And I hope he

4    has them for the rest of his life.

5                    I wouldn't wish upon Alex or anybody the

6    loss that I sustained through a child, and he's very

7    blessed to have his children and God blessed him with

8    that.  But I don't have that anymore.

9         Q.   Before you gave this interview with

10   Miss Kelly, did you ask Alex Jones and his show to stop

11   with what they were doing to you?

12        A.   Did I ever ask Alex Jones to stop what he

13   was doing?

14        Q.   Do you know that -- do you know that he was

15   asked, let me ask another way, do you know that he was

16   asked before this interview to stop what he was doing?

17        A.   I do know that.  I heard that he was -- I

18   personally didn't ask him before that.  I never had any

19   attempts of or way that I knew of to contact Alex Jones

20   or to reach him to personally tell him.  The only way I

21   really had was through the media.

22        Q.   And after that Megyn Kelly interview in

23   2000 -- in April of 2018, you first became aware of Owen

24   Shroyer, broadcaster and newscaster, an employee of Alex

25   Jones.

1         A.    Correct.

2         Q.    I'm going to play what's already been

3    played, a cut of it, Plaintiffs' Exhibit 23.  And after

4    we play it I'm going to ask you a few questions.  Okay,

5    sir?

6         A.    Yes, sir.

7              MR. BALL:  All right.  Play that for us,

8    please, Malisa.

9              (Video played off the record.)

10   BY MR. BALL:

11        Q.    Will there be a clarification from Heslin.

12              Sir, I would never take this moment away

13   from you.  You have the floor.

14        A.    Yes.  I did hold my son with a bullet hole

15   in his head.  Jumping ahead on that, many other people

16   saw Jesse with a bullet hole in his head.  It was an

17   open casket.  Jesse had, as it states on his death

18   certificate, he died of a gunshot wound to the head.

19              It was a wound on the, looking down at

20   him, it would be on his left, or his right, right side,

21   it would be on the right side.  There was a mark where

22   he was grazed by a bullet, it was described to me as

23   bullet splatter later, but it was clearly he was grazed

24   by a bullet.  Fatal shot was to his forehead and just

25   below the hairline.  Just to the left side of his -- the

1  center of his forehead.  The shot shattered his skull

2  when it entered.

3          It exited the rear left of his skull.  The

4  exit wound was about the size of a softball.

5      Q.   Asking for a clarification of that is

6  tantamount to saying it didn't happen.  How did that

7  make you feel?

8      A.   I'm not done.

9      Q.   Thank you, Mr. Heslin.  I'm sorry.

10     A.   That wound had bone fragments of facial

11 material.  That's etched in my mind forever.  At the

12 funeral again we were advised not to touch Jesse's head,

13 it was very fragile.  Basically it would have fallen

14 apart.  He died two feet from his teacher.

15         There's more about that.  The gunman's gun

16 jammed at that point, at one point.  Jesse knew that.

17 At that moment Jesse yelled for his classmates to run.

18 They did.  Nine of them are alive today because of his

19 actions.  Eleven survived.  Two were in the bathroom.

20 Jesse died a hero, it's been brought to my attention and

21 mentioned to me after by the parents, three of the

22 survivors, the runners, thanking me.

23         I went into school after.  A lot was

24 cleaned up, but the only way to describe it was like a

25 combat zone.  Block was shot out, toilets were shot out,

1   shattered.  They were removed.  Windows were shattered,

2   point of entry, the glass still remained on the ground.

3   You walk up to the school, the front door is there, to

4   the right of the front door was a big plate glass.  The

5   gun of Adam Lanza shot the glass out.  Went into the

6   building.  Went on his rampage.

7          I spent a lot of time in the classroom

8   myself alone.  I knew the exact spot Jesse's body was.

9   And I went in.  The school was later torn down and

10  relocated on the same site.  The site where the murders

11  occurred in the school, in the building, the classrooms,

12  that's referred to as the sacred ground.  It's described

13  as a silent memorial.  It's just a mound with some trees

14  around it.  Some paver bricks.  I just refer to it as

15  the murder site.

16          I visited that almost every December 14th

17  at the time the murder occurred.

18       Q.   Mr. Heslin, may I ask you a question?

19       A.   Yes, sir.

20       Q.   Thank you.

21          Every time that you hear this lie that

22  Alex Jones has pushed, does it make you relive

23  everything you just told us?

24       A.   Yes, it does.  I relive parts of it.

25       Q.   How traumatizing is that to you, sir?

1      A.    There's no words for it.  It's just

2  undescribable.  I get anxiety.  I just -- my stress

3  level goes way up.  I get chest pains sometimes.  The

4  whole thing has affected my health greatly, more so in

5  the recent years.  I wake up with anxiety attacks, panic

6  attacks.

7             THE COURT:  Mr. Heslin, I'm so sorry,  I

8  just can barely hear you.

9             THE COURT:  I'm sorry.

10             THE WITNESS:  Will you please speak up and

11  go closer to the microphone.

12             THE WITNESS:  I'm sorry, Your Honor.

13             THE COURT:  It's just I need to be able to

14  hear you and I need the jury to be able to hear you,

15  okay?

16             THE WITNESS:  I understand that, and I

17  apologize once again.

18             THE COURT:  Don't apologize, just talk

19  loud.

20             THE WITNESS:  I apologize for apologizing.

21             I wake up at night with panic attacks

22  sometimes.  I have chest pains.  I ended up in the

23  hospital several weeks ago, chest pains.  I didn't

24  think I was having a heart attack but I didn't.  I

25  wasn't.  It was stress and anxiety that brought it on.

1    Not a healthy thing.  And I hope with the outcome of

2    this trial that will subside a lot.  My hopes and goal

3    is to hold Alex Jones accountable and to be able to walk

4    out of this courthouse very soon with this all behind me

5    and move on with my life.

6    BY MR. BALL:

7         Q.   Mr. Heslin, is holding Alex Jones

8    accountable for what he's done necessary in your mind to

9    move on with your life?

10        A.   It is.  This trial is the only way I can

11   restore my credibility, reputation.  It's been destroyed

12   and damaged by his constant attacks and peddling a

13   conspiracy and a hoax.  At one point I was accused of

14   being a liar.  I haven't lied about nothing.  I'm here

15   in this courtroom telling the truth today.

16             Something I remember in the opening

17   statements, defense attorney said "Lie to a jury, lose

18   the jury."  And I -- I would never come and lie.  I have

19   never lied about any of this.  But I truly believe it's

20   true, what the defense counsel said.  Very true words,

21   very good words.

22        Q.   Mr. Heslin, I understand that your house has

23   been shot up, shot at, while people yell Alex Jones'

24   name and InfoWars.  Is that correct?

25        A.   That's correct.

1      Q.   Tell us about that, if you would, please.

2      A.   A few years back my home was shot up.

3  Vehicles were shot up in my yard.  That's disturbing.

4  Facts, facts are this case, this trial, was supposed to

5  happen a month ago, two -- April I guess it was, and it

6  was postponed due to the bankruptcy filings.  And the

7  proximity at that time when this case was put on stay,

8  somebody drove by my home shouting out the window "Alex

9  Jones" and it sounded like gunfire coming from the

10  vehicle.  It's no way to have to live.

11      Q.   You're aware of other threats to the other

12  families of the Sandy Hook school shooting?

13      A.   I am.

14      Q.   And how does that affect how you deal with

15  what is being said and the lies that Alex Jones is

16  pushing?

17      A.   I have my own threats and safety to deal

18  with.

19           MR. REYNAL:  I have an objection, your

20  honor.

21           THE COURT:  So you have to make it, I'm

22  not making it for you.

23           MR. REYNAL:  I object to --

24           THE COURT:  Legal objection.

25           MR. REYNAL:  Relevance to other families.

```
1                    THE COURT:  Overruled.

2                    MR. BALL:  Thank you, Your Honor.

3    BY MR. BALL:

4          Q.    You may continue, Mr. Heslin.

5          A.    I have my own safety to worry about and my

6    own threats.  I am aware of the other many -- many other

7    threats and situations that have happened, some of them

8    overlap to all the families, not just targeting one in

9    particular.  It's disturbing.  I feel bad for the other

10   families that they have to endure that, too.  I mean, I

11   endure it, I have to deal with it, but I don't wish it

12   on anybody.

13         Q.    How do you recover from losing a child?

14         A.    It took a long time to.  You never recover

15   from the loss of a child.  I accepted what happened

16   right after it happened.  I didn't like it, I couldn't

17   change what happened, but I knew I had to accept it to

18   be able to move forward.  I was able to move forward but

19   I never -- you can't get over the loss of a child.

20                    Many of us have lost our parents, I've

21   lost mine; many have lost siblings.  The loss of a child

22   is no comparison to that.  When you lose a child you're

23   losing part of yourself, and it's just -- it's a feeling

24   you can't describe.  It's an emptiness.  You feel

25   violated by the loss of the child.  You feel like you've
```

1    been violated, robbed, and those feelings don't go away.

2    They haven't changed in nine and a half years.

3         Q.   Mr. Heslin, how do you recover from someone

4    lying about the loss or the murder of your child?

5         A.   Hold them accountable for their actions,

6    being able to have the opportunity to stand up, clarify

7    the truth.  I don't have any more of an answer.  I hope

8    that I could provide an answer, and I hope I have

9    closure to it after this trial.

10        Q.   There have been some questions about an

11   apology versus a payment for damages.  If you could,

12   explain the difference between those two in your mind.

13        A.   Alex Jones' policies -- or apologies are

14   worthless.  At this stage, any apology would not be

15   sincere and it's come too late.  His apologies in the

16   past, there was one we saw earlier in this trial, it

17   wasn't a genuine apology.  And he continuously went on

18   recklessly as a carnival barker would, you know,

19   peddling his propaganda and his lies.  I don't know if

20   Alex is even capable of a sincere apology.

21             What was the other part of the question?

22        Q.   The apology that you told us about now, now

23   I would like for you to compare that in your words to

24   what you're requesting in this case, damages and money

25   and why.

1       A.   Monetary side of it, I believe that's the

2  only way to really put a stop to it and

3  prevent -- prevent this from happening anymore.  And

4  it's clear an apology hasn't worked for Alex Jones.  He

5  hasn't been sincere and when you give an apology you

6  don't turn around and say, I'm sorry, and recklessly do

7  what you did before.  You apologize.  That's not an

8  apology.  It's just useless words.

9              There's got to be a strong deterrent for

10  Alex Jones to prevent him from peddling these -- this

11  propaganda and to put a stop to what's being said to me

12  and about the tragedy and about Jesse, and with that I'm

13  able to restore my credibility and my reputation and

14  Jesse's legacy and honor, as he so much deserves.

15              He would have been 16 years old now.  All

16  I remember him as is as a six-year old,

17  six-and-a-half-year-old boy.  He'll always be six and a

18  half.  He would have been driving now probably instead

19  of riding a bike.  He would be in high school.  And I

20  wouldn't be here today if he was here.

21       Q.   As a beginning to restoring Jesse's honor,

22  I'm going to ask my last question.  Share for us, if you

23  would, one of your favorite memories of Jesse.

24       A.   Well, I could share two, two memories with

25  you.

```
 1        Q.   You sure can.
 2        A.   Best memory was the day he was born.  I
 3   first held him and saw him.  He was a big baby, weighed
 4   11 pounds when he was born.  And that was the best
 5   memory, probably the happiest memory.
 6             The worse memory is the day I laid him to
 7   rest.  I closed the casket that day, went to the church,
 8   went to the cemetery.  I stayed in the cemetery until
 9   9:00 o'clock at night, until the grave was covered over.
10   That was the worse memory.
11             MR. BALL:  Thank you, Mr. Heslin.  I
12   appreciate your courage, your time today.  I don't have
13   any other questions.
14             THE COURT:  All right.  Can you keep going
15   right now, Mr. Heslin?
16             THE WITNESS:  I'm good.
17             THE COURT:  Okay.  Mr. Reynal.
18                  CROSS-EXAMINATION
19   BY MR. REYNAL:
20        Q.   Good morning, Mr. Heslin.
21        A.   Good morning.
22        Q.   As a father of a six-year-old myself, I am
23   very, very sorry for your loss.
24        A.   Thank you.  God bless you and your son, too.
25   Or daughter.
```

1      Q.   God bless you, too, sir.

2           I have just a couple of questions, and I

3  don't want to keep you on the stand very long.

4           There were a couple of things I just

5  wanted to clarify.  When -- or I'll ask it this way, was

6  the first time you actually watched Alex Jones on a

7  screen speaking when it was brought to your attention by

8  Lenny Pozner in 2018, the Owen Shroyer report?

9      A.   Yes, that's correct.

10     Q.   I understand how painful this whole

11 experience must be for you, and I respect your choice,

12 whichever way it went.  Have you chosen to watch the

13 rest of the broadcasts that we have in evidence or have

14 you chosen not to watch anymore broadcasts?

15     A.   Could you clarify that, the broadcasts, are

16 you referring -- when you say broadcasts, are you

17 referring to one broadcast or several broadcasts, or --

18     Q.   So, we have in evidence broadcasts from

19 InfoWars from 2012 and 2013, 2014, 2015, and 2016, and

20 then we have the Owen Shroyer InfoWars broadcast --

21     A.   Yes.

22     Q.   -- in 2017.

23     A.   Yes.

24     Q.   And my question to you is, I know you

25 watched the Owen Shroyer broadcast.

1          A.    Correct.

2          Q.    Have you chosen, as part of this, what's

3    going on here, to watch the others, or have you chosen

4    not to -- not to engage with them?

5          A.    Okay.  Thank you for clarifying that, sir.

6                I have watched, I don't know if it's all

7    of them, I've watched a large number, numerous ones.

8    After it was brought to my attention by Lenny, Lenny

9    Pozner, that's Noah Pozner's father, Noah was killed,

10   too, in the school shooting.

11               I -- I did look a little deeper into the

12   broadcast, clips and that.  But I -- I never watched

13   Alex Jones' show.  I became more aware of who Alex was

14   and he had a show or platforms or social media, but.

15         Q.    You told us that during the period before --

16         A.    I'm sorry?

17         Q.    I would like to refer you to the period

18   before the Megyn Kelly interview.

19         A.    Yes.  The period, okay, yeah.

20         Q.    During that period, before you went on Megyn

21   Kelly, you were generally aware of conspiracy theorists

22   and rumors online.  Is that correct?

23         A.    Yes and no.  I -- I was aware of the

24   statements, the comments, the remarks.  It took a little

25   bit of time to really put it together that what the

1    conspiracy -- a conspiracy and a hoax was.

2              There was just so much of it and it was

3    all intertwined and, as I stated before, it took me a

4    long time to understand the dynamics and the depth of

5    the conspiracy and the hoax theory, hoaxsters, which I

6    didn't even think was a word until the tragedy.  I think

7    Lenny, Lenny was the one that started that, hoaxsters.

8              But I was aware of things on the internet,

9    pictures, like the Superbowl picture that we all saw,

10   that was -- my recollection that was 2013, clearly Jesse

11   was gone in 2012.  I did see that picture and it was

12   floating around the internet.  I'm not on the internet a

13   lot, I'm not a, you know, with email, social media or

14   anything.  I -- over the last few years I've been --

15   became a little more up on it.  Even phones, I still

16   prefer an old-fashioned phone.  But, yeah, that's -- I

17   hope that answered your question.

18        Q.   It does.

19        A.   Or clarified it.

20        Q.   It does.

21              And so what I took from your answer is

22   that you were, although you've never seen Alex Jones'

23   show, you were generally aware that there were a lot of

24   people online that were engaging in conspiracy theories

25   about the tragedy at Sandy Hook.  Is that correct?

1      A.   I didn't know who they were or how many or

2   anything.  I, you know, I, like I said, I just didn't

3   know the depth of it.  You go on the computer or

4   somebody sends -- sends you an article or tells you to

5   look a link up or something and you look it up and

6   that's about as far as it went.

7              I never really -- didn't compile

8   everything together until it got -- it just -- it just

9   grew on me, and I learned the connection between them

10   all and how one feeds the other.  And, you know, with

11   Alex, he had a platform and he had a very strong voice

12   and he had a lot of followers and statements and remarks

13   that, comments, resonate to a lot of people.

14              You have other people that fuel that fire

15   with comments and lies and propaganda that -- being

16   repeated by InfoWars or has been repeated by InfoWars

17   and Alex Jones.  And the way to describe it is, you

18   know, Alex was the one with the match that started the

19   fire and he's there with the tank, other people are

20   bringing pieces of wood and fueling the fire.  That's

21   because Alex has such a large platform.  Through the

22   internet.

23      Q.   What you just told us, is it fair to say

24   that those are beliefs that you've developed as a result

25   of your discussions with Lenny Pozner and with your

```
 1    lawyers and with the expert witnesses?
 2         A.    You mean, the statement I just made about
 3    the fuel tanks?
 4                 MR. BALL:  Objection.  Form.
 5                 THE COURT:  Hang on, there's an objection.
 6                 MR. BALL:  First off, I think that
 7    directly calls for attorney-client communication.
 8                 THE COURT:  Sustained.
 9                 MR. BALL:  Secondly, I think it
10    mischaracterizes the record that we've heard this
11    morning.
12                 THE COURT:  Sustained.
13                 THE WITNESS:  So, does that mean that I
14    can answer it?
15                 THE COURT:  No, sir, he has to ask you a
16    different question that doesn't violate the rules.
17                 THE WITNESS:  Okay.  Thank you.
18    BY MR. REYNAL:
19         Q.    The answer that you gave us previously about
20    the -- what you refer to as the intertwined nature --
21         A.    Yes.
22         Q.    -- of Alex Jones and the people who believe
23    in conspiracy theories, you came to that conclusion at
24    some point after the Megyn Kelly interview as a result
25    of your conversations with Leonard Pozner and others.
```

 1          A.    That's not true.  Maybe I could describe it

 2   a little better but, you know, it was a menagerie of the

 3   comments, the statements, and it was like a can of nuts

 4   and bolts, dump it out and they're all just there until

 5   you sort it out.

 6                And as I said, I didn't follow it, I

 7   didn't investigate it, I -- but then, when it had gotten

 8   more common and there was more of it going on, I had a,

 9   you know, I looked into it a little more and I sorted it

10   out and that's how I put the connection together.

11                And, no, it didn't come from Lenny Pozner

12   or my attorneys, that was from my personal experience

13   and my personal -- putting it into perspective for

14   myself.

15          Q.    And this --

16          A.    The rest of it --

17          Q.    I'm sorry, sir, had you finished?

18          A.    Or the analyzation of it, analyzing it.

19          Q.    And this belief that you formed, you formed

20   it in or about 2017?

21          A.    I don't -- some before, some, you know, it's

22   kind of developed more, I put it more into perspective.

23   I don't really know when I started to kind of realize

24   there was conspiracy going on or a hoax theory going on.

25   But it -- it took right up to -- right up to today to

1    really put things into perspective, the depth of it.

2    And I'm sure I'll learn more in the future.

3        Q.   Would you accept the possibility that the

4    hoax theory that no one died at Sandy Hook did not

5    originate with Alex Jones?

6        A.   I accept that?

7        Q.   As a possibility.

8        A.   I'm not accepting -- or not accepting

9    anything.  I heard what was said, it was repeated by

10   Alex and rebroadcast on InfoWars.  Whether it originated

11   there or not, I personally have no knowledge of where it

12   actually originated.  But it was broadcast and

13   re-publicized on, you know, through Alex and InfoWars.

14   So, that fueled the fire and resonated around the world

15   and through his followers.

16       Q.   You've stated before that you have a

17   vendetta against Alex Jones.

18       A.   Oh, I don't think I ever said that.  I -- I

19   don't think I ever said a vendetta with Alex Jones.  I

20   stated I -- Alex started this fight and I'll finish this

21   fight.  But once -- no, I don't have a vendetta with

22   him.  Once we're done here, I -- no, I don't have an

23   ongoing vendetta with him.  Just solely about what was

24   said and done to me and accountability and being

25   responsible and move forward from there.

1      Q.   Would it refresh your recollection to take a
2  look at your deposition that you gave in January of this
3  year?
4           Yes?
5      A.   Yeah, I'll look at it.
6      Q.   I've highlighted --
7      A.   Okay.  Let me look at it here.
8           Yes, it says my vendetta is with Alex
9  Jones and what was said and done to me.  And that's
10 what's got to be set straight.  My battle is with nobody
11 but Alex and Shroyer and InfoWars.  And that's correct.
12     Q.   When you use the term "vendetta" --
13     A.   Correct.
14     Q.   -- a vendetta is a blood feud; right?
15     A.   I don't really know if I classify it as
16 that, but my -- my -- I don't have a blood feud with
17 Alex Jones.  My, as I stated before, my battle is with
18 what was said and done to me.  Once we're done here in
19 court, as far as I'm concerned my business with Alex is
20 done.  Provided, you know, he never mentions me again,
21 moves on, and no more conspiracy or hoax theories about
22 Jesse.  But no, I have no no blood battle with Alex
23 Jones.
24     Q.   Would you agree with me, Mr. Heslin, that
25 prior to Owen Shroyer using your name, neither Alex

```
 1  Jones nor any InfoWars employee had ever said your name
 2  or Scarlett Lewis's name?
 3              MR. BALL:  Objection, your honor.
 4  Misleading question because we did not have all of the
 5  records that we firmly established over and over again.
 6              THE COURT:  So, misleading and calls for
 7  speculation.
 8              MR. BALL:  Absolutely, Your Honor.
 9              THE COURT:  Sustain.
10  MR. REYNAL:
11      Q.   To your knowledge, before the Owen Shroyer
12  report, had any InfoWars employee or Alex Jones ever
13  mentioned your name or Scarlett Lewis' name?
14      A.   I don't have that answer.
15      Q.   Generally I feel, now I don't know if you
16  feel --
17      A.   I'm sorry, what?
18      Q.   I feel like death is a very private event.
19  Would you agree with that?
20      A.   Private and sacred, yes.
21      Q.   And that's every death, but especially the
22  death of a child.
23      A.   I agree with you, yes.  I agree with you,
24  yes.
25      Q.   And it's sort of --
```

1          A.   Or -- or it should be.  With Jesse's death

2     that wasn't possible because it was such a publicized

3     tragedy and event at a very emotional time, it was

4     Christmas and that --

5          Q.   And there was --

6          A.   That wasn't -- that wasn't a possibility,

7     unfortunately.  But I do agree with what you said.  I

8     wish that was the case.

9          Q.   And there was, I mean, as you just

10    mentioned, there was media from everywhere in Newtown

11    pretty much immediately, wasn't there.

12         A.   I didn't take that sight in or that scenery,

13    but I do know there was lot of reports on the tragedy,

14    as with any major mass tragedy.

15         Q.   Would you prefer it if no media were

16    involved ever when there's a mass tragedy, like what

17    Adam Lanza did at Sandy Hook?

18         A.   Well, it's really an in-depth question.  I

19    think definitely it's newsworthy, the tragedy.  I think

20    it's something that should be covered by reputable

21    media.  I think there should be as much respect and

22    privacy as possible given to the victims that are

23    directly affected, but that's almost an impossible task

24    because the names become part of the news.

25              I mean, I wish I had Jesse with me but,

40

```
 1    you know, if the loss -- I don't want anybody to take it
 2    the wrong way, but, you know, if I had to choose the way
 3    he died, and I'm not saying that like, you know, a way
 4    of -- I wish it had never happened, but it wouldn't have
 5    been -- it would have been -- it wouldn't have been a
 6    mass tragedy, I wish it could have been a private -- I
 7    wish something nobody knew about it.
 8                 But that's not to say I'm, you know, I
 9    want to be real clear with the jury and everybody else,
10    that goes for the media, too, I, you know, I'm not
11    saying I wish he, you know, I wish he was here.  But I'm
12    saying, if there was a choice or a different -- I wish
13    he had perished in a different way, if he had to.  In a
14    private way.
15         Q.   Sir?
16         A.   Yes, sir.
17         Q.   Do you find it disrespectful when
18    politicians and media, pundits, descend upon a mass
19    tragedy and immediately use it to further political
20    goals?
21                 MR. BALL:  Objection.  Relevance,
22    speculation, and disgusting.
23                 THE COURT:  It is not relevant, so that is
24    sustained.  And I will not respond to the rest.
25                 THE WITNESS:  Don't answer that?
```

```
 1                    THE COURT:  No, sir.

 2                    THE WITNESS:  Thank you.

 3   MR. REYNAL:

 4        Q.    Do you recall going back on the Megyn Kelly

 5   show after this lawsuit was filed?

 6        A.    I do.

 7        Q.    And do you recall her asking you, what do

 8   you want out of it, Neil?

 9        A.    I vaguely remember the question, and I don't

10   clearly remember my response to it.

11        Q.    Would you agree with me that your response

12   mentioned nothing about money?

13        A.    I don't recall.

14        Q.    How often do you go to therapy?

15        A.    About once a month now.  It was more

16   frequent in the past.  I think I'm on a pretty good path

17   of existence.  But I -- I need the therapy still.

18        Q.    I'm sorry, sir?

19        A.    I need the therapy still, you know, just to

20   stay mentally in tune.  Just good to be able to talk

21   about it.

22        Q.    Have you ever wanted to go to therapy more

23   often?

24        A.    No.  I wish I didn't have to go at all.  But

25   I know it's, at this time, something that I need to do
```

1    and something I should do.  But I feel it's important

2    for me, anyway, everybody is different, you got to have

3    a balance with that, where I'm at now, about once a

4    month, it's a pretty good balance.  You know, maybe

5    biweekly after this when I get back home, you know,

6    probably.

7          Q.    How much does therapy cost you?

8          A.    It's around $125 a session.

9          Q.    With Dr. Crouch?

10          A.    Correct.

11          Q.    After the Sandy Hook school shooting, did

12    you become an advocate for gun control?

13          A.    It wasn't my intention, it was probably

14    viewed that way.  I spoke and told Jesse's story with

15    hopes it would prevent any future tragedies like that or

16    school shootings.  But I, you know, in the initial part

17    after I told Jesse's story, it was something that I

18    think every, you know, everybody needed to hear.

19                On another note, I fully support, you

20    know, better school security and a lot of improvements

21    across the board with everything.  Everything can be

22    improved upon.

23          Q.    You testified before Congress; is that

24    correct?

25          A.    I did, sir.

1      Q.   In December of 2012, six days after the

2  murder, you went on CNN and spoke to Piers Morgan; true?

3      A.   In that time approximately, I don't recall

4  the exact date, but yes, I did.

5      Q.   A month later you testified before the

6  Connecticut state government; correct?

7      A.   I did.

8      Q.   A couple of days later you went on, this is

9  end of January 2013, you went on CNN again?

10     A.   Refresh my memory on who that was with or --

11     Q.   It would have been with Senator Chris Murphy

12  again with Piers Morgan, discussing the second

13  amendment.

14     A.   I don't recall that, but I do recall going

15  on -- I was on CNN after, you know, the initial Piers

16  Morgan, but I honestly don't recall the date or that

17  particular one with Chris Murphy or --

18     Q.   Do you recall -- I'm sorry, sir.

19     A.   Or discussing -- a discussion with CNN about

20  the second amendment.

21     Q.   Do you recall in February going on CBS after

22  you testified in front of the Senate Judiciary

23  Committee?

24     A.   I don't really -- I don't recall, no.

25     Q.   A month later do you recall coming out in

1    the *New York Daily News* at a press conference regarding

2    politicians?

3         A.    I don't recall it.

4         Q.    That same month, in March of 2013, do you

5    recall appearing on CNN "The Lead" and being interviewed

6    by Jake Tapper?

7         A.    I remember an interview with Jake Tapper;

8    correct.

9         Q.    You're familiar with an organization called

10   Demand Action that advocates for gun control?

11              MR. BALL:  Objection.  Relevance.

12              THE COURT:  Sustained.

13   MR. REYNAL:

14        Q.    You testified earlier, I believe, on direct

15   that after this trial was delayed in April of this year

16   somebody shot at your house while yelling the name Alex

17   Jones and InfoWars.  Do you recall that testimony?

18        A.    That's incorrect, sir.

19        Q.    Okay.

20        A.    You're changing the words with that.  That's

21   not truthful.

22        Q.    Well, you tell me about it.

23        A.    What I said was I don't know the exact --

24   you probably know when the trial was, it was in April;

25   correct?  When it was supposed to go forward before?

1   But at that point, yes, somebody drove by yelling "Alex
2   Jones" and what sounded like gunfire coming from the
3   car.  Where they were shooting, no, I didn't state it
4   was shot at my house, no, to be clear.
5        Q.   So, your testimony is that after the trial
6   was continued in April you heard somebody yelling "Alex
7   Jones" and heard what you thought to be gunfire?
8        A.   Correct, that's what I stated.  I didn't
9   state it was shot at my house at that time.  That's not
10  truthful.
11       Q.   Would you agree with me that at the time of
12  your deposition in January 3rd, months before April, you
13  had already stated that you had been shot at over this?
14       A.   That's a correct statement.
15       Q.   How many times do you claim that you've been
16  shot at?
17       A.   It was one incident that I'm aware of when
18  my home was shot up and a vehicle.  I'm not aware of any
19  others, short of what I stated about in April.  And I
20  wasn't shot at in April, I just want to make that clear,
21  and I stated what sounded to be gun -- sounded like
22  gunfire.
23       Q.   Would you agree with me that's a crime?
24       A.   What?
25       Q.   Would you agree that that's a crime?

```
 1        A.    I totally do agree with you.
 2        Q.    And certainly if somebody shot at your house
 3   and shot at your car, that would be a crime, as well?
 4        A.    It would be, sir.
 5        Q.    A crime that would result in a police
 6   investigation.  True?
 7        A.    I reached out to the police.  It was also
 8   looked into by the State Police.
 9        Q.    Do you know Detective Jewiss?
10        A.    Pardon?
11        Q.    Detective Jewiss?
12        A.    I do know him.
13        Q.    He testified here the first day; do you
14   recall that?
15        A.    That's correct.  I remember that.
16        Q.    Do you recall his testimony that he hadn't
17   produced or knew of any police reports reflecting
18   harassment by anyone other than Wolfgang Halbig?
19        A.    I remember that.  But I will add to that
20   that he was aware of that incident at my home.  He did
21   come and look at the bullet holes.
22             MR. REYNAL:  No further questions.
23             THE COURT:  All right.  Mr. Ball, do you
24   have more?  It's 10:00.
25             MR. BALL:  Very briefly.
```

1          THE COURT:  Okay.  So, like total ten
2    minutes?
3          MR. BALL:  Oh, yes.
4          THE COURT:  All right, then we'll just
5    hold off and do one big break all at once.
6          Go ahead.
7              REDIRECT EXAMINATION
8    BY MR. BALL:
9       Q.   Detective Dan Jewiss, do you recall his
10   testimony, sir?
11      A.   I do.
12      Q.   Do you remember when Detective Dan Jewiss
13   told you that he retired a year ago?
14      A.   I do.
15      Q.   So, Detective Dan Jewiss wouldn't have been
16   someone who would have been involved with those reports
17   that you were just asked about as though it didn't
18   happen.  Right?
19      A.   That's correct.
20      Q.   When you tell Jesse's story, is that a way
21   for you to keep him alive?
22      A.   All I have is Jesse's story to keep him
23   alive, to keep his memories alive.
24              Something I did to keep his memory alive
25   was I started a scholarship fund, gets awarded every

```
 1   year.  I get nothing out of it, it's an endowment now,
 2   it's awarded every year to a student that meets certain
 3   criteria that I'm very proud of that's his legacy that
 4   will live on.  And I hope to be able some day to get
 5   more scholarships.
 6              MR. BALL:  Thank you, Mr. Heslin.
 7              I don't have any other questions.
 8              THE WITNESS:  Thank you.
 9              THE COURT:  Mr. Reynal.
10              MR. REYNAL:  Very briefly.
11                 RECROSS-EXAMINATION
12   BY MR. REYNAL:
13        Q.   You talk about -- you've told us about
14   telling Jesse's story.
15        A.   Yes.
16        Q.   Would you agree with me that, as a result of
17   this, you feel compelled to watch every time there is a
18   school shooting?
19        A.   What?
20              MR. BALL:  Objection, your honor.  Outside
21   the scope and relevance.
22              THE COURT:  Sustained.
23              All right.  At this time we're going to
24   take our first break.  This is going to be a little bit
25   longer break for the jury, not as long for the people
```

 1   the lawyers and I.  This is your opportunity to write

 2   down questions individually.  You're not requested to do

 3   so, this is just an opportunity.

 4            Remember all of my prior instructions,

 5   they are still in place:  No research, no conversation

 6   about anything that's happened in this courtroom.

 7            For the jury it will be about a 30-minute

 8   break, but get the questions in if you have any at the

 9   beginning, please.

10            You may be excused.

11                 *(Brief recess.)*

12            *(Discussion between court and counsel off the*

13   *record.)*

14            THE COURT:  Then on the record, we've gone

15   over the questions from the jury, I've excluded some.

16            For the reminder, are there any

17   objections, Mr. Ball?

18            MR. BALL:  No objections except, I guess,

19   you haven't read it into the record, the one that you

20   read, the one that's not in the record dealt with the

21   answer that could potentially get into --

22            THE COURT:  Let me ask you the question

23   again.

24            MR. BALL:  I'm sorry.

25            THE COURT:  Other than the questions I've

1  already excluded, are there any objections to the

2  questions I'm preparing to ask Mr. Heslin.

3                    MR. BALL:  I'm sorry, I didn't listen.

4  No, Your Honor.

5                    THE COURT:  Mr. Reynal.

6                    MR. REYNAL:  No.

7                    THE COURT:  All right, great.  Then we are

8  ready for Mr. Heslin, if you'll call him back in.  And

9  we are ready for the jury.

10                    *(The following proceedings were held in*

11  *open court in the presence of the jury.)*

12                    THE COURT:  Mr. Heslin, I'm going to ask

13  you some questions and I'll just ask you to listen

14  carefully to them and answer them to the best of your

15  ability for the jury.  Okay.

16                    THE WITNESS:  Yes, Your Honor.

17                    THE COURT:  All right.  Make sure you

18  speak up, you're very soft spoken.

19                              EXAMINATION

20                    THE COURT:  Is the amount being asked for

21  compensation and punitive damages by your family and

22  lawyers meant to prevent Alex Jones from being in

23  business after this case, or do you hope he can still

24  operate as long as he takes it as a learning lesson?

25                    THE WITNESS:  I hope he can still operate

1    and be successful, but take it as a learning experience.

2                    THE COURT:  When did you first meet and

3    start interacting with Detective Jewiss?

4                    THE WITNESS:  Detective Jewiss I met

5    through the tragedy and the investigation at Sandy Hook.

6    He was the lead detective, he testified to.  The actual

7    date I met him, I don't recall that.  It was sometime

8    shortly after the tragedy.

9                    THE COURT:  When did you first start

10   therapy with Dr. Crouch?

11                   THE WITNESS:  That was in 2013, best of my

12   memory it was in the summertime.

13                   THE COURT:  Did you ever try to contact

14   Mr. Jones directly?

15                   THE WITNESS:  No, I never did try to

16   contact Alex Jones directly.  I never had a means of

17   getting ahold of him or a way of it, and no, I did not.

18                   THE COURT:  How has Jesse's passing

19   affected J.T. and your parenting with him?  How old was

20   J.T. when Jesse passed?

21                   THE WITNESS:  J.T. would have been, I

22   believe, 12.

23                   I can't -- I can't answer on how it

24   affected anybody else outside of myself.  But I will

25   say, J.T.'s done an incredible job and grew into an

1    incredible young man.  But I can't answer that, you

2    know, it affects everybody in a different way, and to

3    lose a sibling is definitely different than losing a

4    son, or a child.

5                    THE COURT:  Is it fair to say that gun

6    control and take away guns are two completely separate

7    arguments and they are not equivalent of each other?

8                    THE WITNESS:  Could you repeat that?

9                    THE COURT:  Is it fair to say that gun

10   control and take away guns are two completely separate

11   arguments and they are not equivalent of each other?

12                   THE WITNESS:  That's a very good question.

13   I believe that's a true statement.  There's a difference

14   between gun control and -- there's a difference between

15   taking away guns and people's second amendment.

16                   As with anything, I think we could always

17   improve on our laws and our regulations, even being the

18   second amendment or the First Amendment, in fact.

19   There's steps we can do to preserve those constitutional

20   rights as it should be along with making our lives safer

21   and better.

22                   THE COURT:  The defense attempted to put

23   the words "blood feud" in your mouth.  Do you think this

24   is reckless, given your history with their clients?

25                   THE WITNESS:  I think it was a poor choice

1    of words in my deposition.  I should have had a better

2    choice of words.  I apologize for that.

3                    And to anybody that that has affected or

4    they took it in a negatively or wrong way, it was poor

5    choice of words as I, to be clear and stated before, my

6    only business is just to settle the business with Alex

7    Jones through the legal proceedings in the courtroom.  I

8    wish Alex Jones no physical harm or any more than that,

9    just accountability and responsibility through the legal

10   system.

11                   THE COURT:  How were you not aware of Alex

12   Jones after your Megyn Kelly interview which Alex claims

13   was a hit piece on him?  Did you not watch the segment?

14                   THE WITNESS:  I did not watch the segment.

15   The segment that they broadcast about me, Shroyer?

16                   THE COURT:  Yes.  The Megyn Kelly piece,

17   the whole Megyn Kelly.  Let me just read you the

18   question.

19                   THE WITNESS:  Read it again.

20                   THE COURT:  How were you not aware of Alex

21   Jones -- excuse me, how were you not aware fully of Alex

22   Jones after your Megyn Kelly interview which Alex claims

23   was a hit piece on him?  Did you not watch the segment?

24                   THE WITNESS:  No, I didn't.  I didn't

25   watch the segment until a latter date, approximately the

1    beginning of April it came to my attention.  I had no

2    knowledge of that interview or InfoWars' statement or

3    broadcast.

4                    THE COURT:  You mentioned that harassment

5    by Alex Jones' fans or hoaxsters were frequent and

6    substantial.  Can you further define these terms?  How

7    often are you approached by a hoaxster either online, in

8    person, or over the phone?

9                    THE WITNESS:  Um, I'll do my best to do

10   that.  You know, it's been over 10-year period, 10-year

11   campaign of a conspiracy and a hoax.  The hoax, it's

12   more -- sometimes it's more frequent and more often and

13   a larger volume than other times.  I've had a month, two

14   months where I've had no interaction, negative comments,

15   no confrontations.  I've had other weeks where there's

16   been dozens of comments, anonymous calls or personal

17   interaction.  There's just no way to really give an

18   accurate -- more accurate description than that.

19                    THE COURT:  Have you saved any copies of

20   written threats shared with you online or via email?

21                    THE WITNESS:  As I said, I'm not a big

22   email person or computer person.  I don't even like cell

23   phones.  I -- they're kicking around, some of them, a

24   few of them, but you know, I never -- I probably should

25   have categorized them but I haven't.  Something that

```
 1    I -- I don't really care to remember.  And I -- the
 2    easiest thing to do when you get a call or you get a
 3    message or an email is kind of just push it away, ignore
 4    it.
 5              THE COURT:  Can you further describe how
 6    your reputation has been affected?  Do you have an
 7    example of ways your reputation has been impacted?
 8              THE WITNESS:  Well, as I said, my
 9    reputation and my credibility is damaged by these
10    broadcasts.  People question what I lied about.
11              And it's hard to even go to do a job for
12    somebody or work or give a price, and so many people,
13    especially in Connecticut in the area where I live, they
14    know who I am, they recognize me, who I am, by the
15    name or by the, you know, my person, and it just always
16    seems to come up.  I've done jobs and I can be working
17    on the job and then -- or they look you up or what, I
18    don't know, but the topic comes up of, what did I lie
19    about, why did -- what was fake about the tragedy or
20    what didn't happen?
21              As I stated before, it just -- people
22    can't fathom it.  I guess unless you're not a rational
23    person or a sane person maybe you could, but sane and
24    rational people can't wrap their mind around it and
25    understand it.
```

1          THE COURT:  How will the outcome of this

2     trial allow you to restore Jesse's legacy?

3          THE WITNESS:  Well, outcome of this trial,

4     it will set it straight that Alex Jones was wrong with

5     what he said and did.  And my hopes is, with that, I'll

6     be able to clear Jesse's legacy and his honor, and

7     moving into the future we won't have to deal with the

8     conspiracy or a hoax theory about Jesse or myself.

9     Mainly Jesse.  He's the one that deserves it.  And

10    that's my hopes.

11         THE COURT:  Is there a specific amount you

12    feel would bring you closure with Alex Jones?

13         THE WITNESS:  That's a very good question.

14    It's not really about the closure.  The monetary amount

15    is about making a strong statement and preventing Alex

16    Jones and people in the future from doing what was done

17    to me and my family and Jesse.  I don't -- it can't be a

18    slap on the wrist, it can't be like somebody getting a

19    speeding ticket and just paying the ticket and then they

20    go out and do the same thing over again.

21         It's got to be -- there's got to be

22    substantial consequences for the actions to prevent that

23    from feeling or continuing to happen or happening again

24    in the future.  And a monetary amount has to make a

25    statement for that.

57

```
 1                  THE COURT:  All right.  Thank you,
 2    Mr. Heslin.  You may return back to the counsel table.
 3                  THE WITNESS:  Okay.  Thank you, Your
 4    Honor.
 5                  Thank everybody in the courtroom for their
 6    time.
 7                  THE COURT:  Thank you.
 8                  MR. REYNAL:  I have a motion I can bring
 9    after Miss Lewis is done, if you would prefer, Your
10    Honor.
11                  THE COURT:  Sure.
12                  Mr. Ball, your next witness.  I'm -- yes,
13    sorry, sometimes I look over and I forget which one I'm
14    looking at but I got that one right.
15                  MR. BALL:  The plaintiffs call Scarlett
16    Lewis to the stand.
17                  THE COURT:  Miss Lewis, if you'll come
18    stand in front of me, please.
19                  Raise your right hand.
20                  Do you solemnly swear or affirm under
21    penalty of perjury that the testimony you are about to
22    give shall be the truth, the whole truth, and nothing
23    but the truth?
24                  THE WITNESS:  I do.
25                  THE COURT:  Thank you so much, ma'am.
```

```
 1    Come have a seat in the witness chair.
 2                  And I know you've heard me say it a bunch
 3    of times, there's water, there's tissues.  We need to be
 4    able to hear you, so please speak into the microphone.
 5    Let the lawyers ask their question and then answer,
 6    answer out loud and in words.
 7                  Can you do that for me?
 8                  THE WITNESS:  Yes.
 9                  THE COURT:  Thank you so much.
10                  You may begin.
11                  MR. BALL:  Thank you, Your Honor.
12                     SCARLETT LEWIS,
13        Having been duly sworn, testified as follows:
14                     DIRECT EXAMINATION
15    BY MR. BALL:
16        Q.   Miss Lewis, if you would, please, introduce
17    yourself to the jury.
18        A.   My name's Scarlett Lewis, and I am first and
19    foremost the mom of two boys, Jesse and his surviving
20    brother, and I'm the founder of the Jesse Lewis Choose
21    Love Movement.
22        Q.   We're going to talk about that in a little
23    bit.  Before we do, though, I would like for you to tell
24    us, please, where you were when you first became aware
25    of this disgusting conspiracy that Jesse's murder didn't
```

1    happen.

2        A.    After the firehouse, the firehouse is where

3    we congregated to find out if Jesse was coming back or

4    not, I actually went to my mom's house.  I -- I'm a

5    single mom and I didn't want to go back to the house

6    that I had raised Jesse in.  So, I went back to my mom's

7    house, who lives nearby.  And my -- all of my family and

8    friends since high school flew in, and so it was an --

9    it was a crowded house and I was in shock and just

10   trying to maintain.

11            But I do remember that there were some

12   hushed whispering going around about people talking

13   about something and they didn't want me to know, so, of

14   course I wanted to know.  And they were telling me that

15   there was someone saying that that the tragedy hadn't

16   happened.  Which was so crazy to me, because I was

17   living it.

18       Q.    Is this the first time you became aware of

19   Alex Jones and his associates?

20       A.    Yes.

21       Q.    Tell me when the first time it is that you

22   became aware that this general conspiracy, this

23   disgusting web of lies, began to spin about your son's

24   murder and Sandy Hook in general?

25       A.    Well, other than that first time I guess it

```
1    would be a couple of months later, when the third and
2    fourth grade choir from the Sandy Hook Elementary School
3    had been invited to the Superbowl to sing I think
4    America the Beautiful with Jennifer hudson, and such a
5    beautiful invite for them and kind of exciting
6    experience after what they had been through, they had
7    been in the Sandy Hook Elementary School at the time of
8    the shooting so they're considered survivors.  And I
9    knew that they were going down and I watched them.  And
10   then I saw the picture with overlay afterwards
11   circulating with the kids' names on them.  Jesse being
12   left front.
13        Q.   Malisa, if we could, let's bring up PX 43.
14             The picture that you're talking about, the
15   Superbowl, you heard about this picture before seeing
16   it?
17        A.   I heard about it before seeing it, I can't
18   remember.  I can't remember.  I don't know, things
19   circulated back then.
20        Q.   Sure.  This is the picture you're talking
21   about?
22        A.   Yes.
23        Q.   The Superbowl picture that has I believe you
24   just said Jesse front left?
25        A.   Yes.
```

1          Q.   Jesse's name in the front left?

2          A.   Yes.  Fake name.

3          Q.   Sure.

4               What was your understanding about this and

5     how did it make you feel?

6          A.   It was deeply unsettling.  What people were

7     saying about the -- December 14th, the shooting, that it

8     didn't happen; that these children from the Sandy Hook

9     school were actually the victims, alive, older, it was

10    deeply unsettling to me because it's so out of touch

11    with reality that it's scary.  It was scary to think

12    about who would think like this.

13         Q.   I want to take you back even before this.

14    Well, first off, did you understand this picture, this

15    pushing of this information including this picture and

16    the Superbowl thought came from Alex Jones or was being

17    pushed by Alex Jones?

18         A.   Can you repeat the question?

19         Q.   Sure.  That was a bad question.

20              Did you understand this picture, this

21    conspiracy here, to be coming from Alex Jones?

22         A.   Yes.

23         Q.   Pushed, pushed by Alex Jones?

24         A.   Yes.

25         Q.   I want to take you back even before this.

62

1  Was there anything about your understanding or did you
2  learn or was Jesse's wake interrupted in any way by this
3  conspiracy, this web of lies?
4       A.   Yes.  So, Jesse was murdered on a Friday and
5  the following Wednesday we had a wake for him at a local
6  funeral home, and people were lined up outside.  And
7  then coming in we were -- we had an open casket, and we
8  were blessed to be able to have an open casket because
9  of the lack of damage done to the body.
10            So, people would walk in, they would sign
11  something, they would walk past the casket and then to
12  me.  And so I'm just meeting people as they're coming
13  through and I remember looking up and seeing the Hell's
14  Angels there and I thought, well, at the time I was in
15  shock and so I just thought -- I, you know, it was -- it
16  was surreal, anyway.  But then I found out later that
17  they were there to, ironically, keep the peace, which
18  was also surreal to me, to make sure that there wasn't a
19  disturbance at the wake.
20       Q.   Your understanding is that this came from
21  the beginning of this conspiracy and web of lies that
22  Jones was pushing?
23       A.   Yes.
24       Q.   I want to talk to you a bit about other
25  encounters that you've had with the public as it

1    concerns this web of lies and what Jones was pushing,

2    okay?

3              Have you received, I'm not going to go

4    into every one of them, but have you received emails,

5    threats, death threats and the like, as it concerns

6    this?

7         A.   Yes.

8         Q.   One of those emails let me provide to you.

9    Marked as Plaintiffs' Exhibit Number 131.  Does this

10   refresh your recollection of one of the emails?

11        A.   Yes.  It's actually a couple of emails.

12        Q.   I might have given you the one that is

13   highlighted.  Did I give you the one that's highlighted

14   there?

15        A.   No.

16        Q.   Okay.  It's a bunch of emails.

17        Q.   131, thank you.  This is highlighted.

18              If we could, Plaintiffs move -- first,

19   Plaintiffs move Exhibit 131 into evidence.

20              THE COURT:  Any objection?

21              MR. REYNAL:  No.

22              THE COURT:  Plaintiffs' 131 is admitted.

23         (Plaintiff's Exhibit 131 admitted.)

24              MR. BALL:  If you would please, Malisa,

25   bring up 131.  Go to page 2 there with me.

1    BY MR. BALL:

2         Q.    And we see on page 2 this email is from a

3    person that we've seen or heard of in this trial a

4    bunch, Wolfgang Halbig.

5         A.    Yes.

6         Q.    Do you know who Wolfgang Halbig is?

7         A.    Yes.

8         Q.    One of many people associated with Alex

9    Jones in this grotesque lie about your son's murder?

10        A.    Yes.

11        Q.    One of the people that Alex Jones pushed

12   over and over on his show?

13        A.    Yes.

14        Q.    If we can go to page 3.  We have there at

15   the very top, and we'll highlight it for you, Rob D,

16   InfoWars.com?

17        A.    Yes.

18        Q.    You might be able to see it on the screen,

19   we've highlighted it here.

20              THE COURT:  Can you see those?

21              THE WITNESS:  I can, yes.

22   BY MR. BALL:

23        Q.    That's an Alex Jones InfoWars website, or

24   email, shall I say?

25        A.    Yes.

1    Q.   I want to talk to you a little bit about

2  this email.  It first says, "Neil Heslin is not Jesse's

3  dad, unless you can send me his birth certificate."

4              How did that make you feel?

5    A.   It's not the only time that Jesse and his

6  birth certificate have been questioned.  It was deeply

7  unsettling.  If you read the rest of the email, it's

8  pulling names from different parts of my life, all my

9  family, you know, my friends, previous relationships.

10  It's deeply unsettling.

11    Q.   What is it like, having people associated or

12  Jones and his associates asking you for birth

13  certificates?  How does that make you feel?

14    A.   I remember a different email asking me for

15  Jesse's birth certificate, and I had -- I had actually

16  been on the phone with a school in Texas who had had a

17  child that had died by suicide because of continuous

18  bullying, and I thought -- I sat down, I opened the

19  email and I read that and I thought -- and they were

20  asking me to come in and talk and help their student

21  body.  And I sat down, I opened up the email and I

22  thought, I have a connection with that little boy.

23              That's how it made me feel.

24    Q.   If we go on down this page, I'm going to

25  read something for you, and I'm going to apologize first

1    because I know that this must be true.  It says:

2            "I have been avoiding Scarlett because I

3        find her appalling and disgusting.  If the

4        *Arkansas Democrat Gazette* published a spin

5        article on Scarlett and her beginnings in

6        Fayetteville, then further research is

7        warranted into this woman's past and her

8        extended family.  We know she is a fraud, but

9        how deep it goes we may not know, yet."

10            What is it like, reading those words after

11   what you've gone through?

12        A.   Deeply unsettling.  The *Arkansas Democrat*

13   *Gazette* was actually doing an article on me because I

14   was there speaking in schools about a movement that I

15   started in my son's honor, and I am actually from

16   Arkansas and -- and so it was, you know, deeply, deeply,

17   deeply upsetting.  And then also upsetting that you have

18   people that are thinking that of you, appalling and

19   disgusting.  It's in your face, it's scary.

20        Q.   There is another email where you

21   have -- well, let me ask it a different way.  How does

22   this make you feel as it concerns your own security and

23   safety?

24        A.   I feel compromised.  I mean, you can look at

25   this email and you see that they have done research on

1    me, and I don't -- I guess through social media and

2    maybe websites to do searches on people.  They have all

3    the different names that I've ever used and that I use

4    now, they have people that they've dragged out from my

5    past.  It's, I know I'm using this word a lot, but

6    deeply unsettling, to your very core.

7             Q.   You referenced research that they're doing

8    on you.  Let's look at the next page, page 3.  At the

9    top of the page it reads, "Neil Heslin, 57, reportedly

10   is the father of Jesse McCord Lewis.  Not very likely.

11   Perhaps J.T. stand for Jordan Trent."  And then there is

12   a picture of you with other people in your family.

13             How does this make you feel?  Explain this

14   for us, please.

15             A.   Well, I'll go back to the previous page for

16   a second, and it says, "They attended in 1984," so I was

17   in high school, "a concert," and I did.  But that's not

18   my name.  And yeah, those are the names of my brothers.

19   So it definitely makes me feel victimized and, you know,

20   it's -- it's not just me, it's not just my son, you

21   know, it's interesting, the ripple effect.  This is now

22   my entire family.  It's my friends.  It's people that I

23   have known in my past, it's -- it goes -- it's far

24   beyond just me.  And Jesse and my surviving son.

25             Q.   The next page, please, Malisa.

68

```
 1              Having pictures sent to you by someone you
 2    don't know, who is clearly mentally unstable, what does
 3    that do to your psyche?  To your trust in the outside
 4    world?
 5         A.   I mean, this is supposed to be me but it's
 6    not, it's actually another victim's family.  Supposedly
 7    they think it's me.
 8              It's different than losing a son -- having
 9    a son murdered, I didn't lose him, he was murdered.
10    It's different than having a son murdered, because as
11    shocking as that was, that happens.  People go through
12    that.  But then being a victim's parent and having
13    someone victimize you in a different way is -- and like
14    this, just completely -- like you try to process the
15    death of a child, and it's -- people have done that, but
16    you can't process this.  You can't make sense out of
17    nonsense.
18         Q.   This is one of many emails you have
19    received.  Is that fair?
20         A.   Yes.
21         Q.   Is this representative of the other emails,
22    the other communications that you have received?
23         A.   Yes.
24         Q.   Again I'm not going to talk about every one
25    of them, but I want to talk about a few others.
```

1                    Plaintiffs' Exhibit 128.

2                    Does this refresh your recollection of

3    questions further that were sent to you from this

4    Wolfgang Halbig that Alex Jones over and over again

5    referred to on his radio show?

6        A.   Yes.

7                    MR. BALL:  Plaintiffs move into

8    Exhibit 128.

9                    THE COURT:  Any objection?

10                    MR. REYNAL:  Yes, Your Honor.  Lack of

11   foundation as to how it was received, what year, all

12   that kind of stuff.

13                    THE COURT:  Can I see it?

14                    MR. BALL:  Sure, Your Honor.

15                    I can lay another foundation.

16                    THE COURT:  Okay.

17   BY MR. BALL:

18        Q.   The exhibit that you have in front of you

19   marked as Exhibit 128, this is an email, an attachment

20   to an email that you had received before.  Correct,

21   Miss Lewis?

22        A.   Yes.

23        Q.   And it is an attachment to the email that we

24   looked at there in Exhibit 131?

25                    THE COURT:  This is an attachment to the

```
 1   exhibit that's already been admitted?
 2                 MR. BALL:  Yes, well, I think I probably
 3   should have just admitted them together, but yeah.
 4                 MR. REYNAL:  On that basis I have no
 5   objection, if it's part of the earlier email.
 6                 THE COURT:  128 is admitted.
 7              (Plaintiff's Exhibit 128 admitted.)
 8   BY MR. BALL:
 9        Q.   128, if we could please put that up, Malisa.
10                 I want to read the bottom of it.
11             "A criminal faction is manipulating your
12        thoughts and feelings by withholding
13        information regarding the Sandy Hook school
14        shooting of December 14, 2012.  My friends and
15        I want specific and complete answers to the
16        following questions.  We would be pleased if
17        you, too, would be curious enough to desire
18        answers to these 51 questions."
19                 This is something that was sent to you?
20        A.   Yes.
21        Q.   Were you sent emails from Wolfgang Halbig
22   concerning these questions of Sandy Hook on a number of
23   occasions?
24        A.   Yes.
25        Q.   How does receiving these questions
```

1  questioning the murder of Jesse Lewis, your son, how

2  does that make you feel?

3        A.    Unsafe.

4        Q.    Does it make you relive the moments

5  surrounding his murder?

6        A.    Yes.

7        Q.    Does it reopen the wounds that were created

8  as a result of your grief?

9        A.    Yes.

10       Q.    Does it make them difficult to hear?

11       A.    Yes.

12       Q.    Tell us about that.

13       A.    Healing from having a child murdered is

14  possible.  It's a lifelong, lifelong journey.  It's like

15  losing a limb and, you know, there's phantom pains,

16  evidently, I don't know, but when you lose a limb you

17  always feel it, it's like it's always there, because

18  you're so used to having it.  You should have it and you

19  probably reach out for something with a hand.

20             And that's how I kind of compare losing a

21  child, like that.  He should be here and he's not.  But

22  it's something that you can process.

23             This, I think the fear and anxiety and

24  unsafeness and that this, that all of these, this just

25  continuous, and it doesn't even have to be that many,

1    it's just, you know, this element that's always in the

2    background of fear keeps you from -- keeps me from

3    healing.  It definitely, it definitely negatively

4    impacts the healing process.

5         Q.   Miss Lewis, have -- by the way, where do you

6    live?

7         A.   I live in Sandy Hook.

8         Q.   Do you live in the same house that you lived

9    in with Jesse?

10        A.   I do.

11        Q.   And have you had people come to that house,

12   make you feel unsafe there because of these lies and

13   conspiracy that Jones has been pushing?

14        A.   Yes.

15        Q.   Tell us about that.

16        A.   There was a Christmas, and we usually now go

17   over to my mom's for Christmas because I don't put up a

18   tree anymore.  But it was Christmas morning and I had a

19   car drive into my driveway and a man got out, started

20   taking pictures.

21             And so, I walked outside and I said,

22   excuse me, and he took pictures and then got back in his

23   car and drove away.  Unsettling.

24        Q.   Do you feel unsafe at your own house?

25        A.   I have, yes.

```
 1          Q.    We heard briefly, I just need to address it,
 2   we heard briefly that you own a gun at your house.
 3          A.    Yes.
 4          Q.    Is that because of the safety fears that you
 5   have?
 6          A.    Yes.
 7          Q.    If you would like to explain a little
 8   further.
 9          A.    Well, I'm a single mother and responsible
10   for the safety of both of my boys.  And I was not able
11   to keep one of them safe, and so I am going to keep my
12   surviving son safe.  And, you know, you can tell by
13   these emails that the people writing them are not
14   grounded in reality, and that is deeply concerning.  And
15   you can tell, I could tell, by the InfoWars, the two
16   people that testified from InfoWars, as well as Alex
17   Jones, that they don't care.  That's also deeply
18   unsettling.
19          Q.    When InfoWars, Dan Bidondi I think you've
20   seen on the screen and others from InfoWars, would come
21   to town in Newtown, the Sandy Hook community, would you
22   hear about it?
23          A.    Yes.
24          Q.    How?
25          A.    The mayor at the time would send out an
```

1    email to the parents, advising us of the fact that they

2    were coming to town and telling us to stay in our homes,

3    stay safe, just be aware.  And so I would.

4         Q.   How did it make you feel when someone told

5    you that these people were coming into town, knowing

6    what they were saying?

7         A.   It was frightening.  You didn't know what to

8    expect, you didn't know what they were going to do.

9    They would show up at different places, make outlandish

10   allegations and accusations and threats and, um, you

11   felt limited by that.

12        Q.   The death threats that you heard or the,

13   excuse me, let me ask it a different way.  Are you aware

14   of other parents in the community living these same

15   nightmares and death threats that you're talking about?

16        A.   Yes.

17             MR. REYNAL:  Objection, Your Honor.

18   Relevance, other parents.

19             THE COURT:  Well, we've gotten the answer.

20   I'm going to overrule it, let's see where go.

21   BY MR. BALL:

22        Q.   And does knowledge of what others in that

23   community who have lost a child affect how you feel and

24   go about your day?

25        A.   Absolutely.  I mean, we are almost like a

```
 1    family.  I mean, we are bonded forever, the 26 families,

 2    by what we've been through.  So, if something happens to

 3    one of them, we hear about it.  And it is like it's

 4    happening to us.

 5           Q.   Do you share with them what has happened to

 6    you in that same regard for that same reason?

 7           A.   Yes.

 8           Q.   There are death threats that you are aware

 9    of to other people that you believe apply to you, as

10    well?

11           A.   Yes.

12           Q.   Are you aware of a particular person, her

13    name is Lucy Richards?

14           A.   Yes.

15           Q.   And --

16                MR. REYNAL:  Object again on relevance,

17    hearsay.

18                THE COURT:  Overruled.

19    BY MR. BALL:

20           Q.   What is your awareness and understanding of

21    who Lucy Richards is?

22           A.   Lucy Richards is a woman who made threats to

23    the Pozner family, both Veronique and Lenny, on their

24    voicemails, and she was later arrested and jailed for

25    those death threats.
```

1        Q.    Are you aware that one of the punishments

2   that she was given is she couldn't listen to the Alex

3   Jones Show?

4                MR. REYNAL:  Object to the hearsay, Your

5   Honor.

6                THE WITNESS:  Yes, I am aware of that.

7                THE COURT:  Overruled.

8   BY MR. BALL:

9        Q.    And knowing that someone was punished and

10  that they're not allowed to listen to The Alex Jones

11  Show, how does that affect the way you react to further

12  harassment from his show?

13       A.    You see the type of -- some of the people

14  that listen to his show and take everything that he says

15  at face value.

16       Q.    You have heard the actual death threats from

17  Miss Richards?

18       A.    I have.

19       Q.    Would hearing one of those death threats

20  better help us to understand how you receive them and

21  the anxiety that's given to you?

22       A.    Yes.

23                MR. REYNAL:  Your Honor, I'm going to

24  object to the hearsay, 403.  A death threat that Lucy

25  Richards left for the Pozner family in Florida has no

1    relevance to this case.

2              MR. BALL:  It has -- may I respond, Your

3    Honor?  It has the utmost relevance in this case.  Every

4    family member, as she has testified, talks to each

5    other, and a death threat upon one they perceive as

6    information to themselves.  This is something that I

7    think she well understood thus far that causes her

8    anxiety, and talking about the death threat certainly

9    isn't going to be as easy for her to relay to the jury

10   her feelings than actually hearing the death threat.

11             So, it is for the purposes of not -- not

12   for the truth of the matter asserted, certainly, but

13   because -- for demonstrative purposes, I should say.

14             THE COURT:  So, you're asking to play it

15   but not admit it into evidence.

16             MR. BALL:  That is correct, Your Honor.

17   I'm sorry, I should have said that.

18             THE COURT:  How long is it?

19             MR. BALL:  Four to eight seconds.

20             THE COURT:  All right.  It will be played

21   for the purpose of further questioning of Miss Lewis

22   about her state of mind and how it affects her as

23   relates to this case, not for any truth contained in it,

24   so.

25             MR. BALL:  Thank you, Your Honor.

```
 1                    (Audio played off the record.)
 2   BY MR. BALL:
 3         Q.    When you hear -- by the way, this was sent
 4   to Lenny and Veronique Pozner?
 5         A.    Yes.
 6         Q.    You know the Pozners?
 7         A.    I do.
 8         Q.    You know them well?
 9         A.    Yes.
10         Q.    Speak to them often?
11         A.    Not that often, but.
12         Q.    Sure.  Speak to them --
13         A.    Yes.
14         Q.    -- I guess is what I'm trying to get at.
15               You heard this directly from them?
16         A.    Yes.
17         Q.    They -- they allowed you or wanted you to
18   hear this?
19         A.    Yes.
20         Q.    And when you heard this the first time, how
21   did that make you feel?
22         A.    Frightened.  It's a death threat.
23         Q.    Did you feel as though it was directed to
24   you, as well?
25         A.    I felt like it was directed to all the
```

1    families.

2         Q.    Does that affect you, knowing one family is

3    receiving death threats?

4         A.    Absolutely.

5         Q.    There are -- are there a number of other of

6    these recordings that you heard?

7         A.    Yes.

8         Q.    I'm not going to have you listen to them

9    today for obvious reasons, but have all of the other

10   recordings from this woman caused you fear, anxiety?

11        A.    Yes.

12             MR. REYNAL:  I object to facts not in

13   evidence, Your Honor.

14             THE COURT:  She just testified.  That put

15   it in evidence.  Overruled.

16   BY MR. BALL:

17        Q.    The fear and anxiety that comes with this,

18   can you please explain it to us.

19        A.    It's fear, fear for your life, but I guess

20   it's not even mostly fear for mine, it's fear for my

21   surviving son, it's fear for the other people that have

22   been brought into this, my family and friends.  It's --

23   it paints everything.

24             I paint and I've described it like I

25   just -- it's one more layer.  You have a painting and

80

1   then your son is murdered and that's a varnish on it and

2   then this is another varnish, a darker varnish on top of

3   all of that, it's just with you all the time.  It's just

4   a thought in your head all the time.

5                    THE COURT:  It is actually noon.  I think

6   we will take our lunch break now.  We'll return at 1:30.

7                    For my jury, you may not discuss anything

8   that you have heard in court so far.

9                    All right.  So we'll take a break until

10  1:30.

11

12                    *(Whereupon the jurors exit the courtroom*

13  *and the following proceedings were held in open court)*

14                    MR. REYNAL:  May I briefly, Your Honor?

15                    THE COURT:  You may be seated.

16                    Yes, Mr. Reynal.

17                    MR. REYNAL:  Just to reurge my motion for

18  mistrial under 41.011 based on the testimony of

19  Mr. Heslin and the testimony that's just been elicited

20  from Miss Lewis.

21                    THE COURT:  All right.  That motion is

22  denied.

23                    Anything else?

24                    MR. REYNAL:  No, Your Honor.

25                    THE COURT:  All right.  At some point

1  someone will bring out Version 2 of the charge and leave

2  it on your tables for you during the lunch break.

3                    MR. REYNAL:  Did Your Honor receive my

4  email?

5                    THE COURT:  I received an email from each

6  side and I have incorporated what I think is appropriate

7  and I'll let you take a look at it when we bring it back

8  out.

9                    *(Noon recess.)*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            TUESDAY, AUGUST 2, 2022 - AFTERNOON SESSION
 2        (The following proceedings were held in open court)
 3                   THE COURT:  I heard somebody wanted to
 4    talk to me without the jury?
 5                   MR. BALL:  Yes, Your Honor.
 6                   THE COURT:  On the record?
 7                   MR. BALL:  Sure.
 8                   THE COURT:  Okay.
 9                   MR. BALL:  I wanted to bring to the
10    Court's attention now that, while Mr. Heslin was on the
11    stand, Alex Jones was on his radio show saying what I
12    believe to be pretty much per se defamatory statements
13    of Mr. Heslin.  And, in addition to that, what he had to
14    say about Mr. Heslin in this process and even mentioned
15    Mrs. Lewis's name I believe goes directly to her claim
16    for intentional infliction of emotional distress.  And I
17    am going to admit through her the video of Mr. Jones on
18    his show not 45 minutes or so ago.
19                   I wanted to bring that to the Court's
20    attention now in case we needed to talk about that so
21    the jury doesn't have to leave when I bring it up.
22                   THE COURT:  All right.  Are you going to
23    have an objection?
24                   MR. REYNAL:  I haven't seen the clip.  Is
25    it the whole show that he would like to bring in?
```

1          MR. BALL:  It certainly isn't the whole

2   show that I would like to bring in, I don't think it has

3   any value except for the statement that I want to bring

4   in, and I can play it now.

5          THE COURT:  All right, why don't you that

6   now.

7          MR. BALL:  Sure.

8          *(Video played off the record.)*

9          So, I think this goes to direct evidence

10   of her emotional and -- her intentional infliction of

11   emotional distress, it goes to punitive damages; and

12   there's a number of different ways that it goes to both

13   of those and I would like to play that during her

14   further direct examination.

15          MR. REYNAL:  I've been told that it goes

16   on, and he says that he is sorry, and we ask that the

17   entire part be played.

18          THE COURT:  Spit your gum out, Mr. Jones.

19          Mr. Jones:  It's not gum.

20          THE COURT:  What is it?  Because you're

21   not allowed food or gum of any kind in the courtroom.

22          Mr. Jones:  I had my tooth pulled a week

23   and a half ago and I had some gauze in there earlier and

24   it's been causing me to have some pain.

25          THE COURT:  So, you're chewing on your

1    gauze.

2            Mr. Jones:  Would you like me to show you?

3            THE COURT:  No, I would just like you to

4    answer my question.

5            Mr. Jones:  No, I'm just massaging the

6    hole in your mouth with my tongue (indicating).

7            THE COURT:  I don't want to see the inside

8    of your mouth.

9            Mr. Jones:  There's no gum.  Hole.

10           THE COURT:  Sit down.

11           Do you want to play the rest of it to see

12   if you'll -- I mean, if we're going to go on this path

13   it can go on all day.

14           MR. BALL:  I don't want to play it because

15   defaming someone and continuing this whole saga and then

16   saying "I'm sorry" isn't optional completeness.

17           THE COURT:  Well, I agree with that.

18           You haven't seen it, you don't know what

19   it says.  I'm not going to play it if you are not

20   prepared to play it.  So, your request will be denied at

21   that time, I guess.  Or now.  I can deny it now.

22           MR. REYNAL:  We're not going to play --

23           THE COURT:  I'm not going to play anything

24   extra that I haven't seen that you haven't seen that

25   you're not prepared to show me.  We don't know what it

 1    says.

 2                     MR. REYNAL:  I would object to playing of

 3    any tape, Your Honor.  I think that it just injects

 4    error into this record, there is no purpose to it.  I

 5    object to it, Your Honor, and I object also that, you

 6    know, I haven't been given adequate notice or been able

 7    to review the tape to see what other things --

 8                     THE COURT:  Well, it's hard to give you

 9    more notice when it just was created today.  That's

10    about as much notice as you can get, so that certainly

11    is overruled, as far as an objection.

12                     The other objections, I don't know what

13    objection "there is no purpose to it" is.  I guess

14    relevance.  It's definitely relevant.  So, the objection

15    as to relevance, if I'm reading into what you said, is

16    overruled.

17                     The objection as to notice is overruled.

18    We've also had other attorney and judge conversations

19    about statements made during this trial and how there

20    doesn't have to be any more notice than it's made, it's

21    new, that's the notice.

22                     I don't know.  Let's see what the

23    testimony is and how we continue.

24                     And are we ready?

25                     MR. BALL:  I'm ready, Your Honor.

 1                THE COURT:  All right.  Miss Heslin, can

 2   you come back up here please, ma'am?  I mean Miss Lewis.

 3   I apologize.

 4                We're ready for the jury.

 5                     *(The following proceedings were held*

 6   *in open court in the presence of the jury.)*

 7                THE COURT:  All right, you may be seated.

 8                Mr. Ball and Ms. Lewis, are you ready to

 9   proceed?

10                THE WITNESS:  Yes.

11                THE COURT:  All right, you may do so.

12                     DIRECT EXAMINATION

13   BY MR. BALL:

14        Q.   Miss Lewis, can we continue what we were

15   talking about earlier?

16        A.   Yes.

17        Q.   Okay.  Before we do that, though, are you

18   pleased that you at least now finally get to look this

19   man in the eye?

20        A.   Yes.

21        Q.   Okay.  Then I would like to put some context

22   to what we have spoken about before we continue; okay?

23                Malisa, if you would bring up Plaintiff's

24   Exhibit 3.  Photograph of Jesse.

25                Jesse Lewis.  Your son.  Tell us about

87

1    him.

2         A.   I like to share the story of when Jesse was

3    born, and Neil shared a little bit of this earlier, but

4    he was 11 pounds, so he was a C-section.  And the first

5    time that I saw him I actually walked to the nursery and

6    there were all these nurses gathered around the window

7    taking pictures, and I asked them, what are you taking

8    pictures of?  And they said, there's this enormous baby

9    and he's trying to crawl out of his bassinet.  So, he

10   had literally crawled down to the bottom and he was

11   trying to get out.

12             And I like to share that story because

13   that's how he was his entire life.  He was larger than

14   life, he was loud, he was bouncing off the walls.

15   That's my first memory.

16        Q.   Tell us more about Jesse.  How was his

17   personality?

18        A.   He was very bold, he was very old for his

19   age, he would walk up to a group of people and he would

20   say -- he would introduce himself, a group of men, "Hi,

21   my name is Jesse Lewis.  What's your name?"

22             He was very protective of his family, and

23   I have a little farm, he would put on an army helmet

24   that my friend had given him and he would -- we called

25   it patrolling, he would walk along the walls, all the

1 corners, and then wait for people to come in at the

2 gate.

3     Q.   And what was some of the -- let me ask it

4 this way, what is your understanding of Jesse's last

5 day?

6     A.   So, Jesse is actually known for, during his

7 final few moments, the shooter came into -- he shot his

8 way through the glass doors of Sandy Hook Elementary

9 School and then he made a left and he shot his principal

10 and guidance counselor, they were coming out of the

11 meeting on the first door on the right of the hallway.

12 Now, he, Adam Lanza, had been to this school, so he knew

13 the layout, he knew that this was the first grade

14 hallway.  And so, they heard the gunfire, they came out

15 of the room, they were murdered right outside of Jesse's

16 classroom.  And then he made a left into the classroom

17 door.

18         And was firing adult height and hit his

19 teacher, who he was standing right in front of, and then

20 his gun either jammed or ran out of bullets.  And during

21 the short delay he actually stood up to the shooter and

22 he saved nine of his classmates' lives before losing his

23 own.

24         And for that, for that act of bravery, he

25 was actually given a Commander in Chief funeral reserved

1    for heads of state and returning war heros.  And Jesse

2    was actually considered a war hero, because his first

3    grade classroom was a literal war zone.

4         Q.    This man, through his show and his lies,

5    that's denied the very existence of your son Jesse

6    Lewis, how does it make you feel, being able to come in

7    today and tell him, to his face, your story?

8         A.    I wanted to tell you, to your face, because

9    I wanted you to know that I am a mother, first and

10   foremost, and I know that you're a father.  And my son

11   existed.  You're still on your show today trying to say

12   that I am -- implying that I'm an actress, that I'm deep

13   state.

14                   You have.  This week.

15                   And I don't understand.  Truth, truth is

16   so vital to our world.  Truth is what we base our

17   reality on.  And we have to agree on that to have a

18   civil society.  Sandy Hook is a hard truth.  Hard truth.

19   Nobody would want to ever believe that 26 kids could be

20   murdered.  Nobody would ever want to believe that.  I

21   understand people not wanting to believe that, actually.

22   I don't want to believe it.

23                   But I've, since that day, dedicated my

24   life to keeping kids safe.  It's our responsibility.  I

25   used to think it was the school's responsibility.  It's

 1    actually our responsibility.  And I've dedicated my life

 2    to that.  And having a quarter of Americans doubt that

 3    Sandy Hook happened or doubt the facts around Sandy Hook

 4    is not conducive to keeping our kids safe.  It's not.

 5    And it's our responsibility to keep our kids safe.

 6                    This happened almost ten years ago.  We've

 7    had over 350 school shootings since then.  We have to

 8    keep our kids safe.  Jesse was real.  I am a real mom.

 9    There's nothing out there, nothing, there's records of

10    Jesse's birth, of me.  I mean, I have -- I have a

11    history, and there's nothing that you could have found

12    because it doesn't exist that I'm deep state.  It's just

13    not true.  I know you know that.

14                    That's the problem, I know you know that.

15    And you keep saying it.  You keep saying it.  Why?  Why?

16    For money?  Because you made a lot of money while you've

17    said it.  I know -- I mean, I know you believe me.  And

18    yet you're going to get -- you're going to leave this

19    courthouse and you're going to say it again on your

20    show.

21                    You're saying "no."  You just did it.

22         Q.    Over the break, Ms. Lewis, did you have an

23    opportunity to hear what Mr. Jones said on his show

24    about what Mr. Heslin was -- or about Mr. Heslin and his

25    testimony?

```
 1          A.   Yes.
 2               MR. REYNAL:  I'm going to object, Your
 3  Honor, for all the reasons I stated before.  It's an
 4  edited clip, I don't think it should be played.
 5               THE COURT:  Overruled.
 6  BY MR. BALL:
 7          Q.   Miss Heslin, you have a claim for --
 8          A.   Miss Lewis.
 9          Q.   Did I say -- excuse me.  Miss Lewis.
10               You have a claim for intentional
11  infliction of emotional distress, do you not?
12          A.   Yes.
13          Q.   And when this man says bad things and lies
14  about your son's father, Mr. Heslin, how does that
15  affect you?
16          A.   It affects me because that is the father of
17  my son.  That is, you know, we're bonded forever through
18  connection, through Jesse, through Jesse's spirit.  And
19  that impacts me.
20               If you have the capacity to put yourself
21  in my shoes, do you have empathy?  Because the two
22  people that work for you don't seem to have empathy or
23  care.  They really don't.  I was looking for some
24  caring.  I did not see it.  Do you?
25          Q.   And Miss Lewis, does it continue to cause
```

1    you emotional distress when you hear this man peddle the

2    thought that you are in some way or another an actor or

3    controlled by other people or like thoughts?

4         A.    Or that Sandy Hook was a total hoax; that it

5    was a false flag; that it never happened; that there

6    were no children killed.

7              And you know that's not true.  You know

8    that's not true.  But when you say those things there's

9    a fringe of society that believe you that are actually

10   dangerous.

11        Q.    The video that you saw over break from

12   Mr. Jones' website radio show InfoWars, did that cause

13   you or affect you emotionally further?

14        A.    Absolutely.

15             MR. BALL:  If we could please -- what

16   exhibit will this be, Malisa?  PVX 32?  Please play --

17             We offer PVX 32 into evidence, Your Honor.

18             MR. REYNAL:  Objection, your honor.

19             THE COURT:  The objections are overruled.

20   I, however, think that you need to establish a little

21   bit more about this video, when it was aired, et cetera.

22             MR. BALL:  Sure, sure.

23             THE COURT:  You haven't done that yet.

24   BY MR. BALL:

25        Q.    While you were on break did part of your

```
 1   team download this video?
 2        A.   Yes.
 3        Q.   And are you aware that the video was created
 4   during or shortly after Mr. Heslin's testimony?
 5        A.   Yes.
 6        Q.   Okay.  And did that video come from the
 7   InfoWars website?
 8        A.   Yes.
 9        Q.   And did you personally see that the video
10   came from the InfoWars website?
11        A.   Yes.
12              THE COURT:  PVX 32 is admitted.
13           (Plaintiff's Exhibit PVX 32 admitted.)
14              MR. BALL:  Thank you, Your Honor.
15              (Video played off the record.)
16   BY MR. BALL:
17        Q.   How does it make you feel, knowing that that
18   was said today by this man on his radio show while
19   Jesse's father was testifying in that same seat you're
20   sitting in?
21        A.   I've had a hard time finding words today.
22   It makes me feel astounded in a bad way.  It's horrific.
23   Horrific.  Horrific.
24        Q.   Tell us, if you would, please, what are your
25   last -- one of your last memories of Jesse.
```

1          A.    So, I'm a single mom and I work full time,

2     and so mornings are hectic with two boys, getting them

3     out the door.  Neil was picking up Jesse that morning

4     and so I bundled him up, brought him outside, walked him

5     outside to meet Neil.  And we were going to make

6     gingerbread houses with him, with their class, at

7     2:00 p.m. that day.  So that was -- I never -- I worked

8     a lot, and so I had taken the afternoon off that day.

9              And so, Neil and I were finalizing the,

10    you know, I'll meet you at the school for the

11    gingerbread houses, and I turned around to give Jesse a

12    hug and I noticed that he had written in the frost on

13    the side of my car, because it's Connecticut,

14    December 14th is very cold, "I love you" in his -- with

15    his fingernail in the frost.  And he had drawn hearts in

16    all my windows.  And I knew that that was one of life's

17    special moments.

18              And so I told him, even though running

19    late, he's late, stay right here, I'm going to go get my

20    cellphone.  I ran into the house, got my cellphone, came

21    back out.  I remember taking him by the shoulders,

22    positioning him so he would be right by his message,

23    taking a picture.  I remember it was overexposed so I

24    deleted it and then I took another picture and then I

25    took a close-up picture of the "I love you," and then I

 1    gave him a hug.  And sent him off to school.

 2              That was the last picture that was ever

 3    taken of him, and that was the last time I ever saw him.

 4         Q.   Was Jesse honored for his heroism that day?

 5         A.   He was.  He was honored for his heroism at

 6    his funeral.  He was given a Commander in Chief funeral.

 7    And my last memory really is driving him to the grave

 8    site from where we held the funeral at a church to the

 9    actual grave site, graveyard.  I was in a car behind the

10    hearse that contained the casket, and I was in the car

11    with my son and a couple of other family members and we

12    were -- we had an -- I guess it's called a cavalcade or

13    multiple motorcycles in full uniform were in front of us

14    and behind us.  Lots of first responders showed up from

15    multiple different states to honor his bravery.

16              And so they would, when we approached an

17    intersection, the back would come up to the front and

18    they would block off the intersection.  And cars, just a

19    line of cars, pulled over to the side.  People had

20    gotten out of the cars.  They were kneeling on the

21    ground, praying, saluting (indicating) for his bravery.

22    And that was -- that's a special memory.

23         Q.   How does this man's lies interrupt those

24    memories?

25         A.   I mean, because then, then Alex gets on

1    there and says that it didn't happen; that it was a

2    false flag; that there were no kids killed.

3              And you cater to those people that are not

4    grounded in reality.  You're not telling the truth, you

5    know the truth as a father and as someone that said they

6    researched Sandy Hook and there was lots of things on

7    there, and -- and so to come on and say that Jesse never

8    existed; that -- that it was a hoax; that it was a hoax.

9    I know there are hoaxes that are out there, but this was

10   an incredibly real event and I lived it.  And it's --

11   it's unbelievable that you would continue to say that it

12   didn't happen.

13        Q.   How does it affect your grieving process,

14   what a mother has to go through when she loses a son?

15        A.   Having a son -- having a six-year-old son

16   shot in the forehead in his first grade classroom is

17   unbearable.  Unbearable.  You don't think you're going

18   to survive.  But there are people that have.  And -- and

19   then to have someone, on top of that, perpetuate a lie,

20   a lie, that it was a hoax, that it didn't happen, that

21   it was a false flag, that I'm an actress.  And you get

22   on and you say, oh, sorry, but I know actresses when I

23   see them.

24              Do you think I'm an actress?

25              Mr. Jones:  No, I don't think you're an

```
 1   actress.
 2                  THE COURT:  No, you can't talk right now.
 3                  THE WITNESS:  Sorry, I did, I asked him a
 4   question.
 5                  THE COURT:  You get to testify right now,
 6   you're under oath.  Nobody else in the room is.
 7                  THE WITNESS:  Anyway, and I think -- I
 8   don't think you understand the fear that you perpetuate
 9   to not just the victims's families, all of us and
10   others, but our family, our friends, every survivor from
11   that school.  The ripple effect is enormous because
12   of -- because of the platform that you have, and the
13   fear that comes from that, the fear stops the healing of
14   and the mourning process, because you're afraid.
15                  I don't think the two can happen at once.
16   I don't think that you can -- I don't think that you can
17   heal from the loss of your child and be afraid at the
18   same time.  The fear stops everything.
19   BY MR. BALL:
20       Q.   How do you recover from someone saying your
21   child wasn't murdered?
22       A.   I don't think you can recover.  I don't
23   think you do recover unless it -- unless it stops.
24   Unless it's retracted.  Unless there's accountability
25   and responsibility, and that hasn't happened.
```

```
 1          Q.   What you've seen today, the video today,
 2    what does that do to your hope of this man's
 3    accountability and responsibility for it?
 4          A.   I don't understand.  I don't understand.  I
 5    can't -- I cannot even make sense.  That's one of the
 6    problems.  I can't make sense out of nonsense, out of --
 7    why would you say it doesn't happen -- it didn't happen,
 8    it's not happening, I'm an actress, I'm part of the deep
 9    state, it's a hoax, it was a false flag, it never
10    happened, there were never any children.  I don't
11    understand.
12                    Yeah, I'm stuck.
13          Q.   One of the things that you've done,
14    Miss Heslin, is --
15                    THE COURT:  Miss Lewis.
16                    MR. BALL:  Did I say Heslin?  I'm sorry.
17    Miss Heslin.  I have Mr. Heslin in mind because of the
18    video.
19    BY MR. BALL:
20          Q.   One of the things that you have done,
21    Miss Lewis, to aid in your recovery is the Choose Love
22    Movement?
23          A.   Yes.
24          Q.   I see on your necklace there you've got --
25          A.   I have "Nurturing, Healing, Love."
```

1      Q.   Right.

2      A.   Yeah.

3      Q.   And that is part of the Choose Love

4  Movement?

5      A.   It's actually why I started the Choose Love

6  Movement.

7      Q.   If you could, tell us what the Choose Love

8  Movement is?

9      A.   Yeah.  I -- when I did come home to my house

10  I saw a message that Jesse had left on our kitchen

11  chalkboard shortly before he died.  He had written three

12  words.

13           Alex, I want you to hear this, too.

14           He had written three words:  Nurturing,

15  healing, love.  This is what Jesse wrote on our kitchen

16  chalkboard, three words:  Nurturing, healing, love,

17  phonetically spelled because he was in first grade and

18  just learning to write.

19           But I looked at those words and I found a

20  solution for what had happened.  I knew that if Adam

21  Lanza had been able -- Adam Lanza is the former recent

22  student, recent graduate of Sandy Hook Elementary, the

23  Newtown school system.  If he had been able to give and

24  receive nurturing healing love, the tragedy would never

25  have happened.  And -- and so I dedicated my life to

1    spreading that message.  I have it on my body at all

2    times.

3              I believe it was a spiritual awareness

4    that he had that he wasn't going to be on earth much

5    longer and he wanted to leave a message for his family

6    and friends of comfort.  But also inspiration.  I

7    believe that that message is where we need to turn in

8    order to survive, survive and thrive, keep our kids

9    safe.

10              It helped me.  It helped me determine how

11   I was going to respond, knowing that we were responsible

12   for our children's safety, that what we had been doing

13   wasn't working, obviously.  My son was dead.  And so I

14   decided to take a completely different course.  I

15   decided to address the root cause of the pain that led

16   up to Adam Lanza doing what he did.  The root cause of

17   the isolation, loneliness, pain, suffering, bullying,

18   even -- even the root cause of substance abuse and a lot

19   of mental illness.

20              And so I started the Jesse Lewis Choose

21   Love Movement, and I started that movement in -- I mean,

22   we say it started at the -- at Jesse's funeral because I

23   got up and I talked about -- I talked about how an angry

24   thought started that whole tragedy and that an angry

25   thought can be changed, and I asked everybody to choose

1  a loving thought over an angry thought, and that changed

2  people's lives.

3           And so I -- I took that foundation and

4  Jesse's message and his courage that he showed and I

5  created a movement.  I wanted it to be a place where,

6  because there was so much polarization after Sandy Hook,

7  it was polarized into anti-gun, pro-gun, that was the

8  conversation.  All the blame went on Adam and his mom,

9  and that didn't make sense to me, because if it was all

10 their fault it would never have happened before,

11 obviously, and it would never happen again.

12          So, I wanted to create a space where

13 everyone could come together and what we all had in

14 common, even you and I, the want and need to love and be

15 loved, we're all the same in that, and so I created the

16 Choose Love Movement because I wanted to bring both of

17 the sides together.

18          Of course, we're more polarized now than

19 we ever have been as a country, you know that.  Some of

20 that is because of you.  And I am trying to bring us all

21 together in what we're the same in, which is the want

22 and need to love and be loved.  All of us are the same

23 in that.

24          All of us feel pain.  You've felt pain in

25 your life, I know.  I have, too.  And we have to teach

1    our kids how to process that pain so that they don't

2    turn into an Adam Lanza and they don't take it out on

3    other people.  And that's what the Choose Love Movement

4    does, it's -- it's free programming for schools, homes,

5    and communities, it's comprehensive, there's nothing

6    else like it out there.

7              And that's what I've done every day since

8    I started this, which is very shortly after the funeral,

9    is I focus on the Choose Love Movement and I focus on

10   being part of the solution.

11        Q.   Have you made it your life goal?

12        A.   Yeah, it's absolutely my life goal, to make

13   sure that our children are safe and to safeguard their

14   safety and well-being.  It's our responsibility.  I

15   didn't know that before the tragedy.  I didn't know -- I

16   mean, I'm a single mom, both my sons' safety was my

17   responsibility, and I knew that, but I wasn't aware that

18   our children's safety, our children's, including your

19   six-year-old son or daughter, is our responsibility.

20   And we have to do -- we have to do something to

21   safeguard them, especially in schools.

22             We keep our money safe, we can keep our

23   kids safe.  And that is my life's goal.

24        Q.   I know that your organization has created

25   some informational material.  Would it aid you in your

1   explanation to the jury the further goals and the way

2   that this works if we showed it to them?

3           A.   It would.

4               MR. BALL:  Okay.  If we could.

5               MR. REYNAL:  I object, Your Honor, under

6   Rule 403 and hearsay.

7                   THE COURT:  That will be overruled.

8                   THE WITNESS:  I would like you to watch

9   it, Alex.  I would like you to watch it, please.

10                  *(Video is played off the record.)*

11  BY MR. BALL:

12          Q.   Be a part of the solution.  This has been

13  going since 2013?

14          A.   Yes.

15          Q.   Has it been a way for you to try to continue

16  to heal?

17          A.   It has, yes.

18          Q.   How has what this man has said about you and

19  your family and Jesse affected Choose Love and the way

20  that you are attempting to heal?

21          A.   I am literally -- I have literally dedicated

22  my life to trying to keep kids safe and to spread a

23  message that we can thoughtfully respond in any

24  situation, circumstances, or interaction by choosing

25  love.

1           And you are spreading lies and -- and fear

2    and falsehoods and deception and untruths.  There is a

3    truth and I believe that you know it.  And this is so

4    important.  I -- I feel like we're at odds with our

5    missions.  I am trying to spread love, I am trying to

6    keep kids safe because I couldn't do it for my own.  And

7    you are saying that it didn't happen and that -- and

8    you're taking away the credibility of what I'm trying to

9    do.

10           A quarter of Americans -- a quarter of

11   Americans believes that Sandy Hook didn't happen or they

12   doubt the facts surrounding it, and you continue to

13   peddle that conspiracy theory.  And that is not

14   conducive to keeping our kids safe.  It's not conducive

15   to keeping our kids safe.  That's --

16        Q.   The way that you have used Choose Love to

17   help yourself heal, has what Alex's lies and the lies

18   that he has given you, has that interrupted that

19   healing?

20        A.   It has.  It has.  Because you can't heal

21   when you're afraid.

22        Q.   There have been a couple of questions that

23   have been asked in this room about apology versus money

24   or compensation for damages.

25           You've heard those questions?

1      A.    Yes.

2      Q.    Talk to me about apology and compare that to

3  paying for the damage that has been caused.  The way you

4  feel about those two.

5      A.    Well, first of all, there has not been a

6  sincere apology.  But if there was, ever, I liken it to

7  being in a car accident and you run over someone and

8  cause tremendous bodily damage and you look at that

9  person lying on the ground and say, I'm so sorry, I'm so

10  sorry, but I'm not accountable or responsible for any of

11  the damage that I just caused.  But I'm sorry.

12            That's how I see it.

13      Q.    Would you at this moment in time when you're

14  sitting on that stand now be at the stage where you

15  would be able to accept an apology?  Would it mean

16  anything to you?

17      A.    Not -- no.

18      Q.    As to the other side of this, the damages

19  that this man -- that you're asking this man to pay for,

20  why are -- why are you asking for those damages?  What

21  do you hope will be accomplished?

22            MR. REYNAL:  I'm going to object.  41.011,

23  Your Honor.

24            THE COURT:  Overruled.

25            MR. REYNAL:  May I have a continuing

```
 1   objection to this part of the testimony?
 2                THE COURT:  Sure.
 3                THE WITNESS:  Alex has been asked to stop
 4   and he hasn't.  He's still doing it today.
 5                You've been doing it last week every day,
 6   this week, or at least, I don't know, shows you've had
 7   while you should be in here, you've been on your show
 8   and you've been talking about this.  Your counterpart
 9   has been talking with you about this.  And so you're not
10   going to stop.  I don't even think my pleading with you
11   up here is going to get you to stop.
12                And so -- and all of the damage that you
13   caused, the fear that you've put people in, the -- from
14   your following, the way that you've impacted so many
15   lives, I think that there has to be accountability for
16   that.
17                I don't think you understand.  I
18   don't -- I think you know that Sandy Hook is real and
19   that it happened.  I know you're shaking your head "no,"
20   but I know that you think that it's real, I know that
21   you know that it's real, but I don't think that you
22   understand at all, because the people that work for you
23   don't, understand the repercussions of going on air with
24   a huge audience and lying and calling this a hoax and a
25   false flag.
```

1          You don't understand the repercussions to

2   individuals' lives.  You don't understand the net that

3   is cast in a negative way.  You don't understand that.

4   You don't understand.  And I don't think you will

5   understand unless there's some form of punishment that

6   is significant that would make you understand that this

7   is real, this isn't staged, like one of your people

8   said.  This is a real event.

9          It seems so incredible to me that we have

10  to do this.  That we have to implore you, not just

11  implore you, punish you to get you to stop lying, saying

12  it's a hoax.  It happened.  It's like surreal what's

13  going on in here.  I think everyone in here probably

14  feels that way.

15          I lost my train of thought, sorry.

16  BY MR. BALL:

17      Q.   Is that what you hope to accomplish --

18      A.   Yes.

19      Q.   -- through this process?

20      A.   Yes.

21          Yes.  I hope to accomplish an era of

22  truth.  An era of truth.

23          Please.

24      Q.   How difficult has it been for you waiting

25  for this day, literally for this very moment, where

1   you're sitting in that chair right now, this reality,

2   how difficult has it been for you waiting for that?

3        A.   In some way you've impacted every single day

4   of my life negatively since -- almost since Jesse's

5   murder, since 2013, when your videos were going around

6   in my house, in my mom's house, about starting to say

7   that this didn't happen.  And I'm so glad that this day

8   is here.  I'm actually -- I'm actually relieved,

9   because -- and grateful to everybody that's here in

10  service to our society, and I'm grateful that I got to

11  say all this to you, and that I got to speak my truth.

12            And I just -- I am really looking forward

13  to this being over, so that I can get back to healing

14  and spreading my message, spreading Jesse's message of

15  love.

16       Q.   Miss Lewis, I cannot thank you enough for

17  sitting and being so brave on that chair today, and I

18  don't have any other questions of you.

19       A.   And I want to thank you for representing us.

20            THE COURT:  Mr. Reynal, do you have any

21  questions for Miss Lewis?

22                    CROSS-EXAMINATION

23  BY MR. REYNAL:

24       Q.   Good afternoon, Miss Lewis.

25       A.   Good afternoon.

1       Q.   I read your book, *Nurturing Healing Love,*

2   and I thought it was a beautiful book.

3       A.   Thank you.

4       Q.   And something that any parent who has lost a

5   child should read.

6       A.   Thank you.

7       Q.   I hope that you will use your power of

8   choice to see the good in the questions that I'm going

9   to ask you.

10           In your book you describe how, after

11  Jesse's murder by Adam Lanza, you went on a journey of

12  healing.

13      A.   Yes.

14      Q.   And even before you said that you had read a

15  book called, *You Can Heal Your Life,* by Louise Hay.

16      A.   Yes.

17      Q.   And that you educated both J.T. and Jesse in

18  their power to choose how they would react and view

19  life.

20      A.   Yes.

21      Q.   And that sometimes you'd say, "You know you

22  have the power to --"

23           And then Jesse would say, "Yeah, mom, I

24  know, choose, choose, choose."

25      A.   Yes.

 1         Q.    In the aftermath of the shooting, there were

 2    more than 500,000 letters of condolences that were sent

 3    to Newtown.

 4         A.    Yes, and mostly by little kids.

 5         Q.    And drawings?

 6         A.    And drawings.

 7         Q.    Shortly after the shooting you participated

 8    in an EMDR session?

 9         A.    Yes.

10         Q.    And during that session you describe a

11    tunnel of light.

12         A.    Should we explain what that is?

13         Q.    Well, E.M.D.R. is something that Dr. Crouch

14    testified about?

15         A.    Yes.

16         Q.    And --

17         A.    Okay.

18         Q.    It is a process whereby there is bilateral

19    stimulation and visualization of bad memories.

20         A.    Yes.

21         Q.    And you describe seeing a tunnel of light.

22         A.    I don't remember that.  Can you read in my

23    book where it says that?

24         Q.    Well, maybe this will remind you.

25         A.    Okay.

```
 1          Q.    And if not we can go to the book.
 2          A.    Sure.
 3          Q.    But you described seeing the children who
 4    had been murdered ascending into heaven.
 5          A.    Yes.
 6          Q.    And a dark figure.
 7          A.    Yes.
 8          Q.    And that dark figure was Adam Lanza.
 9          A.    Yes.
10          Q.    And the therapist that was helping you asked
11    you what you wanted to do with him.
12          A.    Yes.
13          Q.    And you sent him up to heaven, too.
14          A.    Yes.
15          Q.    Later you spoke to the Bipartisan Task Force
16    on Gun Violence Prevention and Children Safety.
17          A.    I don't remember that, but I'm sure I did.
18          Q.    It was the -- sort of the first time you had
19    been able to introduce Jesse's message of choosing love
20    to the world.
21          A.    Are you referring to the part in my book?
22          Q.    Yes.
23          A.    Okay.  Yes.
24          Q.    And you got a standing ovation.
25          A.    Yes.
```

```
 1          Q.   You met President Obama?

 2          A.   Yes.

 3          Q.   He came to the funeral.

 4          A.   Um, no.  No.

 5          Q.   Or you met him in Newtown right after?

 6          A.   Yes.  Three days after.  He was speaking in

 7   Newtown.

 8          Q.   And you went to see him in Washington?

 9          A.   Yes.

10          Q.   And then he gave a speech at Hartford

11   University?  Do you recall?

12          A.   Yes.

13          Q.   And you met with him after the speech.

14          A.   Yeah.  In the hallway.

15          Q.   And you told him about your message --

16          A.   Yes.

17          Q.   -- of choosing love.

18          A.   Yes.

19          Q.   He was very taken with the idea?

20          A.   Yes.

21          Q.   And he gave you a hug.

22          A.   Yes.

23          Q.   And he said that he would introduce you to

24   his sister --

25          A.   Yes.
```

1       Q.   -- who lived in Hawaii.

2       A.   Yes.

3       Q.   And you went and visited with her.

4       A.   Yes.

5       Q.   And she gave you tickets to go and meet the

6  Dalai Lama.

7       A.   Yes.

8       Q.   And you went to see the Dalai Lama with

9  several friends?

10      A.   Yes.

11      Q.   And were able to meet with him personally

12 afterwards.

13      A.   Well, he walked by me and we had an

14 interaction, yes.

15      Q.   And he hugged you.

16      A.   He did.

17      Q.   And that must have been very special.

18      A.   It was.

19      Q.   Since then, you've often spoken about

20 Jesse's story.

21      A.   Yes.

22      Q.   And you've said that, "Although Jesse's

23 death could have destroyed me, hope, love, forgiveness,

24 and faith have saved me."

25      A.   Yes.

```
 1          Q.    You wrote, "On that day, the world became
 2    one.  On that day, the world chose love.  I said, but we
 3    have to keep that going through awareness and education.
 4    Nurturing, healing, love.  Getting that message to the
 5    world is the reason Jesse was put on earth."
 6          A.    Yes.
 7          Q.    "He died for it."
 8          A.    Yes.
 9          Q.    Your book was published in late 2013, early
10    2014?
11          A.    October 2013.
12          Q.    Ten months after the shooting?
13          A.    Yeah.  It was about the first six months of
14    my healing process.
15          Q.    Would you agree with me that, in the book,
16    you don't discuss Alex Jones or any kind of hoaxers?
17          A.    Absolutely not.
18          Q.    Absolutely not, you don't agree or you
19    don't --
20          A.    No, no, no, I'm sorry.  I did not.
21          Q.    Before the controversy that arose from the
22    Megyn Kelly interview, had you taken time to watch
23    Alex's show?
24          A.    No, I did not.
25          Q.    Who brought to your attention what had
```

1  happened on the Megyn Kelly show and the subsequent Owen

2  Shroyer report?

3        A.   Neil did.

4        Q.   Have you chosen to watch the entirety of the

5  videos that have been presented in evidence here?

6        A.   I have not.

7        Q.   You would agree that it's our jury's job to

8  decide the case based on the facts in evidence.

9        A.   Yes.

10        Q.   You have spoken your truth today, and your,

11  I think, very honest belief that Alex from the very

12  beginning victimized your family and yourself.

13        A.   Yes.

14        Q.   Wouldn't watching the broadcast be the best

15  way to know whether that was the case or not?

16        A.   I had seen enough.

17            MR. BALL:  Objection, your honor.  This

18  goes back to the thought it's already been ruled that he

19  has done that, so to ask that question assumes it

20  hasn't.

21            MR. REYNAL:  May I respond?

22            THE COURT:  Hang on.

23            So, it's not -- I guess your

24  object -- your -- all right.  I am going to strike the

25  question and the answer, because they go to an issue

1  that's already been decided.

2          MR. REYNAL:  May I be heard?

3          THE COURT:  So, you can try and rephrase

4  it in some other way to get to whatever you're trying to

5  get to, but not that way.

6  BY MR. REYNAL:

7      Q.   I believe you testified about a picture of

8  the Superbowl.

9      A.   I did.

10     Q.   With the names of the victims of Sandy Hook

11 written on top of the photograph of the children who

12 sang there.

13     A.   Yes.

14     Q.   Is your basis for testifying that InfoWars

15 pushed that picture that somebody told you that?

16     A.   I know that InfoWars has given a platform to

17 the conspiracy theorists that say that Sandy Hook never

18 happened.

19     Q.   I would agree with that.

20          But my question is, is your basis for

21 saying that InfoWars either displayed that photograph or

22 pushed that photograph somewhere, based on something

23 somebody told you?

24     A.   No.

25     Q.   Okay.  Did you, yourself, see that picture

```
 1  being pushed by -- on any kind of InfoWars broadcast?
 2        A.    No.
 3        Q.    The video we saw played earlier --
 4        A.    Which one?
 5        Q.    The video of Alex that was represented as
 6  having been taken today.
 7        A.    Yes.
 8        Q.    Was just that clip given to you or did you
 9  watch the entire broadcast?
10        A.    I watched that clip.
11        Q.    Okay.  Did anybody tell you what was said
12  before or after that clip?
13        A.    No.
14        Q.    Who provided you with the clip?
15        A.    My team pulled it up.  My son pulled it up
16  and showed it to me.
17        Q.    Was he the one who created the clip or did
18  somebody else create the clip?
19        A.    I don't know.  No, my son was not -- no, I
20  don't know who created the clip.
21        Q.    Do you know who gave the clip to your son?
22        A.    He found it on the internet.
23        Q.    Oh, understood.
24              Let me ask you about Plaintiff's
25  Exhibit 131.  I think it's in front of you.
```

```
 1        A.    Yes.

 2        Q.    And that is the email from Wolfgang Halbig?

 3        A.    Yes.

 4        Q.    That email is dated September 9th, 2019; is

 5   that correct?

 6        A.    That's correct.

 7        Q.    Are you aware that, as of that date, it had

 8   been several years since Wolfgang Halbig had been on the

 9   InfoWars show or Alex's show?

10        A.    No, I was not aware.

11        Q.    And Plaintiff's Exhibit 128 was an

12   attachment to that email.

13        A.    Yes.

14        Q.    As you sit here today, do you know of any

15   way that InfoWars could have known in 2014 or 2015 when

16   Halbig was on the show that he would go this crazy?

17             MR. BALL:  Objection, your honor.

18   Speculation.

19             THE COURT:  Sustained.

20   BY MR. REYNAL:

21        Q.    Lucy Richards --

22        A.    I was going to say, I don't think they

23   checked his credentials.

24             MR. REYNAL:  May I respond to that, Your

25   Honor?  You sustained the objection.
```

```
 1                 THE COURT:  I mean, you can -- you know
 2    what lawyers can do.  You can ask her another question,
 3    you can make an argument to me about something.  I'm
 4    not --
 5                 MR. REYNAL:  Very well.
 6                 THE COURT:  -- telling you how to do this.
 7    BY MR. REYNAL:
 8        Q.   Were you present for the testimony of Adan
 9    Salazar by deposition?
10        A.   Was I present, like in the room?  Oh, yes,
11    yes.
12        Q.   And so you saw that he testified that maybe
13    he could have done a better job, but they did look into
14    Wolfgang Halbig's credentials at the time.
15        A.   I saw that he -- he did just a surface
16    scratch of looking into his credentials.
17        Q.   Lucy Richards.  She's the woman who left the
18    terrifying message that we heard.
19        A.   Yes.
20        Q.   She, thankfully, has never left a message
21    like that for you.
22        A.   Correct.
23        Q.   Lucy Richards has never worked for InfoWars,
24    has she?
25        A.   She is a devout follower of InfoWars.  I
```

1   don't know that she's ever worked for InfoWars.  I don't

2   know.

3        Q.   In fact, she's just a crazy lady, isn't she?

4        A.   Seemingly so.

5        Q.   And there are crazy people in the world,

6   aren't there?

7        A.   That's correct.

8        Q.   And sometimes they see things on television

9   or they hear things on the radio, and they do crazy

10  things.

11       A.   Yes.

12       Q.   You testified about Dan Bidondi.

13       A.   Did I?

14       Q.   I believe you were asked some questions

15  about Dan Bidondi coming to film a town hall meeting at

16  Newtown.  Do you recall that?

17       A.   Questions I was asked?

18       Q.   Yes, ma'am.

19       A.   I don't remember, I'm sorry.  Can you

20  read --

21       Q.   That's fair.

22          As you sit here today do you know the name

23  Dan Bidondi?

24       A.   Yes.

25       Q.   Okay.  Have you ever had any personal

1   contact with him?

2         A.   No.  I know what you're talking about.  The

3   mayor that would send out the emails, telling us to stay

4   home when they were in town.

5         Q.   Yes.

6         A.   Correct.

7         Q.   You said I believe, or perhaps Ball said,

8   Dan Bidondi and others.

9         A.   Yes.

10        Q.   The term "and others."

11        A.   Yes.

12        Q.   There were no other InfoWars people in

13   Newtown, were there?

14              MR. BALL:  Objection.  Speculation.

15              THE WITNESS:  I don't know.

16              THE COURT:  I'm going to allow it.

17   BY MR. REYNAL:

18        Q.   You testified that a man pulled into your

19   driveway on Christmas day.

20        A.   Yes.

21        Q.   What year was that?

22        A.   I don't remember.

23        Q.   And the man took some photographs, you went

24   outside, you said kind of, Can I help you?

25        A.   Yes.

```
 1          Q.   And he drove off?

 2          A.   Yes.

 3          Q.   He scared you but you really don't know why

 4    he was there.

 5          A.   He was there to photograph my property.  He

 6    took a picture of me standing on my porch.

 7          Q.   Are you still in therapy today?

 8          A.   Yes.

 9          Q.   How often do you attend therapy?

10          A.   I travel a lot and I have -- I've maybe

11    had -- I've had many therapists and done many different

12    kind of therapies in the last ten years.  So, I am

13    currently in therapy, the different kinds that I have,

14    several times a month.

15          Q.   So you have different types of therapy on

16    different days.

17          A.   I have different types of therapy, yes.

18          Q.   Can you estimate for us how much you've

19    spent on therapy since the tragedy at Sandy Hook

20    Elementary School in 2012?

21               MR. BALL:  Objection.  Collateral source,

22    Your Honor.

23               THE COURT:  Overruled.

24               If you know.  If you don't know you can

25    always say that you don't know.
```

```
 1              THE WITNESS:  I don't know.  I don't know.
 2   I'm sorry, I don't know.
 3   MR. REYNAL:
 4        Q.   Less than $500,000?
 5        A.   Yes.
 6        Q.   Less than $200,000?
 7        A.   Less than -- $50,000?  I don't know.
 8        Q.   The therapists that you are seeing now, how
 9   much do they charge?
10        A.   I think she charges -- I'm not -- $150 an
11   hour.
12        Q.   And -- and so about how much per month would
13   you say that you spend on therapy?
14        A.   A couple hundred dollars.
15        Q.   You're a published author?
16        A.   I am.
17        Q.   And I think you've written three books.
18        A.   I have.
19        Q.   A children's book and --
20        A.   Before the tragedy.
21        Q.   And then, since then, you've written two.
22        A.   *Nurturing Healing Love* and *Choose Love*.
23   It's about the movement and about the program and the
24   history of that and how it can positively impact people.
25   That's the third book.  Yes.
```

1      Q.   You work at your foundation?

2      A.   I do.

3      Q.   And I think you have five or six employees?

4      A.   Yes.

5      Q.   You've made many media appearances?

6      A.   Yes.

7      Q.   Starting in 2013 and ongoing to the present

8  day?

9      A.   Correct.

10     Q.   You've appeared on CNN.

11          Yes?

12     A.   Yes.

13     Q.   Various talk shows?

14     A.   Yes.

15     Q.   You're also a motivational speaker.

16     A.   I speak for the Choose Love Movement, I

17  speak to schools and at parent groups.

18     Q.   You speak to private organizations, as well?

19     A.   I have on a limited basis.

20     Q.   If one navigates to the Choose Love Movement

21  website, one can find a place where one can make an

22  inquiry for a private event?

23     A.   Yes.

24     Q.   And it says you'll speak for two hours?

25     A.   I'll speak for as long as you will let me

1    speak.

2         Q.   And can you tell the Members of the Jury,

3    how much is the suggested honorarium for your speaking

4    engagement?

5         A.   It may be $5,000.

6         Q.   Would ten be more accurate?

7         A.   It could be ten.  Five to ten.

8         Q.   During this period that we've been

9    discussing from 2013 at least --

10        A.   Can I clear something up?  100 percent of

11   the proceeds of all three of my books, as well as

12   100 percent of the proceeds of everything that I do,

13   including my speaking, go directly to the Choose Love

14   Movement.  If an organization pays me, they do not write

15   a check to me, they write a check to the movement.  I

16   just want to clear up that.

17        Q.   The movement does -- the movement.  Your

18   501(c)(3) nonprofit does employ you, as well.

19        A.   I'm employed.  I'm a human being, I have

20   expenses, I have to live.  Yes.

21        Q.   To my previous question, from 2013 or from

22   the day of the shooting until, let's say, this

23   litigation began, no one at InfoWars and certainly not

24   Alex Jones ever said your name?

25        A.   I don't know that.

```
1          Q.    Have you asked?

2          A.    Have I asked InfoWars?

3          Q.    Have you asked anyone whether your name was

4   ever mentioned?

5          A.    I guess I feel like it has been in

6   association.

7          Q.    And that's because you feel that, by

8   speaking about parents in general that is a reference to

9   you in particular.

10         A.    It includes me, yeah.  I feel like it does.

11         Q.    InfoWars has never published your

12  photograph.

13         A.    Thank you.

14         Q.    InfoWars has never published your address.

15               THE COURT:  Are these questions,

16  Mr. Reynal?

17  BY MR. REYNAL:

18         Q.    Have they?

19         A.    I don't know.  Are you asking me or telling

20  me?

21         Q.    I'm asking you.

22         A.    Oh, I'm sorry.  I don't know.

23         Q.    And InfoWars has never directed anyone to

24  harass you; isn't that true?

25         A.    I don't know.  They've sent people to Sandy
```

1    Hook.  Then they've definitely harassed people there.

2        Q.    Well, in fairness, they sent --

3        A.    That's my community.  They don't know that I

4    was not going to be around.

5        Q.    Well, the people, the people, the person,

6    Dan Bidondi, went to a meeting of -- that was set up to

7    hear a FOIA request for information regarding the Sandy

8    Hook shooting.  True?

9        A.    I don't know.  But I did see him harass

10   people on the way out, and I know the people that he

11   harassed.

12       Q.    Understood.

13       A.    Yes.

14       Q.    That was an open government meeting; true?

15       A.    I don't know.  I don't really know.  I don't

16   know what FOIA stands for.

17       Q.    Freedom of Information Act.

18       A.    Okay.

19       Q.    It was a meeting addressing freedom of

20   information requests made by Mr. Halbig; true?

21       A.    I don't know.  I don't know what the meeting

22   was about.

23       Q.    Certainly a meeting like that it's fair to

24   have press at.

25       A.    Yes.

```
 1                MR. REYNAL:  Pass the witness.
 2                THE COURT:  All right.  Mr. Ball.
 3                MR. BALL:  Very briefly, Your Honor.
 4                    REDIRECT EXAMINATION
 5   BY MR. BALL:
 6        Q.   Kevin Laprade, Will Turbitt, those are names
 7   of people who were with Mr. Bidondi.  Are you aware of
 8   that?
 9        A.   Yes, I saw other people there.  I wasn't
10   aware of their names.
11        Q.   So, to say that Mr. Bidondi was the only
12   person who went to Newtown would not only be misleading,
13   but it would be a lie; right?
14        A.   Yes.
15        Q.   It wouldn't make a lot of sense to put that
16   image in your book, would it?
17        A.   No.
18        Q.   So, I assume that's why you didn't do it.
19        A.   No.  That's because it's about healing.
20                MR. BALL:  Hopefully you can begin that
21   after today.  Thank you.
22                THE COURT:  Mr. Reynal.
23                    RECROSS-EXAMINATION
24   BY MR. REYNAL:
25        Q.   It's fair to say, Miss Lewis, that, other
```

1    than Mr. Bidondi, you don't know who all went to that

2    meeting.

3          A.    That's correct.

4          Q.    Would it be relevant to you, as you sit here

5    today, after having answered those questions from your

6    lawyer, to know whether or not Mr. Jones apologized

7    during that same broadcast?

8                MR. BALL:  Objection, your honor.

9    Relevance and also scope of the --

10               THE COURT:  Scope is sustained.

11   Sustained.

12               All right.  Now it is the jury's time.

13               It's 2:47, we'll probably end up making

14   this our mid-afternoon break, as well, but let's do try

15   to get the questions, if there are any, to me relatively

16   quickly so that I can look at them.

17               Remember all of my previous instructions:

18   This is an independent opportunity, no conversation, no

19   research.  All the same rules.  You're excused.

20                    *(Brief recess.)*

21          *(Discussion between court and counsel off the*

22   *record.)*

23               THE COURT:  On the record.

24               We have gone through the questions

25   submitted by the jury, eliminated half of them, kept

```
1    half.
2                    The ones that you know I'm going to ask,
3    any objections, Mr. Ball?
4                    MR. BALL:  None, Your Honor.
5                    THE COURT:  Any objections, Mr. Reynal?
6                    MR. REYNAL:  None.
7                    THE COURT:  All right.  Then we were ready
8    for Miss Lewis and, Miss Matusek-Steele, we're ready for
9    the jury.
10                   (The following proceedings were held in
11   open court in the presence of the jury.)
12                   THE COURT:  All right, you may be seated.
13                   I think I forgot to give you the same
14   repetitive reminder with Mr. Heslin's questions, so I'll
15   do it now:  If you don't hear your question, it's
16   because I made the decision that it wasn't appropriate
17   for some reason.  So, you can direct your frustration at
18   me.
19                   Now, Miss Lewis, I'm going to ask you a
20   number of questions and I'm going to ask you to respond
21   to them to the jury.  And if you'll just listen
22   carefully and answer the question, I can't explain it,
23   so you just have to answer the question as it is.  Okay?
24                   THE WITNESS:  Yes.
25   ///
```

1                        EXAMINATION

2                THE COURT:  How has Jesse's passing

3    affected your parenting of your other son, J.T.?

4                THE WITNESS:  That's a good question.

5                It has impacted my parenting, obviously.

6    I think that when you have one son that's murdered, you

7    want to bubble wrap the other son so that they never

8    feel pain, and that's obviously impossible.  And I think

9    that I've -- I've done that a bit with J.T., trying to

10   be overly solicitous and trying to keep him safe and --

11               THE COURT:  How has Alex Jones and

12   InfoWars affected your parenting?

13               THE WITNESS:  I think that question

14   relates to the first question.  As a parent, it's your

15   responsibility to keep your kids safe, and I wasn't able

16   to do that with my first child and so I am so probably

17   overly zealous in trying to do that with J.T.  and so

18   I've taken measures that might seem over the top to

19   some, but to me I don't want to fail my surviving son.

20               And I know consciously that I didn't fail

21   Jesse when he was murdered at Sandy Hook because he was

22   where he was supposed to be by law, but you -- you have

23   a little bit of guilt that you sent them to school that

24   morning.  And so I think that it has definitely impacted

25   my parenting and it's negatively, I would say,

1    unfortunately, I think that he would agree.  And but

2    it -- but, you know, I was doing the best that I could

3    with the skills and tools that I had at the time and I

4    continue to get more.

5                THE COURT:  How many lives has the Choose

6    Love Movement touched and how has it made them better?

7                THE WITNESS:  The Choose Love Movement has

8    impacted millions of lives all over the world.  In fact,

9    our last conservative estimate was over three and a half

10   million children that have received this type of

11   essential life skills programming, this type of

12   programming that enable them to thoughtfully respond to

13   any situation, circumstance, or interaction by choosing

14   love.

15               And we have a powerful formula that we

16   teach and this formula leads you, it's a pathway to

17   flourishing and it starts with courage, courage to tell

18   the truth, courage to be present with whatever is

19   happening in your life, the courage to do the right

20   thing.  Then gratitude is the next formula, and it's the

21   courage to be grateful even when things aren't going

22   your way.  I try to live my life this way.

23               And then forgiveness.  And it's the

24   courage to forgive even when the person who hurt you

25   isn't sorry, doesn't care, or may not even know.  And

1   then compassion and action, which is the courage to step

2   outside of your own pain and suffering, even your own

3   business and distraction, to help other people.  And

4   then the beautiful thing is, when you help other people,

5   that helps and heals yourself, and I have certainly felt

6   that.  These are just some of the things that we teach

7   kids.

8             And this type of programming was priced

9   out of the market for my son.  The school that he went

10  to, when I asked them about this type of programming,

11  they said they spent so much money on this type of

12  program that they couldn't afford to train the teachers

13  in this.  And so I thought, wow, this would have saved

14  my son's life.

15            So, I created a program and I made it

16  free, because every child, actually every parent, every

17  grandparent, every human being should have access to

18  these essential life skills that are backed by science

19  and that we know can create a safer, more peaceful and

20  loving world.

21            THE COURT:  Would you include Alex Jones

22  and his family in the Choose Love Movement if he was

23  inclined to join?

24            THE WITNESS:  Absolutely.  Absolutely.

25            THE COURT:  Would you forgive Alex Jones

1   if he truly apologized and compensated monetarily and

2   stopped the propaganda on or off the InfoWars platform?

3                   THE WITNESS:  I'm so glad you asked that

4   question, whoever did.  It's a great question.

5                   And forgiveness is something that I've

6   learned so much about since the tragedy.  And I didn't

7   know much about it before.  And it's really instrumental

8   in my own personal healing and I think a lot of people

9   are going to learn about it today with me speaking about

10  it.

11                  But I -- I actually -- I have said that I

12  forgive Alex.  I've said that I forgive Adam Lanza.  And

13  I feel compassion for him.  And I forgive Alex.

14                  And I feel compassion for you.

15                  But forgiveness starts with a choice and

16  then it becomes a process.  That doesn't mean that

17  everything goes away, that you make this decision to

18  forgive and then everything is okay.  Forgiveness starts

19  with a choice:  Choose love.  It is choosing love.

20  Forgiving starts with a choice but then it becomes a

21  process.

22                  And depending on who you are and your

23  situation and your story and your level of pain, it is

24  something that you might have to do every single day,

25  multiple times a day.  And it's a way to let go of some

1    of the pain and to get your personal power back to

2    enable you to live your life.  Forgiveness is a powerful

3    healing tool, but it's something that I have to work on

4    every day.

5              And it doesn't mean that you don't hold

6    the person that you're forgiving accountable.  They're

7    still responsible for what they did.  It has nothing to

8    do with accountability.  You can -- this may be a bad

9    example, but if someone was raped, you could forgive

10   your rapist, but you would have to hold them

11   accountable, because if you didn't, then they would

12   continue doing that to other people.  So, you have some

13   amount of responsibility in your forgiveness to continue

14   to hold somebody accountable.  Because if you don't,

15   then they will continue.

16             THE COURT:  Miss Lewis, thank you for your

17   time and your testimony.  We all appreciate it.  At this

18   time you can go back down to where you've been sitting.

19             THE WITNESS:  Thank you.

20             THE COURT:  And somebody from the

21   Plaintiffs' side, do you have another witness for the

22   jury?

23             MR. BANKSTON:  Your Honor, Plaintiffs

24   rest.

25             THE COURT:  Thank you very much.

```
 1              Mr. Reynal, it is your turn to present
 2    your case.  Do you have witness for the jury?
 3              MR. REYNAL:  I have a motion I need to
 4    make outside the presence of the jury, Your Honor.
 5              THE COURT:  All right.  That shouldn't
 6    take very long.  Remember, all my instructions are all
 7    still in place.  You may head back to the jury spot.
 8              (Whereupon the jurors exit the courtroom
 9    and the following proceedings were held in open court)
10              THE COURT:  You may be seated.
11              MR. REYNAL:  May I approach, Your Honor?
12              THE COURT:  You may.
13              Thank you.
14              MR. REYNAL:  At this time Defendants would
15    present their motion for directed verdict.
16              THE COURT:  Let's make sure the door is
17    shut.
18              Okay.  Go ahead.
19              MR. REYNAL:  At this time Defendants would
20    present their motion for directed verdict, we'll file
21    same with the court, but I just wanted to give Your
22    Honor a brief summary.
23              It is our position that Plaintiffs' IIED
24    claim fails as a matter of law.  The evidence as adduced
25    from the witness stand shows that it is predicated upon
```

1    the statements made by Mr. Jones, as well as his

2    employees, on the air and, as such, it is duplicative of

3    the defamation claim and under Texas law shouldn't go

4    forward, either as to Miss Lewis or as to Mr. Heslin,

5    who also has a standalone defamation claim.

6              As for the defamation claim itself, we

7    believe that the evidence shows that the statements were

8    not -- on the Owen Shroyer broadcast were not

9    defamatory, and so we think Your Honor should reconsider

10   her decision.

11             We urge that reputation damages have not

12   been properly proven.  In *Anderson vs. Durant*, a Texas

13   Supreme Court case, the Court wrote that, "Rumors within

14   a community are not enough," and "instead, the evidence

15   must show 'that people believe the statements and the

16   Plaintiff's reputation was actually affected.'"

17             As to Mr. Heslin, who has the only

18   reputation claim, we had no evidence of anybody who

19   denied him work or denied him credit or denied him

20   access to some sort of social organization.  So, we

21   think those should be stricken.

22             We also would urge that the mental anguish

23   damages have not been properly proven.

24             THE COURT:  All right, response.

25             MR. BANKSTON:  Yes, first with regard to

1    the IIED claim, Defendants first advance a gap-filler

2    argument, meaning that the claim sounds in defamation,

3    it doesn't fill a gap in the law and can't be IIED.

4              First, we would point out that this is

5    already law of the case.  Defendants have appealed this

6    on both of the claims, Lewis and Heslin.  Texas Supreme

7    Court has rejected that appeal, Texas Court of Appeals

8    says they are not duplicative, it is not a gap-filler

9    issue.

10             Even if there wasn't already law of the

11   case, meaning that Mr. Heslin's claim for defamation

12   clearly sounds in statements about himself, while the

13   two Plaintiffs' IIED claims sounds in statements

14   regarding the circumstance of their child's death.

15             Those are -- there are statements in which

16   Mr. Jones made, for instance, in which he did not claim

17   that children didn't die.  Instead, he claimed that the

18   children were murdered as part of a two-year pre-planned

19   CIA plot.  That does not actually affect their

20   reputation whatsoever, does not even accuse them of

21   anything.  But it is, nonetheless, intentional

22   infliction of emotional distress.  That is also law of

23   the case.

24             With regard to reputational damages, the

25   simple evidence alone that Mr. Heslin testified that an

1    individual, while yelling out "Alex Jones" and
2    "InfoWars" firing a firearm near his home is clearly
3    legally sufficient on its own to achieve reputational
4    damage.   There's been plenty of testimony about people
5    in the community who had negative thoughts about these
6    parents, and him in particular, and Mr. Heslin in
7    particular.   And so, for that reason, the reputational
8    falls.
9              As far as the mental anguish damage, I
10   don't know a better way you can have legally sufficient
11   evidence than by having two separate psychologists, a
12   psychologist and a psychiatrist, one who has a formal
13   diagnosis and who related to these events, as well as
14   the personal testimony of the plaintiffs about the
15   torment in their lives.
16             As such, we think the motion for directed
17   verdict is frivolous.
18             THE COURT:  Any replay, Mr. Reynal.
19             MR. REYNAL:  No, Your Honor.
20             THE COURT:  All right.  The motion for
21   directed verdict is denied.
22             Any other motions we need to take up
23   outside the presence of the jury?
24             MR. REYNAL:  I have received a copy --
25             THE COURT:  I couldn't hear.  You did

1    what?

2              MR. REYNAL:  I don't have any other

3    motions, Your Honor, but I have a copy of the full clip

4    to play for the jury of Mr. Jones' broadcast today.  I

5    have two versions, one of the versions has some remarks

6    about the attorneys as well as the Court, and I didn't

7    know if Your Honor wanted me to play that clip or one

8    that has been edited to take that out.

9              MR. BANKSTON:  Our response is that I

10   think this is being offered for optional completeness?

11   I'm not sure.

12             THE COURT:  I'm not sure, either.

13             MR. BANKSTON:  Exactly.  So, let me --

14             MR. REYNAL:  It is, Your Honor.

15             MR. BANKSTON:  Okay.  Then if it is for

16   optional completeness, then the rule of optional

17   completeness requires them to identify a specific

18   statement made within the recorded part that was played

19   to the jury, while also identifying a specific -- and

20   also identifying how that statement, existing on its

21   own, could be fundamentally misleading to the jury.

22             Then they must identify a specific

23   statement in the portion that they would like to play

24   that is necessary for the jury to have -- to properly

25   understand what just happened; otherwise, they will be

1    misled.

2              I have -- what I have heard is, basically,

3    that after calling Mr. Heslin mentally challenged and

4    autistic and claiming that his ex-wife and all of us

5    lawyers are exploiting him, that then they want to play

6    an apology, or some other things that Mr. Jones says

7    that they think will be good for them.  That is not a

8    way in which you actually clear up any fundamental

9    misleading bit in that video.

10              So, for optional completeness I don't see

11   how it comes in.

12              MR. REYNAL:  Your Honor, the argument

13   that's been made is that Mr. Jones continues on his show

14   to deny that the plaintiffs are real, to say that

15   they're actors, that they're some kind of a CIA plot.

16   This seems to be a big part of the Plaintiffs'

17   presentation, and it's just not true.  And this clip

18   shows, he says, these are real people, I've been sitting

19   next to them, I'm sorry for what I did, you know.  And

20   in that sense they're -- their portrayal of it is

21   misleading.

22              THE COURT:  So, I didn't actually hear any

23   of that from Mr. Ball, so that's not their portrayal.  I

24   heard some testimony from Miss Lewis about how she feels

25   about it.  Again, I don't think that constitutes a

1    portrayal.

2                    I think -- do you have -- let me put it

3    this way, I believe that Mr. Bankston is correct how he

4    describes the rule of optional completeness.  Do you

5    have an argument to make for why, whatever portion of

6    this video you think needs to be played, is required for

7    the jury to not be confused by the portion they heard

8    earlier today?

9                    MR. REYNAL:  It's the argument I already

10   made, Your Honor.

11                   THE COURT:  Okay.

12                   MR. BANKSTON:  And, Your Honor, I would

13   just reply to that that the idea that to say that

14   they're not -- like, if he wants to play it so that he

15   can show that Mr. Jones believes that they're real,

16   literally said that in the video that we just played,

17   shows --

18                   THE COURT:  Right, I did hear that, as

19   well.  Also the claim that he's been sitting next to

20   them all week, I heard that, also.

21                   I have a hard time imagining, and I have

22   not watched it, that any clip that includes a

23   conversation about what's happening in court this week

24   can be in any way helpful to the jury in their job.  I

25   have certainly --

1           Can you please sit down, Mr. Jones.  It is

2   not your turn to talk.  I will happily allow Mr. Reynal

3   a minute to hear all of your suggestions if you and he

4   think that is necessary, but you have to wait.

5           I haven't watched any of it, so I don't

6   know what it says.  If you want to send it to me and

7   have me watch it on a break, I will do that.  But there

8   are a number of people who have been writing to me and

9   telling me what Mr. Jones is saying every day, I don't

10  know if they're accurate or not in their descriptions,

11  I'm not otherwise going to find out.  So, I will only

12  see this if you send it to me and ask me to look at it.

13          Would you like to confer with your client?

14  I think he wants you to say something else.

15          MR. REYNAL:  We would simply re-urge that

16  it's confusing for the jury because the clip leaves out

17  the part where Mr. Jones says that he certainly believes

18  that Miss Lewis is real.

19          THE COURT:  All right.  So, if you want to

20  send me that part, that may, in fact, meet the

21  requirements of the rule of optional completeness.  And

22  send it to my staff attorney and she'll review it and

23  then I'll review it on a break and I'll let you know.

24          MR. REYNAL:  Thank you.

25          THE COURT:  Anything else before we bring

1    the jury back?

2                    MR. REYNAL:  No, Your Honor.

3                    THE COURT:  Anything from your side?

4                    MR. BANKSTON:  Not our side.

5                    THE COURT:  All right.  We're ready to

6    have the jury back.

7                    *(The following proceedings were held*

8    *in open court in the presence of the jury.)*

9                    THE COURT:  All right, you may all be

10   seated.

11                   All right.  Mr. Reynal, did you have a

12   witness for the jury?

13                   MR. REYNAL:  I do.  The defense would call

14   Alex E. Jones.

15                   THE COURT:  All right, Mr. Jones come

16   stand in front of me, please.

17                   Raise your right hand.

18                   Do you solemnly swear or affirm under

19   penalty of perjury that the testimony you are about to

20   give shall be the truth, the whole truth, and nothing

21   but the truth?

22                   THE WITNESS:  I do.

23                   THE COURT:  Thank you.  Come have a seat

24   in the witness chair.  There is water and glasses.  You

25   have pretty good volume, I don't think you'll need to

1    lean into the microphone.

2                     I see that you have a document with you.

3    I don't know if you were here when I explained to a

4    prior witness who brought documents with them that you

5    can't look at any document for any reason while you're

6    testifying until and unless one of the lawyers or myself

7    instruct you to do so.  So, I'm going to ask you to just

8    give it back to Mr. Reynal until he may think you need

9    it.  Okay.

10                    Did you understand all that?

11                    THE WITNESS:  I did, yes.

12                    THE COURT:  Okay.  While you testify it is

13   not a conversation, it is a question and answer.  So the

14   instructions are to let the lawyers completely finish

15   asking their questions before you begin your answer, to

16   listen to the question and answer what is asked.  So,

17   you can always say that you don't know or you don't

18   understand, those things are true.  Answer out loud in

19   words and not head shakes and the like.

20                    I think that's all my instructions.  I say

21   it so many times sometimes I forget some.  Do you

22   understand them?

23                    THE WITNESS:  I do.

24                    THE COURT:  All right.  You may begin,

25   Mr. Reynal.

```
 1                    ALEX E. JONES,
 2        Having been duly sworn, testified as follows:
 3                    DIRECT EXAMINATION
 4   BY MR. REYNAL:
 5        Q.   Alex, would you please introduce yourself to
 6   the Ladies and Gentlemen of the Jury.
 7        A.   Hi, I'm Alex Jones.
 8        Q.   How are you feeling today, Alex?
 9        A.   I actually feel good because I get a chance
10   to, for the first time, say what's really going on
11   instead of the corporate media and high-power law firms
12   manipulating what I actually did.
13        Q.   I want to start by kind of letting the jury
14   know a little bit about your youth and where you grew
15   up, so they can get to know you better.  Is that okay?
16        A.   Okay.
17             And, you know, before we do that I just
18   want to say that on the record, because I've said it
19   many times, I apologize --
20             MR. BANKSTON:  Objection.  Nonresponsive.
21             THE COURT:  Sustained.
22             So, Mr. Jones, one of the instructions I
23   just gave you is that this is not a conversation, it's a
24   question and answer.
25             THE WITNESS:  So, she got to monolog but
```

1    not me.  I got it.

2                THE COURT:  So, you have to only answer

3    questions that are asked of you.  Mr. Reynal will ask

4    you, I'm certain, all the questions you want.  But you

5    have to wait for the question.

6                You may proceed.

7    BY MR. REYNAL:

8         Q.   Mr. Jones, have you been wanting to

9    apologize to the plaintiffs in this case for a long

10   time?

11        A.   Yes.

12        Q.   And what would you like to say to them?

13        A.   That I never intentionally tried to hurt

14   you.  I never even said your name until this case came

15   to court.  I didn't even really know who you were until

16   a couple of years ago, when all this started up.  The

17   internet, a lot of questions, I had questions, and over

18   that six-, seven-year period before I got sued, or

19   six-year period, it's clear, you can see the whole

20   progression of us, the few times we covered it, trying

21   to actually find out what happened.

22                And that's really been my big frustration

23   is that the people have said that I am personally trying

24   to hurt them or coming after them when I question every

25   big event and a lot of times it turns out that we've not

1    been told the truth.

2              And a perfect example is today, where they

3    play a one-minute clip and I had just done that this

4    morning and I knew that I said I believe that Scarlett

5    Lewis is real and she's a really, you know, nice person

6    and she's really a sweet person, and I went through and

7    talked about her ex-husband, too.  And then I said I

8    believe they're being fed and manipulated --

9              MR. BANKSTON:  Your Honor, objection.

10   Nonresponsive.

11             THE COURT:  Sustained.

12             THE WITNESS:  -- this is a perfect -- this

13   is a perfect --

14             THE COURT:  When you hear "sustained" you

15   have to stop talking.

16             THE WITNESS:  Okay.

17   BY MR. REYNAL:

18       Q.   Do you feel that the video clip was a fair

19   representation of what you meant to convey?

20       A.   No, in the front and back -- no.

21       Q.   Okay.  And why wasn't it fair?

22       A.   Because it had the front and back cut off of

23   it to totally misrepresent the apology at the end and at

24   the first where I said I believe she's a real person and

25   lost her child.  So someone edited that and then showed

1    it to her and then they brought it in here and played it

2    and show it to you.  And I think you should ask to see

3    the full segment.

4         Q.  All right.  So now that we've got that out

5    of the way, I want to ask you some questions about where

6    you grew up and how you came to have your business.

7              Can you let us know where are you from in

8    Texas originally?

9         A.  I first was born in Dallas, then I grew up

10    in a suburb of Dallas called Rockwall.

11         Q.  And how old were you when you moved to

12    Austin?

13         A.  Sixteen.

14         Q.  And can you tell the Members of the Jury why

15    your family relocated to Austin?

16         A.  My dad sold his dental practice and there

17    was too much crime in Dallas and Austin was a safer

18    city.

19         Q.  Were you still in high school when you moved

20    here?

21         A.  Yes.

22         Q.  Did you graduate from high school?

23         A.  Yes.

24         Q.  Here in Austin?

25         A.  Yes.

1          Q.    And did you go to college?

2          A.    No.  I mean, I went a few years to community

3     college.

4          Q.    Are you married?

5          A.    Yes.

6          Q.    How many children do you have?

7          A.    I have four.

8          Q.    Can you tell us their names and their ages?

9          A.    I've got -- I need to say their names?

10          Q.    You don't have to if you don't want to,

11     their ages.

12          A.    Sure, there's Rex, who is 19; Charlotte, who

13     is 18; Georgia, who is 14; and Veronica, who is five.

14          Q.    And is your wife present in the courtroom

15     today?

16          A.    She is.  She's right there.

17          Q.    And what's her name?

18          A.    Erica.

19          Q.    I want to ask you some questions about how

20     you got started up in media with your radio show.  Okay?

21     How old were you when you first felt that you wanted to

22     be on the air, that you wanted to work in media?

23          A.    When I was about 17 I really liked listening

24     to talk radio and I had grown up with my dad on the road

25     trips listening to like Larry King when he was still on

1    radio and I really liked Larry King on radio and then

2    also on CNN.  And I also liked Howard Stern, thought he

3    was funny, and I really wanted to be a talk show host.

4        Q.   And how did you take that desire to be a

5    talk show host and those early influences, how did you

6    translate that into action; how did you first get on the

7    air?

8        A.    I had been on out of high school about a

9    year and a half, two years, and I went down and took

10   classes at the Access TV station in Austin, one of the

11   first places to ever have Access TV, they have one of

12   the best systems.  So, they had a lot of equipment and a

13   lot of studio space.  A lot of it was old, antiquated,

14   but it was still very useful.  So, I became self taught

15   with that equipment, and in about '94, '95, '95 started

16   doing my own little call-in shows and then those became

17   pretty popular quickly.

18              And so, the phone rang and a D.J. by the

19   name of Shark Man, who had a national show that was

20   managing the local station, 98.9, said, I think you

21   should come in and do like a three-hour radio show this

22   Saturday and see what people think.  And they had Howard

23   Stern on their station, they had G. Gordon Liddy, a

24   bunch of other big hosts, they had some other big local

25   hosts who couldn't light the phone lines up and the

1    first time I went in they got a hundred calls, first

2    time.

3         Q.    How old were you?

4         A.    I think I was 21, 22 at that time.

5         Q.    What was the format of your early shows on

6    Austin Public Access TV?

7         A.    It wasn't as conspiratorial or political,

8    there was some of that because there was enough people

9    doing those shows and I already knew about that

10   information.  But it was just all over the map, it was

11   just really call-in shows, different topics.  Did

12   variety shows, like carve pumpkins on TV on Halloween

13   and, you know, have a guy come in with his pet monkey

14   and dance around.  Just fun stuff.  Because I also liked

15   Johnny Carson growing up.

16        Q.    Did people like your show?

17        A.    They did.

18        Q.    And did you -- did your show, I mean, that

19   sounds like -- almost like a Wayne's World kind of

20   thing.

21        A.    I think Wayne's World is a good way to

22   describe it.

23        Q.    And did it win any accolades?

24        A.    It did.  It won Best of Austin a few times

25   in the newspaper and pretty much started getting written

1    about and even national coverage in about two years.

2        Q.    Really.  And so, tell us, in those -- you

3    told us already about Larry King and about Howard Stern.

4    Who would you say influenced you artistically in the

5    format and how you did your show then and became the man

6    you are today.

7        A.    I mean, really, I listened to Larry King a

8    lot because my dad listened to him on the radio a lot

9    when I was -- from the time I was like six or seven I

10   listened to Larry King, and then I would watch him a lot

11   of nights at home in junior high and high school.  So, I

12   would say more than anybody Larry King.

13       Q.    Did there come a time when, because of your

14   success and having won this listener's choice award,

15   viewers choice award, that you were able to be

16   syndicated?

17       A.    Well, I won a couple of those, I don't think

18   the syndication folks were even paying attention to

19   that.  I built the studio in a bedroom in my house

20   because they wouldn't put the equipment in at the local

21   station, where I had, you know, top ratings, to

22   syndicate it.  And so, I went home, got the equipment,

23   had an engineer come set it up and then called a

24   syndication outfit and got a sponsor and I paid to put

25   it on the satellite.  And then I got about probably 60,

154

1    70 affiliates in about a month.  It went up to several

2    hundred affiliates after that.

3         Q.   Can you describe for us what the setup was

4    like, was it in a spare bedroom?

5         A.   It was.

6         Q.   And what kind of furniture was in there?

7         A.   It was a simple wooden desk and a microphone

8    and a little mixer and then a chair if I had a guest.

9         Q.   And what is syndication, for those of us

10   that don't know?

11        A.   Instead of being on one station it goes up,

12   at that time it was satellite, now it's on the internet,

13   and then it's beamed back down and other stations can

14   pick it up.

15        Q.   So, you said you were syndicated on how many

16   radio stations?

17        A.   It fluctuated between 30 or 40 at first, and

18   as much as over 200.

19             I would say things that were politically

20   not popular to talk radio, more left-wing things like

21   being anti war or things like that and I would lose a

22   bunch of stations, then I would gain more stations.  But

23   talk radio was mainly conservative.

24             And so when 9/11 came around I had

25   questions.  We lost 70 percent of our affiliates in one

1    month because I didn't want to, you know, attack all
2    these foreign countries.  But I still stood steadfast
3    and had that message.  So I got real popular with the
4    left wing, but I wasn't trying to be left wing, I was
5    trying to follow the right thing, even though it made me
6    lose most my radio stations.
7                    Which is the issue of how I do what I
8    think's right, sometimes I'm wrong, I've been more right
9    than wrong; but I don't do it for the monetary thing, I
10   do it to tell the truth or try to tell the truth and
11   then the monetary comes with that because people can
12   tell, this guy is not reading off a script.  And with
13   the that comes its own issues.
14                   But I'm not lying like the corporate media
15   on purpose, that's the big difference.
16        Q.   And so, let's focus in on this early period.
17   What year did you get syndicated?
18        A.   I syndicated myself in 1998.
19        Q.   And at that time did you already have the
20   show name the InfoWars?
21        A.   Yes -- no, no.  It wasn't never called
22   InfoWars, it was just the Alex Jones Show.  Because you
23   have to call the show your name, because that's how they
24   do it with the rating that were written in on the little
25   diaries.  So, to be on radio you had to say the name of

1    the show coming in and out.  Just like TV for Nielsen

2    ratings.  So it was the Alex Jones Show.

3         Q.    Tell us about InfoWars.  How did the name

4    InfoWars come to be and how did that business start?

5         A.    Vic Freeland, who was an Air Force veteran

6    who worked in Air Force intelligence in Vietnam, he was

7    the deputy fire chief in Austin and he was a listener

8    and he had done some talk radio interviews, he had been

9    on some syndicated shows because of magazine articles he

10   had written.  And he came to come of the events and he

11   said, listen, you know, you're really involved in an

12   information war.  And because all information is

13   propaganda, whether it's true or not, it's called

14   information war.  And so you ought to try to get that

15   URL.

16              And he had a big old laptop, he said, look

17   it's available.  Do you want InfoWars.com?  And so Vic

18   Freeland got the site.  He even then in his spare time,

19   because he was still working with the fire department

20   then, he built the basic site and stuff, then helped

21   find me a volunteer, whatever, at first we didn't really

22   have any money, to then start updating the site a little

23   every day.  And that was in 1997.

24              So, InfoWars came from an Air Force

25   intelligence term.

157

1      Q.   So, you had the Alex Jones Show that was
2   being broadcast, then you also had InfoWars at the same
3   time.
4      A.   Yes, I had a radio show -- at the time I was
5   doing a local radio show and then I was doing the
6   syndicated one out of my house, and then I had a website
7   that I could post articles on, or links to, to say,
8   look, this is on the site, go check it out on air.  So
9   it was kind of the way to make radio almost like TV
10  because the internet was starting to become more
11  effective and more -- where it actually worked, the word
12  is not effective, so you could actually post stuff and
13  do things.  And so we could put things on there and show
14  people what we were talking about.
15     Q.   Did you also start making, in order to
16  support InfoWars, did you also start making
17  documentaries?
18     A.   I did start making documentaries.  In 1997 I
19  made my first documentary, "America Destroyed By Design"
20  about the great reset that was coming and the different
21  UN documents that were in it.  And I made more than 25
22  more films after that.
23     Q.   Why make the films?
24     A.   Most talk show hosts would sell a coffee cup
25  or a newsletter to fund themselves, and I wanted to

1    build a larger news organization because I wanted to do

2    more, I wanted to make documentaries, so I went out and

3    made documentaries and used the money from that to make

4    more documentaries.  Because that way you could show

5    people what it was you were talking about in a format

6    before there was really the internet.

7              Because even though the internet was

8    around it was mainly text and pictures in '96, you know,

9    '97, '8, '9, documentaries on VHS and then DVD was, you

10   know, the way people interface with that.

11        Q.   And at the time what was your main topic of

12   interest that you wanted to explore through your

13   documentaries, as well as through your radio show and

14   your website?

15        A.   The plan to cut off U.S. energy reserves

16   that we're now experiencing, the plan to cut off all

17   cold power generation and gas, and the forced move onto

18   renewables, but it was in the documents, they didn't

19   plan to even have those.  It was a post-industrial

20   program called Agenda 21 that George Herbert Walker Bush

21   signed onto in Rio de Janeiro in 1992.

22              And I read the plan and it said, we're

23   building a post-industrial world and we're going to have

24   the controlled demolition of civilization to force

25   depopulation.  And now that's mainline news.  Bill Maher

1   called for depopulation last Friday night.

2          Q.    In addition to your documentaries, are you

3   also an author?

4          A.    I am, yes.

5          Q.    How many books have you written?

6          A.    I've written two and contributed to more

7   than 20.

8          Q.    We'll talk about your latest book later.

9   Let's move forward a little bit.  At -- in 2001, what if

10  anything happened with you and your program and YouTube?

11         A.    Say that again, please.

12         Q.    Did you have a series of videos that were

13  very successful on YouTube?  In the early 2000s.

14         A.    Before YouTube came around in I think 2004,

15  and then it was out of some guy's garage in San

16  Francisco, got bought by Google around that time, we

17  were actually putting out videos ourselves that we were

18  streaming ourselves but it became too expensive so we

19  had to stop.  We were doing that by 2000, 2001.

20               And these were all the technical things,

21  but then Google video came around and we had -- we had

22  videos on there with, you know, millions of people that

23  watched them and we were just putting it out for free,

24  and it was -- it was very popular with the left, because

25  it was us tracking and protesting the KKK, it was us

160

1    exposing police brutality and things like that.  And I

2    wasn't trying to be left wing, I just thought those were

3    really important topics.

4              So, I got really popular with the left

5    wing then, and they went and had me speak at San

6    Francisco, New York, and I got big awards by the big,

7    you know, liberal democrat channels.

8        Q.   Let me ask you about that part, because

9    that's an aspect of your work and who you are that you

10   cultivate which is different from in the studio.

11          From the very beginning did you believe it

12   was important to go to demonstrations, to talk to the

13   people on the street, to be part of protests?

14        A.   Absolutely.

15        Q.   And how did that play into what you were

16   trying to do at InfoWars?

17        A.   Well, InfoWars is a radio show on TV.  I

18   mean, that's really what Oprah Winfrey is, too, I mean,

19   that's -- it all goes back to radio, when that started a

20   hundred years ago or a little bit more now.  And so

21   that's a separate thing, a talk show with opinions and

22   people debating are like "The View," they're not fact

23   checking, they're giving their opinions.

24          When I'm on the radio show most of the

25   times I'm a pundit, giving my opinions.  Everybody on

1    talk radio knows that.  We play devil's advocate, we

2    look at both sides.  I don't do that very often now

3    because people can edit tapes and hurt you bad.  And I

4    would say, well, let's look at this, they're saying

5    this, and they believe that.  And now let's look at

6    this.  And as -- later as I realized my show had a lot

7    more power then I thought, I realized, well, even if I'm

8    not the one editing these tapes, I have to be more

9    careful because there's bad guys out there that will do

10   it.

11           But the films I'm proud of, we never put

12   any films out about Sandy Hook, never had any products

13   about Sandy Hook, the films we would try to really vet

14   and do more journalistic research into and fact check

15   and interview renowned people.  I mean, I interviewed

16   like former U.S. attorney generals, members of Congress

17   and former chairman of the joint chiefs of staff.  I

18   mean, that's where we could go with these films, top

19   economists, just really big names for these films.  And

20   they were very, very popular.  So, that's where I've

21   been journalistic and done a good job.

22           I guess, with the age of the internet,

23   people grabbing clips out of talk radio or talk TV and

24   mixing it together, I can see how it can, you know,

25   cause problems.  That's why I've admitted that I've made

1  a lot of mistakes.  But none of it was done from some

2  master plan deal, that was done from a bedroom in my

3  house.

4              MR. BANKSTON:  Objection, nonresponsive.

5              THE COURT:  Sustain.

6  BY MR. REYNAL:

7       Q.   So, one of the things I notice about you is

8  that you have a very distinctive voice.  Very deep, sort

9  of gravelly voice.  Did your voice always sound that

10  way?

11       A.   No.

12       Q.   What happened to your voice, why does it

13  sound the way it does?

14       A.   Well, I remember the two demonstrations

15  where I finally wrecked it, and one was about I guess

16  about 12, 13 years ago.  There was actually film of

17  it --

18              MR. BANKSTON:  Your Honor objection.

19  Relevance why his voice is changed.

20              THE COURT:  Do you have some way to tie

21  this to the damages portion of this trial?

22              Uh-huh.

23              THE WITNESS:  I thought you were talking

24  to me.

25              THE COURT:  No, I'll address you if I'm

1      talking to you.

2                MR. REYNAL:  This is so that the jury can

3      understand who my client is and properly assess his

4      credibility, his demeanor.

5                THE COURT:  Sustain.

6      BY MR. REYNAL:

7           Q.   Let me ask you directly about InfoWars as

8      we're coming into the period where Sandy Hook occurs.

9      Okay?

10          A.   Yes.

11          Q.   About how many employees did you have circa

12     2012?

13          A.   I would say about 45, 50.

14          Q.   And where were you broadcasting from?

15          A.   What year?

16          Q.   2012.

17          A.   Oh, I was broadcasting from offices.

18     Studio.

19          Q.   In terms of size, how does that compare to,

20     for example, the *New York Times* in terms of how many

21     employees?

22                MR. BANKSTON:  Objection.  Speculation.  I

23     don't believe this witness has any personal knowledge

24     about the *New York Times*.

25                THE COURT:  So, you can only answer the

1    question if you have actual knowledge about how many

2    employees the *New York Times* has.  Otherwise, you have

3    to say "I don't know."

4    BY MR. REYNAL:

5         Q.   So, as a member of the media, are you

6    generally familiar with the different media

7    organizations that are in the industry?

8         A.   Yes.

9         Q.   And based on that knowledge of the industry,

10   can you tell us size-wise how your organization compares

11   to the *New York Times* or to CNN?

12        A.   It's between one one-hundredth and

13   one-twentieth the size of those different organizations

14   if you're counting for employees and bureaucracy and the

15   number of offices and the things they do.

16        Q.   So, I want to ask you some questions about

17   the different formats of the different shows that

18   InfoWars broadcasts.  Can you tell us what the sort of

19   different segments are that would appear on a given day

20   at InfoWars circa 2012?

21        A.   There was my four-hour radio show that, in

22   2012, was just a webcam on me for people that wanted to

23   watch it online.  And then it was just -- it was me and

24   the desk with a camera in 2012.  And then, I mean, that

25   was it basically.

1       Q.    At some point did you all begin to have
2  additional segments besides just you doing your radio
3  show and answering callers?
4       A.    Well, yes.  I mean, that's -- now I
5  understand what your first question was, what was the
6  different types of media we were doing.
7       Q.    Yeah.
8       A.    There was the syndicated radio show, that
9  was also had a digital component, digital video online,
10 and then there was documentary making, and that's when I
11 had ten or so people working on with me, and then I
12 started to develop reporters and people to go out and
13 actually cover like live events and protests and things
14 that were going on.
15           And then we also did everything in-house,
16 so we had our own shipping department to be able to ship
17 out, you know, books and films.  Not just my books and
18 films, but a lot of other authors' books and films, we
19 would interview those authors.  And so that's what we
20 were doing back then.
21      Q.    Now, your radio show, was it purely a
22 call-in show?  Or did you also go sort of on rants about
23 different issues that you were seeing?
24      A.    Yes, we would have a lot of calls, sometimes
25 the whole show would be calls, sometimes it would be all

1   guests.  Sometimes I would just decide that I had so

2   much news that I was going to just cover up to a hundred

3   stories on there and just look at them, the audience

4   knows, whether it's BBC or whether it's an InfoWars

5   story or whatever it is, they can choose, they can go

6   look it up for themselves, we're just covering what's in

7   there.

8                   And so we just BAM, BAM, BAM, the same way

9   today, like Pelosi is in Taiwan, what do you think of

10  it, do you think there's going to be a war, the Chinese

11  are threatening war.  Oh, look, Biden fell down again.

12  Oh, look, they found another trailer full of 50 dead

13  people in Texas, this is horrible, we got to do

14  something about this.  And it's just coming up next,

15  it's really simple, I got a stack of news, we're going

16  to play a video clip of Bill Maher saying we need to

17  depopulate the human population.  Let's take calls.

18  What do you think about Bill Maher saying we should get

19  rid of the majority of people?  What is going to do

20  that?  Who is going to do the killing?  I think this is

21  wrong, I think it's dangerous, I think it sounds like

22  Hitler.  I mean, that's what we do.

23       Q.   And how did -- at the time, 2012, how did

24  you you all source the -- or how did you source the

25  stories that you wanted to cover during that segment of

1    your talk radio or --

2         A.   95 percent of what we were covering was

3    mainstream news, going, look, they're saying this, do

4    you believe it.  Or what do you make of this.  I mean,

5    it's that kind of thing.  Is that -- we would simply do

6    what talk radio does, that's what talk radio does,

7    that's what Larry King did, is stack of news articles,

8    talk about what's going on, what people are saying, ask

9    callers, what do you think of that, do you buy that,

10   what do you think is going to happen next.  Are there

11   really WMDs in Iraq or are they lying about it?

12             And then the talk show host make their

13   predictions about what they think and then the talk

14   radio listeners basically keep note and see who is the

15   most accurate and it becomes a big game to see who has

16   made the best predictions and things like that.

17             And so, that kind of lends itself, too, to

18   the very nature of a soap box, is people speculating.

19   That's the nature of people going to a park and standing

20   up in Speakers Corner in London for 600 years and giving

21   their opinion.  That's what free speech is.

22        Q.   Now, please tell the Members of the Jury,

23   has your method, where you get your stories, has that

24   changed over the years from 2012 until today?

25        A.   No, it's not really changed.  I mean, we

1    have clips from the news, where it's like, here is a

2    clip of this person saying this, and we always try to

3    actually play it in context, most of our clips are about

4    two minutes long, so they're not little deceptive clips,

5    we want to show what somebody actually said.

6                    And we'll just play a clip, give our

7    opinion and ask callers what they think about it.  Or

8    again we will say, should Pelosi go to Taiwan, the

9    Chinese are threatening war.  And I said yesterday, I

10   said, I don't really like Pelosi, I don't want a war

11   with China, but I think that it's good she's going

12   because we should stand up for ourselves and not be

13   pushed around.  And then we take calls and say what do

14   you think?  I think you're wrong, we shouldn't go over

15   there; I think you're right.  It's really that simple.

16        Q.   Do you also -- did you then and do you now

17   also host debates?

18        A.   We do.

19        Q.   How do you decide to host a debate and who

20   are going to be the debaters?

21        A.   Any issue that is being contested that

22   people think is interesting, we had a Sandy Hook debate

23   where we got a newspaper reporter on who said he thought

24   that it really happened, and we had like a professor, I

25   forget exactly who on, who thought there were some

1    questions.  And that's the type of thing that we did.

2                I can understand then that people again

3    take clips out of that and move that around and that it

4    can cause problems, and that's why now, I mean I can say

5    I'm more timid, even though they have the state police

6    questions Uvalde in Texas and even though they stood

7    down for 77 minutes, I think it happened, but I'm just

8    going, whoa, I'm going to leave this alone as much as

9    possible just because they'll take what I've said out of

10   context.

11               But my listeners are now mad at me because

12   I'm not covering it when -- I mean, something went on,

13   77 minutes and the kids are begging for help and the

14   police just stand there and the state police in Texas

15   say that -- the head of the state police said, we don't

16   know the truth.  And it's because of things like that

17   that people just get completely blown away and confused

18   by what's going on.

19               But now I realize that those are such

20   touchy subjects that I don't touch it with a ten-foot

21   pole.

22       Q.    And it's not a result of this case?

23       A.    You know, it's a result of a lot of stuff.

24   Like, in the past I would have gotten in a car and

25   driven down there, and I think that's what journalists

1    should do.  But we didn't go down there, because I don't

2    want to be associated with the corporate media and the

3    lawyers and the people that swarm around these mass

4    shootings.  I don't want to be like them.

5            So, they've accused me of being Mr. Mass

6    Shooting and all this stuff with Sandy Hook when I've

7    covered less than one-tenth of one percent over the

8    years, and so, I don't want to be like them, so we

9    didn't send reporters to Uvalde.  And the American

10   people can figure out what's going on, but I'm not going

11   to get involved in it.

12       Q.   So we've talked about the call-in portion,

13   we've talked about hosting debates.  Do you also

14   interview -- and I think we talked about doing the news,

15   based on what you're reading.  Do you also interview

16   guests?

17       A.   I do.

18       Q.   And do you -- do you always select the guest

19   that you're going to interview, or sometimes does one of

20   your producers suggest to you, hey, you should interview

21   this person.

22       A.   In radio, the producer isn't the person

23   paying for it, you know, not like Hollywood or TV, the

24   person paying for the TV show is the producer.  In radio

25   it just means the booker.  Then they call in and get the

1    guest online or on Skype and they check into the person,

2    we get all these guest offers and things.  In the past I

3    would do cursory stuff and sometimes mail it in with

4    guests.  That's just what talk radio does.

5              I mean, I was a producer for other shows

6    25 years ago, not just my own show, and they were

7    pressuring us, I was helping produce a sports show to

8    get up to five guests an hour.  So you're just calling

9    people that are already, you know, in the news, sports

10   casters or pundits, just like ESPN now, you see all

11   these different writers and talk show hosts on the show,

12   so.  It's the same for political stuff, you're just

13   getting guests that are in the news that are interesting

14   and then getting their opinion about things.

15             And so now most of the time show I say, I

16   want this person, I want that person, and I'm more in

17   control of the guests that I have.  But in the past we

18   let more things driven by the internet and by 4Chan and

19   8Chan that in every case I've had problems, it's been a

20   curse, I'm not attacking everybody that's on there, but

21   that's -- I tell my producer, do not touch it when it's

22   on there, because it's the kiss of death and it causes

23   nothing but problems.

24        Q.   Why is it -- do you think it's important to

25   interview people who are causing a stir on the internet

1      or on social media, why do you feel like that's a good

2      thing to do in terms of your listeners?

3            A.    Well, I mean, most of the time we're not

4      just interviewing people that have caused a stir.  When

5      I say like there's a big controversy or there's a big

6      story, if there's riots in Hong Kong and we can find a

7      reporter who will come on the show, we'll get him on.

8      It's whatever the big topic is.  That's just how news

9      is.

10           And more and more I don't really follow

11     the news model of covering the news.  In the past I did.

12     But we still do it a lot.  But now I mainly just talk

13     about philosophy or the big picture and then have some

14     guest on.  And the show has gotten more Christian,

15     because I'm a Christian, but as things progress, all

16     things happening in the world, I'm moving more towards

17     doing a self help life experience type show than the

18     political show.

19           In fact, I'm trying to segue out of this,

20     just because I think we have to change individuals, kind

21     of like Scarlett was saying earlier, more than we're

22     going to change the world, if we can't change ourselves,

23     then we're never going to be able to change the world.

24     And I've made a lot of mistakes and I've learned a lot

25     in that process, and I've also learned how the corporate

1    media is able to completely manipulate a story once
2    you're caught in it, and then manipulate other people.
3    And, if anything, I want to teach people about how that
4    process works.
5             Because they say I'm the mastermind how to
6    manipulate people and I didn't have the understanding of
7    it coming -- and now I've seen it from the inside, the
8    way the stuff goes on, and I -- again, I think only
9    getting the individual awake and aware and not under its
10   control is the way to beat it.  And you can't just cover
11   a bunch of news and get somebody to understand that, you
12   can't be told about the matrix, you've got to see it.
13        Q.   I hear you.
14             Let's slow down a little bit, and I want
15   to ask you about sort of how your, with these
16   responsibilities, how your typical day sort of shapes
17   up.  Okay?  How many hours a day are you on the air?
18        A.   I'm on the air about four hours a day.
19        Q.   And since when have you been on the air
20   about four hours a day?
21        A.   I've been on the air four hours a day since
22   about 1997, '98.
23        Q.   And in order to prepare for those four hours
24   that you're going to be on the air every day -- well,
25   let me ask you this, how many days a week?

1      A.   I'm on the air six days a week.

2      Q.   So, in order to prepare for four hours a day

3   six days a week, how many hours per day do you spend on

4   prep for your show?

5      A.   I spend about two hours at night and about

6   two hours in the morning, and then I do some research in

7   the afternoon.

8      Q.   In addition to prepping for your show for

9   about four hours and being on the air for about four

10   hours, do you have other responsibilities?

11      A.   I do.

12      Q.   And what are your other business

13   responsibilities?

14      A.   Well, we don't have a lot of sponsorship,

15   because with sponsorship comes the control of the

16   sponsor's political views.  And so, we sell books and

17   films and other things to fund ourselves, and then

18   you've go to source that, you've got to have that, you

19   have to get good deals on that because a lot of times,

20   like in the case of foods, we're only making 20 or

21   30 percent on it.  So it's -- you're competing against

22   Amazon and so I've got to really spend some time on

23   that.

24      Q.   And about how many -- so, about how many

25   hours per day do you spend on general business

1    administration, as well?

2          A.    Two or three hours.

3          Q.    So, your average day, would you say, is

4    somewhere between 11 hours, 12 hours a day?

5          A.    Yes.

6          Q.    Six days a week?

7          A.    Yes.

8          Q.    Do you depend on other people to help you

9    produce your show and decide what you're going to talk

10   about?

11         A.    I do.  I depend on my crew and I depend

12   on -- I mean, really what they do is they just give me

13   hundreds of clips that are mainstream news, alternative

14   news, things that are happening, video clips, and I'll

15   sit there on my computer and just review them.  And then

16   I tell them, just print me the top stories off of 10 or

17   15 news sources, and I say, go through everything,

18   randomly change it up.  So, everything from Japanese

19   news to news in Mexico to, you know, the BBC to the *L.A.*

20   *Times*, to just everything, and then also alternative

21   media.

22               But more and more we just show clips of

23   what's actually happening out in the world, it's not

24   disputed, there's just stacks on news.  You would be on

25   air 24 hours a day.  All you're doing is like a curator,

176

1   just showing people, hey, we looked at this, we think

2   it's interesting, we looked at that.  The idea that

3   there's like certain stories that are like these big

4   bonanza stories that we focus on is just not the case,

5   there's a glut of news and information.

6        Q.   So we've talked about your responsibilities

7   and your duties and your workday at InfoWars.  Do you

8   also appear on other people's shows?

9        A.   Yes, I've been on thousands of different

10  programs in the last 27, 28 years.

11       Q.   Any that we would have heard of?

12       A.   I've been on Howard Stern and on his network

13  many times, I have been on Joe Rogan's show many times,

14  even predating his current podcast, I've known him

15  25 years.  I've been on The View, I've been on Piers

16  Morgan, I've been on 20 or 30 BBC shows, I've been on

17  Japanese television, I've been on -- I've been on Saudi

18  Arabian TV, I've been on Israeli TV, I've been

19  basically -- I've been on Brazilian television,

20  Brazilian radio, Mexican TV and radio.  I mean, I've

21  been on basically a lot.

22       Q.   Let's focus in -- in the year 2012, how many

23  hours per day was InfoWars broadcasting, not just your

24  show but everything.

25       A.   Well, there's broadcasting and then there's

Alicia DuBois, Texas CSR 5332 - 459th District Court, Travis County

```
 1   just videos that we're uploading.  I mean, I would
 2   say --
 3         Q.   How many hours of content per day?
 4         A.   Six hours, seven hours.
 5         Q.   Okay.  And in 2013 about how many hours per
 6   day?
 7         A.   2018?
 8         Q.   No, 2013.
 9         A.   Oh, 2013.  Same amount.
10         Q.   And 2014?
11         A.   I would say a little more, maybe seven.
12         Q.   And 15?
13         A.   The same.
14         Q.   16?
15         A.   The same.
16         Q.   17?
17         A.   Sorry, just one second.  I'm sorry.  My torn
18   larynx.  That's why I voice is like this.
19              So, sorry, what were you saying?
20         Q.   I was asking you how many hours per day
21   content is being produced and uploaded or streamed on
22   InfoWars in 2017.
23         A.   Probably seven, eight hours, as well.
24         Q.   And '18?
25         A.   Then it increases to ten hours a day, or in
```

1  '17 it did.

2       Q.   Okay.

3       A.   In '17 it increases to ten hours a day, and

4  then in -- and then it stayed about that.

5       Q.   It stayed constant now at about ten hours

6  per day since then?

7       A.   There's ten hours that's always there if

8  it's talk radio on TV, and then we also put on some

9  other reports and videos.

10      Q.   Okay.  So, the answers you just gave us of

11  seven hours per day basically up until 2016 and then,

12  starting in 2017, ten hours per day, that is content

13  that's on the radio that's being streamed.

14      A.   And being picked up by some radio stations.

15      Q.   So, as we sit here today, since 2017

16  InfoWars has been producing about 3,120 hours of content

17  per year?

18      A.   I haven't done the math.  Is that what that

19  calculates out to?

20      Q.   I will represent to you that it is.

21      A.   It's, I mean, six days a week, we have a

22  little bit less on Sunday, sometimes we do stuff on

23  Saturday.  I mean, that sounds about right.  There's no

24  exact number.  I never -- we never organized it all, so

25  I don't know.

1  Q. When did you start bringing on other hosts

2 that have their own programs?

3  A. I think we started the nightly news in like

4 2000 and -- like 2015?  I don't have the exact dates.

5 So, we started the nightly news that David Knight and

6 Lee Ann McAdoo and others would host sometime before the

7 2016 election.

8  Q. How did you pick who was going to be the

9 first host for the nightly news?

10  A. Well, I hosted it several times and so did

11 David Knight mainly.

12   I'm sorry, I have a really bad deal here.

13  Q. Do you need some more water?

14  A. No, it's a torn larynx.  It's gotten a lot

15 worse.  It's real bad this week, losing your voice like

16 that.  It will get better in a minute.

17   What were you saying?

18  Q. I was asking if --

19  A. Sorry, go ahead.

20  Q. If David Knight won a contest in order to be

21 on the show.

22  A. Yes, he did.

23  Q. Tell us about how that worked.

24  A. We had a contest of news videos and reports

25 of the best -- and I don't think he won, I think he

1    entered the contest but then we -- we hired him.  He

2    came out with his family from North Carolina.  He was an

3    engineer, and also had done a lot of writing for

4    publications and things.  And so, he was just a natural

5    for the show.

6                    THE COURT:  Mr. Jones.

7                    THE WITNESS:  Oh, thank you very much.

8                    I'm sorry.  I just about to have surgery

9    on this, it's been like this for ten years but it's

10   really bad now.

11                   THE COURT:  That's the exception to the

12   food in the courtroom rule.

13                   THE WITNESS:  Sorry, go ahead.

14   BY MR. REYNAL:

15       Q.   Alex, you obviously have a very busy work

16   schedule to yourself, for yourself.  Do you tell the

17   other hosts what to say or what to cover?

18       A.   We're starting to.  I mean no, not in the

19   past, not really, very rarely other than I try to pick

20   people that already have done shows that I've seen their

21   work that I think are trying to tell the truth that are

22   smart and who are funny.  I think we got a pretty good

23   job of that.  But they're definitely -- we're trying to

24   put in more oversight and be more careful, obviously,

25   about what we do.

1          We definitely learned a lesson from this

2    process of not just things we did wrong but how people

3    misrepresent what we've done.

4          Q.    Is it fair to say that yourself and most of

5    your hosts are self taught through the radio business?

6          A.    Owen has a degree in media, but he will tell

7    you he didn't learn anything with that, it was all

8    working at those radio stations from the bottom up, he

9    got on air.  It's the same way -- Owen has a similar

10   deal than I did, I mean, I volunteered when I was in

11   talk radio, I wasn't paid the first six months and then

12   I got into sales and things, but I was doing producing

13   for sports shows.

14          We -- I even got hired by the Howard Stern

15   show to do an interview with Dennis Hopper and some

16   other folks at a big film festival at the governor's

17   mansion.  So, I did that and I worked for Howard Stern

18   on that job.  So, I was doing everything.  And then that

19   was unpaid, to do that.

20          Q.    Would you say that your organization is more

21   like a radio show or more like a newspaper like the

22   *Austin Statesman*?

23          A.    No, we don't pretend to be, we're more like

24   the op ed page of the newspaper, giving our opinion,

25   than, say, the investigative journal section or

something. So yes, we're like the op ed. Or we're like the funny papers, as well. I mean, we've got really serious stuff we do, where we say, here is the documents, here is what they said, this is what's going on. And then we also have the op ed opinion stuff we do, which is what talk radio is.

And then we also have satire and, you know, things like that where it's completely obvious that I'm dressed up in like Cobra Commander but I'm not actually Cobra Commander, people know that's a joke.

Q. Let's talk a little bit about where you get your funding. When is the last time you had a corporate sponsor for InfoWars?

A. You mean a big one?

Q. Yeah.

A. I had some corporate sponsors when I was against George W. Bush and the war. We lost a lot because we were antiwar, but we still had some big once. We had like car companies, clothing lines, everything. We were making a lot of money to expand the operation going back to about 2005, up to when Obama got in, and then being antiwar was not allowed anymore for whatever reason. I wasn't anti-Obama, I was antiwar.

So, I continued being antiwar. Then we lost all our sponsors, we lost -- that was almost -- it

183

1  was about 80 percent of the money we were making were

2  sponsors, we lost about $10 million that was gross money

3  to fund the operation right away when we didn't toe the

4  line with all the wars.

5       Q.   And so, when you lost all that corporate

6  sponsorship because of your position against the war,

7  did you transition to a different business model?

8       A.   Yes.  We had already been selling some books

9  and films, but we accelerated it.  And I said, well, I'm

10  not going to let them shut me down, I said this on air,

11  I said, you want to shut us down, we're $10 million a

12  year, I remember saying, I'm going to go to $70 million

13  a year and I'm going to put it into everything and we're

14  going to advertise, we're going to explode.  And so that

15  was my promise, and I fulfilled it.

16       Q.   And why is it important for you to be self

17  funded?

18       A.   That's what the system fears.  It's actually

19  come out in some of the presidential library documents

20  out of Little Rock that they've -- it was the system

21  fears any independent organic media, whether it's

22  liberal or conservative, that isn't controlled by the

23  big corporations.  They want to think left or thing

24  right.  That's synthetic.  And by fake, they're real

25  groups, they just kind of toe the line, stay within

184

1    certain guardrails, and then society doesn't ever change

2    for the better.

3            Instead we need independent, grassroots

4    media that is self funded, whether it be through

5    donations or whether it be through product sales, so

6    that we can have real diversity of ideas in this world

7    we live in.

8    Q.    What do you -- you use the term "synthetic"

9    as well as "fake."   What do you mean when you say

10   "synthetic"?

11   A.    You know, there's a lot of military terms

12   that I learned just by researching psychological

13   warfare, because I knew that they were using it against

14   us.  So I went in the last 20 years, got some of the

15   declassified once.  But a synthetic event is real stuff

16   happening but they put in place people to help it happen

17   and kind of provocateur to get it started.

18            It's like you have two pit bulls killing

19   each other, that's a real event, but people that throw

20   them in that pin together for that fight, they made it

21   happen.  They brought the dogs there, they raised the

22   dogs, they train them how to fight, they threw them in

23   the pit.  So, there's two dogs really killing each

24   other, but it's synthetic because people made it happen.

25            So, when I talk about staged, most of the

1    time, I mean, they knew it was going to happen and they

2    stood down and let it happen.

3            And that was my view the first few years

4    of Sandy Hook.  Anybody can pull up the *Washington Post,*

5    you name it, about FBI going out there and threatening

6    to shoot the school, nothing being done, the same story,

7    CIA, they were hacking stuff.  That's where I thought it

8    was really suspicious up front because those telltale

9    signs that we've seen before of those type of synthetic

10   connections.  Which don't always mean it was staged, but

11   that's the type of things people look for.

12           So, you've got different types of false

13   flags, you've got synthetic is a way to describe it

14   really happened but there were forces in there letting

15   it happen.

16       Q.   Is it kind of like the idea of purposefully

17   focusing people on a particular news story because you

18   want them to vote a certain way or do certain things?

19               MR. BANKSTON:  Objection, your honor.

20               THE COURT:  Wait, wait.

21               MR. BANKSTON:  Objection, leading.

22               THE COURT:  Sustain.

23   BY MR. REYNAL:

24       Q.   Give us another example of how that would

25   work.

1      A.    Well, take that clip earlier today they

2   aired.  At the beginning of the clip I say, I believe

3   Scarlett Lewis is real, I believe her son died, I'm very

4   very sorry, and they cut that off the front, and then

5   they cut me saying I'm sorry off the end.  And they

6   brought a real clip but it's synthetic to try to deceive

7   you.  And I hope you get to see the real clip and then

8   you'll figure out everything else that's been going on.

9      Q.    Let's go back to InfoWars and its business

10  model.

11          Do you sell vitamins?

12     A.    Yes.

13     Q.    Are your vitamins FDA certified?

14     A.    No, they're not.

15     Q.    Why not?

16     A.    1996 law, the FDA has no jurisdiction over

17  any nutraceuticals, not the once at Whole Foods, not the

18  once at GNC, and not ours.  And ours are private labeled

19  top, brands that are sold at Whole Foods and GNC.  They

20  have -- they are made by the top lab recognized in the

21  United States, all we do is put our label on it.  So, we

22  know it's triple tested, the highest quality, and that's

23  why people love it, because it is the best out there.

24          And I'll give it to Whole Foods and I'll

25  give it to GNC and others, they've got the same stuff.

```
 1    There's all sort of crap you can buy at a gas station
 2    out there.  That's not what ours is.  I mean, we buy our
 3    PQQ and the CoQ10 from the Japanese.  I mean, it's the
 4    best.  Costs five times what synthetic PQQ and CoQ10
 5    costs.
 6          Q.   Miss Karpova was asked about Plaintiff's
 7    Exhibit 35, which is in evidence.  I'm going to put it
 8    on the camera here.
 9               Can you see that?
10          A.   Yes.  Barely.
11               THE COURT:  Do you need reading glasses?
12               THE WITNESS:  No, I can barely see it.
13    BY MR. REYNAL:
14          Q.   Well, let me walk it up to you, you can tell
15    us just generally what kind of document that is.
16          A.   It looks like some type of sales log.
17          Q.   And can you tell us what year begins in?
18          A.   Looks like September, 2015.
19          Q.   And can you flip to the last page and tell
20    us what year it ends in.
21          A.   It ends -- it ends in December 2018.
22          Q.   If you flip back to the front, can you see
23    the headings?
24          A.   Yes.
25          Q.   Can you see the column that -- are you all
```

1 right?

2     A.   Yeah, don't worry, it's not COVID, it's a

3 torn larynx.

4           I'm sorry, go ahead.

5     Q.   There is a column that is labeled "Invoice."

6     A.   Uh-huh.  Yes.

7     Q.   Would that represent gross sales?

8     A.   I believe so.

9     Q.   And let's flip to the last page and you can

10 tell us what the gross sales number is.

11     A.   165,230,000.

12     Q.   Can you tell the Members of the Jury how

13 much of that represents profit versus just gross

14 revenue?

15     A.   It depends on what product it is.  Some

16 products make 20 percent, some products make 60 percent.

17 Like on a book, you know, it might be 20, 30 percent; on

18 food, it's that, and that's the biggest type things.  On

19 supplements if they're on sale you make 50 percent of

20 it; if it's not on sale, you make, you know, more than

21 that.  Sometimes a hundred percent markup.  But usually

22 it's on sale.  So it really all depends.

23           I can tell you bottom line numbers,

24 though, of how much money I've been paid, things like

25 that, or how much money is there.

1      Q.    Before we discuss that let's talk about
2  InfoWars the organization.  Would you describe it as
3  organized or chaotic?
4      A.    It's a mix of both.  But it is the opposite
5  of corporate and there's no corporate culture and
6  there's no -- people are very happy there overall and
7  it's very, very diverse and people stay there a long
8  time.
9            And -- but I would say the sales
10 department and the shopping cart, that's in another
11 building, it's not even there, and it's kind of like two
12 groups that don't really talk to each.  So, the
13 disorganization is between people who do production and
14 the people that do the sales and the warehouse and
15 stuff, and we're trying to get that integrated.  But.
16     Q.    Let me -- maybe this is an easier way to go
17 after it.  Let's discuss, for example, email.  How much
18 email does InfoWars routinely get?
19     A.    I mean, I know when we looked to comply with
20 the discovery, which we complied with, it was over 10
21 million that they had to search that was still in the
22 inbox unopened.  So it was 10 million unopened and a few
23 hundred thousand opened.  And that's why there's a lot
24 of stuff we never saw, because it was in the 10 million
25 emails.

1    Q.   So, about how much email would you say you

2    get on a given day, just sent by random people?

3    A.   I can't answer that because about ten years

4    ago I got rid of my email address because it was getting

5    20,000 a day.  And so, that's -- that was one of the

6    things they didn't believe there wasn't an Alex@InfoWars

7    because, well, of course you've got an email, I'm like,

8    no, I don't.  And that's like, it doesn't exist.

9    Because I can't read that, it's just I can't read 20,000

10   emails.

11   Q.   How many employees would InfoWars have to

12   have in your view if you were to actually read every

13   message, every email, every tip that's sent in?

14   A.   It would take 10, 15, 20 people.  We would

15   go bankrupt, which we are now, but.

16   Q.   Going back to -- I want to ask you a

17   question.  There's a term that's been thrown around

18   during this trial of the truther community or truth

19   people --

20          MR. BANKSTON:  Your Honor, I have a couple

21   of motions I'm going to need to take up outside the

22   presence of the jury.  I don't know if you want to do

23   that now or wait until we're done with the jury.

24          THE COURT:  That really depends on you,

25   Mr. Reynal, whether you think I need to hear them now or

```
 1    later.
 2                 MR. BANKSTON:  I'm worried they need to be
 3    heard contemporaneously, so I would like to go ahead
 4    and do them.
 5                 THE COURT:  All right.  We're going to --
 6    just sit tight for a second.  We're going to take a
 7    break.  I don't know if it will eat up the rest of the
 8    afternoon or not, so I'm not going to release you in
 9    case it doesn't, I want to not waste any time.  And so
10    I'll send someone back if you're going to go or if
11    you're going to come back.
12                 Remember all of my instructions on the
13    chance that I don't see you before tomorrow, please
14    arrive at 8:45 like normal for us to get started.  All
15    right.
16                 Thank you.
17                 (Whereupon the jurors exit the courtroom
18    and the following proceedings were held in open court)
19                 THE COURT:  All right, Mr. Jones, you can
20    go back down to counsel table.
21                 Everyone may be seated.  You just to wait
22    until the jury is moved to their space before you can
23    leave the room.  All right.
24                 All right, Mr. Bankston.
25                 MR. BANKSTON:  I don't know what's going
```

1   on, Your Honor, but I need to bring a couple of motions.

2   They are for jury instructions and I'm going to go ahead

3   and bring a motion for sanctions right now on the

4   record.  I know you don't want to hear it until the end

5   of trial, but the jury instruction I need now.

6                    THE COURT:  All right.

7                    MR. BANKSTON:  We have -- as you know,

8   there's been a pattern of Mr. Reynal blatantly violating

9   MILs and court rules.  Mr. Reynal just absolutely

10  solicited direct testimony from Mr. Jones that he is

11  bankrupt.  Mr. Jones just testified straight into the

12  record that he's bankrupt.  Which is not true.  Which is

13  a sham that's going on right now which Mr. Jones pulled

14  $60 million out of his company last year.

15                   But the most important part, Your Honor,

16  is you have a motion in limine entered in this case that

17  is no uncertain terms that they cannot, due to violating

18  your orders repeatedly to provide net worth information,

19  they cannot imply evidence of net worth.

20                   Mr. Jones just intentionally did that in

21  violation of your order to attempt to poison his

22  compensatory damage verdict, to try to tell this jury

23  that he's broke, when he's not.  And that's in violation

24  of your order.  And Mr. Reynal drew that right out of

25  him, totally expecting that to happen.  It was very

1  obvious from the question he asked he wants Mr. Jones to

2  tell this jury he's broke.  That is ridiculous.

3          The second is that he absolutely --

4  Mr. Jones just wholly testified that "we complied with

5  discovery."  I am, under the standing MIL, not permitted

6  to mention discovery disputes, but we both know

7  Mr. Jones did anything about comply with discovery and

8  did that for four years, thumbing his noise in the face

9  of this Court in rank contempt.

10         There needs to be an instruction to the

11 jury that he did not comply with discovery.  That

12 materials that were repeatedly ordered by this Court

13 were not turned over.  Some of that includes his net

14 worth information.  And I would also like an instruction

15 to the jury to disregard and strike his comments about

16 him being bankrupt, which they are to take as having no

17 evidentiary value and is not true.  Otherwise, I am

18 deeply prejudiced going forward.

19         The other thing that Mr. Jones testified

20 to is that he doesn't communicate by email.  Doesn't

21 have emails to turn over.  You know from a motion for

22 sanctions that involved Defendant's former counsel

23 tampering with evidence that they tampered with a piece

24 of evidence to hide the fact from me that Mr. Jones does

25 have an email and was communicating with it.  To this

```
 1    date we still don't know what that email is, we don't
 2    know, they haven't produced any of it.  But Mr. Jones is
 3    just repeatedly lying on the stand in ways that I cannot
 4    counter because they deal with your discovery rules.
 5              I want the jury to be instructed to
 6    disregard all of that testimony; that it has been
 7    already found by the Court that Mr. Jones does have an
 8    email, that he did not turn those emails over, and did
 9    not admit and denied the existence of that email; that
10    he did not comply with discovery; that he is not
11    bankrupt, and the jury is not to consider any of that.
12              Additionally, on top of those
13    instructions, we are now formally moving for sanctions
14    against both Mr. Jones and Mr. Reynal, who we believe
15    intentionally solicited testimony to sabotage this jury.
16    And I would not normally make that accusation so openly
17    against a fellow attorney, had that attorney not
18    continually violated rules of this Court on every single
19    day, including, before putting Mr. Jones on, clearly
20    attempting to solicit from a witness an attorney-client
21    communication earlier to this day.  Which, as we've seen
22    him violate rules that a first-year law student should
23    know, a first-day law student should know not to ask the
24    plaintiff about her communications with counsel.
25              This is absolutely in bad faith;
```

 1    therefore, we would like the jury instructions and we're

 2    filing a motion for sanctions.

 3                    THE COURT:  Would you like to respond,

 4    Mr. Reynal?

 5                    MR. REYNAL:  If Your Honor thinks it's

 6    necessary, I will.  I think that Your Honor can review

 7    the transcript of my questions, I don't think my

 8    questions elicited that testimony.  I'm sorry that that

 9    came out, I don't think that there was anything I could

10    have done in my questioning of that that would have

11    prevented it from happening.

12                    I know that Your Honor has contemporaneous

13    transcript and can look it over.  So, I would urge you

14    to do so because I, you know, I'm sorry it happened, I

15    tried to move on very, very quickly, I think Your Honor

16    saw me raise my hand, but I can only ask the questions.

17                    THE COURT:  Let me ask Mr. Jones a couple

18    of questions while you're under oath.

19                    THE WITNESS:  Yes.

20                    MR. REYNAL:  Stand up.

21                    THE COURT:  What did your attorney tell

22    you about your testimony today?  Not -- I want to be

23    very careful.  Were you instructed that there were some

24    things you could not testify about?

25                    THE WITNESS:  Yes.

1                    THE COURT:  And do you remember what they

2     were?

3                    THE WITNESS:  Yes.

4                    THE COURT:  And what were they?  Just top

5     level.

6                    THE WITNESS:  I'm trying to remember.

7     First, there was a document you put out saying don't

8     talk about free speech, don't -- don't say I'm innocent,

9     and a bunch of other stuff.  And then that got

10    withdrawn, I believe you withdrew it.  I think called

11    motion in limine.

12                   THE COURT:  Okay.  So, you don't remember.

13                   THE WITNESS:  No, no, no.

14                   THE COURT:  No.

15                   THE WITNESS:  I remember them currently.

16                   THE COURT:  Stop.  Do you remember day one

17    where I said unfair world and you don't get to interrupt

18    the judge, do you remember that?

19                   THE WITNESS:  Sure.

20                   THE COURT:  Yeah, okay.  But the judge

21    gets to interrupt you, do you remember that?

22                   THE WITNESS:  Yeah.

23                   THE COURT:  Okay.  So, you don't really

24    remember what you were not supposed to testify about,

25    that's what I'm hearing.  Because you said, yes, I

1    remember; no, I don't remember.

2              THE WITNESS:  Let me -- I'm trying to

3    remember.

4              THE COURT:  I don't want you to try to

5    remember.  I don't want you to try and remember.  You

6    either knew or you don't.

7              THE WITNESS:  I remember him saying, don't

8    talk about -- don't talk about the financial stuff, or

9    something like that, like a week ago when I asked him.

10   And then I remember today watching part of Heslin's

11   testimony when I was coming here and him talking about

12   the bankruptcy, so I thought that was totally fine.  I

13   mean, he gets to, why do I not get to do what he gets to

14   do to?

15             THE COURT:  Mr. Jones, stop making -- just

16   stop.

17             THE WITNESS:  Okay.

18             THE COURT:  All right.  You can sit down,

19   Mr. Jones.

20             THE WITNESS:  Okay.

21             THE COURT:  Do you have any reply,

22   Mr. Bankston?

23             MR. BANKSTON:  Not really, Your Honor.

24             THE COURT:  And actually, before I hear

25   from you, you know whose obligation it is, Mr. Reynal,

1    to make sure that any witness you put forward

2    understands the orders in limine, understands what he is

3    not allowed to say because of orders that I have made

4    before now.  Right?

5              MR. REYNAL:  As an attorney, it's an

6    impossible position to be in.

7              THE COURT:  That wasn't the question I

8    asked you.

9              MR. REYNAL:  I would -- I know that it is

10   my obligation to communicate Your Honor's orders.

11   Beyond that, I think that's all I need to say.

12             THE COURT:  That's correct.

13             MR. BANKSTON:  Your Honor, the only thing

14   I would say, and I actually probably do need to ask for

15   an additional jury instruction.  During this same

16   testimony, and the reason why I do not believe that

17   Mr. Reynal was keeping a tight leash on his client for

18   MIL and why I do believe he was intentionally trying to

19   violate them, is Mr. Reynal had a long series of

20   questions about whether Mr. Jones is a pundit who merely

21   gives his opinion, does not provide facts, was not

22   stating facts, was only giving his opinion.

23             That's another one of your motion in

24   limine, that the defendants can not contest in this case

25   statements that they were giving were merely protected

1    opinions and not statements of fact.

2              That all came out intentionally from

3    Mr. Reynal.  And you know, too, that the rest of his

4    testimony that he's been intentionally trying to drive

5    out the liability sections of your MIL.  As we said

6    yesterday, we think he's intentionally trying for a

7    mistrial.

8              And if it really is a matter of, oh,

9    whoops, I guess I forgot to remind my client not to

10   suddenly blurt out to the jury that he's broke on the

11   day when he was screaming that he's gonna do it, right,

12   when he says, I'm going to come in there and this judge

13   ain't gonna hold me down, it's going to be her Waterloo,

14   and then he comes in here and do that, maybe we would

15   forget if he wasn't also asking questions that were

16   directly in violation of the motion in limine.

17             And Your Honor, we believe this is just

18   egregious.

19             THE COURT:  All right.

20             MR. REYNAL:  Your Honor, if I may on that

21   point.  Just on that point.

22             Your Honor has ruled already that during

23   this phase of the trial we are to discuss, and over my

24   objection, all the issues raised by Rule 41.011.  I've

25   been objecting to that.

1            THE COURT:  Except net worth.

2            MR. REYNAL:  Except net worth.

3            And within that, for the jury to make an

4    accurate determination, you need to talk about intent.

5    You need to talk about degree of malice.  You need to

6    talk about how extreme the behavior was or wasn't.  And

7    so, the testimony I'm eliciting, which I believe -- I've

8    never said, nor has any client said, that Your Honor's

9    ruling shouldn't stand.  But in order for the jury to be

10   able to make a decision, they need to know the entire

11   context and they need to understand the mental state of

12   the participants.  Because if not, they can't render a

13   ruling on punitive damages.

14           THE COURT:  Well, the problem is, and you

15   know this and we've already had this conversation

16   multiple times in this trial, in addition to it before

17   this trial, the time for that was during discovery, when

18   Mr. Jones chose not to fully participate.  It is not the

19   time to do that now.  If there is anything that he would

20   like to put forth as a defense, he needed to do it a

21   year ago during the discovery process.  It's too late

22   now.

23           And when you ask questions that imply or

24   outright say that he didn't know how to be a journalist

25   or he wasn't a journalist, you're calling into question

1    my ruling, which was based on a longstanding principle

2    in the law that, if you intentionally repeatedly, and

3    over years in this case, again and again, refuse to

4    participate in discovery, that is proof that you do not

5    have a meritorious defense.  That was the basis of my

6    ruling.  You cannot attack that in this trial.

7                 For motions to -- for sanctions, you've

8    got to write them down.  They're under advisement until

9    they're written down and filed.  We'll take that up

10   post-trial.

11                MR. REYNAL:  Your Honor, so that I don't

12   run afoul of your ruling.

13                THE COURT:  I'm not done.

14                MR. REYNAL:  I'm sorry.

15                THE COURT:  You don't know what it is yet.

16                For the motions seeking sanctions against

17   Mr. Jones and Mr. Reynal, you have to write those down,

18   they have to be filed with the court, I'll take them up

19   post-trial.  That may mean during deliberation, that may

20   mean later in August.  I don't know.

21                Assume it will be as soon as I have time,

22   so file a response if you want to.

23                Mr. Jones, you may not say to this jury

24   that you complied with discovery.  That is not true.

25   You may not say it again.  You may not tell this jury

1    that you are bankrupt.  That is also not true.  You may

2    have filed for bankruptcy, I don't know that, but I've

3    heard that.  It doesn't put -- that doesn't make a

4    person or a company bankrupt.

5              You're also under oath to tell the truth.

6    You've already violated that oath twice today in just

7    those two examples.  It seems absurd to instruct you

8    again that you must tell the truth while you testify,

9    yet here I am:  You must tell the truth while you

10   testify.

11             This is not your show.  You need to slow

12   down and not take what you see as opportunities to

13   further the message you're wanting to further; and,

14   instead, only answer the specific and exact question you

15   have been asked.  No asides.

16             The comments about discovery, the comments

17   about the larynx or whatever it was, the comments about

18   bankruptcy, none of those were responsive to questions.

19   They were just you abusing my tolerance and making

20   asides to the jury improperly and, in at least two

21   cases, untruthfully.

22             Do you understand what I have said?  "Yes"

23   or "no."  Do you understand what I have said.

24             THE WITNESS:  Yes.  I believe what I said

25   was true.  So I don't know.

```
 1                    THE COURT:  Yes, you believe everything

 2       you say is true, but it isn't.  Your beliefs do not make

 3       something true.  That is -- that is what we're doing

 4       here.  Just because you claim to think something is true

 5       does not make it true.  It does not protect you.  It is

 6       not allowed.  You are under oath.  That means things

 7       must actually be true when you say them.

 8                    Don't talk.

 9                    Do you understand what I have said?

10                    THE WITNESS:  I do understand.

11                    THE COURT:  You understand the

12       instructions I have given you for your testimony in

13       court.

14                    THE WITNESS:  Yes.

15                    THE COURT:  I am not going to bring the

16       jury back today.  My staff is listening, they can let

17       the jury go home, we'll start back up tomorrow.

18                    When you come back to testify tomorrow,

19       one more time, no asides.  Do you understand what I mean

20       when I say "no asides"?

21                    THE WITNESS:  Yes.

22                    THE COURT:  Answer only the question asked

23       of you.  Do you understand what I mean when I say "only

24       answer the question asked of you"?

25                    THE WITNESS:  Yes.
```

```
 1                    THE COURT:  Do you understand you will
 2      still be under oath when you return tomorrow morning --
 3                    THE WITNESS:  Yes.
 4                    THE COURT:  -- to complete your testimony.
 5      All right.
 6                    And you understand that that means you
 7      must only testify about things that are true.
 8                    THE WITNESS:  To the best of my knowledge.
 9                    THE COURT:  If you don't know something,
10      you don't say it.  If you're asked about your opinion,
11      you can give your opinion.  But if you're asked to
12      relate something that's truthful and a fact, it must be
13      truthful and a fact.  Not an assumption, not a guess,
14      not an opinion.  Do you understand?
15                    THE WITNESS:  Yes.
16                    THE COURT:  All right.  You can sit down.
17                    Anything else.
18                    MR. REYNAL:  Yes, Your Honor.  Just so
19      that I can make sure that I don't run afoul of Your
20      Honor's motion in limine or earlier rulings --
21                    THE COURT:  Just to be clear, we call them
22      motions -- I don't issue motions, I issue orders.  These
23      are orders in limine and have been ordered since before
24      this trial started.
25                    MR. REYNAL:  Is Your Honor ordering me not
```

1    to explore the nature of the wrong?

2                    THE COURT:  That is very broad.

3                    MR. REYNAL:  The character of the conduct

4    involved.

5                    THE COURT:  You may not elicit testimony

6    designed to leave the jury with the impression that

7    Mr. Jones and Free Speech Systems did not defame

8    Mr. Heslin or that Mr. Jones and Free Speech Systems did

9    not engage in the intentional infliction of emotional

10   distress against Miss Lewis and Mr. Heslin.

11                   MR. REYNAL:  May I elicit evidence as to

12   the low degree of culpability that should be ascribed to

13   Free Speech Systems and to Alex Jones by virtue of his

14   education, his situation, the situation at InfoWars, and

15   what was going on?

16                   THE COURT:  So, Mr. Jones was too ignorant

17   to know that he was lying?  Is that your defense?

18                   MR. REYNAL:  Your Honor, my defense is for

19   the jury, not for the Court.  I'm asking whether I can

20   elicit testimony as to his mental state, to the

21   organization of the company, to the standard practices

22   in his industry, to what was going on in his personal

23   life, all to illustrate the low degree of culpability

24   that should an attributable to his conduct.

25                   THE COURT:  You can ask Mr. Jones

1   questions about -- similar to some of the questions or
2   all of the questions that were allowed when Ms. Karpova
3   was on the stand that kind of touch on these same areas
4   that were allowed.  I think those are fair game.  You
5   can ask him -- I mean, I think the answer is yes, as
6   long as you're very careful.
7                    MR. REYNAL:  Very well.
8                    THE COURT:  Anything else from you,
9   Mr. Reynal?
10                   MR. REYNAL:  No, Your Honor.
11                   THE COURT:  Anything else from you,
12  Mr. Bankston?
13                   MR. BANKSTON:  The only thing I want to
14  confirm with you that tomorrow morning we will be taking
15  up whether there will be instructions and should I
16  propose instructions to the court.
17                   THE COURT:  Yes, please propose the exact
18  instruction you would like me to give.  I think it would
19  be appropriate to give those instructions, if any,
20  before Mr. Jones retakes the stand.
21                   MR. REYNAL:  Your Honor.
22                   THE COURT:  One second, please.
23                   I think we need something, we need some
24  instruction.  So you can do it the way you did the
25  proposed charge instruction, you can both send my office

1    an email if you would like to.

2                    Yes, Mr. Reynal.

3                    MR. REYNAL:  Mr. Jones would like to say

4    something that's directly relevant to what we've been

5    discussing.

6                    THE COURT:  I am not --

7                    MR. REYNAL:  Very briefly, Your Honor.  I

8    think it's important for my candor towards the Court

9    that you hear what he has to say.

10                   THE COURT:  I am not typically in the

11   practice of hearing from parties except when they are on

12   the stand.  And I don't see a reason to change that

13   practice anymore than I already have.

14                   MR. REYNAL:  I would -- this is simply in

15   line with You Honor's question as to what he was

16   instructed in terms of what he should testify about.

17                   THE COURT:  It doesn't matter at this

18   stage.  I expect that you will go over the instructions

19   as you are required to do under the rules, and I'm going

20   to leave it there.

21                   Anything else --

22                   MR. BANKSTON:  Nothing else, Your Honor.

23                   THE COURT:  -- from either of you

24   attorneys.

25                   Okay.  Well, let's do a time check.  We're

1    certainly going longer than I think we had all sort of

2    hoped.  Mr. Reynal, you've used 10 hours and 33 minutes,

3    and today is very inflated, all the breaks I just

4    attributed to extra, so it looks like we worked -- well,

5    we have worked, but it's more than five and a half hours

6    for today.

7              So, the sort of extra category is seven

8    hours and 6 minutes.  And Mr. Reynal, for your side it's

9    17 hours and 3 minutes.  So, I haven't done the -- hang

10   on one second.  Let me figure one thing out.

11             Yeah, so, today it's all out of whack

12   because it's well over six hours and I don't

13   calculate -- I calculate five and a half a day.  Anyway,

14   I think we're okay.

15             I'm going to say that we need to

16   conclude -- I think we will run into a problem and run

17   out of time potentially if we go past the lunch hour

18   with evidence.

19             Do you have a witness once Mr. Jones is

20   finished?

21             MR. REYNAL:  Mr. Jones is our only

22   witness.

23             THE COURT:  Okay.  So, hopefully we can

24   get that taken care of.

25             Anything else on the record?

1         MR. BANKSTON:  No, Your Honor.

2         THE COURT:  We can go off the record.

3              (End of proceedings.)

```
 1                    REPORTER'S CERTIFICATE

 2   THE STATE OF TEXAS          )

 3   COUNTY OF TRAVIS            )

 4                I, Alicia DuBois, Official Court Reporter

 5   in and for the 459th District Court of Travis County,

 6   State of Texas, do hereby certify that the above and

 7   foregoing contains a true and correct transcription of

 8   all portions of evidence and other proceedings requested

 9   in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13                I further certify that this Reporter's

14   Record of the Proceedings truly and correctly reflects

15   the exhibits, if any, offered in evidence by the

16   respective parties.

17                WITNESS MY OFFICIAL HAND this, the 1st day

18   of October, 2022.

19                         /s/ Alicia DuBois
                           Alicia DuBois, CSR
20                         Texas CSR 5332
                           Exp. Date:  1/31/24
21                         Official Court Reporter
                           459th District Court
22                         Travis County, Texas
                           P.O. Box 1748
23                         Austin, Texas 78767
                           (512) 854-9301
24

25
```