## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | Chapter 11 |
| ALEXANDER E. JONES, | § § | Case No. 22-33553 (CML) |
| Debtor. | § § § § | |
| ------------------------------------------------------- | § | |
| NEIL HESLIN, SCARLETT LEWIS, LEONARD POZNER, VERONIQUE DE LA ROSA, AND ESTATE OF MARCEL FONTAINE, | § § § § § | Adv. Proc. No. 23-3035 |
| Movants, | § § | |
| v. | § § | |
| ALEXANDER E. JONES, | § § | |
| Defendant. | § § § | |

---

## DEFENDANT'S RESPONSE TO MOVANTS' MOTION FOR SUMMARY JUDGMENT

---

**Submitted by:**

Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
CROWE & DUNLEVY, P.C.
2525 McKinnon Avenue, Suite 425
Dallas, TX 75201
Telephone: 737- 218-6187
dallaservice@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**

J. Christopher Davis
OBA #16629 (admitted *pro hac vice*)
Deric J. McClellan
OBA # 32827 (admitted *pro hac vice*)
CROWE & DUNLEVY, P.C.
222 N. Detroit Ave., Suite 600
Tulsa, Oklahoma 74120
dallaservice@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**

DATED: June 13, 2023

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ..................... 1

III.   FACTS PRECLUDING SUMMARY JUDGMENT ........................................... 4

       A.   The State-Court Actions ..................................................................... 4

       B.   Defendant's Background and Testimony.............................................. 7

IV.    ARGUMENT AND AUTHORITIES ................................................................ 11

       A.   Legal Standard ................................................................................... 11

       B.   Non-Dischargeability Under Section 523(a)(6).................................... 11

       C.   Collateral Estoppel Does Not Apply................................................... 12

            1.   Willfulness and Maliciousness under § 523(a)(6) was not fully and fairly litigated
                 in the State-Court Actions. ....................................................... 13

                 a.   Movants did not plead the issue of "willful and malicious injury." .................... 14

                 b.   The discovery-sanction exception does not apply because no evidence supports
                      a finding of egregious conduct. ............................................ 15

                 c.   The State Court prohibited Defendant from testifying as to his level of
                      culpability, precluding a finding of "actually litigated" as to Heslin and Lewis... 16

            2.   Neither Willful nor malicious injury was essential to the Default Judgments, Jury
                 Charges, or Final Judgment. ..................................................... 20

                 a.   The jury in the Heslin/Lewis Action was instructed on the actual malice
                      standard for defamation, which can be satisfied through reckless conduct, but
                      recklessness cannot support a finding of "willful and malicious injury" under
                      §523(a)(6). ........................................................................ 22

                 b.   The Jury Charges instructed the Heslin/Lewis jury that it could find Defendant
                      liable for IIED based on reckless conduct, which cannot support a finding of
                      "willful and malicious injury" under § 523(a)(6). .............................. 28

                 c.   The Heslin/Lewis jury received the same instructions on exemplary damages as
                      it did for the substantive claims, so the same analysis from above applies to the
                      award of exemplary damages. ............................................... 31

i

      d.    The Default Judgments cannot deem petition allegations admitted. ..................... 34

      e.    Pozner/De La Rosa. .............................................................................. 36

   3.    The doctrine of collateral estoppel must give way when the convenience it affords is outweighed by questions concerning the quality, extent, or fairness of the prior proceeding............................................................................................................ 37

   4.    The Final Judgment violates the First Amendment and is thus not entitled to the preclusive effect of collateral estoppel via the Full Faith and Credit statute, codified at 11 U.S.C. § 1738........................................................................................ 40

      a.    The First Amendment protects against tort claims that intrude on free speech.... 41

      b.    Defendant's speech is protected from tort liability by the First Amendment....... 43

  D.   The state court record does not establish "willful and malicious injury" under §523(a)(6) ........................................................................................................................ 47

V.    CONCLUSION ............................................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antoine v. First Student, Inc.*,
   713 F.3d 824 (5th Cir. 2013) ...............................................11

*Arizona v. Mayorkas*,
   143 S. Ct. 1312 (2023)...........................................................45

*Automated Salvage Transp. Co. v. Swirsky (In re Swirsky)*,
   372 B.R. 551 (Bankr. D. Conn. 2006) .............................11, 48

*B.B. v. Bradley (In re Bradley)*,
   466 B.R. 582 (B.A.P. 1st Cir. 2012) ....................................31

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................36

*Bently v. Bunton*,
   94 S.W.3d 561 (Tex. 2002).....................................................23

*Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found.*,
   402 U.S. 313 (1971)...............................................................37

*Boos v. Barry*,
   485 U.S. 312 (1988)...............................................................43

*Brumfeld v. Hollins*,
   551 F.3d 322 (5th Cir. 2008) ...............................................11

*Bui v. Do (In re Do)*,
   Adv. No. 11-01027-CAG, 2013 WL 1429435
   (Bankr. W.D. Tex. Apr. 9, 2013) ..........................................49

*Campo v. Allstate Ins. Co.*,
   562 F.3d 751 (5th Cir. 2009) ...............................................11

*Caprock Constr. Co. v. Guaranteed Floorcovering, Inc.*,
   950 S.W.2d 203 (Tex. App.—Dallas 1997, no writ) ............33

*Caton v. Trudeau (In re Caton)*,
   157 F.3d 1026 (5th Cir. 1998) ..............................................36

*Cohen v. California*,
   403 U.S. 15 (1971)...............................................................46

*Cooper Tire & Rubber Co. v. Farese*,
423 F.3d 446 (5th Cir. 2005) ......................................................................11, 48

*Crain v. Limbaugh (In re Limbaugh)*,
155 B.R. 952 (Bankr. N.D. Tex. 1993) ................................................................17

*Cuba v. Pylant*,
814 F.3d 701 (5th Cir. 2016) ...............................................................................22

*Cummins v. Bat World Sanctuary*,
No. 02-12-00285-CV, 2015 WL 1641144 (Tex. App.—Fort Worth Apr. 9,
2015, pet. denied) (mem. op.) ..............................................................................26

*Daniels v. City of Arlington*,
246 F.3d 500 (5th Cir. 2001) ...............................................................................11

*Dodson v. Church (In re Church)*,
69 B.R. 425 (Bankr. N.D. Tex. 1987) ..................................................................37

*Doughty v. Hill (In re Hill)*,
265 B.R. 270 (Bankr. M.D. Fla. 2001) .................................................................30

*Eagle Props., Ltd. v. Scharbauer*,
807 S.W.2d 714 (Tex. 1990) ...................................................................13, 21, 24

*In re Estate of Preston*,
346 S.W.3d 137 (Tex. App.—Fort Worth 2011, no pet.) .......................................38

*Fleming Mfg. Co. v. Capitol Brick, Inc.*,
734 S.W.2d 405 (Tex. App.—Austin 1987, writ ref'd n.r.e.) .....................19, 35, 36

*Garner v. Lehrer (In re Garner)*,
56 F.3d 677 (5th Cir. 1995) .................................................................................19

*Gilbert v. Dang (In re Dang)*,
560 B.R. 287 (Bankr. S.D. Tex. 2016) .................................................................30

*Gleason v. Smolinski*,
125 A.3d 920 (Conn. 2015) .................................................................................41

*Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996) .......12, 18

*Gonzalez v. Hibernia Nat. Bank in Texas*,
No. 05-92-02355-CV, 1993 WL 265454 (Tex. App.—Dallas July 16, 1993, no
writ) ....................................................................................................................36

*Gray Law LLP v. Transcon. Ins. Co.*,
560 F.3d 361 (5th Cir. 2009) ...............................................................................11

*GTE Commc'ns Sys. Corp. v. Tanner*,
    856 S.W.2d 725 (Tex. 1993) ................................................................................. 38

*Guion v. Sims (In re Sims)*,
    479 B.R. 415 (Bankr. S.D. Tex. 2012), *subsequently aff'd*, 548 F. App'x 247
    (5th Cir. 2013) ................................................................................... 14, 15, 16

*Hancock v. Variyam*,
    400 S.W.3d 59 (Tex. 2013) ................................................................................. 32

*Harold V. Simpson & Co. v. Shuler (In re Shuler)*,
    722 F.2d 1253 (5th Cir. 1984) ...................................................................... 15, 19

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................................... 23

*Hersh v. Tatum*,
    526 S.W.3d 462 (Tex. 2017) ............................................................................... 28

*Matter of Hoffman*,
    955 F.3d 440 (5th Cir. 2020) ........................................................................ 13, 20

*Horizon Health Corp. v. Acadia Healthcare Co., Inc.*,
    520 S.W.3d 848 (Tex. 2017) ............................................................................... 39

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995) ........................................................................................... 42

*Irvin v. Faller (In re Faller)*,
    547 B.R. 766 (Bankr. W.D. Ky. 2016) ............................................................... 25

*Jackson v. Biotectronics, Inc.*,
    937 S.W.2d 38 (Tex. App.—Houston [14th Dist.] 1996, no writ) ........................ 35

*Jefferson v. Holland (In re Holland)*,
    428 B.R. 465 (Bankr. N.D. Ill. 2010) ........................................................... 26, 48

*Joyce v. Berberian (In re Berberian)*,
    12 B.R. 465 (Bankr. D.R.I. 1981) ...................................................................... 31

*Kawaauhau v. Geiger*,
    523 U.S. 57 (1998) .......................................................................... 12, 15, 24, 29

*Khionidi v. Cummins-Cobb (In re Cummins-Cobb)*,
    Adv. No. 2:18-ap-01066-RK, 2020 WL 634140 (Bankr. C.D. Cal. Feb. 10,
    2020) ................................................................................................................. 26

*King v. Huizar (In re Huizar)*,
  609 B.R. 482 (Bankr. W.D. Tex. 2019) ...........................................................................17, 40

*Kremer v. Chem. Const. Corp.*,
  456 U.S. 461 (1982) ................................................................................................34, 40, 47

*Langan v. Evers (In re Evers)*,
  212 B.R. 945 (Bankr. E.D. Wis. 1997) ...................................................................................25

*Leon v. Rabalais (In re Rabalais)*,
  Adv. No. 11-03167, 2012 WL 42101 (Bankr. S.D. Tex. Jan. 9, 2012) ..................................11

*Madison v. Williamson*,
  241 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)....................................34

*Mahadevan v. Bikkina (In re Mahadevan)*,
  617 F. Supp. 3d 654 (S.D. Tex. 2022) ...............................................................25, 28, 29, 30

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
  470 U.S. 373 (1985)........................................................................................................40, 41

*Matsushita Elec. Indus. Co. v. Epstein*,
  516 U.S. 367 (1996) ...............................................................................................................40

*Merritt v. Rizzo (In re Rizzo)*,
  337 B.R. 180 (Bankr. N.D. Ill. 2006) ....................................................................................26

*Miller v. J.D. Abrams, Inc. (In re Miller)*,
  156 F.3d 598 (5th Cir. 1998) ...........................................................................................12, 15

*Mission Res., Inc. v. Garza Energy Tr.*,
  166 S.W.3d 301 (Tex. App.—Corpus Christi 2005, pet. granted) *rev'd on
  other grounds*, 268 S.W.3d 1 (Tex. 2008) .............................................................................34

*Montana v. United States*,
  440 U.S. 147 (1979).................................................................................................................38

*New York Times v. Sullivan*,
  376 U.S. 254 (1964).................................................................................................................22

*O'Gara v. Hunter (In re Hunter)*,
  610 B.R. 479 (Bankr. M.D.N.C. 2019)..................................................................................26

*Pancake v. Reliance Ins. Co. (In re Pancake)*,
  106 F.3d 1242 (5th Cir. 1997) ...................................................................................19, 20, 35

*Purser v. Scarbrough (In re Scarbrough)*,
  516 B.R. 897 (Bankr. W.D. Tex. 2014)..............................................................................26, 27

*Raspanti v. Keaty (In re Keaty),*
    397 F.3d 264 (5th Cir. 2005) ............................................12

*Rexrode v. Bazar,*
    937 S.W.2d 614 (Tex. App.—Amarillo 1997, no writ)........................14

*Richter v. Thibodaux (In re Thibodaux),*
    112 B.R. 173 (Bankr. S.D. Tex. 1989) ....................................11

*Scurlock Oil Co. v. Smithwick,*
    724 S.W.2d 1 (Tex. 1986)................................................37

*Snyder v. Phelps,*
    562 U.S. 433, 451 (2011)..............................41, 42, 43, 44, 46

*Spilman v. Harley,*
    656 F.2d 224 (6th Cir. 1981) ..........................................15

*Stewart v. Kauanui (In re Kauanui),*
    Adv. No. 14-90018, 2015 WL 359088 (Bankr. D. Haw. Jan. 23, 2015) ............28

*Stoner v. Thompson,*
    578 S.W.2d 679 (Tex. 1979) .......................................19, 35

*Sunrizon Homes, Inc. v. Fuller,*
    747 S.W.2d 530 (Tex. App.—San Antonio 1988, writ denied)................19

*Sysco Food Servs., Inc. v. Trapnell,*
    890 S.W.2d 796 (Tex. 1994)........................................13, 37

*Tarter v. Metro. Sav. & Loan Ass'n,*
    744 S.W.2d 926 (Tex. 1988)........................................20, 21

*Taylor v. Charter Med. Corp.,*
    162 F.3d 827 (5th Cir. 1998) ..........................................48

*Texas v. Johnson,*
    491 U.S. 397 (1989)...................................................41

*Thompson v. Durrance (In re Durrance),*
    84 B.R. 238 (Bankr. M.D. Fla. 1988) ..................................25

*Van Dyke v. Boswell, O'Toole, Davis & Pickering,*
    697 S.W.2d 381 (Tex. 1985)........................................14, 21

*WFAA–TV, Inc. v. McLemore,*
    978 S.W.2d 568 (Tex.1998)............................................22

*Wheeler v. Laudani*,
    783 F.2d 610 (6th Cir. 1986) ..........................................................................24, 25

*Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*,
    337 F.3d 504 (5th Cir. 2003) ..................................................................................15

**Statutes**

11 U.S.C. § 523(a)(6)................................................................................... Passim

28 U.S.C. § 1738.................................................................................1, 40, 41

Tex. Civ. Prac. & Rem. Code Ann. § 41.003 ..............................................39

Tex. Civ. Prac. & Rem. Code § 41.001(5)..................................................31

Texas Penal Code § 22.04.......................................................................6, 34

**Other Authorities**

Fed. R. Bankr. P. 7056 ..............................................................................11

Fed. R. Bankr. P. 9014 ..............................................................................11

Fed. R. Civ. P. 56(a) .................................................................................11

Federal Rules of Evidence Rule 201...........................................................47

Restatement (Second) of Judgments section 27 comments (h) and (i)..........21

On May 12, 2023, Plaintiffs Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa ("Movants") filed a Motion for Summary Judgment (the "Motion") (Doc. 27) against Defendant Alexander E. Jones ("Defendant"). Defendant submits the following Response:

## I.    PRELIMINARY STATEMENT

This Court should deny Movants' Motion, which would summarily deny Defendant the opportunity for a discharge and deny Defendant any opportunity to reorganize in Chapter 11 bankruptcy. The default judgments for defamation and intentional infliction of emotional distress ("IIED") failed to actually litigate and necessarily decide the "willful and malicious injury" exception to discharge under 11 U.S.C. § 523(a)(6). Even if collateral estoppel did apply, the default judgments are not entitled to full faith and credit under 28 U.S.C. § 1738. This Motion can be denied for at least four reasons:

**First**, under Texas law, collateral estoppel only precludes the relitigation of identical issues of fact or law that were actually litigated and essential to the prior judgment. The issue of "willful and malicious injury" was not "actually litigated" in the State Court Actions because (1) the issue of "willful and malicious injury" was not alleged in Movants' petitions or otherwise; (2) the discovery-sanction exception to the general rule that default judgments are not given preclusive effect is inapplicable here because it only applies to a party's "egregious" discovery abuses, and in both cases, Defendant was punished largely for the actions of his co-defendants, or unfavorable commentary about the underlying court proceedings; and (3) the discovery-sanction exception does not apply when a defendant was not allowed to testify to his level of culpability, which Defendant was not allowed to do.

**Second**, the issue of "willful and malicious injury" was not essential to the State Court Actions because the jury awarded compensatory and exemplary damages for defamation and

intentional infliction of emotional distress based on an instruction that incorporated a recklessness culpability standard. But a finding of recklessness in a prior proceeding will not estop the litigation of "willful and malicious injury" under § 523(a)(6).

**Third**, the Court should not apply the doctrine of collateral estoppel because the convenience it affords outweighs questions concerning the quality, extent, or fairness of the prior proceeding. Here, applying collateral estoppel would be unfair under the circumstances of this case because (1) the State Court entered the default against Defendant primarily to the actions of his co-defendants; (2) the State Court prevented Defendant from testifying to his level of culpability so it would be inherently unfair for the Court to apply collateral estoppel to something Defendant was not afforded an opportunity to address in the State-Court Actions; (3) the jury was not instructed that it had to find Defendant liable for exemplary damages by clear and convincing evidence, which is required under Texas law; and (4) the State Court lifted the statutory damages cap on exemplary damages based on the State Court's implied finding in the Final Judgment that Defendant violated a criminal statute, but under Texas law, for the damages cap to be lifted, a jury has to find, beyond a reasonable doubt, that a defendant violated a criminal statute intentionally or knowingly.

**Fourth**, federal law does not require federal courts to grant full faith and credit to unconstitutional state-court judgments. Here, Movants seek full faith and credit of a judgment for defamation and emotional distress that violates Defendant's First Amendment protection from tort suits for exercising his free speech. Thus, even if the state court would use this judgment to bar litigation of the § 523(a)(6) exception to dischargeability, full faith and credit is not warranted for the reasons set forth herein.

Furthermore, viewed in the light most favorable to the non-moving party, the record evidence provided by Movants—much of which would be inadmissible under evidentiary rules—does not independently establish that Movants are entitled to judgment as a matter of law on the § 523(a)(6) exception to dischargeability.

For all the reasons set forth herein, the Motion should be denied.

## II.     RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

The Motion seeks to apply the doctrine of collateral estoppel to default judgments on liability.  Because there was never a trial on liability, Movants' Statement of Uncontested Material Facts ("Statement") (Doc. 28) is largely inapplicable. However, Defendant objects to many of those Statements because they are mere pleading allegations, statements from another court's orders, untested exhibits, and unsworn witness statements, often edited and presented without context. Defendant submits his responses to Movants' Statement in the contemporaneously filed Defendant's Objection and Response to Movants' Statements of Uncontested Material Facts (Doc. 33).

Notwithstanding the foregoing, a decision on collateral estoppel will not turn on the Statements and their veracity, but rather a legal analysis applied to a slim evidentiary record supporting the default judgments. That record speaks for itself. The Statements chosen by Movants seek to arouse prejudice and contempt rather than assist the Court in determining whether Movants are entitled to judgment as a matter of law. As such, Defendant sets forth his additional Facts Precluding Summary Judgment.

### III.   FACTS PRECLUDING SUMMARY JUDGMENT

**A. The State-Court Actions**

1.      On September 27, 2021, the 459th District Court of Travis County, Texas, in *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623 entered a certain Order on Plaintiff's Motion for Contempt in favor of Plaintiff Scarlett Lewis ("Lewis") and against Defendant and Free Speech Systems, LLC ("FSS") (the "Lewis Default Judgment"). (Doc. 29-42).

2.      Lewis attached only one motion related to Defendant's alleged discovery abuses: Lewis's Motion for Contempt dated July 6, 2021, ("Lewis Contempt Motion") (Doc. 29-34). The Lewis Contempt Motion focuses solely on InfoWars' discovery abuses. (*Id*. at 2-4). The sole mention of Defendant in the Lewis Contempt Motion is his personal belief that the Democratic Party was behind the lawsuits which were actually "show trials." (*Id*. at 10-12).

3.      The Lewis Default Judgment lumps the state-court defendants together and omits any personalized discussion of Defendant's specific discovery abuses. (Doc. 29-42). The Default Judgment mentions his "public threats"—without any mention of who he threatened or what he said that constituted a threat—and his characterization of the proceedings as "show trials." (*Id*. at 4).

4.      On October 15, 2021, the 459th District Court of Travis County, Texas, in *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842 (the "Pozner/De La Rosa Action"), entered a certain Amended Order on Plaintiffs' Motion to Compel and Motion for Sanctions in favor of Plaintiffs Leonard Pozner and Veronique De La Rosa ("Pozner/De La Rosa") and against Defendant and FSS (the "Pozner/De La Rosa Default Judgment"). (Doc. 29-41).

5.      Pozner/De La Rosa attached one motion to support Defendant's alleged discovery abuses: Plaintiff's Motion to Compel and Motion for Sanctions ("Pozner/De La Rosa Sanctions Motion") (Doc. 29-40). However, this entire motion concerns discovery requests served on Defendant's co-defendant—FSS; Defendant is not implicated at all. (*Id*. at 2 ("On May 29, 2018, Plaintiffs served written discovery on Defendant Free Speech Systems, LLC."); *Id*. at 10 (listing Exhibit 1 as Plaintiffs' Discovery Requests to FSS)).

6.      The Pozner/De La Rosa Default Judgment, like the Lewis Default Judgment, lumps all state-court defendants together and does not include any discussion of Defendant's specific discovery abuses. (Doc. 29-41). The state-court mirrors the findings in the Lewis Default Judgment again only mentioning Defendant's "public threats" with no detail of who was threatened, when, where, or how, relying solely on his characterization of the Pozner/De La Rosa Actions as "show trials." (*Id*. at 4).

7.      Less than two weeks later, on October 27, 2021, the 261st District Court of Travis County, Texas, in *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835 (the "Heslin Action" and as consolidated with the Lewis Action, the "Heslin/Lewis Action"), entered a certain Amended Order on Plaintiff's Motion for Default Judgment and 2nd Motion for Contempt in favor of Plaintiff Neil Heslin ("Heslin") and against Defendant and FSS (the "Heslin Default Judgment"). (Doc. 29-3).

8.      Heslin attached two motions related to Defendant's alleged discovery abuses: (1) Motion for Default Judgment dated December 9, 2019, ("Heslin Default Motion") (Doc. 29-32); and (2) Heslin's Second Motion for Contempt dated July 6, 2021, ("Heslin Contempt Motion") (Doc. 29-39). The Heslin Default Motion focuses on FSS; the only allegation against Defendant is Heslin's argument that Defendant refused to make a good faith effort in identifying his sources.

(Doc. 29-32 at 23-27). The Heslin Contempt Motion, like that of Pozner/De La Rosa, focuses solely on InfoWars' discovery abuses. (Doc. 29-39 at 2-6). The only personal mention of Defendant in the Lewis Contempt Motion regards Defendant's commentary regarding his belief that the Democratic Party was behind the lawsuits and that the lawsuits were actually "show trials." (*Id*. at 10-12).

9.      On August 3, 2022 and August 4, 2022, in the 261st District Court of Travis County, Texas, the jury of *Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835 (the "Heslin/Lewis Action") (collectively, along with the Pozner/De La Rosa Action, the "State-Court Actions"), reached a compensatory damages verdict in favor of Heslin and Lewis and against Defendant and FSS (the "Heslin/Lewis Compensatory Damages Jury Charge"). (Doc. 29-5). The Heslin/Lewis Compensatory Damages Jury Charge did not contain any charges related to violations of the Texas Penal Code § 22.04 relating to injury to a disabled individual.[1] Moreover, the Heslin/Lewis Compensatory Damages Jury Charge also did not contain any instructions to make findings beyond a reasonable doubt as to whether Defendant violated a criminal statute that would exempt him from the statutory exemplary damages cap.

10.     On August 5, 2022, the Heslin/Lewis jury reached a verdict awarding exemplary damages to Heslin and Lewis and against Defendant and FSS (the "Heslin/Lewis Exemplary Damages Jury Charge"), which failed to contain any instructions to make findings for exemplary damages based on the requisite level of culpability by clear and convincing evidence. (Doc. 29-6). The Heslin/Lewis Exemplary Damages Jury Charge did not.

---

[1] On September 29, 2022, Heslin and Lewis filed Plaintiffs' Motion for Leave to Amend Petition in the Helsin/Lewis Action requesting leave to file a Plaintiffs' Fifth Amended Petition—adding a paragraph of allegation that Defendant's conduct violated Texas Penal Code § 22.04, relating to injury to a disabled individual. On January 11, 2023, the Heslin/Lewis Action's state court granted leave.

11.     On January 12, 2023, the court in the Heslin/Lewis Action, consolidated the completed Compensatory Damages Jury Charge and the Exemplary Damages Jury Charge, entering a certain Final Judgment in favor of Lewis and Heslin and against Defendant and FSS ("Final Judgment"). (Doc. 29-7).

**B.  Defendant's Background and Testimony**

12.     Defendant is currently an employee of FSS. FSS operates the InfoWars website and owns the domain. Declaration of Alexander E. Jones's in Support of His Response to Texas Plaintiffs' Motion for Summary Judgment ("Jones Decl.") at ¶ 2, attached hereto as **Exhibit 1**.

13.     Defendant is the 100% owner of FSS. Defendant has spent over twenty-five years as a talk show host on radio, television, and internet platforms. *Id*. at ¶ 3.

14.     Defendant currently hosts a show on FSS' platform for approximately three to four hours a day, five days a week, where he discusses current events that are being reported by other news outlets and provides his opinion. Just like on many talk shows, his opinions are not vetted prior to his show airing. *Id*. at ¶ 4.

15.     Over 99% of the content on the InfoWars website is not written by Defendant. He writes certain headlines and comments that are specifically attributed to him. He rarely edits or posts videos to InfoWars' website—less than 20 per year. His position at InfoWars is not as an editor and he does not maintain control of the editorial systems at FSS. *Id*. at ¶ 5.

16.     Defendant is a skeptical person and has a general distrust of the government. One of the first stories Defendant covered was the federal Bureau of Alcohol, Tobacco, and Firearms's ("ATF") siege of the Branch Davidians' compound in Waco, Texas. Defendant did not believe the official government narrative of the event. *Id*. at ¶ 6.

17.     Two years later, in 1995, Defendant expressed skepticism that Timothy McVeigh acted alone during the Oklahoma City bombing. *Id*, at ¶ 7.

18.     In 1999, Defendant argued that the World Trade Organization protests in Seattle were infiltrated by violent, property destroying government agent provocateurs to discredit the protestors. *Id*. at ¶ 8.

19.     In 2001, like many people, Defendant expressed skepticism about the immediate media reports and official government accounts of the 9-11 attacks. At the time, Defendant was nationally syndicated on approximately 100 radio stations. Defendant's 9-11 skepticism costed him 70% of his affiliates. Defendant was told that if he stopped discussing his views on 9-11, he could be the next Rush Limbaugh. But because Defendant believed it to be true, he felt a need to report it. *Id*. at ¶ 9.

20.     In 2011, news organizations began reporting on Operation Fast and Furious, an operation where ATF agents allowed licensed firearms dealers to sell weapons to illegal straw buyers hoping to track the guns to Mexican drug cartel leaders. The ATF did this over the expressed concerns from the dealers that the guns might be used in future crimes or that they would be unfairly prosecuted. Approximately 2,000 firearms were sold in the operation, the majority of which were never recovered. Multiple Fast and Furious guns ended up at crime scenes on both sides of the US-Mexico border. United States Border Patrol Agent Brian Terry was killed in December 2010 with a gun purchased in the Fast and Furious Operation. Defendant discussed Operation Fast and Furious numerous times on his show. In Defendant's view, the Obama administration came up with Operation Fast and Furious to pin border crime on gun dealers to arouse public support for new gun regulations. *Id*. at ¶ 10.

21.     When the shooting at Sandy Hook happened, Defendant viewed the official narrative coming from local government and mainstream media with skepticism, as he does with almost all news events covered by the mainstream media. As part of his normal and ordinary course preparation for his daily show, Defendant reviewed content from non-mainstream media coverage questioning the authenticity of the event as reported. On his show, Defendant stated that he did not know what happened but that it would not surprise him if the government staged this event to restrict Americans' access to guns. Defendant warned his audience that politicians in the Democratic Party would use this event to pass legislation that would restrict access to guns, in violation of the Second Amendment. Threats to the Second Amendment particularly concern the Defendant. *Id*. at ¶ 11.

22.     Defendant continued to cover the event's official narrative with skepticism because certain events surrounding the shooting did not make sense to him. For example, in an interview between one of the parents and Anderson Cooper, Defendant believed that it looked like Anderson Cooper was standing in front of a blue screen in a CNN studio rather than on location at the town square vigil. Defendant commented that one could draw from it what one wanted, but he could not understand why CNN would use a blue screen. *Id*. at ¶ 12.

23.     In March 2014, Defendant had a guest, Wolfgang Halbig, on his show. Defendant often invited guests on his show who were associated with viral news stories. In Defendant's opinion, Mr. Halbig had an impressive resume, and Defendant was initially persuaded by Mr. Halbig's views that the shooting at Sandy Hook never happened. Defendant's skeptical view of mainstream media coverage, plus the views of Mr. Halbig and other expressed online, informed by belief at the time that the individuals Defendant saw on media coverage, whom Defendant now knows to be legitimate relatives of Sandy Hook victims, could be actors. *Id*. at ¶ 13.

24.     By July 2015, Defendant began to realize that some of the evidence that Mr. Halbig had relied on was not true, and Defendant started to believe that there were real victims of the Sandy Hook shooting. While Defendant still thought there were some anomalies in coverage of the event by the mainstream media, and he never stopped doubting that the government could fake such an event, Defendant no longer believed the victims of the Sandy Hook shooting were fake or their relatives were actors. *Id*. at ¶ 14.

25.     On June 18, 2017, NBC aired Megyn Kelly's interview with Defendant. In that interview, she asked Defendant about his coverage of the Sandy Hook shooting and his past allegations that the event was faked. Defendant explained that he now believed that children probably did die at Sandy Hook, but he could see why some people think they did not. Defendant also stated that at the time he made the statements in 2015 questioning the reality of the event, he believed them. *Id*. at ¶ 15.

26.     In October 2017, though he once again mentioned the anomalies surrounding the shooting event at Sandy Hook, Defendant did not question the fact that children died there. *Id*. at ¶ 16.

27.     Throughout Defendant's entire evolution on the veracity of the official Sandy Hook narrative, he never once said something on air that he did not believe to be true. Defendant believed everything he ever said about the Sandy Hook shooting at the time he said it. Defendant never intended to cause injury or harm to any of the survivors or relatives of survivors, including Movants, nor did he ever think his statements with respect to the event, or the veracity of the official narrative regarding the shooting, would be likely to cause harm to any Movant. *Id*. at ¶ 17.

## IV.  ARGUMENT AND AUTHORITIES

### A. Legal Standard

28.     Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable by Fed. R. Bankr. P. 7056 and Fed. R. Bankr. P. 9014); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). A genuine issue of material fact is one that could affect the outcome of the action or could enable a reasonable fact finder to find in favor of the respondent. *Brumfeld v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). The Court views all facts and inferences in the light most favorable to the non-movant and resolve factual controversies in favor of the non-movant. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013). As such, summary judgment is generally ill-suited for resolving cases involving allegations of intent. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005); *Automated Salvage Transp. Co. v. Swirsky (In re Swirsky)*, 372 B.R. 551, 565 (Bankr. D. Conn. 2006). Moreover, exceptions to discharge in bankruptcy are to be narrowly construed in favor of the Debtor. *Richter v. Thibodaux (In re Thibodaux)*, 112 B.R. 173, 174 (Bankr. S.D. Tex. 1989). "[I]t is only with the greatest caution that this Court will make [a finding of non-dischargeability under § 523], particularly on a summary basis." *Leon v. Rabalais (In re Rabalais)*, Adv. No. 11-03167, 2012 WL 42101, at *4 (Bankr. S.D. Tex. Jan. 9, 2012).

### B. Non-Dischargeability Under Section 523(a)(6)

29.     The Bankruptcy Code exempts damages from an injury caused willfully and maliciously by a debtor with the intent to cause such injury to another person or their property from discharge. 11 U.S.C. § 523(a)(6). Importantly, "[t]he word 'willful' in (a)(6) modifies the

word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). A "willful and malicious injury" typically falls into the category of intentional tort rather than a mere negligent or reckless act. *Id.* In the Fifth Circuit, a "willful and malicious injury" requires finding an "objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998). "To prevail under § 523(a)(6), a creditor must prove by a preponderance of the evidence that the debt is not dischargeable." *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005).

30.     The Lewis Default Judgment, the Heslin Default Judgment, the Pozner/De La Rosa Default Judgment (collectively the "Default Judgments"), the Heslin/Lewis Compensatory Damages Jury Charge, the Heslin/Lewis Exemplary Damages Jury Charge (collectively the "Jury Charges"), and the Final Judgment fail to establish as a matter of law that Defendant caused willful and malicious injuries under 11 U.S.C. § 523(a)(6), and thus the doctrine of collateral estoppel does not apply. Further, the state-court records fail to establish that Defendant's conduct satisfies the objective and subjective standards for "willful and malicious injury." Defendant submits that Movants cannot meet their burden with the record and this Court should deny summary judgment.

**C.  Collateral Estoppel Does Not Apply**

31.     "Parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability, although the bankruptcy court retains exclusive jurisdiction to ultimately determine the dischargeability of the debt." *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996) (citing *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991)). In determining whether to give preclusive effect to a state court judgment, courts "apply the

preclusion rules of the state that rendered the judgment. *Matter of Hoffman*, 955 F.3d 440, 444 (5th Cir. 2020). Accordingly, Texas rules apply here.

32.    Under Texas law, "collateral estoppel only precludes the relitigation of ***identical issues of fact or law which were actually litigated <u>and</u> essential to the prior judgment***." *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721-22 (Tex. 1990) (emphasis added). Movants must establish that "(1) the facts sought to be litigated in the second action were *fully and fairly litigated* in the first action; (2) those facts were *essential to the judgment* in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994) (emphasis added).

33.    Collateral estoppel cannot apply here because facts supporting "willful and malicious injury" were never fully or fairly litigated nor were they essential to the Default Judgments, Jury Charges, or Final Judgment.

1.   **Willfulness and Maliciousness under § 523(a)(6) was not fully and fairly litigated in the State-Court Actions.**

34.    Each Movant pleaded claims for defamation, intentional infliction of emotional distress ("<u>IIED</u>") and sought exemplary damages. (Docs. 29-4 at 18-24; 29-8 at 21-26). The State Court entered the Default Judgments against Defendant in each State-Court Action as to liability only. (Docs. 29-3; 29-41; 29-42). The Heslin/Lewis Action proceeded to a damages trial, where the jury awarded Heslin and Lewis compensatory damages (Doc. 29-5) and exemplary damages (Doc. 29-6). The Pozner/De La Rosa Action has never empaneled a jury or gone to trial.

35.    An examination of the Default Judgments, the Jury Charges, and the Final Judgment, along with the record supporting each, clearly shows that "willful and malicious injury" was not fully and fairly litigated in any of the State-Court Actions. **First**, Movants did not properly raise the issue of "willful and malicious injury" in their petitions, as none of their causes of action

required a finding of "willful and malicious injury." **Second**, Movants' assertion of the discovery-sanction exception to the general rule that default judgments are not given preclusive effect is inapplicable here because it only applies to "egregious" discovery abuses, and in both cases, Defendant was punished for the actions of his co-defendants. **Third**, the discovery-sanction exception does not apply when the Defendant was not allowed to testify to his level of culpability, which Defendant was not allowed to do.

### a. Movants did not plead the issue of "willful and malicious injury."

36.     "For purposes of collateral estoppel, an issue was 'actually litigated' when it was properly raised, by the pleadings or otherwise, and it was submitted for determination, and determined." *Rexrode v. Bazar*, 937 S.W.2d 614, 617 (Tex. App.—Amarillo 1997, no writ) (citing *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985)). Here, the issue of "willful and malicious injury" was not properly raised in the pleadings. (*See* Doc. 29-8; Doc. 29-4). This omission is not surprising because such elements were unnecessary to prove the claims contained in Movants' petitions. The willful and malicious standard is relatively rare in state torts actions, which may be the reason collateral estoppel as applied to § 523(a)(6) is so rare to find. However, cases applying collateral estoppel to § 523(a)(2)(A) are more common, illustrating the situation where elements are fully and fairly litigated.

37.     The elements of the fraud exception in § 523(a)(2)(A) align closely with fraud under Texas law. *Guion v. Sims (In re Sims),* 479 B.R. 415, 420 (Bankr. S.D. Tex. 2012), *subsequently aff'd,* 548 F. App'x 247 (5th Cir. 2013) (stating that "the elements of a § 523(a)(2)(A) claim are virtually identical to the elements of a Texas state-law fraud claim"). This definition of fraud is uniform across states and consistent with the fraud exception under § 523(a)(2). *Grogan*, 498 U.S. at 290. Thus, nearly every time a court finds fraud, a judgment will be nondischargeable in bankruptcy—but this is not so with "willful and malicious injury" under § 523(a)(6).

38.     The terms "willful" and "malicious" are used across states, often modifying words related to the "act" rather than the "injury." *Kawaauhau v. Geiger* explains that the significance of these terms depends on the word they modify. 523 U.S. at 57-58. Moreover, the Fifth Circuit has held that "willful and malicious injury" does not encompass every intentional tort. *Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003). The unitary-concept approach used in the Fifth Circuit gives these terms a distinct meaning that differs from other states and federal circuits. *In re Miller*, 156 F.3d at 606. Simply associating these terms with an intentional tort in a state court pleading does not put the precise standard of § 523(a)(6) at issue. Accordingly, because the Heslin/Lewis operative petition did not plead "willful and malicious injury" (Doc. 29-8), nor did the Pozner/De La Rosa state-court petition (Doc. 29-4), the issue was not properly raised in their pleadings or otherwise, and the issue of willfulness and maliciousness was thus not "actually litigated."[2]

> **b. The discovery-sanction exception does not apply because no evidence supports a finding of egregious conduct.**

39.     Traditionally, "a default judgment does not through collateral estoppel bar relitigation in the bankruptcy court." *Harold V. Simpson & Co. v. Shuler (In re Shuler)*, 722 F.2d 1253, 1257 n.6 (5th Cir. 1984) (citing *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981), and referencing cases cited therein). While there is an exception for default judgments rendered as a sanction for discovery violations, *In re Sims*, 479 B.R. at 421, applying the exception to the Default Judgments here would extend *Sims* beyond its well-reasoned holding.

40.     In *Sims*, this District found that fraud had been "fully and fairly litigated" for purposes of collateral estoppel because of the defendant's "egregious conduct during the discovery

---

[2] Below, Defendant explains why Movants' claims of Defamation, IIED, and exemplary damages have different culpability standards than does "willful and malicious injury" under § 523(a)(6).

process." *Id.* Thus, as is evident in *Sims*, courts only apply the discovery-sanction exception when a defendant's conduct during discovery is "egregious." But here, Defendant's individual conduct was not egregious in any of the State-Court Actions. Rather, an examination of the pleadings filed seeking sanctions from the State Court clarifies that nearly every discovery complaint was aimed at FSS or InfoWars, not Defendant.

41.     The only discovery abuse alleged by Heslin or Lewis against Defendant personally was Heslin's claim that Defendant failed to provide an adequate description of his sources on the Sandy Hook story. *Supra*, ¶ 8). The remainder of the alleged discovery abuses were attributable to FSS and InfoWars, not Defendant. *Supra*, ¶¶ 2-3, 8. The inability of Defendant to effectively remember the sources of a story covered initially in 2012 in a deposition nearly a decade later seems insufficient to impute willful and malicious intent to injure on the Defendant for purposes of declaring the entire Final Judgment, even as to Lewis who made no such claim, nondischargeable.[3]

42.     Pozner and De La Rosa attached one discovery abuse motion referencing FSS's failure to provide responses to written discovery. *Supra*, ¶ 5-6; (Doc. 29-40). Thus, while there is little regarding discovery abuses from the Heslin/Lewis Action, there is literally nothing in the record relating to Defendant personally from the Pozner/De La Rosa Action. Accordingly, the Motion does not support any egregious discovery violations, and thus, the discovery-sanction exception cannot be applied.

   **c. The State Court prohibited Defendant from testifying as to his level of culpability, precluding a finding of "actually litigated" as to Heslin and Lewis.**

---

[3] The court also stated, without explanation, that Defendant made "public threats" and called the proceedings "show trials," but those reasons are not related to discovery. (Doc. 29-3). There is nothing in the record showing that Defendant made any public threats. As for the "show trial" comment, Defendant's decision to publicly question the fairness of the proceedings he's involved in, while ill-advised, is certainly not a reason to default him on liability, nor should it be a reason to impute willful and malicious intent to injure.

43.     When courts apply the discovery-sanction exception, the reasoning lies with the detailed nature of the damages hearing following a default judgment. *In re Limbaugh*, for example, found that, "despite the fact [d]efendant's liability was determined by default, [p]laintiff was required to establish through evidence that the degree and type of Defendant's misconduct warranted exemplary damages." *Crain v. Limbaugh (In re Limbaugh)*, 155 B.R. 952, 958 (Bankr. N.D. Tex. 1993). Similarly, *In re Huizar*, the debtor was allowed to "present any and all evidence he desired during the five days of hearing on the issue of damages" which was vital to the court's determination to apply collateral estoppel. *King v. Huizar (In re Huizar)*, 609 B.R. 482, 491-92 (Bankr. W.D. Tex. 2019).

44.     Here, Defendant was prevented from presenting any and all evidence he desired. Indeed, when it came time for Defendant to present a defense on damages in the Heslin/Lewis Action, the State Court precluded any testimony concerning his level of culpability. Defendant's attorney explained to the court that:

> for the jury to make an accurate determination, you need to talk about intent. You need to talk about degree of malice. You need to talk about how extreme the behavior was or wasn't. And so, the testimony I'm eliciting, which I believe—I've never said, nor has any client said, that Your Honor's ruling shouldn't stand. But in order for the jury to be able to make a decision, they need to know the entire context and they need to understand the mental state of the participants. Because if not, they can't render a ruling on punitive damages.

(Doc. 29-46 at 200:3-13). The state court judge replied by stating:

> We've already had this conversation multiple times in this trial, in addition to it before this trial, the time for that was during discovery, when Mr. Jones chose not to fully participate. It is not the time to do that now. If there is anything that he would like to put forth as a defense, he needed to do it a year ago during the discovery process. It's too late now.

(*Id*. at 200:14-22).

45.     Thus, not only did the state court prevent Defendant from defending himself as to liability based predominately on the actions of another defendant, but it would not allow him to

offer **any** testimony as to his level of culpability in his damages hearing. *Id.* This is in stark contrast to a case Movants heavily rely on, *In re Gober*, 100 F.3d 1195 (5th Cir. 1995), which warrants an extensive discussion.

46.     In *Gober*, the defendant, an officer, director, and shareholder of an architectural firm, misappropriated client funds and loan proceeds. *Id.* at 1199. His firm filed suit against him, and the defendant filed a general denial. *Id.* After multiple discovery abuses by the defendant, the plaintiff filed a motion to strike the defendant's answer, and after the defendant failed to attend that hearing, the court struck his answer and entered a default against him. *Id.* at 1200. The court then held a trial where it heard "evidence and arguments of counsel," and found that the defendant "embezzled, converted, appropriated, and . . . stole" money from the plaintiff and that he "acted with fraudulent intent" and "acted maliciously and willfully." *Id.*

47.     After the defendant filed for bankruptcy, the plaintiff sought a judgment that the debt was not dischargeable under § 523(a)(2), (4), and (6). *Id.* The bankruptcy court granted plaintiff's motion for summary judgment reasoning that the state court's findings satisfied the elements of § 523(a)(2), (4), and (6) and that issue preclusion barred relitigation of those issues. *Id.*

48.     On appeal to the Fifth Circuit, the defendant argued that because the state court struck his pleadings and deemed all the plaintiff's material allegations admitted, the issues relevant to discharge were not actually litigated for purposes of collateral estoppel. *Id.* at 1203. In coming to its holding, the Fifth Circuit differentiated between a no-answer default and a post-answer default under Texas law. "The effect . . . of a no-answer default judgment is an admission of liability upon a cause of action if the action is properly alleged in plaintiff's petition." *Fleming Mfg. Co. v. Capitol Brick, Inc.*, 734 S.W.2d 405, 408 (Tex. App.—Austin 1987, writ ref'd n.r.e.).

However, "[a] post-answer 'default' constitutes neither an abandonment of defendant's answer nor an implied confession of any issues thus joined by defendant's answer. Judgment cannot be entered on the pleading, but the plaintiff in such a case must offer evidence and prove his case as in a judgment upon a trial." *Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979). In a post-answer default judgment, "the court may not enter judgment based solely upon the pleadings." *Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1245 (5th Cir. 1997) (applying Texas law).

49.     The *Gober* court explained that "[c]ourts generally hold that no-answer default judgments fail to meet the 'actually litigated' prong of the issue preclusion test." 100 F.3d at 1204 (citing *In re Shuler*, 722 F.2d at 1257 n.6). But post-answer defaults "are actually litigated for purposes of collateral estoppel and may be given preclusive effect in a subsequent dischargeability proceeding in bankruptcy." *Id.* (citing *Garner v. Lehrer (In re Garner)*, 56 F.3d 677, 680 (5th Cir. 1995)). The parties in *Gober* disagreed about whether the state court default constituted a no-answer or a post-answer default. The defendant argued that because the court struck his answer, the court essentially turned his post-answer default into a no-answer default, and thus, it lacked preclusive effect. *Id.*

50.     But the court disagreed. It reasoned that the default judgment did not entirely dispense with the defendant's burden of proof because exemplary damages are not admitted by default. *Id.* at 1205 (citing *Sunrizon Homes, Inc. v. Fuller*, 747 S.W.2d 530, 534 (Tex. App.—San Antonio 1988, writ denied)). The *Gober* court then held that the defendant had fully litigated the § 523(a)(6) issue because he "had the right to participate in the damages hearing and ***contest the extent of his culpability***, even though he could not contest liability per se." *Id.* (emphasis added).[4]

---

[4] Even if the Court disagrees with Defendant on this point, *Gober* is still distinguishable. The state court in *Gober* found that the defendant "embezzled, converted, appropriated, and . . . stole" money from the plaintiff and that he "acted with fraudulent intent" and "acted maliciously and willfully." Thus, there was a finding of fact, on the record,

51.     In applying the reasoning of *Gober* to the facts here, because the court struck Defendant's answer and didn't allow him to contest his culpability at his damages trial (Doc. 29-46 at 200:14-22), the Court should refuse to apply the discovery sanction exception. The Heslin/Lewis Action more closely resembles a no-answer default case, which does not have preclusive effect. *See In re Pancake*, 106 F.3d at 1244 (holding default judgment was not actually litigated in case where defendant filed an answer but was defaulted for failure to comply with discovery orders, because court struck his answer, thus creating a no-answer default situation, and where there was nothing in the record showing plaintiff satisfied its evidentiary burden).[5]

## 2. Neither Willful nor malicious injury was essential to the Default Judgments, Jury Charges, or Final Judgment.[6]

52.     Even if this Court finds that the "actually litigated" prong has been satisfied, a finding of "willful and malicious injury" was not essential to the Default Judgments, Jury Charges, or Final Judgment. "Under the second factor, facts are essential when they are 'necessary to form the basis of a judgment' in the first action." *Matter of Hoffman*, 955 F.3d at 445 (citing *Tarter v. Metro. Sav. & Loan Ass'n*, 744 S.W.2d 926, 928 (Tex. 1988)). The question posed to this Court is whether *the same ultimate issue litigated* in the Heslin/Lewis Action is presented in the nondischargeability action. *Tarter*, 744 S.W.2d at 928. "Ultimate issues are those factual determinations submitted to a jury that are necessary to form the basis of a judgment." *Id*. Here,

---

[5] of the requisite level of culpability required under § 523(a)(6). As described in Defendant's next section, that same finding did not occur in the Heslin/Lewis Action and could not occur in the Pozner/De La Rosa Action.

[5] This same rationale applies to Pozner and De La Rosa. They have not had their damages trial yet. However, the same judge who prevented testimony about Defendant's culpability in the Heslin/Lewis Action is the judge in the Pozner/De La Rosa Action. (See Docs. 29-3, 29-41). There is no reason to think the Pozner/De La Rosa Action will be any different.

[6] Heslin/Lewis is analyzed separately from Pozner or De La Rosa because Heslin/Lewis empaneled a jury, took evidence, and a verdict was entered which the state court used to support the Final Judgment. As such, the Default Judgments are all Pozner and De La Rosa have to rely upon to prove collateral estoppel.  The record there is much thinner and easier to analyze; however, the claims made and elements at issue in Heslin/Lewis are identical to those in Pozner/De La Rosa and can be incorporated herein by reference if this Court believes the analysis is helpful or applicable.

none of the Heslin/Lewis Action's claims required a finding of willful or malicious injury to find in favor of Heslin or Lewis. As such, neither Heslin nor Lewis can prove that those ultimate findings were essential to the Final Judgment.

53.     Before discussing the elements of each claim, it is important to acknowledge the Texas Supreme Court's adoption of comments (h) and (i) of section 27 of the Restatement (Second) of Judgments. *See Eagle Props.*, 807 S.W.2d at 722 (adopting Restatement (Second) of Judgments § 27, cmt. (i)); *Van Dyke*, 697 S.W.2d at 385 (adopting Restatement (Second) of Judgments § 27, cmt. (h)). Comment (i) provides that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments § 27 cmt. (i). Comment (h) provides as follows:

> If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation.

Restatement (Second) of Judgments § 27 cmt. (h).

54.     With these principles in mind, a finding of "willful and malicious injury," as it is defined in the Bankruptcy Code, was not essential to any claim contained in the Final Judgment.

**a. The jury in the Heslin/Lewis Action was instructed on the actual malice standard for defamation, which can be satisfied through reckless conduct, but recklessness cannot support a finding of "willful and malicious injury" under §523(a)(6).[7]**

55.     In the Heslin/Lewis Action, Heslin was the only plaintiff where the claim of defamation was sent to the jury. (Docs. 29-5; 29-6). Under Texas law, a claim for defamation has three elements: "The defendant (1) published a statement; (2) that was defamatory concerning the defendant; (3) while acting with actual malice (if the plaintiff was a public official or figure) or with negligence (if the plaintiff was a private individual) regarding the truth of the statement." *Cuba v. Pylant*, 814 F.3d 701, 713-14 (5th Cir. 2016) (citing *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998)). While there was never any determination of whether Heslin was a public figure, the jury was instructed that Defendant committed defamation against Heslin with actual malice, rather than the appropriate negligence standard for a private citizen. (Doc. 29-5; 29-6).

56.     The actual malice standard is derived from *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964), where the Supreme Court held that the First and Fourteenth Amendments require "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

57.     Texas's Pattern Jury Charges on defamation incorporates the actual malice standard. *See* Texas PJC 110.6 Question and Instructions on Actual Malice. In that Pattern Jury Instruction, courts are instructed to ask the following question:

at the time [Defendant] made the statement [at issue] … 1. [Defendant] knew it was false as it related to [Plaintiff], or 2. [Defendant] made the statement with a high

---

[7] No question was submitted to the jury regarding defamation damages as to Lewis.

degree of awareness that it was probably false, to an extent that [Defendant] in fact had serious doubts as to the truth of the statement.[.]

58.     Notably, the instruction does not use the phrase "actual malice" or "reckless disregard," but as noted in the comments to PJC 110.6:

> Because the US. Supreme Court has expressed remorse over the use of 'actual malice' to describe the standard, and chapter 41 of the Texas Civil Practice and Remedies Code uses 'malice' in connection with exemplary damages, the instruction avoid the use of the phrases 'actual malice' and 'reckless disregard.'

*Id.* cmt. Actual Malice (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989)). Thus, the difference in phrasing between the Texas Pattern Jury Instruction on Actual Malice and the traditional phrasing of the actual malice standard is purely semantic.

59.     Turning back to this case, the Jury Charges was modeled on Texas PJC 110.6:

> You are further instructed that at the time Defendants Alex Jones and Free Speech Systems, LLC published the statements on June 26, 2017 and July 20, 2017, Defendants knew the statements were false as it related to Neil Heslin, or that Defendants published the statements with a high degree of awareness that they were probably false, to an extent that Defendants in fact had serious doubts as to the truth of the statements.

(Doc. 29-5 at 5, Jury Charges, Cause of Action No. 1 – Defamation Committed Against Neil Heslin).

60.     As is evident from the Jury Charges, the jury was instructed that Defendant and FSS *either* had actual knowledge that their statements were false *or* made the statements with reckless disregard of whether his statements were true or not. *See Bently v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) (explaining that reckless disregard requires evidence "'that the defendant in fact entertained serious doubts as to the truth of his publication' or evidence 'that the defendant actually had a high degree of awareness of the probable falsity'" (cleaned up) (quoting *Harte-Hanks*, 491 U.S. at 488)). The Jury Charges provided this conclusion to the jury; the jury was never directed to find any fact to support the conclusion or choose a culpability standard for either the

Defendant or FSS. Therefore, it is impossible to tell whether the jury awarded Heslin defamation damages because it thought the Defendant *or* FSS acted intentionally *or* recklessly.

61.     As described above, Texas law precludes only the relitigation of "identical" issues. Here, the jury could have based its damages verdict on reckless conduct, or even negligence under Texas law. However, "reckless acts . . . do not suffice to establish that a resulting injury is 'willful and malicious.'" *Kawaauhau*, 523 U.S. at 64. Accordingly, the Court should not apply the doctrine of collateral estoppel to the defamation damages judgment because a finding of willfulness and maliciousness was not necessary to form the basis of the judgment. S*ee Eagle Props.*, 807 S.W.2d at 722; Restatement (Second) of Judgments § 27, cmt. (h)).

62.     This exact situation arose in *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir. 1986), where a state court jury found the defendant liable for defamation pursuant to a general verdict. Because the plaintiff was a public figure, the jury was required to find actual malice. *Id.* at 615. The bankruptcy court granted the plaintiff's motion for summary judgment, reasoning that "[l]ibel is an intentional tort based upon a willful and malicious injury . . . . It suffices that this court finds that the verdict [in the state-court action], finding Defendant liable for defamation, encompassed within it a finding that Defendant-Debtor willfully and maliciously injured Plaintiffs." *Id.* at 614 (alterations and ellipses in original). The Sixth Circuit reversed the granting of summary judgment in favor of the plaintiff, reasoning that "a libel verdict may be based on reckless conduct," but "***mere reckless disregard for the truth or falsity of the statement . . . is not a willful and malicious injury*** for purposes of § 523(a)(6)." (emphasis added). The *Wheeler* court further reasoned that "[b]ecause the jury's verdict was general, it is impossible on the current state of the record to divine whether the jury verdict rested on a finding that [defendant] acted knowingly or merely recklessly."

*Id.* at 615.[8]   The court concluded by stating that "neither the pleadings nor the general verdict reflects that the issue of willfulness and maliciousness was actually litigated and necessary to the verdict. Thus, based on the record at hand, collateral estoppel would not operate to bar relitigation of this issue." *Id.*

63.     While the Fifth Circuit has not opined on this particular issue, other courts have followed the guidance of the *Wheeler* Court:

> Although the Plaintiff pled intentional defamation in the state court proceeding, the default judgment does not necessarily imply a finding of "willful and malicious" conduct on the part of the Debtor due to the fact that the Plaintiff's Complaint alleged that the statements were made either "with knowledge ... or reckless disregard for the truth." Clearly, reckless acts are insufficient to satisfy § 523(a)(6). *Wheeler, supra.* Further, there was no actual litigation regarding the Debtor's knowledge of the falsity of any statements made by her concerning the Plaintiff. Based on the state court records, this Court is satisfied that collateral estoppel principles should not prevent this Court from considering whether the Debtor's conduct was "willful and malicious" as defined by § 523(a)(6) of the Bankruptcy Code.

*Thompson v. Durrance (In re Durrance)*, 84 B.R. 238, 239-40 (Bankr. M.D. Fla. 1988); *see also Mahadevan v. Bikkina (In re Mahadevan)*, 617 F. Supp. 3d 654, 664 (S.D. Tex. 2022) (holding willful and malicious conduct was not necessarily decided by state-court judgment for defamation when the "jury was not asked to decide whether [the defendant] knew that the statements were false, but spread them anyway, knowing they would harm [the plaintiff]"); *Irvin v. Faller (In re Faller)*, 547 B.R. 766, 771 (Bankr. W.D. Ky. 2016) (holding collateral estoppel did not apply where state court verdict found the defendant liable for defamation per se because the defendant's conduct was potentially reckless, which does not satisfy § 523(a)(6)); *Langan v. Evers (In re Evers)*, 212 B.R. 945, 949 (Bankr. E.D. Wis. 1997) ("Reckless disregard may be sufficient to

---

[8] The Heslin/Lewis Fourth Amended Complaint similarly alleges that the Defendant's statements could have been made recklessly: "Defendants' defamatory statements were knowingly false **or** made with reckless disregard for the truth or falsity of the statements at the time that statements were made." (Doc. 29-8 at ¶ 92 (emphasis added)).

establish libel but it is not sufficient to establish maliciousness under § 523(a)(6).”); *O'Gara v. Hunter (In re Hunter)*, 610 B.R. 479, 509 (Bankr. M.D.N.C. 2019) (“Plaintiffs plausibly pleaded actual malice under California law, but actual malice is a broader scienter requirement than that found in willful and malicious under § 523(a)(6).”); *Merritt v. Rizzo (In re Rizzo)*, 337 B.R. 180, 189 (Bankr. N.D. Ill. 2006) (stating “defamatory statement is not ‘malicious’ unless the debtor knew the statement was false when he made it”); *Jefferson v. Holland (In re Holland)*, 428 B.R. 465, 474 (Bankr. N.D. Ill. 2010) (same).

64.     The Motion erroneously cites to *Khionidi v. Cummins-Cobb (In re Cummins-Cobb)*, Adv. No. 2:18-ap-01066-RK, 2020 WL 634140 (Bankr. C.D. Cal. Feb. 10, 2020), and *Purser v. Scarbrough (In re Scarbrough)*, 516 B.R. 897, 912-13 (Bankr. W.D. Tex. 2014). *Cummins-Cobb* does not stand for the proposition that a finding of willful and malicious under § 523(a)(6) is essential to a defamation judgment under Texas law. (Doc. 27 at 32-33). Rather, the *Cummins-Cobb* court, deciding ***defendants'*** motion for summary judgment, based its holding on the trial court’s finding that the plaintiff had “clearly proven that a defamation in this case was *egregious as well as malicious as well as intentional*.” *Id.* at *9 (“The comments [Defendant] made about [Plaintiff] leave no doubt that [Defendant] had a specific intent to cause substantial injury or harm to [Plaintiff].” (quoting *Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at *24 (Tex. App.—Fort Worth Apr. 9, 2015, pet. denied) (mem. op.)). Further, the Texas Court of Appeals found that the trial court’s defamation judgment was supported by clear and convincing evidence of actual malice.  *Id.* at *8.

65.     *Cummins-Cobb* is distinguishable. First, this is Movants’ motion for summary judgment, so all inferences are drawn to the benefit of Defendant, unlike in *Cummins*. Second, unlike the defendant in Cummins-Cobb, who was afforded a full trial on the merits that proved he

acted with specific intent rather than mere recklessness, Defendant had no opportunity to fully and

fairly litigate his case. Third, the Heslin/Lewis jury never received any instruction on the clear and

convincing evidentiary standard required to award exemplary damages, nor any instruction to find

that the exemplary damages could exceed the statutory cap beyond a reasonable doubt.

      66.    Moreover, *In re Scarbrough*, cited in the Motion, applied collateral estoppel to a

jury finding that the debtor (an attorney) committed "willful, malicious and deliberate

defamation," finding both defamation and defamation per se. 516 B.R. at 912. However,

*Scarbrough* is factually distinguishable. *Scarbrough* applied collateral estoppel to a judgment

based upon a jury trial on the merits, not a default judgment and heavily restricted damages trial.

Further, the record was replete with recorded statements of the debtor's own testimony to his

unfounded beliefs. As an attorney, the debtor lied to the state court regarding the existence of

recordings, filed requests for relief without his client's consent, made false murder accusations to

force an autopsy, served sexually inappropriate discovery to a dead man, and conspired with his

client to make false death-threat allegations.

      67.    That same procedural posture and record is not present here. No direct evidence of

Defendant's willful and malicious intent to injure is referenced in the Motion. Defendant was not

allowed to testify to his culpability in the Heslin/Lewis Action and has not yet been afforded the

opportunity to do so in the Pozner/De La Rosa Action. He presents his sworn declaration to this

Court as evidence that he never said anything on air about the Sandy Hook shooting that he did

not believe to be true, and he never intended to cause any harm to Movants with his statements.

(Jones Decl. at ¶ 17). Indeed, the state-court judge below recognized Defendant's subjective belief

in the veracity of his statements: "Yes, you believe everything you say is true, but it isn't." (Doc.

29-49 at 203:1-2). Accordingly, *Scarbrough* is readily distinguishable from this case.

**b. The Jury Charges instructed the Heslin/Lewis jury that it could find Defendant liable for IIED based on reckless conduct, which cannot support a finding of "willful and malicious injury" under § 523(a)(6).**

68.     Finding willfulness and maliciousness was similarly not essential to the Heslin/Lewis Jury Charge on IIED. Like defamation with actual malice, the tort IIED can be committed with a reckless act. *See Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017) (stating that the first element of IIED is that a defendant must have acted intentionally *or* recklessly). To that end, the charge to the jury on IIED acknowledged that the Defendant could have acted recklessly:

> You are instructed that Defendants Alex Jones and Free Speech Systems, LLC committed intentional infliction of emotional distress against Neil Heslin and Scarlett Lewis in a continuing course of conduct from 2013 to 2018.
>
> "Intentional infliction of emotional distress" means the defendant acts *intentionally or recklessly* with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by plaintiff was severe.

(Doc. 29-5 at 7, Jury Charges, Cause of Action No. 2 – Intentional Infliction of Emotional Distress Committed Against Neil Heslin and Scarlett Lewis) (emphasis added). The State Court instructed the Heslin/Lewis jury that the Defendant could have acted recklessly in committing the tort of IIED against Heslin and Lewis. Importantly, however, a "judgment for . . . intentional infliction of emotional distress . . . 'without additional specific findings [as to intent], do[es] not establish that the defendant acted willfully and malicious[ly] under section 523(a)(6).'" *Mahadevan*, 617 F. Supp. 3d at 664-65 (first alteration in original) (quoting *Stewart v. Kauanui* (*In re Kauanui*), Adv. No. 14-90018, 2015 WL 359088, at *3 (Bankr. D. Haw. Jan. 23, 2015)).

69.     An in-depth analysis of *Mahadevan* is highly relevant to this case. In *Mahadevan*, the plaintiff sued the defendant under California law for negligence, defamation, and intentional infliction of emotional distress after the defendant, the plaintiff's former academic advisor, accused the plaintiff of plagiarizing two scientific papers. *Id.* at 657. At trial, the jury found for the

plaintiff, awarding compensatory and exemplary damages. *Id.* After the defendant filed for bankruptcy, the plaintiff filed an adversary proceeding, seeking to declare the judgment nondischargeable pursuant to § 523(a)(6). *Id.* at 658. The bankruptcy court granted the plaintiff's motion for summary judgment finding that collateral estopped barred the defendant from relitigating the state-court judgments because the jury had already determined that the defendant's conduct in incurring the debt was willful and malicious. *Id.*

70.     On appeal, the District Court for the Southern District of Texas reversed the bankruptcy court, finding that because the jury was instructed that the defendant could have been held liable if the jury found that he acted intentionally ***or*** with reckless disregard, then the issue of willful and malicious conduct had not been necessarily decided in the California state-court case because "[d]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 664 (quoting *Kawaauhau*, 523 U.S. at 64). The court further reasoned that "jury instructions and the verdict form d[id] not, alone, support the finding that Mahadevan acted with an intent to harm." *Id.* at 665. While acknowledging that courts can look beyond the judgment and instructions to see if there was evidence in the state-court proceedings that support a finding of intent, the district court found that the plaintiff did not attach any such evidence to his motion for summary judgment, depriving the bankruptcy court of that record to evaluate. *Id.* The court thus reversed and remanded the case back to the bankruptcy court for further proceedings. *Id.* at 667.

71.     The same situation is present here.[9] The Defendant was held liable pursuant to a jury charge that allowed the jury to find that he acted recklessly or intentionally. (Doc. 29-5 at 7).

---

[9] While the *Mahadevan* court was applying California law, California, like Texas, requires a litigant to show that an issue was necessarily decided in the former proceeding for collateral estoppel to apply. Moreover, California law, like Texas law, requires only reckless conduct for the tort of IIED.

Moreover, like the plaintiff in *Mahadevan*, Heslin and Lewis did not attach any evidence from the record that shows Defendant acted intentionally. While Heslin and Lewis did attach a litany of documents from the Heslin/Lewis Action, nothing attached is competent evidence that Defendant acted intentionally to cause emotional distress. In fact, the opposite is true. Defendant held a sincere belief, misguided as it was at the time, that the official narrative of the Sandy Hook Shooting was inaccurate. (Jones Decl. at ¶ 17).

72.     Accordingly, because the Heslin/Lewis jury was not required to find that the Defendant acted intentionally in committing the tort of IIED, it did not necessarily decide that the Defendant's conduct caused a "willful and malicious injury" to Heslin or Lewis. *See Gilbert v. Dang (In re Dang)*, 560 B.R. 287, 293 (Bankr. S.D. Tex. 2016) ("Disjunctive jury instructions in state-court judgments make it difficult for a bankruptcy court to give preclusive effect to that judgment in deciding whether the judgment debt is nondischargeable."); *see also Doughty v. Hill (In re Hill)*, 265 B.R. 270, 276-77 (Bankr. M.D. Fla. 2001) ("Because the jury's finding of [IIED] could have based upon a finding of reckless disregard, the elements of [IIED] under California law do not closely mirror the requirements for excepting a debt from discharge under § 523(a)(6). Accordingly, collateral estoppel does not apply to the jury's finding of [IIED]. The Court need not address whether the remaining requirements of collateral estoppel, as to the [IIED], are met."); *B.B. v. Bradley (In re Bradley)*, 466 B.R. 582, 589 (B.A.P. 1st Cir. 2012) ("If the judgment were based upon reckless disregard, a 'strong probability' is not identical to 'substantial certainty.'").[10]

---

[10] As the foregoing authorities indicate, courts will generally refuse to apply collateral estoppel to a state court IIED judgment in a nondischargeability action if the state allows the tort to be committed by reckless disregard and there is no other evidence of specific intent. Movants, however, cite to Collier on Bankruptcy § 523.14[4] (16th ed. 2012), for the proposition that claims based on intentional infliction of emotional distress "have typically been held nondischargeable." (Doc. 27 at 33). For this claim, Collier cites to one case from 1981 that did not involve the application of the doctrine of collateral estoppel, but rather, was decided after a full evidentiary hearing in front of the bankruptcy court. *Joyce v. Berberian (In re Berberian)*, 12 B.R. 465, 469 (Bankr. D.R.I. 1981). This statement in Collier does not contain source cites to any binding or instructive proposition on this issue.

     **c.   The Heslin/Lewis jury received the same instructions on exemplary damages as it did for the substantive claims, so the same analysis from above applies to the award of exemplary damages.**

73.     The Heslin/Lewis jury's finding for exemplary damages[11] does not change the analysis. For exemplary damages related to the claim of defamation, the Heslin/Lewis jury was again given the actual malice jury charge and instructed that Defendant either knew his statements were false or had a high degree of awareness that they were false. (Doc. 29-6 at 5). The Heslin/Lewis jury was then instructed to award Mr. Heslin exemplary damages for the Defendant's conduct considering the following factors:

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of the wrongdoer.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Defendants.

(*Id*. at 6).

74.     As the instructions indicate, the jury was only required to find that the Defendant committed defamation with actual malice, not specific intent. Further, under Texas law, actual malice is all a plaintiff is required to prove to recover exemplary damages. *See Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013) ("recovery of exemplary damages are appropriately within the guarantees of the First Amendment if the plaintiff proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice."). [12] Accordingly, as described above, actual malice will not support a finding of willfulness and maliciousness under § 523(a)(6).

---

[11] Technically, the jury found Defendant liable for exemplary damages. In Texas, exemplary damages "means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages. 'Exemplary damages' includes exemplary damages." Tex. Civ. Prac. & Rem. Code § 41.001(5).

[12] Despite requiring a clear and convincing evidence standard for exemplary damages, the Heslin/Lewis jury charge never mentioned this heightened evidentiary burden, failing on its face to support awarding exemplary damages.

75.     Similarly, for exemplary damages related to the claim of IIED, the Heslin/Lewis jury was instructed that the Defendant acted intentionally or recklessly to cause Heslin and Lewis's emotional distress. (Doc. 29-6 at 7). The Heslin/Lewis jury was then instructed to award Heslin and Lewis exemplary damages based on the IIED instruction against the Defendant using the same factors as those in the defamation charge. (*Id.* at 8). Thus, the same analysis from the IIED claim applies to the exemplary damages award for IIED: because the jury in the Heslin/Lewis Action was not required to find that Defendant acted intentionally when committing the tort of IIED, it did not necessarily decide that Defendant's conduct caused a "willful and malicious injury" to Heslin/Lewis.

76.     Finally, Heslin and Lewis argue that because their jury awarded each of them exemplary damages in excess of the statutory cap that means that the jury necessarily found that Defendant acted knowingly or intentionally in injuring them. (Doc. 27 at 35). But the jury did not find that Defendant acted knowingly or intentionally because such issue was never presented to the jury. Heslin and Lewis never sought relief that would exempt their exemplary damages from the statutory cap until ***after the Jury Charges*** were completed by the jury. In fact, Heslin and Lewis recognize as much in both their Statement and their Motion. (Doc. 28 at 18 ("Although exemplary damages are normally capped by Texas statute, ***the court found*** a statutory exception to the cap applied . . . ." (emphasis added))); (Doc. 27 at 19-20 (same)).

77.     However, even that statement is not quite accurate. The court did not make a finding anywhere in the Final Judgment that Defendant acted intentionally or knowingly. Rather, the state-court judge stated the following:

> The jury's findings, along with the Court's default judgment and resulting admissions, entitle Plaintiffs Neil Heslin and Scarlett Lewis to a judgment against Defendants Alex E. Jones and Free Speech Systems, LLC as set forth in their Fifth

Amended Petition. Alternatively, to the extent that a necessary element of their recovery has been omitted, the Court implies a finding to support it.

(Doc. 29-7 at 2). While the Final Judgment does not mention what is in the Fifth Amended Petition that differentiates it from any of the prior versions, it appears that the state court permitted the petition to be amended after the verdict was rendered to add a claim that qualified.[13]

78.     If Heslin and Lewis are trying to argue that the Fifth Amended Petition included some claim that would negate the statutory cap on exemplary damages, such a finding would have to be made by a jury:

> Before a court will apply the exception to the statutory damage cap in section 41.008(c), a plaintiff must obtain jury findings that the defendant violated one of the criminal code provisions listed in the statute, and that the violation was committed knowingly or intentionally. . . . The finding of fraud, malice, or gross negligence necessary to obtain exemplary damages is not sufficient to evoke the exception to the statutory damage caps because the application of the exception under these circumstances would be inconsistent with the statutory scheme of limiting exemplary damages even when fraud, malice, or gross negligence has been proven by clear and convincing evidence.

*Madison v. Williamson*, 241 S.W.3d 145, 161 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Moreover, the jury is required to make this special finding beyond a reasonable doubt. *Id.* (citing *Mission Res., Inc. v. Garza Energy Tr.*, 166 S.W.3d 301, 315 (Tex. App.—Corpus Christi 2005, pet. granted) *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008)).

79.     A simple review of the jury charge shows the Heslin/Lewis jury never considered whether Defendant acted intentionally or knowingly, nor was instructed to make any finding

---

[13] The state court, in its Final Judgment, referred to Helsin and Lewis's operative Petition as the Fifth Amended Petition. However, Movants here attached a document titled Fourth Amended Petition to their Motion. (*See* Doc. 29-8). Defendant presumes that the document that is attached to Movants' Motion was mislabeled below and is indeed the operative Petition from the state-court proceedings. If that is not the case, however, and Movants failed to attach the operative Petition, then the Court should disregard all the citations to the Heslin/Lewis Petition in the Motion and Statement. *Caprock Constr. Co. v. Guaranteed Floorcovering, Inc.*, 950 S.W.2d 203, 204 (Tex. App.—Dallas 1997, no writ) ("[W]hen a plaintiff files an amended petition, the new pleading supplants all earlier petitions—the earlier petitions are no longer part of the pleadings.").

beyond a reasonable doubt, in violating a criminal statute that would except him from the statutory exemplary damages cap. (Doc. 29-6).

80.     It is tough to make sense of Heslin and Lewis's exact argument. But if they argue that the State Court "implied a finding to support" that Defendant violated a criminal statute beyond a reasonable doubt when the underlying state law clearly states that a jury must do so, such a finding cannot be given preclusive effect. See *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and . . . federal courts are not required to accord full faith and credit to such a judgment.").

81.     Moreover, the Heslin/Lewis Amended Petition alleges that Defendant could have violated the criminal code recklessly:

> The allegations of this Petition involve conduct which violates Texas Penal Code Sec. 22.04, relating to injury to a disabled individual. Plaintiffs have alleged through this Petition that Defendants intentionally, knowingly, ***or recklessly*** caused serious mental deficiency, impairment, or injury to disabled individuals. Prior to the injuries caused by Defendants in this case, Plaintiffs were disabled as they were already suffering from severe emotional disturbance.

(Doc. 29-8 at 26 (emphasis added)). Thus, not even Heslin and Lewis's own allegation in their Amended Petition supports a finding of willfulness or maliciousness under § 523(a)(6).

### d.  The Default Judgments cannot deem petition allegations admitted.

82.     Movants contend that because the State Court entered a liability Default Judgments against Defendant, all the allegations in the state-court petitions are deemed admitted and have preclusive effect. (Doc. 27 at 36). This contention is wrong under applicable Texas law and contradictory to what Movants argued in their "actually litigated" section. As detailed above, Texas courts have found that a no-answer default judgment is an admission of liability upon a cause of action if the action is properly alleged in plaintiff's petition." *Fleming Mfg.*, 734 S.W.2d

at 408. However, "[a] post-answer 'default' constitutes neither an abandonment of defendant's answer nor an implied confession of any issues thus joined by defendant's answer. Judgment cannot be entered on the pleading, but the plaintiff in such a case must offer evidence and prove his case as in a judgment upon a trial." *Stoner*, 578 S.W.2d at 682.

83.     To satisfy the "actually litigated" element of collateral estoppel, Movants argued that Defendant's default was a post-answer default. (Doc. 27 at 28-32). However, in a post-answer default judgment, "the court may not enter judgment based solely upon the pleadings." *In re Pancake*, 106 F.3d at 1245 (applying Texas law). Thus, Movants' attempts to use the allegations from their state-court petitions to "settle[]" the issue that Defendant's statements were "knowingly false" are misguided. (Doc. 27 at 33).

84.     Movants cannot have it both ways. Either Defendant's Default Judgments were no-answer defaults where all the allegations in the petitions were deemed admitted but the Judgments lacks preclusive effect, or the Default Judgment was a post-answer default, and the allegations of the petitions are not deemed admitted. Movants must choose one path or the other.

85.     Tellingly, the cases cited by Movants to support that all the allegations of their petitions are deemed admitted for purposes of collateral estoppel are all no-answer default cases. *See, e.g.*, *Jackson v. Biotronics, Inc*., 937 S.W.2d 38, 41 (Tex. App.—Houston [14th Dist.] 1996, no writ) ("This is an appeal by writ of error of a no answer default judgment. . . ."); *Fleming Mfg.*, 734 S.W.2d at 406 ("No answer was filed."); *Gonzalez v. Hibernia Nat. Bank in Texas*, No. 05-92-02355-CV, 1993 WL 265454, at *2 (Tex. App.—Dallas July 16, 1993, no writ) ("Gonzalez's failure to answer Hibernia's petition and the subsequent default judgment against him also establish his liability."); *Caton v. Trudeau (In re Caton)*, 157 F.3d 1026, 1029 (5th Cir. 1998) (applying **Illinois law** to a case where the defendant "failed to respond to [the plaintiff's] claims").

As such, the allegations in the petitions are not admitted as to Defendant and cannot preclude trial on the merits.

86.     Alternatively, even if the Court allowed Movants to rely on their state-court petitions' allegations, Movants only cite to legal conclusions contained therein rather than well-pleaded factual allegations. (See Doc. 27 at 34 (stating that the "Heslin/Lewis Default Judgments settled that [Defendant's] statements were 'knowingly false' . . . his acts were 'intentional' . . . that he made his statements 'knowing they would cause severe emotional distress' . . . and that he 'knew and intended for Movants to suffer emotional distress' in a 'five-year campaign of willful lies and malicious harassment.'" (quoting Doc. 29-8)). Courts "are not bound to accept as true legal conclusions couched as factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As such, viewing the facts in light most favorable to non-movant, such conclusory statements cannot support collaterally estopping the Defendant from a trial on the merits of § 523(a)(6).

### e.  Pozner/De La Rosa.

87.     The Pozner/De La Rosa Action has not yet gone to trial. Therefore, no jury has been empaneled to make any findings. Thus, the Pozner/De La Rosa Default Judgments, are the sole grounds for collateral estoppel. The same arguments presented for the Heslin/Lewis Action apply to Pozner and De La Rosa, except no jury was ever empaneled and no fact-finder ever sat in judgment of the claims they made against Defendant. Pozner and De La Rosa brought the same defamation and IIED claims, alleging that Defendant could have committed those torts with a culpability standard of recklessness. (Doc. 29-4 at 21 ("Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made."); *Id.* at 23 ("Defendants made the statements in these broadcasts in bad faith and with malicious motives, knowing the statements were false or in reckless disregard

for the truth."). For the same reasons, section IV(C)(2) is incorporated herein by reference as to Defendant's arguments regarding Pozner and De La Rosa in the Motion.

88.     Finally, to the extent that Pozner and De La Rosa later attempt to amend their petitions to fall within § 523(a)(6), bankruptcy courts will not apply collateral estoppel if it appears that "bankruptcy was anticipated by the parties and the [prior] proceedings [were] skewed with the specific intention to obtain a non-dischargeable judgment." *Dodson v. Church (In re Church)*, 69 B.R. 425, 431-32 (Bankr. N.D. Tex. 1987).

### 3. The doctrine of collateral estoppel must give way when the convenience it affords is outweighed by questions concerning the quality, extent, or fairness of the prior proceeding.

89.     Evaluating whether to apply collateral estoppel also involves considerations of fairness not encompassed by the "full and fair opportunity" inquiry. *Trapnell*, 890 S.W.2d at 804. Collateral estoppel's goal is to limit relitigation of issues without compromising fairness. *Trapnell*, 890 S.W.2d at 804 (citing *Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 328 (1971)). Accordingly, a court has broad discretion to decide if fairness outweighs the convenience of collateral estoppel. *Id*. Redetermining issues is warranted if there are doubts about the quality, extent, or fairness of procedures followed in previous litigation. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 7 (Tex. 1986) (quoting Restatement (Second) of Judgments § 28); *see also Montana v. United States*, 440 U.S. 147, 164, n.11 (1979).

90.     Here, applying collateral estoppel would be unfair. First, the State Court entered Default Judgments against Defendant based, in whole or in part on the actions of his co-defendants. The only evidence of a discovery abuse attached to the Motion attributable to Defendant personally was a reference to Defendant's faulty memory regarding facts nearly a decade old. *Supra*, ¶ 8. Pozner and De La Rosa attached no evidence to the Motion supporting any allegation of

Defendant's own discovery abuse. *Id.* at ¶ 5-6. Neither did Lewis. *Id.* at ¶ 2-3. Despite this, the State Court gave Defendant the death-penalty sanction. Under Texas law, a "sanction is just if a direct relationship exists between the offensive conduct and the sanctions imposed." *In re Estate of Preston*, 346 S.W.3d 137, 157 (Tex. App.—Fort Worth 2011, no pet.). Moreover, a "sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. Striking a party's pleadings for discovery abuse is 'the most devastating' sanction a trial court may impose and may only be imposed in 'exceptional cases' where they are 'clearly justified.'" *Id.* (quoting *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 728-29 (Tex. 1993)).

91.     In the Heslin/Lewis Action, if the Court believed Defendant's answers were too evasive, it could have allowed Heslin an adverse inference that Defendant did not have any actual sources. Instead, the court imposed the "most devastating sanction" allowed under Texas law. The only conclusion to draw is that Defendant was punished for his co-defendants' conduct, for unspecified "public threats," and for expressing frustration over the unfairness he perceived he was receiving in the state court by calling the proceedings "show trials." (Docs. 29-3; 29-41). The minimal evidence supporting the default is appropriate for this Court to weigh when evaluating collateral estoppel.

92.     Second, the State Court precluded Defendant from testifying on his level of culpability at his damages trial. (Doc. 29-46 at 200:14-22). Defendant presented this argument above and incorporates it here by reference. It would be inherently unfair to apply collateral estoppel to Defendant's level of culpability when he was not allowed to testify to it in the Heslin/Lewis Action.

93.     Third, Texas law requires exemplary damages to be proved by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003; *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 867 (Tex. 2017). But the jury was not instructed to find the requisite level of culpability by clear and convincing evidence. While Defendant is not asking this Court to act as an appellate court on this issue, this Court should take this fact into account when evaluating the fairness of applying collateral estoppel to the Jury Charges and Final Judgment.

94.     Finally, the state-court in the Heslin/Lewis Action found that the exemplary damages cap did not apply to Defendant due to a statutory exception not pled in the Heslin Action at the time of the jury verdict. (Doc. 29-6 at 2). The State Court made such finding itself even though Texas law requires a jury to make such a finding beyond a reasonable doubt. Defendant makes this argument above and incorporates it here. This fact certainly should be considered under the fairness inquiry.

95.     On balance, many factors weigh against the fairness of applying collateral estoppel to the Default Judgments and Final Judgment. The absence of evidence that the death penalty discovery sanctions were the narrowly tailored remedy for any finding of the Defendant's inability to remember his sources for a near-decade old story alone supports a finding that collateral estoppel should not be applied. Moreover, limiting Defendant's ability to testify to his intent, failing to properly instruct the jury on the burdens of proof to award exemplary damages, or even presenting the statutory exception question to the jury to support exceeding the damages cap beyond a reasonable doubt all present fairness questions when seeking to apply collateral estoppel to the Default Judgments and Final Judgment.

**4. The Final Judgment violates the First Amendment and is thus not entitled to the preclusive effect of collateral estoppel via the Full Faith and Credit statute, codified at 11 U.S.C. § 1738.**

96.     If this Court determines that collateral estoppel would otherwise apply to the State Court Judgment, that does not end the inquiry.[14] Federal courts are not required to give full faith and credit to unconstitutional state court judgments under 11 U.S.C. § 1738. Section 1738 provides that properly authenticated state court judgments "shall have the same full faith and credit in [federal court] as they have by law or usage in the courts of such State … from which they are taken." Under this statute, principles of collateral estoppel derived from state court law generally apply to issues in federal bankruptcy dischargeability proceedings. *In re Huizar*, 609 B.R. at 489-90. However, there are exceptions to this general rule.

97.     One such exception arises from the Constitution. As Justice Ruth Bader Ginsburg stated, "[e]very State's law on the preclusiveness of judgments is pervasively affected by the supreme law of the land." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 395 (1996) (Ginsburg, J., dissenting). Accordingly, "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and … federal courts are not required to accord full faith and credit to such a judgment." *Kremer*, 456 U.S. at 482. It follows then that whether to grant full faith and credit to a state court judgment is determined independently of the judgment. Even "if state law indicates that a particular … issue would be barred," the federal court must still independently determine if the constitutional exception to full faith and credit under § 1738 should apply. *Cf. Marrese*, 470 U.S. at 383.[15]

---

[14] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 383 (1985) ("Reference to state preclusion law may make it unnecessary to determine if the federal court, as an exception to § 1738, should refuse to give preclusive effect to a state court judgment. The issue whether there is an exception to § 1738 arises only if state law indicates that litigation of a particular claim or issue should be barred in the subsequent federal proceeding.").

[15] Like in the case of judicial review, applying the exception to full faith and credit should require an "independent second opinion when free speech is curtailed." *Cf. Gleason v. Smolinski*, 125 A.3d 920, 933-34 (Conn. 2015).

      **a.   The First Amendment protects against tort claims that intrude on free speech.**

98.    Speech on matters of public concern is protected by the First Amendment and shielded from tort liability. The determination of whether speech falls into the category of public concern involves evaluating the content, form, and context of the speech. In the case of *Snyder v. Phelps*, the Supreme Court held that the Westboro Baptist Church's protest, although offensive and hurtful to grieving parents, addressed broader public issues, rather than purely private matters. 562 U.S. 443, 451 (2011). The Court emphasized that even controversial speech should be tolerated to preserve the freedoms protected by the First Amendment.

99.    Speech on public issues is granted broad protection under the First Amendment to ensure that courts do not inadvertently act as censors, as open and uninhibited discussion of public matters is essential to self-government. *Id.* at 451-52. The crude or controversial nature of a statement is irrelevant in determining whether it deals with a matter of public concern. *Id.* at 453. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

100.    To ascertain whether speech is of public or private concern, courts must examine the content, form, and context of the speech by conducting an independent evaluation of the entire record to ensure that the judgment does not infringe on the realm of free expression. *Snyder*, 562 U.S. at 453-54. No single factor is conclusive, and the circumstances surrounding the speech, including what was said, where it was said, and how it was said, must be evaluated. *Id.* at 454. In doing so, courts must be mindful that "the point of all speech protection" is protecting speech that someone finds disagreeable—universally appealing speech does not require any constitutional safeguarding. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

101.    Under this legal standard, the U.S. Supreme Court, in an 8-1 decision, overturned a state-court judgment for intentional infliction of emotional distress, which awarded substantial compensatory and exemplary damages to the father of a fallen soldier. The judgment arose from a protest conducted by the Westboro Baptist Church during the soldier's funeral. The church members, positioned outside the funeral, held signs with inflammatory messages falsely suggesting that the soldier was a homosexual destined for hell and expressing offensive viewpoints, including "Thank God for Dead Soldiers," "Thank God for 9/11," "Thank God for IEDs," and "You're Going to Hell." Although the father did not see the signs during the funeral procession, he witnessed them on a news broadcast later, causing severe emotional distress. *Snyder*, 562 U.S. at 456.

102.    In overturning the judgment, the Court reasoned that the content of the signs related to broad societal issues rather than matters of purely private concern. Although some signs and online posts were directed at private individuals, the predominant focus of Westboro's demonstration—while crude and inartful—addressed public issues, such as "the political and moral conduct of the United States and its citizens, the fate of our Nation, [and] homosexuality in the military." *Snyder*, 562 U.S. at 454. Nothing suggested a "pre-existing … conflict between [the parties] that might suggest Westboro's speech on public matters was intended to mask an attack on [the father] over a private matter." *Id.* at 455.

103.    The Court further noted that Westboro had engaged in similar forms of speech on numerous occasions, deliberately aiming to reach a wide audience. *Id.* at 454. They did so not only by directly protesting hundreds of funerals, but also exchanging airtime on news shows for cancelling protests at the funeral "of five Amish girls killed by a crazed gunman" and "of a 9–

year–old girl killed in the shooting spree in Tucson" where the church members planned to "proclaim[] that she was 'better off dead.'" *Id.* at 468 (Alito, J. dissenting).

104.    The hurtful and offensive nature of the speech, while acknowledged, failed to justify restricting protected speech merely because it causes distress. The Court reasoned that "any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed." *Id.* at 443. Given the undisputedly "outrageous" nature of the speech, a factfinder is "unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Id.* at 458 (cleaned up). "Such a risk is unacceptable," as a free society "must tolerate insulting, and even outrageous, speech … to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 458 (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

**b.  Defendant's speech is protected from tort liability by the First Amendment.**

105.    Under the same standard, the speech here must also be regarded as protected by the First Amendment. Upon evaluating all the circumstances surrounding the speech—its content, form, and context—it becomes evident that the speech was directly related to a matter of significant public concern and legitimate news interest, rather than purely private matters.

106.    Regarding the form of the speech, it is crucial to note its medium as pure speech on a radio show. In *Snyder*, Justice Samuel Alito, the sole dissenter, provided examples of forms that would not violate the Constitution, such as creating and disseminating video and audio recordings, posting messages on the internet or sending emails, or appearing on television and radio shows. 562 U.S. at 463 (Alito, J. dissenting). From this, we can conclude that, had the Westboro Baptists' speech been limited to a radio show or internet postings rather than an in-person protest at a funeral, the *Snyder* opinion would have been unanimous.

107.    As to context, the speech in question was expressed during a radio show that had been on the air for many years. Throughout these years, the show consistently addressed themes of broad public concern. The program's overall focus revolved around individual liberties, the nation's safety, political and moral decline, and hypervigilance against a government Defendant perceived as deceitful. It hits hard at the government and those in power Defendant believes seek to curtail individual rights if not outright control the population, often referred to as the "deep state."

108.    The show's heated style and uncomfortable content often elicit disapproval, disagreement, and scorn. Overall, the show blends reporting, opinion, sarcasm, satire, devil's advocacy, and hyperbole. The show's audience knows this. So do people outside the audience. The show often hosts government dissenters, including individuals like Defendant, who are often seen as outside the mainstream. It has also hosted a presidential candidate. And, as Movants emphasize, there is a substantial audience that appreciates and engages with the show's content. Over decades of programming, both before and after Sandy Hook, Defendant discussed various government conspiracy theories, such as FBI involvement in the 1999 WTO protests, the 9/11 terrorist attacks, weapons of mass destruction in Iraq, the Clinton Foundation, and the origins of COVID-19 and its vaccines. (Jones Decl. at ¶¶ 6-10).

109.    Defendant's initial suspicions regarding Sandy Hook were no different. When examining its content in context, it becomes clear that the speech's target remains the same: the government and the "deep state." The overall thrust of the content aligns with this focus. It emphasizes that when the government seeks to exploit an event to restrict individual liberties, the American people must thoroughly and vigorously question the event. For example, when the government used the 9/11 attacks to justify surveillance on law-abiding citizens, Defendant

questioned the official narrative. *See* U.S.A. PATRIOT ACT, Title II, "Enhanced Surveillance Procedure," 115 Stat. 272 (2001). When the government claimed the existence of weapons of mass destruction in Iraq as a basis for war, Defendant questioned that claim—and he has also questioned the government's justification for other foreign interventions. Similarly, when the government imposed what Justice Gorsuch recently described as "the greatest intrusions on civil liberties in the peacetime history of this country" following the government's use of COVID-19 to lockdown the country and inject every citizen with an up-to-that-point-unheard-of substance, the defendant questioned. *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023). And when the government attempted to curtail Second Amendment rights following the Sandy Hook incident, Defendant questioned the event, focusing on government deceit and gun control policies rather than targeting specific individuals. (Jones Decl. at ¶¶ 11, 17).

110.     It is not the event that is key to Defendant's broadcast topics, but the government's response to that event. The government's responses—be it war, gun control, lockdowns, injections, foreign interventions—are matters of public concern. It can hardly be said that Sandy Hook was not a matter of public concern. The incident sparked a nationwide debate on gun control, which was within the overall theme of the show presented in the usual style. Clearly, many consider this style extreme and outrageous. Defendant sincerely believes that the moment rigorous critique and calls for investigation on any topic become off-limits, it will be precisely that topic that totalitarian regimes will exploit. Defendant further believes that "[i]f questioning public events and free speech is banned because it might hurt somebody's feelings, we are not in America anymore." And the U.S. Supreme Court agrees: "[a]s a Nation we have chosen … to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 443.

111.    As we learned in *Snyder*, courts may not isolate individual statements that suggest a private personal attack but must instead determine the overall thrust and dominate theme of the speech from the totality of the circumstances. Movants imply the whole show was about them, but that is not the case. Further, nothing here suggests a pre-existing conflict between Defendant and Movants that would indicate his speech on public matters was intended to mask a personal attack.

112.    Furthermore, any distress caused by Defendant's speech is directly related to the content and viewpoint of the message conveyed. *Id.* at 457. Some speech will certainly test a court's commitment to the First Amendment. But a court may not act as an "instrument for suppression" or, at best, an "inadvertent censor." The First Amendment does not ask courts to the applaud the message—surely the Supreme Court was not condoning that anyone "F--- the Draft" in *Cohen v. California*, 403 U.S. 15, 16 (1971). Rather, such speech "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. Overall, when considering the form, context, and content of the speech: the radio show format, the consistent themes of public concern, and Defendant's intention to critique government actions all contribute to the speech's protected nature.

113.    To be clear, Defendant is not seeking judicial review. It is recognized that the bankruptcy cannot modify or overturn the Final Judgment even if it is unconstitutional. A debtor may nonetheless voluntarily seek to discharge an unconstitutional judgment in bankruptcy. *Kremer*, 456 U.S. at 482. This argument is presented solely for the purpose of determining whether to apply collateral estoppel under the full faith and credit statute. Because Movants have not introduced sufficient evidence to even begin this analysis, summary judgment may be denied for this reason alone.

**D.  The state court record does not establish "willful and malicious injury" under §523(a)(6)**

114.    Finally, Movants argue that even if the court sets the doctrine of collateral estoppel aside, it should still grant them summary judgment based on the doctrine of judicial notice because the state-court records establish non-dischargeability. (Doc. 27 at ¶¶ 86-91). Movants then rely almost exclusively on allegations from their state-court petitions. (Doc. 27, ¶¶ 96-99). Movants appear to misunderstand the role of judicial notice. Rule 201 of the Federal Rules of Evidence provides that a court *may* take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Fed. R. Evid. 201. However,

> even though a court may take judicial notice of a document filed in another court ... to establish the fact of such litigation and related filings, a court cannot take judicial notice of the factual findings of another court. This is so because (1) such findings do not constitute facts not subject to reasonable dispute within the meaning of Rule 201; and (2) were [it] permissible for a court to take judicial notice of a fact merely because it had been found to be true in some other action, the doctrine of collateral estoppel would be superfluous.

*Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (internal citations and quotations omitted) (alteration and ellipses in original). Thus, judicial notice is not an appropriate procedural vehicle for this Court to evaluate the evidence attached to Movants' Motion.

115.    To give Movants the benefit of the doubt, it is possible they meant that even if collateral estoppel does not preclude relitigation of the State-Court Judgments, it does preclude relitigation of the facts established in the State Court. Assuming that is the case, then this section of Movants' Motion does not differ in any substantive way from its previous section. Even so, Movants only cite to their state-court petitions as their evidence. Defendant has already explained above why the Court should not consider the facts of Movants' state-court petitions to be admitted if it decides the State-Court Actions were post-answer defaults and similarly explained why the

Court cannot take legal conclusions as true regardless even if the doctrine of collateral estoppel applies. To the extent it is applicable here, Defendant incorporates it into this section.

116.    Additionally, because material is viewed in the light most favorable to the non-moving party, summary judgment is generally ill-suited for resolving cases involving allegations of intent. *Cooper Tire*, 423 F.3d at 459; *In re Swirsky*, 372 B.R. at 565. Here, Defendant has attached his own sworn declaration testifying that he never said anything about the Sandy Hook shooting that he did not believe to be true and that he never intended to cause Movants any harm. (Jones Decl. at ¶ 17). *See In re Holland*, 428 B.R. at 474 (holding that "defamatory statement is not 'malicious' unless the debtor knew the statement was false when he made it"). The state-court judge in the Heslin/Lewis Action also recognized the sincerity of Defendant's factual inaccuracies. (Doc. 29-46 ("Yes, you believe everything you say is true, but it isn't.")). In contrast, Movants have not attached any admissible evidence that proves Defendant had the requisite intent for a finding of "willful and malicious injury" under § 523(a)(6).[16]

## V.    CONCLUSION

117.    Finding a debt nondischargeable is an exception to the general rule the gives the Defendant a fresh start, allowing him to utilize the Bankruptcy Code for the purpose of paying his disposable income and value of his nonexempt assets over a reasonable period of time to satisfy his debts. In this case, those debts arise nearly exclusively from tort claims of defamation and intentional infliction of emotional distress, where he has never had an opportunity to testify to his culpability (and Movants have never had to litigate proximate cause). Because of this, denying Movants' request to offensively apply collateral estoppel may provide Defendant his only

---

[16] Defendant also notes that Movants' reliance on *Bui v. Do (In re Do)*, Adv. No. 11-01027-CAG, 2013 WL 1429435, at *1 (Bankr. W.D. Tex. Apr. 9, 2013), is completely misplaced. The defendant in *Do* had a trial on the merits in state court on a claim for defamation and then had a trial on the merits in the bankruptcy court to determine whether the debt was dischargeable under § 523(a)(6). *Id.* at *1. That is obviously not the procedural posture of this case.

opportunity to actually litigate the question of his intent and the proximate cause of his actions to their injury.

118.    The Default Judgments are based upon discovery sanctions; however, the record attached to the Motion does not include evidence that Defendant's conduct was so egregious as to apply collateral estoppel to a post-answer default. Without that, no case law exists to deem the Movants' allegations in their petition as true, especially considering their largely conclusory nature. In the single trial held, the jury received insufficient instructions to satisfy § 523(a)(6)'s standard for willful and malicious intent to injure person or property; this is not surprising as those were not essential elements for any of Movants' claims asserted. Those instructions also failed to include proper instructions on burdens of proof, and when the Jury Charges themselves did not fulfill exceptions to vitiate statutory caps on exemplary damages, the State Court found them itself. This calls into question the fairness of the state-court proceedings leading to the Default Judgments and Final Judgments, further cutting against collaterally estopping the Defendant from having a trial on the merits on the § 523(a)(6) issue.

119.    It is not hard to see why a court would want to find against Defendant. To find any means to justify the ends of punishing him. His speech on his show is shocking; his critique of the legal system and the state-court was in poor taste as well as tactically ill-advised. The idea of having a radio personality disbelieve your pain as a grieving family member and for others to send offensive messages is unimaginable.

120.    But the First Amendment must protect offensive speech, if it is to protect any speech at all. Defendant's Sandy Hook skepticism was not unique. He had questioned many events before, centered around his skepticism of government to be straight with its citizens. None of his speech was intended to harm any family member of a victim of violence at Sandy Hook, or anyone

else involved. His bombastic style of delivery is certainly not for everyone, and while most Americans identify him singularly with Sandy Hook, that is drawn more from the mainstream media coverage of his show, not the show itself.

121.    Federal Courts are tasked with determining if state court judgments should be afforded full faith and credit. In a case as emotionally charged as this one, it is certainly understandable that the result could, in retrospect, be unconstitutional. In the event this Court finds itself struggling with the collateral estoppel argument, the constitutionality of using Defendant's free speech as the basis for a tort provides a path to declining to recognize the Default Judgments and Final Judgment as constitutional, providing the Defendant an opportunity to finally defend his statements.

122.    For the foregoing reasons above, Defendant respectfully requests this Court deny Movants' Motion for Summary Judgment (Doc. 27), and grant him such other and further relief, whether in law or in equity, to which he is justly entitled.

Respectfully submitted,

**CROWE & DUNLEVY, P.C.**

*/s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
2525 McKinnon Avenue, Suite 425
Dallas, TX 75201
Telephone: 737- 218-6187
dallaseservice@crowedunlevy.com

-AND-

J. Christopher Davis
Oklahoma Bar #16629 (admitted *pro hac vice*)
Deric J. McClellan
Oklahoma Bar # 32827 (admitted *pro hac vice*)
222 N. Detroit Ave., Suite 600
Tulsa, Oklahoma 74120
Telephone: 737- 218-6187
dallaseservice@crowedunlevy.com

**COUNSEL FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on the 13th day of June 2023, a true and correct copy of the foregoing was served via electronic service on the following:

Jennifer J. Hardy
600 Travis Street
Houston, Texas 77002
Telephone: 713-510-1700
Facsimile: 713-510-1799
Email: jhardy2@willkie.com

AND

Rachel C. Strickland
Stuart R. Lombardi
Ciara A. Sisco
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: rstrickland@willkie.com
slombardi@willkie.com
csisco@willkie.com
*Bankruptcy Co-Counsel to the Texas Plaintiffs*

Avi Moshenberg (Texas Bar No. 24083532)
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street
Suite 2700
Houston, Texas 77002
Telephone: 713-337-5580
Facsimile: 713-337-8850
Email: avi.moshenberg@mhllp.com

AND

Jarrod B. Martin
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street
Suite 1400
Houston, Texas 77002
Telephone: 713-356-1280
Facsimile: 713-658-2553
Email: jarrod.martin@chamberlainlaw.com
*Bankruptcy Co-Counsel to the Texas Plaintiffs*

        */s/ Vickie L. Driver*
        Vickie L. Driver