## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re | |
| Alexander E. Jones, | Bankruptcy |
| | Case No. 22-33553 (CML) |
| Debtor. | |
| | Chapter 11 |
| | |
| Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Estate of Marcel Fontaine, | |
| Plaintiffs, | Adv. Pro. No.: 23-03035 (CML) |
| v. | |
| Alexander E. Jones and Free Speech Systems, LLC, | |
| Defendants. | |

## MOVANTS' REPLY IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

## Table of Contents

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ......................................................................................................2

I.  COLLATERAL ESTOPPEL APPLIES.........................................................2

    A.  Willfulness and maliciousness were fully and fairly litigated. ...........................2

        i.  Jones's willful and malicious injury was properly pleaded in the state-court actions. ....................................................................2

        ii.  The death-penalty sanctions entered against Jones are entitled to preclusive effect..................................................................4

    B.  Willful and malicious injury was essential to the judgments.................................9

        i.  The Pozner/De La Rosa Default Judgment is also entitled to preclusive effect....................................................................15

    C.  Jones's arguments about the "quality, extent, or fairness" of the state-court proceedings are impermissible collateral attacks on the state-court judgments. ........................................................................15

    D.  Jones's Constitutional arguments are an impermissible collateral attack on the state-court judgments and fail on their merits................................................17

II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BASED ON THE FACTS IN THE STATE COURT RECORDS THAT JONES HAS EXPLICITLY ADMITTED OR FAILED TO REBUT IN HIS OPPOSITION....................................20

## Table of Authorities

**Cases**                                                                                          **Page(s)**

*Buckeye Indus., Inc.* v. *Sec'y of Lab., Occupational Safety & Health Rev. Comm'n*,
   587 F.2d 231 (5th Cir. 1979) .............................................................18

*District of Columbia Court of Appeals v. Feldman*,
   460 U.S. 462 (1983) ........................................................................18

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
   544 U.S. 280 (2005) ........................................................................18

*In re Garner*,
   56 F.3d 677 (5th Cir. 1995) .............................................................17

*In re Gober*,
   100 F.3d 1195 (5th Cir. 1996) ............................................... 4, 6, 7, 9

*In re Huizar*,
   609 B.R. 482 (Bankr. W.D. Tex. 2019).................................. 6, 17, 18

*In re Knapper*,
   407 F.3d 573 (3d Cir. 2005) .............................................................18

*Kremer v. Chemical Const. Corp.*,
   456 U.S. 461 (1982)........................................................................19

*Lewis* v. *Green*,
   101 F. App'x 446 (5th Cir. 2004) ....................................................18

*In re Limbaugh*,
   155 B.R. 952 (Bankr. N.D. Tex. 1993) ..............................................6

*In re Mahadevan*,
   617 F. Supp. 3d 654 (S.D. Tex. 2022)........................................ 13, 14

*Migra v. Warren City Sch. Dist. Bd. of Educ.*,
   465 U.S. 75 (1984)..........................................................................16

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................................11

*In re Pancake*,
   106 F.3d 1242 (5th Cir. 1997) ................................................. 7, 8, 9

*Parsons Steel, Inc. v. First Ala. Bank*,
   474 U.S. 518 (1986)........................................................................16

*In re Rabalais*,
    2012 WL 42101 (S.D. Tex. Bankr. Jan. 9, 2012) .....................................................13, 18, 19

*In re Rabalais*,
    496 F. App'x 498 ..................................................................................................................19

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923) .............................................................................................................18

*In re Scarbrough*,
    516 B.R. 897 (Bankr. W.D. Tex. 2014) .............................................................................4, 11

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .............................................................................................................20

*Stoner v. Thompson*,
    578 S.W.2d 679 (Tex. 1979) ..................................................................................................8

*Tarter v. Metropolitan Savings & Loan Ass'n*,
    744 S.W.2d 926 (Tex. 1988) ....................................................................................9, 10, 11

*Wheeler v. Laudani*,
    783 F.2d 610 (6th Cir. 1986) ...........................................................................................13, 14

## Statutes

17 U.S.C. § 1738 ...........................................................................................................................16

Tex. Civ. Prac. & Rem. Code Ann. § 41.001 ...............................................................................12

Tex. Civ. Prac. & Rem. Code Ann. § 41.003 ...............................................................................12

Tex. Civ. Prac. & Rem. Code Ann. § 41.008 ...............................................................................12

Tex. Penal Code Ann. § 6.03 ........................................................................................................12

Plaintiffs Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa ("**Movants**") reply to Alex Jones's summary-judgment response [Docket No. 32] (the "**Response**") in support of their summary-judgment motion [Docket No. 27] (the "**Motion**"):[1]

## PRELIMINARY STATEMENT

1.      Jones's response failed to dispute the material facts. It also failed to dispute the material law, which requires collateral estoppel to apply. Indeed, Jones altogether refused to confront cases *from this Circuit* holding that defamation and intentional infliction of emotional distress judgments are nondischargeable under § 523(a)(6). And he refused to confront the findings from the underlying state-court actions that require summary judgment. Instead, he asks this Court to ignore findings from the state court, claiming that the state-court proceedings were unfair and violated his First Amendment rights. But Jones is making this argument in the wrong forum. This is not an appellate court. Jones will have his chance to appeal the outcomes of the state-court actions. And in the unlikely event the judgments are reversed, then there will be no judgment debt to discharge. But today, the judgments stand and for them to receive the full faith and credit the law requires, collateral estoppel must apply.

2.      Even if collateral estoppel did not apply (and it does), the Court should grant summary judgment. After all, Jones does not dispute the dispositive facts established on the state-court record, which alone demand summary judgment. On the contrary, Jones's own admissions in his declaration [Docket No. 32, Ex. 1] (the "**Jones Declaration**") and in *Defendant's Objections and Responses to Movants' Statement of Uncontested Material Facts and Summary Judgment Evidence* [Docket No. 33] (the "**SUMF Objection**") confirm that summary judgment is warranted. Those admissions include: (1) that by July 2015, Jones "no longer believed that the victims of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Sandy Hook shooting were fake or that their relatives were actors" (Jones Decl. ¶ 14); (2) that over a year later, on November 18, 2016, Jones told his InfoWars audience, "The official story of Sandy Hook has more holes in it than Swiss cheese. . . . If children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real." (SUMF Obj. ¶ 15); and (3) that nearly a year after that, on October 26, 2017, Jones told his InfoWars audience that Ms. De La Rosa's interview was part of the "fake newscasts, with blue screens" and that the school shooting was "phony as a three-dollar bill." SUMF Obj. ¶ 18.

## ARGUMENT

## I. COLLATERAL ESTOPPEL APPLIES.

3.      Jones fails to show that the three prongs of the collateral-estoppel analysis are not met. Nor does he give this Court reason to depart from settled case law holding that default judgments for defamation or intentional infliction of emotional distress are nondischargeable.

### A. Willfulness and maliciousness were fully and fairly litigated.

4.      Jones offers a hodgepodge of unsupported arguments for why his willful and malicious injury of Movants was not actually litigated. Each fails.

*i.    Jones's willful and malicious injury was properly pleaded in the state-court actions.*

5.      As an initial matter, Jones offers no support for his claim that willful and malicious injury was not properly raised in the state-court pleadings. Response ¶ IV(C)(1)(a). He does not cite a single relevant case. Instead, he claims section 523(a)(6) cases are "rare" and attempts to concoct a disconnect between Texas law and the section 523(a)(6) standard by comparing the pleading standards for fraud claims under Texas state law with the grounds for nondischargeability

under section 523(a)(2)(A).  *See* Response ¶¶ 36–38.  This distinction is not only irrelevant but also unsupported.  The Motion is premised on section 523(a)*(6)*—not (a)(2)(A).  Jones's analogy offers no answer to the case law finding judgments for defamation and intentional infliction of emotional distress under Texas law are nondischargeable under section 523(a)(6).  *See* Motion ¶¶ 59, 64, 76.

6.      Jones is also wrong on the facts.  In their state-court actions, Movants pleaded that Jones willfully and maliciously injured them.  As to defamation, the Amended Petitions allege that Jones acted with "actual malice" [Docket No. 29, Ex. 8 ¶ 92]; [Docket No. 29, Ex. 4 ¶ 69], that his "defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time they were made" [Docket No. 29, Ex. 8 ¶ 91]; [Docket No. 29, Ex. 4 ¶ 69], that "Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence" [Docket No. 29, Ex. 8 ¶ 97]; [Docket No. 29, Ex. 4 ¶ 74], *and* that the statements "were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule or attack." [Docket No. 29, Ex. 8 ¶ 92]; [Docket No. 29, Ex. 4 ¶ 68].

7.      As to intentional infliction of emotional distress, Movants pleaded that Jones and FSS made the statements "in bad faith and with malicious motives, knowing the statements were false or in reckless disregard for the truth, and knowing they would cause severe emotional distress." [Docket No. 29, Ex. 8 ¶ 104]; [Docket No. 29, Ex. 4 ¶ 85].  They further allege that Jones's "malicious statements were part of a continuous pattern of five years of intentional and reckless harassment[.]" [Docket No. 29, Ex. 8 ¶ 104]; [Docket No. 29, Ex. 4 ¶ 88].

8.      These pleadings were taken as true under the state-court default judgments— meaning they have been conclusively established.  *See* Motion ¶ 67.  And as discussed in the Motion, courts in and beyond the Fifth Circuit have found similar claims nondischargeable under

section 523(a)(6).  Motion ¶¶ 64–69; *see, e.g., In re Gober*, 100 F.3d 1195 (5th Cir. 1996); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014).  Again, Jones has no response to these cases.

> ii.   *The death-penalty sanctions entered against Jones are entitled to preclusive effect.*

9.      Jones next contends that giving the state-court default judgments preclusive effect based on the discovery-sanction exception is improper because Movants did not provide evidence of Jones's "egregious" discovery conduct.  Response ¶ IV(C)(1)(b).  This is not only a red herring but also false.  Movants detailed Jones's discovery abuses in their Motion (*see* Motion ¶¶ 31–45) and provided accompanying evidence in the Lombardi Declaration [Docket No. 29].  Instead of acknowledging that evidence, Jones insists *he* is not responsible for those discovery violations and that only FSS and InfoWars—which he owns—engaged in misconduct.  But the state-court records and the Motion belie that claim, as the state court found that both Jones *and* his codefendants engaged in "egregious" discovery abuses.  For example, the evidence provided by Movants establishes (and the Motion describes in greater detail) the following:

- The state court entered a discovery order on August 31, 2018 requiring written discovery and depositions of Jones and other defendants in Mr. Heslin's case.  But Jones did not appear for his deposition or comply with the written discovery requests.  Motion ¶ 31.  As a result, Mr. Heslin brought a motion for contempt against the defendants and the next day Jones launched what the appellate court described as a "frivolous" appeal.  *Id.*

- On October 31, 2018, the court ordered written discovery and depositions of Jones and other defendants in the Lewis case.  Again, Jones and his codefendants failed to respond.  Motion ¶ 32.  As a result, the court found that Jones and his codefendants violated its discovery order and sanctioned them $8,100 in attorneys' fees.

- By October 2019, Jones still had not complied with the court's discovery orders, and so the court granted Mr. Heslin's renewed motion for contempt and sanctioned Jones and his codefendants $25,000.  Motion ¶ 33.  This did not deter Jones and his codefendants, who continued to ignore the court's October 2019 order, resulting in the court assessing sanctions totaling $100,000 and holding Jones and his codefendants in contempt for "intentionally disobeying the order."  *Id.* ¶ 36.

- By July 2021, Jones and his codefendants had failed to comply with discovery orders in the Heslin/Lewis Action and Pozner/De La Rosa Action for over three years, and so the

court entered the Default Judgments.  Motion ¶ 41.  In entering the Default Judgments, the court explained that it had "more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective in deterring the abuse" and stated that it "considered lesser sanctions and determined they would be inadequate to cure the violation in light of the history of the Defendants' conduct." *Id.*; *see also* Docket No. 29 Ex. 41.  The court found that Jones *and* his codefendants "unreasonably and vexatiously failed to comply with their discovery duties" and engaged in a "general bad faith approach to litigation," as further evidenced by Jones publicly calling the cases "show trials." Motion ¶ 41; [Docket No. 29, <u>Ex. 41</u> at 2, 4].  The Heslin court also found that "Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit."  Motion ¶ 41; [Docket No. 29, <u>Ex. 3</u> at 4].

- Judge Gamble explained that her ruling "was based on a longstanding principle in the law that, if you intentionally, repeatedly, and over years in this case, again and again, refuse to participate in discovery, that is proof that you do not have a meritorious defense." [Docket No. 29, <u>Ex. 46</u> at 201:1–6].  Judge Gamble was well aware of Jones's history of lying to the court when she instructed Jones:

> You're also under oath to tell the truth.  You've already violated that oath twice today in just two examples.  It seems absurd to instruct you again that you must tell the truth while you testify, yet here I am: You must tell the truth while you testify . . . You are under oath. That means things must actually be true when you say them.

*Id.* at 202:5–10.

- The record also shows that Jones testified at his deposition that he had searched for the phrase "Sandy Hook" on his cell phone and found no responsive messages or emails. Shortly before trial, however, Jones's counsel accidentally sent the entirety of Jones's cell phone to Movants' trial counsel, which revealed that there were hundreds of responsive texts and emails.  *See* [Docket No. 29, <u>Ex. 1</u> at 84:21–93:20].  This is not FSS's or InfoWars' cell phone.  It is Jones's.  FSS and InfoWars did not testify under oath that they had searched their cell phones and found nothing responsive; Jones did.

- Jones already admitted (as he must) that "the State Court gave Defendant [*i.e.*, Jones] the death-penalty sanction."  Response at ¶ 90.

10.    Despite this record of his own "egregious" discovery abuse, Jones now tries to relitigate the state-court findings, arguing that the death-penalty sanctions *should not have been entered* because it was FSS and InfoWars, not Jones, that engaged in the "egregious" discovery conduct.  But the findings against Jones cannot and should not be relitigated now, as detailed below.  In any event, Jones's suggestion that he bears no responsibility for FSS and InfoWars'

conduct defies common sense; those entities are owned by Jones and were under his control when they repeatedly violated the court's orders.

11.     Jones next argues that the death-penalty sanctions should not have been entered because he was not allowed to testify about his culpability.   Response ¶ IV(C)(1)(c). But Jones's discovery abuse is precisely why Jones was not permitted to relitigate liability.   Judge Gamble stated this specifically at trial, telling Jones:

> We've already had this conversation multiple times in this trial, in addition to it before this trial, the time for that was during discovery, when **Mr. Jones** chose not to fully participate. It is not the time to do that now. If there is anything that he would like to put forth as a defense, he needed to do it a year ago during the discovery process. It's too late now.

[Docket No. 29, <u>Ex. 46</u> at 200:15-22]  (emphasis added).

12.     Neither of the cases Jones cites supports his claim that an opportunity for a defendant to testify to his culpability at trial is required in death-penalty sanctions cases. Response ¶ 43.  In fact, they undercut his argument.  Both *In re Limbaugh*, 155 B.R. 952 (Bankr. N.D. Tex. 1993), and *In re Huizar*, 609 B.R. 482 (Bankr. W.D. Tex. 2019), held that the debtors were estopped from relitigating section 523(a)(6) issues where the debtor's liability was already determined by default and plaintiffs were subsequently "required to establish through evidence that the degree and type of Defendant's misconduct warranted punitive damages" in a damages trial.  Response ¶ 43.  That happened here.  While Jones could not relitigate his liability in the damages trial, he could present and challenge evidence "on the issue of damages," just as the debtors in *Huizar* were allowed to do.  *See In re Huizar*, 609 B.R. at 491–92.

13.     Jones's analysis of *In re Gober*, 100 F.3d 1195 (5th Cir. 1996), is similarly flawed. As described in the Motion, the circumstances in *Gober* mirror those here.  In *Gober*, the Fifth Circuit held that a death-penalty sanction entered after two years of the defendant's discovery abuse had preclusive effect and was nondischargeable under 523(a)(6) (*see* Motion ¶¶ 68–69).

14.     Jones argues that the *Gober* court found the defendant had fully litigated the section 523(a)(6) issue "because he 'had the right to participate in the damages hearing and contest the extent of his culpability, even though he could not contest liability per se.'" Response ¶ 50. But that is no distinction. Here, Jones likewise participated in the damages hearing. And the *Gober* court never reasoned that it allowed the default judgment to stand because the defendant was allowed to testify to his culpability. Instead, it expressly acknowledged that "even if [an issue] was not litigated, the party's reasons for not litigating in the prior action may be such that preclusion would be appropriate. Other circuits, applying federal rules of issue preclusion in dischargeability proceedings, have applied this principle to bar relitigation of issues determined by default as a result of sanctions for discovery abuses and dilatory tactics." *In re Gober*, 100 F.3d at 1206 (citations omitted). Because "Gober did not simply give up at the outset, but actively participated in the litigation for two years, filing counterclaims and making discovery requests" and "repeatedly impeded the course of the proceedings by refusing to comply with discovery and by defying court orders" (*Id*. at 1205–06), the court found that Gober's conduct was analogous to those cases and held that the bankruptcy and district courts properly afforded collateral-estoppel effect to the default judgment against Gober. Jones's discovery abuses are similar to (and even more egregious than) those in *Gober* and require preclusive effect for the same reason.

15.     In attempting to turn the default judgments entered here into no-answer defaults, Jones misrepresents what happened here and in *In re Pancake*, 106 F.3d 1242 (5th Cir. 1997). Response ¶¶ 48, 51, 83–84. Jones claims that "in applying the reasoning of *Gober* to the facts here, ***because the court struck Defendant's answer*** and didn't allow him to contest his culpability at his damages trial, the Court should refuse to apply the discovery sanction exception" and instead treat it like the no-answer default at issue in *In re Pancake*, 106 F.3d at 1244. Response ¶ 51

(emphasis added). But the state court did *not* strike Jones's answer. And, unlike *Pancake*, which was decided partially on the grounds that the record did not contain evidence that a hearing was held on the plaintiff's claims (*see In re Pancake*, 106 F.3d at 1245), the record here demonstrates that the state court held a nine-day trial in which Jones testified, introduced his own evidence, and had an opportunity to cross-examine all of plaintiffs' witnesses, who provided significant evidence that Jones knew his statements were false when he made them. The parties also extensively briefed this issue in post-trial briefing to the Texas court.

16.     Moreover, Jones selectively quotes *Pancake* to create a false dichotomy: he insists that Movants "cannot have it both ways" and that the default judgments are either "no-answer defaults where all the allegations in the petitions were admitted but the Judgments lacks [*sic*] preclusive effect, or the Default Judgment was a post-answer default, and the allegations of the petitions are not deemed admitted." Response ¶ 84. According to Jones, *Pancake* stands for the proposition that "in a post-answer default judgment, 'the court may not enter judgment based solely on the pleadings.'" Response ¶ 83 (citing *In re Pancake*). But Jones omits the critical part of the quoted sentence, which defines what the *Pancake* court meant by a post-answer default: "We note that in a post-answer default judgment, i.e., *where the defendant files an answer but fails to appear at trial*, the court may not enter judgment based solely on the pleadings[.]" *In re Pancake*, 106 F.3d at 1244 (emphasis added to the language Jones omitted); *see also Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979) (also defining a post-answer default judgment as one "where an answer is on file but defendant fails to appear at the trial").

17.     That is not the case here—in the state court, Jones filed an answer that was not struck and he appeared at trial. Thus, Movants are not trying to "have it both ways." The default judgments at issue are neither no-answer defaults (because Jones filed an answer and it was not

struck) nor post-answer defaults, as defined in *Pancake* (because Jones appeared at trial). Instead, the default judgments are post-answer death-penalty sanctions like those in *Gober*, where the defendant appeared at trial but could not contest his liability. Under the law in this Circuit, a post-answer default judgment rendered as death-penalty sanctions "bar[s] relitigation of issues determined by default as a result of sanctions for discovery abuses and dilatory tactics." *In re Gober*, 100 F.3d at 1206. As such, this case is not *Pancake*, the findings in the default judgments here were fully litigated, and the Fifth Circuit's decision in *Gober* requires that they receive preclusive effect.

### B. Willful and malicious injury was essential to the judgments.

18.     Jones asserts that the judgments are not entitled to preclusive effect because "none of the Heslin/Lewis Action's claims required a finding of willful and malicious injury to find in favor of" Movants. Response ¶ 52. Again, Jones is wrong on both the law and the facts. For support, Jones cites *Tarter v. Metropolitan Savings & Loan Ass'n*, 744 S.W.2d 926, 928 (Tex. 1988). But, unlike here, the *Tarter* court declined to grant preclusive effect to the prior judgment because the issues in *Tarter* and the prior litigation were completely different.

19.     In *Tarter*, a bank held a note and first lien deed of trust on the home of petitioners Jack and Margaret Tarter. 744 S.W.2d at 928. The Tarters fell into arrears on the note, and the bank notified them of its intent to foreclose. *Id*. at 926. The bank told them they could keep the property if they paid back the arrearages, but before they could reinstate the loan the bank sold the note and first lien deed of trust to the holders of a second lien deed of trust on the home. *Id*. at 927. The trustee then sold the home to the second lien holders. *Id*. In the first suit, the Tarters sued the second lien noteholders for wrongful foreclosure based on alleged procedural irregularities in the foreclosure sale. *Id*. at 928. The Tarters lost that case and the court held the

foreclosure was valid. *Id.* at 926–27. The Tarters then brought a second action against the bank—who was not a party to the first action—alleging that (1) the foreclosure was wrongful because the bank did not give notice of its intent to accelerate the note; (2) the bank breached its own contract by selling the note before the Tarters could reinstate the loan; and (3) the bank engaged in deceptive trade practices by falsely representing that it would reinstate the loan if the Tarters paid before the foreclosure sale. *Id.* at 927.

20.     The bank argued that the Tarters were collaterally estopped from making those claims because the foreclosure was already found to be valid. *Id.* at 928. But the Supreme Court of Texas found that collateral estoppel did not apply because the bank "was not a party to the prior action nor was its conduct at issue in the trial. There [was] nothing in the record to show that a question of fact regarding [the bank's] conduct was necessarily determined as a prerequisite to the rendition of the first judgment." *Id.* Whereas the ultimate issue in the first case was whether *the second lien holders* wrongfully foreclosed on the property, the ultimate issue in the second was whether *the bank* breached the contract (which did not involve the second lien holders) or committed a deceptive trade practice by falsely representing that it would allow the Tarters to pay before the sale (which also did not involve the second lien holders). *Id.* The court specifically noted that "breach of contract and deceptive trade practices were not merely alternative evidentiary grounds for the claim of wrongful foreclosure but were, instead, separate and independent causes of action." *Id.*

21.     Suffice to say that situation was fundamentally different. Here, in the state-court actions, Movants alleged that Jones made defamatory statements and intentionally inflicted emotional distress on Movants "in bad faith and with malicious motives" ([Docket No. 29, Ex. 8 ¶ 104]; [Docket No. 29, Ex. 4 ¶ 85]) and that those statements were "designed to harm Plaintiff's

reputation and subject the Plaintiff to public contempt, disgrace, ridicule or attack" ([Docket No. 29, Ex. 8 ¶ 92]; [Docket No. 29, Ex. 4 ¶ 68]) as "part of a continuous pattern of five years of intentional and reckless harassment[.]" [Docket No. 29, Ex. 8 ¶ 104]; [Docket No. 29, Ex. 4 ¶ 88]. Thus, whether Jones committed willful and malicious injury against Movants was the central issue decided in the state-court judgments. Unlike *Tarter*, this case does not involve separate causes of action against separate parties.

22.     Next, Jones insists that the actual malice standard from *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964), should be read into the state-court Jury Charges because Texas PJC 110.6 allegedly incorporates the actual malice standard. Response ¶ 57. He further asserts that because the *Sullivan* standard defines actual malice as requiring only recklessness *or* malice, the jury's finding of malice here is not essential to the judgment. *Id.* ¶ 60. This argument finds no support in nondischargeability cases or Texas law.

23.     In fact, another court in this Circuit found the "essential to the judgment" prong satisfied and granted preclusive effect to a state-court defamation judgment based on the *same exact* jury instructions used here. *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014). Jones argues *Scarbrough* is factually distinguishable because that court "applied collateral estoppel to a judgment based upon a jury trial on the merits, not a default judgment and heavily restricted damages trial." Response ¶ 66. But this argument is just a rehash of Jones's flawed argument that the judgments against him were not actually litigated in the state-court action. Jones's argument that the words "actual malice" and "reckless disregard" should be read into the Jury Charges is just another sleight of hand that attempts to distract from case law that is exactly on point.

24.     This Court need not look to the Pattern Jury Charges to guess whether the state court found that Jones acted with actual malice. The answer is in the state court records and the

Texas statutes.  Movants' state-court pleadings alleged that Jones and FSS acted with "malice" within the meaning of Chapter 41 of the Texas Civil Practices and Remedies Code.  *See* [Docket No. 29, Ex. 4 ¶ 98]; [Docket No. 29, Ex. 8 ¶ 115].  Movants further alleged that they were entitled to exemplary damages—which are available under Chapter 41[2]—because Jones acted with "malice."  *Id.*  Chapter 41 defines malice as a "*specific intent* by the defendant to cause substantial injury or harm to the claimant."  Tex. Civ. Prac. & Rem. Code Ann. § 41.001 (emphasis added).  And the jury found for Movants and expressly awarded exemplary damages for Jones's defamation.  *See* [Docket No. 29, Ex. 6].

25.     The state court then allowed the total exemplary damages awarded by the jury, which exceeded a statutory cap on damages.  In order to do that, the Heslin/Lewis court had to determine that the exemplary-damages cap did not apply because Jones "intentionally or knowingly" violated Texas Penal Code Section 22.04.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008.  Chapter 41 defines "intentionally" as a "conscious objective or desire to engage in the conduct or cause the result," and it defines "knowingly" as being "aware that his conduct is reasonably certain to cause the result."  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008; Tex. Penal Code Ann. § 6.03.

26.     In other words, the trial court had to find—and did find—that Jones acted intentionally or knowingly, not just recklessly.  The trial court not only allowed the jury to award exemplary damages based on Jones's specific intent but also determined that the statutory cap did not apply because Jones and FSS acted intentionally or with reasonable certainty his conduct would cause the injuries.  Thus, the findings establish Jones's willful and malicious injury for

---

[2] Tex. Civ. Prac. & Rem. Code Ann. § 41.003 ("(a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence.").

purposes of Section 523(a)(6) under both the "objective" standard (because, from a "reasonable person" standpoint, his actions were "substantially certain to cause harm" (*see* Motion ¶ 93)) and the "subjective" standard (because it establishes that Jones acted "deliberately and intentionally, in knowing disregard of the rights" of Movants (*see* Motion ¶ 101)).

27.     Even if the statute and the court's findings did not settle the issue (which they do), Movants explained in the Motion—and Jones does not dispute—that this Court should "'look beyond the [state court] judgment and [jury] instructions to see if the evidence produced in the state-court proceedings supports a finding of intent' under Section 523(a)(6)" to determine whether collateral estoppel applies.  Motion ¶ 90; *see also In re Rabalais*, 2012 WL 42101, at *4 (S.D. Tex. Bankr. Jan. 9, 2012); *In re Mahadevan*, 617 F. Supp. 3d 654, 665 (S.D. Tex. 2022).   Jones's argument that the judgments should not be entitled to preclusive effect because the claims *could have been* satisfied by a showing of recklessness is thus a red herring divorced from the controlling statute and actual state-court record, and ignores overwhelming evidence that Jones knew his statements were false when he made them.  Instead of acknowledging this—or engaging with the subjective/objective standards in the Response at all—Jones alleges, without citing any case law, that the state court's decision to waive the cap on exemplary damages based on that evidence is "constitutionally infirm" and not entitled to preclusive effect.  Response ¶ 80.  But this is another impermissible collateral attack on the state-court judgment, as Jones is asking the bankruptcy court to reverse the state-court judgment.

28.     Similarly, Jones's reliance on *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir. 1986) for the notion that reckless disregard for the truth or falsity of a defamatory statement is not a willful and malicious injury for purposes of section 523(a)(6) is misplaced.  Response ¶ 62.  That court's ruling relied on the fact that "neither party ha[d] sought to 'flesh out' the record by identifying

how and which claimed items of falsity were or were not established at trial." *Wheeler*, 783 F.2d at 615. Moreover, *Wheeler* is a Sixth Circuit case that is not controlling in any event. Jones makes a similar argument about Movants' IIED claims, citing *Mahadevan v. Bikkina (In re Mahadevan)*, 617 F. Supp. 3d 654 (S.D. Tex. 2022), for the proposition that willful and malicious injury was not established because Jones could have acted recklessly or intentionally for the jury to award damages. Response ¶¶ 68–72. But in *Mahadevan*, the court's decision likewise hinged on the fact that movant "did not submit any evidence or transcripts from the state-court proceeding in his motion for summary judgment." *In re Mahadevan*, 617 F. Supp. 3d at 665. Here, in contrast, Movants have provided an extensive record of Jones's defamatory statements and willful and malicious injury through trial transcripts, video evidence, and state court pleadings, among other things. *See generally* Statement of Undisputed Material Facts [Docket No. 28] (the "SUMF"); Lombardi Declaration [Docket No. 29]. Jones now asks the court to discount that evidence and decide it only should have applied to FSS and InfoWars (which are wholly owned by Jones), contradicting the state court's findings that are entitled to full faith and credit.

29.    Finally, Jones asserts that the allegations in the Amended Petitions are not admitted because the judgments are post-answer default judgments. Response ¶¶ 82–85. But that is not accurate, as discussed in paragraphs 15-17 above. And Jones admits that the Final Judgment explicitly stated that the allegations in the Amended Petition were admitted:

> The jury's findings, along with the Court's default judgment and resulting admissions, entitle Plaintiffs Neil Heslin and Scarlett Lewis to a judgment against Defendants Alex E. Jones and Free Speech Systems, LLC *as set forth in their Fifth Amended Petition*.[3] Alternatively, to the extent that a necessary element of their recovery has been omitted, the Court implies a finding to support it.

---

[3] Jones notes that the Final Judgment refers to the operative petition in the Heslin/Lewis Action as the Fifth Amended Petition. Response at n.13. This is a scrivener's error. The Fourth Amended Petition attached to the

Response at ¶ 77; [Docket No. 29, Ex. 7 at 2] (emphasis added).

30.     Thus, the Heslin/Lewis court confirmed that the default judgments admitted the allegations in the Amended Petitions.  The Amended Petitions lay out the factual underpinning of Jones's defamatory statements and state of mind when he repeatedly lied about Movants in detail. *See generally* [Docket No. 29, Ex. 4 ¶¶ 9–59]; [Docket No. 29, Ex. 8 ¶¶ 11–85].  Those admissions are sufficient to establish Jones's willful and malicious injury of Movants and therefore entitle Movants to summary judgment.

                 i.   *The Pozner/De La Rosa Default Judgment is also entitled to preclusive effect.*

31.     Jones does not bother to respond to the issues raised in the Pozner/De La Rosa Action beyond arguing that his rebuttal of the Heslin/Lewis claims necessarily rebuts the Pozner/De La Rosa claims.  For the same reasons discussed here and in the Motion, the default judgment entered in the Pozner/De La Rosa Action should also receive preclusive effect.

**C. Jones's arguments about the "quality, extent, or fairness" of the state-court proceedings are impermissible collateral attacks on the state-court judgments.**

32.     Jones effectively asks this Court to overrule the state court's findings because, according to him, they were unfair.  See Response at IV(C)(3); *see also Id*. ¶ 90 (arguing state court erred in imposing death-penalty sanctions because it was Jones's co-defendants, not Jones, who engaged in egregious discovery abuses); *Id* ¶ 91 (arguing state court erred in not applying lesser sanctions instead of death-penalty sanctions); *Id*. ¶ 92 (arguing state court erred in not allowing Jones to testify to his culpability); *Id*. ¶ 93 (arguing state court erred by not instructing jury that exemplary damages requires clear and convincing evidence); *Id*. ¶ 94 (arguing state court

Lombardi Declaration is the operative complaint, which the court granted Movants leave to amend on January 11, 2023.

erred in finding exemplary damages cap could be exceeded when that wasn't pled at time of jury verdict). But this is an impermissible collateral attack on the state-court judgments, and in any event, based on a flawed premise.

33.   Jones claims he "is not asking this Court to act as an appellate court on this issue, [but states] this Court should take this fact into account when evaluating the fairness of applying collateral estoppel to the Jury Charges and Final Judgment." Response ¶ 93. But all these arguments require the bankruptcy court to reject the state court's findings, effectively reversing the state-court judgments. And Jones's "fairness" argument is undermined by the fact that a different court independently determined that Jones caused willful and malicious injury to the Connecticut Plaintiffs based on many of the same statements on which Movants rely.

34.   Not only are Jones's arguments insufficient to outweigh the factors that favor applying collateral estoppel, but they are also impermissible collateral attacks on the state-court judgments barred by the Full Faith and Credit Act, which mandates that "[t]he records and judicial proceedings of any court" of "any State" "shall have the same full faith and credit in every court within the United States." 17 U.S.C. § 1738; *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."); *see also Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give.").

35.   Jones has not identified a *single case* where a court declined to apply collateral estoppel for the reasons he cites. And the Fifth Circuit has explained that in nondischargeability proceedings, full faith and credit ***requires*** courts to give preclusive effect to a state judgment if it

16

would be entitled to preclusive effect under state law. *In re Garner*, 56 F.3d 677, 679 (5th Cir. 1995) (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985)). Thus, indulging Jones's requests to set aside the established elements of the collateral-estoppel analysis based on unfounded claims that the state-court proceedings were "unfair" or "constitutionally infirm" would require this Court to violate the Full Faith and Credit Act.

> **D. Jones's Constitutional arguments are an impermissible collateral attack on the state-court judgments and fail on their merits.**

36.     Jones next asks this Court to effectively reverse the state-court judgments because they are "constitutionally infirm." *See* Response § IV(C)(4). He claims that even "if this Court determines that collateral estoppel would otherwise apply," it should decline to give the default judgments preclusive effect because "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and . . . federal courts are not required to accord full faith and credit to such a judgment." *Id.* ¶ 97. Jones does not cite a *single case* where a federal court has ever declined to grant preclusive effect to a state-court judgment because of an alleged constitutional violation. The proper forum to make that argument is in his direct appeal in Texas state court, not in a Texas bankruptcy court.

37.     Indeed, *In re Huizar*, which Jones cites repeatedly in the Response (*see* ¶¶ 43, 96), specifically rejected the same argument Jones raises here:

> Defendant argues the state court judgment is void as unconstitutional restraint on Defendant's guaranteed free speech rights and under the First and Fourteenth Amendments of the U.S. Constitution. Defendant's arguments are not well taken . . . . ***even if the North Carolina laws do implement the First Amendment rights of expression, this is not the appropriate forum for challenging such laws . . . . As Plaintiff rightly acknowledges, if Defendant believes the basis of a foreign judgement . . . are somehow unconstitutional[,] the proper venue for that argument is in the North Carolina court system, not in this one.***

*In re Huizar*, 609 B.R. at 496–97 (emphasis added).   And the Fifth Circuit routinely applies collateral estoppel to preclude substantive constitutional challenges.   *See, e.g.*, *Lewis* v. *Green*, 101 F. App'x 446 (5th Cir. 2004) (affirming dismissal of constitutional claim under the "doctrines of collateral estoppel and res judicata"); *Buckeye Indus., Inc.* v. *Sec'y of Lab., Occupational Safety & Health Rev. Comm'n*, 587 F.2d 231, 233 (5th Cir. 1979) ("While we would normally agree with Buckeye's contention following *Barlow*'s that the entry was unconstitutional, we find that this defense is not available to petitioner because of the principle of collateral estoppel.").

38.      Moreover, it is unlikely that the Court even has jurisdiction to grant the relief Jones seeks, as the Rooker-Feldman doctrine prohibits federal courts from "determining whether [a] state court's decision is wrong or voiding [a] state court's ruling." *In re Knapper*, 407 F.3d 573, 580 (3d Cir. 2005).   In *Rooker v. Fidelity Trust Co.*, the Supreme Court held that a federal district court could not render a state court judgment "null and void." 263 U.S. 413, 414 (1923).   That holding was extended in *District of Columbia Court of Appeals v. Feldman*, in which the Supreme Court ruled that United States district courts "do not have jurisdiction . . . over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional." 460 U.S. 462, 486 (1983).   Rooker-Feldman applies in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005).

39.      The Fifth Circuit has held that the Rooker-Feldman doctrine bars bankruptcy courts from overturning a state-court judgment under similar circumstances.   In *In re Rabalais*, a bankruptcy court granted summary judgment on collateral estoppel grounds, holding that a state-

court debt was nondischargeable under Section 523(a). The debtor appealed, attacking the state court judgment that created the debt, but the Fifth Circuit rejected this argument, holding:

> Even assuming, arguendo, that the California court erred . . . the bankruptcy court correctly concluded that it could not revisit that [decision]. Generally speaking, bankruptcy courts may not sit as appellate courts and revisit the merits of state court decisions. Under the Rooker–Feldman doctrine, federal courts "lack jurisdiction to entertain collateral attacks on state court judgments." A state court judgment is "attacked" when the losing party in a state court action seeks "what in substance would be appellate review of the state judgment." Rabalais's "attack" on the California court's decision-making ought to have been raised on appeal in the California court system, not before a federal bankruptcy court. Like the bankruptcy court, we lack the authority to review the decision of the California court.

*In re Rabalais*, 496 F. App'x 498, 500. This rationale is squarely on point here, where Jones asks the bankruptcy court to collaterally attack and reject the state court's findings on the unsupported basis that they are constitutionally infirm.

40.    Even if Jones's constitutional argument was not an improper collateral attack, it fails. Jones invents a rule out of whole cloth: that this Court is not required to accord full faith and credit to the state-court judgments because they violate the First Amendment and are thus "constitutionally infirm." Response ¶ 97. The only collateral estoppel case Jones cites for this proposition is *Kremer v. Chemical Const. Corp.*, 456 U.S. 461 (1982), in which the Supreme Court *affirmed* a decision granting preclusive force to a state court judgment. In doing so, the Supreme Court explicitly acknowledged that "federal courts consistently have applied res judicata and collateral estoppel to causes of action decided by state courts" because those principles "promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." 456 U.S. at n. 6. *Kremer* addressed when a prior judgment should be denied preclusive effect because it violates the Fourteenth Amendment's procedural due process requirements. *Id.* at 481-85. But Jones has not raised procedural due process claims here. And he has not cited any

decision from any court that actually declined to apply collateral estoppel on the basis that the prior decision was "constitutionally infirm."

41.     Instead, Jones analyzes a single case, *Snyder v. Phelps*, in which the Supreme Court overturned a *federal* judgment *on appeal from that judgment*.  562 U.S. 443, 451 (2011); *see* Response ¶¶ 98–104.  That case did not involve collateral estoppel.  If Jones believes that the state court judgments violate *Snyder v. Phelps* (which they do not), the appropriate avenue to pursue that argument is on appeal—just as the defendant did in that case.

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BASED ON THE FACTS IN THE STATE COURT RECORDS THAT JONES HAS EXPLICITLY ADMITTED OR FAILED TO REBUT IN HIS OPPOSITION.

42.     Following Jones's opposition, the following facts are admitted or undisputed:

- Jones discussed the Sandy Hook shooting on air the afternoon it happened, stating: "I've said they are launching attacks. They're getting ready. I can see them warming up with Obama. They've got a bigger majority in the Congress now, in the Senate. They are going to come after our guns; look for mass shootings.  And then magically it happens.  They are coming.  They are coming.  They are coming."  [Docket No. 29, Ex. 9]; *see also* SUMF Obj., 2 (Statement 2) ("The video attached by Movants speaks for itself. (*See* Doc. 29-9).").

- Jones spoke about Sandy Hook again on a broadcast on December 17, 2012 ("Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School"); December 19, 2012 ("Sandy Hook Second Shooter Cover-Up"); December 21, 2012 ("Lower Part of Gotham Renamed 'Sandy Hook' in Dark Knight Film"); January 10, 2013 ("Professor Claims Sandy Hook Massacre MSM Misinformation"); January 15, 2013 ("Sandy Hook AR-15 Hoax?  Still No School Surveillance Footage"); and January 27, 2013 ("Why People Think Sandy Hook is a Hoax").  *See* SUMF Obj., 3 ("It is undisputed that Defendant broadcast the videos mentioned in Statements 3–5 on the dates listed.").

- Upon hearing some of Jones's statements, Movant Mr. Pozner emailed Jones through InfoWars in 2013:

  > Alex,
  > I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown. Accusing us of being actors .
  > . . . Haven't we had our share of pain and suffering?  All these accusations of government involvement, false flag terror, new world order etc. I used to enjoy listening to your shows prior to 12-14-12.  Now I feel that your type of show created these hateful people and they need to be reeled in!

[Docket No. 29, Ex. 13] (ellipsis in original); *see also* SUMF Obj., 3 (Statement 6) ("It is undisputed that Movant Leonard Pozner sent an email to writers@infowars.com. The content of the email speaks for itself.").

- Mr. Pozner was assured by InfoWars' Chief Editor that Jones knew Sandy Hook was "a very real tragedy with very real victims." [Docket No. 29, Ex. 13]; *see also* SUMF Obj., 3 (Statement 6) ("It is further undisputed that Paul Watson replied to Movant Pozner, and the content of his email similarly speaks for itself.").

- Jones continued to talk about Sandy Hook on broadcasts on at least the following occasions throughout 2014: March 14 ("Sandy Hook False Narratives vs. The Reality"); May 9 ("Revealed: Sandy Hook Truth Exposed"); May 13 ("Sandy Hook Massacre was a DHS Illusion Says School Safety Expert"); September 25 ("Sandy Hook Deaths Missing from FBI Report"). *See* SUMF Obj., 4 (Statements 7–8) ("It is undisputed that Defendant broadcasted the videos mentioned in Statements 7–8 on the dates listed.").

- In early December 2014, Mr. Pozner complained to YouTube about Jones's broadcasts. *See* SUMF Obj., 4 (Statement 9) ("It is undisputed that Movant Pozner made complaints to YouTube about Defendant's broadcasts."). On December 28, 2014, Jones told his InfoWars audience, "The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake." [Docket No. 29, Ex. 17]; *see also* SUMF Obj., 4 (Statement 10) ("It is undisputed Defendant said the quote attributed to him in Statement 10.").

- A few weeks later, Jones talked about Noah Pozner on a broadcast, claiming "Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured [event]. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean, they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in . . . Pakistan."[4] *See* SUMF Obj., 4–5 (Statement 11) ("It is undisputed that Defendant broadcast the videos in Statement 11 on the dates listed. It is further undisputed that Defendant said the quote attributed to him in Statement 11.").

- On February 12, 2015, Jones told his audience that Movant Mr. Pozner was "going after the Second Amendment." In the broadcast, Jones stated Mr. Pozner's name and email address, and his guest showed Google maps images of addresses associated with Mr. Pozner and his company, the HONR Network. SUMF Obj., 5 (Statement 12) ("It is undisputed that Defendant broadcast the videos mentioned in Statement 12 on the dates listed. It is further undisputed that Defendant said the quote attributed to him in Statement 12 . . . . The video speaks for itself.").

---

[4] As described in the Motion, this is a reference to Noah Pozner's photo being displayed on a collage at a vigil for victims killed in a mass shooting in Pakistan days after the anniversary of Sandy Hook.

- In June 2015, InfoWars reporters went to Newtown, Connecticut and told residents and town officials that they were "going to jail," called them "scumbags," and told passersby that "Sandy Hook was an inside job." [Docket No. 29, Ex. 21]; [Docket No. 29, Ex. 22]; *see also* SUMF Obj., 5 (Statement 14) ("It is undisputed InfoWars reporters went to Sandy Hook in June 2015. It is further undisputed that the video referenced speaks for itself.").

- **By July 2015, Jones—by his own admission—*"no longer believed that the victims of the Sandy Hook shooting were fake or that their relatives were actors."*** (Jones Decl. ¶ 14.)

- On December 17, 2015, Chief Editor Paul Watson texted Jones: "This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show." SUMF Obj., 7 (Statement 21) ("It is undisputed that Mr. Watson emailed Defendant on December 17, 2015, which included the quoted language in Statement 21.").

- On November 18, 2016, Jones told his InfoWars audience, "If children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook." SUMF Obj., 5 (Statement 15) ("It is undisputed that Defendant said the quote attributed to him in Statement 15. The video speaks for itself.").

- On the same day, Jones's cousin and InfoWars manager Buckley Hamman emailed InfoWars Chief Editor, Paul Watson: "Surely it's a conspiracy theory that they are trying to suppress our popularity so that lizard people can return to the ascension pad at Sandy Hook and feast on Sacrificed crisis actors! lol." SUMF Obj., 8 (Statement 23) ("The email from Buckley Hamman speaks for itself.").

- On June 26, 2017, eight days after Movant Mr. Heslin appeared on Sunday Night with Megyn Kelly, InfoWars broadcast a feature on the interview, in which InfoWars reporter Owen Shroyer stated, "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible." Jones commented on the video when it was rebroadcast on InfoWars in full on July 20, 2017, stating "[t]he stuff I found was they never let them see their bodies." [Docket No. 29, Ex. 26]; [Docket No. 29, Ex. 27]; *see also* SUMF Obj., 6 (Statement 17) ("A different individual is broadcasting in the video labeled Exhibit 26. It is undisputed that Defendant said the quote attributed to him from Exhibit 27, (Doc. 29-27).").

- On October 26, 2017, in reference to Ms. De La Rosa's interview with Anderson Cooper, Jones told his audience: "[I]t's as phony as a $3 bill, with CNN doing fake

newscasts with bluescreens." SUMF Obj., 6–7 (Statement 18) ("It is undisputed that Defendant said the quotes attributed to him in Statement 18.").

- The state court entered "death-penalty sanction" default judgments against Jones in the Pozner/De La Rosa Action and Heslin/Lewis Action based on repeated discovery violations. *See* Response ¶ 90 ("[T]he State Court gave Defendant the death-penalty sanction."); SUMF Objection, 8 (Statements 26–38) ("It is undisputed that the Texas court entered a default judgment against Defendant and in favor of Movants based on a finding of discovery violations").

- At the Heslin/Lewis damages trial, the state court judge addressed Jones's discovery conduct specifically, stating that "the time for [testimony concerning the level of his culpability] was during discovery, when Mr. Jones chose not to fully participate. It is not the time to do that now. If there is anything that he would like to put forward as a defense, he needed to do it a year ago during the discovery process. It's too late now." Response ¶ 44.

43.     Since he cannot genuinely dispute the facts underlying the Motion, Jones instead submits the Jones Declaration, asserting new facts. But the Jones Declaration is irrelevant to whether Movants are entitled to summary judgment. Jones's self-serving assertions cannot raise a genuine issue of material fact over whether his conduct was "willful and malicious," because the state-court records already established that fact and it is unnecessary to look beyond the evidence in those records to make that determination. Even taking the statements in the Jones Declaration as true, they are irrelevant and thus fail to raise a genuine issue of material fact:

- Paragraphs 1–5 of the Jones Declaration provide biographical information and information about his employment at FSS. Those paragraphs are thus irrelevant to whether Jones's conduct constituted "willful and malicious injury."

- Similarly, paragraphs 6–10 of the Jones Declaration detail his history of questioning other mass shootings and terrorist attacks, which have nothing to do with the defamatory statements he made about Movants.

- In paragraphs 11–13 and 15–17 of the Jones Declaration, Jones describes his Sandy Hook coverage in vague and misleading terms, claiming he stated "that I did not know what happened but that it would not surprise me if the government staged this event to restrict Americans' access to guns" (¶ 12), that he "commented that you could draw from [Ms. De La Rosa's Anderson Cooper interview] what you want, but I could not understand why CNN would use a blue screen" (¶ 12), that his "belief at the time that certain individuals I saw on media coverages were actors—whom I now know to be legitimate relatives of Sandy Hook victims—was a result of my cynical view of

mainstream media and the views of Mr. Halbig and those expressed online" (¶ 13), that he explained to Megyn Kelly that he "now believed that children probably did die at Sandy Hook but I could see why people think they did not" (¶ 15), that in October 2017, he "once again mentioned the anomalies surrounding the shooting at Sandy Hook [but] did not question the fact that children actually died there" (¶ 16), and that he "never once said something on air that I did not believe to be true." ¶ 17. But none of that matters, because Jones repeatedly admits that he said what Movants allege and that those statements speak for themselves.

44.     Movants have provided—and Jones admits the authenticity of—the actual videos of Jones's comments, which go much further than questioning "some anomalies in coverage of the event by the mainstream media" (*id.* at ¶ 13), and specifically attack Movants. *See, e.g.*, [Docket No. 29, Ex. 19] ("Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured [event]. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids . . . I mean, they even ended up using photos of kids killed in mass shootings here in a fake shooting in . . . Pakistan."); [Docket No. 29, Ex. 20] (telling his audience Mr. Pozner was "going after the Second Amendment" and broadcasting Mr. Pozner's name, email address, and Google maps images of addresses associated with his family); [Docket No. 29, Ex. 23] ("If children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook."); [Docket No. 29, Ex. 24] (accusing Ms. De La Rosa of conducting a fake interview with Anderson Cooper); [Docket No. 29, Ex. 27] (commenting that "[t]he stuff I found was they never let them see their bodies" about InfoWars reporting that Mr. Heslin was lying about holding his son with a bullet hole in his head).

45.     Critically,  as discussed  above,  Jones  admits  that by July  2015,  he "no longer believed  that the victims  of the Sandy  Hook  shooting  were fake or that their relatives  were actors." Jones Decl. ¶ 14.  And it is undisputed  that Jones  nonetheless  later told his audience:

- "If children  were lost at Sandy  Hook,  my heart  goes out to each and every one of those parents.  And the people  who say they're  parents  that I see on the news.  The only problem  is, I've watched  a lot of soap operas.  And I've seen actors before.  And I know when I'm  watching  a movie  and when  I'm  watching  something  real.  Let's look into Sandy  Hook."  SUMF  Obj., 5 (Statement  15).

- Commenting  on Neil Heslin's  claim  that he held his dead son with a bullet  hole in his head: "The stuff I found  was they never  let them see their bodies."  [Docket  No. 29, Ex. 27];  *see also* SUMF  Obj., 6 (Statement  17).

- In reference  to Ms. De La Rosa's  interview  with Anderson  Cooper:  "[I]t's as phony as a $3 bill,  with CNN  doing  fake newscasts  with bluescreens."  SUMF  Obj., 6-7 (Statement  18).

46.     These statements,  which  Jones  admits  he made after he knew  that the shooting  was real, are alone  enough  to conclude  that Jones  willfully  and maliciously  injured  Movants  by continuing  to suggest  (long after he knew  it was false)  that Movants  were acting  and that their children  were not murdered.  Thus, Jones's  debts to Movants  are nondischargeable.

*     *     *

47.     Because  Jones  could  not prevail  in the state-court  proceedings,  he now seeks a second  bite at the apple,  collaterally  attacking  the state court judgments.  But even if it wanted  to, this Court  could  not relitigate  the state court's findings.  *First*, the Court  is bound  to give preclusive effect to the state-court  findings  based on the longstanding  principle  of collateral  estoppel.  *Second*, the Court  can determine  that Jones  acted willfully  and maliciously  based solely  on the facts already admitted  on the record  in this Court.  *Third*, this Court  is not the proper  forum  to challenge  the state court judgments  on the merits;  that must be done on direct appeal.  As such, Movants  are entitled  to summary  judgment  and the debts owed by Jones  are nondischargeable.

Dated:  July 14, 2023

/s/ *Jennifer J. Hardy*

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone:  713-510-1700
Facsimile:  713-510-1799
Email:  jhardy2@willkie.com


**AND**

Rachel C. Strickland  (admitted  *pro hac vice*)
Stuart R. Lombardi  (admitted  *pro hac vice*)
Ciara A. Sisco (admitted  *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  212-728-8000
Facsimile:  212-728-8111
Email:  rstrickland@willkie.com
          slombardi@willkie.com
          csisco@willkie.com

*Bankruptcy Co-Counsel to the Texas Plaintiffs*

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg (TX Bar No. 24083532)
1001 Fannin Street
Suite 2400
Houston, Texas 77002
Telephone:  713-337-5580
Facsimile:  713-337-8850
Email:  avi.moshenberg@mhllp.com


**AND**

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin (TX Bar No. 24070221)
1200 Smith Street
Suite 1400
Houston, Texas 77002
Telephone:  713-356-1280
Facsimile:  713-658-2553
Email:  jarrod.martin@chamberlainlaw.com

*Bankruptcy Co-Counsel to the Texas Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on July 14, 2023.

/s/ Jennifer J. Hardy
Jennifer J. Hardy