```
                 UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                     .
IN RE:                               .  Case No. 22-60043
                                     .  Chapter 11
ALEXANDER E. JONES,                  .
                                     .
               Debtor.               .
                                     .
                                     .
. . . . . . . . . . . . . . . .      .
NEIL HESLIN, et al.,                 .  Adv. No. 23-03035
                                     .
               Plaintiffs,           .
                                     .  515 Rusk Street
v.                                   .  Houston, TX 77002
                                     .
ALEXANDER E. JONES, et al.,          .  Tuesday, August 15, 2023
                                     .  10:02 a.m.
               Defendants.           .
. . . . . . . . . . . . . . . .      .


          TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT HEARING
             BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Crowe & Dunlevy, P.C.
                         By:  VICKIE L. DRIVER, ESQ.
                              CHRISTINA W. STEPHENSON, ESQ.
                         2525 McKinnon Street, Suite 425
                         Dallas, TX 75201
                         (214) 420-2142

APPEARANCES CONTINUED.

Audio Operator:          Zilde Compean, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

```
APPEARANCES (Continued):


For the Debtor:              Crowe & Dunlevy, P.C.
                             By:  DERIC MCCLELLAN, ESQ.
                                  J. CHRISTOPHER DAVIS, ESQ.
                             222 North Detroit Avenue, Suite 600
                             Tulsa, OK 74120
                             (918) 592-9833

For the Connecticut         Paul, Weiss, Rifkin, Wharton &
Plaintiffs:                 Garrison
                             By:  KYLE KIMPLER, ESQ.
                             1285 Avenue of the Americas
                             New York, NY 10019-6064
                             (212) 373-3253

                             Koskoff Koskoff & Bieder P.C.
                             By:  ALINOR STERLING, ESQ.
                             350 Fairfield Avenue, Suite 501
                             Bridgeport, CT 06604
                             (203) 587-4423

                             Cain & Skarnulis PLLC
                             By:  RYAN CHAPPLE, ESQ.
                             303 Colorado Street, Suite 2850
                             Austin, TX 78701
                             (512) 477-5019

For the Texas               Willkie Farr & Gallagher
Plaintiffs:                 By:  JENNIFER HARDY, ESQ.
                             600 Travis Street, Suite 2310
                             Houston, TX 77002
                             (713) 510-1766

                             Willkie Farr & Gallagher
                             By:  STUART LOMBARI, ESQ.
                             787 Seventh Avenue
                             New York, NY 10019-6099
                             (212) 728-8000

                             McDowell Hetherington LLP
                             By:  AVI MOSHENBERG, ESQ.
                             1001 Fannin Street, Suite 2700
                             Houston, TX 77002
                             (713) 337-5580
```

1          (Proceedings commence at 10:02 a.m.)

2          THE CLERK:  All rise.

3          THE COURT:  Be seated.  All right.  Good morning,

4   everyone.  This is Judge Lopez.  Today is August 15.  I'm going

5   to call the ten o'clock case here on -- I'm just calling the

6   Jones matters.  The adversary is here on summary judgment.

7          Let me -- the line is completely muted.  I -- why

8   don't I just take some appearances in the courtroom as to who

9   will be speaking today?  And then, we'll get right into it.

10         MS. DRIVER:  Your Honor, good morning.  Vickie Driver

11  here with Crowe & Dunlevy.  Christina Stephenson is also with

12  me, but our trial team that will be speaking today is Chris

13  Davis and Deric McClellan.

14         THE COURT:  Okay.

15         MS. DRIVER:  And they will be handling Connecticut

16  and Texas, in turn, and they're here from our Tulsa office.

17         THE COURT:  Okay.  Good morning.

18         All righty.  Anyone else from kind of the Jones side?

19         All right, Mr. Kempler, I kind of caught you in

20  midstride.  I apologize.

21         MR. KEMPLER:  I keep jumping the gun, Your Honor.  I

22  apologize.  Kyle Kempler from Paul, Weiss, Rifkin, Wharton &

23  Garrison, on behalf of the Connecticut plaintiffs.  I'll be

24  handling the argument today.  But in the courtroom is my co-

25  counsel owner, Alinor Sterling, some of my colleagues at Paul,

1    Weiss and I believe, on the phone, Mr. Chapple is here as well.

2              THE COURT:  Okay.

3              MR. KEMPLER:  Thank you.

4              THE COURT:  Thank you.

5              MS. HARDY:  Good morning, Your Honor.  Jennifer Hardy

6    of Willkie Farr & Gallagher, on behalf of the Texas plaintiffs.

7    Iin the courtroom, I have my co-counsel, Avi Moshenberg, as

8    well as my partner, Stuart Lombardi of Willkie Farr.

9    Mr. Lombardi and Mr. Moshenberg will take the lead in today's

10   oral argument for the Texas plaintiffs.

11             THE COURT:  Thank you very much.

12             MS. HARDY:  Thank you, Your Honor.

13             THE COURT:  Anyone else in the courtroom wish to make

14   an appearance?

15             Okay.  Is there anyone on the line who will be

16   speaking today?  If you're just making an appearance -- I'm

17   just going to limit it to anyone who will be speaking today

18   without a doubt.

19             Okay.  Sounds like we're ready to proceed.  How do

20   the parties wish to proceed?

21             And just to kind of lay the, kind of, ground rules,

22   each side will have 45 minutes.  If you're going to reserve

23   some time, let me know now just so I can kind of keep it in

24   mind.  And then we'll go -- it sounds like we're going to go

25   Connecticut first with a Jones response, and then Texas, and

1   then a Jones response on that.

2          So Mr. Kempler, how do you wish to proceed?

3          MR. KEMPLER:  Your Honor, I think the way you

4   outlined it is correct.  I'm hoping to spend 30 minutes in an

5   opening, save 15 minutes for rebuttal.

6          THE COURT:  Okay.

7          MR. KEMPLER:  And as somebody with a flight home

8   tonight, I'm going to do my very, very best to keep those time

9   limits.

10          So, Your Honor, I'm go ahead and get started.

11   We do have a demonstrative for today's argument.  Would it be

12   okay if I present that to the Court?

13          THE COURT:  Sure.

14          MR. KEMPLER:  And we have copies for everybody else

15   in the courtroom as well.

16          THE COURT:  Thank you.  Let me just note, I'm going

17   to spend all of my time focusing on the argument, so I'm not

18   going to focus on the phone line.  So once a party starts to

19   speak, I'm not going to look and -- look to see and unmute

20   anyone on star five.  I'm going to give everyone my attention

21   here.  I'm just pulling out the timer.  I don't want anybody

22   thinking any more than that.

23          So, Counsel, whenever you're ready to begin.

24          MR. KEMPLER:  Thank you, Your Honor.  As you know, we

25   are here today seeking summary judgment of a $1.4 billion

1  judgment that the Connecticut plaintiffs attained in

2  Connecticut state court as nondischargeable under

3  Section 523(a)(6).

4        I don't believe there's really a dispute today over

5  the applicable legal standards we're asking you to apply.  And

6  I think solely, with respect to the collateral -- issue of

7  collateral estoppel, I don't believe there's an issue as to the

8  facts.

9        And that's, of course, exactly why summary judgment

10  here is appropriate.  The facts are undisputed.   The legal

11  standards are clear.  What we're here today to talk about is

12  how to apply those facts to those legal standards.  Let me

13  start briefly, and this is on Slide 2, with what I think we all

14  agree are the standards.

15        The Fifth Circuit, in the 1998 case of Miller, set

16  forth what is now the definitive standard for determining

17  whether an injury is willful and malicious in the Fifth

18  Circuit, and that's a two-part test.  There's an objective and

19  a subjective part.  The subjective part asks whether there was

20  a subjective motive to cause harm.  The objective part asks

21  whether there was a substantial certainty of causing harm.

22  We've satisfied both of those standards, which I'll explain

23  today.

24        Let me give a little bit more color, though, on the

25  objective standard.  Courts in the Fifth Circuit have clarified

1   that to meet the objective substantial certainty standard, it

2   doesn't mean absolute certainty, but it does require something

3   more than a high probability.  It doesn't require serious harm.

4   It requires showing substantial certainty of some harm.  And

5   because it's an objective test, it's from the standpoint of a

6   reasonable person, not a conspiracy theorist.

7          Your Honor, we believe this case starts and ends with

8   the decision that the Connecticut state trial court entered on

9   the issue of punitive damages.  I've set that forth on Page 3

10  here and I'm going to spend a couple of minutes drawing your

11  attention to what I think are five independent bases for you to

12  grant summary judgment today.

13         I want to start at the beginning.  Now, of course,

14  here the Court -- and I'm going to go through in a little bit:

15  This decision didn't come out of nowhere.  There's a long

16  history, and I'm going to give you just a little bit of

17  background there.

18         But let me start with what it says.  In awarding

19  punitive damages, the court turns to what it says is the most

20  important consideration:  the degree of blameworthiness.  And

21  it considers three possibilities, "whether the defendants'

22  conduct was reckless, intentional, or malicious", three

23  choices.  It goes on to say, "The record clearly supports the

24  plaintiffs' argument that the defendants' conduct was

25  intentional and malicious", two of the three choices.  The word

1    "reckless" does not appear there, and that's not an accident.

2             Your Honor, if all I had was that sentence, summary

3    judgment would be appropriate here.  But there's a lot more in

4    this paragraph.  It goes on to say, "The defendants' conduct

5    was" "certain to cause harm."  That would be game over, Your

6    Honor.  That statement alone, courts in this circuit have

7    found, is sufficient to find a debt willful and malicious.  It

8    goes on in the next sentence, "The record also establishes"

9    "repeated" "attacks on the plaintiffs for" "a "decade."

10            Now, you're going to hear today, I suspect, arguments

11   that the conduct was just reckless negligence, a curious guy.

12   You cannot repeatedly attack somebody for a decade with

13   recklessness.  The very idea of repeatedly attacking somebody

14   suggests that you aim and attack.  I think that sentence alone

15   would give a basis for summary judgment, and courts have

16   awarded summary judgment on far lesser grounds.

17            It goes on to describe the conduct as "malicious and

18   heinous".  I already covered that.  But I really want to point

19   you to the last sentence:  "This depravity, and cruel,

20   persistent course of conduct establishes the highest degree of

21   reprehensibility and blameworthiness."

22            And I want the Court to ask Itself, is recklessness

23   the highest degree of blameworthiness?  It is not.  Under clear

24   law in, frankly, any jurisdiction in this country, recklessness

25   is not the highest degree of blameworthiness.  Intentionality,

1    maliciousness, willfulness, those are the highest degrees of

2    blameworthiness.

3            And by the way, that's exactly where we started, what

4    the Court said, considering the degrees of blameworthiness,

5    recklessness, intentional, or malicious, the conduct was

6    intentional and malicious.  That's five separate clues that

7    tell us the answer here.

8            Now, if you went -- a couple of pages earlier, this

9    isn't on the slide -- in the same opinion, you'll see, the

10   court says, quote, "The trial record establishes that the

11   defendants continue to target plaintiffs."  Your Honor, you

12   cannot reconcile the concepts of recklessness and targeting.

13   When you target, you aim.  It's not just recklessness.

14           Now, the parties, your Honor, I believe -- and I'll

15   go through this in a second -- have cited to you dozens of

16   cases in this kind of intersection of collateral estoppel and

17   nondischargeability.  I'll submit to you, Your Honor, that no

18   court has ever confronted such clear and -- excuse me --

19   express factual findings.

20           Now, as I said, that decision I just read to you,

21   it's not just a piece of paper that a judge wrote, you know, to

22   give us a favor.  It's the result of a long process.  I'm going

23   to cover that very quickly because I know, Your Honor has read

24   the briefs, so I'm not going to say anything here that's not in

25   the briefs.

1              But of course, it starts in December of 2012,
2    literally hours after the Sandy Hook shooting, with Mr. Jones
3    claiming that there were witnesses who said that it was a false
4    flag.  He'd later, at trial, admit that there were no
5    witnesses.
6              It continued for a decade, with Mr. Jones saying the
7    shooting was a hoax and that the Sandy Hook families, their
8    children were not dead; not one statement, not two statements,
9    repeated for a decade to an audience of millions.  I'm not even
10   going to go through the quotes, Your Honor.  They're on Page 4.
11   There's more in our brief.
12             After six years of those attacks, the Connecticut
13   plaintiffs filed a complaint in the Connecticut state court.
14   What's important to understand is that Jones actively defended
15   and litigated that action.  He retained counsel.  He moved to
16   dismiss.  He tried to remove the case to federal court on four
17   separate occasions.  He took discovery.  He deposed every
18   plaintiff but one.  He sought their medical records and their
19   psychological records, but that discovery was never reciprocal.
20             When Jones moved in 2018 to dismiss the entire case
21   under the Connecticut anti-SLAPP statute, the plaintiffs sought
22   discovery and that discovery was resisted.  Ultimately, Jones
23   claimed falsely that plaintiff's counsel planted child
24   pornography in his discovery documents.  He went on a tirade,
25   put out a bounty on plaintiffs' counsel.  The court, as a

1   sanction, denied the motion to dismiss on the anti-SLAPP

2   grounds.

3           Now, you'll hear today, although I don't think

4   they'll say it expressly, that Judge Bellis is some rogue

5   court, off the reservation.  Well, that particular issue --

6   which was a big issue because the anti-SLAPP issues cover a lot

7   of the First Amendment issues he wants to raise -- that was

8   appealed all the way up to the Connecticut Supreme Court.

9           The Connecticut Supreme Court, as we say on Page 6

10  here, affirmed.  It said that Jones's conduct was part of a

11  whole picture of bad faith litigation misconduct, that it was a

12  pattern of willfulness on the part of the defendants, so it's

13  not just Judge Bellis.

14          That litigation misconduct continued, even after the

15  Connecticut Supreme Court affirmed.  After seven different

16  warnings, the court entered a disciplinary default.  The court

17  found, similar to what the supreme court had found earlier,

18  that there was a pattern of obstructive conduct; that there was

19  willful noncompliance, both with discovery and with the Court's

20  orders; there was a failure to produce critical information in

21  the case.

22          After the default judgment was entered, a trial was

23  held that commenced in September of 2022, a four-week trial

24  where over 400 exhibits were entered.  Every one of those

25  exhibits, Jones's counsel had the opportunity to object to.

1   Many of them, he did.  There were 25 witnesses called.  Jones

2   testified, and every one of the plaintiffs testified.

3            And Your Honor, I'm sorry, I should have said this at

4   the outset:  Two of those plaintiffs are here today,

5   Mr. Robert Parker and Mr. [sic]  Nicole Hockley.

6            The evidence at that trial demonstrated that Jones

7   lied about the Sandy Hook shooting for over a decade, he knew

8   those lies were false, he knew that they were harming the

9   plaintiffs, that he had an audience of 49 million users, and

10  that his lies about the Sandy Hook shooting had 550,000,000

11  impressions, 550,000,000 views.  It also established why he did

12  it.  He did it to sell vitamins, and he did it to make money.

13           After that four-week trial, there was a unanimous

14  jury, six of Jones's peers that awarded $944 million in the

15  aggregate, to all 15 plaintiffs, and determined that punitive

16  damages were appropriate.  Now, what happened next, I think is

17  important, and this actually, I don't think is fully set out in

18  our briefs.  It's in the record, though.

19           After the trial.  It's -- under Connecticut law, it's

20  the trial court that determines punitive damages.  The trial

21  court didn't just wake up the very next morning and issue a

22  scathing opinion.  The trial court asked for briefing on the

23  issue of punitive damages.

24           On Page 9, you'll see what that looked like.  The

25  Connecticut plaintiffs argued, under the applicable Connecticut

1  legal standards, that punitive damages were appropriate because

2  the defendant acted with the highest possible degree of

3  blameworthiness and reprehensibility; that the defendants'

4  conduct was intentional, malicious, and evil; that the

5  defendants' attacks on plaintiffs were certain to cause massive

6  harm.  Those are headings.  There's nearly ten-plus pages of

7  briefing.

8          Jones, of course, had an opportunity to respond, and

9  he did.  He argued that there should be no punitive damages.

10 He argued that the compensatory damages were so high that there

11 was no point in awarding punitive damages.  He never -- and you

12 can read the brief to check me.  He never challenged any of the

13 assertions made in the plaintiffs' brief that punitives were

14 appropriate because his conduct was intentional, malicious, and

15 evil.  After that post-trial briefing, the court held a

16 hearing, Jones was heard, and the Court ultimately issued a 45-

17 page opinion on punitive damages.

18         And that's the quote that we started with.  That

19 quote we started with is the culmination of a 45-page opinion

20 that starts with a careful survey of the Connecticut law, and

21 frankly, the law under the U.S. Supreme Court on punitive

22 damages engages in a multi-factor analysis, including the

23 degree of blameworthiness, and makes specific factual findings.

24         That was not the end of the story in Connecticut.

25 Jones, after that, moved for a new trial and also for

1   remittitur.  Both of those were denied, and the trial court

2   said, in denying those motions, the evidence clearly supports

3   the verdicts.

4        And that brings us to here, into the question of

5   collateral estoppel.  Again, I don't believe there's any

6   dispute over the legal principles here.  We look to Connecticut

7   law for whether collateral estoppel applies, and the questions

8   under Connecticut law are three:  Were these findings that I've

9   been talking about necessary to the judgment, were they fully

10  and fairly litigated, and were the issues identical?

11       I want to start with the question of whether those

12  specific factual findings, that Jones's conduct was intentional

13  and malicious and certain to cause harm, were findings that

14  were necessary.  The answer is plainly yes.

15       Connecticut law tells us that an issue is necessarily

16  determined if, in the absence of that issue, the judgment could

17  not have been validly rendered.  If an issue has been

18  determined, but the judgment is not dependent upon it, then

19  that issue can be relitigated.  So it's really, if you boil it

20  down, I think, a question of was the punitive damages award

21  dependent upon the findings of his conduct being intentional

22  and malicious?

23       Well, when we look to Connecticut law, we find that,

24  to award punitive damages, the evidence must reveal a reckless

25  indifference to the rights of others or an intentional and

1  wanton violation of those rights.  This is described by the

2  Connecticut Supreme Court as requiring wanton and malicious

3  injury, evil, motive and violence, and that's the Ulbrich

4  decision.

5       Now, although it is true that Connecticut law

6  considers many factors, there is no question that under both

7  Connecticut law and the Supreme Court -- the U.S. Supreme

8  Court, of those various factors, the reprehensibility and

9  blameworthiness of a defendant's conduct, that's the most

10 important factor.  And again, Connecticut law is not novel

11 here.  When the Connecticut Supreme Court in Ulbrich reaches

12 that decision, it's reviewing and analyzing the Supreme

13 Court -- U.S. Supreme Court's decision in Exxon Mobil and BMW

14 and in State Farm Mutual.

15      Now, another thing that's important here is that

16 punitive damages are at the discretion of the judge.  The judge

17 can pick essentially any number that the judge would like.

18 What Connecticut law tells us, though -- and this is at the

19 bottom of Page 45, I think it's important -- is quote, "The

20 precise award in any case, of course, must be based upon the

21 facts and circumstances of the defendant's conduct."  Here, the

22 precise award under this particular statute was $10 million per

23 plaintiff.  It was $150 million in total.

24      Now Jones's argument is that there are lots of

25 factors, this one wasn't essential.  This quote here refutes

1   that.  You can't remove some of the factors, in particularly

2   what Connecticut law says is the most important factor, and

3   just assume that the judge would have issued the exact same

4   amount of damages, because Connecticut law tells us that the

5   precise amount is based on the facts and circumstances of the

6   conduct.

7           On Page 13, we try to get a little cute, a little

8   artwork.  We show this range of conduct because again, that's

9   what the case law talks about, the degrees of blame worthiness.

10  Now we know from the Connecticut Supreme Court decision in

11  Ulbrich that under Connecticut law, if you're guilty of

12  negligence or gross negligence, you're not even entitled to

13  punitive damages under the Unfair Trade Practices Act.  You

14  have to, to even get in the door, show recklessness.

15          Now, the Supreme Court of Connecticut goes on to say

16  that there's also intentional conduct and there's malicious

17  conduct.  As I said at the outset, our judge, Judge Bellis in

18  Connecticut, determined that Jones's conduct was at the highest

19  end of the range.  Those are the exact quotes, "the highest

20  degree of reprehensibility and blameworthiness".  Now, earlier

21  in that opinion, Judge Bellis says, quote, "Plaintiffs support

22  each Ulbrich factor with specific citations to the record," end

23  quote.  And you can go to the brief -- the post-trial briefing

24  that we looked at, the table of contents to confirm that.

25          The analysis here, I think, is quite simple.  Could

1   the court possibly have concluded that Jones's conduct

2   established the highest degree of reprehensibility if that

3   conduct was merely reckless?  Is the finding that that conduct

4   was the highest degree, is it dependent upon a review of

5   Jones's conduct, of his motives, of the certainty of causing

6   harm?  It has to be.  It cannot be the case that a court can

7   say, looking at the range of blameworthy conduct, that

8   recklessness is at the highest end of that spectrum.

9           Let me pivot a second to Fifth Circuit law.  The

10  Fifth Circuit -- and this is on Page 14.  The Fifth Circuit

11  consistently considers punitive damages and punitive damages

12  decisions when assessing collateral estoppel.  Point you to a

13  couple of cases.  In Re Caton, a Fifth Circuit Court of Appeals

14  decision out of 1998.  The court says punitive damages required

15  allegations of outrageous conduct or acts perpetrated by evil

16  motive, with reckless indifference to the rights of others.

17  And thus the Court necessarily determined the issues by

18  rendering that judgment.

19          The debtors libelous statements were objectively

20  substantially certain to result in the injury to plaintiff.

21  Again, the Fifth Circuit is looking at a punitive damages award

22  and determining that's sufficient to end the inquiry.

23          On the next page, we cite the Fifth Circuit Court of

24  Appeal decision In Re Gober.  Again, very similar

25  circumstances, there was a default.  After the default, there

1   was a damages hearing.  And the court says that the plaintiff

2   there was required to establish, by a preponderance of the

3   evidence, that the degree and type of the debtor's misconduct

4   warranted punitive damages.  Court then said under applicable

5   law there that required partaking of a wanton and malicious

6   nature.  And the state court specifically found that the debtor

7   acted maliciously and willfully.  "We therefore find that the

8   issue of the debtor's mental state was fully and fairly

9   litigated for collateral estoppel purposes."

10          We've also cited another Fifth Circuit case,

11  In Re Keaty, where the court looked to a Louisiana trial

12  court's sanctions award against attorney -- an attorney, and

13  said that that sanctions opinion provided clear and specific

14  findings regarding the debtor's state of mind.

15          All right.  So what does Jones say to all of this?

16  He says, yeah, those words exist on the page, but the court

17  could have issued punitive damages on a mere -- on a finding of

18  recklessness.

19          Look at the preliminary statement, the very first

20  substantive argument.  The preliminary statement -- I'll just

21  quote it, from Jones, "The issue of willful and malicious

22  injury as used in Section 523(a)(6) was not essential to the

23  default judgment because the state court could have rendered

24  these without deciding that issue", "could have."

25          Now, to be fair, Jones is not wrong to make this

1   "could have" argument.  There are many cases throughout the

2   country where a court does that analysis.  Those cases though,

3   as I'll explain, are all distinguishable.  I'll explain why.

4   This is on Page 16.

5           A lot of cases in this context come up where there

6   was a general jury verdict.  Something is tried in a state

7   court, let's call it a defamation claim, the instruction to the

8   jury is, is the defendant guilty of defamation, yes or no?  And

9   when you look at a jury instruction, that's what you will see:

10  Somebody in the jury checks yes or no.  So the court says,

11  okay, I know you're guilty of defamation, and now I'm going to

12  go look at the applicable standards.  And under the applicable

13  standards of whether it's Illinois or Utah law, they say, okay,

14  to be guilty of defamation, you either had to intentionally do

15  it or recklessly do it.  So the courts say, when I look at the

16  jury verdict, I can't answer that question.

17          So yeah, the jury could have concluded that it was

18  just recklessness, and there are numbers of cases that say

19  that, but there's a number of cases that don't say that.  And

20  those are the cases we're relying on.  And that's the case you

21  have before you today.  These are cases that have clear,

22  specific factual findings.

23          Let's look at Jones's cases, and this is on Page 17.

24  Of the 71 cases that Jones cites in his brief, there are only

25  four cases in the Fifth Circuit that refuse to apply collateral

1    estoppel on this issue.  We've highlighted each of those four

2    cases for you here.

3         In Mahadevan, a case that started with Judge Jones,

4    he actually granted the collateral estoppel, but was reversed

5    at the district court level.  The district court said a

6    judgment for negligence, intentional infliction of emotional

7    stress, and defamation without additional specific findings as

8    to intent does not establish that a defendant acted willfully

9    and maliciously.

10        In Re Dang, the Court said, "The final judgment

11   included no specific findings of knowledge or intent."  In

12   In Re Church, "The finding of mental distress is not

13   accompanied by a finding of intent."  In the Fifth Circuit

14   decision in In Re Miller, "The jury's finding in the state

15   court did not speak to whether the debtor acted with fraudulent

16   intent."

17        That's just not the universe that we're in here

18   today.  We have clear, explicit, factual findings from the

19   Connecticut court.  More importantly, Your Honor, these

20   cases -- thank you -- these cases are in the minority.  Most of

21   the time, the Fifth Circuit Court of Appeals finds that

22   collateral estoppel in this context does apply.

23        We looked at the number of times the Fifth Circuit

24   has analyzed collateral estoppel and nondischargeability.  It's

25   gone to the Fifth Circuit Court of Appeals 41 times; 29 of

1  those times it applied or affirmed collateral estoppel, 10

2  times it did not.  And every one of those ten times, the court

3  found a lack of specific findings.  There were two other cases

4  that have kind of sui generis issues that don't really fall

5  into this rubric.

6         So, Your Honor, we're not asking you to break new

7  ground here.  This case falls right down the middle of the

8  fairway of the jurisprudence in this circuit and in

9  Connecticut.

10        All right.  Let me quickly talk about the fully and

11  fairly litigated element, which starts on Page 18.  I'm not

12  going to belabor this.  The Fifth Circuit has three times held

13  that a default judgment is sufficient for preclusive effect.

14  Connecticut courts hold the same.  Those cite -- cases are

15  cited in our paper.

16        The test under Connecticut law is whether Jones had

17  an adequate opportunity to litigate.  He did.  I've already

18  went through that at the outset.  He clearly had the

19  opportunity.  He clearly did participate.

20        Let's go to the last factor, which I have on Slide

21  21, identical issues.  And I think there's a little bit of a

22  confusion in the briefing here.  Jones oftentimes suggests that

23  the identical issue test requires identical claims or identical

24  standards.  That's not true.

25        The Connecticut Supreme Court in Solon v. Slater says

1  that to determine whether the present case -- sorry -- the

2  issues in the present case are identical, we compare the facts

3  underlying the claims.  The court then assesses whether the

4  party is attempting to relitigate those facts in the second

5  proceeding.

6        So the question of identicalness is a question of

7  fact.  And the question for this Court, then, is whether

8  Jones's intent and Jones's motive and whether his actions were

9  certain to cause harm, whether those facts, which have been

10 decided by the Connecticut court, are being decided here as

11 part of the 523(a)(6) analysis.

12       Your Honor, given the time -- and I told you I'd

13 stick to it -- I'm going to skip through.  We have in our brief

14 a number of other reasons which I think confirm that summary

15 judgment here is appropriate.  You can look to the jury

16 instructions.  You can look to the facts that have been deemed

17 admitted by the default in the complaint, which the Fifth

18 Circuit has a -- endorsed twice.  You can look at the

19 underlying record, confirm for yourself, judge was right when

20 the judge made those specific factual findings.

21       I want to go to Page 25, very quickly.  I said that

22 this is a case that I think lands right down the middle of the

23 fairway.  I think it's a textbook case for the application of

24 Section 523(a)(6).

25       I look at some of the other cases in this circuit

```
 1    that have found actions to be nondischargeable, things like

 2    accusing somebody of theft; sending out a tweet that's saying

 3    somebody was promiscuous; accusing somebody of acting

 4    unethically; the unauthorized use of a trademark; an

 5    extramarital affair with the loss of love, affection, and

 6    consortium, which was a very bizarre case.  Your Honor, here

 7    the facts are a decade of lies, accusing families of faking the

 8    death of their own children, lies that were heard hundreds of

 9    millions of times.

10            In the last few minutes I have, I'll quickly address

11    what I'll call the "collateral attacks", the argument where

12    Jones asks you not to give full faith and credit to the

13    Connecticut judgment, either because that proceeding was unfair

14    to him, it was a violation of his First Amendment rights.  We

15    have, on Page 26, numerous decisions from the Court of Appeals

16    that says that federal courts, including bankruptcy courts,

17    lack authority to review state court decisions, that it's not

18    appropriate to raise those challenges here.

19            More importantly, we're not aware of any case, Jones

20    has not cited any case, where a federal court has ever denied

21    the full faith and credit to a state court judgment on these

22    grounds.  He's asking you to take truly, truly unprecedented

23    decisions.

24            In closing, Your Honor, what do we do if I'm wrong?

25    If you don't buy anything I just sold, where do we go?  We'd
```

1    have a trial in this court.  We'd have to take discovery and

2    depositions.  Those would largely cover the same issues and

3    facts that have already been happened in the Connecticut court.

4         And more importantly, what would it take for Jones to

5    prevail at that trial?  He would have to produce evidence and

6    prove to you that he did not intend to harm the plaintiffs, the

7    subjective test; and that there was not a substantial certainty

8    that his actions would harm the plaintiffs.  He'd have to prove

9    both of those.

10        And you'd have to write an opinion or give a decision

11   from the bench adopting those arguments.  And I'd asked the

12   Court:  Is that even possible to be done without directly

13   contradicting the findings of Judge Bellis in the paragraph

14   that I started with, but throughout the proceeding?  We submit

15   that that's just not possible.

16        There's no way this Court could make those findings

17   and then reconcile them with the findings of the earlier court.

18   And that should set up a red flag that should tell us, wait a

19   second, if, to grant relief to Mr. Jones, I have to do

20   something that is 180 degrees at odds with a prior court, that

21   these issues must have already been litigated, and that's

22   exactly why collateral estoppel should apply here.

23        Notwithstanding my request for rebuttal, Your Honor,

24   if you have questions, I'm happy to use that time now.

25        THE COURT:  No questions.

```
1              MR. KEMPLER:  Thank you very much.

2              THE COURT:  Thank you.

3              MR. DAVIS:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. DAVIS:  As Ms. Driver early introduced us, my

6    name is Chris Davis.  I'm from the Tulsa office of Crowe &

7    Dunlevy, here on behalf of the debtor, and I will be taking up

8    the objection and response of the debtor in opposition to the

9    Connecticut plaintiff's motion for summary.  Mr. Deric

10   McClellan, you're going to hear from shortly, will address the

11   Texas plaintiff's motion for summary, and also certain of the

12   constitutional arguments which we believe apply to both cases,

13   in our view.

14             Now, in our brief, Your Honor, in opposition, on

15   Pages 9 and 10, you'll find a brief summation of the four

16   general arguments that we raised and which we believe defeats

17   the Connecticut movants' request for relief.  Now, given our

18   time limitations here, I intend to focus really on the first

19   and maybe a little bit of the second of those arguments.  And

20   we may just have to urge and stand on our third and fourth

21   points as briefed.

22             Your Honor, for many years now, decades in fact, Alex

23   Jones's public persona, his entire purpose for being, and his

24   only motivation, really, behind what he broadcasts is

25   summarized, we think fairly summarized, in one of the video
```

1    clips that's referenced by the Connecticut movants as Document

2    57-4, at Page 26, and it's Paragraph 264.  And here's the quote

3    of the video clip.  Mr. Jones is speaking.

4              "And then we've got Anderson Cooper famously not just

5              with the flowers blowing and a fake, but when he

6              turns his nose disappears repeatedly because the

7              green screen isn't set right and they don't like to

8              do live feeds because somebody might run up.  CNN did

9              that in the Gulf War and admitted it.  They just got

10             caught two weeks ago doing it in supposedly Syria.

11             And all we're saying is, if these are known liars

12             that lied about the WMDs and lied to get us into all

13             these wars and back the Arab Spring and Libya and

14             Syria and Egypt and everywhere else to overthrow the

15             governments and put in the radical Islamists.  If

16             they'd do that and have blood on their hands and lied

17             about the Iraq war and were for sanctions that killed

18             a half a million kids and let the Islamists attack

19             Serbia, lied about Serbia launching the attack when

20             it all came out later, that Serbia didn't do it.  How

21             could you believe any of it?"

22             -- unquote.

23             Your Honor, we believe as a threshold matter it's

24    critical to a proper examination of the underlying trial and

25    all the record evidence to appreciate this bedrock fact about

1  Alex Jones.  He does not trust the government, nor the

2  mainstream media which, together, this media-government complex

3  for him are the deep state.  His target is the deep state.  And

4  so it was, when the national tragedy of Sandy Hook came

5  along -- and it was a national tragedy and still is -- it

6  became for him the latest in a series of national events,

7  matters of public interest for which he did not trust the

8  official narrative coming from the mainstream media or the

9  government.

10        The idea that he had a willful and malicious intent

11  to cause harm to these plaintiffs as required by 523(a)(6) is

12  in substantial factual dispute.  Now, that may or may not have

13  been the Connecticut court's determination, but that analysis

14  was being done for purposes of Connecticut state court common

15  law and statutory damages, not pursuant to what the Fifth

16  Circuit requires for a determination under 523(a)(6).  Under

17  the 523(a)(6) analysis, as we will go into, the worst-case

18  scenario that the record of evidence supports is one of

19  recklessness, and not the high bar required by Congress for

20  this very narrow exception to dischargeability.

21        Now, the movants have suggested they'd like you to

22  watch videos, and we say watch every one of them that you want.

23  And his intent, Mr. Jones's intent, to rail against the deep

24  state will become abundantly clear.  What won't be clear is any

25  actual intent to cause harm to these families.

1          Now, I know you're familiar that before the Supreme

2    Court case of Geiger, the Fifth Circuit had held that the term

3    "malicious", under 523(a)(6), meant "without just cause or

4    excuse."  That was the prior definition of "malicious" before

5    Geiger.  And you can see the Seven Elves v. Eskenazi case,

6    704 F.2d 241.  After the Geiger case, the Fifth Circuit merged

7    "willful" and "malicious" into a unitary concept and jettisoned

8    the "without just cause or excuse" definition entirely.  And

9    they adopted what we now know as the "objective-subjective

10   test" from In Re Miller.

11          Now, Your Honor, after we filed our briefs, I just

12   happened to come across the case of In Re Powers, 421 BR 326.

13   It's Judge Leif Clark, 2009.  And he just takes the parties

14   through the evolution of the Fifth Circuit's view and its

15   development of its standard both before Geiger and then after.

16   And I recommend that case to Your Honor.

17          And one of the things Judge Clark points out is that

18   the Fifth Circuit's view, as I'm sure you're well-familiar

19   with, is not shared by the other circuits, such as the Ninth

20   and the Tenth Circuit.  There appears to be a split in the

21   circuits on this topic.

22          The Ninth Circuit believes the Fifth Circuit standard

23   eliminates the requirement of scienter, which Congress intended

24   to be required for 523(a)(6).  And this is thoroughly explained

25   in In Re Su, that's S-U, 290 F.3d 1140.  It's a Ninth Circuit

1   2002 case.

2          I mean, so to the extent possible, I certainly would

3   urge the Court to reevaluate whether the Fifth Circuit view is

4   correct.  We want to urge the adoption of the Ninth or Tenth

5   Circuit's view.  But having said that, I recognize that you

6   must follow the precedent of this circuit.

7          And that does lead us to the Mahadevan case.  Your

8   Honor, I'm not sure how to pronounce that.  North of the Red

9   River in Oklahoma, we've been calling this the Mahadevan case,

10  617 F. Supp.3d 654.  And as you're no doubt familiar, that case

11  dealt with a fact pattern of intentional infliction of

12  emotional distress and defamation claims, as here, and the

13  issue of dischargeability under 523(a)(6).

14         And Judge Rosenthal, in that case, teaches us several

15  important things.  Your findings of fact, for instance, are

16  going to be reviewed for clear error, but any conclusions of

17  law will be reviewed de novo.  And your interpretation of

18  523(a)(6) is a question of law, a de novo review, according to

19  Judge Rosenthal.  Judge Rosenthal further pointed out that

20  under In Re Williams, 337 F.3d 504, that, despite similarities

21  in language used to describe an injury under 523(a)(6), in

22  intentional torts, the 523(a)(6) standard is a narrower

23  category than intentional torts.  523(a)(6) does not discharge

24  debts from negligent or reckless injuries.  The objective

25  substantial certainty of harm does not mean the absolute

1   certainty, but it does require more than a high probability;

2   more than a high probability.

3            Judge Rosenthal pointed us to two different cases in

4   Mahadevan.  She pointed out the In Re Delaney and the In Re Red

5   case when she discussed that.

6            And the In Re Delaney case had the fact pattern of

7   the debtor intentionally loading a shotgun and then carrying

8   the shotgun to a car where a creditor was sitting and with

9   loaded gun and a finger on the trigger tapping the window of

10  that car and the gun went off.  As Judge Rosenthal pointed out,

11  that was not a high enough standard for the objective

12  substantial certainty test.  In Re Red, she pointed out, had to

13  do with the debtor driving a car into a crowded bar where some

14  of the creditor's relatives were, killing some people.  That

15  did meet these standards.  So somewhere above the shotgun

16  tapping on a window is what we're talking about here, according

17  to Judge Rosenthal.

18           The Mahadevan case tells us that to determine the

19  preclusive effect of state court judgments we've got to apply

20  the preclusion law of the state in which the judgment was

21  entered.  And that was California for her, Connecticut for you.

22           And you'll notice in that case, Your Honor, that

23  Judge Rosenthal went into meticulous detail, parsing out what

24  words like malice meant in California.  And she didn't assume

25  that just because we see the word malice from a state court

1    judgment that it automatically fits into 523(a)(6).  That is

2    part of your task, to carefully look the -- at what these words

3    the Connecticut court used and determine what they mean under

4    Connecticut law versus whether they automatically apply to

5    523(a)(6).

6            Now, the Connecticut court trial judge in the CUTPA

7    and punitive damages opinion did say, quote, "The record

8    clearly supports the plaintiffs' argument that the defendants'

9    conduct was intentional, malicious, and certain to cause harm."

10   Now, the Mahadevan case, though, teaches us that it's not so

11   simple and not so automatic that those words are a finding

12   suitable for 523(a)(6).

13           Judge Rosenthal would have you look deeper, lest we

14   fall into the same trap that the bankruptcy judge did in

15   Mahadevan and which I believe the movants today would have you.

16   To do to be sure, if you do what the movants are asking, I

17   believe you'll be doing the very thing Judge Rosenthal had to

18   correct.

19           Now, the judgments in intentional infliction of

20   emotional distress and defamation and CUTPA do not necessarily

21   determine the nondischargeability.  If you just do a careful

22   examination of the movant's exhibits in this case -- so for

23   instance, we'll take a quick look at the Lafferty complaint and

24   the default judgment ruling, the jury charge, the verdict

25   forms, and the Connecticut damages order, these all include

1  different issues and use different legal standards under a

2  lighter burden than what the 523(a)(6) standard per the Fifth

3  Circuit requires.  There's not the identity of issues as

4  required by Connecticut law.

5          And we're dealing with offensive collateral estoppel

6  here, Judge Lopez.  And in the In Re Fitch case, which we

7  cited, 349 BR 133 -- that's a Northern District of Texas

8  Bankruptcy decision in 2006 -- we're admonished that courts

9  must tread cautiously and that collateral stopped is not

10 favored -- offensive collateral estoppel is not favored.

11         Now, in our read of the Connecticut cases,

12 Connecticut has a tough standard, a high bar for issue

13 preclusion to apply.  And when applied, there are several

14 factors to consider.  First, must conduct a precise identity of

15 the issues analysis between the first and the second case, and

16 the issue must have been actually litigated and necessarily

17 determined in the first case.  Those are two separate factors,

18 Your Honor.  And we cited to the Efthimiou v. Smith case,

19 846 A.2d 222.

20         So the issue to be litigated in the second proceeding

21 must be identical in the prior proceeding, and we cited to the

22 Peterson case.  "Overlap, even significant overlap of the

23 issues is not enough", and that comes from the Independent

24 Party of Connecticut case.

25         And, Your Honor, what's being described there is

1  there can be no daylight between the issue in the first case

2  and the issue being presented for the second case, no daylight.

3  "If a judgment does not specify the issue on which it was

4  based, collateral estoppel does not apply."  This comes from

5  the Dowling case.  And if there are multiple possible reasons

6  for the judgment, and the court cannot determine whether one is

7  inherent in the judgment, collateral estoppel will not apply.

8  That is also from Dowling.

9          Now, Your Honor, you must specifically determine that

10  the issue presented in the second case here was necessary to

11  the judgment in the first case.  And we looked to the Laurel

12  Beach case in our briefing.  That's 785 A.2d 1169 for that

13  proposition.

14          And, Your Honor, in my mind, this issue is a bit more

15  nuanced and difficult, and I think that we clearly see it a bit

16  different than our worthy adversaries here.  An issue is

17  necessary only if, quote, "In the absence of a determination of

18  the issue, the judgment could not have been validly rendered,"

19  unquote.  That's from the Deutsche Bank v Sebastian case.

20  That's 166 A.3d 716.

21          We said that if, "The judgment is not dependent on

22  the determination of the issues, the parties may relitigate,"

23  and that comes from the Jackson v. Whipple case.

24          And even outside the default judgment context, the

25  first court's findings were statements that go beyond what is

1   essential, go beyond what is essential, to the judgment are

2   treated as dicta for collateral stopped purposes.  This comes

3   from the Gladysz case, G-L-A-D-Y-Z.  That's 773 A.2d 300.  And

4   the Gladysz case explains that dicta is given no preclusive

5   effect.

6          What we're trying to argue from our briefing, Your

7   Honor, is on this issue of essentiality or necessity, it's our

8   view, for instance, if the judgment could be affirmed on other

9   grounds such as recklessness, then the issue of malicious and

10  willful, while that may very well have been the finding of the

11  trial court, it's not necessary to the judgment.  In other

12  words, the Connecticut appellate court in this case could

13  affirm, could very well affirm, the trial court's findings and

14  the jury's findings on other grounds, like reckless, even if it

15  does not find malice or some higher, more culpable issue had

16  been met.

17         So we believe the question to be asked is what is the

18  finding that is essential or necessary for that issue to be

19  established under that state's law?  And a -- for instance, as

20  Mr. Kempler just explained, you know, without a showing of

21  recklessness or reckless, we don't get to punitive damages, I

22  don't believe, in any state in the union.  If all you have is

23  ordinary negligence, I can't think of a state in the union that

24  would allow for a punitive damages award.  You have to have at

25  least recklessness.  Now, more than that, while it may be

1   accurate, is not essential, and it would be dicta under

2   Connecticut collateral estoppel law, is what we're arguing in

3   our brief.  That comes from the Gladysz case again.

4         Now, let's apply some of these Connecticut bullet

5   point rules to what was actually litigated in the present case.

6   Let's look at the intentional confliction of emotional distress

7   claim, the defamation claim, and the CUTPA claims as litigated.

8   And let's start with the Lafferty complaint, which is the

9   movants' Exhibit 1-4.  It was Exhibit 4 to the present

10  adversary complaint filed in this case.

11        And if the Court were to look at Count 2 and look at

12  the defamation and defamation per se claim, the Court would

13  first observe here that both defamation and defamation per se

14  are merged into a single count, and there's no distinction made

15  between the two.  But if you looked at Paragraph 354 and 356,

16  and I'll read these, 354 says, "In light of their prior

17  experience with similar sorts of reckless and false

18  statements", reckless and false statements, "the defendants

19  knew that their publications could cause the plaintiffs to

20  suffer harassment and potential violence."

21        Paragraph 356 says, "The defendants broadcast their

22  outrageous, cruel, and malicious lies about the plaintiffs with

23  knowledge that the statements were false or with reckless

24  disregard as to whether or not they were true."

25        Count 3 of the complaint, the intentional infliction

1    of emotional distress count, Paragraph 361 alleges, "In

2    broadcasting their campaign of outrageous and false statements

3    about the plaintiffs, the defendants intended to inflict

4    emotional distress, or knew or should have known that emotional

5    distress was the likely result of their conduct"; knew or

6    should have known, which is a reckless standard, Your Honor.

7              Paragraph 366, alleges, "In light of their prior

8    experience with similar sorts of false and reckless statements,

9    the defendants knew that their publications could cause," could

10   cause, "the plaintiffs to suffer harassment and potential

11   violence."

12             Paragraph 369 alleges, "The defendants broadcast

13   their outrageous, cruel, and malicious lies about the

14   plaintiffs, with knowledge that the statements were false or

15   with reckless disregard as to whether or not they were true."

16             And then finally, Your Honor, Count 5, which is the

17   CUTPA account, Paragraph 319, it is alleged that, "The

18   defendants broadcast their outrageous, cruel, and malicious

19   lies about the plaintiffs with knowledge that the statements

20   were false or with reckless disregard as to whether or not they

21   were true."

22             The point to be made here, Your Honor, is that we

23   have the disjunctive of recklessness running through all three

24   of these counts.  Now, I don't fault or I'm not in any way

25   critical of the way the complaint was drafted.  This is how I

1    would have drafted the complaint, because at the time you're

2    trying to allege the elements of the claims under that state

3    court's laws, and recklessness is one of the elements that is

4    the minimum that has to be reached for those claims to attach.

5            Now, we know that default judgment was rendered as a

6    sanction on these allegations, and the movants have taken the

7    position that all of the allegations in the complaint are now

8    deemed admitted in the present adversary complaint.  Footnote

9    3, Document 1 -- this would be Footnote 3 of Document 1 in this

10   case.  They say that under Connecticut law, an entry of default

11   conclusively establishes the facts alleged in a complaint.  And

12   in their briefing they cited to Smith v. Snyder and a case

13   called DeBlasio.  And Your Honor, that Smith case and the

14   DeBlasio case do say that.  As it's recounted here in Footnote

15   3, it does say that.

16           But Your Honor, after the briefing was done, I went

17   back and looked, and one or both of those cases cite to a case

18   called Zullo.  And Zullo is 143 Connecticut 124, or

19   120 A.2d 73.  It's a 1956 Connecticut Supreme Court case.  And

20   I urge the Court to take a look at that because it gives a

21   little bit more color and a more fulsome description of what is

22   the effect of a default judgment under Connecticut law on the

23   allegations of a complaint.

24           And you're going to read, in that Zullo case, that in

25   an action at law, the rule is that the entry of default

1   operates as a confession by the defaulted defendant of the

2   truth of the material facts alleged in the complaint, which are

3   essential to entitle the plaintiff to some of the relief

4   prayed.  It is not the equivalent of an admission of all the

5   facts pleaded.  The limit of the effect is to preclude the

6   defaulted defendant from making any further defense and to

7   permit entry of a judgment against him on the theory that he

8   has admitted such of the facts alleged in the complaint as are

9   essential to such a judgment.  And I'll let you read that for

10  yourself.  I have copies of the case for counsel and anyone

11  else who may want it.  But, Your Honor, we've had default

12  judgment on the complaint, and in all three of the claims we

13  have the disjunctive of recklessness.

14          So how was the jury then charged at the end of the

15  damages hearing that we had, the four-week damages hearing?

16  The evidence is now all in at that point.  The evidence

17  basically is closed.  The jury's heard all they're going to

18  hear, and now it's time for the jury to be charged.  And the

19  Connecticut court said the following.  This is Document 57-21,

20  and if you look at the bottom half of Page 12, you'll read the

21  Court's instruction to the jury:

22          "As I have instructed you, the Court has determined

23  that the defendants are liable for having intentionally

24  inflicted emotional distress on each plaintiff.  Four elements

25  must be shown to establish intentional infliction of emotional

1    distress.  These four elements have been established:  One, the

2    defendants intended to inflict emotional distress or the

3    defendants knew or should have known that emotional distress

4    was the likely result."

5         So, for intentional infliction of emotional distress,

6    Your Honor, the disjunctive of "knew or should have known,"

7    which is a reckless standard, has been established and the jury

8    was so instructed.

9         Now, the jury was also instructed on defamation.  And

10   again, this is after the damages hearing.  At the bottom of

11   Page 13 of the jury charge, the top of Page 16, and then onward

12   a little bit to Page 22, you'll read what the jury was charged

13   on, on defamation.

14        And Your Honor, you can search in vain for any

15   reference to language that equates to willful and malicious

16   actions with intent to cause harm.  In fact, the defamation

17   per se claim is not used or referenced in the jury charge at

18   all.  And we know that the Lafferty complaint merged the two

19   into one count.

20        Now, in this venue, we cite to the In re Doe case,

21   which says a defamation verdict in state court will not always

22   support a finding of willful and malicious injury under

23   523(a)(6).  Now, we cited to the Cweklinsky case and the

24   Gleason case for the idea of what does it take to establish a

25   prima facie case of defamation in Connecticut.  The plaintiff

1    must show that the defendant published a defamatory statement

2    which identified the plaintiff to a third person and the

3    plaintiff's reputation suffered because of it, and so forth.

4            Only the act of publishing is required, not

5    necessarily intending an injury is what we argue.  Defamation

6    per se doesn't change the analysis, Your Honor.  Only one

7    element -- that would be injury to reputation, and not the

8    intent to publish, is presumed.  That's from the Gleason case.

9            Actual malice, which is the most stringent standard

10   in Connecticut for defamation, can be met with mere

11   recklessness as to the truth of the statement.  And that comes

12   from the Gambardella case, 969 A.2d 731.

13           So back to the Lafferty complaint for which default

14   judgment was granted establishing the issues and what was

15   established, Paragraphs 354 and 356 reference recklessness.

16           So, Your Honor, the question is when the jury awarded

17   compensatory damages for 900 -- almost $950 million, what were

18   those awards based on?  Can you tell?  Well, in part, we have

19   recklessness.  And the Court here cannot determine that those

20   awards were based on the identity of issues required under

21   Connecticut law, and that the willful and malicious of

22   523(a)(6) is what was litigated.  Because what was pled was

23   recklessness in the alternative, and that this is also how the

24   jury was so instructed.  We just simply cannot apply collateral

25   estoppel to those debts.  There's too much daylight.

1          So what about the common law punitive damages and the

2   CUTPA award?  Well, likewise, if we look at the common law

3   punitive damages jury instruction which begins at the bottom of

4   Page 23 and following, the Connecticut Trial Court instructed,

5   quote, "Punitive damages may be awarded if you find that the

6   defendant's actions were willful, wanton, or malicious."

7          The judge instructed that "A willful and malicious

8   harm is one repeated" -- "is one inflicted intentionally

9   without just cause or excuse."  I'll repeat that.  "A willful

10  and malicious harm," the jury was instructed, "is one inflicted

11  intentionally without just cause or excuse."

12         The jury was further instructed that wanton

13  misconduct is reckless misconduct.  "If you determine that

14  they" -- punitive damages -- "should be awarded, I will

15  determine how much the compensation will be."

16         Your Honor, I wasn't there for the Connecticut trial;

17  but, as I understand it, it was jury that checks the box as to

18  whether or not punitive damages is to be awarded.  The trial

19  judge decides how much.  But that threshold question of did we

20  reach the standard is a jury determination, and they're being

21  instructed accordingly.

22         The judge explained, "You are to determine whether

23  plaintiffs should be compensated by considering the extent to

24  which you find the defendants' conduct is outrageous, the

25  degree to which you find the defendants were recklessly

1   indifferent to the rights of the plaintiffs, or intentionally

2   and wantonly violated their rights."  The jury was told, "This

3   is a matter for your sound discretion."

4          So, Your Honor, in Connecticut, punitive damages, as

5   the jury was instructed in this case, it's either wanton or

6   willful and malicious.  And wantonness is recklessness.  They

7   were expressly told that.

8          Now, certainly, willful and malicious sounds an awful

9   lot like 523(a)(6).  In fact, it's the very same words.  But

10  Judge Rosenthal would never stop there.  Under Connecticut law,

11  malicious, we were just told and instructed, is defined as

12  without just cause or excuse.

13         So Connecticut, in Connecticut, they define malicious

14  with precisely the same terminology and in same way that the

15  Fifth Circuit has rejected after Geiger in In Re Miller, where

16  the Miller court said the "just cause or excuse" approach is

17  particularly inappropriate, however, given the Supreme Court's

18  definition of willful injury in Geiger.

19         So we need to do here what Rosenthal did, parsing --

20  what Judge Rosenthal did, parsing malice.  And we learn, as she

21  did, about California.  She observed in California malice as

22  two different possible definitions, one of them, I think, is

23  called "despicable malice," she explained in the Mahadevan

24  case.  And despicable malice is a recklessness standard.  And

25  what she learned and what she observed is that not all malices

1   are the same.  And here, we've got Connecticut, malice that

2   uses a definition that is the very definition that the Fifth

3   Circuit rejected and now says cannot be used for 523(a)(6).

4          So, if we look at jury verdict forms, Document 57-22,

5   the jury did end up checking the box for punitive damages.

6   Your Honor, what was that based on?  Did the jury check the box

7   because of wantonness and recklessness, or malicious and

8   willful only?  We can't tell.

9          And even if it was malicious, we're not using malice

10  in Connecticut the same way that the Fifth Circuit requires for

11  523(b)(6).  And In re Dang, the case that Counsel just cited,

12  560 B.R. 287, Judge Rosenthal referred to this also in the

13  Mahadevan case, explained that disjunctive jury instructions in

14  state court judgments, which is whether there was willful,

15  malicious, or reckless, "make it difficult for a bankruptcy

16  court to give preclusive effect."

17         And so here we are with $1.39 billion of an award,

18  and we cannot tell from the jury verdict form and the jury

19  charge what was the jury thinking, and what does that debt rest

20  upon?

21         So let's turn finally to the CUTPA award.  The

22  Connecticut court, state court, did state on Page 37 of the

23  45-page -- we call it the "Connecticut damages opinion," but

24  it's the opinion of -- awarding CUTPA damages and then awarding

25  the punitive damages amounts.  And the judge cited to the

1    Ulbrich v. Groth case, supra 310 Conn. 446, 447, and stated

2    that the Supreme Court held that a trial court's award of

3    punitive damages under CUTPA was not an abuse of discretion

4    when the trial court reasonably could have found -- where the

5    trial court reasonably could have found that the defendant's

6    conduct was reckless.  That's a quote from that opinion.

7            Your Honor, it's our read of Connecticut law, in

8    looking at the Ulbrich case, that Ulbrich requires a minimum

9    showing of recklessness for a CUTPA claim, a CUTPA award.  And

10   recklessness then, in our read of this, is what is essential or

11   necessary.  That is the sine que non, the without which not,

12   for a judgment in CUTPA to rest upon.  Okay?  That's what's

13   essential.

14           So on Page 43, then, of that opinion, this is the

15   quote:  "Finally, the Court turns to the most important

16   consideration, the degrees of relative blameworthiness, that

17   is, whether the defendant's conduct was reckless, intentional,

18   or malicious.  The record clearly supports the plaintiff's

19   argument that the defendant's conduct was intentional and

20   malicious and certain to cause harm by virtue of their

21   infrastructure, ability to spread content, and massive

22   audience, including the InfoWarriors," unquote.

23           Now, Your Honor, in truth, I'd feel a lot better if I

24   had the ability to airbrush right over that phrase of the

25   opinion, but I don't.  It's there.  We have to deal with it.

1   So the question is why doesn't that get us over the top for

2   collateral estoppel?

3            We have several things we argue in our brief in

4   response.  The first, obviously, is that while the trial judge

5   may very well have found reprehensible conduct, malicious

6   conduct, and all the other evil -- all the other adjectives she

7   used -- that may very well have been her finding for her

8   purposes in the Connecticut proceeding.  What's essential and

9   necessary for a CUTPA award, though, is recklessness.  And so

10  for collateral estoppel analysis, that becomes dicta and given

11  no preclusive effect under Connecticut law looking to the

12  Gladych (phonetic) case.

13           Now, Your Honor, number two, second argument:  We're

14  not raising a bar here to nondischargeability.  Your Honor, I

15  can't stress this enough.  It may very well be that at the end

16  of the day the movants here are correct that this one point --

17  almost $1.5 billion debt is nondischargeable.  We don't think

18  so, but we can't get there through collateral estoppel.  Can't

19  be -- we just -- it's not a route that we can get there.

20           Malice, we see the word malice in her opinion.

21  Intentional malice certain to cause harm.  We know that malice

22  in Connecticut is not the same thing as malice as required by

23  523(a)(6) in the Fifth Circuit.  In fact, it uses the very

24  definition that the Fifth Circuit has rejected.

25           The trial court found that every factor in the

1   <u>Ulbrich v. Groth</u> case favored high punitive damages, and so the

2   concept of "certain to cause harm" cannot be isolated amongst

3   many factors.

4           And Your Honor, regarding the "certainty to cause

5   harm" finding that our trial judge did in Connecticut, the

6   reference is made to the infrastructure that Mr. Jones and his

7   media group have, the large presence of -- on the internet and

8   radio and everywhere else and the wide listening audience.

9   Those are the factors that she points to that caused her to

10  conclude that there was a certainty to cause harm.

11          I think the Fifth Circuit not only invites you, I

12  think requires for you to take a look at that and decide that

13  for 523(a)(6) purpose is that certainty to cause harm?  Is the

14  infrastructure that Mr. Jones had developed over the years, the

15  InfoWarriors listening audience around the country, and the

16  presence of those external factors, is that the kind of

17  certainty to cause harm that 523(a)(6) requires?

18          We don't think so.  And we look back at the <u>Mahadevan</u>

19  case, for instance, where Judge Rosenthal observed the jury was

20  not asked to decide whether <u>Mahadevan</u> knew that the statements

21  were false but spread them anyway knowing they would cause

22  harm.  If her "certainty to cause harm" maybe was tied to

23  things he actually said, I don't know where that would leave

24  us, but that's not what her "certainty to cause harm" finding

25  seems to be tied to in that opinion.

1          Your Honor, was the 523(a)(6) -- and I'll conclude

2   with this.  Was the 523(a)(6) standard really even ever

3   actually litigated?  It certainly was never pled.  It's not in

4   the IIED defamation or CUTPA claim and, candidly, Your Honor,

5   by the time the judge wrote that opinion, we already had a jury

6   determination of 1.3 -- or what came to be 1.39 million --

7   billion dollars.  And we can't determine what that hinged on.

8          Your Honor, under Connecticut law, an issue must be

9   actually litigated and necessarily decided for collateral

10  estoppel to apply.  "Actually litigated" requires that it's

11  properly raised in the pleadings, submitted for determination,

12  and in fact determined.  And we cited to the Efthimiou v. Smith

13  case.

14         Your Honor, the central element under 523(a)(6) to

15  determine whether we get into that exception is intent.  And

16  that was the very thing that Mr. Jones was not allowed to

17  testify to, to put on evidence about in the damages hearing.

18  Sure, he testified, and there was a long parade of witnesses

19  and exhibits, but the one thing that he was shackled and

20  muzzled from being able to testify to is the very thing that an

21  analysis under 523(a)(6) would require.

22         And so, Your Honor, we are left either with the fact

23  that if 523(a)(6) was what -- and that standard was what was

24  being litigated in that damages hearing, then this was a gross

25  procedural due process violation of Mr. Jones.  But I don't

1  think we can presume that and I don't think it's appropriate to

2  presume that of the trial court.  I don't believe for a minute

3  that the judge in the Connecticut trial court intended to

4  violate Mr. Jones' due process -- procedural due process.

5        Instead, I think what you're left with, the

6  conclusion, is that standard was in fact not before the Court.

7  It wasn't actually litigated.  It wasn't on anyone's mind.  It

8  isn't until we get to the end and this order comes out, as a

9  result of the briefing done, that this phraseology, certain to

10 cause harm, malicious, so forth, even pops up.  But Mr. Jones

11 was not given a chance to litigate the issue of his intent in

12 that damages hearing for sure.

13       So, Your Honor, if I may, in summation, we follow

14 Mahadevan and In re Miller, we apply Connecticut law on

15 collateral estoppel, the compensatory damage awards for

16 intentional infliction of emotional distress and defamation can

17 be given no preclusive effect.  Recklessness was pled,

18 defaulted, and the jury was instructed in accordance with

19 Connecticut law.

20       We do not have the identity of issues, the -- too

21 much daylight here, the disjunctive pleading resulting in

22 default establishing those elements, plus the jury charge.  We

23 just can't say that the issue of willful, malicious intent, per

24 523(a)(6) is what caused those injuries and that that was ever

25 litigated.  There's no way to determine what those compensatory

1   damage awards rest upon.

2          And likewise, with the common law punitive damages

3   decision, that award, that can't be given preclusive effect

4   either.  Wantonness is recklessness, and malice as defined in

5   Connecticut is defined exactly opposite and in opposition of

6   what the Fifth Circuit requires.

7          And with the CUTPA award and that decision, Your

8   Honor, it can't be given preclusive effect either because

9   recklessness is what's essential for a CUTPA award in

10  Connecticut and all the other findings that she made, accurate

11  as they may have been for her purposes, her collateral estoppel

12  analysis, her dicta, that can be given no preclusive effect.

13         And so, for all these reasons, Your Honor, and all

14  the other arguments that we've raised in our brief, we believe

15  the movant's motion for summary judgment simply must be denied.

16  Thank you.

17         THE COURT:  Thank you very much.

18         Kempler, to keep it fair, I've got to hold you to 13

19  and a half minutes.

20         MR. KEMPLER:  That's more than fair, Your Honor.

21  Your Honor, Kyle Kempler from Paul Weiss on behalf of

22  Connecticut plaintiffs.  I'd just like to address a couple of

23  points and then, of course, if the Court has any questions.

24         I think what we have here, Your Honor, is frankly two

25  ships passing in the night.  I understand that Mr. Jones is

1    focused on the elements of the claims, and he's looking at the

2    elements of those claims -- and I'll talk about those in a

3    second -- and he says, as I think Counsel just did, we just

4    can't say.  We just don't know.

5              That is not true.  We do know.  We know because the

6    judge issued an opinion.  And I heard a couple of answers to

7    that.  Let me start with clarifying one thing.  The jury did

8    not decide -- there are two types of punitive damages in this

9    case.  There are common law punitive damages, that's

10   essentially the attorneys' fees in this case, and there are

11   punitive damages under the Connecticut Unfair Trade Practices

12   Act.  Those are two separate issues.

13             It is true that the jury -- and he was reading you

14   some jury instructions about punitive damages -- that applies

15   to the common law punitive damages.  The jury was not

16   instructed at all with respect to the elements of the punitive

17   damages under the Connecticut Unfair Trade Practices Act.  That

18   issue was decided solely by the judge.

19             We also know that the Connecticut judge in looking at

20   that issue, as I said at the outset, did not just say it was

21   malicious.  I've heard an argument that says, hey, the word

22   "malicious" under Connecticut law means something different.  I

23   actually don't think it does.  I think this, you know,

24   insistence on the Fifth Circuit changing its case law by not

25   having an unjust excuse standard -- I think if you read Miller,

1    you'll see that the Fifth Circuit was already where the Supreme

2    Court was.  They never held that an intentional act that just

3    happens to harm somebody, which was the issue in Geiger v.

4    Kawaauhau, they never held that that was willful and malicious.

5            And so, if you read the Miller decision, you'll see

6    yes, the Supreme Court has issued a new decision.  It does not

7    change our substantive law.  They do say that they have to

8    reformat the test because in the Supreme Court's opinion they

9    cabined the holding of an old case Tinker, from 1927.  And they

10   said, now that the Supreme Court has done that, we should

11   reformulate our test.  But I don't believe you can fairly read

12   Miller that somehow makes a big change in Fifth Circuit law.

13   It didn't.

14           But I hear him, the word "malicious," maybe that

15   means something different under Connecticut law.  But what

16   about the word "intentional"?  What did we hear for why a

17   finding that defendant's conduct was intentional doesn't meet

18   the standard of Section 523(a)(6)?  What about the word

19   "attack"?  What about the words "highest degree of

20   blameworthiness"?

21           There's no answer to those language -- to that

22   language.  The answer is the "could have" test.  And I want to

23   unpack that a second.  If the Court could have issued punitive

24   damages under the Connecticut Unfair Trade Practices Act, if

25   the Court had found just recklessness, and they cite the

1  Supreme Court case in <u>Ulbrich</u> -- the Connecticut Supreme Court

2  case.  I want to be very clear.  <u>Ulbrich</u> is not a collateral

3  estoppel case.  It's an appeal of a lower court's finding of

4  punitive damages under the Connecticut Unfair Trade Practices

5  Act.  And they're saying to survive appeal the Court had to

6  have at least found recklessness.

7        And what's happening here is that the Jones counsel

8  is taking that and saying, all right, so all we have to do to

9  find out if collateral estoppel applies is find out if it could

10 survive appeal on a lower standard.  But that is not the test

11 for applying collateral estoppel.  The test for whether

12 something is necessary to a judgment is not whether the

13 judgment could be affirmed on appeal with some different set of

14 facts.  The question is whether the judgment that was issued

15 depended upon those facts.

16        I won't reiterate all the reasons why this judgment

17 depends on those facts, but I will reiterate the one point that

18 I called out earlier.  The law under the Connecticut Supreme

19 Court and the U.S. Supreme Court is that the precise award must

20 be based upon the facts and circumstances of the case, the

21 precise award.

22        What they are telling you is that you could ignore --

23 I think he said he'd like to gloss over.  You could ignore all

24 of these findings because, in theory, on appeal, a Connecticut

25 appellate court could still apply punitive damages without a

1  finding of intentionality, without an intent -- a finding of

2  maliciousness.

3          I don't think that's right.  I don't think a

4  $150 million judgment, the precise amount of the CUTPA punitive

5  damages award here, can be the exact same amount if you strip

6  out what are clearly the Court's factual findings.  The test is

7  not whether in some universe they could survive appeal.  The

8  test is whether or not the opinion that we are asking to apply

9  preclusive effect to, whether those facts were necessary to it,

10  whether it depended on it, and they clearly did.

11          Now, we heard a lot about Mr. Jones's intent.  He's

12  just out to question the government, question the deep state.

13  If you read or watch his videos, you'll find that that's all he

14  is.  At best, if you accept that argument -- and I don't think

15  the record here reflects that -- but even if you accepted that

16  argument, that only goes to the subjective test.  It says

17  nothing about the objective test, whether his actions, judged

18  from a reasonable person's standpoint, were substantially

19  certain to cause harm.

20          And I don't think it's an accident, Your Honor, the

21  argument we heard started there and then cites some cases

22  that's not in the briefing, so I haven't had a chance to read

23  them, but I think they ask you to look to the Ninth Circuit, to

24  not apply the Fifth Circuit law.

25          Now, the reason they're asking you to do that is

1  because they know that, even if you accept their story that

2  Jones is just somebody who doesn't trust the media, it does

3  nothing to dislodge the clear outcome under the objective test.

4         I want to talk briefly about the jury instructions.

5  The entire discussion of reading the jury discussions, of

6  course, ignores what the judge's opinion finds.  But even if we

7  go one by one, I'd start with the first -- I'm sorry, the

8  defamation.  Now, Counsel said that the Court did not find

9  anywhere in its opinion that it was defamation per se.  That's

10 not true.  We cited in our papers, but I'll say again, on

11 Page 21 of the jury instructions, it says, quote, "The law

12 presumes that there is injury to the plaintiffs' reputations,"

13 end quote.  That's defamation per se.

14        I'd point Your Honor to the Fifth Circuit Court of

15 Appeals opinion in In re Scarbrough, 836 F.3d 447, where it

16 found that defamation per se was nondischargeable.  Why is

17 that?  Because of the objective test.  If a statement -- and

18 this is what the Fifth Circuit says when it's looking at a

19 defamation per se there, is, quote, "so obviously hurtful," end

20 quote, that a plaintiff doesn't even need to prove injury.

21 That same statement is substantially certain to cause harm.

22 There is no daylight between those two issues.  If the law

23 makes an exception for certain statements that are so

24 outrageous that the law presumes injury, it is fair to say that

25 it is substantially certain to cause harm.

```
 1              Spends a lot of time on the intentional infliction of
 2   emotional distress claim.  We don't dispute that under
 3   Connecticut law you can have a successful intentional
 4   infliction of emotional distress claim when somebody acts in a
 5   way where they knew or should have known that it would cause
 6   harm.  I don't, frankly, think that's very different from this
 7   objective test.  I'd ask Your Honor to look at the end of
 8   Miller.  So Miller is the case post Supreme Court Geiger case.
 9   They reformulate this test.  They spent a lot of time saying,
10   okay, there's an actual malice or there's an implied malice,
11   we're going to adopt an implied malice.
12              It says, at the end of that, that -- once they
13   formulated the substantial certainty to cause harm, they say
14   that this is very similar to what a lot of commentators have
15   asked us to adopt, which is a test of "knew or should have
16   known."  That's the language he's telling you precludes summary
17   judgment here.  We've also cited to Colliers, which says that
18   claims on intentional infliction of emotional distress,
19   typically held to be nondischargeable.
20              With regard to whether the Court could look to the
21   facts of the complaint as deemed admitted, another case not
22   brought up in the briefing, they cite to Zullo.  My diligent
23   team tells me that that's a case from 1956.  We cite in our
24   papers a Connecticut Supreme Court case from 2004 that says
25   every fact in a complaint in a default judgment case is deemed
```

1  admitted.

2        He also says that if you apply Zullo -- I don't know

3  why you would, there's much more recent pronouncements from the

4  Connecticut Supreme Court -- that it only applies to facts

5  essential to the relief sought, but our complaint did seek

6  punitive damages under both common law and the Connecticut

7  Unfair Trade Practices Act.  I'd also note that this issue

8  about the importance of Zullo is being raised on appeal in

9  Connecticut.

10        He ended, Your Honor, I believe, with an argument

11 that Mr. Jones didn't have a fair opportunity.  He couched it

12 in the sense of the issues were not actually litigated because

13 Mr. Jones didn't have an ability at trial to testify as to his

14 intent.  It's not a surprise that somebody who's been -- had a

15 default judgment entered against them is not allowed at trial

16 to testify on the issues that have already been decided by

17 default.  And that's what happened.

18        In any event, his complaints are a complaint about

19 the process in the Connecticut court; it's a collateral attack

20 on the Connecticut court; and again, they've cited no case law

21 that would allow you, even if you had misgivings about what

22 happened in Connecticut, to somehow ignore the result of the

23 Connecticut proceeding.

24        So, Your Honor, I think really we're just at a

25 difference here about how the facts apply to the law, and I'd

1  urge Your Honor to think through, as you're contemplating this

2  case, the punitive damages opinion, the five different ways

3  that that opinion establishes either subjective or objective

4  intent under the Fifth Circuit law; and Your Honor, we'd kindly

5  ask that you apply summary judgment here.

6          THE COURT:  Thank you very much.

7          MR. KEMPLER:  Thank you.

8          THE COURT:  I very much appreciate the arguments of

9  the parties and the briefing.  I will take the Connecticut

10 matter under advisement.  Why don't we take -- why don't we

11 start back up at 11:45 and start with Texas.  I'll just step

12 off and we'll come back on.  Thank you.

13         THE CLERK:  All rise.

14    (Recess taken at 11:36 a.m.)

15    (Proceedings resumed at 11:47 a.m.)

16         THE CLERK:  All rise.  Please be seated.

17         THE COURT:  Okay.  Good -- I guess I can still say

18 good morning.  This is Judge Lopez us back on the record in the

19 Jones case.  We will now turn to summary judgment in the Texas

20 plaintiffs' case.

21         MR. MOSHENBERG:  Good morning, Judge.

22         THE COURT:  Good morning.

23         MR. MOSHENBERG:  We're going to reserve about ten

24 minutes or so for rebuttal, Your Honor.

25         THE COURT:  Okay.

1                MR. MOSHENBERG:  So we just heard about some of the

2    horrific statements that Jones made about the Sandy Hook

3    families.  The reality is those statements weren't just

4    targeted to the Connecticut plaintiffs.  They were targeted to

5    all the Sandy Hook families, including our clients.  In fact,

6    the evidence shows that Alex Jones specifically targeted our

7    clients when they tried to take him on.

8                We also just heard about the discovery abuses Alex

9    Jones committed in the Connecticut litigation.  Unfortunately,

10   those discovery abuses, those antics, made their way into the

11   Texas courtroom as well.

12               We also heard that the Court in Connecticut had to

13   render a default judgment on liability because of those

14   discovery abuses, and the same thing happened in Texas.

15               We also heard why the facts established from the

16   trial litigation in Connecticut support that Jones willfully

17   and maliciously injured the Sandy Hook families; and the record

18   established in the Texas litigation also shows and confirms on

19   summary judgment that Alex Jones willfully and maliciously

20   injured the Texas plaintiffs.  And that's for two separate and

21   independent grounds, Judge.  There's two separate and

22   independent reasons why summary judgment is proper on the

23   willful and malicious injury issue.

24               The first, which my co-counsel, Stuart Lombardi, is

25   going to hit is collateral estoppel, that the trial court in

1  Texas already determined as a factual matter that Jones

2  willfully and maliciously injured Texas plaintiffs.  And

3  because it was already litigated and decided, it cannot be

4  relitigated.  The Court must give that judgment full faith and

5  credit.

6          Now, separate and apart from that, even if the Court

7  thinks it's still an open issue, that whether Alex Jones

8  willfully and maliciously injured the Texas plaintiffs can

9  still be litigated in this proceeding, the outcome is the same,

10  summary judgment is proper, because the undisputed facts show

11  that he willfully and maliciously injured the Texas plaintiffs,

12  and that will be under the objective standard and the

13  subjective test.

14          First, we're going to focus on collateral estoppel,

15  Your Honor.  So Stuart Lombardi is going to go first, and then

16  I'll wrap up with the undisputed facts, Your Honor.

17          THE COURT:  Thank you.

18          MR. LOMBARDI:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. LOMBARDI:  Stuart Lombardi of Wilkie Farr &

21  Gallagher for the Texas plaintiffs.  So I'm going to spend the

22  next few minutes talking about why Alex Jones is collaterally

23  estopped from contesting that the judgments against him are for

24  his willful and malicious injury of Neil Heslin, Scarlett

25  Lewis, Leonard Pozner, and Veronique De La Rosa, parents whose

1  children were murdered in their classroom at Sandy Hook

2  Elementary School.

3          As you've heard already today, the Fifth Circuit has

4  a two-part standard, and either part is enough.  The debtor's

5  conduct is willful and malicious if there's either an objective

6  certainty of harm or a subjective motive to cause harm on the

7  part of the debtor.  That's In re Williams and In re Miller.

8  And here, willful and malicious injury was established in the

9  state court proceedings, and Jones is collaterally estopped

10 from relitigating that.

11         The parties agree that Texas law governs the

12 collateral estoppel analysis.  And under Texas law, there are

13 three requirements for collateral estoppel:  The first is the

14 facts sought to be litigated in the second action were fully

15 and fairly litigated in the first.  The second is those facts

16 were essential to the judgment in the first action.  And the

17 third is that the parties were cast as adversaries.

18         There's no dispute about those standards.  There's

19 also no dispute that the third requirement is met here.  We've

20 got the same parties.  So that leaves the first two

21 requirements, and I'm going to take them in reverse order if I

22 can.

23         First, I'm going to spend a few minutes explaining

24 why the state court's finding that Alex Jones acted willfully

25 and maliciously was essential to the judgments.  Second, I'm

1   going to explain why that issue was fully and fairly litigated.

2          So let's start with essential to the judgments.  In

3   order to enter the judgments that it did, the state court had

4   to find and did find that Jones acted willfully and

5   maliciously.  And I'd like to walk through why for each case:

6   Heslin-Lewis and then Pozner-De La Rosa.

7          In the Heslin-Lewis case, the jury awarded exemplary

8   damages that were over 27 times greater than the statutory cap.

9   And the trial court let those damages stand in full.  And under

10  Texas law, in order to do that, the Court had to find that

11  Jones "knowingly or intentionally" -- and that's a quote,

12  "knowingly or intentionally" violated Penal Code 22.04.

13         And I'm going to go into a bit more detail on that in

14  a minute, but to preview on Pozner-De La Rosa, there's a

15  similar reason.  Movants have a liability judgment that

16  includes exemplary damages subject only to liquidation of the

17  amount of those damages.  And in their petition, Pozner and

18  De La Rosa alleged only one basis entitling them to exemplary

19  damages.  That basis was malice.  So, in order to enter the

20  default judgment on liability that it did, that includes

21  exemplary damages subject only to liquidation of amount, the

22  state court had to find that Jones acted with malice.

23         So let's break those two cases down with citations to

24  the record, and I'm going to start with Heslin and Lewis.  The

25  Court issued death penalty defaults judgment on liability, and

1  those are in the record, at DI 29-3 and DI 29-42, one for

2  Heslin, one for Lewis.

3          And then the Court held a two-week jury trial on

4  damages.  The jury awarded exemplary damages, about $25 million

5  to Heslin and about $20 million to Lewis.  And that exemplary

6  damages award and the jury instruction on which it was written

7  is at DI 29-6.  And as I mentioned, those exemplary damages

8  were over 27 times greater than a statutory cap under Texas

9  law.  And the trial court allowed those damages to stand in

10 full in the final judgment that it entered, and that's at

11 DI 29-7.

12          And to do that, the trial court had to find that

13 Jones knowingly or intentionally committed the felony of

14 injuring a disabled individual.  You see, Civil Practice and

15 Remedies Codes, Code 41.008(b) -- 41.008(b) lays out the cap,

16 and here it was $750,000.  But subsection (c) -- 41.008(c) says

17 that that cap does not apply "to a cause of action against a

18 defendant" -- and I'm quoting -- "to a cause of action against

19 a defendant from whom a plaintiff seeks recovery of exemplary

20 damages based on conduct described as a felony in the following

21 sections of the Penal Code, if the conduct was committed

22 knowingly or intentionally."  And the statute then lists 17

23 felonies that count.

24          Heslin and Lewis allege that one of those felonies,

25 Penal Code Section 22.04, is the one that qualified them for

1 exemplary damages, and that includes injury to a disabled

2 individual.  And in order to have violated that statute, Jones

3 has to have intentionally or knowingly caused the injury.

4          Now, if you actually go to Penal Code Section 22.04,

5 you'll see that the text reads "a person commits an offense if

6 he intentionally, knowingly, recklessly, or with criminal

7 negligence, causes to a disabled individual injury."

8          So the statute itself includes recklessness or

9 criminal negligence, but that isn't enough to go over the

10 damages cap.  So, when you read that statute, you've got to

11 cross out the words "recklessly or with criminal negligence"

12 for purposes of this award; because again, under 41.008(c),

13 Jones had to violate that penal code knowingly or intentionally

14 in order for the exemplary damages to stand in full.  And,

15 again, the Court let them stand in full.

16          So that's why we know in Heslin and Lewis that a

17 finding that Jones knowingly or intentionally injured Heslin

18 and Lewis was essential to the judgment.  And under the test in

19 this circuit for 523(a)(6), that is enough.  Knowingly or

20 intentionally is willful and malicious.

21          So what about Pozner and De La Rosa?  There, as I

22 mentioned, they have a judgment on liability that will include

23 exemplary damages subject only to liquidation of the amount.

24 So you've got to look at their petition to see what they

25 alleged that entitled them to exemplary damages, because under

1  Texas Civil Practice and Remedies Codes 41.003(a), you can only

2  get exemplary damages in three situations:  either if there's

3  fraud or malice or gross negligence.  Fraud, malice, or gross

4  negligence.

5           But if you look at their petition, which is DI 29-4,

6  Page 25, Paragraph 98, Pozner and De La Rosa only alleged that

7  one of those grounds applied:  malice.  They alleged that

8  defendants, quote, "acted with malice."

9           So when the Court entered a default judgment on

10  liability that includes exemplary damages subject only to

11  liquidation of amount, it necessarily had to find that Jones

12  acted with malice.  That was essential to the judgment, because

13  otherwise you don't get exemplary damages.

14           And we know that that finding had to be based on what

15  was pled in the petition, because that's how a default works in

16  Texas law.  When the defendant defaults, plaintiff only gets

17  judgment on what is well pleaded in the petition.  So you've

18  got to look at the four corners of that petition which say

19  malice in order to understand why the Court allowed exemplary

20  damages.

21           So in Heslin and Lewis, the Court is going to be

22  asked -- or so just like in Heslin and Lewis, in Pozner and

23  De La Rosa, the jury is going to be asked how much to award in

24  exemplary damages, but not whether the statutory grounds are

25  met.  And if you look at the jury instructions in Heslin and

1   Lewis, you'll see that.  The jury wasn't asked which of the

2   statutory grounds permitting exemplary damages was met.  The

3   Court had already decided that.  The jury was only asked to

4   come up with the number.

5           You know, that's a lot like what happened in <u>Garner</u>,

6   the Fifth Circuit case, 1995.  There, the debtor defaulted and

7   the creditor got punitive damages.  And the punitive damages

8   award was based solely on malice because neither of the other

9   statutory grounds were at issue in that case.  And the Fifth

10  Circuit said, yeah, collateral estoppel applies here.  And the

11  fact that malice was the sole basis the creditor alleged for

12  punitive damages confirms that the conduct was malicious.

13          That's exactly what we've got in <u>Pozner</u> and

14  <u>De La Rosa</u>.  It's also a lot like <u>Sims</u>, and that's 479 B.R.

15  415.  And there, the creditor had a death penalty default.  The

16  amount of the damages hadn't been liquidated, but the creditor

17  had a death penalty default.  And Judge Isgur said that's

18  enough for collateral estoppel to apply, the fact that you've

19  got the default.  And that's because, for purposes of 523,

20  nondischargeability is about the nature of the debt.  It's not

21  about the number.  It's about the liability and the basis for

22  it.

23          So, in both cases here, the state court had to find

24  that Jones willfully and maliciously injured movants, and that

25  finding was essential to the judgment.  It was essential for

1   Heslin and Lewis because the Court had to find, to allow

2   damages in excess of the cap, that Jones's conduct was

3   knowingly or intentionally.  And for Pozner and De La Rosa, it

4   had to find that Jones acted with malice to allow exemplary

5   damages at all.

6          Now, even if the record weren't so clear here, and it

7   is, courts in this circuit have repeatedly held that judgments

8   for defamation, intentional infliction of emotional distress,

9   libel, and slander establish by estoppel that the debt is

10  nondischargeable.

11         You can look at Scarbrough, where the Bankruptcy

12  Court held defamation judgments were nondischargeable because

13  of collateral estoppel.

14         You can look at Saxton, where the creditor had a Utah

15  default judgment for slander and other claims, and the

16  Bankruptcy Court held that the death penalty sanctions entered

17  in that case were entitled to preclusive force, and so the debt

18  was nondischargeable.

19         You can look at Huizar, where the creditor had

20  judgments for alienation of affection, criminal conversion, and

21  intentional infliction of emotional distress under North

22  Carolina law for the debtor's affair with the creditor's then

23  wife.  And after the debtor failed to answer, the state court

24  entered a default judgment and had a trial on damages.  And

25  there, too, the Bankruptcy Court in the Western District of

1  Texas found the judgment debt nondischargeable under collateral

2  estoppel.

3          And then there's Marks (phonetic).  The bankruptcy

4  court there held that a judgment for intentional infliction of

5  emotional distress under California law was nondischargeable

6  because of collateral estoppel, again under the test in this

7  circuit.  All of those cases are cases in this circuit.

8          And then there's Caton where the Fifth Circuit

9  affirmed a decision holding that an Illinois libel judgment was

10  nondischargeable because of collateral estoppel.

11          Now, on the other side, Jones hasn't cited a single

12  case in our circuit, not one, that ultimately finds that a

13  judgment for defamation or intentional infliction of emotional

14  distress is dischargeable.  Not one.  And he hasn't cited any

15  case anywhere in the country finding that a Texas judgment for

16  defamation or IIED is ultimately dischargeable.

17          So the conclusion that the judgments themselves

18  established willful and malicious is supported by two grounds,

19  and either one is sufficient.  The first is the very clear

20  records in the underlying state court cases, the findings that

21  the Court had to make that were essential to the judgments:

22  knowing nor intentional in Heslin and Lewis, and malice in

23  Pozner and De La Rosa.  And the other is the clear case law in

24  this circuit that applies a subjective test or an objective

25  test.

1            I'm going to pivot to "fully and fairly litigated."

2    But before I do, I want to pause if the Court has any

3    questions.

4            THE COURT:  No questions.

5            MR. LOMBARDI:  Okay.  So we've got one more

6    collateral estoppel requirement and then we're done, and then

7    collateral estoppel applies, and that's "fully and fairly

8    litigated."  And that's satisfied here, too.  Here, that issue

9    that was essential to the judgment was fully and fairly

10   litigated in both cases.  In Heslin and Lewis, the Court

11   entered a default judgment on liability, and after that, it

12   held a two-week damages trial.

13           Alex Jones had counsel.  He appeared.  He testified.

14   And after all that, based on the evidence, the jury awarded

15   each plaintiff over $20 million in exemplary damages, well

16   above the cap.  And based on the evidence, the Court let those

17   exemplary damages award stand.  And we just talked about what

18   the Court had to find in order to do that.

19           So then what about Pozner and De La Rosa?  Jones

20   wants you to look at what happens after the default, right?

21   Well, we know what's going to happen after the default.  And

22   there's going to be a trial, liquidating damages, just like we

23   saw in Heslin and Lewis.  But the case law in this circuit

24   tells us that you have to -- you also have to look at what

25   happened leading up to the default.

1          Well, and what happened?  Jones fully litigated the

2   case -- not fairly to movants, but he fully and fairly

3   litigated it for his purposes, for three years, before he was

4   held in default.  He had a lawyer, he appeared, he answered the

5   petitions, he then repeatedly failed to comply with discovery

6   obligations and the Court imposed an escalating series of

7   sanctions and held him in default.

8          And Texas law is clear that when you have a default

9   like this, a death penalty sanctions default for failure to

10  comply with discovery obligations, it is based on the very,

11  very long-held view that when a defendant repeatedly fails to

12  comply with his discovery obligations, it's because he has no

13  defense.  He's not giving the discovery because it's not going

14  to help him, it's going to sink him.

15         And as a result, under Texas law, a death penalty

16  sanction is deemed an admission of everything alleged in the

17  petitions.  It's fully and fairly litigated and admitted by the

18  defendant's own conduct.  Gober tells us that.  There, the

19  Fifth Circuit held that a default judgment entered as a

20  sanction for discovery abuse was entitled to preclusive force

21  for nondischargeability.

22         And the panel in that case wrote that, quote, "Issues

23  in a post-answer default judgment are actually litigated for

24  purposes of collateral estoppel and may be given preclusive

25  effect in a subsequent dischargeability proceeding in

1  bankruptcy," just like we have right here.  That's 100 F.3d

2  1195 at 1204.

3         And then, and this is critical, the Fifth Circuit

4  went on to say that "a death penalty sanction default judgment

5  likewise counts as fully and fairly litigated for our purposes

6  and it's entitled to preclusive force."  And that's at 1205.

7         And to do that, the panel looked at all the

8  litigation before the default as well as the litigation after,

9  which will come, and said, yeah, the debtor had his chance, he

10 blew it, he wants a mulligan.  But that's not how this works.

11 That's not how collateral estoppel works.  He had his chance to

12 fully and fairly litigate.

13        And again, that's exactly what happened in Pozner and

14 De La Rosa.  Jones had counsel, he appeared, he answered the

15 petition, he litigated for three years, and then he was held in

16 default because of his own failures, because of his failure to

17 provide discovery.

18        So Gober tells us that a death penalty default is

19 fully and fairly litigated, and Limbaugh tells us that too.  In

20 Limbaugh, the Bankruptcy Court explained that actually

21 litigated does not require, quote, "thorough litigation."  The

22 court said that a default as a discovery sanction is enough.

23 That's 155 B.R. 952, Bankruptcy in the Northern District of

24 Texas.

25        And Judge Isgur said it in Sims as well.  In Sims,

1    Judge Isgur held that a death penalty default was entitled to

2    preclusive force.  That's 479 B.R. 419 (Bankr. S.D. Tex. 2012).

3         So that's it, Your Honor.  You add those two things

4    together.  Willful and malicious injury was essential to the

5    judgments, as shown by the fact that Heslin and Lewis got

6    damages in excess -- exemplary damages in excess of the cap,

7    and as shown by the fact that Pozner and De La Rosa have a

8    judgment that includes entitlement to exemplary damages.  And

9    it's ball game, game over.  The debt cannot be discharged.

10        Now, one last bucket of arguments.  Jones raises a

11   series of collateral attacks on the underlying judgments and

12   criticisms about what the state court did in the two Texas

13   cases.  Well, Your Honor, that's not for you.  That's not for

14   this court.  He's raising the issue in the wrong court.  If he

15   has an issue with the underlying judgments, he has to appeal in

16   the Texas state court system all the way up to the Supreme

17   Court of the United States if he wishes.  But unless and until

18   those judgments are reversed, they're entitled to full faith

19   and credit under the United States Constitution and 28 U.S.C.

20   1738, the Full Faith and Credit Act.  It's not a choice.

21   They're entitled to full faith and credit.

22        And with that, Your Honor, I'm happy to answer any

23   questions, and otherwise I'll pass the podium back to my

24   co-counsel.

25        THE COURT:  Thank you.

1          MR. LOMBARDI:  Thank you.

2          MR. MOSHENBERG:  Judge, you just heard my co-counsel

3  explain why under collateral estoppel, the issue has already

4  been litigated, and it can't be relitigated again.  We have to

5  give full faith and credit to that judgment.  The reality is

6  that reason alone supports why summary judgment needs to be

7  granted in this case.

8          Even if the Court wants to look at this issue

9  further, even if it decides it's an open issue that can be

10  litigated, summary judgment is appropriate under Rule 56

11  because it's a traditional summary judgment motion.  We've

12  attached uncontroverted evidence that show undisputed facts

13  that we're entitled to a judgment as a matter of law.

14          In fact, they established that Jones willfully and

15  maliciously injured the Texas plaintiffs under both the

16  subjective standard and the objective standard.  So why don't

17  we turn to the subjective standard first.

18          The facts established through the default judgment

19  show that Jones intentionally tried and subjectively tried to

20  injure the Texas plaintiffs to harm these families.  And when

21  you look at the briefing, there may be some confusion about

22  what a Texas default judgment does.  I want to take a moment to

23  clarify that confusion, because the reality is the word default

24  judgment in Texas case law comes up in a lot of different

25  contexts.  And the Fifth Circuit had to grapple with different

1   types of default judgments in cases like Gober or Pancake.

2           There are different types of default judgments.  And

3   for a good discussion about it, Judge, I'm going to send the

4   Court to Paradigm Oil vs. Retamco Operating.  It's 372 S.W.3d

5   177.  And it's just really -- it's a Texas Supreme Court case

6   from 2012.  And it's just a good discussion explaining the

7   different types of default judgments under Texas law.

8           Here's what they boil down to.  You've got your

9   traditional default judgment where you file -- it's a no answer

10  default.  You file a lawsuit, you serve the lawsuit, the person

11  doesn't answer, and you get a default judgment, and the

12  allegations in that default are deemed to be true and admitted

13  except for damages which need to be tried.

14          You have on the other end of the spectrum, where a

15  defendant has answered, they've denied the allegations in the

16  lawsuit.  They do discovery.  They litigate the case.  Well,

17  when it's time to fight over the evidence, when it's time to

18  have a trial, they don't appear.  That's a post-answer default

19  judgment.  In that case, the Court can't just render a judgment

20  because the allegations have been denied in the answer.

21  There's still a live pleading out there.

22          So what the Court is required to do is the plaintiff

23  is allowed to put on ex parte evidence supporting their case.

24  So what the Court does is -- when there's a post-answer

25  default, is it allows the plaintiff to proceed with their case,

1   put on their evidence, and then render a judgment based on that
2   by default.

3          We don't have either of those types of default
4   judgments.  We have a different category.  It's called a Rule
5   215 judgment.  It's Texas Rule of Civil Procedure 215.  It's a
6   default judgment that's entered as a last resort under Texas
7   rules for discovery when there's a discovery abuse going on.

8          And what it does is Rule 215 requires courts to take
9   every step possible to try to get a defendant to comply with
10  their discovery obligations, to turn over those documents, to
11  not destroy evidence, to present witnesses.  And in this case,
12  like 215 requires, when Jones repeatedly abused the discovery
13  process, there were monetary sanctions rendered against him.
14  There were orders requiring him to comply, order after order
15  after order.

16         What happened was he continued to defy the Court,
17  continued to defy his discovery obligations.  And what the
18  Court did is it rendered a default judgment under 215, which
19  has a specific legal implication under Texas law.  What it is,
20  is it's the judge concluding under Texas law that the reason
21  the defendant isn't turning over the records, the reason
22  they're not presenting the witnesses, the reason they're not
23  complying with those discovery obligations, is because if they
24  turned over, if they had complied, it would have only proved
25  the plaintiff's claims; that their failure to comply with

1   discovery is their admission that the allegations in the

2   petition against them are true.  Not just some allegations, all

3   of the allegations.

4        In fact, if the Court only wanted some allegations to

5   be deemed true, 215 says you can do that.  You can say, this

6   issue is no longer off the table, this fact is no longer off

7   the table.  Or the Court can do what the Court did here in the

8   Pozner case, Pozner-De La Rosa and the Heslin-Lewis case.  It

9   can render an entire default judgment on liability, deeming all

10  of the allegations in the petition as true because they're the

11  defendant's admissions that they are true.  They're judicial

12  admissions, Your Honor.

13       And I bring that up because the Fifth Circuit has

14  spoken about what happens when you have a deemed admission

15  against you.  And the one thing you can't do is try to, on

16  summary judgment, controvert a deemed admission against you

17  with a self-serving affidavit.  You can't use a contradictory

18  affidavit to try to create a fact issue on something that's

19  already been deemed to be admitted.

20       And I want to point the Court to a case that says

21  that.  It's the Poon-Atkins case v. Sappington, 2022 WL 102042,

22  Fifth Circuit case from January 2022.  And it cited the Carney

23  case, which everyone cites on this point.  So I'm just citing a

24  recent one, but really it all comes from Carney, which is the

25  idea that if some admission has been deemed against a party,

1   you can't try to cure that deemed admission by using a

2   contradictory affidavit.

3            In fact, I'll read you the quote from that case,

4   Judge.  This is from the Poon-Atkins case.  "A party who makes

5   an admission, whether express or by default, is bound by that

6   admission for summary judgment purposes.  Not even contrary

7   evidence can overcome an admission at the summary judgment

8   stage."

9            We have Jones's admission that the allegations

10  against him are true from the underlying state court cases.

11  Those admissions show, the admissions themselves, the

12  allegations themselves that have been admitted to, show Jones

13  was intending to harm the Texas families, to harm our clients.

14           Let's go over some of those, Your Honor.  I won't go

15  over all of them, but I'll give you just a handful.  If you

16  look at Exhibit 4 Paragraph 68, Exhibit 8 Paragraph 91, they

17  say that the "defendants' defamatory publications were designed

18  to harm the plaintiffs' reputation and to subject the

19  plaintiffs to public contempt, disgrace, ridicule, or attack."

20  Jones admitted to that.

21           If you look at Exhibit 8, Paragraph 101, "Defendants

22  made the statements in these videos in bad faith, with

23  malicious motives, knowing the statements were false or in

24  reckless disregard for their truth, and knowing they would

25  cause severe emotional distress."  Jones admitted that.

1              Paragraph 107 on Exhibit 8, "Severe emotional

2    distress was the primary risk created by defendants' reckless

3    conduct, and defendants knew and intended for plaintiffs to

4    suffer emotional distress."  Jones admitted that.

5              Exhibit 4, Paragraph 74, and Exhibit 8, Paragraph 97,

6    "In light of their prior experience with these kinds of

7    reckless statements, defendants knew that their publication

8    could cause the plaintiffs to suffer harassment and potential

9    violence.

10             Exhibit 4, Paragraph 84, "Defendants knew or should

11   have known that their broadcasts" -- and it lists the dates of

12   the broadcasts -- "would cause plaintiffs severe emotional

13   distress and cause them to be subject of harassment, ridicule,

14   and threats to their safety."  Jones admitted that.

15             Exhibit 4, Paragraph 88, "Defendants latest malicious

16   statements were part of a continuous pattern of years of

17   intentional and reckless harassment."

18             Exhibit 4, Paragraph 89 -- and I'm wrapping up,

19   Judge.  "In the course of their harassment, defendants

20   broadcast the private, personal details and addresses of

21   Plaintiff Leonard Pozner in an act of personal retaliation,

22   knowing that danger it would pose to his family's safety."

23   Jones admitted that.

24             There are more, Judge, and I'll just spit out the

25   paragraphs.  You can look at Paragraph 106 in Exhibit 8.

1  Exhibit 4, you can look at Paragraph 98.  Exhibit 8, you can

2  look at Paragraph 115.  Those last ones, I want to just point

3  real quickly.  Those are the pleadings that entitled the

4  plaintiffs to exemplary damages.

5          And as my co-counsel just said, for instance, in the

6  Pozner-De La Rosa case, they pleaded that he acted with malice.

7  And if you look at the Civil Practices Remedies Code for

8  malice, that's the area that defines malice for exemplary

9  damages purposes -- I think it's 41.001 -- it defines malice as

10  a specific intent to cause an injury.  Jones admitted that as

11  true.

12          So Jones's deemed admissions, that he can't

13  controvert with a self-serving, contradictory declaration in

14  this case, his own admissions show he intended to harm the

15  Sandy Hook families.  And we have to hold him to those

16  admissions that he made through his discovery abuses because

17  otherwise we'll be rewarding him for flouting his discovery

18  obligations.  If we give him that mulligan that my co-counsel

19  talked about, he will have benefited from cheating through the

20  discovery process.

21          The reality is his actions under Texas law mean that

22  he took them as true.  He was admitting what was alleged

23  against him was true.  That's why.  It's not that the Court

24  acts as a trier of fact when they render a default judgment

25  under Rule 215 for death penalty sanctions.  It's not that

1   they're saying, well, both sides disagree, and so I'm going to

2   render a judgment.

3          What the Court is saying is your actions show,

4   Defendant, that you're admitting the things alleged against you

5   are true.  And since you're admitting they're true, I can

6   render a judgment against you because you've agreed it's true.

7          That's what a default judgment is under Texas Rule of

8   Civil Procedure 215.  That's what a death penalty sanction is.

9   And if we're going to give that full faith and credit in this

10  case, Your Honor, we have to take those deemed admissions, and

11  we can't ignore them.  And those deemed admissions entitle us

12  to summary judgment under this subjective test.

13         Reality is, though, we don't need to look at those

14  deemed admissions to grant summary judgment.  Under the

15  objective test, we have all the evidence we need.  Jones's

16  statements.  Even with his declaration, Jones doesn't deny that

17  he said what he said.  They've tried to characterize it.

18  They're trying to put some spin on what he meant and all that.

19  We can disagree about it.  But what we don't disagree and what

20  actually legally matters is that Jones admits he said what he

21  said.  How could he deny it?  We have the videos.  We've

22  provided them to you, Your Honor.  He admits he said what he

23  said.  And what matters in the willful/malicious analysis under

24  the objective standard is what he said.  Is there a substantial

25  certainty that was going to cause harm?

1        And that's for the Court to decide, and courts decide

2   that kind of stuff regularly.  You take, for instance, the In

3   re Red case that came up earlier today, where the person drove

4   into a crowd.  To be clear, the Bankruptcy Court made a fact

5   finding in that litigation that the person intentionally drove

6   into the crowd.  The Court did not make a fact finding that the

7   person, that that defendant intentionally was trying to hurt

8   these people.  There was no fact finding on that.

9        And what the debtor argued was, look, you have at

10  best me admitting to intentionally driving into a crowd of

11  people.  But what matters is, under the Supreme Court

12  precedent, is whether I was trying to hurt them.  And there's

13  no evidence of that.

14       And what the Fifth Circuit said was "not true,"

15  because under -- maybe under the subjective test you've got a

16  point; but under the objective test, the nature of driving into

17  a crowd is substantially certain to cause harm.  And so as an

18  objective standard, that alone is enough to trigger a willful

19  and malicious injury under the objective test.

20       Punching someone, this came up in -- and by the way,

21  the driving into the crowd with a car, I think I said, is In re

22  Red.  It's 96 F. App'x 229 (5th Cir. 2004).

23       Punching someone is another great example that came

24  up in the Fifth Circuit.  It's the Weatherford case, the

25  district -- it's a Bankruptcy Court case, but it's citing the

1   <u>Vollbracht</u> case out of the Fifth Circuit.  So I'll give you the

2   <u>Vollbracht</u> site.  It's 276 F. App'x 360 (Fifth Circuit 2007).

3   In the <u>Weatherford</u> case in our briefing, it's 2022 WL 174213.

4   They discuss punching someone, where the debtor in that case --

5   the defendant was saying, yeah, I punched them, but I wasn't

6   trying to hurt them.  I wasn't intending to hurt them.

7           Again, fair point for the subjective test, whether

8   you were intending to hurt someone when you punch them.  But

9   what the District Court -- what the Bankruptcy Court recognized

10  under the Fifth Circuit precedent is that the very nature of

11  punching someone is substantially certain to cause harm.

12  Doesn't matter whether you're saying you intended to or not.

13  You can't punch someone and not be substantially certain you're

14  going to cause harm.

15          And the Court contrasted that.  They're not saying

16  any physical contact.  They were saying, look, if you were

17  trying to swat a fly -- this is literally the Court talking

18  about this.  If you try to swat a fly and miss, maybe that's

19  not substantially certain to cause harm.  Even if you slap

20  someone with an open hand, maybe that's not substantially

21  certain to cause harm.  But punching someone, when you're

22  physically punching someone, you can expect physical harm.

23  There's a substantial certainty of physical harm.

24          And it goes beyond these physical issues.  I mean,

25  you've got cases dealing with breach of contract where --

1   that's the Laggard case from our brief, 2022 WL 333040 at *421.

2   That one was a standard breach of contract case, which seems on

3   its face the most innocuous of all.  You don't even need intent

4   to prove a breach of contract.  But the contract required --

5   had a nondisparagement clause.  You couldn't disparage the

6   other side.  The person breached it.  He said that the

7   business -- he accused them of having racially discriminatory

8   practices.

9           The Court recognized, under the objective standard,

10  that's substantially -- if you say another business has

11  racially discriminatory practices, that's substantially certain

12  to cause that business harm.

13          Same idea for using another business's name, like in

14  the In re Garvey case.  And that one is 2011 WL 831 706, where

15  a company that had been franchised with Century 21, their

16  agreement with Century 21 had ended, but they continued to use

17  the Century 21 name on their website.

18          Again, if you're using someone else's name

19  representing that your business is them, you're causing that

20  other business harm.  It's under the objective test.  These are

21  what these courts have recognized, under the objective test,

22  that's substantially certain to harm that other business.

23          And so the question is, Jones said what he said.  He

24  doesn't deny it.  He said things like that these families'

25  grief wasn't real, that their children didn't die, that they're

1    actors, that their children were actors, that they never lived.

2         When you say something like that, question is, isn't

3    there a substantial certainty that's going to cause harm?  Harm

4    to reputation, harm to -- on a mental level, on an emotional

5    level?  How can you say something like that and, from an

6    objective standpoint, not expect there to be harm?

7         Physical punches are substantially certain, cause

8    physical harm.  Jones punched these families for years with his

9    words.  He verbally assaulted them, Judge, for years, year

10   after year after year.  He stabbed Lenny Pozner.  Let's be

11   clear about that.  When Lenny Pozner had one of Jones's

12   articles taken down from YouTube, Jones decided to put Pozner's

13   name, email address, physical address, a picture of Jones -- of

14   Pozner's physical address on his show, broadcasted it on his

15   show.

16        What did you think was going to happen?  Activating

17   all of his viewers, telling his viewers that Pozner is trying

18   to take away your First Amendment rights, your Second Amendment

19   rights?

20        We don't have to guess what would happen.  Look at

21   Exhibit 25.  Mr. Pozner had a stalker against him.  Someone

22   actually made death threats against Mr. Pozner, and that person

23   went to prison.  And that person, they admitted, they learned

24   all this from the Alex Jones show.

25        We don't have to wonder whether the statements Alex

1    Jones made was substantially certain to cause harm.  We already

2    know it did.  We already know it caused harm to these families.

3    And Judge, I just -- I think -- I don't want to cheapen what

4    Alex Jones said and the horror of what he said by trying to

5    paraphrase it all.  I want to just direct you, Your Honor, to

6    some of the videos.  We sent you a lot.  Some of the videos are

7    longer.  I think there's about 13 minutes that gives you a

8    really good taste, 13 minutes of video clips that I think gives

9    you a good sense of what Alex Jones said.

10           So let me point you, Your honor, if you're okay with

11   it, to Exhibit 14A.  So we did the regular exhibits are the

12   full video, so there's no complaint that they're incomplete,

13   but then we did clips of the relevant parts that we care about.

14           So Exhibit 14A, it's a March 2014 clip where Jones

15   says Sandy Hook was undoubtedly a coverup, the parents were

16   actors, it was a preplanned staged event.

17           Exhibit 15A, a September 2014 clip where Jones -- he

18   literally mock imitates the crying parents as if the parents

19   are faking it.

20           Exhibit 17A, it's December 2014 clip where Jones

21   describes Sandy Hook as a total hoax and how it took him a year

22   to come to grips with the fact that the whole thing was fake.

23           Exhibit 19A, it's a January 2015 clip where Jones

24   describes Sandy Hook as synthetic, completely fake, with

25   actors, manufactured.

1          Exhibit 20, Your Honor, covers a lot of the Lenny

2  Pozner when he had the Jones article taken down from YouTube

3  and how Jones broadcast his name, physical address, email

4  address.  Jones literally said -- and the whole Exhibit 20 is

5  pretty long, but if you look at, for instance, Exhibit 20F, or

6  if you look at the 78 minute marker on Exhibit 28 -- on Exhibit

7  20 -- excuse me -- where Jones talks about he's going to

8  personally visit Florida, where Mr. Pozner was located.  He's

9  going to personally visit Pozner and investigate what happened.

10          And then Exhibit 23C, Your Honor, it's a November

11  2016 clip where Jones literally says this -- this was supposed

12  to be his final statement on Sandy Hook.  He was supposed to

13  say one last thing and then move on.  Of course he didn't, but

14  this is what he said.  "If children were lost at Sandy Hook, my

15  heart goes out to each and every one of those parents and the

16  people who say they're parents that I see on the news.  The

17  only problem is I've watched a lot of soap operas and I've seen

18  actors before, and I know when I'm watching a movie and when

19  I'm watching something real."

20          I'll also point out Exhibit 28A.  It's more of the

21  same.  And the point is, Your Honor -- that's 13 minutes, and I

22  think it gives you a good sample of what Jones has said.

23          And I also think the Court can look briefly at

24  Exhibits 25, 26, and 27.  Exhibit 25 is a Megyn Kelly feature

25  on Alex Jones.  She ran a story about who Alex Jones is and the

1  kinds of things he says and she talks about, in her show, how

2  the families are -- how Jones's remarks about Sandy Hook has

3  caused these families lasting pain.

4        Neil Heslin, my client, went on Megyn Kelly's show

5  and had to explain that he's a real person, that he held his

6  six-year-old son with a bullet hole in his head, basically

7  pleading with Jones to stop saying this.

8        And Exhibits 26 and 27 are Jones's reaction to that,

9  especially 27.  But they show the Megyn Kelly clips and they

10  start dissecting.  Well, that's not possible.  No one was

11  allowed to see the bodies that day.  Mr. Heslin's making it up.

12        They begged him to stop, and he doubled down,

13  Your Honor.  And the reality is we don't need to look at his

14  motivations.  A reasonable person looking at the kinds of

15  remarks he made is going to say that there was a substantial

16  certainty of harm.

17        We're asking the Court now, it's really for the Court

18  to decide, when you look at those remarks saying these

19  children, six-year-olds who were murdered going to a first

20  grade class, and that they weren't real, and that their parents

21  weren't real, that their grief isn't real, is that

22  substantially certain to cause harm?

23        THE COURT:  Counsel, I'm going to stop you.  We're

24  now at the 45-minute mark.

25        MR. MOSHENBERG:  Okay.

1            THE COURT:  I just want to keep it fair to

2  everybody's sides, including the other side, so --

3            MR. MOSHENBERG:  Thank you, Honor.

4            THE COURT:  Thank you.

5            MR. MCCLELLAN:  Your Honor, and may it please the

6  Court, I'm Deric McClellan from the Crowe & Dunlevy Tulsa

7  office, and I represent defendant Alex Jones.  In 1998, the

8  Supreme Court in Geiger settled a split among the circuits and

9  clarified the scope of the willful and malicious injury

10  exception to dischargeability in Section 523(a)(6).  The Court

11  noted that the term "willful and malicious" modifies the word

12  "injury," and that nondischargeability takes a deliberate or

13  intentional injury rather than a deliberate or intentional act

14  that leads to injury.

15            With this formulation, the Court instructed litigants

16  and courts to think of intentional torts, which generally

17  require that the actor intend the consequences of an act and

18  not simply the act itself, and ultimately held that debts

19  arising from recklessly-inflicted injuries do not fall within

20  the compass of Section 523(a)(6).

21            That same year, the Fifth Circuit in Miller added its

22  gloss to the Geiger test.  The Fifth Circuit clarified that not

23  all intentional torts fall within the purview of Section

24  523(a)(6).  Rather, it is only those injuries where there is

25  either an objective substantial certainty of harm or a

1  subjective motive to cause harm.

2       The Fifth Circuit told readers to think of

3  traditional intentional torts like assault, battery, and false

4  imprisonment, where there is a requirement that a defendant act

5  with the intent to injure or with substantial certainty that

6  his actions would injure the plaintiff.  The Miller court, of

7  course, reiterated that recklessly-inflicted injuries would not

8  satisfy a finding of willful and malicious injury under Section

9  523(a)(6).

10      You just heard plaintiffs argue there are two

11  theories for why this Court should grant them summary judgment.

12  First, they argue that the Heslin-Lewis final judgment and the

13  Pozner-De La Rosa default judgment are entitled to preclusive

14  effect under the doctrine of collateral estoppel.

15      Second, they argue that even if the judgments aren't

16  entitled to preclusive effect, this Court can and should take

17  judicial notice of the factual findings from the state court

18  and find the defendant caused willful and malicious injury

19  under the Miller test.

20      Plaintiffs are wrong on both theories.  I will start

21  with discussing their argument regarding collateral estoppel

22  and then proceed to their judicial notice argument.  Parties

23  may invoke collateral estoppel in certain circumstances to bar

24  relitigation of issues relevant to dischargeability, although

25  the Bankruptcy Court retains exclusive jurisdiction to

1   ultimately determine the dischargeability of the debt.

2           In determining whether to give preclusive effect to

3   state court judgments, courts applied the preclusion rules of

4   the state that rendered the judgment.  Here, Texas rules will

5   apply.  Under Texas law, collateral estoppel only precludes the

6   relitigation of identical issues of fact or law which were

7   actually litigated and essential to the prior judgment.

8   Movants must establish that:  one, the facts sought to be

9   litigated here were fully and fairly litigated in their state

10  court actions; and, two, that those facts were essential to the

11  judgment in the first action.

12          Now, while the fully and fairly litigated prong comes

13  first, both analytically and in defendant's brief, I believe

14  the essentiality prong is the most important one in this case,

15  and thus I will begin there.  Also, I'm going to discuss the

16  Heslin-Lewis action first, because there has been a trial in

17  that case.  And then I will discuss the Pozner-De La Rosa

18  action, which will consist of largely the same analysis with

19  just a few wrinkles, since those plaintiffs have not yet gone

20  to trial.

21          Under the essentiality prong, facts are essential

22  when they are necessary to form the basis of a judgment in the

23  first action.  The question you must answer is whether the same

24  ultimate issue litigated in the Heslin-Lewis action is

25  presented in the nondischargeability action.  Ultimate issues

1   are those factual determinations submitted to a jury that are

2   necessary to form the basis of a judgment.

3          Now, you see this particular prong come into play a

4   lot in cases such as this one, where the jury was given

5   disjunctive jury instructions.  Judge Rosenthal, in In re Dang,

6   stated that "disjunctive jury instructions in state court

7   judgments make it difficult for a bankruptcy court to give

8   preclusive effect to that judgment in deciding whether the

9   judgment debt is nondischargeable."

10         Here, the jury was given disjunctive jury

11  instructions on both Heslin's defamation claim and Heslin and

12  Lewis's IIED claim.  The jury was then given the same

13  instructions for exemplary damages as it was for the two

14  substantive claims.  All of the jury instructions allowed the

15  Heslin-Lewis jury to award damages based on reckless conduct.

16  And as Geiger and Miller instruct, recklessly-inflicted

17  injuries do not fall within the compass of Section 523(a)(6).

18         Starting with defamation, the jury was instructed

19  that they could find defendant liable based on reckless

20  conduct.  The jury instruction on defamation, which is

21  Plaintiffs' Exhibit 5, located at Document 29-5, states the

22  following:  quote, "You are further instructed that at the time

23  Defendants Alex Jones and Free Speech Systems, LLC published

24  the statements on June 26, 2017 and July 20, 2017, defendants

25  knew the statements were false as it related to Neil Heslin or

1   that defendants published the statements with a high degree of

2   awareness that they were probably false, to an extent that

3   defendants, in fact, had serious doubts as to the truth of the

4   statements."

5          Now, this instruction doesn't use the term "reckless

6   disregard" and instead opts for the phrase "published

7   statements with a high degree of awareness that they were

8   probably false."  But that's a recklessness standard, Your

9   Honor.  And the Texas Supreme Court recognized this fact in

10  Bentley v. Bunton, 94 S.W.3d 561, where the court explained

11  that reckless disregard requires evidence of, quote, "that the

12  defendant in fact entertained serious doubts as to the truth of

13  his publication, or that defendant actually had a high degree

14  of awareness of the probable falsity."

15         Now, that's the same language that's in the Heslin

16  jury charge on defamation.  Thus, there is no dispute in the

17  record that the Heslin jury charge for defamation was

18  disjunctive and allowed the jury to award damages based on

19  recklessness, and that is dispositive on the essentiality

20  prong.

21         And you see this in a host of cases we cited.  In

22  Wheeler v. Laudani, the Sixth Circuit declined to grant a state

23  court defamation judgment preclusive effect, noting that,

24  quote, "mere reckless disregard for the truth or falsity of the

25  statement is not willful and malicious injury for purposes of

1   523(a)(6)."

2           The Court held that because the jury's verdict was

3   general, it is impossible on the current state of the record to

4   define whether the jury verdict rested on a finding that

5   defendant acted knowingly or merely recklessly.  And we cite to

6   numerous other cases holding the same on Page 25 of our brief,

7   including Mahadevan, which my colleague Mr. Davis discussed

8   with the Court at length.

9           The same argument applies to Heslin and Lewis's IIED

10  claim.  I would like to direct Your Honor to the jury charge on

11  IIED.  It is Plaintiffs' Exhibit 5, and that's Document 29-5,

12  at Page 7.  Quote, "You are instructed that Defendants Alex

13  Jones and Free Speech Systems, LLC committed intentional

14  infliction of emotional distress against Neil Heslin and

15  Scarlett Lewis in a continuing course of conduct from 2013 to

16  2018.  Intentional affliction of emotional distress means the

17  defendant acts intentionally or recklessly with extreme and

18  outrageous conduct to cause the plaintiff emotional distress,

19  and the emotional distress suffered by plaintiff was severe."

20          Again, Your Honor, Mahadevan is directly on point.

21  The Mahadevan court declined to give preclusive effect to a

22  state court IIED judgment because a state court jury

23  instruction was disjunctive and the jury could have based its

24  award on defendant's recklessness rather than specific intent.

25          We also cite to a litany of other cases holding the

1    same on Page 31 of our brief.  The upshot of all these cases is

2    clear.  If a jury is instructed on recklessness and could have

3    based its award on reckless conduct, then the judgment will not

4    be given preclusive effect on the issue of willful and

5    malicious injury under 523(a)(6).

6           Now, plaintiffs don't address all the cases defendant

7    cites, but they did address Wheeler and Mahadevan.  They tried

8    to distinguish those cases because in Wheeler, the Court noted

9    that the parties hadn't fleshed out the record by identifying

10   what was established at trial.  And in Mahadevan, while the

11   Court noted that it could look beyond the judgment and

12   instructions to see if the evidence produced in the state court

13   proceeding supported a finding of intent, the plaintiff in that

14   case didn't submit any evidence or transcripts from the state

15   court proceeding.

16          Plaintiffs here argue that, because they did attach a

17   record, neither precedent applies to them.  But plaintiffs did

18   not attach anything from the state court that establishes a

19   level of culpability higher than recklessness.  All of

20   plaintiffs' citation to the record on this point in their main

21   brief, which the Court can find on Pages 32 to 35, where they

22   are discussing the essentiality prong -- and that's Document

23   27, that's their main brief -- all of those are to allegations

24   in their state court petition.  Every single one of them.

25          Now, there are two issues with that:  one, the Fifth

1    Circuit, when applying the doctrine of collateral estoppel

2    under Texas law, requires specific factual findings from an

3    evidentiary hearing; and, two, even if defendant is wrong on

4    this point, Texas law does not allow legal conclusions to be

5    taken as true, and all of plaintiffs' citations to their state

6    court petition are legal conclusions.

7             Starting with my first point, I just want to note for

8    the court that there is some overlap here with the "actually

9    litigated" prong, because the "actually litigated" prong

10   instructs what the Court can review to determine what was

11   essential.

12            Plaintiffs rely heavily on the Fifth Circuit case

13   Gober, but Gober doesn't support the position that this Court

14   can rely exclusively on allegations from plaintiffs' state

15   court petition for a finding of willful and malicious injury.

16   Gober did involve a death penalty sanction default from a Texas

17   state court, and the Gober court did give it preclusive effect.

18   But it did not do so based on the plaintiffs' allegations in

19   its state court petition.

20            The Gober court noted that the default judgment did

21   not entirely dispense with the plaintiffs' burden of proof.

22   Specifically, under Texas law, conduct sufficient to warrant

23   punitive damages is not regarded as admitted by default.  Thus,

24   the plaintiff was required to establish by a preponderance of

25   the evidence that the degree and type of defendants' misconduct

1   warranted punitive damages.

2          After hearing evidence and arguments of counsel, the

3   Court made a finding on the record that the defendant acted

4   maliciously and willfully when he converted 370,000 for which

5   exemplary and punitive damages should be awarded.  Thus, the

6   Gober court did not rely on the allegations in the underlying

7   state court petitions to find the state court judgment

8   preclusive.  Rather, it relied on specific findings from the

9   Court based on evidence presented at a damages hearing.

10          Plaintiffs here do not have any such evidence.

11  In re Pancake is another case that illustrates this point.

12  Plaintiffs claim we misrepresented what happened in Pancake,

13  but it is plaintiffs who can't seem to grasp the key takeaway.

14  Pancake involved a death penalty discovery default, just like

15  this case.  The defendant in Pancake failed to comply with

16  discovery orders, and the Court struck his answer.  The Pancake

17  court noted that there was no evidence that the state court

18  ever conducted a hearing where the plaintiff was put to its

19  evidentiary burden of proving the defendant committed fraud.

20  Thus, the Court explained that the case resembled a no-answer

21  default judgment.  And while a state court judgment can be

22  based on a no-answer default, because the defendant is deemed

23  to have admitted the factual allegations in his pleading, the

24  Pancake court explained that the inquiry for collateral

25  estoppel purposes is different.

1          In that context, the Court explained, the central
2    focus is whether the issue had been fully and fairly litigated.
3    The Pancake court concluded by stating that if the plaintiff
4    could produce record evidence that the state court conducted a
5    hearing where the defendant was put to its evidentiary burden,
6    then collateral estoppel may be appropriate.  Thus, Pancake
7    stands for the proposition that simply regurgitating the
8    allegations from a state court petition, even in a case
9    involving a discovery sanction default, will not support the
10   application of the doctrine of collateral estoppel.

11         Now, plaintiff attempts to distinguish Pancake by
12   arguing that there was an evidentiary hearing in this case, and
13   that is true.  But the key point for this part of the argument
14   is that the Pancake court clearly said that allegations from a
15   petition are not enough for collateral estoppel purposes.
16   Instead, a party has to present record evidence that was
17   introduced in a state court evidentiary hearing.

18         And just to tie a bow on this point, I will direct
19   the Court to the appellant's brief in Pancake, and the Court
20   can find that at 1996 WL 334 55395.  The appellant in Pancake
21   noted that they attached their state court petition to their
22   motion for summary judgment.  So the Pancake court had the
23   plaintiffs' state court petition in front of them, but did not
24   accept the pleadings as true for purposes of collateral
25   estoppel.

1         Nine years later, the Fifth Circuit in In re

2    Harrison, 180 F.App'x 485, noted that, quote, "Pancake stands

3    for the proposition that a reviewing court is required to fully

4    investigate a record to determine if a default judgment should

5    have preclusive effect," end quote.  And it celebrated the

6    bankruptcy court in that case for taking a, quote, "hard look

7    at the facts in the case showing that the issues were fully and

8    fairly litigated."  Thus, the Court here should not rely on

9    allegations from the Heslin-Lewis state court petitions in

10   determining whether to apply collateral estoppel.

11        So to tie all this together, yes, Mahadevan does say

12   that a court can look beyond the judgment and instructions to

13   determine whether the issue of willful and malicious injury was

14   necessarily decided.  But plaintiffs have not cited to anything

15   in the record other than allegations in their state court

16   petition.

17        Indeed, in their reply on Page 14 after seeing

18   defendants' argument in his response, and knowing they needed

19   to distinguish Mahadevan, plaintiffs stated that, quote, "Here,

20   in contrast to Mahadevan, movants have provided an extensive

21   record of Jones's defamatory statements and willful and

22   malicious injury through trial transcripts, video evidence, and

23   state court pleadings, among other things," end quote.

24        Then they cite to their statement of undisputed

25   material facts as a whole without mentioning a single piece of

1   specific evidence that they believe supports the conclusion

2   that willful and malicious injury was necessarily decided.

3          And as you know, Your Honor, this Court is not

4   required to sift through the record in search of evidence to

5   support a motion for summary judgment.  And that's a Fifth

6   Circuit case, Ragas v. Tennessee Gas Pipeline, 136 F.3d 455.

7          Now, I will say the plaintiffs try to rectify their

8   failure to identify facts establishing a culpability level

9   higher than recklessness in the judicial notice section of

10  their reply by referencing numerous videos of defendant

11  discussing the Sandy Hook shooting.  And I will discuss later

12  why none of those videos establish willful and malicious injury

13  under 523(a)(6).

14         Now, as to our second point, even if the Court

15  disagrees with us on the interpretation of Gober and Pancake,

16  all of the allegations that plaintiffs reference are legal

17  conclusions rather than well pleaded allegations.  The Court

18  can find these references on Page 34 of plaintiffs' brief.

19  They cite to allegations like defendant's statements were,

20  quote, "knowingly false"; his acts were, quote, "intentional";

21  that he made his statements, quote, "knowing they would cause

22  severe emotional distress"; and that he, quote, "knew and

23  intended for movements to suffer emotional distress in a five-

24  year campaign of willful lies and malicious harassment."

25         That's the extent of the allegations they cite, Your

1   Honor.  Now, those are all legal conclusions and do not have to

2   be taken as true under Texas law.  And I will direct the court

3   to S&H Transportation Co. v. Wright [sic], 396 S.W.2d 443.  And

4   that Court said, "Purely legal conclusion without facts and

5   support thereof are not sufficient to support a judgment by

6   default."

7            For this reason, plaintiffs' main case on this prong,

8   Scarbrough, is readily distinguishable.  We discuss Scarbrough

9   in our response at Page 26 and 27.  Scarbrough has a pretty

10  confusing set of facts, Your Honor, but I think the most

11  important fact from it as applied to this case is that the

12  defendant in Scarbrough had a full trial on the merits in both

13  the state court and in the bankruptcy court where he was

14  allowed to testify as to his level of intent.  And two fact

15  finders in that case determined that the defendant knew he was

16  lying about the plaintiff in that case.

17           Now, we direct the Court to document -- well, we

18  don't have that here, Your Honor, and defendant wasn't allowed

19  to testify to his intent below.  And we direct the Court to

20  Document 29-46 at Page 200, Lines 3 through 22.  And you can

21  see where the state court refused to let defendant testify to

22  his degree of culpability in his damages hearing.

23           We've also presented a declaration as evidence from

24  defendant where he states that he never said anything he didn't

25  believe.  Moreover, the state court judge noted defendant's

1  sincerity in his mistaken beliefs on the record when she said,

2  quote, "Yes, you believe everything you say is true, but it

3  isn't," end quote.  Accordingly, I think Scarbrough is so

4  factually distinguishable from this case that it's not all that

5  helpful to the Court.

6         So, to bring all this full circle, Your Honor, the

7  jury instructions in this case allowed the jury to award

8  damages for defamation and IIED based on reckless conduct.

9  Mahadevan tells us that such a judgment is not entitled to

10 preclusive effect without more evidence from the trial court.

11 But plaintiff has failed to provide any references to evidence

12 that would independently establish willful and malicious injury

13 outside conclusory allegations from their state court

14 petitions.

15        THE COURT:  Let me ask you a question.

16        MR. MCCLELLAN:  Yeah.

17        THE COURT:  Let's talk at the 10,000-foot level.

18 I've been thinking a lot about this for the past couple of

19 days.  I'm not saying it applies here.  I'm just thinking

20 theoretically.  One could say, if one follows the logic that

21 you're arguing now, the reasoning, that a party knew they were

22 being sued for defamation.  I'm not talking about Jones, I'm

23 just talking about a party in any state court case.  Let's just

24 use Texas because we're in Texas.

25        The playbook could then be say nothing because you

1   know the parties are going to plead in the alternative and then

2   file for bankruptcy, and let the parties try the first case,

3   and now you've got leverage because now the party has got to

4   come into bankruptcy.  But the bankruptcy court could never

5   find -- make findings under 523(a)(6) because that person was

6   never -- never spoke.  And then they can come into court and

7   say they were never given the opportunity to speak.

8           It seems, if taken to its logical conclusion, what

9   you're saying is that, you know, I could never find that

10  someone was liable for defamation under 523(a)(6) if that party

11  chose to never participate in the trial as a defendant anyway.

12          MR. MCCLELLAN:  Your Honor, just, you know --

13          THE COURT:  And I'm not saying that applies in the

14  Jones case.  I'm just thinking -- I'm just -- there's one way

15  to say, you know, he wasn't given an opportunity.  There's

16  another one saying he just chose not to.  But look at the cool

17  result that comes from it, right?  That's what they're going to

18  argue, right?  Like, look at the cool result that comes from

19  not arguing, not saying anything, is that now I get to stand in

20  front of Lopez and say we never talked about intent and people

21  pleaded in the alternative.

22          What's your response to that?

23          MR. MCCLELLAN:  Well, Your Honor, I would say that

24  for instance, in Gober, right, the Court -- the defendant

25  didn't show up.  The Court made a specific factual finding

1    after, you know, the defendants put on their evidence.  They

2    said the defendant could have showed up and testified as to his

3    level of intent, right?  So they acknowledged that, you know, a

4    defendant should probably be allowed to testify as to that.

5             And so I would say that if you have a whole trial

6    where all that the defendants need to do is testify to

7    recklessness, and the judge says you can't testify to your

8    level of intent, we're not going to hear anything on it, then I

9    don't think -- yeah, the Court would have a record of the

10   defendant's level of culpability in a case such as that.

11            THE COURT:  Okay.  Thank you.

12            MR. MCCLELLAN:  Yes, Your Honor.  Moving on to

13   exemplary damages, defendant directs the Court to the state

14   court jury charge on exemplary damages, which is Plaintiffs'

15   Exhibit 6 located at Document 29-6.  This has the same

16   instruction for defamation and IIED as did the compensatory

17   damages charge.  Thus here, too, the jury could have based its

18   award on reckless conduct.

19            Further, Texas allows exemplary damages and exemplary

20   damages award to be based on reckless conduct, and I would

21   point the court to Section 41.003 of the Texas Practice and

22   Remedies Code.  That provision states, quote, "Exemplary

23   damages may be awarded only if the claimant proves by clear and

24   convincing evidence that the harm with respect to which the

25   claimant seeks recovery of exemplary damages results from:

1    one, fraud; two, malice; or three, gross negligence."

2         Gross negligence is defined in Section 41.001; but

3    essentially, gross negligence in Texas is the same thing as

4    recklessness.  And I will direct the court to Dunagan v.

5    Coleman, 427 S.W.3d 552.  And there, the Texas court equates

6    those two standards.  And importantly, the jury charge didn't

7    ask the jury to choose a basis for its award, so the jury could

8    have based the award on gross negligence.

9         Now, plaintiffs argue that the jury awarded exemplary

10   damages based on malice, because that's what they pled in their

11   state court petition.  But, as I explained earlier, that does

12   not matter.  As the Mahadevan court explained, if a jury is

13   instructed on recklessness and could have based its award on

14   reckless conduct, then the judgment will not be given

15   preclusive effect on the issue of willful and malicious injury.

16        Further, Heslin and Lewis pled that they were

17   entitled to exemplary damages because defendant acted with,

18   quote, "gross negligence, ill will, and malice."  That is in

19   Paragraph 115 of the Heslin and Lewis petition.  So even their

20   own pleading recognizes that they could have been awarded

21   exemplary damages based on gross negligence.  In sum, it is

22   clear that the jury could have based its award on reckless

23   conduct, and thus, the Heslin-Lewis punitive damages award is

24   not entitled to preclusive effect.

25        Now, as you heard plaintiffs argue, Your Honor, they

1    believe that the final judgment entered by the Court saves the

2    deficient jury charges that were arguably based on the finding

3    of recklessness.  The final judgment is plaintiffs' Exhibit 7,

4    which Your Honor can view at Document 29-7.  Plaintiff argues

5    the state court judge made a finding that defendant acted

6    knowingly and intentionally, and that such finding establishes

7    willful and malicious injury under 523(a)(6).  There are

8    numerous issues with plaintiff's argument that encompass the

9    actually litigated prong, the essentiality prong, the fairness

10   exceptions, issues of constitutionality, and just simply

11   understanding what the judge is actually saying in the

12   judgment.

13           And I'll start with the text.  Starting with the

14   second paragraph on Page 1, the Court states, "Based on the

15   evidence presented at trial, the jury returned a verdict in

16   favor of plaintiffs and against defendants.  The questions

17   submitted to the jury and the jury's findings are attached as

18   Exhibits 1 and 2 and are incorporated by reference into this

19   final judgment.  The jury's findings alone" -- "the jury's

20   findings, along with the Court's default judgment and resulting

21   admissions, entitle plaintiffs Neil Heslin and Scarlett Lewis

22   to a judgment against defendant Alex E. Jones and Free Speech

23   Systems, LLC, as set forth in their fifth amended petition.

24   Alternatively, to an extent" -- "to the extent that a necessary

25   element of the recovery has been omitted, the Court implies a

1  finding to support it."

2        The Court goes on to list all the damages owed by

3  defendant and his codefendants and then continues in the last

4  paragraph of the judgment.  Quote, "Of importance to the Court

5  is that no party sought a judgment addressing the

6  constitutionality, either in general, or as specifically

7  applied in this case, of the limitation on the amount of

8  recovery prescribed by Texas Civil Practice and Procedures

9  Remedies Code 41.008(b).  Instead, plaintiffs' fifth amended

10  petition includes a cause of action referenced in 41.008(c),

11  which exempts this judgment from the exemplary damages

12  limitation.

13        Now, people who have been steeped in this case for

14  years apparently understand what is going on here; but those

15  who haven't, this is a bit confusing, and maybe even to

16  Your Honor.  So what happened was that plaintiff filed their

17  fifth amended complaint on September 29th, 2022, and Your Honor

18  can see that in the certificate of service on Page 28 of

19  Plaintiffs' Exhibit 8.

20        Now, this was almost two months after the trial,

21  which concluded on August 5th, 2022.  And in the amended

22  complaint that they filed after the trial, in Paragraph 118 on

23  Page 26, plaintiffs added the following claim.  Quote, "The

24  allegations of this petition involve conduct which violates

25  Texas Penal Code Section 22.04 relating to injury" -- "relating

1  to injury to a disabled individual.  Plaintiffs have alleged

2  through this petition that defendants intentionally, knowingly,

3  or recklessly caused serious mental deficiency, impairment, or

4  injury to disabled individuals.  Prior to the injuries caused

5  by defendants in this case, plaintiffs were disabled as they

6  were already suffering from severe emotional disturbance."

7       Now, the reason plaintiffs amended their petition to

8  include this claim accusing defendant of committing a felony is

9  because punitive damages are statutorily capped in Texas,

10 except when a defendant knowingly or intentionally commits an

11 enumerated felony under Section 41.008(c).  But you might still

12 be wondering where the Court made a finding that defendant

13 knowingly or intentionally committed a felony, as those words

14 are nowhere in the final judgment.

15      Apparently, the state court judge made this finding

16 by implication.  I'll direct you back to the last sentence of

17 the second paragraph of the final judgment.  Quote,

18 "Alternatively, to the extent that a necessary element of the

19 recovery has been omitted, the Court implies a finding to

20 support it," a felony by implication.

21      The Court cannot give this finding preclusive effect.

22 As we cited in our brief, the U.S. Supreme Court in Kremer v.

23 Chemical Construction Corporation held that "a state may not

24 grant preclusive effect in its own courts to a constitutionally

25 infirm judgment, and federal courts are not required to accord

1  full faith and credit to such a judgment.  The state court's

2  final judgment violates defendant's right to a trial by jury

3  enshrined in the Texas Constitution at Article I, Section 15,

4  which states that a right to a jury shall be inviolate.

5  Defendant unequivocally had a right to a determination by a

6  jury on this issue.  As the Texas Court of Civil Appeals stated

7  in Madison v. Williamson, 241 S.W.3d 145, quote, "Before a

8  court will apply the exception to the statutory damage cap in

9  Section 41.008(c), a plaintiff must obtain jury findings that

10 the defendant violated one of the criminal code provisions

11 listed in the statute and that the violation was committed

12 knowingly or intentionally."

13        And the Madison court went on to say that the jury is

14 required to make this special finding beyond a reasonable

15 doubt.  Of course, here, no such jury finding was made because

16 the felony allegation was not added to the petition until after

17 the jury trial concluded.  The jury made no such finding, and

18 such a finding cannot be implied by the Court as it was here.

19        The felony by implication finding also violates

20 defendants' procedural due process rights.  Due process, at a

21 minimum, requires notice and an opportunity to be heard.  Here,

22 defendant didn't have notice until almost two months after his

23 limited trial on damages that he could be subject to liability

24 pursuant to a federal statute -- to a felony statute.

25 Similarly, due to the timing, he didn't have a meaningful

1   opportunity to be heard on that claim either.

2          Finally, and most importantly, if the Court wishes to

3   avoid the constitutional and fairness issues on this point, it

4   can refuse to give the felony by implication finding in the

5   final judgment preclusive effect under the fully and fairly

6   litigated prong.  For purposes of collateral estoppel, an issue

7   was actually litigated when it was properly raised by the

8   pleadings or otherwise, and it was submitted for determination

9   and determined.

10         Here, plaintiff did not raise their felony claim

11  until after the damages trial was over.  Accordingly, defendant

12  never had a chance throughout four years of litigation to ever

13  defend against plaintiffs' felony claim because it was not in

14  their operative petition until after the fact.

15         I'd like to turn the Court's attention back to the

16  Pancake case for instruction here.  Pancake, as I explained

17  earlier, was a case where the plaintiff didn't submit a state

18  court record, and the Pancake court thus declined to give a

19  judgment preclusive effect.

20         Importantly, though, the Pancake court noted that the

21  plaintiff did attach the state court judgment for fraud; and in

22  the judgment, the State court noted that it held a hearing and

23  heard evidence and arguments of counsel.  But the Pancake court

24  declined to give that conclusory language in the final judgment

25  preclusive effect because there was no other indication that a

1    meaningful hearing on damages actually occurred.

2         Indeed, Judge Rosenthal did the same thing in In re

3    Dang.  In reversing the Bankruptcy Court, she stated, quote,

4    "Based on the record and applicable law, the Bankruptcy Court

5    should not have relied on the conclusory statement in the state

6    court's final judgment that Dang and Chau committed knowing and

7    intentional violations of the Texas Deceptive Trade Practices

8    Act to determine that the entire judgment debt was

9    nondischargeable."

10        So too here this Court can follow the precedents from

11   Pancake and Dang and decline to give preclusive effect to the

12   state court's felony by implication finding because there is no

13   other evidence in the record that supports it.  In fact, there

14   is no evidence in the record that it was even discussed prior

15   to the filing of the fifth amended petition, almost two months

16   after the jury entered its award for damages.

17        Accordingly, regardless of the route it chooses,

18   whether the Court does so because it violates defendant's

19   constitutional right to a trial by jury, his procedural due

20   process rights, or just simply the actually litigated prong of

21   collateral estoppel, it must decline to give the state court's

22   felony by implication finding preclusive effect.

23        I next want to discuss the Pozner-De La Rosa default

24   judgment.  There's some overlap here in this argument with the

25   actually litigated prong and the essentiality prong since the

1    Pozner and De La Rosa case has not gone to trial.  Because of

2    that, we can't look at any jury charges and, rather, have to

3    look at their petition.

4         Pozner and De La Rosa brought the same defamation and

5    IIED claims as did Heslin and Lewis, and allege that defendant

6    could have committed those torts with a culpability standard of

7    recklessness.  In regard to defamation, Pozner and De La Rosa

8    pled at Document 29-4, Page 21, quote, "Defendants' defamatory

9    statements were knowingly false or made with reckless disregard

10   for the truth or falsity of the statements at the time the

11   statements were made."

12        At Page 23 in regard to IIED, Pozner and De La Rosa

13   pled, quote, "Defendants made the statements in these

14   broadcasts in bad faith and with malicious motives, knowing the

15   statements were false or in reckless disregard for their truth.

16   Defendant has already explained how the disjunctive culpability

17   standards of these torts, where liability could have been

18   premised on reckless conduct, is fatal to a finding of willful

19   and malicious injury under 523(a)(6)."  And that applies here,

20   too.

21        Additionally, plaintiffs rely heavily on their

22   allegations from the state court petition to show that

23   defendant's conduct was willful and malicious.  Again, I've

24   already explained why this Court can't rely on plaintiffs'

25   state court petition when applying collateral estoppel.

1          Finally, plaintiff argues that because Pozner and

2    De La Rosa allege that they are entitled to exemplary damages

3    based on malice, and because malice requires specific intent,

4    the Court should grant the default judgment preclusive effect.

5    Again, plaintiffs cannot rely on allegations from their

6    pleading, and they certainly can't do it based on a conclusory

7    statement like, quote, "defendant acted with malice," end

8    quote.

9          But even stepping back from collateral stopped for a

10   second, punitive damages under Texas law are not regarded as

11   admitted by the default, and the Court can find that quote in

12   Sunrizon Homes, Inc. v. Fuller, 747 S.W.2d 530.

13         Thus, even if plaintiffs could rely on conclusory

14   allegations from their petition to establish the application of

15   collateral estoppel, Texas law does not even consider Pozner

16   and De La Rosa's allegations concerning punitive damages to yet

17   be admitted.  Thus, the Court should decline to give Pozner and

18   De La Rosa's default judgment preclusive effect.

19         Moving on to the actually litigated prong, Your

20   Honor, I've already spent some time -- some of my time on the

21   actual litigated prong.  As I explained earlier, there is

22   obviously some overlap between the actually litigated prong and

23   the essentiality prong, in that the actually litigated prong

24   instructs what the Court can review to determine what was

25   essential.  But, along with the obvious overlap, we make three

1   arguments in our brief for why this case was not actually

2   litigated.

3          First, we argued that plaintiffs did not properly

4   raise the issue of willful and malicious injury in their

5   petitions as none of their causes of action required a finding

6   of willful and malicious injury.  In sum, because they didn't

7   bring a cause of action under a theory that required a finding

8   of culpability higher than recklessness, willful and malicious

9   injury under 523(a)(6) wasn't actually litigated.

10         Second, we argue that plaintiffs' assertion of the

11  discovery sanction exception to the general rule that default

12  judgments are not given preclusive effect is inapplicable here

13  because it only applies to egregious discovery abuses.  And in

14  both cases, defendant was punished for the actions of his

15  codefendants.

16         And third, the discovery sanction exception does not

17  apply when the defendant was not allowed to testify as to his

18  level of culpability, which defendant was not allowed to do

19  here.  Defendant's response includes an extensive discussion of

20  these arguments from Pages 13 to 20, and defendant will stand

21  on his brief for those arguments.

22         Moving on to the fairness factors, Your Honor, in our

23  response, we also note that under Texas law, the evaluation of

24  whether to apply collateral estoppel also involves

25  considerations of fairness not encompassed by the full and fair

1   opportunity inquiry.  Collateral estoppel's goal is to limit

2   relitigation of issues without compromising fairness, and the

3   Court has broad discretion to decide if fairness outweighs the

4   convenience of collateral estoppel.  Redetermining issues is

5   warranted if there are doubts about the quality, extent, or

6   fairness of procedures followed in the previous litigation.

7            This inquiry is not, as plaintiffs argue, an

8   impermissible collateral attack.  This is an integral component

9   of the law of collateral estoppel in Texas, and the Court can

10  and should consider them.  I touched on its relevance to the

11  felony by implication finding, but we include a few other

12  examples in our response, and I would direct the Court to

13  Pages 37 through 39 of our response, and Defendant will stand

14  on his brief for those arguments.

15           Moving on to our constitutional argument, and this

16  part applies equally to the Connecticut case as well,

17  Your Honor, we devote an entire section of our brief to

18  explaining that the state court judgment violated the First

19  Amendment's right to free speech.

20           THE COURT:  Just want to tell you I'm not going to

21  consider anything you tell me in connection with the

22  Connecticut case.  That case is closed, but I'll let you talk

23  about it in Texas.

24           MR. MCCLELLAN:  Thank you, Your Honor.  I believe our

25  brief covers the substance of this issue in detail, but I did

1    want to address plaintiffs' assertion that our argument is an

2    improper collateral attack.  We disagree.  We explain in our

3    brief that the second step in the Supreme Court's two-step

4    process for determining whether federal courts should grant

5    collateral estoppel to state court judgments is to ask whether

6    the judgment was constitutionally affirmed.

7            In formulating this two-step approach, the Supreme

8    Court and Marrese v. American Academy of Orthopedic Surgeons

9    expressly relied on the reasoning set forth in Kremer.  And I

10   quoted that Kremer case to you earlier, Your Honor, that Kremer

11   said, quote, "A state may not grant preclusive effect in its

12   own courts to a constitutionally infirm judgment, and federal

13   courts are not required to accord full faith and credit to such

14   a judgment."

15           Thus, we are not asking the Court to act as an

16   appellate court here, as plaintiffs argue.  You obviously

17   cannot do that.  You cannot do anything to overturn the Texas

18   or Connecticut courts' judgments.  Instead, what we're asking

19   you to do is complete the second step of the full faith and

20   credit analysis to determine whether the judgments were

21   constitutionally infirm and thus should not be granted

22   preclusive effect.

23           Accordingly, Your Honor, we ask this Court to deny

24   plaintiffs' motion for summary judgment on their collateral

25   estoppel theory.

```
 1            I'd like to move on to plaintiffs' second main
 2    argument that even if the doctrine of collateral estoppel
 3    doesn't apply -- how much time do I have yet left, Your Honor?
 4    Ten minutes?  Okay.  Nine minutes?
 5            THE COURT:  According to Lopez, you've got about nine
 6    minutes.
 7            MR. MCCLELLAN:  Okay.  Thank you, Your Honor.  Find
 8    that Defendant caused -- so I'd like to move on to plaintiffs'
 9    second main argument that even if the doctrine of collateral
10    estoppel doesn't apply, this Court can take judicial notice of
11    factual findings of the state court and independently find that
12    defendant caused plaintiffs' willful and malicious injury under
13    523(a)(6).
14            As a quick note, Your Honor, before I dive into my
15    substantive arguments on this point, defendant contends that
16    the court should not be considering plaintiffs' second
17    argument.  Defendant directs the Court to the stipulation and
18    agreed order regarding scheduling on plaintiffs' motion for
19    summary judgment.  That's at Document 12 on the docket, and I
20    would direct you to Paragraph 7.
21            In the stipulation, the parties included a note about
22    the scope of their summary judgment motions.  I think
23    reasonable minds can probably differ on the interpretation of
24    this paragraph, but from our perspective, this part of the
25    litigation was supposed to be limited to the purely legal
```

1   question of whether the doctrine of collateral estoppel applies

2   to the findings of the state court.  That's why we initially

3   agreed to an expedited scheduling order in this case, because

4   we thought it would benefit everyone involved to have this

5   threshold question answered at the beginning of the case.  We

6   think the stipulation supports that interpretation, but

7   plaintiffs disagree.  Regardless, we just wanted to get our

8   objection on the record.

9           As to the substance of plaintiffs' argument, judicial

10  notice cannot do what plaintiffs ask of it.  Rule 201 of the

11  Federal Rules of Evidence provides that a court "may take

12  judicial notice of an adjudicative fact if the fact is not

13  subject to reasonable dispute, in that it is either:  one,

14  generally known within the territorial jurisdiction of the

15  trial court; or, two, capable of accurate and ready

16  determination by resort to sources whose accuracy cannot be

17  questioned."

18          However, as the Fifth Circuit explained in Taylor v.

19  Charter Medical Corp., quote, "Even though a court may take

20  judicial notice of a document filed in another court to

21  establish the fact of such litigation and related filings, a

22  court cannot take judicial notice of the factual findings of

23  another court.  This is so because, one, such findings do not

24  constitute facts not subject to reasonable dispute within the

25  meaning of Rule 201; and two, were it permissible for a court

1  to take judicial notice of a fact merely because it had been

2  found to be true in some other action, the doctrine of

3  collateral estoppel would be superfluous."

4        Wright & Miller's Federal Practice and Procedure kind

5  of has the same note, Your Honor, and it says, quote, "It has

6  long been settled that preclusion ordinarily is an all or

7  nothing thing.  The prior determination either precludes any

8  further dispute about the matter, or it is irrelevant and

9  cannot be admitted, even as some evidence bearing on the

10 matter."

11        And in their main brief, and in their argument today,

12 plaintiffs rely exclusively on jury charges, trial transcripts

13 quoting the judge, allegations from their petition, and now

14 today, the allegations from the default judgment.  And all that

15 is hearsay, Your Honor. This Court cannot take as true the

16 contents of those pleadings, jury charges, or trial transcripts

17 based on judicial notice.  That's what collateral estoppel is

18 for.

19        Now, as I mentioned earlier, plaintiffs seemed to

20 revise their strategy in their reply as they shifted from

21 relying solely on pleading, allegations, and the jury charges,

22 citing numerous videos from the state court record of

23 Defendant's broadcasts.  And plaintiffs did that today earlier

24 as well.  And you can find references to those on Pages 20

25 through 25 of plaintiffs' reply.  They claim these videos

1  confirm that defendant's conduct falls within the compass of

2  523(a)(6).

3           As an initial matter, I do want to note that

4  defendant normally broadcasts four hours a day, six days a

5  week, and his coverage of Sandy Hook represented a minuscule

6  part of the overall content of his show.  Regardless, as my

7  colleague, Mr. Davis, instructed this Court earlier today, we

8  encourage Your Honor to watch all the videos that Plaintiff

9  attached to their motion.

10          The videos show a man who, to his core, does not

11 trust the government or the mainstream media.  The early

12 broadcasts of Defendants show him wondering aloud whether the

13 event could have been staged, analogizing it to other events

14 that he believes the government has staged in the past.

15          There was a broadcast of Anderson Cooper with the

16 Sandy Hook parents where something happens to his nose on

17 screen, and Defendant became fixated on that as evidence that

18 something was off about the official narrative.  As the videos

19 continue into 2014, you'll see Defendant get more and more

20 persuaded by Wolfgang Halbig to a point where he said that the

21 event was, quote, "completely fake with actors," end quote.

22          As the videos move into 2015 and later, you see

23 Defendant back off his claim that it was completely fake with

24 actors, but still express skepticism over the official

25 narrative, while always fixating on Anderson Cooper's nose and

1   always expressing sympathy for those who believe the event was

2   fake because the government and media are always lying.  These

3   videos do not show a person who satisfies 523(a)(6)'s strict

4   standard for willful and malicious injury.

5              Plaintiffs argue that his skepticism from defendant

6   that he refuses to believe every single detail about the

7   official narrative alone are alone enough to conclude that

8   Defendant willfully and maliciously injured them.  But surely

9   skepticism isn't enough.  How many million Americans don't

10  believe the official story about the JFK assassination?  And

11  even if they do believe Lee Harvey Oswald was the lone gunman,

12  how many millions more question why the bullet that passed

13  through JFK and Governor Connally was pristine, or question

14  dozens more perceived anomalies surrounding the shooting?

15             And this stuff isn't just on the fringes of our

16  society, Your Honor.  We're currently seeing 9/11 skepticism in

17  the news from a top Republican contender for president.  Vivek

18  Ramaswamy recently stated, quote, "What I've seen in the last

19  several years is we have to be skeptical of what the government

20  tells us.  I haven't seen evidence to the contrary, but do I

21  believe everything the government told us about 9/11?

22  Absolutely not," end quote.

23             Were his statements willful and malicious?  Or was he

24  just expressing the thoughts and feelings of millions of

25  Americans, that you can't trust what the government tells you?

1              What sets this case apart from the numerous other

2    cases Plaintiffs cite for support is that Defendant believed

3    everything he said when he said it.  We attach this affidavit

4    to our response, Your Honor, at Document 32-1, and Defendant

5    testifies that he never said anything on air that he did not

6    believe to be true and that he never intended to cause harm to

7    any Plaintiff.

8              The central point of this case is that a defamatory

9    statement does not fall within the compass of Section 523(a)(6)

10   unless the debtor knew his statement was false when he made it.

11   And that's In re Rizzo, 337 BR 180.  It's in our brief, and it

12   cites in numerous cases holding the same.

13             Plaintiffs argue that certain statements from other

14   people within Defendant's company show the Defendant did

15   actually know what he was saying was a lie.  But Defendant's

16   affidavit creates a factual dispute for Plaintiffs' judicial

17   notice argument.  What Defendant knew and when he knew it

18   cannot be determined as a matter of law with what the Court has

19   in front of it on this motion.  The Court should thus deny

20   Plaintiffs' motion on their judicial notice theory as well as

21   their collateral estoppel theory.

22             Thank you for your time, Your Honor.

23             THE COURT:  Thank you very much.  I just have one

24   procedural question for the parties.  I just want to make sure

25   that -- and this is just in the Texas case.  There was a

1   reference to -- in the judgment and obviously in the pleadings

2   to a fifth amended petition.  Is that attached as summary

3   judgment evidence in any of the docs?  Sometimes things get

4   labeled "amended petition" that they don't.  And I don't want

5   any argument on it.  I just want to know because sometimes

6   things get labeled "amended complaint," but it's the fifth, and

7   I just want to make sure that I'm understanding it.  Or is it

8   just the fourth?

9        MR. MOSHENBERG:  There was only a fourth, Your Honor.

10  That was a typo.  I'm counsel record in that case.  There is no

11  fifth amended.  It was just a typo by the Court, and I think we

12  put that in our brief, that it was --

13       THE COURT:  I'm just -- I don't know.  I just wanted

14  to make sure that I had a clean understanding in terms of if

15  there was a document called the fifth or if there's just

16  something at the fourth.  I will -- I'm going to take the

17  record, is what it is.

18       Counsel, do you have anything to say?

19       MR. MCCLELLAN:  Yeah, I would just say, just from

20  reviewing the state court record, it looks like the fourth

21  amended petition was filed on July 22nd, 2022.  The fifth

22  amended petition was filed on September 29th, 2022.  And the

23  scrivener's error was the -- whenever Plaintiffs filed their

24  motion for leave to file a fifth amended petition, the document

25  they attached said fourth amended petition on it.  So I think

1   you have the operative petition.

2          MR. MOSHENBERG:  Right.  That may be true.  The point

3   is, that is the document that the Court is referring to, the

4   fourth amended attached.

5          THE COURT:  Alrighty, folks.  Thank you very much for

6   your time.  I very much appreciate all the arguments in both

7   the Connecticut and the Texas cases.  I will consider the Texas

8   matter closed as well, and I'll take that under advisement.

9   We'll get to work right away and try to get you a decision, but

10  I'm going to take my time to make sure that I provide everyone

11  with a very thoughtful decision.

12         I thank everyone.  I thank all the lawyers.  I thank

13  everyone who participated today.  We'll stand in adjournment.

14  Thank you.

15         THE CLERK:  All rise.

16      (Proceedings concluded at 1:18 p.m.)

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2

3            I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE: August 21, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25